# UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT
## CIVIL APPEAL PRE-ARGUMENT STATEMENT (FORM C)

**1. SEE NOTICE ON REVERSE**     **2. PLEASE TYPE OR PRINT**     **3. STAPLE ALL ADDITIONAL PAGES**

| Case Caption: | District Court or Agency: | Judge: |
|---|---|---|
| In re Windstream Holdings, Inc., et al.,<br>Debtors.<br><br>Windstream Holdings, Inc., et al.,<br><br>v.                    Plaintiffs<br><br>Charter Communications Inc. and Charter Communications Operating, LLC.<br>Defendants. | Southern District of New York | Hon. Cathy Seibel |
| | Date the Order or Judgment Appealed from was Entered on the Docket:<br>10/06/2022 | District Court Docket No.:<br>No. 21-CV-4552 (CS) |
| | Date the Notice of Appeal was Filed:<br>11/03/2022 | Is this a Cross Appeal?<br>☐ Yes  ☑ No |

| **Attorney(s) for Appellant(s):**<br>☑ Plaintiff<br>☐ Defendant | Counsel's Name:      Address:      Telephone No.:      Fax No.:      E-mail:<br><br>SEE ATTACHED |
|---|---|

| **Attorney(s) for Appellee(s):**<br>☐ Plaintiff<br>☑ Defendant | Counsel's Name      Address:      Telephone No.:(      Fax No.:      E-mail:<br><br>SEE ATTACHED |
|---|---|

| Has Transcript Been Prepared?<br><br>Yes | Approx. Number of Transcript Pages:<br><br>649 | Number of Exhibits Appended to Transcript:<br><br>0 | Has this matter been before this Circuit previously? ☐ Yes ☑ No<br><br>If Yes, provide the following:<br><br>Case Name:<br><br>2d Cir. Docket No.:          Reporter Citation: (i.e., F.3d or Fed. App.) |
|---|---|---|---|

*ADDENDUM "A"*:  COUNSEL MUST ATTACH TO THIS FORM: (1) A BRIEF, BUT NOT PERFUNCTORY, DESCRIPTION OF THE NATURE OF THE ACTION;  (2) THE RESULT BELOW;  (3) A COPY OF THE NOTICE OF APPEAL AND A CURRENT COPY OF THE LOWER COURT DOCKET SHEET; AND  (4) A COPY OF ALL RELEVANT OPINIONS/ORDERS FORMING THE BASIS FOR THIS APPEAL, INCLUDING TRANSCRIPTS OF ORDERS ISSUED FROM THE BENCH OR IN CHAMBERS.

*ADDENDUM "B"*:  COUNSEL MUST ATTACH TO THIS FORM A LIST OF THE ISSUES PROPOSED TO BE RAISED ON APPEAL, AS WELL AS THE APPLICABLE APPELLATE STANDARD OF REVIEW FOR EACH PROPOSED ISSUE.

### PART A:  JURISDICTION

| 1. _Federal Jurisdiction_ | 2. _Appellate Jurisdiction_ |
|---|---|
| ☐ U.S. a party<br>☐ Federal question (U.S. not a party) | ☐ Diversity<br>☑ Other (specify):<br>28 U.S.C. 158(a)(1) | ☑ Final Decision<br>☐ Interlocutory Decision Appealable As of Right | ☐ Order Certified by District Judge (i.e., Fed . R. Civ. P. 54(b))<br>☐ Other (specify): _____ |

**IMPORTANT.  COMPLETE AND SIGN REVERSE SIDE OF THIS FORM.**

## PART B:  DISTRICT  COURT DISPOSITION   (Check as many as apply)

**1. Stage of Proceedings**

☐ Pre-trial
☐ During trial
☑ After trial

**2. Type of Judgment/Order Appealed**

☐ Default judgment
☐ Dismissal/FRCP 12(b)(1)
   lack of subject matter juris.
☐ Dismissal/FRCP 12(b)(6)
   failure to state a claim
☐ Dismissal/28 U.S.C. § 1915(e)(2)
   frivolous complaint
☐ Dismissal/28 U.S.C. § 1915(e)(2)
   other dismissal

☐ Dismissal/other jurisdiction
☐ Dismissal/merit
☑ Judgment / Decision of the Court
☐ Summary judgment
☐ Declaratory judgment
☐ Jury verdict
☐ Judgment NOV
☐ Directed verdict
☐ Other (specify):

**3. Relief**

☐ Damages:                          ☐ Injunctions:

   ☐ Sought:  $ _____      ☐ Preliminary
   ☐ Granted: $ _____     ☐ Permanent
   ☐ Denied:  $ _____     ☐ Denied

District Court order vacating Bankruptcy
Court order holding Defendants in contempt
and imposing sanctions.

## PART C:  NATURE OF SUIT  (Check as many as apply)

**1. Federal Statutes**

☑ Antitrust          ☐ Communications        ☐ Freedom of Information Act
☑ Bankruptcy         ☐ Consumer Protection   ☐ Immigration
☐ Banks/Banking      ☐ Copyright / Patent    ☐ Labor
☐ Civil Rights       ☐ Trademark             ☐ OSHA
☐ Commerce           ☐ Election              ☐ Securities
☐ Energy             ☐ Soc. Security         ☐ Tax
☐ Commodities        ☐ Environmental
☐ Other (specify): _____

**2. Torts**

☐ Admiralty/
  Maritime
☐ Assault /
  Defamation
☐ FELA
☐ Products Liability
☐ Other (Specify):

**3. Contracts**

☐ Admiralty/
  Maritime
☐ Arbitration
☐ Commercial
☐ Employment
☐ Insurance
☐ Negotiable
  Instruments
☐ Other Specify

**4. Prisoner Petitions**

☐ Civil Rights
☐ Habeas Corpus
☐ Mandamus
☐ Parole
☐ Vacate Sentence
☐ Other

**5. Other**

☐ Hague Int'l Child Custody Conv.
☐ Forfeiture/Penalty
☐ Real Property
☐ Treaty (specify):
☐ Other (specify): _____

**6. General**

☐ Arbitration
☐ Attorney Disqualification
☐ Class Action
☐ Counsel Fees
☐ Shareholder Derivative
☐ Transfer

**7.** Will appeal raise constitutional issue(s)?

☐ Yes     ☑ No

Will appeal raise a matter of first
impression?

☑ Yes     ☐ No

---

1.  Is any matter relative to this appeal still pending below? ☐ Yes, specify:                          ☑ No

2.  To your knowledge, is there any case presently pending or about to be brought before this Court or another court or administrative agency
    which:

    (A)    Arises from substantially the same case or controversy as this appeal?          ☑ Yes          ☐ No

    (B)    Involves an issue that is substantially similar or related to an issue in this appeal?          ☐ Yes          ☑ No

If yes, state whether ☒ "A," or ☐ "B," or ☐ both are applicable, and provide in the spaces below the following information on the *other* action(s):

| Case Name: Windstream Holdings, Inc. v. Charter Communications, Inc. et al | Docket No. 7:19-CV-09354 | Citation: | Court or Agency: Southern District of New York |
|---|---|---|---|
| Name of Appellant: | | | |

| Date: 11/17/2022 | Signature of Counsel of Record:  /s/ Terence Patrick Ross |
|---|---|

# NOTICE TO COUNSEL

**Once you have filed your Notice of Appeal with the District Court or the Tax Court, you have only 14 days in which to complete the following important steps:**
1. Complete this Civil Appeal Pre-Argument Statement (Form C); serve it upon all parties, and file it with the Clerk of the Second Circuit in accordance with LR 25.1.
2. File the Court of Appeals Transcript Information/Civil Appeal Form (Form D) with the Clerk of the Second Circuit in accordance with LR 25.1.
3. Pay the $505 docketing fee to the United States District Court or the $500 docketing fee to the United States Tax Court unless you are authorized to prosecute the appeal without payment.

**PLEASE NOTE: IF YOU DO NOT COMPLY WITH THESE REQUIREMENTS WITHIN 14 DAYS, YOUR APPEAL WILL BE DISMISSED.** *SEE* LOCAL RULE 12.1.

**FORM C**  (Rev. December 2016)

# ATTACHMENT TO CIVIL APPEAL PRE-ARGUMENT STATEMENT
# (FORM C)

**Attorney(s) for Plaintiffs-Appellants:**

|  | Address | Telephone No. | Fax No. | Email |
|---|---|---|---|---|
| Terence P. Ross | 2900 K St., NW, #200 Washington, DC 20007 | (202) 625-3676 | (202) 298-7570 | terence.ross@katten.com |
| Shaya Rochester | 50 Rockefeller Plaza New York, NY 10020 | (212) 940-8529 | (212) 940-8776 | shaya.rochester@katten.com |
| Robert T. Smith | 2900 K St., NW, #200 Washington, DC 20007 | (202) 625-3616 | (202) 298-7570 | robert.smith1@katten.com |
| Timothy H. Gray | 2900 K St., NW, #200 Washington, DC 20007 | (202) 625-3608 | (202) 298-7570 | timothy.gray@katten.com |

**Attorney(s) for Defendants-Appellees:**

|  | Address | Telephone No. | Fax No. | Email |
|---|---|---|---|---|
| Brian W. Hockett | One Us Bank Plaza, Ste. 2700 St. Louis, MO 63101 | (314) 552-6000 | (314) 552-7000 | bhockett@thompsoncoburn.com |
| John Scott Kingston | One Us Bank Plaza, Ste. 2700 St. Louis, MO 63101 | (314) 552-6464 | (314) 552-7000 | jkingston@thompsoncoburn.com |
| Benjamin Isidore Finestone | 51 Madison Ave., 22nd Fl. New York, NY 10010 | (212) 849-7000 | (212) 849-7100 | benjaminfinestone@quinnemanuel.com |
| Susheel Kirpalani | 51 Madison Ave., 22nd Fl. New York, NY 10010 | (212) 849-7200 | (212) 849-7100 | susheelkirpalani@quinnemanuel.com |

# ADDENDUM A TO CIVIL APPEAL PRE-ARGUMENT STATEMENT (FORM C)

## <u>Statement of the Nature of the Action and Result Below</u>

Windstream Holdings, Inc. and its debtor affiliates (collectively, "Windstream")[1] are Plaintiffs-Appellants in this matter. Defendants-Appellees are Charter Communications Inc. and Charter Communications Operating, LLC (together, "Charter"). Windstream and Charter are both telecommunications service providers, and, in many states, they are competitors in the market for residential and commercial phone and internet services.

On February 25, 2019, Windstream filed for Chapter 11 reorganization, and, by operation of 11 U.S.C. § 362, an automatic stay went into effect on that date. Thereafter, in March 2019, Charter began an advertising campaign targeting Windstream customers. Charter's advertising campaign included mailing an advertisement to Windstream's customers in an envelope intentionally designed to mislead them into believing the advertisement came from Windstream. The advertisement falsely advised Windstream customers that Windstream's Chapter 11 filing meant that they were at risk of being left without internet and TV services, and urged them to switch to Charter's service to avoid being left without any internet and TV service. Charter knew that its false and misleading advertising was unlawful because, during its own Chapter 11 reorganization, it brought suit against a competitor who distributed similar false advertising to Charter's customers.

On April 5, 2019, Windstream initiated an adversary action in the United States Bankruptcy Court for the Southern District of New York alleging, *inter alia*, violations of the

---

[1] On September 21, 2022, Windstream emerged from their Chapter 11 reorganization cases.

Bankruptcy Court's automatic stay. Windstream immediately sought and obtained a temporary restraining order enjoining Charter's false and misleading advertising. On May 16, 2019, the Bankruptcy Court converted the temporary restraining order into a preliminary injunction. In November 2019, after completion of discovery, the parties filed cross-motions for summary judgment. On December 18, 2019, the Bankruptcy Court, as relevant here, granted Windstream's motion for summary judgment on its claim that Charter violated the automatic stay. Although the Bankruptcy Court held that Charter's false and misleading advertising violated the automatic stay, it did not at that time determine whether Charter should be held in contempt for that violation.

In April and May 2020, the Bankruptcy Court held a trial to determine whether Charter should be held in contempt for violating the automatic stay and the amount of sanctions, if any, to be imposed. On April 8, 2021, the Bankruptcy Court issued an order holding Charter in contempt for violating the automatic stay and imposing sanctions in the amount of $19,184,658.30, representing the total losses incurred by Windstream as a result of Charter's violation of the automatic stay. Charter appealed the Bankruptcy Court's April 8, 2021 order to the United States District Court for the Southern District of New York, arguing that its false and misleading advertising did not violate the automatic stay. On October 6, 2022, the District Court entered an order vacating "the portion of the Bankruptcy Court's Judgment holding Charter in contempt for violation of the automatic stay based on Charters advertisements and sanctioning it in the amount of $19,179,329.45." The District Court held that Charter's false and misleading advertising did not constitute an act to "exercise control over property of the estate" within the meaning of 11 U.S.C. § 362(a)(3), and, therefore, Charter did not violate the automatic stay. The District Court further held that, even if Charter's conduct violated the automatic stay, the

Bankruptcy Court abused its discretion by holding Charter in contempt and imposing sanctions because, under the Supreme Court's decision in *Taggart v. Lorenzen*, 139 S. Ct. 1795 (2019), there was "fair ground of doubt" as to whether the advertising violated the automatic stay. On November 3, 2022, Windstream timely filed a notice of appeal in this Court, appealing the District Court's October 6, 2022 order.

# ADDENDUM B TO CIVIL APPEAL PRE-ARGUMENT STATEMENT (FORM C)

**Issues on Appeal:**

In vacating the Bankruptcy Court's judgment holding Charter in civil contempt for violating the automatic stay, the District Court held that Charter's false and misleading advertising directed at Windstream customers was not "an act to obtain possession of property of the estate" or an "exercise [of] control over property of the estate," and, thus, did not constitute a violation of the automatic stay. *See* 11 U.S.C. § 362(a)(3). The District Court further held that, even if Charter's false and misleading advertising violated the automatic stay, the Bankruptcy Court abused its discretion by holding Charter in civil contempt, reasoning that there was "fair ground of doubt" as to whether Charter's false and misleading advertising violated the stay. Therefore, the issues on appeal are:

1. Whether the District Court erred in holding that Charter's false and misleading advertising—which, the Bankruptcy Court found specifically targeted Windstream customers and utilized a mailing envelope purposely designed to mislead customers into believing the advertisement came from Windstream—did not constitute an act "to exercise control over property of the estate" within the meaning of 11 U.S.C. § 362(a)(3).

2. Whether the District Court erred in holding that the Bankruptcy Court abused its discretion by finding Charter in civil contempt for violating the automatic stay, based on the District Court's application of the "no fair ground of doubt" standard announced by the Supreme Court in *Taggart v. Lorenzen*, 139 S. Ct. 1795, 1799 (2019), given the fact that Charter knew this false advertising was wrongful because it had previously sued a competitor over the exact same type of advertising when it was in Chapter 11. Whether

the "no fair ground of doubt" standard announced in *Taggart*—where the Supreme Court considered the standard to be applied in holding a defendant in contempt for violating a *discharge order* under Bankruptcy Code § 524(a), not the *automatic stay* under Bankruptcy Code § 362(a)—applies to a contempt proceeding for a violation of the automatic stay, as well as how that standard is to be applied in the context of a violation of the automatic stay, is an issue of first impression in this Circuit.

**Standard of Review:**

In reviewing the District Court's disposition of this appeal from the Bankruptcy Court, the District Court's conclusions of law are reviewed *de novo. See In re Metromedia Fiber Network, Inc*., 416 F.3d 136, 139 (2d Cir. 2005). This Court therefore independently reviews the Bankruptcy Court's conclusions of law, but it "must accept the bankruptcy court's findings of fact unless clearly erroneous." *In re Best Prods. Co.*, 68 F.3d 26, 29 (2d Cir. 1995).

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| *In re*: | ) |
| | ) |
| | ) |
| WINDSTREAM HOLDINGS, INC., *et al.*, | ) |
| | ) |
| Debtors. | ) |
| | ) |
| | ) | Case No. 21-CV-4552 (CS) |
| | ) |
| WINDSTREAM HOLDINGS, INC., *et al.*, | ) | **Plaintiffs' Notice of Appeal** |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) |
| | ) |
| CHARTER COMMUNICATIONS, INC. and CHARTER | ) |
| COMMUNICATIONS OPERATING, LLC, | ) |
| | ) |
| Defendants. | ) |

## <u>NOTICE OF APPEAL</u>

Notice is hereby given that plaintiffs in the above-named case, Windstream Holdings, Inc., *et al.*, hereby appeal to the United States Court of Appeals for the Second Circuit from the opinion and order entered in this action on October 6, 2022 (Dkt. No. 28), vacating in part the Bankruptcy Court's order holding defendants in contempt.

Dated:   New York, New York
         November 3, 2022

Respectfully Submitted,

**KATTEN MUCHIN ROSENMAN LLP**

By: /s/ Terence P. Ross
Terence P. Ross
Shaya Rochester
Robert T. Smith

**KATTEN MUCHIN ROSENMAN LLP**
50 Rockefeller Plaza
New York, NY 10020

2900 K Street, NW – Suite 200
Washington, DC  20007

Telephone: (212) 940-8800
Facsimile:  (212) 940-8876
Email:   terence.ross@katten.com
              shaya.rochester@katten.com
              robert.smith1@katten.com

*Attorneys for Plaintiffs*

## **CERTIFICATE OF SERVICE**

I hereby certify that on November 3, 2022, I caused the foregoing to be filed with the Clerk of the U.S. District Court for the Southern District of New York using the Court's CM/ECF system. Service was accomplished on all counsel of record via the Court's CM/ECF system.

/s/ *Terence P. Ross*
Terence P. Ross
*Counsel for Plaintiffs*

**Query    Reports    Utilities    Help    Log Out**

CLOSED,APPEAL,ECF,RELATED

# U.S. District Court
## Southern District of New York (White Plains)
## CIVIL DOCKET FOR CASE #: 7:21-cv-04552-CS

In Re: Windstream Holdings, Inc.
Assigned to: Judge Cathy Seibel
Related Case: 7:19-cv-09354-CS
Case in other court: USBC-SDNY, 19-B-22312 (RDD)
Cause: 28:0158 Notice of Appeal re Bankruptcy Matter (BA

Date Filed: 05/20/2021
Date Terminated: 10/06/2022
Jury Demand: None
Nature of Suit: 422 Bankruptcy Appeal (801)
Jurisdiction: Federal Question

**In Re**

**Windstream Holdings, Inc.**

**Debtor**

**Windstream Holdings, Inc.**

**Appellant**

**Charter Communications, Inc.**                    represented by    **Brian W. Hockett**
Thompson Coburn LLP (St. Louis)
One Us Bank Plaza, Ste. 2700
St. Louis, MO 63101
(314)-552-6000
Fax: (314)-552-7000
Email: bhockett@thompsoncoburn.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Benjamin Isidore Finestone**
Quinn Emanuel Urquhart & Sullivan (NYC)
51 Madison Avenue
New York, NY 10010
(212)-849-7000
Fax: (212)-849-7100
Email:
benjaminfinestone@quinnemanuel.com
*ATTORNEY TO BE NOTICED*

**Susheel Kirpalani**
Quinn Emanuel
51 Madison Avenue, 22nd Floor
New York, NY 10010
(212) 849-7200
Fax: (212) 849-7100
Email:

                                                                     susheelkirpalani@quinnemanuel.com
*ATTORNEY TO BE NOTICED*

**Appellant**

**Charter Communications Operating,**            represented by   **Brian W. Hockett**
**LLC**                                                                                     (See above for address)
                                                     *LEAD ATTORNEY*
                                                     *PRO HAC VICE*
                                                     *ATTORNEY TO BE NOTICED*

                                                     **Benjamin Isidore Finestone**
                                                     (See above for address)
                                                     *ATTORNEY TO BE NOTICED*

                                                     **Susheel Kirpalani**
                                                     (See above for address)
                                                     *ATTORNEY TO BE NOTICED*

V.

**Appellee**

**Windstream Holdings, Inc.**                    represented by   **Steven J. Reisman**
                                                     Katten Muchin Rosenman LLP
                                                     50 Rockefeller Plaza
                                                     New York, NY 10020
                                                     212-940-8700
                                                     Email: sreisman@katten.com
                                                     *LEAD ATTORNEY*
                                                     *ATTORNEY TO BE NOTICED*

                                                     **Terence Ross**
                                                     Katten Muchin Rosenman LLP
                                                     2900 K Street N.W.
                                                     North Tower Suite 200
                                                     Washington, DC 20007
                                                     (202) 628-3676
                                                     Fax: (202) 628-5116
                                                     Email: terence.ross@katten.com
                                                     *LEAD ATTORNEY*
                                                     *ATTORNEY TO BE NOTICED*

                                                     **Terrence P. Ross**
                                                     Gibson, Dunn & Crutcher, L.L.P.
                                                     1050 Connecticut Avenue, N.W.
                                                     Washington, DC 20036
                                                     *LEAD ATTORNEY*
                                                     *ATTORNEY TO BE NOTICED*

                                                     **Eric Thomas Werlinger**
                                                     Katten Muchin Rosenman LLP
                                                     2900 K Street N.W.
                                                     North Tower Suite 200
                                                     Washington, DC 20007

202-625-3553
Email: eric.werlinger@kattenlaw.com
*ATTORNEY TO BE NOTICED*

**Robert Thomas Smith**
Katten Muchin Rosenman
2900 K Street, NW, Suite 200
Washington, DC 20007
(202)-625-3616
Fax: (202)-298-7570
Email: robert.smith1@kattenlaw.com
*ATTORNEY TO BE NOTICED*

**Stephen Jeffrey Rochester**
Katten Muchin Rosenman LLP
50 Rockefeller Plaza
New York, NY 10020
212-940-8529
Email: shaya.rochester@katten.com
*ATTORNEY TO BE NOTICED*

**Timothy H. Gray**
Katten Muchin Rosenman LLP
2900 K Street NW
North Tower
Suite 200
Washington, DC 20007
202-625-3608
Email: timothy.gray@katten.com
*ATTORNEY TO BE NOTICED*

**Appellee**

**Official Committee of Unsecured
Creditors of Windstream Holdings, Inc.**                represented by  **Lorenzo Marinuzzi**
Morrison & Foerster LLP
1290 Avenue of The Americas.
NY, NY 10169
(212)-336-8000
Fax: (212)-336-7900
Email: lmarinuzzi@mofo.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Steven Thomas Rappoport**
Morrison & Foerster LLP (NYC)
250 West 55th Street
New York, NY 10019
(212)-468-8000
Fax: (212)-468-7900
Email: srappoport@mofo.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
| --- | --- | --- |

| | | |
|---|---|---|
| 05/20/2021 | 1 | NOTICE OF APPEAL FROM THE BANKRUPTCY COURT TO THE S.D.N.Y. from the Judgment of Judge Robert D. Drain dated April 15, 2021. Bankruptcy Court Case Numbers: 19-8246A, 19-B-22312 (RDD). Certified copies of file received.Document filed by Charter Communications, Inc., Charter Communications Operating, LLC..(bkar) (Entered: 05/20/2021) |
| 05/20/2021 | 2 | CIVIL COVER SHEET filed..(bkar) (Entered: 05/20/2021) |
| 05/20/2021 | | BANKRUPTCY APPEAL CASE REFERRED BY ATTORNEY TO Judge Cathy Seibel as possibly related to 19-9354. (bkar) (Entered: 05/20/2021) |
| 05/20/2021 | | Case Designated ECF. (bkar) (Entered: 05/20/2021) |
| 05/20/2021 | 3 | STATEMENT OF RELATEDNESS re: that this action be filed as related to 19-cv-9354. Document filed by Charter Communications Operating, LLC, Charter Communications, Inc...(bkar) (Entered: 05/20/2021) |
| 05/21/2021 | | CASE ACCEPTED AS RELATED. Create association to 7:19-cv-09354-CS. Notice of Assignment to follow. (wb) (Entered: 05/21/2021) |
| 05/21/2021 | | NOTICE OF CASE REASSIGNMENT to Judge Cathy Seibel. Judge Unassigned is no longer assigned to the case..(wb) (Entered: 05/21/2021) |
| 05/21/2021 | | Magistrate Judge Judith C. McCarthy is so designated. Pursuant to 28 U.S.C. Section 636(c) and Fed. R. Civ. P. 73(b)(1) parties are notified that they may consent to proceed before a United States Magistrate Judge. Parties who wish to consent may access the necessary form at the following link: https://nysd.uscourts.gov/sites/default/files/2018-06/AO-3.pdf. (wb) (Entered: 05/21/2021) |
| 05/25/2021 | 4 | NOTICE OF APPEARANCE by Benjamin Isidore Finestone on behalf of Charter Communications Operating, LLC, Charter Communications, Inc...(Finestone, Benjamin) (Entered: 05/25/2021) |
| 05/25/2021 | 5 | NOTICE OF APPEARANCE by Susheel Kirpalani on behalf of Charter Communications Operating, LLC, Charter Communications, Inc...(Kirpalani, Susheel) (Entered: 05/25/2021) |
| 05/26/2021 | 6 | MOTION / APPELLANTS MOTION TO ACCEPT DOCUMENTS SEALED BY THE BANKRUPTCY COURT AS PART OF THE RECORD ON APPEAL . Document filed by Charter Communications Operating, LLC, Charter Communications, Inc...(Kirpalani, Susheel) (Entered: 05/26/2021) |
| 05/27/2021 | 7 | ORDER granting 6 APPELLANTS MOTION TO ACCEPT DOCUMENTS SEALED BY THE BANKRUPTCY COURT AS PART OF THE RECORD ON APPEAL (HEREBY ORDERED by Judge Cathy Seibel)(Text Only Order) (Seibel, Cathy) (Entered: 05/27/2021) |
| 06/01/2021 | 8 | NOTICE OF APPEARANCE by Terence Ross on behalf of Windstream Holdings, Inc... (Ross, Terence) (Entered: 06/01/2021) |
| 06/01/2021 | 9 | NOTICE OF APPEARANCE by Stephen Jeffrey Rochester on behalf of Windstream Holdings, Inc...(Rochester, Stephen) (Entered: 06/01/2021) |
| 06/03/2021 | 10 | MOTION To Accept Documents Sealed By The Bankruptcy Court As Part Of The Record On Appeal . Document filed by Windstream Holdings, Inc...(Ross, Terence) (Entered: 06/03/2021) |
| 06/03/2021 | 11 | ORDER granting 10 Motion for To Accept Documents Sealed By The Bankruptcy Court As Part Of The Record On Appeal. (HEREBY ORDERED by Judge Cathy Seibel)(Text |

| | | |
|---|---|---|
| | | Only Order) (Seibel, Cathy) (Entered: 06/03/2021) |
| 06/07/2021 | 12 | DESIGNATION OF BANKRUPTCY RECORD ON APPEAL re: 1 Bankruptcy Appeal,. Document filed by Appellants Charter Communications Operating, LLC, Charter Communications, Inc...(bkar) (Entered: 06/07/2021) |
| 06/07/2021 | 13 | COUNTER DESIGNATION OF BANKRUPTCY RECORD ON APPEAL Document filed by Appellee Windstream Holdings, Inc..(bkar) (Entered: 06/07/2021) |
| 06/25/2021 | 14 | NOTICE OF RECORD OF APPEAL AVAILABILITY (COMPLETION). Re: 1 Bankruptcy Appeal,. All Documents from the United States Bankruptcy Court - Southern District of New York have been filed with the U.S.D.C. S.D.N.Y. Record of Appeal is Complete and Available Electronically. Appellant Brief due by 7/26/2021..(bkar) (Entered: 06/25/2021) |
| 07/26/2021 | 15 | Appellant's BRIEF. Document filed by Charter Communications Operating, LLC, Charter Communications, Inc.. Appellee Brief due by 8/25/2021..(Kirpalani, Susheel) (Entered: 07/26/2021) |
| 07/30/2021 | 16 | FIRST LETTER MOTION for Extension of Time *of the Remaining Bankruptcy Appeal Briefing Deadlines,* addressed to Judge Cathy Seibel from Terence P. Ross dated 7/30/21. Document filed by Windstream Holdings, Inc...(Ross, Terence) (Entered: 07/30/2021) |
| 07/30/2021 | 17 | ORDER granting 16 Letter Motion for Extension of Time. The joint request to extend the briefing schedule is granted. Plaintiffs-Appellees response shall be filed on or before September 24, 2021, and Defendants-Appellants reply shall be filed on or before October 22, 2021. SO ORDERED. Appellant Reply due by 10/22/2021. Appellee Response due by 9/24/2021. (Signed by Judge Cathy Seibel on 7/30/2021) (mml) (Entered: 08/02/2021) |
| 09/16/2021 | 18 | MOTION for Eric T. Werlinger to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number ANYSDC-25070834. **Motion and supporting papers to be reviewed by Clerk's Office staff.** Document filed by Windstream Holdings, Inc.. (Attachments: # 1 Affidavit Of Eric T. Werlinger In Support, # 2 Exhibit 1 - Certificates Of Good Standing, # 3 Proposed Order).(Werlinger, Eric) (Entered: 09/16/2021) |
| 09/16/2021 | | **>>>NOTICE REGARDING PRO HAC VICE MOTION. Regarding Document No. 18 MOTION for Eric T. Werlinger to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number ANYSDC-25070834. Motion and supporting papers to be reviewed by Clerk's Office staff.. The document has been reviewed and there are no deficiencies. (wb)** (Entered: 09/16/2021) |
| 09/16/2021 | 19 | ORDER granting 18 Motion for Eric T. Werlinger to Appear Pro Hac Vice (HEREBY ORDERED by Judge Cathy Seibel)(Text Only Order) (Seibel, Cathy) (Entered: 09/16/2021) |
| 09/22/2021 | 20 | LETTER addressed to Judge Cathy Seibel from Terence P. Ross dated 9/22/21 re: Plaintiffs'-Appellees' Rule 8012 Statement. Document filed by Windstream Holdings, Inc...(Ross, Terence) (Entered: 09/22/2021) |
| 09/22/2021 | 21 | MEMO ENDORSEMENT on re: 20 Letter filed by Windstream Holdings, Inc. ENDORSEMENT: Plaintiffs-Appellees' proposal is fine with the Court. SO ORDERED. (Signed by Judge Cathy Seibel on 9/22/2021) (mml) (Entered: 09/22/2021) |
| 09/24/2021 | 22 | NOTICE OF APPEARANCE by Timothy H. Gray on behalf of Windstream Holdings, Inc...(Gray, Timothy) (Entered: 09/24/2021) |
| 09/24/2021 | 23 | NOTICE OF APPEARANCE by Robert Thomas Smith on behalf of Windstream Holdings, Inc...(Smith, Robert) (Entered: 09/24/2021) |
| | | |

| 09/24/2021 | 24 | Appellee's BRIEF. Document filed by Windstream Holdings, Inc.. Appellant Reply Brief due by 10/8/2021. (Attachments: # 1 Exhibit A).(Ross, Terence) (Entered: 09/24/2021) |
| 10/22/2021 | 25 | Appellant's REPLY BRIEF. Document filed by Charter Communications Operating, LLC, Charter Communications, Inc...(Kirpalani, Susheel) (Entered: 10/22/2021) |
| 12/30/2021 | 26 | LETTER addressed to Judge Cathy Seibel from Susheel Kirpalani dated December 30, 2021 re: Notice of Supplemental Authority. Document filed by Charter Communications Operating, LLC, Charter Communications, Inc...(Kirpalani, Susheel) (Entered: 12/30/2021) |
| 01/06/2022 | 27 | LETTER addressed to Judge Cathy Seibel from Terence P. Ross dated 1/6/22 re: Response to Notice of Supplemental Authority. Document filed by Windstream Holdings, Inc... (Ross, Terence) (Entered: 01/06/2022) |
| 10/06/2022 | 28 | OPINION AND ORDER: For the foregoing reasons, the portion of the Bankruptcy Court's Judgment holding Charter in contempt for violation of the automatic stay based on Charter's advertisements and sanctioning it in the amount of $19,179,329.45 for that violation is VACATED. The Clerk of Court is respectfully directed to close the case. SO ORDERED. (Signed by Judge Cathy Seibel on 10/6/2022) (mml) Transmission to Orders and Judgments Clerk for processing. (Entered: 10/06/2022) |
| 11/03/2022 | 29 | NOTICE OF APPEAL from 28 Memorandum & Opinion,. Document filed by Windstream Holdings, Inc.. Filing fee $ 505.00, receipt number ANYSDC-26913534. Form C and Form D are due within 14 days to the Court of Appeals, Second Circuit..(Ross, Terence) (Entered: 11/03/2022) |
| 11/03/2022 | | Transmission of Notice of Appeal and Certified Copy of Docket Sheet to US Court of Appeals re: 29 Notice of Appeal. (tp) (Entered: 11/03/2022) |
| 11/03/2022 | | Appeal Record Sent to USCA (Electronic File). Certified Indexed record on Appeal Electronic Files for 29 Notice of Appeal, filed by Windstream Holdings, Inc. were transmitted to the U.S. Court of Appeals. (tp) (Entered: 11/03/2022) |

| **PACER Service Center** | | |
|---|---|---|
| **Transaction Receipt** | | |
| 11/16/2022 21:25:25 | | |
| **PACER Login:** | km3280 | **Client Code:** | 392355-00008 |
| **Description:** | Docket Report | **Search Criteria:** | 7:21-cv-04552-CS |
| **Billable Pages:** | 5 | **Cost:** | 0.50 |

**SealedDoc, WDREF, PENAP, APPEAL**

# U.S. Bankruptcy Court
## Southern District of New York (White Plains)
## Adversary Proceeding #: 19-08246-lgb

*Assigned to:* Judge Lisa G Beckerman                    *Date Filed:* 04/05/19
*Lead BK Case:* 19-22312
*Lead BK Title:* Windstream Holdings, Inc.
*Lead BK Chapter:* 11
*Demand:*

*Nature[s] of Suit:* 72 Injunctive relief - other
                     81 Subordination of claim or interest
                     02 Other (e.g. other actions that would have been brought in state court if unrelated to bankruptcy)
                     14 Recovery of money/property - other

### *Plaintiff*
-----------------------
**Windstream Holdings, Inc., et al.**                    represented by **Steven J. Reisman**
                                                         Katten Muchin Rosenman LLP
                                                         50 Rockefeller Plaza
                                                         New York, NY 10020
                                                         212-940-8700
                                                         Email: sreisman@katten.com

                                                         **Shaya Rochester**
                                                         Katten Muchin Rosenman LLP
                                                         50 Rockefeller Plaza
                                                         New York, NY 10020
                                                         212-940-8529
                                                         Email: shaya.rochester@katten.com

                                                         **Terence P. Ross**
                                                         *LEAD ATTORNEY*

V.

### *Defendant*
-----------------------
**Charter Communications, Inc.**                         represented by **Brian W. Hockett**
                                                         Thompson Coburn LLP
                                                         One US Bank Plaza
                                                         St. Louis, MO 63101
                                                         314-552-6461
                                                         Fax : 314-552-7461
                                                         Email: bhockett@thompsoncoburn.com

                                                         **John Scott Kingston**

Thompson Coburn LLP
One US Bank Plaza
Suite 2700
St. Louis, MO 63101
314-552-6464
Email: jkingston@thompsoncoburn.com

**Susheel Kirpalani**
Quinn Emanuel Urquhart
& Sullivan LLP
51 Madison Avenue
22nd Floor
New York, NY 10010
(212) 849-7000
Fax : 212 849-7100
Email: susheelkirpalani@quinnemanuel.com

**Nino Przulj**
Thompson Coburn LLP
One US Bank Plaza
Saint Louis, MO 63101
314-552-6559
Fax : 314-552-7000
Email: nino.przulj@usdoj.gov
*LEAD ATTORNEY*

*Defendant*
-----------------------
**Charter Communications Operating, LLC**                    represented by **Brian W. Hockett**
c/o Brian W. Hockett, Esq.                                   (See above for address)
Thompson Coburn LLP
One US Bank Plaza                                            **John Scott Kingston**
St. Louis, MO 63101                                          (See above for address)

                                                             **Susheel Kirpalani**
                                                             (See above for address)

                                                             **Nino Przulj**
                                                             (See above for address)
                                                             *LEAD ATTORNEY*

*Claims and Noticing Agent*
-----------------------
**Kurtzman Carson Consultants LLC**
222 N. Pacific Coast Highway
Suite 300
El Segundo, CA 90245
310-823-9000

| Filing Date | # | Docket Text |
|---|---|---|

| | | |
|---|---|---|
| 04/05/2019 | <u>1</u><br>(80 pgs; 6 docs) | **[Unredacted Document Filed Under Seal Pursuant to Order signed on 4/16/2019 (Related Doc. <u>24</u>)]** Adversary case 19-08246. Complaint against Charter Communications, Inc., Charter Communications Operating, LLC (Fee Amount $ 350.). Nature(s) of Suit: (72 (Injunctive relief - other)), (81 (Subordination of claim or interest)), (02 (Other (e.g. other actions that would have been brought in state court if unrelated to bankruptcy))), (14 (Recovery of money/property - other)) Filed by Steven J. Reisman on behalf of Windstream Holdings, Inc., et al.. (Attachments: # <u>1</u> Exhibit A # <u>2</u> Exhibit B # <u>3</u> Exhibit C # <u>4</u> Exhibit D # <u>5</u> Exhibit E) (Reisman, Steven) Additional attachment(s) added on 4/10/2019 (Correa, Mimi). (Entered: 04/05/2019) |
| 04/05/2019 | <u>2</u><br>(48 pgs; 2 docs) | **[Unredacted Document Filed Under Seal Pursuant to Order signed on 5/22/2019 (Related Doc. <u>24</u>) ]** Motion for Temporary Restraining Order *DEBTORS MOTION FOR A TEMPORARY RESTRAINING ORDER, PRELIMINARY INJUNCTION AND OTHER EQUITABLE RELIEF AGAINST CHARTER COMMUNICATIONS, INC. AND CHARTER COMMUNICATIONS OPERATING, LLC* filed by Steven J. Reisman on behalf of Windstream Holdings, Inc., et al.. (Attachments: # <u>1</u> Exhibit A) (Reisman, Steven) Additional attachment(s) added on 4/10/2019 (Correa, Mimi). (Entered: 04/05/2019) |
| 04/05/2019 | <u>3</u><br>(74 pgs; 12 docs) | Affidavit *AFFIDAVIT OF LEWIS LANGSTON IN SUPPORT OF DEBTORS MOTION FOR A TEMPORARY RESTRAINING ORDER, PRELIMINARY INJUNCTION AND OTHER EQUITABLE RELIEF AGAINST CHARTER COMMUNICATIONS, INC. AND CHARTER COMMUNICATIONS OPERATING, LLC* (related document(s)<u>2</u>) Filed by Steven J. Reisman on behalf of Windstream Holdings, Inc., et al.. (Attachments: # <u>1</u> Exhibit 1 # <u>2</u> Exhibit 2 # <u>3</u> Exhibit 3 # <u>4</u> Exhibit 4 # <u>5</u> Exhibit 5 # <u>6</u> Exhibit 6 # <u>7</u> Exhibit 7 # <u>8</u> Exhibit 8 # <u>9</u> Exhibit 9 # <u>10</u> Exhibit 10 # <u>11</u> Exhibit 11)(Reisman, Steven) Additional attachment(s) added on 4/10/2019 (Correa, Mimi). (Entered: 04/05/2019) |
| 04/05/2019 | <u>4</u><br>(244 pgs; 7 docs) | Motion to Seal *DEBTORS MOTION SEEKING ENTRY OF ORDER AUTHORIZING DEBTORS TO FILE UNDER SEAL CERTAIN PORTIONS OF (I) MOTION FOR A TEMPORARY RESTRAINING ORDER, PRELIMINARY INJUNCTION, AND OTHER EQUITABLE RELIEF AGAINST CHARTER COMMUNICATIONS, INC. AND CHARTER COMMUNICATIONS OPERATING, LLC, (II) AFFIDAVIT OF LEWIS LANGSTON IN SUPPORT THEREOF AND (III) ACCOMPANYING ADVERSARY COMPLAINT* (related document(s)<u>2</u>, <u>1</u>, <u>3</u>) filed by Steven J. Reisman on behalf of Windstream Holdings, Inc., et al.. (Attachments: # <u>1</u> Exhibit A # <u>2</u> Exhibit B-1 # <u>3</u> Exhibit B-2 # <u>4</u> Exhibit B-3 # <u>5</u> Exhibit B-4 # <u>6</u> Exhibit B-5) (Reisman, Steven) Additional attachment(s) added on 4/10/2019 (Correa, Mimi). (Entered: 04/05/2019) |
| 04/05/2019 | | Receipt of Complaint( <u>19-08246-rdd</u>) [cmp,cmp] ( 350.00) Filing Fee. Receipt number A13131067. Fee amount 350.00. (Re: Doc # <u>1</u>) (U.S. Treasury) (Entered: 04/05/2019) |
| 04/08/2019 | <u>5</u><br>(1 pg) | Summons with Notice of Pre-Trial Conference issued by Clerk's Office with Pre-Trial Conference set for 6/17/2019 at 10:00 AM at Courtroom 118, White Plains Courthouse. Answer due by 5/8/2019. (Vargas, Ana) (Entered: 04/08/2019) |
| 04/08/2019 | <u>6</u><br>(4 pgs) | Notice of Hearing *ON DEBTORS MOTION FOR A TEMPORARY RESTRAINING ORDER, PRELIMINARY INJUNCTION, AND OTHER EQUITABLE RELIEF AGAINST CHARTER COMMUNICATIONS,* |

| | | |
|---|---|---|
| | | *INC. AND CHARTER COMMUNICATIONS OPERATING, LLC* (related document(s)2) filed by Steven J. Reisman on behalf of Windstream Holdings, Inc., et al.. (Reisman, Steven) (Entered: 04/08/2019) |
| 04/10/2019 | 7 (3 pgs) | Notice of Hearing *NOTICE OF HEARING ON DEBTORS MOTION SEEKING ENTRY OF ORDER AUTHORIZING DEBTORS TO FILE UNDER SEAL CERTAIN PORTIONS OF THE (I) MOTION FOR A TEMPORARY RESTRAINING ORDER, PRELIMINARY INJUNCTION, AND OTHER EQUITABLE RELIEF AGAINST CHARTER COMMUNICATIONS, INC. AND CHARTER COMMUNICATIONS OPERATING, LLC, (II) AFFIDAVIT OF LEWIS LANGSTON IN SUPPORT THEREOF AND (III) THE ACCOMPANYING ADVERSARY COMPLAINT* with hearing to be held on 4/15/2019 (check with court for location) Objections due by 4/12/2019, (Reisman, Steven) (Entered: 04/10/2019) |
| 04/11/2019 | 8 (11 pgs; 3 docs) | Declaration *SUPPLEMENTAL DECLARATION OF LEWIS LANGSTON IN SUPPORT OF DEBTORS MOTION FOR A TEMPORARY RESTRAINING ORDER, PRELIMINARY INJUNCTION AND OTHER EQUITABLE RELIEF AGAINST CHARTER COMMUNICATIONS, INC. AND CHARTER COMMUNICATIONS OPERATING, LLC* (related document(s)2) filed by Steven J. Reisman on behalf of Windstream Holdings, Inc., et al.. (Attachments: # 1 Exhibit 1 # 2 Exhibit 2) (Reisman, Steven) (Entered: 04/11/2019) |
| 04/11/2019 | 9 (17 pgs) | Affidavit of Service *re: Documents Served on April 5, 2019* (related document(s)2, 1, 3, 4) filed by Kurtzman Carson Consultants LLC. (Kass, Albert) (Entered: 04/11/2019) |
| 04/11/2019 | 10 (16 pgs) | Affidavit of Service *re: Notice of Hearing ON DEBTORS MOTION FOR A TEMPORARY RESTRAINING ORDER, PRELIMINARY INJUNCTION, AND OTHER EQUITABLE RELIEF AGAINST CHARTER COMMUNICATIONS, INC. AND CHARTER COMMUNICATIONS OPERATING, LLC* (related document(s)6) filed by Kurtzman Carson Consultants LLC.(Kass, Albert) (Entered: 04/11/2019) |
| 04/11/2019 | 11 (18 pgs) | Affidavit of Service *re: NOTICE OF HEARING ON DEBTORS MOTION SEEKING ENTRY OF ORDER AUTHORIZING DEBTORS TO FILE UNDER SEAL CERTAIN PORTIONS OF THE (I) MOTION FOR A TEMPORARY RESTRAINING ORDER, PRELIMINARY INJUNCTION, AND OTHER EQUITABLE RELIEF AGAINST CHARTER COMMUNICATIONS, INC. AND CHARTER COMMUNICATIONS OPERATING, LLC, (II) AFFIDAVIT OF LEWIS LANGSTON IN SUPPORT THEREOF AND (III) THE ACCOMPANYING ADVERSARY COMPLAINT* (related document(s)7) filed by Kurtzman Carson Consultants LLC.(Kass, Albert) (Entered: 04/11/2019) |
| 04/11/2019 | 12 (261 pgs; 5 docs) | Opposition *to Debtor's Motion for Temporary Restraining Order* (related document(s)2) filed by Brian W. Hockett on behalf of Charter Communications Operating, LLC, Charter Communications, Inc.. (Attachments: # 1 Exhibit A # 2 Exhibit B # 3 Exhibit C # 4 Exhibit D) (Hockett, Brian) (Entered: 04/11/2019) |
| 04/11/2019 | 13 (2 pgs) | Certificate of Service (related document(s)12) Filed by Brian W. Hockett on behalf of Charter Communications Operating, LLC, Charter |

| | | Communications, Inc.. (Hockett, Brian) (Entered: 04/11/2019) |
|---|---|---|
| 04/11/2019 | [14](#)<br>(23 pgs; 3 docs) | Motion to Seal *DEBTORS MOTION SEEKING ENTRY OF AN ORDER AUTHORIZING DEBTORS TO FILE UNDER SEAL CERTAIN PORTIONS OF THE SUPPLEMENTAL DECLARATION OF LEWIS LANGSTON IN SUPPORT OF DEBTORS MOTION FOR A TEMPORARY RESTRAINING ORDER, PRELIMINARY INJUNCTION AND OTHER EQUITABLE RELIEF AGAINST CHARTER COMMUNICATIONS, INC. AND CHARTER COMMUNICATIONS OPERATING, LLC* (related document(s)[8](#)) filed by Steven J. Reisman on behalf of Windstream Holdings, Inc., et al.. (Attachments: # [1](#) Exhibit A # [2](#) Exhibit B) (Reisman, Steven) (Entered: 04/11/2019) |
| 04/11/2019 | [15](#)<br>(3 pgs) | Notice of Hearing *NOTICE OF HEARING ON DEBTORS MOTION SEEKING ENTRY OF AN ORDER AUTHORIZING DEBTORS TO FILE UNDER SEAL CERTAIN PORTIONS OF THE SUPPLEMENTAL DECLARATION OF LEWIS LANGSTON IN SUPPORT OF DEBTORS MOTION FOR A TEMPORARY RESTRAINING ORDER, PRELIMINARY INJUNCTION AND OTHER EQUITABLE RELIEF AGAINST CHARTER COMMUNICATIONS, INC. AND CHARTER COMMUNICATIONS OPERATING, LLC* (related document(s)[14](#)) filed by Steven J. Reisman on behalf of Windstream Holdings, Inc., et al.. (Reisman, Steven) (Entered: 04/11/2019) |
| 04/11/2019 | [16](#)<br>(4 pgs) | Affidavit of Service *re Documents filed on April 11, 2019* (related document(s)[2](#), [1](#), [3](#), [6](#), [7](#), [4](#)) filed by Kurtzman Carson Consultants LLC. (Kass, Albert) (Entered: 04/11/2019) |
| 04/12/2019 | [17](#)<br>(124 pgs; 2 docs) | Reply to Motion *DEBTORS' REPLY IN SUPPORT OF THEIR MOTION FOR TEMPORARY RESTRAINING ORDER, PRELIMINARY INJUNCTION AND OTHER EQUITABLE RELIEF* (related document(s)[2](#)) filed by Steven J. Reisman on behalf of Windstream Holdings, Inc., et al.. (Attachments: # [1](#) Exhibit A) (Reisman, Steven) (Entered: 04/12/2019) |
| 04/12/2019 | [18](#)<br>(8 pgs) | Motion to Join */ Joinder of the Official Committee of Unsecured Creditors to Debtors Motion for a Temporary Restraining Order, Preliminary Injunction, and Other Equitable Relief Against Charter Communications, Inc. and Charter Communications Operating, LLC* (related document(s)[2](#)) filed by Lorenzo Marinuzzi on behalf of Official Committee of Unsecured Creditors. with hearing to be held on 4/15/2019 at 10:00 AM at Courtroom TBA, White Plains Courthouse (RDD) (Marinuzzi, Lorenzo) (Entered: 04/12/2019) |
| 04/12/2019 | [19](#)<br>(4 pgs) | Notice of Agenda *AGENDA FOR HEARING* filed by Steven J. Reisman on behalf of Windstream Holdings, Inc., et al.. with hearing to be held on 4/15/2019 (check with court for location) (Reisman, Steven) (Entered: 04/12/2019) |
| 04/14/2019 | [20](#)<br>(35 pgs) | Notice of Proposed Order *NOTICE OF FILING OF REVISED PROPOSED TEMPORARY RESTRAINING ORDER AGAINST CHARTER COMMUNICATIONS, INC. AND CHARTER COMMUNICATIONS OPERATING, LLC AND REVISED PROPOSED SHOW CAUSE ORDER SETTING A HEARING WITH RESPECT TO DEBTORS MOTION FOR PRELIMINARY INJUNCTION AND OTHER EQUITABLE RELIEF AGAINST CHARTER COMMUNICATIONS, INC. AND CHARTER COMMUNICATIONS OPERATING, LLC* (Reisman, Steven) (Entered: 04/14/2019) |

| | | |
|---|---|---|
| 04/14/2019 | [21](#)<br>(4 pgs) | Notice of Agenda *REVISED AGENDA FOR APRIL 15, 2019 HEARING* filed by Steven J. Reisman on behalf of Windstream Holdings, Inc., et al.. with hearing to be held on 4/15/2019 (check with court for location) (Reisman, Steven) (Entered: 04/14/2019) |
| 04/15/2019 | [22](#)<br>(19 pgs) | Affidavit of Service *re: 1) Debtors Motion Seeking Entry of an Order Authorizing Debtors to File Under Seal Certain Portions of the Supplemental Declaration of Lewis Langston in Support of Debtors Motion for a Temporary Restraining Order, Preliminary Injunction and Other Equitable Relief Against Charter Communications, Inc. and Charter Communications Operating, LLC; and 2) Notice of Hearing on Debtors Motion Seeking Entry of an Order Authorizing Debtors to File Under Seal Certain Portions of the Supplemental Declaration of Lewis Langston in Support of Debtors Motion for a Temporary Restraining Order, Preliminary Injunction and Other Equitable Relief Against Charter Communications, Inc. and Charter Communications Operating, LLC* (related document(s)[15](#), [14](#)) filed by Kurtzman Carson Consultants LLC.(Kass, Albert) (Entered: 04/15/2019) |
| 04/15/2019 | [23](#)<br>(22 pgs) | Affidavit of Service *re: 1) Debtors' Reply in Support of Their Motion for Temporary Restraining Order, Preliminary Injunction and Other Equitable Relief; and 2) Agenda for Hearing* (related document(s)[17](#), [19](#)) filed by Kurtzman Carson Consultants LLC.(Kass, Albert) (Entered: 04/15/2019) |
| 04/16/2019 | [24](#)<br>(4 pgs) | Order signed on 4/16/2019 Authorizing Debtors to File Under Seal Certain Portions of (I) Debtors' Motion for Temporary Restraining Order, Preliminary Injunction, and Other Equitable Relief, (II) Affidavit of Lewis Langston, (III) Supplemental Declaration of Lewis Langston and (IV) Adversary Complaint (Related Doc # [4](#)). (Correa, Mimi) (Entered: 04/16/2019) |
| 04/16/2019 | [25](#)<br>(7 pgs) | Temporary Restraining Order (TRO) signed on 4/16/2019 Against Charter Communications, Inc. and Charter Communications Operating, LLC (related document(s)[2](#)). (Correa, Mimi) (Entered: 04/16/2019) |
| 04/16/2019 | [26](#)<br>(18 pgs) | Affidavit of Service *(Amended) re: NOTICE OF HEARING ON DEBTORS MOTION SEEKING ENTRY OF ORDER AUTHORIZING DEBTORS TO FILE UNDER SEAL CERTAIN PORTIONS OF THE (I) MOTION FOR A TEMPORARY RESTRAINING ORDER, PRELIMINARY INJUNCTION, AND OTHER EQUITABLE RELIEF AGAINST CHARTER COMMUNICATIONS, INC. AND CHARTER COMMUNICATIONS OPERATING, LLC, (II) AFFIDAVIT OF LEWIS LANGSTON IN SUPPORT THEREOF AND (III) THE ACCOMPANYING ADVERSARY COMPLAINT* (related document(s)[7](#)) filed by Kurtzman Carson Consultants LLC.(Kass, Albert) (Entered: 04/16/2019) |
| 04/17/2019 | [27](#)<br>(22 pgs) | Affidavit of Service *re 1) Notice of Filing Revised Proposed Temporary Restraining Order Against Charter Communications, Inc. and Charter Communications Operating, LLC and Revised Proposed Show Cause Order Setting a Hearing with Respect to Debtors' Motion for Preliminary Injunction and Other Equitable Relief Against Charter Communications, Inc. and Charter Communications Operating, LLC; 2) Revised Agenda for April 15, 2019 Hearing* (related document(s)[21](#), [20](#)) filed by Kurtzman Carson Consultants LLC.(Kass, Albert) (Entered: 04/17/2019) |

| 04/17/2019 | [28](#)<br>(19 pgs) | Affidavit of Service *re Documents Served on April 16, 2019* (related document(s)[2](#), [8](#), [3](#), [25](#)) filed by Kurtzman Carson Consultants LLC. (Kass, Albert) (Entered: 04/17/2019) |
|---|---|---|
| 04/17/2019 | [29](#)<br>(4 pgs) | Affidavit of Service *(Supplemental) re: 1) Complaint; and 2) Summons with Notice of Pre-Trial Conference* (related document(s)[1](#), [5](#)) filed by Kurtzman Carson Consultants LLC.(Kass, Albert) (Entered: 04/17/2019) |
| 04/19/2019 | [30](#)<br>(4 pgs) | Affidavit of Service *(Supplemental) re: 1) Complaint; and 2) Summons and Notice of Pretrial Conference* (related document(s)[1](#), [5](#)) filed by Kurtzman Carson Consultants LLC.(Kass, Albert) (Entered: 04/19/2019) |
| 04/24/2019 | [31](#)<br>(4 pgs) | Show Cause Order signed on 4/24/2019 Setting a Hearing with Respect to Debtors' Motion for Preliminary Injunction and Other Equitable Relief Against Charter Communications, Inc. and Charter Communications Operating, LLC. Hearing to be held on 5/14/2019 at 10:00 AM at Courtroom 118, White Plains Courthouse (related document(s)[25](#)). (Vargas, Ana) (Entered: 04/24/2019) |
| 05/01/2019 | [32](#)<br>(1 pg) | Notice of Withdrawal *NOTICE OF LIMITED WITHDRAWAL OF COUNSEL* filed by Steven J. Reisman on behalf of Windstream Holdings, Inc., et al.. (Reisman, Steven) (Entered: 05/01/2019) |
| 05/01/2019 | [33](#)<br>(16 pgs) | Affidavit of Service *re: Show Cause Order Setting a Hearing with Respect to Debtors' Motion for Preliminary Injunction and Other Equitable Relief Against Charter Communications, Inc. and Charter Communications Operating, LLC* (related document(s)[31](#)) filed by Kurtzman Carson Consultants LLC.(Kass, Albert) (Entered: 05/01/2019) |
| 05/03/2019 | [34](#)<br>(6 pgs) | Affidavit of Service *re: Notice of Limited Withdrawal of Counsel* (related document(s)[32](#)) filed by Kurtzman Carson Consultants LLC. (Kass, Albert) (Entered: 05/03/2019) |
| 05/06/2019 | [35](#)<br>(47 pgs) | **[Unredacted Document Filed Under Seal Pursuant to Order signed on 5/16/2019 (Related Doc. [63](#)) ]** Memorandum of Law (related document(s)[2](#)) filed by Shaya Rochester on behalf of Windstream Holdings, Inc., et al.. (Rochester, Shaya) (Entered: 05/06/2019) |
| 05/06/2019 | [36](#)<br>(684 pgs; 28 docs) | **[Unredacted Document Filed Under Seal Pursuant to Order signed on 5/16/2019 (Related Doc. [63](#)) ]** Declaration *DECLARATION OF TAMI SIMS IN SUPPORT OF THE DEBTORS' MOTION FOR PRELIMINARY INJUNCTION* (related document(s)[35](#), [2](#), [25](#)) filed by Shaya Rochester on behalf of Windstream Holdings, Inc., et al.. (Attachments: # [1](#) Exhibit A # [2](#) Exhibit 2 # [3](#) Exhibit 13 # [4](#) Exhibit 15 # [5](#) Exhibit 16 # [6](#) Exhibit 17 # [7](#) Exhibit 18 # [8](#) Exhibit 19 # [9](#) Exhibit 20 # [10](#) Exhibit 21 # [11](#) Exhibit 22 # [12](#) Exhibit 23 # [13](#) Exhibit 26-1 # [14](#) Exhibit 26-2 # [15](#) Exhibit 27 # [16](#) Exhibit 28 # [17](#) Exhibit 30 # [18](#) Exhibit 31 # [19](#) Exhibit 32 # [20](#) Exhibit 36 # [21](#) Exhibit 37 # [22](#) Exhibit 38 # [23](#) Exhibit 39 # [24](#) Exhibit 40 # [25](#) Exhibit 41 # [26](#) Exhibit 42 # [27](#) Exhibit 43) (Rochester, Shaya) (Entered: 05/06/2019) |
| 05/06/2019 | [37](#)<br>(6 pgs; 2 docs) | **[Unredacted Document Filed Under Seal Pursuant to Order signed on 5/16/2019 (Reated Doc. [63](#))]** Declaration *DECLARATION OF SHAYA ROCHESTER IN SUPPORT OF THE DEBTORS' MOTION* |

| | | |
|---|---|---|
| | | *FOR PRELIMINARY INJUNCTION* (related document(s)2, 25, 35) filed by Shaya Rochester on behalf of Windstream Holdings, Inc., et al.. (Attachments: # 1 Exhibits A-B, 2-38) (Rochester, Shaya) (Entered: 05/06/2019) |
| 05/06/2019 | 38 (12 pgs; 2 docs) | Motion to Seal *DEBTORS MOTION FOR LEAVE TO (I) FILE UNDER SEAL PORTIONS OF (A) DEBTORS MEMORANDUM OF LAW IN SUPPORT OF PRELIMINARY INJUNCTION AGAINST CHARTER COMMUNICATIONS, INC. AND CHARTER COMMUNICATIONS OPERATING, LLC AND (B) DECLARATION OF TAMI SIMS IN SUPPORT AND (II) FILE CONDITIONALLY UNDER SEAL DOCUMENTS DESIGNATED BY CHARTER* (related document(s)36, 37, 35) filed by Shaya Rochester on behalf of Windstream Holdings, Inc., et al.. (Attachments: # 1 Exhibit A) (Rochester, Shaya) (Entered: 05/06/2019) |
| 05/06/2019 | 39 (3 pgs) | Notice of Hearing *NOTICE OF HEARING ON DEBTORS MOTION FOR LEAVE TO (I) FILE UNDER SEAL PORTIONS OF (A) DEBTORS MEMORANDUM OF LAW IN SUPPORT OF PRELIMINARY INJUNCTION AGAINST CHARTER COMMUNICATIONS, INC. AND CHARTER COMMUNICATIONS OPERATING, LLC AND (B) DECLARATION OF TAMI SIMS IN SUPPORT AND (II) FILE CONDITIONALLY UNDER SEAL DOCUMENTS DESIGNATED BY CHARTER* (related document(s)38) filed by Shaya Rochester on behalf of Windstream Holdings, Inc., et al.. with hearing to be held on 5/14/2019 (check with court for location) (Rochester, Shaya) (Entered: 05/06/2019) |
| 05/08/2019 | 40 (24 pgs) | Response to Motion *Response to Order to Show Cause* filed by John Scott Kingston on behalf of Charter Communications Operating, LLC, Charter Communications, Inc.. (Kingston, John) (Entered: 05/08/2019) |
| 05/08/2019 | 41 (15 pgs) | Answer to Complaint (Related Doc # 1) (related document(s)1) filed by Brian W. Hockett on behalf of Charter Communications Operating, LLC, Charter Communications, Inc.. (Hockett, Brian) (Entered: 05/08/2019) |
| 05/08/2019 | 42 (2 pgs) | Corporate Ownership Statement . Filed by Brian W. Hockett on behalf of Charter Communications Operating, LLC, Charter Communications, Inc.. (Hockett, Brian) (Entered: 05/08/2019) |
| 05/08/2019 | 43 (16 pgs) | Affidavit of Service *re: Documents Served on May 6, 2019* (related document(s)39, 36, 37, 38, 35) filed by Kurtzman Carson Consultants LLC.(Kass, Albert) (Entered: 05/08/2019) |
| 05/08/2019 | 44 (542 pgs; 10 docs) | **[Unredacted Document Filed Under Seal Pursuant to Order signed on 5/16/2019 (Related Doc. 62) ]** Declaration *of Brian Hockett* filed by Brian W. Hockett on behalf of Charter Communications Operating, LLC, Charter Communications, Inc.. (Attachments: # 1 Exhibit A # 2 Exhibit B # 3 Exhibit C # 4 Exhibit D # 5 Exhibit E # 6 Exhibit 25 # 7 Exhibit 26 A # 8 Exhibit 26 B # 9 Exhibit 28) (Hockett, Brian) (Entered: 05/08/2019) |
| 05/08/2019 | 45 (138 pgs; 6 docs) | Motion to Seal *Exhibits attached to Declaration of Brian Hockett* (related document(s)44) filed by Brian W. Hockett on behalf of Charter Communications Operating, LLC, Charter Communications, Inc.. (Attachments: # 1 Exhibit A # 2 Exhibit B # 3 Exhibit C # 4 Exhibit E # 5 Proposed Order) (Hockett, Brian) (Entered: 05/08/2019) |

| 05/08/2019 | <u>46</u><br>(3 pgs) | Notice of Hearing (related document(s)<u>45</u>) filed by Brian W. Hockett on behalf of Charter Communications Operating, LLC, Charter Communications, Inc.. (Hockett, Brian) (Entered: 05/08/2019) |
| --- | --- | --- |
| 05/10/2019 | <u>47</u><br>(22 pgs) | **[Unredacted Document Filed Under Seal Pursuant to Order signed on 5/16/2019 (Related Doc. <u>62</u>) ]** Memorandum of Law *DEBTORS REPLY MEMORANDUM OF LAW IN SUPPORT OF A PRELIMINARY INJUNCTION AGAINST CHARTER COMMUNICATIONS, INC. AND CHARTER COMMUNICATIONS OPERATING, LLC* (related document(s)<u>2</u>, <u>31</u>, <u>6</u>, <u>40</u>, <u>35</u>) filed by Shaya Rochester on behalf of Windstream Holdings, Inc., et al.. (Rochester, Shaya) (Entered: 05/10/2019) |
| 05/10/2019 | <u>48</u><br>(10 pgs) | Motion to Join */ Joinder of Proposed Intervenor the Official Committee of Unsecured Creditors to Debtors Motion for a Preliminary Injunction Against Charter Communications, Inc. and Charter Communications Operating, LLC* (related document(s)<u>35</u>) filed by Lorenzo Marinuzzi on behalf of Official Committee of Unsecured Creditors. with hearing to be held on 5/14/2019 at 10:00 AM at Courtroom TBA, White Plains Courthouse (RDD) (Marinuzzi, Lorenzo) (Entered: 05/10/2019) |
| 05/10/2019 | <u>49</u><br>(4 pgs; 2 docs) | Declaration *SUPPLEMENTAL DECLARATION OF TAMI SIMS IN SUPPORT OF THE DEBTORS MOTION FOR PRELIMINARY INJUNCTION* (related document(s)<u>2</u>, <u>36</u>, <u>35</u>) filed by Shaya Rochester on behalf of Windstream Holdings, Inc., et al.. (Attachments: # <u>1</u> Exhibit 14) (Rochester, Shaya) (Entered: 05/10/2019) |
| 05/10/2019 | <u>50</u><br>(12 pgs; 3 docs) | **[Unredacted Document Filed Under Seal Pursuant to Order signed on 5/16/2019 (Related Doc. <u>62</u>) ]** Declaration *DECLARATION OF TIMOTHY WYATT IN SUPPORT OF DEBTORS REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION AND OTHER EQUITABLE RELIEF AGAINST CHARTER COMMUNICATIONS, INC. AND CHARTER COMMUNICATIONS OPERATING, LLC* (related document(s)<u>2</u>, <u>25</u>, <u>35</u>) filed by Shaya Rochester on behalf of Windstream Holdings, Inc., et al.. (Attachments: # <u>1</u> Exhibit A # <u>2</u> Exhibit B) (Rochester, Shaya) (Entered: 05/10/2019) |
| 05/10/2019 | <u>51</u><br>(20 pgs; 3 docs) | **[Unredacted Document Filed Under Seal Pursuant to Order signed on 5/16/2019 (Related Doc. <u>62</u>) ]** Declaration *DECLARATION OF SHONNE BANDY IN SUPPORT OF DEBTORS REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION AND OTHER EQUITABLE RELIEF AGAINST CHARTER COMMUNICATIONS, INC. AND CHARTER COMMUNICATIONS OPERATING, LLC* (related document(s)<u>2</u>, <u>25</u>, <u>35</u>) filed by Shaya Rochester on behalf of Windstream Holdings, Inc., et al.. (Attachments: # <u>1</u> Exhibit A # <u>2</u> Exhibit B) (Rochester, Shaya) (Entered: 05/10/2019) |
| 05/10/2019 | <u>52</u><br>(27 pgs; 3 docs) | Notice of Proposed Order *NOTICE OF FILING OF REVISED PROPOSED PRELIMINARY INJUNCTION ORDER AGAINST CHARTER COMMUNICATIONS, INC. AND CHARTER COMMUNICATIONS OPERATING, LLC* (related document(s)<u>2</u>, <u>31</u>, <u>25</u>) filed by Shaya Rochester on behalf of Windstream Holdings, Inc., et al.. (Attachments: # <u>1</u> Exhibit A # <u>2</u> Exhibit B)(Rochester, Shaya) (Entered: 05/10/2019) |
| 05/10/2019 | <u>53</u><br>(11 pgs; 2 docs) | Motion to File Under Seal *DEBTORS MOTION FOR LEAVE TO FILE UNDER SEAL PORTIONS OF (A) EXHIBITS ATTACHED TO* |

| | | |
|---|---|---|
| | | *DECLARATION OF BRIAN HOCKETT IN SUPPORT OF CHARTERS RESPONSE TO ORDER TO SHOW CAUSE, (B) DEBTORS REPLY IN SUPPORT OF PRELIMINARY INJUNCTION AGAINST CHARTER AND (C) DECLARATIONS OF TIMOTHY WYATT AND AND SHONNE BANDY IN SUPPORT OF DEBTORS REPLY* (related document(s)[47](#), [50](#), [51](#), [44](#)) filed by Shaya Rochester on behalf of Windstream Holdings, Inc., et al.. (Attachments: # [1](#) Exhibit A) (Rochester, Shaya) (Entered: 05/10/2019) |
| 05/10/2019 | [54](#)<br>(3 pgs) | Notice of Hearing *NOTICE OF HEARING ON DEBTORS MOTION FOR LEAVE TO FILE UNDER SEAL PORTIONS OF (A) EXHIBITS ATTACHED TO DECLARATION OF BRIAN HOCKETT IN SUPPORT OF CHARTERS RESPONSE TO ORDER TO SHOW CAUSE, (B) DEBTORS REPLY IN SUPPORT OF PRELIMINARY INJUNCTION AGAINST CHARTER AND (C) DECLARATIONS OF TIMOTHY WYATT AND SHONNE BANDY IN SUPPORT OF DEBTORS REPLY* (related document(s)[47](#), [53](#), [50](#), [51](#)) filed by Shaya Rochester on behalf of Windstream Holdings, Inc., et al.. (Rochester, Shaya) (Entered: 05/10/2019) |
| 05/11/2019 | [55](#)<br>(3 pgs) | Certificate of Service (related document(s)[46](#), [45](#), [40](#), [42](#), [41](#), [44](#)) filed by Brian W. Hockett on behalf of Charter Communications Operating, LLC, Charter Communications, Inc.. (Hockett, Brian) (Entered: 05/11/2019) |
| 05/13/2019 | [56](#)<br>(6 pgs) | So Ordered Stipulation Signed on 5/10/2019 Authorizing Intervention by the Official Committee of Unsecured Creditors in Adversary Proceeding No. 19-8246. (Li, Dorothy) (Entered: 05/13/2019) |
| 05/13/2019 | [57](#)<br>(13 pgs) | Declaration *of Latisha Truong* filed by Brian W. Hockett on behalf of Charter Communications Operating, LLC, Charter Communications, Inc.. (Hockett, Brian) (Entered: 05/13/2019) |
| 05/13/2019 | [58](#)<br>(7 pgs; 2 docs) | Motion to Seal *Declaration of Latisha Truong* filed by Brian W. Hockett on behalf of Charter Communications Operating, LLC, Charter Communications, Inc.. (Attachments: # [1](#) Proposed Order) (Hockett, Brian) (Entered: 05/13/2019) |
| 05/13/2019 | [59](#)<br>(19 pgs) | Affidavit of Service *re Documents Served on May 10, 2019* (related document(s)[47](#), [49](#), [53](#), [50](#), [52](#), [51](#), [48](#), [54](#)) filed by Kurtzman Carson Consultants LLC.(Kass, Albert) (Entered: 05/13/2019) |
| 05/14/2019 | [60](#)<br>(2 pgs) | Certificate of Service *for Interrogatory directed to Plaintiff Windstream Holdings, Inc.* filed by Brian W. Hockett on behalf of Charter Communications Operating, LLC, Charter Communications, Inc.. (Hockett, Brian) (Entered: 05/14/2019) |
| 05/16/2019 | [61](#)<br>(11 pgs) | Preliminary Injunction signed on 5/16/2019 Against Charter Communications, Inc. and Charter Communications Operating, LLC (Related Doc # [2](#)) . (Vargas, Ana) (Entered: 05/16/2019) |
| 05/16/2019 | [62](#)<br>(3 pgs) | Order On Debtors' Motion signed on 5/16/2019 for Leave to File Under Seal Portions of (A) Exhibit Attached to Declaration of Brian Hockett in Support of Charter's Response to Order to Show Cause, (B) Debtors' Reply in Support of Preliminary Injunction Against Charter and (C) Declarations of Timothy Wyatt and Shonne Bandy in Support of |

| | | |
|---|---|---|
| | | Debtors' Reply (Related Doc # 53) . (Vargas, Ana) (Entered: 05/16/2019) |
| 05/16/2019 | 63 (3 pgs) | Order on Debtors' Motion signed on 5/16/2019 for Leave To (I) File Under Seal Portions of (A) Debtors' Memorandum of Law in Support of Preliminary Injunction Against Charter Communications, Inc. and Charter Communications Operating, LLC and (B) Declaration of Tami sims in Support and (II) File Conditionally Under Seal Documents Designated by Charter (Related Doc # 38) . (Vargas, Ana) (Entered: 05/16/2019) |
| 05/16/2019 | 64 (18 pgs) | Affidavit of Service re Stipulation and Agreed Order Authorizing Intervention by the Official Committee of Unsecured Creditors in Adversary Proceeding No. 19-08246 (related document(s)56) filed by Kurtzman Carson Consultants LLC.(Kass, Albert) (Entered: 05/16/2019) |
| 05/17/2019 | 65 (16 pgs) | Affidavit of Service re 1) Preliminary Injunction Against Charter Communications, Inc. and Charter Communications Operating, LLC; 2) Order on Debtors' Motion for Leave to File Under Seal Portions of (A) Exhibit Attached to Declaration of Brian Hockett in Support of Charter's Response to Order to Show Cause, (B) Debtors' Reply in Support of Preliminary Injunction Against Charter and (C) Declarations of Timothy Wyatt and Shonne Bandy in Support of Debtors' Reply; and 3) Order on Debtors' Motion for Leave To (I) File Under Seal Portions of (A) Debtors' Memorandum of Law in Support of Preliminary Injunction Against Charter Communications, Inc. and Charter Communications Operating, LLC and (B) Declaration of Tami Sims in Support and (II) File Conditionally Under Seal Documents Designated by Charter (related document(s)63, 62, 61) filed by Kurtzman Carson Consultants LLC.(Kass, Albert) (Entered: 05/17/2019) |
| 05/17/2019 | 66 | **( This document was amended by document No. 83)** Transcript regarding Hearing Held on 05/14/19 At 10:21 AM RE: Debtors Motion For Leave To File Under Seal (A) Debtors' Memorandum And (B) Declaration Of Tami Sims (Document #38).; Motion To File Under Seal (Charter's Response) (Document #45).; Motion To File Under Seal (Debtors' Reply)(Document #53).; Etc. Remote electronic access to the transcript is restricted until 8/15/2019. The transcript may be viewed at the Bankruptcy Court Clerks Office. [Transcription Service Agency: Veritext Legal Solutions.]. (See the Courts Website for contact information for the Transcription Service Agency.) (RE: related document(s) 45, 53, 38, 25). Notice of Intent to Request Redaction Deadline Due By 5/24/2019. Statement of Redaction Request Due By 6/7/2019. Redacted Transcript Submission Due By 6/17/2019. Transcript access will be restricted through 8/15/2019. (Ramos, Jonathan) Modified on 7/2/2019 (Ortiz, Carmen). (Entered: 05/21/2019) |
| 05/22/2019 | 67 (3 pgs) | Order signed on 5/22/2019 Granting Charter Communications, Inc. and Charter Communications Operating, LLC's Motion to Seal Documents Filed with the Response to Order to Show Cause (Related Doc # 45) . (Vargas, Ana) (Entered: 05/22/2019) |
| 05/22/2019 | 68 (3 pgs) | Order signed on 5/22/2019 Granting Charter Communications, Inc. and Charter Communications Operating, LLC's Motion to Seal Declaration of Latisha Truong (Related Doc # 58) . (Vargas, Ana) (Entered: 05/22/2019) |

| | | |
|---|---|---|
| 05/24/2019 | [69](#)<br>(4 pgs) | Order to Show Cause Signed on 5/24/2019. Setting A Hearing With Respect to Holding Charter In Contempt for Violating the Court's Temporary Restraining Order and Sanctioning Charter For Violating Automatic Stay (related document(s)[2](#), [1](#)) with hearing to be held on 8/7/2019 at 10:00 AM at Courtroom 118, White Plains Courthouse (Li, Dorothy) (Entered: 05/24/2019) |
| 05/24/2019 | [70](#)<br>(2 pgs) | Certificate of Service (related document(s)[67](#), [68](#)) Filed by Brian W. Hockett on behalf of Charter Communications Operating, LLC, Charter Communications, Inc.. (Hockett, Brian) (Entered: 05/24/2019) |
| 05/29/2019 | [71](#)<br>(16 pgs) | Affidavit of Service *re Show Cause Order Setting a Hearing with Respect to Holding Charter in Contempt for Violating the Court's Temporary Restraining Order and Sanctioning Charter for Violating the Automatic Stay* (related document(s)[69](#)) filed by Kurtzman Carson Consultants LLC.(Kass, Albert) (Entered: 05/29/2019) |
| 06/06/2019 | [72](#)<br>(2 pgs) | Certificate of Service *re Charter Communications, Inc.'s Second Set of Requests for Production to Windstream Holdings, Inc.* Filed by Brian W. Hockett on behalf of Charter Communications Operating, LLC, Charter Communications, Inc.. (Hockett, Brian) (Entered: 06/06/2019) |
| 06/06/2019 | [73](#)<br>(2 pgs) | Certificate of Service *re Charter Communications, Inc.'s Second Set of Interrogatories to Windstream Holdings, Inc.* Filed by Brian W. Hockett on behalf of Charter Communications Operating, LLC, Charter Communications, Inc.. (Hockett, Brian) (Entered: 06/06/2019) |
| 06/07/2019 | [74](#)<br>(22 pgs) | Confidentiality Agreement and Stipulated Protective Order Signed on 6/7/2019. (Li, Dorothy) (Entered: 06/07/2019) |
| 06/10/2019 | [75](#)<br>(17 pgs) | Affidavit of Service *re: Confidentiality Agreement and Stipulated Protective Order* (related document(s)[74](#)) filed by Kurtzman Carson Consultants LLC.(Kass, Albert) (Entered: 06/10/2019) |
| 06/11/2019 | [76](#)<br>(11 pgs) | Status Report *JOINT RULE 26(F) REPORT* Filed by Shaya Rochester on behalf of Windstream Holdings, Inc., et al.. (Rochester, Shaya) (Entered: 06/11/2019) |
| 06/13/2019 | [77](#)<br>(2 pgs) | Scheduling and Pre-Trial Order signed on 6/13/2019. The Court will hold a final pretrial conference on December 12, 2019 at 10:00 AM at Courtroom 118, White Plains Courthouse. (Vargas, Ana) (Entered: 06/13/2019) |
| 06/14/2019 | [78](#)<br>(17 pgs) | Affidavit of Service *re: 1) Joint Rule 26(f) Report; and 2) Scheduling and Pre-Trial Order* (related document(s)[76](#), [77](#)) filed by Kurtzman Carson Consultants LLC.(Kass, Albert) (Entered: 06/14/2019) |
| 06/18/2019 | [79](#)<br>(2 pgs) | Certificate of Service *(Third Set of Interrogatories to Windstream Holdings, Inc.)* Filed by John Scott Kingston on behalf of Charter Communications Operating, LLC, Charter Communications, Inc.. (Kingston, John) (Entered: 06/18/2019) |
| 06/18/2019 | [83](#)<br>(111 pgs) | Transcript regarding Hearing Held on 05/14/19 At 10:21 AM RE: ( **Amends Doc # 66**) Debtors Motion For Leave To File Under Seal (A) Debtors' Memorandum And (B) Declaration Of Tami Sims (Document #38).; Motion To File Under Seal (Charter's Response) (Document |

| | | |
|---|---|---|
| | | #45).; Motion To File Under Seal (Debtors' Reply)(Document #53).; Etc.. Remote electronic access to the transcript is restricted until 9/16/2019. The transcript may be viewed at the Bankruptcy Court Clerks Office. [Transcription Service Agency: Veritext Legal Solutions.]. (See the Courts Website for contact information for the Transcription Service Agency.) (RE: related document(s) 45, 53, 38). Notice of Intent to Request Redaction Deadline Due By 6/25/2019. Statement of Redaction Request Due By 7/9/2019. Redacted Transcript Submission Due By 7/19/2019. Transcript access will be restricted through 9/16/2019. (Ramos, Jonathan) (Entered: 07/01/2019) |
| 06/19/2019 | 80 (2 pgs) | Certificate of Service *of Rule 26 Initial Disclosures* Filed by John Scott Kingston on behalf of Charter Communications Operating, LLC, Charter Communications, Inc.. (Kingston, John) (Entered: 06/19/2019) |
| 06/25/2019 | 81 (2 pgs) | Certificate of Service *re Notice of Deposition of Shonne Bandy* Filed by Brian W. Hockett on behalf of Charter Communications Operating, LLC, Charter Communications, Inc.. (Hockett, Brian) (Entered: 06/25/2019) |
| 06/27/2019 | 82 (2 pgs) | Certificate of Service *(Charter Communications, Inc.'s First Requests for Admission to Windstream Holdings, Inc.)* Filed by John Scott Kingston on behalf of Charter Communications Operating, LLC, Charter Communications, Inc.. (Kingston, John) (Entered: 06/27/2019) |
| 07/24/2019 | 84 (117 pgs) | Transcript regarding Hearing Held on 04/15/19 At 11:23 AM RE: Notice Of Agenda Revised Agenda For April 15, 2019 Hearing.; Debtors Motion For A Temporary Restraining Order, Preliminary Injunction, And Other Equitable Relief Against Charter Communications, Inc. And Charter Communications.; Supplemental Declaration Of Lewis Langston In Support Of Debtors Motion For A Temporary Restraining Order, Preliminary Injunction And Other Equitable Relief Against Charter Communications, Inc. And Charter Communications Operating, Llc (Related Document(s)2).; Etc. Remote electronic access to the transcript is restricted until 10/22/2019. The transcript may be viewed at the Bankruptcy Court Clerks Office. [Transcription Service Agency: Veritext Legal Solutions.]. (See the Courts Website for contact information for the Transcription Service Agency.) (RE: related document(s) 2). Notice of Intent to Request Redaction Deadline Due By 7/31/2019. Statement of Redaction Request Due By 8/14/2019. Redacted Transcript Submission Due By 8/26/2019. Transcript access will be restricted through 10/22/2019. (Ramos, Jonathan) (Entered: 08/05/2019) |
| 08/15/2019 | 85 (2 pgs) | Certificate of Service *(Charter Communication, Inc.'s Fourth Set of Interrogatories to Windstream Holdings, Inc.)* filed by John Scott Kingston on behalf of Charter Communications Operating, LLC, Charter Communications, Inc.. (Kingston, John) (Entered: 08/15/2019) |
| 08/15/2019 | 86 (2 pgs) | Certificate of Service *(Charter Communications, Inc.'s Third Set of Requests for Production to Windstream Holdings, Inc.)* filed by John Scott Kingston on behalf of Charter Communications Operating, LLC, Charter Communications, Inc.. (Kingston, John) (Entered: 08/15/2019) |
| 08/15/2019 | 87 (2 pgs) | Certificate of Service *(Charter Communications, Inc.'s Second Set of Requests for Admissions to Windstream Holdings, Inc.)* filed by John Scott Kingston on behalf of Charter Communications Operating, LLC, Charter Communications, Inc.. (Kingston, John) (Entered: 08/15/2019) |

| 08/15/2019 | [88](#)<br>(2 pgs) | Certificate of Service *(Charter Communications, Inc.'s Notice of Video Deposition Pursuant to FRCP 30(b)(6))* filed by John Scott Kingston on behalf of Charter Communications Operating, LLC, Charter Communications, Inc.. (Kingston, John) (Entered: 08/15/2019) |
|---|---|---|
| 08/15/2019 | [89](#)<br>(2 pgs) | Certificate of Service *(Notice of Deposition of Lewis Langston)* filed by John Scott Kingston on behalf of Charter Communications Operating, LLC, Charter Communications, Inc.. (Kingston, John) (Entered: 08/15/2019) |
| 08/20/2019 | [90](#)<br>(2 pgs) | Certificate of Service *(Notice of Deposition of Jerry Wayne Parrish)* filed by John Scott Kingston on behalf of Charter Communications Operating, LLC, Charter Communications, Inc.. (Kingston, John) (Entered: 08/20/2019) |
| 08/20/2019 | [91](#)<br>(2 pgs) | Certificate of Service *(Amended Notice of Deposition of Shonne Bandy)* filed by John Scott Kingston on behalf of Charter Communications Operating, LLC, Charter Communications, Inc.. (Kingston, John) (Entered: 08/20/2019) |
| 08/27/2019 | [92](#)<br>(2 pgs) | Certificate of Service *(Charter Communications, Inc.'s Third Set of Requests for Admissions to Windstream Holdings, Inc.)* filed by John Scott Kingston on behalf of Charter Communications Operating, LLC, Charter Communications, Inc.. (Kingston, John) (Entered: 08/27/2019) |
| 08/27/2019 | [93](#)<br>(2 pgs) | Certificate of Service *(Charter Communications, Inc.'s Fifth Set of Interrogatories to Windstream Holdings, Inc.)* filed by John Scott Kingston on behalf of Charter Communications Operating, LLC, Charter Communications, Inc.. (Kingston, John) (Entered: 08/27/2019) |
| 08/28/2019 | [94](#)<br>(34 pgs; 5 docs) | Letter *(Request for Telephonic Discovery Dispute Conference)* Filed by John Scott Kingston on behalf of Charter Communications Operating, LLC, Charter Communications, Inc.. (Attachments: # [1](#) Exhibit A # [2](#) Exhibit B # [3](#) Exhibit C # [4](#) Exhibit D)(Kingston, John) (Entered: 08/28/2019) |
| 08/29/2019 | [95](#)<br>(26 pgs) | Letter *Debtors' Response to Charters Request for Telephonic Discovery Dispute Conference* (related document(s)[94](#)) Filed by Shaya Rochester on behalf of Windstream Holdings, Inc., et al.. (Rochester, Shaya) (Entered: 08/29/2019) |
| 09/09/2019 | [96](#)<br>(21 pgs) | Letter *Request for Telephonic Discovery Dispute Conference* Filed by Shaya Rochester on behalf of Windstream Holdings, Inc., et al.. (Rochester, Shaya) (Entered: 09/09/2019) |
| 09/10/2019 | [97](#)<br>(8 pgs; 4 docs) | Ex Parte Motion to Seal *Certain Documents in Support of Charter's Response to Windstream Holding, Inc.'s Request for Telephonic Conference* filed by John Scott Kingston on behalf of Charter Communications Operating, LLC, Charter Communications, Inc.. (Attachments: # [1](#) Exhibit A # [2](#) Exhibit B # [3](#) Exhibit C) (Kingston, John) (Entered: 09/10/2019) |
| 09/10/2019 | [98](#)<br>(47 pgs; 6 docs) | Letter *Charter's Response to Windstream's Request for Telephonic Discovery Dispute Conference to Quash Subpoenas directed to KCC* (related document(s)[95](#)) Filed by John Scott Kingston on behalf of Charter Communications Operating, LLC, Charter Communications, |

| | | |
|---|---|---|
| | | Inc.. (Attachments: # <u>1</u> Exhibit A # <u>2</u> Exhibit B # <u>3</u> Exhibit C # <u>4</u> Exhibit D # <u>5</u> Exhibit E)(Kingston, John) (Entered: 09/10/2019) |
| 09/10/2019 | <u>99</u><br>(6 pgs) | Affidavit of Service *re: Letter to the Court by Terence P. Ross re: Request for Telephonic Discovery Conference* (related document(s)<u>96</u>) filed by Kurtzman Carson Consultants LLC.(Kass, Albert) (Entered: 09/10/2019) |
| 09/13/2019 | <u>100</u><br>(10 pgs; 6 docs) | Ex Parte Motion to Seal *Certain Documents in Support of Charter's Request for Telephonic Discovery Dispute Conference* filed by John Scott Kingston on behalf of Charter Communications Operating, LLC, Charter Communications, Inc.. (Attachments: # <u>1</u> Exhibit B # <u>2</u> Exhibit C # <u>3</u> Exhibit D # <u>4</u> Exhibit E # <u>5</u> Exhibit F) (Kingston, John) (Entered: 09/13/2019) |
| 09/13/2019 | <u>101</u><br>(75 pgs; 9 docs) | Letter *Charter's Request for Telephonic Discovery Dispute Conference* Filed by John Scott Kingston on behalf of Charter Communications Operating, LLC, Charter Communications, Inc.. (Attachments: # <u>1</u> Exhibit A # <u>2</u> Exhibit B # <u>3</u> Exhibit C # <u>4</u> Exhibit D # <u>5</u> Exhibit E # <u>6</u> Exhibit F # <u>7</u> Exhibit G # <u>8</u> Exhibit H)(Kingston, John) (Entered: 09/13/2019) |
| 09/16/2019 | <u>102</u><br>(4 pgs) | Letter *Debtors' Response to Charters Request for Telephonic Discovery Dispute Conference* (related document(s)<u>101</u>) Filed by Shaya Rochester on behalf of Windstream Holdings, Inc., et al.. (Rochester, Shaya) (Entered: 09/16/2019) |
| 09/18/2019 | <u>103</u><br>(6 pgs) | Affidavit of Service *re: Letter to the Court by Terence P. Ross re: Charter's Request for Telephonic Discovery Dispute Conference* (related document(s)<u>102</u>) filed by Kurtzman Carson Consultants LLC.(Kass, Albert) (Entered: 09/18/2019) |
| 10/09/2019 | <u>104</u><br>(2 pgs) | Motion to Withdraw the Reference *of Counts I through V of Windstream's Complaint* filed by John Scott Kingston on behalf of Charter Communications Operating, LLC, Charter Communications, Inc.. (Kingston, John) (Entered: 10/09/2019) |
| 10/09/2019 | | Receipt of Motion to Withdraw the Reference (fee)( <u>19-08246-rdd</u>) [motion,205] ( 181.00) Filing Fee. Receipt number B13464004. Fee amount 181.00. (Re: Doc # <u>104</u>) (U.S. Treasury) (Entered: 10/09/2019) |
| 10/09/2019 | <u>105</u><br>(114 pgs; 8 docs) | Memorandum of Law *in Support of Motion to Withdraw the Automatic Reference of Counts I through V of Windstream's Complaint* (related document(s)<u>104</u>) filed by John Scott Kingston on behalf of Charter Communications Operating, LLC, Charter Communications, Inc.. (Attachments: # <u>1</u> Exhibit 1 # <u>2</u> Exhibit 2 # <u>3</u> Exhibit 3 # <u>4</u> Exhibit 4 # <u>5</u> Exhibit 5 # <u>6</u> Exhibit 6 # <u>7</u> Exhibit 7) (Kingston, John) (Entered: 10/09/2019) |
| 10/10/2019 | <u>106</u><br>(2 pgs) | Civil Cover Sheet from U.S. District Court, Case Number: 1909354 Judge Kenneth M. Karas (related document(s)<u>104</u>) (Rouzeau, Anatin). (Entered: 10/10/2019) |
| 10/10/2019 | <u>107</u><br>(3 pgs) | Letter *Re: Request for Pre-Motion Conference Regarding Summary Judgment* (related document(s)<u>1</u>, <u>76</u>, <u>77</u>) Filed by Shaya Rochester on behalf of Windstream Holdings, Inc., et al.. (Rochester, Shaya) (Entered: 10/10/2019) |

| | | |
|---|---|---|
| 10/14/2019 | [108](#)<br>(17 pgs) | Affidavit of Service *re: Letter to the Court re: Request for Pre-Motion Conference Regarding Summary Judgment* (related document(s)[107](#)) filed by Kurtzman Carson Consultants LLC.(Kass, Albert) (Entered: 10/14/2019) |
| 10/14/2019 | [109](#)<br>(7 pgs) | Motion to Dismiss Adversary Proceeding *(Motion for Judgment on the Pleadings on Count VI and Motion to Dismiss Count VII for Lack of Subject Matter Jurisdiction)* filed by John Scott Kingston on behalf of Charter Communications Operating, LLC, Charter Communications, Inc.. with hearing to be held on 12/18/2019 at 10:00 AM at Courtroom TBA, White Plains Courthouse (RDD) Responses due by 12/11/2019, (Kingston, John) (Entered: 10/14/2019) |
| 10/14/2019 | [110](#)<br>(3 pgs) | Notice of Hearing (related document(s)[109](#)) filed by John Scott Kingston on behalf of Charter Communications Operating, LLC, Charter Communications, Inc.. with hearing to be held on 12/18/2019 at 10:00 AM at Courtroom TBA, White Plains Courthouse (RDD) (Kingston, John) (Entered: 10/14/2019) |
| 10/14/2019 | [111](#)<br>(2 pgs) | Letter *re Windstream's Request for Pre-Motion Conference re Summary Judgment* Filed by John Scott Kingston on behalf of Charter Communications Operating, LLC, Charter Communications, Inc.. (Kingston, John) (Entered: 10/14/2019) |
| 10/22/2019 | [112](#)<br>(4 pgs) | Letter *REQUEST FOR TELEPHONIC DISCOVERY DISPUTE CONFERENCE* (related document(s)[76](#)) Filed by Shaya Rochester on behalf of Windstream Holdings, Inc., et al.. (Rochester, Shaya) (Entered: 10/22/2019) |
| 10/23/2019 | [113](#)<br>(122 pgs; 4 docs) | Letter *Charter's Response to Windstream's October 22, 2019 Request for Teleconference* (related document(s)[112](#)) Filed by John Scott Kingston on behalf of Charter Communications Operating, LLC, Charter Communications, Inc.. (Attachments: # [1](#) Exhibit 1 # [2](#) Exhibit 2 # [3](#) Exhibit 3)(Kingston, John) (Entered: 10/23/2019) |
| 10/30/2019 | [114](#)<br>(5 pgs) | Notice of Withdrawal *of Affirmative Defense* filed by John Scott Kingston on behalf of Charter Communications Operating, LLC, Charter Communications, Inc.. (Kingston, John) (Entered: 10/30/2019) |
| 11/15/2019 | [115](#)<br>(5 pgs) | Motion to Approve *Defendants Charter Communications, Inc. and Charter Communications Operating, LLC's Motion to Exclude the Testimony of John C. Jarosz* filed by John Scott Kingston on behalf of Charter Communications Operating, LLC, Charter Communications, Inc. with hearing to be held on 12/18/2019 at 10:00 AM at Courtroom TBA, White Plains Courthouse (RDD) Responses due by 12/11/2019,. (Kingston, John) (Entered: 11/15/2019) |
| 11/15/2019 | [116](#)<br>(35 pgs) | Memorandum of Law *Defendants Charter Communications, Inc. and Charter Communications Operating, LLC's Memorandum in Support of Motion to Exclude the Testimony of John C. Jarosz* (related document(s)[115](#)) filed by John Scott Kingston on behalf of Charter Communications Operating, LLC, Charter Communications, Inc.. Objections due by 12/11/2019, (Kingston, John) (Entered: 11/15/2019) |
| 11/15/2019 | [117](#)<br>(270 pgs; 17 docs) | Declaration *of Brian Hockett in Support of Defendants Charter Communications, Inc. and Charter Communications Operating, LLC's* |

| | | |
|---|---|---|
| | | *Motion to Exclude the Testimony of John C. Jarosz* (related document(s)115) filed by John Scott Kingston on behalf of Charter Communications Operating, LLC, Charter Communications, Inc.. (Attachments: # 1 Exhibit 1 # 2 Exhibit 2 # 3 Exhibit 3 # 4 Exhibit 4 # 5 Exhibit 5 # 6 Exhibit 6 # 7 Exhibit 7 # 8 Exhibit 8 # 9 Exhibit 9 # 10 Exhibit 10 # 11 Exhibit 11 # 12 Exhibit 12 # 13 Exhibit 13 # 14 Exhibit 14 # 15 Exhibit 15 # 16 Exhibit 16) (Kingston, John) (Entered: 11/15/2019) |
| 11/15/2019 | 118 (68 pgs; 10 docs) | Motion to Seal *Defendants Charter Communications, Inc. and Charter Communications Operating, LLC's Ex-Parte Motion to Seal Documents Filed in Connection with their Motion to Exclude the Testimony of John C. Jarosz* (related document(s)115) filed by John Scott Kingston on behalf of Charter Communications Operating, LLC, Charter Communications, Inc.. with hearing to be held on 12/18/2019 at 10:00 AM at Courtroom TBA, White Plains Courthouse (RDD) Objections due by 12/11/2019, (Attachments: # 1 Proposed Order # 2 Redacted Memorandum in Support of Motion to Exclude Testimony of J. Jarosz # 3 Exhibit 1 # 4 Exhibit 4 # 5 Exhibit 5 # 6 Exhibit 11 # 7 Exhibit 12 # 8 Exhibit 13 # 9 Exhibit 15) (Kingston, John) (Entered: 11/15/2019) |
| 11/15/2019 | 119 (4 pgs) | Notice of Hearing *on Defendants Charter Communications, Inc. and Charter Communications Operating, LLC's Motion to Exclude the Testimony of John C. Jarosz* filed by John Scott Kingston on behalf of Charter Communications Operating, LLC, Charter Communications, Inc.. with hearing to be held on 12/18/2019 at 10:00 AM at Courtroom TBA, White Plains Courthouse (RDD) (Kingston, John) (Entered: 11/15/2019) |
| 11/15/2019 | 120 (4 pgs) | Notice of Hearing *on Defendants Charter Communications, Inc. and Charter Communications Operating, LLC's Ex-Parte Motion to Seal Documents filed in Connection with their Motion to Exclude the Testimony of John C. Jarosz* filed by John Scott Kingston on behalf of Charter Communications Operating, LLC, Charter Communications, Inc.. with hearing to be held on 12/18/2019 at 10:00 AM at Courtroom TBA, White Plains Courthouse (RDD) (Kingston, John) (Entered: 11/15/2019) |
| 11/15/2019 | 121 (266 pgs; 11 docs) | Response to Motion *Defendant Charter Communications, Inc. and Charter Communications Operating, LLC's Memorandum in Opposition to Motion to Strike the Rebuttal Expert Reports of Robert Borders and Dr. Henry Osterberg* filed by John Scott Kingston on behalf of Charter Communications Operating, LLC, Charter Communications, Inc.. (Attachments: # 1 Exhibit 1 # 2 Exhibit 2 # 3 Exhibit 3 # 4 Exhibit 4 # 5 Exhibit 5 # 6 Exhibit 6 # 7 Exhibit 7 # 8 Exhibit 8 # 9 Exhibit 9 # 10 Exhibit 10) (Kingston, John) (Entered: 11/15/2019) |
| 11/15/2019 | 122 (12 pgs) | Motion for Summary Judgment *DEBTORS MOTION FOR SUMMARY JUDGMENT OF LIABILITY ON ALL COUNTS* (related document(s)1) filed by Shaya Rochester on behalf of Windstream Holdings, Inc., et al.. (Rochester, Shaya) (Entered: 11/15/2019) |
| 11/15/2019 | 123 (42 pgs) | Memorandum of Law *DEBTORS MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT OF LIABILITY ON ALL COUNTS* (related document(s)122) filed by Shaya Rochester on behalf of Windstream Holdings, Inc., et al.. (Rochester, Shaya) (Entered: 11/15/2019) |

| 11/15/2019 | [124](#)<br>(15 pgs) | Statement of Undisputed Facts *DEBTORS STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT OF LIABILITY ON ALL COUNTS* Filed by Shaya Rochester on behalf of Windstream Holdings, Inc., et al.. (Rochester, Shaya) (Entered: 11/15/2019) |
|---|---|---|
| 11/15/2019 | [125](#)<br>(137 pgs; 2 docs) | **[Unredacted Document Filed Under Seal Pursuant to Order signed on 12/23/2019 (Related Doc. [183](#)) ]** Declaration *DECLARATION OF JEFFREY H. AUMAN IN SUPPORT OF THE DEBTORS MOTION FOR SUMMARY JUDGMENT OF LIABILITY ON ALL COUNTS* (related document(s)[122](#)) filed by Shaya Rochester on behalf of Windstream Holdings, Inc., et al.. (Attachments: # [1](#) Exhibit 1) (Rochester, Shaya) (Entered: 11/15/2019) |
| 11/15/2019 | [126](#)<br>(9 pgs; 2 docs) | **[Unredacted Document Filed Under Seal Pursuant to Order signed on 12/23/2019 (Related Doc. [183](#)) ]** Declaration *DECLARATION OF PAUL STRICKLAND, JR. IN SUPPORT OF THE DEBTORS MOTION FOR SUMMARY JUDGMENT OF LIABILITY ON ALL COUNTS* (related document(s)[122](#)) filed by Shaya Rochester on behalf of Windstream Holdings, Inc., et al.. (Attachments: # [1](#) Exhibits 1 - 37) (Rochester, Shaya) (Entered: 11/15/2019) |
| 11/15/2019 | [127](#)<br>(349 pgs; 15 docs) | **[Unredacted Document Filed Under Seal Pursuant to Order signed on 12/23/2019 (Related Doc. [183](#)) ]** Declaration *DECLARATION OF GRACE A. THOMPSON IN SUPPORT OF THE DEBTORS MOTION FOR SUMMARY JUDGMENT OF LIABILITY ON ALL COUNTS* (related document(s)[122](#)) filed by Shaya Rochester on behalf of Windstream Holdings, Inc., et al.. (Attachments: # [1](#) Exhibit 1 # [2](#) Exhibit 2 - Part 1 of 6 # [3](#) Exhibit 2 Part 2 of 6 # [4](#) Exhibit 2 Part 3 of 6 # [5](#) Exhibit 2 Part 4 of 6 # [6](#) Exhibit 2 Part 5 of 6 # [7](#) Exhibit 2 Part 6 of 6 # [8](#) Exhibit 3 # [9](#) Exhibit 4 # [10](#) Exhibit 5 # [11](#) Exhibit 6 # [12](#) Exhibit 7 # [13](#) Exhibit 8 # [14](#) Exhibit 9) (Rochester, Shaya) (Entered: 11/15/2019) |
| 11/15/2019 | [128](#)<br>(16 pgs) | Motion to Seal *DEBTORS MOTION FOR LEAVE TO FILE UNDER SEAL CERTAIN PORTIONS OF (A) DEBTORS MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT OF LIABILITY ON ALL COUNTS; (B) DEBTORS STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT THEREOF; AND (C) CERTAIN EXHIBITS TO THE DECLARATIONS OF JEFFREY H. AUMAN, PAUL STRICKLAND, JR., AND GRACE A. THOMPSON* (related document(s)[126](#), [125](#), [127](#), [124](#), [123](#)) filed by Shaya Rochester on behalf of Windstream Holdings, Inc., et al.. (Rochester, Shaya) (Entered: 11/15/2019) |
| 11/15/2019 | [129](#)<br>(4 pgs) | Motion for Summary Judgment *Defendant Charter Communications, Inc. and Charter Communications Operating, LLC Motion for Summary Judgment* filed by John Scott Kingston on behalf of Charter Communications Operating, LLC, Charter Communications, Inc.. with hearing to be held on 12/18/2019 at 10:00 AM at Courtroom TBA, White Plains Courthouse (RDD) Responses due by 12/6/2019, (Kingston, John) (Entered: 11/15/2019) |
| 11/15/2019 | [130](#)<br>(45 pgs) | Memorandum of Law *Defendants Charter Communications, Inc. and Charter Communications Operating, LLC Memorandum in Support of Summary Judgment* (related document(s)[129](#)) filed by John Scott Kingston on behalf of Charter Communications Operating, LLC, |

| | | |
|---|---|---|
| | | Charter Communications, Inc.. Objections due by 12/6/2019, Reply due by 12/13/2019, (Kingston, John) (Entered: 11/15/2019) |
| 11/15/2019 | [131](#) (100 pgs) | Statement of Undisputed Facts *in Support of Defendants' Motion for Summary Judgment* Filed by John Scott Kingston on behalf of Charter Communications Operating, LLC, Charter Communications, Inc.. with hearing to be held on 12/18/2019 at 10:00 AM at Courtroom TBA, White Plains Courthouse (RDD) Objections due by 12/6/2019, (Kingston, John) (Entered: 11/15/2019) |
| 11/15/2019 | [132](#) (920 pgs; 63 docs) | Declaration *of Brian Hockett in Support of Defendants Charter Communications, Inc. and Charter Communications Operating, LLC's Motion for Summary Judgment* (related document(s)[129](#)) filed by John Scott Kingston on behalf of Charter Communications Operating, LLC, Charter Communications, Inc.. with hearing to be held on 12/18/2019 at 10:00 AM at Courtroom TBA, White Plains Courthouse (RDD) Objections due by 12/6/2019, Reply due by 12/13/2019, (Attachments: # [1](#) Exhibit 1 # [2](#) Exhibit 2 # [3](#) Exhibit 3 # [4](#) Exhibit 4 # [5](#) Exhibit 5 # [6](#) Exhibit 6 # [7](#) Exhibit 7 # [8](#) Exhibit 8 # [9](#) Exhibit 9 # [10](#) Exhibit 10 # [11](#) Exhibit 11 # [12](#) Exhibit 12 # [13](#) Exhibit 13 # [14](#) Exhibit 14 # [15](#) Exhibit 15 # [16](#) Exhibit 16 # [17](#) Exhibit 17 # [18](#) Exhibit 18 # [19](#) Exhibit 19 # [20](#) Exhibit 20 # [21](#) Exhibit 21 # [22](#) Exhibit 22 # [23](#) Exhibit 23 # [24](#) Exhibit 24 # [25](#) Exhibit 25 # [26](#) Exhibit 26 # [27](#) Exhibit 27 # [28](#) Exhibit 28 # [29](#) Exhibit 29 # [30](#) Exhibit 30 # [31](#) Exhibit 31 # [32](#) Exhibit 32 # [33](#) Exhibit 33 # [34](#) Exhibit 34 # [35](#) Exhibit 35 # [36](#) Exhibit 36 # [37](#) Exhibit 37 # [38](#) Exhibit 38 # [39](#) Exhibit 39 # [40](#) Exhibit 40 # [41](#) Exhibit 41 # [42](#) Exhibit 42 # [43](#) Exhibit 43 # [44](#) Exhibit 44 # [45](#) Exhibit 45 # [46](#) Exhibit 46 # [47](#) Exhibit 47 # [48](#) Exhibit 48 # [49](#) Exhibit 49 # [50](#) Exhibit 50 # [51](#) Exhibit 51 # [52](#) Exhibit 52 # [53](#) Exhibit 53 # [54](#) Exhibit 54 # [55](#) Exhibit 55 # [56](#) Exhibit 56 # [57](#) Exhibit 57 # [58](#) Exhibit 58 # [59](#) Exhibit 59 # [60](#) Exhibit 60 # [61](#) Exhibit 61 # [62](#) Exhibit 62) (Kingston, John) (Entered: 11/15/2019) |
| 11/15/2019 | [133](#) (172 pgs; 22 docs) | Motion to Seal *Defendants Charter Communications, Inc. and Charter Communications Operating, LLC's Ex-Parte Motion to Seal Documents Filed in Connection with their Motion for Summary Judgment* (related document(s)[131](#), [129](#), [130](#), [132](#)) filed by John Scott Kingston on behalf of Charter Communications Operating, LLC, Charter Communications, Inc.. with hearing to be held on 12/18/2019 at 10:00 AM at Courtroom TBA, White Plains Courthouse (RDD) (Attachments: # [1](#) Proposed Order # [2](#) Redacted Memorandum in Support of Motion for Summary Judgment # [3](#) Redacted Statement of Facts # [4](#) Exhibit 1 # [5](#) Exhibit 2 # [6](#) Exhibit 4 # [7](#) Exhibit 8 # [8](#) Exhibit 11 # [9](#) Exhibit 13 # [10](#) Exhibit 15 # [11](#) Exhibit 16 # [12](#) Exhibit 17 # [13](#) Exhibit 19 # [14](#) Exhibit 21 # [15](#) Exhibit 23 # [16](#) Exhibit 31 # [17](#) Exhibit 51 # [18](#) Exhibit 55 # [19](#) Exhibit 57 # [20](#) Exhibit 59 # [21](#) Exhibit 62) (Kingston, John) (Entered: 11/15/2019) |
| 11/15/2019 | [134](#) (4 pgs) | Notice of Hearing *on Defendants Charter Communications, Inc. and Charter Communications Operating, LLC's Motion for Summary Judgment* (related document(s)[129](#)) filed by John Scott Kingston on behalf of Charter Communications Operating, LLC, Charter Communications, Inc.. with hearing to be held on 12/18/2019 at 10:00 AM at Courtroom TBA, White Plains Courthouse (RDD) (Kingston, John) (Entered: 11/15/2019) |
| 11/15/2019 | [135](#) (4 pgs) | Notice of Hearing *on Defendants Charter Communications, Inc. and Charter Communications Operating, LLC's Ex-Parte Motion to Seal Documents Filed in Connection with their Motion for Summary* |

| | | |
|---|---|---|
| | | *Judgment* (related document(s)133) filed by John Scott Kingston on behalf of Charter Communications Operating, LLC, Charter Communications, Inc.. with hearing to be held on 12/18/2019 at 10:00 AM at Courtroom TBA, White Plains Courthouse (RDD) (Kingston, John) (Entered: 11/15/2019) |
| 11/18/2019 | 136<br>(2 pgs) | Letter *Request for Telephonic Conference* (related document(s)131) Filed by Shaya Rochester on behalf of Windstream Holdings, Inc., et al.. (Rochester, Shaya) (Entered: 11/18/2019) |
| 11/19/2019 | 137<br>(17 pgs) | Affidavit of Service *re: Documents Served on November 15, 2019* (related document(s)122, 124, 123, 128, 127, 126, 125) filed by Kurtzman Carson Consultants LLC.(Kass, Albert) (Entered: 11/19/2019) |
| 11/19/2019 | 138<br>(3 pgs) | Letter *Charter's Response to Windstream's Request for Telephonic Conference Regarding Charter's Undisputed Facts* Filed by Brian W. Hockett on behalf of Charter Communications Operating, LLC, Charter Communications, Inc.. (Hockett, Brian) (Entered: 11/19/2019) |
| 11/21/2019 | 139<br>(17 pgs) | Affidavit of Service *re: Letter to the Court by Terence P. Ross re: Request for Telephonic Conference* (related document(s)136) filed by Kurtzman Carson Consultants LLC.(Kass, Albert) (Entered: 11/21/2019) |
| 12/06/2019 | 140<br>(36 pgs) | Response to Motion *(Defendants' Response to Debtors' Statement of Facts)* filed by John Scott Kingston on behalf of Charter Communications Operating, LLC, Charter Communications, Inc.. (Kingston, John) (Entered: 12/06/2019) |
| 12/06/2019 | 141<br>(67 pgs; 10 docs) | Declaration *of Brian Hockett in Support of Defendants Charter Communications, Inc. and Charter Communications Operating, LLC's Response to Debtors' Statement of Facts* filed by John Scott Kingston on behalf of Charter Communications Operating, LLC, Charter Communications, Inc.. (Attachments: # 1 Exhibit 1 # 2 Exhibit 2 # 3 Exhibit 3 # 4 Exhibit 4 # 5 Exhibit 5 # 6 Exhibit 6 # 7 Exhibit 7 # 8 Exhibit 8 # 9 Exhibit 9) (Kingston, John) (Entered: 12/06/2019) |
| 12/06/2019 | 142<br>(27 pgs; 21 docs) | Motion to Seal *(Defendants' Ex-Parte Motion to Seal Documents Filed in Connection with their Memorandum in Opposition to Debtors' Motion for Partial Summary Judgment)* filed by John Scott Kingston on behalf of Charter Communications Operating, LLC, Charter Communications, Inc.. with hearing to be held on 12/18/2019 at 10:00 AM at Courtroom TBA, White Plains Courthouse (RDD) (Attachments: # 1 Proposed Order # 2 Exhibit 1 # 3 Exhibit 2 # 4 Exhibit 3 # 5 Exhibit 4 # 6 Exhibit 8 # 7 Exhibit 11 # 8 Exhibit 13 # 9 Exhibit 15 # 10 Exhibit 16 # 11 Exhibit 17 # 12 Exhibit 19 # 13 Exhibit 21 # 14 Exhibit 23 # 15 Exhibit 31 # 16 Exhibit 51 # 17 Exhibit 55 # 18 Exhibit 57 # 19 Exhibit 59 # 20 Exhibit 62) (Kingston, John) (Entered: 12/06/2019) |
| 12/06/2019 | 143<br>(3 pgs) | Notice of Hearing *on Defendants' Motion to Seal Documents filed in Connection with their Memorandum in Opposition to Debtors' Motion for Partial Summary Judgment* (related document(s)142) filed by John Scott Kingston on behalf of Charter Communications Operating, LLC, Charter Communications, Inc.. with hearing to be held on 12/18/2019 at 10:00 AM at Courtroom TBA, White Plains Courthouse (RDD) (Kingston, John) (Entered: 12/06/2019) |

| | | |
|---|---|---|
| 12/06/2019 | [144](#)<br>(47 pgs) | **[Unredacted Document Filed Under Seal Pursuant to Order signed on 12/23/2019 (Related Doc. 182) ]** Memorandum of Law *DEBTORS MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS MOTION FOR SUMMARY JUDGMENT* (related document(s)129) filed by Shaya Rochester on behalf of Windstream Holdings, Inc., et al.. (Rochester, Shaya) (Entered: 12/06/2019) |
| 12/06/2019 | [145](#)<br>(30 pgs) | **[Unredacted Document Filed Under Seal Pursuant to Order signed on 12/23/2019 (Related Doc. 182) ]** Response to Motion *DEBTORS RESPONSE TO DEFENDANTS STATEMENT OF UNCONTROVERTED MATERIAL FACTS* filed by Shaya Rochester on behalf of Windstream Holdings, Inc., et al.. (Rochester, Shaya) (Entered: 12/06/2019) |
| 12/06/2019 | [146](#)<br>(20 pgs; 10 docs) | **[Unredacted Document Filed Under Seal Pursuant to Order signed on 12/23/2019 (Related Doc. 182) ]** Declaration *DECLARATION OF GRACE A. THOMPSON* filed by Shaya Rochester on behalf of Windstream Holdings, Inc., et al.. (Attachments: # 1 Exhibit 1 # 2 Exhibit 2 # 3 Exhibit 3 # 4 Exhibit 4 # 5 Exhibit 5 # 6 Exhibit 6 # 7 Exhibit 7 # 8 Exhibit 8 # 9 Exhibit 9) (Rochester, Shaya) (Entered: 12/06/2019) |
| 12/06/2019 | [147](#)<br>(7 pgs; 2 docs) | **[Unredacted Document Filed Under Seal Pursuant to Order signed on 12/23/2019 (Related Doc. 182) ]** Declaration *DECLARATION OF JEFFREY H. AUMAN IN SUPPORT OF THE DEBTORS OPPOSITION TO DEFENDANTS MOTION FOR SUMMARY JUDGMENT* filed by Shaya Rochester on behalf of Windstream Holdings, Inc., et al.. (Attachments: # 1 Exhibit 1) (Rochester, Shaya) (Entered: 12/06/2019) |
| 12/06/2019 | [148](#)<br>(6 pgs) | **[Unredacted Document Filed Under Seal Pursuant to Order signed on 12/23/2019 (Related Doc. 182) ]** Declaration *DECLARATION OF JOHN C. JAROSZ IN SUPPORT OF DEBTORS OPPOSITION TO DEFENDANTS MOTION FOR SUMMARY JUDGMENT* filed by Shaya Rochester on behalf of Windstream Holdings, Inc., et al.. (Rochester, Shaya) (Entered: 12/06/2019) |
| 12/06/2019 | [149](#)<br>(6 pgs) | Motion to Join / *Joinder of the Official Committee of Unsecured Creditors to the Debtors' Opposition to Charter's Motion for Summary Judgment* (related document(s)130, 144) filed by Lorenzo Marinuzzi on behalf of Official Committee of Unsecured Creditors. (Marinuzzi, Lorenzo) (Entered: 12/06/2019) |
| 12/06/2019 | [150](#)<br>(12 pgs) | Statement *DEBTORS MOTION FOR LEAVE TO FILE REBUTTAL EXPERT REPORT* filed by Shaya Rochester on behalf of Windstream Holdings, Inc., et al.. (Rochester, Shaya) (Entered: 12/06/2019) |
| 12/06/2019 | [151](#)<br>(16 pgs; 3 docs) | Motion to File Under Seal / *The Committee's Motion for Leave to File Under Seal Certain Portions of the Committee's Joinder to the Debtors' Opposition to Charter's Motion for Summary Judgment* (related document(s)149) filed by Lorenzo Marinuzzi on behalf of Official Committee of Unsecured Creditors with hearing to be held on 12/18/2019 at 10:00 AM at Courtroom TBA, White Plains Courthouse (RDD) Responses due by 12/11/2019,. (Attachments: # 1 Notice of Motion # 2 Exhibit A - Proposed Order) (Marinuzzi, Lorenzo) (Entered: 12/06/2019) |
| 12/06/2019 | [152](#) | Memorandum of Law *DEBTORS MEMORANDUM OF LAW IN* |

| | | |
|---|---|---|
| | (7 pgs) | *SUPPORT OF THEIR MOTION FOR LEAVE TO FILE A REBUTTAL EXPERT REPORT* filed by Shaya Rochester on behalf of Windstream Holdings, Inc., et al.. (Rochester, Shaya) (Entered: 12/06/2019) |
| 12/06/2019 | 153 (826 pgs; 58 docs) | Declaration *of Brian Hockett in Support of Defendants Charter Communications, Inc. and Charter Communications Operating, LLC's Memorandum in Opposition to Debtors' Motion for Partial Summary Judgment* filed by John Scott Kingston on behalf of Charter Communications Operating, LLC, Charter Communications, Inc.. (Attachments: # 1 Exhibit 1 # 2 Exhibit 2 # 3 Exhibit 3 # 4 Exhibit 4 # 5 Exhibit 5 # 6 Exhibit 6 # 7 Exhibit 7 # 8 Exhibit 8 # 9 Exhibit 9 # 10 Exhibit 10 # 11 Exhibit 11 # 12 Exhibit 12 # 13 Exhibit 13 # 14 Exhibit 14 # 15 Exhibit 15 # 16 Exhibit 16 # 17 Exhibit 17 # 18 Exhibit 18 # 19 Exhibit 19 # 20 Exhibit 20 # 21 Exhibit 21 # 22 Exhibit 22 # 23 Exhibit 23 # 24 Exhibit 24 # 25 Exhibit 25 # 26 Exhibit 26 # 27 Exhibit 27 # 28 Exhibit 28 # 29 Exhibit 29 # 30 Exhibit 30 # 31 Exhibit 31 # 32 Exhibit 32 # 33 Exhibit 33 # 34 Exhibit 34 # 35 Exhibit 35 # 36 Exhibit 36 # 37 Exhibit 39 # 38 Exhibit 41 # 39 Exhibit 42 # 40 Exhibit 43 # 41 Exhibit 44 # 42 Exhibit 44 # 43 Exhibit 46 # 44 Exhibit 47 # 45 Exhibit 48 # 46 Exhibit 49 # 47 Exhibit 50 # 48 Exhibit 51 # 49 Exhibit 52 # 50 Exhibit 53 # 51 Exhibit 54 # 52 Exhibit 55 # 53 Exhibit 56 # 54 Exhibit 57 # 55 Exhibit 58 # 56 Exhibit 59 # 57 Exhibit 62) (Kingston, John) (Entered: 12/06/2019) |
| 12/06/2019 | 154 (212 pgs) | **[Unredacted Document Filed Under Seal Pursuant to Order signed on 12/23/2019 (Related Doc. 182) ]** Declaration *EXPERT DECLARATION OF SARAH BUTLER* filed by Shaya Rochester on behalf of Windstream Holdings, Inc., et al.. (Rochester, Shaya) (Entered: 12/06/2019) |
| 12/06/2019 | 155 (10 pgs) | Statement *DEBTORS MOTION TO EXCLUDE THE REBUTTAL EXPERT REPORT OF HENRY D. OSTBERG* filed by Shaya Rochester on behalf of Windstream Holdings, Inc., et al.. (Rochester, Shaya) (Entered: 12/06/2019) |
| 12/06/2019 | 156 (25 pgs) | Memorandum of Law *DEBTORS MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION TO EXCLUDE THE REBUTTAL EXPERT REPORT OF HENRY D. OSTBERG* filed by Shaya Rochester on behalf of Windstream Holdings, Inc., et al.. (Rochester, Shaya) (Entered: 12/06/2019) |
| 12/06/2019 | 157 (50 pgs) | Memorandum of Law *in Opposition to Debtors' Motion for Partial Summary Judgment* (related document(s)122) filed by John Scott Kingston on behalf of Charter Communications Operating, LLC, Charter Communications, Inc.. (Kingston, John) (Entered: 12/06/2019) |
| 12/06/2019 | 158 (22 pgs) | Statement of Undisputed Fact *(Defendants' Statement of Additional Facts)* filed by John Scott Kingston on behalf of Charter Communications Operating, LLC, Charter Communications, Inc.. with hearing to be held on 12/18/2019 at 10:00 AM at Courtroom TBA, White Plains Courthouse (RDD) (Kingston, John) (Entered: 12/06/2019) |
| 12/06/2019 | 159 (16 pgs) | Motion to Seal *DEBTORS MOTION FOR LEAVE TO FILE UNDER SEAL CERTAIN PORTIONS OF (A) DEBTORS MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS MOTION FOR SUMMARY JUDGMENT, (B) DEBTORS RESPONSE TO DEFENDANTS STATEMENT OF UNCONTROVERTED MATERIAL FACTS (C)* |

| | | |
|---|---|---|
| | | *CERTAIN EXHIBITS TO THE DECLARATION OF GRACE A. THOMPSON, (D) DECLARATION OF JEFFREY H. AUMAN IN SUPPORT OF THE DEBTORS OPPOSITION TO DEFENDANTS MOTION FOR SUMMARY JUDGMENT, AND (E) EXPERT DECLARATION OF SARAH BUTLER* filed by Shaya Rochester on behalf of Windstream Holdings, Inc., et al.. (Rochester, Shaya) (Entered: 12/06/2019) |
| 12/06/2019 | [160](#) (16 pgs) | Motion to Seal *DEBTORS MOTION FOR LEAVE TO FILE UNDER SEAL DEBTORS MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION TO EXCLUDE THE REBUTTAL EXPERT REPORT OF HENRY D. OSTBERG* filed by Shaya Rochester on behalf of Windstream Holdings, Inc., et al.. (Rochester, Shaya) (Entered: 12/06/2019) |
| 12/11/2019 | [161](#) (15 pgs) | Opposition *DEBTORS OPPOSITION TO DEFENDANTS MOTION FOR JUDGMENT ON THE PLEADINGS ON COUNT VI AND MOTION TO DISMISS COUNT VII FOR LACK OF SUBJECT MATTER JURISDICTION* (related document(s)[109](#)) filed by Shaya Rochester on behalf of Windstream Holdings, Inc., et al.. (Rochester, Shaya) (Entered: 12/11/2019) |
| 12/11/2019 | [162](#) (10 pgs) | Declaration *DECLARATION OF GRACE A. THOMPSON IN SUPPORT OF DEBTORS OPPOSITION TO DEFENDANTS MOTION FOR JUDGMENT ON THE PLEADINGS ON COUNT VI AND MOTION TO DISMISS COUNT VII FOR LACK OF SUBJECT MATTER JURISDICTION* (related document(s)[161](#)) filed by Shaya Rochester on behalf of Windstream Holdings, Inc., et al.. (Rochester, Shaya) (Entered: 12/11/2019) |
| 12/11/2019 | [163](#) (5 pgs) | Statement / *Joinder of the Official Committee of Unsecured Creditors to the Debtors' Opposition to Defendants' Motion for Summary Judgment on the Pleadings on Count VI and Motion to Dismiss Count VII for Lack of Subject Matter Jurisdiction* (related document(s)[109](#), [161](#)) filed by Lorenzo Marinuzzi on behalf of Official Committee of Unsecured Creditors. (Marinuzzi, Lorenzo) (Entered: 12/11/2019) |
| 12/11/2019 | [164](#) (30 pgs) | Opposition Brief *DEBTORS MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS MOTION TO EXCLUDE THE TESTIMONY OF JOHN C. JAROSZ* (related document(s)[115](#)) filed by Shaya Rochester on behalf of Windstream Holdings, Inc., et al.. (Rochester, Shaya) (Entered: 12/11/2019) |
| 12/11/2019 | [165](#) (4 pgs) | Declaration *DECLARATION OF JOHN C. JAROSZ IN SUPPORT OF DEBTORS' OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE THE EXPERT TESTIMONY OF JOHN C. JAROSZ* (related document(s)[164](#)) filed by Shaya Rochester on behalf of Windstream Holdings, Inc., et al.. (Rochester, Shaya) (Entered: 12/11/2019) |
| 12/11/2019 | [166](#) (27 pgs) | Declaration *DECLARATION OF GRACE A. THOMPSON IN SUPPORT OF DEBTORS MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS MOTION TO EXCLUDE THE EXPERT TESTIMONY OF JOHN C. JAROSZ* (related document(s)[164](#)) filed by Shaya Rochester on behalf of Windstream Holdings, Inc., et al.. (Rochester, Shaya) (Entered: 12/11/2019) |
| 12/11/2019 | [167](#) (18 pgs) | Affidavit of Service *re: Documents Served on December 6, 2019 and December 9, 2019* (related document(s)[148](#), [150](#), [145](#), [156](#), [152](#), [159](#), |

| | | |
|---|---|---|
| | | 146, 155, 154, 160, 151, 144, 149, 147) filed by Kurtzman Carson Consultants LLC.(Kass, Albert) (Entered: 12/11/2019) |
| 12/11/2019 | 168 (15 pgs) | Motion to Seal *DEBTORS MOTION FOR LEAVE TO FILE UNDER SEAL CERTAIN PORTIONS OF (A) DEBTORS MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS MOTION TO EXCLUDE EXPERT TESTIMONY OF JOHN C. JAROSZ, AND (B) DECLARATION OF JOHN C. JAROSZ IN SUPPORT OF DEBTORS OPPOSITION TO DEFENDANTS MOTION TO EXCLUDE EXPERT TESTIMONY OF JOHN C. JAROSZ* (related document(s)165, 164) filed by Shaya Rochester on behalf of Windstream Holdings, Inc., et al.. (Rochester, Shaya) (Entered: 12/11/2019) |
| 12/13/2019 | 169 (26 pgs) | Reply to Motion *DEBTORS REPLY MEMORANDUM IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT OF LIABILITY ON ALL COUNTS* (related document(s)122) filed by Shaya Rochester on behalf of Windstream Holdings, Inc., et al.. (Rochester, Shaya) (Entered: 12/13/2019) |
| 12/13/2019 | 170 (28 pgs) | Reply Statement of Undisputed Fact *DEBTORS REPLY STATEMENT OF FACTS IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT OF LIABILITY ON ALL COUNTS* (related document(s)122, 124, 169) filed by Shaya Rochester on behalf of Windstream Holdings, Inc., et al.. (Rochester, Shaya) (Entered: 12/13/2019) |
| 12/13/2019 | 171 (20 pgs) | Counterstatement of Undisputed Fact *DEBTORS RESPONSE TO DEFENDANTS STATEMENT OF ADDITIONAL FACTS* (related document(s)129, 158) filed by Shaya Rochester on behalf of Windstream Holdings, Inc., et al.. (Rochester, Shaya) (Entered: 12/13/2019) |
| 12/13/2019 | 172 (4 pgs) | Declaration *DECLARATION OF JEFFREY H. AUMAN IN FURTHER SUPPORT OF THE DEBTORS MOTION FOR SUMMARY JUDGMENT OF LIABILITY ON ALL COUNTS* (related document(s)122) filed by Shaya Rochester on behalf of Windstream Holdings, Inc., et al.. (Rochester, Shaya) (Entered: 12/13/2019) |
| 12/13/2019 | 173 (15 pgs) | Motion to Seal *DEBTORS MOTION FOR LEAVE TO FILE UNDER SEAL CERTAIN PORTIONS OF (A) DEBTORS REPLY MEMORANDUM IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT OF LIABILITY ON ALL COUNTS, (B) DEBTORS REPLY STATEMENT OF FACTS IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT OF LIABILITY ON ALL COUNTS, AND (C) DEBTORS RESPONSE TO DEFENDANTS STATEMENT OF ADDITIONAL FACTS* (related document(s)169, 170, 171) filed by Shaya Rochester on behalf of Windstream Holdings, Inc., et al.. (Rochester, Shaya) (Entered: 12/13/2019) |
| 12/13/2019 | 174 (5 pgs) | Statement */ Joinder of the Official Committee of Unsecured Creditors to the Debtors' Reply in Support of the Debtors' Motion for Summary Judgment of Liability on All Counts* (related document(s)122, 169) filed by Lorenzo Marinuzzi on behalf of Official Committee of Unsecured Creditors. (Marinuzzi, Lorenzo) (Entered: 12/13/2019) |
| 12/13/2019 | 175 (8 pgs) | Counterstatement of Undisputed Fact *Defendants' Response to Debtors' Statement of Additional Material Facts* (related document(s)145) filed by John Scott Kingston on behalf of Charter Communications |

| | | |
|---|---|---|
| | | Operating, LLC, Charter Communications, Inc.. (Kingston, John) (Entered: 12/13/2019) |
| 12/13/2019 | [176](#) (26 pgs; 2 docs) | Reply to Motion *Defendants' Reply Memorandum in Support of Motion for Partial Summary Judgment* (related document(s)[129](#)) filed by John Scott Kingston on behalf of Charter Communications Operating, LLC, Charter Communications, Inc.. (Attachments: # [1](#) Exhibit A) (Kingston, John) (Entered: 12/13/2019) |
| 12/16/2019 | [177](#) (4 pgs) | Notice of Adjournment of Hearing (related document(s)[118](#), [115](#), [168](#)) filed by Brian W. Hockett on behalf of Charter Communications Operating, LLC, Charter Communications, Inc.. with hearing to be held on 1/16/2020 at 10:00 AM at Courtroom TBA, White Plains Courthouse (RDD) (Hockett, Brian) (Entered: 12/16/2019) |
| 12/16/2019 | [178](#) (17 pgs) | Affidavit of Service *re: Documents Served on December 11, 2019* (related document(s)[166](#), [165](#), [162](#), [163](#), [168](#), [164](#), [161](#)) filed by Kurtzman Carson Consultants LLC.(Kass, Albert) (Entered: 12/16/2019) |
| 12/17/2019 | [179](#) (10 pgs) | Reply to Motion *(Defendants' Reply In Support of Motion for Judgment on the Pleadings on Count VI and Motion to Dismiss Count VII for Lack of Subject Matter Jurisdiction)* (related document(s)[109](#)) filed by Brian W. Hockett on behalf of Charter Communications Operating, LLC, Charter Communications, Inc.. (Hockett, Brian) (Entered: 12/17/2019) |
| 12/17/2019 | [180](#) (17 pgs) | Affidavit of Service *re: Documents Served on December 13, 2019* (related document(s)[169](#), [170](#), [174](#), [172](#), [173](#), [171](#)) filed by Kurtzman Carson Consultants LLC.(Kass, Albert) (Entered: 12/17/2019) |
| 12/17/2019 | [181](#) (13 pgs) | Reply to Motion - *Defendants Charter Communications, Inc. and Charter Communications Operating, LLCs Reply Memorandum in Support of Motion to Exclude the Testimony of John C. Jarosz* filed by Brian W. Hockett on behalf of Charter Communications Operating, LLC, Charter Communications, Inc.. (Hockett, Brian) (Entered: 12/17/2019) |
| 12/23/2019 | [182](#) (4 pgs) | Order signed on 12/23/2019 on Debtors' Motion for Leave to File Under Seal Certain Portions of (A) Debtors' Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment, (B) Debtors' Response to Defendants' Statment of Uncontroverted Material Facts (C) Certain Exhibits to the Declaration of Jeffrey H. Auman in Support of the Debtors' Opposition to Defendants' Motion for Summary Judgment, and (E) Expert Declaration of Sarah Butler (Related Doc # [159](#)) . (Vargas, Ana) (Entered: 12/23/2019) |
| 12/23/2019 | [183](#) (4 pgs) | Order signed on 12/23/2019 on Debtors' Motion for Leave to File Under Seal Certain Portions of (A) Debtors' Memorandum of Law in Support of Their Motion for Summary Judgment of Liability on All Accounts; (B) Debtors' Statement of Undisputed Material Facts in Support Thereof; and (C) Certain Exhibits to the Declaration of Jeffrey H. Auman, Paul Strickland, Jr. and Grace A. Thompson(Related Doc # [128](#)) . (Vargas, Ana) (Entered: 12/23/2019) |
| 12/23/2019 | [184](#) (3 pgs) | Order signed on 12/23/2019 on Debtors' Motion for Leave to File Under Seal Certain Portions of (A) Debtors' Reply Memorandum in Support of |

| | | | |
|---|---|---|---|
| | | | Their Motion for Summary Judgment of Liability on All Counts, (B) Debtors' Reply Statement of Facts in Support of its Motion for Summary Judgment of Liability on All Accounts, and (C) Debtors' Response to Defendants' Statement of Additional Facts (related document(s)<u>173</u>) . (Vargas, Ana). Modified on 5/27/2021 (Correa, Mimi). (Entered: 12/23/2019) |
| 12/23/2019 | <u>185</u> (10 pgs) | | Motion to Approve *DEBTORS MOTION TO EXCLUDE THE EXPERT TESTIMONY OF ROBERT BORDERS* filed by Shaya Rochester on behalf of Windstream Holdings, Inc., et al.. (Rochester, Shaya) (Entered: 12/23/2019) |
| 12/23/2019 | <u>186</u> (15 pgs) | | Memorandum of Law *DEBTORS MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION TO EXCLUDE THE EXPERT TESTIMONY OF ROBERT BORDERS* filed by Shaya Rochester on behalf of Windstream Holdings, Inc., et al.. (Rochester, Shaya) (Entered: 12/23/2019) |
| 12/23/2019 | <u>187</u> (6 pgs; 3 docs) | | Declaration *DECLARATION OF GRACE A. THOMPSON IN SUPPORT OF DEBTORS MOTION TO EXCLUDE THE EXPERT TESTIMONY OF ROBERT BORDERS* filed by Shaya Rochester on behalf of Windstream Holdings, Inc., et al.. (Attachments: # <u>1</u> Exhibit A # <u>2</u> Exhibit B) (Rochester, Shaya) (Entered: 12/23/2019) |
| 12/23/2019 | <u>188</u> (10 pgs) | | Motion to Approve *DEBTORS MOTION TO EXCLUDE THE EXPERT TESTIMONY OF MATTHEW KARDOS* filed by Shaya Rochester on behalf of Windstream Holdings, Inc., et al.. (Rochester, Shaya) (Entered: 12/23/2019) |
| 12/23/2019 | <u>189</u> (24 pgs) | | Memorandum of Law *DEBTORS MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION TO EXCLUDE THE EXPERT TESTIMONY OF MATTHEW KARDOS* filed by Shaya Rochester on behalf of Windstream Holdings, Inc., et al.. (Rochester, Shaya) (Entered: 12/23/2019) |
| 12/23/2019 | <u>190</u> (11 pgs; 7 docs) | | Declaration *DECLARATION OF GRACE A. THOMPSON IN SUPPORT OF DEBTORS MOTION TO EXCLUDE THE EXPERT TESTIMONY OF MATTHEW KARDOS* filed by Shaya Rochester on behalf of Windstream Holdings, Inc., et al.. (Attachments: # <u>1</u> Exhibit A # <u>2</u> Exhibit B # <u>3</u> Exhibit C # <u>4</u> Exhibit D # <u>5</u> Exhibit E # <u>6</u> Exhibit F) (Rochester, Shaya) (Entered: 12/23/2019) |
| 12/23/2019 | <u>191</u> (10 pgs) | | Motion to Approve *DEBTORS MOTION TO EXCLUDE THE EXPERT TESTIMONY OF JULES KAMIN* filed by Shaya Rochester on behalf of Windstream Holdings, Inc., et al.. (Rochester, Shaya) (Entered: 12/23/2019) |
| 12/23/2019 | <u>192</u> (15 pgs) | | Memorandum of Law *DEBTORS MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION TO EXCLUDE THE EXPERT TESTIMONY OF JULES KAMIN* filed by Shaya Rochester on behalf of Windstream Holdings, Inc., et al.. (Rochester, Shaya) (Entered: 12/23/2019) |
| 12/23/2019 | <u>193</u> (6 pgs; 3 docs) | | Declaration *DECLARATION OF GRACE A. THOMPSON IN SUPPORT OF DEBTORS MOTION TO EXCLUDE THE EXPERT TESTIMONY OF JULES KAMIN* filed by Shaya Rochester on behalf of |

| | | |
|---|---|---|
| | | Windstream Holdings, Inc., et al.. (Attachments: # 1 Exhibit A # 2 Exhibit B) (Rochester, Shaya) (Entered: 12/23/2019) |
| 12/23/2019 | 194 (14 pgs) | Motion to Seal *DEBTORS MOTION FOR LEAVE TO FILE UNDER SEAL PORTIONS OF (A) DEBTORS MEMORANDUM OF LAW IN SUPPORT OF MOTION TO EXCLUDE EXPERT TESTIMONY OF ROBERT BORDERS, AND (B) DECLARATION OF GRACE A. THOMPSON IN SUPPORT OF DEBTORS MOTION TO EXCLUDE EXPERT TESTIMONY OF ROBERT BORDERS* (related document(s)186, 187) filed by Shaya Rochester on behalf of Windstream Holdings, Inc., et al.. (Rochester, Shaya) (Entered: 12/23/2019) |
| 12/23/2019 | 195 (14 pgs) | Motion to Seal *DEBTORS MOTION FOR LEAVE TO FILE UNDER SEAL PORTIONS OF (A) DEBTORS MEMORANDUM OF LAW IN SUPPORT OF MOTION TO EXCLUDE EXPERT TESTIMONY OF MATTHEW KARDOS, AND (B) DECLARATION OF GRACE A. THOMPSON IN SUPPORT OF DEBTORS MOTION TO EXCLUDE EXPERT TESTIMONY OF MATTHEW KARDOS* (related document(s)189, 190) filed by Shaya Rochester on behalf of Windstream Holdings, Inc., et al.. (Rochester, Shaya) (Entered: 12/23/2019) |
| 12/23/2019 | 196 (14 pgs) | Motion to Seal *DEBTORS MOTION FOR LEAVE TO FILE UNDER SEAL PORTIONS OF (A) DEBTORS MEMORANDUM OF LAW IN SUPPORT OF MOTION TO EXCLUDE EXPERT TESTIMONY OF JULES KAMIN, AND (B) DECLARATION OF GRACE A. THOMPSON IN SUPPORT OF DEBTORS MOTION TO EXCLUDE EXPERT TESTIMONY OF JULES KAMIN* (related document(s)192, 193) filed by Shaya Rochester on behalf of Windstream Holdings, Inc., et al.. (Rochester, Shaya) (Entered: 12/23/2019) |
| 12/24/2019 | 197 (18 pgs) | Affidavit of Service *re: Documents Served on December 23, 2019* (related document(s)188, 182, 186, 187, 196, 195, 192, 193, 183, 191, 185, 189, 184, 194, 190) filed by Kurtzman Carson Consultants LLC. (Kass, Albert) (Entered: 12/24/2019) |
| 12/26/2019 | 198 (8 pgs) | Motion to Strike *John C. Jarosz's Untimely Declarations* filed by Brian W. Hockett on behalf of Charter Communications Operating, LLC, Charter Communications, Inc. with hearing to be held on 1/16/2020 at 10:00 AM at Courtroom TBA, White Plains Courthouse (RDD) Responses due by 1/9/2020,. (Hockett, Brian) (Entered: 12/26/2019) |
| 12/26/2019 | 199 (4 pgs) | Notice of Hearing *on Defendants' Motion to Strike John C. Jarosz's Untimely Declarations* filed by Brian W. Hockett on behalf of Charter Communications Operating, LLC, Charter Communications, Inc.. with hearing to be held on 1/16/2020 at 10:00 AM at Courtroom TBA, White Plains Courthouse (RDD) (Hockett, Brian) (Entered: 12/26/2019) |
| 12/27/2019 | 200 | **(THIS TRANSCRIPT HAS BEEN REVISED, SEE DOCUMENT # 237 FOR CORRECT ENTRY)**Transcript regarding Hearing Held on 12/18/19 At 10:24 AM RE: Declaration Of Grace A. Thompson In Support Of The Debtors Motion For Summary Judgment Of Liability On All Counts (Related Document(S) 122) Filed By Shaya Rochester On Behalf Of Windstream Holdings, Inc., Et Al (Ecf 127).; Motion To Dismiss Adversary Proceeding (Motion For Judgment On The Pleadings On Count Vi And Motion To Dismiss Count Vii For Lack Of Subject Matter Jurisdiction) (Ecf 109).; Notice Of Hearing (Related Document(S) |

| | | |
|---|---|---|
| | | 109).; Etc. Remote electronic access to the transcript is restricted until 3/26/2020. The transcript may be viewed at the Bankruptcy Court Clerks Office. [Transcription Service Agency: Veritext Legal Solutions.]. (See the Courts Website for contact information for the Transcription Service Agency.) (RE: related document(s) 122, 109, 124, 145, 129, 123, 128, 157, 158, 153, 133, 127, 140, 146, 126, 125, 151, 130, 141, 144, 149, 142, 147, 131, 132). Notice of Intent to Request Redaction Deadline Due By 1/3/2020. Statement of Redaction Request Due By 1/17/2020. Redacted Transcript Submission Due By 1/27/2020. Transcript access will be restricted through 3/26/2020. (Ramos, Jonathan) Modified on 1/15/2020 (Ortiz, Carmen). (Entered: 01/02/2020) |
| 01/02/2020 | 201 (63 pgs; 5 docs) | Notice of Appeal filed by John Scott Kingston on behalf of Charter Communications, Inc.. (Attachments: # 1 Civil Cover Sheet # 2 Ex. A to Civil Cover Sheet # 3 Ex. B to Civil Cover Sheet # 4 Related Case Statement)(Kingston, John) (Entered: 01/02/2020) |
| 01/02/2020 | | Receipt of Notice of Appeal( 19-08246-rdd) [appeal,97] ( 298.00) Filing Fee. Receipt number A13636495. Fee amount 298.00. (Re: Doc # 201) (U.S. Treasury) (Entered: 01/02/2020) |
| 01/02/2020 | 202 (51 pgs; 4 docs) | Notice of Appeal filed by John Scott Kingston on behalf of Charter Communications, Inc.. (Attachments: # 1 Civil Cover Sheet # 2 Ex. A to Civil Cover Sheet # 3 Related Case Statement)(Kingston, John) (Entered: 01/02/2020) |
| 01/02/2020 | | Receipt of Notice of Appeal( 19-08246-rdd) [appeal,97] ( 298.00) Filing Fee. Receipt number A13636498. Fee amount 298.00. (Re: Doc # 202) (U.S. Treasury) (Entered: 01/02/2020) |
| 01/02/2020 | 203 (13 pgs) | Motion for Leave to Appeal filed by John Scott Kingston on behalf of Charter Communications, Inc.. (Kingston, John) (Entered: 01/02/2020) |
| 01/02/2020 | 204 (291 pgs; 6 docs) | Objection *to Report and Recommendation* filed by John Scott Kingston on behalf of Charter Communications, Inc.. (Attachments: # 1 Supporting Suggestions # 2 Exhibit A # 3 Ex. B # 4 Ex C # 5 Ex D) (Kingston, John) (Entered: 01/02/2020) |
| 01/02/2020 | 205 (26 pgs; 3 docs) | Motion to Seal *Objections to Report and Recommendation* filed by John Scott Kingston on behalf of Charter Communications, Inc.. (Attachments: # 1 Ex C # 2 Proposed Order) (Kingston, John) (Entered: 01/02/2020) |
| 01/03/2020 | 206 (3 pgs) | Order signed on 1/2/2020 Granting the Committee's Motion to File Under Seal Certain Portions of the Committee's Joinder to the Debtors' Opposition to Charter's Motion for Summary Judgment (Related Doc # 151). (Correa, Mimi) (Entered: 01/03/2020) |
| 01/03/2020 | 207 (3 pgs) | Order signed on 1/2/2020 Granting Debtors' Motion To Seal Portions of (A) Debtors' Memorandum of Law in Support of Motion to Exclude Expert Testimony of Robert Borders, and (B) Declaration of Grace A. Thompson in Support of Debtors' Motion to Exclude Expert Testimony of Robert Borders (Related Doc # 194). (Correa, Mimi) (Entered: 01/03/2020) |
| 01/03/2020 | 208 (3 pgs) | Order signed on 1/2/2020 Granting Debtors' Motion To Seal Portions of (A) Debtors Memorandum of Law in Support of their Motion To Exclude |

| | | |
|---|---|---|
| | | the Expert Testimony Of Jules Kamin, and (B) Declaration of Grace A. Thompson in Support of Debtors Motion To Exclude the Expert Testimony of Jules Kamin (Related Doc # 196). (Correa, Mimi) (Entered: 01/03/2020) |
| 01/03/2020 | 209 (3 pgs) | Order signed on 1/2/2020 Granting Debtors' Motion To Seal Portions of (A) Debtors Memorandum of Law in Support of their Motion To Exclude the Expert Testimony Of Matthew Kardos, and (B) Declaration of Grace A. Thompson in Support of Debtors Motion To Exclude the Expert Testimony of Matthew Kardos (Related Doc # 195). (Correa, Mimi) (Entered: 01/03/2020) |
| 01/07/2020 | 210 (6 pgs) | Civil Cover Sheet from U.S. District Court, Case Number: 2000121 (related document(s)201) (Rouzeau, Anatin). (Entered: 01/07/2020) |
| 01/07/2020 | 211 (6 pgs) | Civil Cover Sheet from U.S. District Court, Case Number: 2000132 (related document(s)202) (Rouzeau, Anatin). (Entered: 01/07/2020) |
| 01/07/2020 | 212 (17 pgs) | Affidavit of Service *re: Documents Served on January 3, 2020* (related document(s)206, 208, 207, 209) filed by Kurtzman Carson Consultants LLC.(Kass, Albert) (Entered: 01/07/2020) |
| 01/09/2020 | 213 (17 pgs) | Opposition *DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION TO EXCLUDE EXPERT TESTIMONY OF ROBERT BORDERS* (related document(s)186, 185) filed by John Scott Kingston on behalf of Charter Communications Operating, LLC, Charter Communications, Inc.. (Kingston, John) (Entered: 01/09/2020) |
| 01/09/2020 | 214 (41 pgs; 3 docs) | Declaration *OF JUSTIN MULLIGAN IN SUPPORT OF DEFENDANTS CHARTER COMMUNICATIONS, INC. AND CHARTER COMMUNICATIONS OPERATING, LLC'S RESPONSE IN OPPOSITION TO DEBTORS' MOTION TO EXCLUDE TESTIMONY OF ROBERT BORDERS* filed by John Scott Kingston on behalf of Charter Communications Operating, LLC, Charter Communications, Inc.. (Attachments: # 1 Exhibit 1 # 2 Exhibit 2) (Kingston, John) (Entered: 01/09/2020) |
| 01/09/2020 | 215 (12 pgs) | Motion to Seal *DEFENDANTS MOTION TO SEAL PORTIONS OF DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION TO EXCLUDE TESTIMONY OF ROBERT BORDERS* (related document(s)213) filed by John Scott Kingston on behalf of Charter Communications Operating, LLC, Charter Communications, Inc.. (Kingston, John) (Entered: 01/09/2020) |
| 01/09/2020 | 216 (24 pgs) | Opposition *DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION TO EXCLUDE EXPERT TESTMONY OF DR. JULES KAMIN* filed by John Scott Kingston on behalf of Charter Communications Operating, LLC, Charter Communications, Inc.. (Kingston, John) (Entered: 01/09/2020) |
| 01/09/2020 | 217 (33 pgs; 3 docs) | Declaration *OF JUSTIN MULLIGAN IN SUPPORT OF DEFENDANTS CHARTER COMMUNICATIONS, INC. AND CHARTER COMMUNICATIONS OPERATING, LLC'S RESPONSE IN OPPOSITION TO DEBTORS' MOTION TO EXCLUDE TESTMONY OF DR. JULES KAMIN* filed by John Scott Kingston on behalf of Charter Communications Operating, LLC, Charter Communications, Inc.. |

| | | |
|---|---|---|
| | | (Attachments: # 1 Exhibit 1 # 2 Exhibit 2) (Kingston, John) (Entered: 01/09/2020) |
| 01/09/2020 | 218 (15 pgs) | Opposition *DEBTORS MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS MOTION TO STRIKE JOHN C. JAROSZS DECLARATIONS* (related document(s)198) filed by Shaya Rochester on behalf of Windstream Holdings, Inc., et al.. (Rochester, Shaya) (Entered: 01/09/2020) |
| 01/09/2020 | 219 (12 pgs) | Motion to Seal *DEFENDANTS' EX-PARTE MOTION TO SEAL PORTIONS OF DEFENDANTS' RESPONSE IN OPPOOSITION TO PLAINTIFF'S MOTION TO EXCLUDE TESTMONY OF DR. JULES KAMIN* (related document(s)216) filed by John Scott Kingston on behalf of Charter Communications Operating, LLC, Charter Communications, Inc.. (Kingston, John) (Entered: 01/09/2020) |
| 01/09/2020 | 220 (27 pgs) | Opposition *DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION TO EXCLUDE THE EXPERT TESTIMONY OF MATTHEW KARDOS* filed by John Scott Kingston on behalf of Charter Communications Operating, LLC, Charter Communications, Inc.. (Kingston, John) (Entered: 01/09/2020) |
| 01/09/2020 | 221 (91 pgs; 4 docs) | Declaration *OF JUSTIN MULLIGAN IN SUPPORT OF DEFENDANTS' RESPONSE IN OPPOSITION TO DEBTORS' MOTION TO EXCLUDE TESTMONY OF MATTHEW KARDOS* filed by John Scott Kingston on behalf of Charter Communications Operating, LLC, Charter Communications, Inc.. (Attachments: # 1 Exhibit 1 # 2 Exhibit 2 # 3 Exhibit 3) (Kingston, John) (Entered: 01/09/2020) |
| 01/09/2020 | 222 (12 pgs) | Motion to Seal *DEFENDANTS' EX-PARTE MOTION TO SEAL PORTIONS OF DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION TO EXCLUDE TESTIMONY OF MATTHEW KARDOS* (related document(s)220) filed by John Scott Kingston on behalf of Charter Communications Operating, LLC, Charter Communications, Inc.. (Kingston, John) (Entered: 01/09/2020) |
| 01/09/2020 | 223 (37 pgs) | Opposition *DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION TO EXCLUDE THE EXPERT REPORT OF DR. HENRY D. OSTBERG* filed by John Scott Kingston on behalf of Charter Communications Operating, LLC, Charter Communications, Inc.. (Kingston, John) (Entered: 01/09/2020) |
| 01/09/2020 | 224 (21 pgs; 2 docs) | Declaration *OF JUSTIN MULLIGAN IN SUPPORT OF DEFENDANTS ' RESPONSE IN OPPOSITION TO DEBTORS' MOTION TO EXCLUDE TESTIMONY OF DR. HENRY OSTBERG* filed by John Scott Kingston on behalf of Charter Communications Operating, LLC, Charter Communications, Inc.. (Attachments: # 1 Exhibit 1) (Kingston, John) (Entered: 01/09/2020) |
| 01/09/2020 | 225 (12 pgs) | Motion to Seal *DEFENDANTS' EX-PARTE MOTION TO SEAL PORTIONS OF DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION TO EXCLUDE TESTIMONY OF DR. HENRY OSTBERG* filed by John Scott Kingston on behalf of Charter Communications Operating, LLC, Charter Communications, Inc.. (Kingston, John) (Entered: 01/09/2020) |
| 01/09/2020 | 226 | Response to Motion *DEFENDANTS' RESPONSE IN OPPOSITION TO* |

| | | |
|---|---|---|
| | (13 pgs) | *PLAINTIFFS' MOTION FOR LEAVE TO FILE A REBUTALL EXPERT REPORT* filed by John Scott Kingston on behalf of Charter Communications Operating, LLC, Charter Communications, Inc.. (Kingston, John) (Entered: 01/09/2020) |
| 01/13/2020 | 227 (10 pgs) | Reply to Motion *DEFENDANTS' REPLY MEMORANDUM IN SUPPORT OF MOTION TO STRIKE JOHN C. JAROSZ'S UNTIMELY DECLARATIONS* (related document(s)198) filed by John Scott Kingston on behalf of Charter Communications Operating, LLC, Charter Communications, Inc.. (Kingston, John) (Entered: 01/13/2020) |
| 01/13/2020 | 228 (11 pgs) | Memorandum of Law *DEBTORS REPLY MEMORANDUM IN SUPPORT OF THEIR MOTION FOR LEAVE TO FILE A REBUTTAL EXPERT REPORT* (related document(s)150) filed by Shaya Rochester on behalf of Windstream Holdings, Inc., et al.. (Rochester, Shaya) (Entered: 01/13/2020) |
| 01/13/2020 | 229 (18 pgs) | Memorandum of Law *DEBTORS REPLY MEMORANDUM IN SUPPORT OF THEIR MOTION TO EXCLUDE THE REBUTTAL EXPERT REPORT OF HENRY D. OSTBERG* (related document(s)155) filed by Shaya Rochester on behalf of Windstream Holdings, Inc., et al.. (Rochester, Shaya) (Entered: 01/13/2020) |
| 01/13/2020 | 230 (14 pgs) | Motion to Seal *DEBTORS MOTION FOR LEAVE TO FILE UNDER SEAL PORTIONS OF DEBTORS REPLY MEMORANDUM IN SUPPORT OF THEIR MOTION TO EXCLUDE THE REBUTTAL EXPERT REPORT OF HENRY D. OSTBERG* (related document(s)229) filed by Shaya Rochester on behalf of Windstream Holdings, Inc., et al.. (Rochester, Shaya) (Entered: 01/13/2020) |
| 01/13/2020 | 231 (9 pgs) | Reply to Motion *DEBTORS REPLY MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION TO EXCLUDE THE EXPERT TESTIMONY OF ROBERT BORDERS* (related document(s)185) filed by Shaya Rochester on behalf of Windstream Holdings, Inc., et al.. (Rochester, Shaya) (Entered: 01/13/2020) |
| 01/13/2020 | 232 (17 pgs) | Reply to Motion *DEBTORS REPLY MEMORANDUM IN SUPPORT OF THEIR MOTION TO EXCLUDE THE EXPERT TESTIMONY OF MATTHEW KARDOS* (related document(s)188) filed by Shaya Rochester on behalf of Windstream Holdings, Inc., et al.. (Rochester, Shaya) (Entered: 01/13/2020) |
| 01/13/2020 | 233 (11 pgs) | Reply to Motion *DEBTORS REPLY MEMORANDUM IN SUPPORT OF THEIR MOTION TO EXCLUDE THE EXPERT TESTIMONY OF JULES H. KAMIN* (related document(s)191) filed by Shaya Rochester on behalf of Windstream Holdings, Inc., et al.. (Rochester, Shaya) (Entered: 01/13/2020) |
| 01/13/2020 | 234 (14 pgs) | Motion to Seal *DEBTORS MOTION FOR LEAVE TO FILE UNDER SEAL PORTIONS OF DEBTORS REPLY MEMORANDUM IN SUPPORT OF THEIR MOTION TO EXCLUDE EXPERT TESTIMONY OF MATTHEW KARDOS* (related document(s)232) filed by Shaya Rochester on behalf of Windstream Holdings, Inc., et al.. (Rochester, Shaya) (Entered: 01/13/2020) |
| 01/13/2020 | 235 (14 pgs) | Motion to Seal *DEBTORS MOTION FOR LEAVE TO FILE UNDER SEAL PORTIONS OF DEBTORS REPLY IN SUPPORT OF MOTION* |

| | | |
|---|---|---|
| | | *TO EXCLUDE EXPERT TESTIMONY OF JULES KAMIN* (related document(s)233) filed by Shaya Rochester on behalf of Windstream Holdings, Inc., et al.. (Rochester, Shaya) (Entered: 01/13/2020) |
| 01/14/2020 | 236 (17 pgs) | Affidavit of Service *re: Debtors' Memorandum of Law in Opposition to Defendants' Motion to Strike John C. Jarsoz's Declarations* (related document(s)218) filed by Kurtzman Carson Consultants LLC.(Kass, Albert) (Entered: 01/14/2020) |
| 01/15/2020 | 237 (200 pgs) | Transcript regarding Hearing Held on 12/18/2019 at 10:24 AM RE: **(REVISED)**Motion to Dismiss adversary Proceeding (Motion for Judgment on the Pleadings on Count VI and Motion to Dismiss Count VII for Lack of Subject Matter Jurisdiction); Notice of Hearing...etc.... Remote electronic access to the transcript is restricted until 4/14/2020. The transcript may be viewed at the Bankruptcy Court Clerks Office. [Transcription Service Agency: Veritext Legal Solutions.]. (See the Courts Website for contact information for the Transcription Service Agency.) (RE: related document(s) 122, 109, 124, 145, 129, 123, 157, 158, 153, 133, 127, 140, 146, 126, 125, 151, 130, 141, 149, 142, 147, 131, 132). Notice of Intent to Request Redaction Deadline Due By 1/22/2020. Statement of Redaction Request Due By 2/5/2020. Redacted Transcript Submission Due By 2/18/2020. Transcript access will be restricted through 4/14/2020. (Ortiz, Carmen) (Entered: 01/15/2020) |
| 01/15/2020 | 238 (15 pgs) | Response *DEBTORS RESPONSE TO (I) NOTICE OF DEFENDANTS OBJECTIONS TO BANKRUPTCY COURTS REPORT AND RECOMMENDATION AND (II) SUGGESTIONS IN SUPPORT OF DEFENDANTS OBJECTIONS TO BANKRUPTCY COURTS REPORT AND RECOMMENDATION* (related document(s)204) filed by Shaya Rochester on behalf of Windstream Holdings, Inc., et al.. (Rochester, Shaya) (Entered: 01/15/2020) |
| 01/16/2020 | 239 (506 pgs; 3 docs) | Statement of Issues *DEFENDANTS' DESIGNATION OF THE RECORD ON APPEAL AND STATEMENT OF ISSUES TO BE PRESENTED FOR INTERLOCUTORY APPEAL* filed by John Scott Kingston on behalf of Charter Communications Operating, LLC, Charter Communications, Inc.. (Attachments: # 1 Exhibit A # 2 Exhibit B)(Kingston, John) (Entered: 01/16/2020) |
| 01/16/2020 | 240 (503 pgs; 3 docs) | Statement of Issues *DEFENDANTS' DESIGNATION OF THE RECORD ON APPEAL AND STATEMENT OF ISSUES TO BE PRESENTED FOR APPEAL AS OF RIGHT* filed by John Scott Kingston on behalf of Charter Communications Operating, LLC, Charter Communications, Inc.. (Attachments: # 1 Exhibit A # 2 Exhibit B)(Kingston, John) (Entered: 01/16/2020) |
| 01/16/2020 | 241 (6 pgs) | Statement *WINDSTREAM'S STATEMENT IN SUPPORT OF THIS COURT'S JURISDICTION* filed by Shaya Rochester on behalf of Windstream Holdings, Inc., et al.. (Rochester, Shaya) (Entered: 01/16/2020) |
| 01/16/2020 | 242 (501 pgs; 3 docs) | Objection *DEFENDANTS' DESIGNATION OF THE RECORD IN SUPPORT OF DEFENDANTS' OBJECTIONS TO BANKRUPTCY COURT'S REPORT AND RECOMMENDATION* (related document(s)204) filed by John Scott Kingston on behalf of Charter Communications Operating, LLC, Charter Communications, Inc.. (Attachments: # 1 Exhibit A # 2 Exhibit B) (Kingston, John) (Entered: 01/16/2020) |

| | | |
|---|---|---|
| 01/16/2020 | 243 (17 pgs) | Affidavit of Service *re: Documents Served on January 13, 2020* (related document(s)229, 228, 235, 230, 234, 233, 231, 232) filed by Kurtzman Carson Consultants LLC.(Kass, Albert) (Entered: 01/16/2020) |
| 01/16/2020 | 244 (17 pgs) | Affidavit of Service *re: Debtors' Response to (I) Notice of Defendants' Objections to Bankruptcy Court's Report and Recommendation and (II) Suggestions in Support of Defendants' Objection to Bankruptcy Court's Report and Recommendation* (related document(s)238) filed by Kurtzman Carson Consultants LLC.(Kass, Albert) (Entered: 01/16/2020) |
| 01/17/2020 | 245 (10 pgs; 3 docs) | Motion to Seal *DEFENDANTS' RULE OF BANKRUPTCY PROCEDURE 8009(F) NOTIFICATION FOR TRANSMISSION OF SEALED DOCUMENTS TO THE DISTRICT COURT* filed by John Scott Kingston on behalf of Charter Communications Operating, LLC, Charter Communications, Inc.. (Attachments: # 1 Exhibit A # 2 Exhibit B) (Kingston, John) (Entered: 01/17/2020) |
| 01/22/2020 | 246 (17 pgs) | Affidavit of Service *re Windstream's Statement in Support of This Court's Jurisdiction* (related document(s)241) filed by Kurtzman Carson Consultants LLC.(Kass, Albert) (Entered: 01/22/2020) |
| 01/23/2020 | 247 (14 pgs; 2 docs) | Motion to Allow*DEFENDANTS' MOTION TO CONTINUE THE MARCH 30, 2020 TRIAL SETTING FOR COUNTS VI AND VII PENDING A JURY TRIAL ON THE PREDICATE CLAIMS (COUNTS I-V)* filed by John Scott Kingston on behalf of Charter Communications Operating, LLC, Charter Communications, Inc. with hearing to be held on 2/13/2020 at 10:00 AM at Courtroom TBA, White Plains Courthouse (RDD) Objections due by 2/6/2020,. (Attachments: # 1 Exhibit A) (Kingston, John) (Entered: 01/23/2020) |
| 01/23/2020 | 248 (4 pgs) | Notice of Hearing *ON DEFENDANTS' MOTION TO CONTINUE THE MARCH 30, 2020 TRIAL SETTING FOR COUNTS VI AND VII PENDING A JURY TRIAL ON THE PREDICATE CLAIMS (COUNTS I-V)* filed by John Scott Kingston on behalf of Charter Communications Operating, LLC, Charter Communications, Inc.. with hearing to be held on 2/13/2020 at 10:00 AM at Courtroom TBA, White Plains Courthouse (RDD) Objections due by 2/6/2020, (Kingston, John) (Entered: 01/23/2020) |
| 01/28/2020 | 249 (3 pgs) | Order signed on 1/27/2020 On Debtors' Motion for Leave to file Under Seal Portions of Debtors' Reply Memorandum in Support of Their Motion to Exclude Expert Testimony of Matthew Kardos (Related Doc # 234). (Correa, Mimi) (Entered: 01/28/2020) |
| 01/28/2020 | 250 (2 pgs) | Order signed on 1/28/2020 Denying In Part and Continuing In Part Debtors' Motion to Exclude the Expert Testimony of Jules Kamin (Related Doc # 191) . (Correa, Mimi) (Entered: 01/28/2020) |
| 01/28/2020 | 251 (2 pgs) | Order signed on 1/28/2020 Granting Debtors' Motion to Exclude the Rebuttal Expert Report and Testimony of Henry D. Ostberg (related document(s)155) (Correa, Mimi) (Entered: 01/28/2020) |
| 01/28/2020 | 252 (3 pgs) | Order signed on 1/28/2020 Granting in Part and Denying in Part Debtors' Motion to Exclude the Expert Testimony of Robert Borders (Related Doc # 185) . (Correa, Mimi) (Entered: 01/28/2020) |

| | | |
|---|---|---|
| 01/28/2020 | [253](#) (3 pgs) | Order signed on 1/28/2020 Granting in Part and Denying in Part Debtors' Motion to Exclude the Expert Testimony of Matthew Kardos (Related Doc # [188](#)) . (Vargas, Ana) (Entered: 01/28/2020) |
| 01/28/2020 | [254](#) (2 pgs) | Order signed on 1/28/2020 Denying Defendants' Motion to Exclude the Testimony of John C. Jarosz (Related Doc # [115](#)) . (Vargas, Ana) (Entered: 01/28/2020) |
| 01/28/2020 | [255](#) (2 pgs) | Order signed on 1/28/2020 Denying Defendants' Motion to Strike the Declarations John C. Jarosz's (Related Doc # [198](#)) . (Vargas, Ana) (Entered: 01/28/2020) |
| 01/29/2020 | [256](#) (3 pgs) | Order signed on 1/27/2020 On Debtors' Motion for Leave to File Under Seal Certain Portions of (a) Debtors' Memorandum of Law in Opposition to Defendants' Motion to Exclude Expert Testimony of John C. Jarosz, and (B) Declaration of John C. Jarosz in Support of Debtors' Opposition to Defendants' Motion to Exclude Expert Testimony of John C. Jarosz (Related Doc # [168](#)). (Correa, Mimi) (Entered: 01/29/2020) |
| 01/30/2020 | [257](#) (6 pgs) | Response *DEBTORS STATEMENT IN RESPONSE TO DEFENDANTS DESIGNATIONS OF THE RECORD* (related document(s)[239](#), [240](#)) filed by Shaya Rochester on behalf of Windstream Holdings, Inc., et al.. (Rochester, Shaya) (Entered: 01/30/2020) |
| 01/30/2020 | [258](#) (4 pgs) | Order signed on 1/30/2020 on Defendants' Motion to Recognition that the Bankruptcy Court is Divested of jurisdiction (Oral motion). (Vargas, Ana) Modified on 1/31/2020 (Correa, Mimi). (Entered: 01/30/2020) |
| 01/30/2020 | [259](#) (3 pgs) | Order signed on 1/30/2020 on Defendants' Motion for Judgment on the Pleadings on Count VI and Motion to Dismiss Count VII for Lack of Subject Matter Jurisdiction (Related Doc # [109](#)) . (Vargas, Ana) (Entered: 01/30/2020) |
| 01/31/2020 | [260](#) (17 pgs) | Affidavit of Service re: *Documents Served on January 28, 2020* (related document(s)[252](#), [250](#), [249](#), [251](#), [253](#)) filed by Kurtzman Carson Consultants LLC.(Kass, Albert) (Entered: 01/31/2020) |
| 01/31/2020 | [261](#) (17 pgs) | Affidavit of Service re: *Order on Debtors' Motion for Leave to File Under Seal Certain Portions of (A) Debtors' Memorandum of Law in Opposition to Defendants' Motion to Exclude Expert Testimony of John C. Jarosz, and (B) Declaration of John C. Jarosz in Support of Debtors' Opposition to Defendants' Motion to Exclude Expert Testimony of John C. Jarosz* (related document(s)[256](#)) filed by Kurtzman Carson Consultants LLC.(Kass, Albert) (Entered: 01/31/2020) |
| 01/31/2020 | [262](#) (17 pgs) | Affidavit of Service re: *Debtors Statement in Response to Defendants Designation of the Record* (related document(s)[257](#)) filed by Kurtzman Carson Consultants LLC.(Kass, Albert) (Entered: 01/31/2020) |
| 02/06/2020 | [263](#) (20 pgs) | Opposition Brief *DEBTORS OBJECTION TO DEFENDANTS MOTION TO CONTINUE THE MARCH 30, 2020 TRIAL SETTING FOR COUNTS VI AND VII PENDING A JURY TRIAL ON THE PREDICATE CLAIMS (COUNTS I-V)* (related document(s)[247](#)) filed by Shaya Rochester on behalf of Windstream Holdings, Inc., et al.. (Rochester, Shaya) (Entered: 02/06/2020) |
| 02/10/2020 | [264](#) | Reply to Motion -- *Defendants' Reply in Support of Motion to Continue* |

| | | |
|---|---|---|
| | (20 pgs) | *the Bench Trial on Counts VI and VII Pending a Jury Trial on Plaintiffs' Predicate Claim* (related document(s)247) filed by Brian W. Hockett on behalf of Charter Communications Operating, LLC, Charter Communications, Inc.. (Hockett, Brian) (Entered: 02/10/2020) |
| 02/10/2020 | 265 (17 pgs) | Affidavit of Service re: *Debtors' Objection to Defendants' Motion to Continue the March 30, 2020 Trial Setting for Counts VIand VII Pending a Jury Trial on the Predicate Claims (Counts I-V)* (related document(s)263) filed by Kurtzman Carson Consultants LLC.(Kass, Albert) (Entered: 02/10/2020) |
| 02/11/2020 | 266 (3 pgs) | Notice of Agenda *AGENDA FOR FEBRUARY 13, 2020 HEARING* filed by Shaya Rochester on behalf of Windstream Holdings, Inc., et al.. (Rochester, Shaya) (Entered: 02/11/2020) |
| 02/11/2020 | 267 (510 pgs; 7 docs) | Objection *NOTICE OF DEFENDANTS' OBJECTIONS TO BANKRUPTCY COURT'S REPORT AND RECOMMENDATION* filed by John Scott Kingston on behalf of Charter Communications Operating, LLC, Charter Communications, Inc.. (Attachments: # 1 Exhibit A # 2 Exhibit B # 3 Exhibit C # 4 Exhibit D # 5 Exhibit E # 6 Exhibit F) (Kingston, John) (Entered: 02/11/2020) |
| 02/14/2020 | 268 (17 pgs) | Affidavit of Service re: *Agenda for February 13, 2020* (related document(s)266) filed by Kurtzman Carson Consultants LLC.(Kass, Albert) (Entered: 02/14/2020) |
| 02/18/2020 | 270 (109 pgs) | Transcript regarding Hearing Held on 02/13/2020 At 10:15 AM RE: Motion To Allow Defendant's Motion To Continue The March 30, 2020 Trial Setting For Counts VI And VII Pending A Jury Trial On The Predicate Claims (Counts I-V).; Final Pre-Trial Conference. Remote electronic access to the transcript is restricted until 5/18/2020. The transcript may be viewed at the Bankruptcy Court Clerks Office. [Transcription Service Agency: Veritext Legal Solutions.]. (See the Courts Website for contact information for the Transcription Service Agency.). Notice of Intent to Request Redaction Deadline Due By 2/25/2020. Statement of Redaction Request Due By 3/10/2020. Redacted Transcript Submission Due By 3/20/2020. Transcript access will be restricted through 5/18/2020. (Ramos, Jonathan) (Entered: 02/19/2020) |
| 02/19/2020 | 269 (9 pgs) | Written Opinion Signed on 2/19/2020 re: Defendants' Objections To Bankruptcy Court's Report AND Recommendation (related document(s)267). (Li, Dorothy) (Entered: 02/19/2020) |
| 02/21/2020 | 271 (2 pgs) | Order Signed on 2/20/2020 Regarding Defendants' February 11, 2020 Objections to "Bankruptcy Court's Report and Recommendations" (related document(s)269, 267). (Li, Dorothy) (Entered: 02/21/2020) |
| 03/02/2020 | 272 (18 pgs) | Statement *Defendants Rule 26(a)(3) Pretrial Disclosure* filed by Brian W. Hockett on behalf of Charter Communications, Inc.. (Hockett, Brian) (Entered: 03/02/2020) |
| 03/02/2020 | 273 (8 pgs) | Statement *Debtors' Deposition Designations* filed by Shaya Rochester on behalf of Windstream Holdings, Inc., et al.. (Rochester, Shaya) (Entered: 03/02/2020) |
| 03/03/2020 | 274 (5 pgs) | Order signed on 3/3/2020 In Part and Denying In Part Debtors' Motion for Partial Summary Judgment of Liability (Related Doc # 122) . |

| | | (Vargas, Ana) (Entered: 03/03/2020) |
|---|---|---|
| 03/03/2020 | [275](#) (2 pgs) | Order signed on 3/3/2020 Denying Defendants' Motion for Summary Judgment (Related Doc # [129](#)). (Vargas, Ana) (Entered: 03/03/2020) |
| 03/04/2020 | [276](#) (2 pgs) | Notice of Hearing *NOTICE OF TELEPHONIC FINAL PRE-TRIAL CONFERENCE SCHEDULED FOR MARCH 9, 2020, AT 3:00 P.M. (PREVAILING EASTERN TIME)* filed by Shaya Rochester on behalf of Windstream Holdings, Inc., et al.. (Rochester, Shaya) (Entered: 03/04/2020) |
| 03/06/2020 | [277](#) (17 pgs) | Affidavit of Service *re: 1) Debtors' Deposition Designations; and 2) Order Granting in Part and Denying in Part Debtors' Motion for Partial Summary Judgment of Liability* (related document(s)[274](#), [273](#)) filed by Kurtzman Carson Consultants LLC.(Kass, Albert) (Entered: 03/06/2020) |
| 03/06/2020 | [278](#) (17 pgs) | Affidavit of Service *re: Notice of Telephonic Final Pre-Trial Conference Scheduled for March 9, 2020 at 3:00 p.m. (Prevailing Eastern Time)* (related document(s)[276](#)) filed by Kurtzman Carson Consultants LLC. (Kass, Albert) (Entered: 03/06/2020) |
| 03/16/2020 | [279](#) (15 pgs) | Objection *and Counter Designations to Plaintiff's Deposition Designations* filed by John Scott Kingston on behalf of Charter Communications Operating, LLC, Charter Communications, Inc.. (Kingston, John) (Entered: 03/16/2020) |
| 03/16/2020 | [280](#) (14 pgs) | Objection *DEBTORS RULE 26(a)(3)(B) OBJECTIONS AND COUNTER-DESIGNATIONS* filed by Shaya Rochester on behalf of Windstream Holdings, Inc., et al.. (Rochester, Shaya) (Entered: 03/16/2020) |
| 03/17/2020 | [281](#) (18 pgs) | **WRITTEN OPINION:** Memorandum Of Decision On Defendants Motion To Continue Bench Trial In The Light Of Jury-Trial Demand Signed On 3/17/2020 (related document(s)[247](#), [41](#)). (Li, Dorothy) Modified on 3/23/2020 (Correa, Mimi). (Entered: 03/17/2020) |
| 03/17/2020 | [282](#) (8 pgs) | Statement *DEBTORS DESIGNATION OF ADDITIONAL ITEMS TO BE INCLUDED IN THE RECORD ON APPEAL* filed by Shaya Rochester on behalf of Windstream Holdings, Inc., et al.. (Rochester, Shaya) (Entered: 03/17/2020) |
| 03/19/2020 | [283](#) (2 pgs) | Order Adjourning Trial signed on 3/19/2020. Trial to be held on 4/27/2020 and 4/28/2020 at 10:00 AM at Courtroom 118, White Plains Courthouse. (Vargas, Ana) (Entered: 03/19/2020) |
| 03/19/2020 | [284](#) (17 pgs) | Affidavit of Service *re: Debtors' Rule 26(a)(3)(B) Objections and Counter-Designations* (related document(s)[280](#)) filed by Kurtzman Carson Consultants LLC.(Kass, Albert) (Entered: 03/19/2020) |
| 03/19/2020 | [285](#) (17 pgs) | Affidavit of Service *re: Debtors' Designation of Additional Items to be Included in the Record on Appeal* (related document(s)[282](#)) filed by Kurtzman Carson Consultants LLC.(Kass, Albert) (Entered: 03/19/2020) |
| 03/23/2020 | [286](#) (7 pgs) | Letter *to the Court by Plaintiff's attorney in connection with the recently issued Memorandum of Decision on Defendants Motion to Continue* |

| | | |
|---|---|---|
| | | *Trial* (related document(s)281) Filed by Terence P. Ross on behalf of Windstream Holdings, Inc., et al.. (Correa, Mimi) (Entered: 03/23/2020) |
| 03/30/2020 | 287 (2 pgs) | Order signed on 3/30/2020 Denying Defendants' Motion to Continue the March 20, 2020 Trial Setting for Counts VI & VII (Related Doc # 247) . (Vargas, Ana) (Entered: 03/30/2020) |
| 03/30/2020 | 288 (2 pgs) | [DUPLICATE OF DOC. 287] Order signed on 3/30/2020 Denying Defendants' Motion to Continue the March 30, 2020 Trial Setting for Counts VI and VII (Related Doc 247) . (McCaffrey, Dawn) Modified on 3/31/2020 (Correa, Mimi). (Entered: 03/30/2020) |
| 04/13/2020 | 289 (26 pgs; 3 docs) | Motion to Reconsider FRCP 60 or FRBP 3008 *DEFENDANTS' MOTION FOR RELIEF FROM THIS COURT'S MARCH 30, 2020 ORDER* (related document(s)287) filed by John Scott Kingston on behalf of Charter Communications Operating, LLC, Charter Communications, Inc.. (Attachments: # 1 Exhibit 1 # 2 Exhibit 2) (Kingston, John) (Entered: 04/13/2020) |
| 04/13/2020 | 290 (9 pgs; 2 docs) | Notice of Motion to Set Hearing *DEFENDANTS' MOTION FOR EXPEDITED HEARING ON THEIR MOTION FOR RELIEF FROM THIS COURT'S MARCH 30, 2020 ORDER* (related document(s)289) filed by John Scott Kingston on behalf of Charter Communications Operating, LLC, Charter Communications, Inc.. (Attachments: # 1 Exhibit 1)(Kingston, John) (Entered: 04/13/2020) |
| 04/20/2020 | 291 (5 pgs) | Order signed on 4/20/2020 Establishing Remote Trial Procedures for the Trial of Counts VI VII Beginning April 27, 2020. (Vargas, Ana) (Entered: 04/20/2020) |
| 04/20/2020 | 292 (2 pgs) | Statement *DEBTORS NOTICE OF SKYPE PARTICIPANTS AT TRIAL* (related document(s)291) filed by Shaya Rochester on behalf of Windstream Holdings, Inc., et al.. (Rochester, Shaya) (Entered: 04/20/2020) |
| 04/20/2020 | 293 (2 pgs) | Statement / *The Official Committee of Unsecured Creditors' Notice of Skype Participants at Trial* filed by Lorenzo Marinuzzi on behalf of Official Committee of Unsecured Creditors. (Marinuzzi, Lorenzo) (Entered: 04/20/2020) |
| 04/21/2020 | 294 (28 pgs) | Objection to Motion *DEBTORS OBJECTION TO DEFENDANTS MOTION FOR RELIEF FROM THIS COURTS MARCH 30, 2020 ORDER* (related document(s)289) filed by Shaya Rochester on behalf of Windstream Holdings, Inc., et al.. (Rochester, Shaya) (Entered: 04/21/2020) |
| 04/21/2020 | 295 (77 pgs) | Declaration *DECLARATION OF GRACE A. THOMPSON IN SUPPORT OF THE DEBTORS OBJECTION TO DEFENDANTS MOTION FOR RELIEF FROM THIS COURTS MARCH 30, 2020 ORDER* (related document(s)294) filed by Shaya Rochester on behalf of Windstream Holdings, Inc., et al.. (Rochester, Shaya) (Entered: 04/21/2020) |
| 04/21/2020 | 296 (11 pgs) | Objection *DEBTORS OBJECTIONS TO DEFENDANTS TRIAL EXHIBITS* filed by Shaya Rochester on behalf of Windstream Holdings, Inc., et al.. (Rochester, Shaya) (Entered: 04/21/2020) |
| 04/22/2020 | 297 | Motion to Approve *DEFENDANTS' OMNIBUS MOTION IN LIMINE* |

| | (352 pgs; 20 docs) | filed by John Scott Kingston on behalf of Charter Communications Operating, LLC, Charter Communications, Inc.. (Attachments: # 1 Exhibit 1 # 2 Exhibit 2 # 3 Exhibit 3 # 4 Exhibit 4 # 5 Exhibit 5 # 6 Exhibit 6 # 7 Exhibit 7 # 8 Exhibit 8 # 9 Exhibit 9 # 10 Exhibit 10 # 11 Exhibit 11 # 12 Exhibit 12 # 13 Exhibit 13 # 14 Exhibit 14 # 15 Exhibit 15 # 16 Exhibit 16 # 17 Exhibit 17 # 18 Exhibit 18 # 19 Exhibit 19) (Kingston, John) (Entered: 04/22/2020) |
|---|---|---|
| 04/22/2020 | 298 (17 pgs) | Motion to Approve *DEFENDANTS' MOTION IN LIMINE TO EXCLUDE INADMISSIBLE AND INCOMPLETE DEPOSITION TESTIMONY* filed by John Scott Kingston on behalf of Charter Communications Operating, LLC, Charter Communications, Inc.. (Kingston, John) (Entered: 04/22/2020) |
| 04/22/2020 | 299 (123 pgs; 7 docs) | Motion to Approve *DEFENDANTS' MOTION IN LIMINE TO PRECLUDE THE TRIAL DECLARATION OF JEFFREY AUMAN* filed by John Scott Kingston on behalf of Charter Communications Operating, LLC, Charter Communications, Inc.. (Attachments: # 1 Exhibit 1 # 2 Exhibit 2 # 3 Exhibit 3 # 4 Exhibit 4 # 5 Exhibit 5 # 6 Exhibit 6) (Kingston, John) (Entered: 04/22/2020) |
| 04/22/2020 | 300 (12 pgs) | Motion to Approve *DEBTORS MOTION IN LIMINE TO STRIKE DEFENDANTS USE AT TRIAL OF CERTAIN DEPOSITION TESTIMONY, EXHIBITS, AND PROPOSED TRIAL TESTIMONY* filed by Shaya Rochester on behalf of Windstream Holdings, Inc., et al.. (Rochester, Shaya) (Entered: 04/22/2020) |
| 04/23/2020 | 301 (17 pgs) | Certificate of Mailing of Claims Agent *re: 1) Debtors' Notice of Skype Participants at Trial; and 2) The Official Committee of Unsecured Creditors' Notice of Skype Participants at Trial* (related document(s)293, 292) filed by Kurtzman Carson Consultants LLC. (Kass, Albert) (Entered: 04/23/2020) |
| 04/23/2020 | 302 (17 pgs) | Certificate of Mailing of Claims Agent *re: 1) Debtors' Objection to Defendants' Motion for Relief from This Court's March 30, 2020 Order; 2) Declaration of Grace A. Thompson in Support of the Debtors' Objection to Defendants' Motion for Relief from this Court's March 30, 2020; and 3) Debtors' Objections to Defendants' Trial Exhibits* (related document(s)295, 294, 296) filed by Kurtzman Carson Consultants LLC.(Kass, Albert) (Entered: 04/23/2020) |
| 04/24/2020 | 303 (15 pgs) | Objection to Motion *DEBTORS OBJECTION TO DEFENDANTS MOTION IN LIMINE TO PRECLUDE THE TRIAL DECLARATION OF JEFFREY AUMAN* (related document(s)299) filed by Shaya Rochester on behalf of Windstream Holdings, Inc., et al.. (Rochester, Shaya) (Entered: 04/24/2020) |
| 04/24/2020 | 304 (23 pgs) | Declaration *DECLARATION OF GRACE A. THOMPSON IN SUPPORT OF THE DEBTORS OBJECTION TO DEFENDANTS MOTION IN LIMINE TO PRECLUDE THE TRIAL DECLARATION OF JEFFREY AUMAN* (related document(s)303) filed by Shaya Rochester on behalf of Windstream Holdings, Inc., et al.. (Rochester, Shaya) (Entered: 04/24/2020) |
| 04/24/2020 | 305 (21 pgs) | Objection to Motion *DEBTORS OBJECTION TO DEFENDANTS MOTION IN LIMINE TO EXCLUDE INADMISSIBLE AND INCOMPLETE DEPOSITION TESTIMONY* (related document(s)298) |

| | | filed by Shaya Rochester on behalf of Windstream Holdings, Inc., et al.. (Rochester, Shaya) (Entered: 04/24/2020) |
|---|---|---|
| 04/24/2020 | [306](#) (9 pgs) | Opposition *DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION IN LIMINE* (related document(s)[300](#)) filed by John Scott Kingston on behalf of Charter Communications Operating, LLC, Charter Communications, Inc.. (Kingston, John) (Entered: 04/24/2020) |
| 04/24/2020 | [307](#) (25 pgs) | Objection to Motion *DEBTORS OBJECTION TO DEFENDANTS OMNIBUS MOTION IN LIMINE* (related document(s)[297](#)) filed by Shaya Rochester on behalf of Windstream Holdings, Inc., et al.. (Rochester, Shaya) (Entered: 04/24/2020) |
| 04/26/2020 | [308](#) (415 pgs; 7 docs) | Motion to Use*DEFENDANTS' MOTION FOR JUDICIAL NOTICE OF FACTS THAT CAN BE ACCURATELY AND READILY DETERMINED FROM PUBLICLY AVAILABLE LEGAL DATABASES AND ELECTRONIC FILING SYSTEMS* filed by John Scott Kingston on behalf of Charter Communications Operating, LLC, Charter Communications, Inc.. (Attachments: # [1](#) Exhibit 1 # [2](#) Exhibit 2 # [3](#) Exhibit 3 # [4](#) Exhibit 4 # [5](#) Exhibit 5 # [6](#) Exhibit 6) (Kingston, John) (Entered: 04/26/2020) |
| 04/28/2020 | [309](#) (18 pgs) | Objection to Motion *DEBTORS OBJECTION TO DEFENDANTS MOTION FOR JUDICIAL NOTICE* (related document(s)[308](#)) filed by Shaya Rochester on behalf of Windstream Holdings, Inc., et al.. (Rochester, Shaya) (Entered: 04/28/2020) |
| 04/28/2020 | [310](#) (17 pgs) | Certificate of Mailing of Claims Agent *re: Debtors' Motion in Limine to Strike Defendants' Use at Trial of Certain Deposition Testimony, Exhibits, and Proposed Trial Testimony* (related document(s)[300](#)) filed by Kurtzman Carson Consultants LLC.(Kass, Albert) (Entered: 04/28/2020) |
| 04/29/2020 | [311](#) (17 pgs) | Certificate of Mailing of Claims Agent *re: Documents Served on April 24, 2020* (related document(s)[307](#), [304](#), [303](#), [305](#)) filed by Kurtzman Carson Consultants LLC.(Kass, Albert) (Entered: 04/29/2020) |
| 05/01/2020 | [312](#) (2 pgs) | Notice of Hearing *NOTICE OF TRIAL SCHEDULED TO RESUME MAY 6, 2020, AT 9:30 A.M. (PREVAILING EASTERN TIME)* filed by Shaya Rochester on behalf of Windstream Holdings, Inc., et al.. (Rochester, Shaya) (Entered: 05/01/2020) |
| 05/01/2020 | [313](#) (17 pgs) | Certificate of Mailing of Claims Agent *re: Debtors' Objection to Defendants' Motion for Judicial Notice* (related document(s)[309](#)) filed by Kurtzman Carson Consultants LLC.(Kass, Albert) (Entered: 05/01/2020) |
| 05/06/2020 | [314](#) (17 pgs) | Certificate of Mailing of Claims Agent *re: Notice of Trial Scheduled to Resume May 6, 2020, at 9:30 a.m. (Prevailing Eastern Time)* (related document(s)[312](#)) filed by Kurtzman Carson Consultants LLC.(Kass, Albert) (Entered: 05/06/2020) |
| 05/11/2020 | [315](#) (3 pgs) | Letter *to Judge Drain re: Defendant's Exhibit 383* Filed by Nino Przulj on behalf of Charter Communications Operating, LLC, Charter Communications, Inc.. (Vargas, Ana) (Entered: 05/11/2020) |
| 05/14/2020 | [316](#) | Statement *Exhibits Admitted At Trial* filed by Shaya Rochester on |

| | | |
|---|---|---|
| | (11 pgs) | behalf of Windstream Holdings, Inc., et al.. (Rochester, Shaya) (Entered: 05/14/2020) |
| 06/09/2020 | [317](#)<br>(61 pgs) | Memorandum of Law *DEBTORS POST-TRIAL MEMORANDUM* filed by Shaya Rochester on behalf of Windstream Holdings, Inc., et al.. (Rochester, Shaya) (Entered: 06/09/2020) |
| 06/09/2020 | [318](#)<br>(5 pgs) | Statement / *The Committee's Post-Trial Brief* filed by Lorenzo Marinuzzi on behalf of Official Committee of Unsecured Creditors. (Marinuzzi, Lorenzo) (Entered: 06/09/2020) |
| 06/09/2020 | [319](#)<br>(57 pgs; 2 docs) | Memorandum of Law *Defendants' Post-Trial Brief on Counts VI and VII* filed by John Scott Kingston on behalf of Charter Communications Operating, LLC, Charter Communications, Inc.. (Attachments: # [1](#) Appendix A) (Kingston, John) (Entered: 06/09/2020) |
| 06/12/2020 | [320](#)<br>(17 pgs) | Certificate of Mailing of Claims Agent *re: 1) Debtors' Post-Trial Memorandum; and 2) The Committee's Post-Trial Brief* (related document(s)[317](#), [318](#) filed by Kurtzman Carson Consultants LLC. (Kass, Albert) (Entered: 06/12/2020) |
| 08/03/2020 | [321](#)<br>(114 pgs) | Statement *PLAINTIFFS REQUEST FOR JUDICIAL NOTICE OF FEE APPLICATIONS TO SUPPLEMENT SANCTIONS REQUEST AGAINST DEFENDANTS* (related document(s)[317](#) filed by Shaya Rochester on behalf of Windstream Holdings, Inc., et al.. (Rochester, Shaya) (Entered: 08/03/2020) |
| 08/05/2020 | [322](#)<br>(17 pgs) | Certificate of Mailing of Claims Agent *re: Plaintiffs' Request for Judicial Notice of Fee Applications to Supplement Sanctions Request Against Defendants* (related document(s)[321](#) filed by Kurtzman Carson Consultants LLC.(Kass, Albert) (Entered: 08/05/2020) |
| 09/09/2020 | [323](#)<br>(76 pgs) | Statement *PLAINTIFFS REQUEST FOR JUDICIAL NOTICE OF FEE APPLICATION TO SUPPLEMENT SANCTIONS REQUEST AGAINST DEFENDANTS* (related document(s)[317](#) filed by Shaya Rochester on behalf of Windstream Holdings, Inc., et al.. (Rochester, Shaya) (Entered: 09/09/2020) |
| 09/10/2020 | [324](#)<br>(17 pgs) | Certificate of Mailing of Claims Agent *re: Plaintiffs' Request for Judicial Notice of Fee Applications to Supplement Sanctions Request Against Defendants* (related document(s)[323](#) filed by Kurtzman Carson Consultants LLC.(Kass, Albert) (Entered: 09/10/2020) |
| 09/28/2020 | [326](#)<br>(254 pgs) | Transcript regarding Hearing Held on 1/16/2020 at 10:20 AM RE: Motion to File Under Seal..etc... Remote electronic access to the transcript is restricted until 12/28/2020. The transcript may be viewed at the Bankruptcy Court Clerks Office. [Transcription Service Agency: Veritext Legal Solutions.]. (See the Courts Website for contact information for the Transcription Service Agency.) (RE: related document(s) [215](#), [117](#), [118](#), [235](#), [222](#), [180](#), [196](#), [195](#), [225](#), [191](#), [185](#), [230](#), [234](#), [160](#), [168](#), [219](#), [164](#), [194](#), [198](#)). Notice of Intent to Request Redaction Deadline Due By 10/5/2020. Statement of Redaction Request Due By 10/19/2020. Redacted Transcript Submission Due By 10/29/2020. Transcript access will be restricted through 12/28/2020. (Ortiz, Carmen) (Entered: 10/01/2020) |
| 09/30/2020 | [325](#) | Transcript regarding Hearing Held on 3/9/2020 at 3:01 PM RE: Final |

| | (15 pgs) | Pre-Trial Conference via Phone. Remote electronic access to the transcript is restricted until 12/29/2020. The transcript may be viewed at the Bankruptcy Court Clerks Office. [Transcription Service Agency: Veritext Legal Solutions.]. (See the Courts Website for contact information for the Transcription Service Agency.). Notice of Intent to Request Redaction Deadline Due By 10/7/2020. Statement of Redaction Request Due By 10/21/2020. Redacted Transcript Submission Due By 11/2/2020. Transcript access will be restricted through 12/29/2020. (Ortiz, Carmen) (Entered: 09/30/2020) |
|---|---|---|
| 10/01/2020 | [327](#)<br>(58 pgs) | Transcript regarding Hearing Held on 04/29/2020 At 2:09 PM RE: Trial. Remote electronic access to the transcript is restricted until 12/30/2020. The transcript may be viewed at the Bankruptcy Court Clerks Office. [Transcription Service Agency: Veritext Legal Solutions.]. (See the Courts Website for contact information for the Transcription Service Agency.). Notice of Intent to Request Redaction Deadline Due By 10/8/2020. Statement of Redaction Request Due By 10/22/2020. Redacted Transcript Submission Due By 11/2/2020. Transcript access will be restricted through 12/30/2020. (Ramos, Jonathan) (Entered: 10/01/2020) |
| 10/01/2020 | [328](#)<br>(184 pgs) | Transcript regarding Hearing Held on 05/06/2020 At 9:37 AM RE: Trial. Remote electronic access to the transcript is restricted until 12/30/2020. The transcript may be viewed at the Bankruptcy Court Clerks Office. [Transcription Service Agency: Veritext Legal Solutions.]. (See the Courts Website for contact information for the Transcription Service Agency.). Notice of Intent to Request Redaction Deadline Due By 10/8/2020. Statement of Redaction Request Due By 10/22/2020. Redacted Transcript Submission Due By 11/2/2020. Transcript access will be restricted through 12/30/2020. (Ramos, Jonathan) (Entered: 10/01/2020) |
| 10/01/2020 | [329](#)<br>(243 pgs) | **(THIS TRANSCRIPT HAS BEEN AMENDED, SEE DOCUMENT # 331 FOR CORRECT ENTRY)**Transcript regarding Hearing Held on 04/28/2020 At 10:05 AM RE: Trial. Remote electronic access to the transcript is restricted until 12/30/2020. The transcript may be viewed at the Bankruptcy Court Clerks Office. [Transcription Service Agency: Veritext Legal Solutions.]. (See the Courts Website for contact information for the Transcription Service Agency.). Notice of Intent to Request Redaction Deadline Due By 10/8/2020. Statement of Redaction Request Due By 10/22/2020. Redacted Transcript Submission Due By 11/2/2020. Transcript access will be restricted through 12/30/2020. (Ramos, Jonathan) Modified on 3/24/2021 (Ortiz, Carmen). (Entered: 10/01/2020) |
| 10/01/2020 | [330](#)<br>(125 pgs) | Transcript regarding Hearing Held on 04/27/2020 At 10:02 AM RE: Trial. Remote electronic access to the transcript is restricted until 12/30/2020. The transcript may be viewed at the Bankruptcy Court Clerks Office. [Transcription Service Agency: Veritext Legal Solutions.]. (See the Courts Website for contact information for the Transcription Service Agency.). Notice of Intent to Request Redaction Deadline Due By 10/8/2020. Statement of Redaction Request Due By 10/22/2020. Redacted Transcript Submission Due By 11/2/2020. Transcript access will be restricted through 12/30/2020. (Ramos, Jonathan) (Entered: 10/01/2020) |
| 03/23/2021 | [331](#)<br>(198 pgs) | Amended Transcript regarding Hearing Held on 4/28/2020 at 10:05 AM RE: Trial. Remote electronic access to the transcript is restricted until 6/21/2021. The transcript may be viewed at the Bankruptcy Court |

| | | |
|---|---|---|
| | | Clerks Office. [Transcription Service Agency: Veritext Legal Solutions.]. (See the Courts Website for contact information for the Transcription Service Agency.) (RE: related document(s) 329). Notice of Intent to Request Redaction Deadline Due By 3/30/2021. Statement of Redaction Request Due By 4/13/2021. Redacted Transcript Submission Due By 4/23/2021. Transcript access will be restricted through 6/21/2021. (Ortiz, Carmen) (Entered: 03/24/2021) |
| 04/08/2021 | 332 (45 pgs) | Memorandum Of Decision On Count VI (CONTEMPT FOR VIOLATION OF THE AUTOMATIC STAY) and Count VII (EQUITABLE SUBORDINATION) Signed on 4/8/2021 (related document(s)122, 274). (Li, Dorothy) (Entered: 04/08/2021) |
| 04/13/2021 | 333 (17 pgs) | Certificate of Mailing of Claims Agent *re: Memorandum of Decision on Count VI (Contempt for Violation of the Automatic Stay) and Count VII (Equitable Subordination)* (related document(s)332) filed by Kurtzman Carson Consultants LLC.(Kass, Albert) (Entered: 04/13/2021) |
| 04/15/2021 | 334 (2 pgs) | Judgment signed on 4/13/2021 Judgment shall be entered against Charter Communications, Inc. and Charter Communications Operating, LLc. and in favor of Windstream Holdings, Inc., et al., JUDGMENT INDEX NUMBER WPBC 21,0007(related document(s)122, 274, 332) (Tavarez, Arturo) (Entered: 04/15/2021) |
| 04/19/2021 | 335 (15 pgs) | Certificate of Mailing of Claims Agent *re: Judgement on Counts VI and VII in Adversary Proceeding* (related document(s)334) filed by Kurtzman Carson Consultants LLC.(Kass, Albert) (Entered: 04/19/2021) |
| 04/23/2021 | 336 (5 pgs; 2 docs) | Motion to Approve *Amount of Supersedeas Bond* filed by Brian W. Hockett on behalf of Charter Communications Operating, LLC, Charter Communications, Inc.. (Attachments: # 1 Proposed Order) (Hockett, Brian) (Entered: 04/23/2021) |
| 04/29/2021 | 337 (29 pgs; 3 docs) | Notice of Appeal *and Statement of Election* (related document(s)334) filed by Brian W. Hockett on behalf of Charter Communications Operating, LLC, Charter Communications, Inc.. (Attachments: # 1 Civil Cover Sheet # 2 Related Case Statement)(Hockett, Brian) (Entered: 04/29/2021) |
| 04/29/2021 | | Receipt of Notice of Appeal( 19-08246-rdd) [appeal,97] ( 298.00) Filing Fee. Receipt number A15317951. Fee amount 298.00. (Re: Doc # 337) (U.S. Treasury) (Entered: 04/29/2021) |
| 05/04/2021 | 338 (3 pgs) | Notice of Hearing (related document(s)336) filed by Brian W. Hockett on behalf of Charter Communications Operating, LLC, Charter Communications, Inc.. with hearing to be held on 5/18/2021 at 10:00 AM at Teleconference Line (CourtSolutions) (RDD) (Hockett, Brian) (Entered: 05/04/2021) |
| 05/11/2021 | 339 (20 pgs; 3 docs) | Objection to Motion *OBJECTION TO CHARTERS MOTION TO APPROVE SUPERSEDEAS BOND* (related document(s)336) filed by Shaya Rochester on behalf of Windstream Holdings, Inc., et al.. (Attachments: # 1 Exhibit 1 # 2 Exhibit 2) (Rochester, Shaya) (Entered: 05/11/2021) |

| 05/11/2021 | [340](340)<br>(2 pgs) | Notice of Appearance in Adversary Proceeding filed by Susheel Kirpalani on behalf of Charter Communications Operating, LLC, Charter Communications, Inc.. (Kirpalani, Susheel) (Entered: 05/11/2021) |
|---|---|---|
| 05/13/2021 | [341](341)<br>(452 pgs; 42 docs) | Designation of Contents (appellant). *Defendants-Appellants Designation of the Record and Statement of Issues to be Presented on Appeal* (related document(s)[334](334) filed by Brian W. Hockett on behalf of Charter Communications Operating, LLC, Charter Communications, Inc.. (Attachments: # [1](1) Item No. 112 # [2](2) Item No. 113 # [3](3) Item No. 116 # [4](4) Item No. 117 # [5](5) Item No. 118 # [6](6) Item No. 121 # [7](7) Item No. 123 # [8](8) Item No. 124 # [9](9) Item No. 125 # [10](10) Item No. 126 # [11](11) Item No. 127 # [12](12) Item No. 128 # [13](13) Item No. 129 # [14](14) Item No. 130 # [15](15) Item No. 131 # [16](16) Item No. 132 # [17](17) Item No.133 # [18](18) Item No. 134 # [19](19) Item No. 135 # [20](20) Item No. 136 # [21](21) Item No. 137 # [22](22) Item No. 138 # [23](23) Item No. 139 # [24](24) Item No. 140 # [25](25) Item No. 141 # [26](26) Item No. 143 # [27](27) Item No. 144 # [28](28) Item No. 145 # [29](29) Item No. 146 # [30](30) Item No. 147 # [31](31) Item No. 148 # [32](32) Item No. 149 # [33](33) Item No. 150 # [34](34) Item No. 151 # [35](35) Item No. 152 # [36](36) Item No. 153 # [37](37) Item No. 154 # [38](38) Item No. 155 # [39](39) Item No. 156 # [40](40) Item No. 157 # [41](41) Item No. 158)(Hockett, Brian) (Entered: 05/13/2021) |
| 05/13/2021 | [342](342)<br>(3167 pgs; 57 docs) | Designation of Contents (appellant). *Defendants-Appellants' Notice of Filing Attachments* (related document(s)[334](334) filed by Brian W. Hockett on behalf of Charter Communications Operating, LLC, Charter Communications, Inc.. (Attachments: # [1](1) Item No. 161 # [2](2) Item No. 162 # [3](3) Item No. 163 # [4](4) Item No. 164 # [5](5) Item No. 165 # [6](6) Item No. 166 # [7](7) Item No. 167 # [8](8) Item No. 168 # [9](9) Item No. 169 # [10](10) Item No. 170 # [11](11) Item No. 171 # [12](12) Item No. 172 # [13](13) Item No. 173 # [14](14) Item No. 174 # [15](15) Item No. 175 # [16](16) Item No. 177 # [17](17) Item No. 178 # [18](18) Item No. 179 # [19](19) Item No. 180 # [20](20) Item No. 181 # [21](21) Item No. 182 # [22](22) Item No. 183 # [23](23) Item No. 184 # [24](24) Item No. 185 # [25](25) Item No. 186 # [26](26) Item No. 187 # [27](27) Item No. 188 # [28](28) Item No. 189 # [29](29) Item No. 190 # [30](30) Item No. 191 # [31](31) Item No. 192 # [32](32) Item No. 193 # [33](33) Item No. 194 # [34](34) Item No. 195 # [35](35) Item No. 196 # [36](36) Item No. 197 # [37](37) Item No. 198 # [38](38) Item No. 199 # [39](39) Item No. 200 # [40](40) Item No. 201 # [41](41) Item No. 202 # [42](42) Item No. 203 # [43](43) Item No. 204 # [44](44) Item No. 205 # [45](45) Item No. 206 # [46](46) Item No. 207 # [47](47) Item No. 208 # [48](48) Item No. 209 # [49](49) Item No. 210 # [50](50) Item No. 211 # [51](51) Item No. 212 # [52](52) Item No. 213 # [53](53) Item No. 214 # [54](54) Item No. 215 # [55](55) Item No. 216 # [56](56) Item No. 217)(Hockett, Brian) (Entered: 05/13/2021) |
| 05/13/2021 | [343](343)<br>(721 pgs; 44 docs) | Designation of Contents (appellant). *Defendants-Appellants' Notice of Filing Attachments* (related document(s)[334](334) filed by Brian W. Hockett on behalf of Charter Communications Operating, LLC, Charter Communications, Inc.. (Attachments: # [1](1) Item No. 219 # [2](2) Item No. 220 # [3](3) Item No. 221 # [4](4) Item No. 222 # [5](5) Item No. 223 # [6](6) Item No. 224 # [7](7) Item No. 225 # [8](8) Item No. 227 # [9](9) Item No. 229 # [10](10) Item No. 230 # [11](11) Item No. 231 # [12](12) Item No. 232 # [13](13) Item No. 233 # [14](14) Item No. 234 # [15](15) Item No. 235 # [16](16) Item No. 236 # [17](17) Item No. 237 # [18](18) Item No. 238 # [19](19) Item No. 239 # [20](20) Item No. 240 # [21](21) Item No. 241 # [22](22) Item No. 242 # [23](23) Item No. 243 # [24](24) Item No. 244 # [25](25) Item No. 245 # [26](26) Item No. 246 # [27](27) Item No. 247 # [28](28) Item No. 248 # [29](29) Item No. 249 # [30](30) Item No. 250 # [31](31) Item No. 251 # [32](32) Item No. 252 # [33](33) Item No. 253 # [34](34) Item No. 254 # [35](35) Item No. 255 # [36](36) Item No. 256 # [37](37) Item No. 257 # [38](38) Item No. 258 # [39](39) Item No. 259 # [40](40) Item No. 260 # [41](41) Item No. 261 # [42](42) Item No. 262 # [43](43) Item No. 263)(Hockett, Brian) (Entered: 05/13/2021) |

| 05/13/2021 | [344](#)<br>(69 pgs; 2 docs) | Designation of Contents (appellant). *Defendants-Appellants' Notice of Filing Attachments* (related document(s)[334](#)) filed by Brian W. Hockett on behalf of Charter Communications Operating, LLC, Charter Communications, Inc.. (Attachments: # [1](#) Item No. 218 - Part 1 of 4)(Hockett, Brian) (Entered: 05/13/2021) |
| --- | --- | --- |
| 05/13/2021 | [345](#)<br>(66 pgs; 2 docs) | Designation of Contents (appellant). *Defendants-Appellants' Notice of Filing Attachment* (related document(s)[334](#)) filed by Brian W. Hockett on behalf of Charter Communications Operating, LLC, Charter Communications, Inc.. (Attachments: # [1](#) Item No. 218 - Part 2 of 4)(Hockett, Brian) (Entered: 05/13/2021) |
| 05/13/2021 | [346](#)<br>(66 pgs; 2 docs) | Designation of Contents (appellant). *Defendants-Appellants' Notice of Filing Attachments* (related document(s)[334](#)) filed by Brian W. Hockett on behalf of Charter Communications Operating, LLC, Charter Communications, Inc.. (Attachments: # [1](#) Item No. 218 - Part 3 of 4)(Hockett, Brian) (Entered: 05/13/2021) |
| 05/13/2021 | [347](#)<br>(24 pgs; 2 docs) | Designation of Contents (appellant). *Defendants-Appellants' Notice of Filing Attachments* (related document(s)[334](#)) filed by Brian W. Hockett on behalf of Charter Communications Operating, LLC, Charter Communications, Inc.. (Attachments: # [1](#) Item No. 218 - Part 4 of 4)(Hockett, Brian) (Entered: 05/13/2021) |
| 05/14/2021 | [348](#)<br>(15 pgs; 2 docs) | Reply to Motion -- *Defendants' Reply in Support of Motion to Approve Amount of Supersedeas Bond* (related document(s)[336](#)) filed by Susheel Kirpalani on behalf of Charter Communications Operating, LLC, Charter Communications, Inc.. (Attachments: # [1](#) Exhibit A)(Kirpalani, Susheel) (Entered: 05/14/2021) |
| 05/14/2021 | [349](#)<br>(17 pgs) | Certificate of Mailing of Claims Agent *re: Objection to Charter's Motion to Approve Supersedeas Bond* (related document(s)[339](#)) filed by Kurtzman Carson Consultants LLC.(Kass, Albert) (Entered: 05/14/2021) |
| 05/14/2021 | [350](#)<br>(17 pgs; 2 docs) | Certificate of Service *for Reply In Further Support Of Motion To Approve Supersedeas Bond* filed by Susheel Kirpalani on behalf of Charter Communications Operating, LLC, Charter Communications, Inc.. (Attachments: # [1](#) Exhibit Exhibit 1)(Kirpalani, Susheel) (Entered: 05/14/2021) |
| 05/19/2021 | [351](#)<br>(7 pgs) | Order signed on 5/19/2021 granting Supersedeas Bond (Related Doc # [336](#)) . (Vargas, Ana) (Entered: 05/19/2021) |
| 05/20/2021 | [352](#)<br>(8 pgs) | Civil Cover Sheet from U.S. District Court, Case Number: 21-cv-4552 (related document(s)[337](#)) (Rouzeau, Anatin). (Entered: 05/20/2021) |
| 05/27/2021 | [353](#)<br>(1225 pgs; 13 docs) | Counter Designation (appellee) *Plaintiffs-Appellees' Designation of Additional Items to be Included on the Record on Appeal* (related document(s)[341](#)) filed by Shaya Rochester on behalf of Windstream Holdings, Inc., et al.. (Attachments: # [1](#) Item No. 312 # [2](#) Item No. 313 # [3](#) Item No. 314 # [4](#) Item No. 315 # [5](#) Item No. 316 # [6](#) Item No. 317 # [7](#) Item No. 318 # [8](#) Item No. 319 # [9](#) Item No. 320 # [10](#) Item No. 321 # [11](#) Item No. 322 # [12](#) Item No. 323)(Rochester, Shaya) (Entered: 05/27/2021) |
| 05/27/2021 | [354](#) | Designation of Contents (appellant). *Notice of Order Granting* |

| | (5 pgs; 2 docs) | *Appellants' Motion to Accept Documents Sealed By the Bankruptcy Court As Part of The Record on Appeal* filed by Susheel Kirpalani on behalf of Charter Communications Operating, LLC, Charter Communications, Inc.. (Attachments: # 1 Exhibit A)(Kirpalani, Susheel) (Entered: 05/27/2021) |
|---|---|---|
| 06/01/2021 | 355 (8 pgs) | Certificate of Mailing of Claims Agent *re: Plaintiffs-Appellees' Designation of Additional Items to be Included on the Record on Appeal* (related document(s)353) filed by Kurtzman Carson Consultants LLC.(Kass, Albert) (Entered: 06/01/2021) |
| 06/04/2021 | 356 (5 pgs; 2 docs) | Statement *Notice of Entry* filed by Shaya Rochester on behalf of Windstream Holdings, Inc., et al.. (Attachments: # 1 Exhibit A) (Rochester, Shaya) (Entered: 06/04/2021) |
| 06/08/2021 | 357 (8 pgs) | Certificate of Mailing of Claims Agent *re: Notice of Entry* (related document(s)356) filed by Kurtzman Carson Consultants LLC.(Kass, Albert) (Entered: 06/08/2021) |
| 06/25/2021 | 358 (2 pgs; 2 docs) | Notice of Transmittal of Record of Appeal. All documents have been filed with the United States District Court for the Southern District of New York. Record of Appeal is Complete and Available Electronically under Civil Case Number 21-cv-4552 assigned to the Honorable Cathy Seibel. Check the District Court Docket Sheet for the Briefing Schedule. (related document(s)337) (Rouzeau, Anatin). (Entered: 06/25/2021) |
| 07/08/2021 | 359 (1 pg) | Order of U.S. District Court Judge Cathy Seibel signed on 4/24/2020 Dismissing Notice of Appeal (related document(s)210, 201). (Correa, Mimi) (Entered: 07/08/2021) |
| 07/08/2021 | 360 (1 pg) | Order of U.S. District Court Judge Cathy Seibel signed on 4/24/2020 Denying Motion for Leave to Appeal (related document(s)203, 202, 211). (Correa, Mimi) (Entered: 07/08/2021) |
| 07/13/2021 | 361 (6 pgs) | Certificate of Mailing of Claims Agent *re: Order* (related document(s)359) filed by Kurtzman Carson Consultants LLC.(Kass, Albert) (Entered: 07/13/2021) |
| 03/29/2022 | 362 (2 pgs; 2 docs) | Notice of Case Reassignment From Judge Robert D. Drain to Judge Lisa G Beckerman. Judge Lisa G Beckerman added to the case. (Acosta, Annya). (Entered: 03/29/2022) |
| 03/30/2022 | 363 (2 pgs) | Notice of Withdrawal *of Counsel* filed by Brian W. Hockett on behalf of Charter Communications Operating, LLC, Charter Communications, Inc.. (Hockett, Brian) (Entered: 03/30/2022) |
| 03/31/2022 | 364 (3 pgs) | Certificate of Mailing Re: Notice of Case Reassignment (related document(s) (Related Doc # 362)) . Notice Date 03/31/2022. (Admin.) (Entered: 04/01/2022) |

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 11/16/2022 21:30:50 | | | |
| **PACER Login:** | km3280 | **Client Code:** | 392355-00008 |
| **Description:** | Docket Report | **Search Criteria:** | 19-08246-lgb Fil or Ent: filed From: 11/2/2000 To: 11/16/2022 Doc From: 0 Doc To: 99999999 Headers: included Format: html Page counts for documents: included |
| **Billable Pages:** | 30 | **Cost:** | 3.00 |

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------x

*In re*:

WINDSTREAM HOLDINGS, INC. *et al.*,

                              Debtors.
-----------------------------------------------------------------------x

WINDSTREAM HOLDINGS, INC. *et al.*,

                         Plaintiffs-Appellees,

     - against -

CHARTER COMMUNICATIONS INC. and
CHARTER COMMUNICATIONS OPERATING, LLC,

                        Defendants-Appellants.

-----------------------------------------------------------------------x

**OPINION AND ORDER**

No. 21-CV-4552 (CS)

Appearances:
Terence P. Ross
Shaya Rochester
Robert T. Smith
Eric T. Werlinger
Timothy H. Gray
Katten Muchin Rosenman LLP
New York, New York
Washington, D.C.
*Counsel for Plaintiffs-Appellees*

Susheel Kirpalani
Benjamin I. Finestone
Quinn Emanuel Urquhart & Sullivan, LLP
New York, New York
*Counsel for Defendants-Appellants*

Seibel, J.

       Before the Court is the appeal of Defendants-Appellants Charter Communications Inc.

and Charter Communications Operating, LLC (together, "Charter") from the Bankruptcy Court's

April 15, 2021 judgment holding Charter in contempt for violation of the automatic stay under

11 U.S.C. § 362(a) and assessing sanctions (the "Judgment").  (Bankr. Dkt. 334.)[1]  For the

following reasons, the Judgment is VACATED in part.[2]

## I.    **BACKGROUND**

Plaintiffs-Appellees Windstream Holdings Inc. and its debtor affiliates (collectively,

"Windstream") and Charter are telecommunications service providers.  (Bankr. Dkt. 1 ("Adv.

Compl.") ¶¶ 11-12.)  Windstream filed for Chapter 11 reorganization on February 25, 2019.  (*Id.*

¶ 14.)  By operation of 11 U.S.C. § 362, the automatic stay went into effect on that date.

Charter competes with Windstream in providing residential and commercial voice and

data communication services in certain locations.  (*Id.* ¶¶ 11-13.)  In March 2019, Charter

launched a direct-mail advertising campaign directed at Windstream customers.  (*Id.* ¶¶ 18-19.)

The initial mailing had text on the front of the envelope that stated:  "Important Information

Enclosed for Windstream Customers."  (Bankr. Dkt. 341-7.)  Inside was a two-sided

advertisement for Spectrum (which is Charter's residential internet brand).  (Bankr. Dkt. 341-6 at

1-2.)  Text on the front of the ad stated in large text:  "Windstream Customers, Don't Risk

Losing Your Internet and TV Services."  (*Id.* at 1.)  In smaller text below that, the advertisement

read (in relevant part):  "Windstream has filed for Chapter 11 bankruptcy, which means

---

[1] References to "Bankr. Dkt." refer to documents filed on the docket in the underlying adversary proceeding in the Bankruptcy Court for the Southern District of New York under docket number 19-8246.  References to "ECF No." are to documents filed on this Court's docket.

[2] Charter appeals only the Bankruptcy Court's contempt ruling with respect to the claim that its advertising campaign violated the automatic stay, and does not challenge that Court's holdings that:  (1) its termination of "last mile" service to Windstream customers – in violation of the parties' Value Added Reseller ("VAR") Agreement – violated the automatic stay; or (2) its unsecured claims should be equitably subordinated.  (*See* ECF No. 15 ("Appellants' Mem.") at 15 n.3.)

uncertainty.  Will they be able to provide the Internet and TV services you rely on in the future?

To ensure you are not left without vital Internet and TV services, switch to Spectrum. . . .

Windstream has a 2-year contract.  With Spectrum there are no contracts.  Plus, we will buy you

out of your current contract up to $500." (*Id.*)  The back of the advertisement stated, among

other things, "Windstream's future is unknown, but Spectrum is here to stay . . . ." (*Id.*)

Windstream alleges that this advertising was knowingly false, in that Charter was aware that

Windstream's bankruptcy was not going to result in any interruption of service to its customers.

(Adv. Compl. ¶¶ 3-4.)

Charter mailed this advertisement to 800,000 residences in geographic markets that it

determined were likely to include Windstream subscribers.  (*See* Bankr. Dkt. 343-35 at 26:6-14,

32:13-33:9.)  At trial, Windstream introduced evidence and testimony that the advertisement

caused confusion among its customers, (*see, e.g.*, Bankr. Dkt. 341-26 at 11:19-14:14, 25:15-

26:21; Bankr. Dkt. 328 at 37:4-8), and caused it to lose several thousand customers, (*see* Bankr.

Dkt. 343-27 ¶¶ 17-19; Bankr. Dkt. 343-28 ¶ 20; *see also* Bankr. Dkt. 328 at 57:23-58:7).

Windstream also introduced evidence that it offered credits and discounts, (Bankr. Dkt. 343-27

¶¶ 12-14; Bankr. Dkt. 342-55), launched a corrective advertising campaign, (Bankr. Dkt. 343-27

¶ 16; Bankr. Dkt. 342-13; Bankr. Dkt. 342-14), and later launched an additional promotional

campaign, (Bankr. Dkt. 328 at 48:5-15, 56:3-23, 109:11-110:12; Bankr. Dkt. 343-27 ¶ 15; Bankr.

Dkt. 342-53), all to mitigate the impact of this advertising on its business.

On April 5, 2019, Windstream initiated an adversary proceeding before the Bankruptcy

Court, bringing seven claims.  (Adv. Compl.)[3]  On the same day it sought a temporary

---

[3] Counts I-IV in the Adversary Complaint alleged violations of the Lanham Act and its
Georgia, North Carolina, and Nebraska equivalents; Count V alleged breach of contract based on

restraining order and preliminary injunction against Charter's advertising campaign.  (Bankr. Dkt. 2.)  On April 16, 2019, the Bankruptcy Court granted Windstream's request for a temporary restraining order and enjoined the direct mail campaign, (Bankr. Dkt. 25), and on May 16, 2019 issued the requested preliminary injunction providing the same relief, (Bankr. Dkt. 61).

On October 9, 2019, Charter filed in this Court a motion to withdraw the reference on Counts I through V of the Adversary Complaint.  (No. 19-CV-9354, ECF No. 1; Bankr. Dkt. 104.)  On October 14, Charter filed in the Bankruptcy Court a motion for judgment on the pleadings on Count VI of the Adversary Complaint and a motion to dismiss Count VII.  (Bankr. Dkt. 109.)  On November 15, 2019, while Charter's motion to withdraw the reference as to Counts I through V was pending, the parties filed cross-motions for summary judgment in the Bankruptcy Court:  Charter moved for summary judgment on Counts I through V, (Bankr. Dkt. 129), and Windstream moved for summary judgment on all counts, (Bankr. Dkt. 122).  On December 18, 2019, the Bankruptcy Court held a hearing on the parties' motions and issued rulings from the bench, including denying Charter's motion for summary judgment, (Bankr. Dkt. 237 ("SJ Hr'g") at 132:6-156:9; *see* Bankr. Dkt. 275); denying Charter's motion for judgment on the pleadings as to Count VI and denying in part and granting in part Charter's motion to dismiss Count VII, (SJ Hr'g at 54:8-61:10; *see* Bankr. Dkt. 259); granting Windstream's motion for summary judgment on Counts I-V as to liability (SJ Hr'g at 136:24-151:21); and granting in part and denying in part Windstream's motion for summary judgment on Counts VI-VII, (*id.* at 151:22-154:24; *see* Bankr. Dkt. 274).  With respect to Count VI, the Bankruptcy Court determined that Charter was liable for violating the automatic stay through its advertising

---

the VAR Agreement; Count VI alleged violations of the automatic stay; and Count VII sought equitable subordination.  (*See* Bankr. Dkt. 1; Bankr. Dkt. 41.)

campaign, which the Bankruptcy Court described as "an act to control property of the estate, namely, the debtors' customers or contracts with those customers."  (SJ Hr'g at 152:7-14.)[4]  The Bankruptcy Court did not determine damages at that time, explaining that disputed facts remained as to "whether the actions taken as alleged in the motion and the complaint in violation of the stay would satisfy the standard for civil contempt as most recently articulated by the Supreme Court in the *Taggart* case."  (*Id.* at 135:23-136:23.)[5]

In May 2020, the Bankruptcy Court held a four-day trial on Counts VI and VII to determine, as relevant to this appeal, whether Charter should be held in contempt for violation of the automatic stay and, if so, what sanctions should be imposed.  On April 8, 2021, the Bankruptcy Court issued a memorandum of decision (the "Order") noting its prior summary judgment rulings as to Counts VI and VII and setting out its decisions on the remaining issues on those counts.  (*See* Bankr. Dkt. 332.)  As relevant to this appeal, the Order noted the Bankruptcy Court's previous holding that Charter had breached the automatic stay by its "literally false and intentionally misleading advertising campaign that wrongfully interfered with the Debtors' customer contracts and goodwill" and held that Charter should be (1) held in contempt for that violation and (2) sanctioned $19,179,329.45 for the losses caused thereby.  (Order at 3.)  On

---

[4] Specifically, the Bankruptcy Court stated that the conduct that it had found to violate the Lanham Act and similar state laws also violated the automatic stay:

> [T]he violation of the Lanham Act and its state law equivalents is an act to control property of the estate, namely, the debtors' customers or contracts with those customers, which would also constitute a violation of the automatic stay, given that those rights are protected by the automatic stay. . . .  [T]he automatic stay was violated by . . . interference with the Windstream entities' contracts with their customers by the mailing campaign.

(SJ Hr'g at 152:7-19.)

[5] The Bankruptcy Court was referring to *Taggart v. Lorenzen*, 139 S. Ct. 1795 (2019).

April 15, 2021, the Bankruptcy Court entered Judgment on Counts VI and VII of the Adversary

Complaint in favor of Windstream.  (Bankr. Dkt. 334.)  On April 29, 2021, Charter timely filed a

notice of appeal.  (Bankr. Dkt. 337.)

## II.    <u>LEGAL STANDARD</u>

This Court has jurisdiction pursuant to 28 U.S.C. § 158(a)(1) to hear appeals from final

judgments, orders, and decrees of a bankruptcy court.  "Generally in bankruptcy appeals, the

district court reviews the bankruptcy court's factual findings for clear error and its conclusions of

law *de novo*."  *R$^2$ Invs., LDC v. Charter Commc'ns, Inc. (In re Charter Commc'ns Inc.)*, 691

F.3d 476, 482-83 (2d Cir. 2012).  The Court reviews *de novo* the bankruptcy court's legal

conclusion that Charter violated the automatic stay.  *Bank of Am., N.A. v. Adomah (In re*

*Adomah)*, 368 B.R. 134, 137 (S.D.N.Y. 2007).

"When reviewing for clear error, [the Court] may reverse only if [it is] left with the

definite and firm conviction that a mistake has been committed."  *United States v. Bershchansky*,

788 F.3d 102, 110 (2d Cir. 2015) (cleaned up).  "Thus, if the factual findings of the bankruptcy

court are plausible in light of the record viewed in its entirety, this Court may not reverse it even

though convinced that had it been sitting as the trier of fact, it would have weighed the evidence

differently."  *Savage & Assocs., P.C. v. Williams Commc'ns (In re Teligent Servs., Inc.)*, 372

B.R. 594, 599 (S.D.N.Y. 2007) (cleaned up).  "[W]here there are two permissible views of the

evidence, the factfinder's choice between them cannot be clearly erroneous."  *Id.* (cleaned up).

"On appellate review, this Court may set aside a bankruptcy court's order holding a party

in contempt only for abuse of discretion, but such review is more exacting than under the

ordinary abuse-of-discretion standard because a bankruptcy court's contempt power is narrowly

circumscribed."  *Blair Ventures, LLC v. Famous Restoration Inc. (In re Blair Ventures)*, 581

B.R. 728, 732 (S.D.N.Y. 2017) (cleaned up). A bankruptcy court's award of sanctions is also subject to an "abuse of discretion" standard. *Solow v. Kalikow (In re Kalikow)*, 602 F.3d 82, 91 (2d Cir. 2010). A bankruptcy court "abuses its discretion if it (1) bases its decision on an error of law or uses the wrong legal standard; (2) bases its decision on a clearly erroneous factual finding; or (3) reaches a conclusion that, though not necessarily the product of a legal error or a clearly erroneous factual finding, cannot be located within the range of permissible decisions." *Klipsch Grp., Inc. v. ePRO E-Com. Ltd.*, 880 F.3d 620, 627 (2d Cir. 2018) (cleaned up).

## III.   DISCUSSION

The Court addresses in this opinion whether (1) Charter's advertisements violated the automatic stay and (2) the Bankruptcy Court properly held that there was no fair ground of doubt that the advertisements would violate the stay, such that civil contempt sanctions were appropriate. Because I find that Charter's advertisements did not violate the automatic stay, and in any case, there was a fair ground of doubt whether they did so, I do not address any other issue presented on this appeal.[6]

### A.   Whether the Bankruptcy Court Erred in Holding that Charter Violated the Automatic Stay

"The Bankruptcy Code's automatic stay provisions, set forth in Section 362, protect bankruptcy estates by restraining any formal or informal action or legal proceeding that might dissipate estate assets or interfere with the trustee's orderly administration of the estate." *Bayview Loan Servicing LLC v. Fogarty (In re Fogarty)*, 39 F.4th 62, 71 (2d Cir. 2022) (cleaned

---

[6] Specifically, I need not and do not address whether Charter violated the Lanham Act or its state law equivalents, nor do I address the Court's findings as to the appropriate quantum of damages. My reversal of the contempt finding will not leave Windstream without a remedy, as it still may pursue its false advertising and breach of contract claims as to which I have withdrawn the reference.

up).  Upon the filing of a bankruptcy petition, "any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate" is automatically stayed.  11 U.S.C. § 362(a)(3); *see Shimer v. Fugazy (In re Fugazy Express, Inc.)*, 982 F.2d 769, 776 (2d Cir. 1992) ("Section 362 of the Code operates, immediately upon a debtor's filing of a bankruptcy petition, to, *inter alia*, stay automatically any act to transfer control over property of the estate.").  Under 11 U.S.C. § 541(a)(1), "property of the estate" includes "all legal or equitable interests of the debtor in property as of the commencement of the case."  Such interests include a debtor's interest in executory contracts, *see Lehman Bros. Special Fin. Inc. v. Bank of Am. Nat'l Ass'n (In re Lehman Bros. Holdings Inc.)*, 544 B.R. 16, 40 (Bankr. S.D.N.Y. 2015),[7] and, in certain circumstances, intangible assets like goodwill, *see Golden Distribs., Ltd. v. Reiss (In re Golden Distribs., Ltd.)*, 122 B.R. 15, 20 (Bankr. S.D.N.Y. 1990).

Charter asserts it did not violate § 362(a)(3) because its advertisements were not acts to "exercise control" over Windstream's "property."  In doing so it challenges (1) the bankruptcy court's conclusion that Windstream had executory contracts with its customers that constituted property protected by § 362(a)(3); (2) the bankruptcy court's reliance on "customer goodwill" as a property interest protected by § 362(a)(3); and (3) the bankruptcy court's conclusion that the advertisement constituted an act to "obtain" or "exercise control" over either of those two forms of protected property.

---

[7] "Executory contracts" refers to "contract[s] under which the obligation of both the bankrupt and the other party to the contract are so far unperformed that the failure of either to complete performance would constitute a material breach excusing the performance of the other."  *ReGen Cap. I, Inc. v. Halperin (In re U.S. Wireless Data, Inc.)*, 547 F.3d 484, 488 n.1 (2d Cir. 2008).

1.       **Executory Contracts**

Charter does not dispute that "Section 362(a)(3) clearly encompasses and protects a debtor's executory contracts, which are property of the debtor's estate under 11 U.S.C. § 541." (Order at 11.)  But it asserts that the Bankruptcy Court erred in determining that Windstream's relationship with its subscribers was contractual, and more specifically that Windstream had a protectible property interest in any such relationship.

Charter asserts that there is no evidence in the record of any contracts Windstream had with customers.  The record before me is underdeveloped as to the specifics of the agreements Windstream had with its customers.  At summary judgment, Windstream did not assert interference with *contracts* as a basis for its assertion that Charter violated the automatic stay. Rather, with regard to the advertisements in question, Windstream asserted only "that Charter intentionally disseminated advertisements regarding Windstream's Chapter 11 cases, which harmed Windstream's *goodwill* by falsely stating and implying that Windstream will not be able to provide services and/or that Windstream will be going out of business."  (Bankr. Dkt. 123 at 32 (emphasis added).)[8]

Nevertheless, at summary judgment the Bankruptcy Court found that Charter's advertising campaign was "an act to control property of the estate, namely, the debtors' customers or contracts with those customers, which would also constitute a violation of the

_____

[8] The only mention in the motion for summary judgment of an executory contract appears in a partially redacted paragraph which seems to address Charter's disconnections of Windstream customers in alleged breach of the parties' VAR Agreement, (*see* Bankr. Dkt. 123 at 32-34), an issue that Charter does not appeal, (*see* Appellants' Mem. at 15 n.3).  I note that the parties, in their designation of the record of appeal, have not provided the Court with unredacted docket materials.  Nevertheless, Windstream does not argue that it claimed at summary judgment that Charter's advertisements were acts of control over executory customer contracts or point to any argument it made or record evidence it presented to the Bankruptcy Court on summary judgment regarding the customer contracts it now alleges to be property subject to the automatic stay.

automatic stay." (SJ Hr'g at 152:7-14.) In the Order, the Bankruptcy Court cited as evidence of the contracts in question testimony from a Windstream employee that the "average tenure of a customer is let's just say ballpark 50 months." (Order at 16 n.17, 19 n.24 (citing Bankr. Dkt. 328 at 39).) The witness did not, however, state that its customers remained with Windstream for an average of 50 months because of any contract.

Windstream argues on appeal that it has both "term contracts and month-to-month contracts," but does not elaborate which contracts it claims to have lost due to Charter's advertisements. (ECF No. 24 ("Appellees' Opp.") at 22.) As evidence of the existence of these contracts, Windstream points to Charter's advertisement stating that "Windstream has a 2-year contract," (*id.* at 25); a statement in Charter's Statement of Additional Facts in opposition to Windstream's summary judgment motion that it had "bought out 32 contracts from Windstream Customers in 2019" and a spreadsheet showing those contracts, (Bankr. Dkt. 158 ¶ 65; Bankr. Dkt. 153-51); and a vague reference to "contract concessions" that Windstream argued it had to offer to retain customers in the wake of Charter's advertising campaign, (SJ Hr'g at 67:24-25).

This evidence is quite thin. It suggests that some kind of contractual relationship may exist between Windstream and at least some of its subscribers, but does not reflect anything about the terms and conditions of those contracts, their duration, or what performance was required of either party to the contract. Windstream argues that, in addition to the limited evidence in the record, this Court can and should take judicial notice of the Terms and Conditions on its website, which it represents were in effect at the time of the stay violation, (Appellees' Opp. at 26 n.5), and to which it points as evidence that "all Windstream subscribers are bound at least by month-to-month, *automatically* renewing contracts," (*id.* at 27 (emphasis in original)). But this Court must "limit [its] review to the record on appeal" and accordingly

cannot take judicial notice of evidence that was not presented to the trial court.  *Pullman v. Alpha Media Publ'g, Inc.*, 624 F. App'x 774, 779 (2d Cir. 2015) (summary order); *see Int'l Bus. Machs. Corp. v. Edelstein*, 526 F.2d 37, 45 (2d Cir.1975) (*per curiam*) ("[A]bsent extraordinary circumstances, federal appellate courts will not consider rulings or evidence which are not part of the trial record.").[9]  Thus, to the extent that Windstream relies on those terms and conditions – for example, in arguing that all of its customers are at least covered by a month-to-month contract that is executory because the Terms and Conditions include "automatic renewal provisions that render the contracts continuous" – it fails to identify any evidence that this Court can properly consider to support that assertion.

The issue of whether Windstream had contracts with its customers is a question of fact reviewed for clear error.  I find that despite the lack of evidence regarding the specifics of the contracts in question, the Bankruptcy Court did not clearly err in concluding that Windstream had some kind of contracts under which it provided services to at least some customers.  This is supported by Charter's assertions that "Windstream has a two-year contract," (Bankr. Dkt. 341-6 at 2), and that it "bought out 32 contracts from Windstream customers," (*see* Bankr. Dkt. 158 ¶ 65).  While the fact that customers typically stay with Windstream for 50 months does not necessarily mean that they do so pursuant to a contract, that fact, combined with Charter's

---

[9] Windstream cites *Force v. Facebook, Inc.*, 934 F.3d 53, 59 n.5 (2d Cir. 2019), for the proposition that this Court may judicially notice the terms and conditions on its website and consider them for their truth, *i.e.*, as evidence of customer contracts.  But that case stands only for the proposition that the Court can consider representations or statements on a public website for the fact that they were made, not for their truth.  *Id.*; *see Dwyer v. Allbirds, Inc.*, No. 21-CV-5238, 2022 WL 1136799, at *4 (S.D.N.Y. Apr. 18, 2022) (matters of which a court can take judicial notice under Fed. R. Evid. 201 include "information on a party's publicly available website, as long as the authenticity of the site is not in dispute, but such information may be considered only for the fact that it was said, not for its truth").

concessions, could support an inference of the existence of either a term contract or some form of month-to-month contract that automatically renews.

On the legal question of whether such contracts are executory, Windstream points to case law to the effect that an automatically renewing contract does not end with the conclusion of the term, but rather is regarded as continuing until either party terminates. *See Pirinate Consulting Grp., LLC v. ERCO Worldwide (In re NewPage Corp.)*, 586 B.R. 551, 564 (Bankr. D. Del. 2018) (supply agreement between Chapter 11 debtor and non-debtor party that would renew automatically unless parties gave requisite notice of termination was executory contract for purposes of assumption); *In re Country Club Ests. at Aventura Maint. Ass'n*, 227 B.R. 565, 568 (Bankr. S.D. Fla. 1998) ("This Court adopts the majority position that a contract which is renewed pursuant to an automatic renewal provision is merely a continuation of the original contract. . . . Therefore, the renewal period constitutes a continuation of the original prepetition executory contract . . . ."). These authorities are persuasive that an automatically renewing subscriber agreement, requiring notice of termination, would be an executory contract subject to the automatic stay. But, as noted, there is an insufficient record basis to conclude that Windstream's customer contracts were the sort of automatically renewing contracts that would be considered executory and part of Windstream's property in bankruptcy. In any case, I need not resolve this question definitively because, as I will explain, Charter's advertisements were not acts to "obtain" or "control" any such contracts.

### 2.   Goodwill

Charter also challenges the conclusion that goodwill constitutes property of the estate in this case. As a general matter, as the Bankruptcy Court held, "Section 362(a)(3) protects a debtor's goodwill" as "property of the estate under 11 U.S.C. § 541(a)(1)." (Order at 12.) But,

as reflected by the authority cited by the Bankruptcy Court and Windstream, "goodwill" in this sense is typically tied to wrongful impersonation and/or involves goodwill associated with customer lists or trademarks.  *See Cyganowski v. Biolitec U.S. Inc. (In re Biolitec, Inc.)*, No. 13-11157, 2015 WL 351201, at *10 (Bankr. D.N.J. Jan. 22, 2015) (finding violation of automatic stay where, "despite the Court's finding and approval of the fact that the Debtor's customer information and goodwill belonged to the estate and were to be included in the sale of substantially all of the Debtor's assets to AngioDynamics, and its explicit prohibition against the use of such customer information by the affiliates of the Debtor, New Biolitec used the Debtor's customer information to contact the Debtor's customers and solicit sales"); *Phillips v. Diecast Mktg. Innovations, L.L.C. (In re Collecting Concepts, Inc.)*, No. 99-6003, 2000 WL 1191026, at *4 (Bankr. E.D. Va. Feb. 28, 2000) (protecting goodwill associated with debtor's trademark); *Merry Hull & Co. v. Hi-Line Co.*, 243 F. Supp. 45, 50 (S.D.N.Y. 1965) (same).  To the extent the advertising at issue here affected Windstream's goodwill in the marketplace, it did so not through misuse of intellectual property (like a trademark) or proprietary business information (like customer lists or trade secrets), but through forward-looking representations about Windstream's business prospects.  As I explain in detail below, Charter did not engage in any act that "exercised control" over any goodwill that is cognizable as a property interest.

### 3. Control

Even assuming that Windstream had executory contracts with its customers, and that its goodwill in the marketplace is protected by the automatic stay, Charter did not violate the automatic stay unless its advertisements were "an act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate."  11 U.S.C.

§ 362(a)(3).  The plain language of this statute does not clearly encompass solicitation of a debtor's customers, which one does not typically regard as "exercising control" over "property."

The Bankruptcy Court acknowledged that advertising alone does not violate the automatic stay, but nevertheless held that "[a]lthough every corporation expects legitimate advertising by competitors, and thus such advertising does not 'exercise control' over its property, improper advertising such as the Defendants' clearly and objectively interfered with the Debtors' customer contracts and goodwill and thus clearly was precluded by section 362(a)(3)'s plain terms and the caselaw applying them."  (Order at 19-20.)  But there is nothing in the "plain terms" of § 362(a)(3) that suggests that "improper" advertisements are methods of "control" but "legitimate" ones are not.  While the automatic stay is to be "liberally interpreted," *Suh v. Anderson (In re Moo Jeong)*, No. 19-1244, 2020 WL 1277575, at *6 (B.A.P. 9th Cir. Mar. 16, 2020), such an interpretation cannot stretch the statutory text beyond its meaning.  The statute does not prohibit all conduct that harms or interferes with a debtor's business, but only that which amounts to an effort to obtain or control estate property.

As to the whether the case law permits such a broad interpretation of § 362(a)(3), the Bankruptcy Court was correct as a general proposition that "section 362(a)(3) stays acts that impair, interfere with or destroy the estate's interest in contracts or goodwill."  (Order at 12.)  But it cannot stay all such acts, or any attempt to compete with an entity going through reorganization would be stayed, whether wrongful or not.  The cases cited by the Bankruptcy Court shed light on the kinds of acts that can be said to "impair" or "interfere" with estate property such that that they can plausibly amount to the "exercise [of] control."  Several involve litigation or other legal action that would, or did, indirectly destroy or transfer control of the debtor's property.  *See e.g.*, *ACandS, Inc. v. Travelers Cas. & Sur. Co.*, 435 F.3d 252, 260-61 (3d

Cir. 2006) (arbitration award that effectively terminated debtor's insurance coverage); *Licensing by Paolo, Inc. v. Sinatra (In re Gucci)*, 126 F.3d 380, 392 (2d Cir. 1996) (trademark litigation against non-debtor sublicensee of debtor licensor); *48th St. Steakhouse, Inc. v. Rockefeller Grp., Inc. (In re 48th St. Steakhouse, Inc.)*, 835 F.2d 427, 430-31 (2d Cir. 1987) (termination of non-debtor's lease, which also terminated debtor's sublease); *In re Extraction Oil & Gas, Inc.*, No. 20-11548, 2020 WL 7074142, at *4 (Bankr. D. Del. Dec. 3, 2020) (litigation to enjoin non-debtors' fulfillment of contract with debtor). While these cases stand for the proposition that even acts aimed at a non-debtor may impact the property interests of the estate and thus violate the automatic stay, the advertising at issue in this case, which sought to influence consumer choice, is clearly distinguishable from legal actions which would have the downstream effect of altering a debtor's interest in real property, commercial contracts, or insurance contracts. Other cases cited by the Bankruptcy Court involved the use of trade secrets or confidential/proprietary information, *see Corp. Claims Mgmt., Inc. v. Shaiper (In re Patriot Nat'l Inc.)*, 592 B.R. 560, 571 (Bankr. D. Del. 2018); *In re Biolitec, Inc.*, 2015 WL 351201, at *10; *In re Collecting Concepts, Inc.*, 2000 WL 1191026, at *4, neither of which are at issue here.

Charter does not dispute that its advertisements were an attempt to influence customer behavior: they publicized Windstream's bankruptcy, suggested that Windstream's customers might lose service as a result of the bankruptcy, and proposed their own service as an alternative. But even if this conduct violated other, non-bankruptcy law (an issue I need not and do not resolve in this opinion), it is not clear how it was an act to "exercise control" over contracts or goodwill. Windstream posits that "false and misleading advertising subverts the customer's decision-making, allowing the liar to exercise control by manipulating the consumer." (Appellees' Opp. at 35.) But even advertising that is not false or misleading can be, and often is,

manipulative.  And in any case, the customer is not property of the estate.  It is thus difficult to see how, without more, influencing or manipulating a customer to opt for a competitor's service over a debtor's through advertisements, false or otherwise, is an act of control over estate property.

The mere fact that the conduct may be wrongful or unlawful does not automatically convert it into a violation of the automatic stay.  *In re Golden Distributors*, in which the debtor raised similar arguments, illustrates the point.  There, the debtor sought a temporary restraining order and preliminary injunction under § 362(a)(3) against former employees who were allegedly soliciting the debtor's customers in violation of non-compete agreements.  *See* 122 B.R. at 16-17.  The court held that "the fact that the defendants may have breached the restrictive covenants in their employment contracts or that they may have improperly solicited the debtor's customers, for which the defendants might ultimately be liable to the debtor for damages or enjoined from engaging in such improper conduct, does not mean that the defendants attempted to obtain possession or control of property of the estate in violation of 11 U.S.C. § 362(a)(3)."  *Id.* at 19-20.  Rather, absent a contract that bound the customers to purchase exclusively from the debtor or required those customers to purchase specific quantities of products, the former employees did not breach the stay by competing for those customers.  *Id.* at 20.  And as to goodwill, the court observed that "[t]here was no evidence that the defendants sought to continue the debtor's business or hold themselves out as related in any way to the debtor's business so as to acquire the good will that was associated with such business."  *Id.* at 20.  The same is true here, as Charter's advertisements were clearly mailings from a competitor.

By contrast, in *Alert Holdings, Inc. v. Interstate Protective Services (In re Alert Holdings)*, 148 B.R. 194 (Bankr. S.D.N.Y. 1992), cited by Windstream and the Bankruptcy

Court, the court held that a competitor of the debtors (who were in the business of monitoring and servicing alarm systems) violated the automatic stay when it told the debtors' accountholders (who had term contracts) that the debtors were going out of business and that the competitor had been designated to take over their accounts, and sent representatives to the customers' homes to switch their service. *Id.* at 197-98.  When customers began receiving bills from both the debtors and the competitor, and the debtors attempted to correct the misconceptions caused by the competitor, the competitor sent another mailing telling the customers that their contracts with the debtors were unenforceable and offering legal assistance to anyone who had legal issues with the debtors over canceling their contract. *Id.* at 198.  These acts, through which the competitor actively sought to convert or override exclusive term contracts between debtors and their customers, by using the debtors' customer list and holding itself out as the proper and authorized servicer of those accounts, are properly characterized as attempts to exercise control.  Such conduct is clearly distinguishable from Charter's mailing campaign here, which involved no proprietary information and in which Charter did not misrepresent its identity.

In short, Charter's advertisements cannot reasonably be seen as an act to exercise control over property of Windstream's estate.  Accordingly, this conduct did not violate the automatic stay under 11 U.S.C. § 362(a)(3).

### B.    <u>Whether the Bankruptcy Court Erred in Holding Charter in Contempt</u>

Even if Charter's conduct violated the automatic stay, the Bankruptcy Court abused its discretion in concluding that there was no fair ground of doubt as to whether the advertisements were a violation of the automatic stay.

While the bankruptcy code provides that "an individual injured by any willful violation of a stay provided by this section shall recover actual damages, including costs and attorneys' fees, and, in appropriate circumstances, may recover punitive damages," 11 U.S.C. § 362(k)(1),

under Second Circuit precedent this provision is inapplicable to corporate debtors like

Windstream. *See Maritime Asbestosis Legal Clinic v. LTV Steel Co. (In re Chateaugay Corp.)*,

920 F.2d 183, 186-87 (2d Cir. 1990). For corporate debtors, "contempt proceedings are the

proper means of compensation and punishment for willful violations of the automatic stay." *Id.*

at 187. Courts have identified 11 U.S.C. § 105(a), under which a bankruptcy court may "issue

any order, process, or judgment that is necessary or appropriate to carry out the provisions of this

title," as a source of authority to issue sanctions for willful violations of the automatic stay. *See*

*Feltman v. Wells Fargo Bank, N.A. (In re TS Emp., Inc.)*, 597 B.R. 494, 536 (Bankr. S.D.N.Y.

2019); *Bartel v. Shugrue (In re Ionosphere Clubs, Inc.)*, 171 B.R. 18, 21 (S.D.N.Y. 1994).[10]

     In 2019, the Supreme Court addressed bankruptcy courts' civil contempt power under

§ 105(a), albeit in the context of a violation of a bankruptcy discharge order, not a violation of

the automatic stay. *See Taggart*, 139 S. Ct. 1795. In *Taggart*, the Court held that § 105(a) and

11 U.S.C. § 524 (the latter of which "operates as an injunction against the commencement or

continuation of an action, the employment of process, or an act, to collect, recover or offset a

discharged debt") together "authorize a court to impose civil contempt sanctions when there is no

objectively reasonable basis for concluding that the creditor's conduct might be lawful under the

discharge order" – that is, where there is "*no fair ground of doubt* as to whether the order barred

the creditor's conduct." *Taggart*, 139 S. Ct. at 1799, 1801 (cleaned up) (emphasis in original).

---

[10] To the extent that Charter questions the Bankruptcy Court's authority to issue sanctions under § 105(a), the Court rejects that argument. While the Supreme Court held "that § 105(a) does not allow the bankruptcy court to override explicit mandates of other sections of the Bankruptcy Code," *Law v. Siegel*, 571 U.S. 415, 421 (2014) (cleaned up), there is no explicit mandate that bankruptcy courts cannot issue contempt sanctions for automatic stay violations with regard to corporate debtors. The mere fact that § 362(k) addresses only individual debtors and is silent as to corporate debtors is not an explicit mandate that corporate debtors cannot be sanctioned for violations of the stay, and thus that provision is not "overridden" by the use of § 105(a) to enforce the stay as it applies to non-individual debtors.

"This standard reflects the fact that civil contempt is a severe remedy and that principles of basic fairness require that those enjoined receive explicit notice of what conduct is outlawed before being held in civil contempt." *Id.* at 1802 (cleaned up).  Both parties and the Bankruptcy Court agreed that *Taggart* is relevant to this case.  (*See* Order at 6-8; Appellants' Mem. at 23; Appellees' Opp. at 50-53.)

In discussing the application of *Taggart* to violations of the automatic stay, the Bankruptcy Court noted that, given the interests in administration of the estate that the automatic stay protects, "it is logical to require those in doubt whether the stay applies to seek clarification from the court or be sanctioned for shooting first and aiming later."  (Order at 7-8.)  This observation echoes that of courts in this Circuit discussing the standard applicable to individual debtors under § 362(k), under which "any deliberate act taken in violation of a stay, which the violator knows to be in existence, justifies an award of actual damages."  *Crysen/Montenay Energy Co. v. Esselen Assocs. (In re Crysen/Montenay Energy Co.)*, 902 F.2d 1098, 1105 (2d Cir. 1990); *see In re Congregation Birchos Yosef*, 535 B.R. 629, 635 (Bankr. S.D.N.Y. 2015) ("'This standard encourages would-be violators to obtain declaratory judgments before seeking to vindicate their interests in violation of an automatic stay, and thereby protects debtors' estates from incurring potentially unnecessary legal expenses in prosecuting stay violations.'  That is, Congress intended in § 362 to prevent self-help, or shooting first and aiming later.") (quoting *In re Crysen/Montenay Energy*, 902 F.2d at 1105).  Under this standard, "so long as the violator possessed general intent in taking actions which have the effect of violating the automatic stay,

the intent requirement of § 362[(k)] is satisfied." *Sucre v. MIC Leasing Corp. (In re Sucre)*, 226

B.R. 340, 346 (Bankr. S.D.N.Y. 1998) (cleaned up).

The bankruptcy court in *Taggart* proposed, and the Supreme Court rejected, a

substantially similar standard under § 105(a), which "would permit a finding of civil contempt if

the creditor was aware of the discharge order and intended the actions that violated the order."

*Taggart*, 139 S. Ct. at 1803.  The Court characterized this standard as "akin to strict liability"

because "most creditors are aware of discharge orders and intend the actions they take to collect

a debt."  *Id.*  And while acknowledging the argument that such a standard was not unfair to

creditors, who could always "head to federal bankruptcy court and obtain an advance

determination on that question before trying to collect the debt" if they were uncertain whether

their course of action would violate the discharge order, the Court was skeptical of this

procedure:

> We doubt, however, that advance determinations would provide a workable
> solution to a creditor's potential dilemma.  A standard resembling strict liability
> may lead risk-averse creditors to seek an advance determination in bankruptcy
> court even where there is only slight doubt as to whether a debt has been
> discharged.  And because discharge orders are written in general terms and
> operate against a complex statutory backdrop, there will often be at least some
> doubt as to the scope of such orders.  Taggart's proposal thus may lead to frequent
> use of the advance determination procedure.

*Id.*  The strict liability proposal would "risk additional federal litigation, additional costs, and

additional delays" that "would interfere with a chief purpose of the bankruptcy laws:  to secure a

prompt and effectual resolution of bankruptcy cases within a limited period."  *Id.* (cleaned up).

Some of the same concerns are present here:  a standard that requires creditors to move to

lift the stay, lest they be held strictly liable for an action determined to violate the stay, would

generate more lift-stay motions.  Further, § 362(a)(3) – which enjoins "any act to obtain

possession of property of the estate or of property from the estate or to exercise control over

property of the estate" – is similar to the discharge orders discussed in *Taggart* in that it is

"written in general terms and operate[s] against a complex statutory backdrop." *Id.*

Despite these similarities, aspects of *Taggart* focus on concerns that are specific to

discharges and inapplicable to the automatic stay.  The Court explicitly acknowledged the

differences between stay violations and discharge violations and acknowledged that the "aware

of and intended to violate" standard was applied by lower courts in the context of § 362(k):

> An automatic stay is entered at the outset of a bankruptcy proceeding.  The
> statutory provision that addresses the remedies for violations of automatic stays
> says that "an individual injured by any willful violation" of an automatic stay
> "shall recover actual damages, including costs and attorneys' fees, and, in
> appropriate circumstances, may recover punitive damages."  This language,
> however, differs from the more general language in section 105(a).  The purposes
> of automatic stays and discharge orders also differ:  A stay aims to prevent
> damaging disruptions to the administration of a bankruptcy case in the short run,
> whereas a discharge is entered at the end of the case and seeks to bind creditors
> over a much longer period.  These differences in language and purpose
> sufficiently undermine Taggart's proposal to warrant its rejection.

*Id.* at 1803-04 (quoting 11 U.S.C. § 362(k)(1)).

The question here is whether – given controlling precedent in this circuit that § 105(a),

not § 362(k)(1), is the source of the bankruptcy court's authority to issue civil contempt

sanctions for violations of the automatic stay with regard to a corporate debtor – requiring a party

in Charter's position to seek clarification, through a motion to lift the automatic stay, is

consistent with *Taggart*.  While *Taggart* indicates that the "no fair ground of doubt" standard,

which includes no such requirement, should apply whenever a bankruptcy court issues civil

contempt sanctions under § 105(a), the Court's discussion of the differences between the

discharge order and the automatic stay might suggest that a more debtor-friendly standard than

the *Taggart* standard – one requiring a motion to lift the stay – is appropriate, as the Bankruptcy

Court believed and for which Windstream argues.

Notwithstanding the differences between the discharge injunction and the automatic stay, it is contrary to *Taggart* to read into § 105(a) a requirement that a creditor "seek clarification from the court or be sanctioned for shooting first and aiming later" if the creditor is unsure whether its contemplated course of conduct would run afoul of the automatic stay. *See Harker v. Eastport Holdings, LLC (In re GYPC, Inc.)*, 634 B.R. 983, 991 (Bankr. S.D. Ohio 2021) ("*Taggart* fundamentally is contrasting § 362(k), a congressionally approved private right of action for individuals, and the separate and more general language under § 105 supporting contempt proceedings. As Congress has chosen to limit any private right of action for stay violations to those against individuals, the court believes it must apply *Taggart* to § 105 contempt actions not covered by § 362(k) (or another private right of action)."). In so deciding, this Court is bound by both the *Taggart* Court's holding with regard to §105(a) and binding Second Circuit authority on § 362(k)'s application to corporate debtors. Because, under *In re Chateaugay*, the Bankruptcy Court's source of authority for the sanctions at issue on this appeal is § 105(a), the Court is bound to follow the Supreme Court's interpretation of that provision, under which there is no requirement that the would-be violator move to lift the stay prior to acting. *Taggart*, 139 S. Ct. at 1803. Accordingly, to the extent the Bankruptcy Court relied on such a rule, (*see* Order at 18-19 (citing Charter's failure to note a case's "clear guidance that if a party doubts section 362(a)'s applicability to their conduct, they should seek relief from the automatic stay under 11 U.S.C. § 362(d))"), it erred in doing so.[11]

Further, the Bankruptcy Court's conclusion that there could have been objectively "no fair ground of doubt" on Charter's part that its advertisements would violate the automatic stay

---

[11] There might be some logic to the argument that, as a matter of policy, the less debtor-friendly *Taggart* standard should not apply to violations of the automatic stay as it does to violations of a discharge order. But this Court cannot make policy.

was outside the permissible range of decisions and thus an abuse of discretion.  The Bankruptcy Court's conclusion that Charter's advertising campaign "exercises control" over estate property is at least highly debatable.  The plain language of the automatic stay does not clearly proscribe the conduct here, as advertising (even misleading advertising) is not typically understood to exercise control over property.  Even if I were to accept the theory of the stay violation here – that because the advertisements were false, they were improperly influential – it is not an objectively obvious reading of the statute or the caselaw.

Particularly under the more searching standard that I must apply in assessing sanctions awarded under 11 U.S.C. § 105(a), *see In re Blair Ventures*, 581 B.R. at 732, the Bankruptcy Court abused its discretion in holding Charter in civil contempt.

## IV.    CONCLUSION

For the foregoing reasons, the portion of the Bankruptcy Court's Judgment holding Charter in contempt for violation of the automatic stay based on Charter's advertisements and sanctioning it in the amount of $19,179,329.45 for that violation is VACATED.  The Clerk of Court is respectfully directed to close the case.

**SO ORDERED.**

Dated:  October 6, 2022
White Plains, New York

_____
CATHY SEIBEL, U.S.D.J.

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------x
In re:

Windstream Holdings, Inc., et al.,

                     Debtors.
----------------------------------------------------------------x
Windstream Holdings, Inc., et al.,

        Plaintiffs,

        v.

Charter Communications Inc. and
Charter Communications Operating, LLC

        Defendants.
----------------------------------------------------------------x

Chapter 11
Case No. 19-22312 (RDD)
(Jointly Administered)

Adv. Pro. No. 19-08246

**MEMORANDUM OF DECISION ON COUNT VI (CONTEMPT FOR VIOLATION OF THE AUTOMATIC STAY) AND COUNT VII (EQUITABLE SUBORDINATION)**

Appearances:

Katten Muchin Rosenman LLP, by Terence P. Ross, Michael R. Justus, and Shaya Rochester, for Debtors/Plaintiffs

Morrison & Foerster LLP, by Lorenzo Marinuzzi and Todd M. Goren, for the Official Committee of Unsecured Creditors

Thompson Coburn LLP, by John Kingston, Michael Nepple, and Brian Hockett, for Defendants

Hon. Robert D. Drain, United States Bankruptcy Judge

       After December 18, 2019 a bench ruling, the Court entered an order [Dkt. No. 274]

granting in part and denying in part the motion of plaintiffs/debtors and debtors in possession

("Plaintiffs or "Debtors") for partial summary judgment on all counts in this adversary

proceeding.  In an order dated March 30, 2020 following a memorandum of decision appearing

1

at <u>Windstream Hldgs., Inc. v. Charter Communs. Inc.</u> (<u>In re Windstream Hldgs., Inc.</u>), 2020

Bankr. LEXIS 708 (Bankr. S.D.N.Y. Mar. 17, 2020), the Court decided to hear the remaining

issues in this adversary proceeding only with respect to Count VI (breach of the automatic stay

set forth in 11 U.S.C. § 362(a)) and Count VII (equitable subordination under 11 U.S.C. § 510(c))

of the claims filed in these chapter 11 cases by defendant Charter Communications Operating,

LLC ("Operating;" the defendants together, "Defendants" or "Charter").[1]

The Court's order on the Debtors' summary judgment motion held that the Defendants

breached the automatic stay set forth in 11 U.S.C. § 362(a) by their termination of "last mile"

connectivity service to certain of the Debtors' customers based on the Debtors' prepetition

default under the parties' Spectrum Business Value Added Reseller Agreement, dated April 11,

2018 (the "VAR Agreement"),[2] as well as Defendants' literally false and intentionally misleading

advertising campaign to induce the Debtors' customers to terminate their agreements with the

Debtors.

The remaining issues on Count VI are whether the Defendants are liable in civil

contempt for such breaches and, if so, the proper compensatory sanction.

As to Count VII, the remaining issues are the amount of harm caused by the foregoing

conduct to the creditors of the Debtors against which Operations has filed claims (the

"Applicable Debtors") and whether equitably subordinating Operations' claims to those

creditors' claims conflicts with any other provision of the Bankruptcy Code, the Applicable

---

[1] The reference has since been withdrawn by the District Court with respect to the remaining issues pertaining to Counts I-V, for a jury trial.  The Court assumes the parties' familiarity with these and the other prior rulings in this adversary proceeding
[2] Joint Exhibit ("JE") 1.

Debtors' summary judgment motion having previously established the other elements of their

equitable subordination claim under 11 U.S.C. § 510(c).

The Court conducted a four-day trial on these issues and has considered the witness'

testimony, the parties' agreed deposition designations, the documents admitted into evidence,

and the parties' post-trial submissions.  This Memorandum of Decision explains why (a) the

Defendants should be held in contempt for violating the automatic stay under (i) 11 U.C.C. §

362(a)(3) and (6) for their termination of service to the Debtors' customers on account of

prepetition amounts owing under the VAR Agreement, and (ii) 11 U.S.C. § 362(a)(3) for their

literally false and intentionally misleading advertising campaign that wrongfully interfered with

the Debtors' customer contracts and goodwill; (b) the Defendants should be jointly and

severally sanctioned in the amount of certain of the Debtors' actual damages arising from their

termination of customer service under the VAR Agreement, in the aggregate sum of $5,278.85;

(c) the Defendants should be jointly and severally sanctioned $19,179,329.45 for the losses

caused by their violation of the automatic stay by intentionally and wrongfully interfering with

the Debtors' customer contracts and good will; (d) (i) the harm to the Applicable Debtors'

general unsecured creditors in Class 6A under the Debtors' confirmed Chapter 11 Plan caused

by Operations' foregoing conduct is, as set forth in in the Court-Approved Disclosure Statement

therefor,[3] far greater than Operations' projected recovery on its claims against the Applicable

Debtors that are Class 6A Obligors, warranting the equitable subordination of Operations'

unsecured claims in full under 11 U.S.C. § 510(c) to the other general unsecured claims against

the those Debtors, and (ii) such subordination does not conflict with any other provision of the

---

[3] Dkt. No. 1813 at 5.

Bankruptcy Code; and (e) because the general unsecured creditors in Class 6B under the

Debtor's Chapter 11 Plan would receive a full recovery regardless of the damages caused by

Operations, Operations' claims against the Applicable Debtors that are Class 6B Obligors should

not be equitably subordinated.

## Jurisdiction

The Court has previously ruled that it has "arising under" jurisdiction under 28 U.S.C. §§

157(a)-(b) and 1334(b) with respect to Counts VI and VII, which are core proceedings under 28

U.S.C. § 157(b) that the Court can decide by a final order under the United States Constitution.

In re Windstream Hldgs., Inc., 2020 Bankr. LEXIS 708 at *6, *12-14; *see also* In re Residential

Capital, LLC, 571 B.R. 581, 585 (Bankr. S.D.N.Y. 2017) ("If a civil contempt proceeding arises out

of a core matter, the contempt proceeding is core."); Ames Dept. Stores, Inc. v. Lumbermens

Mut. Cas. Co. (In re Ames Dep't. Stores, Inc.), 542 B.R. 121, 141-43, 145 (Bankr. S.D.N.Y. 2015)

(bankruptcy court has not only core but also exclusive jurisdiction over claims for breach of the

automatic stay and equitable subordination).  Confirmation of the Debtors' Chapter 11 Plan

after the trial in this proceeding did not deprive the Court of jurisdiction over these pending

claims.  New York Skyline Inc. v. Empire State Bldg. Co. LLC (In re New York Skyline Inc.), 2019

Bankr. LEXIS 2837, at *35-39 (Bankr. S.D.N.Y. Aug. 26, 2015).

## Discussion

**Contempt for Violation of the Automatic Stay**.

Acts taken in violation of the automatic stay set forth in 11 U.S.C. § 362(a) are void.  In

re 48th St. Steakhouse, 835 F.2d 427, 431 (2d Cir. 1987); 3 Collier on Bankruptcy ¶ 362.12[1]

(16th ed. 2020), and courts routinely grant injunctive relief to ameliorate their effect.  In re

4

Adelphia Communs. Corp. v. The American Channel, LLC, 345 B.R. 69, 83-84, 86 (Bankr. S.D.N.Y. 2006).  In addition, under certain circumstances monetary sanctions may be warranted for such violations.  In the Second Circuit, if the debtor is not a natural person such sanctions derive from the Court's inherent contempt power, Maritime Asbestos Legal Clinic v. LTV Steel Co. (In re Chateaugay Corp.), 920 F.2d 183, 187 (2d Cir. 1990); see also Fidelity Mortgage Investors v. Camelia Builders, Inc., 550 F.2d 47, 52-53 (2d Cir. 1976), cert. denied, 429 U.S. 1093 (1977); 3 Collier on Bankruptcy ¶ 362.12[2], as well as under 11 U.S.C. § 105(a), which provides that "The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title," in this instance 11 U.S.C. § 362(a).[4]

Generally, "Federal Courts consider two factors in determining whether to hold a party in civil contempt:  whether the alleged contemnor had notice of the court order, and whether that person complied with the order."  In re Residential Capital, 571 B.R. at 585.  As held by In re Chateaugay Corp., the automatic stay has the effect of a court order for purposes of the contempt power as further supported by 11 U.S.C. § 105(a).  920 F.2d at 187; see also Knupfer v. Lindblade (In re Dyer), 322 F.3d 1178, 1191 (9th Cir. 2003) ("Because the metes and bounds of the automatic stay are provided by statute and systematically applied to all cases, there can be no doubt that the automatic stay qualifies as a specific and definite court order.") (internal quotation and citation omitted).

---

[4] A separate, statutory basis governs sanctions for breach of the automatic stay, 11 U.S.C. § 362(k) (formerly section 362(h)), which states that, with one exception, "[A]n individual injured by any willful violation of a stay provided by this section shall recover actual damages, including costs and attorneys' fees, and, in appropriate circumstances, may recover punitive damages." The Second Circuit has determined, however, that this provision applies only to natural persons.  In re Chateaugay Corp., 920 F.2d at 186-87.

In addition, "To justify a civil contempt order, a movant must establish that (1) the order the contemnor failed to comply with is clear and unambiguous, (2) the proof of noncompliance is clear and convincing, and (3) the contemnor has not diligently attempted to comply in a reasonable manner." Weston Capital Advisors v. PT Bank Mutiara, Tbk, 736 Fed. App'x 19, 21 (2d Cir. 2018); see also In re Residential Capital, 571 B.R. at 585; In re Chief Exec. Officers Clubs, Inc., 359 B.R. 527, 535 (Bankr. S.D.N.Y. 2007) (noting, further, at 534, "it is well established that bankruptcy courts have power to enter civil contempt orders").  Lastly, an alleged contemnor's inability to comply with an order cannot be punished by contempt if the burden to prove such inability is carried "clearly, plainly, and unmistakably." Huber v. Marine Midland Bank, 51 F.3d 5, 10 (2d Cir. 1995).

The Supreme Court has clarified that when a court uses its inherent civil contempt power (including in the bankruptcy context when invoked in conjunction with 11 U.S.C. §§ 105(a) and 524), an additional finding of bad faith or willfulness is not required.  Taggart v. Lorenzen, 139 S. Ct. 1795, 1802 (2019).  See also Dibattista v. Selene Fin. LP (In re Debattista), 615 B.R. 31 (S.D.N.Y. 2020), which dismissed the argument that the willful violation of an order in the sense of an intent to violate, as opposed to an intentional act in violation of the order, is required to hold one in contempt:  "This standard . . . does not seem to survive Taggart, where the Court held that 'the absence of willfulness does not relieve [a party] from civil contempt.' 139 S. Ct. at 1802." Id. at 39.

Instead, "civil contempt should not be resorted to where there is a fair ground of doubt as to the wrongfulness of the defendant's conduct." Taggart v. Lorenzen, 139 S. Ct. at 1801 (internal quotation and citation omitted).  Moreover, "This standard is generally an objective

6

one.  We have explained before that a party's subjective belief that she was complying with an

order ordinarily will not insulate her from civil contempt if that belief was objectively

unreasonable."  Id. at 1802.

Taggart applied to a motion to hold a creditor in contempt for violating a discharge

order under 11 U.S.C. § 524, and the Court specifically reserved on whether the "fair ground of

doubt" standard should also apply to violations of the automatic stay, where "lower courts

often have used a standard akin to strict liability to remedy violations," id. at 1803-04, and the

automatic stay "aims to prevent damaging disruptions to the administration of a bankruptcy

case in the short run."  Id. at 1804.  This has led to some uncertainty with respect to the post-

Taggert standard to be applied to stay violations.  Compare Suh v. Anderson (In re Jeong), 2020

Bankr. LEXIS 714, at *10-11 (BAP 9th Cir. March 16, 2020) (applying Taggert's "fair ground of

doubt" standard) and In re Freeland, 2020 Bankr. LEXIS 2174, at *7 n.3 (Bankr. D. Ore. Aug. 12,

2020) (noting issue but finding contempt under Taggart standard as well as prior Ninth Circuit

standard in any event); see also In re Spiech Farms, LLC, 603 B.R. 395, 408 (Bankr. W.D. Mich.

2019).

There are at least two reasons to make such a distinction.  First, to the extent that

section 363(k) of the Bankruptcy Code applies to a stay violation, it reflects a congressional

policy separate from the courts' general contempt power and is the subject of extensive case

law interpretation.  Second, because (a) bankruptcy courts are actively supervising cases

covering all of the debtor's property while the automatic stay is in effect and (b) the automatic

stay is of fundamental importance in the collective, multi-party context of bankruptcy cases,

see Midlantic Nat. Bank v. N.Y. Dept of Envtl Prot., 474 U.S. 494, 503 (1986); United States v.

Colasuanno, 697 F.3d 164, 172 (2d Cir. 2012); H.R. Rep. No. 95-595 at 340-41 (1977), it is logical

to require those in doubt whether the stay applies to seek clarification from the court or be

sanctioned for shooting first and aiming later.  *See* Squire v. Stringer, 820 Fed. App'x 429, 434

(6th Cir. Aug. 10, 2020) ("Allowing a creditor to circumvent the automatic stay based on his own

judgments would lead to the very chaotic and uncontrolled scramble for the debtor's assets the

stay was designed to prevent.") (internal quotation and citation omitted).

In any event, it should be clear from the nature of Taggert's reservation regarding

breaches of the automatic stay that applying a standard that is more *lenient* to potential

violators of the automatic stay than the objective "fair ground of doubt" approach is highly

unlikely.  Any issue in the Second Circuit whether a greater showing is required when applying

the Court's contempt power, such as of malice or bad faith, for violation of the stay therefore

appears to be resolved by Taggert in the negative.[5]

Applying the facts to the foregoing standard, the evidence shows that the Defendants

should be held in contempt for breaching the automatic stay set forth in 11 U.S.C. § 362(a)(3)

and (6) when they terminated services to certain customers of the Debtors based on the

---

[5] Such doubts might otherwise have arisen because of dicta in In re Chateaugay Corp., which summarized In re Crysen/Montenay Energy Co., 902 F.2d 1098, 1105 (2d Cir. 1990), as holding that "contempt involves maliciousness or a lack of a good faith argument and belief that the party's actions were not in violation of the automatic stay."  920 F.2d at 187.  On the other hand, courts have interpreted Crysen/Montenay as holding that "any deliberate act taken in violation of the stay, which the violator knows to be in existence [suffices for contempt] . . .  In other words, specific intent to violate the stay is not required; instead, general intent in taking actions which have the effect of violating the stay is sufficient to warrant damages."  Wells Fargo Bank, N.A. v. Weidenbenner (In re Weidenbenner), 2019 U.S. Dist. LEXIS 69907, at *6, *17-18 (S.D.N.Y. Apr. 25, 2019), and the cases cited therein.  *See also* FirstBank P.R. v. Barclays Capital Inc. (In re Lehman Bros. Hldgs Inc.), 526 B.R. 481, 496 (S.D.N.Y. 2014), *aff'd* 645 Fed. App'x 6 (2d Cir. 2016) ("The Bankruptcy Court also correctly held that subjective good faith is not a bar to contempt."), *citing* City of New York v. Local 28 Sheet Metal Workers' Int'l Ass'n, 170 F.3d 279, 283 (2d Cir. 1999).  *Compare* In re Diamond Beach Assocs. Ltd Pship, 185 B.R. 408, 412 (Bankr. D. Conn. 1995) (accord) *and* In re Coney Island Land Co., LLC, 2005 Bankr. LEXIS 2909, at *11 (Bankr. E.D.N.Y. Mar. 31, 2005) (requiring a showing of malice or lack of a good faith argument and belief that stay was violated before contempt sanctions would be imposed).

Debtors' default under the VAR Agreement.  It is uncontroverted that Charter had notice of the

commencement of the Debtors' chapter 11 cases and the imposition of the automatic stay

before terminating services, which Charter admittedly terminated because of its belief that the

Debtor parties to the VAR Agreement were in default of prepetition obligations thereunder.  It

is also uncontroverted that 11 U.S.C. § 362(a)(6) clearly and unambiguously stays such conduct.

A reasonable person would not think otherwise.

Charter's only response is a variation on the "inability" defense to a finding of contempt,

that is, that the termination of service was wholly mechanical, arising from "automatic

nonpayment protocols" programmed into its computerized billing system,[6] or, possibly, that

Charter reasonably attempted to comply.  There are two problems with these arguments,

however.  First, it is not really a defense for a large and sophisticated entity like Charter that

provides services to many customers, some of whom inevitably will file for relief under the

Bankruptcy Code, to argue that its systems do not have an effective fail-safe to prevent it from

violating the automatic stay.  Charter has not contended that it lacked the capacity to adopt

systems to override such automated collection activity.  Under similar circumstances, courts

have routinely found contempt for a stay violation.  *See, e.g.*, Jove Eng'g Inc. v. IRS (In re Jove

Eng'g, Inc.), 92 F.3d 1539, 1556-57 (11th Cir. 1996); Price v. U.S. (In re Price), 42 F.3d 1068, 1070

(7th Cir. 1994); Associated Credit Servs. v. Campion (In re Campion), 294 B.R. 313, 317 (B.A.P.

9th Cir. 2003); De La Fuente v. Wells Fargo Bank, N.A., 430 B.R. 764, 799-89 (Bankr. S.D. Tex.

---

[6] Defendants' Post-Trial Brief on Counts VI and VII, dated June 9, 2020 ("Charter Mem.") 3-4. As stated in agreed designations from the deposition of Charter's Frederick Gunzel, because of Operation's automated billing system, its personnel took from February 25, 2019 to May 9, 2019 to complete their manual analysis and restoration of the Debtors' accounts that should not have been automatically terminated in violation of the automatic stay.  This resulted in the termination of service to many the Debtors' customers in March 2019 and a smaller number of additional shutoffs in April and May 2019.  Gunzel Dep. Tr. at 25-27, 66.

2010).  Turning a blind eye to the automatic stay by choosing systems that are incapable of

complying with it is not tantamount to an inability to comply nor with making diligent efforts to

comply in a reasonable manner.[7]

Second, when the Defendants terminated service to the Debtors' customers, they did

not even comply with the VAR Agreement itself, which provides at page 2 for 30-days' notice

before service cancellation.  Such compliance would perhaps have enabled the Debtors to

identify their affected customers so that Charter could have manually overridden its automated

cancellation procedures in a timely manner in compliance with the automatic stay.

The evidence also shows that Charter should be held in contempt of 11 U.S.C. §

362(a)(3) for interfering with the Plaintiffs' customer contracts and goodwill through Charter's

literally false and intentionally misleading advertising campaign intended to create the

impression, using mailings designed to seem as if they were coming from the Debtors, that the

Debtors were going out of business.  As set forth in the Court's summary judgment decision,

the existence of that campaign was clearly established.  Again, it is also uncontroverted that

Charter had notice of the Plaintiffs' bankruptcy cases and the imposition of the automatic stay

when it launched the campaign; indeed, Charter premised the campaign on false assertions

regarding the Debtors' bankruptcy cases.

Like section 362(a)(6), section 362(a)(3) of the Bankruptcy Code also is clear and

unambiguous as applied to Charters' conduct.  It automatically stays "any act to obtain

possession of property of the estate or of property from the estate or to exercise control over

---

[7] It is possible that Charter also may be arguing in its post-trial memorandum that its after-the-fact efforts to correct its violation of the automatic stay should excuse it from being held in contempt, but the focus should be on its actions before the violation, not after.

property of the estate." 11 U.S.C. § 362(a)(3). By its plain terms section 362(a)(3) is not

confined to acts to collect or enforce a claim or judgment against the debtor, i.e., creditor

activity. National Tax Credit Partners, L.P. v. Havlik, 20 F.3d 705, 708 (7th Cir. 1994). Other

subsections of section 362(a) address such conduct. Instead, as noted by the leading treatise

on bankruptcy law, section 362(a)(3) of the Bankruptcy Code was enacted, with 11 U.S.C. §§

542 and 543, to ensure that a trustee or debtor in possession maintains control of the estate's

property and to protect against its "dismemberment" in furtherance of an eventual equitable

distribution to creditors. 3 Collier on Bankruptcy ¶ 362.03[5]; *see also* In re Trump Entm't

Resorts, Inc., 534 B.R. 93, 102 (Bankr. D. Del. 2015); In re Stinson, 221 B.R. 726, 730-31 (Bankr.

E.D Mich. 1998).

Section 362(a)(3) clearly encompasses and protects a debtor's executory contracts,

which are property of the debtor's estate under 11 U.S.C. § 541. 3 Collier on Bankruptcy ¶

362.03[5][a] ("Executory contracts and leases are considered a form of property of the estate.

As property of the estate, the debtor's interests in such contracts and leases are protected

against termination or other interference that would have the effect of removing or hindering

the debtor's rights in violation of section 362(a)(3)."); *see also* U.S. BankTrust Nat'l Assn. v. Am.

Airlines, Inc. (In re AMR, Inc.), 485 B.R. 279, 294 (Bankr. S.D.N.Y. 2013) (contract rights are

property of the estate protected by section 362(a)(3) from the exercise of control over them),

*aff'd* 730 F.3d 88 (2nd Cir. 2013); Adelphia Communs. Corp. v. The America Channel, LLC (In re

Adelphia Communs. Corp.), 2006 Bankr. LEXIS 975, at *10 (Bankr. S.D.N.Y. Apr. 5, 2006) ("An

interference with the estate's . . . contractual right [under its sale contract] . . . is a classic and

egregious violation of section 362(a)(3).").

Section 362(a)(3) protects a debtor's goodwill, too, which also is well recognized property of the estate under 11 U.S.C. § 541(a)(1).  3 Collier on Bankruptcy. ¶ 362.03[5], n. 48; Cyganowski v. Biolitec U.S., Inc. (In re Biolitec, Inc.), 2015 Bankr. LEXIS 228, at *31-32 (Bankr. D. N.J. Jan. 22, 2015); Phillips v. Diecast Marketing Innovations, LLC (In re Collecting Concepts), 2000 Bankr. LEXIS 615, at *9 (Bankr. E.D. Va. Feb. 28, 2000); *see also* Merry Hull & Co. v. Hi-Line Co., Inc., 243 F. Supp. 45, 50 (S.D.N.Y. 1965) ("Goodwill is an asset of a bankrupt like any other asset, and to hold that upon the bankruptcy of the business the goodwill vanishes would be to deprive the creditors of the bankrupt of what might be a substantial asset.").

Consistent with section 362(a)(3)'s plain terms, which automatically stay not only actions directly against the debtor but all actions to obtain property of or from the estate or to exercise control over property of the estate, *see* Amedisys, Inc. v. Nat'l Century Fin. Enters. (In re Nat'l Century Fin. Enters.), 423 F.3d 567, 578 (6th Cir. 2005); Official Com. of Unsecured Creditors v. PSS Steamship Co. (In re Prudential Lines), 928 F.2d 565, 573-74 (2d Cir. 1991) (because net operating loss carryforward was an asset of the debtor's estate, taking a worthless stock deduction that would impair the NOL was stayed), section 362(a)(3) stays acts that impair, interfere with or destroy the estate's interest in contracts or goodwill. *See, e.g.*, ACandS, Inc. v. Travelers Cas. & Sur. Co., 435 F.3d 252, 260 (3d Cir. 2006) (Alito, J.) (third-party litigation that would adversely impair debtor's insurance contract rights automatically stayed), *cert. denied*, 547 U.S. 1159 (2006); Licensing by Paolo v. Sinatra (In re Gucci), 126 F.3d 380, 392 (2d Cir. 1996) (trade mark litigation against non-debtor sublicensee of debtor licensor automatically stayed); In re 48th St. Steakhouse, 835 F.2d 427, 430-31 (2d Cir. 1987) (owner's termination of lease with non-debtor that had the effect of terminating debtor's sublease automatically stayed); In re

Extraction Oil & Gas, Inc., 2020 Bankr. LEXIS 3378, at *9-11 (Bankr. D. Del. Dec. 3, 2020) (third-party litigation that interfered with debtor's contractual and business relationships with service providers automatically stayed); Cyganowski v. Biolitec U.S., Inc. (In re Biolitec, Inc.), 2015 Bankr. LEXIS 228, at *31-41 (interference with debtor's customer contracts and goodwill automatically stayed); Alert Hldgs., Inc. v. Interstate Protective Services, Inc. (In re Alert Hldgs., Inc.), 148 B.R. 194, 202-03 (Bankr. S.D.N.Y. 1992) (intentionally deceptive advertising that interfered with debtor's customer contracts and harmed goodwill automatically stayed); *see also* Corp. Claim Mgmt. v. Shaiper (In re Patriot Nat'l, Inc.), 592 B.R. 560, 571-72 (Bankr. D. Del. 2018) (motion to dismiss denied: complaint stated claim for breach of section 362(a)(3) based on defendants' knowing use of misappropriated information protected by debtor's contracts); In re Prithvi Catalytic, Inc., 2015 Bankr. LEXIS 1185, at *36-40 (Bankr. W.D. Pa. Apr. 8, 2015) (motion to dismiss denied; complaint stated claim for breach of section 362(a)(3) based on defendants' hiring key employees knowing that they were parties to debtor's non-compete contracts); Phillips v. Diecast Marketing Innovations, LLC (In re Collecting Concepts), 2000 Bankr. LEXIS 615, at *9-10 (preliminary injunction granted against interference with debtor's goodwill and executory contracts by competitor in violation of section 362(a)(3)).

Many of these decisions do not limit the effect of section 362(a)(3) of the Bankruptcy Code to acts for which the violator would be liable under applicable non-bankruptcy law and instead apply the stay by its plain terms to conduct that simply interferes with the debtor's contract rights. *See, e.g.*, ACandS, Inc. v. Travelers Cas. & Sur. Co., 435 F.3d at 260, and In re 48th Street Steakhouse, 835 F.2d at 430-31. In contrast, where it was clear that the acts impairing the debtor's property, including the debtor's contracts and goodwill, were lawful

under applicable non-bankruptcy law, the courts in In re Trump Entm't Resorts, Inc., 534 B.R. at

104-05, and Allentown Ambassadors, Inc. v. Northeast Am. Baseball, LLC (In re Allentown

Ambassadors, Inc.), 361 B.R. 22, 439-40 (Bankr. E.D. Pa. 2007), employed a balancing test to

determine whether to enforce the stay.  The issue need not be resolved here, of course,

because Defendants' literally false and intentionally misleading advertising campaign was not,

in the words of Allentown Ambassadors, "ordinary course commercial conduct," 361 B.R. at

440, but, rather, violated federal and state statutes, in contrast to the union's actions in Trump

Entm't that were protected by the Norris-Laguardia Act.  534 B.R. at 104.

The Defendants do not meaningfully address any of this caselaw or commentary.

Instead, in addition to attempting to reargue the merits of the Court's prior ruling that they

violated the automatic stay by engaging in their literally false and intentionally misleading

advertising campaign to poach the Debtors' customers,[8] they argue, contrary to Taggert's

objective "no reason to doubt" standard, that they subjectively did not believe they were

violating the stay.[9]  Further, they contend that if anyone violated the stay, it was their

advertising agency and their consultant, One Touch Intelligence in developing the campaign,[10]

which, however, ignores the Defendants' authorization of the campaign to be modeled on a

prior campaign relating to a competitor that was "shutting down service"[11] to create doubt

whether the Debtors would remain in business,[12] and the obvious contradictions between it

---

[8] Indeed, Defendants go so far as to point to "undisputed evidence" allegedly adduced at trial that they did not
engage in such a campaign, Charter Mem. 10-13, ignoring that such "evidence" was irrelevant to the remaining
issues to be tried after the Court's summary judgment ruling.
[9] Charter Mem. 7-8, 13-14.
[10] Charter Mem. 10-11, 12-13.
[11] Dep. Tr. of Kelly Atkinson, dated May 1, 2019, at 42.
[12] Dep. Tr. of Kelly Atkinson, dated September 19, 2019 at 117-18.

and One Touch and Charter's own analyses of the Debtors' financial condition.[13]  Moreover, the

acts of the Defendants' agents in violation of the stay would be imputed to them.  HSBC Bank

USA v. Crawford (In re Crawford), 476 B.R. 83, 86-87 (S.D.N.Y. 2012); In re Stringer, 586 B.R.

535, 446 (Bankr. S.D. Oh. 2019), *aff'd* Squire v. Stringer, 820 Fed. App'x 429 (6th Cir. Aug. 10,

2020).[14]

        The Defendants make two other arguments that require more attention.  First, they

contend that applying section 362(a)(3) to their literally false and intentionally misleading

advertising campaign would violate their First Amendment right to free speech[15] and, implicitly,

that they therefore would have a fair ground for doubt that the automatic stay applied.

        In doing so, however, they acknowledge, albeit in a footnote, that this right is not

absolute and can be curtailed, such as by application of the automatic stay, if part of behavior

prohibited in furtherance of a legitimate government interest.[16]  *See, e.g.*, Desert Palace Inc. v.

Baumblit (In re Baumblit), 15 Fed. App'x 30, 36-37 (2d Cir. 2001) ("It is well settled that First

Amendment rights are not immune from regulation when they are used as an integral part of

conduct which violates a valid statute.").  The principle clearly applies to violations of the

automatic stay.  *See* Collier v. Hill (In re Collier), 410 B.R. 464, 474-76 (Bankr. E.D. Tex. 2009), in

which the posting of a sign that said, "Brad Collier owes me $943.23. Will you please come and

---

[13] One Touch Intelligence's February 25, 2010 report to Charter noted that the Debtors had "secured $1 billion in debtor-in-possession financing to maintain operations during the reorganization process" which "minimizes operational disruptions" and that the Chapter 11 filing "will allow [the Debtors] to reorganize."  JE 27.  Charter itself recognized that the Debtors "have funding to continue in normal operations," Plaintiffs' Trial Ex. 29 ("P. Ex.") and would operate "BAU" (business as usual). P. Ex. 8.

[14] The Defendants' argument that their response to the Plaintiffs' cease and desist letter adequately addressed any violation of the automatic stay, Charter Mem. 13, apparently on a waiver theory, is not only precluded by the Court's summary judgment ruling but contradicted by the correspondence itself and the Debtors' ongoing efforts to enforce their rights.

[15] Charter Mem. 29-30.

[16] Charter Mem. 30 n. 34.

pay me!" was not protected by the First Amendment because it was debt collection activity prohibited by 11 U.S.C. § 362(a)(6), and In re Andrus, 189 B.R. 413, 416-18 (N.D. Ill 1995), which held that conduct including the posting of signs stating that the debtor "Went Bankrupt! He Didn't Pay His Bills! He Is A Deadbeat!  This Is a  Public Service Announcement" and "Gene Andrus, Where's My Money?" was not protected speech, but, rather, properly prohibited:  "The fact that [defendant's] conduct contained a communicative element does not necessarily render it protected speech under the First Amendment."). *See also* In re Sechuan City, Inc., 96 B.R. 37, 42-44 (Bankr. E.D. Pa. 1989); 3 Collier on Bankruptcy ¶ 362.03[8][d].

The Defendants nonetheless contend that this principle, clearly applicable to section 362(a)(6) of the Bankruptcy Code, does not apply to section 362(a)(3) of the Bankruptcy Code. To the contrary, Defendants' advertising campaign constituted conduct that Congress could properly regulate under section 362(a)(3).  The campaign's goal was to induce the Debtors' customers to terminate their contracts[17] and switch to Charter by sending them literally false and intentionally misleading information about the Debtors' bankruptcy cases and financial wherewithal.  Such commercial speech is properly curtailed by precluding such wrongful conduct. *See generally* Milavetz, Gallop & Milavetz, P.A. v. United States, 559 U.S. 229, 248-53 (2010) (regulation of misleading commercial speech is not entitled to either strict or intermediate scrutiny under the First Amendment but instead must only be reasonably related to a governmental interest).  As discussed at length above, section 362(a)(3) of the Bankruptcy Code, like section 362(a)(6), protects a strong governmental interest threatened by the

---

[17] On average a customer's relationship with the Debtors lasts 50 months.  May 6, 2020 Trial Tr. at 39 (testimony of Jeffrey H. Auman).

16

Defendants' conduct.  The Defendants' failure to identify any countervailing interest is highlighted by In re National Service Corp., 742 F.2d 859 (5th Cir. 1984), upon which they heavily rely for the incorrect proposition that section 362(a)(3) cannot be used to regulate any speech not intended to coerce payment of a claim.[18]  In fact, unlike here, the defendant in National Service *accurately* reported a debtor's bankruptcy status on a billboard commissioned from it by the debtor which otherwise would have *inaccurately* implied that the debtor was affiliated with a financially healthy company and therefore could pay its bills.  Id. at 860, 862. The defendant's addition to the billboard was found to be primarily informational; there was no act to harm and thus no violation of section 362(a) of the Bankruptcy Code.  Id. at 862.

Second, the Defendants contend that section 362(a)(3) is ambiguous or impermissibly broad in regulating their conduct[19] and therefore, again implicitly, that they would have a fair ground of doubt that their advertising campaign violated the stay.  Section 362(a)(3) indeed has at times been found to be ambiguous with respect to the meaning of "any act . . . to exercise control over property of the estate."  11 U.S.C. § 362(a)(3).  That ambiguity has been identified in only two contexts, however, neither of which is relevant here.  First, courts have differed over whether the statute covers the *failure* to act to return property seized prepetition that nonetheless remains property of the estate.  *See, e.g.*, In re Young, 193 B.R. 630, 624 (Bankr. D. D.C. 1991), cited by the Defendants for the general proposition that section 362(a)(3) is ambiguous.[20]  Second, courts have grappled with the application of the subsection's use of the

---

[18] Charter Mem. 2 n. 2, 30.
[19] Charter Mem. 30-32.
[20] The Supreme Court has since held that section 362(a)(3) does not apply to a creditor's maintaining the status quo by merely retaining a vehicle seized prepetition on account of a debt.  City of Chicago v. Fulton, 141 S. Ct. 585 (2021).

phrase "exercise control over property of the estate" where estate property is sought to be

protected against a strong countervailing interest held by the alleged violator of the stay. Id. at

627 (possessory lien would be destroyed by returning vehicle repossessed prepetition); In re

Harchar, 393 B.R. 160, 177 (Bankr. N.D. Oh. 2008), aff'd Harchar v. United States (In re Harchar),

694 F.3d 639, 646 (6th Cir. 2012) (temporary freeze of tax refund to enable IRS to determine

whether to seek amendment to debtor's plan or to obtain stay relief to exercise setoff right or

to pay the refund to the chapter 13 trustee is not a violation of section 362(a)(3)); see also In re

Trump Entm't, 534 B.R. at 103-104 (section 362(a)(3) not enforced to enjoin union

communications with prospective customers of debtor where Norris-Laguardia Act precluded

an injunction of the union's actions outside of bankruptcy and debtor's interest in prospective

customers was tenuous).[21]

        As highlighted by the Trump Entm't decision, at times evaluation of the nature and

extent of the estate's interest in the property at issue can pose challenges to application of

section 362(a)(3).  For example, because the court in In re Allentown Ambassadors, Inc. needed

to consider further the nature of the debtor's contract rights, it denied the defendants' motion

for summary judgment that they did not violate section 362(a)(3) when they dissolved the

baseball league in which the debtor was a member and formed a new league that excluded the

debtor.  361 B.R. at 457.  Again, the Defendants cited this decision for the general proposition

that "control" as used in the statute is ambiguous, a matter of degree, but failed to address

whether there was any ambiguity in how the statute applied to their own conduct.[22]  They also

---

[21] The same judge enforced section 362(a)(3) in In re Patriot Nat'l, Inc., 592 B.R. at 571-72, where the debtor had a clear property interest in existing contracts.
[22] Charter Mem. 31.

failed to note the decision's clear guidance that if a party doubts section 362(a)'s applicability to

their conduct, they should seek relief from the automatic stay under 11 U.S.C. § 362(d).  Id. at

441 n. 40.  Similarly, in In re Golden Distribs., Ltd., 122 B.R. 15 (Bankr. S.D.N.Y. 1990), also relied

upon by the Defendants, the debtor's former salespeople did not harm the debtor's goodwill or

contracts because they had not appropriated any customer lists or similarly protected

information and the former customers who changed their allegiance did not have contracts

with the debtor.  Id. at 19-20 (stating that "Under certain circumstances where the debtor has

contractual arrangements with its customers which can be translated into assured sales or

income, such intangible property rights or good will can be protected from interference by

others within the context of 11 U.S.C. § 362(a)(3).") (emphasis added).[23]  Here, to the contrary,

there is uncontroverted evidence that the Debtors' customer contracts' average duration at the

time of the stay violation was 50 months.[24]

No reasonable person would believe that Defendants' advertising campaign, designed

to use false and knowingly misleading information to cause the Debtors' customers to

terminate their contracts and switch to Charter, protected a legitimate interest of Charter's and

did not harm property interests of the Debtors.  Although every corporation expects legitimate

advertising by competitors, and thus such advertising does not "exercise control" over its

property, improper advertising such as the Defendants' clearly and objectively interfered with

---

[23] See also United States v. Inslaw, Inc., 932 F.2d 1467, 1472-73 (D.C. Cir. 1991) (section 362(a)(3) not violated
where debtor's alleged property interest in computer software in the possession of the Department of Justice was
in dispute and therefore not yet, if ever, property of the estate).
[24] May 6, 2020 Trial Tr. at 39 (testimony of Jeffrey H. Auman).

the Debtors' customer contracts and goodwill and thus clearly was precluded by section

362(a)(3)'s plain terms and the caselaw applying them.

Nor, as applied here, is section 362(a)(3) unduly broad as the Defendants contend

simply because it could conceivably be applied more broadly to advertising in general.  It is the

actual application of the statute that matters for First Amendment purposes, Milavetz, Gallop &

Milavetz, P.A. v. United States, 559 U.S. at 247-49; and the foregoing caselaw sufficiently cabins

that application for there to be no fair ground of doubt that Charter fell on the wrong side of

the statute when it undertook to mislead the Debtors' customers to end their contracts and

impaired the Debtors' goodwill.

**Sanctions for Violation of the Automatic Stay**

Bankruptcy courts can award three types of sanction under their civil contempt power

for breach of the automatic stay:  (1) coercive sanctions to encourage compliance, Bartel v.

Shugrue (In re Ionosphere Clubs, Inc.), 171 B.R. 18, 21 (S.D.N.Y. 1994); (2) damages for

monetary harm, id.; *see generally* Taggart v. Lorenzen, 139 S. Ct. at 1801; McComb v.

Jacksonville Paper Co., 336 U.S. 187, 191 (1940) ("Civil contempt . . . is a sanction to enforce

compliance with an order of the court or to compensate for losses or damages sustained by

reason of noncompliance."); Weston Capital Advisors v. PT Bank Mutiara, Tbk, 738 Fed. App'x at

21 ("Compensatory [contempt] sanctions shall reimburse the injured party for actual damages,

though there need not be a one-to-one ratio between actual damages and the value of the

assets subject to civil contempt.  Where a fine is paid directly to the other party rather than the

court, the sanction should correspond at least to some degree with the amount of damages.")

(internal citations and quotations omitted); and (3) in appropriate, generally egregious

circumstances, relatively minor non-compensatory, or punitive sanctions.  In re

Crysen/Montenay Energy Co., 902 F.2d at 1105; In re 1601 Sunnyside #106, LLC, 2010 Bankr.

LEXIS 4903, at *20 (Bankr. D. Idaho Dec. 20, 2010); see generally Rosellini v. United States

Bankruptcy Ct. (In re Sanchez), 941 F.3d 625, 627-28 (2d Cir. 2019) (bankruptcy court has power

to issue minor non-compensatory contempt sanction).

Courts have stated that unlike under section 362(k) of the Bankruptcy Code, which

provides that the Court "shall" award actual damages for a willful stay violation, they have

discretion to award damages when exercising their general contempt power and 11 U.S.C. §

105(a) with respect to a breach of the automatic stay.  See, e.g., First Bank P.R. v. Barclays

Capital Inc. (In re Lehman Bros. Hldgs.), 526 B.R. 481, 497 (S.D.N.Y. 2014), aff'd 645 Fed. App'x 6

(2d Cir. 2016), in which the court also observed that while a party's subjective good faith is not

relevant to whether it should be held in contempt, it "is merely a factor that a bankruptcy court

may consider in deciding whether to impose sanctions."  Id.[25]  On the other hand, other courts,

including the Second Circuit, have held that courts' discretion is considerably narrowed and

perhaps absent when the focus is on compensatory rather than coercive or punitive sanctions.

Weitzman v. Stein, 98 F.3d 717, 719 (2d Cir. 1995) ("The compensatory goal . . . can only be

met by awarding to the plaintiff any proven damages"); Vuitton Fils, S.A. v. Carousel Handbags,

592 F.2d 126, 131 (2d Cir. 1979) ("The District Court is not free to exercise its discretion and

withhold an order of civil contempt awarding damages to the extent they are established.");

Robin Woods Inc. v. Woods, 28 F.3d 396, 400 (3d Cir. 1994) ("Because damages assessed in civil

---

[25] See also Taggert v. Lorenzen, noting in dicta that "a party's good faith, even where it does not bar civil contempt, may help to determine the appropriate sanction."  139 S. Ct. at 1802.

contempt cases are oftentimes compensatory (instead of coercive) the mental state of the violator should not determine the level of compensation due.") (internal quotation and citation omitted). *See generally* In re Genesys, Inc., 273 B.R. 290, 294 (Bankr. D. D.C. 2001) (listing cases on both sides of the question and noting, "The Court was unable to find any decision addressing the possible conflict between these two sets of decisions."), an observation that applies today, as well, although a closer look at the caselaw can harmonize most of the disagreement.

First, based on the principle underlying compensatory sanctions, awarding actual damages for contempt generally does not require a finding that the contemnor acted willfully, Manhattan Indust. v. Sweater Bee By Banff, Ltd., 885 F.2d 1, 5 (2d Cir. 1989) ("that [contemnor's] conduct may not have been willful does not preclude such an award, since sanctions for civil contempt can be awarded without a finding of willfulness" where violations were "sustained and material"), *citing* McComb v. Jacksonville Paper Co, 336 U.S. at 191. *See also* Leary v. Great Lakes Educ. Loan Servs. (In re Leary), 620 B.R. 39, 57-58 (Bankr. S.D.N.Y. 2020), and the cases cited therein (rejecting argument that bad faith or willfulness is required to impose civil contempt sanction), although such a finding of course supports the sanction, Taggert, 139 S. Ct. at 1802; Lehman Bros. Hldgs., 526 B.R. at 497.

Nevertheless, courts should have some discretion to decide whether further warnings are warranted before imposing a compensatory sanction in the light of the complexity of the issues and the risk of harm to the non-breaching party. That is, when a court can manage the parties' conduct to avoid more conflict, it may and sometimes should give the alleged contemnor the chance to comply without imposing a monetary sanction. Relatedly, even if the court does not have such an opportunity, a plaintiff is not relieved of the duty to mitigate; a

debtor should not recover extensive attorneys' fees, for example, for litigating a stay violation

that was voluntarily and promptly corrected before other damages accrued or that it failed to

try to head off with a simple phone call or by invoking a well-established, court-approved

procedure for addressing such violations short of litigation.  In re Sturman, 2011 U.S. Dist. LEXIS

1095, at *10-12 (S.D.N.Y. Sept. 26, 2010); In re Squire, 2014 Bankr. LEXIS 1291, at *10 (Bankr.

N.D.N.Y. Mar. 26, 2014). In re Genesys Inc., 273 B.R. at 294-95.

Third, while it is well recognized that compensatory damages for violation of the

automatic stay include fees and expenses incurred in trying to enforce the stay, In re

Ionosphere Clubs, 171 B.R. at 21; see also Lowe v. Bowers (In re Nicole Gas Prod.), 916 F.3d 566,

577-79 (6th Cir. 2019), cert. denied sub nom. Caffey v. Bowers, 140 S. Ct. 39 (2019), as well as in

proving and enforcing a sanction for other damages caused by the violation, In re Pace, 67 F.3d

at 193; Americas Servicing Co. v. Schwartz-Tallard, (In re Schwartz-Tallard), 803 F.3d 1095, 1099

(9th Cir. 2015); In re Am. Med. Utilization Mgmt. Corp., 494 B.R. 626, 637-38 (Bankr. E.D.N.Y.

2013) (fees and expenses awarded for curing breach and prosecuting contempt and sanctions

motion); 3 Collier on Bankruptcy ¶ 362.12[3]; see generally Weitzman v. Stein, 98 F.3d at 719

(district court may award appropriate attorneys' fees to a victim of civil contempt); In re Cowan,

2020 Bankr. LEXIS 3466, at *22 (Bankr. N.D. Ga. Dec. 10, 2020) (well established exception to

"American Rule" applies to contempt sanction for violations of court order, including discharge

injunction), the Second Circuit has recognized that it has yet to decide whether "a finding of

willfulness or bad faith is required before a court may order attorneys' fees as a sanction for

violating a court order, and the issue appears to remain an open one in our Circuit," Jacobs v.

Citibank, N.A., 318 Fed App'x 3, 5 n.3 (2d Cir. 2008).  Again, though, while a finding of

23

willfulness may not necessarily be a prerequisite to an award of fees and costs, a finding of willfulness strongly supports them.  Weitzman v. Stein, 98 F.3d at 719.

In any event, however, "willfulness" for this purpose is defined as "where the contemnor had actual notice of the court's order, was able to comply with it, did not seek to have it modified, and did not make a good faith effort to comply."  Fendi Adele S.R.L. v. Burlington Coat Factory Warehouse Corp., 2007 U.S. Dist. LEXIS 75812, at *12 (S.D.N.Y. Oct. 10, 2007); In re Lehman Bros. Hldgs., 526 B.R. at 496-97.

Last, it is also well recognized that courts have considerable discretion when determining the proper attorneys' fees and expenses as a compensatory sanction, albeit guided by established principles pertaining to fee and expense awards.  See, e.g., Medina v. Bother, 2019 U.S. Dist. LEXIS 156139, at *11-18, *22-23 (S.D.N.Y. Sept. 9, 2019) (lodestar rate sets presumptive framework, subject to market evidence; analysis of complexity of work performed and number of hours to be compensated is guided by Johnson factors and the court's understanding of what a reasonable lawyer would do under the circumstances).  These principles are well embodied in the standards followed by bankruptcy courts in deciding fee and expense applications for estate compensated professionals under section 330 of the Bankruptcy Code, a task that they regularly perform.  11 U.S.C. § 330; see also In re Cenargo Int'l PLC, 294 B.R. 571, 595-96 (Bankr. S.D.N.Y. 2003).

Notwithstanding the Defendants' suggestion that the Plaintiffs seek coercive and substantial punitive sanctions, the latter requiring a jury trial,[26] it is clear that, to the contrary, Plaintiffs seek only compensatory sanctions for their damages.

---

[26] Charter Mem. 5, 33.

These damages are easily addressed with respect to Charter's termination of services under the VAR Agreement, which constituted a willful breach of the automatic stay under the caselaw cited above.  The Debtors' contention that they provided $5,278.85 of credits[27] to customers whose service was temporarily shut off apparently is uncontroverted and, in any event, credible.  Because the Defendants' breach was a proscribed act to collect under the VAR Agreement, such sum should be paid to the Debtor parties to that agreement.  Although the Debtors argued that they incurred additional loss to their goodwill, as well as attorneys' fees and expenses to enforce their rights under the automatic stay based on this breach,[28] they have not provided quantifiable evidence in support, however.  Nor do the time and expense records submitted by the Debtors sufficiently identify legal work related to the violation of the automatic stay related to the VAR Agreement, and no evidence has been submitted regarding the amount of allegedly lost goodwill.

On the other hand, the Debtors have provided evidence to support the following types of damages caused by the Defendants' literally false and intentionally misleading advertising campaign in breach of section 362(a)(3) of the Bankruptcy Code:  (1) lost profits from customers who switched to Charter as a result of the campaign, (2) the cost of corrective advertising to maintain customers, (3) the cost of a promotional campaign to recover market share, or new customer momentum lost because of the breach, and (4) the fees and expenses of outside counsel and the Plaintiffs' expert witness related to enforcing the automatic stay and recovering the foregoing damages.

---

[27] Witness Declaration of Jeffrey H. Auman, dated April 20, 2020 ("Auman Decl."), ¶14.
[28] Auman Decl., ¶¶14, 20.

Although the Defendants identified four expert witnesses, they chose not to present

them.[29]  Nor did they offer any fact witness regarding the scope and reasonableness of the

damages claimed by the Plaintiffs as to lost profits, the reach or cost of Plaintiffs' corrective

advertising and the promotional campaign, or the Plaintiffs' claimed legal fees and costs.

Instead, they chose to attack certain portions of the Plaintiffs' damages case on cross and with

certain exhibits as noted below.

The Plaintiffs offered John C. Jarosz as their expert on lost profits attributable to

customers' termination of their agreements because of the ad campaign.[30] Mr. Jarosz opined

that the Plaintiffs "lost approximately 1,386 customers as a result of the unlawful conduct of

Charter, and that this represents lost profits to [Plaintiffs] in the range of approximately $3.2

million to $5.1 million."[31] He further testified that his calculation of lost customers "is

conservative" because (a) his analysis covered only April through August 2019 while Charter's

late-March 2019 campaign could have influenced customers after August 2019, and (b) he

considered customers lost only in areas where the Plaintiffs and Charter competed, and

customers in other areas might well be influenced by communications with friends and family

---

[29] The Defendants argued that they were in effect precluded from presenting these experts by the Court's ruling in
Windstream Hldgs., Inc. v. Charter Communs., Inc. (In re Windstream Hldgs., Inc.), 2020 Bankr. LEXIS 708, on their
motion for a declaration that the Court lacked jurisdiction to decide Counts VI and VII of the complaint because of
their right to a jury trial on the other counts. After reviewing the parties' post-trial submissions on this issue,
however – more specifically, their timelines related to it provided at the Court's request – as well as the docket, it
is clear that the Plaintiffs put the Defendants on sufficient notice that they were introducing expert testimony on
the scope of the sanction under Count VI and the extent of equitable subordination under Count VII with ample
time for Plaintiffs to prepare and present their expert witnesses, who already had prepared opinions and been
deposed, in rebuttal.
[30] Witness Declaration of John C. Jarosz, dated April 17, 2020 ("Jarosz Decl."), ¶6
[31] Id.

and on social media.[32]  As discussed in more detail below, he also stated that the lower end of

his lost profits range is likely too conservative.[33]

Mr. Jarosz is an economist "whose specialty is IP valuation and monetary relief

(including damages) assessments."[34]  He is well credentialed; his CV, attached as an exhibit to

his Witness Declaration runs 44 pages of small print, including a list of 20 articles, most of which

involve the calculation of damages.  He has provided expert testimony approximately 100 times

at trial or in arbitration.[35]

He was also a credible expert witness.  Notwithstanding an untethered reference to

"junk science" in a heading in their post-trial brief,[36] the Defendants do not challenge Mr.

Jarosz's general methodology, which he describes as "a commonly used empirical methodology

that I have used in the past and which is widely accepted for use in this type of economic

analysis."[37]  To form his opinion, he took three steps:  he determined the number of customers

lost by examining whether there were any changes to the Plaintiffs' "churn rate" for the April-

August 2019 period following Charter's ad campaign that would be reasonably attributable to

that campaign and quantifiable in terms of lost customers; he determined the lost revenue

associated with those lost customers; and he applied the Plaintiffs' profit margins to the lost

revenue associated with the lost customers.[38]  The Defendants quarrel with only the first step.

---

[32] Id., ¶20
[33] Id., ¶26.
[34] Id. ¶2.
[35] Id.
[36] Charter Mem. 16
[37] Jarosz Decl., ¶5.
[38] Id., ¶7.

"'Churn rate' refers to the percentage of customers that discontinue service in a given period. It is calculated as the number of disconnected customers in a period divided by the total number of customers at the beginning of that period."[39] The Plaintiffs kept this information in the regular course of their business.[40] It was recorded according to, or by, "Exchanges," which are the geographical units in which the Plaintiffs' usually input and retain their customer data, which includes not only the number of customers in a particular Exchange, but also customer adds and disconnects from service and other information routinely used in their business.[41]

To determine the change in churn rate attributable to Charter's ad campaign, Mr. Jarosz compared Plaintiffs' churn rate data for April-August 2019 (the first full month through the last month of the campaign) against their churn rate for April-August 2018 in (a) Exchanges where the Plaintiffs competed with Charter and (b) the Exchanges were the Plaintiffs and Charter did not compete and in which, also, Charter did not engage in the ad campaign.[42] Assuming no material competitive changes during the relevant periods with the exception of Charter's ad campaign as between the Charter Exchanges, on the one hand, and the non-Charter Exchanges, on the other, this "difference-in-difference" comparison would logically identify whether the ad campaign caused a higher churn rate and, if so, enable one to calculate the number of lost customers attributable to that higher rate.[43] That is, the trend in churn rate for the Charter Exchanges for the two periods can be compared to the parallel trend in churn rate for the non-

---

[39] Id., ¶8.

[40] Auman Decl., ¶18

[41] May 6, 2020 Trial Tr. at 76-77, 87 (testimony of Jeffrey H. Auman) at 76-77, 87. P. Ex. 5. See also April 28, 2020 Trial Tr. at 177 (testimony on John C. Jarosz).

[42] Jarosz Decl., ¶9. See P. Ex. 60.

[43] Id., ¶¶9-11

Charter Exchanges for those periods to determine if the key distinguishing factor, the ad campaign in the Charter Exchanges, had a quantifiable effect in the form of lost customers.[44]

And indeed according to Mr. Jarosz, the Charter Exchanges and the control group, non-Charter Exchanges had comparable parallel churn rates for the two periods until the introduction of Charter's ad campaign, at which point the Charter Exchanges reflected a materially greater churn.[45] Multiplying the increase in churn rate against Plaintiffs' customer base in the Charter Exchanges yielded Mr. Jarosz's 1,386 lost customers attributable to the ad campaign[46] (out of at least approximately 4,500 who switched to Charter during that period).[47]

Again, the Defendants have not attacked Mr. Jarosz's general methodology, which, as he noted, is commonly accepted for such damage calculations. *See*, *e.g.*, Messner v. Northshore Univ. HealthSystems, 669 F.3d 802, 818 (7th Cir. 2012), *reh. denied*, 2012 U.S. App. LEXIS 4778 (7th Cir. Feb. 28, 2012); Smith v. Keurig Green Mt., Inc., 2020 U.S. Dist. LEXIS 172826, at *26-30 (N.D. Cal. Sept. 21, 2020); Lowes Foods LLC v. Burroughs & Chapin Co., 2019 U.S. Dist. LEXIS 100410, at *7 (D. S.C. Apr. 17, 2019) (each discussing "difference-in-difference" analysis); and Kurtz v. Kimberly-Clark Co., 414 F. Supp. 3d 317, 330 (E.D.N.Y. 2019), and the cases cited therein, *aff'd in part, rev'd in part on other grounds*, 818 Fed. App'x 57 (2d Cir. 2020)

---

[44] Id. ¶¶11-14.

[45] Id. ¶17-19 and Tabs 2 and 3 to Jarosz Decl. See also Auman Decl., ¶¶17-19 (discussing "significant spike in customers discontinuing service in those exchanges in which [the Plaintiffs] compete with Charter; P. Ex. 60; May 5, 2020 Trial Tr. at 110 (testimony of Jeffrey H. Auman): "The false and misleading advertising had a big impact on our business, and it was immediate, it was seen in net subscriber losses, it was seen by my sales organization in customers not coming in, missed commissions, missed sales plans.  It had a profound impact on our business and we didn't see it in the non-Charter [Exchanges]."

[46] Id., ¶20.

[47] Auman Decl., ¶ 19

(discussing general acceptance of regression models).  Instead, the Defendants raise three

relatively narrow criticisms.

First, they argue that Mr. Jarosz's calculations should have been on a Plaintiff-by-

Plaintiff basis.  However, the Plaintiffs established that the ad campaign attacked their common

"Kinetic by Windstream" brand by which they marketed themselves to their customers.[48] If

there is any dispute as to what particular Plaintiff was injured by the loss of which particular

customers based on that attack, it would properly be among the Debtors/Plaintiffs, not

between the Plaintiffs and the Defendants, who, if Mr. Jarosz's calculations are reasonably

accurate, would owe aggregate lost profits damages to the Plaintiffs as a whole, for later

allocation among the Plaintiffs without Defendants' further involvement.[49]  The authority relied

upon by the Defendants, Hatahley v. United States, 351 U.S. 173, 182 (1956), where the trial

court did not tie the numbers of lost horses and burros to specific plaintiffs, is clearly

distinguishable.

Second, the Defendants contend that the geographical unit of measurement -- by

Exchange -- for Mr Jarosz's "difference-in-difference" analysis was not precise enough, in that

another unit of measurement for the areas in which the Plaintiffs and Defendants allegedly

competed head to head -- FCC census reporting data[50] -- shows locations within Charter

Exchanges where the companies actually did not compete.  This argument is not persuasive,

---

[48]Id., ¶3; May 6, 2020 Trial Tr. at 88, 118 (testimony of Jeffrey H. Auman); April 28, 2020 Trial Tr. at 68, 177 (testimony of John C. Jarosz).

[49] The Debtors' confirmed Chapter 11 Plan basically moots any such inter-Debtor dispute by establishing a class of general unsecured creditors holding allowed claims against the so-called "Obligor Debtors," entitled to a very small pro rata distribution, and a class of general unsecured holding allowed claims against the so-called "Non-Obligor Debtors," entitled to payment in full.

[50] Charter Impeachment Exs. 1-5, 23, 25, 30-31, 38-39.

however, because (a) as noted above, the Plaintiffs record their new customer and customer discontinuance data by Exchanges, and the FCC reporting data does not include such information,[51] (b) the Exchanges are themselves rather small in size and enable the Plaintiffs to readily track their customers vis a vis their competitors, including Charter, which they do actively and in many ways, by Exchange,[52] and (c) the difference-in-difference comparison of Charter and non-Charter Exchanges was uniformly undertaken; that is, the geographical configuration of the Exchanges did not change from the April-August 2018 time frame to the April-August 2019 time frame.  Thus, as long as the spike in lost customers in the Charter Exchanges without a corresponding change in the non-Charter Exchanges can be tied to the ad campaign as opposed to other variables, Exchanges would appear to be an appropriate geographical unit for the analysis.

The Defendants' third criticism of Mr. Jarosz's analysis, based on the contention that there were in fact other variables besides the ad campaign to which the spike in "churn" can be attributed, requires closer consideration.  Clearly if such a variable or variables were established, Mr. Jarosz's difference-in-difference analysis would lose efficacy based on the failure to control for them.  *See, e.g.*, Banks v. United States, 102 Fed. Cl. 115, 197-98 (2011), *rev'd on other grounds*, 741 F.3d 1268 (Fed. Cir. 2014).  It should be noted, however, that in establishing lost profits, some degree of speculation on the Plaintiffs' part is acceptable, although causation must be initially established.  Playtex Prods. V. Proctor & Gamble Co., 2003 U.S. Dist. LEXIS 8913, at *14 (S.D.N.Y. May 28, 2003), *aff'd* 126 Fed. App'x 32 (2d Cir. 2005).

---

[51] See n.41 supra; May 6, 2020 Trial Tr. at 121 (testimony of Jeffrey H. Auman).
[52] See n.41 supra; May 6, 2020 Trial Tr. at 34-35, 92-93, 96-97 (testimony of Jeffrey H. Auman).

The trend study for non-Charter Exchanges generally reflected, as Mr. Jarosz noted, that both the Charter and non-Charter Exchanges "were exposed to [the same] systemic factors unrelated to Charter's false advertising campaign that may affect [the Plaintiffs'] churn rate," such as the Plaintiffs' "corporate strategy or truthful and accurate news surrounding [the Plaintiffs'] bankruptcy"[53] as the data moved in parallel tracks until the start of the ad campaign. Mr. Jarosz further concluded that "there were no indications of other variables causing those parallel trends to deviate during the time period I reviewed."[54]  And indeed the Defendants raised no confounding variables -- such as, for example, a different business strategy for the non-Charter Exchanges than in the Charter Exchanges or increased competition in Charter Exchanges but not in the non-Charter Exchanges from third parties during April-August 2019 -- with two exceptions.[55]  The first alleged confounding variable was Charter's introduction of higher internet speed service in much of the Charter Exchanges starting at some time after the end of 2017 and during 2018.[56]  The Defendants introduced no evidence, however, of the effect of such an increase on their position vis a vis the Plaintiffs and other business competitors, although one can reasonably infer that such evidence exists in such a clearly competitive and data-driven market.  In other words, the Defendants left it to the Court to speculate that faster

---

[53] Jarosz Decl., ¶9.

[54] Id., ¶13.

[55] Charter refers to a third possible confounding variable at Charter Mem. 15 and 22, namely that "in 2019, Charter offered its high-speed internet in new markets."  However, not only does Charter fail to identify these "new markets" or whether and, if so, when in 2019, and to what extent, any involved new competition with the Plaintiffs, but also offers no evidence for the assertion with the exception of a reference to Windstream Holdings, Inc.'s Form 10-K for the year ending December 31, 2018 stating that "Cable television companies have aggressively expanded in our consumer markets."

[56] April 28, 2020 Trial Tr. at 127-29 (testimony of John C. Jarosz) (discussing FCC data showing that the percentage of Plaintiffs' internet service in excess of 500 mbps remained basically stable between December 2017 and December 2018 while Defendants' percentage of such service increased between December 2017 and December 2018 from 17.91 percent to 98.93 percent).

internet speeds lead to greater churn without showing anything regarding the tipping point between Defendants' speeds and Plaintiffs' for purposes of customer churn.[57]  Moreover, they did not explain how the April-August 2019 spike in churn could be tied to the introduction of higher speeds when Charter's increased speeds were introduced on a widespread basis sometime between the end of 2017 and the end of 2018, with almost complete coverage at higher speeds by December 2018,[58] which could easily have affected the April-August 2018 control period as well the April-August period of Charter's misleading ad campaign.

In addition, Plaintiffs provided unrefuted testimony that after the Defendants' ad campaign was halted and the Plaintiffs engaged in corrective advertising and promotional efforts to recover suppressed demand, the Plaintiffs eventually returned to plan,[59] yet there is no evidence that the Plaintiffs came close to matching Defendants' increased internet speeds during that time.  It is unlikely, therefore, that the Plaintiffs would have regained their market share if the earlier spike in lost customers was, as Charter contends, attributable to Charter's widespread introduction of higher internet speeds in 2018.

Charter's second proposed confounding variable is that "Charter also widely offered a new product throughout 2019 that was not even available in March, April, and May of 2018."[60] The "product" according to one of the two pieces of evidence cited by Charter in support of this statement, was the introduction of "Spectrum mobile service to residential customers" before

---

[57] On the other hand, there is evidence that simple differences in internet speed alone did not drive competition between Plaintiffs and Defendants.  May 6, 2020 Trial Tr. at 63-65 (testimony of Jeffrey H. Auman).
[58] Id.  See also id. at 178 (testimony of John C. Jarosz).
[59] May 6, 2020 Trial Tr. at 110-11 (testimony of Jeffrey H. Auman:  "October was the first month we got back, where we started meeting our plan again.  So, we finally started to offset the losses in October and it continued through the end of the year."
[60] Charter Mem. 15.

the end of 2018.[61]  The other evidence cited in support of the statement, Charter

Communications Inc.'s Form 10-Q for the period ending June 30, 2019, states, "We began mass

market advertising of Spectrum Mobile in September 2018.  In the second quarter of 2019, we

expanded our Spectrum Mobile bring-your-own-device ("BYOD") program across all sales

channels to include a broader set of devices.  We believe our BYOD program will lower the cost

for consumers of switching mobile carriers, and will reduce the short-term working capital

impact of selling new mobile devices on installment plans.  We expect these developments to

contribute to the growth of our mobile business."[62]  Again, Charter did not provide evidence of

the nature and scope of this product or program or its effect vis a vis the Plaintiffs and Charter's

other competitors.  Charter therefore again asks the Court to speculate, as did its Form 10-Q,

that the program would increase its competitiveness generally (although even the Form 10-Q

does not address competitiveness versus the Plaintiffs) and explain at least some portion in the

spike in churn during April-August 2019.  Again also, the inference that Charter asks to be

drawn is belied by Plaintiffs' eventual return to plan by the end of 2019[63] notwithstanding

Charter's BYOD program, as well as the parallel trends for 2018 and 2019 with the exception of

the period immediately following the misleading ad campaign.

Based on the foregoing, on the only contested aspects of Plaintiffs' lost-profits case the

Plaintiffs have carried their burden of proof.  *See* Ardray v. Ardry-Mart, Inc., 76 F.3d 984, 989

(9th Cir. 1995), and Alpo Petfoods Inc. v. Ralston Purina Co., 997 F.2d 949, 954 (D.C. Cir. 1993)

---

[61] JE 3, Charter Communications Inc. Form 10-K for year ending December 31, 2018.
[62] JE 4, Charter Communications Inc. Form 10-Q for period ending June 30, 2019.
[63] See n. 59.

(burden on uncertainty of damages is rightfully on the wrongdoer), each citing <u>Bigelow v. RKO Pictures Inc.</u>, 327 U.S. 251, 265 (1945).

It remains to briefly address the third step in Mr. Jarosz's analysis, translating lost customers into lost profits. He posited two ways to make such a calculation, each starting with Plaintiffs' average monthly revenue per customer in March 2019 ($73.63) and the number of months the lost customers otherwise would have remained with the Plaintiffs (50 months), both taken from data kept by the Plaintiffs in the ordinary course.[64] For his first alternative calculation, Mr. Jarosz applied the Plaintiffs' gross profit margin to the lost revenue and derived lost profits of $5.1 million.[65] Alternatively, he deducted from gross profit margin Plaintiffs-wide operating expenses such as selling, general, and administrative expenses, resulting in a lost profits calculation of $3.2 million.[66] He opined, however, that this alternative was probably too low based on the likelihood that such operating expenses would be incurred regardless of the loss of 1,386 customers from a much larger customer pool.[67] Given the size of the Plaintiffs' customer base in the Charter Exchanges -- 360,865[68] -- and the nature of Plaintiffs' business, that assessment, which the Plaintiffs have not challenged, is reasonable. Whatever common operating expenses might be attributable to the lost customers would be offset, moreover, by the spillover effect of Charter's campaign past August 2019 and in non-Charter Exchanges discussed but not included by Mr. Jarosz in his lost profits calculation. Accordingly, Plaintiffs'

---

[64] May 6, 2020 Trial Tr. at 39 (testimony of Jeffrey H. Auman); Jarosz Decl., ¶¶23-24.
[65] Id., ¶24.
[66] Id., ¶25-26.
[67] Id., ¶26.
[68] Id., ¶17.

have met their burden to show that they suffered $5.1 million of lost profits because of

Defendants' violation of section 362(a)(3) with their ad campaign.

The Defendants have not challenged Plaintiffs' assertion[69] of damages of $862,775

comprising the cost of corrective advertising in response to the ad campaign.[70]  The cost of such

corrective advertising is a well-recognized component of damages for harm caused by wrongful

advertising.  Alpo Pet Foods v. Ralston Purina Co., 997 F.2d at 952; Mobius Management Sys. v.

Fourth Dimension Software, 880 F. Supp. 1005, 1022-23 (S.D.N.Y. 1995); Cuisinarts v. Robot-

Coupe Int'l Corp., 580 F. Supp. 634, 641 (S.D.N.Y. 1984).  Given the lack of objection and the

evidence in support of this element of Plaintiffs' damages claim, Plaintiffs have carried their

burden that such costs were reasonable and causally related to Defendants' ad campaign.  Alpo

Pet Foods, 997 F.2d at 952 ("We think it hardly meet that the party injured by a false

advertising campaign be required to prove the false advertisements were the sole reason for

the responsive campaign.  It is enough that the campaign would not have been undertaken but

for the false ads."); Mobius Management Sys., 880 F. Supp. at 1025 n.13.

The Defendants have, however, challenged the next element of Plaintiffs' damages

claim, namely Plaintiffs' claim for the cost of a promotional campaign comprising customer

upgrades, discounts and other pricing promotions undertaken from September through

December 2019.[71]  The Defendants do not question the $4,033,425 cost or reasonableness of

the campaign, nor that it was, like Plaintiffs' corrective advertising, incurred because of and in

---

[69] Auman Decl., ¶ 15 and the exhibits cited therein.
[70] Charter Mem. 16-17 ("A plaintiff could recover for its Retained Customer Injury by receiving a payment for the costs it incurred convincing customers to maintain their service.").
[71] May 6, 2020 Trial Tr. at 56-58 (testimony of Jeffrey H. Auman).

response to Defendants' ad campaign.  In any event, the cost of the promotional campaign is

supported by sufficient evidence in addition to Mr. Auman's testimony,[72] as is Plaintiffs'

assertion that the campaign was targeted in direct response to Charter's misleading ad

campaign.[73] It was "the most aggressive campaign that [Plaintiffs] have run,"[74] "was absolutely

uncommon for [Plaintiffs],"[75] and was aimed to address the Charter campaign's "profound

impact on [Plaintiffs'] business, and we didn't see it in the non-Charter [Exchanges],"[76] where

Plaintiffs' campaign was not offered.[77]

Instead, the Defendants assert that awarding such damages would unfairly duplicate

Plaintiffs' lost profits damages, based on the contention that because Plaintiffs' promotional

campaign concededly was not intended to retain remaining customers,[78] it must have been

intended to win back the lost customers accounted for in Mr. Jarosz's lost profits calculation.[79]

It stands to reason that, just as with the corrective advertising that Defendants do not

contest as an element of damages, some the promotional campaign reached former customers

---

[72] Id. at 55-57; P. Exs. 313, 316.

[73] May 6, 2020 Trial Tr. at 52, 58, 109-10 (testimony of Jeffrey H. Auman).

[74] Id. at 66.

[75] Id. at 109; see also id. at 111.

[76] Id. at 110.

[77] Id. at 52

[78] Id. at 56-57, 58-59.

[79] Charter Mem. 16, 19-20.  At the same time, Defendants make the rather wild argument that because Mr. Auman, Plaintiffs' witness on this issue, described the promotional campaign in ¶15 of his witness Declaration as intended "to convince customers to maintain their service with [Plaintiffs]," the Court should disregard his testimony in its entirety because he made it clear in his live testimony that the promotional campaign was intended to attract new customers to replace "suppressed demand."  May 5, 2020 Trial Tr. at 56, 109.  Such testimony does not warrant Defendants' allegations of perjury or justify the wholesale disregard of Mr. Auman's testimony on cross examination, however, which the Court found to be consistently credible.  (It is worth noting that there was nettle to no added difficulty in assessing witness credibility presented by the video format of the trial.)  Nor should the Court give credence to Defendants' speculation about Mr. Jarosz' motive for reducing his damages calculation from his expert report to his trial declaration, which Defendants apparently base not on any testimony by Mr. Jarosz (he was not questioned about this issue on cross examination), but, rather, on the alleged effect on Mr. Jarosz of a report by an expert retained by the Defendants who was not offered at trial.  Charter Mem. 17.

who had terminated their contracts with Plaintiffs because of Charter's campaign.  Indeed, Mr.

Auman testified that although the promotion was open only to those who had not

disconnected with the Plaintiffs in the past 30 days, "some of those customers likely

disconnected and came back with us and enjoyed a promotional period, or a promotion that we

offered."[80] The question, however, is whether the promotional campaign was intended to win

back the customers that Plaintiffs had lost or primarily to redress other damages caused by

Charter, because it is well recognized that damages for wrongful advertising can include both

lost profits and the cost of damage control programs, including corrective advertising, at the

same time.  *See* Merck Eprova AG v. Gnosis S.p.A., 760 F.3d 247, 264-65 (2d Cir. 2014)

(overruling defendant's contention that "corrective advertising when paired with the district

court's award of damages, constitutes an unfair double recovery"); Alpo Pet Foods Inc. v.

Ralston Purina Co., 913 F.3d 958, 969 (D.C. Cir. 1990) (actual damages based on false

advertising include (i) plaintiff's lost profits on sales diverted to the defendant, (ii) plaintiff's lost

profits on sales made at reduced prices because of defendant, (iii) plaintiff's cost of corrective

advertising, and (iv) quantifiable harm to plaintiff's goodwill, to the extent that corrective

advertising has not repaired that harm); Gayle Martz v. Geo Global Grp., 1998 U.S. Dist. LEXIS

6295, at *9 (S.D.N.Y. Apr. 30, 1998) (actual damages include lost profits, cost of corrective

advertising and the harm to plaintiff's goodwill).  *See also* Balance Dynamics Corp. v. Schmitt

Indus., 204 F.3d 683, 692-93 (6th Cir. 2000), *cert. denied* 531 U.S. 927 (2000) (recognizing

damage control costs and harm to goodwill as damages).

---

[80] May 5, 2020 Trial Tr. at 52 (testimony of Jeffrey H. Auman).

Here, Mr. Auman testified credibly that before the Defendants' false advertising campaign, Plaintiffs "were on a growth trajectory" but after the campaign they were "behind plan.  And at one point, in April-June timeframe, we were about 5,000 customers behind our busines plan. And so, we introduced [the promotional program] later in the year."[81] That program was primarily designed to recover "demand that was suppressed"[82] or Plaintiffs' "commitment" to return to plan,[83] which occurred in October 2020, "the first month we go back, we started meeting our plan again."[84]  Under the circumstances, therefore, Plaintiffs have carried their burden, including that the cost of their promotional campaign constitutes damages separate from their lost profits damages from lost customers.[85]

As discussed above, the Plaintiffs are also entitled to damages in the amount of the reasonable attorneys' fees and expenses incurred because of Defendants' breach of the automatic stay under section 362(a)(3) of the Bankruptcy Code. Plaintiffs' have asserted that the amount of such fees and expenses is $10,281.858.26, comprising the fees and expenses of their counsel and experts, the fees and expenses of counsel for the Official Committee of Unsecured Creditors, which intervened in support of the Plaintiffs, and the imputed fees and expenses of Plaintiffs' in-house counsel.  The Court has reviewed these asserted damages employing the standard set forth in section 330 of the Bankruptcy Code, which generally adopts

---

[81] Id. at 51-52.
[82] Id. at 109.
[83] Id. at 110
[84] Id.
[85] Alternatively, one could find that Mr. Auman's testimony establishes the cost of the successful promotional campaign as damages for Plaintiffs' loss of business goodwill.  Defendants' contention that this should be precluded because the Debtors' monthly operating reports filed during their bankruptcy cases showed no erosion in goodwill clearly misses the mark; GAAP goodwill for purposes of the Debtors' monthly operating reports is not business goodwill for purposes of calculating damages.

the lodestar method of determining a reasonable fee and reasonable and necessary expenses with certain additional limitations and is consistent, as discussed above, with the caselaw on fees and expenses as damages for contempt.

Based on that review, the portion of Plaintiffs' claimed fee and expense damages comprising the legal fees and expenses of the Official Committee of Unsecured Creditors, $592,134.56, should not be granted.  These fees and expenses, while they may have been properly incurred as part of the Committee's monitoring role in these chapter 11 cases, were not necessary to proving Defendants' stay violation and enforcing sanctions therefor.

Nor should Plaintiffs' damages include Plaintiffs' imputed in-house legal fees of $389,200.  Although such legal fees can be recoverable, <u>Broadcast Music, Inc. v. R Bar of Manhattan, Inc.</u>, 919 F. Supp. 656, 661 (S.D.N.Y. 1996), here the Plaintiffs' records of the claimed fees[86] are concededly not substantially contemporaneous with the services performed but, rather, prepared several months after the fact based on calendar entries, travel records, invoices and other recollections.[87]  They also are not broken out incrementally by task performed and instead usually record several hours each day spent on the Charter matter generally, which makes meaningful review impossible.  Under section 330 of the Bankruptcy Code and the caselaw discussed above, this time therefore was not recorded in a way to support a fee request.  <u>Id.</u>  Similarly, the time and expense records of NERA Economic Consulting, apparently a non-testimonial expert for the Plaintiffs, are insufficiently detailed to enable meaningful review, as they are by and large limited to entries such as "Review

---

[86] P. Ex. 315.
[87] May 6, 2020 Tr. Tr. at 103-04 (testimony of Jeffrey H. Auman).

materials," "Review documents," "Discussions with staff," "Discussions with counsel," and

"Worked on report."[88]  These $33,396.25 of fees and expenses therefore also cannot be

included in Plaintiffs' damages.

On the other hand, the $154,330 of fees and expenses of Mr. Jarosz's company, Analysis

Group, Inc.[89] were reasonable and are warranted as damages, as are most of Plaintiffs' claimed

damages attributable to the fees and expenses of its outside counsel.  The Court has previously

reviewed and approved the final allowance of Plaintiffs' outside counsel's fees and expenses

under section 330 of the Bankruptcy Code.[90]  Mr. Jarosz's firm's fees and expenses also satisfy

that standard.  Plaintiffs' damages based on its outside counsel's fees and expenses should be

reduced from the amount previously allowed, however, by $83,948 for time spent representing

the Debtors on matters other than this adversary proceeding, which are properly compensable

but not properly damages that Charter should pay.[91]

To the extent that the law of the Second Circuit would require a showing of Defendants'

"willfulness" before approval of these fees and expenses for proving contempt and damages

therefor, the Court finds Charter to have acted willfully as defined by the foregoing caselaw.

While the ratio of Plaintiffs' fees and expenses to Plaintiffs' damages is high

($9,183179.45/$9,996,200), a large portion of the legal fees and expenses were incurred in

---

[88] P. Ex. 95.  Apparently, the report mentioned is not part of the record.

[89] P. Ex. 94.

[90] The Court's order approving counsel's final fees and expenses appears at Dkt. No. 2626.  The final fee and expense application appears at Dkt. No. 2393, and counsel's interim applications appear at Dkt. Nos. 932, 1319, 1679, 1701, 1824, 1993, and 2324.

[91] This includes $1,875 of Ms. Lockhart's time from Dkt. No. 1360; $8,730 of Ms. Thompson's time from Dkt. Nos. 1360 and 1449; $47,767.50 of Mr. Rochester's time from Dkt. Nos. 1360, 1449, and 1522; $12,360 of Mr. Churbuck's time from Dkt. Nos. 1360 and 1449; $640 of Mr. Justus' time from Dkt. No. 1360; $8,766.50 of Mr. Ross' time from Dkt. Nos.1449, 1522, 1993, and 2324; $2,117.50 of Ms. Yager's time from Dkt. No.1449; $195 of Mr. Sieger's time from Dkt. No.1449; and $1,496 of Ms. O'Brien's time from Dkt. No. 1449.

response to several questionable litigation choices by Defendants, some of which are detailed

in prior opinions in this adversary proceeding but which also included unnecessary discovery

disputes and misguided motions for summary judgment, judgment on the pleadings and

Daubert witness exclusion, the filing of a mammoth motion for judicial notice on the eve of trial

and then later withdrawn, and, after the Court specifically directed the parties not to do so, the

filing of purported proposed findings of fact and conclusions of law. [92]  In addition, the ration

does not take into account the significant portion of fees and expenses incurred in obtaining

the contested cessation of Charter's violation of the stay.  Plaintiffs' damages therefore should

include $9,183,179.45 of litigation fees and expenses.

       In sum, Defendants should be sanctioned, jointly and severally,[93] $19,179,329.45 based

on their misleading ad campaign's willful violation of the automatic stay under section 363(a)(3)

of the Bankruptcy Code.

**Equitable Subordination**

       The purpose of the doctrine of equitable subordination codified in section 510(c) of the

Bankruptcy Code is "to undo wrongdoing by an individual creditor in the interest of the other

creditors."  Enron Corp. v. Springfield Assocs. LLC (In re Enron Corp.), 379 B.R. 425, 434 (S.D.N.Y.

2007).  It has been described as "a drastic and unusual remedy" that "should be applied only to

the extent necessary to offset the specific harm that creditors have suffered on account of the

inequitable conduct."  Id.  Courts in this district have long applied to so-called Mobile Steel test

---

[92] Without, however, citations to the record.
[93] The sanction should be joint and several because each Defendant was responsible for the stay violation as part of their concerted misleading ad campaign.  Of course, the aggregate recovery against both Defendants cannot exceed the $19,179,329.45 sanction.

derived from Benjamin v. Diamond (In re Mobile Steel Corp.), 563 F.2d 692, 700 (5th Cir. 1977), when asked to equitably subordinate a claim: (1) the claimant must have engaged in some type of inequitable conduct, (2) the misconduct caused injury to the creditors or conferred an unfair advantage on the claimant, and (3) equitable subordination of the claim is consistent with bankruptcy law. Assante v. Eastern Sav. Bank (In re Assante), 2013 U.S. Dist. LEXIS 30132, at *12 (S.D.N.Y. March 4, 2013); In re Enron Corp., 379 B.R. at 433; 80 Nassau Assocs. v. Crossland Fed. Sav. Bank (In re 80 Nassau Assocs.), 69 B.R. 832, 837 (Bankr. S.D.N.Y. 1994). *See also* United States v. Noland, 517 U.S. 535, 538-39 (1996) (citing Mobile Steel).[94]  The required "misconduct" is best described as conduct that violates a generally recognized duty that justifies the intervention of equity. In re 80 Nassau Assocs., 69 B.R. at 839-40.

Here, as previously determined on summary judgment, Operating's two violations of the automatic stay, giving rise to $19,184,658.30 of contempt sanctions, clearly constitutes the requisite misconduct. Imposing equitable subordination of Operating's unsecured claims in this case also would not violate any other provision of the Bankruptcy Code and would be consistent with bankruptcy law. As noted above, the harm caused by Operations' stay violations was to the Debtors' common brand; it therefore does not have to be particularized on an Applicable Debtor-by-Debtor basis.

Nevertheless, based on the Debtors' Chapter 11 Plan and the Court-approved Disclosure Statement, of which judicial notice may be taken, unsecured creditors in Class 6B, comprising

---

[94] Although Mobile Steel and most cases applying it, including United States v. Noland, refer to "injury to the creditors *or* conferred an unfair advantage" (emphasis added), some decisions use "and/or" (*see* In re Assante, 2013 U.S. Dist. LEXIS 30132, at *12), and some courts have stated that a finding of unfair advantage without injury to creditors is insufficient. *See* LightSquared LP v. SP Special Opportunities LCC (In re LightSquared Inc.), 511 B.R. 253, 347 n. 152 (Bankr. S.D.N.Y. 2014). Charter makes much of this distinction, although it fails to explain why it is relevant to the present facts, Charter Mem. at 42, 43, but they key point is that there must be injury to creditors.

the holders of allowed unsecured claims against "Non-Obligor Debtors" are unimpaired by the

Plan and thus will receive a 100% recovery on their claims regardless of Charters' misconduct.[95]

Therefore, the remedy of equitable subordination would not apply to Operating's Class 6B

claim numbers 5740, 5786, 5668, 5755, 5767, 5761, 5748, 5780, 5749, 5750, 5734, 5751, 5752,

5753, 5754, 5763, 5737, 5747, and 5793, which are against Non-Obligor Debtors.[96]

On the other hand, unsecured creditors in Class 6A, comprising the holders of allowed

unsecured claims against "Obligor Debtors" are described in the Disclosure Statement as

receiving a projected pro rata recovery of between 0 and .125%.[97]  The Disclosure Statement

estimated the aggregate allowed amount of these claims as being between $1.183 billion -

$1.203 billion.[98]  The face amount of Operating's aggregate claims against the Obligor Debtors

is $16,974,706.43, which would result in a maximum projected recovery of $21,218.34 from

such Debtors.  Clearly Operating's misconduct harmed the other Class 6A creditors more than

this sum, and therefore the full amount of Operating's Class 6A claims against the Obligor

Debtors[99] should be equitably subordinated to the other Class 6A claims.

## Conclusion

For the foregoing reasons, the Defendants are in contempt of the automatic stay under

section 362(a) of the Bankruptcy Code and jointly and severally liable for compensatory

sanctions therefor constituting Defendants' resulting lossess in the aggregate amount of

---

[95] Dkt. No. 1813 at 5.
[96] See www.kccllc,net/windstream/ for "Charter claim search results.
[97] Id. at 7.
[98] Id.
[99] These are claim numbers 5731, 5732, 5733, 5735, 5736, 5738, 5739, 5758, 5759, 5760, 5762, 5764, 5765, 5766, 5769, 5790, 5791, and 5792.  See www.kccllc.net/windstream/ for Charter claim search results.

$19,184,658.30.  Operating's Class 6A claims also are equitably subordinated in full under

section 510(c) of the Bankruptcy Code to the other Class 6A claims.

Counsel for the Plaintiffs shall email chambers a proposed judgment on Counts VI and

VII consistent with this Memorandum of Decision, with a copy to counsel for Defendants.

Dated:  White Plains, New York
        April 8, 2021

                                        /s/Robert D. Drain
                                        United States Bankruptcy Judge

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| WINDSTREAM HOLDINGS, INC., *et al.*,[1] | ) | Case No. 19-22312 (RDD) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |
| | ) | |
| WINDSTREAM HOLDINGS, INC., *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | Adv. Pro. No. 19-08246 |
| | ) | |
| v. | ) | |
| | ) | |
| CHARTER COMMUNICATIONS, INC. and | ) | |
| CHARTER COMMUNICATIONS OPERATING, LLC, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**ORDER GRANTING IN PART AND DENYING IN PART DEBTORS'**
**MOTION FOR PARTIAL SUMMARY JUDGMENT OF LIABILITY**

Upon consideration of the Debtors' *Motion for Summary Judgment of Liability on All*

*Counts*, dated November 15, 2019 [Adv. Dkt. No. 122] (the "Motion"),[2] the memorandums of law

in support thereof, and the responses and objections filed in response thereto and all other related

pleadings; and the Court having jurisdiction to consider the Motion and the relief requested therein

pursuant to 28 U.S.C. §§ 157(a)-(b), 28 U.S.C. §§ 1334(b) and the Amended Standing Order of

Reference from the United States District Court for the Southern District of New York, dated

---

[1] The last four digits of Debtor Windstream Holdings, Inc.'s tax identification number are 7717. Due to the large number of debtor entities in these Chapter 11 cases, for which joint administration has been granted, a complete list of the debtor entities and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at http://www.kccllc.net/windstream. The location of the Debtors' service address for purposes of these Chapter 11 cases is: 4001 North Rodney Parham Road, Little Rock, Arkansas 72212.

[2] Each capitalized term used in this Order shall unless otherwise defined herein have the same meaning ascribed to such term in the Motion.

January 31, 2012; and venue being proper before this Court pursuant to 28 U.S.C. §§ 1408 and

1409; and consideration of the Motion and the relief requested therein being a core proceeding

pursuant to 28 U.S.C. § 157(b); and this Court having found that due and sufficient notice of the

Motion and the relief requested therein has been provided in accordance with the Bankruptcy Rules

and this Court's Final Order Establishing Certain Notice, Case Management and Administrative

Procedures [Bankr. Dkt. No. 392]; and it appearing that no other or further notice need be provided;

and upon the record of, and for the reasons stated by the Court in its bench ruling at, the hearing

held by the Court on the Motion on December 18, 2019 (the "Hearing"), it is HEREBY ORDERED

THAT:

1.      The Motion is GRANTED *IN PART* and DENIED *IN PART,* as follows:

     a.      The Motion is GRANTED with respect to liability on Counts I-IV for violation of

the Lanham Act and related state deceptive trade practices laws for the reasons described

in pages 136-149 of the Revised Transcript for the Hearing [Adv. Dkt. No. 237].

        i.  There are no genuine disputes of material fact and, as a matter of law, the

Defendants' advertising is literally false, intentionally misleading, and

misleading; the Defendants' literally false and misleading statements are

material; the Defendants' literally false and misleading statements were placed

in interstate commerce; and the Debtors have been injured as a direct and

proximate result of Defendants' literally false and misleading advertising.

        ii. There are no genuine disputes of material fact and, as a matter of law, the

Defendants intentionally set out to deceive the public by intentionally designing

the false mailer to look like it was sent by the Debtors at a time when the

Debtors would be notifying their customers of these Chapter 11 cases, and then

2

by falsely communicating in the mailer that the Debtors' service was at imminent risk of being terminated.

iii. No other genuine disputes of material fact remain for trial with respect to liability on Counts I-IV, and the Debtors are entitled to judgment as a matter of law of liability on Counts I-IV.

b.      The Motion is GRANTED with respect to liability on Count V for breach of contract for the reasons described in pages 149-151 of the Revised Transcript for the Hearing [Adv. Dkt. No. 237].

i. There are no genuine disputes of material fact and, as a matter of law, a Value Added Reseller ("VAR") agreement existed between the Defendants and the Debtors; the Debtors adequately performed under the VAR agreement; and the Defendants breached the VAR agreement by disconnecting service to the Debtors' customers without providing the required prior notice.

ii. No other genuine disputes of material fact remain for trial with respect to liability on Count V and the Debtors are entitled to judgment as a matter of law of liability on Count V.

c.      The Motion is GRANTED *IN PART* and DENIED *IN PART* with respect to liability on Count VI for violation of the Bankruptcy Code's automatic stay provision for the reasons described in pages 151-152 of the Revised Transcript for the Hearing [Adv. Dkt. No. 237].

i. There are no genuine disputes of material fact and, as a matter of law, the Defendants violated 11 U.S.C. § 362(a) in two ways: (A) through the Defendants' breach of the VAR agreement, by terminating service to the

3

Debtors' customers without the required prior notice, in an effort to enforce a prepetition debt and/or to control property of the estate; and (B) through the Defendants' literally false and misleading advertising in an effort to control property of the Debtors' estate, namely, the Debtors' customers or contracts with those customers.

ii. The Court finds that genuine disputes of material fact remain for trial on the remaining elements of this cause of action.

d.      The Motion is GRANTED *IN PART* and DENIED *IN PART* with respect to liability on Count VII for equitable subordination for the reasons described in pages 152-154 of the Revised Transcript for the Hearing [Adv. Dkt. No. 237].

i. There are no genuine disputes of material fact and, as a matter of law, Defendant Charter Communications Operating, LLC ("Operating") has filed proofs of claim against numerous Debtors in these Chapter 11 cases; Defendant Operating engaged in inequitable conduct tantamount to fraud and misrepresentation through its literally false and misleading advertising, with an intent to deceive, in violation of the Lanham Act and related state deceptive trade practices laws that are the subject of Counts I-IV; and the Debtors against whom Defendant Operating filed proofs of claim were harmed by such inequitable conduct.

ii. The Court finds that genuine disputes of material fact remain for trial on the remaining elements of this cause of action.

2.      Given that the Court is granting only partial summary judgment of liability on less than all claims in this adversary proceeding, this Order is not a final order or proposed findings of fact and

4

conclusions of law for the reasons described in pages 130-131 and 154-156 of the Revised

Transcript for the Hearing [Adv. Dkt. No. 237].

3.      This Court retains jurisdiction with respect to all matters arising from or related to this

Order.


Dated: March 3, 2020                    /s/Robert D. Drain
        White Plains, NY                THE HONORABLE ROBERT D. DRAIN
                                        UNITED STATES BANKRUPTCY COURT JUDGE

1   UNITED STATES BANKRUPTCY COURT

2   SOUTHERN DISTRICT OF NEW YORK

3   Case No. 19-22312-rdd

4   Adv. Case No. 19-08246-rdd

5   - - - - - - - - - - - - - - - - - - - - - - - - - x

6   In the Matter of:

7

8   WINDSTREAM HOLDINGS, INC.,

9

10       Debtor.

11  - - - - - - - - - - - - - - - - - - - - - - - - - x

12  WINDSTREAM HOLDINGS, INC., et al.,

13         Plaintiffs,

14       v.

15  CHARTER COMMUNICATIONS INC., et al.,

16         Defendants.

17  - - - - - - - - - - - - - - - - - - - - - - - - - x

18

19

20

21

22

23

24

25

1          United States Bankruptcy Court

2          300 Quarropas Street, Room 248

3          White Plains, NY 10601

4

5          April 27, 2020

6          10:02 AM

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21   B E F O R E :

22   HON ROBERT D. DRAIN

23   U.S. BANKRUPTCY JUDGE

24

25   ECRO:   UNKNOWN

1    HEARING re Adversary proceeding: 19-08246-rdd Windstream

2    Holdings, Inc., et al. v. Charter Communications, Inc. et

3    al. Trial

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    Transcribed by:  Sonya Ledanski Hyde

1    A P P E A R A N C E S :

2

3    KATTAN MUCHIN ROSENMAN LLP

4         Attorneys for Plaintiffs

5         575 Madison Avenue

6         New York, NY, 10022

7

8    BY:   TERENCE ROSS (TELEPHONICALLY)

9         DOUGLAS BAYLIS (TELEPHONICALLY)

10        MICHAEL JUSTUS (TELEPHONICALLY)

11        SHAYA ROCHESTER (TELEPHONICALLY)

12

13   THOMPSON COBURN LLP

14        Attorneys for Charter Communications

15        One US Bank Plaza

16        St. Louis, MO, 63101

17

18   BY:   JOHN KINGSTON (TELEPHONICALLY)

19        KRISTEN SANOCKI (TELEPHONICALLY)

20

21

22

23

24

25

1    MORRISON FOERSTER LLP

2         Attorneys for Official Committee of Unsecured Creditors

3         250 West 55th Street

4         New York, NY 10019

5

6    BY:  STEVEN RAPPAPORT (TELEPHONICALLY)

7         JOCELYN GREER (TELEPHONICALLY)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

 1   ALSO PRESENT TELEPHONICALLY:

 2

 3   JEFFREY AUMAN

 4   JOHN JAROSZ

 5   NINO PRZULJ

 6   ANA LUCIA HURTADO

 7   KRISTIN LOCKHART

 8   MICHAEL ROSELLA

 9   MARIE SIENA

10   GRACE THOMPSON

11   JUSTIN MULLIGAN

12   ERIC WERLINGER

13   STEVEN SHREDL

14   LAURENCE CHRISTOPHER

15   BRIAN HOCKETT

16   KAT RICHARDSON

17   AISHA AL-MUSLIM

18   RICK ARCHER

19   PATRICK HOLOHAN

20   ROBERT BORDERS

21

22

23

24

25

1          P R O C E E D I N G S

2          THE COURT:  Okay.  Good morning, everyone.  This

3     is Judge Drain.  I hope you can see me.  Yes, okay.  This is

4     Windstream Holdings, Inc. v. Charter, et al, and more

5     specifically is the scheduled trial on Counts 6 and 7 in the

6     adversary proceeding, and more specifically than that, it's

7     the trial on the remaining undecided elements of Counts 6

8     and 7, namely the proper sanction under Section 362 for

9     violation of the automatic stay in the Court's adherence to

10    the tenth power and the applicable remedy with respect to

11    Count 7 for equitable subordination of the Charter

12    claimants' claims in the Windstream bankruptcy cases.

13          This is a trial with no one in the courtroom

14    because of the COVID-19 problems.  The parties have quite

15    diligently enabled the trial to proceed by Skype where

16    witnesses are going to be examined.  And in addition, the

17    parties will be participating telephonically through Court

18    Solutions, which will be recording the transcript or

19    recording the proceedings, which will then be used as the

20    transcript.

21          So with that being said as an introduction and

22    recognizing the work that the parties have done so far, I'll

23    ask you to proceed with the Plaintiffs' case.  If for some

24    reason someone is having a hard time hearing or seeing the

25    matters, you know, on the Skype screen or through the

1    telephonic feed, please raise your hand, indicate by

2    speaking up so that we can address it.

3              MR. ROSS:  Good morning, Your Honor.  This is Mr.

4    Ross representing the Plaintiffs.

5              THE COURT:  Good morning.

6              MR. ROSS:  At the outset, let me move into

7    admission several exhibits that the parties have agreed upon

8    having admitted.  They've been submitted to the Court as

9    Joint Exhibit Nos. 1 through 17, I believe, and the

10   Plaintiffs, and without objection from the Defendants, would

11   move the admission of Joint Exhibits 1 through 17.

12             MR. KINGSTON:  No objection, Your Honor.

13             THE COURT:  All right.  I have eight exhibit books

14   with the label Joint Exhibits.  Under the -- maybe I'm

15   mistaken.  It's really just 1 through 17 that you were able

16   to agree on, and the other eight are not agreed as to

17   admissibility?

18             MR. ROSS:  The other eight binders, yes, Your

19   Honor.

20             THE COURT:  All right, very well.  So 1 through 17

21   are admitted.

22        (Joint Exhibits 1 through 17 Entered into Evidence)

23             MR. ROSS:  Thank you, Your Honor.  Your Honor,

24   Plaintiffs also move at this time the admission into

25   evidence of the Declaration of Jeffrey H. Auman in lieu of

1    his direct testimony as instructed by this Court in the

2    adversary proceeding.

3             THE COURT:  Okay.

4             MR. KINGSTON:  Your Honor, Defendants do object to

5    the admission of portions of Mr. Auman's declaration.

6             THE COURT:  And is that based on the motion in

7    limine that was provided to the Court's chambers late Friday

8    afternoon, this being Monday?

9             MR. KINGSTON:  It is, in part, Your Honor.  I

10   don't know if the motion in limine goes line by line.

11            THE COURT:  Well, clearly it doesn't, as you know.

12            MR. KINGSTON:  So I guess an answer to the Court's

13   inquiry, no, the objections are not covered in the motion in

14   limine.

15            THE COURT:  Okay.  What do you propose to do about

16   the motion in limine?

17            MR. KINGSTON:  I'm happy to argue any part of the

18   motion in limine that the Court would like to argue.  If

19   it's more convenient for the Court, I'm happy to walk

20   through the declaration and identify and those portions of

21   which the Defendants object to and the Court can address

22   those objections as we go.

23            THE COURT:  Okay.  Where does, Mr. Ross, where

24   does -- what exhibit is Mr. Auman's declaration?

25            MR. ROSS:  It's not an exhibit, Your Honor.  It

1    was separately submitted to the Court, both in hard copy and

2    electronically.

3              THE COURT:  Great, I have it.  Thank you.  Okay.

4    I have Mr. Auman's declaration.

5              MR. KINGSTON:  And, Your Honor --

6              THE COURT:  Go ahead.

7              MR. KINGSTON:  Well, we're showing that the motion

8    in limine was delivered at 9:52 a.m. on 4/23.

9              THE COURT:  Delivered where; in person, right?

10             MR. KINGSTON:  Yes, Your Honor, the courthouse.

11             THE COURT:  Right.  Do you realize that we have

12   not been in the courthouse?  I think you should, right?

13             MR. KINGSTON:  Yes, Your Honor.  I apologize.

14             THE COURT:  And you were also told earlier in the

15   week that if you're seeking relief on short notice, you

16   should email it to the chambers email address.

17             MR. KINGSTON:  Yes, Your Honor.

18             THE COURT:  That was with respect to your other

19   emergency motion for reconsideration.

20             MR. KINGSTON:  I believe that motion was provided

21   to the chambers by email within two hours of when it was

22   filed.  So I thought that with that motion, it wasn't the

23   case that we weren't notifying the chambers of a motion for

24   relief; it was provided to the chambers within hours of

25   being filed.

1          THE COURT:  In any event, after I advised you and

2     your colleagues that if you are seeking review of something

3     on short notice, and certainly a Friday filed motion for a

4     trial on Monday that is over 350 pages long counts.  You

5     should email it.

6          MR. KINGSTON:  Very good, Your Honor.

7          THE COURT:  Are you going into the office daily?

8          MR. KINGSTON:  I have been for the last two weeks,

9     Your Honor, yes.

10          THE COURT:  Okay.  Well, I'm glad for you for

11     that.  All right.  So let's go through the declaration.

12          MR. KINGSTON:  Thank you, Your Honor.

13          THE COURT:  I'm waiting Mr. Kingston.

14          MR. KINGSTON:  Yes, Your Honor.  I'm trying to

15     narrow the list of objections.  Defendants object to the

16     admission of Paragraph 7, specifically the last sentence of

17     Paragraph 7 that says, "Windstream has adequately performed

18     all of its obligations under the VAR agreement."  The basis

19     of the objection is foundation.  It is specifically based on

20     the following testimony from Mr. Auman on behalf of the

21     Defendants during his September 24, 2019 deposition, Pages

22     33 Line 21 to 35 Line 3.

23          "Q. Mr. Auman, do you have any responsibility

24     related to the Spectrum business value-added reseller

25     agreement?"  "A. No."  "Q. Do you have any personal

1  knowledge related to the Spectrum business value-added

2  reseller agreement?"  "A. No."

3            On that basis, Defendants submit that Mr. Auman

4  does not have a foundation to testify about Windstream's

5  performance under the VAR agreement and his testimony is,

6  therefore, admissible under Federal Rule of Evidence 602.

7            MR. ROSS:  This is Mr. Ross.  That was a

8  deposition taken in his Rule 30(b)(6) capacity last

9  September.  Should not have been asked about personal

10 knowledge, but he answered correctly.  On this declaration

11 if the Court notices on Paragraph 2, he says he does have

12 personal knowledge.  And if you examine it --

13            THE COURT:  I'm sorry.  Could you say that again?

14 It didn't come through.

15            MR. ROSS:  On Paragraph 2, he states he has

16 personal knowledge of everything here, and that is because

17 he's been designated the corporate representative for this

18 trial, and he's gone out and learned what he needs to learn.

19            THE COURT:  Well, could I ask a basic question?

20 This sentence, "Windstream has adequately performed all of

21 its obligations under the VAR agreement."  The allegation

22 here is with regard to the breach of the automatic stay with

23 respect to collection activity and the like.  I'm not sure

24 why this is even relevant.  It may be relevant to something

25 else, a breach of contract claim, but I'm not sure it's

1    relevant here.

2              MR. KINGSTON:  That's fine, Your Honor.  We'll

3    move on.

4              THE COURT:  Okay.  So I won't consider this

5    sentence, not because it should be excluded under Rule 602,

6    but simply on relevance grounds.  It's not an issue that we

7    need to try today.

8              MR. KINGSTON:  Paragraph 8, Your Honor, Mr. Auman

9    purports to provide testimony as follows: "After Debtors

10   filed their Chapter 11 petitions in the Bankruptcy Court,

11   they provided to Charter a comprehensive list of Windstream

12   customers receiving last connectivity through Charter

13   pursuant to the VAR agreement.  This list was provided at

14   the request of Charter, despite the fact that Charter

15   already knew the identities of all such customers."

16             As to -- well, two points, Your Honor.  The first

17   is that the entirety of Paragraph 8 is not based on Mr.

18   Auman's personal knowledge.  In response to Mr. Ross's

19   response to the prior objection on the same grounds, if Mr.

20   Auman did not have personal knowledge in September of 2019

21   and subsequently obtained it, he obtained it by reading

22   pieces of paper or talking to people.  So he's obtained it

23   through hearsay, and we have a right to test and cross-

24   examine whoever the person is that he talked to or to look

25   at and attach whatever piece of paper he looked at.  So this

1      -- it's both foundation and a hearsay objection.

2              MR. ROSS:  Well, Your Honor, that's incorrect.

3      And we've cited in our objection to their -- everything that

4      is being covered here by Mr. Kingston is, in fact, in the

5      motion in limine filed against Mr. Auman.  We've addressed

6      it.  It's not inadmissible hearsay because, as the case law

7      that we pointed out establishes, a corporate representative

8      has to go out and look at documents and talk to people in

9      order to give testimony.

10             That is how a corporation speaks to a court.

11     Corporation is just a name on a piece of paper, asked to

12     talk through people.  It is entitled to talk on behalf of

13     all of its employees and all of its records.  Case law is

14     crystal clear on this.  It's at Page 5 and 6 of our

15     objection, Your Honor, and there's simply no basis for

16     saying that a corporate representative can't testify based

17     on the knowledge of the corporation.

18             MR. KINGSTON:  I'm aware of no Court of the Second

19     Circuit, Your Honor, that has said that Rule 30, the ability

20     of a corporation to designate a person pursuant to 30(b)(6)

21     somehow trumps Rule 602.  Moreover, Rule 32, which is cited

22     in Plaintiffs' motion in limine, provides some guidance

23     where it says that a corporate rep deposition can be used

24     against a corporate rep, unless it's already been partially

25     admitted.

1          So the foundation requirement is waived if a

2     defendant, for example, is using the plaintiff's corporate

3     representation -- representative deposition against the

4     plaintiff.  But it doesn't go -- Rule 30(b)(6) doesn't

5     permit the plaintiffs to put up somebody with no foundation

6     to testify about untestable assertions made out of court.

7          So, Your Honor, Rule 30(b)(6) doesn't apply here.

8     We're not attempting to use a transcript from his

9     deposition.  This is in lieu of live testimony.  And the

10     Second Circuit has neither said that you can or you cannot

11     do this; no Court in the Second Circuit can ask.

12          However, the Fifth Circuit, the Sixth Circuit, the

13     Northern District of Illinois, Southern District of New York

14     have all said that you can do exactly this; that a corporate

15     representative can appear and testify based on the entirety

16     of the knowledge of the corporation if they've gone out and

17     learned that knowledge.  And those cases, I can cite if the

18     Court wants, but there is no case to the contrary.

19          THE COURT:  Do you have any authority, Mr.

20     Kingston, in this context?

21          MR. KINGSTON:  I believe we do, but I'm putting up

22     the Skype.  Somehow, I'm not able to get to my email, but I

23     think we have pulled some cases that I'm happy to provide

24     the Court later in the day.

25          THE COURT:  Okay.  And you had the opportunity to

1    depose Mr. Auman as the corporate representative, correct?

2            MR. KINGSTON:  I certainly did, Your Honor.  And

3    when I did that, he had no personal knowledge about this, so

4    there was nothing for me to depose him on.  So whatever

5    knowledge he gained, I was not able to explore after that

6    deposition.

7            THE COURT:  Okay.  Well, subject to seeing your

8    cases, which you can email to chambers, on both sides,

9    because I have -- Mr. Ross, I have your objection to the

10   omnibus motion in limine.  Pages 5 and 6 don't refer to

11   those cases?

12           MR. ROSS:  But, Your Honor, it's an object- --

13   they filed three motions in limine, so we had to file an

14   objection against each.  This is Debtors' objection to

15   Defendants' motion in limine to preclude the trial

16   declaration of Jeffrey Auman; it is Docket #303.

17           THE COURT:  I have that.  I have that, so you

18   don't need to send me those cases.  Okay.

19           MR. KINGSTON:  I think that the same --

20           THE COURT:  The same point on all of these others

21   ones, I gather.

22           MR. KINGSTON:  Well, no, that's not exactly right.

23   I wanted to -- on the last sentence of Paragraph 8, Mr.

24   Auman is testifying about Charter's knowledge.  This list

25   was provided at the request of Charter, comma, despite the

1    fact that Charter already knew the identities of such

2    customers.  There's nobody at Windstream that he could talk

3    to.  There's no paper at Windstream that he could look at to

4    give him knowledge about what Charter knew about the

5    identities of such customers.  So we would ask that that

6    last sentence be stricken on additional grounds.

7                MR. ROSS:  But that's just incorrect.  They

8    provide the last connectivity to cable into the customer's

9    site.  Anybody can draw the logical conclusion that they

10   must know the identity of every site to which they're

11   providing the cable.  How else did they do it?  It's, again,

12   a frivolous objection.

13               THE COURT:  Well, so the testimony here isn't --

14   it's based on the inferences to the contractual

15   relationship.

16               MR. ROSS:  Which a witness is allowed to draw, if

17   available.

18               THE COURT:  But that's all it's based on.  It's

19   not based on some admission by Charter separate and apart

20   from that.

21               MR. ROSS:  No, that's covered in a subsequent

22   paragraph.

23               THE COURT:  Okay, all right.  All right.  So with

24   that clarification, it can stay in.

25               MR. KINGSTON:  Okay, I'm sorry.  Your Honor, I've

1    been provided with the cases.

2            THE COURT:  Just email me the cites.

3            MR. KINGSTON:  We will, Your Honor.  All right,

4    Paragraph 14, Your Honor.  I think through Paragraph 13, the

5    objections will be covered.  I think that the -- as I

6    understand counsel's argument, our objection is foundation,

7    and Plaintiffs' response is don't need to have the regular

8    foundation on a Rule 602 when it's a corporate

9    representative witness and the parties are providing

10   authority to the Court for their positions, so I'll move on

11   from paragraphs to Paragraph 13.

12           Paragraph 14 said Windstream provided at least

13   $5,278.85 in customer out-of-service credits in connection

14   with certain customers who opened trouble tickets in

15   connection with the disconnection of service by Charter.

16   That sentence is a summary to provide contents under Rule

17   1006 of evidence.  If you're going to use a summary, if

18   you're going to say we know that we have $5,200 in out-of-

19   service credits in connection with certain customers, you

20   have to provide the data related to those credits, which has

21   never been provided for us.  So maybe articulate it more

22   coherently.

23           The proponent may use a summary, a chart, or a

24   calculation to prove the contents of voluminous writings,

25   recordings, or photographs that cannot be conveniently

1    examined in court.  The proponent must make the originals or

2    duplicates available for examination or copying or both by

3    other parties at a reasonable time and place, and the court

4    may order the proponent to produce them in court.

5              So a condition precedent to offering a summary

6    such as that $5,278 calculation is providing us the

7    originals or duplicates of the voluminous writings upon

8    which it is based.  And we haven't seen and we haven't --

9    they have not been produced in discovery any of those

10   trouble tickets connected with the disconnection of service

11   by Charter.

12             The closest thing that we've seen to that, I

13   believe, would be Plaintiffs' Exhibit 34, which has zero

14   dollar amounts, zero references to credits.  So we would

15   object to Paragraph 14, the second sentence, under Rule --

16   Federal Rule of Evidence 1006, in addition to the foundation

17   objections that we've already discussed based on Mr. Auman's

18   testimony that he does not have any responsibility for this

19   contract.

20             MR. ROSS:  So, Your Honor, this is not some sort

21   of summation document or demonstrative.  This is simply a

22   fact that the witness is testifying to.  He can be cross-

23   examined on how he knows this fact, but it is a fact, and

24   witnesses are allowed to testify to facts to which they have

25   knowledge.  It's just that simple.

```
 1              THE COURT:  I agree with that.  I'll overruled
 2    this objection.
 3              MR. KINGSTON:  Okay.  I think the same objection
 4    would -- the other objection, which is covered in our motion
 5    in limine is that that $5,278 figure was never provided
 6    pursuant to Rule 26(a) before the close of discovery.  There
 7    was never -- there has never been provided a computation of
 8    any damages that is an explanation as how they were
 9    calculated.  And consistent with what I said earlier,
10    there's never been any production of the underlying
11    documents, which is also required under Rule 26(a)(1).
12              And I think this is very straightforward, Your
13    Honor.  Rule 26(a)(1) says, provide your computation of
14    damages and identify all the documents that support it, and
15    Rule 37 says, if you haven't produced information before, if
16    you haven't disclosed it pursuant to Rule 26(a)(1), you
17    can't use it at trial.
18              To be more specific, Your Honor, Rule 37(c)(a)
19    reads as follows: "Failure to disclose or supplement.  If a
20    party fails to provide information or identify a witness, as
21    required by Rule 26(a) or (e), the party is not allowed to
22    use that information or witness to supply evidence on a
23    motion, at a hearing or at trial unless the failure was
24    substantially justified or harmless."
25              There's been no justification, the failure is
```

1    admitted, and the harm is self-evidence in that we don't

2    have -- we've had no opportunity to look at whatever the

3    documents are, whatever the pieces of paper, whatever the

4    formulas are that are the underpinning for that calculation,

5    and we have no chance to test that until day one of trial;

6    that is not how -- that is not what Rule 26 was supposed to

7    accomplish, Your Honor.

8              MR. ROSS:  So, Your Honor, Rule 26 is inapplicable

9    here because it only requires a computation of damages.

10   We're not seeking any damages at this adversary proceeding

11   today.  We're seeking sanctions and remed- -- and other

12   types of remedial relief.

13             Second, we disclosed this about within a range of

14   what we believed to be the credits issues between $5,000 and

15   I think it was $16,000.  When we attempted to prove up that

16   amount, we decided that, to a hundred percent certainty, the

17   amount was $5,278, so it's at the low end of the range.

18   Instead of complaining, they should be thanking us that it's

19   at the low end of the range.

20             MR. KINGSTON:  Mr. Ross's representation is

21   incredible, Your Honor.  He told you that they disclosed

22   that damage calculation.  Your Honor, he disclosed that

23   damage calculation within 10 minutes of filing their

24   opposition to Charter's motion for summary judgment, long

25   after the close of discovery on December 6th.

1          (Audio distortion/crosstalk)

2          MR. KINGSTON:  And that disclosure, Your Honor,

3     did not include a computation and it did not include the

4     underpinning documents.  So even their disclosure a month

5     after discovery, in connection with their opposition to

6     Charter's summary judgment motion, didn't comply with the

7     rule.

8          Mr. Ross's second point I'd like to address as

9     well, Your Honor.  The suggestion that this action, Count 6,

10    doesn't involve damages is, one, incredible and, two, could

11    divest this Court or would require a jury trial.  Paragraph

12    84 of Plaintiffs' Complaint, Exhibit 1, Plaintiff's Exhibit

13    1, Paragraph 84: "Windstream is therefore entitled to a

14    judgment that Charter willfully violated the stay, damages

15    according to proof, and attorneys' fees."

16         On February 24th when this Court emailed counsel

17    to talk about the advisement of the remaining issues in the

18    case, the Court identified sanctions, including actual

19    damages as the issues that were -- as among the issues that

20    were live.

21         Plaintiffs are trying to avoid their failure to

22    provide a damage computation, as obviously required by the

23    Rule, by recasting their damage calculation as some kind of

24    a punitive sanction.  There's a serious problem with that

25    effort, Your Honor.  It can be summarized and addressed

1   pretty clearly in just three Second Circuit cases, which I'd

2   like to do for the Court if it's okay.

3           THE COURT:  No.  I understand your sanctions

4   point, to the extent it's based on actual harm.  So, I mean,

5   and this is a specific number, $5,278.85, so I understand

6   that it's being offered up in part to show me that

7   Windstream was harmed in that amount by the actions that

8   Charter took in violation of the stay.

9           But let's go back to the first point.  As I

10  understand it, Windstream gave you a range of I think $5,000

11  to $16,000.  And are you saying it did not make available

12  for inspection and copying the documents or other

13  evidentiary material on which the computation is based?

14          MR. KINGSTON:  Yes, Your Honor.  What I'm saying,

15  I'm saying two things.  Windstream did not give us that

16  range until long after discovery had closed.  Windstream

17  didn't provide that $5,000 to $16,000 damage range until

18  December 6th of 2019, which was 12 days before this Court

19  granted partial summary judgment for Windstream.  That was

20  long after the close of discovery.

21          And in those intervening 12 days, I was not able,

22  obviously, to depose anybody because discovery had closed.

23  And they never provided any documents for me to review in

24  those intervening 12 days between when Windstream disclosed

25  that $5,000 to $16,000 damage number and the Court entered

1    partial summary judgment -- or entered a finding of partial

2    summary judgment, excuse me, on December 18th of 2019.

3            THE COURT:  Well --

4            MR. KINGSTON:  Maybe I took a long way of saying,

5    no, Your Honor, they didn't provide any documents and I

6    never had a chance to depose any witness on that number.

7            THE COURT:  Okay.  Mr. Ross.

8            MR. ROSS:  So I'll repeat what I said before.

9    Rule 26 applies to computation damages.  This is not a

10    damage figure; it's a sanction.  This goes to the

11    overarching argument that they first dreamed up last week,

12    which is somehow that this is a trial about damages and,

13    therefore, Your Honor can't do it.

14            I would cite to the Court, United States v. United

15    Mineworkers case from 1989, in which the Supreme Court

16    explained a hundred years of Supreme Court juris prudence, a

17    civil contempt sanction, the relief is based on sanctions

18    determined as to the harm caused to the person who's the

19    victim.  They use the word sanctions.  They never use the

20    word damages in connection with civil contempt.  They cite

21    all the cases going back to the early 20th century in that

22    case.  Happy to provide the cite to Your Honor.

23            THE COURT:  But that's --

24            MR. ROSS:  This is what we're here to do.  This is

25    a civil contempt proceeding.  It's governed by the Supreme

1    Court precedent.  The fact that some court -- and I'll be

2    frank, Your Honor -- Second Circuit, this Court, some other

3    district court, has used loosey-goosey language calling it

4    damage is irrelevant.  The Supreme Court says the remedy for

5    civil sanction -- for civil contempt is a sanction to be

6    determined by the loss to the victim.  That's what we're

7    here to prove.  This is one of those numbers, so we never

8    had to give it up under Rule 26.

9              And as for the document argument, there aren't any

10   documents.  These are credits that were entered on a

11   computer database in bits and bytes.

12             THE COURT:  Well, but you could -- there could be

13   discovery taken on the bits and bytes if they wanted to,

14   although, of course, they'd be spending more than the

15   $5,278.85 to do that.

16             MR. ROSS:  Absolutely.  To do the -- to get at

17   that information through the computer would cost them tens

18   of thousands of dollars; it would be absurd, just as we

19   thought this was absurd to even bring up such a small amount

20   and fight over it.

21             MR. KINGSTON:  Two points, Your Honor.

22             THE COURT:  It applies to the next point and next

23   paragraph too, which is the 4 million figure.  So while I

24   agree with you that it's absurd as to Paragraph 14, I think

25   we're laying the stage for Paragraph 15, which is real

1    money.

2          MR. ROSS:  So Paragraph 15 was, the number that

3    was disclosed to Charter by Mr. Auman at his deposition was

4    $8 million.  They said that is the budget because this

5    promotional campaign was launched then in September and it

6    lasted to the end of the year.  Impossible to project ahead

7    of time how much would actually be given out in credits.

8    This is that number now that the promotional campaign is

9    over with.  There simply was no mechanism for producing

10   anything else, other than to tell them that the number would

11   be no higher than $8 million before the close of discovery.

12   And it turned out to be half that number; again, they should

13   be thankful for that.

14          THE COURT:  Do either of you have any case law

15   interpreting Rule 26(a)(iii), (a)(1)(a)(iii) in the context

16   of whether it applies to a sanction as opposed to damages?

17          MR. ROSS:  I don't have any sitting right here,

18   Your Honor, but I'm sure one of my people do and I can have

19   it sent to chambers.

20          THE COURT:  What about you, Mr. Kingston?

21          MR. KINGSTON:  I don't believe that I do, Your

22   Honor.  I...on Mr. Auman's point -- excuse me, on Mr. Ross'

23   point on paragraph 15, there are a couple of points.  First,

24   his suggestion that the $4 million number is just a reduced

25   version of the $8 million number that Mr. Auman articulated

1    further is false on its face.  Mr. Auman talked about an $8

2    million number in promotional cost for providing three

3    months of free service to customers and what he contends are

4    the charter competitive footprint.  So, it was three months

5    free service for everybody in a certain geographic location.

6    That claim was parroted by Mr. Jarosz in his expert report.

7    It was not worth -- it was obviously a worthless claim

8    because they abandoned it.

9            Paragraph 15 is an entirely different suggestion.

10   That $4 million number purports to be a cumulative, an

11   accumulation of customer upgrades, discounts and pricing

12   promotions to convince customers to maintain their service

13   with Windstream.  It's completely different than that $8

14   million number that was first articulated with a computation

15   again on December 6th in Plaintiff's untimely Rule 26

16   disclosure.

17           THE COURT:  I'm sorry.  Am I right that you all

18   deposed him on this?

19           MR. KINGSTON:  Yes, Your Honor.  And when I tried

20   to question Mr. Auman about damages, Mr. Ross prohibited him

21   from answering it -- prohibited him from answering and said

22   they were producing an expert on it, and that's who I could

23   talk to.  They also lodged an objection to our Rule 30(b)(6)

24   notice and said, we're not giving you a damage witness, you

25   can talk to our experts.

 1              THE COURT:  But I'm talking about did you depose

 2     him on the promotions point?

 3              MR. KINGSTON:  I deposed him on the $8 million,

 4     three months free credit, which is not discussed in

 5     paragraph 15.  I didn't depose him on that $4 million

 6     number, Your Honor, because it was never disclosed.  So, I

 7     did not -- I did not know that in April in 2020 that he

 8     would provide that $4 million number and I didn't depose him

 9     of that $4 million number that we didn't receive -- that

10     we've never seen until they provided their trial declaration

11     on Monday.

12              MR. ROSS:  So, Your Honor, he's just wrong, and

13     the witness is here and will testify that that's exactly

14     where this 4 million comes from.  It comes from that $8

15     million.  Mr. Kingston simply doesn't understand what a

16     promotion is in this area, apparently.  But the witness is

17     here, he's testified in the declaration that that's it, and

18     he'll testify again.  And he can cross-examine him on it.

19              As far as documents or this exact number, it

20     didn't exist until April.  So, this is a complaint that is

21     really frivolous.

22              MR. KINGSTON:  Now, I want to turn to Mr. Ross'

23     suggestion that the "competentory" -- compensatory, excuse

24     me, Your Honor, that the compensatory sanctions aren't

25     actual damages.  In New York State, National Organization

1    for Women v. Terry, 886 F.2d, 1339, 1353 (2d Cir. 1989), the

2    Second Circuit stated as follows:  "Compensatory sanctions

3    should reimburse the injured party for its actual damages."

4            THE COURT:  I'm just trying to focus on...  Look,

5    there is language in the cases -- I appreciate this -- that

6    refer to damages in determining in part -- well, frankly, in

7    sum, what's compensatory.  That's fine.  I -- what I ask

8    both of you is whether there is any case law on the argument

9    that Windstream has made that since the determination

10   ultimately is -- with respect to an equitable remedy, which

11   is sanction, it's covered by Rule 26(1)(a)(iii), which

12   refers to damages.

13           And it's the same argument that is made with

14   regard to equitable subordination, i.e., an equitable remedy

15   is not one for damages per se, which is a legal remedy, and

16   therefore, in Rule 26 it's not covered.  I understand fully

17   the argument that when talking about sanctions, including

18   for breach of the automatic stay, courts routinely use the

19   word damages.  So, we don't need to cover that ground again.

20           MR. KINGSTON:  I think, Your Honor, your reference

21   to Rule 26(a) may be instructive.  I've been involved in a

22   number of cases in Federal Court that involve both legal and

23   equitable claims, as I'm sure Mr. Ross has.  I've never,

24   ever tried not to disclose a witness as required by Rule

25   26(a) because it was an equitable claim, Your Honor.  I've

1    never heard of --

2            THE COURT:  No, it's not the whole -- please, I'm

3    just talking about (a)(3), which specifically refers to

4    damages, not the whole rule.

5            MR. KINGSTON:  Very good.

6            THE COURT:  Just the reference to damages.

7            MR. KINGSTON:  I'm not aware of a case on that

8    precise issue, Your Honor.  I will note that at the December

9    18, 2019 hearing where the Court denied charter's motion to

10   dismiss count six under the Second Circuit authority stating

11   that Rule 36(k) was not available -- Rule 36(k) -- Rule

12   36(k) 36-...excuse me.  Under Second Circuit authority

13   stating that Section 362(k) cause of action was not

14   available to nonpersons, the Court instructed that it would

15   be seeing the civil -- it would be allowing the civil

16   contempt proceedings to proceed in an adversary proceeding

17   for the benefit of all the parties, which would incorporate

18   Rule 26, which would incorporate the idea that you have to

19   be put on notice since you can't contest a $4 million damage

20   figure.

21           THE COURT:  I, frankly, don't follow that argument

22   at all.  The rule either applies or it doesn't in the

23   adversary proceeding.  It doesn't mean that all rules apply

24   in the adversary proceeding if the terms of the specific

25   rule don't apply.  So, let's not cover this again.

1              Can I go back to paragraph 14 as to the $5,000

2     figure?  Is it agreed that the range of damages wasn't

3     disclosed?  The 15-16,000 range wasn't disclosed until after

4     discovery was complete?

5              MR. KINGSTON:  Yes, Your Honor.

6              THE COURT:  I'm asking Mr. Ross.

7              MR. ROSS:  I'd have to look at the dates but I

8     think that's right.

9              THE COURT:  Okay.  Unlike the 4 million where that

10    was -- the 8 million was disclosed?

11             MR. ROSS:  Yes, Your Honor.  And, again, our

12    position on the 5,000 and the 8 million is that both are

13    equitable in nature and therefore not subject to that damage

14    requirement.

15             THE COURT:  Well, I understand, but you have a

16    fallback on the 15, which is that you did disclose the upper

17    end of the range and they had the opportunity to take

18    discovery on it.

19             MR. ROSS:  That's correct, Your Honor.

20             THE COURT:  Okay.  And did they ask you for the

21    documents that supported it?

22             MR. ROSS:  No, they didn't, Your Honor.

23             MR. KINGSTON:  Your Honor, we most certainly did

24    ask for all documents that supported their claim if they

25    were harmed.  And it was damages, it was all documents that

1    support a claim of harm, and that was a request to produce

2    identified in our motion in limine.

3              Mr. Auman was deposed on September 24th.  That was

4    long after they were to have produced all the documents in

5    response to our request for production for all documents

6    that evidenced your contention that the Plaintiffs were

7    harmed.  So, the suggestion that we haven't asked for

8    documents about the harm that they suffered is not true.

9              MR. ROSS:  Your Honor, this is a campaign that was

10   launched in September and was decided upon in September.

11   Document production was before that.  There was no document

12   to produce.  There is to this day -- the documents weren't

13   graded until well after summary judgment was ruled upon.  I

14   mean, that's just the way this went.  This was a promotional

15   campaign that was end of 2019 into 2020.  And that's why,

16   although we had a budget laid out, we didn't know what the

17   number was going to be.

18             THE COURT:  Okay.  I mean, there is an obligation

19   to supplement, though, right?  I mean, if the campaign came

20   in later, wouldn't you be obligated to provide them that

21   information, which is a follow-up on their question?

22             MR. ROSS:  Well, I guess we could supplement it

23   the week before trial but then you'd have a different motion

24   in front of you saying that we were dumping stuff on them at

25   the end of trial.  I mean, it...

1          THE COURT:  It's better to do it then than not do

2     it at all, right?

3          MR. ROSS:  I don't know about that.  I mean, this

4     is a pretty simple straightforward point of fact that's

5     being testified to the witness.  He knows this amount

6     because it's his budget that it comes out of.

7          THE COURT:  But on the other hand, they're

8     entitled to look at it.  I mean, if it doesn't say 4 million

9     or if it's for promotions completely unrelated to the

10    territories that these folks are in, or relates to other

11    things, then, you know, maybe it's not 4 million, maybe it's

12    1 million, or maybe it's 500,000.

13         MR. ROSS:  No, they can ask them that question.

14    The total was over 6 million for all the territories.  This

15    4 million relates just to the charter exchanges.

16         THE COURT:  But they can ask them the question but

17    they don't have the documents or the prep.

18         MR. ROSS:  If they'd like to have the documents,

19    we'll produce them.  But, again, I don't know what value it

20    is, unless they want to conduct a deposition as cross-

21    examination, in which case we'll be here a week on Mr.

22    Auman.

23         THE COURT:  Well, again, I mean, they can't really

24    prepare for his testimony without having that, I think.  I

25    mean, they're from --

1          MR. ROSS:  Well, we can put it -- no, we can put

2    it...  I'm sorry, Your Honor, I didn't mean to over-speak

3    you.  We can put it in the number $8 million if you would

4    prefer.

5          THE COURT:  But correct me if I'm wrong.  The 8

6    million was an estimate of what it would cost.  The campaign

7    hadn't yet been undertaken.

8          MR. ROSS:  Correct.  It was the budget that was

9    laid out.  It was the most money that they were willing to

10   spend on it.

11         THE COURT:  Right.  So, the actual campaign,

12   again, happened after discovery was complete.  So, I

13   understand why you didn't produce it at the time, but I'm

14   not sure why they are not entitled to it at this point --

15   since they asked for it.

16         MR. ROSS:  If Your Honor wants us to produce it to

17   them, we're happy to do that.

18         THE COURT:  Okay.

19         MR. KINGSTON:  Yeah, we'd like it, Your Honor.

20         THE COURT:  All right.  I mean, this is real money

21   we're talking about here, as opposed to the 5,000.

22         MR. ROSS:  I'll have somebody send it over to

23   them, Your Honor.

24         THE COURT:  Okay.  Okay, do you want to keep going

25   through the declaration, Mr. Kingston?

1            MR. KINGSTON:  I would like to talk about, I

2     guess, the logistics of reviewing that and...  But we would

3     like time -- I'd like time to review it, and I'd like time

4     to prepare to respond to the $4 million damage claim, Your

5     Honor.

6            THE COURT:  I understand.

7            MR. ROSS:  It's not a damage claim.

8            THE COURT:  Well, I understand you'd like time to

9     review it but why don't we cover the rest of the declaration

10    while we're at it?

11           MR. ROSS:  I think that's a good point, Your

12    Honor.

13           MR. KINGSTON:  Your Honor, the same objection -- I

14    think a similar objection with respect to paragraph 21.

15    There's a $400,000 number related to Windstream's internal

16    legal cost.

17           THE COURT:  Right.

18           MR. KINGSTON:  Which was never -- again, that

19    figure, $408,000, has never been disclosed and there have

20    never been any pieces of paper produced to charter.  And

21    I've got to think there are some pieces of paper or

22    something because 1,911 hours is a pretty doggone specific

23    number.  So, we haven't seen -- we haven't seen that 1,911

24    number, we haven't seen that $408,000 number, and we haven't

25    seen those numbers going all the way up through the

1   disclosure a month after discovery with their summary

2   judgment opposition.

3          MR. ROSS:  We have said from day one that we

4   intend to claim attorneys' fees.  Attorneys' fees in all the

5   case law includes the attorneys' fees of in-house legal

6   personnel who work on a matter.  So, we've disclosed that.

7   In depositions we've disclosed the number over 1,000 hours.

8   But because that number keeps changing, this was the -- and

9   it's actually now higher than that, this was the last

10  opportunity to put in the exact amount as of that point in

11  time.

12         $408,000 is simply a mathematical computation.

13  It's a multiplication of standard Little Rock, Arkansas

14  legal rights times the hours.

15         THE COURT:  So, was there a request to see the

16  time records?

17         MR. ROSS:  I don't believe that there ever was a

18  request to see time records of attorneys.

19         MR. KINGSTON:  I think the request was for every

20  document that you contend evidences your harm.  Those time

21  records would evidence harm, Your Honor.  There's a -- when

22  you're looking for attorneys' fees as a compensation for

23  actual harm as opposed to as some kind of a post-judgment

24  penalty, it's just like any other actual damage claim and

25  we're entitled to a number, we're entitled to look at the

1    documents, we're entitled -- they have to prove it and we

2    get to test it.  And the way that you test those claims is

3    to look at the pieces of paper that comprise them.  And they

4    haven't provided it and there's no dispute that we asked for

5    it.

6          MR. ROSS:  I do dispute whether they asked for it.

7    That's not correct.  Attorneys' fees are not damages.  I'll

8    say that for the umpteenth time.  They're never treated that

9    way.  They aren't considered to be within this notion that

10   you have to produce everything relating to damages.

11         MR. KINGSTON:  I would like to address that point,

12   Your Honor, because I do think there's kind of an important

13   issue for making sure everybody's on the same page.  When

14   you are seeking or when somebody seeks attorneys' fees after

15   a judgment, like, for example, the exceptional circumstances

16   fees in the Lanham Act case, well, then those keys are penal

17   in nature and there are different rules that apply as to how

18   those -- what's sufficient to prove those up.

19         When you're seeking fees as damages, when you're

20   seeking fees as compensation for an injury, you've got to

21   prove them up just like any other damage.  If the fees are

22   penal, like the exceptional circumstances one, and it's not

23   pursuant to a statute or a contract or the like, well, then

24   you're talking about a serious -- what the Second Circuit

25   describes as a substantial punitive sanction if it's

1    anywhere north of $100,000 in 1989, which I guess translates

2    to about $200,000 today.

3              And if you're talking about a substantial punitive

4    sanction in the form of attorneys' fees with the reduced

5    proof requirements consistent with that kind of substantial

6    punitive sanction, then the Second Circuit has been crystal

7    clear if the dollar amount is north of $200,000, well, we've

8    got a 6th Amendment right to a jury trial because that's a

9    criminal contempt motion and we get a jury trial, we get

10   proof beyond a reasonable doubt.

11             So, if you're going to call it a penalty, if

12   you're going to say, we don't have to prove it because it's

13   a penal sanction like a post-judgment fee award, well, then

14   you're talking about a case with a jury trial, and you're

15   talking about a case with a jury trial under the 6th

16   Amendment, not the 7th Amendment.  And we've never raised

17   that issue, Your Honor, because we've been guided by the

18   Plaintiff's statement in paragraph 84 of their complaint

19   that they're looking for actual damages.

20             THE COURT:  When was the -- was there any

21   discussion in the deposition of Mr. Auman of attorneys'

22   fees?

23             MR. ROSS:  They asked him how many -- we talked

24   about -- was that posed to me, Your Honor?  I'm sorry.

25             THE COURT:  No, go ahead.

1          MR. ROSS:  So, they asked -- there was a reference

2    somewhere to how much time was being spent on this matter

3    and either Mr. Auman or Mr. Langston said, thousands of

4    hours and it's going up.  There was no -- there's never been

5    any follow-up on that.  They've been aware of that.

6          MR. KINGSTON:  Well, I think Mr. Ross is referring

7    to Mr. Langston's deposition, and the follow-up was the

8    request to produce saying, give us all the pieces of paper

9    that evidence your harm.

10          MR. ROSS:  There was no request for that.  I

11    remember this distinctly.  You kept saying, well, is it a

12    thousand now?  Is it 10,000 hours...?  You asked those

13    absurd questions.  And the best he said was more than a

14    thousand hours.  This is consistent with that.

15          THE COURT:  Well, if there's a follow-up document

16    request to support that statement, then --

17          MR. ROSS:  There was no follow-up document request

18    on that statement.  He keeps referencing this general demand

19    that they have to produce damages documents.  No one has

20    ever specifically asked us for attorneys' fees documents of

21    any sort.

22          MR. KINGSTON:  I think the request was for all

23    documents that evidenced an injury, Your Honor.  And I'll

24    get the exact language momentarily.

25          MR. ROSS:  Your Honor, apparently, I've just been

1    handed a case that answers your previous question.  In the

2    Eastern District of New York, not your court, Your Honor,

3    saying that the Rule 26(a) reference that you cited, (a)(1)

4    (iii) does not require a computation for equitable claims

5    such as disgorgement because such remedies are not damages

6    within the meaning of the rule.  That's SEC v. -- I have to

7    spell this defendant's name -- R-A-D-M-I-L-O-V-I-C, 210

8    Westlaw 2540762 at Star 2 (E.D.N.Y., 2010).

9            It's also discussed in Adversary Docket Number 37

10   at page 9, if that's easier for Your Honor.  It's a brief we

11   submitted...in response to their motion in limine against

12   Mr. Auman.  So, actually, we did anticipate that and have

13   cited to it, Your Honor.

14            MR. KINGSTON:  Your Honor, there's a pretty

15   obvious difference between disgorgement, which is based on

16   the Defendant's profit, which a Plaintiff could not be

17   expected to know or not have the burden of producing

18   evidence on --

19            THE COURT:  Look, rather than do this on the fly,

20   I'll read the cases that you all send me, okay?  But going

21   back to -- I mean, normally when I hear a motion for

22   sanctions for violation of the automatic stay, the

23   attorneys' fee portion of it, which is based on specific

24   hours and expenses, I require the attorney to provide the

25   time records.

1          So, the only reason that I wouldn't do that here

2     is if I concluded that Charter waived its right to seek that

3     based on the failure to ask for it.  I'm being told that

4     Charter didn't ask for those documents specifically but I'm

5     also told that Charter asked for everything that would

6     support the sanctions calculation.

7          MR. ROSS:  Well, I'm happy to do as we did with

8     the 4 million, Your Honor, and provide them with this.  It

9     was just --

10          THE COURT:  Okay.

11          MR. ROSS:  The document was created, if you put

12     parentheses around the created -- last week.

13          THE COURT:  Well, I appreciate it.  Like the other

14     one, this is a running tab.  It's a running tab.  I mean,

15     you can argue that even today is part of the running tab.

16     So, I understand that.  But normally a contempt motion for

17     violation of the stay is done quickly and you don't have

18     this lengthy discovery process.  But I think they're

19     entitled to get the time records that support this.

20          MR. ROSS:  I'll send it over, Your Honor.

21          THE COURT:  Okay.  And that's just based on the

22     request for it, not necessarily Rule 26.

23          MR. ROSS:  The request that Mr. Kingston just

24     made.  Yes, Your Honor.

25          THE COURT:  Well, no, that he says he made at the

1    beginning of the discovery process -- or at some point

2    during the discovery process for all documents pertaining to

3    damages.

4              MR. ROSS:  That's fine.  But just to be clear, the

5    document didn't exist until recently.

6              THE COURT:  Yeah, I understand, but then there's

7    the update issue.

8              MR. ROSS:  Yeah.

9              THE COURT:  Okay.  So, are there other paragraphs,

10   Mr. Kingston, that you want to address?

11             MR. KINGSTON:  Sure.  In paragraph 20, Mr. Auman

12   purports to identify invoices from conflicts counsel as

13   Windstream's business records under the business record

14   exception for Windstream.  I don't know the --

15             THE COURT:  These are the time records for the law

16   firm, right?

17             MR. KINGSTON:  Yes, Your Honor.

18             MR. ROSS:  That's correct, Your Honor.

19             THE COURT:  Right.  So, that's a matter that's

20   filed on the docket under penalty of perjury.  I could take

21   judicial notice of that.

22             MR. KINGSTON:  Okay.  And the other piece of that,

23   Your Honor, was the --

24             THE COURT:  And, I'm sorry, just to be clear for

25   the record, they're filed on the docket as part of fee

1    applications, not in this case.  They're filed, you know,

2    for interim fee applications, I gather, right?

3              MR. ROSS:  Yes, Your Honor.

4              MR. KINGSTON:  Yes, Your Honor.

5              THE COURT:  Okay, so I could take judicial notice

6    of that.  And you've had them.  I mean, they're on the

7    docket.

8              MR. KINGSTON:  Yeah, we're not suggesting that

9    those aren't documents that we haven't had access to.  We

10   have not been able to talk to a witness who can say, this is

11   why these fees were necessary for -- in this case, which is

12   what you would need to do for a damage case as opposed to

13   penal fees.

14             THE COURT:  I don't agree with that.  You know,

15   they speak for themselves.  I review fees all the time.  You

16   can tell what's covered on almost all situations, and the

17   burden is on the Plaintiff to make it clear what they are

18   for.  So, if they aren't for something, unless they want to

19   supplement it in testimony, they're stuck with them.

20             MR. KINGSTON:  Well, and the way in which

21   Plaintiffs purport to make it clear is through a declaration

22   of somebody that we've never been able to depose, which is

23   hearsay, Your Honor.

24             THE COURT:  But it's just attaching the fee --

25   it's just attaching the time records.

 1             MR. KINGSTON:  Your Honor, it is certainly the

 2     case that hearsay for fee applications regularly comes in

 3     when you're talking about a post-judgment penal fee award.

 4     When you're talking about fees for damages, they're just

 5     like any other damages and they have to be -- they get to be

 6     tested and they have to be proved, just like any other

 7     number for which you're asking somebody to write a check for

 8     actual damages.  And so they're distinctive.

 9             MR. ROSS:  Your Honor?

10             THE COURT:  But we're just talking about the time

11     records.  It's not -- you don't need to -- they're not

12     offering him as a witness to testify other than just to get

13     the time records in, right?  So, the time records are just

14     an exhibit.

15             MR. KINGSTON:  Okay.  If I understand Your Honor,

16     those come in as a document that is -- and that Mr. Auman is

17     not able to -- is not the witness who's going to be

18     testifying that the hours reflected in those time records

19     were reasonably incurred pursuing stopping Charter from

20     disseminating the subject to advertising, then maybe we're

21     talking past each other.

22             THE COURT:  I don't -- I mean, I doubt their...

23     Look, there's a bill.  He looks at the bill.  It has the

24     time records attached.  Ultimately, the Court approves it

25     and that's what the company has to pay.  So, the bill speaks

1 for itself.  You and I can look at the time records and you

2 can point out to me what you think is unreasonable in them.

3          I can't count anymore the number of fee

4 applications I have reviewed, and as a result of that, the

5 expertise I have gained since 2002 in looking at them and

6 determining what's reasonable and what's not reasonable.

7          MR. KINGSTON:  I have no doubt of the Court's

8 ability and experience looking at reasonable fee awards.  My

9 suspicion is those awards, if you're looking at them -- if

10 you're letting them come in -- if you're letting hearsay

11 come in, then they're in a non -- a non-damages context.

12 They're not being asserted as actual damages; they're being

13 provided as some sort of a penalty.  And --

14          THE COURT:  Well, I'm sorry.  You're just off base

15 on this one.  It's just --

16          MR. KINGSTON:  Okay.

17          THE COURT:  Look, they speak for themselves.  You

18 and I can point out that Time Entry X is for something else

19 or someone spent two hours when they should've spent one

20 hour.  They speak for themselves.  They don't need any...

21 To have each lawyer testify about what he or she did would

22 be ridiculous here.  They've assessed -- in essence, done

23 that by submitting the time records, which are

24 contemporaneous business records submitted to the Court

25 ultimately as the truth, and they are the truth.  And

1    they're reviewable under a standard as to whether they

2    actually were spent on this matter and whether they're

3    reasonable, and they speak for themselves, so let's just

4    move on on this point.  I appreciate that Mr. Auman is just

5    saying this is the bill.  He's not going to tell me whether

6    they're reasonable or not, but the records do.

7              MR. KINGSTON:  And I don't want to belabor the

8    point, Your Honor.

9              THE COURT:  Then don't.  Let's move on.

10             MR. KINGSTON:  I think I'm ready to proceed with

11   the examination of Mr. Auman, Your Honor.

12             THE COURT:  Okay.  So, can I take it then that

13   with regard to the motion in limine as to Mr. Auman, we've

14   dealt with those issues in the context of the argument we've

15   had for roughly the last hour or so?

16             MR. KINGSTON:  I believe so, Your Honor.

17             THE COURT:  Okay.  So obviously, there are some

18   things that need to be addressed.  So you want to proceed

19   with cross, but what about the things that are still to be

20   done with respect to Mr. Auman.

21             MR. KINGSTON:  Well, however you want to do it,

22   Your Honor.  I could do a little bit of cross.  I understand

23   we have a hard stop at 12:45 your time.

24             THE COURT:  Yeah.

25             MR. KINGSTON:  What I would like, given that we're

1    faced with a $4 million damage number is a continuance to

2    review those documents and, if necessary, depose somebody

3    who can testify as to how that $4 million came to be.  So I

4    think we'd like a recess to review and conduct a deposition.

5            MR. ROSS:  They don't need a deposition, Your

6    Honor.  This will be a very short document they get.  They

7    can look at it.  The only question, really legitimate

8    question, is did you really spend it and on what.  And they

9    can ask that to Mr. Auman on cross-examination.

10           THE COURT:  Well, that may be the case, but I'm

11   not sure we should have...  If you're going to ask him

12   questions, I don't know what you're -- obviously, I don't

13   know what you're going to be asking Mr. Kingston, but —

14           MR. ROSS:  I think the Court —

15           THE COURT:  Let me -- wait a second.  I'm sorry.

16   I apologize.  See if I can say this correctly.  I don't want

17   you to ask him about the same sort of issues twice.  So if

18   the questions you can ask him deal with things other than

19   where they're going to be supplementing the discovery, I

20   guess we can go forward.  Although, you know, I don't know

21   whether you could do that.

22           MR. KINGSTON:  I don't think we can, Your Honor,

23   and I prefer not to.  I just don't want to do a $4 million

24   case on the fly.

25           THE COURT:  Well, there's more to his declaration

1    than the attorneys' fees or the remedial measures, although

2    maybe not that much more.  So —

3                MR. KINGSTON:  Well, maybe —

4                THE COURT:  What I'm saying is I'm not going to

5    have you do the attorneys fees and the remedial measures on

6    the fly.  But I don't know if there's much more for you to

7    ask him at this point.  And if not, then maybe we should do

8    this on Wednesday, depending on whether it makes sense to do

9    it then or if what you've been produced would realistically

10   require a deposition.

11               MR. KINGSTON:  I'm sorry, I --

12               MAN 1:  (indiscernible)

13               MR. KINGSTON:  I mean, yeah, I think it makes

14   sense to just do it on Wednesday, Your Honor.

15               THE COURT:  Right.

16               MR. KINGSTON:  I --

17               THE COURT:  Okay --

18               MR. KINGSTON:  (indiscernible)

19               THE COURT:  No, that's fine.  It was just a simple

20   question.  So you don't need to explain.  I mean, I think

21   Mr. Ross, that makes sense, right?  I mean, I'm sorry, Mr.

22   Auman, that this -- we're going to have to have you come

23   back again.  But I just think given where we are, that's

24   where we are.

25               MR. ROSS:  If Your Honor thinks so.  But I don't

1    think a deposition should be necessary.  We can just do it

2    on the record.

3              THE COURT:  It may not be.  I agree with you.  It

4    may well not be, depending on what's provided.  I understand

5    that completely.

6              MR. ROSS:  So, Your Honor —

7              THE COURT:  Can you remind me, what are the trial

8    days here?  What are the days that have been set aside?

9              MR. ROSS:  Today, tomorrow and Wednesday, Your

10   Honor.

11             THE COURT:  Okay.

12             MR. ROSS:  Before we leave this, Your Honor, we

13   actually do need to move into evidence some exhibits that

14   were not agreed to by Charter.  They've provided no

15   objections.  They just wouldn't agree to them.  But we have

16   to move them in as a formality.

17             THE COURT:  Well, okay.  What are they?

18             MR. ROSS:  It's a large number, Your Honor.  Do

19   you want me to just read the list?

20             THE COURT:  Well, I mean, my instructions were

21   quite clear, to agree on the admissibility of his many

22   exhibits as you can.  If there's no legitimate objection, we

23   shouldn't be spending time on this.  (indiscernible)

24             MR. ROSS:  I agree, Your Honor.  We sent them a

25   list of our objections.  They told us which ones they could

1    agree to.  There are documents that we have to move in here

2    which are on Charter's trial exhibit list.  Both parties had

3    it on their list and Charter would not agree to put them in

4    the joint exhibit book.

5            MR. KINGSTON:  Your Honor, those are --

6            MR. ROSS:  Never seen this done in 35 years of

7    trials.

8            THE COURT:  I don't understand why that's the

9    case.  If that is the case, Mr. Kingston.  I mean --

10           MR. KINGSTON:  Yeah.

11           THE COURT:  -- I don't understand why I need to

12   have two sets of exhibit books if there are no objections to

13   the admissibility of the whole host of exhibits.

14           MR. KINGSTON:  (indiscernible)

15           THE COURT:  There are (indiscernible) exhibit

16   book.

17           MR. KINGSTON:  I'm happy to respond, Your Honor.

18   As is, there are exhibits identified on our list that we may

19   use for some purposes, for rebuttal purposes, that we may

20   not use, depending on what evidence Plaintiffs put in the

21   case.

22           There's also exhibits on our list that relate to

23   Counts 1 through 5, because at the time the list was

24   circulated, those counts were part of the case.  Our exhibit

25   list, which we provided in March 2nd, included, as required

1    by Rule 26(a)(3) a list of the documents that you expect to

2    use.  What Rule 26(a)(3) contemplates, as in a regular old

3    trial, is you have a may use list and an expect to use list,

4    and the --

5                THE COURT:  Could I interrupt you?

6                MR. KINGSTON:  Sure.

7                THE COURT:  I'm really just focusing on whether

8    you actually have objections to the admissibility of the

9    exhibits that Windstream wants to have admitted that are not

10   in the joint exhibit book.

11               MR. KINGSTON:  They've identified some one hundred

12   and some odd minutes.  Charter's identified a number itself.

13   I would have to see what exhibit it is and for what purpose

14   they're offering it for.

15               THE COURT:  But that was why you were supposed to

16   meet and confer and go through that process.

17               MR. KINGSTON:  There are many, many exhibits on

18   Windstream's list that look to be exhibits related to counts

19   that are now pending in the District Court, Your Honor.  So

20   we would probably object to those on --

21               THE COURT:  But look, I am only going to consider

22   the exhibit to the extent it pertains to this matter.

23   Otherwise, it would be a total waste of time.  But it's more

24   of a waste of time I think just not to admit them, if that's

25   your concern.

1          As a practical matter, in most trials there are

2    about six or seven exhibits that matter, even though people

3    give me binders that are 12 feet high, which is literally

4    the case here.  But rather than go through 200 exhibits to

5    try to determine whether it applies to Counts 1 through 5 or

6    Counts 6 and 7, I don't see why we don't admit them, if

7    that's the basis for the objection.  And you know, I will

8    consider them if they're not relevant.

9          MR. KINGSTON:  I think Your Honor's point is well

10   taken.  I'm happy to have both parties agree to the

11   admissibility of all the exhibits on both lists and we could

12   just save the Court a bunch of time.

13          MR. ROSS:  So, Your Honor, you know --

14          THE COURT:  I just want to know --

15          MR. KINGSTON:  -- this is very frustrating.

16          THE COURT:  _- are there any other objections, Mr.

17   Kingston, besides your concern that perhaps some of the

18   material in some of the exhibits pertains to Counts 1

19   through 5, which clearly, I am not trying.

20          MR. KINGSTON:  Yeah, a lot of those exhibits are

21   hearsay, Your Honor, depending on the exhibit.  A lot of

22   them have not been authenticated, Your Honor.  There's a

23   large number of exhibits, and whether a document is

24   admissible, the rules are very clear, depends on what

25   purpose it's coming in for.  This is --

1          THE COURT:  All right.  I guess we could spend the

2     next, you know, hour doing this, although this is exactly

3     what I instructed you all to do separately.

4          MR. KINGSTON:  Your Honor, I'd be happy to have a

5     conference with Mr. Ross and see if we can't go through both

6     parties' lists, because I'll tell you, those 17 documents,

7     there's a heck of a lot of Defendant's exhibits that weren't

8     stipulated to as well.  So it --

9          THE COURT:  This goes for both sides.  I was

10    pretty shocked to see that there were only 17 documents that

11    were on the agreed exhibit book.

12         MR. KINGSTON:  My suspicion is with the admonition

13    that both sides have received that Mr. Ross and I could very

14    quickly come up with a much broader joint exhibit list that

15    could save the Court a whole lot of time.  And I'd be happy

16    to do so, Your Honor.

17         THE COURT:  Okay.

18         MR. ROSS:  Your Honor, I don't think that's going

19    to be possible.  I'll just be frank.  We sat down, like in

20    any other case, prepared to go through these exhibits.  We

21    sent them in advance a specific list of objections we had

22    and problems we have with each document that we couldn't see

23    coming in.  We also said, here's a whole bunch that could.

24         They then said, well, even on those ones you say

25    we could, we're not going to put in the joint exhibit book.

1    They never gave us a list of objections to our documents.

2    They just said, well, those can't go in the joint exhibit

3    book.  This is the way they have conducted themselves

4    throughout this case.  I think there's zero opportunity here

5    to get this done.  We've got other things to prepare for.

6              I think the appropriate process at this time is

7    for me to move these into evidence, and if they've got a

8    specific objection, something they've never put on the

9    record, we filed our objections to their exhibits with the

10   Court, they haven't done that, then we can go through it.

11             THE COURT:  Okay.

12             MR. ROSS:  These foundational objections, for

13   example, are absurd.  Every single one of them, Mr. Auman

14   has said in his declaration, under oath, he's identified

15   what the document is.  That's all that's required by Rule

16   01.  And yet they persist in making those objections.

17             THE COURT:  He's --

18             MR. ROSS:  We should go through the documents one

19   by one.  He can make whatever objection he has, no matter

20   how frivolous, and the Court can rule upon it.  It's the

21   only way we're going to get anything done here with them.

22             THE COURT:  Okay.  Let's do that.

23             MR. ROSS:  Plaintiff's move into evidence, Your

24   Honor, Exhibit 1, Exhibit 3 -- these are all  Plaintiff's

25   trial exhibits, by the way, Your Honor -- Plaintiff's Trial

1    Exhibits 5-15, Plaintiff's Trial Exhibits 17-20, Plaintiff's

2    Trial Exhibits 25-30, Plaintiff's Trial Exhibits 33-35,

3    Plaintiff's Trial Exhibits 39-48, Plaintiff's Trial Exhibits

4    50-53, Plaintiff's Trial Exhibit 55, Plaintiff's Trial

5    Exhibits 58-62, Plaintiff's Trial Exhibits 64-66,

6    Plaintiff's Trial Exhibits 67-93, which are all the fees,

7    Your Honor; Plaintiff's Trial Exhibits 94, 95; Plaintiff's

8    Trial Exhibits 99, 100, 104, 105, 106, which are all fees

9    also; and Plaintiff's Trial Exhibits 101 and 102, which is

10   the reorganization plan, the Chapter 11 plan.

11            THE COURT:  Okay.  Is there objection to the

12   admissibility of any of those?

13            MR. KINGSTON:  Yeah, Your Honor.  As to -- I think

14   that a number of those documents were pleadings --

15            THE COURT:  No.  You know, you need to tell me the

16   specific document and the specific objection.

17            MR. KINGSTON:  I'm happy to do that, Your Honor.

18   I was hoping I could do it in the fastest way possible, but

19   I'll walk through the list and you just pull them up so I

20   can do it quicker without even looking through a binder.

21            Exhibit 1 is a complaint.  We don't have any

22   problem with the Court taking judicial notice of it,

23   consistent with the rule that it's judicial notice for

24   what's asserted, not for the truth of the matter asserted.

25   So you can take judicial notice of a pleading; that's

1    obvious.  You can't take judicial notice for the truth of

2    the matter asserted therein.

3              THE COURT:  I agree with that.  Okay.

4              MR. KINGSTON:  The same for Exhibit 3.  The Court

5    can obviously take judicial notice of the content of a

6    pleading, but not to the truth of the matter asserted.

7              Exhibit 5 has been falsely identified as a

8    business record, so we would object to the admissibility of

9    Exhibit 5.

10             THE COURT:  All right.  Well, let's stop on that.

11   This is Tab 5 to expert report of Mr. Jarosz.

12             MR. KINGSTON:  Yes, Your Honor.

13             THE COURT:  Okay.  So this is a summary.

14             MR. ROSS:  Your Honor, it's a summary of

15   Plaintiff's Trial Exhibit 60, six zero.  If the Court would

16   prefer to have six zero 60 into evidence, that's fine with

17   us.  This just makes it a lot easier for everybody.

18             THE COURT:  Well, you could have a summary if the

19   underlying information is there.

20             (Overlapping speakers)

21             THE COURT:  (indiscernible)

22             MR. KINGSTON:  That should (indiscernible) Exhibit

23   60.

24             THE COURT:  Okay.  So it's admitted as a summary?

25             MR. ROSS:  Yes, Your Honor.

1                    THE COURT:  Okay.

2                    MR. KINGSTON:  We would object to the admission of

3    Exhibit 60 as a summary because the underlying information

4    has not been provided to us.  It was requested in multiple

5    requests for production and was not provided.

6                    THE COURT:  Exhibit 60?

7                    MR. KINGSTON:  Exhibit 60, Your Honor.

8                    MR. ROSS:  Mr. Kingston, I think -- I'm sorry, I

9    should be directing that to you -- but I think you

10   misunderstood.  Plaintiff's Trial Exhibit 5 is the summary.

11   Plaintiff's Trial Exhibit 60 is the raw data.

12                   MR. KINGSTON:  Plaintiff's Trial Exhibit 5 is a

13   summary of Plaintiff's Trial Exhibit 60, which is a summary

14   of daily and weekly churn data that Charter did request,

15   which was never provided.  So it's a summary of a summary,

16   but whenever you're using a summary, whether it's the big

17   summary in Exhibit 60 or the little summary in Exhibit 5,

18   you need to provide the voluminous writings to the other

19   side so they can examine them.  And they've never been

20   provided to us, Your Honor.

21                   MR. ROSS:  That's just incorrect.  60 is not a

22   summary.  It is the actual data.  And the witness will

23   testify to that.  It's in his declaration.  He'll testify to

24   it if you want to, Your Honor.

25                   THE COURT:  Okay.  Well, I will admit it, subject

1    to Charter's ability to test that statement on cross.  And

2    that would mean that 5 is admitted also.

3            (Plaintiff's Exhibits 5 and 60 were admitted into

4    evidence.)

5            MR. KINGSTON:  Your Honor, no objection to 6; 7,

6    no objection; 8, no objection; 9, no objection; 10, no

7    objection; same with 11; same with 12.

8            (Plaintiff's Exhibits 6-12 were admitted into

9    evidence)

10            MR. KINGSTON:  I thought that, I -- I thought the

11    segment results were a joint exhibit already.  I thought 13

12    -- maybe I'm mistaken, but I thought 13 was admitted as a

13    joint exhibit.  13 is Joint Exhibit Number 2 and it was not

14    on the list I just moved into evidence.

15            MR. ROSS:  Say that again.

16            MR. KINGSTON:  You said 5 through 14.

17            MR. ROSS:  Our notes show 5 through -- you said 5

18    through 15.  I'm sorry if I did.  I --

19            MR. KINGSTON:  Well, that's fine, that's fine.

20    We're wasting time with.  I'm sorry, Your Honor.  14, no

21    objection; 15, no objection.

22            (Plaintiff's Exhibits 14 and 15 were admitted into

23    evidence)

24            MR. KINGSTON:  17, we do object.  It's not a

25    proper business record.  It doesn't satisfy the requirements

1   of Rule 8036.  I think this is a document that is hearsay,

2   and it's also double hearsay.  So I guess we object to 16 --

3   or excuse me, 17, Your Honor.

4          THE COURT:  All right.  What's your response to

5   that, Mr. Ross?

6          MR. ROSS:  So, Your Honor, you've already said

7   that document -- that Plaintiff's Trial Exhibits 17, 18, 19

8   -- you've already overruled the same objection that they

9   made at summary judgment.  These are the calls, Your Honor.

10  There was substantial discussion of that during the motion

11  for summary judgment.  You actually on the record overruled

12  their objection to those.  So this is a matter that's

13  already been decided by the Court.

14         MR. KINGSTON:  I think that -- well, I guess two

15  things.  So for the purposes of this trial, everybody's

16  understanding then is that the summary judgment record is

17  part of the trial record?  I understood that to be the point

18  that Mr. Ross was making.

19         MR. ROSS:  That's not the point I'm just making.

20  I'm saying that when a court makes a decision during the

21  course of a adversary pleading, that for the most part that

22  decision stands.  You don't get two bites out of the apple.

23  You've already objected.  Charter has already objected to

24  this document on the exact same grounds, double hearsay, and

25  the Court overruled that objection on December 18.

1          MR. KINGSTON:  I think that Mr. Ross is mistaken.

2   I think he's thinking about maybe the next exhibit.  But I

3   don't think that the Court addressed the double hearsay

4   issue on December 18.  I think that the standard for summary

5   judgment is that it's likely it'll be admissible evidence,

6   and the Court's interlocutory finding that it's likely to be

7   admissible evidence certainly doesn't mean that it gets to

8   come into trial.  So I'm happy to talk about Exhibits 16 or

9   17.

10          MR. ROSS:  It's 17, but the Court's ruling was

11  somewhat more precise now.  It's the Court's -- expressly

12  held that wasn't hearsay, let alone double hearsay.

13          THE COURT:  We're talking about 16?  No, we're

14  talking about 17, 18 and 19?  Are those the ones we're

15  talking about?

16          MR. ROSS:  Yes.  These are a cause of customer

17  confusion.  They are admissible, not for the truth of the

18  matter.  They are admissible to demonstrate that there was

19  confusion amongst the customer base.  And in trademark

20  cases, such evidence always comes in, never held to be

21  hearsay.

22          THE COURT:  And what are they being offered for

23  here?

24          MR. ROSS:  Simply to show the havoc that was

25  wreaked on or customer base and the destruction of the good

1    will that we had with our customers, which is an element

2    that this Court may consider in deciding appropriate

3    sanctions.

4              THE COURT:  Okay.  No, I'll admit them for that

5    purpose.

6              (Plaintiff's Exhibits 16, 17 and 19 were admitted

7    into evidence.)

8              MR. KINGSTON:  18, Your Honor, we would object to

9    under the best evidence rule.  Mr. Ross is correct that on

10   December 18th, the Court suggested that the transcripts

11   would come in because Charter requested audio recordings but

12   did not move to compel audio recordings after Plaintiffs

13   refused to provide audio recordings.

14             Charter maintains that the applicable rule is

15   Federal Rule of Evidence 1002, which reads as follows:  "An

16   original writing, recording or photograph is required in

17   order to prove its content."  Unless these rules or a

18   Federal statute provides otherwise, neither of the rules nor

19   a Federal statute says that Charter's failure to move to

20   compel audio recordings waives the requirement of the best

21   evidence rule.  Transcripts are not evidence.  The audio

22   recordings are evidence and transcripts are just not

23   admissible under the best evidence rule.

24             But Mr. Ross is correct that this an issue that

25   the Court did address and rule on on December 18, so to the

1    extent the Court is inclined to stay with its prior ruling,

2    we've explained the basis for our objection.

3            THE COURT:  Okay.  Did you subsequently ask for

4    the transcripts, I mean, for the recordings?

5            MR. KINGSTON:  Yes, we did, Your Honor.  The

6    Court's reasoning wasn't that we didn't ask for them.  We

7    asked for audio recordings.  The Court's reasoning was that

8    we didn't move to compel after they refused to provide them.

9            THE COURT:  Did you do that thereafter as part of

10   preparing for today's trial?

11           MR. ROSS:  Your Honor, your ruling was on December

12   18, long after the close of discovery.  And you ruled that

13   the transcripts were admissible for summary judgment purpose

14   because we didn't -- because we --

15           THE COURT:  Okay.  I'll go with the ruling, then.

16   I'm not going to reconsider that.

17           (Plaintiff's Exhibit 18 was admitted into

18   evidence.)

19           MR. KINGSTON:  Exhibit 20, again, no objection.

20   Coming in for judicial notice, just not for the truth of the

21   matter asserted.

22           THE COURT:  Right.

23           (Plaintiff's Exhibit 20 was admitted into

24   evidence.)

25           MR. KINGSTON:  No objection to the next exhibit.

1          MR. ROSS:  The next exhibit, Mr. Kingston, would

2    be 25, just to make sure you're --

3          MR. KINGSTON:  Thank you.

4          THE COURT:  Well, you know, maybe it makes sense

5    just to go through all of these so we're not going to do it

6    again.

7          MR. KINGSTON:  Right.  Well, 21 Your Honor,

8    Plaintiff's Exhibits 21 and 22 are now Joint Exhibits 3 and

9    4.

10          THE COURT:  Okay.

11          MR. KINGSTON:  We have withdrawn --

12          THE COURT:  Unless they're a joint exhibit.  I

13    understand.

14          MR. KINGSTON:  And we have withdrawn Plaintiff's

15    Exhibits 23 and 24.  That's why I didn't move them into

16    admission just now.

17          THE COURT:  Okay.

18          MR. KINGSTON:  So the next one is 25.

19          THE COURT:  Okay.

20          MR. KINGSTON:  No objection.  Oh, I'm sorry.  No

21    objection to 26, Your Honor.  No objection to 27, no

22    objection to 28, Your Honor, nor to 29, Your Honor.  And no

23    objection to 30.  No objection to 33.

24          (Plaintiff's Exhibits 25-30 were admitted into

25    evidence.)

1          MR. KINGSTON:  34 -- yeah, with 34 -- 34 doesn't

2     have a Bates number.  I don't know if this was a document

3     that was ever produced to us.  I don't know if my friend at

4     the other table can offer some guidance on that.

5          MR. ROSS:  If these are the trouble tickets I

6     believe they were, can we -- I'll tell you this.  Let's come

7     --

8          MR. KINGSTON:  I'm happy to have counsel offer

9     this one after Mr. Jarocz has testified about it.  But I

10    don't know that I've seen this before.  We'll come back to

11    it after.  Somebody who's not in the room will have to look

12    that up.  And so we'll put that aside for now.

13          MAN 1:  This our Exhibit 1 to (indiscernible).

14          MR. KINGSTON:  Yeah, I mean, of course the Court

15    can take judicial notice of 35.  No objection to 39.  No

16    objection to 40.  No objection to 41, Your Honor.  No

17    objection to 42 nor 43.  No objection to 44.  No objection

18    to 45.  No objection to 46 or 47.  No objection to 48.  No

19    objection to 50.  No objection to 51.  No objection to 52.

20    No objection to 53.  No objection to 55, nor -- no objection

21    to 58.  No objection to 59.

22          (Plaintiff's Exhibits 35, Exhibits 39-48, and

23    Exhibits 50-53 were admitted into evidence.)

24          MR. KINGSTON:  I think the Court has addressed our

25    objection to summary Exhibit 60.  I'm sorry, I wasn't trying

1    to steal a base there.  Mr. Ross contends it's not a summary

2    exhibit.

3            61 looks to be duplicative of -- I'm sorry.  Yeah,

4    we would object to 61.  I have no idea what that is.  It

5    doesn't have a Bates number.

6            MR. ROSS:  It doesn't have a Bates number because

7    it was so voluminous it had to be produced in native format,

8    which prevents you from putting Bates stamps on it.

9    However, it was produced.  It's the underlying data relating

10   to Paragraph 2, Plaintiff's Trial Exhibit 5, Plaintiff's

11   Trial Exhibit 60, which you said we did not produce.

12           MR. KINGSTON:  No, this is a revenue report.

13   You're saying that this is a churn report.  Is there a --

14   I'm sorry -- and I apologize, Your Honor, for speaking

15   directly to Mr. Ross, but --

16           THE COURT:  No, 61 does look like not underlying

17   data.  It looks like a one-page -- it's Page 1 of 1 of -- I

18   don't think it --

19           MR. KINGSTON:  Do we have an Excel spreadsheet?

20   We don't see a native production.  I think the -- I know

21   that we emailed some voluminous Excel spreadsheets to the

22   Court and to Mr. Ross, but I don't know that I remember

23   seeing the same email to the Court or to us.  And I don't

24   know that we have a big Excel spreadsheet.

25           WOMAN:  We don't have anything.

1        MR. ROSS:  They confirm to me that we do not, Your
2    Honor.  Again, the person who knows the answer to this is
3    not here in the room, Your Honor, because of the social
4    distancing requirements in the District of Columbia.  So
5    we'll have to postpone this until subsequently.
6        THE COURT:  Okay.  Okay.  One point you should ask
7    them is, the title for this, "Consumer ARPU_GM.pdf" doesn't,
8    to me, look like it relates to Exhibit 61 unless there's a
9    whole lot behind it.
10        MR. ROSS:  Your Honor, I'm going to have to ask
11    that --
12        THE COURT:  No, no, I just say, that's the
13    underlying issue is whether it's just maybe put in a
14    different tab than -- or whether it is just the first page
15    of a very voluminous document.  So I understand your point,
16    so you'll be talking to that person.
17        MR. ROSS:  Yes, Your Honor.
18        THE COURT:  Okay.
19        MR. KINGSTON:  I don't know what the redactions
20    are on 62.
21        MR. ROSS:  So the redactions, Mr. Kingston --
22        MR. KINGSTON:  I'm sorry, Mr. Ross.  I don't
23    object.  I'll -- whatever the redactions are, we can
24    discuss.
25        THE COURT:  Okay.

1              MR. KINGSTON:  And I apologize for speaking over
2       you, Mr. Ross.
3              MR. ROSS:  No problem.
4              MR. KINGSTON:  Sixty-four, no objection.  Sixty-
5       five is -- 65, no objection.  Sixty-six, I believe the Court
6       has already addressed.  It's another of the series of
7       transcripts, so I assume that there -- our prior discussion
8       governs that.
9              THE COURT:  Right, it's admitted for the same
10      purpose.
11             MR. KINGSTON:  We would object to all of the fee
12      statements at 67 through 93, but I think that the Court has
13      -- I think that we've discussed the basis for that objection
14      and I won't belabor it.
15             THE COURT:  Right.  That's overruled.  They're
16      admissible under several exceptions.  Well, at least a
17      couple of exceptions to the hearsay rule.
18             MR. KINGSTON:  I think that the Court's ruling
19      would probably also cover 94.  We would object, but this
20      looks like to be a fee for professional services.  We
21      maintain the same objection.
22             MR. ROSS:  That's correct, Mr. Kingston, for both
23      94 and 95.  They're invoices for professional -- they're
24      bills.
25             MR. KINGSTON:  So, same objection.

1          THE COURT:  The bills can be admitted.  They're

2     business records.  You could inquire into them, obviously,

3     but...

4          MR. KINGSTON:  Same objection and I assume the

5     same response for 99, 100.  No objection to the Court taking

6     judicial notice of the reorganization plan, which is No.

7     101.  No objection to the Court taking judicial notice of

8     102.  I'm sorry, we're pulling up the remaining exhibits.  I

9     think it's the same objection for 104, which the Court has

10    addressed.  It looks like it's the fee applications.  Same

11    for 105, same for 106.

12         MR. ROSS:  Mr. Kingston, you're correct.  Those

13    were fee applications.  The only one I have you missing, Mr.

14    Kingston, is 103, which is Mr. Jarosz's curriculum vitae.

15         MR. KINGSTON:  Yeah, no -- no objection to that.

16         THE COURT:  Okay.  All right, so --

17         MR. KINGSTON:  Your Honor, I just want to raise --

18         THE COURT:  -- exhibits is admitted with the

19    exception of the two that the Katten Muchin firm is going to

20    check on as to whether they did produce previously.

21         MR. KINGSTON:  Your Honor, that last exhibit

22    raises an issue that I want to make sure that the Court has

23    addressed, which was the Court denied our motion to continue

24    because Mr. Ross and plaintiff represented to the Court that

25    there were no common issues between Counts 1 through 5 and

1    Count 6.  They've indicated their intent to have Mr. Jarosz

2    testify.  That would seem, as we expressed in our motion to

3    reconsider, to belie their contention that there's no common

4    issues, and so we would like this Court to exclude evidence

5    on the common issues that plaintiffs represented to this

6    Court did not exist and that this Court relied on that

7    representation when it denied our motion to continue.

8            THE COURT:  So we're turning to the -- well, it's

9    referred as a motion to continue, but it's really a motion

10   under Rule 59, right?

11           MR. KINGSTON:  I think it was a motion under Rule

12   60 --

13           THE COURT:  Okay.

14           MR. KINGSTON:  Sixty A and B.

15           THE COURT:  All right, and it's really, then,

16   based on 60(b)(3), fraud, misrepresentation, or misconduct

17   by an opposing party?

18           MR. KINGSTON:  We said misconduct or mistake, but

19   Yes, Your Honor.  The representation was made that there are

20   no common issues.  How much money Windstream Holdings or any

21   of the other plaintiffs lost because of customers leaving

22   seems to be a pretty common issue between the Lanham Act

23   case where lost profit is an issue and this case where they

24   propose to insert that exact same evidence with these exact

25   same facts.

1          THE COURT:  Okay.  Why don't we turn to the

2     specific misrepresentation you're pointing to?

3          MR. KINGSTON:  Your Honor, it is the

4     representation that there are no common issues of fact.

5          THE COURT:  No, let's turn to the actual language.

6          MR. KINGSTON:  I believe that -- the actual

7     language from their opposition to our motion to continue,

8     Your Honor.

9          THE COURT:  I'm getting that out.  Well, I mean,

10    there's an exchange during the hearing on the first motion

11    for a continuance that appears at Page 81 through 82 where

12    the Court says, "So how are you going to -- how do you

13    proposed to establish the remedy for equitable subordination

14    or the contempt sanctions for breach of the automatic stay?"

15         Mr. Ross says, "Well, that's a good question.  It

16    might -- that's a very good question.  I'd have to think

17    about that one, Your Honor.  The question presented was,

18    does he -- what the expert report does is to explain why

19    there are lost profits, why there are lost customers, how

20    many lost customers, and how do you quantify that."

21         The Court, "Right."  Mr. Ross:  "Not sure that

22    that does or does not.  I'm not able to tell you right now."

23    The Court:  "Okay."  So is there another representation

24    you're referring to?

25         MR. KINGSTON:  Yes, Your Honor.  Docket No. 262 at

1  12, there's an entire section of the opposition to our

2  motion to continue that is titled, "There are no common

3  issues of fact."

4        THE COURT:  Well, that's a separate point, and I

5  want to address that point.  As far as equitable

6  subordination is concerned, the calculation of harm or

7  inequitable conduct, which would be the -- here, primarily

8  the conduct that would constitute the Lanham Act violation

9  but could also include conduct for violation of the stay,

10  but that's covered by the separate stay motion and you can't

11  recover twice, does not require the same type of one-for-one

12  calculation that a Lanham Act claim would require.

13        As the Ninth Circuit said, "Where it has been

14  shown that the claimant act would inequitably in his

15  relationship with the Debtor and that the Debtor has

16  suffered harm thereby, it is incumbent upon that claimant to

17  come forward with reasonable dispatch and certainty with

18  evidence indicating that the harm caused by the challenged

19  conduct was discrete in nature and did not result in general

20  prejudice to the bankruptcy proceedings.  If the appropriate

21  showing is not made, the claimant may fact subordination."

22  That's In RE:  Westgate-California Corp., 642 F.2d. 1174,

23  1178 (Ninth Circuit, 1981).

24        Similarly, in the Winstar case, In RE:  Winstar

25  Communications, Inc., 554 F.3d. 382, 413 through 414 (Third

1    Circuit 2009), the Court -- the Third Circuit said that, "We

2    have never required the bankruptcy estate to quantify

3    specific harms to the estate or other creditors, merely a

4    showing of rough proportionality is enough."  So the two

5    issues or the two proofs are considerably different.

6                MR. KINGSTON:  I'm --

7                THE COURT:  Is Mr. Ross being submitted also for

8    the violation of the stay?  I'm sorry, Mr. Jarosz.  Mr.

9    Ross, is he being submitted also for the -- on the stay

10   violation?

11               MR. ROSS:  His testimony with respect to the

12   number of lost customers is being submitted on Count 6 as

13   well, Your Honor.

14               THE COURT:  Okay.

15               MR. ROSS:   And the argument there is fairly

16   straightforward, Your Honor.  The caselaw does not require

17   you to make specific findings to a dollar amount as to what

18   the proper quantum of sanctions should be.  It says that you

19   have to give reasons, so there's no requirement -- the

20   ruling on Count 6, which is all that matters, the ruling,

21   not the evidence -- in ruling on Count 6, you do not have to

22   say, I find as a matter of fact that they lost 1,381

23   customers, or whatever number.

24               You have to simply say it's clear that they lost

25   customers and that this was more than a minor loss in

1    dollars, was significant into the millions of dollars, and

2    that justifies the sanction, along with the other findings

3    that you make.  That, in no way, then, binds or, to use the

4    right word, collaterally estops that in the trial on 1

5    through 5.

6              THE COURT:  Which was the point you made in your

7    brief.

8              MR. ROSS:  Yes, Your Honor, and the --

9              THE COURT:  I mean, in the first -- in response to

10   the first motion for a continuance.

11             MR. ROSS:  Yes, and the caption, as all captions

12   are, are intended to encapsulate what's beneath.  What we

13   say at Page 2 is, there is no open, triable issue of fact on

14   Counts 1 through 5 that would become res judicata upon entry

15   of final judgment on Counts 6 and 7.  So obviously, there

16   are common facts.  The plaintiffs are the same.  That's a

17   fact.

18             The defendants are the same.  That's a fact.

19   What's -- the difference is that it's not a common fact that

20   you have to decide, necessarily, on counts 6 and 7 that then

21   becomes collaterally estopped on Counts 1 to 5.

22             THE COURT:  Okay.  And of course, this is in the

23   context of determining whether I had the power to determine

24   where there would be collateral estoppel which I didn't

25   specifically rule on after the Stern v. Marshall Holding

```
 1    cast CBI on compulsory counterclaims in doubt, but it was an
 2    extra point in my opinion.
 3            MR. ROSS:  That's correct, Your Honor.
 4            THE COURT:  Going to the collateral estoppel
 5    issue, but it seems to me, Mr. Kingston, that neither of
 6    these rulings, to the extent that they would depend upon Mr.
 7    Jarosz's testimony, would constitute collateral estoppel on
 8    Lanham Act damages.
 9            MR. KINGSTON:  Your Honor, I think there is a
10    potential for collateral estoppel.  I think the reasons why
11    they wouldn't constitute collateral estoppel would be
12    unrelated to whether or not the facts overlap and, frankly,
13    just related to the fact it would be -- there would be
14    prejudice in a partial summary -- and it would be a partial
15    judgment, but --
16            THE COURT:  What?  That's not a Rule 60(b) --
17            MR. KINGSTON:  No, no, no, that's not what I was
18    saying, Your Honor.
19            THE COURT:  Okay.
20            MR. KINGSTON:  The basis for the Rule 60(b) is
21    that plaintiffs were unequivocal.  They told you there were
22    no common issues.
23            THE COURT:  There aren't.
24            MR. KINGSTON:  In --
25            THE COURT:  I just said it.  There aren't.  If
```

1  there were common issues, there'd be a collateral estoppel,

2  as said, but there really aren't --

3              MR. KINGSTON:  A common issue --

4              THE COURT:  -- applicable standards.

5              MR. KINGSTON:  A common issue would be a damage

6  calculation under the Lanham Act.  After they told you there

7  were no common issues, you told us on February 24, "I don't

8  believe that the parties should be preparing for a March 30

9  bench trial before me regarding the parties' damage

10  calculations under the Lanham Act and related state

11  statutes."

12              THE COURT:  That's correct.

13              MR. KINGSTON:  Plaintiffs are not proposing to

14  offer the testimony of John Jarosz on that exact Lanham Act

15  calculation.  His declaration --

16              THE COURT:  No, it's not.  It's not a Lanham Act

17  calculation.  It's to be used in the context of claims for

18  breach of the automatic stay and for equitable

19  subordination, both of which, depending if I rule in their

20  favor, the calculation of the sanction would, in my view,

21  not be collateral estoppel in respect of a Lanham Act claim.

22              MR. KINGSTON:  In Mr. Jarosz -- I want to be

23  clear, Your Honor.  The point I'm talking about now is

24  prejudice.  We have witnesses who would have testified in

25  response to Mr. Jarosz who are not available to testify

1    because we have not been preparing them to testify.

2              THE COURT:  Well, that's not -- that's not

3    prejudice.  That's your decision.

4              MR. KINGSTON:  Well, Your Honor, that --

5              THE COURT:  It doesn't take too long to read the

6    caselaw and to determine that what he's testifying to here

7    is being applied in a different context --

8              MR. KINGSTON:  Your Honor --

9              THE COURT:  -- A, not a Lanham Act context, and B,

10   one where there's not collateral estoppel.  And if you had

11   any concern about that, you could've raised it.

12             MR. KINGSTON:  We did, Your Honor.  That was our

13   Rule 60 motion.

14             THE COURT:  No, no.  No, no.  What you're arguing

15   is that you were misled by a statement that you'd have to

16   prepare for a Lanham Act trial, but this isn't a Lanham Act

17   trial.

18             MR. KINGSTON:  Your Honor, Mr. Jarosz provided an

19   expert report pursuant to Rule 26(a)(2).  In that expert

20   report, he said, "As to Count 6, I don't have enough

21   information to calculate damages."  He did calculate damages

22   as to the Lanham Act.  After that happened, this Court told

23   the parties, "I don't believe that the parties should be

24   preparing for a Marc 30 bench trial before me regarding the

25   parties' damage calculations under the Lanham Act and

1    related state statues."

2            If we look at Mr. Jarosz's opinion, he says,

3    here's what I'm opining on about the Lanham Act, and I can't

4    do -- I can't figure it out on Count 6.  Given that --

5            THE COURT:  That's not -- that's a separate point

6    from your motion.  That's not misrepresentation.  That's a

7    separate point.  You're arguing that his opinion doesn't go

8    to sanctions for breach of the automatic stay, which is not

9    what your motion is couched on, nor could it be, because

10   Rule 60 doesn't cover something like that.

11           MR. KINGSTON:  Based on this Court's order, based

12   on this Court's correspondence, we have not been preparing

13   those witnesses to respond to Mr. Jarosz and they are not

14   available.

15           THE COURT:  Well --

16           MR. KINGSTON:  I think that it's pretty clear --

17           THE COURT:  That's your problem.  I mean, I don't

18   -- look, there are two significant Circuit Court cases on

19   equitable subordination.  As far as the law on sanctions for

20   breach of the automatic stay, again, I may or may not take

21   as evidence, but it's a different legal analysis than the

22   legal analysis under the Lanham Act, which is exactly the

23   point that they made in their brief that you're complaining

24   about.

25           MR. KINGSTON:  And the point that the Supreme

1    Court makes time and time again is it's not the legal

2    analysis that matters; it's the fact issue.  And the fact

3    issue is, how many customers did plaintiffs lose.

4              THE COURT:  But it's not --

5              MR. KINGSTON:  And if --

6              THE COURT:  It's a fact issue that literally you

7    don't have to decide in these two claims, and it's just not

8    a -- and by the way -- no, I'm not going to.  Look, you read

9    the opinion.  To tell me that the Supreme Court said this

10   again and again, after I think the opinion makes it pretty

11   clear that you are mis-citing the caselaw, including the

12   Second Circuit caselaw, is beyond the pale.  So I will deny

13   this motion.  Enough.

14             MR. ROSS:  Your Honor, if we still -- this is Mr.

15   Ross, I should say, for the record -- we still have a couple

16   minutes here, we've got Bates stamp numbers and explanation

17   for a couple of these exhibits I'd like to get on the record

18   and we can try to finish this up.

19             THE COURT:  Okay.

20             MR. ROSS:  So Exhibit 32R which is the trouble

21   ticket was produced with Bates stamp No. WIN000220 and so

22   with that representation, Mr. Kingston, I would again move

23   Plaintiff's Trial Exhibit 34 into evidence.

24             MR. KINGSTON:  No objection.

25             THE COURT:  Okay.

1     (Plaintiff's Exhibit 34 Entered Into Evidence)

2          MR. ROSS:  And then with respect to Exhibit 61,

3     which is the exhibit -- Plaintiff's Trial Exhibit 61, Your

4     Honor specifically asked about, one-page document.  Story

5     behind that is that attorneys from Charter asked for

6     production of that, for some reason, in October.  It was

7     sent to them by email on October 22nd at their request.  It

8     was not Bates stamped inadvertently, even though that was

9     before the end of the discovery period, so that's our bad on

10    that one.

11         THE COURT:  Okay.  Well, if you could have your

12    associate just forward that email to Mr. Kingston.  I'm

13    assuming, Mr. Kingston, if the email was sent at your

14    request, then it shouldn't be an issue.

15         MR. KINGSTON:  I'm sorry, yeah, I'll take a look

16    at the email, Your Honor.  I didn't follow completely what

17    Mr. Ross was saying.  I apologize.

18         THE COURT:  Okay, well, it's not --

19         MR. KINGSTON:  I'm not --

20         THE COURT:  -- document.  It was just -- the

21    reason, I think -- correct me if I'm wrong, Mr. Ross -- the

22    reason it's not Bates stamped is that -- is not because it's

23    the first page of a voluminous document that could only be

24    produced in zip file form, but rather, I'm being told,

25    Charter for some reason requested this one-page document

1    after discovery ended and it was emailed to Charter in

2    October and if you have the email, then I'm assuming it

3    wouldn't present an issue.

4            MR. ROSS:  I'll send the emails to Mr. Kingston,

5    Your Honor, after we finish up this morning.

6            THE COURT:  Okay.  All right.  So in addition to

7    Mr. Auman, were you going to call anyone else today, Mr.

8    ross?  Were you going to call Mr. Jarosz?

9            MR. ROSS:  Yes.  Yes, Your Honor.

10           THE COURT:  All right.  Well, we have about 45

11   minutes.  I don't know if that makes sense or not.

12           MR. KINGSTON:  Your Honor, I am not prepared to

13   examine Mr. Jarosz at this time, to be just candid with the

14   Court.  The Court --

15           THE COURT:  You assumed that we would be doing Mr.

16   Alman first and wouldn't be done --

17           MR. KINGSTON:  I assumed that after the Court said

18   in its opinion that Mr. Jarosz is not slated to testify on

19   Counts 6 and 7 and -- that was the phrase used, not slated

20   to testify, and told us not to prepare for a damage

21   calculation, that Mr. Jarosz wouldn't be testifying, so --

22           THE COURT:  You've got -- I mean, we've left this

23   out, but it's in the record, too.  You got Windstream's

24   letter, like, two days later, right?

25           MR. KINGSTON:  No, Your Honor.

1           THE COURT:  You did not get their letter saying

2    that --

3           MR. KINGSTON:  Their letter --

4           THE COURT:  -- mistaken in that portion of its

5    ruling and that he was --

6           MR. KINGSTON:  Your Honor --

7           THE COURT:  -- going to testify?

8           MR. KINGSTON:  The timing was, Your Honor, on

9    February 24th, the Court told us that we're not going to --

10   that you shouldn't be preparing for a Lanham Act damage

11   calculation at trial.  Shortly thereafter, we told our

12   experts, Mr. Kamin and Mr. Kardos, we don't need you.  It's

13   not going to be this one.

14           And then early, I want to say, or mid to late

15   March, I can't remember what the exact date was, but

16   somewhere just short of a month later, after this Court had

17   issued the memo opinion saying that Mr. Jarosz isn't going

18   to be at trial and after we agreed that it would be a one-

19   day trial, given how much more narrow the issues were,

20   Windstream tried to take a mulligan and then sometime after

21   that, this Court entered its order and we asked the Court to

22   reconsider its order.

23           MR. ROSS:  So that timing's not quite correct.

24           THE COURT:  -- after that, was many weeks after, a

25   month after that, right?

1          MR. KINGSTON:  No.  Which is the "that" that

2    you're talking about?  If Your Honor is talking about

3    Windstream's letter --

4          THE COURT:  Yeah.

5          MR. KINGSTON:  Frankly, we thought the Court was

6    going to respond to that letter and ask them to show cause

7    why that didn't change the outcome.  We didn't respond until

8    the Court entered an order and the response was that the

9    order was contrary to -- was based, was contrary to what was

10   said in Windstream's brief and its letter.

11         THE COURT:  The order didn't say anything about

12   Mr. Jarosz testifying.

13         MR. KINGSTON:  I'm sorry, the order was on the

14   memorandum opinion which the memorandum opinion also came

15   before Windstream's letter as well.

16         THE COURT:  But the order said nothing about Mr.

17   Jarosz testifying, one way or the other.

18         MR. KINGSTON:  You're right, Your Honor.  I

19   misspoke.  The order didn't say it; the memorandum of

20   opinion that came out sometime after the -- well, I have the

21   timeline in front of me.  I apologize.

22         THE COURT:  But then, they sent their letter like

23   two days later.

24         MR. KINGSTON:  I think that the -- the email --

25         THE COURT:  -- opinion --

1          MR. KINGSTON:  Your Honor, the email was February

2     24.  Three weeks after that February 24 email, the Court

3     entered a memo of decision saying the issues were

4     fundamentally different and saying that plaintiff's witness

5     on damages for purposes of Count 1 through 5 is not slated

6     to testify on Counts 6 and 7.  So during that intervening

7     three weeks, between when the Court said don't get ready for

8     a Lanham Act damage trial and when the Court issued an

9     opinion saying that Mr. Jarosz isn't slated to testify,

10    Windstream didn't protest.

11          After that Court's -- I'm sorry, after the Court's

12    March 20 decision, I think that Windstream's letter was -- I

13    have as March 31st and then we did not respond to

14    Windstream's letter because, frankly, we wanted to see how

15    the Court would react and when the Court entered the order

16    we responded to the order.

17          MR. ROSS:  So the one piece of the narrative

18    missing, Your Honor, is that during that time period, I

19    filed a witness list in which they listed these experts they

20    supposedly told to stop -- stop preparing, and also exhibits

21    lists with numerous exhibits that could've been understood

22    for no purpose other than to rebut Mr. Jarosz's testimony.

23          MR. KINGSTON:  In response to that, Your Honor, is

24    of course the Court and Mr. Ross were crystal clear that

25    counts 1 through 7 were proceeding and so we made our

1    disclosures consistent with Counts 1 through 7 and we freely

2    concede that Mr. Kamin and Mr. Kardos, their testimony is

3    relevant to Counts 1 through 7.

4              MR. ROSS:  We've never, ever misled them into

5    believing, once this Court said the trial's on Counts 6 and

6    7, that's what we proceeded on.  It's impossible for any

7    reasonable person to draw any other conclusion.

8              MR. KINGSTON:  Here's the actual language from the

9    February 13th hearing, Your Honor.  Mr. Ross:  "The

10   defendants keep saying that there's a trial setting for

11   Counts 6 and 7.  That's wrong."  The Court:  "It's for

12   everything."  Mr. Ross:  "It's for the adversary

13   proceeding."  The Court:  "Right."  That's at Docket No. 270

14   at 61, Lines 5 through 9.

15             MR. ROSS:  Of course, that was obviated by the

16   Court's decision which it previewed in an email February

17   23rd and which it entered a memorandum of decision on March

18   17th.

19             MR. KINGSTON:  And as we said to Mr. Ross shortly

20   thereafter when we provided our exhibit list, we think we

21   will be able to cull this down dramatically -- or maybe it

22   was significantly.  We'll cut down this list once the Court

23   enters an order consistent with that.  The Court's order

24   that was entered, and it was -- I know it was a proposed

25   order provided by plaintiff -- didn't include the language

1    severing Counts 1 through 5 from Counts 6 and 7 and that was

2    among the relief that was sought under our Rule 60 motion.

3              Now, the District Court mooted that relief by

4    withdrawing -- that relief request by withdrawing the

5    reference for Counts 1 through 5, but it's just not true to

6    suggest that up until that -- up until a severed trial order

7    was entered or until the reference was withdrawn, as the

8    Court recognized, we were scheduled for 1 through 7.

9              MR. ROSS:  No reasonable attorney --

10             THE COURT:  No, we weren't.  I ruled --

11             MR. ROSS:  -- could've understood --

12             THE COURT:  -- specifically that I would be doing

13   the 1 through 5.

14             MR. KINGSTON:  Your Honor, we had a --

15             THE COURT:  I specifically ruled that.  That's

16   what we had the hearing on.

17             MR. KINGSTON:  Your Honor, we had a long and

18   incredibly uncomfortable conversation in January between --

19             THE COURT:  Yes.  That's because you were making

20   the point that it already had been severed, which was wrong.

21   But --

22             MR. KINGSTON:  No, Your Honor --

23             THE COURT:  -- I ruled.

24             MR. KINGSTON:  Your Honor was crystal clear.  Your

25   Honor has been crystal clear throughout this case that it's

1   not an order until you enter an order.  And when you entered

2   an order, you didn't enter an order severing the case.

3            THE COURT:  So the 25-page opinion doesn't count.

4            MR. KINGSTON:  Your Honor, we had this -- the last

5   line of that 25 -- the end of that 25-page opinion, I don't

6   want to say it's the last line.  I don't have it in front of

7   me -- was something along the lines of, plaintiff shall

8   submit an order consistent with this opinion.  What we --

9            THE COURT:  Right.

10           MR. KINGSTON:  What we told Mr. Ross, right after

11  that, was once they -- once you submit that order, once the

12  order is submitted, we can cut all this down.  For reasons

13  that are unclear to me, when they submitted an order, they

14  didn't include a separate trial order and that's why we

15  asked you to do so.  In fact --

16           THE COURT:  There's no reason to.

17           MR. KINGSTON:  In fact, defendant --

18           THE COURT:  Yes, you're now telling me that you

19  made some sort of offer to cut it all down.  Did that

20  include not having any expert testimony?

21           MR. KINGSTON:  Those experts are just responding

22  to Mr. Jarosz.  Kamin and Kardos are just responding to Mr.

23  Jarosz.

24           THE COURT:  Did he respond saying, well, we're not

25  going to have Jarosz?

1          MR. KINGSTON:  There was no response.

2          MR. ROSS:  There was a response.  We put him on

3    our witness list.  There's -- no reasonable attorney could

4    not have understood that after the Court's decision and

5    previewed in its email that Counts 6 and 7 was all that was

6    left, and nobody could misunderstand from our exhibit list

7    and from our witness list that Mr. Jarosz was going to

8    testify and the nature of his testimony was going to be as

9    shown in the exhibits.

10          THE COURT:  Beyond that, you sent the letter in a

11   couple of days after the memorandum of decision came out.

12          MR. ROSS:  Yes, and Your Honor then posted it on

13   the ECF system, the very next day, I believe.

14          THE COURT:  So I just -- look, as a practical

15   matter, I'm assuming he's going to be on for more than 45

16   minutes anyway, but I just -- it's two different standards.

17          MR. KINGSTON:  If plaintiffs intend to put on

18   evidence, Your Honor, of the fact -- of the factual issue as

19   to how many customers plaintiffs lost, we would like the

20   Court to continue the case so that we can get Mr. Kamin and

21   Mr. Kardos ready to respond to that factual assertion

22   regardless of what it's under.  The factual issue is the

23   same.

24          MR. ROSS:  This is just the third or fourth

25   iteration of their motion to continue the trial, and at some

1    point, we have to say enough is enough.

2            THE COURT:  I just -- I mean, look, Mr. Kingston,

3    we've already established that it's not based on any sort of

4    Rule 60 requirement.  You're basically saying you were

5    somehow misled in connection with trial preparation.  I just

6    don't see it.  I think it's your lookout.  You know, if you

7    were right -- although, I don't see you actually arguing

8    this -- that the legal standards for -- and therefore the

9    facts that are relevant to them, would be the same, then

10   you'd have a point, maybe.

11           Although, again, the reference, in my opinion, to

12   their accepting this not collateral estoppel is, in essence,

13   an alternative holding.  But they're not the same.  It's not

14   collateral estoppel, so it was a risk you took in not being

15   able to be prepared to cross examine him.

16           MR. KINGSTON:  I think I understand the Court's

17   position.

18           THE COURT:  Okay.

19           MR. ROSS:  Your Honor, there is one more useful

20   thing we can do in the short time we have left here, so I

21   don't believe in wasting Court time.  It's a valuable thing.

22   If the Court is willing to, we'd like to tender Mr. Jarosz,

23   get through that part, to be qualified as an expert witness.

24   It should take 30 seconds, but let's use the Court's time,

25   if you're willing to do that.

1                    THE COURT:  Okay.

2                    MR. ROSS:  So, Your Honor, move into admission the

3      declaration of Mr. Jarosz as direct testimony in this

4      adversary proceeding.  Your Honor, the plaintiff, based on

5      Plaintiff's Trial Exhibit 103, which is his curriculum

6      vitae, tender Mr. Jarosz as an expert in the field of

7      economics and more particularly in the assessment of

8      monetary loss caused by unlawful acts under the intellectual

9      property laws.

10                    He's qualified based on his education and

11      experience, as shown by his curriculum vitae, Plaintiff's

12      Exhibit 103, to provide expert testimony in this adversary

13      proceeding.  He's been qualified -- he has testified as an

14      expert in more than a hundred trials.  He's never been found

15      by any Court to be unqualified to testify as an expert in

16      this field.  And accordingly, we would tender him to be

17      qualified as an expert.

18                    THE COURT:  And again, he's an expert for what

19      purpose?

20                    MR. ROSS:  In the field of economics with a

21      particular specialty in the assessment of monetary loss

22      cause by unlawful acts.

23                    THE COURT:  Okay.

24                    MR. KINGSTON:  I understand counsel's tender to be

25      asking the Court to accept that they've established the

1    element of Subsection A of Rule 702, not Subsections B, C,

2    and D, and with that understanding, we don't object to the

3    tender.

4              THE COURT:  Is that right, Mr. Ross?

5              MR. ROSS:  I made my tender.  I'm -- give me one

6    second.

7              THE COURT:  Okay.

8              MR. ROSS:  Your Honor, we've made a simple tender

9    that he's qualified as an expert.  We've not proffered that

10   -- anything about his opinion yet, which is the remainder of

11   subsection, so we stand on our tender that he's --

12             THE COURT:  So this is just --

13             MR. ROSS:  -- an expert.

14             THE COURT:  This is just to qualify him as an

15   expert for that purpose.

16             MR. ROSS:  Yes, Your Honor.

17             THE COURT:  Okay.

18             MR. KINGSTON:  Yeah, with that understanding, no

19   objection under 702(a), Your Honor.

20             THE COURT:  Okay.  All right.  Then, I rule that

21   Mr. Jarosz is, in fact, qualified as an expert witness for

22   the purpose for which he's been offered to testify under FRE

23   702(a).

24             MR. ROSS:  Thank you, Your Honor.  Before we

25   adjourn for the morning, I'd like to ask the Court for some

1    guidance with respect to tomorrow.  We will obviously send

2    the two documents we promised in the email over to opposing

3    counsel, but what is the Court's preference tomorrow, to

4    start with Mr. Jarosz or to start with Mr. Auman?

5              THE COURT:  Probably make sense to start with Mr.

6    Jarosz.

7              MR. ROSS:  Okay.  We'll make sure he's here and

8    ready to go.  I assume at 10 a.m., Your Honor?

9              THE COURT:  Is that right?  I thought it was in

10   the afternoon.  Oh, no, tomorrow, 10 a.m.  Yeah, we could do

11   it earlier, but 10 a.m. is fine.

12             MR. ROSS:  Thank you, Your Honor.

13             THE COURT:  Okay.  So you don't want to deal with

14   Mr. Jarosz's report and the other contemplated objections to

15   that report?

16             MR. ROSS:  Happy to do whatever the Court would

17   like.

18             THE COURT:  -- 702(b) through (d)?

19             MR. ROSS:  We've not offered -- expert reports are

20   hearsay.  This Court has ruled that repeatedly as all Courts

21   have.  We've not put on the list his expert report.  We're

22   not going to offer it.

23             THE COURT:  Okay.

24             MR. ROSS:  His testimony is in his declaration.

25             THE COURT:  All right.  All right, well, are there

1    going to be evidentiary issues, Mr. Kingston, with regard to

2    Mr. Jarosz's declaration?

3            MR. KINGSTON:  Yes, Your Honor.  If not based on -

4    - yes, Your Honor.

5            THE COURT:  I mean, that's what I thought.  I

6    don't know if it makes sense to deal with them in the next

7    half hour or so, whether you want to deal with them tomorrow

8    morning.

9            MR. KINGSTON:  I think what I'd like to do is

10   prepare, maybe try and see if I can't bring out those

11   evidentiary issues on cross.

12           THE COURT:  Okay, that's fine, too.  That's fine.

13   All right.  So we can resume at 10.  I would like you both

14   to send me the cases on the narrow point that we discussed

15   under Rule 26(a)(1)(A)(iii) whether damages as used in that

16   sentence includes proof of -- appropriate sanction.  I have

17   the one case from Windstream's opposition and I have that

18   opposition, but if there's anything on that specific issue,

19   I'd appreciate it.

20           MR. ROSS:  We will do that, Your Honor.

21           THE COURT:  And same for Charter's side.

22           MR. KINGSTON:  We will, Your Honor.

23           MR. ROSS:  Your Honor, I hate to even bring this

24   up, but we do have a couple minutes and Court time is a

25   valuable thing.  We were served last night with a 418-page

1    pleading from Charter and would like to -- the Court's

2    guidance on what you want us to do about that.  We've sent

3    in, I think by now, an email to the Court saying it should

4    be denied out of hand, given served on the eve of trial.

5    But if we need to prepare an objection, we'd like to know

6    that.

7            THE COURT:  Well, again, I don't -- unless I

8    missed it, I don't think it was emailed to chambers.  What

9    is it?

10           MR. KINGSTON:  It was emailed to chambers, Your

11   Honor.

12           THE COURT:  Okay.

13           MR. KINGSTON:  It was just a motion for judicial

14   notice.

15           THE COURT:  Oh, the judicial notice motion.  Okay,

16   I did get that, but I -- it was billed as a simple motion

17   for judicial notice.  I didn't read the 400 pages last night

18   of what it is that you want me to take judicial notice of.

19           MR. KINGSTON:  It's a 14-page motion, Your Honor,

20   and the --

21           THE COURT:  Yeah, no, I know the motion itself,

22   but...

23           MR. KINGSTON:  There's exhibits so that the Court

24   -- and the purpose of the exhibits, of course, is so that

25   the Court can readily and accurately verify that the things

1   we're asking it to take judicial notice of are true.

2          THE COURT:  Well, what -- are they Court records

3   or something else?

4          MR. KINGSTON:  Yes, Your Honor.  They're Court

5   records.  They're printouts from Westlaw and they're all

6   there.  The Court -- you can disregard them, but we wanted

7   there to be no question that the contents can be accurately

8   and readily determined from sources whose accuracy cannot be

9   reasonably questioned and those are the contents, those are

10   the sources.

11          MR. ROSS:  Let's be clear here, Your Honor.  They

12   are not Court records in the sense that you are using that

13   term.  Court records would be something in the way you're

14   using it, something like a decision whereby the property at

15   100 Main Street has been decided to be owned by John Doe.

16   These are, in fact, cases, printouts of cases and one case

17   an ALR annotation, these are not the sorts of facts that you

18   can take judicial notice of, and we'll explain that in

19   objection, if you would like.

20          THE COURT:  I'm sorry.  Mr. Kingston, are you

21   offering them for their legal -- what are they being offered

22   for?

23          MR. KINGSTON:  There's two issues, and Your Honor,

24   just to be candid with the Court, we provided this to the

25   Court in advance.  We don't intend to take this up until

1    it's our turn to put on evidence.

2         THE COURT:  Right, and I understood that, too, but

3    I guess before any time is spent in responding, I just want

4    to get a sense of, are you offering it up as legal authority

5    or something else?

6         MR. KINGSTON:  No.  No, no, Your Honor, we're not.

7    We're offering up the -- they're pleadings consistent with

8    what we've just gone through where we talked about the

9    complaint and some of the other pleadings and we're not

10   asking that they be considered for the truth of the matter

11   asserted and then we're asking that the matter of law be

12   judicially noticed as a matter of fact consistent -- as a

13   social fact covering evidential issues, not as a legal

14   matter.  And we cite for the authority for that in the

15   motion for judicial notice.

16         For the benefit of the Court, it's City of Wichita

17   versus U.S. Gypsum, 73 F.3d. 1491, 1496 (Tenth Circuit,

18   1996).  So it's actually a very straightforward judicial

19   notice motion in our view, Your Honor.  The exhibits are

20   voluminous, but that's so the Court doesn't have to waste

21   its time looking anything up.  It can verify it all right

22   there.

23         THE COURT:  But what is the fact you're asking me

24   to have these accepted for?

25         MR. KINGSTON:  That the -- that if you need to

1    look to extraneous facts, that I guess goes to two issues.

2    One, does Section 362(a)(3) clearly and unambiguously,

3    drawing all ambiguities against a finding of contempt

4    proscribe the advertising at issue.  And then two, it does

5    to reasonable diligence, Your Honor.

6              THE COURT:  And you're citing legal authority for

7    that as opposed to --

8              MR. KINGSTON:  No, we're --

9              THE COURT:  -- Mr. Kingston, it doesn't really

10   seem to make much sense.  This seems like a legal argument

11   you're making.

12             MR. KINGSTON:  It is not, Your Honor.  There's a

13   question -- one of the questions this Court has to decide

14   for civil contempt is, there's no question that a

15   requirement for civil contempt is the order has to clearly

16   and unambiguously proscribe the conduct at issue.  The

17   conduct that you found that Charter engaged in was a -- was

18   false advertising which you found was proscribed by Section

19   362(a)(3).

20             The question is, whether or not Section 362(a)(3)

21   clearly and unambiguously proscribes the false advertising.

22   I mean, Judge Bernstein articulated the standard, like the

23   cases are legion that articulate it.  "To be clear and

24   unambiguous, the order must leave no uncertainty in the

25   minds of those to whom it is addressed, who must be able to

1    ascertain from the four corners of the order precisely what
2    acts are forbidden."
3            And, Your Honor, what the material that we're
4    asking the Court to take judicial notice of demonstrates is
5    that Section 362(a)(3) does not unambiguously say, don't
6    engage in bankruptcy-related advertising.  So we ask the
7    Court to take --
8            THE COURT:  That's a legal -- I'm assuming those
9    are legal precedents or commentary, correct?
10           MR. KINGSTON:  There's a number of things.  The
11   very first thing is, the order proving the language
12   notifying the creditors for the commencement of plaintiff's
13   Chapter 11 case, which does not include the word
14   advertising.
15           THE COURT:  All right.  So this is -- look, I'm
16   putting you on notice now.  This is really ridiculous.
17   You're citing to me legal authority about how to construe
18   Section 362, right?
19           MR. KINGSTON:  Your Honor, we -- yes.
20           THE COURT:  And you want to have this introduced
21   as a fact?
22           MR. KINGSTON:  Yes, Your Honor.  That's -- Your
23   Honor, consistent with the decision that we cited for that
24   purpose.  We're also asking the Court to take judicial
25   notice of the pleading, not for the truth of the matter

1    asserted, but for what they say, just like I just agreed to

2    with --

3             THE COURT:  Which pleading?  Which pleading?

4    Pleadings in cases?

5             MR. KINGSTON:  Yes, Your Honor.  We just took

6    judicial notice of pleadings that I agreed to here.  We just

7    had a whole --

8             THE COURT:  In this case?  In this case?

9             MR. KINGSTON:  Yes, Your Honor.

10            THE COURT:  Like the complaint, which I would want

11   to refer to in an opinion, sure.

12            MR. KINGSTON:  I think that in deciding --

13            THE COURT:  I'm not going to refer to some

14   defendant or plaintiff's pleading in another case on other

15   facts.

16            MR. KINGSTON:  These --

17            THE COURT:  Except -- well, I would never do that.

18   That's just ridiculous.

19            MR. KINGSTON:  I'm happy to walk through --

20            THE COURT:  Wait.  And as far as a Court citation,

21   if it's on point, you can cite it to me in a brief.

22            MR. KINGSTON:  Your Honor, I'm happy to walk

23   through it when we offer it in evidence.

24            THE COURT:  Well, I'm just telling you, if we're

25   at the same place as we are today on this, when you do that

1    and Mr. Ross sends you a Rule 11 notice and you don't

2    withdraw it, you'll be sanctioned for the time spent on

3    this.

4              MR. KINGSTON:  Thank you, Your Honor.

5              THE COURT:  You know, I think you would learn in

6    the first week of law school the difference between a

7    precedent and a fact.

8              MR. KINGSTON:  Your Honor, we're not -- the

9    caselaw is pretty clear, Your Honor.  I'm happy to talk

10   about it.

11             THE COURT:  Okay, very well.  Anything else?

12   Okay.

13             MR. KINGSTON:  Nothing from the defendant, Your

14   Honor.

15             THE COURT:  All right.  So the Court Solutions

16   can be turned off.

17             (Whereupon these proceedings were concluded at

18   12:24 PM)

19

20

21

22

23

24

25

**I N D E X**

RULINGS

|  | Page | Line |
|---|---|---|
| Motion for Continuance Denied | 78 | 11 |

1                C E R T I F I C A T I O N

2

3       I, Sonya Ledanski Hyde, certified that the foregoing

4   transcript is a true and accurate record of the proceedings.

5

6

7

8   Sonya Ledanski Hyde

9

10

11

12

13

14

15

16

17

18

19

20   Veritext Legal Solutions

21   330 Old Country Road

22   Suite 300

23   Mineola, NY 11501

24

25   Date:  April 29, 2020

| 0 |
| --- |

**01** 54:16

| 1 |
| --- |

**1** 8:9,11,15,20,22
20:11,13,16 22:12
22:13 26:15 29:11
33:12 40:3 48:12
50:23 52:5,18
54:24 55:21 64:13
64:13 65:17,17
68:25 73:4,14,21
83:5,25 84:1,3
85:1,5,8,13 92:15
**1,000** 36:7
**1,381** 72:22
**1,911** 35:22,23
**10** 21:23 58:6 91:8
91:10,11 92:13
**10,000** 39:12
**100** 55:8 68:5
94:15
**100,000** 38:1
**10019** 5:4
**1002** 61:15
**10022** 4:6
**1006** 18:17 19:16
**101** 55:9 68:7
**102** 55:9 68:8
**103** 68:14 89:5,12
**104** 55:8 68:9
**105** 55:8 68:11
**106** 55:8 68:11
**10601** 2:3
**10:02** 2:6
**11** 13:10 55:10
58:7 97:13 99:1
100:6
**11501** 101:23
**1174** 71:22
**1178** 71:23
**12** 23:18,21,24
52:3 58:7 71:1

**12:24** 99:18
**12:45** 46:23
**13** 18:4,11 58:11
58:12,13
**1339** 29:1
**1353** 29:1
**13th** 84:9
**14** 18:4,12 19:15
25:24 31:1 58:16
58:20,22 93:19
**1491** 95:17
**1496** 95:17
**15** 25:25 26:2,23
27:9 28:5 31:16
58:18,21,22
**15-16,000** 31:3
**16** 59:2 60:8,13
61:6
**16,000** 21:15
23:11,17,25
**17** 8:9,11,15,20,22
53:6,10 58:24
59:3,7 60:9,10,14
61:6
**17-20** 55:1
**17th** 84:18
**18** 30:9 59:7,25
60:4,14 61:8,25
62:12,17
**18th** 24:2 61:10
**19** 7:14 59:7 60:14
61:6
**19-08246** 1:4 3:1
**19-22312** 1:3
**1981** 71:23
**1989** 24:15 29:1
38:1
**1996** 95:18

| 2 |
| --- |

**2** 12:11,15 40:8
58:13 65:10 73:13
76:19

**20** 42:11 62:19,23
83:12
**200** 52:4
**200,000** 38:2,7
**2002** 45:5
**2009** 72:1
**2010** 40:8
**2019** 11:21 13:20
23:18 24:2 30:9
32:15
**2020** 2:5 28:7
32:15 101:25
**20th** 24:21
**21** 11:22 35:14
63:7,8
**210** 40:7
**22** 63:8
**22nd** 79:7
**23** 63:15
**23rd** 84:17
**24** 11:21 63:15
75:7 83:2,2
**248** 2:2
**24th** 22:16 32:3
81:9
**25** 63:2,18 86:3,5
86:5
**25-30** 55:2 63:24
**250** 5:3
**2540762** 40:8
**26** 20:6,11,13,16
20:21 21:6,8 24:9
25:8 26:15 27:15
29:11,16,21,25
30:18 40:3 41:22
51:1,2 63:21
76:19 92:15
**262** 70:25
**27** 2:5 63:21
**270** 84:13
**28** 63:22
**29** 63:22 101:25

**2d** 29:1
**2nd** 50:25

| 3 |
| --- |

**3** 11:22 30:3 51:1
51:2 54:24 56:4
63:8 69:16 96:2
96:19,20 97:5
**30** 12:8 14:19,20
15:4,7 27:23
63:23 75:8 76:24
88:24
**300** 2:2 101:22
**303** 16:16
**31st** 83:13
**32** 14:21
**32r** 78:20
**33** 11:22 63:23
**33-35** 55:2
**330** 101:21
**34** 19:13 64:1,1,1
78:23 79:1
**35** 11:22 50:6
64:15,22
**350** 11:4
**36** 30:11,11,12,12
**362** 7:8 30:13 96:2
96:19,20 97:5,18
**37** 20:15,18 40:9
**382** 71:25
**39** 64:15
**39-48** 55:3 64:22

| 4 |
| --- |

**4** 25:23 26:24
27:10 28:5,8,9,14
30:19 31:9 33:8
33:11,15 35:4
41:8 47:1,3,23
63:9
**4/23** 10:8
**40** 64:16
**400** 93:17
**400,000** 35:15

**408,000** 35:19,24
36:12
**41** 64:16
**413** 71:25
**414** 71:25
**418** 92:25
**42** 64:17
**43** 64:17
**44** 64:17
**45** 64:18 80:10
87:15
**46** 64:18
**47** 64:18
**48** 64:18

**5**

**5** 14:14 16:10
50:23 52:5,19
56:7,9,11 57:10
57:12,17 58:2,3
58:16,17,17 65:10
68:25 73:5,14,21
83:5 84:14 85:1,5
85:13
**5,000** 21:14 23:10
23:17,25 31:1,12
34:21
**5,200** 18:18
**5,278** 19:6 20:5
21:17
**5,278.85** 18:13
23:5 25:15
**5-15** 55:1
**50** 64:19
**50-53** 55:4 64:23
**500,000** 33:12
**51** 64:19
**52** 64:19
**53** 64:20
**55** 55:4 64:20
**554** 71:25
**55th** 5:3
**575** 4:5

**58** 64:21
**58-62** 55:5
**59** 64:21 69:10

**6**

**6** 7:5,7 12:8 14:14
14:20 15:4,7
16:10 22:9 27:23
33:14 52:6 58:5
69:1 72:12,20,21
73:15,20 76:20
77:4 80:19 83:6
84:5,11 85:1 87:5
**6-12** 58:8
**60** 56:15,16,23
57:3,6,7,11,13,17
57:21 58:3 64:25
65:11 69:12,16
74:16,20 76:13
77:10 85:2 88:4
**602** 12:6 13:5
14:21 18:8
**61** 65:3,4,16 66:8
79:2,3 84:14
**62** 66:20
**63101** 4:16
**64-66** 55:5
**642** 71:22
**65** 67:5
**67** 67:12
**67-93** 55:6
**6th** 21:25 23:18
27:15 38:8,15

**7**

**7** 7:5,8,11 11:16
11:17 52:6 58:5
73:15,20 80:19
83:6,25 84:1,3,6
84:11 85:1,8 87:5
**702** 90:1,19,23
91:18
**73** 95:17
**78** 100:6

**7th** 38:16

**8**

**8** 13:8,17 16:23
26:4,11,25 27:1
27:13 28:3,14
31:10,12 34:3,5
58:6
**8036** 59:1
**81** 70:11
**82** 70:11
**84** 22:12,13 38:18
**886** 29:1

**9**

**9** 40:10 58:6 84:14
**93** 67:12
**94** 55:7 67:19,23
**95** 55:7 67:23
**99** 55:8 68:5
**9:52** 10:8

**a**

**a.m.** 10:8 91:8,10
91:11
**abandoned** 27:8
**ability** 14:19 45:8
58:1
**able** 8:15 15:22
16:5 23:21 43:10
43:22 44:17 70:22
84:21 88:15 96:25
**absolutely** 25:16
**absurd** 25:18,19
25:24 39:13 54:13
**accept** 89:25
**accepted** 95:24
**accepting** 88:12
**access** 43:9
**accomplish** 21:7
**accumulation**
27:11
**accuracy** 94:8
**accurate** 101:4

**accurately** 93:25
94:7
**act** 37:16 69:22
71:8,12,14 74:8
75:6,10,14,16,21
76:9,16,16,22,25
77:3,22 81:10
83:8
**action** 22:9 30:13
**actions** 23:7
**activity** 12:23
**acts** 89:8,22 97:2
**actual** 22:18 23:4
28:25 29:3 34:11
36:23,24 38:19
44:8 45:12 57:22
70:5,6 84:8
**added** 11:24 12:1
**addition** 7:16
19:16 80:6
**additional** 17:6
**address** 8:2 9:21
10:16 22:8 37:11
42:10 61:25 71:5
**addressed** 14:5
22:25 46:18 60:3
64:24 67:6 68:10
68:23 96:25
**adequately** 11:17
12:20
**adherence** 7:9
**adjourn** 90:25
**admissibility** 8:17
49:21 50:13 51:8
52:11 55:12 56:8
**admissible** 12:6
52:24 60:5,7,17
60:18 61:23 62:13
67:16
**admission** 8:7,11
8:24 9:5 11:16
17:19 57:2 63:16
89:2

**admit** 51:24 52:6 57:25 61:4
**admitted** 8:8,21 14:25 21:1 51:9 56:24 58:2,3,8,12 58:22 61:6 62:17 62:23 63:24 64:23 67:9 68:1,18
**admonition** 53:12
**adv** 1:4
**advance** 53:21 94:25
**adversary** 3:1 7:6 9:2 21:10 30:16 30:23,24 40:9 59:21 84:12 89:4 89:12
**advertising** 44:20 96:4,18,21 97:6 97:14
**advised** 11:1
**advisement** 22:17
**afternoon** 9:8 91:10
**agree** 8:16 20:1 25:24 43:14 49:3 49:15,21,24 50:1 50:3 52:10 56:3
**agreed** 8:7,16 31:2 49:14 53:11 81:18 98:1,6
**agreement** 11:18 11:25 12:2,5,21 13:13
**ahead** 10:6 26:6 38:25
**aisha** 6:17
**al** 1:12,15 3:2,3 6:17 7:4
**allegation** 12:21
**allowed** 17:16 19:24 20:21

**allowing** 30:15
**alman** 80:16
**alr** 94:17
**alternative** 88:13
**ambiguities** 96:3
**amendment** 38:8 38:16,16
**amount** 21:16,17 23:7 25:19 33:5 36:10 38:7 72:17
**amounts** 19:14
**ana** 6:6
**analysis** 77:21,22 78:2
**annotation** 94:17
**answer** 9:12 66:2
**answered** 12:10
**answering** 27:21 27:21
**answers** 40:1
**anticipate** 40:12
**anybody** 17:9 23:22
**anymore** 45:3
**anyway** 87:16
**apart** 17:19
**apologize** 10:13 47:16 65:14 67:1 79:17 82:21
**apparently** 28:16 39:25
**appear** 15:15
**appears** 70:11
**apple** 59:22
**applicable** 7:10 61:14 75:4
**applications** 43:1 43:2 44:2 45:4 68:10,13
**applied** 76:7
**applies** 24:9 25:22 26:16 30:22 52:5

**apply** 15:7 30:23 30:25 37:17
**appreciate** 29:5 41:13 46:4 92:19
**appropriate** 54:6 61:2 71:20 92:16
**approves** 44:24
**april** 2:5 28:7,20 101:25
**archer** 6:18
**area** 28:16
**aren't** 28:24 37:9 43:9,18 74:23,25 75:2
**argue** 9:17,18 41:15
**arguing** 76:14 77:7 88:7
**argument** 18:6 24:11 25:9 29:8 29:13,17 30:21 46:14 72:15 96:10
**arkansas** 36:13
**arpu** 66:7
**articulate** 18:21 96:23
**articulated** 26:25 27:14 96:22
**ascertain** 97:1
**aside** 49:8 64:12
**asked** 12:9 14:11 32:7 34:15 37:4,6 38:23 39:1,12,20 41:5 62:7 79:4,5 81:21 86:15
**asking** 31:6 44:7 47:13 89:25 94:1 95:10,11,23 97:4 97:24
**asserted** 45:12 55:24,24 56:2,6 62:21 95:11 98:1

**assertion** 87:21
**assertions** 15:6
**assessed** 45:22
**assessment** 89:7 89:21
**associate** 79:12
**assume** 67:7 68:4 91:8
**assumed** 80:15,17
**assuming** 79:13 80:2 87:15 97:8
**attach** 13:25
**attached** 44:24
**attaching** 43:24 43:25
**attempted** 21:15
**attempting** 15:8
**attorney** 40:24 85:9 87:3
**attorneys** 4:4,14 5:2 22:15 36:18 48:1,5 79:5
**attorneys'** 36:4,4 36:5,22 37:7,14 38:4,21 39:20 40:23
**audio** 22:1 61:11 61:12,13,20,21 62:7
**auman** 6:3 8:25 11:20,23 12:3 13:8,20 14:5 16:1 16:16,24 26:3,25 27:1,20 32:3 33:22 38:21 39:3 40:12 42:11 44:16 46:4,11,13,20 47:9 48:22 54:13 80:7 91:4
**auman's** 9:5,24 10:4 13:18 19:17
**auman's** 26:22

authenticated 52:22
authority 15:19 18:10 30:10,12 95:4,14 96:6 97:17
automatic 7:9 12:22 29:18 40:22 70:14 75:18 77:8 77:20
available 17:17 19:2 23:11 30:11 30:14 75:25 77:14
avenue 4:5
avoid 22:21
award 38:13 44:3
awards 45:8,9
aware 14:18 30:7 39:5

**b**

b 2:21 12:8 14:20 15:4,7 27:23 69:14,16 74:16,20 76:9 90:1 91:18
back 23:9 24:21 31:1 40:21 48:23 64:10
bad 79:9
bank 4:15
bankruptcy 1:1 2:1,23 7:12 13:10 71:20 72:2 97:6
base 45:14 60:19 60:25 65:1
based 9:6 11:19 13:17 14:16 15:15 17:14,18,19 19:8 19:17 23:4,13 24:17 40:15,23 41:3,21 69:16 77:11,11 82:9 88:3 89:4,10 92:3

basic 12:19
basically 88:4
basis 11:18 12:3 14:15 52:7 62:2 67:13 74:20
bates 64:2 65:5,6 65:8 78:16,21 79:8,22
baylis 4:9
beginning 42:1
behalf 11:20 14:12
belabor 46:7 67:14
belie 69:3
believe 8:9 10:20 15:21 19:13 26:21 36:17 46:16 64:6 67:5 70:6 75:8 76:23 87:13 88:21
believed 21:14
believing 84:5
bench 75:9 76:24
beneath 73:12
benefit 30:17 95:16
bernstein 96:22
best 39:13 61:9,20 61:23
better 33:1
beyond 38:10 78:12 87:10
big 57:16 65:24
bill 44:23,23,25 46:5
billed 93:16
bills 67:24 68:1
binder 55:20
binders 8:18 52:3
binds 73:3
bit 46:22
bites 59:22

bits 25:11,13
book 50:4,16 51:10 53:11,25 54:3
books 8:13 50:12
borders 6:20
breach 12:22,25 29:18 70:14 75:18 77:8,20
brian 6:15
brief 40:10 73:7 77:23 82:10 98:21
bring 25:19 92:10 92:23
broader 53:14
budget 26:4 32:16 33:6 34:8
bunch 52:12 53:23
burden 40:17 43:17
business 11:24 12:1 42:13,13 45:24 56:8 58:25 68:2
bytes 25:11,13

**c**

c 4:1 7:1 20:18 40:7 90:1 101:1,1
cable 17:8,11
calculate 76:21,21
calculated 20:9
calculation 18:24 19:6 21:4,22,23 22:23 41:6 71:6 71:12 75:6,15,17 75:20 80:21 81:11
calculations 75:10 76:25
california 71:22
call 38:11 80:7,8
calling 25:3

calls 59:9
campaign 26:5,8 32:9,15,19 34:6 34:11
candid 80:13 94:24
can't 30:19 33:23 45:3 71:10 77:3,4 81:15 92:10
capacity 12:8
caption 73:11
captions 73:11
case 1:3,4 7:23 10:23 14:6,13 15:18 22:18 24:15 24:22 26:14 29:8 30:7 33:21 36:5 37:16 38:14,15 40:1 43:1,11,12 44:2 47:10,24 50:9,9,21,24 52:4 53:20 54:4 69:23 69:23 71:24 85:25 86:2 87:20 92:17 94:16 97:13 98:8 98:8,14
caselaw 72:16 76:6 78:11,12 99:9
cases 7:12 15:17 15:23 16:8,11,18 18:1 23:1 24:21 29:5,22 40:20 60:20 77:18 92:14 94:16,16 96:23 98:4
cast 74:1
cause 30:13 60:16 82:6 89:22
caused 24:18 71:18 89:8
cbi 74:1

century 24:21
certain 18:14,19
  27:5
certainly 11:3
  16:2 31:23 44:1
  60:7
certainty 21:16
  71:17
certified 101:3
challenged 71:18
chambers 9:7
  10:16,21,23,24
  16:8 26:19 93:8
  93:10
chance 21:5 24:6
change 82:7
changing 36:8
chapter 13:10
  55:10 97:13
chart 18:23
charter 12:15 3:2
  4:14 7:4,11 13:11
  13:12,14,14 16:25
  17:1,4,19 18:15
  19:11 22:14 23:8
  26:3 27:4 33:15
  35:20 41:2,4,5
  44:19 49:14 50:3
  57:14 59:23 61:11
  61:14 79:5,25
  80:1 93:1 96:17
charter's 16:24
  21:24 22:6 50:2
  51:12 58:1 61:19
charter's 30:9
  92:21
check 44:7 68:20
christopher 6:14
churn 57:14 65:13
cir 29:1
circuit 14:19
  15:10,11,12,12
  23:1 25:2 29:2

30:10,12 37:24
38:6 71:13,23
72:1,1 77:18
78:12 95:17
circulated 50:24
circumstances
  37:15,22
citation 98:20
cite 15:17 24:14
  24:20,22 95:14
  98:21
cited 14:3,21 40:3
  40:13 97:23
cites 18:2
citing 78:11 96:6
  97:17
city 95:16
civil 24:17,20,25
  25:5,5 30:15,15
  96:14,15
claim 12:25 27:6,7
  29:25 31:24 32:1
  35:4,7 36:4,24
  71:12 75:21
claimant 71:14,16
  71:21
claimants 7:12
claims 7:12 29:23
  37:2 40:4 75:17
  78:7
clarification
  17:24
clear 14:14 38:7
  42:4,24 43:17,21
  49:21 52:24 72:24
  75:23 77:16 78:11
  83:24 85:24,25
  94:11 96:23 99:9
clearly 9:11 23:1
  52:19 96:2,15,21
close 20:6 21:25
  23:20 26:11 62:12

closed 23:16,22
closest 19:12
coburn 4:13
coherently 18:22
collateral 73:24
  74:4,7,10,11 75:1
  75:21 76:10 88:12
  88:14
collaterally 73:4
  73:21
colleagues 11:2
collection 12:23
columbia 66:4
come 12:14 44:16
  45:10,11 48:22
  53:14 60:8 61:11
  64:6,10 71:17
comes 28:14,14
  33:6 44:2 60:20
coming 52:25
  53:23 62:20
comma 16:25
commencement
  97:12
commentary 97:9
committee 5:2
common 68:25
  69:3,5,20,22 70:4
  71:2 73:16,19
  74:22 75:1,3,5,7
communications
  1:15 3:2 4:14
  71:25
company 44:25
compel 61:12,20
  62:8
compensation
  36:22 37:20
compensatory
  28:23,24 29:2,7
competentory
  28:23

competitive 27:4
complaining
  21:18 77:23
complaint 22:12
  28:20 38:18 55:21
  95:9 98:10
complete 31:4
  34:12
completely 27:13
  33:9 49:5 79:16
comply 22:6
comprehensive
  13:11
comprise 37:3
compulsory 74:1
computation 20:7
  20:13 21:9 22:3
  22:22 23:13 24:9
  27:14 36:12 40:4
computer 25:11
  25:17
concede 84:2
concern 51:25
  52:17 76:11
concerned 71:6
concluded 41:2
  99:17
conclusion 17:9
  84:7
condition 19:5
conduct 33:20
  47:4 71:7,8,9,19
  96:16,17
conducted 54:3
confer 51:16
conference 53:5
confirm 66:1
conflicts 42:12
confusion 60:17
  60:19
connected 19:10
connection 18:13
  18:15,19 22:5

24:20 88:5
**connectivity**
13:12 17:8
**consider** 13:4
51:21 52:8 61:2
**considerably** 72:5
**considered** 37:9
95:10
**consistent** 20:9
38:5 39:14 55:23
84:1,23 86:8 95:7
95:12 97:23
**constitute** 71:8
74:7,11
**construe** 97:17
**consumer** 66:7
**contemplated**
91:14
**contemplates** 51:2
**contemporaneous**
45:24
**contempt** 24:17
24:20,25 25:5
30:16 38:9 41:16
70:14 96:3,14,15
**contend** 36:20
**contends** 27:3
65:1
**content** 56:5
61:17
**contention** 32:6
69:3
**contents** 18:16,24
94:7,9
**contest** 30:19
**context** 15:20
26:15 45:11 46:14
73:23 75:17 76:7
76:9
**continuance** 47:1
70:11 73:10 100:6
**continue** 68:23
69:7,9 70:7 71:2

87:20,25
**contract** 12:25
19:19 37:23
**contractual** 17:14
**contrary** 15:18
82:9,9
**convenient** 9:19
**conveniently**
18:25
**conversation**
85:18
**convince** 27:12
**copy** 10:1
**copying** 19:2
23:12
**corners** 97:1
**corp** 71:22
**corporate** 12:17
14:7,16,23,24
15:2,14 16:1 18:8
**corporation** 14:10
14:11,17,20 15:16
**correct** 16:1 31:19
34:5,8 37:7 42:18
61:9,24 67:22
68:12 74:3 75:12
79:21 81:23 97:9
**correctly** 12:10
47:16
**correspondence**
77:12
**cost** 25:17 27:2
34:6 35:16
**couched** 77:9
**could've** 76:11
83:21 85:11
**counsel** 22:16
42:12 64:8 91:3
**counsel's** 18:6
**counsel's** 89:24
**count** 7:11 22:9
30:10 45:3 69:1
72:12,20,21 76:20

77:4 83:5 86:3
**counterclaims**
74:1
**country** 101:21
**counts** 7:5,7 11:4
50:23,24 51:18
52:5,6,18 68:25
73:14,15,20,21
80:19 83:6,25
84:1,3,5,11 85:1,1
85:5 87:5
**couple** 26:23
67:17 78:15,17
87:11 92:24
**course** 25:14
59:21 64:14 73:22
83:24 84:15 93:24
**court** 1:1 2:1 7:2
7:17 8:5,8,13,20
9:1,3,6,11,15,18
9:19,21,23 10:1,3
10:6,9,11,14,18
11:1,7,10,13
12:11,13,19 13:4
13:10 14:10,18
15:6,11,18,19,24
15:25 16:7,17,20
17:13,18,23 18:2
18:10 19:1,3,4
20:1 22:11,16,18
23:2,3,18,25 24:3
24:7,14,15,16,23
25:1,1,2,3,4,12,22
26:14,20 27:17
28:1 29:4,22 30:2
30:6,9,14,21 31:6
31:9,15,20 32:18
33:1,7,16,23 34:5
34:11,18,20,24
35:6,8,17 36:15
38:20,25 39:15
40:2,19 41:10,13
41:21,25 42:6,9

42:15,19,24 43:5
43:14,24 44:10,22
44:24 45:14,17,24
46:9,12,17,24
47:10,14,15,25
48:4,15,17,19
49:3,7,11,17,20
50:8,11,15 51:5,7
51:15,19,21 52:12
52:14,16 53:1,9
53:15,17 54:10,11
54:17,20,22 55:11
55:15,22 56:3,4
56:10,13,15,18,21
56:24 57:1,6,25
59:4,13,20,25
60:3,13,22 61:2,4
61:10,25 62:1,3,9
62:15,22 63:4,10
63:12,17,19 64:14
64:24 65:16,22,23
66:6,12,18,25
67:5,9,12,15 68:1
68:5,7,9,16,18,22
68:23,24 69:4,6,6
69:8,13,15 70:1,5
70:9,12,21,23
71:4 72:1,7,14
73:6,9,22 74:4,16
74:19,23,25 75:4
75:12,16 76:2,5,9
76:14,22 77:5,15
77:17,18 78:1,4,6
78:9,19,25 79:11
79:18,20 80:6,10
80:14,14,15,17,22
81:1,4,7,9,16,21
81:21,24 82:4,5,8
82:11,16,22,25
83:2,7,8,15,15,24
84:5,11,13,22
85:3,8,10,12,15
85:19,23 86:3,9

86:16,18,24 87:10
87:14,20 88:2,18
88:21,22 89:1,15
89:18,23,25 90:4
90:7,12,14,17,20
90:25 91:5,9,13
91:16,18,20,23,25
92:5,12,21,24
93:3,7,12,15,21
93:23,25 94:2,2,4
94:6,12,13,20,24
94:25 95:2,16,20
95:23 96:6,9,13
97:4,7,8,15,20,24
98:3,8,10,13,17
98:20,20,24 99:5
99:11,15,15
**court's** 7:9 9:7,12
60:6,10,11 62:6,7
**courthouse** 10:10
10:12
**courtroom** 7:13
**courts** 29:18
91:20
**court's** 45:7 67:18
77:11,12 83:11,11
84:16,23 87:4
88:16,24 91:3
93:1
**cover** 29:19 30:25
35:9 67:19 77:10
**covered** 9:13 14:4
17:21 18:5 20:4
29:11,16 43:16
71:10
**covering** 95:13
**covid** 7:14
**created** 41:11,12
**credit** 28:4
**creditors** 5:2 72:3
97:12
**credits** 18:13,19
18:20 19:14 21:14

25:10 26:7
**criminal** 38:9
**cross** 13:23 19:22
28:18 33:20 46:19
46:22 47:9 58:1
88:15 92:11
**crosstalk** 22:1
**crystal** 14:14 38:6
83:24 85:24,25
**cull** 84:21
**cumulative** 27:10
**curriculum** 68:14
89:5,11
**customer** 18:13
27:11 60:16,19,25
**customer's** 17:8
**customers** 13:12
13:15 17:2,5
18:14,19 27:3,12
61:1 69:21 70:19
70:20 72:12,23,25
78:3 87:19
**cut** 84:22 86:12
86:19

**d**

**d** 2:22 7:1 40:7
90:2 91:18 100:1
**daily** 11:7 57:14
**damage** 21:22,23
22:22,23 23:17,25
24:10 25:4 27:24
30:19 31:13 35:4
35:7 36:24 37:21
43:12 47:1 75:5,9
76:25 80:20 81:10
83:8
**damages** 20:8,14
21:9,10 22:10,14
22:19 24:9,12,20
26:16 27:20 28:25
29:3,6,12,15,19
30:4,6 31:2,25
37:7,10,19 38:19

39:19 40:5 42:3
44:4,5,8 45:11,12
74:8 76:21,21
83:5 92:15
**data** 18:20 57:11
57:14,22 65:9,17
**database** 25:11
**date** 81:15 101:25
**dates** 31:7
**day** 15:24 21:5
32:12 36:3 81:19
87:13
**days** 23:18,21,24
49:8,8 80:24
82:23 87:11
**deal** 47:18 91:13
92:6,7
**dealt** 46:14
**debtor** 1:10 71:15
71:15
**debtors** 13:9
16:14
**december** 21:25
23:18 24:2 27:15
30:8 59:25 60:4
61:10,25 62:11
**decide** 73:20 78:7
96:13
**decided** 21:16
32:10 59:13 94:15
**deciding** 61:2
98:12
**decision** 59:20,22
76:3 83:3,12
84:16,17 87:4,11
94:14 97:23
**declaration** 8:25
9:5,20,24 10:4
11:11 12:10 16:16
28:10,17 34:25
35:9 43:21 47:25
54:14 57:23 75:15
89:3 91:24 92:2

**defendant** 15:2
86:17 98:14 99:13
**defendant's** 53:7
**defendants** 1:16
8:10 9:4,21 11:15
11:21 12:3 16:15
73:18 84:10
**defendant's** 40:7
40:16
**delivered** 10:8,9
**demand** 39:18
**demonstrate**
60:18
**demonstrates**
97:4
**demonstrative**
19:21
**denied** 30:9 68:23
69:7 93:4 100:6
**deny** 78:12
**depend** 74:6
**depending** 48:8
49:4 50:20 52:21
75:19
**depends** 52:24
**depose** 16:1,4
23:22 24:6 28:1,5
28:8 43:22 47:2
**deposed** 27:18
28:3 32:3
**deposition** 11:21
12:8 14:23 15:3,9
16:6 26:3 33:20
38:21 39:7 47:4,5
48:10 49:1
**depositions** 36:7
**describes** 37:25
**designate** 14:20
**designated** 12:17
**despite** 13:14
16:25
**destruction** 60:25

**determination** 29:9
**determine** 52:5 73:23 76:6
**determined** 24:18 25:6 94:8
**determining** 29:6 45:6 73:23
**didn't** 28:5,8,9,20 31:22 32:16 34:2 34:13 41:4 42:5 73:24 79:16 82:7 82:7,11,19 83:10 84:25 86:2,14 93:17
**difference** 40:15 73:19 99:6
**different** 27:9,13 32:23 37:17 66:14 72:5 76:7 77:21 83:4 87:16
**diligence** 96:5
**diligently** 7:15
**direct** 9:1 89:3
**directing** 57:9
**directly** 65:15
**disclose** 20:19 29:24 31:16
**disclosed** 20:16 21:13,21,22 23:24 26:3 28:6 31:3,3 31:10 35:19 36:6 36:7
**disclosure** 22:2,4 27:16 36:1
**disclosures** 84:1
**disconnection** 18:15 19:10
**discounts** 27:11
**discovery** 19:9 20:6 21:25 22:5 23:16,20,22 25:13 26:11 31:4,18

34:12 36:1 41:18 42:1,2 47:19 62:12 79:9 80:1
**discrete** 71:19
**discuss** 66:24
**discussed** 19:17 28:4 40:9 67:13 92:14
**discussion** 38:21 59:10 67:7
**disgorgement** 40:5,15
**dismiss** 30:10
**dispatch** 71:17
**dispute** 37:4,6
**disregard** 94:6
**disseminating** 44:20
**distancing** 66:4
**distinctive** 44:8
**distinctly** 39:11
**distortion** 22:1
**district** 1:2 15:13 15:13 25:3 40:2 51:19 66:4 85:3
**divest** 22:11
**docket** 16:16 40:9 42:20,25 43:7 70:25 84:13
**document** 19:21 25:9 32:11,11 36:20 39:15,17 41:11 42:5 44:16 47:6 52:23 53:22 54:15 55:16 59:1 59:7,24 64:2 66:15 79:4,20,23 79:25
**documents** 14:8 20:11,14 21:3 22:4 23:12,23 24:5 25:10 28:19 31:21,24,25 32:4

32:5,8,12 33:17 33:18 37:1 39:19 39:20,23 41:4 42:2 43:9 47:2 50:1 51:1 53:6,10 54:1,18 55:14 91:2
**doe** 94:15
**doesn't** 28:15 30:22,23 33:8 66:7 76:5 77:7,10 86:3 95:20 96:9
**doggone** 35:22
**doing** 53:2 80:15 85:12
**dollar** 19:14 38:7 72:17
**dollars** 25:18 73:1 73:1
**don't** 26:21 29:19 30:21,25 33:3,17 33:19 35:9 36:17 38:12 41:17 42:14 43:14 44:11,22 45:20 46:7,9 47:12,23 48:20 65:18,25 66:19,22 70:1 75:7 76:20 76:23 77:17 78:7 80:11 81:12 83:7 86:5,6 88:6,7,21 90:2 91:13 92:6 93:7,8 94:25 97:5 99:1
**double** 59:2,24 60:3,12
**doubt** 38:10 44:22 45:7 74:1
**douglas** 4:9
**drain** 2:22 7:3
**dramatically** 84:21

**draw** 17:9,16 84:7
**drawing** 96:3
**dreamed** 24:11
**dumping** 32:24
**duplicates** 19:2,7
**duplicative** 65:3

## e

**e** 2:21,21 4:1,1 7:1 7:1 20:21 100:1 101:1
**e.d.n.y.** 40:8
**earlier** 10:14 20:9 91:11
**early** 24:21 81:14
**easier** 40:10 56:17
**eastern** 40:2
**ecf** 87:13
**economics** 89:7 89:20
**ecro** 2:25
**education** 89:10
**effort** 22:25
**eight** 8:13,16,18
**either** 26:14 30:22 39:3
**electronically** 10:2
**element** 61:1 90:1
**elements** 7:7
**email** 10:16,16,21 11:5 15:22 16:8 18:2 65:23 79:7 79:12,13,16 80:2 82:24 83:1,2 84:16 87:5 91:2 93:3
**emailed** 22:16 65:21 80:1 93:8 93:10
**emails** 80:4
**emergency** 10:19
**employees** 14:13

enabled 7:15
encapsulate 73:12
ended 80:1
engage 97:6
engaged 96:17
enter 86:1,2
entered 8:22
  23:25 24:1 25:10
  79:1 81:21 82:8
  83:3,15 84:17,24
  85:7 86:1
enters 84:23
entire 71:1
entirely 27:9
entirety 13:17
  15:15
entitled 14:12
  22:13 33:8 34:14
  36:25,25 37:1
  41:19
entry 45:18 73:14
equitable 7:11
  29:10,14,14,23,25
  31:13 40:4 70:13
  71:5 75:18 77:19
eric 6:12
essence 45:22
  88:12
establish 70:13
established 88:3
  89:25
establishes 14:7
estate 72:2,3
estimate 34:6
estopped 73:21
estoppel 73:24
  74:4,7,10,11 75:1
  75:21 76:10 88:12
  88:14
estops 73:4
et 1:12,15 3:2,2
  7:4

eve 93:4
event 11:1
everybody 27:5
  56:17
everybody's
  59:15
everybody's
  37:13
evidence 8:22,25
  12:6 18:17 19:16
  20:22 21:1 36:21
  39:9 40:18 49:13
  50:20 54:7,23
  56:16 58:4,9,14
  58:23 60:5,7,20
  61:7,9,15,21,21
  61:22,23 62:18,24
  63:25 64:23 69:4
  69:24 71:18 72:21
  77:21 78:23 79:1
  87:18 95:1 98:23
evidenced 32:6
  39:23
evidences 36:20
evidential 95:13
evidentiary 23:13
  92:1,11
exact 28:19 36:10
  39:24 59:24 69:24
  69:24 75:14 81:15
exactly 15:14
  16:22 28:13 53:2
  77:22
examination 19:2
  33:21 46:11 47:9
examine 12:12
  13:24 28:18 57:19
  80:13 88:15
examined 7:16
  19:1,23
example 15:2
  37:15 54:13

excel 65:19,21,24
exception 42:14
  68:19
exceptional 37:15
  37:22
exceptions 67:16
  67:17
exchange 70:10
exchanges 33:15
exclude 69:4
excluded 13:5
excuse 24:2 26:22
  28:23 30:12 59:3
exhibit 8:9,13
  9:24,25 19:13
  22:12,12 44:14
  50:2,4,12,15,24
  51:10,13,22 52:21
  53:11,14,25 54:2
  54:24,24 55:4,21
  56:4,7,9,15,22
  57:3,6,7,10,11,12
  57:13,17,17 58:11
  58:13,13 60:2
  62:17,19,23,25
  63:1,12 64:13,25
  65:2,10,11 66:8
  68:21 78:20,23
  79:1,2,3,3 84:20
  87:6 89:5,12
exhibits 8:7,11,14
  8:22 49:13,22
  50:13,18,22 51:9
  51:17,18 52:2,4
  52:11,18,20,23
  53:7,20 54:9,25
  55:1,1,2,2,3,3,5,5
  55:6,7,8,9 58:3,8
  58:22 59:7 60:8
  61:6 63:8,8,15,24
  64:22,22,23 68:8
  68:18 78:17 83:20
  83:21 87:9 93:23

93:24 95:19
exist 28:20 42:5
  69:6
expect 51:1,3
expected 40:17
expenses 40:24
experience 45:8
  89:11
expert 27:6,22
  56:11 70:18 76:19
  76:19 86:20 88:23
  89:6,12,14,15,17
  89:18 90:9,13,15
  90:21 91:19,21
expertise 45:5
experts 27:25
  81:12 83:19 86:21
explain 48:20
  70:18 94:18
explained 24:16
  62:2
explanation 20:8
  78:16
explore 16:5
expressed 69:2
expressly 60:11
extent 23:4 51:22
  62:1 74:6
extra 74:2
extraneous 96:1

**f**

f 2:21 101:1
f.2d 29:1
f.2d. 71:22
f.3d. 71:25 95:17
face 27:1
faced 47:1
fact 13:14 14:4
  17:1 19:22,23,23
  25:1 33:4 70:4
  71:3,21 72:22
  73:13,17,18,19
  74:13 78:2,2,6

86:15,17 87:18
90:21 94:16 95:12
95:13,23 97:21
99:7
**facts** 19:24 69:25
73:16 74:12 88:9
94:17 96:1 98:15
**factual** 87:18,21
87:22
**fails** 20:20
**failure** 20:19,23
20:25 22:21 41:3
61:19
**fairly** 72:15
**fallback** 31:16
**false** 27:1 96:18
96:21
**falsely** 56:7
**far** 7:22 28:19
71:5 77:19 98:20
**fastest** 55:18
**favor** 75:20
**february** 22:16
75:7 81:9 83:1,2
84:9,16
**federal** 12:6 19:16
29:22 61:15,18,19
**fee** 38:13 40:23
42:25 43:2,24
44:2,3 45:3,8
67:11,20 68:10,13
**feed** 8:1
**fees** 22:15 36:4,4
36:5,22 37:7,14
37:16,19,20,21
38:4,22 39:20
43:11,13,15 44:4
48:1,5 55:6,8
**feet** 52:3
**field** 89:6,16,20
**fifth** 15:12
**fight** 25:20

**figure** 20:5 24:10
25:23 30:20 31:2
35:19 77:4
**file** 16:13 79:24
**filed** 10:22,25
11:3 13:10 14:5
16:13 42:20,25
43:1 54:9 83:19
**filing** 21:23
**final** 73:15
**find** 72:22
**finding** 24:1 60:6
96:3
**findings** 72:17
73:2
**fine** 13:2 29:7
42:4 48:19 56:16
58:19,19 91:11
92:12,12
**finish** 78:18 80:5
**firm** 42:16 68:19
**first** 13:16 23:9
24:11 26:23 27:14
66:14 70:10 73:9
73:10 79:23 80:16
97:11 99:6
**five** 67:5
**fly** 40:19 47:24
48:6
**focus** 29:4
**focusing** 51:7
**foerster** 5:1
**folks** 33:10
**follow** 30:21
32:21 39:5,7,15
39:17 79:16
**following** 11:20
**follows** 13:9 20:19
29:2 61:15
**footprint** 27:4
**forbidden** 97:2
**foregoing** 101:3

**form** 38:4 79:24
**formality** 49:16
**format** 65:7
**formulas** 21:4
**forward** 47:20
71:17 79:12
**found** 89:14 96:17
96:18
**foundation** 11:19
12:4 14:1 15:1,5
18:6,8 19:16
**foundational**
54:12
**four** 67:4 97:1
**fourth** 87:24
**frank** 25:2 53:19
**frankly** 29:6
30:21 74:12 82:5
83:14
**fraud** 69:16
**fre** 90:22
**free** 27:3,5 28:4
**freely** 84:1
**friday** 9:7 11:3
**friend** 64:3
**frivolous** 17:12
28:21 54:20
**front** 32:24 82:21
86:6
**frustrating** 52:15
**fully** 29:16
**fundamentally**
83:4
**further** 27:1

## g

**g** 7:1
**gained** 16:5 45:5
**gather** 16:21 43:2
**general** 39:18
71:19
**geographic** 27:5
**getting** 70:9

**give** 14:9 17:4
23:15 25:8 39:8
52:3 72:19 90:5
**given** 26:7 46:25
48:23 77:4 81:19
93:4
**giving** 27:24
**glad** 11:10
**gm.pdf** 66:7
**go** 9:22 10:6 11:11
14:8 15:4 23:9
31:1 38:25 47:20
51:16 52:4 53:5
53:20 54:2,10,18
62:15 63:5 77:7
91:8
**goes** 9:10 24:10
53:9 96:1
**going** 7:16 11:7
18:17,18 24:21
32:17 34:24 35:25
38:11,12 39:4
40:20 44:17 46:5
47:11,13,19 48:4
48:22 51:21 53:18
53:25 54:21 62:16
63:5 66:10 68:19
70:12 74:4 78:8
80:7,8 81:7,9,13
81:17 82:6 86:25
87:7,8,15 91:22
92:1 98:13
**good** 7:2 8:3,5
11:6 30:5 35:11
60:25 70:15,16
**goosey** 25:3
**governed** 24:25
**governs** 67:8
**grace** 6:10
**graded** 32:13
**granted** 23:19
**great** 10:3

greer 5:7
ground 29:19
grounds 13:6,19
  17:6 59:24
guess 9:12 32:22
  35:2 38:1 47:20
  53:1 59:2,14 95:3
  96:1
guidance 14:22
  64:4 91:1 93:2
guided 38:17
gypsum 95:17

**h**

h 8:25
hadn't 34:7
half 26:12 92:7
hand 8:1 33:7
  93:4
handed 40:1
happened 34:12
  76:22
happy 9:17,19
  15:23 24:22 34:17
  41:7 50:17 52:10
  53:4,15 55:17
  60:8 64:8 91:16
  98:19,22 99:9
hard 7:24 10:1
  46:23
harm 21:1 23:4
  24:18 32:1,8
  36:20,21,23 39:9
  71:6,16,18
harmed 23:7
  31:25 32:7
harmless 20:24
harms 72:3
hate 92:23
haven't 32:7
  35:23,23,24,24
  37:4 43:9
havoc 60:24

he'll 57:23
hear 40:21
heard 30:1
hearing 3:1 7:24
  20:23 30:9 70:10
  84:9 85:16
hearsay 13:23
  14:1,6 43:23 44:2
  45:10 52:21 59:1
  59:2,24 60:3,12
  60:12,21 67:17
  91:20
heck 53:7
held 60:12,20
here's 77:3 84:8
he'll 28:18
he's 28:12,17 46:5
  76:6 87:15 89:13
  89:14,18 90:9,11
  90:22 91:7
high 52:3
higher 26:11 36:9
hockett 6:15
holding 73:25
  88:13
holdings 1:8,12
  3:2 7:4 69:20
holohan 6:19
hon 2:22
honor 8:3,12,19
  8:23,23 9:4,9,25
  10:5,10,13,17
  11:6,9,12,14 13:2
  13:8,16 14:2,15
  14:19 15:7 16:2
  16:12 17:25 18:3
  18:4 19:20 20:13
  20:18 21:7,8,21
  21:22 22:2,9,25
  23:14 24:5,13,22
  25:2,21 26:18,22
  27:19 28:6,12,24
  29:20,25 30:8

31:5,11,19,22,23
32:9 34:2,16,19
34:23 35:5,12,13
36:21 37:12 38:17
38:24 39:23,25
40:2,10,13,14
41:8,20,24 42:17
42:18,23 43:3,4
43:23 44:1,9,15
46:8,11,16,22
47:6,22 48:14,25
49:6,10,12,18,24
50:5,17 51:19
52:13,21,22 53:4
53:16,18 54:24,25
55:7,13,17 56:12
56:14,25 57:7,20
57:24 58:5,20
59:3,6,9 61:8 62:5
62:11 63:7,21,22
63:22 64:16 65:14
66:2,3,10,17
68:17,21 69:19
70:3,8,17,25
72:13,16 73:8
74:3,9,18 75:23
76:4,8,12,18
78:14 79:4,16
80:5,9,12,25 81:6
81:8 82:2,18 83:1
83:18,23 84:9
85:14,17,22,24,25
86:4 87:12,18
88:19 89:2,4 90:8
90:16,19,24 91:8
91:12 92:3,4,20
92:22,23 93:11,19
94:4,11,23 95:6
95:19 96:5,12
97:3,19,22,23
98:5,9,22 99:4,8,9
99:14

honor's 52:9
hope 7:3
hoping 55:18
host 50:13
hour 45:20 46:15
  53:2 92:7
hours 10:21,24
  35:22 36:7,14
  39:4,12,14 40:24
  44:18 45:19
house 36:5
hundred 21:16
  24:16 51:11 89:14
hurtado 6:6
hyde 3:25 101:3,8

**i**

i.e. 29:14
idea 30:18 65:4
identified 22:18
  32:2 50:18 51:11
  51:12 54:14 56:7
identify 9:20
  20:14,20 42:12
identities 13:15
  17:1,5
identity 17:10
iii 26:15,15 29:11
  40:4 92:15
illinois 15:13
important 37:12
impossible 26:6
  84:6
inadmissible 14:6
inadvertently
  79:8
inapplicable 21:8
inclined 62:1
include 22:3,3
  71:9 84:25 86:14
  86:20 97:13
included 50:25
includes 36:5
  92:16

including 22:18
29:17 78:11
incorporate 30:17
30:18
incorrect 14:2
17:7 57:21
incredible 21:21
22:10
incredibly 85:18
incumbent 71:16
incurred 44:19
indicate 8:1
indicated 69:1
indicating 71:18
indiscernible
48:12,18 49:23
50:14,15 56:21,22
64:13
inequitable 71:7
inequitably 71:14
inferences 17:14
information 20:15
20:20,22 25:17
32:21 56:19 57:3
76:21
injured 29:3
injury 37:20
39:23
inquire 68:2
inquiry 9:13
insert 69:24
inspection 23:12
instructed 9:1
30:14 53:3
instructions 49:20
instructive 29:21
intellectual 89:8
intend 36:4 87:17
94:25
intended 73:12
intent 69:1
interim 43:2

interlocutory
60:6
internal 35:15
interpreting
26:15
interrupt 51:5
intervening 23:21
23:24 83:6
introduced 97:20
introduction 7:21
invoices 42:12
67:23
involve 22:10
29:22
involved 29:21
irrelevant 25:4
isn't 76:16 81:17
83:9
issue 13:6 30:8
37:13 38:17 42:7
60:4 61:24 66:13
68:22 69:22,23
73:13 74:5 75:3,5
78:2,3,6 79:14
80:3 87:18,22
92:18 96:4,16
issued 81:17 83:8
issues 21:14 22:17
22:19,19 46:14
47:17 68:25 69:4
69:5,20 70:4 71:3
72:5 74:22 75:1,7
81:19 83:3 92:1
92:11 94:23 95:13
96:1
it'll 60:5
iteration 87:25
it's 27:13 29:11
29:13,16 30:2
33:1,6,9,11,11,12
35:7 36:9,13,24
37:22,25 38:12
39:4 40:9,10

41:14 43:24,25
44:11 45:15 66:13
67:6,9 68:9,10
69:8,9,15 72:24
73:19 75:16,16,17
77:16,21 78:1,2,4
78:6,7 79:18,22
79:22 80:23 81:12
84:6,11,12 85:5
85:25 86:6 87:16
87:22 88:3,6,13
88:21 93:19 95:1
95:16,18 98:21
i'd 31:7 35:3,3
70:16 78:17 90:25
92:9,19
i'll 34:22 37:7
39:23 40:20 41:20
66:23 79:15 80:4
i'm 27:17 28:1
29:4,23 30:2,7
31:6 34:2,5,13
38:24 41:3,4,7
42:24 45:14 46:10
66:10,22 68:8
70:9,22 72:6,8
75:23 77:3 78:8
79:12,15,19,21,24
80:2 82:13 83:11
87:15 90:5 94:20
97:8,15 98:13,19
98:22,24 99:9
i've 29:21,23,25
35:21 39:25

**j**

january 85:18
jarocz 64:9
jarosz 6:4 27:6
56:11 69:1 72:8
75:14,22,25 76:18
77:13 80:8,13,18
80:21 81:17 82:12
82:17 83:9 86:22

86:23,25 87:7
88:22 89:3,6
90:21 91:4,6
jarosz's 68:14
74:7 77:2 83:22
91:14 92:2
jeffrey 6:3 8:25
16:16
jocelyn 5:7
john 4:18 6:4
75:14 94:15
joint 8:9,11,14,22
50:4 51:10 53:14
53:25 54:2 58:11
58:13,13 63:8,12
judge 2:23 7:3
96:22
judgment 21:24
22:6,14 23:19
24:1,2 32:13 36:2
36:23 37:15 38:13
44:3 59:9,11,16
60:5 62:13 73:15
74:15
judicata 73:14
judicial 42:21
43:5 55:22,23,25
56:1,5 62:20
64:15 68:6,7
93:13,15,17,18
94:1,18 95:15,18
97:4,24 98:6
judicially 95:12
juris 24:16
jury 22:11 38:8,9
38:14,15
justification
20:25
justified 20:24
justifies 73:2
justin 6:11
justus 4:10

**k**

**k** 30:11,11,12,13
**kamin** 81:12 84:2
86:22 87:20
**kardos** 81:12 84:2
86:22 87:21
**kat** 6:16
**kattan** 4:3
**katten** 68:19
**keep** 34:24 84:10
**keeps** 36:8 39:18
**kept** 39:11
**keys** 37:16
**kind** 22:23 36:23
37:12 38:5
**kingston** 4:18
8:12 9:4,9,12,17
10:5,7,10,13,17
10:20 11:6,8,12
11:13,14 13:2,8
14:4,18 15:20,21
16:2,19,22 17:25
18:3 20:3 21:20
22:2 23:14 24:4
25:21 26:20,21
27:19 28:3,15,22
29:20 30:5,7 31:5
31:23 34:19,25
35:1,13,18 36:19
37:11 39:6,22
40:14 41:23 42:10
42:11,17,22 43:4
43:8,20 44:1,15
45:7,16 46:7,10
46:16,21,25 47:13
47:22 48:3,11,13
48:16,18 50:5,9
50:10,14,17 51:6
51:11,17 52:9,15
52:17,20 53:4,12
55:13,17 56:4,12
56:22 57:2,7,8,12
58:5,10,16,19,24

59:14 60:1 61:8
62:5,19,25 63:1,3
63:7,11,14,18,20
64:1,8,14,24
65:12,19 66:19,21
66:22 67:1,4,11
67:18,22,25 68:4
68:12,14,15,17,21
69:11,14,18 70:3
70:6,25 72:6 74:5
74:9,17,20,24
75:3,5,13,22 76:4
76:8,12,18 77:11
77:16,25 78:5,22
78:24 79:12,13,15
79:19 80:4,12,17
80:25 81:3,6,8
82:1,5,13,18,24
83:1,23 84:8,19
85:14,17,22,24
86:4,10,17,21
87:1,17 88:2,16
89:24 90:18 92:1
92:3,9,22 93:10
93:13,19,23 94:4
94:20,23 95:6,25
96:8,9,12 97:10
97:19,22 98:5,9
98:12,16,19,22
99:4,8,13
**knew** 13:15 17:1,4
**know** 7:25 9:10
9:11 17:10 18:18
28:7 32:16 33:3
33:11,19 40:17
42:14 43:1,14
47:12,13,20,20
48:6 52:7,13,14
53:2 55:15 63:4
64:2,3,10 65:20
65:22,24 66:19
80:11 84:24 88:6
92:6 93:5,21 99:5

**knowledge** 12:1
12:10,12,16 13:18
13:20 14:17 15:16
15:17 16:3,5,24
17:4 19:25
**knows** 19:23 33:5
66:2
**kristen** 4:19
**kristin** 6:7

**l**

**l** 40:7
**label** 8:14
**laid** 32:16 34:9
**langston** 39:3
**langston's** 39:7
**language** 25:3
29:5 39:24 70:5,7
84:8,25 97:11
**lanham** 37:16
69:22 71:8,12
74:8 75:6,10,14
75:16,21 76:9,16
76:16,22,25 77:3
77:22 81:10 83:8
**large** 49:18 52:23
**lasted** 26:6
**late** 9:7 81:14
**launched** 26:5
32:10
**laurence** 6:14
**law** 14:6,13 26:14
29:8 36:5 42:15
77:19 95:11 99:6
**laws** 89:9
**lawyer** 45:21
**laying** 25:25
**learn** 12:18 99:5
**learned** 12:18
15:17
**leave** 49:12 96:24
**leaving** 69:21
**ledanski** 3:25
101:3,8

**left** 80:22 87:6
88:20
**legal** 29:15,22
35:16 36:5,14
77:21,22 78:1
88:8 94:21 95:4
95:13 96:6,10
97:8,9,17 101:20
**legion** 96:23
**legitimate** 47:7
49:22
**lengthy** 41:18
**letter** 80:24 81:1,3
82:3,6,10,15,22
83:12,14 87:10
**letting** 45:10,10
**let's** 30:25 46:3,9
70:5 88:24 94:11
**lieu** 8:25 15:9
**limine** 9:7,10,14
9:16,18 10:8 14:5
14:22 16:10,13,15
20:5 32:2 40:11
46:13
**line** 9:10,10 11:22
11:22 86:5,6
100:4
**lines** 84:14 86:7
**list** 11:15 13:11,13
16:24 49:19,25
50:2,3,18,22,23
50:25 51:1,3,3,18
53:14,21 54:1
55:19 58:14 83:19
84:20,22 87:3,6,7
91:21
**listed** 83:19
**lists** 52:11 53:6
83:21
**literally** 52:3 78:6
**little** 36:13 46:22
57:17

live 15:9 22:20
llp 4:3,13 5:1
location 27:5
lockhart 6:7
lodged 27:23
logical 17:9
logistics 35:2
long 11:4 21:24
  23:16,20 24:4
  32:4 62:12 76:5
  85:17
look 13:24 14:8
  17:3 21:2 29:4
  31:7 33:8 36:25
  37:3 40:19 44:23
  45:1,17 47:7
  51:18,21 64:11
  65:16 66:8 77:2
  77:18 78:8 79:15
  87:14 88:2 96:1
  97:15
looked 13:25
looking 36:22
  38:19 45:5,8,9
  55:20 95:21
lookout 88:6
looks 44:23 65:3
  65:17 67:20 68:10
loosey 25:3
lose 78:3
loss 25:6 72:25
  89:8,21
lost 69:21,23
  70:19,19,20 72:12
  72:22,24 87:19
lot 52:20,21 53:7
  53:15 56:17 66:9
louis 4:16
low 21:17,19
lucia 6:6

**m**

m 40:7
madison 4:5
main 94:15
maintain 27:12
  67:21
maintains 61:14
making 37:13
  54:16 59:18,19
  85:19 96:11
man 48:12 64:13
marc 76:24
march 50:25 75:8
  81:15 83:12,13
  84:17
marie 6:9
marshall 73:25
material 23:13
  52:18 97:3
mathematical
  36:12
matter 1:6 36:6
  39:2 42:19 46:2
  51:22 52:1,2
  54:19 55:24 56:2
  56:6 59:12 60:18
  62:21 72:22 87:15
  95:10,11,12,14
  97:25
matters 7:25
  72:20 78:2
mean 23:4 30:23
  32:14,18,19,25
  33:3,8,23,25 34:2
  34:20 40:21 41:14
  43:6 44:22 48:13
  48:20,21 49:20
  50:9 58:2 60:7
  62:4 64:14 70:9
  73:9 77:17 80:22
  88:2 92:5 96:22
meaning 40:6

measures 48:1,5
mechanism 26:9
meet 51:16
memo 81:17 83:3
memorandum
  82:14,14,19 84:17
  87:11
merely 72:3
michael 4:10 6:8
mid 81:14
million 25:23 26:4
  26:11,24,25 27:2
  27:10,14 28:3,5,8
  28:9,14,15 30:19
  31:9,10,12 33:8
  33:11,12,14,15
  34:3,6 35:4 41:8
  47:1,3,23
millions 73:1
minds 96:25
mineola 101:23
mineworkers
  24:15
minor 72:25
minutes 21:23
  51:12 78:16 80:11
  87:16 92:24
mis 78:11
misconduct 69:16
  69:18
misled 76:15 84:4
  88:5
misrepresentation
  69:16 70:2 77:6
missed 93:8
missing 68:13
  83:18
misspoke 82:19
mistake 69:18
mistaken 8:15
  58:12 60:1 81:4
misunderstand
  87:6

misunderstood
  57:10
mo 4:16
momentarily
  39:24
monday 9:8 11:4
  28:11
monetary 89:8,21
money 26:1 34:9
  34:20 69:20
month 22:4 36:1
  81:16,25
months 27:3,4
  28:4
mooted 85:3
morning 7:2 8:3,5
  80:5 90:25 92:8
morrison 5:1
motion 9:6,10,13
  9:16,18 10:7,19
  10:20,22,23 11:3
  14:5,22 16:10,15
  20:4,23 21:24
  22:6 30:9 32:2,23
  38:9 40:11,21
  41:16 46:13 59:10
  68:23 69:2,7,9,9
  69:11 70:7,10
  71:2,10 73:10
  76:13 77:6,9
  78:13 85:2 87:25
  93:13,15,16,19,21
  95:15,19 100:6
motions 16:13
move 8:6,11,24
  13:3 18:10 46:4,9
  49:13,16 50:1
  54:7,23 61:12,19
  62:8 63:15 78:22
  89:2
moved 58:14
muchin 4:3 68:19

**mulligan** 6:11 81:20
**multiple** 57:4
**multiplication** 36:13
**muslim** 6:17

**n**

**n** 4:1 7:1 100:1 101:1
**name** 14:11 40:7
**narrative** 83:17
**narrow** 11:15 81:19 92:14
**national** 28:25
**native** 65:7,20
**nature** 31:13 37:17 71:19 87:8
**necessarily** 41:22 73:20
**necessary** 43:11 47:2 49:1
**need** 13:7 16:18 18:7 29:19 43:12 44:11 45:20 46:18 47:5 48:20 49:13 50:11 55:15 57:18 81:12 93:5 95:25
**needs** 12:18
**neither** 15:10 61:18 74:5
**never** 18:21 20:5 20:7,7,10 23:23 24:6,19 25:7 28:6 28:10 29:23 30:1 35:18,19,20 37:8 38:16 39:4 43:22 50:6 54:1,8 57:15 57:19 60:20 72:2 84:4 89:14 98:17
**new** 1:2 4:6 5:4 15:13 28:25 40:2
**night** 92:25 93:17

**nino** 6:5
**ninth** 71:13,23
**non** 45:11,11
**nonpersons** 30:14
**normally** 40:21 41:16
**north** 38:1,7
**northern** 15:13
**nos** 8:9
**note** 30:8
**notes** 58:17
**notice** 10:15 11:3 27:24 30:19 42:21 43:5 55:22,23,25 56:1,5 62:20 64:15 68:6,7 93:14,15,17,18 94:1,18 95:15,19 97:4,16,25 98:6 99:1
**noticed** 95:12
**notices** 12:11
**notifying** 10:23 97:12
**notion** 37:9
**number** 23:5,25 24:6 26:2,8,10,12 26:24,25 27:2,10 27:14 28:6,8,9,19 29:22 32:17 34:3 35:15,23,24,24 36:7,8,25 40:9 44:7 45:3 47:1 49:18 51:12 52:23 55:14 58:13 64:2 65:5,6 72:12,23 97:10
**numbers** 25:7 35:25 78:16
**numerous** 83:21
**ny** 2:3 4:6 5:4 101:23

**o**

**o** 2:21 7:1 40:7 101:1
**oath** 54:14
**object** 9:4,21 11:15 16:12 19:15 51:20 56:8 57:2 58:24 59:2 61:8 65:4 66:23 67:11 67:19 90:2
**objected** 59:23,23
**objection** 8:10,12 11:19 13:19 14:1 14:3,15 16:9,14 16:14 17:12 18:6 20:2,3,4 27:23 35:13,14 49:22 52:7 54:8,19 55:11,16 58:5,6,6 58:6,7,21,21 59:8 59:12,25 62:2,19 62:25 63:20,21,21 63:22,23,23 64:15 64:16,16,17,17,17 64:18,18,19,19,19 64:20,20,20,21,25 67:4,5,13,21,25 68:4,5,7,9,15 78:24 90:19 93:5 94:19
**objections** 9:13,22 11:15 18:5 19:17 49:15,25 50:12 51:8 52:16 53:21 54:1,9,12,16 91:14
**obligated** 32:20
**obligation** 32:18
**obligations** 11:18 12:21
**obtained** 13:21,21 13:22

**obviated** 84:15
**obvious** 40:15 56:1
**obviously** 22:22 23:22 27:7 46:17 47:12 56:5 68:2 73:15 91:1
**october** 79:6,7 80:2
**odd** 51:12
**offer** 64:4,8 75:14 86:19 91:22 98:23
**offered** 23:6 60:22 90:22 91:19 94:21
**offering** 19:5 44:12 51:14 94:21 95:4,7
**office** 11:7
**official** 5:2
**oh** 63:20 91:10 93:15
**okay** 7:2,3 9:3,15 9:23 10:3 11:10 13:4 15:25 16:7 16:18 17:23,25 20:3 23:2 24:7 31:9,20 32:18 34:18,24,24 40:20 41:10,21 42:9,22 43:5 44:15 45:16 46:12,17 48:17 49:11,17 53:17 54:11,22 55:11 56:3,13,24 57:1 57:25 61:4 62:3 62:15 63:10,17,19 66:6,6,18,25 68:16 69:13 70:1 70:23 72:14 73:22 74:19 78:19,25 79:11,18 80:6 88:18 89:1,23 90:7,17,20 91:7

91:13,23 92:12
93:12,15 99:11,12
**old** 51:2 101:21
**omnibus** 16:10
**once** 84:5,22
86:11,11,11
**ones** 16:21 49:25
53:24 60:14
**open** 73:13
**opened** 18:14
**opining** 77:3
**opinion** 74:2 77:2
77:7 78:9,10
80:18 81:17 82:14
82:14,20,25 83:9
86:3,5,8 88:11
90:10 98:11
**opportunity**
15:25 21:2 31:17
36:10 54:4
**opposed** 26:16
34:21 36:23 43:12
96:7
**opposing** 69:17
91:2
**opposition** 21:24
22:5 36:2 70:7
71:1 92:17,18
**order** 14:9 19:4
61:17 77:11 81:21
81:22 82:8,9,11
82:13,16,19 83:15
83:16 84:23,23,25
85:6 86:1,1,2,2,8
86:11,12,13,14
96:15,24 97:1,11
**organization**
28:25
**original** 61:16
**originals** 19:1,7
**outcome** 82:7
**outset** 8:6

**overarching**
24:11
**overlap** 74:12
**overlapping**
56:20
**overruled** 20:1
59:8,11,25 67:15
**owned** 94:15

**p**

**p** 4:1,1 7:1
**page** 14:14 37:13
40:10 65:17,17
66:14 70:11 73:13
79:4,23,25 86:3,5
92:25 93:19 100:4
**pages** 11:4,21
16:10 93:17
**pale** 78:12
**paper** 13:22,25
14:11 17:3 21:3
35:20,21 37:3
39:8
**paragraph** 11:16
11:17 12:11,15
13:8,17 16:23
17:22 18:4,4,11
18:12 19:15 22:11
22:13 25:23,24,25
26:2,23 27:9 28:5
31:1 35:14 38:18
42:11 65:10
**paragraphs** 18:11
42:9
**parentheses** 41:12
**parroted** 27:6
**part** 9:9,17 23:6
29:6 41:15 42:25
50:24 59:17,21
62:9 88:23
**partial** 23:19 24:1
24:1 74:14,14
**partially** 14:24

**participating** 7:17
**particular** 89:21
**particularly** 89:7
**parties** 7:14,17,22
8:7 18:9 19:3
30:17 50:2 52:10
53:6 75:8 76:23
76:23
**parties'** 75:9
76:25
**party** 20:20,21
29:3 69:17
**patrick** 6:19
**pay** 44:25
**penal** 37:16,22
38:13 43:13 44:3
**penalty** 36:24
38:11 42:20 45:13
**pending** 51:19
**people** 13:22 14:8
14:12 26:18 52:2
**percent** 21:16
**performance** 12:5
**performed** 11:17
12:20
**period** 79:9 83:18
**perjury** 42:20
**permit** 15:5
**persist** 54:16
**person** 10:9 13:24
14:20 24:18 66:2
66:16 84:7
**personal** 11:25
12:9,12,16 13:18
13:20 16:3
**personnel** 36:6
**pertaining** 42:2
**pertains** 51:22
52:18
**petitions** 13:10
**photograph** 61:16
**photographs**
18:25

**phrase** 80:19
**piece** 13:25 14:11
42:22 83:17
**pieces** 13:22 21:3
35:20,21 37:3
39:8
**place** 19:3 98:25
**plains** 2:3
**plaintiff** 15:4
40:16 43:17 68:24
84:25 86:7 89:4
**plaintiff's** 15:2
22:12 54:23,24,25
55:1,1,2,3,3,4,4,5
55:6,7,7,9 56:15
57:10,11,12,13
58:3,8,22 59:7
61:6 62:17,23
63:8,14,24 64:22
65:10,10
**plaintiffs** 1:13 4:4
7:23 8:4,10,24
14:22 15:5 18:7
19:13 22:12,21
32:6 43:21 50:20
61:12 69:5,21
73:16 74:21 75:13
78:3 87:17,19
**plaintiff's** 27:15
38:18 78:23 79:1
79:3 83:4 89:5,11
97:12 98:14
**plan** 55:10,10
68:6
**plaza** 4:15
**pleading** 55:25
56:6 59:21 93:1
97:25 98:3,3,14
**pleadings** 55:14
95:7,9 98:4,6
**please** 8:1 30:2
**pm** 99:18

point 16:20 22:8
23:4,9 25:22
26:22,23 28:2
33:4 34:14 35:11
36:10 37:11 42:1
45:2,18 46:4,8
48:7 52:9 59:17
59:19 66:6,15
71:4,5 73:6 74:2
75:23 77:5,7,23
77:25 85:20 88:1
88:10 92:14 98:21
pointed 14:7
pointing 70:2
points 13:16
25:21 26:23
portion 40:23
81:4
portions 9:5,20
posed 38:24
position 31:12
88:17
positions 18:10
possible 53:19
55:18
post 36:23 38:13
44:3
posted 87:12
postpone 66:5
potential 74:10
power 7:10 73:23
practical 52:1
87:14
precedent 19:5
25:1 99:7
precedents 97:9
precise 30:8 60:11
precisely 97:1
preclude 16:15
prefer 34:4 47:23
56:16
preference 91:3

prejudice 71:20
74:14 75:24 76:3
prep 33:17
preparation 88:5
prepare 33:24
35:4 54:5 76:16
80:20 92:10 93:5
prepared 53:20
80:12 88:15
preparing 62:10
75:8 76:1,24
77:12 81:10 83:20
present 6:1 80:3
presented 70:17
pretty 23:1 33:4
35:22 40:14 53:10
69:22 77:16 78:10
99:9
prevents 65:8
previewed 84:16
87:5
previous 40:1
previously 68:20
pricing 27:11
primarily 71:7
printouts 94:5,16
prior 13:19 62:1
67:7
probably 51:20
67:19 91:5
problem 22:24
55:22 67:3 77:17
problems 7:14
53:22
proceed 7:15,23
30:16 46:10,18
proceeded 84:6
proceeding 3:1
7:6 9:2 21:10
24:25 30:16,23,24
83:25 84:13 89:4
89:13

proceedings 7:19
30:16 71:20 99:17
101:4
process 41:18
42:1,2 51:16 54:6
produce 19:4 32:1
32:12 33:19 34:13
34:16 37:10 39:8
39:19 65:11 68:20
produced 19:9
20:15 32:4 35:20
48:9 64:3 65:7,9
78:21 79:24
producing 26:9
27:22 40:17
production 20:10
32:5,11 57:5
65:20 79:6
professional
67:20,23
proffered 90:9
profit 40:16 69:23
profits 70:19
prohibited 27:20
27:21
project 26:6
promised 91:2
promotion 28:16
promotional 26:5
26:8 27:2 32:14
promotions 27:12
28:2 33:9
proof 22:15 38:5
38:10 92:16
proofs 72:5
proper 7:8 58:25
72:18
property 89:9
94:14
proponent 18:23
19:1,4
proportionality
72:4

propose 9:15
69:24
proposed 70:13
84:24
proposing 75:13
proscribe 96:4,16
proscribed 96:18
proscribes 96:21
protest 83:10
prove 18:24 21:15
25:7 37:1,18,21
38:12 61:17
proved 44:6
provide 13:9
15:23 17:8 18:16
18:20 20:13,20
22:22 23:17 24:5
24:22 28:8 32:20
40:24 41:8 57:18
61:13 62:8 89:12
provided 9:7
10:20,24 13:11,13
16:25 18:1,12,21
20:5,7 23:23
28:10 37:4 45:13
49:4,14 50:25
57:4,5,15,20
76:18 84:20,25
94:24
provides 14:22
61:18
providing 17:11
18:9 19:6 27:2
proving 97:11
prudence 24:16
przulj 6:5
pull 55:19
pulled 15:23
pulling 68:8
punitive 22:24
37:25 38:3,6
purport 43:21

**purports** 13:9
27:10 42:12
**purpose** 51:13
52:25 61:5 62:13
67:10 83:22 89:19
90:15,22 93:24
97:24
**purposes** 50:19,19
59:15 83:5
**pursuant** 13:13
14:20 20:6,16
37:23 76:19
**pursuing** 44:19
**put** 15:5 30:19
34:1,1,3 36:10
41:11 50:3,20
53:25 54:8 64:12
66:13 87:2,17
91:21 95:1
**putting** 15:21
65:8 97:16

**q**

**qualified** 88:23
89:10,13,17 90:9
90:21
**qualify** 90:14
**quantify** 70:20
72:2
**quantum** 72:18
**quarropas** 2:2
**question** 12:19
27:20 32:21 33:13
33:16 40:1 47:7,8
48:20 70:15,16,17
94:7 96:13,14,20
**questioned** 94:9
**questions** 39:13
47:12,18 96:13
**quicker** 55:20
**quickly** 41:17
53:14
**quite** 7:14 49:21
81:23

**r**

**r** 2:21 4:1 7:1 40:7
101:1
**raise** 8:1 68:17
**raised** 38:16
76:11
**raises** 68:22
**range** 21:13,17,19
23:10,16,17 31:2
31:3,17
**rappaport** 5:6
**raw** 57:11
**rdd** 1:3,4 3:1
**react** 83:15
**read** 40:20 49:19
76:5 78:8 93:17
**readily** 93:25 94:8
**reading** 13:21
**reads** 20:19 61:15
**ready** 46:10 83:7
87:21 91:8
**real** 25:25 34:20
**realistically** 48:9
**realize** 10:11
**really** 8:15 28:21
33:23 47:7,8 51:7
69:9,15 75:2 96:9
97:16
**reason** 7:24 41:1
79:6,21,22,25
86:16
**reasonable** 19:3
38:10 45:6,6,8
46:3,6 71:17 84:7
85:9 87:3 96:5
**reasonably** 44:19
94:9
**reasoning** 62:6,7
**reasons** 72:19
74:10 86:12
**rebut** 83:22
**rebuttal** 50:19

**recasting** 22:23
**receive** 28:9
**received** 53:13
**receiving** 13:12
**recess** 47:4
**recognized** 85:8
**recognizing** 7:22
**reconsider** 62:16
69:3 81:22
**reconsideration**
10:19
**record** 42:13,25
49:2 54:9 56:8
58:25 59:11,16,17
78:15,17 80:23
101:4
**recording** 7:18,19
61:16
**recordings** 18:25
61:11,12,13,20,22
62:4,7
**records** 14:13
36:16,18,21 40:25
41:19 42:13,15
43:25 44:11,13,13
44:18,24 45:1,23
45:24 46:6 68:2
94:2,5,12,13
**recover** 71:11
**redactions** 66:19
66:21,23
**reduced** 26:24
38:4
**refer** 16:10 29:6
98:11,13
**reference** 29:20
30:6 39:1 40:3
85:5,7 88:11
**references** 19:14
**referencing** 39:18
**referred** 69:9
**referring** 39:6
70:24

**refers** 29:12 30:3
**reflected** 44:18
**refused** 61:13
62:8
**regard** 12:22
29:14 46:13 92:1
**regarding** 75:9
76:24
**regardless** 87:22
**regular** 18:7 51:2
**regularly** 44:2
**reimburse** 29:3
**relate** 50:22
**related** 11:24 12:1
18:20 35:15 51:18
74:13 75:10 77:1
97:6
**relates** 33:10,15
66:8
**relating** 37:10
65:9
**relationship**
17:15 71:15
**relevance** 13:6
**relevant** 12:24,24
13:1 52:8 84:3
88:9
**relied** 69:6
**relief** 10:15,24
21:12 24:17 85:2
85:3,4
**remainder** 90:10
**remaining** 7:7
22:17 68:8
**remed** 21:11
**remedial** 21:12
48:1,5
**remedies** 40:5
**remedy** 7:10 25:4
29:10,14,15 70:13
**remember** 39:11
65:22 81:15

remind 49:7
reorganization 55:10 68:6
rep 14:23,24
repeat 24:8
repeatedly 91:20
report 27:6 56:11 65:12,13 70:18 76:19,20 91:14,15 91:21
reports 91:19
representation 15:3 21:20 69:7 69:19 70:4,23 78:22
representative 12:17 14:7,16 15:3,15 16:1 18:9
represented 68:24 69:5
representing 8:4
request 13:14 16:25 32:1,5 36:15,18,19 39:8 39:10,16,17,22 41:22,23 57:14 79:7,14 85:4
requested 57:4 61:11 79:25
requests 57:5
require 22:11 40:4,24 48:10 71:11,12 72:16
required 20:11,21 22:22 29:24 50:25 54:15 61:16 72:2
requirement 15:1 31:14 61:20 72:19 88:4 96:15
requirements 38:5 58:25 66:4
requires 21:9

res 73:14
reseller 11:24 12:2
respect 7:10 10:18 12:23 29:10 35:14 46:20 72:11 75:21 79:2 91:1
respond 35:4 50:17 77:13 82:6 82:7 83:13 86:24 87:21
responded 83:16
responding 86:21 86:22 95:3
response 13:18,19 18:7 32:5 40:11 59:4 68:5 73:9 75:25 82:8 83:23 87:1,2
responsibility 11:23 19:18
rest 35:9
result 45:4 71:19
results 58:11
resume 92:13
revenue 65:12
review 11:2 23:23 35:3,9 43:15 47:2 47:4
reviewable 46:1
reviewed 45:4
reviewing 35:2
richardson 6:16
rick 6:18
ridiculous 45:22 97:16 98:18
right 8:13,20 10:9 10:11,12 11:11 13:23 16:22 17:23 17:23 18:3 26:17 27:17 31:8 32:19 33:2 34:11,20 35:17 38:8 41:2

42:16,19 43:2 44:13 48:15,21 53:1 56:10 59:4 62:22 63:7 67:9 67:15 68:16 69:10 69:15 70:21,22 73:4 80:6,10,24 81:25 82:18 84:13 86:9,10 88:7 90:4 90:20 91:9,25,25 92:13 95:2,21 97:15,18 99:15
rights 36:14
risk 88:14
road 101:21
robert 2:22 6:20
rochester 4:11
rock 36:13
room 2:2 64:11 66:3
rosella 6:8
rosenman 4:3
ross 4:8 8:3,4,6,18 8:23 9:23,25 12:7 12:7,15 14:2 16:9 16:12 17:7,16,21 19:20 21:8 24:7,8 24:24 25:16 26:2 26:17 27:20 28:12 29:23 31:6,7,11 31:19,22 32:9,22 33:3,13,18 34:1,8 34:16,22 35:7,11 36:3,17 37:6 38:23 39:1,6,10 39:17,25 41:7,11 41:20,23 42:4,8 42:18 43:3 44:9 47:5,14 48:21,25 49:6,9,12,18,24 50:6 52:13 53:5 53:13,18 54:12,18 54:23 56:14,25

57:8,21 58:15,17 59:5,6,18,19 60:1 60:10,16,24 61:9 61:24 62:11 63:1 64:5 65:1,6,15,22 66:1,10,17,21,22 67:2,3,22 68:12 68:24 70:15,21 72:7,9,11,15 73:8 73:11 74:3 78:14 78:15,20 79:2,17 79:21 80:4,8,9 81:23 83:17,24 84:4,9,12,15,19 85:9,11 86:10 87:2,12,24 88:19 89:2,20 90:4,5,8 90:13,16,24 91:7 91:12,16,19,24 92:20,23 94:11 99:1
ross's 13:18 21:20 22:8
ross' 26:22 28:22
rough 72:4
roughly 46:15
routinely 29:18
rule 12:6,8 13:5 14:19,21,21 15:4 15:7 18:8,16 19:15,16 20:6,11 20:13,15,16,18,21 21:6,8 22:7,23 24:9 25:8 26:15 27:15,23 29:11,16 29:21,24 30:4,11 30:11,11,18,22,25 40:3,6 41:22 51:1 51:2 54:15,20 55:23 59:1 61:9 61:14,15,21,23,25 67:17 69:10,11 73:25 74:16,20

75:19 76:13,19
77:10 85:2 88:4
90:1,20 92:15
99:1
**ruled** 32:13 62:12
85:10,15,23 91:20
**rules** 30:23 37:17
52:24 61:17,18
**ruling** 60:10 62:1
62:11,15 67:18
72:20,20,21 81:5
**rulings** 74:6 100:3
**running** 41:14,14
41:15

**s**

**s** 4:1 7:1
**sanction** 7:8 22:24
24:10,17 25:5,5
26:16 29:11 37:25
38:4,6,13 73:2
75:20 92:16
**sanctioned** 99:2
**sanctions** 21:11
22:18 23:3 24:17
24:19 28:24 29:2
29:17 40:22 41:6
61:3 70:14 72:18
77:8,19
**sanocki** 4:19
**sat** 53:19
**satisfy** 58:25
**save** 52:12 53:15
**saying** 14:16
23:11,14,15 24:4
32:24 39:8,11
40:3 46:5 48:4
59:20 65:13 74:18
79:17 81:1,17
83:3,4,9 84:10
86:24 88:4 93:3
**says** 11:17 12:11
14:23 20:13,15
25:4 41:25 61:19

70:12,15 72:18
77:2
**scheduled** 7:5
85:8
**school** 99:6
**screen** 7:25
**se** 29:15
**sec** 40:6
**second** 14:18
15:10,11 19:15
21:13 22:8 23:1
25:2 29:2 30:10
30:12 37:24 38:6
47:15 78:12 90:6
**seconds** 88:24
**section** 7:8 30:13
71:1 96:2,18,20
97:5,18
**see** 7:3 36:15,18
47:16 51:13 52:6
53:5,10,22 65:20
83:14 88:6,7
92:10
**seeing** 7:24 16:7
30:15 65:23
**seek** 41:2
**seeking** 10:15
11:2 21:10,11
37:14,19,20
**seeks** 37:14
**seen** 19:8,12
28:10 35:23,23,24
35:25 50:6 64:10
**segment** 58:11
**self** 21:1
**send** 16:18 34:22
40:20 41:20 80:4
91:1 92:14
**sends** 99:1
**sense** 48:8,14,21
63:4 80:11 91:5
92:6 94:12 95:4
96:10

**sent** 26:19 49:24
53:21 79:7,13
82:22 87:10 93:2
**sentence** 11:16
12:20 13:5 16:23
17:6 18:16 19:15
92:16
**separate** 17:19
71:4,10 77:5,7
86:14
**separately** 10:1
53:3
**september** 11:21
12:9 13:20 26:5
32:3,10,10
**series** 67:6
**serious** 22:24
37:24
**served** 92:25 93:4
**service** 18:13,15
18:19 19:10 27:3
27:5,12
**services** 67:20
**set** 49:8
**sets** 50:12
**setting** 84:10
**seven** 52:2
**severed** 85:6,20
**severing** 85:1 86:2
**shaya** 4:11
**shocked** 53:10
**short** 10:15 11:3
47:6 81:16 88:20
**shortly** 81:11
84:19
**shouldn't** 79:14
81:10
**should've** 45:19
**show** 23:6 58:17
60:24 82:6
**showing** 10:7
71:21 72:4

**shown** 71:14 87:9
89:11
**shredl** 6:13
**side** 57:19 92:21
**sides** 16:8 53:9,13
**siena** 6:9
**significant** 73:1
77:18
**significantly**
84:22
**similar** 35:14
**similarly** 71:24
**simple** 19:25 33:4
48:19 90:8 93:16
**simply** 13:6 14:15
19:21 26:9 28:15
36:12 60:24 72:24
**single** 54:13
**site** 17:9,10
**sitting** 26:17
**situations** 43:16
**six** 30:10 52:2
56:15,16 67:5
**sixth** 15:12
**sixty** 67:4,4,5
69:14
**skype** 7:15,25
15:22
**slated** 80:18,19
83:5,9
**small** 25:19
**social** 66:3 95:13
**solutions** 7:18
99:15 101:20
**somebody** 15:5
34:22 37:14 43:22
44:7 47:2 64:11
**somewhat** 60:11
**sonya** 3:25 101:3
101:8
**sorry** 12:13 17:25
27:17 34:2 38:24
42:24 45:14 47:15

48:11,21 57:8
58:18,20 63:20
64:25 65:3,14
66:22 68:8 72:8
79:15 82:13 83:11
94:20
sort 19:20 39:21
45:13 47:17 86:19
88:3
sorts 94:17
sought 85:2
sources 94:8,10
southern 1:2
15:13
speak 34:2 43:15
45:17,20 46:3
speakers 56:20
speaking 8:2
65:14 67:1
speaks 14:10
44:25
specialty 89:21
specific 20:18
23:5 30:24 35:22
40:23 53:21 54:8
55:16,16 70:2
72:3,17 92:18
specifically 7:5,6
11:16,19 30:3
39:20 41:4 73:25
79:4 85:12,15
spectrum 11:24
12:1
spell 40:7
spend 34:10 47:8
53:1
spending 25:14
49:23
spent 39:2 45:19
45:19 46:2 95:3
99:2
spreadsheet 65:19
65:24

spreadsheets
65:21
st 4:16
stage 25:25
stamp 78:16,21
stamped 79:8,22
stamps 65:8
stand 90:11
standard 36:13
46:1 60:4 96:22
standards 75:4
87:16 88:8
stands 59:22
star 40:8
start 91:4,4,5
state 28:25 75:10
77:1
stated 29:2
statement 38:18
39:16,18 58:1
76:15
statements 67:12
states 1:1 2:1
12:15 24:14
stating 30:10,13
statues 77:1
statute 37:23
61:18,19
stay 7:9 12:22
17:24 22:14 23:8
29:18 40:22 41:17
62:1 70:14 71:9
71:10 72:8,9
75:18 77:8,20
steal 65:1
stern 73:25
steven 5:6 6:13
stipulated 53:8
stop 46:23 56:10
83:20,20
stopping 44:19

story 79:4
straightforward
20:12 33:4 72:16
95:18
street 2:2 5:3
94:15
stricken 17:6
stuck 43:19
stuff 32:24
subject 16:7 31:13
44:20 57:25
submit 12:3 86:8
86:11
submitted 8:8
10:1 40:11 45:24
72:7,9,12 86:12
86:13
submitting 45:23
subordination
7:11 29:14 70:13
71:6,21 75:19
77:19
subsection 90:1
90:11
subsections 90:1
subsequent 17:21
subsequently
13:21 62:3 66:5
substantial 37:25
38:3,5 59:10
substantially
20:24
suffered 32:8
71:16
sufficient 37:18
suggest 85:6
suggested 61:10
suggesting 43:8
suggestion 22:9
26:24 27:9 28:23
32:7
suite 101:22

sum 29:7
summarized
22:25
summary 18:16
18:17,23 19:5
21:24 22:6 23:19
24:1,2 32:13 36:1
56:13,14,18,24
57:3,10,13,13,15
57:15,16,17,17,22
59:9,11,16 60:4
62:13 64:25 65:1
74:14
summation 19:21
supplement 20:19
32:19,22 43:19
supplementing
47:19
supply 20:22
support 20:14
32:1 39:16 41:6
41:19
supported 31:21
31:24
supposed 21:6
51:15
supposedly 83:20
supreme 24:15,16
24:25 25:4 77:25
78:9
sure 12:23,25
26:18 29:23 34:14
37:13 42:11 47:11
51:6 63:2 68:22
70:21 91:7 98:11
suspicion 45:9
53:12
system 87:13

**t**

t 101:1,1
tab 41:14,14,15
56:11 66:14

table 64:4
take 31:17 42:20
 43:5 46:12 55:25
 56:1,5 64:15 76:5
 77:20 79:15 81:20
 88:24 93:18 94:1
 94:18,25 97:4,7
 97:24
taken 12:8 25:13
 52:10
talk 14:8,12,12
 17:2 22:17 27:23
 27:25 35:1 43:10
 60:8 99:9
talked 13:24 27:1
 38:23 95:8
talking 13:22 28:1
 29:17 30:3 34:21
 37:24 38:3,14,15
 44:3,4,10,21
 60:13,14,15 66:16
 75:23 82:2,2
telephonic 8:1
telephonically 4:8
 4:9,10,11,18,19
 5:6,7 6:1 7:17
tell 26:10 43:16
 46:5 53:6 55:15
 64:6 70:22 78:9
telling 86:18
 98:24
tender 88:22 89:6
 89:16,24 90:3,5,8
 90:11
tens 25:17
tenth 7:10 95:17
terence 4:8
term 94:13
terms 30:24
territories 33:10
 33:14
terry 29:1

test 13:23 21:5
 37:2,2 58:1
tested 44:6
testified 28:17
 33:5 64:9 75:24
 89:13
testify 12:4 14:16
 15:6,15 19:24
 28:13,18 44:12
 45:21 47:3 57:23
 57:23 69:2 75:25
 76:1 80:18,20
 81:7 83:6,9 87:8
 89:15 90:22
testifying 16:24
 19:22 44:18 76:6
 80:21 82:12,17
testimony 9:1
 11:20 12:5 13:9
 14:9 15:9 17:13
 19:18 33:24 43:19
 72:11 74:7 75:14
 83:22 84:2 86:20
 87:8 89:3,12
 91:24
thank 8:23 10:3
 11:12 63:3 90:24
 91:12 99:4
thankful 26:13
thanking 21:18
that's 27:22 28:13
 28:17 29:7 31:8
 31:19 32:14,15
 33:4 35:11 37:7
 38:8 40:6,10
 41:21 42:4,18,19
 42:19 44:25 66:12
 67:15,22 70:15,16
 71:4,10,22 73:16
 73:18 74:3,16,17
 75:12 76:2,2,3
 77:5,5,6,6,17 79:9
 84:6,11,13 85:15

85:19 86:14 92:5
 92:12,12 95:20
 97:8,22 98:18
there'd 75:1
there's 35:15
 36:21 37:4,12
 39:4,15 40:14
 42:6 44:23 66:8
 69:3 70:10 71:1
 72:19 76:10 84:10
 86:16 87:3 92:18
 93:23 94:23 96:12
 96:14 97:10
they'd 33:18
they're 33:7,25
 37:8 38:19 41:18
 42:25 43:1,6,19
 44:4,8,11 45:11
 45:12,12 46:1,2,6
 67:15,23,23 68:1
 88:13 94:4,5,5
 95:7
they've 39:5
 45:22 69:1 89:25
thing 19:12 88:20
 88:21 92:25 97:11
things 23:15
 33:11 46:18,19
 47:18 54:5 59:15
 93:25 97:10
think 10:12 15:23
 16:19 18:4,5 20:3
 20:12 21:15 23:10
 25:24 29:20 31:8
 33:24 35:11,14,21
 36:19 37:12 39:6
 39:22 41:18 45:2
 46:10 47:4,14,22
 48:13,20,23 49:1
 51:24 52:9 53:18
 54:4,6 55:13 57:8
 57:9 59:1,14 60:1
 60:2,3,4 64:24

65:18,20 67:12,13
 67:18 68:9 69:11
 70:16 74:9,10
 77:16 78:10 79:21
 82:24 83:12 84:20
 88:6,16 92:9 93:3
 93:8 98:12 99:5
thinking 60:2
thinks 48:25
third 71:25 72:1
 87:24
thompson 4:13
 6:10
thought 10:22
 25:19 58:10,10,11
 58:12 82:5 91:9
 92:5
thousand 39:12
 39:14
thousands 25:18
 39:3
three 16:13 23:1
 27:2,4 28:4 83:2,7
ticket 78:21
tickets 18:14
 19:10 64:5
time 7:24 8:24
 19:3 26:7 34:13
 35:3,3,3,8 36:11
 36:16,18,20 37:8
 39:2 40:25 41:19
 42:15 43:15,25
 44:10,13,13,18,24
 45:1,18,23 46:23
 49:23 50:23 51:23
 51:24 52:12 53:15
 54:6 58:20 78:1,1
 80:13 83:18 88:20
 88:21,24 92:24
 95:3,21 99:2
timeline 82:21
times 36:14

timing 81:8
timing's 81:23
title 66:7
titled 71:2
today 13:7 21:11
38:2 41:15 49:9
80:7 98:25
today's 62:10
told 10:14 21:21
41:3,5 49:25
74:21 75:6,7
76:22 79:24 80:20
81:9,11 83:20
86:10
tomorrow 49:9
91:1,3,10 92:7
total 33:14 51:23
trademark 60:19
transcribed 3:25
transcript 7:18,20
15:8 101:4
transcripts 61:10
61:21,22 62:4,13
67:7
translates 38:1
treated 37:8
triable 73:13
trial 3:3 7:5,7,13
7:15 11:4 12:18
16:15 20:17,23
21:5 22:11 24:12
28:10 32:23,25
38:8,9,14,15 49:7
50:2 51:3 54:25
54:25 55:1,2,2,3,3
55:4,4,5,6,7,8,9
56:15 57:10,11,12
57:13 59:7,15,17
60:8 62:10 65:10
65:11 73:4 75:9
76:16,17,24 78:23
79:3 81:11,18,19
83:8 84:10 85:6

86:14 87:25 88:5
89:5 93:4
trials 50:7 52:1
89:14
trial's 84:5
tried 27:19 29:24
81:20
trouble 18:14
19:10 64:5 78:20
true 32:8 85:5
94:1 101:4
trumps 14:21
truth 45:25,25
55:24 56:1,6
60:17 62:20 95:10
97:25
try 13:7 52:5
78:18 92:10
trying 11:14
22:21 29:4 52:19
64:25
turn 28:22 70:1,5
95:1
turned 26:12
99:16
turning 69:8
twice 47:17 71:11
two 10:21 11:8
13:16 22:10 23:15
25:21 45:19 50:12
59:14,22 68:19
72:4,5 77:18 78:7
80:24 82:23 87:16
91:2 94:23 96:1,4
type 71:11
types 21:12

**u**

u.s. 2:23 95:17
ultimately 29:10
44:24 45:25
umpteenth 37:8
unambiguous
96:24

unambiguously
96:2,16,21 97:5
uncertainty 96:24
unclear 86:13
uncomfortable
85:18
undecided 7:7
underlying 20:10
56:19 57:3 65:9
65:16 66:13
underpinning
21:4 22:4
understand 18:6
23:3,5,10 28:15
29:16 31:15 34:13
35:6,8 41:16 42:6
44:15 46:22 49:4
50:8,11 63:13
66:15 88:16 89:24
understanding
59:16 90:2,18
understood 59:17
83:21 85:11 87:4
95:2
undertaken 34:7
unequivocal
74:21
united 1:1 2:1
24:14,14
unknown 2:25
unlawful 89:8,22
unqualified 89:15
unreasonable
45:2
unrelated 33:9
74:12
unsecured 5:2
untestable 15:6
untimely 27:15
update 42:7
upgrades 27:11
upper 31:16

use 15:8 18:17,23
20:17,22 24:19,19
29:18 50:19,20
51:2,3,3 73:3
88:24
useful 88:19

**v**

v 1:14 3:2 7:4
24:14 29:1 40:6,7
73:25
valuable 88:21
92:25
value 11:24 12:1
33:19
var 11:18 12:5,21
13:13
verify 93:25 95:21
veritext 101:20
version 26:25
versus 95:17
victim 24:19 25:6
view 75:20 95:19
violated 22:14
violation 7:9 23:8
40:22 41:17 71:8
71:9 72:8,10
vitae 68:14 89:6
89:11
voluminous 18:24
19:7 57:18 65:7
65:21 66:15 79:23
95:20

**w**

wait 47:15 98:20
waiting 11:13
waived 15:1 41:2
waives 61:20
walk 9:19 55:19
98:19,22
want 28:22 33:20
34:24 42:10 43:18
46:7,18,21 47:16
47:23 49:19 52:14

57:24 68:17,22
71:5 75:22 81:14
86:6 91:13 92:7
93:2,18 95:3
97:20 98:10
**wanted** 16:23
25:13 83:14 94:6
**wants** 15:18 34:16
51:9
**wasn't** 31:2,3
**waste** 51:23,24
95:20
**wasting** 58:20
88:21
**way** 24:4 32:14
35:25 37:2,9
43:20 54:3,21,25
55:18 73:3 78:8
82:17 94:13
**we've** 14:3,5
19:12,17 21:2
54:5 62:2
**wednesday** 48:8
48:14 49:9
**week** 10:15 24:11
32:23 33:21 41:12
99:6
**weekly** 57:14
**weeks** 11:8 81:24
83:2,7
**went** 32:14
**weren't** 32:12
85:10
**werlinger** 6:12
**west** 5:3
**westgate** 71:22
**westlaw** 40:8 94:5
**we'd** 34:19 88:22
93:5
**we'll** 33:19,21
84:22 91:7 94:18
**we're** 27:24 34:17
34:21 35:10 36:25

36:25 37:1 43:8
44:10,20 68:8
69:8 81:9 86:24
91:21 94:1 95:6,7
95:9,11 96:8 97:3
97:24 98:24 99:8
**we've** 28:10 36:6
36:7 38:7,16,17
43:22 46:13,14
67:13 78:16 80:22
84:4 88:3 90:8,9
91:19,21 93:2
95:8
**what's** 29:7 37:18
43:16 45:6,6
73:12,19
**white** 2:3
**who's** 44:17
**wichita** 95:16
**willfully** 22:14
**willing** 34:9 88:22
88:25
**win000220** 78:21
**windstream** 1:8
1:12 3:1 7:4,12
11:17 12:20 13:11
17:2,3 18:12
22:13 23:7,10,15
23:16,19,24 27:13
29:9 42:14 51:9
69:20 81:20 83:10
**windstream's**
12:4 51:18
**windstream's**
35:15 42:13 80:23
82:3,10,15 83:12
83:14 92:17
**winstar** 71:24,24
**withdraw** 99:2
**withdrawing** 85:4
85:4
**withdrawn** 63:11
63:14 85:7

**witness** 17:16
18:9 19:22 20:20
20:22 24:6 27:24
28:13,16 29:24
33:5 43:10 44:12
44:17 57:22 83:4
83:19 87:3,7
88:23 90:21
**witnesses** 7:16
19:24 75:24 77:13
**woman** 65:25
**women** 29:1
**won't** 67:14
**word** 24:19,20
29:19 73:4 97:13
**work** 7:22 36:6
**worth** 27:7
**worthless** 27:7
**wouldn't** 32:20
41:1 74:11 80:3
80:16,21
**wreaked** 60:25
**write** 44:7
**writing** 61:16
**writings** 18:24
19:7 57:18
**wrong** 28:12 34:5
79:21 84:11 85:20

**x**

**x** 1:5,11,17 45:18
100:1

**y**

**yeah** 34:19 42:6,8
43:8 46:24 48:13
50:10 52:20 55:13
64:1,14 65:3
68:15 79:15 82:4
90:18 91:10 93:21
**year** 26:6
**years** 24:16 50:6
**york** 1:2 4:6 5:4
15:13 28:25 40:2

**you'd** 32:23 35:8
76:15 88:10
**you'll** 66:16 99:2
**you're** 36:22
37:19,19,24 38:3
38:11,12,14,14
44:3,4,7 45:9,10
45:10,14 68:12
70:2,24 76:14
77:7,23 82:2,18
86:18 88:4,25
94:13 95:23 96:6
96:11 97:17
**you've** 37:20 43:6
80:22

**z**

**zero** 19:13,14
54:4 56:15,16
**zip** 79:24

1   UNITED STATES BANKRUPTCY COURT

2   SOUTHERN DISTRICT OF NEW YORK

3   Case No. 19-22312-rdd

4   Adv. Case No. 19-08246-rdd

5   - - - - - - - - - - - - - - - - - - - - - - - - - - - x

6   In the Matter of:

7

8   WINDSTREAM HOLDINGS, INC.,

9

10          Debtor.

11  - - - - - - - - - - - - - - - - - - - - - - - - - - - x

12  WINDSTREAM HOLDINGS, INC., et al.,

13                  Plaintiffs,

14          v.

15  CHARTER COMMUNICATIONS INC., et al.,

16                  Defendants.

17  - - - - - - - - - - - - - - - - - - - - - - - - - - - x

18

19

20

21

22

23

24

25

1          United States Bankruptcy Court

2          300 Quarropas Street, Room 248

3          White Plains, NY 10601

4

5          April 28, 2020

6          10:05 AM

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21   B E F O R E :

22   HON ROBERT D. DRAIN

23   U.S. BANKRUPTCY JUDGE

24

25   ECRO:   UNKNOWN

1   HEARING re Adversary proceeding: 19-08246-rdd Windstream

2   Holdings, Inc., et al. v. Charter Communications, Inc.

3   et al Trial

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25   Transcribed by:  Sonya Ledanski Hyde

1    A P P E A R A N C E S :

2

3    KATTAN MUCHIN ROSENMAN LLP

4         Attorneys for Plaintiffs

5         575 Madison Avenue

6         New York, NY, 10022

7

8    BY:  TERENCE ROSS (TELEPHONICALLY)

9         DOUGLAS BAYLIS (TELEPHONICALLY)

10        MICHAEL JUSTUS (TELEPHONICALLY)

11        SHAYA ROCHESTER (TELEPHONICALLY)

12

13   THOMPSON COBURN LLP

14        Attorneys for Charter Communications

15        One US Bank Plaza

16        St. Louis, MO 63101

17

18   BY:  JOHN KINGSTON (TELEPHONICALLY)

19        KRISTEN SANOCKI (TELEPHONICALLY)

20

21

22

23

24

25

1    THOMPSON COBURN

2        Attorney for Charter Communications

3        One US Bank Plaza, Suite 2700

4        St. Louis, MO 63101

5

6    BY:  MICHAEL NEPPLE (TELEPHONICALLY)

7

8    MORRISON FOERSTER LLP

9        Attorneys for Official Committee of Unsecured Creditors

10       250 West 55th Street

11       New York, NY 10019

12

13   BY:  STEVEN RAPPAPORT (TELEPHONICALLY)

14        JOCELYN GREER (TELEPHONICALLY)

15

16   ALSO PRESENT TELEPHONICALLY:

17

18   JEFFREY AUMAN

19   JOHN JAROSZ

20   NINO PRZULJ

21   ANA LUCIA HURTADO

22   KRISTIN LOCKHART

23   MICHAEL ROSELLA

24   MARIE SIENA

25   GRACE THOMPSON

1    JUSTIN MULLIGAN

2    ERIC WERLINGER

3    STEVEN SHREDL

4    LAURENCE CHRISTOPHER

5    BRIAN HOCKETT

6    KAT RICHARDSON

7    AISHA AL-MUSLIM

8    RICK ARCHER

9    PATRICK HOLOHAN

10   ROBERT BORDERS

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Loading...

P R O C E E D I N G S

1

2          THE COURT:  Okay, good morning.  This is

3    Windstream Holdings, Inc., et al., v. Charter

4    Communications, Inc. and Charter Communications Operating,

5    LLC.  It's the second day of the scheduled trial on counts 6

6    and 7 in the Plaintiff's complaint.

7          So, I've received the briefing that the parties

8    provided overnight in my request.  I don't know whether the

9    information that I asked be provided to Charter's counsel

10   yesterday was, in fact, provided and, if so, when.

11         MR. ROSS:  Yes, Your Honor, this is Mr. Ross on

12   behalf of the Plaintiffs.  We sent to Charter yesterday

13   evening the email in which -- from back in October in which

14   they request that we provided Exhibit 61.  We also provided

15   them the chart of the internal legal spend that's referenced

16   in paragraph 21 of Mr. Auman's declaration.  We sent Charter

17   the customer credit document, which is referenced in

18   paragraph 14 of Mr. Auman's declaration.  And we sent

19   Charter a spreadsheet for the $4 million that is referenced

20   in paragraph 15 of Mr. Auman's declaration.  Those were all

21   done at various times between 4 o'clock and 6 o'clock, I

22   think, last night.

23         THE COURT:  Okay.  Why don't we take these in

24   order?  As far as the email and Exhibit 61 is concerned,

25   does the -- does Charter still object to the admission of

1    that exhibit?

2             MR. NEPPLE:  Yes, Judge, we do.  This is Mike

3    Nepple for the record, for Thompson Coburn.  Yes, Judge, we

4    do.  What we can tell from what has been produced to us is

5    the one-page cover summary document from the October

6    production that Mr. Ross mentioned to the Court yesterday.

7    I do not see and we do not see, and we have checked for an

8    Excel Spreadsheet supporting that.  He is accurate that

9    Exhibit 60 produced the Excel Spreadsheets for connections

10   and disconnections, but we do not see any production for

11   Exhibit 61, which is what's at issue for the Court, and we

12   do object to that because they did not produce it.  That

13   does not comply with Rule 26.  So we move to strike that

14   category of damages.

15            THE COURT:  I thought 61 was the summary of 60.

16   It's not?

17            MR. NEPPLE:  There is a one-page -- it is not.

18   There's a one-page...  60 is additions and disconnect, 61 is

19   different, Judge.

20            THE COURT:  What's it a summary of?

21            MR. NEPPLE:  61 is purportedly -- I've got it --

22   it's purportedly directed to the loss-profit calculation

23   which would include profit margins and that sort of data.

24   There is a one-page summary.  I will give that to

25   Windstream.  But there is no underlying Excel Spreadsheet

1    that would support that, which does not comply with the

2    Requirement Rule 26, which requires the supporting

3    documentation.

4            THE COURT:  Okay.

5            MR. ROSS:  So, I'll repeat.  We don't believe it's

6    a summary.  It's a factual issue you can ask the witness

7    about.  This is something that they asked for.  We provided

8    it to them prior to the end of discovery and they had time

9    to examine the expert witness on it.  It's just that simple.

10           THE COURT:  Why is it -- remind -- why is it not a

11   summary?

12           MR. ROSS:  So, it is...  It's not being offered as

13   a summary, it's being offered as facts, is the short answer.

14   The longer answer is this, and I said this yesterday:  We no

15   longer live in a world in which a certain type of report is

16   printed every day, every month, every quarter.  Data is put

17   into software packages by Oracle and SAP and others in bits

18   and bytes, and then you can ask it to print out that data.

19   There's way to give the underlying data without letting

20   opposing counsel come in and troll through our entire set of

21   financial records online, which is where it gets kept.

22           So, this issue comes up commonly in court.  Where

23   there's actually an issue, a court will order a limited

24   inspection of the underlying database, something they did

25   not seek.  They never followed up and asked for more

1    information here.  But this is what it is.  You can tell a

2    computer to slice and dice all the data in there any way you

3    want, and then that becomes the data, the report printed

4    out.  It is not a summary.

5              MR. NEPPLE:  Judge, if I may respond?  Sorry, I

6    didn't meant to interrupt.

7              MR. ROSS:  I'm sorry, I paused for a second so I

8    could turn and look at the document.  So, no problem, Mr.

9    Nepple.

10             MR. NEPPLE:  Thank you.

11             MR. ROSS:  So, if you look at this, the first line

12   is recurring expenses -- revenue.  That would constitute

13   every check.  Your Honor's still there?  That would

14   constitute every check.  And by check I mean, physical check

15   or payment online that was received from a customer.  Are we

16   expected to produce a copy of every check we received during

17   the month of January 2019?

18             On the expense side, we have every expense.  So,

19   are we expected to produce every invoice that came in during

20   that month?  Of course not.  No court has ever required

21   that.

22             MR. NEPPLE:  If I can respond briefly, Judge.

23             THE COURT:  Okay.

24             MR. NEPPLE:  Rule 26 requires -- Rule 26 requires

25   when you -- the supporting documents, not just the summary -

1   - and this is more than a summary.  That was admitted by Mr.

2   Ross when he told the Court yesterday that they produced the

3   underlying Excel Spreadsheet that supports 61.  It is now

4   clear that they have not produced the underlying Excel

5   Sheet.  And what is present on Exhibit 61 is a one-page

6   document -- and I have sent this and the other two documents

7   that they produced last night to the Court for its

8   inspection to the chamber's email address.  It's a simple

9   one-page document.  There's nothing supporting it.  They

10  could've produced documents that support each of these

11  categories.  I'm not asking for a granular level "give us

12  every check you have."

13          But this one-page document does not comply with

14  Rule 26, it does not allow Charter to cross-examine the

15  witness effectively, it's not consistent with the spirit of

16  the discovery rules, and simply, what else can we do?  We

17  asked for it, they produced it, that's all they produced.

18  Their responsibility is to produce it under Rule 26.

19          MR. ROSS:  So, Your Honor, if I may just respond?

20  That's incorrect.  We said yesterday Rule 26 doesn't apply

21  to any form of calculation for equitable relief.  We sent

22  the Court last night a short email memo on this that's

23  clear.  For this proceeding, all the relief that's being

24  sought is equitable in nature and therefore not subject to

25  Rule 26(a)(1)(a)(iii).  And so the argument about 26 is

1    simply wrong.

2          Second, there's no intermediate step here.

3    There's the granular data.  All the checks, all the

4    invoices.  And then somebody pushed a button and said, tell

5    me what that was.  This is what gets created.  It is life in

6    the modern age that the federal rules don't strictly

7    contemplate.  There are no journals of accounts that can be

8    produced, there are no ledgers showing Check 37 was received

9    in the amount of $21 on such-and-such a date.

10          That's the supporting data he appears to want.

11    And if we had produced that, he would've been complaining

12    that they can't go through all that because it's impossible

13    to go through it.  It would be millions of pages of data.

14          THE COURT:  Do you have the instruction as to what

15    was given to produce this document, to generate it?

16          MR. ROSS:  We produced the email that encompasses

17    --

18          THE COURT:  No, I'm not being clear.  Not the

19    request by Charter's counsel to provide the document, but

20    the instruction to the computer to have it be generated.

21          MR. ROSS:  I doubt -- I mean, somebody could

22    probably go into the computer system and find that

23    instruction.  I don't have that now.  If you mean the

24    instruction given to the operator who actually performed

25    this, we might be able to find that email but it will take

1    some time.

2          THE COURT:  Well, the operation -- the instruction

3    to the computer, how this is generated.  Or was it...  When

4    was this document produced to Charter?

5          MR. ROSS:  In October, prior to the end of

6    discovery.

7          THE COURT:  Okay.  All right.  And what -- I mean,

8    I guess -- I understand your argument but I don't...  What

9    we don't have is the instruction to the computer to produce

10    this document, which you're just asking everyone to rely on.

11    How are you going to lay the foundation for it, in other

12    words?

13          MR. ROSS:  Mr. Auman has already testified in his

14    declaration as to what this is, which is all that's required

15    under 901, as far as foundation is required.

16          THE COURT:  Including as to how it was generated,

17    though?

18          MR. ROSS:  No.  He could do that but that's not

19    required for foundation.  The piece that's missing here is I

20    hear nothing from the other side that suggests that other

21    than some sort of gotcha, that there's anything that

22    shouldn't come in here.  Indeed, it's being used only by the

23    expert who can rely on hearsay or documents not in evidence,

24    as long as he simply identifies what he relied upon.

25          THE COURT:  So, it's only being used for the

1    expert?

2              MR. ROSS:  Right.

3              THE COURT:  Okay.  I will admit it then.

4              MR. ROSS:  Thank you, Judge.

5              THE COURT:  Okay.

6              MR. ROSS:  So, there was one other housekeeping

7    matter Your Honor asked us last night to -- and I am almost

8    positive chambers was copied on this.  But we did send out

9    the safe harbor notice the Court requested.  We did receive

10   an email response from Charter, which I also think the Court

11   was copied on -- I'm almost positive the Court was copied

12   on.  And because it wasn't a totally withdrawal, we

13   submitted this morning what has now been filed as Adversary

14   Docket Number 309, which is our objection to their motion

15   for a finding of facts.  And so that's been complied with.

16   All the -- so, I believe that completes the list that we had

17   of all the things the Court asked us to do yesterday

18   afternoon.

19             THE COURT:  Okay.  Well, let's go back to the

20   provision of the underlying records, which I guess would be

21   produced under 26(e) with regard to the calculation of the

22   internal legal cost to Windstream described in paragraph 21

23   of Mr. Auman's declaration as well as the approximate total

24   costs for customer upgrades, etc., in paragraph 15.

25             Those were provided, as you said, yesterday

1    afternoon.  What is the position of Charter at this point on

2    that information?

3              MR. NEPPLE:  Again, Judge, Mike Nepple for the

4    record.  We'll take them in the easy order, Judge.  Let's

5    talk about the alleged internal attorney time for

6    Windstream.  The first time this information has been

7    disclosed to Charter was last evening.  It was never

8    contained in an expert report, it was never --

9              THE COURT:  No, I understand.  That's what we went

10   over yesterday.  I understand that.

11             MR. NEPPLE:  Yes.  So, what I'm saying is that

12   should be excluded under Rule 26 and 37.  To produce it in

13   the middle of trial without the ability to look at that, it

14   should be excluded.  If it's not excluded, we should get a

15   continuance and a deposition because this is real money.  As

16   the Court -- I'm not talking about 5,000 yesterday -- this

17   is $400,000 that they're seeking based upon a document that

18   they produced last night for the first time in the evening.

19   How are we supposed to respond to that, Your Honor?  That

20   goes against the entire grain of the federal rules.

21             THE COURT:  How long is the document?

22             MR. NEPPLE:  11 pages, Your Honor.

23             THE COURT:  Okay.  And how many attorneys are

24   involved?

25             MR. NEPPLE:  I don't know attorneys, Judge,

1    because I don't know who the people are.  It's a PDF which

2    I've sent to the Court, which was just sent to the Court so

3    that it's in front of you.  There are a number of people

4    disclosed and there are weeks disclosed but, you know, I

5    don't know who's the attorneys, I don't know who's

6    paralegals, I don't know exactly what they were --

7              THE COURT:  Well, there are obviously a number of

8    people, right?  How many are you...

9              MR. ROSS:  Your Honor, to answer the question,

10   there are five timekeepers, three lawyers, one who was

11   minimal time...so, potentially, two lawyers, two paralegals.

12   They are identified at the bottom of the last page.

13             THE COURT:  Okay.  And as far as a deposition,

14   what would be the subject of the deposition other than

15   simply reviewing the document?

16             MR. NEPPLE:  I think it's twofold, Judge.  One

17   would be reviewing the documents not in the middle of trial.

18   There's inherent prejudice there.  And the second one would

19   be simply what we do in usual cases where attorneys' fees

20   are awarded after the fact within a 30-day filing of the

21   judgment.

22             I may look at this, I may talk to a billing expert

23   to tell me if that's reasonable, I may do some

24   investigation.  All I'm asking for is if you don't strike

25   it, which I think you should strike anyway -- it's not

1    timely.  But if you don't strike it, I think to cure the

2    prejudice you have to at least give us an opportunity to

3    look at it, do a reasonable investigation.  If we want a

4    deposition, have them produce someone.  If we don't want a

5    deposition, we'll tell them we don't want a deposition but

6    we want an opportunity to hold the record open on that issue

7    if the Court is not inclined to strike it.

8                 THE COURT:  Okay.

9                 MR. ROSS:  So, once again, Your Honor -- this is

10   Mr. Ross -- there is no requirement under Rule 26 to produce

11   this sort of computation in connection with the equitable

12   relief that's being sought here.  So, that's simply a red

13   herring.

14                THE COURT:  Okay.

15                MR. ROSS:  There's very little doubt here.  Mr.

16   Auman is the witness on this.  They can ask him these

17   questions in cross-examination.

18                THE COURT:  When was this document prepared?

19                MR. ROSS:  It was prepared last week, Your Honor,

20   and there was -- I should report there were two revisions

21   last night.  We identified a person who was not a lawyer who

22   was on here, and that's why the quantity is slightly lower

23   than was previously sought and there was apparently a

24   mistaken bill with respect to some time on July 4th that

25   never actually happened.

1            THE COURT:  All right.  And then as to the other

2    piece of information that was produced yesterday -- Mr.

3    Nepple, do you want to address that too?

4            MR. NEPPLE:  Yeah, the only piece of information,

5    Judge, that was produced was yesterday.  This is the first

6    time, yesterday evening was the first time Charter --

7            THE COURT:  I understand.  That's what we went

8    over yesterday.

9            MR. NEPPLE:  Okay.  I don't understand the Court's

10   question then, please.

11           THE COURT:  I thought you were also going to get

12   the backup for the $4,033,425 calculation in paragraph 15.

13           MR. NEPPLE:  Oh, I'm sorry, Your Honor, I didn't

14   know you had moved on from the internal attorneys' fees.

15   Yes, we got yesterday a one-page document purportedly

16   supporting their claim for $4 million, which is certainly

17   real money.  That claim is -- there are several problems

18   with that.  They blocked us on factual discovery.  They

19   would not let us take the deposition of it.

20           They put -- they asked us -- they said, hey,

21   you're only going to get this from the expert.  The expert

22   didn't know the providence of the document.  And what they

23   produced yesterday, Judge, for the first time, they had

24   claimed that they were going to have an $8 million program,

25   and for the first time yesterday evening, they produced a

1    document that says it's $4 million.  I have no idea what the

2    basis is.  Again, there's no underlying documents produced

3    for the actual spend -- the actual spend they did.  They

4    didn't update it at any point between the time it started in

5    September, discovery closed in October, up before trial --

6    this is the first time that we get this document saying, oh,

7    we've spent $4 million.

8              And it appears, Judge, it's different.  It appears

9    to us -- we don't know because we haven't cross-examined

10   anyone -- the expert didn't know.  But if you look at it,

11   the 8 million was for an advertising or a campaign to retain

12   people.  It looks like this, the 4 million is a combination.

13   The 8 million was for three-month programs, this is a

14   combination of three-month programs, one-month programs,

15   $150 credit in lieu.  We don't know how this document was

16   created, we don't know when it was created, but we do know

17   they had the information well before fact discovery closed

18   and they didn't produce it.  So, again, we move to strike

19   this category of damages or, if not, a continuance to depose

20   someone on what this document is and order them to produce

21   the underlying information.  One page -- I can't cross-

22   examine a one-page document.

23             MR. ROSS:  This is Mr. Ross and, again, almost

24   everything you just told is wrong.  They deposed Mr. Auman

25   on this in September, well before the close of discovery,

1    asked no follow-up whatsoever about it.  The document was

2    created yesterday specifically at their request.  Again,

3    this is based on data that is kept in a database.  Bits and

4    bytes.  There are no reports being created.  From time to

5    time, you could be able to query it and say, well, how far

6    have we come in the program?  This is not, as he said, some

7    sort of different thing from what Mr. Auman testified to.

8    They simply don't understand or have not reread his

9    deposition testimony.

10            He described it as a three-month program.  He did

11   not say, because he was not asked, what sorts of sub-

12   discounts are being offered here.  There were different

13   types of discounts within the program.  That's why some

14   people got a one-month because that's all they bargained

15   for.  Other people got three-month.  It did not complete

16   until the end of February, just recently, because that's how

17   long you had to run off these discounts.

18            If somebody called on December 30th, they got the

19   discount for three months still.  And so that's why this is

20   -- backup data, there is none.  There are simply raw

21   entries.  A subscriber joined.  Somebody writes that up and

22   it goes into a database.  We get charged a credit against

23   that.  Again, it's a complete misunderstanding of how

24   records and data are kept in a modern corporation, Your

25   Honor.

1          MR. NEPPLE:  Judge, if I can respond to that --

2    again, Mike Nepple for the record.  Mr. Ross just indicated

3    there's backup data -- they're kept in a database.  There

4    are conversations with people who they gave credits to.

5    We're entitled to query and test that information and that

6    evidence.  They gave credits to what?  Because of Charter?

7    We don't know.  We have no idea.  And to say that there's no

8    backup data for it and I have to take the one-page summary

9    as gospel -- "Hey, trust us, this is what we spent," it's

10   like Mr. Ross writing down "We lost $4 million.  Here you

11   go, Nepple."

12          And with respect to depositions, what was in Mr.

13   Auman's deposition, quote, page 53, line 15:  "Beyond what

14   you've already described for me related to the harm that you

15   believe Windstream has suffered, do you have any personal

16   knowledge related to Windstream's claimed damages in this

17   proceeding?" Answer:  "Mr. Ross, we've rejected this and,

18   instead, we're producing a witness on this except -- we're

19   not producing a witness on this except for the expert.  So,

20   he's not here to testify about it."

21          Let's turn to what the expert said -- Mr. Jarosz,

22   his deposition.  Page 101, lines 4-13.  "The promotional

23   campaign that you have just referenced..." -- by the way,

24   that's different than the promotional campaign they're now

25   claiming -- "...do you know whether that campaign was

1    limited to what Windstream describes as Charter exchanges or

2    whether it was in both the Charter exchanges and the non-

3    Charter exchanges?" Answer:  This is Jarosz, their purported

4    expert.  "I don't know for sure.  I wouldn't be surprised to

5    learn that it was primarily Charter exchanges.  Possibly

6    there were some non-Charter exchanges.  I don't know for

7    sure but the campaign was in response to what was happening

8    in the Charter exchanges.  That is my understanding."

9              Jarosz acted as a pass-through.  That's what he's

10   provided.  I don't know if it's either...  He can't even

11   tell if it's just in the Charter exchanges, which is

12   information -- if Mr. Ross had complied with Rule 26 and

13   provided the supporting data and not a one-page document, I

14   would have -- I would know who the customers are, what they

15   complained about.  They have a database management.  Every

16   big company has a database.  Every discussion with a client,

17   or customer, or potential is recorded somehow.  And for him

18   to say there's no information and I don't understand how big

19   corporations work is just ridiculous.

20             MR. ROSS:  So, Your Honor, this is Mr. Ross.  And,

21   again, this is grossly misstated.  The question, as you

22   heard, was about damages.  It was objectionable because that

23   witness wasn't there to present on damages.  The expert was.

24   That's expressly allowed under Rule 26.

25             THE COURT:  Okay.

1          MR. ROSS:  What he was asked about were non-damage

2     elements, promotions.  He testified on that.  As for this

3     notion that there's somehow recorded conversations of

4     customers, that's false.  I didn't say that.  I said that

5     somebody enters data as it happens into a database.  And,

6     again, the only backup is to allow somebody to troll through

7     our database, which no court has ever allowed.

8          THE COURT:  Well, but -- I want to get a couple

9     facts straight.  These calculations were not completed until

10    well after discovery ended, correct?

11         MR. ROSS:  Correct, Your Honor.

12         THE COURT:  And they're based upon an instruction

13    or a series of instructions that you say were given to

14    Windstream's computer with respect to, you know, certain

15    inputs, right?

16         MR. ROSS:  Correct, Your Honor.

17         THE COURT:  And leaving aside for the moment the

18    Rule 26 issue, there was a request for both documents,

19    including electronically stored information, and answers to

20    deposition questions of Mr. Auman -- I'm leaving aside the

21    expert -- of Mr. Auman with respect to the calculation,

22    which at the time was estimated to be, roughly, $8 million.

23    And he addressed that to some extent but did not testify as

24    to the inputs for that calculation, the specific inputs?

25    Because they were still being done?

1          MR. ROSS:  Well, they hadn't even started yet at

2     that point, Your Honor.  The offer, I believe began in

3     October.  So, there was nothing -- there was no data to

4     produce.

5          THE COURT:  All right, but he was asked about it?

6          MR. ROSS:  He was asked about it, he testified

7     everything he knew about it.

8          THE COURT:  At the time?

9          MR. ROSS:  At the time.

10          THE COURT:  All right.  So, I think -- I mean, and

11     I appreciate that this declaration was prepared on the 20th

12     of this month, and that this calculation was derived

13     probably sometime in March, but I don't see why there

14     wouldn't be an obligation to update his testimony and/or at

15     least the instructions that were given to the computer in

16     connection with the earlier discovery request other than

17     Windstream's contention that Rule 26(iii) doesn't apply.

18          MR. ROSS:  Well, I don't believe that there's an

19     obligation to update or supplement testimony.  Indeed, I

20     think that would be -- would violate a number of rules.  The

21     testimony is what it is at the date it's signed.

22          THE COURT:  No, it would be the basis, the

23     documentary basis for the $4 million figure.

24          MR. ROSS:  Right.  And there were no documents.

25          THE COURT:  But there has to be at least an

1   instruction to the computer to put this -- to spit this out.

2          MR. ROSS:  Yes, and that instruction was given by

3   Mr. Auman yesterday and he can testify to that on his cross-

4   examination.

5          THE COURT:  Well, it wasn't given yesterday.  It

6   must've been given sometime before then because his

7   declaration was signed on the 20th.

8          MR. ROSS:  Well, it was not an instruction to

9   produce this.  It was simply tell me -- ask the computer

10  what was the total number of credits we gave out.  You can

11  do something that precisely with the way these software

12  packages, data packages now work.

13         THE COURT:  Well, but...it still seems to me that

14  there's an obligation to update as far as the elements of

15  that instruction.  I mean, there was an instruction that

16  gave him the ability to estimate $8 million and --

17         MR. ROSS:  No, that was not an instruction, Your

18  Honor.  That was sort of an informal budget that they had.

19  There was never we're going to spend -- it was the max we

20  expect to spend here is 8 million.  And EBIT was clear on

21  that, that that was a budget, not an actual base itself.

22  This was -- if he would've asked for this number last week,

23  either on Thursday or Friday, he wouldn't have asked for

24  this level of detail but, you know, the earliest they

25  would've gotten them, and they'd still be in here

1    complaining, would've been last Thursday or Friday.

2          MR. NEPPLE:  Judge, if I can briefly respond, I

3    think the Court understands our concerns and the prejudice

4    inherent to Charter.  What Mr. Ross just said is that Mr.

5    Auman queried the computer or had someone query the computer

6    last week, and we just produced it yesterday.  That query

7    could've been done in September, it could've been updated in

8    October, it could've been done before discovery closed, it

9    could've been done in November, December.  And if I'm

10   getting information on that that says, this is what our

11   spend is, I pick up the phone and I call Mr. Ross and I say,

12   hey, thanks, appreciate it.  I'd like a quick depo on where

13   this is created.  But to drop it on Charter 12 hours before

14   trial is just -- it's the definition of prejudice.

15          So, we again move to strike it.  If we don't

16   strike it, we want a continuance to look at it and a

17   deposition and what the computer was queried with.

18          THE COURT:  Well, I don't think it's a Rule 26

19   issue because they didn't have -- the programs hadn't

20   started then.  At least that's what's being represented.  By

21   the time discovery was complete or the time for providing a

22   computation or the evidentiary material underlying it.

23          MR. NEPPLE:  Judge, can I briefly respond to that?

24          THE COURT:  Okay.

25          MR. NEPPLE:  Again, Mike Nepple for the record.

1    It had started.  If I'm reading the document correctly,

2    there were promotions apparently given out in September and

3    October.  Discovery closed at the end of October, so there's

4    at least, according to this document, what I know of it,

5    there was some in September and some in October.  So, I

6    think that's incorrect.

7              THE COURT:  All right.  What is your response to

8    that, Mr. Ross?

9              MR. ROSS:  None of this data would've been

10   available until a much later point in time because it is a

11   three-month program.  So, somebody could sign up in

12   September, they wouldn't start getting any credits until

13   later.  And then the credit -- and then to determine the

14   value of that, because you have to apply a churn to it.

15             So, if you look at this, that's why this has to

16   run through the end of February.  You don't know any of

17   these dollar amounts until at least the end of February.

18   You simply can't do that calculation.  This was run for the

19   first time last week -- not this document but the query was

20   run -- and this document was produced yesterday.

21             MR. NEPPLE:  Judge, I sent -- again, Mike Nepple

22   for the record -- I sent to the Court the document.  They

23   have a three-month program started in September.  September,

24   October, November, that's when it ends.  So, for Mr. Ross to

25   say, by the way, off the top of his head, that that could've

1  have been queried, I find that almost unbelievable that they

2  don't know what the spend was partially the way through in

3  September, or they don't know at the end of -- the people

4  that have been granted September, October, November credit.

5  All I do know is that should've been provided well before

6  yesterday afternoon.

7          MR. ROSS:  This is Mr. Ross.  That's just lawyer

8  argument on both sides, quite frankly.  We should put Mr.

9  Auman up.  He's been sitting here for two days now.  And let

10  them ask questions.  They don't need a deposition.  They

11  know what their questions are.  Let them ask their

12  questions.  If they want to have a day to look at this, he

13  can testify tomorrow.

14          And that's the solution.  If this were -- if we

15  weren't doing this by video trial, the way it would be done,

16  he'd be called as a witness, we'd put up this, and then they

17  would examine him.

18          MR. NEPPLE:  Again, Mike Nepple for the record.

19  If this was done as a trial in front of your court, I

20  would've moved to strike his testimony before he even got to

21  the category, because the disclosure wasn't made.  Rule 26

22  says --

23          THE COURT:  Well, you have done that, you have

24  done that.  And I was hopeful that the underlying

25  information provided to you on both categories would give me

1 a better sense of what the prejudice to Charter would be by

2 getting it when you got it, which was yesterday afternoon.

3 　　　　Perhaps I should begin with the first issue, which

4 is Windstream's contention that because what we have here is

5 a request for sanction, either under the Court's contempt

6 power, which is ultimately a power residing in equity, to

7 enforce the automatic stay under Section 362(a) of the

8 Bankruptcy Code or, alternatively, or in addition, the

9 Court's power to equitably subordinate a claim under Section

10 510(c) of the Code, that the requirement of Rule

11 26(a)(1)(A)(ii) does not apply, and that Windstream

12 therefore does not need to provide either a computation of

13 damages, which is the phrase in Romanette iii, or any

14 additional update to the discovery request made by Charter

15 during the discovery period, both for document discovery as

16 well as questions asked of the witness, Mr. Auman, regarding

17 his calculation of, at that time, an estimate of damages.

18 　　　　That was the question that has now resulted in, I

19 think, two material calculations.  One in paragraph 15 of

20 this declaration with respect to injury to Windstream as a

21 result of Charter's false advertising, and in paragraph 21,

22 the internal cost to Windstream of, approximately, $408,000

23 for internal Legal Department time.

24 　　　　As I read the deposition, Mr. Auman was instructed

25 not to get into anything pertaining to damages.  And,

1    secondly, nothing was provided in response to the document

2    request until I directed it yesterday.  The parties were

3    asked to brief this issue further and they had done so in

4    connection with Windstream's motion in limine, which the

5    Court received only on Friday, albeit that it was over 350

6    pages.  And that briefing has not yielded up any cases on

7    point as to what the drafters of the rule meant by referring

8    to each category of damages.

9              It appears to me, though, that they do not make a

10   distinction between remedies at law and remedies at equity

11   and, in fact, have stated in the commentary that the rule

12   applies to any recovery of money or claim for money.  On the

13   other hand, Windstream has provided case law which makes it

14   clear that at times at least, where a plaintiff is seeking

15   equitable relief, which may include the payment of money, it

16   does not need to comply with Rule 26(iii).

17             It does appear, though, that in those cases, the

18   relief being sought was either penal or in the nature of a

19   recovery for profits made by the Defendant, i.e.,

20   information uniquely in the Defendant's control.  Charter is

21   correct that with the exception of what has been

22   characterized by the Second Circuit and other courts as

23   light or modest nonmonetary sanctions, the Bankruptcy Courts

24   lack the power to issue penal sanctions.

25             And here, Windstream is seeking recovery for its

1    own losses, both with respect to the campaign to counter the

2    false advertising as well as the out of pocket expense

3    related to its Legal Department.  Ultimately, I'm being

4    asked to fix a number here, in other words, a dollar number.

5    And it appears to me that under that scenario, Windstream

6    should not be able to get a free pass as far as discovery

7    with regard to the calculation of that number or the

8    components of that number -- unless it's prepared to just

9    limit its request to amounts that can, in fact, be

10   calculated in compliance with the discovery rules and modest

11   or light punitive sanction.

12          If it's not prepared to do that, the issue before

13   me is whether I should grant Charter's motion and preclude

14   the introduction of any of this evidence as to the, roughly,

15   $4 million figure or the, roughly, $400,000 figure or,

16   alternatively, permit additional discovery.  I believe I

17   have the discretion to do either.

18          As to the motion in limine, this is not a clear

19   issue, as I've just outlined.  Charter did not raise the

20   issue with the Court until the eve of the trial, literally.

21   And under those circumstances, it would appear to me to be

22   unduly prejudicial to Windstream to preclude it from

23   introducing evidence on these two points.

24          On the other hand, it also appears to me that

25   Charter would be prejudiced without the opportunity, other

1    than on cross-examination of Mr. Auman at trial, to delve

2    into the components of both of these numbers that I believe

3    I'm being asked to accept as a basis for Windstream's loss

4    for violation of the automatic stay.

5           I appreciate that Windstream was not hit with a

6    request after it refused to provide backup and that that

7    request was not made of the Court under the pretrial

8    procedures that have been in place here, but it also appears

9    to me that these calculations were made after the discovery

10    cutoff period, in any event, albeit that there was an

11    outstanding request that I think needs to be supplemented.

12           So, that's my inclination here.  I'm happy to hear

13    the parties briefly on it.  But I believe there needs to be

14    more of a supplement than was provided here, and the

15    supplement was required under Rule 26(a)(1), given when

16    these calculations were made and the outstanding discovery

17    request that was made during the discovery period, and that

18    Charter should have the opportunity to look into these two

19    numbers.

20           It may well be that in doing so, Charter's request

21    will be viewed as overbroad and we can deal with that.  But

22    simply to say that Charter cannot inquire except in cross-

23    examination I believe is unduly prejudicial to it.

24           MR. ROSS:  So, Your Honor, we're happy to make Mr.

25    Auman available for a deposition.  We would request that it

1    be set for less than the seven hours provided for in the

2    federal rules for the simple reason that these are two

3    discrete topics and that --

4         THE COURT:  Well, that's clear.  It's just -- it

5    would just be on these topics, so it shouldn't be a full

6    day, I wouldn't think.  But I think there would need to be

7    some additional discovery before that deposition, at least

8    in respect of how the request was made of the computer, for

9    example.

10         MR. ROSS:  Happy to do that.  There is no

11   additional information with respect to the legal spend.

12   There are internal legal records that are privileged, just

13   as when you accept a fee application you allow us to redact

14   privileged information.  There's nothing else besides that.

15         But with respect to the query of the computer,

16   happy to provide the query that was asked, if that's the

17   information that Charter wants.

18         THE COURT:  Well, I think it's entitled to think

19   of whether it needs anything else and anything else can be

20   provided.  But I think that would be at a minimum.

21         MR. ROSS:  Just so long as we don't get a 50-page

22   document request, which would be par for the course for this

23   litigation.  The Court should make it clear that this should

24   be a discrete request and that it happen very quickly.

25         THE COURT:  I agree with both of those things.

1   You know, obviously, I'm loath to put off a trial that the

2   parties have put a lot of effort into preparing for but,

3   again, unless Charter is prepared to limit its request for

4   sanctions, I think I am being asked to fix a specific dollar

5   amount and based on my interpretation of the rule.  Albeit

6   that no court has really addressed this, I think that that

7   entitles the Defendant to inquire into that dollar amount

8   and how it was derived in discovery.

9           MR. ROSS:  That's fine with us, Your Honor.  The

10  only part of the trial that would be continued would be Mr.

11  Auman.  I think the Court should set, you know, close of

12  business Friday for this so that we can -- and we'll do the

13  rest of the witnesses on the days we have here, and any

14  other evidence that needs to be put up, and then set a day

15  as soon after Friday as possible for Mr. Auman's testimony

16  and closing argument.

17          THE COURT:  Okay.  Mr. Nepple?

18          MR. NEPPLE:  Judge, Mike Nepple for the record.  I

19  understand that the Court has denied our request to strike,

20  and I accept the Court's ruling.  I understand that the

21  Court has asked us to target and be narrow with our

22  discovery request, and I will do that.  I've got the Courts

23  admonition on that.  I appreciate the alternative relief the

24  Court has granted and will work with Mr. Ross, and I'll pick

25  up the phone and try to work this out and try to do it as

1    soon as possible.

2             THE COURT:  Okay, thank you.

3             MR. NEPPLE:  Thank you, Judge.

4             THE COURT:  I should give you also, because this

5    also pertains to Mr. Auman -- I don't know if you intend to

6    go forward with him on anything else.  There's really very

7    little else that pertains to his testimony, other than the

8    legal fees.  So, I don't know whether you want to just put

9    him off so he has one time as a witness.  To me, that

10   probably makes sense.

11            MR. ROSS:  Yes, Your Honor, I think that does make

12   sense.  We think it serves judicial economy to just do it

13   all at one time.

14            THE COURT:  Okay.  You had an outstanding request,

15   separate and apart from the request that I just ruled on,

16   that certain of the paragraphs of his declaration should be

17   stricken based on a lack of personal knowledge under Federal

18   Rule of Evidence 602.

19            I believe that the key issue here, which would

20   only really come out in his direct -- in his cross-

21   examination, rather, on the point is whether, A, he himself

22   obtained this knowledge either from his direct knowledge or

23   from discussions with others at Windstream; and, B, if it's

24   the latter, whether there's a hearsay exception.

25            In other words, the mere fact that he is a

1    30(b)(6) witness would not shield his testimony from

2    hearsay, although if he got the information from any source

3    including a Windstream employee, it would be sufficient

4    under Rule 602.  However, then the Plaintiff would have to

5    come up with an appropriate -- either argument that the

6    hearsay exception doesn't apply other than the 30(b)(6)

7    argument that I'm not accepting or, alternatively, that

8    there's an exception to the hearsay rule.

9            Windstream has argued that, in any event, Rule

10   803(6) would apply, the business records exception, to all

11   of this information.  And, obviously, that is a proper

12   exception to the hearsay rule when dealt with.  I'm sorry --

13   when established with respect to a particular piece of

14   hearsay.  And there may be other exceptions as well.

15           So, it appears to me that there's not a basis to

16   strike generally under Rule 602 but that we would deal --

17   and I'm assuming perhaps we would do it at cross or with a

18   voir dire regarding any particular item that I haven't

19   already ruled on in his declaration.  Now, that's just

20   guidance for when he will testify.

21           So, Mr. Auman, you're free to stay on the phone

22   but you're not going to be testifying today.

23           MR. AUMAN:  Yes, sir, I understand.  Thank you.

24           THE COURT:  Okay.  Very well.  So, I don't know

25   whether you want to proceed now with Mr. Jarosz, Mr. Catton

1    -- I'm sorry, Mr. Ross?

2              MR. ROSS:  Of course, Your Honor.  Mr. Jarosz

3    should testify.  We did all the preliminaries yesterday and

4    it's time for cross-examination.

5              THE COURT:  Okay.  Perhaps before he does that,

6    let me just give you the authorities for that last ruling.

7    I accept the analysis in the Union Pump Company, Case 404 F.

8    App'x 899, 907-08, (5th Cir., Dec. 16, 2010) that

9    designating someone as a Rule 30(b)(6) witness does not

10   provide a free pass as to the hearsay exception.  It's been

11   followed by a number of cases recently, including Cooley v.

12   Lincoln Electric Company, 693 F. Supp. 2d 767, 791-92 (N.D.

13   Ohio, 2010) as well as the office of 7 Moore's Federal

14   Practice, Civil at paragraph 30.25.

15             There is some suggestion that the rule is not

16   entirely clear or entirely followed by the courts.  See

17   Lister v. Hyatt Corp. 2020 U.S. District, Lexis 14802, (W.D.

18   Washington, Jan. 24, 2020), although the discussion in that

19   case really deals with instances where someone is objecting

20   to a third party who is serving as a 30(b)(6) witness or to

21   the 30(b)(6) witness being used without the hearsay

22   objections by the party on the other side.

23             But I think the logic is actually best laid out by

24   Rothstein in Federal Rules of Evidence, 3rd edition, at page

25   409 where he states, "The requirement of personal firsthand

1    knowledge should not be confused with the hearsay rule.  If

2    a witness states, 'X hit Y' but knows this only from

3    Elizabeth, he violates the personal firsthand knowledge rule

4    because the statement applies he has personal firsthand

5    knowledge, which he does not have, i.e., direct perception

6    of X hitting Y.  If the same witness in the same

7    circumstance testifies instead that Elizabeth told me X hit

8    Y, he does not violate the personal firsthand knowledge rule

9    but he may violate the hearsay rule.  He does not violate

10   the firsthand knowledge rule because he does not appear to

11   have personal firsthand knowledge direct perception of

12   anything other than Elizabeth's statement, which statement

13   he does not know firsthand personally by direct perception."

14          And, of course, as a witness for the corporation,

15   Mr. Auman would be entitled to and is expected to obtain

16   information from people within the corporation.  He then has

17   knowledge of their statements, but those statements might

18   again violate the hearsay rule unless it's established that

19   they don't violate the hearsay rule or, alternatively,

20   there's an exception.  So, that's enough on that point.

21          Why don't we proceed then to Mr. Jarosz?  And then

22   I will ask you, after you confer, about the further

23   discovery that I've directed as to when the portion of the

24   trial involving Mr. Auman would pick up again.

25          Okay, so I have Mr. Jarosz's declaration.  And I

1    believe we went through all of the items yesterday except

2    for Exhibit 61, which we dealt with today that he's

3    referring to.  So, I'm going to put you under oath, Mr.

4    Jarosz.  Would you raise your right hand, please?

5              MR. JAROSZ:  Yes.

6              THE COURT:  Okay.  Do you swear or affirm to tell

7    the truth, the whole truth and nothing but the truth, so

8    help you God?

9              MR. JAROSZ:  I do.

10              THE COURT:  And it's John C. J-A-R-O-S-Z?  You can

11    put your hand down.  That's the correct spelling?

12              MR. JAROSZ:  Yes.

13              THE COURT:  Okay.  And I have before you -- before

14    me, I'm sorry, a declaration that's intended to be your

15    direct testimony in this adversary proceeding.  It's dated

16    April 17, 2020.  It has attached to it various tabs or

17    exhibits.  Sitting here today and knowing that this would be

18    your direct testimony, is there anything that you wish to

19    change in it?

20              MR. JAROSZ:  No, sir.

21              THE COURT:  Okay.  All right.  So, I think that's

22    Mr. Kingston, right?

23              MR. KINGSTON:  Yes, Your Honor.

24              THE COURT:  You're free to cross.

25              MR. KINGSTON:  Thank you, Your Honor.

 1          CROSS EXAMINATION OF JOHN C. JAROSZ

 2     BY MR. KINGSTON:

 3     Q     Good morning, sir.  How are you today, Mr. Jarosz?

 4     A     Good morning.  Fine.  Thank you very much.

 5     Q     I'm correct your name is spelled J-A-R-O-S-Z but it's

 6     pronounced in such a fashion that it rhymes with Paris for

 7     the transcript?

 8     A     Yes, sir.

 9     Q     And you've been really patient with me when I goofed

10     that up before and I apologize in advance if I goof it up

11     again.  You were present, Mr. Jarosz, when there was some

12     discussion this morning about physical checks and bank

13     accounts?

14     A     Yes.

15     Q     Is that right, sir?

16     A     Yes.

17     Q     I'd like to start there with the discussion of physical

18     checks.  Do you have in front of you or can you put in front

19     of you a Defendant's Exhibit 128?

20     A     If you give me one moment I'll grab the binder in which

21     that is included.  I have in front of me Charter Exhibit

22     128.

23     Q     And do you see in the lower right hand corner the words

24     Kinetic Business along with the distinctive Kinetic logo?

25     A     Yes, I do.

1    Q    Okay.  And what is Defendant's Exhibit 128 caption,

2    sir?

3    A    You mean, what's the title of the document?

4    Q    Yes, sir.

5    A    It says, "Understanding Your Kinetic Business by

6    Windstream Bill" and then there's a subheading under that:

7    "Need help understanding your bill from Kinetic Business by

8    Windstream?  We're here to help!"

9    Q    And then when I look at page 128.1 kind of on the right

10   hand side, I see what looks to be a exemplar -- excuse me,

11   an exemplar of a Kinetic Business bill.  Do you see the same

12   thing, Mr. Jarosz?

13   A    That appears to be the case, yes.

14   Q    And generally, Exhibit 128 sets forth information for

15   Windstream Kinetic Business customers about what they'll see

16   to help them understand their bill.  Is that right, sir?

17   A    That appears to be the case, yes.

18   Q    Okay.  And if you -- like most bills, there's a

19   detachable pay stub at the bottom of the exemplar.  Do you

20   see that?

21   A    Yes, I do.

22   Q    Okay.  And you'll have to squint a little bit, sir, but

23   do you see to whom the physical check -- checks like those

24   that Mr. Ross was talking about this morning -- is made paid

25   out to?

1    A    Well, there's a block that has a description of whose

2    attention it should be brought to but the mailing address,

3    if that's what you're asking, appears to be associated with

4    a company called Pennsylvania ILEC Business, and then

5    there's more information under that.

6    Q    Mr. Jarosz, do you see where the perforated line would

7    be?

8    A    Oh, I'm sorry, I'm sorry.  Off to the right.  This bill

9    is supposed to be sent to Windstream and there's a P.O.

10   Box.  If that's what you're asking, I see that.

11   Q    Actually, what I'm referring to is on the exemplar bill

12   do you see where there's a line that would be sort of where

13   the perforation from where the paystub would be taken off?

14   A    Yes.

15   Q    And then immediately below that do you see where it

16   says, "Detach and return this payment slip with your check

17   payable to Windstream Pennsylvania, LLC?"

18   A    Yes, I see that.

19   Q    Okay.  And so I read that to be an instruction that

20   when you're mailing one of the physical checks, in this

21   instance, you would be mailing that physical check to

22   Windstream Pennsylvania, LLC.  Do you draw the same

23   inference, sir?

24        MR. ROSS:  I'm sorry, Your Honor, I'm going to

25   object.  He's asking the witness to speculate.  He's not

1     testifying from actual knowledge.  Also, have no foundation

2     for this document.  Also, not referenced anywhere in his

3     declaration.  This is supposed to be cross-examination.

4              THE COURT:  Okay.  How does this tie into the

5     declaration?

6              MR. KINGSTON:  It's going to go to the reliability

7     of his calculation of -- purported calculation of lost

8     customers, Your Honor.

9              THE COURT:  Well, then, Mister --

10             MR. KINGSTON:  And I think it'll be made clear as

11    I proceed, Your Honor.

12             MR. ROSS:  So, Your Honor, our objection then

13    changes to this is irrelevant.  This is relating not to the

14    consumer side of the business, but as you see there, the

15    Windstream Business, Kinetic Business, which is the

16    enterprise side of the business.

17             MR. KINGSTON:  I'm happy to move on, Your Honor.

18             THE COURT:  Okay.

19    BY MR. KINGSTON:

20    Q    If you would, turn to -- do you have in front of you

21    Exhibit 127, Mr. Jarosz?

22             MR. ROSS:  I hate to be pedantic, Your Honor, but

23    we've got three types of exhibits:  Joint exhibits,

24    Windstream trial exhibits and Charter trial exhibits.  To

25    keep the record clear I would just respectfully request that

1   we be careful and identify them as which type.  So, I think

2   Mr. Kingston means Charter exhibit, but I think the record

3   needs to show this.

4           MR. KINGSTON:  Mr. Ross' point is well taken, Your

5   Honor, and I will endeavor to be more specific.

6   BY MR. KINGSTON:

7   Q    Mr. Jarosz, can you take out Defendant's Exhibit 127?

8   A    I have that in front of me.

9   Q    And is that an explanation for customers seeking to

10  understand their Kinetic by Windstream Bill?

11  A    I don't know for sure but the title of the document

12  appears to be "Need help understanding your bill from

13  Kinetic by Windstream?  We're here to help!" So, it seems to

14  me that this is a description of what the bill might look

15  like.

16  Q    Okay.  And if you look above the paystub on the

17  exemplar bill on Exhibit 127, that indicates that the check

18  should be made payable to Windstream Georgia Communications,

19  LLC, does it not, sir?

20  A    Yes.

21  Q    And so it looks like there are four ways in which one

22  can pay Windstream Georgia Communications, LLC, according to

23  this bill:  One could pay online, one could pay in person,

24  one could send a check by mail, or one could pay by phone.

25  Do your read it the same way, sir?

1    A    Yes, I do.

2              MR. ROSS:  Your Honor, I'm going to object to

3    these questions.  They call for speculation by the witness

4    on a document he's not aware of and has never seen before.

5              THE COURT:  Well, I mean, it's Windstream's

6    document.  I'd be speculating too but it's Windstream's

7    document.

8              MR. ROSS:  There's no question about that, Your

9    Honor, but normalizing --

10             THE COURT:  So, I'm assuming that Mr. Kingston is

11   asking these questions just to set up a question that Mr.

12   Jarosz actually can testify to.

13             MR. KINGSTON:  Yes, Your Honor.

14             THE COURT:  So, you can go ahead, Mr. Kingston.

15             MR. KINGSTON:  Thank you, Your Honor.

16   BY MR. KINGSTON:

17   Q    Actually, Mr. Jarosz, you can turn, if you would now,

18   to Defendant's Exhibit 129.

19   A    I'm there.

20   Q    Okay.  And just for the record, Defendant's Exhibit 129

21   is an 18-page document that purports to be a corporate

22   monthly operating report in the proceeding 19-22312-RDD.

23   Have I described that correctly, Mr. Jarosz?

24   A    I don't know.  I see at the top of the table it says,

25   Bank Account Reconciliations and it seems to be submitted in

1  the Bankruptcy Court -- in a Bankruptcy Court proceeding.

2  Q    Okay.  Do you see -- I think we're looking at the same

3  document, sir, and I appreciate your patience.  Defendant's

4  129.  Do you see above where it says Bank Reconciliation,

5  where it says Corporate Monthly Operating Report?

6            THE COURT:  If you look at 129.001 on the left,

7  that would be the first page.

8            THE WITNESS:  I'm sorry.  The first page that I

9  have in this binder is 129.009.  I don't appear to have

10  .001.  I'm sorry.

11  BY MR. KINGSTON:

12  Q    All right, do you have Defendant's Exhibit 130?

13  A    Yes.

14            MR. KINGSTON:  Your Honor, before I go on, there's

15  two things I just remembered I was supposed to bring up at

16  the beginning of this hearing, and I apologize.  First,

17  Defendants were considering asking a court reporter to -- a

18  personal court reporter to transcribe these proceedings.  I

19  don't know if we're allowed to do that pursuant to the

20  Court's order.  If we do, we'd be happy to share dailies

21  with our friends at the other table and just split the cost.

22  But I don't know what -- it's not clear to me if that is

23  something that would be permitted or not.

24            THE COURT:  Well, it's the first I'm hearing of

25  it.  I have permitted it in the past, but usually the

1    parties work it out in advance.

2            MR. KINGSTON:  Oh, I --

3            THE COURT:  Do you have someone to -- I mean, to

4    put it differently, without getting my permission, no one

5    should be recording this other than the tape that's being

6    run by Court Solutions.

7            MR. KINGSTON:  I've got a note that says, "Ask for

8    court reporter." I know that we were looking to find

9    somebody.  I don't know that we have, Your Honor.

10           THE COURT:  All right.  Well, if you want to

11   discuss that for going forward that's fine, but I don't see

12   why we're discussing it at this point.

13           MR. KINGSTON:  No, you're right.  My second point,

14   Your Honor, was just to inform the Court that the air

15   conditioning is out in our building and to inquire whether

16   the Court would mind if Mr. Nepple and I appeared in

17   shirtsleeves given that we're on the 35th floor and it's out

18   for the whole building, I'm afraid.

19           THE COURT:  That's fine.

20           MR. KINGSTON:  Thank you, Judge.  I appreciate the

21   courtesy.

22           THE COURT:  Okay.

23           MR. KINGSTON:  Ms. (indiscernible), could you pull

24   up 130 so I can see it?

25           THE COURT:  You can take your tie off too.

1          MR. KINGSTON:  This is my father's tie.  It's my

2     lucky tie.

3          THE COURT:  Okay.

4     BY MR. KINGSTON:

5     Q    Mr. Jarosz, do you have in front of you Exhibit 130?

6     A    Yes, I do.

7     Q    And do you see that it's designated as a corporate

8     monthly operating report?

9     A    I see that at the top of page 130.001.  I see Corporate

10    Monthly Operating Report.

11    Q    And do you see a signature of Mr. Eichler?  E-I-C-H-L-

12    E-R?

13    A    Yes, that appears to be the case.

14    Q    And if you look to the page that is designated 130.

15         (Sound drops out)

16         THE COURT:  Mr. Kingston...?

17         THE WITNESS:  I might have lost the audio

18    connection.

19         THE COURT:  Yeah, Mr. Kingston, we're not hearing

20    you.

21         MR. ROSS:  We're actually hearing him here,

22    though.  So, I don't know what that could be.

23         THE WITNESS:  I'm sorry, I'm not.

24         THE COURT:  Well, Mr. Kingston, are you saying...

25    Can you hear me, Mr. Kingston?  You have to hold that up

1    longer if you want us to read that.  Are you getting any

2    audio from him, Arthur?

3              CLERK:  He actually must have muted on his end.

4              THE COURT:  I mean, Mr. Kingston, your microphone

5    does indicate you're muted up in the corner there.  Can you

6    check your mute button?

7              THE WITNESS:  Your Honor, if I can add one more

8    thing, I don't have a video feed from Mr. Kingston either,

9    but I haven't had one all day.  So, if he's showing

10   something on the screen, unfortunately, I can't --

11             THE COURT:  We have one from him.  Had you guys

12   discussed what would happen if something like this happened?

13   Mr. Kingston, we're showing the microphone being muted in

14   the corner of your screen.  Please check the mute button.

15   Can we unmute him from here?

16             CLERK:  That's what I was trying to do and it

17   appears that it's not on, I think.

18             THE COURT:  Yeah.  Mr. Kingston, can you look up?

19   He's still moving around.

20             CLERK:  Yeah, but --

21             THE COURT:  Well, he should be on Court Solutions

22   too, right?

23             CLERK:  Yeah.  I think he unmuted himself.

24             THE COURT:  But it's still on mute.

25             CLERK:  No, because they're supposed to be muted

1    at their end like that.  What it is, I believe we lost him

2    in Court Solutions.  Let me just make sure...

3                THE COURT:  Well, he is frantically trying to do

4    something, I can see.

5                CLERK:  Yeah.  We lost him in Court Solutions.

6    That's what it looks like.

7                THE COURT:  Okay.

8                CLERK:  He's not one of the participants.

9                THE COURT:  All right.  Well, he said their power

10   went out on their air conditioning.  I don't know if they

11   had some surge or something.  I mean, obviously, the lights

12   are still on where he is.

13               CLERK:  Yeah.

14               THE WITNESS:  Your Honor, for what it's worth, I

15   can now see Mr. Kingston.

16               THE COURT:  Okay.

17               THE WITNESS:  Where until this point, I could not.

18               THE COURT:  But no one can hear him.

19               THE WITNESS:  I cannot.

20               THE COURT:  Right.

21               CLERK:  He actually -- we lost him from Court

22   Solutions.

23               THE COURT:  Yeah.  He needs to -- Mr. Kingston,

24   you need to log on to Court Solutions again.  You're not

25   logged on to Court Solutions.

1          MR. KINGSTON:  Your Honor, can you hear me?

2          THE COURT:  Yes.  Excellent.  All right.

3          MR. KINGSTON:  I apologize.  The Court Solutions

4    dropped.  I'm sure it was the fault of somebody on our end.

5    And I had just this horrible vision of having walked out of

6    a courtroom and turning my back on a judge in the middle of

7    a trial.  I had trouble getting it back on.  I apologize.

8          THE COURT:  That's fine.  So, we're back live with

9    you.  So, you had just asked Mr. Jarosz to turn to a page in

10   the operating report.

11         MR. KINGSTON:  Yes, Your Honor.  130.5

12         THE WITNESS:  All right, I'm there.

13   BY MR. KINGSTON:

14   Q    And is that a schedule of cash receipts and

15   disbursements?

16   A    Yes, that's the title of the table.

17   Q    And do you see Georgia -- excuse me, Windstream Georgia

18   Communications, LLC's cash receipts on page 7, sir?

19   A    Did you say Windstream Georgia Communications, LLC?

20   Q    I did, sir.

21   A    Yes, I see that.

22   Q    And what were those?

23   A    The cash receipts are reported here to be $670,034.

24   The cash disbursements appear to be $670,778.

25   Q    Okay.  And just by comparison, what are the cash

1    receipts and disbursements for Plaintiff PiTech

2    Communications, LLC on page 6?

3              MR. ROSS:  Your Honor, this is Mr. Ross.  This is

4    an objection.  I want to make clear that the witness has no

5    knowledge of these numbers.  All he appears to be doing --

6              THE COURT:  I understand.  This is -- again, I'm

7    assuming, based on what Mr. Kingston told us earlier, that

8    this is just setting up a question for Mr. Jarosz, and he's

9    giving him the factual background so that he could then ask

10   him the question.

11             MR. KINGSTON:  The Court is exactly right.

12             THE COURT:  You can answer the question.

13             THE WITNESS:  I'm sorry?

14             THE COURT:  So, you can answer that question.

15             THE WITNESS:  Thank you.

16   BY MR. KINGSTON:

17   A    The cash receipts for that entity appear to be

18   $134,002,901.  The cash disbursements appear to be

19   $134,088,881.

20   Q    And the last one, I won't belabor it, but do you see

21   the cash receipts for Windstream Holdings, Inc., another

22   Plaintiff in this matter?

23   A    Yes, I do.

24   Q    And what are those?

25   A    The cash receipts appear to be $54,730,625 and the cash

1    disbursements appear to be $54,730,625.

2    Q    All right.  And do you recall, Mr. Jarosz, before you

3    had an opportunity to testify, that Mr. Ross made some

4    discussion about bank accounts?  Do you recall that, sir?

5    A    Yes.

6    Q    All right.  Do you see any reference to bank accounts

7    on pages 9 and 10 of Defendant's Exhibit 130?

8    A    It appears that that table is titled Bank Account

9    Reconciliations.

10   Q    And do you see a list of account numbers in the column

11   that is the second from the right?

12   A    I see account numbers.  Is that what you're asking?

13   Q    Yes, sir.  Is that not what I said?  And if I look at

14   page 10, do you see a variety of different account numbers

15   for Windstream Georgia Communications, LLC?

16   A    On page 10 I only see one account number for that

17   entity.  I'm sorry.

18   Q    You know what?  I apologize.  I'm still looking at

19   Exhibit 129.  So, maybe it's on page 9 and 10.

20   A    I see at the bottom of 9, four different account

21   numbers and at the top of 10, a fifth account number.

22   Q    And so do you recall there was a discussion about

23   getting checks and sending these checks to bank accounts,

24   and then once these checks were in different bank accounts,

25   you would make an inquiry into a computer and it would spit

1    out a number based on the checks that had gone to the bank

2    accounts?  Do you recall that conversation, sir?

3    A    Generally, yes.

4    Q    And so would these bank accounts -- these, what is it,

5    five bank accounts for Windstream Georgia Communications,

6    LLC -- would you infer those would be among the bank

7    accounts from which one could get that formula?

8              MR. ROSS:  Your Honor, it's now clear if that's

9    the question we've been waiting for, that we've been setting

10   up, that it's outside the scope of his direct examination

11   and, indeed, has nothing to do with any issue with this

12   case.

13             MR. KINGSTON:  It's not, Your Honor.

14             THE COURT:  Okay.

15             MR. ROSS:  Well, it calls for speculation.

16   Specifically, your question asked him can you infer?  Which

17   is just another word for speculation.

18             THE COURT:  So, where...

19             MR. KINGSTON:  I'll move on, Your Honor.

20             THE COURT:  Yeah, I think you should move on.

21   BY MR. KINGSTON:

22   Q    Okay.  Windstream Communications Georgia, LLC and

23   Windstream Holdings, Inc., and PiTech all have different

24   bank accounts and all have different cash receipts, don't

25   they, sir, according to this document?

1          MR. ROSS:  Well, again, the witness is being asked

2     to speculate as to information he has no basis for other

3     than reading a document, which, the rule -- the document

4     speaks for itself, so it would seem to cover this situation.

5          THE COURT:  I mean, again, this is fine to ask if

6     it's leading somewhere.  So far I'm not seeing where it's

7     leading.

8          MR. ROSS:  But, Your Honor, I think it's at the

9     point where we need to have the question that it's leading

10    to, to see if that's true and to be able to test whether any

11    of these are, in fact, leading to that.

12          MR. KINGSTON:  I'm getting there shortly, Your

13    Honor, and I appreciate the Court's patience.

14          THE COURT:  Okay.  So, the document's clear -- it

15    has this information for each of the three entities that you

16    already discussed.

17    BY MR. KINGSTON:

18    Q    And, Mr. Jarosz, in forming your opinions you didn't

19    come to any conclusions that suggest it was not the case

20    that Windstream Georgia Communications, LLC, and Windstream

21    Holdings, and PiTech were different companies with different

22    bank accounts and different sets of cash receipts, isn't

23    that so, sir?

24    A    I didn't investigate that issue.  That wasn't part of

25    my assignment nor relevant to my determination of harm.

1  Q    And turning back to Exhibit 127, to the extent that

2  people are sending checks, or paying by phone, or otherwise

3  sending payment to Windstream Georgia Communications, LLC,

4  they're doing that in return for broadband service, isn't

5  that right, sir?

6  A    That would make sense to me, yes.

7  Q    And if I'm paying you, Mr. Jarosz, so that you'll give

8  me broadband service, would it be fair to say that I was a

9  customer of yours?

10  A    Yes.

11  Q    And so if I'm taking --

12  A    I think there's a slight difference -- go ahead, I'm

13  sorry, Mr. Kingston.

14  Q    So, if I'm paying Windstream Georgia Communications,

15  LLC for the provision of broadband services, I'm a customer

16  of Windstream Georgia Communications, LLC, isn't that right,

17  sir?

18  A    I believe that to be true that you are a customer of

19  that legal entity.  It may have a different operational

20  entity that's actually out in the marketplace.

21  Q    You're suggesting that perhaps Windstream Georgia

22  Communications, LLC, that's the company that's getting paid

23  the money from these customers but it might do business as a

24  different name somewhere out in the marketplace?

25  A    I'm suggesting that that's the legal entity that

1    receives the check but the branding in the marketplace could

2    very well be different from that, and in this case, it is.

3    Q    I have one more question on Exhibit 130 and then I'm

4    happy to move on from that.  Is there a note on the very

5    last page that says, "Copies of bank statements and cash

6    disbursement journals are available upon request?"

7    A    Are you asking me to look at 130.017; if so, I'm not

8    sure I'm seeing that.

9    Q    No, sir, 010.

10   A    Okay.  That does not appear to be the last page of the

11   document that's identified Exhibit 130, but I'll look at

12   page 010.  I read -- I see one note down there, "Copies of

13   bank statements and cash disbursement journals are available

14   upon request."  I do see that.

15   Q    And you don't have any reason to believe that that's

16   not true?

17   A    Not sitting here right now, though I'm not familiar

18   with this document.

19   Q    Very good.  Mr. Jarosz, you're a lawyer?

20   A    I have a law degree.  I've never practiced law,

21   however.

22   Q    And you've testified in hundreds of cases, true?

23   A    Yes.

24   Q    And those cases involve intellectual property rights

25   and federal law, is that right, occasionally?

1    A    Yes.

2    Q    Do you spend more time in federal court or state court,

3    sir?

4    A    More of my matters are in federal court than state

5    court.

6    Q    You've testified a hundred times, maybe appeared in 400

7    matters?

8    A    I'm not sure how you're defining appeared.

9    Q    That's fair.

10   A    But I have testified at trial or arbitration about a

11   hundred times, and I've had 400 or more assignments over the

12   years.

13   Q    And as a part of those assignments, you provide a --

14   you're used to providing Rule 26 reports?

15   A    Yes.  That's not always the case, but it's often the

16   case.

17   Q    You've provided a lot of them?

18   A    I have, yes.

19   Q    And you're aware that as an expert offering an opinion

20   under Rule 26(a)(2)(B) that you're obliged to provide a

21   complete statement of all opinions that you'll express and

22   their basis and reasons for them, including the facts or

23   data considered in forming your opinions?

24   A    I'm generally familiar with the obligations.  I

25   certainly have not memorized them, however, but what you

1    read appears to be accurate.

2    Q    And obviously, it's not your habit to make false

3    statements in your report?

4    A    Correct.  I work hard not to do that.

5    Q    You work hard to make sure that if you say it in your

6    report, it's so; is that fair?

7    A    To the best of my knowledge and ability, yes.

8    Q    And, of course, because you've appeared in hundreds of

9    federal cases -- excuse me.  Because you've offered opinions

10   or have been hired in hundreds of federal cases, you're also

11   familiar with your obligation to supplement your opinion

12   under Rule 26(e)(2); are you not, sir?

13   A    I'm not as clearly familiar with the requirement there.

14   I have supplemented my opinions over the years, but I don't

15   know what the obligation is to which you refer.

16   Q    Based on your experience providing testimony in

17   hundreds of cases, do you have any reason to disbelieve me

18   if I suggest that your obligation to supplement, quote,

19   "Extends both to information included in the report and to

20   information given during the expert's deposition."

21   A    I just don't know.  I would like to see what you're

22   referencing.  Again, I have supplemented my opinions in the

23   past.

24   Q    Right.  You're aware that it's an obligation that

25   experts have in federal court?

1    A    Again, I'm not --

2         MR. ROSS:  I think he's already asked that

3    question a couple of times now.

4    BY MR. KINGSTON:

5    A    I'm not specifically aware of the obligation.  I'd be

6    happy to look at what you might have in mind, but I have

7    supplemented in the past.

8    Q    All right.  Did you supplement your report in this

9    lawsuit, sir?

10   A    Not that I recall, no.

11   Q    All right.  And you didn't supplement your deposition

12   testimony either; is that right?

13   A    I don't think I supplemented it.  It's possible we went

14   through and corrected transcription errors.  I don't know

15   whether you would call that supplementation or not.

16   Q    Okay.  Do you have in front of you, Mr. Jarosz, a

17   binder of defendants' impeachment exhibits?

18   A    I don't have it immediately in front of me.  But I

19   think I know where the binders are, so if you give me a

20   moment, I'll go grab them.  Are there two binders, Mr.

21   Kingston?

22   Q    I don't know the answer to that question, sir.  I

23   apologize.  If it'll help you, I'm asking you about

24   Defendants' Impeachment Exhibit 58.

25   A    Okay.  Give me one moment and I'll reach it.  I do have

1    the two binders and I will turn to Exhibit 58.  All right.

2    I have it open in front of me.

3    Q    Mr. Jarosz, can you turn to Page 43, the very last page

4    of Exhibit 58?

5    A    Yes, I'm there.

6    Q    And do you recognize your signature on October 11th of

7    2019?

8    A    Yes, that appears to be my signature.

9    Q    And is Defendants' Impeachment Exhibit 58 the Rule

10   26(a)(2)(B) report that you provided in this lawsuit, Mr.

11   Jarosz?

12   A    It's the expert report that I provided.  I don't think

13   I characterized it as Rule 26 report, but it is my expert

14   report.

15   Q    You understand --

16             MR. ROSS:  Your Honor, if we could please pause.

17   We have an objection.  This document is not his complete

18   report; it's missing all of the tabs.  Whether that was

19   intentional or not, I don't know, but the record should be

20   made clear in that respect.

21             THE COURT:  Does his report appear in another

22   exhibit somewhere else?

23             MR. ROSS:  I believe it does, Your Honor, and if

24   you give me one second.

25             MR. KINGSTON:  Your Honor, I don't intend to go

1    through the tabs on this line of questioning.  Mr. Ross is

2    correct that defense Exhibit 58 doesn't include the tabs.

3              THE COURT:  Okay.  Well --

4              MR. KINGSTON:  Well, I mean, the point, Your Honor

5    -- again, Mr. Ross, the point is that if the tabs are an

6    integral part of the report (crosstalk).

7              THE COURT:  Well, it depends on what Mr. Kingston

8    is going to ask him about.  It's clear that this exhibit is

9    incomplete, so we'll see where we are after that.

10             MR. KINGSTON:  I'm happy to accommodate Mr. Ross,

11   Your Honor.  If he would prefer that we have a report with

12   the tabs, I'm happy to -- he's free to direct us to it.

13             MR. ROSS:  I mean, I believe Mr. Jarosz has one

14   available that, and if he could simply be allowed to pull

15   that out and answer questions based on that.

16             MR. KINGSTON:  Mr. Jarosz, if we get to a question

17   that requires you to refer to a tab, will you let me know,

18   sir?

19             THE WITNESS:  Yes.

20             MR. KINGSTON:  Okay.

21   BY MR. KINGSTON:

22   Q    With the exception of the attachment, is Exhibit 158

23   your expert report?

24   A    Did you say Exhibit 158 or 58?

25   Q    Thank you, sir.  Actually, I misspoke.  With the

1    exception of attachments, Mr. Jarosz, is Defendants'

2    Impeachment Exhibit 58 your expert report?

3    A    It appears to be, although you can see I'm just looking

4    at it very quickly.

5    Q    And that's what you signed on the last page?

6    A    I did sign the prose of my expert report on Page 41 of

7    the report.

8    Q    Right.  And by signing it, you're conveying that the

9    stuff in there is true and those are the opinions I'm going

10   to offer.

11   A    Yes.

12   Q    Right.  Turn if you would, sir, to Page 24.

13   A    I'm there.

14   Q    Page 40.

15   A    I thought you said 24.  I'm sorry.

16   Q    I misspoke.  Page 24, Paragraph 40.

17   A    I'm there.

18   Q    I read your statement to be: "I currently do not have

19   sufficient data in evidence allowing me to estimate with a

20   reasonable degree of certainty damages from and flowing from

21   only the alleged violation of the automatic stay."  Have I

22   read that correctly, sir?

23   A    Yes.  From only the alleged violation, that's correct.

24   Q    All right.  You can put that aside.

25   A    Are you saying put the whole binder aside or just that

1    exhibit?

2    Q    I believe the whole binder, sir.

3    A    Okay.

4    Q    You recall we were talking, Mr. Jarosz, about people

5    making payments to Windstream Georgia Communications, LLC?

6    A    Yes, to that legal entity.  I do recall that.

7    Q    Do you have any idea how many people were making

8    payments to Windstream Georgia Communications, LLC on

9    February 28th of 2019?

10   A    No.

11   Q    And you don't have any idea how many people were making

12   payments to Windstream Georgia Communications, LLC in return

13   for broadband service on September 1 of 2019, do you?

14   A    Correct.

15   Q    And you don't know how -- you don't have any idea how

16   many people were making payments to PiTech Communications,

17   Inc. in return for broadband service on February 28, 2019;

18   isn't that right?

19   A    Correct.  I assume you're putting all those questions

20   to me sitting here today without a document in front of me;

21   is that right?

22   Q    Yes, sir.

23   A    Okay.

24   Q    Is there a document that you have that you think would

25   help you identify the number of people that were making

1    payments to PiTech Communications, Inc. in return for

2    broadband service on September 1 of 2019?

3    A    Not to my knowledge, but it's possible you have such a

4    document.  I don't.

5    Q    Would the bank accounts or -- do you have a bank, sir?

6    A    Do I have a bank?

7    Q    Yeah.

8    A    I don't know exactly what you mean by that, but we have

9    accounts at several banks.

10   Q    And do you get monthly statements?

11   A    Yes.

12   Q    And would looking at bank statements give you some idea

13   of how many people were making payments to you?

14   A    Maybe, although I don't receive all that many payments

15   from people.  I have an employer.  Most of my bank activity

16   is expense oriented.

17   Q    If -- I'd like to pose a hypothetical to you, Mr.

18   Jarosz.  Can I do that?

19   A    Sure.

20   Q    I want you to suppose that your name was Windstream

21   Communications of Georgia, LLC and that you sold broadband

22   service and that you instructed folks who bought that

23   broadband service from you that they could make checks

24   payable to you and send those checks in.  Are you with my

25   hypothetical so far?

1    A    As a normal consumer, I am.  I don't have any

2    particular expertise on that.

3    Q    Wouldn't one way of figuring out how many people were

4    sending you checks be to look at the bank account and see

5    how many checks were deposited?

6    A    I don't know.  I'm not an accountant, nor do I receive

7    many receipts from other people.

8    Q    You would need to be an accountant to determine whether

9    a good way to figure out if people are sending you checks is

10   to look at your bank account and see if checks are being

11   deposited, sir?

12   A    Certainly if I were an accountant, I could say that

13   with some confidence.  It would make sense to me that the

14   deposit of checks in an account with records associated with

15   that might give me somewhat reliable information on how many

16   people wrote me checks.

17   Q    If you were selling broadband service and you wanted to

18   figure out how many people were paying for that broadband

19   service, one way you could do that would be to look at the

20   number of payments going into your bank account, right?

21   A    That makes some sense to me, but I don't have any

22   particular expertise in that.

23   Q    Right.  That's not an area that you inquired into in

24   preparing your opinions for this matter, right?

25   A    No, it is not.  You're correct, it's not an area that I

1    investigated.

2    Q    I want to stick with people that are paying Windstream

3    Georgia Communications, LLC for internet service for a

4    moment.  Can we do that, sir?

5    A    Sure.

6    Q    And do you have your incomplete report in front of you?

7    A    I'll get it back in front of me.

8    Q    I did tell you to put it aside and I apologize, sir.  I

9    lost where I was going.

10   A    Did you say before that that was Tab 58?

11   Q    I did.

12   A    Okay.  All right.  I have that in front of me.

13   Q    I'll direct your attention to Page 33, Paragraph 56.

14   A    Okay, I'm there.

15   Q    Customer churn from -- I read the following sentence in

16   that paragraph: "Customer churn from April 2019 through

17   August of 2019 is calculated as the number of disconnects in

18   these five months divided by the total number of customers

19   in March 2019."  Have I read that correctly?

20   A    Not exactly, but I see what sentence you're referring

21   to.

22   Q    Well, maybe you could read it into the record for me,

23   sir.

24   A    "Accordingly, customer churn from April 2019 through

25   August 2019 is calculated as the number of disconnects in

1    these five months divided by the total number of customers

2    in March 2019," and then there's footnote 111.

3    Q    What was the total number of disconnects in the five

4    months of April 2019 through August of 2019 for Windstream

5    Georgia Communications, LLC?

6    A    I haven't broken it down by legal entity.  I have

7    collected the information for Broadstream, sometimes more

8    specifically Kinetic by Broadstream, which is the brand name

9    used by a variety of legal entities.

10   Q    You don't know how many people disconnected their

11   service from Plaintiff Windstream Georgia Communications,

12   LLC in the months between April of 2019 and August of 2019;

13   isn't that so?

14   A    That's correct, and I'm not sure if Windstream itself

15   knows.  I don't know if the records are kept at that level,

16   at the legal entity level.

17   Q    You don't know, sir, if from April 2019 through August

18   of 2019 what the number of disconnects that Windstream

19   Georgia Communications, LLC had; isn't that right?

20   A    Yes, that's correct.

21   Q    And you don't know the total number of customers that

22   Windstream Georgia Communications, LLC had as of March 2019;

23   isn't that also right?

24   A    That's correct.

25   Q    Do you know how many people were making payments to

1    Broadview Networks of Massachusetts in February of 2019 in

2    return for broadband service?

3    A     Not sitting here right now, I do not.

4    Q     Did you make any effort to identify the number of

5    customers that disconnected from April 2019 through August

6    of 2019 from Plaintiff American Telephone Company?

7    A     No.  I did not do my analysis at that legal entity

8    level.

9    Q     Do you know whether American Telephone Company is a

10   provider of broadband service?

11   A     Sitting here right now, I do not.  I would expect that

12   they're a legal entity that's generally involved in the

13   Windstream business, but I don't know the particulars of

14   their precise business.

15   Q     Do you know whether Broadview Network Holdings, Inc. is

16   a provider of internet service?

17   A     Same answer.

18   Q     All right.  And you don't know how many, if any,

19   customers disconnected from Broadview Network Holdings, Inc.

20   between April 2019 and August of 2019.

21   A     Correct.  Sitting here right now, I do not know;

22   furthermore, I did not do my analysis at the legal entity

23   level.

24   Q     You don't know how many customers disconnected from

25   Business Only Broadband, another plaintiff in this case,

1    from (audio distortion).

2            THE COURT:  Mr. Kingston, at this point, it's just

3    cumulative.

4            MR. KINGSTON:  Your Honor --

5            THE COURT:  He's testified he did not do this on

6    an entity-by-entity basis.

7    BY MR. KINGSTON:

8    Q    So there is not a single individual plaintiff, Mr.

9    Jarosz, for whom you can tell us how many customers

10   disconnected between April 2019 through August of 2019?

11   A    I'm not sure who all the individual specific plaintiffs

12   are.  I did my analysis at the level of the -- what is in

13   the marketplace, that is the Windstream service, and I did

14   my analysis across the legal entities associated with that

15   servicing providing.

16   Q    There are 205 plaintiffs in this lawsuit; isn't that

17   right, Mr. Jarosz?

18   A    That sounds right to me, yes.

19   Q    For any single one of those 205 plaintiffs, can you

20   tell me the number of disconnects that they had from April

21   2019 through August of 2019?

22   A    No.  I can't give you any numbers at the individual

23   legal entity level.  I did not do my analysis at that level.

24   Q    And you understand that plaintiff, American Telephone

25   Company, is suing the defendants in this lawsuit?

1   A     That makes sense to me.  I don't have reason to doubt

2   that.

3   Q     And you understand that plaintiff, American Telephone

4   Company, is saying that defendants ought to pay its damages?

5   A     I don't know that there's a separate claim from

6   American Telephone Company.  There's a claim across the

7   plaintiffs for damages.

8   Q     All right.  You're understanding is that American

9   Telephone Company on its own is not seeking damages?

10  A     I don't know.  I understand that there are a number of

11  plaintiffs.  I did my analysis at the Windstream level, that

12  is what service is available in the marketplace.

13  Q     For any individual plaintiff, sir, you can't tell me

14  the number of disconnects from April 2019 through August of

15  2019.

16  A     Yes.  I think you might have asked that before.  If you

17  didn't, the answer is still, no, I did not do my analysis at

18  that level.

19  Q     And because you didn't do your analysis at that level,

20  Mr. Jarosz, you cannot answer the question for any plaintiff

21  in this lawsuit how many customers disconnected from April

22  2019 through August of 2019; isn't that so?

23  A     Again, I didn't do my analysis at a legal entity-by-

24  legal entity basis.  I did my analysis across the legal

25  entities for the Windstream brand name.

1   Q    You cannot tell me, sir, for a single plaintiff in this

2   case the number of disconnects that it had from April 2019

3   through August 2019; isn't that the case?

4   A    Correct, not for an individual separate legal entity.

5   Q    Not for an individual plaintiff, true?

6   A    Correct.

7            THE COURT:  The same question.

8   BY MR. KINGSTON:

9   A    I'm assuming each plaintiff is a separate legal entity.

10  Q    Well, we can test that assumption can't we, sir?

11  A    That would make sense, yes.

12  Q    I'll direct your attention, Mr. Jarosz, to Defendants'

13  Exhibit 309.

14  A    Is that in the impeachment book or should I go get

15  another book?

16  Q    No, no, sir.  It's Defendants' Exhibit 309; it is not

17  in the impeachment book.

18  A    Okay, give me one moment.  Did you say 309?

19  Q    I did.

20  A    Okay.  I think I grabbed the wrong binder.  Give me

21  another moment.

22  Q    Take your time, sir.

23            MR. KINGSTON:  Judge, thank you so much for

24  indulging us wearing shirtsleeves.  It's much better.

25  BY MR. KINGSTON:

1   A    Okay.  I have that in front of me.

2   Q    All right.  And I read Defendants' Exhibit 309 to be a

3   voluntary petition for non-individuals filing for

4   bankruptcy.  Do you read it the same way, sir?

5   A    Yes, I do.

6   Q    And do you see the entity's name?

7   A    Yes, I do.  I see the debtors' name, if that's what

8   you're referring to.

9   Q    Do you see 205 names, or do you see one name?

10  A    Under the debtors' name, I see one.

11  Q    And what's that name, sir?

12  A    Windstream Georgia Communications, LLC.

13  Q    And then as you go through the document, do you see

14  that there's a variety of information that's been provided?

15  A    Yes.

16  Q    And then if you get to Page 4, do you see a really

17  scary warning?

18  A    I see a warning.

19  Q    Do you see a warning that says, "Bankruptcy fraud is a

20  serious crime."

21  A    Yes, I do.

22  Q    And does it go on to state that, "Making a false

23  statement in connection with a bankruptcy case can result in

24  fines up to $500,000 or imprisonment for up to 20 years or

25  both."

1    A    Yes, I do.

2    Q    And then do you see that there's a declaration that has

3    been made under penalty of perjury that the foregoing is

4    true and correct?

5    A    Yes, I do.

6    Q    And do you see who signed that declaration under

7    penalty of perjury?

8    A    Yes, I do.

9    Q    And who is that?

10   A    It appears to be Kristi Moody.

11   Q    And does Ms. Moody identify herself as an authorized.

12            THE COURT:  Mr. Kingston, is all of this intended

13   to show that each of the plaintiffs is a separate legal

14   entity?

15            MR. KINGSTON:  I'll move on, Your Honor.

16            THE COURT:  Yes, you should.

17   BY MR. KINGSTON:

18   Q    I'll direct your attention to Defendants' Exhibit 252.

19   A    You'll have to give me another moment and I'll grab

20   that.  All right.  I have that in front of me.

21   Q    All right.  And who is the debtor there, Mr. Jarosz?

22   A    PiTech Communications, LLC.

23   Q    And we talked about PiTech earlier; do you recall that?

24   A    We talked about a PiTech entity.  I don't recall

25   whether it's this entity or not.

1    Q    And just quickly, can you turn to Page 4 and confirm

2    that this document, like its predecessor, was signed under

3    penalty of perjury by an officer.

4              THE COURT:  Enough.  Mr. Kingston, this is a total

5    waste of time.  No one is disputing that each of these

6    debtors and, therefore, each of the plaintiffs is a separate

7    legal entity.

8              MR. KINGSTON:  Very good, Your Honor.

9    BY MR. KINGSTON:

10   Q    Direct your attention, Mr. Jarosz, to category 2.

11   A    I'm sorry, category 2 --

12   Q    On the first page.

13   A    Of what?

14   Q    On the first page.

15   A    Okay.

16   Q    Do you see the first page, sir?

17   A    Yes.

18   Q    Do you see a request for the following information: all

19   other names debtor used in the last eight years.

20   A    Yes.

21   Q    Do you see that, sir?

22   A    Yes, I do.

23   Q    What information is provided?

24   A    PiTech Communications, Inc., and then three lines below

25   that, none.

1    Q    Okay.  And so, I think you anticipated my next

2    question.  Do you see a request for the following

3    information on Exhibit 252: include any assumed names, trade

4    names, and doing business names.  Do you mind if I take

5    another crack at it, Mr. Jarosz?  I think I misread it.

6    A    I have no problem with that.  Go ahead, please.

7    Q    Do you see the request on Defendants' Exhibit 252 for

8    the following information: include any assumed names, trade

9    names, and doing business as names.  Have I read that

10   correctly?

11   A    Yes, I think so.

12   Q    And what information is provided?

13   A    It appears to say none.

14   Q    PiTech Communications, LLC in a document signed under

15   penalty of perjury by an authorized officer responds none to

16   the question asking for doing business as names; is that

17   right, sir?

18   A    Whether that debtor has used other assumed names, trade

19   names, and doing business as names, yes.

20   Q    Let's take a look at Defendants' Exhibit 185.

21   A    I think I'll need to get up again.  Okay.  I have that

22   in front of me.

23   Q    Is that a form similar to Defendants' Exhibit 252?

24   A    Yes, I think so.

25   Q    And who is the debtor identified on that form?

1    A    Choice One Communications of Maine, Inc.

2    Q    All right.  And you understand that Choice One

3    Communications of Maine, Inc. is a plaintiff in this case

4    suing Charter Communications, Inc. and Charter

5    Communications Operating for damages?

6    A    I don't have reason to dispute that that is one of the

7    plaintiffs in this matter.

8    Q    I mean, that's one of the parties for whom you prepared

9    a report, right?

10   A    Yes.

11   Q    Your report says, I'm preparing the report on behalf of

12   Windstream, but then defines Windstream as every doggone

13   plaintiff in this case; isn't that right?

14   A    I'm not quite sure if that's right.  We could look if

15   you need at the first page of my report.  And there I've

16   written, "I submit this expert report on behalf of

17   Windstream Holdings, Inc. and its affiliated debtors as

18   debtors-in-possession, collectively plaintiffs are

19   Windstream in the adversary proceeding in the above-

20   captioned Chapter 11 cases."

21   Q    You understand, sir, that there are 207 parties in this

22   lawsuit?

23   A    I thought 205, so you probably know the number better

24   than I do.

25   Q    Well, I think you anticipated my next question; that

1   205 of those parties are plaintiffs and two of them are

2   defendants.

3   A     Oh, I'm sorry.  I misunderstood your question.  Yes, I

4   think you're right.

5   Q     And one of those 205 plaintiffs is plaintiff, Choice

6   One Communications of Maine, Inc.?

7   A     Again, that makes sense to me.  I would have to go back

8   and look at another list, but it would make sense to me.

9   Q     It's possible that's one of the entities whose damages

10  you're opining upon, but you're not positive sitting here

11  today?

12  A     I'm not positive, but I think it's likely to be one of

13  the plaintiffs here.

14  Q     You understand that your report is to help the Court

15  calculate how much money some or all of these 205 plaintiffs

16  ought to be paid?

17  A     I'm not quite sure.  It sounds like a legal question.

18  I was asked to provide my testimony as to harm, and I

19  believe that that might be considered by the Court in the

20  Court's decision as to the amount of money, if any, that

21  should be paid here.

22  Q     But you don't know whether or not you're offering your

23  expert opinion on behalf of plaintiff Choice One

24  Communications of Maine, Inc. or not; is that right, sir?

25  A     Again, I believe they're a plaintiff.  And so, the work

1   that I did covers the collection of all the plaintiffs and

2   the harm done to them collectively.

3   Q    According to the sworn statement of its authorized

4   officer, what doing business as names does Choice One

5   Communications of Maine use?

6   A    That legal entity appears to have used EarthLink

7   Business too and One Communications.

8   Q    I'll direct your attention, Mr. Jarosz, to Joint

9   Exhibit 10.

10  A    All right.  I have that open in front of me.

11  Q    And you understand Joint Exhibit 10 to be the

12  advertising that is alleged to have harmed the 205

13  plaintiffs in this case.

14          MR. ROSS:  I'm just going to object to the way

15  that was phrased.  There's no allegation of all -- the

16  Court's already found that this was -- that false

17  advertising was engaged in here.

18  BY MR. KINGSTON:

19  A    I believe this was a document that was used in the

20  false advertising campaign.

21  Q    All right.  Do you see -- do you know whether the

22  advertising campaign at issue extended into Maine?

23  A    I'd have to go back and look at my records.  I believe

24  it extended to what are called Charter exchanges.  Sitting

25  here right now, I don't recall if I had specific information

1    on whether it extended into Maine.

2    Q    Take a look at Defendants' Impeachment Exhibit 158.

3    Did I say 158 -- I think I said 158 again.  Before anybody

4    stands up and starts looking for it, I meant to say

5    Defendants' Impeachment Exhibit 58, and I apologize.

6              THE COURT:  58 or 68?

7              MR. KINGSTON:  58, Your Honor.  I believe that

8    it's on Mr. Jarosz's report without the tab.

9    BY MR. KINGSTON:

10   Q    And you identify in a footnote, don't you, Mr. Jarosz,

11   the --

12   A    Just give me one moment to get it in front of me if you

13   don't mind.

14   Q    I apologize, sir.  I was looking down and didn't see

15   where you were.

16   A    You're drawing my attention to Charter Exhibit 58?

17   Q    I am, sir.

18   A    It's a small document.  It's not my report.

19   Q    I know.  We're talking past each other, sir.  I

20   apologize.  I'm drawing your attention to Defendants'

21   Impeachment Exhibit 58.

22   A    I'm sorry, I did not hear that.  I apologize.

23   Q    It's a brave new world.

24   A    All right.  I have that open in front of me.

25   Q    Page 9, Footnote 21, sir.

1   A    All right, I'm there.

2   Q    What is -- well, just I guess in your own words, tell

3   me what Footnote 21 tells you?

4   (crosstalk)

5   A    It identifies -- oh, I'm sorry.  I thought you were

6   done.  It identifies the 18 states in which Windstream

7   competes or attempts to obtain business, and it also

8   identifies those 12 states in which it competes for Charter

9   -- with Charter for business.

10  Q    Is Maine among the first 18 states, sir?

11  A    No.

12  Q    Is Maine among the second 12?

13  A    No.

14  Q    Is it a fair inference that a company that calls itself

15  Choice One Communications of Maine, Inc. might do business

16  in Maine?

17  A    I don't know one way or the other what that legal

18  entity does.

19  Q    It's not crazy to suggest that if I call myself Choice

20  One Communications of Maine that I might do business in

21  Maine?

22  A    I just don't know one way or the other.  I have no

23  expertise in setting up legal entities.

24  Q    Turning your attention back to Joint Exhibit 10.

25  A    All right, I'm there.

1  Q    Do you see any reference to Choice One Communications

2  of Maine, Inc.?  Strike that.  Do you mind if I start over,

3  Mr. Jarosz?

4  A    I do not, no.

5  Q    Do you see the phrase, "Choice One Communications of

6  Maine, Inc." anywhere on Joint Exhibit 10?

7  A    Well, it's a 20-page document.  So if you want me to

8  look through page-by-page, I will.

9  Q    Take your time, sir.  Choice One Communications of

10 Maine is suing Charter for quite a bit of money.

11             THE COURT:  I'm sorry.  Are you talking about

12 Joint Exhibit 10?

13             MR. KINGSTON:  Yes, sir.  Your Honor, you're on

14 the right exhibit.

15             THE COURT:  But that's just a one-page exhibit,

16 Mr. Jarosz.

17             MR. KINGSTON:  No.  I believe the Joint Exhibit 10

18 is a 20-page exhibit, Your Honor.  Joint Exhibit?

19             THE COURT:  I only have the one page.

20             MR. KINGSTON:  Your Honor, at the bottom of your

21 one page, does it say Page 1 of 20?

22             THE COURT:  No, it says Page 1 of 1.

23             MR. KINGSTON:  My copy has 20 pages.

24             THE COURT:  Okay.

25             MR. KINGSTON:  I didn't put these together.

1          THE COURT:  All right.

2          MR. KINGSTON:  Mr. Ross, do you have a -- maybe

3    you could direct the Court to the original plaintiffs'

4    exhibit version of the joint exhibit, which might be more

5    complete.  I apologize to speaking to my friend at the other

6    table directly, Your Honor.

7          MR. ROSS:  Your Honor, may I suggest that you

8    might be looking at the Windstream exhibit binder?  He's

9    making reference to the joint exhibit binder.

10          THE COURT:  Oh, I'm sorry.  I got it.  You're

11    right.  You're right.  This is the likely exhibit, 1 of 20.

12    BY MR. KINGSTON:

13    Q    Returning to my original question.  Mr. Jarosz, do you

14    see the phrase, "Choice One Communications of Maine, Inc.,"

15    anywhere on Exhibit 20?

16          MR. ROSS:  Your Honor, this is Mr. Ross.  To save

17    some time, I'll stipulate that it's not there, instead of

18    the witness looking through 20 pages.

19          MR. KINGSTON:  We gladly accept the stipulation of

20    Mr. Ross, Your Honor.

21          THE COURT:  Okay.

22    BY MR. KINGSTON:

23    Q    Mr. Jarosz, do you see the doing business as names

24    identified in the sworn statement on behalf of Choice One

25    Communications of Maine?

1    A    Could you remind me what those names are?  I don't have

2    that document open in front of me right this moment.

3    Q    Sure.  And for the record, it's on Defendants' Exhibit

4    185.  One of the doing business as names that Choice One

5    Communications of Maine, Inc. identified as EarthLink

6    Business.  Do you see any reference to EarthLink Business in

7    Joint Exhibit 10, Mr. Jarosz?

8    A    I don't recall seeing it when I looked through over the

9    last few moments.  If it's important, I can look more

10   closely.

11            MR. KINGSTON:  I would welcome a similar

12   stipulation from my friend at the other table.

13            MR. ROSS:  I'm sorry, Mr. Kingston.  I'm still

14   trying to find -- go back to the exhibit, so I was missing

15   the question.

16            MR. KINGSTON:  I apologize, and I was looking at

17   pieces of paper and wasn't able to see where we were.

18            MR. ROSS:  Could you just -- I'm sorry to do this,

19   but there's no court reporter.  Could you just tell me which

20   exhibit we've moved back to?  These are all in different

21   binders.

22            MR. KINGSTON:  I understand.  Defendants' Exhibit

23   185, and I'm just briefly asking Mr. Jarosz to refer to it.

24            THE WITNESS:  So you'd like me to put that in

25   front of myself as well?

1                MR. KINGSTON:  Sure, go ahead.

2                THE WITNESS:  Okay.  All right.  I have that in

3        front of me.

4                MR. ROSS:  Not to interrupt.  But, Mr. Kingston,

5        I've now been explained -- it's been explained to me what

6        you're asking.  Yes, we will stipulate that EarthLink

7        Business/One Communications isn't mentioned in Joint Exhibit

8        10.  That's what you wanted me to stipulate to?

9                MR. KINGSTON:  I believe so, yes.

10               MR. ROSS:  Okay.

11       BY MR. KINGSTON:

12       Q    So, Mr. Jarosz, you don't see any reference at all.  Do

13       you see any reference -- do you see the word Windstream in

14       the doing business as names identified in Defense Exhibit

15       185, sir?

16       A    No, I don't see the word Windstream in those legal

17       entity names.

18       Q    Do you see the word in the Windstream in the doing

19       business as names identified?

20               THE COURT:  No, let's move on.  You've already --

21       you've already covered this.  You've asked him what it is

22       and it's listed and everything else is not listed.

23       BY MR. KINGSTON:

24       Q    There are 205 plaintiffs on whose behalf you're

25       opining; isn't that right, Mr. Jarosz?

1  A    Yes.

2  Q    Do you know how many of those 205 plaintiffs do not

3  have the word Windstream in their name?

4  A    No, but we could look at the list to answer that.

5  Q    Okay.  Would that be helpful for you, sir?

6         THE COURT:  No.  We can look at the list in the

7  caption.  He doesn't need to look at it.

8         MR. KINGSTON:  I believe the caption is just

9  Windstream Holdings, Inc., Your Honor.

10        THE COURT:  Well, then we can look at the list of

11  all the debtors.

12        MR. KINGSTON:  I think we may be able to do that,

13  Your Honor.

14        THE COURT:  No.  I mean, we can separately.  Mr.

15  Jarosz doesn't need to.  It's clear many of them don't have

16  the name Windstream.

17  BY MR. KINGSTON:

18  Q    Do you know whether more than a hundred or less than a

19  hundred of the plaintiffs suing defendants for false

20  advertising don't have the name Windstream in their name,

21  Mr. Jarosz?

22  A    I don't know sitting here right now.

23  Q    One of the things that you didn't inquire into in

24  forming your opinions on behalf of 205 plaintiffs was

25  whether the plaintiffs' names were mentioned in the

1    advertising at issue?

2    A    I did not do an investigation of the existence of those

3    legal entity names in the advertisements.

4    Q    What about the existence of any of those entities doing

5    business as names in the advertisement, Mr. Jarosz; did you

6    do any investigation into that?

7    A    No, not separately.

8              MR. KINGSTON:  I get the impression from the Court

9    they would like me to move on from this topic, and I'm going

10   to do that.  If you give just a moment to kind of organize

11   the mess that I've made at the table, Your Honor.

12             THE COURT:  All right.  It's not the topic; it's

13   just asking the same question over again.

14             MR. KINGSTON:  Your Honor --

15             THE COURT:  But I would clear off the table;

16   that's fine.

17             MR. KINGSTON:  I will 100 percent be happy not to

18   ask a single question again about PiTech Communications, LLC

19   if it'll dismiss its claim.  I think whenever you're -- are

20   you ready, Mr. Jarosz?

21             THE WITNESS:  Yes.

22   BY MR. KINGSTON:

23   Q    You based your loss profit analysis, in large part,

24   about distinctions that you perceived between what you call

25   the Charter exchanges and the non-Charter exchanges; isn't

1    that right, sir?

2    A    I'm not fully appreciating your questions -- your

3    question, but I --

4    Q    It got away from me.  Why don't I take another run at

5    it, sir?

6    A    Okay.

7    Q    You talk about exchanges in your report, don't you?

8    A    Yes.

9    Q    What's an exchange?

10   A    It's an area within which Windstream does business.

11   Q    How is that area defined?

12   A    I don't recall seeing how those are defined by

13   Windstream.

14   Q    So an exchange, the geographic area defined by

15   Windstream; that's your understanding, sir?

16   A    I think so, yes.

17   Q    Right.  And one of your documents that you review in

18   forming your opinion was the corporate representative

19   testimony provided on behalf of plaintiffs by Mr. Auman;

20   isn't that right, sir?

21   A    Yes.

22   Q    I think that you might have a copy of Mr. Auman's

23   deposition in front of you.  I think -- I believe it's an

24   impeachment exhibit, and this is where I'm afraid the Skype

25   file is stymying me because I can't approach and hand it to

1    you, but I think that you have it.

2    A    So would you like me to grab the impeachment binder?

3    Q    Let me make sure that I have his deposition and,

4    doggone it, it doesn't have an exhibit number on it, so let

5    me just make sure that I can tell you where to go.  While

6    we're looking, do you have your own deposition with you,

7    sir?

8    A    I have my transcript, yes.

9    Q    Okay.  And you recall you were deposed on October 30th

10   of 2019.

11   A    Yes.  I recall it was on my birthday.

12   Q    Yeah, that's right.  I remember that.  I'm sorry that

13   you had to remind me.  Mr. Auman's deposition I'm told is

14   Impeachment Exhibit 65.

15   A    All right.  I have that in front of me.

16   Q    And that's one of the documents you reviewed in forming

17   your opinions; isn't that right, sir?

18   A    I think that's right.  But if you give me one moment, I

19   will double check that.  If you directed me to where my tabs

20   are, that would help me double check that.

21   Q    If I direct you to a footnote where you say you read

22   his deposition, would that help you?

23   A    Yes, that would.

24   Q    Maybe take a look at Footnote 4 on Page 6 of

25   Defendants' Impeachment Exhibit 58 where I see a reference

1    to a corporate representative deposition of Windstream.

2    A    Yes, I see that.

3    Q    I read that footnote as follows: "The $8 million

4    estimate reflects Windstream forecast of the costs

5    associated with offering free service to certain new

6    customers for 90 days.  See 90 days free cost XLSX, and then

7    Rule 30(b)(6) deposition, Windstream, September 24, 2019."

8    Have I read that portion of it correctly, sir?

9    A    You read a portion of it correctly, yes.

10   Q    And so, do you have in front of you the September 24,

11   2019 of Windstream's corporate representative?

12   A    Yes, I do.

13   Q    Actually, just for -- looking back at that Footnote 4;

14   do you see it, sir?

15   A    Yes.

16   Q    Is there a difference between offering free service to

17   new customers and then offering discounts or other incentive

18   packages to existing customers in your view?

19   A    It seems to make some sense to me.

20   Q    Retaining old customers is a different thing than

21   offering free service to new customers; isn't that right,

22   sir?

23   A    I'm not quite sure what you're getting at, but new

24   customers are different from existing customers.

25   Q    Right.  It's one thing for me to call my cable company

1    and say I'm going to leave unless you guys give me free HBO,

2    and quite another for my cable -- for a cable company to

3    reach out to a non-customer and say we'll give you free

4    service for 90 days if you join with us; isn't that right,

5    sir?

6    A    The economics are the same, but the communications

7    might be different.

8    Q    If I was describing a thing that I actually did and the

9    thing that I described was giving free service to a new

10   customer, as opposed to giving a discount to an existing

11   customer, I would be describing two different things; isn't

12   that right?

13   A    They're economically the same.  One could say that

14   they, on their face, sound like two different things from

15   their descriptors, but the economics are the same.

16   Q    If I told you I was giving free service to a new

17   customer, but I was actually giving discounts to an existing

18   customer, and then you called me on it and I say, well, I

19   wasn't lying to you because the economics are the same;

20   would that be a convincing response in your view, Mr.

21   Jarosz?

22   A    I'm not quite sure how to answer your question.

23   Q    Okay.  Directing your attention -- or actually, you

24   reviewed the corporate representative deposition testimony

25   that Mr. Auman gave on behalf of the company; didn't you,

```
 1   sir?

 2   A    Yes.

 3   Q    And you recall he talked about exchanges in there some.

 4   A    That makes sense to me.  I certainly have not memorized

 5   his transcript.

 6   Q    All right.  Do you recall whether he gave these answers

 7   to these questions?  Question: "Tell me, exchanges have some

 8   function in Windstream providing the service that it

 9   provides."  Answer: "Yes."

10   A    Do you mind if I interrupt you and ask if I should be

11   looking at a particular page?

12   Q    Sure.  Why don't you take a look at Page 150, sir?  I'm

13   starting at Line 18.

14   A    Okay, I'm there.

15   Q    And did Mr. Auman, on behalf of Windstream, give these

16   answers to these questions?  Question: "Tell me, exchange

17   have some function in Windstream providing the service that

18   it provides."  Answer: "Yes."  "Tell me about that,"

19   question.  Answer: "So typically, we speak in terms of

20   exchanges as a central office, so it's, another term would

21   be wire center, kind of an old telephone company.  So

22   customers would be serviced out of a central office or a

23   wire center or exchange.  And so, it's one of the smallest

24   common denominator and so, there's thousands of these wire

25   centers, these exchanges."
```

1          Question: "So once upon a time, when your long-

2     distance phone company was a different company from your

3     local phone company, you had a central office which would be

4     sometimes called an exchange.  That would be sort of your

5     local calling area and that long-distance would be a

6     different company that would run in connection with those

7     exchanges."  Answer by Mr. Auman: "Yeah.  I know,

8     unfortunately, I remember that."  Question: "And so,

9     Windstream's market is tracked in terms of those sort of

10    holdover, those exchanges from the landline days."  Answer:

11    "That's right.  It's a legacy type of reporting, you know.

12    Most of the business now has evolved to broadband, right,

13    but how we serve customers is still fundamentally the same;

14    those central offices."

15         Question: "Windstream is at its roots a telephone

16    company, and so its sort of customer footprint is still

17    identified in terms of exchanges."  Answer: "Yes, sir, I

18    believe that's a fair characterization."

19         Have I read correctly, Mr. Jarosz, the testimony

20    set forth on Pages 150 Line 18 through 152 Line 2 of

21    plaintiffs' corporate representative deposition?

22    A    Yes, I believe you did.

23    Q    How many -- so it looks like exchanges is a Windstream

24    term; is that fair?

25    A    Certainly they use that firm.  I don't know whether

1    others in the business do.

2    Q    And the reason the plaintiffs use that term is because

3    plaintiffs are at their core a telephone company?

4    A    I don't know if that's the reason they use it.  But Mr.

5    Auman did say at their core, they are telephone companies.

6    Q    All right.  Do you know whether Charter Communications

7    started off as a telephone company?

8    A    I'd have to go back and look.  I certainly do think of

9    them as a cable provider.  I don't know whether they have

10   roots in the telephone business or not without looking at

11   more records.

12   Q    All right.  Did you see anything in preparing to offer

13   the opinions that you'd like to offer I guess today that

14   suggested to you that Charter Communications ever operated

15   out of central offices?

16   A    I'm sorry.  I lost track of the question.  Would you

17   mind asking that again?

18   Q    It wasn't a great one.  Why don't I just take a run at

19   a different one.  Did you review any pieces of paper while

20   you were getting ready to testify that suggested to you that

21   Charter used central offices?

22   A    I don't recall one way or the other.

23   Q    Did you review anything that suggested to you that

24   Charter used to be a local landline company that interfaced

25   with a long-distance company at an exchange?

1    A    I just don't recall hearing or seeing that.

2    Q    How many exchanges does Windstream break its

3    competitive footprint into?

4    A    According to Mr. Auman here, I think he says thousands,

5    although I may not have paid close enough attention.  Yes,

6    he says there are thousands of these wire centers, these

7    exchanges.

8    Q    Did you -- were you provided with a precise count of

9    these wire centers, these exchanges when you were forming

10   your damage opinions on behalf of the 205 plaintiffs in this

11   case?

12   A    I don't recall one way or the other.

13   Q    Do you have in front of you Plaintiffs' Exhibit 60?

14   You probably don't.  Would you mind getting it, sir?

15   A    So this is not Joint Exhibit; this is Plaintiffs'

16   Exhibit?

17   Q    60.

18   A    Okay.  All right.  I have that in front of me.

19   Q    Could you look at Page 18 of 60?

20   A    All right, I'm there.

21   Q    Does that refresh your recollection as to the total

22   number of exchanges in plaintiffs' competitive footprint?

23   A    If you're drawing my attention to the 1,428, I think

24   that probably does.

25   Q    And it looks like all of the 1,428 exchanges are listed

1    on the following pages?

2    A    If that's a question, the answer appears to be yes.

3              MR. ROSS:  Mr. Kingston, would you mind if I

4    interrupted you for a moment?  Will there be a point at

5    which we take a restroom break?

6              THE COURT:  Yeah, we're coming to it.

7              MR. KINGSTON:  I'm at a fine stopping point now,

8    Your Honor, whatever works for the Court.

9              THE COURT:  Well, we also have to sign off because

10   of the technology every four hours.  So I was contemplating

11   taking a lunch breach between 12:30 and 1:00.  We could do

12   it now or we move on.

13             MR. ROSS:  That's just fine, Your Honor.

14             THE COURT:  Is this a good stopping point, Mr.

15   Kingston?

16             MR. KINGSTON:  Yes, Your Honor, and I appreciate

17   the courtesy.

18             THE COURT:  Okay.  So let's resume at 1:15.  Is

19   that okay with everyone?

20             MR. ROSS:  That's fine, Your Honor.

21             THE COURT:  Is that fine with everyone?

22             MR. KINGSTON:  Yes, Your Honor.

23             THE COURT:  We'll pick up then.

24             MR. ROSS:  And, Your Honor, this is Mr. Ross, and

25   I could just -- there's no IT person on.  Folks, you don't

 1    sign off the Skype.  You sign off on the sound on the Court

 2    Solutions only and sign back in on Court Solutions only.

 3              THE COURT:  Right, but don't sign back in until

 4    1:15 or shortly before 1:15.  Just sign out of Court

 5    Solutions and then re-sign on about 1:10-1:12.

 6              MR. KINGSTON:  We'll do so, Your Honor.  Thank

 7    you, Mr. Ross.

 8              THE COURT:  And Skype can stay on, right?  Skype

 9    should stay on, so don't close your -- don't close that out.

10    Okay, thank you.  So see you at 1:15.

11              (Recess)

12              THE COURT:  Okay, good afternoon.  We're back on

13    the record in Windstream, et al. versus the two Charter

14    defendants.  Mr. Jarosz is still on the stand and Mr.

15    Jarosz, you're still under oath.  You understand that,

16    right?

17              THE WITNESS:  Yes, sir.

18              THE COURT:  Okay, very well.  So you can pick up

19    where you left off, Mr. Kingston.

20              MR. KINGSTON:  Thank you, Your Honor.

21    BY MR. KINGSTON:

22    Q    Mr. Jarosz, I believe we were talking about exchanges.

23    Isn't that right, sir?

24    A    Yes.

25    Q    And Windstream divides its footprint into about 1,400

1    exchanges.  Is that right?

2    A    At least as of the point of this document that we're

3    looking at, that is Exhibit 60.

4    Q    And Windstream purported to identify where Windstream

5    and Charter compete for the same customers within those

6    exchanges?  Is that right?

7    A    Yes, I think so.

8    Q    And who at Windstream told you about that?

9    A    I'm sorry, told me about what?

10   Q    How did they accomplish that?

11   A    I don't recall.  I may have had a conversation on it,

12   but I don't recall it sitting here now.

13   Q    You don't know who you talked to at Windstream that

14   could've explained to you how plaintiffs went about

15   identifying the exchanges where they believe defendants and

16   Windstream compete?

17   A    Yes, I think that's fair.  The candidates would be Mr.

18   Auman, Mr. Brannon and Mr. Pierce, but it's possible we

19   learned of it through a document, including deposition

20   testimony.

21   Q    And Mr. Auman is slated to testify at some point in

22   this proceeding?  Right?

23   A    I think that's the case, although it's -- the last day

24   or two have been a little confusing to me.

25   Q    And the other two gentlemen are not, is your

1  understanding?

2  A    That's my understanding, yes.

3  Q    If Windstream had just a central office in the middle

4  of the United States and only had one exchange, would that

5  be a -- would exchange units be a reliable measure -- mind

6  if I take another run at that, Mr. Jarosz?  It kind of got

7  away from me.

8  A    I don't mind, no.

9  Q    I'm trying to get my arms around this geographic unit

10  of an exchange.  Would you mind helping me do that, sir?

11  A    I'm happy to answer your questions.

12  Q    So if it was a great big geographic unit, if Windstream

13  divided the United States down the middle and had one

14  Charter exchange on the east side and a non-Charter exchange

15  on the west side, would that be a more precise or a less

16  precise way of identifying competition than the 1,400

17  exchanges in Exhibit 60?

18  A    I haven't posed myself that question.  It's certainly

19  not as granular.

20  Q    Well, I mean, you could pose it to yourself now.  What

21  do you think, sir?

22  A    So the question, again, is what?  Is that --

23  Q    Windstream has --

24  A    -- for what purpose?

25  Q    I'll take another run at it.  Windstream currently

1  divides its geographic footprint into 1,400 exchanges,

2  right?  Roughly.

3  A    Again, as of the point of this document.

4  Q    Okay.  If Windstream divided its geographic footprint

5  into two exchanges, one of which was a Charter exchange and

6  one of which was a non-Charter exchange, would that be a

7  more precise or a less precise way of apportioning

8  Windstream's geographic footprint?

9  A    What do you mean by precise, here?  It's much less

10  granular.

11  Q    Okay.  And if it's less granular, would it be less

12  reliable?

13  A    Not necessarily.  It depends on what purposes you want

14  to use that data break, so I'm really not fully appreciating

15  your question.

16  Q    Let's see if we can't unpack it together, sir.  Let's

17  say the purpose we were using that data -- for which we were

18  using that data was to identify where Windstream and Charter

19  compete.  Are you with me so far?

20  A    Yes.

21  Q    And if Windstream said, we only have two exchanges in

22  the United States, one of which is the Charter exchange and

23  the other of which is the non-Charter exchange, do you think

24  it would be likely that that would be a more accurate or a

25  less accurate depiction of the competitive footprint than

1    the division of the 1,400 exchanges identified in Exhibit

2    60?

3    A    I really don't know how to answer that question.  It's

4    at a different level.

5    Q    You can't say that it would be less accurate if they

6    only had two exchanges?

7    A    Not necessarily.  If they compete throughout those

8    exchanges and the -- it's pretty fairly evenly distributed

9    across those exchanges, that could be a fairly useful way to

10   think about the competition.

11   Q    Well, you recall --

12   A    They happen -- I'm sorry, go ahead.

13   Q    No, no.  I spoke over you, sir.  You, please finish.

14   A    They happen to look at competition at a much more

15   granular level and I accepted that and used the data at that

16   level.

17   Q    I want to -- I won't stay with it a whole, whole lot

18   longer, but if they divided the United States into the east

19   exchange and the west exchange and said that they compete

20   with Charter in the east exchange, that would include Maine,

21   wouldn't it?

22   A    In your hypothetical, yes.

23   Q    Okay.  And I think that we discussed in your report you

24   identified Maine as a state where Windstream and Charter do

25   not compete.  Isn't that right, sir?

1   A    I'm not sure that I said that.  They don't compete for

2   consumer business there, directly.  They --

3   Q    There --

4   A    Indirectly, they may compete for business customers.

5   Moreover, people move to and from exchanges, so it could be

6   that someone was in a Georgia exchange and moved to Maine

7   and in that regard, the significance of the Windstream-

8   Charter competition may matter.

9   Q    Your suggestion is that a two-exchange geographic

10  division could very well be as precise and reliable as the

11  1,400-exchange geographic division in Exhibit 60?

12  A    I don't think I said that.  I don't know what you mean

13  by precise.  You and I may define that differently.  The

14  1,400 exchanges is more granular, but in terms of

15  reliability, it depends on what purposes it's used for.  So

16  I'm not sure that I can make the categorical statements that

17  you'd like me to make.

18  Q    Can we agree, sir, that if there's -- if a given

19  exchange includes areas where Windstream and Charter do

20  compete and do not compete, both in the same exchange, it

21  would be classified as a Charter exchange in --

22            THE COURT:  Okay, I apologize.  We lost our

23  connection to the phone line, so I think people stopped

24  quite soon after I was waving my hands, but if -- I'll tell

25  you where we ended up is Mr. Kingston was asking about

1    whether in his example of dividing the country in two, an

2    eastern half and a western half, and Maine was not in the

3    eastern half, would it be a less effective comparison, and

4    Mr. Jarosz was saying that it depends.  People move from

5    place to place, et cetera.  So what's where I stopped being

6    able to hear you all.

7              MR. KINGSTON:  I sort of lost the thread after

8    that myself, Your Honor, so I think that that's fine.

9              THE COURT:  Okay.

10   BY MR. KINGSTON:

11   Q    So let me -- Windstream generally builds its exchanges,

12   according to Mr. Auman's testimony, around a central office.

13   You recall that, Mr. Jarosz?

14   A    Did you bills or builds its exchanges around a central

15   office?

16   Q    I said builds, but I think I was grasping for

17   identifies.  Whatever is the easiest way to answer my

18   question is fine with me, sir.

19   A    I'm not really sure what your question is.

20   Q    Oh, sure.

21   A    I know the testimony that Mr. Auman gave and that you

22   had us read.

23   Q    Without putting words in Mr. Auman's mouth or yours,

24   generally, if there's a central office in the town,

25   Windstream locates its exchange around that central office

1    and identifies that as a geographic unit.  Fair summary?

2    A    I don't know -- first of all, I don't think he

3    mentioned a town.  He said that exchanges are built or

4    centered around central office facilities.  I believe he did

5    say that.

6    Q    Okay.  Say an exchange is centered 20 miles around a

7    central office.  Are you with me so far?

8    A    I'm following your hypothetical, yes.

9    Q    Okay.  And in those 20 miles around that central

10   office, Windstream and Charter do compete.  Are you with me?

11   A    You're saying just accept that as part of your

12   hypothetical?

13   Q    Yes, sir.  Yes, sir.

14   A    Yeah.  Okay.

15   Q    And say that Windstream decided to expand that 20-mile

16   exchange into a 60-mile exchange and every bit of the

17   additional 40 miles represented a geographic area where

18   Windstream and Charter did not compete.  Are you with me so

19   far?

20   A    So you're saying it redefined an exchange?

21   Q    Yes, sir.

22   A    Okay.  Yes.  I'm following.

23   Q    And in redefining the exchange, included a great deal

24   of geographic area in which Windstream and Charter do not

25   offer services to the same subscribers.  Are you still with

1   me?

2   A    You mean, they don't compete head to head for every one

3   of the subscribers in that larger.

4   Q    Yes.  Are you with me?

5   A    I think so, yes.

6   Q    By expanding the exchange to include a geographic area

7   where Charter and Windstream don't necessarily compete,

8   would Windstream be making its use of changes to identify

9   competitors more reliable or less reliable?

10  A    It's different.  It's -- in the smaller exchange in

11  your hypothetical, there is quite vigorous direct

12  competition.  In the larger exchange in your hypothetical,

13  there is less vigorous direct competition, but there may be

14  indirect competition.

15  Q    Let me try it another way, sir.  I'm going to start all

16  the way over.  Do you mind if I do that?

17  A    No.

18  Q    Let's say if I was trying to figure out if you and I

19  ate out of the same refrigerator.  Are you with me?

20  A    Okay.

21  Q    I want to see who eats sandwiches out of this --- who

22  competes for sandwiches within the same refrigerator.  With

23  me?

24  A    Okay.

25  Q    One way that I can do that is to say, well, Mr.

1    Kingston and Mr. Jarosz are in the same city, so therefore,

2    they compete for the same refrigerator.  Would that be a

3    precise way of doing it?

4    A    Maybe I need to have an understanding of what you mean

5    by the word precise.  I think it's different from my

6    definition.

7    Q    If I use the word reliable, will that help you?

8    A    That -- I might be following you better --

9    Q    Okay.

10   A    -- using that term.

11   Q    I -- if I was trying to find a reliable way of

12   determining whether Mr. Jarosz and Mr. Kingston ate out of

13   the same refrigerator, and I said I can determine that by

14   determining whether or not they are in the same city, would

15   you view that as a reliable way of making that

16   determination?

17   A    Not in the abstract.  The more information I have about

18   our patterns would make me more comfortable about making

19   some observations on reliability in your hypothetical.

20   Q    If you and I -- if we were trying to -- boy, I said a

21   lot of words.  You mind if I start over just so our record

22   is clear?

23   A    No, I don't mind.

24   Q    If we were trying to determine if Mr. Jarosz and Mr.

25   Kingston were eating out of the same refrigerator, one way -

1  - one method would be to see if we were in the same state.

2  True?

3  A    Yes.

4  Q    A more reliable method would be to see if we were in

5  the same city.  True?

6  A    I'm sorry, more reliable than what, again?

7  Q    Than the statewide method.

8  A    Maybe, maybe not.  If neither of -- if one of us has

9  never used the refrigerator in the past, whether we look at

10  the state or city level doesn't provide much more

11  reliability.

12  Q    You wouldn't concede that trying to determine whether

13  or not two people ate out of the same refrigerator, your

14  chances of getting that determination right would be better

15  if you used the -- a city as a unit of measure as opposed to

16  a state?

17  A    It may be better, yes.  Not always, but it might be.

18  Q    You'll concede that trying to determine if two people

19  eat out of the same refrigerator would be a little more

20  reliable at the city level than it would be at the state

21  level.  Fair?

22  A    Yes, I think that's a fair statement.  Of course,

23  depending on other things like timing and do you and I both

24  eat lunch, and those kinds of things, but holding all else

25  constant, yes.

1    Q    There's a phrase that economists use called ceteris

2    paribus.  Are you familiar with that one?

3    A    Yes.

4    Q    Ceteris paribus, it would be more reliable in trying to

5    determine whether two people ate out of the same

6    refrigerator to use a citywide geographic unit than a

7    statewide geographic unit.  True?

8    A    I think I might more comfortably agree with the

9    following representation.  It's more likely, ceteris

10   paribus, that you and I ate out of the same refrigerator if

11   we reside in the same city versus just residing in the same

12   state.  I do agree with that.

13   Q    And if we narrowed it even down to the city block,

14   because we were trying to figure out if you and I ate out of

15   the same refrigerator and we narrowed our geographic unit

16   down to the city block, why that would be even more reliable

17   than at the city or the statewide level, ceteris paribus.

18   True?

19   A    Yes, that's a more likely indicator of competition if

20   we're both in the same block, in your hypothetical.

21   Q    And along the same lines, if we wanted to figure out if

22   you and I were trying to sell a vacuum cleaner to the same

23   person, why we would have a more reliable methodology if we

24   used geographic units at the city block as opposed to the

25   city level or the statewide level.  True?

1   A    I'm sorry.  I'm not following that hypothetical.

2   Q    All I did, sir, was change eating out of the same

3   refrigerator to selling vacuum cleaners to the same person.

4   Are you with me?

5   A    I didn't hear selling to the same person in your

6   hypothetical.  I apologize.

7   Q    No, it's no problem.  It's -- we're on Skype; I

8   understand.  Are you with me at this point, Mr. Jarosz?

9   A    If you wouldn't mind just restating that to make sure

10  that I'm with you.

11  Q    Along similar lines, sir, if we were trying to

12  determine whether two people were trying to sell vacuum

13  cleaners to the same person, it would be more reliable to

14  use a geographic measure based on city blocks than it would

15  be on citywide, than it would be on statewide, all else

16  being equal.  Is that fair, Mr. Jarosz?

17  A    I wouldn't use those words again.  What I would say is,

18  it's more likely that we compete for the same customer if we

19  -- if transportation costs matter and if we live in the same

20  block versus just living in the same state.

21  Q    Is it fair to say, Mr. Jarosz, that you are less likely

22  to get false positives related to either eating out of the

23  same refrigerator or selling vacuum cleaners to the same

24  person, in general, if you use a smaller geographic area?

25  A    I'm not sure that I would either agree or disagree with

1    that categorically.  I don't even really know what you're

2    asking.

3    Q    You can't -- you're not willing -- you're not prepared

4    today to concede that if you were trying to identify whether

5    two entities competed for the same customer, that using a

6    geographic footprint at the city block level would be more

7    reliable than at the citywide or state level?  Fair?

8    A    Using -- you're using the term more reliable.  It's

9    more likely that we compete if we're in the same city block

10   versus in the same state, depending on the service, of

11   course.

12   Q    What state are you in currently, Mr. Jarosz?

13   A    This moment, I'm in the District of Columbia, but I

14   live in the State of Virginia.

15   Q    I'm in Missouri.  If I was trying to figure out -- if I

16   was trying to figure out if you and I competed in the same

17   geographic area, Mr. Jarosz, and I treated the United States

18   as a geographic area, would it be possible that could

19   incorrectly conclude that you and I competed in the same

20   area because my unit of measure was too big?

21   A    I thought you said at the beginning, assume we both

22   compete.  I'm not following.

23   Q    I was trying to figure out, if you and I compete for

24   the same customers.  Are you with me?

25   A    Okay.  So what business are we hypothetically in?

1   Q    We're shoe salesmen.

2   A    Okay.

3   Q    I want to try and figure out if you and I sell shoes to

4   the same people.  You with me so far?

5   A    You're trying to determine if we're selling shoes to

6   the same customers.  Okay.

7   Q    How about this?  Let's be house painters.  Can we do

8   that, Mr. Jarosz?

9   A    Fine.

10  Q    Okay.  I want to find out if you and I are house

11  painters and we're in competition.  Fair?

12  A    Fine.

13  Q    Okay.  I'm trying to figure out a geographic area

14  that'll help me to that.  Are you with me?

15  A    I think so; although, I don't know what you're trying

16  to exactly accomplish, but I'm following your hypothetical.

17  Q    You're a house painter in Washington, D.C.  I'm a house

18  painter in Missouri.  With me?

19  A    Yes.

20  Q    If I use the United States as my geographic area, is

21  there a higher probability that I'm likely to erroneously

22  conclude that you and I are competitive house painters?

23  A    Really struggling with your hypothetical.  If you and I

24  have never competed for a job, we're not competitors.

25  Q    That's right.  But if I use the United States as my

1    area of measure, I could incorrectly conclude that you and I

2    were competitors because, well, we're both in the United

3    States, aren't we, sir?

4    A    If there's no evidence that you've competed, I wouldn't

5    come to the conclusion that we are competitors.

6    Q    Right.  It would be ludicrous to suggest that we're

7    competitors just because we're in the same arbitrary

8    geographic area that I've just articulated.  Isn't that

9    right, sir?

10   A    I agree with the following statement.  Competition is

11   not just determined by geographic positioning.

12   Q    Do you know whether broadband providers are required to

13   report where they provide broadband service?

14   A    Depending on the services they provide, some are, yes.

15   Q    Do you know whether any of the plaintiffs are required

16   to report where they provide broadband service?

17   A    I believe Charter is and I don't know about the various

18   Windstream entities.  Probably ---

19   Q    You don't know whether --

20   A    Probably some do have the requirement, but I'm not sure

21   about all of them.

22   Q    Some of the Windstream are required to report where

23   they provide broadband service?  That's your understanding,

24   sir?

25   A    I missed the very start of your question.  Would you

1    mind asking it again?

2    Q    Some plaintiffs are required to report where they

3    provide broadband service?

4    A    That makes sense to me, but I'm not a legal expert.

5    Q    You don't know whether any of the plaintiffs are

6    required to report where they provide broadband service by

7    the Federal Communications Commission?

8    A    I know that certain entities are required to provide

9    information to the FCC.  I don't know what those precise

10   requirements are.

11   Q    And among those certain entities are some of the

12   plaintiffs.  Is that right?

13   A    That makes sense to me.  I don't know as a factual

14   matter.

15   Q    Do you know which plaintiffs are required to report

16   where they provide broadband service to the FCC?

17   A    Not sitting here right now, I do not.

18   Q    Do you know whether broadband providers are required to

19   report the speeds at which they advertise their service to

20   the FCC?

21   A    I don't know for sure.  That would make some sense to

22   me, but I'm certainly not an expert in that.

23   Q    There something we could easily look up on the FCC's

24   website?

25   A    Probably, but I can't even say that for sure.

1   Q    Are you familiar at all with a compilation of data

2   maintained by the Federal Communications Commission called

3   the Fixed Broadband Deployment Map?

4   A    I think I've seen that, yes.

5   Q    I'm going to direct your attention, Mr. Jarosz, to

6   Defendant's Impeachment Exhibit 1.  Or, excuse me,

7   Defendant's Impeachment Exhibit 2.

8   A    Give me a moment.  I have a binder that starts with

9   four.

10          MR. ROSS:  Your Honor, this is Mr. Ross.  I can

11  facilitate things, here.  Mr. Kingston, you sent us a binder

12  that has, at the start, 364A, B, and then you start 1, 2, 3.

13  I think you mean the 1, 2, 3 after the 364.  I don't know

14  why you sent it that way, though.

15          MR. KINGSTON:  Mr. Ross is completely correct,

16  Your Honor.  Exhibits 364A and 364B are screenshots of the

17  voluminous Windstream Form 477 data that was provided as an

18  Excel spreadsheet as Defense Exhibit 364.

19          MR. ROSS:  If there's no objection from Mr.

20  Kingston from Charter, Your Honor, I'll walk next door and

21  make sure the witness has it in front of him to move things

22  along, with your permission, Your Honor.

23          THE COURT:  Okay.  Well --

24          THE WITNESS:  No need to do that.  I have two in

25  front of me.  It's after 364.

1           THE COURT:  I think how you explained it led him

2      to it.

3           MR. KINGSTON:  Thank you, Your Honor, and thank

4      you, Mr. Ross.

5      BY MR. KINGSTON:

6      Q    Do you see at the bottom of Defendant's Impeachment

7      Exhibit 2 the seal of the Federal Communications Commission?

8      A    Yes, is see what appears to be the FCC seal.

9      Q    And you see kind of the FCC logo there in the upper

10     lefthand corner?

11     A    Yes, I see that.

12     Q    And then do you see there on the righthand side,

13     there's what looks to be a census block ID?  You see that,

14     sir?

15     A    Yes.

16     Q    And then on the -- kind of continuing down the

17     righthand side, do you see a reference to Charter

18     Communications, Viasat, and Windstream Holdings?

19     A    There are others on that list, but I do see those

20     three, yes.

21     Q    And is the map in front of you captioned, "Fixed

22     Broadband Deployment"?

23     A    Yes.

24     Q    And do you see entities affiliated with Windstream

25     Holdings, Inc. identified as providers below the name

1    Windstream Holdings?

2    A    I see two entities listed below Windstream Holdings,

3    Inc.  I don't know what they are.

4    Q    You don't know whether Valor Telecommunications of

5    Texas, LLC is a plaintiff in this lawsuit?

6    A    I don't, without looking back at the list of

7    plaintiffs.

8    Q    And do you see the Charter download speed offered in

9    that area?

10   A    Yes, I do.

11   Q    And what is that speed?

12   A    940 mbps.

13   Q    And do you see the speed offered by Valor

14   Telecommunications of Texas in that same area?

15   A    No.  I see the download speed associated with

16   Windstream Holdings.

17   Q    And you know the difference between a holding company

18   and a subsidiary of a holding company, don't you, sir?

19   A    Generally.

20   Q    And what's the speed associated with Windstream

21   Holdings, Inc. on exhibit -- Defense Impeachment Exhibit 2?

22   A    75 mbps.

23   Q    And that's quite a bit slower than the 940 mbps, isn't

24   that right, sir?

25   A    Seventy-five is a fraction of 940.  I agree with that.

1   Q    Now, if you flip to Defense Impeachment Exhibit 1, do

2   you see the same broadband map for the same census block but

3   using the data available at the beginning of the year 2018,

4   which is the end of the year 2017?

5   A    Yes.

6   Q    And do you again see references to Charter and

7   Windstream?

8   A    Yes, I do.

9   Q    And what's Windstream 2017 speed?

10  A    Are you asking -- I'm sorry, what it was?

11  Q    Yes, sir.

12  A    75 mbps.

13  Q    And what's Charter's?

14  A    120 mbps.

15  Q    And do you see where that's the data as of December of

16  2017?

17  A    Yes.

18  Q    And if you turn back to Defense Impeachment Exhibit 2,

19  do you see that that's the data as of December 2018?

20  A    Yes.

21  Q    So roughly, Exhibit 1 -- excuse me, Defense Impeachment

22  Exhibit 1 is roughly the beginning of 2018 and Defense

23  Impeachment Exhibit 2 is roughly the beginning of 2019.

24  Fair?

25  A    Yes.

1   Q   And so in 2018, Charter and Windstream and the census

2   block associated with Fabens, Texas were at 120 megabits per

3   second and 75 megabits per second, respectively, and then in

4   2019, Charter jumped up to 940 megabits per second and

5   Windstream advanced to 100 megabits per second.  Is that

6   right?

7   A   Yeah --

8   Q   Oh, excuse me.  Windstream was still clunking around at

9   75 megabits per second, isn't that right, sir?

10   A   Windstream is 75 megabits per second in those two time

11   periods.

12   Q   My confusion was because something else happened

13   between 2017 and 2018.  You see that, sir?

14   A   Yes.

15   Q   And what happened was a new competitor entered that

16   census block, offering speeds at a higher download than

17   Windstream.  Do you see that?

18   A   Yes.  That's a satellite provider, but yes, I do see

19   that.

20   Q   And what speed does it offer?

21   A   100 mbps.

22   Q   And is that faster or slower than the speed that

23   Windstream offers?

24   A   I would expect that's faster, for the downloading

25   speed.

1    Q    And is Fabens, Texas identified as one of the Charter

2    exchanges on Exhibit 60?

3    A    I'll have to go to Exhibit 60.

4    Q    It's Plaintiff's Exhibit 60, and I apologize.  I will

5    try and remember the prefixes.  Plaintiff's Exhibit 60.

6    A    Looking at Page 50 of that exhibit, that appears to be

7    the case, yes.

8    Q    So that census block is within what Windstream has

9    identified as a Charter exchange.  Is that right?

10   A    Fabens is identified as a Charter exchange, yes.  I

11   think it is.

12   Q    And what happened there, Charter getting faster, that

13   only happens where Charter is, right?

14   A    I'm not following your question.

15   Q    Well, it's impossible to Charter to offer faster speeds

16   where Charter is not.  True?

17   A    It can offer that it has a faster speed, but in fact,

18   offers that speed advantage itself in that exchange.  I

19   agree with that.

20   Q    Right.  It is impossible for Charter to offer faster

21   speeds as compared to Windstream in exchanges where Charter

22   does not exist.  True?

23   A    It can't provide that service, that's right.  It can

24   advertise certain features, but not the service, if it's not

25   in that exchange.

1  Q    Right.  And of course, the FCC Form 77 data is the

2  fastest advertised speed, isn't that true, sir?

3  A    I don't know.

4  Q    And of course, speed is an important thing in the

5  telecommunications industry, isn't it, Mr. Jarosz?

6  A    To some -- in fact, probably many customers, certain

7  levels of speed matter.  I don't know if there's a direct

8  correlation between speed and utility.  There may be step

9  functions.

10 Q    That wasn't something you tested for in performing your

11 analysis?

12 A    Tested for what, in particular, do you have in mind,

13 Mr. Kingston?

14 Q    To see how speed impacted customers' purchase

15 decisions.

16 A    No.  I worked under the assumption that speed, in some

17 dimension, does matter.

18 Q    Where can I find your efforts to remove speed as a

19 compounding factor in your expert report?

20 A    I haven't.  I wouldn't need to because the analysis

21 that I did between Charter and non-Charter exchanges assumes

22 the speeds are as they are.  I didn't need to rip that out.

23 I needed to see what differed between those two sets of

24 exchanges and speed is not one thing that differed, to the

25 best of my knowledge.

1    Q    How does Charter offer faster Charter speeds in non-

2    Charter exchanges?

3    A    It doesn't.  I'm not following.  I think it offers the

4    speed that it does and that's the same speed, whether it's

5    in Charter exchanges or non-Charter exchanges.

6    Q    Your testimony to the Court today is that Charter

7    offers faster speeds in area where Charter doesn't offer

8    service?

9    A    I see what -- I see what you're asking.  That's --

10   you're absolutely correct.  The service is not provided by

11   Charter in non-Charter exchanges.  I stand corrected.

12   Q    So whatever the impact of Charter's faster speeds, that

13   would only be in Charter exchanges, true?

14   A    Yes, but faster than what?

15   Q    It's a fair question.  Can I ask you to turn to

16   Plaintiff's Exhibit 1?

17   A    I'm not sure if I have it in front of me.  I'll have to

18   go see if it's on the shelf here.  So on my model, speed

19   matters if it changed after March 2019 versus before.

20   Q    Does March of 2019 come after December of 2019, sir?

21   A    Yes.

22   Q    And does March of 2018 come after December of 2017?

23   A    Yes.  March of 2019 comes after January and February of

24   2019.

25   Q    And Form 477 data is reported by providers twice

1   annually.  Isn't that true?

2   A    That's my understanding, yes.

3   Q    In June and December?  True?

4   A    That makes sense to me.  I don't know with absolute

5   certainty, but that makes sense.

6   Q    And a hint as to when the Form FCC -- excuse me, the

7   Form 477 data is reported would be that little date,

8   December 2018 on Defense Impeachment Exhibit 2?

9   A    I saw December 2018 reported -- data reported there.

10  Q    Oh, I'm sorry, sir.  Did you have exhibit --

11  Plaintiff's Exhibit 1?

12  A    Yes, I do.  I think so.  Let me double check.  Yes.

13  Q    And --

14  A    You're talking about the complaint?

15  Q    Yes, sir.

16  A    Yes, I have that.

17  Q    And do you see an advertisement on Page 10 of

18  Plaintiff's Exhibit 1?

19  A    Yes.

20  Q    And what's the first word there?

21  A    On that --

22  Q    Yeah.  The advertisement, sir.

23  A    It appears to be superfast, is the first - is the top

24  left word.

25  Q    And do you think that Windstream put that word up there

1  because fast speeds matter to consumers, Mr. Jarosz?

2  A    Yes, I would imagine that's generally true.

3  Q    And what is the superfast speed that Windstream offers?

4  A    I see in a circled area, it says speeds up to 100 mbps,

5  and then it gives a price for that.

6  Q    Turn to Joint Exhibit 10, if you would, sir.

7  A    All right, I'm there.

8  Q    Do you see a speed in the upper lefthand corner

9  displayed on a computer monitor?

10  A    Yes.

11  Q    And what's that speed?

12  A    200 mbps.

13  Q    And is that faster or slower than Windstream's

14  superfast speed on Exhibit 1?

15  A    I believe that's faster.  Whether that difference

16  matters to consumers, I don't know.

17  Q    Do you know whether Windstream was worried about cable

18  companies offering faster speeds in 2018, Mr. Jarosz?

19  A    I think it was generally aware of what the competitors

20  were doing, and speed is one dimension on which the

21  companies compete.

22  Q    Do you have in front of you Defendant's Exhibit 3?

23  A    I think I'll have to go get it.  Hold on.  I'm not sure

24  -- oh, here's one more binder.  I'm sorry.  Yep.  Yes, I

25  have that open in front of me.

1    Q    You turn to Page 28?  Actually, can you tell me what

2    Defendant's Exhibit 3 is?

3    A    This appears to be Windstream's 10K for the year 2018.

4    Q    And that's a document that you reviewed in preparing

5    the report that you offered in this case, isn't it true, Mr.

6    Jarosz?

7    A    I think it's one of the documents, yes.  What page were

8    you directing my attention to?

9    Q    Twenty-eight.  Defendant's Exhibit 28 -- you can see

10   the page in the bottom lefthand corner.  The pagination does

11   differ from the document itself.

12   A    I'm there.

13   Q    Okay.  And what does the top line read, sir?

14   A    "Risks relating to our business."

15   Q    And then are there risks kind of set forth on the

16   following pages?

17   A    Yes.

18   Q    If you'll turn to Page 36.

19   A    I'm there.

20   Q    Do you see a risk identified, "New technologies may

21   affect our ability to compete in our consumer markets"?

22   A    Yes, I see that.

23   Q    And I read the last sentence of that first paragraph as

24   follows.  "In addition, cable operators may be able to take

25   advantage of certain technology to deploy faster broadband

1   speeds more rapidly than Windstream."  Have I read that

2   correctly?

3   A    You did, yes.

4   Q    Then I read the next -- I'll just go on to the last

5   sentence of the next paragraph as follows.  "If we cannot

6   develop new services and products to keep pace with

7   technology's advances -- with technological advances,"

8   excuse me, "or if such services and products are not widely

9   embraced by our customers, our results of operations could

10  be adversely affected."  Have I read that correctly?

11  A    Yes.

12  Q    Can I direct your attention back to the Defense

13  Impeachment binder, sir?

14  A    There are two of them.  Which one should I access?

15  Q    The one that contains the broadband map to which we

16  were referring earlier.

17  A    I'm sorry.  I don't remember that number.

18  Q    I'm looking at Defense Impeachment Exhibit 4.

19  A    All right, I'm there.

20  Q    And do you see, again, the FCC logo in the upper

21  lefthand corner?

22  A    Yes, I do.

23  Q    And this is another portrayal of the fixed broadband

24  deployment data map, isn't that right, sir?

25  A    I'm not sure if it says that here.  Maybe there's

1    something that...

2    Q    If you look up at the very top of the document, do you

3    see a URL link identifier?

4    A    Yes.

5    Q    And does that say https://broadbandmap.fcc.gov and then

6    continue to say some more stuff?

7    A    Yes.

8    Q    So that's the broadbandmap.fcc.gov?

9    A    It's from that website.  I don't know for sure what

10   this is a map of.

11   Q    Okay.

12   A    Besides the fact that it says, "Provider coverage

13   overlap and population coverage."

14   Q    And do you see on Page 2 of Defense Exhibit 4 a

15   breakdown of the percent of each provider's broadband

16   footprint for different speeds and technologies?

17   A    Yes.  You're talking about the bar chart in the middle

18   of the page?

19   Q    Yes, sir.  It says speed, any technology.  You see

20   that, sir?

21   A    -- right.  I do, yes.

22   Q    And I see Windstream in blue and Charter in red.  You

23   see the same thing?

24   A    I do, yes.

25   Q    And do you see the date as to what timeframe of data is

1    portrayed on Defense Impeachment Exhibit 4 there in the

2    middle of the page?

3    A    Yes, I think so.

4    Q    And what date is that, sir?

5    A    December 2017, it says.

6    Q    So that's kind of roughly the beginning -- December

7    2017, roughly the beginning of 2019.  Fair?

8    A    I would say December 2017 is more likely -- roughly the

9    beginning of 2018, not '19.

10   Q    Thank you for the correct.  I misspoke, sir.  And what

11   percentage of the advertised speeds of at least 500 megabits

12   and over is associated with Windstream there?

13   A    I don't know the exact number, but it looks like

14   something on the order of five.  Might be less than that.

15   Q    Does roughly 4.17 percent sound right to you, sir?

16   A    Yes.

17   Q    And then, again, at the beginning of 2018, what's the

18   percentage of speed in the Charter footprint that's at least

19   500 megabits per second?

20   A    I can't say for sure, but it looks like something on

21   the order of 15 percent.

22   Q    Does roughly 17.91 percent sound fair to you, sir?

23   A    Yes.

24   Q    And then if we look at Defense Impeachment Exhibit 5,

25   do we see the same data as Defense Impeachment Exhibit 4,

1    but this time at the beginning of 2019?

2    A    I'm sorry, is there a question?

3    Q    I'm asking you if you see the same thing I see when you

4    look at exhibit -- Defense Impeachment Exhibit 5.

5    A    I see data as of December 2018.

6    Q    So, beginning of 2019?

7    A    Yes, roughly the beginning, yes.

8    Q    And roughly the beginning of 2019, what's the

9    percentage of Windstream's speed that is in excess of at

10   least 500 megabits per second?

11   A    It looks like it's close to 100 percent.

12   Q    500 megabits per second?

13   A    I'm sorry, I was answering for -- with regard to

14   Charter.  You were asking Windstream?

15   Q    Yes, sir.

16   A    That number is about 5 percent, again.

17   Q    So at the beginning of 2019, according to the FCC's

18   broadband map data, the percentage of the footprint of

19   subsidiaries that Windstream Holdings offering speeds of at

20   least 500 megabits per second, was roughly 4.91 percent.

21   Does that sound right, sir?

22   A    That sounds right, yes.

23   Q    And you beat me to it, but did Charter's speed go up or

24   down between 2000 -- the beginning of 2018 and the beginning

25   of 2019?

 1    A    I don't know that the speed went up or down, but

 2   they're more -- there's a larger percentage of speed being

 3   in the category of 500 mbps in 2018 versus 2017.

 4    Q    Did Charter offer faster speeds in more places or fewer

 5   places in 2019 as opposed to 2018?

 6    A    I don't know.  I don't think you can tell, based on

 7   this right now.

 8    Q    You can't tell --

 9    A    If it's more -- I can't tell if it's more places or

10   just higher speeds in existing locations.

11    Q    I read the middle of that page to say, "A percent of

12   each provider's broadband footprint for different speeds and

13   technologies."  You read it the same way?

14    A    Yes.  You're exactly right.

15    Q    So did the percentage of Charter's footprint where it

16   offered speeds in excess of 500 megabits per second increase

17   from 2018 to '19 or decrease?

18    A    It appeared to increase from December 2017 to December

19   2018.

20    Q    And that increase was from 17.91 percent to 98.93

21   percent, right?

22    A    That sounds about right, and I expect it's probably

23   looking over the prior year, in other words, the first chart

24   covered all of 2017 and this covered all of 2018.  But I

25   don't know that for sure.  Said a different way, it looks

1    like Charter achieved many of its speed advantages before

2    the 2019 observation period that I looked at in my model.

3    Q    December '18 comes before March 2019, right?

4    A    Correct.

5    Q    And are there any intervening reporting periods between

6    December '18 and March of 2019?

7    A    Not for this report, to the best of my knowledge.

8    Q    You're not aware of either Charter or Windstream or any

9    of their subsidiaries submitting reports in the three months

10   between December of 2018 and March of 2019?

11   A    I don't think I'm aware of any submissions, at least to

12   the FCC, but I could be wrong.

13   Q    Do you have defendant's exhibit -- excuse me.  Do you

14   have Plaintiff's Exhibit 60 with you, Mr. Jarosz?

15   A    Yes.

16   Q    You find Odenville, Alabama on defendant's exhibit --

17   excuse me, Plaintiff's Exhibit 60?  I apologize.

18   A    Yes.

19   Q    And is that identified as an exchange in which Charter

20   and Windstream compete or one in which they do not compete?

21   A    It appears to be one in which they compete.

22   Q    You turn to plaintiff's -- excuse me -- Defense

23   Impeachment Exhibit 23?

24   A    Yes, I have that.

25   Q    And is this -- you see the FCC seal, again, at the

1  bottom of Defense Impeachment Exhibit 23?

2  A    Yes, that appears to be the seal.

3  Q    And the logo on the upper lefthand side?

4  A    Yes, I see that.

5  Q    And it looks similar to fixed broadband deployment data

6  and you and I have talked about earlier today?

7  A    Yes.

8  Q    And is that -- do you see Odenville, Alabama there?

9  A    Yes.

10  Q    And do you see a census block?

11  A    Yes.

12  Q    And so that census block ending in 4063 is in

13  Odenville, Alabama?

14  A    That appears to be the case, yes.

15  Q    And according to the certified data that Windstream

16  Holdings and its subsidiaries provided to the FCC, is

17  Windstream Holdings in that census block?

18  A    It doesn't appear to be the case, based on this

19  document; although, I'm not certain I know the date of this

20  document.

21  Q    All right.  Do you see a date --

22  A    Oh, there it is.

23  Q    -- 2018?

24  A    Yes.  I see it.

25  Q    And if you turn to Defense Impeachment Exhibit 24 --

1    no, I apologize.  Twenty-five, I think, is what I'm looking

2    for.

3    A    I'm there.

4    Q    Mr. Jarosz, bear with me for just a moment.  I'm lost,

5    now.  Oh, I see.  Okay.  Exhibit -- Defendant's Exhibit 25.

6    The orientation is changed.  That threw me.  And does that

7    look like it's just moved over one census block from the

8    census block depicted on Defense Impeachment Exhibit 23?

9    A    I don't know.

10   Q    You see Odenville, Alabama listed on the map?

11   A    On 25 I do, yes.

12   Q    And then it looks like we've just moved over one spot

13   to the left.  Do you see the other -- the First Avenue,

14   Autrey Avenue that are on both maps?

15   A    I see Autrey Avenue.  I'm not sure that I see First

16   Avenue on Exhibit 23.

17   Q    If you look right above the little yellow --

18   A    Oh, there it is.  It's red -- there's red through it.

19   Yes, I see that.

20   Q    Okay.  And so it looks like if you do a search for

21   Odenville, Alabama on the fixed broadband deployment map, it

22   puts you in the middle of a census block depicted on Defense

23   Impeachment Exhibit 23 in which Windstream does not offer

24   service.  Do you see that?

25   A    I see 23, yes.

1    Q    And do you see Windstream there?

2    A    No, I do not.

3    Q    You do see Autrey Avenue and you so see First Avenue,

4    although it's got a line through it?

5    A    Yes, on 23.

6    Q    And then if you go to 25, do you see the census block

7    on the immediate left of the one we were just looking at on

8    Defense Impeachment Exhibit 23?

9    A    That appears to be the case, though I can't say that

10   with absolutely certainty, but that appears to be the case.

11   Q    And in that census block, do we find Windstream

12   Holdings and some subsidiaries?

13   A    Yes.

14   Q    In either of those, do you see Charter?

15   A    No, not as of December 2018.

16   Q    And March of 2019 comes three months after December of

17   2019?  Is that right?

18   A    Correct.  Yes, that's correct, although I don't -- I'm

19   not sure census block is defined to be equivalent to an

20   exchange in Windstream's analysis.

21   Q    Indeed, it looks like a census block is much, much

22   smaller than an exchange.  True?

23   A    I don't know that.  I would imagine in some instances,

24   it is.

25   Q    Well, Windstream gave you a piece of paper that you're

1    holding as Plaintiff Exhibit 60 that said -- that identifies

2    an exchange as Odenville, Alabama, correct?

3    A    The name of the exchange is Odenville, Alabama, yes.

4    Q    And according to the data that Windstream provided to

5    the FCC, in the census block right in the middle of

6    Odenville, Alabama, Windstream does not provide services.

7    Isn't that what Defense Impeachment Exhibit 23 indicates to

8    you, Mr. Jarosz?

9    A    Defendant's Exhibit 23 says as of December 2018,

10   Charter was not a provider.

11   Q    Nor in the census block in the middle of Odenville,

12   Alabama, according to Defense Impeachment Exhibit 23, was

13   Windstream.  Isn't that true, sir?

14   A    Yes, based on the census block in 23, yes.

15   Q    And so if we were just using an exchange to figure out

16   where Windstream was and we said Odenville, Alabama, why we

17   would mistakenly believe that Windstream was in a census

18   block ending with 24063.  Isn't that right, sir?

19   A    No, I didn't do an analysis at the census block level.

20   I did an analysis at the exchange level.

21   Q    Well, you didn't do the analysis on defendant's -- or

22   on Plaintiff's Exhibit 60 at all.  Isn't that right, sir?

23   A    Those were the underlying data that I used.  I'm not

24   following you.

25   Q    You didn't purport to identify the Charter exchanges

1    and the non-Charter exchanges.  Isn't that right, sir?

2    A    Correct, I did not.

3    Q    And because you're not the one who identified the

4    Charter exchanges and the not Charter exchanges, you're not

5    the one who can explain to the Court why the exchange in

6    Odenville, Alabama that is identified as a Charter exchange

7    doesn't actually include Charter.  Isn't that true?

8    A    Again, the exchange is not necessarily coincident with

9    a census block.  Moreover, what's in the census block is

10   only what's reported for certain providers.

11   Q    And the provider that we're interested in is Charter,

12   right?

13   A    Yes.

14   Q    Does Windstream define Charter as just a provider in

15   that -- in the Odenville, Alabama exchange or as a primary

16   competitor?

17   A    Primary competitor.

18   Q    Can you find that primary competitor in Defense

19   Impeachment Exhibit 25, sir?

20   A    No.  But again, this census block is not the same as an

21   exchange.

22   Q    Are you aware of broadband providers that report

23   exchanges to the Federal Communications Commission?

24   A    No.

25   Q    That's not --

1    A    I believe --

2    Q    -- a thing that they do, right?

3    A    I believe that's correct.  I believe its Windstream's

4    analysis to assess its competitors.

5    Q    And Windstream's analysis to assess its competitor is

6    different than the results depicted on the fixed broadband

7    deployment data maintained by the FCC, right?

8    A    Maybe different, maybe not.  Again, I don't know the

9    precise definition of Odenville in Exhibit 60, and I don't

10   know if that's coincident with what's in Exhibit 23 and

11   Exhibit 25.

12   Q    Somebody could explain why the exchange identified as

13   Odenville, Alabama, when plugged into the FCC broadband

14   data, fails to identify Charter, yes?

15   A    What is your question, again?

16   Q    Somebody can explain why Charter is not on the FCC

17   broadband map for Odenville, Alabama; it's just not you.

18   A    Yes, I would expect the answer to be in that geographic

19   area in the fixed broadband deployment map that as of that

20   point in time, Charter didn't offer services to the best of

21   the author's knowledge.

22   Q    And so the data that you relied on said that Charter

23   did offer services and did compete with Charter in

24   Odenville, Alabama, right?

25   A    In an exchange that they called Odenville, Alabama,

1    which might be broader than the sum of 23 and 25.

2    Q    Is there an exchange reference for Catlettsburg,

3    Kentucky on Plaintiff's Exhibit 60?

4    A    Yes.

5    Q    Does Plaintiff's Exhibit 60 suggest to you that Charter

6    and Windstream compete in Catlettsburg, Kentucky?

7    A    That is Windstream's belief as of the date of the

8    production of this data, yes.

9    Q    Do you know who a Windstream formed the opinion that

10   Windstream and Charter compete in Catlettsburg, Kentucky?

11   A    I don't know who designated the primary competitor as

12   Spectrum.

13   Q    You don't know who made that decision that we're going

14   to say that Spectrum and Windstream compete in Catlettsburg,

15   Kentucky, do you, sir?

16   A    Correct, I do not.

17   Q    And so whoever that person is, he or she is not here

18   for me to ask questions to.  Is that right?

19   A    I don't know.

20   Q    Maybe lurking on the Skype call?  Do you see Defense

21   Impeachment Exhibit 30, sir?

22   A    Yes.

23   Q    Is Defense Impeachment Exhibit 30 another screenshot

24   from the FCC's fixed broadband deployment data map?

25   A    Yes, again, as of December 2018.  This is not 2019 or

1    2020.

2    Q    One of the premises of your opinion, Mr. Jarosz, was

3    that Windstream and Charter competed in the same exchanges

4    in 2018 and in 2019, correct?

5    A    No, I don't know that that's necessarily correct.  I

6    know that they competed in certain exchanged in 2018 and

7    certain exchanges in 2019.  I don't know that those were

8    identical across the years.

9    Q    So another thing that could have happened between

10   December '18 -- excuse me, between 2018 and 2019, is that

11   Charter may have entered new competitive areas.  Is that

12   true?

13   A    Entered or exited, yes.  That's true.

14   Q    And if Charter is entering a new area, would it be

15   likely to get more or less business than an area that it

16   didn't exist in before?

17   A    Holding all else constant, more likely to get more.

18   Q    Yeah.  So if Charter is coming into new areas, Charter

19   is going to get more business because you can't get business

20   in an area in which you don't offer business.  Fair?

21   A    Yes, I think that's fair.

22   Q    And so what you're telling the Court is that a lot of

23   these places in 2019 or some number of these places in 2019

24   are places where Charter did not offer service, but now

25   does?

1    A    That's possible, yes.

2    Q    In any event, Plaintiff's Exhibit 60, which was the

3    underpinning for your lost profit analysis, tells you that

4    the Catlettsburg, Kentucky exchange is an exchange in which

5    Charter and Windstream compete.  Is that right, sir?

6    A    As of the point in time of the production of this

7    document, yes.

8    Q    And do you see Charter in the FCC's fixed broadband

9    deployment data for Catlettsburg, Kentucky as of the

10   beginning of the year 2019?

11   A    I see at the end of 2018, yes.

12   Q    Is there a whole heck of a lot of 2018 left between

13   December and January 1, 2019?

14   A    No, but the FCC report covers six months of 2018 or

15   perhaps it covers 12.  I'm not sure.

16   Q    Is it a fair inference that it covers six, given that

17   you have to submit reports in June and December?

18   A    I don't know if you present full-year results in

19   December of 2018.

20   Q    That's something we could look up on the FCC's website,

21   isn't that right?

22   A    Probably, yes.

23   Q    That's public information.  That's not something that's

24   subject to reasonable dispute, correct?

25   A    I think that's correct, yes.

1    Q    Does your Plaintiff's Exhibit 60 suggest to you that

2    Charter and Windstream compete in Dover, Kentucky?

3    A    Yes.

4    Q    If you look at Defense Impeachment Exhibit 31, is it

5    consistent with or inconsistent with that suggestion?

6    A    As of December 2018, for Dover, Kentucky, looking at

7    Exhibit 31, it appears that Charter is not a provider.

8    Q    What about Madison, Missouri?  Does Plaintiff's Exhibit

9    60 suggest to you that Charter and Windstream compete in

10   Madison, Missouri?

11   A    Yes.

12   Q    You turn to Defense Impeachment Exhibit 38?

13   A    I'm there.

14   Q    Is the FCC's fixed broadband deployment data for

15   Madison, Missouri consistent with or inconsistent with the

16   representation upon which you relied in Plaintiff's Exhibit

17   60?

18            MR. ROSS:  I'm going to object to that, Your

19   Honor.  This is Mr. Ross.  It assumes a fact not in

20   evidence, and that fact is that the exchange information is

21   exactly identical to the census block information, which the

22   witness has already said it's not.

23            THE COURT:  You could rephrase the question, Mr.

24   Kingston.

25   BY MR. KINGSTON:

1    Q    Do you see Charter in the FCC's fixed broadband

2    deployment data associated with the address, Madison,

3    Missouri, United States?

4    A    I do not, but as I've said before, these census blocks

5    may not be exactly the same as the Windstream exchanges.

6    Q    Are you aware of any broadband providers that are

7    required to report exchanges to a government entity under

8    penalty of perjury?

9    A    No.

10   Q    Are you aware of broadband providers having to provide,

11   by census block, information to the Federal Communications

12   Commission?

13   A    I am aware of the existence of the Form 477s and the

14   census block information.  I don't know precisely what the

15   obligation is.

16   Q    Is the reporting unit the census block?

17   A    Of the last several exhibits we've look at, yes.  That

18   is the impeachment exhibits.

19   Q    You're not suggesting that the FCC requires data be --

20   the reporting unit to be exchanges.  Is that right?

21   A    Correct.  I believe that's the way Windstream keeps its

22   data and examines its position in the marketplace.

23   Q    And the uniform reporting unit that Windstream and

24   Charter and Comcast and everybody else uses when they're

25   filing forms that they're required to file by law with the

1   FCC is the census block.  Isn't that right?

2   A    I understand that they do provide census block

3   information.

4   Q    And so if you wanted to compare apples to apples, what

5   you could compare would be census blocks, because that's

6   what everybody uses.  Isn't that so?

7   A    There are census block data for those companies who are

8   required to file information for Forms 477.  Those are not

9   necessarily coincident with the data that Windstream uses in

10  examining its business and its success in the marketplace.

11  Q    When Windstream reports data to the Federal

12  Communications Committee -- Commission, excuse me, as it is

13  obliged to do by law, does it do so in the census block unit

14  or the exchange unit?

15  A    Census block unit, to the best of my knowledge.

16  Q    And a census-to-census block is much closer to apples

17  to apples than census block to exchange.  Isn't that so,

18  sir?

19  A    Yes, but data may not exist at the census block level

20  within Windstream.  It does exist at the Charter -- at the

21  exchange level.

22  Q    Explain to me how data cannot exist at the census block

23  level at Windstream when Windstream is obliged by law to

24  report data at the census block level to the FCC.

25  A    I don't know exactly its requirements, but I think it

1   needs to report whether it operates in a certain census

2   block.  For its exchange data, it has information about its

3   performance in those exchanges.

4   Q    Does Windstream identify the speeds at which it offers

5   -- or which it advertised in the census block associated

6   with Murdock, Nebraska, in Defense Impeachment Exhibit 39?

7   A    That's a reasonable surmise.  I see download

8   information and upload information that is speed associated

9   with Windstream.

10  Q    Do you see Charter in the fixed broadband deployment

11  data associated with Murdock, Nebraska?

12  A    Do I see Charter's name?  No, I do not.

13  Q    Is Charter identified as a competitor associated with

14  the Murdock, Nebraska exchange?

15  A    Yes.  Again, they're different points in time and

16  different definitions, but for the Windstream data for

17  exchanges, they are identified as a competitor in Murdock.

18  Q    Are they identified as an incidental competitor or a

19  primary competitor?

20  A    Well, there's no designation for incidental.  They're

21  identified as a primary competitor.

22  Q    Do you see that primary competitor on Defense

23  Impeachment Exhibit 39?

24  A    I'm sorry, do I see Charter or Spectrum?  The answer is

25  no.  I thought you asked that already.

1    Q    Anahuac, Texas.  Do you see an exchange --

2              MR. ROSS:  Your Honor, I'd like to object to any

3    further questions on this.  It's clear that the witness

4    established that these are comparing apples to oranges and

5    we're perfectly happy to stipulate that census blocks and

6    exchange comparisons are apples to oranges, and I don't see

7    that we should be here until 7:00 going through every one of

8    these census blocks, which is not part of Mr. Jarosz's

9    analysis.

10             MR. KINGSTON:  Your Honor, Mr. Jarosz is the only

11   person here who I can ask these questions to, because

12   whoever put together the exchange report has never been

13   identified as an expert witness or produced in this case.

14             MR. ROSS:  Mr. Auman's coming to testify.  You

15   didn't want testify -- him to testify today.  You said that

16   expressly.  We'll wait on him.  The judge offered you the

17   opportunity to take -- do part of his examination today, and

18   you declined.  So please don't say that.

19             THE COURT:  I -- Mr. Kingston, do you have a

20   series of exhibits left to go like Exhibits 31, 38, and 39?

21             MR. KINGSTON:  If the Court is suggesting to me

22   that the Court gets the point and I should move along, I'm

23   happy to --

24             THE COURT:  Well, I -- no, let me -- the reason

25   I'm asking is, if there's no objection to the -- to your

1    identifying each exhibit that you would otherwise take Mr.

2    Jarosz through, and then link it up to the name on Exhibit

3    60, then I think we can do it that way as opposed to having

4    him just repeat the same thing.

5            MR. KINGSTON:  I think --

6            THE COURT:  -- if there's an objection to those

7    exhibits, then I guess we need to go one -- exhibit by

8    exhibit or deal with it with Mr. Auman, but I think we can -

9    - I mean, the only reason to go through all of them is to

10   see how many are like that, but I think you can do that

11   without Mr. Jarosz doing it.

12           MR. KINGSTON:  We didn't make an effort to do

13   that, Your Honor.

14           THE COURT:  Okay.

15           MR. KINGSTON:  So I -- what I'm saying is, Defense

16   Impeachment book doesn't purport to include the universe of

17   mis-identified exchanges.

18           THE COURT:  All right, but I don't see why we

19   can't just agree that whatever ones you want to identify,

20   Mr. Ross can see if they are as you've identified them, and

21   then the parties can argue how they compare to the name on

22   Exhibit 60.  We don't need to have Mr. Jarosz for that.

23           MR. KINGSTON:  I think that's --

24           MR. ROSS:  Your Honor, I'm happy, on behalf of

25   Windstream, to have Mr. Kingston send me a subset of his

1   exhibits here that are census block that he thinks are

2   relevant and, without agreeing that they're relevant, I'm

3   happy to say they're fine, to --

4           THE COURT:  Okay.

5           MR. ROSS:  -- not object to their entry.

6           THE COURT:  Why don't we do that, then?  Because I

7   think at this point, the witness' testimony is just

8   cumulative.  Each of you have your points on these exhibits

9   and you can deal with just getting the rest of them covered

10  by following that procedure.

11          MR. KINGSTON:  Thank you, Your Honor.

12  BY MR. KINGSTON:

13  Q   Mr. Jarosz, you recall just recently had a colloquy

14  with the Court and my friend at the other table about

15  possibly asking Mr. Auman about identifying the markets in

16  which Windstream and Spectrum compete?  You recall that just

17  a moment ago, sir?

18  A   Yes.

19  Q   One of the documents that you reviewed in preparing

20  your expert report was the corporate representative

21  deposition testimony that Mr. Auman provided on September

22  24th, 2019.  Isn't that so?

23  A   Yes, I think so.

24  Q   And do you have that in front of you, sir?  It is

25  Defense Impeachment Exhibit 65.

1    A    Yes, I do.

2    Q    And I'm looking at Page 98.  I'm sorry, I'm looking at

3    Page 97, Line 25 through 99, 11.  Excuse me, through 99, 1.

4         MR. ROSS:  Your Honor, before question gets asked,

5    I thought I was very generous before when you referred to

6    this.  Is Mr. Kingston attempting to impeach this witness

7    with somebody else's deposition testimony?  Because

8    otherwise, it's in appropriate.  If he wants to enter this

9    deposition in the record, we had a date and a deadline for

10   designating depositions, and he either did or didn't

11   designate this, in which case, we can move on.

12        MR. KINGSTON:  Your Honor, Mr. Jarosz identified

13   this deposition as a document on which he relied in forming

14   his opinion.  I'm obviously allowed to ask him questions

15   about the documents on which he relied in forming his

16   opinions.

17        MR. ROSS:  He is entitled to do that, Your Honor.

18   He's not entitled to read it into the record.  If he has a

19   question to ask, let him ask the question.

20        MR. KINGSTON:  My question is going to be about

21   what the document says, Your Honor.  I don't know how to --

22   I could wave it at him, but beyond reading the document, I

23   don't know how to work with a document.

24        MR. ROSS:  Oh, come on, Mr. Kingston.  The way

25   it's done is you ask him, do you remember being -- relying

 1    on his statements as to how a market was identified.  I

 2    mean, otherwise, you're circumventing the rule against

 3    putting in deposition designation that you failed to

 4    designate.

 5    BY MR. KINGSTON:

 6    Q    Mr. Jarosz, when you reviewed Mr. Auman's deposition,

 7    did he indicate -- did that deposition indicate to you

 8    whether identifying the competitive markets was his area or

 9    Brad Brannon's area?

10    A    I don't recall one way or the other.

11    Q    I direct your attention, sir, to Page 98, Lines 21

12    through 23.  Or, excuse me, 21 through 99, Line 1.  "You say

13    it's not your area.  Whose area is it?"

14              MR. ROSS:  I'm sorry to object again, Your Honor -

15    -

16    BY MR. KINGSTON:

17    Q    -- "Brad" --

18              MR. ROSS:  I'm sorry, this is inappropriate

19    recollection refresh.  Again, you do not read into the

20    record the deposition testimony.  You show it to the witness

21    and ask if that refreshes his recollection.

22              MR. KINGSTON:  I appreciate my friend at the other

23    table's tutelage, Your Honor, and I'm happy to do it in that

24    fashion.

25    BY MR. KINGSTON:

1   Q    Mr. Brannon -- or, excuse me, Mr. Jarosz, having

2   reviewed Defendant's Exhibit -- Impeachment Exhibit 65, does

3   that refresh your recollection as to whether understanding

4   the competitive markets was Brad Brannon's responsibility or

5   Jeff Auman's responsibility?

6   A    It actually doesn't refresh my memory.  I see what's

7   written here, but it doesn't bring a memory back into mind.

8   Q    Did you talk to Brad Brannon in preparing your report?

9   A    I or somebody at my office did.

10            MR. KINGSTON:  What exhibit was that?  Was that

11   58?

12            WOMAN 1:  Which one?

13            MR. KINGSTON:  His -- Mr. Jarosz's report.

14            THE COURT:  Yes, it was 58.

15   BY MR. KINGSTON:

16   Q    Mr. Jarosz, was your report Defendant's Exhibit 58?

17            THE COURT:  Yes.  Impeachment 58.

18            MR. KINGSTON:  Thank you, Your Honor.

19            THE WITNESS:  You're directing my attention to

20   Defendant's Exhibit 58?

21            THE COURT:  Defendant's Impeachment Exhibit 58.

22            THE WITNESS:  Oh, Impeachment Exhibit.  I'm sorry.

23   All right.  I have that in front of me.

24   BY MR. KINGSTON:

25   Q    Do you see a discussion of -- can I direct your

1    attention, sir, to page 29?

2    A    Is it stamp page 29 or text page --

3    Q    Yes, that is a fair question.  It's 58.029.

4    A    Okay.  I'm there.

5    Q    And do you see paragraph 50 where you discuss

6    Windstream dividing its customers into Windstream exchanges

7    and Charter exchanges -- or all exchanges and Charter

8    exchanges?

9    A    Yes.

10   Q    And that data is reported in an Excel spreadsheet that

11   is Plaintiff's Exhibit 60.  Correct?

12   A    It's not that I identify Plaintiff Exhibit 60 here but

13   I believe that's the correct reference.

14   Q    And who did you have a conversation with related to

15   dividing Windstream's geographic footprint into all

16   exchanges and Charter exchanges?

17   A    Again, I don't recall.  I see at the end of footnote 99

18   there's reference to a conversation with Brad Brannon.

19   Whether discussed there was all exchanges versus Charter

20   exchanges, I don't recall.

21   Q    Does paragraph 50 talk about all exchanges versus

22   Charter exchanges?

23   A    Yes.  But it's generally --

24   Q    And is there a footnote associated with paragraph 50?

25   A    I'm sorry.  I  --

1   Q    Is there a footnote associated with paragraph 50?

2   A    Yes.  As I just --

3   Q    And does that footnote identify a person?

4   A    Yes.

5   Q    And is that person Mr. Ammon?

6   A    No.

7   Q    Is that person Mr. Brannon?

8   A    Yes.

9   Q    Mr. Jarosz, do you know how many states -- strike that.

10       Directing your attention back to Plaintiff's Exhibit 60

11  --

12  A    Just give me one moment.

13  Q    I'm sorry.  That's fine, sir.

14  A    All right.  I'm there.

15  Q    Do you see a first exchange on page 18 of 60, Ashville,

16  Alabama?

17  A    Yeah, yeah.  Yes, I see that.

18  Q    Do you know how many of the direct mailers at issue

19  were mailed into Ashville, Alabama?

20  A    I do not.  And I wasn't aware that only direct mailers

21  were at issue.

22  Q    Do you know how many letters were mailed to Ashville,

23  Alabama?

24  A    No.

25  Q    Do you which Windstream customers received the Charter

1    advertisements that were the subject of plaintiff's claims

2    in this adversary proceeding?

3    A    No.

4    Q    Can I direct your attention to Defendant's Exhibit 146?

5    A    All right.  I'm there.

6    Q    Defendant's Exhibit 146 to my eye has a caption

7    consistent with this case and then on page 2 indicates that

8    it's debtor's responses and objections to Charter

9    Communication, Inc's interrogatories.  Do you read the

10   caption and the first page of -- or the first part of page 2

11   the same way, Mr. Jarosz?

12   A    Yes.

13   Q    And then I see a question posed on page 4.  Do you see

14   that, sir?

15   A    An interrogatory?

16   Q    Yes, sir.

17   A    Yes.

18   Q    And does that interrogatory ask the plaintiffs to

19   identify all Windstream customers that you contend received

20   the Charter advertisements that are the subject of your

21   claims in this adversary proceeding?

22   A    Yes.

23   Q    And then do you see about a page's worth of objections

24   and then starting on page 146 -- excuse me -- starting on

25   page 5 the following paragraph:  \Subject to and without

1    waiving -- or without waiver -- of the previously asserted

2    objections, Windstream responds that it does not know to

3    whom the Charter false and misleading advertisements were

4    sent.  Windstream has identified customers who have

5    contacted Windstream and have indicated that they received

6    the Charter advertisement, indeed, pursuant to a court

7    order.  Windstream has received from Charter a list of

8    approximately 800,000 individuals to whom the advertisements

9    were sent.  Windstream believes that this is the best

10   evidence identifying those individuals that were sent the

11   Charter advertisements and hereby incorporates that document

12   in response to this interrogatory pursuant to Rule 33(d) of

13   the federal rules of civil procedure.  Have I read that

14   correctly, sir?

15   A    I think so, yes.

16   Q    And do you see that document is verified under penalty

17   of perjury by Louis Langston?

18   A    Yes.

19   Q    And do you have access to Defendant's Exhibit 110 which

20   is a pretty significant Excel spreadsheet?  I believe that

21   it was only provided in Excel format, sir.

22   A    I have Charter Exhibit 110.

23           MR. ROSS:  So, Your Honor, if I may just

24   interrupt.  Mr. Kingston's right.  Provided in Excel format

25   and a paralegal tried to print it out here and so -- Mr.

1    Kingston, you can't see what's on our end, but as with many

2    Excel spreadsheets that are large that you try to print out,

3    it's a real mess.

4              MR. KINGSTON:  You know, I have a thought, Your

5    Honor.

6    BY MR. KINGSTON:

7    Q    Actually, Mr. Jarosz, can you take a look at

8    Defendant's Exhibit 87?

9    A    Yes.  I think I'm there.

10   Q    And do you see a list of 22 states, sir?

11   A    I do.

12             MR. ROSS:  So, Your Honor, I'm going to object and

13   I've been pretty lenient here.  None of these exhibits --

14   defendant exhibits which should be referred to defendant's

15   exhibits for identification -- have been entered into

16   evidence and yet we keep reading them into the record which

17   is inappropriate.  And this one in particular is a single

18   page list that somebody typed up.

19             MR. KINGSTON:  Your Honor --

20             MR. ROSS:  There's no indication of veracity of

21   anything here.  We need to -- I know we're sitting in the

22   court in equity but there has to be some evidentiary

23   standards followed here.

24             THE COURT:  Well, none of these has been admitted

25   into evidence.  Mr. Kingston is just asking the witness

1    about them.

2              MR. ROSS:  Well, that -- he's perfectly entitled

3    to do that as long he doesn't read them into the record.

4              THE COURT:  Well, he has to ask Mr. Kingston --

5    Mr. Kingston has to ask Mr. Jarosz about them so -- I

6    appreciate they're not in evidence.  I don't have any

7    problem with him asking him questions.  Mr. Jarosz is -- and

8    you can point out if there are problems with the assumptions

9    or the exhibits which has happened already a number of

10   times.  So you can go ahead, Mr. Kingston.

11             MR. KINGSTON:  Thank you, Your Honor.

12   BY MR. KINGSTON:

13   Q    Mr. Jarosz, do you know one way or another whether or

14   not those are the 22 states to which the advertisement was

15   sent?

16   A    I'm sorry.  I don't.

17   Q    All right.  And Mr. Jarosz, do you know one way or not

18   whether -- strike that.

19        Mind if I start over, Mr. Jarosz?

20   A    No.

21   Q    Can you identify a single exchange where you know that

22   the advertisements were directed on Plaintiff's Exhibit 50?

23   A    I'm sorry.  Take me back to Plaintiff's Exhibit -- you

24   said 60?

25   Q    Yes, sir.  My question you may know without looking at

1  the exhibit, sir, so maybe I can save the Court and you some

2  time.  Plaintiff's Exhibit 60 identifies a bunch of cities

3  and states.  Does it not, sir?

4  A    Yes.

5  Q    And if we looked at the mailing list that Windstream

6  identified as the best evidence identifying those

7  individuals that were sent the Charter advertisement we

8  could look up those cities and states, could we not, sir?

9  A    Yes.

10  Q    Do you know if anybody has performed that exercise?

11  A    I don't.

12          MR. KINGSTON:  Your Honor, I think I'm pretty

13  close to passing the witness.  I would like an opportunity

14  to step out and confer with my colleague Mr. Nepple before I

15  do so and he's in a different room.

16          THE COURT:  You could do that briefly, for like a

17  couple minutes.

18          MR. KINGSTON:  Okay.  Thank you, Your Honor.

19          THE COURT:  I'm not sure -- has he been watching?

20          MR. KINGSTON:  I think he may have been listening

21  or sleeping.

22          THE COURT:  Okay.  That's fine.  Then go ahead.

23          MR. KINGSTON:  If he's asleep I won't wake him,

24  Your Honor.

25          THE COURT:  Well, he may have been doing other

1    work.  He can't give you advice unless he's been listening.

2              MR. ROSS:  Your Honor, are we taking, for example,

3    five-minute break -- sufficient for someone to run to the

4    restroom or --

5              THE COURT:  Yes.  That's fine.  I'm just going to

6    stay in here but, yes, you should assume we're not going to

7    come back for another five minutes or so.

8              MR. ROSS:  Thank you, Your Honor.

9              THE COURT:  Okay.

10             (Recess)

11             THE COURT:  Okay.  We're back on the record in the

12   Windstream Plaintiffs, et al, versus the two Charter

13   entities.  Mr. Kingston, did you have any more on cross?

14             MR. KINGSTON:  I have a very -- a little bit, Your

15   Honor, and I'll note that the air conditioner's working so I

16   can be properly respectful.  I appreciate the Court's

17   indulgence.

18   BY MR. CASE:

19   Q    Mr. Jarosz, do you have Joint Exhibit 3?

20   A    Yes, I do.

21   Q    All right.  And that's already admitted so I think we

22   can move quickly.  What is Joint Exhibit 3?

23   A    It appears to be Charter's 10K for the period ending

24   December 31, 2018.

25   Q    And that's another document that you reviewed informing

1    your opinions?  Is that right, sir?

2    A     I believe so, yes.

3    Q     All right.  Page 15.

4    A     Yes, I'm there.

5    Q     Page 15 of Charter Communications form 10K, do you see

6    a reference to mobile services?

7    A     I do, yes.

8    Q     Starting with the second sentence, I read that as

9    follows:  At the end of the second quarter of 2018, we

10   launched our mobile products, Spectrum Mobile, to

11   residential customers under our MVNO reseller agreement with

12   Verizon and began mass market advertising of our Spectrum

13   Mobile service in September 2018.  We currently offer our

14   Spectrum Mobile service to residential customers subscribing

15   to our internet service.  We expect to begin offering mobile

16   service to our small and medium business customers on

17   similar terms in 2019.  We believe Spectrum-branded mobile

18   service will drive more sales of our core products, create

19   longer customer lives, and increase profitability and cash

20   flow over time.  Have I read that correctly?

21   A     I think you did, yes.

22   Q     All right.  And so in 2018, Spectrum Mobile -- a mobile

23   telephone you could buy from Spectrum wasn't mass marketed

24   before September of 2018.  Isn't that right, sir?

25   A      It was launched in the second quarter of 2018 and there

1    was mass market advertising begun in September of 2018.

2    Q    So March, April, June, August, there's -- of 2018 --

3    there's not mass advertising of Spectrum Mobile in the areas

4    where Charter offers internet service.  Isn't that right,

5    sir?

6    A    I don't know the extent to which there was advertising

7    but they said they began mass market advertising in

8    September 2018.

9    Q    And so by March of 2019, there's mass marketing of

10   Spectrum Mobile in the areas where Charter sells its

11   internet service.  Isn't that right, sir?

12   A    I don't know by that point in time how much mass

13   marketing had occurred.  I do see that the mobile business

14   for Charter has been fairly insignificant -- 10 percent or

15   less than its business.

16   Q    Is 10 percent a bigger number than .83 percent?

17   A    Yes.

18   Q    And so Spectrum brand mobile service being offered,

19   that only happens in places where Charter sells service,

20   right?

21   A    I don't know exactly all the places in which they

22   placed that vertisement.  Mass market suggests that it could

23   be broader than every single either census block or exchange

24   in which Charter operates.

25   Q    I read -- the sentence right in the middle of that

1   paragraph to say:  We currently offer our Spectrum Mobile

2   service to residential customers subscribing to our internet

3   service.  Do you read it the same way, sir?

4   A    Yes.

5   Q    And so that Spectrum Mobile service is offered where

6   Charter customers subscribe to Charter internet service.

7   Correct?

8   A    Correct.  I don't believe it says that it's limited to

9   that but I do see that and that the advertising was limited

10  to that.  It does not say the advertising was limited to

11  that.

12  Q    So in the exchanges that Mr. Brannon identified as

13  Charter exchanges, Charter got faster between 2018 and 2019

14  and Charter started mass marketing Spectrum Mobile.  Isn't

15  that right, sir?

16  A    I don't know on what you base the hypothesis that it

17  got faster between 2018 and 2019.  We saw speeds at the end

18  of 2018.

19  Q    Yes, sir.  And didn't we also see speeds at the end of

20  2017?

21  A    Yes.  But we didn't see anything in 20 --

22  Q    I'm sorry.  Go ahead.

23  A    We didn't see anything in 2019.  So you had said in

24  2019 which was my model period.  That was my treatment

25  period.

1    Q    I thought you and I had agreed that 2019 comes right on

2    the heels of December of 2018.  Had we not?

3    A    Yes.  I don't think there are many humans that would

4    disagree that January 2019 is right after December of 2018.

5    However, as you know, my model was run in March of 2019

6    forward.

7    Q    I thought your model -- that's not so, isn't it, Mr.

8    Jarosz?  You didn't do any -- your model didn't start in

9    March.  Correct?

10   A    The control period did.  It's absolutely how it worked.

11   Q    You didn't try and determine how many customers --

12   A    I'm sorry.  I said control group.  I meant treatment

13   group.  I misspoke.  The treatment group occurred beginning

14   in March of -- actually, April of 2019.

15   Q    Yes.  You didn't consider March, right?

16   A    I considered March.  March was a partial month in the

17   sense that during some part of that month the false

18   advertising occurred.  I wasn't able to break that into two

19   pieces so I started my analysis in April of 2019.  That was

20   after the speed advantages had been obtained by Charter, the

21   ones that you and I have spoken about this afternoon.

22   Q    March of 2019 being after December of 2018?

23   A    Absolutely.

24   Q    Did those speed advantages exist in March 2018?

25   A    Very possibly.  I don't know.

1    Q    (sounds drops) -- 17?

2    A    I'm sorry.  Say that again.

3    Q    March of 2018 comes shortly after December of 2017,

4    doesn't it?

5    A    Yes.  I think we can all agree to that.

6    Q    And we can -- I won't start -- I don't want to get

7    yelled at for looking up the FCC broadband data but we could

8    pull up data for '17 and '18 in any one of these exchanges,

9    can't we, sir?

10   A    I don't think the data are kept by exchanges at the

11   FCC.

12   Q    We could pull up any one of these towns on Plaintiff's

13   Exhibit 60, couldn't we, sir?

14   A    You could pull census blocks and you could see what the

15   speeds were as of a point certain, I think.

16   Q    Yeah.  A point that's much more certain than an

17   exchange, right?

18   A    No.  In a date certain I was referring to.

19   Q    We would just start on --

20   A    Exchanges aren't any less precise to use your

21   terminology than census blocks.

22   Q    Do you know how many census blocks subsidiaries of

23   Windstream Holdings have reported to the FCC or have

24   identified to the FCC as areas in which they offer broadband

25   service?

1    A    No.  I do not.

2    Q    You think that it's more or less than 1,428?

3    A    I don't know.

4    Q    Were you aware, Mr. Jarosz, that you could download

5    form 477 data for all reporting providers on the FCC

6    website?

7    A    That makes sense to me.  I've never done that but that

8    -- it would seem like the data are accessible that way.

9    Q    Take at look at Defendant's Exhibit 364A.

10   A    Is that in the impeachment binder?

11   Q    It is.  It's -- Mr. Ross, you may recall, helpfully

12   pointed out that 364A and 364B --

13            THE COURT:  The first exhibit in that binder.

14            THE WITNESS:  Yes.  I have A in front of me.  Did

15   you say A or B I should look at?

16            MR. CASE:  A is fine.  We may turn to B briefly.

17   And this data has been provided as an Excel spreadsheet and

18   the Court or anybody else can download all of it.  It's a

19   little time consuming but it is publicly available.  362A

20   and B are just screen shots of the Excel spreadsheet that we

21   provided.  I guess that was just by way of the record, none

22   of which was really a question for you, Mr. Jarosz, and I

23   appreciate your patience.

24   BY MR. KINGSTON:

25   Q    Do you have 364A in front of you, sir?

1    A    I do, yes.

2    Q    Take a look if you would, sir, at page 23.

3    A    All right.  I'm there.

4    Q    And do you see a reference to a provider name?

5    A    Yes.

6    Q    And what's that provider?

7    A    USLEC, LLC.

8    Q    And do you know whether USLEC, LLC, is a plaintiff in

9    this lawsuit?

10   A    Not offhand I don't.  I guess we can look at the list

11   of plaintiffs.

12   Q    Assuming that it is -- well, do you see that there's a

13   holding company associated with USLEC?

14   A    Yes.  Well, I see a holding company name that's two

15   columns over.

16   Q    Yes, sir.  And is that Windstream Holdings?

17   A    Windstream Holdings, Inc, yes.

18   Q    And does that suggest to you that perhaps USLEC, LLC,

19   is among the 205 plaintiffs that you're offering a damages

20   opinion for?

21   A    It would make sense to me, but it's easy enough to look

22   up.

23   Q    Okay.  And does USLEC, LLC, have a doing business as

24   name?

25   A    Yes.

1    Q    And what's that?

2    A    USLEC of Virginia, LLC.

3    Q    And I got distracted.  You're familiar with -- have you

4    looked at Excel spreadsheets before?

5    A    Yes.

6    Q    And if you add up the number column on the left-hand

7    side corresponding to the number of rows?

8    A    There's a row number?  Yes, I see that.

9    Q    And is it a reasonable inference from the row number,

10   106,230, that are at least 106,229 census blocks identified

11   in the form 477 data for Windstream Holdings subsidiaries?

12   A    Not necessarily.  That just gives you the row number

13   for the Excel spreadsheet.  It could be that there are many,

14   many rows with no entries or entries with other information

15   so it doesn't tell you much besides the first row number of

16   that page is 106,203.

17   Q    And that's something we could explore for ourselves, of

18   course, with Exhibit 364?

19   A    With the Excel spreadsheet itself, yes.

20   Q    Okay.  Is 106,229 a bigger number than 1,428?

21   A    I'm sure that's not a trick -- all right.  I assume

22   that's not a trick question.  Yes, it is bigger.

23   Q    I mean, it's a lot bigger, right?

24   A    Yes.

25   Q    There's a lot more census blocks than there are

1    exchanges, aren't there, sir?

2    A    That would make sense to me, yes.

3    Q    I mean, that's -- so that's -- that's pretty granular,

4    right?

5    A    I don't know how many census blocks there are.  Again,

6    it's not safe to assume it's 106,000.  It might be the case,

7    but I don't know that that's true.

8    Q    It could be the case that somebody spaced down 105,202

9    times and then just put in like 20 entries for USLEC, LLC.

10   Is that right?

11   A    It's possible.  It's pretty unlikely, however.

12   Q    I'll direct your attention Exhibit 364B.  Do you see a

13   list of providers with doing business names nested?

14   A    I don't know that those are doing business names, but I

15   see a provider and then a name underneath each provider -- a

16   name or more than one under each provider.

17   Q    Have you ever put together a pivot table in an Excel

18   spreadsheet before or had a member of your staff do so for

19   you?

20   A    Yes.

21   Q    Is that usually what it looks like?

22   A    I don't know usually but this is a common look.

23   Q    And do you see that possibly you could sort by provider

24   name and DBA name?

25   A    Yes.  That tells me that this is -- that the second

1    entry is a DBA name.  Thank you.

2    Q    No problem at all, sir.  Are there any of those

3    providers -- strike that.

4         Do you know how many of the direct mail letters in

5    question were sent to subscribers of the American Telephone

6    Company, LLC?

7    A    No.

8    Q    What about Broadview Networks Holdings, Inc?

9    A    Same answer.

10   Q    You can't identify as to any particular provider the

11   number of mailers that were sent to its subscribers.

12   A    That's correct.  I cannot.

13   Q    And of course the mailers didn't reference American

14   Telephone Company, LLC.  Isn't that right, sir?

15   A    I'm working under that assumption, yes.

16   Q    You compared -- in calculating -- performing your

17   calculations you took the time period from April to August

18   of 2018 for the Charter exchanges and the non-Charter

19   exchanges and then what did you do with it?

20   A    I looked at the difference between Charter exchanges

21   and non-Charter exchanges during that period and then I

22   compared that with the difference in Charter versus non-

23   Charter exchanges exactly one year later.

24   Q    So you took all the lost customers that were lost from

25   April to August, yes?  That was step one?

1   A    I'm not --

2   Q    I'm trying to make sure I understand how you performed

3   your calculations, sir.  So step one would to identify lost

4   customers from April to August of 2018?

5   A    No.  That's not what I did.  I looked at churn rates

6   for April 2018 for Charter exchanges versus non-Charter

7   exchanges and I compared that with the churn rate

8   differential in 2019 over those same months.

9   Q    Maybe we're talking past each other.  I was just trying

10  to make sure I understood from math what you did.  Somebody

11  at Windstream divided its footprint into Charter exchanges

12  and non-Charter exchanges as step one.  Is that fair?

13  A    Yes.  In the normal course of business they tracked

14  their customers into Charter exchanges and non-Charter

15  exchanges.

16  Q    Did they -- did anybody ever show you any

17  correspondence where Charter sends letters to Windstream

18  saying, hey, guys, these are the exchanges where we do

19  business?

20  A    Not that I recall.

21  Q    And are you aware of anything suggesting that Charter

22  tracks its own information through exchanges?

23  A    Not that I know of.

24  Q    And did anybody tell you where Windstream got that data

25  if not from the publicly available form 477 data provided

1    under penalty of perjury to the FCC?

2    A    I don't know where they obtained the information on

3    Charter versus non-Charter exchanges, but they used that in

4    the normal course of their business.

5    Q    Somebody split the Windstream exchanges up into two

6    groups and whoever that somebody was, it wasn't you.

7    Correct?

8    A    It was not me.  Correct.  Yes, that's correct.

9    Q    Having split Windstream up into two groups, you

10   calculated the average churn for April to 2018 from a number

11   of years, right?

12   A    There's several things that confuse me about your

13   question.  I looked at the period April through August of

14   2018, the difference in churn rates, and compared that with

15   the difference in churn rate for April through August 2019.

16   Q    I'm looking at -- and I apologize -- I'm probably

17   missing it and I apologize.  I'm looking at page 33 of

18   Defendant's Impeachment Exhibit 58 which is your report less

19   the tabs.  Do you see that, sir?

20   A    Let me get that in front of me.  What page should I

21   turn to?

22   Q    Thirty-three in the bottom left.

23   A    Okay.  I'm there.

24   Q    You see that first paragraph, an explanation of how

25   customer churn is calculated?  You see that, sir?

```
1    A      In the last sentence, yes.

2    Q      And so --

3    A      And in the second to last.

4    Q      And you did that all the way from 2016 to 2019?  You

5    performed that same exercise, right?

6    A      No, I did 2018 versus 2019 and I think we talked about

7    this at my deposition.

8    Q      I apologize.  So what you did for it, starting with

9    2019, somebody divided that, exchanged it into two groups.

10   For each group you counted all the customers lost from April

11   through August and then took those five months of 2019 and

12   divided it by the total number of customers in March.  Isn't

13   that right?

14   A      No.  I looked at churn rates.  I looked at the churn

15   rate differential and then I converted that to number of

16   accounts.

17   Q      I'm sorry, I just want to talk about the first step

18   that you did, just step one. We're going to talk about the

19   rest of the steps I hope briefly.  But I understand the very

20   first step one was dividing up the exchanges.  And that

21   wasn't your step, that was somebody else's.  Right?

22   A      The date were already kept such that there were churn

23   rates or churn data for Charger exchanges and non-Charter

24   exchanges.  So I had those data.  To be a little bit more

25   precise, we had all exchanges and Charter exchanges.  So
```

1    subtracting one from the other gives me non-Charter

2    exchanges.

3    Q    The process of identifying what was a Charter exchange

4    and what was not, that was not your process, correct?

5    A    Correct.  I think we've said that several times.

6    Q    I know.  I just want to be clear.  Your process as I

7    read paragraph 56 was to -- step one would be to calculate

8    customer churn from April 2019 through August 2019 by taking

9    the total number of disconnects for those five months and

10   dividing that by the total number of customers in March of

11   2019.  Isn't that right?

12   A    That's right.

13   Q     And so then you've got that -- now you have a

14   statistic to work with.  You have the churn for April to

15   August 2019 for Charter exchanges, right?

16   A    Yes.

17   Q    Okay.  And then --

18   A    Or -- yes.  There was more to it than that, but yes, I

19   did have for Charter exchanges.

20   Q    And then you developed that same statistic for the non-

21   charter exchanges in the same fashion.  April through

22   August, total disconnects for those five months divided by

23   the total number of customers in March 2019.  Right?

24   A    It's not exactly how the process worked, but it's

25   mathematically the same thing.  Yes.

1   Q    So at this point you have two statistics for 2019, the

2   churn in the Charter exchanges and the churn in the non-

3   Charter exchanges, right?

4   A    I have the churn rate.  That's what I worked from.

5   Q    Correct.  And the churn rate -- because that's the

6   statistic for April through August inclusive, right?

7   A    Yes.

8   Q    And since April through August, that only happens once

9   a year, that's an annual statistic.  Isn't that so?

10  A    Right.  And I might draw your attention to paragraph

11  59, which has a little table.  That same table is in my

12  declaration.  And what you're describing right now give us

13  the difference between the 12.58 and the 10.36.

14  Q    There we go.  That's what I'm looking for.  So doing

15  the process we just developed, we got the statistic 12.58

16  percent for 2019 and a statistic 10.36 percent for 2019 both

17  in the Charter and non-Charter exchanges.  Isn't that right?

18  A    What do you mean, both in the -- one is Charter --

19  Q    That was a question that from me, Mr. Jarosz, and I

20  apologized to the Court and you.  That was kind of a mess.

21  Do you mind if I start it over?

22  A    No.

23  Q    Okay.  So we've got a statistic, 12.58 percent.

24  A    Yes.

25  Q    And that's an annual number because it's April to

1    August of 2019.  Yes?

2    A    It's not annual.  It's over that five-month period.

3    Q    Those five months only happen once a year, right?

4    A    Correct.

5    Q    So that's a number that you can only develop once a

6    year.

7    A    Yes.

8    Q    Okay.  And then you get that same number that you can

9    only develop once a year for the non-Charter exchanges.

10   A    Yes.

11   Q    Okay.  and then the difference between those two

12   numbers is that 2.2 percent.  Yes?

13   A    2.22 percent, yes.

14   Q    Thank you.  And then you get those same two yearly

15   numbers for 2018 and you get 1.83 percent.

16   A    Correct.

17   Q    And the difference -- between the difference in those

18   yearly numbers is 0.38 percent.  Isn't that right, sir?

19   A    Correct.

20   Q    What are those yearly numbers for 2017?

21   A    I don't know.  2017 was enough different from 2019 that

22   it was of limited significance.  In 2018 a lot had changed

23   for Windstream.  And that's why I used that as the control

24   period.

25   Q    You have only two-- excuse me.  Don't you have only two

1    points there?

2    A    No.

3    Q    I see an annual number for 2019.  I'm looking at your

4    chart.  And then I have another annual number under 59 --

5    A    Which represents -- I'm sorry, go ahead.

6    Q    No, that's okay.  So you've got your yearly number for

7    Charter exchanges in 2018 and then your yearly number for

8    2019.  So you've got those two yearly numbers.  And --

9    A    Yeah.  And that's five months of data that results in

10   that number over that period.

11   Q    Right.  And those five months only happen once a year,

12   right?

13   A    Correct.

14           THE COURT:  I think the confusion is when you say

15   yearly number, one could perhaps infer, although

16   incorrectly, that you're talking about the whole year.

17           MR. KINGSTON:  Thank you, Your Honor.  That is a -

18   - maybe -- that's a good clarification.

19   BY MR. KINGSTON:

20   Q    That 12.58 number for Charter exchanges for 2019, Mr.

21   Jarosz, that can only -- you can only calculate that number

22   once a year because April through August only happens once a

23   year.  Isn't that right?

24   A    I have agreed with that statement I think five times

25   already.  I --

1    Q    Very good.  And I won't keep -- I appreciate

2    everybody's patience.  I think what I'll do is I'll call it

3    a once-yearly number.  So you've got a once-yearly number --

4    A    Fine.  But it represents five months of data.

5    Q    Correct.  But show me where you -- have you tried to

6    compare those once-yearly numbers to their once-yearly

7    counterparts for 2017 and 2018?

8    A    No.  As I said, 2017 was different enough -- the

9    company's strategic and marketing focus changed quite

10   dramatically in 2018.  Therefore, I used that as the control

11   period.

12   Q    Well, where is your once-yearly number that establishes

13   that those -- that there is no change between -- I'm sorry,

14   I think I understand it now.  The 1.83 percent is the

15   difference between those two once-yearly numbers in August

16   of 2018, yes?

17   A    Yes, though I don't particularly agree with your once-

18   yearly characterization.  But that's difference between

19   11.88 and 10.05.

20   Q    What part of April through August only happening once a

21   year do you disagree with --

22            THE COURT:  Stop.  We've already -- this is a dead

23   horse.  Please.

24            MR. KINGSTON:  Okay, very good.

25   BY MR. KINGSTON:

1    Q    Okay, very good.  And there is some basis for which you

2    presume that that 1.83 number would not change, Mr. Jarosz?

3    A    Yes, not change dramatically.

4    Q    And in fact if we did the same calculation, that 1.83

5    number would change dramatically if we went back to 2017 and

6    2016.  Isn't that right?

7    A    I don't know.  The number is probably different.  But

8    there are many other things going on that were different

9    enough from 2019 that it was not reasonable to keep that in

10   the control group.

11   Q    So that once-yearly number for 2017 and 2018 is not

12   1.83 percent?

13   A    I don't know for sure, but I would think it's probably

14   not.

15   Q    Okay.

16            MR. KINGSTON:  Okay.  I think I pass the witness,

17   Your Honor.

18            THE COURT:  Okay.  All right.  Do you have

19   redirect, Mr. Ross?

20            MR. ROSS:  Yes, Your Honor.  Briefly.

21            THE COURT:  Okay.

22                       REDIRECT EXAMINATION

23   BY MR. ROSS:

24   Q    Mr. Jarosz, you have -- just by way of clarifying the

25   record, you testified a couple of times during the course of

1   the day using the word Broadstream.  I take it that you

2   meant the word Windstream, so the record is clear as to what

3   you were referring to.

4   A    Yes.  I don't remember instances in which I said

5   Broadstream, but if I did, it was a mistake and I almost for

6   sure meant to say Windstream in each one of those

7   circumstances.

8   Q    Thank you.  Now, you were asked some questions about

9   census blocks according to the FCC.  Are you sufficiently

10  familiar with that area to tell us whether or not there's

11  any customer data that is reported as part of those census

12  blocks?

13  A    I'm not aware that there is customer data reported with

14  those census blocks.

15  Q    So that census block does not tell you how many new

16  customers a particular broadband provider gained during the

17  period in that census block?

18  A    Correct.  And important for my purposes, it did not

19  have specifically additions, subtractions, and period-ending

20  stocks.  So the data are not gathered at the level that I

21  needed to do an economic analysis.

22  Q    However, the data you just described was available in

23  the exchanges kept in the regular course of business by

24  Windstream.  Is that right?

25  A    Yes.

```
1    Q    Now, you were talking about the period, April 1, 2019

2    to August of 2019.  I believe you referred to that as the

3    treatment group.  Is that correct?

4    A    Or treatment period, yes.

5    Q    For your analysis, right?

6    A    That's right.

7    Q    And what was the control period?

8    A    The same months one year before.  So April of 2018

9    through August 2018.

10   Q    And the Spectrum Mobile service was introduced during

11   that control period.  Am I right?

12   A    That's right.  Mr. Kingston walked me through those

13   documents.

14   Q    And all those speed upgrades that he walked you

15   through, that was during the control period as well.  Am I

16   right?

17   A    That's right.

18   Q    So you have, I hope, in front of you your declaration

19   that you submitted to the Court.  Is that right?

20   A    Yes.  Give me one moment and I'll put it right in front

21   of me.  Yes, here it is.

22   Q    So, Mr. Kingston sort of started you in your analysis

23   right in the middle.  And I think so the Court is clear and

24   understands how you got to your conclusion, perhaps you an

25   start at the beginning of the analysis, particularly how you
```

1    determined that the comparison of the control group and

2    treatment group was appropriate and explain to the Court in

3    doing that what tab 2 is all about in your declaration.

4    A    Tab 2 is a reflection of why it was appropriate to do

5    the analysis that I did.  In other words, as tab 2 shows,

6    the churn rate, the rate at which customers left, tracked

7    fairly closely and in a parallel way between the Charter

8    exchanges and the non-Charter exchanges over the period

9    January of 2018 through March of 2019.

10        So in other words, looking at that chart you'll see

11   that the Charter exchanges rates had churn rates that were

12   slightly higher than the non-Charter exchanges, and that

13   carried through for that whole period.  The end result then

14   is what is reflected in tab 3.  So over that period, meaning

15   the 2018 period, you see that the difference between the

16   exchanges was about 1.83 percent on average.  So that said

17   to me there's fairly consistent differences, and that

18   accounts for conflating factors or things that are impacting

19   both Charter exchanges and non-Charter exchanges.

20        So I took that relationship and I asked myself, does

21   that difference stay constant after the false advertising

22   campaign that began in March of 2019.  That's what's called

23   a difference in differences analysis.  And what I found was

24   in fact the Charter exchange churn rates went up.  They went

25   up to the tune of -- they went up to 2.2 percent.  So that

1    means the difference before the false advertising campaign

2    was lower than the difference after.  And that was by 0.38

3    percent.  So it's a small change, but a change nonetheless,

4    that said over time because of the false advertising

5    campaign, the churn rate, or rate at which customers was

6    lost, was slightly higher.

7        I then converted that 0.38 percent into the number of

8    customers.  And you'll see that at tab 4.  What that means

9    is I take that 0.38 percent added difference times the

10   number of customers.  And that means that because of the

11   campaign, Windstream lost approximately 1,386 customers.

12   Multiplying that by the revenues per customer and the period

13   over which it lost that customers means that the harm to

14   Windstream associated with the false advertising on a

15   revenue basis was about $5.4 million.  Applying profit

16   margins to that, I arrived at harm associated with the

17   campaign in the range of $3.2 million to $5.1 million.

18   Q    Mr. Jarosz, let me back you up for a second and ask you

19   why you looked at the same months, April through August,

20   first in 2018 and then in 2019.

21   A    Because I wanted to hold constant any seasonality

22   effects.  People move in and out and switch on and switch on

23   services at different points in time throughout the year.

24   So I wanted to hold the observation periods constant so as

25   not to be guilty of comparing apples to oranges.  I wanted

1    to compare activity over the same calendar period in 2018

2    with activity over that same period in 2019.  So that's why

3    I took April through August in the pre-campaign period and

4    April through August in the post-campaign period.

5    Q    And by the campaign period you mean the launch of the

6    false -- what this court has found to be a false

7    advertisement by Charter?

8    A    Yes.

9    Q    So you used two terms which I believe are defined in

10   the declaration, but just to help the Court out.  You used

11   the term variant control group and treatment period,

12   treatment group.  Could you just briefly explain to the

13   Court what you mean by those terms and why they are

14   relevant?

15   A    The treatment group is that group that you're trying to

16   determine did something unusual happen.  And you can make

17   that determination by comparing the treatment group or

18   treatment period versus the control group.  In other words,

19   you say is there something unusual that happened holding

20   constant all the systematic impacts that impact all of the

21   customers.  So that's the control group.  There's inflation

22   and there's normal relocations of employees and there's

23   speed upgrades.  I want to hold all those constant. And

24   that's done through looking at the control group.  The

25   treatment group then lets me determine if there was some

1    unusual results that occurred.  And I saw some associated

2    with the false advertising campaign.

3    Q    Now, your opinion arrives at a range, a dollar range of

4    $3.2 million to $5.1 million.  Could you explain why there's

5    a range of numbers there as opposed to a single number?

6    A    That range exists because I have offered the Court two

7    alternative ways to think about the profit rate or the

8    profit margin.  The higher number, the $5.1 million says

9    from Windstream's revenues just subtract the direct cost,

10   the cost of providing services.  The $3.2 million number

11   subtracts the direct costs and overhead and/or support

12   costs; selling and marketing, network buildout costs, things

13   that don't and probably wouldn't change with the small

14   revenues we have here.  But in the interest of giving the

15   court options and in the interest of being conservative, I

16   put both numbers, though I think the number associated with

17   the gross margin deduction, which is the $5.1 million

18   number, is more likely to be the more accurate number.

19   Q    You conclude your report on page 11 at paragraph 27, or

20   you conclude your declaration on page 11 at paragraph 27 by

21   saying, "This range should be regarded as conservative and

22   likely underestimates Windstream's actual losses."  What do

23   you mean by that?

24            MR. KINGSTON:  Objection, Your Honor.  Beyond the

25   scope of the cross.

1          THE COURT:  Do you have a response to that, Mr.

2     Ross?  It does seem to go beyond the scope.

3          MR. ROSS:  Whatever Your Honor wants.  The Court

4     is here to decide on the numbers.  And this is simply to

5     clarify for the Court.

6          THE COURT:  Okay.  I don't -- I'll sustain the

7     objection.

8          MR. ROSS:  And we'll submit this declaration into

9     evidence, Your Honor, something perhaps we should have done

10    yesterday.  But it's not reflected in the record, so we

11    would move it into evidence in lieu of his direct testimony.

12         THE COURT:  Okay.

13         MR. KINGSTON:  Your Honor, we would object.  We

14    submit that the cross-examination of Mr. Jarosz demonstrates

15    that his proffered opinion testimony is not the product of a

16    reliable methodology and is not based on reliable data.  And

17    we would object to its admission under Federal Rule of

18    Evidence 702.

19         MR. ROSS:  So, Your Honor, the Court has already

20    ruled on this.  This was the predicate and the basis.  And

21    the cross-examination today was simply a wide version of

22    their Daubert motion that they brought back in January.

23    This Court rejected that at the time.  It should not change

24    this decision in that regard.  Therefore, the objection

25    should be overruled, as the Court I believe already has, and

1    allow this into evidence.

2              THE COURT:  Well, as far as the data is concerned,

3    what are you addressing?  You're addressing that he should

4    have used different sources?

5              MR. KINGSTON:  Is that directed to me, Your Honor?

6              THE COURT:  Yes.  I'm sorry.

7              MR. KINGSTON:  Okay.  I'm sorry.  Briefly, Your

8    Honor.  And I think that my friend at the other table is

9    mistaken in that the Court found that there was a proffer on

10   Federal Rule of Evidence 701(a), the witness' special

11   knowledge and expertise.  Our objection is to the

12   methodology has to be -- it has to be based -- there has to

13   be a reliable methodology.  We submit that the methodology

14   is not reliable because the examination of the witness

15   identified two confounding factors that he made no effort to

16   account for that would only happen in Charter exchanges.

17   One, increased speed, and two, the increase of a new

18   product, either one of which independently could easily have

19   accounted for the 0.38 percent.  And then as far as the

20   data, Your Honor, the witness obviously couldn't validate

21   the exchange data because he wasn't the one who provided it.

22   The only objective data demonstrated that the exchange data

23   was fraught with error until we submit that the data is

24   likewise unreliable.

25              MR. ROSS:  So, Your Honor, in response, this is

1   the exact argument that they made in the Daubert motion

2   against Mr. Jarosz back at the beginning of the year, the

3   exact argument.  I will repeat our arguments from our brief

4   if you wish.  Our arguments are that there is no incorrect

5   data being used because it is the actual data kept in the

6   regular course of business by the company. It was not

7   specially created for this lawsuit.  And therefore, it is

8   exactly the type of data that would be used by experts in

9   the field.  He has testified to that effect.  No expert has

10  contradicted him on there.  Therefore it is reliable data.

11          As far as the methodology, the claim is that

12  somehow we could have used census blocks instead of

13  exchanges, whereas Mr. Kingston repeatedly said that would

14  be more precise, or at least implied that it would be more

15  precise.  In fact, the census blocks have no customer

16  information whatsoever.  So it was impossible to use

17  customer -- census blocks because they lacked any data.  To

18  the extent that you can test whether or not Charter actually

19  competes in a particular exchange with Windstream, the

20  simple answer is who would know better than the customer.

21  And there is no evidence to the contrary other than the

22  census blocks, which do not compare apples to oranges.  And

23  therefore, the methodology is also appropriate.  And as Your

24  Honor ruled on the Daubert motion, this is acceptable and

25  should be allowed into evidence.

1          THE COURT:  Okay.

2          MR. KINGSTON:  Responding briefly.  The business

3    record suggestion is specious, Your Honor.  A business

4    record has to be kept by somebody with knowledge.  There is

5    nobody at Windstream that anybody has identified who has

6    knowledge of where Charter competes for business.  The only

7    objective source of that knowledge would be the public

8    reports.  And truly they could have accessed that.  But it's

9    been demonstrated that's not what they relied on.  So you

10   can't have Charter's information as a Windstream business

11   record, because they're separate businesses.  It's no more

12   than Thompson Coburn's business record could tell you what

13   Katten does.

14         MR. ROSS:  I could tell you exactly which markets

15   Thompson competes in.  Five minutes online.

16         THE COURT:  Competitors in this industry keep

17   track of who provides services in what area.  I think that's

18   indisputable.  There's certainly no testimony to the

19   contrary.  And the notion that you might be able to poke

20   holes in the conclusion based on the argument that the

21   control group is not perfect, i.e. there might be some

22   residual momentum from Charter's increasing speed, although

23   the chart showed, which was I think indisputable, that by

24   the control group period, essentially a hundred percent of

25   Charter's speeds was already vastly beyond Windstream's,

1    argues that it isn't much of a hole there.  And

2    additionally, you've tried to poke a hole in the conclusion

3    based on the runout of the mobile service, which for the

4    control group period had already occurred provided, however,

5    that the mass marketing, whatever that means, in Charter's

6    10K began immediately after the control period.  And there

7    is I assume some effect from that mass marketing.  But

8    that's just a matter of cross-examination of an expert.  It

9    doesn't disqualify the expert under 702(b).  The data -- I

10   believe the underlying data is sufficient to form an opinion

11   based on a well-recognized factor, both in the industry and

12   in the professional literature that Mr. Jarosz cites

13   regarding churn.

14            So as far as the application of F.R.E. 702(b), the

15   objection is overruled.  As far as 702(c) is concerned, i.e.

16   the testimony is a product of reliable principles and

17   methods -- I'm sorry, I got that reversed.  702(c) is

18   overruled.  As far as (b) is concerned, the testimony is

19   based on sufficient facts or data.  I've already addressed

20   the sufficiency.  I guess you're saying that the facts have

21   not yet been established upon which Mr. Jarosz is relying.

22   But that is not really for him to opine on.  He takes the

23   facts that he's been given.  And again, if there is

24   sufficient factual basis for the preparation of the charts

25   that are in Exhibit 60, then he's properly relying on them.

1    He couldn't, as Mr. Ross says, rely on the FCC data, because

2    there's nothing about the customers in it.  So you have to

3    look at the customers in the best way you can, which is on

4    the exchange data.

5            You are certainly entitled to question Mr. Auman

6    as to why the FCC data for certain localities labeled as

7    they are in that data for certain localities labeled as they

8    are in that data don't show a primary competitive role by

9    either in one case Windstream itself, or in a number of

10   cases Charter, and why that is shown in Exhibit 60.  But

11   it's not a basis for disqualifying Mr. Jarosz now.

12   Obviously if I conclude that Exhibit 60 is simply wrong,

13   that affects his conclusion in the end.  So I'll overrule

14   the objection.

15           MR. KINGSTON:  Thank you, Your Honor.

16           THE COURT:  Okay.  So does that mean you've

17   concluded your redirect, Mr. Ross?

18           MR. ROSS:  Yes, Your Honor, it did.

19           THE COURT:  Okay.  Is there any recross on that?

20           MR. KINGSTON:  No, Your Honor.

21           THE COURT:  Okay, very well.  So Mr. Jarosz's

22   testimony is concluded on direct.

23           Mr. Ross, do you have any other witnesses?  I

24   don't think you do, right?

25           MR. ROSS:  No, Your Honor.  We have Mr. Auman, who

1    we've agreed will come back next week or at the earliest

2    opportunity after a deposition this week.

3            We have moved into evidence our exhibits.  We have

4    deposition designations that we filed, and we would move

5    those into evidence as well as part of our case.

6            THE COURT:  All right.  I have not reviewed those

7    designations.  And as is my practice with all deposition

8    designations based on my experience that they are often

9    somewhat of just throwing in the kitchen sink -- no

10   disparagement meant by that -- I think it's important for

11   counsel to let me now why they're important or to identify

12   them at least at post-trial briefing as to why they're

13   important rather than have the court hunt through them to

14   try to discern why they're being offered in.

15           Are you offering any of them as direct testimony

16   by someone else?

17           MR. ROSS:  By someone who has not appeared live.

18   Yes, Your Honor.

19           THE COURT:  You are.  Okay.  All right.  Is there

20   an objection to those requests for admission?

21           MR. KINGSTON:  I'm not certain which ones they

22   are, Your Honor.

23           MR. ROSS:  It was provided in a deposition

24   designation notice that the Court set a deadline for, and we

25   complied with by serving upon you and the Court.

1          MR. KINGSTON:  Your Honor, the parties have

2     exchanged deposition designations.  I don't quibble with

3     that.  I didn't understand Mr. Ross saying that he was using

4     all of those depositions as live testimony.  I think --

5          THE COURT:  Let me ask the question a little

6     differently then.  Is there an objection to the admission of

7     any of those deposition excerpts?

8          MR. KINGSTON:  With our completeness objections

9     and counters, I would be comfortable with the Court -- I

10    would be comfortable with the Court taking all of them.  I

11    think we've articulated objections in some motions filed.

12    It's a bench trial and I'm not worried about irrelevant

13    testimony prejudicing the jury.  So I don't have strong

14    feelings one way or the other.

15         THE COURT:  Okay.  So the objections that you have

16    --

17         MR. ROSS:  Your Honor, I'll make a similar

18    concession with respect to their deposition designations to

19    make this easy for the Court.  They have designated -- I'm

20    not sure the exact wording, but they've essentially said,

21    okay, so you want to put in such-and-such a deposition

22    testimony of five pages, we think you need page six.  And

23    they've told us what they think they are.  And we did file

24    proforma objection.  We will accept those without objection.

25         THE COURT:  All right.  So I'm not reading as to

```
1    overrule anything with regard to any of the deposition
2    testimony then as far as objections --
3              MR. ROSS:  That is correct, Your Honor.  There are
4    no objections then.
5              THE COURT:  All right.  So I'll admit them.  But
6    my first statement goes I will in all likelihood ask for
7    brief submissions on a post-trial basis here.  And it's
8    especially important for the parties to identify by page or
9    pages the deposition testimony that you think really I
10   should be looking at and relying on in addition to the live
11   trial record and the printed exhibits, which I have and
12   we'll go through.
13             MR. ROSS:  Your Honor, could I ask the Court's
14   guidance on two issues in that respect?  We had prepared
15   them to send over to chambers when Mr. Kingston and Charter
16   sent you the video files, which caused me to stop and hold
17   off.  I do not know what your preference is.  Would you like
18   the video of the depositions, or just the transcripts?
19             THE COURT:  I would prefer the transcripts.
20             MR. ROSS:  Very good.  So we'll get those sent
21   over.
22             The second point, and it's almost more a
23   housekeeping matter, Your Honor, but I'm trying to be as
24   efficient as possible here.  You had during the pretrial
25   indicated that you wanted closing argument.  Are you now
```

1  suggesting that you would prefer briefs in lieu of closing

2  arguments so that we don't spend any time preparing a

3  closing argument for you?

4         THE COURT:  I still want closing arguments.  Bu I

5  use that to highlight for the parties -- to first understand

6  the parties' main pointes as they would articulate them and

7  to highlight for them what I would like to have addressed in

8  post-trial briefing.  So I don't contemplate the post-trial

9  briefing being more than hitting the issues that I believe I

10 need briefing on.  That's about all I can say at this point

11 because I haven't heard either Mr. Auman or Charter's case.

12        MR. ROSS:  No, that's very helpful, Your Honor.  I

13 appreciate that.  It helps us to allocate our resources.

14 And so with that we would rest our case in chief.

15        THE COURT:  All right.  Very well.  And just to go

16 back to your question though.  I would note that you have

17 rested on your case in chief.  The one exception on post-

18 trial briefing may be -- and you should probably assume this

19 -- that if there is something important in the deposition

20 designations, you should let me know that either at oral

21 argument or in the post-trial brief, even if I have not

22 asked for it.  Because it's a lot to ask to go through a

23 significant amount of depositions in my experience.  They

24 usually, unless something is identified to me, yield next to

25 nothing.  So you should have someone focusing on that as to

1   seeing if there's something really important that has not

2   come out at the trial or that cannot be identified in the

3   exhibits.

4           MR. ROSS:  We will do so, Your Honor.

5           THE COURT:  Okay.  And as to video versus paper, I

6   have found that videotaped deposition testimony is good for

7   -- as a video as opposed to on paper, putting my children to

8   sleep, as I used to do with a particular client of mine, and

9   not much else.  So the transcript is actually better.

10          MR. ROSS:  That makes sense, Your Honor.

11          THE COURT:  Okay.  Well, Mr. Kingston, where do

12  you want to go from here?  We have a little more time.  Is

13  there anything that you can put on in your case now?

14          MR. KINGSTON:  I don't think that there is, Your

15  Honor.  I think it's maybe worth -- so I don't think -- we

16  are -- I'm going to withdraw Mr. Border's declaration.  I

17  don't think at this point we need it.  So he will not be

18  testifying.  We have one -- I think that as I understand the

19  agreement on depositions, I'm not sure if we have any

20  witnesses at all, Your Honor.  But I'm not -- we may -- the

21  only witness we would have would be Rick Gunzel as an

22  impeachment witness after Mr. Auman.  But I'm not going to

23  ask him about anything that wasn't in his deposition.  So if

24  that deposition is coming in, then I don't think that we

25  have any witnesses.

1          THE COURT:  Okay.  All right.  Unless after Mr.

2   Auman you decide you want to put him on for something.

3          MR. KINGSTON:  Yes, Your Honor.  That's right.

4   And thank you for saying what I should have said.

5          THE COURT:  All right.

6          MR. ROSS:  We have no objection to Mr. Gunzel's

7   testimony coming in by the previously-submitted deposition

8   designations, Your Honor.

9          THE COURT:  You object or you don't?

10         MR. ROSS:  We do not.

11         THE COURT:  You do not.

12         MR. ROSS:  We have no objection to designations on

13  Mr. Gunzel they provided us coming in lieu of having to drag

14  him into the court.

15         THE COURT:  Right.  That's fine.

16         MR. KINGSTON:  We very much appreciate the

17  courtesy, Mr. Ross.

18         THE COURT:  Okay.  So we reserved time for

19  tomorrow also, starting at 2:00.  But I'm not going to hear

20  closing argument because I'm not going to hear Mr. Auman by

21  then.  So I don't know what we're going to do tomorrow, if

22  there's anything to do.

23         MR. KINGSTON:  I guess we could fuss about Charter

24  moving in exhibits.  I expect Mr. Ross will be as

25  accommodating as I was when we moved in all of his exhibits.

1    But that can happen after Mr. Auman.

2              MR. ROSS:  Well, court time is precious,

3    especially in a bankruptcy case.  I think we should do it.

4              THE COURT:  Well, I agree with that.  What I would

5    like you to do is, if you can, go over the exhibits and your

6    issues with them.  If you can resolve them with Mr. Kingston

7    and Mr. Nepple overnight and tomorrow morning, great.  If

8    there are still exhibits that need to be addressed by

9    objection, then we can do that tomorrow afternoon.

10             MR. ROSS:  I'm happy to do that, Your Honor.  I

11   would also like to reserve that I think we should meet and

12   confer with respect to this additional discover so that if

13   there's not an agreement reached tomorrow morning, we can

14   bring that to the Court.

15             THE COURT:  That's fair.  That's a good idea also.

16             Lastly, the motion for judicial notice, is there

17   anything left on that, Mr. Kingston?

18             MR. KINGSTON:  I think not, Your Honor.  We

19   weren't -- our intention was to do that during our case in

20   chief.  And I don't think that we intend to do anything with

21   it at this point.

22             THE COURT:  All right.  It seems to me that I

23   don't need a motion to hear citations as to what is out

24   there in the legal world.  And what I didn't see in the

25   motion is that -- and I didn't really expect you to say this

1    -- is that Charter's people itself who were involved in

2    doing this campaign reviewed those authorities before they

3    started the campaign.  So it seems to me this is really

4    limited to legal argument and the issue of whether as a

5    legal matter the aspect of the stay violation under A(3) and

6    the advertising campaign is sufficient to warrant

7    substantial sanctions as opposed to what I've already ruled

8    as it being a violation of the automatic stay.  And to me,

9    the exhibits that were offered up, to the extent they're not

10   already in -- which I think all involve Charter, so one can

11   infer at least that someone at Charter was aware of its own

12   litigation history -- are really just sort of -- were being

13   offered up as to what was in the air, the zeitgeist.  And

14   that's basically just referring to other opinions.  So I

15   didn't really see a basis for it, and that's why I think

16   it's proper to have it resolved the way it has been.

17          MR. KINGSTON:  Your Honor, I should have dropped

18   the issue five minutes before I did yesterday.  I don't

19   intend to pursue it any more today.

20          THE COURT:  Okay, very well.  So you all should

21   meet and confer.  I think you should not do that on Skype.

22   You can do that separately to set up a call with each other

23   on the two topics that we've just discussed.  And if you

24   want to go ahead on either of those two because you haven't

25   resolved them all, let's do that tomorrow at 2:00.

1          MR. ROSS:  Your Honor, even if we resolve them, we

2    should actually put it on the record at 2:00.  So I think we

3    should just assume that we'll meet at two.

4          THE COURT:  That's fine.

5          MR. ROSS:  And we would also make a request either

6    for us to be allowed to talk to Ms. Li, or for the Court to

7    do so, to come up with a date as soon as possible, a time as

8    soon as possible --

9          THE COURT:  No, you should do that.  After you

10   have your meet and confer, you should get hold of her.  She

11   is reachable until about 5:30 today and starting tomorrow

12   morning.

13         MR. ROSS:  She's always been very accommodating to

14   us, Your Honor.  So yes, we understand that.

15         THE COURT:  Okay, very well.  Anything else?

16         MR. ROSS:  No, Your Honor.

17         MR. KINGSTON:  None from the Defendant, Your

18   Honor.

19         THE COURT:  Okay.  Thank you.  I actually thought

20   this worked pretty well mechanically, and I appreciate all

21   the work that you put into it with our court IT people.  So

22   for Court Solutions that ends the transcript for today's

23   hearing.

24         (Whereupon these proceedings were concluded at

25   4:15 PM.)

1                    C E R T I F I C A T I O N

2

3        I, Sonya Ledanski Hyde, certified that the foregoing

4    transcript is a true and accurate record of the proceedings.

5

6    *Sonya M. Ledanski Hyde*

7

8    Sonya Ledanski Hyde

9

10

11

12

13

14

15

16

17

18

19

20    Veritext Legal Solutions

21    330 Old Country Road

22    Suite 300

23    Mineola, NY 11501

24

25    Date:  April 30, 2020

**0**

**0.38** 173:18 180:2
180:7,9 184:19
**001** 46:10
**010** 57:9,12

**1**

**1** 11:25 29:11
32:15 64:13 65:2
82:21,22,22 83:11
114:6,12,13 117:1
117:21,22 121:16
122:11,18 123:14
139:13 147:3
148:12 149:12
178:1
**1,386** 180:11
**1,400** 97:25 99:16
100:1 101:1
102:11,14
**1,428** 95:23,25
163:2 165:20
**1.83** 173:15
175:14 176:2,4,12
179:16
**10** 53:7,14,16,19
53:21 79:9,11
81:24 82:6,12,17
84:7 85:8 122:17
123:6 159:14,16
**10.05.** 175:19
**10.36** 172:16
**10.36.** 172:13
**100** 87:17 118:5
118:21 123:4
128:11
**10019** 5:11
**10022** 4:6
**101** 21:22
**105,202** 166:8
**106,000** 166:6
**106,203** 165:16
**106,229** 165:10,20

**106,230** 165:10
**10601** 2:3
**10:05** 2:6
**10k** 124:3 157:23
158:5 187:6
**11** 15:22 77:20
147:3 182:19,20
**11.88** 175:19
**110** 153:19,22
**111** 68:2
**11501** 198:23
**11th** 61:6
**12** 26:13 81:8,12
139:15
**12.58** 172:13,15
172:23 174:20
**120** 117:14 118:2
**127** 43:21 44:7,17
56:1
**128** 40:19,22 41:1
41:14
**128.1** 41:9
**129** 45:18,20 46:4
53:19
**129.001** 46:6
**129.009.** 46:9
**12:30** 96:11
**130** 46:12 47:24
48:5,14 53:7 57:3
57:11
**130.001.** 48:9
**130.017** 57:7
**130.5** 51:11
**134,002,901** 52:18
**134,088,881** 52:19
**14** 7:18
**146** 152:4,6,24
**14802** 37:17
**15** 7:20 14:24
18:12 21:13 29:19
127:21 158:3,5
**150** 19:15 92:12
93:20

**152** 93:20
**158** 62:22,24 80:2
80:3,3
**16** 37:8
**17** 39:16 162:1,8
**17.91** 127:22
129:20
**18** 45:21 81:6,10
92:13 93:20 95:19
151:15 162:8
**185** 76:20 84:4,23
85:15
**19-08246** 1:4 3:1
**19-22312** 1:3
45:22
**1:00** 96:11
**1:10-1:12** 97:5
**1:15** 96:18 97:4,4
97:10

**2**

**2** 58:20 59:12
61:10 75:10,11
93:20 114:7,12,13
115:7 116:21
117:18,23 122:8
126:14 152:7,10
179:3,4,5
**2.2** 173:12 179:25
**2.22** 173:13
**20** 73:24 82:7,18
82:21,23 83:11,15
83:18 104:6,9,15
160:21 166:9
**200** 123:12
**2000** 128:24
**2010** 37:8,13
**2016** 170:4 176:6
**2017** 117:4,9,16
118:13 121:22
127:5,7,8 129:3
129:18,24 160:20
162:3 173:20,21
175:7,8 176:5,11

**2018** 117:3,19,22
118:1,13 121:22
122:8,9 123:18
124:3 127:9,17
128:5,24 129:3,5
129:17,19,24
130:10 131:23
133:15 134:9
137:25 138:4,6,10
139:11,12,14,19
140:6 157:24
158:9,13,22,24,25
159:1,2,8 160:13
160:17,18 161:2,4
161:22,24 162:3
167:18 168:4,6
169:10,14 170:6
173:15,22 174:7
175:7,10,16
176:11 178:8,9
179:9,15 180:20
181:1
**2019** 10:17 61:7
64:9,13,17 65:2
67:16,17,19,24,25
68:2,4,4,12,12,17
68:18,22 69:1,5,6
69:20,20 70:10,10
70:21,21 71:14,15
71:22,22 72:2,3
89:10 90:7,11
117:23 118:4
121:19,20,20,23
121:24 127:7
128:1,6,8,17,25
129:5 130:2,3,6
130:10 133:16,17
137:25 138:4,7,10
138:23,23 139:10
139:13 146:22
158:17 159:9
160:13,17,23,24
161:1,4,5,14,19

161:22 168:8
169:15 170:4,6,9
170:11 171:8,8,11
171:15,23 172:1
172:16,16 173:1
173:21 174:3,8,20
176:9 178:1,2
179:9,22 180:20
181:2
**2020** 2:5 37:17,18
39:16 138:1
198:25
**205** 70:16,19 73:9
77:23 78:1,5,15
79:12 85:24 86:2
86:24 95:10
164:19
**207** 77:21
**20th** 24:11 25:7
**21** 7:16 12:9 14:22
29:21 80:25 81:3
148:11,12
**22** 154:10 155:14
**23** 130:23 131:1
132:8,16,23,25
133:5,8 134:7,9
134:12,14 136:10
137:1 148:12
164:2
**24** 37:18 63:12,15
63:16 90:7,10
131:25
**24063** 134:18
**248** 2:2
**24th** 146:22
**25** 132:5,11 133:6
135:19 136:11
137:1 147:3
**250** 5:10
**252** 74:18 76:3,7
76:23
**26** 8:13 9:2 10:24
10:24 11:14,18,20

11:25,25 14:21
15:12 17:10 22:12
22:24 23:18 24:17
26:18 28:21 29:11
30:16 32:15 58:14
58:20 59:12 61:10
61:13
**27** 182:19,20
**2700** 5:3
**28** 2:5 64:17 124:1
124:9
**28th** 64:9
**29** 150:1,2
**2:00** 194:19
196:25 197:2
**2d** 37:12

### 3

**3** 114:12,13
123:22 124:2
157:19,22 179:14
196:5
**3.2** 180:17 182:4
182:10
**30** 16:20 36:1,6
37:9,20,21 90:7
137:21,23 198:25
**30.25.** 37:14
**300** 2:2 198:22
**309** 14:14 72:13
72:16,18 73:2
**30th** 20:18 89:9
**31** 140:4,7 144:20
157:24
**33** 67:13 153:12
169:17
**330** 198:21
**350** 30:5
**35th** 47:17
**36** 124:18
**362** 29:7
**362a** 163:19
**364** 114:13,18,25
165:18

**364a** 114:12,16
163:9,12,25
**364b** 114:16
163:12 166:12
**37** 12:8 15:12
**38** 140:12 144:20
**39** 143:6,23
144:20
**3rd** 37:24

### 4

**4** 7:19,21 18:16
19:1,7,12 21:10
24:23 31:15 73:16
75:1 89:24 90:13
125:18 126:14
127:1,25 152:13
180:8
**4,033,425** 18:12
**4-13** 21:22
**4.17** 127:15
**4.91** 128:20
**40** 63:14,16
104:17
**400** 58:6,11
**400,000** 15:17
31:15
**404** 37:7
**4063** 131:12
**408,000** 29:22
**409** 37:25
**41** 63:6
**43** 61:3
**477** 114:17 121:25
122:7 142:8 163:5
165:11 168:25
**477s** 141:13
**4:15** 197:25
**4th** 17:24

### 5

**5** 127:24 128:4,16
152:25
**5,000** 15:16

**5.1** 180:17 182:4,8
182:17
**5.4** 180:15
**50** 33:21 119:6
150:5,21,24 151:1
155:22
**500** 127:11,19
128:10,12,20
129:3,16
**500,000** 73:24
**510** 29:10
**53** 21:13
**54,730,625** 52:25
53:1
**55th** 5:10
**56** 67:13 171:7
**575** 4:5
**58** 60:24 61:1,4,9
62:2,24 63:2
67:10 80:5,6,7,16
80:21 89:25
149:11,14,16,17
149:20,21 169:18
**58.029.** 150:3
**59** 172:11 174:4
**5:30** 197:11
**5th** 37:8

### 6

**6** 7:5,21 36:1,6,10
37:9,20,21 52:2
89:24 90:7
**60** 8:9,15,18 95:13
95:17,19 98:3
99:17 101:2
102:11 104:16
119:2,3,4,5
130:14,17 134:1
134:22 136:9
137:3,5 139:2
140:1,9,17 145:3
145:22 150:11,12
151:10,15 155:24
156:2 162:13

187:25 188:10,12
**602** 35:18 36:4,16
**61** 7:14,24 8:11,15
8:18,21 11:3,5
39:2
**63101** 4:16 5:4
**65** 89:14 146:25
149:2
**670,034** 51:23
**670,778** 51:24
**68** 80:6
**693** 37:12

**7**

**7** 7:6 37:13 51:18
**701** 184:10
**702** 183:18 187:9
187:14,15,17
**75** 116:22 117:12
118:3,9,10
**767** 37:12
**77** 120:1
**791-92** 37:12
**7:00** 144:7

**8**

**8** 18:24 19:11,13
23:22 25:16,20
90:3
**800,000** 153:8
**803** 36:10
**83** 159:16
**87** 154:8
**899** 37:8

**9**

**9** 53:7,19,20 80:25
**90** 90:6,6 91:4
**901** 13:15
**907-08** 37:8
**940** 116:12,23,25
118:4
**97** 147:3
**98** 147:2 148:11

**98.93** 129:20
**99** 147:3,3 148:12
150:17

**a**

**ability** 15:13
25:16 59:7 124:21
**able** 12:25 20:5
31:6 55:10 84:17
86:12 103:6
124:24 161:18
186:19
**absolute** 122:4
**absolutely** 121:10
133:10 161:10,23
**abstract** 106:17
**accept** 32:3 33:13
34:20 37:7 83:19
104:11 190:24
**acceptable** 185:24
**accepted** 101:15
**accepting** 36:7
**access** 125:14
153:19
**accessed** 186:8
**accessible** 163:8
**accommodate**
62:10
**accommodating**
194:25 197:13
**accomplish** 98:10
111:16
**account** 45:25
53:8,10,12,14,16
53:20,21 66:4,10
66:14,20 184:16
**accountant** 66:6,8
66:12
**accounted** 184:19
**accounts** 12:7
40:13 53:4,6,23
53:24 54:2,4,5,7
54:24 55:22 65:5
65:9 170:16

179:18
**accurate** 8:8 59:1
100:24,25 101:5
182:18 198:4
**achieved** 130:1
**acted** 22:9
**activity** 65:15
181:1,2
**actual** 19:3,3
25:21 43:1 182:22
185:5
**add** 49:7 165:6
**added** 180:9
**addition** 29:8
124:24 191:10
**additional** 29:14
31:16 33:7,11
104:17 195:12
**additionally**
187:2
**additions** 8:18
177:19
**address** 11:8 18:3
42:2 141:2
**addressed** 23:23
34:6 187:19 192:7
195:8
**addressing** 184:3
184:3
**admission** 7:25
183:17 189:20
190:6
**admit** 14:3 191:5
**admitted** 11:1
154:24 157:21
**admonition** 34:23
**adv** 1:4
**advance** 40:10
47:1
**advanced** 118:5
**advances** 125:7,7
**advantage** 119:18
124:25

**advantages** 130:1
161:20,24
**adversary** 3:1
14:13 39:15 77:19
152:2,21
**adversely** 125:10
**advertise** 113:19
119:24
**advertised** 120:2
127:11 143:5
**advertisement**
87:5 122:17,22
153:6 155:14
156:7 181:7
**advertisements**
87:3 152:1,20
153:3,8,11 155:22
**advertising** 19:11
29:21 31:2 79:12
79:17,20,22 86:20
87:1 158:12 159:1
159:3,6,7 160:9
160:10 161:18
179:21 180:1,4,14
182:2 196:6
**advice** 157:1
**affect** 124:21
**affiliated** 77:17
115:24
**affirm** 39:6
**afraid** 47:18
88:24
**afternoon** 14:18
15:1 28:6 29:2
97:12 161:21
195:9
**age** 12:6
**ago** 146:17
**agree** 33:25
102:18 108:8,12
109:25 112:10
116:25 119:19
145:19 162:5

175:17 195:4
**agreed** 161:1
174:24 189:1
**agreeing** 146:2
**agreement** 158:11
193:19 195:13
**ahead** 45:14 56:12
76:6 85:1 101:12
155:10 156:22
160:22 174:5
196:24
**air** 47:14 50:10
157:15 196:13
**aisha** 6:7
**al** 1:12,15 3:2,3
6:7 7:3 97:13
157:12
**alabama** 130:16
131:8,13 132:10
132:21 134:2,3,6
134:12,16 135:6
135:15 136:13,17
136:24,25 151:16
151:19,23
**albeit** 30:5 32:10
34:5
**allegation** 79:15
**alleged** 15:5 63:21
63:23 79:12
**allocate** 192:13
**allow** 11:14 23:6
33:13 184:1
**allowed** 22:24
23:7 46:19 62:14
147:14 185:25
197:6
**allowing** 63:19
**alternative** 34:23
182:7
**alternatively** 29:8
31:16 36:7 38:19
**american** 69:6,9
70:24 71:3,6,8

167:5,13
**ammon** 151:5
**amount** 12:9 34:5
34:7 78:20 192:23
**amounts** 27:17
31:9
**ana** 5:21
**anahuac** 144:1
**analysis** 37:7 69:7
69:22 70:12,14,23
71:11,17,19,23,24
87:23 120:11,20
133:20 134:19,20
134:21 136:4,5
139:3 144:9
161:19 177:21
178:5,22,25 179:5
179:23
**annual** 172:9,25
173:2 174:3,4
**annually** 122:1
**answer** 9:13,14
16:9 21:17 22:3
52:12,14 60:22
62:15 69:17 71:17
71:20 86:4 91:22
92:9,18,19 93:7
93:10,17 96:2
99:11 101:3
103:17 136:18
143:24 167:9
185:20
**answering** 128:13
**answers** 23:19
92:6,16
**anticipated** 76:1
77:25
**anybody** 80:3
156:10 163:18
168:16,24 186:5
**anyway** 16:25
**apart** 35:15

**apologize** 40:10
46:16 51:3,7
53:18 60:23 67:8
80:5,14,20,22
83:5 84:16 102:22
109:6 119:4
130:17 132:1
169:16,17 170:8
**apologized** 172:20
**apparently** 17:23
27:2
**appear** 30:17
31:21 38:10 46:9
51:24 52:17,18,25
53:1 57:10 61:21
131:18
**appeared** 47:16
58:6,8 59:8
129:18 189:17
**appears** 12:10
19:8,8 30:9 31:5
31:24 32:8 36:15
41:13,17 42:3
44:12 48:13 49:17
52:5 53:8 59:1
61:8 63:3 74:10
76:13 79:6 96:2
115:8 119:6
122:23 124:3
130:21 131:2,14
133:9,10 140:7
157:23
**apples** 142:4,4,16
142:17 144:4,6
180:25 185:22
**application** 33:13
187:14
**applies** 30:12 38:4
**apply** 11:20 24:17
27:14 29:11 36:6
36:10
**applying** 180:15

**apportioning**
100:7
**appreciate** 24:11
26:12 32:5 34:23
46:3 47:20 55:13
96:16 148:22
155:6 157:16
163:23 175:1
192:13 194:16
197:20
**appreciating** 88:2
100:14
**approach** 88:25
**appropriate** 36:5
147:8 179:2,4
185:23
**approximate**
14:23
**approximately**
29:22 153:8
180:11
**app'x** 37:8
**april** 2:5 39:16
67:16,24 68:4,12
68:17 69:5,20
70:10,20 71:14,21
72:2 159:2 161:14
161:19 167:17,25
168:4,6 169:10,13
169:15 170:10
171:8,14,21 172:6
172:8,25 174:22
175:20 178:1,8
180:19 181:3,4
198:25
**arbitrary** 112:7
**arbitration** 58:10
**archer** 6:8
**area** 66:23,25
88:10,11,14 93:5
104:17,24 105:6
109:24 110:17,18
110:20 111:13,20

112:1,8 116:9,14
121:7 123:4
136:19 138:14,15
138:20 148:8,9,13
148:13 177:10
186:17
**areas** 102:19
138:11,18 159:3
159:10 162:24
**aren't** 112:3
**argue** 145:21
**argued** 36:9
**argues** 187:1
**argument** 11:25
13:8 28:8 34:16
36:5,7 185:1,3
186:20 191:25
192:3,21 194:20
196:4
**arguments** 185:3
185:4 192:2,4
**arms** 99:9
**arrived** 180:16
**arrives** 182:3
**arthur** 49:2
**articulate** 192:6
**articulated** 112:8
190:11
**ashville** 151:15,19
151:22
**aside** 23:17,20
63:24,25 67:8
**asked** 7:9 9:7,25
11:17 14:7,17
18:20 20:1,11
23:1 24:5,6 25:22
25:23 29:16 30:3
31:4 32:3 33:16
34:4,21 51:9
54:16 55:1 60:2
71:16 78:18 85:21
143:25 147:4
177:8 179:20

192:22
**asking** 11:11
13:10 16:24 42:3
42:10,25 45:11
46:17 53:12 57:7
60:23 76:16 84:23
85:6 87:13 94:17
102:25 110:2
113:1 117:10
121:9 128:3,14
144:25 146:15
154:25 155:7
**asleep** 156:23
**aspect** 196:5
**asserted** 153:1
**assess** 136:4,5
**assignment** 55:25
**assignments**
58:11,13
**associated** 42:3
66:14 70:14 90:5
116:15,20 118:2
127:12 141:2
143:5,8,11,13
150:24 151:1
164:13 180:14,16
182:1,16
**assume** 64:19
110:21 157:6
165:21 166:6
187:7 192:18
197:3
**assumed** 76:3,8
76:18
**assumes** 120:21
140:19
**assuming** 36:17
45:10 52:7 72:9
164:12
**assumption** 72:10
120:16 167:15
**assumptions**
155:8

**ate** 105:19 106:12
107:13 108:5,10
108:14
**attached** 39:16
**attachment** 62:22
**attachments** 63:1
**attempting** 147:6
**attempts** 81:7
**attention** 42:2
67:13 72:12 74:18
75:10 79:8 80:16
80:20 81:24 91:23
95:5,23 114:5
124:8 125:12
148:11 149:19
150:1 151:10
152:4 166:12
172:10
**attorney** 5:2 15:5
**attorneys** 4:4,14
5:9 15:23,25 16:5
**attorneys'** 16:19
18:14
**audio** 48:17 49:2
70:1
**august** 67:17,25
68:4,12,17 69:5
69:20 70:10,21
71:14,22 72:3
159:2 167:17,25
168:4 169:13,15
170:11 171:8,15
171:22 172:6,8
173:1 174:22
175:15,20 178:2,9
180:19 181:3,4
**auman** 5:18 13:13
17:16 19:24 20:7
23:20,21 25:3
26:5 28:9 29:16
29:24 32:1,25
34:11 35:5 36:21
36:23 38:15,24

88:19 91:25 92:15
93:7 94:5 95:4
98:18,21 103:21
145:8 146:15,21
188:5,25 192:11
193:22 194:2,20
195:1
**auman's** 88:22
89:13
**auman's** 7:16,18
7:20 14:23 21:13
34:15 103:12,23
144:14 148:6
149:5
**authorities** 37:6
196:2
**authorized** 74:11
76:15 79:3
**author's** 136:21
**automatic** 29:7
32:4 63:21 196:8
**autrey** 132:14,15
133:3
**available** 27:10
32:25 57:6,13
62:14 71:12 117:3
163:19 168:25
177:22
**avenue** 4:5 132:13
132:14,15,16
133:3,3
**average** 169:10
179:16
**awarded** 16:20
**aware** 45:4 58:19
59:24 60:5 123:19
130:8,11 135:22
141:6,10,13
151:20 163:4
168:21 177:13
196:11

**b**

**b** 2:21 35:23 36:1
36:6 37:9,20,21
58:20 61:10 90:7
114:12 163:15,16
163:20 187:9,14
187:18
**back** 7:13 14:19
51:6,7,8 56:1 67:7
78:7 79:23 81:24
84:14,20 90:13
94:8 97:2,3,12
116:6 117:18
125:12 149:7
151:10 155:23
157:7,11 176:5
180:18 183:22
185:2 189:1
192:16
**background** 52:9
**backup** 18:12
20:20 21:3,8 23:6
32:6
**bank** 4:15 5:3
40:12 45:25 46:4
53:4,6,8,23,24
54:1,4,5,6,24
55:22 57:5,13
65:5,5,6,12,15
66:4,10,20
**bankruptcy** 1:1
2:1,23 29:8 30:23
46:1,1 73:4,19,23
195:3
**banks** 65:9
**bar** 126:17
**bargained** 20:14
**base** 25:21 160:16
**based** 15:17 20:3
23:12 34:5 35:17
52:7 54:1 59:16
62:15 87:23
109:14 129:6

131:18 134:14
183:16 184:12
186:20 187:3,11
187:19 189:8
**basically** 196:14
**basis** 19:2 24:22
24:23 32:3 36:15
55:2 58:22 70:6
71:24 176:1
180:15 183:20
187:24 188:11
191:7 196:15
**baylis** 4:9
**bear** 132:4
**beat** 128:23
**began** 24:2 158:12
159:7 179:22
187:6
**beginning** 46:16
110:21 117:3,22
117:23 127:6,7,9
127:17 128:1,6,7
128:8,17,24,24
139:10 161:13
178:25 185:2
**begun** 159:1
**behalf** 7:12 77:11
77:16 78:23 83:24
85:24 86:24 88:19
91:25 92:15 95:10
145:24
**belabor** 52:20
**belief** 137:7
**believe** 9:5 14:16
21:15 24:2,18
31:16 32:2,13,23
35:19 39:1 50:1
56:18 57:15 61:23
62:13 64:2 78:19
78:25 79:19,23
80:7 82:17 85:9
86:8 88:23 93:18
93:22 97:22 98:15

104:4 112:17
123:15 134:17
136:1,3,3 141:21
150:13 153:20
158:2,17 160:8
178:2 181:9
183:25 187:10
192:9
**believes** 153:9
**bench** 190:12
**best** 37:23 59:7
120:25 130:7
136:20 142:15
153:9 156:6 188:3
**better** 29:1 72:24
77:23 106:8
107:14,17 185:20
193:9
**beyond** 21:13
147:22 182:24
183:2 186:25
**big** 22:16,18
99:12 110:20
**bigger** 159:16
165:20,22,23
**bill** 17:24 41:6,7
41:11,16 42:8,11
44:10,12,14,17,23
**billing** 16:22
**bills** 41:18 103:14
**binder** 40:20 46:9
60:17 63:25 64:2
72:20 83:8,9 89:2
114:8,11 123:24
125:13 163:10,13
**binders** 60:19,20
61:1 84:21
**birthday** 89:11
**bit** 41:22 82:10
104:16 116:23
157:14 170:24
**bits** 9:17 20:3

**block** 42:1 108:13
108:16,20,24
109:20 110:6,9
115:13 117:2
118:2,16 119:8
131:10,12,17
132:7,8,22 133:6
133:11,19,21
134:5,11,14,18,19
135:9,9,20 140:21
141:11,14,16
142:1,2,7,13,15
142:16,17,19,22
142:24 143:2,5
146:1 159:23
177:15,17
**blocked** 18:18
**blocks** 109:14
141:4 142:5 144:5
144:8 162:14,21
162:22 165:10,25
166:5 177:9,12,14
185:12,15,17,22
**blue** 126:22
**book** 72:14,15,17
145:16
**border's** 193:16
**borders** 6:10
**bottom** 16:12
41:19 53:20 82:20
115:6 124:10
131:1 169:22
**bought** 65:22
**box** 42:10
**boy** 106:20
**brad** 148:9,17
149:4,8 150:18
**brand** 68:8 71:25
159:18
**branded** 158:17
**branding** 57:1
**brannon** 98:18
149:1,8 150:18

151:7 160:12
**brannon's** 148:9
  149:4
**brave** 80:23
**breach** 96:11
**break** 95:2 96:5
  100:14 157:3
  161:18
**breakdown**
  126:15
**brian** 6:5
**brief** 30:3 185:3
  191:7 192:21
**briefing** 7:7 30:6
  189:12 192:8,9,10
  192:18
**briefly** 10:22 26:2
  26:23 32:13 84:23
  156:16 163:16
  170:19 176:20
  181:12 184:7
  186:2
**briefs** 192:1
**bring** 46:15 149:7
  195:14
**broadband** 56:4,8
  56:15 64:13,17
  65:2,21,23 66:17
  66:18 69:2,10,25
  93:12 112:12,13
  112:16,23 113:3,6
  113:16,18 114:3
  115:22 117:2
  124:25 125:15,23
  126:15 128:18
  129:12 131:5
  132:21 135:22
  136:6,13,17,19
  137:24 139:8
  140:14 141:1,6,10
  143:10 162:7,24
  177:16

**broadbandmap....**
  126:5,8
**broader** 137:1
  159:23
**broadstream** 68:7
  68:8 177:1,5
**broadview** 69:1
  69:15,19 167:8
**broken** 68:6
**brought** 42:2
  183:22
**bu** 192:4
**budget** 25:18,21
**building** 47:15,18
**buildout** 182:12
**builds** 103:11,14
  103:16
**built** 104:3
**bunch** 156:2
**business** 34:12
  36:10 40:24 41:5
  41:7,11,15 42:4
  43:14,15,15,16
  56:23 69:13,14,25
  76:4,9,16,19 79:4
  79:7 81:7,9,15,20
  83:23 84:4,6,6
  85:7,14,19 87:5
  88:10 93:12 94:1
  94:10 102:2,4
  110:25 124:14
  138:15,19,19,20
  142:10 158:16
  159:13,15 164:23
  166:13,14 168:13
  168:19 169:4
  177:23 185:6
  186:2,3,6,10,12
**businesses** 186:11
**button** 12:4 49:6
  49:14
**buy** 158:23

**bytes** 9:18 20:4

**c**

**c** 4:1 7:1 29:10
  39:10 40:1 48:11
  187:15,17 198:1,1
**cable** 90:25 91:2,2
  94:9 123:17
  124:24
**calculate** 78:15
  171:7 174:21
**calculated** 31:10
  67:17,25 169:10
  169:25
**calculating**
  167:16
**calculation** 8:22
  11:21 14:21 18:12
  23:21,24 24:12
  27:18 29:17 31:7
  43:7,7 176:4
**calculations** 23:9
  29:19 32:9,16
  167:17 168:3
**calendar** 181:1
**call** 26:11 45:3
  60:15 81:19 87:24
  90:25 137:20
  175:2 196:22
**called** 20:18 28:16
  42:4 79:24 91:18
  93:4 108:1 114:2
  136:25 179:22
**calling** 93:5
**calls** 54:15 81:14
**campaign** 19:11
  21:23,24,25 22:7
  31:1 79:20,22
  179:22 180:1,5,11
  180:17 181:3,4,5
  182:2 196:2,3,6
**candidates** 98:17
**can't** 12:12 19:21
  22:10 27:18 49:10

100:16 101:5
  110:3 113:25
  119:23 127:20
  129:8,9 133:9
  138:19 145:19
**caption** 41:1 86:7
  86:8 152:6,10
**captioned** 77:20
  115:21
**careful** 44:1
**carried** 179:13
**case** 1:3,4 30:13
  37:7,19 41:13,17
  48:13 54:12 55:19
  57:2 58:15,16
  69:25 72:2,3
  73:23 77:3,13
  79:13 95:11 98:23
  119:7 124:5
  131:14,18 133:4
  133:10 144:13
  147:11 152:7
  157:18 163:16
  166:6,8 188:9
  189:5 192:11,14
  192:17 193:13
  195:3,19
**cases** 16:19 30:6
  30:17 37:11 57:22
  57:24 59:9,10,17
  77:20 188:10
**cash** 51:14,18,23
  51:24,25 52:17,18
  52:21,25,25 54:24
  55:22 57:5,13
  158:19
**categorical**
  102:16
**categorically**
  110:1
**categories** 11:11
  28:25

category 8:14
19:19 28:21 30:8
75:10,11 129:3
catlettsburg
137:2,6,10,14
139:4,9
catton 36:25
caused 191:16
census 115:13
117:2 118:1,16
119:8 131:10,12
131:17 132:7,8,22
133:6,11,19,21
134:5,11,14,17,19
135:9,9,20 140:21
141:4,11,14,16
142:1,2,5,7,13,15
142:16,16,17,19
142:22,24 143:1,5
144:5,8 146:1
159:23 162:14,21
162:22 165:10,25
166:5 177:9,11,14
177:15,17 185:12
185:15,17,22
center 92:21,23
centered 104:4,6
centers 92:25 95:6
95:9
central 92:20,22
93:3,14 94:15,21
99:3 103:12,14,24
103:25 104:4,7,9
certain 9:15 23:14
35:16 90:5 113:8
113:11 119:24
120:6 124:25
131:19 135:10
138:6,7 143:1
162:15,16,18
188:6,7 189:21
certainly 18:16
58:25 66:12 92:4

93:25 94:8 99:18
113:22 186:18
188:5
certainty 63:20
122:5 133:10
certified 131:15
198:3
cetera 103:5
ceteris 108:1,4,9
108:17
chambers 14:8
191:15
chamber's 11:8
chances 107:14
change 39:19
109:2 175:13
176:2,3,5 180:3,3
182:13 183:23
changed 121:19
132:6 173:22
175:9
changes 43:13
105:8
chapter 77:20
characterization
93:18 175:18
characterized
30:22 61:13
charged 20:22
charger 170:23
chart 7:15 126:17
129:23 174:4
179:10 186:23
charter 1:15 3:2
4:14 5:2 7:3,4,12
7:16,19,25 11:14
13:4 14:10 15:1,7
18:6 21:6 22:1,2,3
22:5,6,8,11 26:4
26:13 29:1,14
30:20 31:19,25
32:18,22 33:17
34:3 40:21 43:24

44:2 77:4,4 79:24
80:16 81:8,9
82:10 87:25,25
94:6,14,21,24
97:13 98:5 99:14
99:14 100:5,6,18
100:22,23 101:20
101:24 102:8,19
102:21 104:10,18
104:24 105:7
112:17 114:20
115:17 116:8
117:6 118:1,4
119:1,9,10,12,13
119:15,16,20,21
120:21,21 121:1,1
121:2,5,5,6,7,11
121:11,13 126:22
127:18 128:14
129:4 130:1,8,19
133:14 134:10,25
135:1,4,4,6,7,11
135:14 136:14,16
136:20,22,23
137:5,10 138:3,11
138:14,18,18,24
139:5,8 140:2,7,9
141:1,24 142:20
143:10,13,24
150:7,7,16,19,22
151:25 152:8,20
153:3,6,7,11,22
156:7 157:12
158:5 159:4,10,14
159:19,24 160:6,6
160:13,13,14
161:20 167:18,18
167:20,21,22,23
168:6,6,11,12,14
168:14,17,21
169:3,3 170:23,25
171:1,3,15,19,21
172:2,3,17,17,18

173:9 174:7,20
179:7,8,11,12,19
179:19,24 181:7
184:16 185:18
186:6 188:10
191:15 194:23
196:10,11
charter's 157:23
186:10,22,25
187:5 192:11
196:1
charter's 7:9
12:19 29:21 31:13
32:20 117:13
121:12 128:23
129:15 143:12
charts 187:24
check 10:13,14,14
10:14,16 11:12
12:8 41:23 42:16
42:21 44:17,24
49:6,14 57:1
89:19,20 122:12
checked 8:7
checks 12:3 40:12
40:18 41:23 42:20
53:23,23,24 54:1
56:2 65:23,24
66:4,5,9,10,14,16
chief 192:14,17
195:20
children 193:7
choice 77:1,2 78:5
78:23 79:4 81:15
81:19 82:1,5,9
83:14,24 84:4
christopher 6:4
churn 27:14 67:15
67:16,24 168:5,7
169:10,14,15,25
170:14,14,22,23
171:8,14 172:2,2
172:4,5 179:6,11

179:24 180:5
187:13
**cir** 37:8
**circled** 123:4
**circuit** 30:22
**circumstance**
38:7
**circumstances**
31:21 177:7
**circumventing**
148:2
**citations** 195:23
**cites** 187:12
**cities** 156:2,8
**city** 106:1,14
107:5,10,15,20
108:11,13,16,17
108:24,25 109:14
110:6,9
**citywide** 108:6
109:15 110:7
**civil** 37:14 153:13
**claim** 18:16,17
29:9 30:12 71:5,6
87:19 185:11
**claimed** 18:24
21:16
**claiming** 21:25
**claims** 152:1,21
**clarification**
174:18
**clarify** 183:5
**clarifying** 176:24
**classified** 102:21
**cleaner** 108:22
**cleaners** 109:3,13
109:23
**clear** 11:4,23
12:18 25:20 30:14
31:18 33:4,23
37:16 43:10,25
46:22 52:4 54:8
55:14 61:20 62:8

86:15 87:15
106:22 144:3
171:6 177:2
178:23
**clearly** 59:13
**clerk** 49:3,16,20
49:23,25 50:5,8
50:13,21
**client** 22:16 193:8
**close** 19:25 34:11
95:5 97:9,9
128:11 156:13
**closed** 19:5,17
26:8 27:3
**closely** 84:10
179:7
**closer** 142:16
**closing** 34:16
191:25 192:1,3,4
194:20
**clunking** 118:8
**coburn** 4:13 5:1
8:3
**coburn's** 186:12
**code** 29:8,10
**coincident** 135:8
136:10 142:9
**colleague** 156:14
**collected** 68:7
**collection** 79:1
**collectively** 77:18
79:2
**colloquy** 146:13
**columbia** 110:13
**column** 53:10
165:6
**columns** 164:15
**combination**
19:12,14
**comcast** 141:24
**come** 9:20 13:22
20:6 35:20 36:5
55:19 112:5

121:20,22 147:24
157:7 189:1 193:2
197:7
**comes** 9:22
121:23 130:3
133:16 161:1
162:3
**comfortable**
106:18 190:9,10
**comfortably**
108:8
**coming** 96:6
138:18 144:14
193:24 194:7,13
**commentary**
30:11
**commission** 113:7
114:2 115:7
135:23 141:12
142:12
**committee** 5:9
142:12
**common** 92:24
166:22
**commonly** 9:22
**communication**
152:9
**communications**
1:15 3:2 4:14 5:2
7:4,4 44:18,22
51:18,19 52:2
53:15 54:5,22
55:20 56:3,14,16
56:22 64:5,8,12
64:16 65:1,21
67:3 68:5,11,19
68:22 73:12 74:22
75:24 76:14 77:1
77:3,4,5 78:6,24
79:5,7 81:15,20
82:1,5,9 83:14,25
84:5 85:7 87:18
91:6 94:6,14

113:7 114:2 115:7
115:18 135:23
141:11 142:12
158:5
**companies** 55:21
94:5 123:18,21
142:7
**company** 22:16
37:7,12 42:4
56:22 69:6,9
70:25 71:4,6,9
81:14 90:25 91:2
91:25 92:21 93:2
93:2,3,6,16 94:3,7
94:24,25 116:17
116:18 164:13,14
167:6,14 185:6
**company's** 175:9
**compare** 142:4,5
145:21 175:6
181:1 185:22
**compared** 119:21
167:16,22 168:7
169:14
**comparing** 144:4
180:25 181:17
**comparison** 51:25
103:3 179:1
**comparisons**
144:6
**compete** 98:5,16
100:19 101:7,19
101:25 102:1,4,20
102:20 104:10,18
105:2,7 106:2
109:18 110:9,22
110:23 123:21
124:21 130:20,20
130:21 136:23
137:6,10,14 139:5
140:2,9 146:16
**competed** 110:5
110:16,19 111:24

112:4 138:3,6
**competes** 81:7,8
105:22 185:19
186:6,15
**competition** 99:16
101:10,14 102:8
105:12,13,14
108:19 111:11
112:10
**competitive** 95:3
95:22 100:25
111:22 138:11
148:8 149:4 188:8
**competitor**
118:15 135:16,17
135:18 136:5
137:11 143:13,17
143:18,19,21,22
**competitors** 105:9
111:24 112:2,5,7
123:19 136:4
186:16
**compilation** 114:1
**complained** 22:15
**complaining**
12:11 26:1
**complaint** 7:6
122:14
**complete** 20:15,23
26:21 58:21 61:17
83:5
**completed** 23:9
**completely**
114:15
**completeness**
190:8
**completes** 14:16
**compliance** 31:10
**complied** 14:15
22:12 189:25
**comply** 8:13 9:1
11:13 30:16

**components** 31:8
32:2
**compounding**
120:19
**computation**
17:11 26:22 29:12
**computer** 10:2
12:20,22 13:3,9
23:14 24:15 25:1
25:9 26:5,5,17
33:8,15 53:25
123:9
**concede** 107:12
107:18 110:4
**concerned** 7:24
184:2 187:15,18
**concerns** 26:3
**concession** 190:18
**conclude** 110:19
111:22 112:1
182:19,20 188:12
**concluded** 188:17
188:22 197:24
**conclusion** 112:5
178:24 186:20
187:2 188:13
**conclusions** 55:19
**conditioner's**
157:15
**conditioning**
47:15 50:10
**confer** 38:22
156:14 195:12
196:21 197:10
**confidence** 66:13
**confirm** 75:1
**conflating** 179:18
**confounding**
184:15
**confuse** 169:12
**confused** 38:1
**confusing** 98:24

**confusion** 118:12
174:14
**connection** 17:11
24:16 30:4 48:18
73:23 93:6 102:23
**connections** 8:9
**conservative**
182:15,21
**consider** 161:15
**considered** 58:23
78:19 161:16
**considering** 46:17
**consistent** 11:15
140:5,15 152:7
179:17
**constant** 107:25
138:17 179:21
180:21,24 181:20
181:23
**constitute** 10:12
10:14
**consumer** 43:14
66:1 102:2 124:21
**consumers** 123:1
123:16
**consuming** 163:19
**contacted** 153:5
**contained** 15:8
**contains** 125:15
**contemplate** 12:7
192:8
**contemplating**
96:10
**contempt** 29:5
**contend** 152:19
**contention** 24:17
29:4
**continuance**
15:15 19:19 26:16
**continue** 126:6
**continued** 34:10
**continuing** 115:16

**contradicted**
185:10
**contrary** 185:21
186:19
**control** 30:20
161:10,12 173:23
175:10 176:10
178:7,11,15 179:1
181:11,18,21,24
186:21,24 187:4,6
**conversation** 54:2
98:11 150:14,18
**conversations**
21:4 23:3
**converted** 170:15
180:7
**conveying** 63:8
**convincing** 91:20
**cooley** 37:11
**copied** 14:8,11,11
**copies** 57:5,12
**copy** 10:16 82:23
88:22
**core** 94:3,5
158:18
**corner** 40:23 49:5
49:14 115:10
123:8 124:10
125:21
**corp** 37:17
**corporate** 45:21
46:5 48:7,9 88:18
90:1,11 91:24
93:21 146:20
**corporation** 20:24
38:14,16
**corporations**
22:19
**correct** 23:10,11
23:16 30:21 39:11
40:5 59:4 62:2
63:23 64:14,19
66:25 68:14,20,24

69:21 72:4,6 74:4
114:15 121:10
127:10 130:4
133:18,18 134:2
135:2 136:3
137:16 138:4,5
139:24,25 141:21
150:11,13 160:7,8
161:9 167:12
169:7,8,8 171:4,5
172:5 173:4,16,19
174:13 175:5
177:18 178:3
191:3
**corrected** 60:14
121:11
**correctly** 27:1
45:23 63:22 67:19
76:10 90:8,9
93:19 125:2,10
153:14 158:20
**correlation** 120:8
**correspondence**
168:17
**corresponding**
165:7
**cost** 14:22 29:22
46:21 90:6 182:9
182:10
**costs** 14:24 90:4
109:19 182:11,12
182:12
**could've** 11:10
26:7,7,8,9 27:25
98:14
**counsel** 7:9 9:20
12:19 189:11
**count** 95:8
**counted** 170:10
**counter** 31:1
**counterparts**
175:7

**counters** 190:9
**country** 103:1
198:21
**counts** 7:5
**couple** 23:8 60:3
156:17 176:25
**course** 10:20
33:22 37:2 38:14
59:8 107:22
110:11 120:1,4
165:18 167:13
168:13 169:4
176:25 177:23
185:6
**court** 1:1 2:1 7:2
7:23 8:6,11,15,20
9:4,10,22,23
10:20,23 11:2,7
11:22 12:14,18
13:2,7,16,25 14:3
14:5,9,10,11,17
14:19 15:9,16,21
15:23 16:2,2,7,13
17:7,8,14,18 18:1
18:7,11 22:25
23:7,8,12,17 24:5
24:8,10,22,25
25:5,13 26:3,18
26:24 27:7,22
28:19,23 30:5
31:20 32:7 33:4
33:18,23,25 34:6
34:11,17,19,21,24
35:2,4,14 36:24
37:5 39:6,10,13
39:21,24 43:4,9
43:18 45:5,10,14
46:1,1,6,17,18,24
47:3,6,8,10,14,16
47:19,22,25 48:3
48:16,19,24 49:4
49:11,18,21,21,24
50:2,3,5,7,9,16,18

50:20,21,23,24,25
51:2,3,8 52:6,11
52:12,14 54:14,18
54:20 55:5,14
58:2,2,4,5 59:25
61:21 62:3,7 70:2
70:5 72:7 74:12
74:16 75:4 78:14
78:19 80:6 82:11
82:15,19,22,24
83:1,3,10,21
84:19 85:20 86:6
86:10,14 87:8,12
87:15 96:6,8,9,14
96:18,21,23 97:1
97:2,3,4,8,12,18
102:22 103:9
114:23 115:1
121:6 135:5
138:22 140:23
144:19,21,22,24
145:6,14,18 146:4
146:6,14 149:14
149:17,21 153:6
154:22,24 155:4
156:1,16,19,22,25
157:5,9,11 163:13
163:18 172:20
174:14 175:22
176:18,21 178:19
178:23 179:2
181:6,10,13 182:6
182:15 183:1,3,5
183:6,12,19,23,25
184:2,6,9 186:1
186:16 188:16,19
188:21 189:6,13
189:19,24,25
190:5,9,10,15,19
190:25 191:5,19
192:4,15 193:5,11
194:1,5,9,11,14
194:15,18 195:2,4

195:14,15,22
196:20 197:4,6,9
197:15,19,21,22
**court's** 78:20
79:16 157:16
191:13
**courtesy** 47:21
96:17 194:17
**courtroom** 51:6
**courts** 30:22,23
34:22 37:16
**court's** 18:9 29:5
29:9 34:20 46:20
55:13
**cover** 8:5 55:4
**coverage** 126:12
126:13
**covered** 85:21
129:24,24 146:9
**covers** 79:1
139:14,15,16
**crack** 76:5
**crazy** 81:19
**create** 158:18
**created** 12:5
19:16,16 20:2,4
26:13 185:7
**credit** 7:17 19:15
20:22 27:13 28:4
**creditors** 5:9
**credits** 21:4,6
25:10 27:12
**crime** 73:20
**cross** 11:14 17:17
19:9,21 25:3 32:1
32:22 35:20 36:17
37:4 39:24 40:1
43:3 157:13
182:25 183:14,21
187:8
**crosstalk** 62:6
81:4

cumulative 70:3
146:8
cure 17:1
currently 63:18
99:25 110:12
158:13 160:1
customer 7:17
10:15 14:24 22:17
56:9,15,18 67:15
67:16,24 91:3,10
91:11,17,18 93:16
109:18 110:5
158:19 169:25
171:8 177:11,13
180:12 185:15,17
185:20
customers 22:14
23:4 41:15 43:8
44:9 56:23 67:18
68:1,21 69:5,19
69:24 70:9 71:21
90:6,17,18,20,21
90:24,24 92:22
93:13 98:5 102:4
110:24 111:6
120:6 125:9 150:6
151:25 152:19
153:4 158:11,14
158:16 160:2,6
161:11 167:24
168:4,14 170:10
170:12 171:10,23
177:16 179:6
180:5,8,10,11,13
181:21 188:2,3
customers'
120:14
cutoff 32:10

**d**

d 2:22 7:1 153:12
d.c. 111:17
dailies 46:20

damage 23:1
95:10
damages 8:14
19:19 21:16 22:22
22:23 29:13,17,25
30:8 63:20 71:4,7
71:9 77:5 78:9
164:19
data 8:23 9:16,18
9:19 10:2,3 12:3
12:10,13 20:3,20
20:24 21:3,8
22:13 23:5 24:3
25:12 27:9 58:23
63:19 100:14,17
100:18 101:15
114:1,17 117:3,15
117:19 120:1
121:25 122:7,9
125:24 126:25
127:25 128:5,18
131:5,15 134:4,23
136:7,14,22 137:8
137:24 139:9
140:14 141:2,19
141:22 142:7,9,11
142:19,22,24
143:2,11,16
150:10 162:7,8,10
163:5,8,17 165:11
168:24,25 170:23
170:24 174:9
175:4 177:11,13
177:20,22 183:16
184:2,20,21,22,22
184:23 185:5,5,8
185:10,17 187:9
187:10,19 188:1,4
188:6,7,8
database 9:24
20:3,22 21:3
22:15,16 23:5,7

date 12:9 24:21
122:7 126:25
127:4 131:19,21
137:7 147:9
162:18 170:22
197:7 198:25
dated 39:15
daubert 183:22
185:1,24
day 7:5 9:16
16:20 28:12 33:6
34:14 49:9 98:23
177:1
days 28:9 34:13
90:6,6 91:4 93:10
dba 166:24 167:1
dead 175:22
deadline 147:9
189:24
deal 32:21 36:16
104:23 145:8
146:9
deals 37:19
dealt 36:12 39:2
debtor 1:10 74:21
75:19 76:18,25
debtor's 152:8
debtors 73:7,10
75:6 77:17,18
86:11
dec 37:8
december 20:18
26:9 117:15,19
121:20,22 122:3,8
122:9 127:5,6,8
128:5 129:18,18
130:3,6,10 133:15
133:16 134:9
137:25 138:10
139:13,17,19
140:6 157:24
161:2,4,22 162:3

decide 183:4
194:2
decided 104:15
decision 78:20
137:13 183:24
decisions 120:15
declaration 7:16
7:18,20 13:14
14:23 24:11 25:7
29:20 35:16 36:19
38:25 39:14 43:3
43:5 74:2,6
172:12 178:18
179:3 181:10
182:20 183:8
193:16
declined 144:18
decrease 129:17
deduction 182:17
defendant 30:19
34:7 154:14
197:17
defendant's
149:20,21 152:4,6
153:19 154:8,14
163:9 169:18
defendants 1:16
46:17 60:17,24
61:9 63:1 70:25
71:4 72:12,16
73:2 74:18 76:7
76:20,23 78:2
80:2,5,20 84:3,22
86:19 89:25 97:14
98:15
defendant's 30:20
40:19 41:1 44:7
45:18,20 46:3,12
53:7 114:6,7
115:6 123:22
124:2,9 130:13,16
132:5 134:9,21
149:2,16

defense 62:2
85:14 114:18
116:21 117:1,18
117:21,22 122:8
125:12,18 126:14
127:1,24,25 128:4
130:22 131:1,25
132:8,22 133:8
134:7,12 135:18
137:20,23 140:4
140:12 143:6,22
145:15 146:25
define 102:13
135:14
defined 88:11,12
88:14 133:19
181:9
defines 77:12
defining 58:8
definition 26:14
106:6 136:9
definitions 143:16
degree 57:20
63:20
delve 32:1
demonstrated
184:22 186:9
demonstrates
183:14
denied 34:19
denominator
92:24
department 29:23
31:3
depending 107:23
110:10 112:14
depends 62:7
100:13 102:15
103:4
depicted 132:8,22
136:6
depiction 100:25

deploy 124:25
deployment 114:3
115:22 125:24
131:5 132:21
136:7,19 137:24
139:9 140:14
141:2 143:10
depo 26:12
depose 19:19
deposed 19:24
89:9
deposit 66:14
deposited 66:5,11
deposition 15:15
16:13,14 17:4,5,5
18:19 20:9 21:13
21:22 23:20 26:17
28:10 29:24 32:25
33:7 59:20 60:11
88:23 89:3,6,13
89:22 90:1,7
91:24 93:21 98:19
146:21 147:7,9,13
148:3,6,7,20
170:7 189:2,4,7
189:23 190:2,7,18
190:21 191:1,9
192:19 193:6,23
193:24 194:7
depositions 21:12
147:10 190:4
191:18 192:23
193:19
derived 24:12
34:8
described 14:22
20:10 21:14 45:23
91:9 177:22
describes 22:1
describing 91:8
91:11 172:12
description 42:1
44:14

descriptors 91:15
designate 147:11
148:4
designated 48:7
48:14 137:11
190:19
designating 37:9
147:10
designation
143:20 148:3
189:24
designations
189:4,7,8 190:2
190:18 192:20
194:8,12
detach 42:16
detachable 41:19
detail 25:24
determination
55:25 106:16
107:14 181:17
determine 27:13
66:8 106:13,24
107:12,18 108:5
109:12 111:5
161:11 181:16,25
determined
112:11 179:1
determining
106:12,14
develop 125:6
173:5,9
developed 171:20
172:15
dice 10:2
didn't 10:6 18:13
18:22 19:4,10,18
23:4 26:19 55:18
55:24 109:5
120:22 134:19,21
134:25 136:20
138:16 144:15
145:12 147:10

differ 124:11
differed 120:23
120:24
difference 56:12
90:16 116:17
123:15 167:20,22
169:14,15 172:13
173:11,17,17
175:15,18 179:15
179:21,23 180:1,2
180:9
differences
179:17,23
different 8:19
19:8 20:7,12
21:24 53:14,20,24
54:23,24 55:21,21
55:22 56:19,24
57:2 84:20 90:20
90:24 91:7,11,14
93:2,6 94:19
101:4 105:10
106:5 126:16
129:12,25 136:6,8
143:15,16 156:15
173:21 175:8
176:7,8 180:23
184:4
differential 168:8
170:15
differently 47:4
102:13 190:6
dimension 120:17
123:20
dire 36:18
direct 35:20,22
38:5,11,13 39:15
39:18 54:10 62:12
67:13 72:12 74:18
75:10 79:8 83:3
89:21 105:11,13
114:5 120:7
125:12 148:11

149:25 151:18,20
152:4 166:12
167:4 182:9,11
183:11 188:22
189:15
**directed** 8:22 30:2
38:23 89:19
155:22 184:5
**directing** 91:23
124:8 149:19
151:10
**directly** 83:6
102:2
**disagree** 109:25
161:4 175:21
**disbelieve** 59:17
**disbursement**
57:6,13
**disbursements**
51:15,24 52:1,18
53:1
**discern** 189:14
**disclosed** 15:7
16:4,4
**disclosure** 28:21
**disconnect** 8:18
**disconnected**
68:10 69:5,19,24
70:10 71:21
**disconnections**
8:10
**disconnects** 67:17
67:25 68:3,18
70:20 71:14 72:2
171:9,22
**discount** 20:19
91:10
**discounts** 20:12
20:13,17 90:17
91:17
**discover** 195:12
**discovery** 9:8
11:16 13:6 18:18

19:5,17,25 23:10
24:16 26:8,21
27:3 29:14,15,15
31:6,10,16 32:9
32:16,17 33:7
34:8,22 38:23
**discrete** 33:3,24
**discretion** 31:17
**discuss** 47:11
150:5
**discussed** 49:12
55:16 101:23
150:19 196:23
**discussing** 47:12
**discussion** 22:16
37:18 40:12,17
53:4,22 149:25
**discussions** 35:23
**dismiss** 87:19
**disparagement**
189:10
**displayed** 123:9
**dispute** 77:6
139:24
**disputing** 75:5
**disqualify** 187:9
**disqualifying**
188:11
**distance** 93:2,5
94:25
**distinction** 30:10
**distinctions** 87:24
**distinctive** 40:24
**distortion** 70:1
**distracted** 165:3
**distributed** 101:8
**district** 1:2 37:17
110:13
**divided** 67:18
68:1 99:13 100:4
101:18 168:11
170:9,12 171:22

**divides** 97:25
100:1
**dividing** 103:1
150:6,15 170:20
171:10
**division** 101:1
102:10,11
**docket** 14:14
**document** 7:17
8:5 10:8 11:6,9,13
12:15,19 13:4,10
15:17,21 16:15
17:18 18:15,22
19:1,6,15,20,22
20:1 22:13 27:1,4
27:19,20,22 29:15
30:1 33:22 41:3
43:2 44:11 45:4,6
45:7,21 46:3
54:25 55:3,3
57:11,18 61:17
64:20,24 65:4
73:13 75:2 76:14
79:19 80:18 82:7
84:2 98:2,19
100:3 124:4,11
126:2 131:19,20
139:7 147:13,21
147:22,23 153:11
153:16 157:25
**documentary**
24:23
**documentation**
9:3
**documents** 10:25
11:6,10 13:23
16:17 19:2 23:18
24:24 88:17 89:16
124:7 146:19
147:15 178:13
**document's** 55:14
**doesn't** 11:20
24:17 36:6 107:10

121:3,7 131:18
135:7 145:16
149:6,7
**doggone** 77:12
89:4
**doing** 28:15 32:20
52:5 56:4 76:4,9
76:16,19 79:4
83:23 84:4 85:14
85:18 87:4 106:3
123:20 145:11
156:25 164:23
166:13,14 172:14
179:3 196:2
**dollar** 27:17 31:4
34:4,7 182:3
**don't** 7:8,23 9:5
12:6,23 13:8,9
15:25 16:1,5,5,6
16:24 17:1,4,5
18:9 19:9,15,16
20:8 21:7 22:4,6
22:10,18 24:13,18
26:15,18 27:16
28:2,3,10 33:21
35:5,8 36:24
38:19,21 44:11
45:24 46:9,19,22
47:9,11 48:22
49:8 50:10 54:24
98:11,12,13 99:8
101:3 102:1,12,12
104:2,2 105:2,7
106:23 110:1
111:15 112:17,19
113:5,9,13,21
114:13 116:3,4,6
116:18 120:3,7
122:4 123:16
125:17 126:9
127:13 129:1,6,6
129:25 130:11
132:9 133:18,23

136:8,9 137:11,13
137:19 138:5,7,20
139:18 141:14
142:25 144:6,18
145:18,22 146:6
147:21,23 148:10
**door** 114:20
**double** 89:19,20
122:12
**doubt** 12:21 17:15
71:1
**douglas** 4:9
**dover** 140:2,6
**download** 116:8
116:15 118:16
143:7 163:4,18
**downloading**
118:24
**drafters** 30:7
**drag** 194:13
**drain** 2:22
**dramatically**
175:10 176:3,5
**draw** 42:22
172:10
**drawing** 80:16,20
95:23
**drive** 158:18
**drop** 26:13
**dropped** 51:4
196:17
**drops** 48:15 162:1

**e**

**e** 2:21,21 4:1,1 7:1
7:1 14:21 48:11
48:12 59:12 198:1
**earlier** 24:16 52:7
74:23 125:16
131:6
**earliest** 25:24
189:1
**earthlink** 79:6
84:5,6 85:6

**easiest** 103:17
**easily** 113:23
184:18
**east** 99:14 101:18
101:20
**eastern** 103:2,3
**easy** 15:4 164:21
190:19
**eat** 107:19,24
**eating** 106:25
109:2,22
**eats** 105:21
**ebit** 25:20
**economic** 177:21
**economically**
91:13
**economics** 91:6
91:15,19
**economists** 108:1
**economy** 35:12
**ecro** 2:25
**edition** 37:24
**effect** 185:9 187:7
**effective** 103:3
**effectively** 11:15
**effects** 180:22
**efficient** 191:24
**effort** 34:2 69:4
145:12 184:15
**efforts** 120:18
**eichler** 48:11
**eight** 75:19 124:9
**either** 22:10 25:23
29:5,12 30:18
31:17 35:22 36:5
49:8 60:12 109:22
109:25 130:8
133:14 147:10
159:23 184:18
188:9 192:11,20
196:24 197:5
**electric** 37:12

**electronically**
23:19
**elements** 23:2
25:14
**elizabeth** 38:3,7
**elizabeth's** 38:12
**else's** 170:21
**else's** 147:7
**email** 7:13,24 11:8
11:22 12:16,25
14:10
**embraced** 125:9
**employee** 36:3
**employees** 181:22
**employer** 65:15
**encompasses**
12:16
**endeavor** 44:5
**ended** 23:10
102:25
**ends** 27:24 197:22
**enforce** 29:7
**engaged** 79:17
**enter** 147:8
**entered** 118:15
138:11,13 154:15
**entering** 138:14
**enterprise** 43:16
**enters** 23:5
**entire** 9:20 15:20
**entirely** 37:16,16
**entities** 55:15 68:9
70:14 71:25 78:9
81:23 87:4 110:5
112:18 113:8,11
115:24 116:2
157:13
**entitled** 21:5
33:18 38:15
147:17,18 155:2
188:5
**entitles** 34:7

**entity** 52:17 53:17
56:19,20,25 64:6
68:6,16 69:7,12
69:22 70:6,6,23
71:23,24 72:4,9
74:14,24,25 75:7
79:6 81:18 85:17
87:3 141:7
**entity's** 73:6
**entries** 20:21
165:14,14 166:9
**entry** 146:5 167:1
**equal** 109:16
**equitable** 11:21
11:24 17:11 30:15
**equitably** 29:9
**equity** 29:6 30:10
154:22
**equivalent** 133:19
**eric** 6:2
**erroneously**
111:21
**error** 184:23
**errors** 60:14
**especially** 191:8
195:3
**essentially** 186:24
190:20
**established** 36:13
38:18 144:4
187:21
**establishes** 175:12
**estimate** 25:16
29:17 63:19 90:4
**estimated** 23:22
**et** 1:12,15 3:2,3
7:3 97:13 103:5
157:12
**eve** 31:20
**evening** 7:13 15:7
15:18 18:6,25
**evenly** 101:8

event 32:10 36:9
139:2
everybody 141:24
142:6
everybody's
175:7
evidence 13:23
21:6 31:14,23
34:14 35:18 37:24
63:19 112:4
140:20 153:10
154:16,25 155:6
156:6 183:9,11,18
184:1,10 185:21
185:25 189:3,5
evidentiary 26:22
154:22
evolved 93:12
exact 127:13
185:1,3 190:20
exactly 16:6 52:11
65:8 67:20 111:16
129:14 140:21
141:5 142:25
159:21 167:23
171:24 185:8
186:14
examination
17:17 25:4 32:1
32:23 35:21 37:4
40:1 43:3 54:10
144:17 176:22
183:14,21 184:14
187:8
examine 9:9 11:14
19:22 28:17
examined 19:9
examines 141:22
examining 142:10
example 33:9
103:1 157:2
excel 8:8,9,25
11:3,4 114:18

150:10 153:20,21
153:24 154:2
163:17,20 165:4
165:13,19 166:17
excellent 51:2
exception 30:21
35:24 36:6,8,10
36:12 37:10 38:20
62:22 63:1 192:17
exceptions 36:14
excerpts 190:7
excess 128:9
129:16
exchange 88:9,14
92:16,23 93:4
94:25 99:4,5,10
99:14,14 100:5,6
100:22,23 101:19
101:19,20 102:6,9
102:11,19,20,21
103:25 104:6,16
104:16,20,23
105:6,10,12 119:9
119:10,18,25
130:19 133:20,22
134:2,3,15,20
135:5,6,8,15,21
136:12,25 137:2
139:4,4 140:20
142:14,17,21
143:2,14 144:1,6
144:12 151:15
155:21 159:23
162:17 171:3
179:24 184:21,22
185:19 188:4
exchanged 138:6
170:9 190:2
exchanges 22:1,2
22:3,5,6,8,11
79:24 87:25,25
88:7 92:3,7,20,25
93:7,10,17,23

95:2,7,9,22,25
97:22 98:1,6,15
99:17 100:1,5,21
101:1,6,8,9 102:5
102:14 103:11,14
104:3 119:2,21
120:21,24 121:2,5
121:5,11,13
134:25 135:1,4,4
135:23 138:3,7
141:5,7,20 143:3
143:17 145:17
150:6,7,7,8,16,16
150:19,20,21,22
160:12,13 162:8
162:10,20 166:1
167:18,19,20,21
167:23 168:6,7,11
168:12,14,15,18
168:22 169:3,5
170:20,23,24,25
170:25 171:2,15
171:19,21 172:2,3
172:17 173:9
174:7,20 177:23
179:8,8,11,12,16
179:19,19 184:16
185:13
excluded 15:12,14
15:14
excuse 41:10
51:17 59:9 114:6
117:21 118:8
122:6 125:8
130:13,17,22
138:10 142:12
147:3 148:12
149:1 152:24
173:25
exemplar 41:10
41:11,19 42:11
44:17

exercise 156:10
170:5
exhibit 7:14,24
8:1,9,11 11:5 39:2
40:19,21 41:1,14
43:21 44:2,7,17
45:18,20 46:12
48:5 53:7,19 56:1
57:3,11 60:24
61:1,4,9,22 62:2,8
62:22,24 63:2
64:1 72:13,16
73:2 74:18 76:3,7
76:20,23 79:9,11
80:2,5,16,21
81:24 82:6,12,14
82:15,17,18,18
83:4,4,8,9,11,15
84:3,7,14,20,22
85:7,14 88:24
89:4,14,25 95:13
95:15,16 98:3
99:17 101:1
102:11 114:6,7,18
115:7 116:21,21
117:1,18,21,22,23
119:2,3,4,5,6
121:16 122:8,10
122:11,18 123:6
123:14,22 124:2,9
125:18 126:14
127:1,24,25 128:4
128:4 130:13,14
130:16,17,23
131:1,25 132:5,5
132:8,16,23 133:8
134:1,7,9,12,22
135:19 136:9,10
136:11 137:3,5,21
137:23 139:2
140:1,4,7,8,12,16
143:6,23 145:1,2
145:7,8,22 146:25

149:2,2,10,16,20
149:21,22 150:11
150:12 151:10
152:4,6 153:19,22
154:8 155:22,23
156:1,2 157:19,22
162:13 163:9,13
165:18 166:12
169:18 187:25
188:10,12
**exhibits** 39:17
43:23,23,24,24
60:17 114:16
141:17,18 144:20
144:20 145:7
146:1,8 154:13,14
154:15 155:9
189:3 191:11
193:3 194:24,25
195:5,8 196:9
**exist** 119:22
138:16 142:19,20
142:22 161:24
**existence** 87:2,4
141:13
**existing** 90:18,24
91:10,17 129:10
**exists** 182:6
**exited** 138:13
**expand** 104:15
**expanding** 105:6
**expect** 25:20
69:11 118:24
129:22 136:18
158:15 194:24
195:25
**expected** 10:16,19
38:15
**expense** 10:18,18
31:2 65:16
**expenses** 10:12
**experience** 59:16
189:8 192:23

**expert** 9:9 13:23
14:1 15:8 16:22
18:21,21 19:10
21:19,21 22:4,23
23:21 58:19 61:12
61:13 62:23 63:2
63:6 77:16 78:23
113:4,22 120:19
144:13 146:20
185:9 187:8,9
**expert's** 59:20
**expertise** 66:2,22
81:23 184:11
**experts** 59:25
185:8
**explain** 135:5
136:12,16 142:22
179:2 181:12
182:4
**explained** 85:5,5
98:14 115:1
**explanation** 44:9
169:24
**explore** 165:17
**express** 58:21
**expressly** 22:24
144:16
**extended** 79:22,24
80:1
**extends** 59:19
**extent** 23:23 56:1
159:6 185:18
196:9
**eye** 152:6

**f**

**f** 2:21 37:7,12
198:1
**f.r.e.** 187:14
**fabens** 118:2
119:1,10
**face** 91:14
**facilitate** 114:11

**facilities** 104:4
**fact** 7:10 16:20
19:17 30:11 31:9
35:25 55:11
119:17 120:6
126:12 140:19,20
176:4 179:24
185:15
**factor** 120:19
187:11
**factors** 179:18
184:15
**facts** 9:13 14:15
23:9 58:22 187:19
187:20,23
**factual** 9:6 18:18
52:9 113:13
187:24
**failed** 148:3
**fails** 136:14
**fair** 56:8 58:9
59:6 81:14 93:18
93:24 98:17 104:1
107:21,22 109:16
109:21 110:7
111:11 117:24
121:15 127:7,22
138:20,21 139:16
150:3 168:12
195:15
**fairly** 101:8,9
159:14 179:7,17
**false** 23:4 29:21
31:2 59:2 73:22
79:16,20 86:19
109:22 153:3
161:17 179:21
180:1,4,14 181:6
181:6 182:2
**familiar** 57:17
58:24 59:11,13
108:2 114:1 165:3
177:10

**far** 7:24 13:15
16:13 20:5 25:14
31:6 55:6 65:25
100:19 104:7,15
111:4 184:2,19
185:11 187:14,15
187:18 191:2
**fashion** 40:6
148:24 171:21
**fast** 123:1
**faster** 118:22,24
119:12,15,17,20
121:1,7,12,14
123:13,15,18
124:25 129:4
160:13,17
**fastest** 120:2
**father's** 48:1
**fault** 51:4
**fcc** 113:9,16,20
115:8,9 120:1
122:6 125:20
130:12,25 131:16
134:5 136:7,13,16
139:14 141:19
142:1,24 162:7,11
162:23,24 163:5
169:1 177:9 188:1
188:6
**fcc's** 113:23
128:17 137:24
139:8,20 140:14
141:1
**features** 119:24
**february** 20:16
27:16,17 64:9,17
69:1 121:23
**federal** 12:6 15:20
33:2 35:17 37:13
37:24 57:25 58:2
58:4 59:9,10,25
113:7 114:2 115:7
135:23 141:11

142:11 153:13
183:17 184:10
**fee** 33:13
**feed** 49:8
**feelings** 190:14
**fees** 16:19 18:14
35:8
**fewer** 129:4
**field** 185:9
**fifth** 53:21
**figure** 24:23 31:15
31:15 66:9,18
105:18 108:14,21
110:15,16,23
111:3,13 134:15
**figuring** 66:3
**file** 88:25 141:25
142:8 190:23
**filed** 14:13 189:4
190:11
**files** 191:16
**filing** 16:20 73:3
141:25
**financial** 9:21
**find** 12:22,25 28:1
47:8 84:14 106:11
111:10 120:18
130:16 133:11
135:18
**finding** 14:15
**fine** 34:9 40:4
47:11,19 51:8
55:5 87:16 96:7
96:13,20,21 103:8
103:18 111:9,12
146:3 151:13
156:22 157:5
163:16 175:4
194:15 197:4
**fines** 73:24
**finish** 101:13
**firm** 93:25

**first** 10:11 15:6,18
18:5,6,23,25 19:6
27:19 29:3 46:7,8
46:16,24 75:12,14
75:16 77:15 81:10
104:2 122:20,23
124:23 129:23
132:13,15 133:3
151:15 152:10,10
163:13 165:15
169:24 170:17,20
180:20 191:6
192:5
**firsthand** 37:25
38:3,4,8,10,11,13
**five** 16:10 54:5
67:18 68:1,3
116:25 127:14
132:1 157:3,7
170:11 171:9,22
173:2,3 174:9,11
174:24 175:4
186:15 190:22
196:18
**fix** 31:4 34:4
**fixed** 114:3
115:21 125:23
131:5 132:21
136:6,19 137:24
139:8 140:14
141:1 143:10
**flip** 117:1
**floor** 47:17
**flow** 158:20
**flowing** 63:20
**focus** 175:9
**focusing** 192:25
**foerster** 5:8
**folks** 65:22 96:25
**follow** 20:1
**followed** 9:25
37:11,16 154:23

**following** 67:15
75:18 76:2,8 96:1
104:8,22 106:8
108:9 109:1
110:22 111:16
112:10 119:14
121:3 124:16
134:24 146:10
152:25
**follows** 90:3
124:24 125:5
158:9
**footnote** 68:2
80:10,25 81:3
89:21,24 90:3,13
150:17,24 151:1,3
**footprint** 93:16
95:3,22 97:25
100:1,4,8,25
110:6 126:16
127:18 128:18
129:12,15 150:15
168:11
**forecast** 90:4
**foregoing** 74:3
198:3
**form** 11:21 76:23
76:25 114:17
120:1 121:25
122:6,7 141:13
158:5 163:5
165:11 168:25
187:10
**format** 153:21,24
**formed** 137:9
**forming** 55:18
58:23 86:24 88:18
89:16 95:9 147:13
147:15
**forms** 141:25
142:8
**formula** 54:7

**forth** 41:14 93:20
124:15
**forward** 35:6
47:11 161:6
**found** 79:16
179:23 181:6
184:9 193:6
**foundation** 13:11
13:15,19 43:1
**four** 44:21 53:20
96:10 114:9
**fraction** 116:25
**frankly** 28:8
**frantically** 50:3
**fraud** 73:19
**fraught** 184:23
**free** 31:6 36:21
37:10 39:24 62:12
90:5,6,16,21 91:1
91:3,9,16
**friday** 25:23 26:1
30:5 34:12,15
**friend** 83:5 84:12
146:14 148:22
184:8
**friends** 46:21
**front** 16:3 28:19
40:18,18,21 43:20
44:8 48:5 60:16
60:18 61:2 64:20
67:6,7,12 73:1
74:20 76:22 79:10
80:12,24 84:2,25
85:3 88:23 89:15
90:10 95:13,18
114:21,25 115:21
121:17 123:22,25
146:24 149:23
163:14,25 169:20
178:18,20
**full** 33:5 139:18
**fully** 88:2 100:14

function 92:8,17
functions 120:9
fundamentally 93:13
further 30:3 38:22 144:3
furthermore 69:22
fuss 194:23

**g**

g 7:1
gained 177:16
gathered 177:20
general 109:24
generally 36:16 41:14 54:3 58:24 69:12 103:11,24 116:19 123:2,19 150:23
generate 12:15
generated 12:20 13:3,16
generous 147:5
gentlemen 98:25
geographic 88:14 99:9,12 100:1,4,8 102:9,11 104:1,17 104:24 105:6 108:6,7,15,24 109:14,24 110:6 110:17,18 111:13 111:20 112:8,11 136:18 150:15
georgia 44:18,22 51:17,17,19 53:15 54:5,22 55:20 56:3,14,16,21 64:5,8,12 65:21 67:3 68:5,11,19 68:22 73:12 102:6
getting 26:10 27:12 29:2 47:4 49:1 51:7 53:23

55:12 56:22 90:23 94:20 95:14 107:14 119:12 146:9
give 8:24 9:19 11:11 17:2 28:25 35:4 37:6 40:20 56:7 60:19,25 61:24 65:12 66:15 70:22 72:18,20 74:19 80:12 87:10 89:18 91:1,3 92:15 114:8 151:12 157:1 172:12 178:20
given 12:15,24 23:13 24:15 25:2 25:5,6 27:2 32:15 47:17 59:20 102:18 139:16 187:23
gives 123:5 165:12 171:1
giving 52:9 91:9 91:10,16,17 182:14
gladly 83:19
go 12:12,13,22 14:19 21:11 35:6 43:6 45:14 46:14 56:12 60:20 61:25 72:14 73:13,22 76:6 78:7 79:23 84:14 85:1 89:5 94:8 101:12 119:3 121:18 123:23 125:4 128:23 133:6 144:20 145:7,9 155:10 156:22 160:22 172:14 174:5 183:2 191:12 192:15,22 193:12

195:5 196:24
god 39:8
goes 15:20 20:22 191:6
going 13:11 18:11 18:21,24 25:19 36:22 39:3 42:24 43:6 45:2 47:11 62:8 63:9 66:20 67:9 79:14 87:9 91:1 105:15 114:5 137:13 138:19 140:18 144:7 147:20 154:12 157:5,6 170:18 176:8 193:16,22 194:19,20,21
good 7:2 40:3,4 57:19 66:9 75:8 96:14 97:12 174:18 175:1,24 176:1 191:20 193:6 195:15
goof 40:10
goofed 40:9
gospel 21:9
gotcha 13:21
gotten 25:25
government 141:7
grab 40:20 60:20 74:19 89:2
grabbed 72:20
grace 5:25
grain 15:20
grant 31:13
granted 28:4 34:24
granular 11:11 12:3 99:19 100:10 100:11 101:15 102:14 166:3
grasping 103:16

great 94:18 99:12 104:23 195:7
greer 5:14
gross 182:17
grossly 22:21
group 161:12,13 161:13 170:10 176:10 178:3 179:1,2 181:11,12 181:15,15,17,18 181:21,24,25 186:21,24 187:4
groups 169:6,9 170:9
guess 13:8 14:20 81:2 94:13 145:7 163:21 164:10 187:20 194:23
guidance 36:20 191:14
guilty 180:25
gunzel 193:21 194:13
gunzel's 194:6
guys 49:11 91:1 168:18

**h**

h 48:11
habit 59:2
hadn't 24:1 26:19
half 103:2,2,3
hand 30:13 31:24 39:4,11 40:23 41:10 88:25 165:6
hands 102:24
happen 33:24 49:12 101:12,14 173:3 174:11 181:16 184:16 195:1
happened 17:25 49:12 118:12,15 119:12 138:9

155:9 181:19
**happening** 22:7
175:20
**happens** 23:5
119:13 159:19
172:8 174:22
**happy** 32:12,24
33:10,16 43:17
46:20 57:4 60:6
62:10,12 87:17
99:11 144:5,23
145:24 146:3
148:23 195:10
**harbor** 14:9
**hard** 59:4,5
**harm** 21:14 55:25
78:18 79:2 180:13
180:16
**harmed** 79:12
**hate** 43:22
**haven't** 19:9
36:18 49:9 99:18
120:20
**hbo** 91:1
**head** 27:25 105:2
105:2
**hear** 13:20 32:12
48:25 50:18 51:1
80:22 103:6 109:5
194:19,20 195:23
**heard** 22:22
192:11
**hearing** 3:1 46:16
46:24 48:19,21
95:1 197:23
**hearsay** 13:23
35:24 36:2,6,8,12
36:14 37:10,21
38:1,9,18,19
**heck** 139:12
**heels** 161:2
**help** 39:8 41:7,8
41:16 44:12,13

60:23 64:25 78:14
89:20,22 106:7
111:14 181:10
**helpful** 86:5
192:12
**helpfully** 163:11
**helping** 99:10
**helps** 192:13
**here's** 123:24
**herring** 17:13
**hey** 18:20 21:9
26:12 168:18
**he'd** 28:16
**he's** 21:20 22:9
28:9 39:2 42:25
42:25 45:4 49:9
49:19 50:8 52:8
147:18
**higher** 111:21
118:16 129:10
179:12 180:6
182:8
**highlight** 192:5,7
**hint** 122:6
**hired** 59:10
**history** 196:12
**hit** 32:5 38:2,7
**hitting** 38:6 192:9
**hockett** 6:5
**hold** 17:6 48:25
123:23 180:21,24
181:23 191:16
197:10
**holding** 107:24
116:17,18 134:1
138:17 164:13,14
181:19
**holdings** 1:8,12
3:2 7:3 52:21
54:23 55:21 69:15
69:19 77:17 86:9
115:18,25 116:1,2
116:16,21 128:19

131:16,17 133:12
162:23 164:16,17
165:11 167:8
**holdover** 93:10
**hole** 187:1,2
**holes** 186:20
**holohan** 6:9
**hon** 2:22
**honor** 7:11 11:19
14:7 15:19,22
16:9 17:9,19
18:13 20:25 22:20
23:11,16 24:2
25:18 32:24 34:9
35:11 37:2 39:23
39:25 42:24 43:8
43:11,12,17,22
44:5 45:2,9,13,15
46:14 47:9,14
49:7 50:14 51:1
51:11 52:3 54:8
54:13,19 55:8,13
61:16,23,25 62:4
62:11 70:4 74:15
75:8 80:7 82:13
82:18,20 83:6,7
83:16,20 86:9,13
87:11,14 96:8,13
96:16,20,22,24
97:6,20 103:8
114:10,16,20,22
115:3 140:19
144:2,10 145:13
145:24 146:11
147:4,12,17,21
148:14,23 149:18
153:23 154:5,12
154:19 155:11
156:12,18,24
157:2,8,15 174:17
176:17,20 182:24
183:3,9,13,19
184:5,8,20,25

185:24 186:3
188:15,18,20,25
189:18,22 190:1
190:17 191:3,13
191:23 192:12
193:4,10,15,20
194:3,8 195:10,18
196:17 197:1,14
197:16,18
**honor's** 10:13
**hope** 170:19
178:18
**hopeful** 28:24
**horrible** 51:5
**horse** 175:23
**hours** 26:13 33:1
96:10
**house** 111:7,10,17
111:17,22
**housekeeping**
14:6 191:23
**https** 126:5
**humans** 161:3
**hundred** 58:6,11
86:18,19 186:24
**hundreds** 57:22
59:8,10,17
**hunt** 189:13
**hurtado** 5:21
**hyatt** 37:17
**hyde** 3:25 198:3,8
**hypothesis** 160:16
**hypothetical**
65:17,25 101:22
104:8,12 105:11
105:12 106:19
108:20 109:1,6
111:16,23
**hypothetically**
110:25

**i**

**i.e.** 30:19 38:5
  186:21 187:15
**idea** 19:1 21:7
  64:7,11,15 65:12
  195:15
**identical** 138:8
  140:21
**identification**
  154:15
**identified** 16:12
  17:21 57:11 76:25
  83:24 84:5 85:14
  85:19 93:17 101:1
  101:24 115:25
  119:1,9,10 124:20
  130:19 135:3,6
  136:12 143:13,17
  143:18,21 144:13
  145:17,20 147:12
  148:1 153:4 156:6
  160:12 162:24
  165:10 184:15
  186:5 192:24
  193:2
**identifier** 126:3
**identifies** 13:24
  81:5,6,8 103:17
  104:1 134:1 156:2
**identify** 44:1
  64:25 69:4 74:11
  80:10 98:4 100:18
  105:8 110:4
  134:25 136:14
  143:4 145:19
  150:12 151:3
  152:19 155:21
  167:10 168:3
  189:11 191:8
**identifying** 98:15
  99:16 145:1
  146:15 148:8
  153:10 156:6

171:3
**ii** 29:11
**iii** 11:25 24:17
  29:13 30:16
**ilec** 42:4
**imagine** 123:2
  133:23
**immediate** 133:7
**immediately**
  42:15 60:18 187:6
**impact** 121:12
  181:20
**impacted** 120:14
**impacting** 179:18
**impacts** 181:20
**impeach** 147:6
**impeachment**
  60:17,24 61:9
  63:2 72:14,17
  80:2,5,21 88:24
  89:2,14,25 114:6
  114:7 115:6
  116:21 117:1,18
  117:21,23 122:8
  125:13,18 127:1
  127:24,25 128:4
  130:23 131:1,25
  132:8,23 133:8
  134:7,12 135:19
  137:21,23 140:4
  140:12 141:18
  143:6,23 145:16
  146:25 149:2,17
  149:21,22 163:10
  169:18 193:22
**implied** 185:14
**important** 84:9
  120:4 177:18
  189:10,11,13
  191:8 192:19
  193:1
**impossible** 12:12
  119:15,20 185:16

**impression** 87:8
**imprisonment**
  73:24
**inappropriate**
  148:18 154:17
**inc's** 152:9
**incentive** 90:17
**incidental** 143:18
  143:20
**inclination** 32:12
**inclined** 17:7
**include** 8:23
  30:15 62:2 76:3,8
  101:20 105:6
  135:7 145:16
**included** 40:21
  59:19 104:23
**includes** 102:19
**including** 13:16
  23:19 36:3 37:11
  58:22 98:19
**inclusive** 172:6
**incomplete** 62:9
  67:6
**inconsistent** 140:5
  140:15
**incorporates**
  153:11
**incorrect** 11:20
  27:6 185:4
**incorrectly**
  110:19 112:1
  174:16
**increase** 129:16
  129:18,20 158:19
  184:17
**increased** 184:17
**increasing** 186:22
**independently**
  184:18
**indicate** 49:5
  148:7,7

**indicated** 21:2
  153:5 191:25
**indicates** 44:17
  134:7 152:7
**indication** 154:20
**indicator** 108:19
**indirect** 105:14
**indirectly** 102:4
**indiscernible**
  47:23
**indisputable**
  186:18,23
**individual** 70:8,11
  70:22 71:13 72:4
  72:5
**individuals** 73:2
  153:8,10 156:7
**indulgence**
  157:17
**indulging** 72:24
**industry** 120:5
  186:16 187:11
**infer** 54:6,16
  174:15 196:11
**inference** 42:23
  81:14 139:16
  165:9
**inflation** 181:21
**inform** 47:14
**informal** 25:18
**information** 7:9
  10:1 15:2,6 18:2,4
  19:17,21 21:5
  22:12,18 23:19
  26:10 28:25 30:20
  33:11,14,17 36:2
  36:11 38:16 41:14
  42:5 55:2,15
  59:19,20 66:15
  68:7 73:14 75:18
  75:23 76:3,8,12
  79:25 106:17
  113:9 139:23

140:20,21 141:11
141:14 142:3,8
143:2,8,8 165:14
168:22 169:2
185:16 186:10
**informing** 157:25
**inherent** 16:18
26:4
**injury** 29:20
**inputs** 23:15,24
23:24
**inquire** 32:22
34:7 47:15 86:23
**inquired** 66:23
**inquiry** 53:25
**insignificant**
159:14
**inspection** 9:24
11:8
**instance** 42:21
**instances** 37:19
133:23 177:4
**instructed** 29:24
65:22
**instruction** 12:14
12:20,23,24 13:2
13:9 23:12 25:1,2
25:8,15,15,17
42:19
**instructions** 23:13
24:15
**integral** 62:6
**intellectual** 57:24
**intend** 35:5 61:25
195:20 196:19
**intended** 39:14
74:12
**intention** 195:19
**intentional** 61:19
**interest** 182:14,15
**interested** 135:11
**interfaced** 94:24

**intermediate** 12:2
**internal** 7:15
14:22 15:5 18:14
29:22,23 33:12
**internet** 67:3
69:16 158:15
159:4,11 160:2,6
**interpretation**
34:5
**interrogatories**
152:9
**interrogatory**
152:15,18 153:12
**interrupt** 10:6
85:4 92:10 153:24
**interrupted** 96:4
**intervening** 130:5
**introduced**
178:10
**introducing** 31:23
**introduction**
31:14
**investigate** 55:24
**investigated** 67:1
**investigation**
16:24 17:3 87:2,6
**invoice** 10:19
**invoices** 12:4
**involve** 57:24
196:10
**involved** 15:24
69:12 196:1
**involving** 38:24
**irrelevant** 43:13
190:12
**isn't** 55:22 56:4
56:16 97:23
101:25 112:8
116:23 118:9
120:2,5 122:1
124:5 125:24
134:7,13,18,22
135:1,7 139:21

142:1,6,17 146:22
**issue** 8:11 9:6,22
9:23 17:6 23:18
26:19 29:3 30:3
30:24 31:12,19,20
35:19 54:11 55:24
79:22 87:1 151:18
151:21 196:4,18
**issues** 191:14
192:9 195:6
**it'll** 60:23 87:19
**item** 36:18
**items** 39:1
**it'll** 43:10
**it's** 7:5 8:16,22
9:5,6,9,12,13 11:8
11:15 12:12 13:22
13:25 15:14 16:1
16:3,16,25 19:1,8
20:23 21:9 22:10
22:11 24:21 26:14
26:18 31:8,12
33:4,18 35:23
37:4,10 38:18
39:10,15 40:5
43:6 45:5,6 46:22
46:24 47:17 48:1
48:7 49:17,24
50:14 53:19 54:8
54:10,13 55:6,6,8
55:9 98:18,23
99:18 100:9,11
101:3,8 102:15
105:10,10 106:5
108:9 109:7,7,18
110:8 114:25
119:4,15,24 121:4
121:15,18 124:7
126:9 128:11
129:9,9,22 132:7
132:18 133:4
136:17 140:22
144:3 147:8,25

148:13 150:23
**i'd** 26:12 40:17
45:6 144:2
**i'll** 9:5 34:24
40:20 54:19 99:25
102:24 114:20
119:3 121:17
123:23 125:4
**i'm** 10:7 11:11
12:18 14:11 15:11
15:16 16:24 18:13
23:20 26:9 27:1
31:3 32:3,12 34:1
36:7,12,17 37:1
39:3,14 40:5 42:8
42:8,11,24,24
43:17 45:2,10,19
46:8,10,24 47:18
48:23,23 51:4,12
52:6,13 53:17,18
55:6,12 56:7,11
56:12,14,15,25
57:3 98:9 99:9,11
100:14 101:12
102:1,16 103:19
104:8,22 105:15
107:6 109:1,1,10
109:25 110:13,15
110:22 111:13,16
111:17,21 112:20
113:4,22 114:5
117:10 119:14
121:3,17 122:10
123:7,23,24
124:12,19 125:17
125:18,19,25
128:2,3,13 130:11
131:19 132:1,3,4
132:15 133:18
134:23 139:15
140:13,18 143:24
144:22,25 145:15
145:24 146:2

147:2,2,2,14
148:14,18,23
**i've** 7:7 8:21 16:2
31:19 34:22 38:23
47:7 112:8 114:4
141:4

## j

**j** 39:10 40:5
**jan** 37:18
**january** 10:17
121:23 139:13
161:4 179:9
183:22
**jarosz** 5:19 21:21
22:3,9 36:25 37:2
38:21 39:4,5,9,12
39:20 40:1,3,11
41:12 42:6 43:21
44:7 45:12,17,23
48:5 51:9 52:8
53:2 55:18 56:7
57:19 60:16 61:3
61:11 62:13,16
63:1 64:4 65:18
70:9,17 71:20
72:12 74:21 75:10
76:5 79:8 80:10
82:3,16 83:13,23
84:7,23 85:12,25
86:15,21 87:5,20
91:21 93:19 97:14
97:15,22 99:6
103:4,13 106:1,12
106:24 109:8,16
109:21 110:12,17
111:8 114:5 120:5
123:1,18 124:6
130:14 132:4
134:8 138:2
144:10 145:2,11
145:22 146:13
147:12 148:6
149:1,16 151:9

152:11 154:7
155:5,7,13,17,19
157:19 161:8
163:4,22 172:19
174:21 176:2,24
180:18 183:14
185:2 187:12,21
188:11
**jarosz's** 80:8
188:21
**jarosz's** 38:25
144:8 149:13
**jeff** 149:5
**jeffrey** 5:18
**job** 111:24
**jocelyn** 5:14
**john** 4:18 5:19
39:10 40:1
**join** 91:4
**joined** 20:21
**joint** 43:23 79:8
79:11 81:24 82:6
82:12,17,18 83:4
83:9 84:7 85:7
95:15 123:6
157:19,22
**journals** 12:7 57:6
57:13
**judge** 2:23 8:2,3
8:19 10:5,22 14:4
15:3,4,25 16:16
18:5,23 19:8 21:1
26:2,23 27:21
34:18 35:3 47:20
51:6 72:23 144:16
**judgment** 16:21
**judicial** 35:12
195:16
**july** 17:24
**jumped** 118:4
**june** 122:3 139:17
159:2

**jury** 190:13
**justin** 6:1
**justus** 4:10

## k

**kat** 6:6
**kattan** 4:3
**katten** 186:13
**keep** 43:25 125:6
154:16 175:1
176:9 186:16
**keeps** 141:21
**kentucky** 137:3,6
137:10,15 139:4,9
140:2,6
**kept** 9:21 20:3,24
21:3 68:15 162:10
170:22 177:23
185:5 186:4
**key** 35:19
**kind** 41:9 87:10
92:21 99:6 115:9
115:16 124:15
127:6 172:20
**kinds** 107:24
**kinetic** 40:24,24
41:5,7,11,15
43:15 44:10,13
68:8
**kingston** 4:18
39:22,23,25 40:2
43:6,10,17,19
44:2,4,6 45:10,13
45:14,15,16 46:11
46:14 47:2,7,13
47:20,23 48:1,4
48:16,19,24,25
49:4,8,13,18
50:15,23 51:1,3
51:11,13 52:7,11
52:16 54:13,19,21
55:12,17 56:13
60:4,21 61:25
62:4,7,10,16,20

62:21 70:2,4,7
72:8,23,25 74:12
74:15,17 75:4,8,9
79:18 80:7,9
82:13,17,20,23,25
83:2,12,19,22
84:11,13,16,22
85:1,4,9,11,23
86:8,12,17 87:7
87:14,17,22 96:3
96:7,15,16,22
97:6,19,20,21
102:25 103:7,10
106:1,12,25
114:11,15,20
115:3,5 120:13
140:24,25 144:10
144:19,21 145:5
145:12,15,23,25
146:11,12 147:6
147:12,20,24
148:5,16,22,25
149:10,13,15,18
149:24 154:1,4,6
154:19,25 155:4,5
155:10,11,12
156:12,18,20,23
157:13,14 163:24
174:17,19 175:24
175:25 176:16
178:12,22 182:24
183:13 184:5,7
185:13 186:2
188:15,20 189:21
190:1,8 191:15
193:11,14 194:3
194:16,23 195:6
195:17,18 196:17
197:17
**kingston's** 153:24
**kitchen** 189:9
**knew** 24:7

**know** 7:8 15:25
16:1,4,5,5,6 18:14
18:22 19:9,10,15
19:16,16 21:7,25
22:4,6,10,14
23:14 25:24 27:4
27:16 28:2,3,5,11
34:1,11 35:5,8
36:24 38:13 44:11
45:24 46:19,22
47:8,9 48:22
50:10 53:18 59:15
59:21 60:14,19,22
61:19 62:17 64:15
65:8 66:6 68:10
68:15,17,21,25
69:9,13,15,18,21
69:24 71:5,10
77:23 78:22 79:21
80:19 81:17,22
86:2,18,22 93:7
93:11,25 94:4,6,9
98:13 101:3
102:12 103:21
104:2 110:1
111:15 112:12,15
112:17,19 113:5,8
113:9,13,15,18,21
114:13 116:3,4,17
120:3,7 122:4
123:16,17 126:9
127:13 129:1,6,25
131:19 132:9
133:23 136:8,10
137:9,11,13,19
138:5,6,7 139:18
141:14 142:25
147:21,23 151:9
151:18,22 153:2
154:4,21 155:13
155:17,21,25
156:10 159:6,12
159:21 160:16

161:5,25 162:22
163:3 164:8 166:5
166:7,14,22 167:4
168:23 169:2
171:6 173:21
176:7,13 185:20
191:17 192:20
194:21
**knowing** 39:17
**knowledge** 21:16
35:17,22,22 38:1
38:3,5,8,10,11,17
43:1 52:5 59:7
65:3 120:25 130:7
136:21 142:15
184:11 186:4,6,7
**knows** 38:2 68:15
**kristen** 4:19
**kristi** 74:10
**kristin** 5:22

**l**

**l** 48:11
**labeled** 188:6,7
**lack** 30:24 35:17
**lacked** 185:17
**laid** 37:23
**landline** 93:10
94:24
**langston** 153:17
**large** 87:23 154:2
**larger** 105:3,12
129:2
**lastly** 195:16
**launch** 181:5
**launched** 158:10
158:25
**laurence** 6:4
**law** 30:10,13
57:20,20,25
141:25 142:13,23
**lawsuit** 60:9 61:10
70:16,25 71:21
77:22 116:5 164:9

185:7
**lawyer** 17:21 28:7
57:19
**lawyers** 16:10,11
**lay** 13:11
**leading** 55:6,7,9
55:11
**learn** 22:5
**learned** 98:19
**leave** 91:1
**leaving** 23:17,20
**led** 115:1
**ledanski** 3:25
198:3,8
**ledgers** 12:8
**left** 46:6 97:19
122:24 132:13
133:7 139:12
144:20 165:6
169:22 179:6
195:17
**lefthand** 115:10
123:8 124:10
125:21 131:3
**legacy** 93:11
**legal** 7:15 14:22
29:23 31:3 33:11
33:12 35:8 56:19
56:25 64:6 68:6,9
68:16 69:7,12,22
70:14,23 71:23,24
71:24 72:4,9
74:13 75:7 78:17
79:6 81:17,23
85:16 87:3 113:4
195:24 196:4,5
198:20
**lenient** 154:13
**letters** 151:22
167:4 168:17
**letting** 9:19
**let's** 14:19 15:4
21:21 100:16,16

105:18 111:7
**level** 11:11 25:24
68:15,16 69:8,23
70:12,23,23 71:11
71:18,19 101:4,15
101:16 107:10,20
107:21 108:17,25
108:25 110:6,7
134:19,20 142:19
142:21,23,24
177:20
**levels** 120:7
**lexis** 37:17
**li** 197:6
**lieu** 19:15 183:11
192:1 194:13
**life** 12:5
**light** 30:23 31:11
**lights** 50:11
**likelihood** 191:6
**likewise** 184:24
**limine** 30:4 31:18
**limit** 31:9 34:3
**limited** 9:23 22:1
160:8,9,10 173:22
196:4
**lincoln** 37:12
**line** 10:11 21:13
42:6,12 62:1
92:13 93:20,20
102:23 124:13
133:4 147:3
148:12
**lines** 21:22 75:24
108:21 109:11
148:11
**link** 126:3 145:2
**list** 14:16 53:10
78:8 86:4,6,10
115:19 116:6
153:7 154:10,18
156:5 164:10
166:13

**listed** 85:22,22
95:25 116:2
132:10
**listening** 156:20
157:1
**lister** 37:17
**literally** 31:20
**literature** 187:12
**litigation** 33:23
196:12
**little** 17:15 35:7
41:22 98:24
107:19 122:7
132:17 157:14
163:19 170:24
172:11 190:5
193:12
**live** 9:15 51:8
109:19 110:14
189:17 190:4
191:10
**lives** 158:19
**living** 109:20
**llc** 7:5 42:17,22
44:19,22 51:19
52:2 53:15 54:6
54:22 55:20 56:3
56:15,16,22 64:5
64:8,12 65:21
67:3 68:5,12,19
68:22 73:12 74:22
76:14 87:18 116:5
164:7,8,18,23
165:2 166:9 167:6
167:14
**llc's** 51:18
**llp** 4:3,13 5:8
**loath** 34:1
**local** 93:3,5 94:24
**localities** 188:6,7
**locates** 103:25
**locations** 129:10

**lockhart** 5:22
**log** 50:24
**logged** 50:25
**logic** 37:23
**logo** 40:24 115:9
125:20 131:3
**long** 13:24 15:21
20:17 33:21 93:1
93:5 94:25 155:3
**longer** 9:14,15
49:1 101:18
158:19
**look** 10:8,11
15:13 16:22 17:3
19:10 26:16 27:15
28:12 32:18 41:9
44:14,16 46:6
48:14 49:18 53:13
57:7,11 60:6 66:4
66:10,19 76:20
77:14 78:8 79:23
80:2 82:8 84:9
86:4,6,7,10 89:24
92:12 94:8 95:19
101:14 107:9
113:23 126:2
127:24 128:4
132:7,17 139:20
140:4 141:17
154:7 156:8 163:9
163:15 164:2,10
164:21 166:22
188:3
**looked** 84:8 130:2
156:5 165:4
167:20 168:5
169:13 170:14,14
180:19
**looking** 46:2 47:8
53:18 63:3 65:12
80:4,14 83:8,18
84:16 89:6 90:13
92:11 94:10 98:3

116:6 119:6
125:18 129:23
132:1 133:7 140:6
147:2,2 155:25
162:7 169:16,17
172:14 174:3
179:10 181:24
191:10
**looks** 19:12 41:10
44:21 50:6 93:23
95:25 115:13
127:13,20 128:11
129:25 131:5
132:12,20 133:21
166:21
**loss** 8:22 32:3
87:23
**losses** 31:1 182:22
**lost** 21:10 43:7
48:17 50:1,5,21
67:9 94:16 102:22
103:7 132:4 139:3
167:24,24 168:3
170:10 180:6,11
180:13
**lot** 34:2 58:17
101:17 106:21
138:22 139:12
165:23,25 173:22
192:22
**louis** 4:16 5:4
153:17
**lower** 17:22 40:23
180:2
**lucia** 5:21
**lucky** 48:2
**ludicrous** 112:6
**lunch** 96:11
107:24
**lurking** 137:20
**lying** 91:19

**m**

**madison** 4:5
140:8,10,15 141:2
**mail** 44:24 167:4
**mailed** 151:19,22
**mailers** 151:18,20
167:11,13
**mailing** 42:2,20
42:21 156:5
**main** 192:6
**maine** 77:1,3 78:6
78:24 79:5,22
80:1 81:10,12,15
81:16,20,21 82:2
82:6,10 83:14,25
84:5 101:20,24
102:6 103:2
**maintained** 114:2
136:7
**making** 64:5,7,11
64:16,25 65:13
68:25 73:22 83:9
105:8 106:15,18
**management**
22:15
**map** 114:3 115:21
117:2 125:15,24
126:10 128:18
132:10,21 136:17
136:19 137:24
**maps** 132:14
**march** 24:13
67:19 68:2,22
121:19,20,22,23
130:3,6,10 133:16
159:2,9 161:5,9
161:14,15,16,16
161:22,24 162:3
170:12 171:10,23
179:9,22
**margin** 182:8,17
**margins** 8:23
180:16

marie 5:24
market 93:9
  148:1 158:12
  159:1,7,22
marketed 158:23
marketing 159:9
  159:13 160:14
  175:9 182:12
  187:5,7
marketplace
  56:20,24 57:1
  70:13 71:12
  141:22 142:10
markets 124:21
  146:15 148:8
  149:4 186:14
mass 158:12,23
  159:1,3,7,9,12,22
  160:14 187:5,7
massachusetts
  69:1
material 26:22
  29:19
math 168:10
mathematically
  171:25
matter 1:6 14:7
  52:22 66:24 77:7
  102:8 109:19
  113:14 120:7,17
  123:1 187:8
  191:23 196:5
matters 58:4,7
  121:19 123:16
max 25:19
mbps 116:12,22
  116:23 117:12,14
  118:21 123:4,12
  129:3
mean 10:14 12:21
  12:23 13:7 24:10
  25:15 41:3 45:5
  47:3 49:4 50:11

55:5 62:4,13 65:8
  77:8 86:14 99:20
  100:9 102:12
  105:2 106:4
  114:13 145:9
  148:2 165:23
  166:3 172:18
  181:5,13 182:23
  188:16
meaning 179:14
means 44:2 180:1
  180:8,10,13 187:5
meant 10:6 30:7
  80:4 161:12 177:2
  177:6 189:10
measure 99:5
  107:15 109:14
  110:20 112:1
mechanically
  197:20
medium 158:16
meet 195:11
  196:21 197:3,10
megabits 118:2,3
  118:4,5,9,10
  127:11,19 128:10
  128:12,20 129:16
member 166:18
memo 11:22
memorized 58:25
  92:4
memory 149:6,7
mentioned 8:6
  85:7 86:25 104:3
mere 35:25
mess 87:11 154:3
  172:20
method 107:1,4,7
methodology
  108:23 183:16
  184:12,13,13
  185:11,23

methods 187:17
michael 4:10 5:6
  5:23
microphone 49:4
  49:13
middle 15:13
  16:17 51:6 99:3
  99:13 126:17
  127:2 129:11
  132:22 134:5,11
  159:25 178:23
mike 8:2 15:3
  21:2 26:25 27:21
  28:18 34:18
mile 104:15,16
miles 104:6,9,17
million 7:19 18:16
  18:24 19:1,7,11
  19:12,13 21:10
  23:22 24:23 25:16
  25:20 31:15 90:3
  180:15,17,17
  182:4,4,8,10,17
millions 12:13
mind 47:16 60:6
  76:4 80:13 82:2
  92:10 94:17 95:14
  96:3 99:5,8,10
  105:16 106:21,23
  109:9 113:1
  120:12 149:7
  155:19 172:21
mine 193:8
mineola 198:23
minimal 16:11
minimum 33:20
minute 157:3
minutes 156:17
  157:7 186:15
  196:18
mis 145:17
misleading 153:3

misread 76:5
missed 112:25
missing 13:19
  61:18 84:14
  169:17
missouri 110:15
  111:18 140:8,10
  140:15 141:3
misspoke 62:25
  63:16 127:10
  161:13
misstated 22:21
mistake 177:5
mistaken 17:24
  184:9
mistakenly
  134:17
mister 43:9
misunderstanding
  20:23
misunderstood
  78:3
mo 4:16 5:4
mobile 158:6,10
  158:10,13,14,15
  158:17,22,22
  159:3,10,13,18
  160:1,5,14 178:10
  187:3
model 121:18
  130:2 160:24
  161:5,7,8
modern 12:6
  20:24
modest 30:23
  31:10
moment 23:17
  40:20 60:20,25
  67:4 72:18,21
  74:19 80:12 84:2
  87:10 89:18 96:4
  110:13 114:8
  132:4 146:17

151:12 178:20
**moments** 84:9
**momentum**
186:22
**money** 15:15
18:17 30:12,12,15
56:23 78:15,20
82:10
**monitor** 123:9
**month** 9:16 10:17
10:20 19:13,14,14
20:10,14,15 24:12
27:11,23 161:16
161:17 173:2
**monthly** 45:22
46:5 48:8,10
65:10
**months** 20:19
67:18 68:1,4,12
130:9 133:16
139:14 168:8
170:11 171:9,22
173:3 174:9,11
175:4 178:8
180:19
**moody** 74:10,11
**moore's** 37:13
**morning** 7:2
14:13 40:3,4,12
41:24 195:7,13
197:12
**morrison** 5:8
**motion** 14:14 30:4
31:13,18 183:22
185:1,24 195:16
195:23,25
**motions** 190:11
**mouth** 103:23
**move** 8:13 19:18
26:15 43:17 54:19
54:20 57:4 74:15
85:20 87:9 96:12
102:5 103:4

114:21 144:22
147:11 157:22
180:22 183:11
189:4
**moved** 18:14
28:20 84:20 102:6
132:7,12 189:3
194:25
**moving** 49:19
194:24
**muchin** 4:3
**mulligan** 6:1
**multiplying**
180:12
**murdock** 143:6
143:11,14,17
**muslim** 6:7
**must've** 25:6
**mute** 49:6,14,24
**muted** 49:3,5,13
49:25
**mvno** 158:11

## n

**n** 4:1 7:1 198:1
**n.d.** 37:12
**name** 40:5 56:24
65:20 68:8 71:25
73:6,7,9,10,11
86:3,16,20,20
115:25 134:3
143:12 145:2,21
164:4,14,24
166:15,16,24,24
167:1
**names** 73:9 75:19
76:3,4,4,8,9,9,16
76:18,19,19 79:4
83:23 84:1,4
85:14,17,19 86:25
87:3,5 166:13,14
**narrow** 34:21
**narrowed** 108:13
108:15

**nature** 11:24
30:18
**nebraska** 143:6
143:11,14
**necessarily**
100:13 101:7
105:7 135:8 138:5
142:9 165:12
**need** 28:10 29:12
30:16 33:6 41:7
44:12 50:24 55:9
66:8 76:21 77:15
86:7,15 106:4
114:24 120:20,22
145:7,22 154:21
190:22 192:10
193:17 195:8,23
**needed** 120:23
177:21
**needs** 32:11,13
33:19 34:14 44:3
50:23 143:1
**neither** 107:8
**nepple** 5:6 8:2,3
8:17,21 10:5,9,10
10:22,24 15:3,3
15:11,22,25 16:16
18:3,4,9,13 21:1,2
21:11 26:2,23,25
26:25 27:21,21
28:18,18 34:17,18
34:18 35:3 47:16
156:14 195:7
**nested** 166:13
**network** 69:15,19
182:12
**networks** 69:1
167:8
**never** 9:25 15:7,8
17:25 25:19 45:4
57:20 107:9
111:24 144:12
163:7

**new** 1:2 4:6 5:11
80:23 90:5,17,21
90:23 91:9,16
118:15 124:20
125:6 138:11,14
138:18 177:15
184:17
**night** 7:22 11:7,22
14:7 15:18 17:21
**nino** 5:20
**non** 22:2,6 23:1
73:3 87:25 91:3
99:14 100:6,23
120:21 121:1,5,11
135:1 167:18,21
167:22 168:6,12
168:14 169:3
170:23 171:1,20
172:2,17 173:9
179:8,12,19
**nonmonetary**
30:23
**normal** 66:1
168:13 169:4
181:22
**normalizing** 45:9
**note** 47:7 57:4,12
157:15 192:16
**notice** 14:9 189:24
195:16
**notion** 23:3
186:19
**november** 26:9
27:24 28:4
**number** 14:14
16:3,7 24:20
25:10,22 31:4,4,7
31:8 37:11 53:16
53:21 54:1 64:25
66:20 67:17,18,25
68:1,3,18,21 69:4
70:20 71:10,14
72:2 77:23 89:4

95:22 125:17
127:13 128:16
138:23 155:9
159:16 165:6,7,8
165:9,12,15,20
167:11 169:10
170:12,15 171:9
171:10,23 172:25
173:5,8 174:3,4,6
174:7,10,15,20,21
175:3,3,12 176:2
176:5,7,11 180:7
180:10 182:5,8,10
182:16,18,18
188:9
**numbers** 32:2,19
52:5 53:10,12,14
53:21 70:22
173:12,15,18,20
174:8 175:6,15
182:5,16 183:4
**ny** 2:3 4:6 5:11
198:23

**o**

**o** 2:21 7:1 39:10
40:5 198:1
**oath** 39:3 97:15
**object** 7:25 8:12
42:25 45:2 79:14
140:18 144:2
146:5 148:14
154:12 183:13,17
194:9
**objecting** 37:19
**objection** 14:14
43:12 52:4 61:17
114:19 144:25
145:6 182:24
183:7,24 184:11
187:15 188:14
189:20 190:6,24
190:24 194:6,12
195:9

**objectionable**
22:22
**objections** 37:22
152:8,23 153:2
190:8,11,15 191:2
191:4
**objective** 184:22
186:7
**obligation** 24:14
24:19 25:14 59:11
59:15,18,24 60:5
141:15
**obligations** 58:24
**obliged** 58:20
142:13,23
**observation** 130:2
180:24
**observations**
106:19
**obtain** 38:15 81:7
**obtained** 35:22
161:20 169:2
**obviously** 16:7
34:1 36:11 50:11
59:2 147:14
184:20 188:12
**occasionally**
57:25
**occurred** 159:13
161:13,18 182:1
187:4
**october** 7:13 8:5
13:5 19:5 24:3
26:8 27:3,3,5,24
28:4 61:6 89:9
**odenville** 130:16
131:8,13 132:10
132:21 134:2,3,6
134:11,16 135:6
135:15 136:9,13
136:17,24,25
**offer** 24:2 63:10
94:12,13 104:25

118:20 119:15,17
119:20 121:1,7
129:4 132:23
136:20,23 138:20
138:24 158:13
160:1 162:24
**offered** 9:12,13
20:12 59:9 116:8
116:13 124:5
129:16 144:16
159:18 160:5
182:6 189:14
196:9,13
**offering** 58:19
78:22 90:5,16,17
90:21 118:16
123:18 128:19
158:15 164:19
189:15
**offers** 118:23
119:18 121:3,7
123:3 143:4 159:4
**offhand** 164:10
**office** 37:13 92:20
92:22 93:3 99:3
103:12,15,24,25
104:4,7,10 149:9
**officer** 75:3 76:15
79:4
**offices** 93:14
94:15,21
**official** 5:9
**oh** 18:13 19:6
42:8 47:2 78:3
81:5 83:10 103:20
118:8 122:10
123:24 131:22
132:5,18 147:24
149:22
**ohio** 37:13
**okay** 7:2,23 9:4
10:23 13:7 14:3,5
14:19 15:23 16:13

17:8,14 18:9
22:25 26:24 34:17
35:2,14 36:24
37:5 38:25 39:6
39:13,21 41:1,18
41:22 42:19 43:4
43:18 44:16 45:20
46:2 47:22 48:3
50:7,16 51:25
54:14,22 55:14
57:10 60:16,25
62:3,20 64:3,23
67:12,14 72:18,20
73:1 75:15 76:1
76:21 82:24 83:21
85:2,10 86:5 88:6
89:9 91:23 92:14
95:18 96:18,19
97:10,12,18 100:4
100:11 101:23
102:22 103:9
104:6,9,14,22
105:20,24 106:9
110:25 111:2,6,10
111:13 114:23
124:13 126:11
132:5,20 145:14
146:4 150:4
156:18,22 157:9
157:11 164:23
165:20 169:23
171:17 172:23
173:8,11 174:6
175:24 176:1,15
176:16,18,21
183:6,12 184:7
186:1 188:16,19
188:21 189:19
190:15,21 193:5
193:11 194:1,18
196:20 197:15,19
**old** 90:20 92:21
198:21

**once** 17:9 53:24
93:1 172:8 173:3
173:5,9 174:11,22
174:22 175:3,3,6
175:6,12,15,17,20
176:11
**ones** 145:19
161:21 189:21
**online** 9:21 10:15
44:23 186:15
**open** 17:6 61:2
79:10 80:24 84:2
123:25
**operated** 94:14
**operates** 143:1
159:24
**operating** 7:4
45:22 46:5 48:8
48:10 51:10 77:5
**operation** 13:2
**operational** 56:19
**operations** 125:9
**operator** 12:24
**operators** 124:24
**opine** 187:22
**opining** 78:10
85:25
**opinion** 58:19
59:11 78:23 88:18
137:9 138:2
147:14 164:20
182:3 183:15
187:10
**opinions** 55:18
58:21,23 59:9,14
59:22 63:9 66:24
86:24 89:17 94:13
95:10 147:16
158:1 196:14
**opportunity** 17:2
17:6 31:25 32:18
53:3 144:17
156:13 189:2

**opposed** 91:10
107:15 108:24
129:5 145:3 182:5
193:7 196:7
**opposing** 9:20
**options** 182:15
**oracle** 9:17
**oral** 192:20
**oranges** 144:4,6
180:25 185:22
**order** 7:24 9:23
15:4 19:20 46:20
127:14,21 153:7
**organize** 87:10
**orientation** 132:6
**oriented** 65:16
**original** 83:3,13
**ought** 71:4 78:16
**outlined** 31:19
**outside** 54:10
**outstanding** 32:11
32:16 35:14
**overbroad** 32:21
**overhead** 182:11
**overlap** 126:13
**overnight** 7:8
195:7
**overrule** 188:13
191:1
**overruled** 183:25
187:15,18
**o'clock** 7:21,21

**p**

**p** 4:1,1 7:1
**p.o.** 42:9
**pace** 125:6
**packages** 9:17
25:12,12 90:18
**page** 8:5,17,18,24
11:5,9,13 16:12
18:15 19:21,22
21:8,13,22 22:13
33:21 37:24 41:9

45:21 46:7,8 48:9
48:14 51:9,18
52:2 53:14,16,19
57:5,10,12 61:3,3
63:5,6,12,14,16
67:13 73:16 75:1
75:12,14,16 77:15
80:25 82:7,8,8,15
82:18,19,21,21,22
89:24 92:11,12
95:19 119:6
122:17 124:1,7,10
124:18 126:14,18
127:2 129:11
147:2,3 148:11
150:1,2,2 151:15
152:7,10,10,13,24
152:25 154:18
158:3,5 164:2
165:16 169:17,20
182:19,20 190:22
191:8
**page's** 152:23
**pages** 12:13 15:22
30:6 53:7 82:23
83:18 93:20 96:1
124:16 190:22
191:9
**pagination** 124:10
**paid** 41:24 56:22
78:16,21 95:5
**painter** 111:17,18
**painters** 111:7,11
111:22
**paper** 84:17 94:19
133:25 193:5,7
**par** 33:22
**paragraph** 7:16
7:18,20 14:22,24
18:12 29:19,21
37:14 63:16 67:13
67:16 124:23
125:5 150:5,21,24

151:1 152:25
160:1 169:24
171:7 172:10
182:19,20
**paragraphs** 35:16
**paralegal** 153:25
**paralegals** 16:6
16:11
**parallel** 179:7
**paribus** 108:2,4
108:10,17
**paris** 40:6
**part** 34:10 55:24
58:13 62:6 87:23
104:11 144:8,17
152:10 161:17
175:20 177:11
189:5
**partial** 161:16
**partially** 28:2
**participants** 50:8
**particular** 36:13
36:18 66:2,22
92:11 120:12
154:17 167:10
177:16 185:19
193:8
**particularly**
175:17 178:25
**particulars** 69:13
**parties** 7:7 30:2
32:13 34:2 47:1
77:8,21 78:1
145:21 190:1
191:8 192:5,6
**party** 37:20,22
**pass** 22:9 31:6
37:10 176:16
**passing** 156:13
**patience** 46:3
55:13 163:23
175:2

patient 40:9
patrick 6:9
patterns 106:18
pause 61:16
paused 10:7
pay 41:19 44:22
44:23,23,24 71:4
payable 42:17
44:18 65:24
paying 56:2,7,14
66:18 67:2
payment 10:15
30:15 42:16 56:3
payments 64:5,8
64:12,16 65:1,13
65:14 66:20 68:25
paystub 42:13
44:16
pdf 16:1
pedantic 43:22
penal 30:18,24
penalty 74:3,7
75:3 76:15 141:8
153:16 169:1
pennsylvania
42:4,17,22
people 16:1,3,8
19:12 20:14,15
21:4 28:3 38:16
56:2 64:4,7,11,16
64:25 65:13,15
66:3,7,9,16,18
67:2 68:10,25
102:5,23 103:4
107:13,18 108:5
109:12 111:4
180:22 196:1
197:21
perceived 87:24
percent 87:17
126:15 127:15,21
127:22 128:11,16
128:20 129:11,20

129:21 159:14,16
159:16 172:16,16
172:23 173:12,13
173:15,18 175:14
176:12 179:16,25
180:3,7,9 184:19
186:24
percentage
127:11,18 128:9
128:18 129:2,15
perception 38:5
38:11,13
perfect 186:21
perfectly 144:5
155:2
perforated 42:6
perforation 42:13
performance
143:3
performed 12:24
156:10 168:2
170:5
performing
120:10 167:16
period 29:15
32:10,17 130:2
157:23 160:24,25
161:10 167:17,21
169:13 173:2,24
174:10 175:11
177:17,19 178:1,4
178:7,11,15 179:8
179:13,14,15
180:12 181:1,2,3
181:4,5,11,18
186:24 187:4,6
periods 118:11
130:5 180:24
perjury 74:3,7
75:3 76:15 141:8
153:17 169:1
permission 47:4
114:22

permit 31:16
permitted 46:23
46:25
person 17:21
44:23 96:25
108:23 109:3,5,13
109:24 137:17
144:11 151:3,5,7
personal 21:15
35:17 37:25 38:3
38:4,8,11 46:18
personally 38:13
pertaining 29:25
pertains 35:5,7
petition 73:3
phone 26:11
34:25 36:21 44:24
56:2 93:2,3
102:23
phrase 29:13 82:5
83:14 108:1
phrased 79:15
physical 10:14
40:12,17 41:23
42:20,21
pick 26:11 34:24
38:24 96:23 97:18
piece 13:19 18:2,4
36:13 133:25
pieces 84:17 94:19
161:19
pierce 98:18
pitech 52:1 54:23
55:21 64:16 65:1
74:22,23,24 75:24
76:14 87:18
pivot 166:17
place 32:8 103:5,5
placed 159:22
places 129:4,5,9
138:23,23,24
159:19,21

plains 2:3
plaintiff 30:14
36:4 52:1,22
68:11 69:6,25
70:8,24 71:3,13
71:20 72:1,5,9
77:3,13 78:5,23
78:25 116:5 134:1
150:12 164:8
plaintiff's 150:11
151:10 152:1
155:22,23 156:2
162:12
plaintiffs 1:13 4:4
7:12 70:11,16,19
71:7,11 74:13
75:6 77:7,18 78:1
78:5,13,15 79:1
79:13 83:3 85:24
86:2,19,24,25
88:19 93:21 94:2
94:3 95:10,13,15
95:22 98:14
112:15 113:2,5,12
113:15 116:7
152:18 157:12
164:11,19
plaintiff's 7:6
119:4,5 121:16
122:11,18 130:14
130:17,22 134:22
137:3,5 139:2
140:1,8,16
plaza 4:15 5:3
please 18:10 39:4
49:14 61:16 76:6
101:13 144:18
175:23
plugged 136:13
pm 197:25
pocket 31:2
point 15:1 19:4
24:2 27:10 30:7

35:21 38:20 44:4
47:12,13 50:17
55:9 62:4,5 70:2
96:4,7,14 98:2,21
100:3 109:8
136:20 139:6
144:22 146:7
155:8 159:12
162:15,16 172:1
191:22 192:10
193:17 195:21
**pointed** 163:12
**pointes** 192:6
**points** 31:23
143:15 146:8
174:1 180:23
**poke** 186:19 187:2
**population**
126:13
**portion** 38:23
90:8,9
**portrayal** 125:23
**portrayed** 127:1
**pose** 65:17 99:20
**posed** 99:18
152:13
**position** 15:1
141:22
**positioning**
112:11
**positive** 14:8,11
78:10,12
**positives** 109:22
**possession** 77:18
**possible** 34:15
35:1 60:13 65:3
78:9 98:18 110:18
139:1 166:11
191:24 197:7,8
**possibly** 22:5
146:15 161:25
166:23

**post** 181:4 189:12
191:7 192:8,8,17
192:21
**potential** 22:17
**potentially** 16:11
**power** 29:6,6,9
30:24 50:9
**practice** 37:14
189:7
**practiced** 57:20
**pre** 181:3
**precious** 195:2
**precise** 69:14 95:8
99:15,16 100:7,7
100:9 102:10,13
106:3,5 113:9
136:9 162:20
170:25 185:14,15
**precisely** 25:11
141:14
**preclude** 31:13,22
**predecessor** 75:2
**predicate** 183:20
**prefer** 62:11
191:19 192:1
**preference** 191:17
**prefixes** 119:5
**prejudice** 16:18
17:2 26:3,14 29:1
**prejudiced** 31:25
**prejudicial** 31:22
32:23
**prejudicing**
190:13
**preliminaries**
37:3
**premises** 138:2
**preparation**
187:24
**prepared** 17:18
17:19 24:11 31:8
31:12 34:3 77:8
110:3 191:14

**preparing** 34:2
66:24 77:11 94:12
124:4 146:19
149:8 192:2
**present** 5:16 11:5
22:23 40:11
139:18
**presume** 176:2
**pretrial** 32:7
191:24
**pretty** 101:8
153:20 154:13
156:12 166:3,11
197:20
**previously** 17:23
153:1 194:7
**price** 123:5
**primarily** 22:5
**primary** 135:15
135:17,18 137:11
143:19,21,22
188:8
**principles** 187:16
**print** 9:18 153:25
154:2
**printed** 9:16 10:3
191:11
**prior** 9:8 13:5
129:23
**privileged** 33:12
33:14
**probability**
111:21
**probably** 12:22
24:13 35:10 77:23
95:14,24 112:18
112:20 113:25
120:6 129:22
139:22 169:16
176:7,13 182:13
192:18
**problem** 10:8
76:6 109:7 155:7

167:2
**problems** 18:17
155:8
**procedure** 146:10
153:13
**procedures** 32:8
**proceed** 36:25
38:21 43:11
**proceeding** 3:1
11:23 21:17 39:15
45:22 46:1 77:19
98:22 152:2,21
**proceedings**
46:18 197:24
198:4
**process** 171:3,4,6
171:24 172:15
**produce** 8:12
10:16,19 11:18
12:15 13:9 15:12
17:4,10 19:18,20
24:4 25:9
**produced** 8:4,9
11:2,4,7,10,17,17
12:8,11,16 13:4
14:21 15:18 18:2
18:5,23,25 19:2
26:6 27:20 144:13
**producing** 21:18
21:19
**product** 183:15
184:18 187:16
**production** 8:6,10
137:8 139:6
**products** 125:6,8
158:10,18
**professional**
187:12
**proffer** 184:9
**proffered** 183:15
**profit** 8:22,23
87:23 139:3
180:15 182:7,8

profitability 158:19

profits 30:19

proforma 190:24

program 18:24 20:6,10,13 27:11 27:23

programs 19:13 19:14,14 26:19

promotional 21:22,24

promotions 23:2 27:2

pronounced 40:6

proper 36:11 196:16

properly 157:16 187:25

property 57:24

prose 63:6

provide 12:19 29:12 32:6 33:16 37:10 58:13,20 78:18 107:10 112:13,14,16,23 113:3,6,8,16 119:23 134:6 141:10 142:2

provided 7:8,9,10 7:14,14 9:7 14:25 22:10,13 28:5,25 30:1,13 32:14 33:1,20 58:17 61:10,12 73:14 75:23 76:12 88:19 95:8 114:17 121:10 131:16 134:4 146:21 153:21,24 163:17 163:21 168:25 184:21 187:4 189:23 194:13

providence 18:22

provider 69:10,16 94:9 118:18 126:12 134:10 135:11,14 140:7 164:4,6 166:15,15 166:16,23 167:10 177:16

providers 112:12 113:18 115:25 121:25 135:10,22 141:6,10 163:5 166:13 167:3

provider's 126:15 129:12

provides 92:9,18 186:17

providing 26:21 58:14 59:16 70:15 92:8,17 182:10

provision 14:20 56:15

przulj 5:20

public 139:23 186:7

publicly 163:19 168:25

pull 47:23 62:14 162:8,12,14

pump 37:7

punitive 31:11

purchase 120:14

purport 134:25 145:16

purported 22:3 43:7 98:4

purportedly 8:21 8:22 18:15

purports 45:21

purpose 99:24 100:17

purposes 100:13 102:15 177:18

pursuant 46:19 153:6,12

pursue 196:19

pushed 12:4

put 9:16 18:20 25:1 28:8,16 34:1 34:2,14 35:8 39:3 39:11 40:18 47:4 63:24,25 67:8 82:25 84:24 122:25 144:12 166:9,17 178:20 182:16 190:21 193:13 194:2 197:2,21

puts 132:22

putting 64:19 103:23 148:3 193:7

**q**

quantity 17:22

quarropas 2:2

quarter 9:16 158:9,25

queried 26:5,17 28:1

query 20:5 21:5 26:5,6 27:19 33:15,16

question 16:9 18:10 22:21 29:18 45:8,11 52:8,10 52:12,14 54:9,16 55:9 57:3 60:3,22 62:16 71:20 72:7 76:2,16 77:25 78:3,17 83:13 84:15 87:13,18 88:3 91:22 92:7 92:16,19 93:1,8 93:15 94:16 96:2 99:18,22 100:15 101:3 103:18,19

112:25 119:14 121:15 128:2 136:15 140:23 147:4,19,19,20 150:3 152:13 155:25 163:22 165:22 167:5 169:13 172:19 188:5 190:5 192:16

questioning 62:1

questions 17:17 23:20 28:10,11,12 29:16 45:3,11 62:15 64:19 88:2 92:7,16 99:11 137:18 144:3,11 147:14 155:7 177:8

quibble 190:2

quick 26:12

quickly 33:24 63:4 75:1 157:22

quite 28:8 77:14 78:17 82:10 90:23 91:2,22 102:24 105:11 116:23 175:9

quote 21:13 59:18

**r**

r 2:21 4:1 7:1 39:10 40:5 48:12 198:1

raise 31:19 39:4

range 180:17 182:3,3,5,6,21

rapidly 125:1

rappaport 5:13

rate 168:7 169:15 170:15 172:4,5 179:6,6 180:5,5 182:7

rates 168:5
169:14 170:14,23
179:11,11,24
raw 20:20
rdd 1:3,4 3:1
45:22
reach 60:25 91:3
reachable 197:11
reached 195:13
read 29:24 42:19
44:25 49:1 57:12
59:1 63:18,22
67:15,19,22 73:2
73:4 76:9 89:21
90:3,8,9 93:19
103:22 124:13,23
125:1,4,10 129:11
129:13 147:18
148:19 152:9
153:13 155:3
158:8,20 159:25
160:3 171:7
reading 27:1 55:3
147:22 154:16
190:25
ready 87:20 94:20
real 15:15 18:17
154:3
really 34:6 35:6
35:20 37:19 40:9
73:16 100:14
101:3 103:19
110:1 111:23
163:22 187:22
191:9 193:1
195:25 196:3,12
196:15
reason 33:2 57:15
59:17 71:1 77:6
94:2,4 144:24
145:9
reasonable 16:23
17:3 63:20 139:24

143:7 165:9 176:9
reasons 58:22
recall 53:2,4,22
54:2 60:10 64:4,6
74:23,24 79:25
84:8 88:12 89:9
89:11 92:3,6
94:22 95:1,12
98:11,12 101:11
103:13 146:13,16
148:10 150:17,20
163:11 168:20
receipts 51:14,18
51:23 52:1,17,21
52:25 54:24 55:22
66:7
receive 14:9 65:14
66:6
received 7:7 10:15
10:16 12:8 30:5
151:25 152:19
153:5,7
receives 57:1
recess 97:11
157:10
recognize 61:6
recognized
187:11
recollection 95:21
148:19,21 149:3
reconciliation
46:4
reconciliations
45:25 53:9
record 8:3 15:4
17:6 21:2 26:25
27:22 28:18 34:18
43:25 44:2 45:20
61:19 67:22 84:3
97:13 106:21
147:9,18 148:20
154:16 155:3
157:11 163:21

176:25 177:2
183:10 186:3,4,11
186:12 191:11
197:2 198:4
recorded 22:17
23:3
recording 47:5
records 9:21
14:20 20:24 33:12
36:10 66:14 68:15
79:23 94:11
recovery 30:12,19
30:25
recross 188:19
recurring 10:12
red 17:12 126:22
132:18,18
redact 33:13
redefined 104:20
redefining 104:23
redirect 176:19
176:22 188:17
refer 59:15 62:17
84:23
reference 53:6
82:1 83:9 84:6
85:12,13 89:25
115:17 137:2
150:13,18 158:6
164:4 167:13
referenced 7:15
7:17,19 21:23
43:2
references 117:6
referencing 59:22
referred 147:5
154:14 178:2
referring 30:7
39:3 42:11 67:20
73:8 125:16
162:18 177:3
196:14

reflected 179:14
183:10
reflection 179:4
reflects 90:4
refresh 95:21
148:19 149:3,6
refreshes 148:21
refrigerator
105:19,22 106:2
106:13,25 107:9
107:13,19 108:6
108:10,15 109:3
109:23
refused 32:6
regard 14:21 31:7
102:7 128:13
183:24 191:1
regarded 182:21
regarding 29:16
36:18 187:13
regular 177:23
185:6
rejected 21:17
183:23
related 21:14,16
31:3 109:22
150:14
relating 43:13
124:14
relationship
179:20
relevant 55:25
146:2,2 181:14
reliability 43:6
102:15 106:19
107:11
reliable 66:15
99:5 100:12
102:10 105:9,9
106:7,11,15 107:4
107:6,20 108:4,16
108:23 109:13
110:7,8 183:16,16

184:13,14 185:10
187:16
**relied** 13:24
136:22 140:16
147:13,15 186:9
**relief** 11:21,23
17:12 30:15,18
34:23
**relocations**
181:22
**rely** 13:10,23
188:1
**relying** 147:25
187:21,25 191:10
**remedies** 30:10,10
**remember** 89:12
93:8 119:5 125:17
147:25 177:4
**remembered**
46:15
**remind** 9:10 84:1
89:13
**remove** 120:18
**repeat** 9:5 145:4
185:3
**repeatedly** 185:13
**rephrase** 140:23
**report** 9:15 10:3
15:8 17:20 45:22
46:5 48:8,10
51:10 59:3,6,19
60:8 61:10,12,13
61:14,18,21 62:6
62:11,23 63:2,6,7
67:6 77:9,11,11
77:15,16 78:14
80:8,18 88:7
101:23 112:13,16
112:22 113:2,6,15
113:19 120:19
124:5 130:7
135:22 139:14
141:7 142:24

143:1 144:12
146:20 149:8,13
149:16 169:18
182:19
**reported** 51:23
121:25 122:7,9,9
135:10 150:10
162:23 177:11,13
**reporter** 46:17,18
47:8 84:19
**reporting** 93:11
130:5 141:16,20
141:23 163:5
**reports** 20:4
58:14 130:9
139:17 142:11
186:8
**representation**
108:9 140:16
**representative**
88:18 90:1,11
91:24 93:21
146:20
**represented** 26:20
104:17
**represents** 174:5
175:4
**request** 7:8,14
12:19 20:2 23:18
24:16 29:5,14
30:2 31:9 32:6,7
32:11,17,20,25
33:8,22,24 34:3
34:19,22 35:14,15
43:25 57:6,14
75:18 76:2,7
197:5
**requested** 14:9
**requests** 189:20
**required** 10:20
13:14,15,19 32:15
112:12,15,22
113:2,6,8,15,18

141:7,25 142:8
**requirement** 9:2
17:10 29:10 37:25
59:13 112:20
**requirements**
113:10 142:25
**requires** 9:2 10:24
10:24 62:17
141:19
**reread** 20:8
**reseller** 158:11
**reserve** 195:11
**reserved** 194:18
**reside** 108:11
**residential** 158:11
158:14 160:2
**residing** 29:6
108:11
**residual** 186:22
**resolve** 195:6
197:1
**resolved** 196:16
196:25
**resources** 192:13
**respect** 17:24
21:12 23:14,21
29:20 31:1 33:8
33:11,15 36:13
61:20 190:18
191:14 195:12
**respectful** 157:16
**respectfully** 43:25
**respectively** 118:3
**respond** 10:5,22
11:19 15:19 21:1
26:2,23
**responding** 186:2
**responds** 76:15
153:2
**response** 14:10
22:7 27:7 30:1
91:20 153:12
183:1 184:25

**responses** 152:8
**responsibility**
11:18 149:4,5
**rest** 34:13 146:9
170:19 192:14
**restating** 109:9
**rested** 192:17
**restroom** 96:5
157:4
**result** 29:21 73:23
179:13
**resulted** 29:18
**results** 125:9
136:6 139:18
174:9 182:1
**resume** 96:18
**retain** 19:11
**retaining** 90:20
**return** 42:16 56:4
64:12,17 65:1
69:2
**returning** 83:13
**revenue** 10:12
180:15
**revenues** 180:12
182:9,14
**reversed** 187:17
**review** 88:17
94:19,23
**reviewed** 89:16
91:24 124:4
146:19 148:6
149:2 157:25
189:6 196:2
**reviewing** 16:15
16:17
**revisions** 17:20
**rhymes** 40:6
**richardson** 6:6
**rick** 6:8 193:21
**ridiculous** 22:19
**right** 13:7 14:2
16:8 18:1 23:15

24:5,10,24 27:7
39:4,21,22 40:15
40:23 41:9,16
42:8 46:12 47:10
47:13 49:22 50:9
50:20 51:2,12
52:11 53:2,6,11
56:5,16 57:17,25
59:24 60:8,11,12
61:1 63:8,12,24
64:18,21 66:20,23
66:24 67:12 68:19
68:23 69:3,11,18
69:21 70:17,18
71:8 73:2 74:20
74:21 76:17 77:2
77:9,13,14 78:4
78:24 79:10,21,25
80:24 81:1,25
82:14 83:1,11,11
84:2 85:2,25
86:22 87:12 88:1
88:17,20 89:12,15
89:17,18 90:21,25
91:4,12 92:6
93:11,12 94:6,12
95:18,20 97:3,8
97:16,23 98:1,6
98:22 100:2
101:25 107:14
111:25 112:6,9
113:12,17 116:24
118:6,9 119:9,13
119:20,23 120:1
123:7 125:19,24
126:21 127:15
128:21,22 129:7
129:14,21,22
130:3 131:21
132:17 133:17
134:5,18,22 135:1
135:12 136:2,7,24
137:18 139:5,21

141:20 142:1
145:18 149:23
151:14 152:5
153:24 155:17
157:21 158:1,3,22
158:24 159:4,11
159:20,25 160:15
161:1,4,15 162:17
164:3 165:21,23
166:4,10 167:14
169:11 170:5,13
170:21 171:11,12
171:15,23 172:3,6
172:10,12,17
173:3,18 174:11
174:12,23 176:6
176:18 177:24
178:5,6,11,12,16
178:17,19,20,23
188:24 189:6,19
190:25 191:5
192:15 194:1,3,5
194:15 195:22
**righthand** 115:12
115:17
**rights** 57:24
**rip** 120:22
**risk** 124:20
**risks** 124:14,15
**road** 198:21
**robert** 2:22 6:10
**rochester** 4:11
**role** 188:8
**romanette** 29:13
**room** 2:2 156:15
**roots** 93:15 94:10
**rosella** 5:23
**rosenman** 4:3
**ross** 4:8 7:11,11
8:6 9:5,12 10:7,11
11:2,19 12:16,21
13:5,13,18 14:2,4
14:6 16:9 17:9,10

17:15,19 19:23,23
21:2,10,17 22:12
22:20,20 23:1,11
23:16 24:1,6,9,18
24:24 25:2,8,17
26:4,11 27:8,9,24
28:7,7 32:24
33:10,21 34:9,24
35:11 37:1,2
41:24 42:24 43:12
43:22 45:2,8
48:21 52:3,3 53:3
54:8,15 55:1,8
60:2 61:16,23
62:1,5,10,13
79:14 83:2,7,16
83:16,20 84:13,18
85:4,10 96:3,13
96:20,24,24 97:7
114:10,10,15,19
115:4 140:18,19
144:2,14 145:20
145:24 146:5
147:4,17,24
148:14,18 153:23
154:12,20 155:2
157:2,8 163:11
176:19,20,23
183:2,3,8,19
184:25 186:14
188:1,17,18,23,25
189:17,23 190:3
190:17 191:3,13
191:20 192:12
193:4,10 194:6,10
194:12,17,24
195:2,10 197:1,5
197:13,16
**ross'** 44:4
**rothstein** 37:24
**roughly** 23:22
31:14,15 100:2
117:21,22,23

127:6,7,8,15,22
128:7,8,20
**row** 165:8,9,12,15
**rows** 165:7,14
**rule** 8:13 9:2
10:24,24 11:14,18
11:20,25 15:12
17:10 22:12,24
23:18 24:17 26:18
28:21 29:10 30:7
30:11,16 32:15
34:5 35:18 36:4,8
36:9,12,16 37:9
37:15 38:1,3,8,9
38:10,18,19 55:3
58:14,20 59:12
61:9,13 90:7
148:2 153:12
183:17 184:10
**ruled** 35:15 36:19
183:20 185:24
196:7
**rules** 11:16 12:6
15:20 24:20 31:10
33:2 37:24 153:13
**ruling** 34:20 37:6
**run** 20:17 27:16
27:18,20 47:6
88:4 93:6 94:18
99:6,25 157:3
161:5
**runout** 187:3

**s**

**s** 4:1 7:1 39:10
40:5
**safe** 14:9 166:6
**sales** 158:18
**salesmen** 111:1
**sanction** 29:5
31:11
**sanctions** 30:23
30:24 34:4 196:7

**sandwiches** 105:21,22
**sanocki** 4:19
**sap** 9:17
**satellite** 118:18
**save** 83:16 156:1
**saw** 122:9 160:17 182:1
**saying** 15:11 19:6 48:24 63:25 71:4 103:4 104:11,20 145:15 168:18 182:21 187:20 190:3 194:4
**says** 19:1 26:10 28:22 41:5 42:16 45:24 46:4,5 47:7 57:5 73:19 77:11 82:22 95:4,6 123:4 125:25 126:12,19 127:5 134:9 147:21 160:8 182:8 188:1
**scary** 73:17
**scenario** 31:5
**schedule** 51:14
**scheduled** 7:5
**scope** 54:10 182:25 183:2
**screen** 49:10,14 163:20
**screenshot** 137:23
**screenshots** 114:16
**seal** 115:7,8 130:25 131:2
**search** 132:20
**seasonality** 180:21
**second** 7:5 10:7 12:2 16:18 30:22 47:13 53:11 61:24 81:12 118:3,3,4,5

118:9,10 127:19 128:10,12,20 129:16 158:8,9,25 166:25 170:3 180:18 191:22
**secondly** 30:1
**section** 29:7,9
**see** 8:7,7,10 24:13 37:16 40:23 41:10 41:11,15,20,23 42:6,10,12,15,18 43:14 45:24 46:2 46:4 47:11,24 48:7,9,9,11 50:4 50:15 51:17,21 52:20 53:6,10,12 53:14,16,20 55:10 57:12,14 59:21 62:9 63:3 66:4,10 67:20 73:6,7,9,9 73:10,13,16,18,19 74:2,6 75:16,18 75:21 76:2,7 79:21 80:14 82:1 82:5 83:14,23 84:6,17 85:12,13 85:13,16,18 89:25 90:2,6,14 94:12 97:10 100:16 105:21 107:1,4 115:6,8,9,11,12 115:13,17,19,24 116:2,8,13,15 117:2,6,15,19 118:13,17,18 120:14,23 121:9,9 121:18 122:17 123:4,8 124:9,20 124:22 125:20 126:3,14,19,22,23 126:25 127:25 128:3,3,5 130:25 131:4,8,10,21,24

132:5,10,13,15,15 132:19,24,25 133:1,3,3,6,14 137:20 139:8,11 141:1 143:7,10,12 143:22,24 144:1,6 145:10,18,20 149:6,25 150:5,17 151:15,17 152:13 152:13,23 153:16 154:1,10 158:5 159:13 160:9,19 160:21,23 162:14 164:4,12,14 165:8 166:12,15,23 169:19,24,25 174:3 179:10,15 180:8 195:24 196:15
**seeing** 55:6 57:8 84:8 88:12 95:1 193:1
**seek** 9:25
**seeking** 15:17 30:14,25 44:9 71:9
**seen** 45:4 114:4
**sell** 108:22 109:12 111:3
**selling** 66:17 109:3,5,23 111:5 182:12
**sells** 159:10,19
**send** 14:8 44:24 65:24 145:25 191:15
**sending** 53:23 56:2,3 66:4,9
**sends** 168:17
**sense** 29:1 35:10 35:12 56:6 66:13 66:21 71:1 72:11 78:7,8 90:19 92:4

113:4,13,21 122:4 122:5 161:17 163:7 164:21 166:2 193:10
**sent** 7:12,16,18 11:6,21 16:2,2 27:21,22 42:9 114:11,14 153:4,9 153:10 155:15 156:7 167:5,11 191:16,20
**sentence** 67:15,20 124:23 125:5 158:8 159:25 170:1
**separate** 35:15 71:5 72:4,9 74:13 75:6 186:11
**separately** 86:14 87:7 196:22
**september** 19:5 19:25 26:7 27:2,5 27:12,23,23 28:3 28:4 64:13 65:2 90:7,10 146:21 158:13,24 159:1,8
**series** 23:13 144:20
**serious** 73:20
**serve** 93:13
**serves** 35:12
**service** 56:4,8 64:13,17 65:2,22 65:23 66:17,19 67:3 68:11 69:2 69:10,16 70:13 71:12 90:5,16,21 91:4,9,16 92:8,17 110:10 112:13,16 112:23 113:3,6,16 113:19 119:23,24 121:8,10 132:24 138:24 158:13,14

158:15,16,18
159:4,11,18,19
160:2,3,5,6
162:25 178:10
187:3
**serviced** 92:22
**services** 56:15
104:25 112:14
125:6,8 134:6
136:20,23 158:6
180:23 182:10
186:17
**servicing** 70:15
**serving** 37:20
189:25
**set** 9:20 33:1
34:11,14 45:11
93:20 124:15
189:24 196:22
**sets** 41:14 55:22
120:23
**setting** 52:8 54:9
81:23
**seven** 33:1
**seventy** 116:25
**share** 46:20
**shaya** 4:11
**sheet** 11:5
**shelf** 121:18
**shield** 36:1
**shirtsleeves** 47:17
72:24
**shoe** 111:1
**shoes** 111:3,5
**short** 9:13 11:22
**shortly** 55:12 97:4
162:3
**shots** 163:20
**shouldn't** 13:22
33:5
**should've** 28:5
**show** 44:3 74:13
148:20 168:16

175:5 188:8
**showed** 186:23
**showing** 12:8 49:9
49:13
**shown** 188:10
**shows** 179:5
**shredl** 6:3
**side** 10:18 13:20
37:22 41:10 43:14
43:16 99:14,15
115:12,17 131:3
165:7
**sides** 28:8
**siena** 5:24
**sign** 27:11 63:6
96:9 97:1,1,2,3,4
97:5
**signature** 48:11
61:6,8
**signed** 24:21 25:7
63:5 74:6 75:2
76:14
**significance** 102:7
173:22
**significant** 153:20
192:23
**signing** 63:8
**similar** 76:23
84:11 109:11
131:5 158:17
190:17
**simple** 9:9 11:8
33:2 185:20
**simply** 11:16 12:1
13:24 16:15,19
17:12 20:8,20
25:9 27:18 32:22
62:14 183:4,21
188:12
**single** 70:8,19
72:1 87:18 154:17
155:21 159:23
182:5

**sink** 189:9
**sir** 36:23 39:20
40:3,8,15 41:2,4
41:16,22 42:23
44:19,25 46:3
51:18,20 53:4,13
54:2,25 55:23
56:5,17 57:9 58:3
59:12 60:9,22
62:18,25 63:12,22
64:2,22 65:5
66:11 67:4,8,23
68:17 71:13 72:1
72:10,16,22 73:4
73:11 75:16,21
76:17 77:21 78:24
80:14,17,19,25
81:10 82:9,13
85:15 86:5 88:1,5
88:15,20 89:7,17
90:8,14,22 91:5
92:1,12 93:17
95:14 97:17,23
99:10,21 100:16
101:13,25 102:18
103:18 104:13,13
104:21 105:15
109:2,11 112:3,9
112:24 115:14
116:18,24 117:11
118:9,13 120:2
121:20 122:10,15
122:22 123:6
124:13 125:13,24
126:19,20 127:4
127:10,15,22
128:15,21 134:13
134:18,22 135:1
135:19 137:15,21
139:5 142:18
146:17,24 148:11
150:1 151:13
152:14,16 153:14

153:21 154:10
155:25 156:1,3,8
158:1,24 159:5,11
160:3,15,19 162:9
162:13 163:25
164:2,16 166:1
167:2,14 168:3
169:19,25 173:18
**sitting** 28:9 39:17
57:17 64:20 69:3
69:11,21 78:10
79:24 86:22 98:12
113:17 154:21
**situation** 55:4
**six** 139:14,16
190:22
**skype** 88:24 97:1
97:8,8 109:7
137:20 196:21
**slated** 98:21
**sleep** 193:8
**sleeping** 156:21
**slice** 10:2
**slight** 56:12
**slightly** 17:22
179:12 180:6
**slip** 42:16
**slower** 116:23
118:22 123:13
**small** 80:18
158:16 180:3
182:13
**smaller** 105:10
109:24 133:22
**smallest** 92:23
**software** 9:17
25:11
**sold** 65:21
**solution** 28:14
**solutions** 47:6
49:21 50:2,5,22
50:24,25 51:3
97:2,2,5 197:22

198:20
**somebody** 12:4,21
20:18,21 23:5,6
27:11 47:9 51:4
136:12,16 147:7
149:9 154:18
166:8 168:10
169:5,6 170:9,21
186:4
**somewhat** 66:15
189:9
**sonya** 3:25 198:3
198:8
**soon** 34:15 35:1
102:24 197:7,8
**sorry** 10:5,7 18:13
36:12 37:1 39:14
42:8,8,24 46:8,10
48:23 52:13 53:17
56:13 63:15 75:11
78:3 80:22 81:5
82:11 83:10 84:13
84:18 89:12 94:16
98:9 101:12 107:6
109:1 117:10
122:10 123:24
125:17 128:2,13
143:24 147:2
148:14,18 149:22
150:25 151:13
155:16,23 160:22
161:12 162:2
170:17 174:5
175:13 184:6,7
187:17
**sort** 8:23 13:21
17:11 20:7 25:18
42:12 93:4,9,16
103:7 166:23
178:22 196:12
**sorts** 20:11
**sought** 11:24
17:12,23 30:18

**sound** 48:15 91:14
97:1 127:15,22
128:21
**sounds** 70:18
78:17 128:22
129:22 162:1
**source** 36:2 186:7
**sources** 184:4
**southern** 1:2
**spaced** 166:8
**speak** 92:19
**speaking** 83:5
**speaks** 55:4
**special** 184:10
**specially** 185:7
**specific** 23:24
34:4 44:5 70:11
79:25
**specifically** 20:2
54:16 60:5 68:8
177:19
**specious** 186:3
**spectrum** 137:12
137:14 143:24
146:16 158:10,12
158:14,17,22,23
159:3,10,18 160:1
160:5,14 178:10
**speculate** 42:25
55:2
**speculating** 45:6
**speculation** 45:3
54:15,17
**speed** 116:8,11,13
116:15,20 117:9
118:20,22,25
119:17,18 120:2,4
120:7,8,14,16,18
120:24 121:4,4,18
123:3,8,11,14,20
126:19 127:18
128:9,23 129:1,2
130:1 143:8

161:20,24 178:14
181:23 184:17
186:22
**speeds** 113:19
118:16 119:15,21
120:22 121:1,7,12
123:1,4,18 125:1
126:16 127:11
128:19 129:4,10
129:12,16 143:4
160:17,19 162:15
186:25
**spelled** 40:5
**spelling** 39:11
**spend** 7:15 19:3,3
25:19,20 26:11
28:2 33:11 58:2
192:2
**spent** 19:7 21:9
**spirit** 11:15
**spit** 25:1 53:25
**split** 46:21 169:5
169:9
**spoke** 101:13
**spoken** 161:21
**spot** 132:12
**spreadsheet** 7:19
8:8,25 11:3
114:18 150:10
153:20 163:17,20
165:13,19 166:18
**spreadsheets** 8:9
154:2 165:4
**squint** 41:22
**st** 4:16 5:4
**staff** 166:18
**stamp** 150:2
**stand** 97:14
121:11
**standards** 154:23
**stands** 80:4
**start** 27:12 40:17
82:2 105:15

106:21 112:25
114:12,12 155:19
161:8 162:6,19
172:21 178:25
**started** 19:4 24:1
26:20 27:1,23
94:7 160:14
161:19 178:22
196:3
**starting** 92:13
152:24,24 158:8
170:8 194:19
197:11
**starts** 80:4 114:8
**state** 58:2,4 73:22
101:24 107:1,10
107:16,20 108:12
109:20 110:7,10
110:12,14
**stated** 30:11
**statement** 38:4,12
38:12 58:21 63:18
73:23 79:3 83:24
107:22 112:10
174:24 191:6
**statements** 38:17
38:17 57:5,13
59:3 65:10,12
102:16 148:1
**states** 1:1 2:1
37:25 38:2 81:6,8
81:10 99:4,13
100:22 101:18
110:17 111:20,25
112:3 141:3 151:9
154:10 155:14
156:3,8
**statewide** 107:7
108:7,17,25
109:15
**statistic** 171:14,20
172:6,9,15,16,23

statistics 172:1
stay 29:7 32:4
  36:21 63:21 97:8
  97:9 101:17 157:6
  179:21 196:5,8
step 12:2 120:8
  156:14 167:25
  168:3,12 170:17
  170:18,20,21
  171:7
steps 170:19
steven 5:13 6:3
stick 67:2
stipulate 83:17
  85:6,8 144:5
stipulation 83:19
  84:12
stocks 177:20
stop 175:22
  191:16
stopped 102:23
  103:5
stopping 96:7,14
stored 23:19
straight 23:9
strategic 175:9
street 2:2 5:10
stricken 35:17
strictly 12:6
strike 8:13 16:24
  16:25 17:1,7
  19:18 26:15,16
  28:20 34:19 36:16
  82:2 151:9 155:18
  167:3
strong 190:13
struggling 111:23
stub 41:19
stuff 63:9 126:6
stymying 88:25
sub 20:11
subheading 41:6

subject 11:24
  16:14 139:24
  152:1,20,25
submissions
  130:11 191:7
submit 77:16
  139:17 183:8,14
  184:13,23
submitted 14:13
  45:25 178:19
  194:7
submitting 130:9
subordinate 29:9
subscribe 160:6
subscriber 20:21
subscribers
  104:25 105:3
  167:5,11
subscribing
  158:14 160:2
subset 145:25
subsidiaries
  128:19 130:9
  131:16 133:12
  162:22 165:11
subsidiary 116:18
substantial 196:7
subtract 182:9
subtracting 171:1
subtractions
  177:19
subtracts 182:11
success 142:10
suffered 21:15
sufficiency 187:20
sufficient 36:3
  63:19 157:3
  187:10,19,24
  196:6
sufficiently 177:9
suggest 55:19
  59:18 81:19 83:7
  112:6 137:5 140:1

140:9 164:18
suggested 94:14
  94:20,23
suggesting 56:21
  56:25 141:19
  144:21 168:21
  192:1
suggestion 37:15
  102:9 140:5 186:3
suggests 13:20
  159:22
suing 70:25 77:4
  82:10 86:19
suite 5:3 198:22
sum 137:1
summary 8:5,15
  8:20,24 9:6,11,13
  10:4,25 11:1 21:8
  104:1
superfast 122:23
  123:3,14
supp 37:12
supplement 24:19
  32:14,15 59:11,18
  60:8,11
supplementation
  60:15
supplemented
  32:11 59:14,22
  60:7,13
support 9:1 11:10
  182:11
supporting 8:8
  9:2 10:25 11:9
  12:10 18:16 22:13
supports 11:3
suppose 65:20
supposed 15:19
  42:9 43:3 46:15
  49:25
sure 22:4,7 44:11
  50:2 51:4 57:8
  58:8 59:5 65:19

67:5 68:14 70:11
  77:14 78:17 84:3
  85:1 89:3,5 90:23
  91:22 92:12 102:1
  102:16 103:19,20
  109:9,25 112:20
  113:21,25 114:21
  121:17 123:23
  125:25 126:9
  127:20 129:25
  132:15 133:19
  139:15 156:19
  165:21 168:2,10
  176:13 177:6
  190:20 193:19
surge 50:11
surmise 143:7
surprised 22:4
sustain 183:6
swear 39:6
switch 180:22,22
sworn 79:3 83:24
system 12:22
systematic 181:20

**t**

t 198:1,1
tab 62:17 67:10
  80:8 179:3,4,5,14
  180:8
table 45:24 46:21
  51:16 53:8 83:6
  84:12 87:11,15
  146:14 166:17
  172:11,11 184:8
table's 148:23
tabs 39:16 61:18
  62:1,2,5,12 89:19
  169:19
take 7:23 12:25
  15:4 18:19 21:8
  44:7 47:25 72:22
  76:4,20 80:2 82:9
  88:4 89:24 92:12

94:18 96:5 99:6
99:25 124:24
144:17 145:1
154:7 155:23
163:9 164:2 177:1
180:9
**taken** 42:13 44:4
**takes** 187:22
**talk** 15:5 16:22
88:7 149:8 150:21
170:17,18 197:6
**talked** 74:23,24
92:3 98:13 131:6
170:6
**talking** 15:16
41:24 64:4 80:19
82:11 97:22
122:14 126:17
168:9 174:16
178:1
**tape** 47:5
**target** 34:21
**technological**
125:7
**technologies**
124:20 126:16
129:13
**technology** 96:10
124:25 126:19
**technology's**
125:7
**telecommunicat...**
116:4,14 120:5
**telephone** 69:6,9
70:24 71:3,6,9
92:21 93:15 94:3
94:5,7,10 158:23
167:5,14
**telephonically** 4:8
4:9,10,11,18,19
5:6,13,14,16
**tell** 8:4 10:1 12:4
16:23 17:5 22:11

25:9 39:6 67:8
70:9,20 71:13
72:1 81:2 84:19
89:5 92:7,16,18
102:24 124:1
129:6,8,9 165:15
168:24 177:10,15
186:12,14
**telling** 138:22
**tells** 81:3 139:3
166:25
**terence** 4:8
**term** 92:20 93:24
94:2 106:10 110:8
181:11
**terminology**
162:21
**terms** 92:19 93:9
93:17 102:14
158:17 181:9,13
**test** 21:5 55:10
72:10 185:18
**tested** 120:10,12
**testified** 13:13
20:7 23:2 24:6
57:22 58:6,10
70:5 176:25 185:9
**testifies** 38:7
**testify** 21:20
23:23 25:3 28:13
36:20 37:3 45:12
53:3 94:20 98:21
144:14,15,15
**testifying** 36:22
43:1 193:18
**testimony** 20:9
24:14,19,21 28:20
34:15 35:7 36:1
39:15,18 59:16
60:12 78:18 88:19
91:24 93:19 98:20
103:12,21 121:6
146:7,21 147:7

148:20 183:11,15
186:18 187:16,18
188:22 189:15
190:4,13,22 191:2
191:9 193:6 194:7
**texas** 116:5,14
118:2 119:1 144:1
**text** 150:2
**thank** 10:10 14:4
35:2,3 36:23
39:25 40:4 45:15
47:20 52:15 62:25
72:23 97:6,10,20
115:3,3 127:10
146:11 149:18
155:11 156:18
157:8 167:1
173:14 174:17
177:8 188:15
194:4 197:19
**thanks** 26:12
**that'll** 111:14
**that's** 7:15 11:17
11:20,22,23 12:10
13:14,18,19 14:15
15:9 16:23 17:12
17:12,22 18:7
20:13,14,16,19
21:24 22:9,24
23:4 26:20 27:6
27:15,24 28:7,14
32:12 33:4,16
34:9 36:19 38:20
39:11,14,21 42:3
42:10 47:5,11,19
49:16 50:6 51:8
51:16 54:8 55:10
56:20,22,22,25
98:17,23 99:2
103:8 107:22
108:19 111:25
112:23 116:23
117:15,19 118:18

118:24 119:23
121:4,9 122:2
123:2,15 124:4
126:8 127:6,18
133:18 135:25
136:3,10 138:5,13
138:21 139:1,20
139:23,23,23,25
141:21 142:5
143:7 145:23
**there's** 8:18 9:19
9:23 11:9 12:2,3
13:21 16:18 17:15
19:2 21:3,7 22:18
23:3 24:18 25:14
27:3 33:14 35:6
35:24 36:8,15
38:20 41:6,18
42:1,5,9,12 45:8
46:14 56:12
102:18 103:24
108:1 112:4
114:19 115:13
120:7 125:25
129:2 132:18
143:20 144:25
145:6
**they'd** 25:25
**they'll** 41:15
**they're** 15:17 21:3
21:24 23:12 49:25
56:4 129:2 141:24
141:25 143:15,20
146:2,3
**thing** 20:7 41:12
49:8 90:20,25
91:8,9 120:4,24
126:23 128:3
136:2 138:9 145:4
171:25
**things** 14:17
33:25 46:15 86:23
91:11,14 107:23

107:24 114:11,21
169:12 176:8
179:18 182:12
**think** 7:22 14:10
16:16,25 17:1
24:10,20 26:3,18
27:6 29:19 32:11
33:6,6,18,18,20
34:4,6,11 35:11
35:12 37:23 39:21
43:10 44:1,2 46:2
49:17,23 54:20
55:8 56:12 60:2
60:13,19 61:12
64:24 71:16 72:20
76:1,5,11,21,24
77:25 78:4,12
80:3 86:12 87:19
88:16,22,23 89:1
89:18 94:8 95:4
95:23 98:7,17,23
99:21 100:23
101:10,23 102:12
102:23 103:8,16
104:2 105:5 106:5
107:22 108:8
111:15 114:4,13
115:1 119:11
121:3 122:12,25
123:19,23 124:7
127:3 129:6
130:11 132:1
138:21 139:25
142:25 145:3,5,8
145:10,23 146:7
146:23 153:15
154:9 156:12,20
157:21 158:21
161:3 162:5,10,15
163:2 170:6 171:5
174:14,24 175:2
175:14 176:13,16
178:23 182:7,16

184:8 186:17,23
188:24 189:10
190:4,11,22,23
191:9 193:14,15
193:15,17,18,24
195:3,11,18,20
196:10,15,21
197:2
**thinks** 146:1
**third** 37:20
**thirty** 169:22
**thompson** 4:13
5:1,25 8:3 186:12
186:15
**thought** 8:15
18:11 63:15 77:23
81:5 110:21
143:25 147:5
154:4 161:1,7
197:19
**thousands** 92:24
95:4,6
**thread** 103:7
**three** 16:10 19:13
19:14 20:10,15,19
27:11,23 43:23
55:15 75:24
115:20 130:9
133:16 169:22
**threw** 132:6
**throwing** 189:9
**thursday** 25:23
26:1
**tie** 43:4 47:25
48:1,2
**time** 9:8 13:1 15:5
15:6,18 16:11
17:24 18:6,6,23
18:25 19:4,6 20:4
20:5 23:22 24:8,9
26:21,21 27:10,19
29:17,23 35:9,13
37:4 58:2 72:22

75:5 82:9 83:17
93:1 118:10 128:1
136:20 139:6
143:15 156:2
158:20 159:12
163:19 167:17
180:4,23 183:23
192:2 193:12
194:18 195:2
197:7
**timeframe** 126:25
**timekeepers**
16:10
**timely** 17:1
**times** 7:21 30:14
58:6,11 60:3
155:10 166:9
171:5 174:24
176:25 180:9
**timing** 107:23
**title** 41:3 44:11
51:16
**titled** 53:8
**today** 36:22 39:2
39:17 40:3 64:20
78:11 94:13 110:4
121:6 131:6
144:15,17 183:21
196:19 197:11
**today's** 197:22
**told** 11:2 19:24
38:7 52:7 89:13
91:16 98:8,9
190:23
**tomorrow** 28:13
194:19,21 195:7,9
195:13 196:25
197:11
**top** 27:25 45:24
48:9 53:21 122:23
124:13 126:2
**topic** 87:9,12

**topics** 33:3,5
196:23
**total** 14:23 25:10
67:18 68:1,3,21
75:4 95:21 170:12
171:9,10,22,23
**totally** 14:12
**town** 103:24
104:3
**towns** 162:12
**track** 94:16
186:17
**tracked** 93:9
168:13 179:6
**tracks** 168:22
**trade** 76:3,8,18
**transcribe** 46:18
**transcribed** 3:25
**transcript** 40:7
89:8 92:5 193:9
197:22 198:4
**transcription**
60:14
**transcripts**
191:18,19
**transportation**
109:19
**treated** 110:17
**treatment** 160:24
161:12,13 178:3,4
179:2 181:11,12
181:15,17,18,25
**trial** 3:3 7:5 15:13
16:17 19:5 26:14
28:15,19 31:20
32:1 34:1,10
38:24 43:24,24
51:7 58:10 189:12
190:12 191:7,11
192:8,8,18,21
193:2
**trick** 165:21,22

**tried** 153:25 175:5
187:2
**troll** 9:20 23:6
**trouble** 51:7
**true** 55:10 56:18
57:16,22 63:9
72:5 74:4 107:2,5
108:7,18,25
119:16,22 120:2
121:13 122:1,3
123:2 124:5
133:22 134:13
135:7 138:12,13
166:7 198:4
**truly** 186:8
**trust** 21:9
**truth** 39:7,7,7
**try** 34:25,25
105:15 111:3
119:5 154:2
161:11 189:14
**trying** 49:16 50:3
84:14 99:9 105:18
106:11,20,24
107:12,18 108:4
108:14,22 109:11
109:12 110:4,15
110:16,23 111:5
111:13,15 168:2,9
181:15 191:23
**tune** 179:25
**turn** 10:8 21:21
43:20 45:17 51:9
61:1,3 63:12 75:1
117:18 121:15
123:6 124:1,18
130:22 131:25
140:12 163:16
169:21
**turning** 51:6 56:1
81:24
**tutelage** 148:23

**twenty** 124:9
132:1
**twice** 121:25
**two** 11:6 16:11,11
17:20 28:9 29:19
31:23 32:18 33:2
46:15 60:20 61:1
78:1 91:11,14
97:13 98:24,25
100:5,21 101:6
102:9 103:1
107:13,18 108:5
109:12 110:5
114:24 116:2
118:10 120:23
125:14 157:12
161:18 164:14
169:5,9 170:9
172:1 173:11,14
173:25,25 174:8
175:15 181:9
182:6 184:15,17
191:14 196:23,24
197:3
**twofold** 16:16
**type** 9:15 44:1
93:11 185:8
**typed** 154:18
**types** 20:13 43:23
**typically** 92:19

**u**

**u.s.** 2:23 37:17
**ultimately** 29:6
31:3
**unbelievable** 28:1
**underestimates**
182:22
**underlying** 8:25
9:19,24 11:3,4
14:20 19:2,21
26:22 28:24
134:23 187:10

**underneath**
166:15
**underpinning**
139:3
**understand** 13:8
15:9,10 18:7,9
20:8 22:18 34:19
34:20 36:23 41:16
44:10 52:6 61:15
70:24 71:3,10
77:2,21 78:14
79:11 84:22 97:15
109:8 142:2 168:2
170:19 175:14
190:3 192:5
193:18 197:14
**understanding**
22:8 41:5,7 44:12
71:8 88:15 99:1,2
106:4 112:23
122:2 149:3
**understands** 26:3
178:24
**understood**
168:10
**unduly** 31:22
32:23
**unfortunately**
49:10 93:8
**uniform** 141:23
**union** 37:7
**uniquely** 30:20
**unit** 99:9,12 104:1
107:15 108:6,7,15
110:20 141:16,20
141:23 142:13,14
142:15
**united** 1:1 2:1
99:4,13 100:22
101:18 110:17
111:20,25 112:2
141:3

**units** 99:5 108:24
**universe** 145:16
**unknown** 2:25
**unmute** 49:15
**unmuted** 49:23
**unpack** 100:16
**unreliable** 184:24
**unsecured** 5:9
**unusual** 181:16
181:19 182:1
**update** 19:4 24:14
24:19 25:14 29:14
**updated** 26:7
**upgrades** 14:24
178:14 181:23
**upload** 143:8
**upper** 115:9 123:8
125:20 131:3
**url** 126:3
**use** 79:5 93:25
94:2,4 100:14
105:8 106:7 108:1
108:6 109:14,17
109:24 111:20,25
162:20 185:16
192:5
**useful** 101:9
**uses** 141:24 142:6
142:9
**uslec** 164:7,8,13
164:18,23 165:2
166:9
**usual** 16:19
**usually** 46:25
166:21,22 192:24
**utility** 120:8

**v**

**v** 1:14 3:2 7:3
37:11,17
**vacuum** 108:22
109:3,12,23
**validate** 184:20

valor 116:4,13
value 27:14
variant 181:11
variety 53:14 68:9
  73:14
various 7:21
  39:16 112:17
vastly 186:25
veracity 154:20
verified 153:16
veritext 198:20
verizon 158:12
version 83:4
  183:21
versus 97:13
  108:11 109:20
  110:10 121:19
  129:3 150:19,21
  157:12 167:22
  168:6 169:3 170:6
  181:18 193:5
vertisement
  159:22
viasat 115:18
video 28:15 49:8
  191:16,18 193:5,7
videotaped 193:6
view 90:18 91:20
  106:15
viewed 32:21
vigorous 105:11
  105:13
violate 24:20 38:8
  38:9,9,18,19
violates 38:3
violation 32:4
  63:21,23 196:5,8
virginia 110:14
  165:2
vision 51:5
voir 36:18
voluminous
  114:17

voluntary 73:3

**w**

w.d. 37:17
wait 144:16
waiting 54:9
waiver 153:1
waiving 153:1
wake 156:23
walk 114:20
walked 51:5
  178:12,14
want 10:3 12:10
  17:3,4,5,6 18:3
  23:8 26:16 28:12
  35:8 36:25 47:10
  49:1 52:4 65:20
  67:2 82:7 100:13
  101:17 105:21
  111:3,10 144:15
  145:19 162:6
  170:17 171:6
  181:23 190:21
  192:4 193:12
  194:2 196:24
wanted 66:17
  85:8 108:21 142:4
  180:21,24,25
  191:25
wants 33:17 147:8
  183:3
warning 73:17,18
  73:19
warrant 196:6
washington 37:18
  111:17
wasn't 14:12
  22:23 25:5 28:21
  55:24 120:10
waste 75:5
watching 156:19
wave 147:22
waving 102:24

way 9:19 10:2
  21:23 25:11 27:25
  28:2,15 44:25
  66:3,9,19 73:4
  79:14 81:17,22
  94:22 95:12 99:16
  100:7 101:9
  103:17 105:15,16
  105:25 106:3,11
  106:15,25 114:14
  129:13,25 141:21
  145:3 147:24
  148:10 152:11
  155:13,17 160:3
  163:8,21 170:4
  176:24 179:7
  188:3 190:14
  196:16
ways 44:21 182:7
we've 84:20 171:5
  172:23 175:22
  189:1 190:11
  196:23
wearing 72:24
website 113:24
  126:9 139:20
  163:6
week 17:19 25:22
  26:6 27:19 189:1
  189:2
weeks 16:4
welcome 84:11
went 15:9 18:7
  39:1 50:10 60:13
  98:14 129:1 176:5
  179:24,24,25
weren't 28:15
werlinger 6:2
west 5:10 99:15
  101:19
western 103:2
we'd 28:16 46:20

we'll 15:4 17:5
  34:12 144:16
we're 21:5,18,18
  25:19 32:24 41:8
  44:13 46:2,19
  47:12,17 48:19,21
  49:13 51:8 97:12
  98:2 108:20 109:7
  110:9 111:1,5,11
  111:24 112:2,6,7
  135:11 137:13
  144:5
we've 19:7 21:17
  43:23 54:9,9
  132:12 141:17
whatsoever 20:1
  185:16
what's 8:11,20
  26:20 41:3 103:5
  116:20 117:9,13
  122:20 123:11
  127:17 128:8
  135:9,10 136:10
  149:6
white 2:3
who's 16:5,5
wide 183:21
widely 125:8
willing 110:3
windstream 1:8
  1:12 3:1 7:3 8:25
  14:22 15:6 21:15
  22:1 29:11,20,22
  30:13,25 31:5,22
  32:5 35:23 36:3,9
  41:6,8,15 42:9,17
  42:22 43:15,24
  44:10,13,18,22
  51:17,19 52:21
  53:15 54:5,22,23
  55:20,20 56:3,14
  56:16,21 64:5,8
  64:12 65:20 67:2

68:4,11,14,18,22
69:13 70:13 71:11
71:25 73:12 77:12
77:12,17,19 81:6
83:8 85:13,16,18
86:3,9,16,20
88:10,13,15 90:1
90:4,7 92:8,15,17
93:15,23 95:2
97:13,25 98:4,4,8
98:13,16 99:3,12
99:23,25 100:4,18
100:21 101:24
102:7,19 103:11
103:25 104:10,15
104:18,24 105:7,8
112:18,22 114:17
115:18,24 116:1,2
116:16,20 117:7,9
118:1,5,8,10,17
118:23 119:8,21
122:25 123:3,17
125:1 126:22
127:12 128:14,19
130:8,20 131:15
131:17 132:23
133:1,11,25 134:4
134:6,13,16,17
135:14 137:6,9,10
137:14 138:3
139:5 140:2,9
141:5,21,23 142:9
142:11,20,23,23
143:4,9,16 145:25
146:16 150:6,6
151:25 152:19
153:2,4,5,7,9
156:5 157:12
162:23 164:16,17
165:11 168:11,17
168:24 169:5,9
173:23 177:2,6,24
180:11,14 185:19

186:5,10 188:9
**windstream's**
90:11 93:9 150:15
182:9,22 186:25
**windstream's**
21:16 23:14 24:17
29:4 30:4 32:3
45:5,6 100:8
123:13 124:3
128:9 133:20
136:3,5 137:7
**wire** 92:21,23,24
95:6,9
**wish** 39:18 185:4
**withdraw** 193:16
**withdrawal** 14:12
**witness** 9:6,9
11:15 17:16 21:18
21:19 22:23 28:16
29:16 35:9 36:1
37:9,20,21 38:2,6
38:14 42:25 45:3
46:8 48:17,23
49:7 50:14,17,19
51:12 52:4,13,15
55:1 62:19 83:18
84:24 85:2 87:21
97:17 114:21,24
140:22 144:3,13
147:6 148:20
149:19,22 154:25
156:13 163:14
176:16 184:10,14
184:20 193:21,22
**witnesses** 34:13
188:23 193:20,25
**witness'** 146:7
**woman** 149:12
**won't** 52:20
101:17
**word** 54:17 85:13
85:16,18 86:3
106:5,7 122:20,24

122:25 177:1,2
**wording** 190:20
**words** 13:12 31:4
35:25 40:23 81:2
103:23 106:21
109:17 129:23
179:5,10 181:18
**work** 22:19 25:12
34:24,25 47:1
59:4,5 78:25
147:23 157:1
171:14 197:21
**worked** 120:16
161:10 171:24
172:4 197:20
**working** 157:15
167:15
**works** 96:8
**world** 9:15 80:23
195:24
**worried** 123:17
190:12
**worth** 50:14
152:23 193:15
**wouldn't** 22:4
24:14 25:23 27:12
33:6 101:21
107:12 109:9,17
112:4 120:20
**would've** 12:11
25:22,25 26:1
27:9 28:20
**writes** 20:21
**writing** 21:10
**written** 77:16
149:7
**wrong** 12:1 19:24
72:20 130:12
188:12
**wrote** 66:16

**x**

**x** 1:5,11,17 38:2,6
38:7
**xlsx** 90:6

**y**

**y** 38:6,8
**yeah** 18:4 48:19
49:18,20,23 50:5
50:13,23 54:20
65:7 89:12 93:7
96:6 104:14 118:7
122:22 138:18
151:17,17 162:16
174:9
**year** 117:3,4
124:3 129:23
139:10,18 167:23
172:9 173:3,6,9
174:11,16,22,23
175:21 178:8
180:23 185:2
**yearly** 173:14,18
173:20 174:6,7,8
174:15 175:3,3,6
175:6,12,15,18
176:11
**years** 58:12 59:14
73:24 75:19 138:8
169:11
**yelled** 162:7
**yellow** 132:17
**yep** 123:24
**yesterday** 7:10,12
8:6 9:14 11:2,20
14:17,25 15:10,16
18:2,5,6,8,15,23
18:25 20:2 25:3,5
26:6 27:20 28:6
29:2 30:2 37:3
39:1 183:10
196:18
**yield** 192:24

yielded 30:6
york 1:2 4:6 5:11
you'd 102:17
you'll 41:22 56:7
107:18 124:18
you're 13:10
18:21 36:21,22
39:24 42:3,10,20
47:13 49:5 50:24
53:12 56:21 97:15
104:11,20 110:1,3
110:3,8 111:5,15
111:17 121:9,10
122:14 126:17
129:14 130:8
133:25 135:3,4
138:22 141:19
148:2
you've 21:14 40:9
112:4 145:20
y' 38:2

**z**

z 39:10 40:5
zeitgeist 196:13

**'**

'18 130:3,6
138:10
'19 127:9 129:17

1   UNITED STATES BANKRUPTCY COURT

2   SOUTHERN DISTRICT OF NEW YORK

3   Case No. 19-22312-rdd

4   Adv. Case No. 19-08246-rdd

5   - - - - - - - - - - - - - - - - - - - - - - - - - - x

6   In the Matter of:

7

8   WINDSTREAM HOLDINGS, INC.,

9

10          Debtor.

11  - - - - - - - - - - - - - - - - - - - - - - - - - - x

12  WINDSTREAM HOLDINGS, INC., et al.,

13               Plaintiffs,

14          v.

15  CHARTER COMMUNICATIONS INC., et al.,

16               Defendants.

17  - - - - - - - - - - - - - - - - - - - - - - - - - - x

18

19

20

21

22

23

24

25

1    United States Bankruptcy Court

2    300 Quarropas Street, Room 248

3    White Plains, NY 10601

4

5    April 29, 2020

6    2:09 PM

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21   B E F O R E :

22   HON ROBERT D. DRAIN

23   U.S. BANKRUPTCY JUDGE

24

25   ECRO:   UNKNOWN

1    HEARING re Adversary proceeding: 19-08246-rdd Windstream

2    Holdings, Inc., et al. v. Charter Communications, Inc.

3    et al Trial

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    Transcribed by:  Sonya Ledanski Hyde

```
1    A P P E A R A N C E S :

2

3    KATTAN MUCHIN ROSENMAN LLP

4         Attorneys for Plaintiffs

5         575 Madison Avenue

6         New York, NY, 10022

7

8    BY:  TERENCE ROSS (TELEPHONICALLY)

9

10   THOMPSON COBURN LLP

11        Attorneys for Charter Communications

12        One US Bank Plaza

13        St. Louis, MO 63101

14

15   BY:  JOHN KINGSTON (TELEPHONICALLY)

16

17   THOMPSON COBURN

18        Attorney for Charter Communications

19        One US Bank Plaza, Suite 2700

20        St. Louis, MO 63101

21

22   BY:  MICHAEL NEPPLE (TELEPHONICALLY)

23

24

25
```

1    MORRISON FOERSTER LLP

2         Attorneys for Official Committee of Unsecured Creditors

3         250 West 55th Street

4         New York, NY 10019

5

6    BY:  STEVEN RAPPOPORT (TELEPHONICALLY)

7

8    ALSO APPEARING TELEPHONICALLY:

9    JASON SANJANA

10   BRIAN HOCKETT

11   KAT RICHARDSON

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              P R O C E E D I N G S

2           THE COURT:  Good afternoon.  This is Judge Drain

3     in In re Windstream Holdings, Inc. and the Windstream

4     Holdings debtors versus the two Charter Communications

5     defendants in this adversary proceeding.

6              We left off yesterday with my instructions and the

7     parties' agreement to meet and confer to discuss two issues,

8     which is first the scope and duration of the discovery that

9     I generally directed yesterday needed to take place and when

10    we would resume with the trial with respect to Mr. Auman's

11    testimony.  And secondly the issue of the admission of

12    Charter's not yet admitted exhibits.

13             I did have a chance to read the parties' emails.

14    I think you've made a fair amount of progress, but it's

15    clear that you're not completely in agreement on those two

16    points.  I confess I read them pretty quickly since I had

17    hearings today that went until about 1:40.  But I'm happy to

18    go through the two issues now.

19            MR. ROSS:  Good afternoon, Your Honor.  This is

20    Mr. Ross for the Debtors.  Mr. Kingston and I just spoke

21    briefly by email and sort of agreed on a pro forma agenda,

22    if you will.  And what we agreed and would suggest subject

23    to your approval to do is that Mr. Kingston will move on the

24    record certain exhibits into evidence which we do not object

25    to so that that's formally on the record.  Then Mr. Kingston

1    will move certain exhibits that we do object to, and we can

2    discuss those one by one our objections.  Then we have a

3    minor administerial correction from yesterday that I will do

4    third.  And then we will come to the discovery last, which

5    has far more disputes than the first three topics, if that's

6    all right with the Court to proceed in that manner.

7                THE COURT:  Yes, that's fine.  And I do have both

8    of your emails on the exhibits, and it does appear to me

9    that at this point you have about eight or nine that may be

10   at issue unless you've further narrowed them from there.

11               So, Mr. Kingston, why don't you go ahead with the

12   ones that there is no agreement as to admissibility.

13               MR. KINGSTON:  Thank you, Your Honor.  I guess

14   first I should note that given that Mr. Auman hasn't been

15   put on for cross-examination yet, the Defendants reserve the

16   right to move for admission of exhibits used with Mr. Auman

17   or to impeach Mr. Auman's testimony.

18               With that said, Defendants move for impeachment

19   purposes only for the admission of the following exhibits

20   from Defendant's impeachment exhibit list.  One, two, four,

21   five, 23, 25, 30, 31, 38, and 39, again, for impeachment

22   purposes only.

23               THE COURT:  Right.

24               MR. ROSS:  That's without objection, Your Honor.

25               THE COURT:  Okay.  So each of those exhibits is

1    admitted for that purpose, i.e. impeachment purposes.

2         MR. KINGSTON:  Defendants further respectfully

3    move for the admission of the following exhibits from

4    Defendant's exhibit list.  Three, 15 through 17, 26, 27, 77,

5    78, 84, 127, 128, 130, 146, 185, 252, and 309.

6         MR. ROSS:  Without objection, Your Honor, from the

7    Plaintiff.

8         THE COURT:  Okay, that's fine.  Those exhibits,

9    those Defendant's exhibits are admitted for all purposes.

10        MR. KINGSTON:  Defendants withdraw - or no longer

11   intend to move in Exhibit 74, Your Honor.

12        THE COURT:  Okay.

13        MR. KINGSTON:  I think the remaining exhibits can

14   be taken in - I think they're just basically three chunks.

15   The first chunk includes Exhibits 110 and 87, Your Honor.

16   Exhibit 110 is the mailing list of approximately 800,000

17   individuals to whom the advertisements were sent.  Exhibit

18   110 is actually incorporated by reference into previously

19   admitted Defendant's Exhibit 146, which is Plaintiff's

20   responses and objections to Charter Communication, Inc.'s

21   interrogatories.  Page 5 of --

22        THE COURT:  Right.  So this is referred to as the

23   best evidence.

24        MR. KINGSTON:  No, no, no.  I'm sorry, Your Honor.

25        THE COURT:  I thought this list was the list of

1    people that were the best evidence of the customers.

2              MR. KINGSTON:  Yes, Your Honor.  That's exactly

3    right.

4              THE COURT:  Okay.  And what was 87?

5              MR. KINGSTON:  87 is a summary exhibit of that

6    same list.  And it just identifies the states that are

7    listed in Exhibit 110.

8              THE COURT:  Okay.

9              MR. ROSS:  Your Honor, we object to 87, which is

10   the list that was shown yesterday, on  multiple grounds.  We

11   don't know where that came from.  Nobody laid a foundation

12   for it.  The witness said he didn't recognize it.  We don't

13   believe it's the correct list.  So it's not simply we're

14   trying to be obstreperous, we think it's actually

15   substantively wrong and therefore should not be allowed in

16   without foundation, hearsay, and somebody who says what it

17   is, why it is, and to be cross-examined.

18             THE COURT:  So in essence you're saying it's not

19   an accurate summary?

20             MR. ROSS:  That's correct, Your Honor.

21             THE COURT:  Okay.

22             MR. ROSS:  Your Honor, it's more than that.  We

23   don't think it's actually a summary of anything that

24   somebody has made up; it is simply wrong.  So it can't be a

25   summary of anything.  I don't know how else to explain it.

1            THE COURT:  Okay.  Other than the fact that it's

2      not an accurate summary, why do you believe it's not a

3      summary of 110?

4            MR. ROSS:  So we only have residential customers

5      in 18 states.  This lists 22 states.  So on its face,

6      knowing nothing else, it has to be wrong.  The testimony in

7      deposition from Ms. Atkinson, who was in charge of this

8      campaign, is they sent it only to residential customers in

9      the states in which we competed with Charter.  So this

10     simply cannot be a correct summary of anything.

11           THE COURT:  Okay.

12           MR. KINGSTON:  May I, Your Honor?

13           THE COURT:  Yes.

14           MR. KINGSTON:  Your Honor, at this Court's

15     direction, after the preliminary injunction was entered --

16     or before the preliminary injunction was entered on May

17     13th, Charter provided that the 800,000-plus list that is

18     Exhibit 110 to Windstream.  Windstream used that list to

19     send out, as I understand it, the corrected mailer that the

20     Court instructed be sent out.  Those are the states that are

21     in that list.  The Court, my friend at the other table, we

22     all have that list.  We can readily determine whether those

23     22 states are on there or not, Your Honor.

24           MR. ROSS:  Your Honor, that brings us back to 110.

25           THE COURT:  Right.

1      MR. ROSS:  We don't believe that that's the list

2   that got mailed to.  And again, nobody has come to testify

3   that it is.  When we first got that back in May, we're not

4   sure that this is what we got first because it doesn't match

5   up.  Second, it never -- we attempted repeatedly to match it

6   up with our actual customer list and could not do so.  So

7   whatever they sent us in May we don't think was the list of

8   our customers that were mailed to.  And second, this is not

9   that list anyway as best we can tell.  And there's no

10  witness who is coming in and willing to testify to it.

11      THE COURT:  Let's break that down.  It's a fact I

12  think that Charter, after I granted the injunctive relief,

13  provided you with a list of who they sent the advertising to

14  so that you could take whatever steps you felt were

15  appropriate to correct the effect.  Have you compared the

16  list you got then with proposed Exhibit 110?

17      MR. ROSS:  Not line-by-line.  It is a very

18  voluminous exhibit.  But we found enough differences that we

19  do not believe it is trustworthy as being represented in

20  that.

21      THE COURT:  Because you compared it against the

22  list of customers that you got at my direction back in the

23  spring?

24      MR. ROSS:  Correct, Your Honor.  Now, we're in no

25  way saying or suggesting that Charter either sent us the

1    wrong list then or this is -- this could be the product of

2    simple error, copying it, I don't know what.  That is why we

3    have witnesses come into court and explain what a document

4    is and how it was produced.  Especially something as

5    voluminous as this.

6            THE COURT:  So what the interrogatory answer

7    refers to is the list that you got back in May, not this

8    list.

9            MR. ROSS:  Your Honor prefaced that by saying the

10   interrogatory request.  And I'm not --

11           THE COURT:  No, the interrogatory answer.  Mr.

12   Kingston referred to an answer to an interrogatory to

13   identify the customers affected by the advertising campaign.

14   And the answer ultimately -- there are some other objections

15   to the interrogatory, but the answer ultimately was we

16   believe that the list that we were sent by Charter is the

17   best way to identify them.

18           MR. ROSS:  We have no independent knowledge of who

19   it got sent to.  So that is not just the best; it appears to

20   be the only evidence on that subject.

21           THE COURT:  But that list is one in your

22   possession now.  And you say at least with some cross-

23   checking, it doesn't match up to Exhibit 110.

24           MR. ROSS:  That is correct.  But again, I'm being

25   very careful here.  This could be ministerial.

1      THE COURT:  It just seems to me that maybe what

2  you should do is use that list instead of 110.

3      Mr. Kingston, is there any problem with that?

4      MR. KINGSTON:  There's no problem with that at

5  all, although if we provided the wrong list to the Court, I

6  want to -- I would like to get to the bottom of that.

7  Because that's not -- that's concerning to me.

8      THE COURT:  That's fine.  But I guess I don't mind

9  putting in the record the list that Charter got back in May,

10  the one that's referred to in the interrogatory answer,

11  because that is I think everyone agrees was what was

12  provided and what Charter is relying on.

13      MR. ROSS:  We'll find that and get it, Your Honor.

14  And if you don't mind, we'll give it a new exhibit number

15  and submit it post hoc to the court.

16      THE COURT:  Okay. And hopefully it will be a joint

17  exhibit.  I mean, you can verify that it was actually sent,

18  Mr. Kingston.

19      MR. KINGSTON: Sure.

20      THE COURT:  Was it attached to an email, Mr. Ross?

21      MR. ROSS:  I doubt it because of the size, Your

22  Honor.  I assume it had to be from a Dropbox or some other

23  method.

24      THE COURT:  Well, if you can -- if there's a way

25  to send -- to return, however it was sent, to Mr. Kingston,

1    he can just look it up and see that that was what was sent

2    to you all.

3              MR. ROSS:  We will do that, Your Honor.

4              THE COURT:  Okay.  And then as far as the summary

5    goes, if you want to do a summary of that one, Mr. Kingston,

6    I'll let you admit it when we resume.

7              MR. KINGSTON:  That's perfectly fine, Your Honor.

8              THE COURT:  Okay.

9              MR. KINGSTON:  I think that takes us to Exhibit

10   110.  Exhibits 158 through 362, excluding 185, 252, and 309,

11   which have been admitted, are the Chapter 11 petitions of

12   the Plaintiff in this action.  And so we would move those

13   in.

14             THE COURT:  That's what 158 through 362 is?

15             MR. KINGSTON:  Yes, Your Honor.

16             THE COURT:  Okay.  Well, I mean, that's -- I can

17   take judicial notice of those, too.  But if you want to put

18   them in the exhibits -- what's the objection to those?

19             MR. ROSS:  Well, the objection is exactly the one

20   you just noted, Your Honor.  First, it's cumulative.  It

21   inflicts a real burden upon -- having worked in a courthouse

22   before, it inflicts a real burden upon the clerk.  That then

23   has to be transmitted to the district court as part of the

24   appeal and then to the second circuit part of the appeal, it

25   simply is -- it's multiple, multiple volumes.  It's

1      something that's just unnecessary.

2                    THE COURT:  Well, I'm happy to say in whatever

3      form you want, I'm assuming maybe an order, that the Court

4      will take judicial notice of Exhibits 158 through 362 to the

5      extent they have not been separately admitted.

6                    MR. KINGSTON:  Defendants are comfortable with

7      that approach, Your Honor.

8                    THE COURT:  Okay, that's fine.

9                    MR. KINGSTON:  Defendant's Exhibits 364, 364A, and

10     364B are an excerpt from publication on the Federal

11     Communications Commission's website.  It's -- I'm sorry.

12     It's the Form 477 data for Windstream Holdings, Inc.'s

13     subsidiaries.  And Charter moves those in as well, Your

14     Honor.

15                   THE COURT:  Okay.  And this was in the impeachment

16     binder.  I'm looking at it now.

17                   MR. KINGSTON:  Your Honor, Exhibit 364 was a

18     voluminous Excel spreadsheet that was served separately.

19     Exhibits 364A and 364B are screenshots of that voluminous

20     exhibit.  So they're not true impeachment exhibits; they are

21     a portion of Exhibit 364.  But they were included with the

22     impeachment binder, Your Honor.

23                   THE COURT:  Okay.  Well, but 364 is an impeachment

24     exhibit and the other ones are just the backup?

25                   MR. KINGSTON:  I think, Your Honor, 364 was just a

1    regular exhibit.  It wasn't listed as an impeachment

2    exhibit.

3              THE COURT:  Okay.  It just ended up in the binder?

4              MR. KINGSTON:  The screenshots did, Your Honor,

5    yes.

6              THE COURT:  Okay.  Well, you're right, 364 is too

7    big to be in the binder.

8              MR. KINGSTON:  Yes, Your Honor.

9              THE COURT:  All right.  So what is the objection

10   to these?

11             MR. ROSS:  First, Your Honor, forgive me for this,

12   but I need to ask Mr. Kingston a question.  Because we don't

13   have 364, just as the Court does not appear to.  And we had

14   sent them an email earlier saying is 364A and B the same as

15   364.  I understand it's not.  Is this a box of some 15,000

16   pages, Mr. Kingston?

17             MR. KINGSTON:  No.  Your Honor, do you mind if I

18   respond directly to Mr. Ross?

19             THE COURT:  That's fine.

20             MR. KINGSTON:  Okay.  It is not.  364A and 364B

21   are the product of somebody, and I think in this case the

22   somebody was me, scrolling through the spreadsheet that was

23   provided electronically as Exhibit 364 and just taking

24   screenshots of various portions of the spreadsheet.  364A is

25   the product of the same exercise, but it's doing the same

1     thing with a pivot table that was created at the front of

2     Exhibit 364.  All of the data is data that's stored on the

3     Federal Communications Commission's website and can be

4     accessed through uniform record locators that we're happy to

5     provide to the Court and our friends at the other table.

6             MR. ROSS:  Your Honor, I don't have a problem with

7     364, but I do have a problem with A and B.  They are not

8     representative of anything in 364.  Somebody randomly

9     scrolled through.  The witness yesterday said he didn't

10    recognize them and they didn't seem to make sense.  So let's

11    put in the actual documents in full.  It seems like a waste

12    of space, but let's put them in full and leave out the

13    random screenshots that somebody picked out, which could

14    easily be misrepresented in a record on appeal.

15            THE COURT:  I think, Mr. Kingston, if we have 364

16    in, it's the entire universe.  And then if you want to point

17    out particular pages of it or entries of it, you can do

18    that.

19            MR. KINGSTON:  Your Honor's point is well taken,

20    and that's fine with Defendants.

21            THE COURT:  Okay.  And as far as how this -- I'm

22    not sure I have 364.  It's certainly not something that I

23    reviewed before yesterday.  And so can you just double check

24    to make sure that it's actually been transmitted?

25            MR. KINGSTON:  Yes, Your Honor.  I'll do that as

1   soon as this hearing breaks.

2            THE COURT:  And then as far as -- again, this is

3   somewhat similar to the issue with the 200-plus petitions.

4   I would think that the parties would be able to agree, and I

5   would think that the district court and/or the court of

6   appeals would appreciate this, that when the record is

7   transmitted, it could be transmitted with regard to this

8   information just with the link to the site so that if they

9   want to review it, they can, as opposed to a paper record.

10            MR. KINGSTON:  Your Honor's point is well taken.

11   And I believe that given that it's a publication from a

12   federal website, my suspicion is that we could probably end

13   up leaving 364 out of the record and accomplish at least

14   what I think we'd like to -- make the points we'd like to

15   make through judicial notice, which I'm happy to do.

16            THE COURT:  Okay.  So as with the last ones, you

17   can just identify how to access this information on the FCC

18   website, and that will be -- when people turn to the

19   exhibit, that's what it will say.

20            MR. KINGSTON:  That's fine with us.  And with that

21   understanding I guess -- I don't know that the Court has

22   admitted -- you can't have admitted it until we provide it

23   to you, but we won't move to admit 364 until we've maybe

24   figured out a way to do that that doesn't involve a giant

25   Excel spreadsheet.

1           THE COURT:  All right.  But I conclude it's

2     admissible.

3           MR. KINGSTON:  Okay.

4           THE COURT:  And I don't think there's any

5     objection to it.  Just confirming that -- all you need to do

6     is confirm to Mr. Ross that when you type in the website

7     address, this is what comes up.

8           MR. KINGSTON:  We'll do that, Your Honor.

9           THE COURT:  Okay.  So I think that resolves the

10    issue of the admission of all of Charter's exhibits that

11    hadn't previously been admitted.

12          And then, Mr. Ross, you said you had something

13    else that you wanted to clarify before we got to the process

14    of the initial discovery and --

15          MR. ROSS:  Yes, Your Honor, just briefly.  And let

16    me start by saying not attempting here to relitigate

17    anything decided yesterday.  But during the course of the

18    discussion yesterday, it seemed as if it had been -- and

19    perhaps I should have been more diligent.  The spreadsheet

20    that was provided for the $4 million figure, Your Honor,

21    which was prepared by Mr. Auman, there may have been an

22    inference gathered that nothing like that had ever been

23    produced during discovery.

24          In fact, it was pointed out to me afterwards by

25    one of my colleagues that we had produced that same

1    spreadsheet in its initial form in October before the close

2    of discovery, obviously not with the final numbers.  And

3    that was available for deposition of Mr. Jarosz, who relied

4    upon it in one of his footnotes, or mentioned it in one of

5    his footnotes.

6              And so, again, not relitigating anything from

7    yesterday, not re-arguing anything from yesterday.  I want

8    the record to be clear that we did not simply ignore all

9    production during the pre-close discovery on that issue.

10   And that's all, Your Honor.

11             THE COURT:  All right.  Do you agree that some

12   version of this spreadsheet was produced during the

13   discovery period, Mr. Kingston?

14             MR. KINGSTON:  Your Honor, there was a spreadsheet

15   that was connected to Mr. Jarosz's report that included a

16   forecast that looked a lot like the spreadsheet that was

17   produced to us.  But I understand the spreadsheet that was

18   produced to us this week wasn't a forecast, it was actual

19   numbers.  And my understanding is -- I'm not an Excel

20   expert, but I think the formulas that would be relevant to a

21   forecast are different than the formula that would be

22   relevant for actual numbers.

23             And so I think the spreadsheets, it does look the

24   same.  But I think the Court talked about the difference

25   between a forecast and then actual numbers yesterday,

1    although I will admit that that was more Mr. Nepple's issue

2    than mine.

3              THE COURT:  Okay.  But I think that doe highlight

4    though that the area for questioning about it is probably

5    more narrow than I thought it would be.  Not that it

6    eliminates the need to do it, but that it would be more

7    narrow than I thought it would have to be.  Okay.

8              So I did get your emails also about the request

9    for production and interrogatories as well as timing here.

10   I don't know if they've been -- well, you did further narrow

11   it down a bit, because I got Mr. Kingston's second email

12   regarding this where he said that certain requests for

13   production were withdrawn, paragraph 4, paragraph 8, and I

14   believe also one or more of the interrogatories was

15   withdrawn.  But why don't we go through what's left?

16             Let me start with the proper time to depose Mr.

17   Auman.  Maybe there's no disagreement about this.  It seems

18   to me that his supplemental deposition should be after the

19   document production, not before.  Is there any disagreement

20   about that?

21             MR. ROSS:  No, Your Honor.  And that's what we

22   proposed yesterday afternoon, is that we'll -- as soon as we

23   have the decision today as to what it should be, we've got

24   people waiting to pull them, get them copied, Bates stamped

25   overnight, start producing them first thing tomorrow

1    morning, have the deposition Friday afternoon.

2              THE COURT:  All right.

3              MR. NEPPLE:  Judge, Mike Nepple from the

4    Defendants.  Obviously, it depends upon the volume that is

5    produced.  But yes, I think we should get our documents

6    first before we take the deposition.

7              THE COURT:  Okay.  Well, I guess you won't know

8    until you see what they are.  Friday isn't very far away.

9    But if they're not voluminous, I guess that makes sense.  If

10   they are or if they raise issues that third parties need to

11   be involved in, maybe, maybe not.  I don't know if there's

12   anything more to say on that.

13             Have you gotten a date from Ms. Li for coming back

14   with Mr. Auman?

15             MR. ROSS:  She is proposing Monday morning, the

16   sixth of May -- Monday morning -- sorry, Your Honor,

17   Wednesday the sixth.

18             THE COURT:  Okay.  All right.  Did she give you

19   any dates, you know, not weeks after that, but shortly after

20   that just as a fallback in case Friday doesn't work?

21             MR. ROSS:  No, Your Honor.  And she said she had

22   to -- well, Mr. Li is very competent, so I hope this -- she

23   said she moved heaven and earth to open up that time and

24   pointed out that, as we should have already known, the next

25   day you have the Uniti -- the Windstream --

1           THE COURT:  The Windstream.  Yeah.  Part of this -

2  - I'm being a little selfish.  I had hoped to have a little

3  time to prepare for the Windstream-Uniti settlement that's

4  coming up the seventh.  But if she gave you the sixth...

5           MR. ROSS:  She also put in a hard stop on the

6  sixth, Your Honor.  And she made it very clear that you

7  needed after 2:00, I think it was, to work on other things,

8  which I assume --

9           THE COURT:  Okay.  All right.  So let's try to

10  work for that and see where -- again, Mr. Nepple, I

11  understand if, you know -- I think both of you know it when

12  you see it if it would make sense to delay Friday.  But I

13  think you should plan on Friday for now.

14           So then as far as the document requests are

15  concerned, which are the ones at this point that are not

16  agreed?

17           MR. NEPPLE:  Judge, Mike Nepple for the Charter

18  defendants, for the record.  After the withdrawals we are at

19  one, two, three, five, six, nine.  So we're dealing with six

20  requests for production.

21           THE COURT:  And which ones aren't agreed?

22           MR. NEPPLE:  Correct.  One, two, three, five, six,

23  nine, Your Honor.

24           THE COURT:  Those are not agreed?

25           MR. NEPPLE:  That's correct.

1           THE COURT:  One, two, three, five, six, nine.

2     Okay. And I guess the one of those that jumped out to me was

3     six, but I'm happy to hear Mr. Ross on all of them.

4           MR. ROSS:  I agree with you on number six, Your

5     Honor.  Our preliminary calculation is that this would be in

6     excess, minimum 500,000 pages of documents --

7           THE COURT:  I'm sorry, this meaning which -- let's

8     --

9           MR. ROSS:  Number six, the one that you said

10    jumped out at you.

11          THE COURT:  Okay.  But I was going to suggest we

12    do them in order.

13          MR. ROSS:  Oh, okay.  I'm sorry, Your Honor.  I

14    thought you --

15          THE COURT:  Let's do one first.

16    MR. ROSS:  So the first problem with -- and it's a problem

17    shared by all these -- is that word, "all".  That requires

18    me to hire an email vendor -- a discovery vendor to come in

19    and search all emails as you would at the start of a case.

20    Typically on a supplemental production like this, the

21    phraseology that's acceptable to the Court is documents

22    sufficient to show.  Not all documents.  And so my first

23    objection is that all of these should say -- should be

24    amended to say documents sufficient to show, then here,

25    support for the testimony, blah, blah, blah.

1          THE COURT:  Okay.  Are there other objections to

2    this besides that on --

3          MR. ROSS:  My understanding of this one is simply

4    that they want -- this is what you actually said they should

5    get, which is the backup for that chart.  And that, we

6    intend to give them the backup for that chart.

7          THE COURT:  Okay.  And for two?

8          MR. ROSS:  So, again, the same, to the all

9    documents.  The real problem here is -- and I've already

10   identified this to the defendants, so there's no surprise

11   that other than a handful of things like travel records,

12   which makes no sense spending time producing, everything is

13   privileged.  They don't keep timesheets in the way we do

14   that can be carefully redacted.

15          This record was produced based on the email

16   reports of past work by them made and how they were doing

17   the work and other stuff that's highly privileged and would

18   take forever to redact, other than a handful of things like

19   travel records.  We could also call Mr. Kingston as a

20   witness, since he was at some of these depositions that

21   we're claiming time and saw Mr. Smith there present, if he

22   would prefer that.

23          THE COURT:  Well, if they don't produce time

24   records, how do you compile the 1,900 hours?

25          MR. ROSS:  A good example is, he -- Mr. Smith, one

1    of the lawyers, in-house lawyers attended the deposition of

2    Mr. Auman and was there the day before to help prepare him.

3    So he has whatever number -- I'm making this up -- 8, 10

4    hours for each of those days.

5              Did an email back to his boss reporting on it, so

6    a paralegal -- at the time, shortly after it happened, then

7    paralegal went through and pulled all those records and

8    looked and say, okay, he spent eight hours at the deposition

9    of Mr. Auman and 10 hours the day before preparing him.  I

10   don't know how you would get much better than that.

11             THE COURT:  Are those pulls still in hand?

12             MR. ROSS:  I don't think they were pulled, if you

13   mean by printed out.  These are online.

14             THE COURT:  But, I mean, would they be easy enough

15   to identify?

16             MR. ROSS:  They're all privileged.

17             THE COURT:  No, I -- leave aside that for the

18   moment.

19             MR. ROSS:  If we put in enough time, we could

20   probably do that.  Yes, Your Honor.  But again, we have

21   until -- a few days to do this.  This is a very

22   straightforward proposition.

23             THE COURT:  Well, this isn't really a lot to deal

24   with for Mr. Auman.  This is just to show that there really

25   was someone who went through these items.

1              MR. ROSS:  And he can testify to that.  He's

2     already -- he's already prepared to testify to that.

3              THE COURT:  He, who?

4              MR. ROSS:  Mr. Auman.

5              THE COURT:  Okay.  And what about three?

6              MR. ROSS:  I believe this is another variant of

7     number two, but I may be wrong.

8              THE COURT:  Well, can I -- let me just, as far as

9     the privilege issue, I guess I'm still a little confused.  A

10    paralegal went through these folks' emails where they

11    reported to someone, I guess their boss, what they were

12    doing that day.  Do they say more than attended deposition?

13             MR. ROSS:  Yes, Your Honor.  It wasn't an attempt

14    to keep track of time, per se.  It was an attempt to

15    substantively report on tasks being performed.

16             THE COURT:  So it would be a report on the

17    deposition.

18             MR. ROSS:  Well, tasks --

19             THE COURT:  Preparation for the deposition?

20             MR. ROSS:  -- yes.  Yes, Your Honor.  That

21    particular instance would be.

22             THE COURT:  Okay.

23             MR. ROSS:  So my understanding is two and three

24    are basically different ways of asking for the same

25    documents.

1          THE COURT:  Right.  I think I agree with you on

2   that point.

3          MR. ROSS:  Number four --

4          THE COURT:  And then --

5          MR. ROSS:  -- has been withdrawn.

6          THE COURT:  And then number five?

7          MR. ROSS:  Number five is easy to do.  We don't

8   believe there's a written direction, but Mr. Auman's

9   prepared to tell -- to state what he asked to be done on the

10  computer.

11         THE COURT:  Sorry, I didn't quite follow that.

12  What is he prepared to do?

13         MR. ROSS:  The gist is he picked up the phone and

14  called somebody and said, go into the database and get this

15  information, and he's prepared to testify to what he asked

16  for.

17         THE COURT:  What about the person who programmed

18  the computer for the information or the instructions to the

19  computer?

20         MR. ROSS:  He can testify to that.  There's no

21  record of -- we didn't take -- there wasn't a camera

22  overlooking the keyboard operator's shoulders recording a

23  photo of what was being entered, so there's no documents is

24  what I'm saying, Your Honor.

25         THE COURT:  And there's no record of the

1    instructions provided?

2              MR. ROSS:  The way it works is the computer would

3    call up from the database a number.  Person would look at

4    that, grab it, move it into a spreadsheet -- separately open

5    spreadsheet, and go back into the database, look for another

6    number, grab it, pull it into the spreadsheet.  It's just

7    the way business is run nowadays on the accounting side.

8              THE COURT:  No, but if I were that person, I

9    would've -- maybe they have a good memory, but I would've

10   wanted something to make sure I was doing it as told.

11   You're saying there was no --

12             MR. ROSS:  This was not complicated.

13             THE COURT:  There was no email to, you know, Joe

14   in accounting or administration to, this is what I want you

15   to do?

16             MR. ROSS:  My understanding, again, what I was

17   told is that there is not.  It was a telephone call.  We can

18   ask Mr. Auman again and if there's an email I'll produce the

19   email.  But this was not a complicate ask because the

20   spreadsheet had already been set up back in October.  It

21   was, could you please grab the customers in the Charter

22   exchanges.

23             THE COURT:  Okay.  And so that --

24             MR. ROSS:  Pull that --

25             THE COURT:  And actually, this is why what you

1    told me about the earlier version of the spreadsheet, I

2    guess, is relevant; although, at this point, it's not a

3    projection.  And then as -- and then on six?

4            MR. ROSS:  Six, as I started to say earlier, Your

5    Honor, our minimum estimate is that this is a half a million

6    pages of documents, each one of which will have to be

7    redacted for personally identifiable information because

8    these are customer names, addresses, in some cases check

9    numbers, in some cases credit card numbers.

10           I will also point out that this information was

11   never asked for in the original discovery of the case.  They

12   asked repeatedly for lost customers, but this is new add-on

13   customers which was not asked for and therefore it's sort of

14   like a new discovery round, which we don't think is

15   appropriate.  More particularly, this is unnecessary and as

16   the Federal Rules contemplate, it is not reasonably

17   tailored, not reasonably related to what actually is needed.

18           THE COURT:  Okay.  So, Mr. Nepple, let's go back

19   to number one.  Why does putting at the beginning of this

20   request instead of all documents the phrase, documents

21   sufficient to show --

22           MR. NEPPLE:  Judge -- again, Mike Nepple, for the

23   record.  Judge, I believe for both one and two, you can

24   handle it in that same group.  We know that some documents

25   must have been referenced to create the two exhibits that

1    are referenced -- that are referenced in both one and two.

2    Some documents had to have been referred to to create those

3    documents.  However the Court would like to define that

4    universe, this is what you ordered to be produced.  I used

5    all documents, not in the persuasive go run email searches,

6    Mr. Ross.

7              I went, what are the documents that you reviewed

8    to create the two.  That should be a limited universe.

9              THE COURT:  So let's handle it that way, then, for

10   one.  And then as for two, same way; although, we still have

11   the privilege issue, then.

12             MR. NEPPLE:  Judge, if I could address two, with

13   respect to the privilege issue.  There's two issues.  Again,

14   Mike Nepple for the record.  One is the salaries of the

15   people.  They have included in the document the first time

16   that they've asked for attorneys' fees, in the middle of

17   trial, an implied rate, an implied hourly rate.  I would

18   like to know what each of these employees are paid.  You

19   know, you said there's a phrase for Show-Me State of

20   Missouri.  I'm from Iowa.  The Show-Me State is pigs get

21   fat; hogs get slaughtered.  I want to know that each of

22   these people are actually paid because if they spend an hour

23   of time, the fair rate is whatever 1/2000th of their annual

24   salary.

25             THE COURT:  Okay, and that's not a privilege

1    issue.

2              MR. NEPPLE:  Okay.

3              THE COURT:  Okay.

4              MR. ROSS:  No, and we're happy, Your Honor --

5    that's an interrogatory.  We're happy to provide their

6    compensation.  However, I have to correct Mr. Nepple.  The

7    caselaw is voluminous on this.  The mechanism for

8    determining in-house rates for in-house legal expenses for

9    award is not a function of their salary.  It's, what does it

10   cost in that local marketplace.  What is the hourly rate for

11   an attorney in that local marketplace to do that same work?

12             THE COURT:  Well, I mean --

13             MR. ROSS:  But we're happy to provide those

14   salaries.

15             THE COURT:  I think you should provide that.

16             MR. ROSS:  Happy to provide it.

17             THE COURT:  Okay.  All right.  So we'll narrow it

18   down like that, Mr. Nepple?

19             MR. NEPPLE:  Yes, Your Honor.

20             THE COURT:  Okay.  And I think three is the same

21   as two.  I think they can be combined that way.

22             MR. NEPPLE:  Yes, Judge.  Again, Mike Nepple for

23   the record.  My understanding is there are no contemporary -

24   - contemporaneous billing time records, as in what I would

25   do here at the firm.  You know, I have to submit my time

1  within two days, but what is given to the Court is a

2  reconstruction months after the date and I understand what

3  the Court's ruling is with respect to that.

4           THE COURT:  Basically, how did you get there?

5           MR. NEPPLE:  Thank you.  Yep, exactly, Judge.

6           THE COURT:  Without necessarily all the emails

7  with the description of their legal work that they would

8  raise the privilege issues, and the billing -- and then

9  separately, their salaries and, I guess, the theory if there

10 was a basis to do this other than legal argument as to how

11 the imputed rate was derived, if there are document to deal

12 with that.

13          MR. NEPPLE:  Judge, Mike Nepple again for the

14 record.  No information is become or was submitted on what

15 is the relevant rate in the relevant market, so I don't have

16 an ability to challenge that, so it hasn't been produced and

17 --

18          THE COURT:  So that would be part of this.  That's

19 part of the documents that are covered by this instruction.

20          MR. NEPPLE:  Thank you, Judge.

21          THE COURT:  Okay.  So then as far as five goes, I

22 think, actually, the fact that the projection was provided,

23 the projected chart did give the opportunity to ask some of

24 this already, I think what you really want to get into is

25 the instructions given for this chart to create the Appendix

1    3 chart.

2              MR. NEPPLE:  Yes, Judge.

3              THE COURT:  It's represented that this is oral.  I

4    think maybe you back that up with an interrogatory.  I don't

5    know, just confirming that there's nothing else.  I don't

6    know how else you deal with this.  I mean, if you're being

7    told it's just oral.

8              MR. ROSS:  the witness will say the same thing,

9    Your Honor, so we don't need an interrogatory.  Just ask the

10   witness.  I'll ask him myself and if there is some stray

11   email, we'll produce it in response.  Otherwise, they can

12   just ask the witness, what did you --

13             THE COURT:  Right.

14             MR. ROSS:  -- orally know --

15             THE COURT:  I think you need to ask, in addition

16   to the witness, you need to ask the person that he

17   instructed to do this.

18             MR. ROSS:  Okay.  We will do that, Your Honor.

19             THE COURT:  And make sure that that person didn't

20   have notes, didn't take down what he was told, and I guess

21   what I was thinking of as an interrogatory answer is to have

22   that person say what he did.  You're right, Mr. Auman will

23   say what he told that person to do and -- but if that person

24   just basically doesn't have anything written as to what he

25   did, he probably should answer an interrogatory saying what

1    he did.

2           MR. NEPPLE:  Judge, again, Mike Nepple, for the

3    record.  There has to be either some inbound communication

4    or some outbound communication from the person that was

5    asked, so we'd like, obviously, the name of the person that

6    was asked -- tasked with this information, this request, and

7    if Mr. Auman doesn't know, which is what I understand from

8    my discussions with Mr. Ross at the meet and confer, we'd

9    like an opportunity to either get an interrogatory answer

10   first from that person and if that's insufficient, to take

11   that person's depo.

12          It's a 15-minute depo.  What were you asked to do?

13   When did you provide it?  When was the outbound traffic?

14          THE COURT:  All right.  I would start with an

15   interrogatory answer and see if you need to even do anything

16   else besides that.

17          MR. NEPPLE:  Thank you, Judge.  Appreciate it.

18          THE COURT:  Okay.  And then, as I said, six seemed

19   to be not really on point, here.

20          MR. NEPPLE:  Judge, if I could address it again.

21   Mr. Nepple for the record.  Whatever form it comes in, I

22   don't care.  I don't know how they keep their records, all

23   right.  What I'm asking for is what has been represented to

24   Charter is that Windstream was required to issue discounts

25   in Charter exchanges and that there were 12,000 of them.

1          There has to be some way to get me the information

2     that I can test that discounts were actually applied,

3     actually given.  There were 12,000 of them and they were to

4     people in Charter exchanges.  I --

5          THE COURT:  Okay --

6          MR. NEPPLE:  I phrased it how I thought --

7          THE COURT:  I think that's -- I understand what

8     you're looking for.  I would think there probably is some

9     reporting after the fact as to what was offered, a summary.

10    I mean --

11         MR. ROSS:  I don't think --

12         THE COURT:  I would hope that there would be,

13    like, an execution report.

14         MR. ROSS:  Your Honor, I think you're proceeding

15    from a false assumption.  What would happen is that there

16    would be an entry in the database.  This really -- first,

17    Mr. Nepple -- what Mr. Nepple just asked for isn't in six.

18    Not --

19         THE COURT:  No, six is much broader.  I --

20         MR. ROSS:  No, but --

21         THE COURT:  -- trying to get a sense of what he

22    was --

23         MR. ROSS:  -- it's not even -- what he asked for

24    is not even encompassed within six as a subset.  What he's

25    asking for, I think, is document request nine, but I may be

1  wrong on that.

2          THE COURT:  Well, that's really a decision as -- I

3  mean, that's the decision.  That's before it's done as

4  opposed to after it's done.

5          MR. ROSS:  So after the fact, Your Honor, there's

6  just bits and bytes that, you know, there are entries made

7  that such-and-such a discount was given and you collect that

8  as a total because that's all that matters is they don't

9  care whether Jane Smith bought the discount or not.  They

10  want to know how many bought it, what's the hit on our

11  budget.

12          THE COURT:  Right, but isn't there some internal

13  accounting that would reflect that, how many took it?

14          MR. ROSS:  You have it in the exhibit we've

15  already provided.  It says exactly how many took it, month

16  by month.

17          THE COURT:  And how is that derived?  How do they

18  know --

19          MR. ROSS:  You ask --

20          THE COURT:  How do you all know how to get that?

21          MR. ROSS:  So you ask the computer in the Charter

22  exchanges, which are pre-coded and built into the database,

23  who accepted the pre-coded offer which is built into the

24  database.

25          THE COURT:  So that's really --

1            MR. ROSS:  That's the number.

2            THE COURT:  So that's really part of the response

3    to five, you're saying?

4            MR. ROSS:  Correct.

5            THE COURT:  Okay.

6            MR. NEPPLE:  And, Judge, again, Mike Nepple for

7    the record.  What I've been provided is a one-piece --

8            THE COURT:  I know, but if you get the response to

9    five, you should know how that's actually being done.

10           MR. NEPPLE:  I should know and I should be

11   entitled to that they're actually in Charter markets.  All I

12   have to tell me that it's Charter market is a word that says

13   Charter market.

14           THE COURT:  Right.

15           MR. NEPPLE:  He just said --

16           THE COURT:  But again, the response to five should

17   show you how they -- how Windstream determined that.

18           MR. NEPPLE:  That's fine, Judge, subject to -- I

19   could take a look at that.  That's fine, Your Honor.

20           THE COURT:  Okay.  All right.  And then, so then

21   nine is all documents related to plaintiff's decision to

22   offer.  So what is the objection to this one?  This would

23   seem to me to be a fairly small universe.

24           MR. ROSS:  Again, because of the words all

25   documents, it's not.  If people wrote back and forth emails,

1   hey, come to this meeting about this, et cetera, et cetera.

2   What I offered to produce during the meet and confer was to

3   go back and look because often, the way these decisions get

4   made, there's a meeting with a PowerPoint presentation,

5   right, Your Honor, and then everybody talks about it.

6           So I offered to go back and see if there was such

7   a PowerPoint presentation and produce that and then he could

8   ask the witness, what was the discussion around that.  But

9   to ask for every email again delays this trial for three

10  months, which is not -- it should not happen.

11          MR. NEPPLE:  Judge, Mike Nepple again, for the

12  record.  We discussed this, Mr. Ross, in the meet and confer

13  and what I said specifically in the meet and confer is this

14  has to be less than a handful of documents.  Somebody went

15  to Auman and said, hey, we should offer this and here's why.

16  It's either a finance guy or a it's a business strategy guy

17  or it's a marketing guy and it's a PowerPoint presentation.

18  I didn't -- he doesn't need to go through millions of

19  emails.

20          It's got to be a handful of documents.  We need to

21  do this and let's do this and this is the business

22  justification for why.  It has to be 20 documents or less.

23          MR. ROSS:  I'm happy to do that, but he should've

24  written a request.  If you look at his definition of all

25  documents, it's starts --

1    THE COURT: All right.

2    MR. ROSS: -- all emails.

3    THE COURT: You can modify that initial clause,

4  again --

5    MR. NEPPLE: Thank you, Judge.

6    THE COURT: -- so it's not all documents.

7    MR. NEPPLE: Thank you, Judge.

8    THE COURT: Okay. All right. So I think we've

9  covered the document requests. And then as far as the

10  interrogatories are concerned, we've added an interrogatory

11  and I -- so which are the ones on Page 6 and 7 that are

12  remaining that are objected to?

13    MR. NEPPLE: Judge, Mike Nepple from the record.

14  During the meet and confer, Mr. Ross said that they weren't

15  going to answer any of the five interrogatories because it

16  was excess work and it wasn't within the scope of your order

17  yesterday. For the reasons we've all discussed already with

18  respect to the document request, each of these

19  interrogatories asks what we've just been talking about for

20  the last 15 minutes. Interrogatory --

21    THE COURT: Okay, well I think, one, you are going

22  to provide, right, the salary?

23    MR. ROSS: I agreed to do that already.

24    THE COURT: Okay.

25    MR. ROSS: I don't know why he would make the

1    representation he did just --

2              THE COURT:  All right.  And then --

3              MR. ROSS:  We've already agreed to one.

4              THE COURT:  -- two, identify the individual, I

5    think that's part of answering the -- I mean, that's part of

6    the new interrogatory on five, right?

7              MR. NEPPLE:  I think that would accompany, Your

8    Honor.

9              THE COURT:  Okay.  So we'll deal with it that way

10   as we've already discussed.  I had an issue with three.

11   First of all, you're going to get the documents.  I don't

12   know whether you need -- why you need an interrogatory, too.

13             MR. NEPPLE:  I didn't know if I was going to get

14   the documents, Judge.

15             THE COURT:  Okay.

16             MR. NEPPLE:  If I get --

17             THE COURT:  So I think the documents should

18   suffice here, along with your opportunity to question Mr.

19   Auman, so I think three should come out.

20             MR. NEPPLE:  Thank you, Judge.

21             THE COURT:  And probably four is the same way,

22   too.  I mean, again, you have the documents from nine, the

23   document request, and you can question Mr. Auman about

24   those.

25             MR. NEPPLE:  That's fine, if I get the documents,

1    Judge, that's fine with Charter.

2             THE COURT:  Okay.  And then five, I'm not quite

3    sure what...

4             MR. NEPPLE:  If I could briefly touch on that,

5    Judge.  Again, Mike Nepple for the record.  What we are

6    learning here is that Windstream has offered discounts in

7    Charter exchanges.  They also offered discounts in non-

8    Charter exchanges.  They've offered the same discount

9    universally, right, so it's not just the Charter exchanges.

10   So I want to know, it's a simple question, how many

11   prospective customers or customers did you offer discounts

12   to because I think I'm entitled to test the issue.

13            What they're essentially doing is saying, even

14   though we're six months or even later and outside the scope

15   of what their own expert says the impact of the

16   advertisement in February -- or in March of 2019, they're

17   offering discounts in January.  Outside of their own

18   experts, they're saying we need to offer these because of

19   how bad Charter impacted us.  Well, that's undercut if

20   they're offering the exact same discounts to other people

21   who are non-Charter exchanges.  They're trying to shift the

22   cost of doing business from their --

23            THE COURT:  But that's --

24            MR. NEPPLE:  -- Charter.

25            THE COURT:  That's fine, but isn't that a question

1    you'd ask Mr. Auman and you have the materials for the

2    discount program to help ask him that?  I got to say, I'm --

3    unless it really narrows issues, I'm just not a big fan of

4    interrogatories, because I don't think it really -- they

5    don't really help that much.  So, as long as you're getting

6    those documents from the document production, I don't think

7    -- there's no reason to put someone down to writing an essay

8    on this.

9              MR. NEPPLE:  Judge -- again, Mike Nepple for the

10   record.  I'm fine with that -- interrogatories are written

11   by attorneys and they're generally worthless anyway -- as

12   long as Mr. Auman comes prepared to the depo to answer that

13   question.  If I go in there and he says, I don't know how

14   many people --

15             THE COURT:  Well, that's the thing.  I mean,

16   whatever he -- he knows you're going to ask the question.

17             MR. NEPPLE:  Yep.

18             THE COURT:  If he says no, I don't have a clue,

19   then that says something, too.  So I think we can leave it

20   at that --

21             MR. NEPPLE:  Thank you, Judge.

22             THE COURT:  -- and take out four and five, then.

23   And I don't know, was there an issue with the request for

24   admission?

25             MR. ROSS:  No, that's been withdrawn, Your Honor.

1          THE COURT:  Right.  I thought that's right.  So --

2          MR. ROSS:  That's correct.

3          THE COURT:  I think we've narrowed down the

4    discovery on that and I don't know if someone from your

5    office, Mr. Ross, has been listening, but they can now get

6    to work on providing that stuff.

7          MR. ROSS:  Thank you, Your Honor.  I hope someone

8    was listening, also.

9          THE COURT:  Okay.  And they do, too.

10          MR. ROSS:  My people are pretty well trained and

11    they're wonderful, so I'm pretty sure --

12          THE COURT:  Okay.

13          MR. ROSS:  -- they were.

14          THE COURT:  All right, very well.  All right.

15    anything else?

16          MR. ROSS:  No, that's it, Your Honor.

17          THE COURT:  Okay --

18          MR. NEPPLE:  No, Judge.

19          THE COURT:  Thank you.  thank you both.

20          MR. NEPPLE:  Thank you, Judge.

21          THE COURT:  I would ask you to let chambers and

22    Ms. Li know as soon as you can just to confirm that we're

23    going on on the 6th or, alternatively, you know, if there's

24    some issue about that, either where there's an agreement or

25    there's a disagreement on whether we're doing that, but

1    hopefully there won't be.

2                MR. NEPPLE:  Thank you, Judge.

3                MR. ROSS:  We're planning on going on the 6th,

4    Your Honor.  We're fine with that.  Thank you.

5                THE COURT:  Okay, thank you.  Okay, I'm going to

6    shut this, then.  All right, fine.  Anyway, that's the end

7    of our transcript.

8                (Whereupon these proceedings were concluded at

9    3:06 PM)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T I O N

2

3        I, Sonya Ledanski Hyde, certified that the foregoing

4    transcript is a true and accurate record of the proceedings.

5

6

7

8    Sonya Ledanski Hyde

9

10

11

12

13

14

15

16

17

18

19

20    Veritext Legal Solutions

21    330 Old Country Road

22    Suite 300

23    Mineola, NY 11501

24

25    Date:  May 1, 2020

| **1** | |
|---|---|
| **1** 46:25 | |
| **1,900** 25:24 | |
| **1/2000th** 31:23 | |
| **10** 26:3,9 | |
| **10019** 5:4 | |
| **10022** 4:6 | |
| **10601** 2:3 | |
| **11** 14:11 | |
| **110** 8:15,16,18 9:7 | |
|   10:3,18,24 11:16 | |
|   12:23 13:2 14:10 | |
| **11501** 46:23 | |
| **12,000** 35:25 36:3 | |
| **127** 8:5 | |
| **128** 8:5 | |
| **130** 8:5 | |
| **13th** 10:17 | |
| **146** 8:5,19 | |
| **15** 8:4 35:12 40:20 | |
| **15,000** 16:15 | |
| **158** 14:10,14 15:4 | |
| **17** 8:4 | |
| **18** 10:5 | |
| **185** 8:5 14:10 | |
| **19-08246** 1:4 3:1 | |
| **19-22312** 1:3 | |
| **1:40** 6:17 | |

| **2** | |
|---|---|
| **20** 39:22 | |
| **200** 18:3 | |
| **2019** 42:16 | |
| **2020** 2:5 46:25 | |
| **22** 10:5,23 | |
| **23** 7:21 | |
| **248** 2:2 | |
| **25** 7:21 | |
| **250** 5:3 | |
| **252** 8:5 14:10 | |
| **26** 8:4 | |
| **27** 8:4 | |
| **2700** 4:19 | |

| **29** 2:5 |
|---|
| **2:00** 23:7 |
| **2:09** 2:6 |

| **3** | |
|---|---|
| **3** 34:1 | |
| **30** 7:21 | |
| **300** 2:2 46:22 | |
| **309** 8:5 14:10 | |
| **31** 7:21 | |
| **330** 46:21 | |
| **362** 14:10,14 15:4 | |
| **364** 15:9,17,21,23 | |
|   15:25 16:6,13,15 | |
|   16:23 17:2,7,8,15 | |
|   17:22 18:13,23 | |
| **364a** 15:9,19 | |
|   16:14,20,24 | |
| **364b** 15:10,19 | |
|   16:20 | |
| **38** 7:21 | |
| **39** 7:21 | |
| **3:06** 45:9 | |

| **4** | |
|---|---|
| **4** 19:20 21:13 | |
| **477** 15:12 | |

| **5** | |
|---|---|
| **5** 8:21 | |
| **500,000** 24:6 | |
| **55th** 5:3 | |
| **575** 4:5 | |

| **6** | |
|---|---|
| **6** 40:11 | |
| **63101** 4:13,20 | |
| **6th** 44:23 45:3 | |

| **7** | |
|---|---|
| **7** 40:11 | |
| **74** 8:11 | |
| **77** 8:4 | |
| **78** 8:5 | |

| **8** | |
|---|---|
| **8** 21:13 26:3 | |
| **800,000** 8:16 | |
|   10:17 | |
| **84** 8:5 | |
| **87** 8:15 9:4,5,9 | |

| **a** | |
|---|---|
| **ability** 33:16 | |
| **able** 18:4 | |
| **acceptable** 24:21 | |
| **accepted** 37:23 | |
| **access** 18:17 | |
| **accessed** 17:4 | |
| **accompany** 41:7 | |
| **accomplish** 18:13 | |
| **accounting** 29:7 | |
|   29:14 37:13 | |
| **accurate** 9:19 | |
|   10:2 46:4 | |
| **action** 14:12 | |
| **actual** 11:6 17:11 | |
|   20:18,22,25 | |
| **add** 30:12 | |
| **added** 40:10 | |
| **addition** 34:15 | |
| **address** 19:7 | |
|   31:12 35:20 | |
| **addresses** 30:8 | |
| **administerial** 7:3 | |
| **administration** | |
|   29:14 | |
| **admissibility** 7:12 | |
| **admissible** 19:2 | |
| **admission** 6:11 | |
|   7:16,19 8:3 19:10 | |
|   43:24 | |
| **admit** 14:6 18:23 | |
|   21:1 | |
| **admitted** 6:12 8:1 | |
|   8:9,19 14:11 15:5 | |
|   18:22,22 19:11 | |
| **adv** 1:4 | |

| **adversary** 3:1 6:5 | |
|---|---|
| **advertisement** | |
|   42:16 | |
| **advertisements** | |
|   8:17 | |
| **advertising** 11:13 | |
|   12:13 | |
| **afternoon** 6:2,19 | |
|   21:22 22:1 | |
| **agenda** 6:21 | |
| **agree** 18:4 20:11 | |
|   24:4 28:1 | |
| **agreed** 6:21,22 | |
|   23:16,21,24 40:23 | |
|   41:3 | |
| **agreement** 6:7,15 | |
|   7:12 44:24 | |
| **agrees** 13:11 | |
| **ahead** 7:11 | |
| **al** 1:12,15 3:2,3 | |
| **allowed** 9:15 | |
| **alternatively** | |
|   44:23 | |
| **amended** 24:24 | |
| **amount** 6:14 | |
| **annual** 31:23 | |
| **answer** 12:6,11,12 | |
|   12:14,15 13:10 | |
|   34:21,25 35:9,15 | |
|   40:15 43:12 | |
| **answering** 41:5 | |
| **anyway** 11:9 | |
|   43:11 45:6 | |
| **appeal** 14:24,24 | |
|   17:14 | |
| **appeals** 18:6 | |
| **appear** 7:8 16:13 | |
| **appearing** 5:8 | |
| **appears** 12:19 | |
| **appendix** 33:25 | |
| **applied** 36:2 | |
| **appreciate** 18:6 | |
|   35:17 | |

approach 15:7
appropriate
  11:15 30:15
approval 6:23
approximately
  8:16
april 2:5
area 21:4
arguing 20:7
argument 33:10
aside 26:17
asked 28:9,15
  30:11,12,13 31:16
  35:5,6,12 36:17
  36:23
asking 27:24
  35:23 36:25
asks 40:19
assume 13:22
  23:8
assuming 15:3
assumption 36:15
atkinson 10:7
attached 13:20
attempt 27:13,14
attempted 11:5
attempting 19:16
attended 26:1
  27:12
attorney 4:18
  32:11
attorneys 4:4,11
  5:2 43:11
attorneys' 31:16
auman 7:14,16
  19:21 21:17 22:14
  26:2,9,24 27:4
  29:18 34:22 35:7
  39:15 41:19,23
  43:1,12
auman's 6:10
  7:17

auman's 28:8
available 20:3
avenue 4:5
award 32:9

**b**

b 2:21 16:14 17:7
back 10:24 11:3
  11:22 12:7 13:9
  22:13 26:5 29:5
  29:20 30:18 34:4
  38:25 39:3,6
backup 15:24
  25:5,6
bad 42:19
bank 4:12,19
bankruptcy 1:1
  2:1,23
based 25:15
basically 8:14
  27:24 33:4 34:24
basis 33:10
bates 21:24
beginning 30:19
believe 9:13 10:2
  11:1,19 12:16
  18:11 21:14 27:6
  28:8 30:23
best 8:23 9:1 11:9
  12:17,19
better 26:10
big 16:7 43:3
billing 32:24 33:8
binder 15:16,22
  16:3,7
bit 21:11
bits 37:6
blah 24:25,25,25
boss 26:5 27:11
bottom 13:6
bought 37:9,10
box 16:15
break 11:11

breaks 18:1
brian 5:10
briefly 6:21 19:15
  42:4
brings 10:24
broader 36:19
budget 37:11
built 37:22,23
burden 14:21,22
business 29:7
  39:16,21 42:22
bytes 37:6

**c**

c 4:1 6:1 46:1,1
calculation 24:5
call 25:19 29:3,17
called 28:14
camera 28:21
campaign 10:8
  12:13
card 30:9
care 35:22 37:9
careful 12:25
carefully 25:14
case 1:3,4 16:21
  22:20 24:19 30:11
caselaw 32:7
cases 30:8,9
certain 6:24 7:1
  21:12
certainly 17:22
certified 46:3
cetera 39:1,1
challenge 33:16
chambers 44:21
chance 6:13
chapter 14:11
charge 10:7
chart 25:5,6 33:23
  33:25 34:1
charter 1:15 3:2
  4:11,18 6:4 8:20
  10:9,17 11:12,25

12:16 13:9,12
  15:13 23:17 29:21
  35:24,25 36:4
  37:21 38:11,12,13
  42:1,7,8,9,19,21
  42:24
charter's 6:12
  19:10
check 17:23 30:8
checking 12:23
chunk 8:15
chunks 8:14
circuit 14:24
claiming 25:21
clarify 19:13
clause 40:3
clear 6:15 20:8
  23:6
clerk 14:22
close 20:1,9
clue 43:18
coburn 4:10,17
coded 37:22,23
colleagues 19:25
collect 37:7
combined 32:21
come 7:4 11:2
  12:3 24:18 39:1
  41:19
comes 19:7 35:21
  43:12
comfortable 15:6
coming 11:10
  22:13 23:4
commission's
  15:11 17:3
committee 5:2
communication
  8:20 35:3,4
communications
  1:15 3:2 4:11,18
  6:4 15:11 17:3

**compared** 11:15
  11:21
**compensation**
  32:6
**competed** 10:9
**competent** 22:22
**compile** 25:24
**completely** 6:15
**complicate** 29:19
**complicated**
  29:12
**computer** 28:10
  28:18,19 29:2
  37:21
**concerned** 23:15
  40:10
**concerning** 13:7
**conclude** 19:1
**concluded** 45:8
**confer** 6:7 35:8
  39:2,12,13 40:14
**confess** 6:16
**confirm** 19:6
  44:22
**confirming** 19:5
  34:5
**confused** 27:9
**connected** 20:15
**contemplate**
  30:16
**contemporaneous**
  32:24
**contemporary**
  32:23
**copied** 21:24
**copying** 12:2
**correct** 9:13,20
  10:10 11:15,24
  12:24 23:22,25
  32:6 38:4 44:2
**corrected** 10:19
**correction** 7:3

**cost** 32:10 42:22
**country** 46:21
**course** 19:17
**court** 1:1 2:1 6:2
  7:6,7,23,25 8:8,12
  8:22,25 9:4,8,18
  9:21 10:1,11,13
  10:20,21,25 11:11
  11:21 12:3,6,11
  12:21 13:1,5,8,15
  13:16,20,24 14:4
  14:8,14,16,23
  15:2,3,8,15,23
  16:3,6,9,13,19
  17:5,15,21 18:2,5
  18:5,16,21 19:1,4
  19:9 20:11,24
  21:3 22:2,7,18
  23:1,9,21,24 24:1
  24:7,11,15,21
  25:1,7,23 26:11
  26:14,17,23 27:3
  27:5,8,16,19,22
  28:1,4,6,11,17,25
  29:8,13,23,25
  30:18 31:3,9,25
  32:3,12,15,17,20
  33:1,4,6,18,21
  34:3,13,15,19
  35:14,18 36:5,7
  36:12,19,21 37:2
  37:12,17,20,25
  38:2,5,8,14,16,20
  40:1,3,6,8,21,24
  41:2,4,9,15,17,21
  42:2,23,25 43:15
  43:18,22 44:1,3,9
  44:12,14,17,19,21
  45:5
**court's** 10:14
**courthouse** 14:21
**court's** 33:3

**covered** 33:19
  40:9
**create** 30:25 31:2
  31:8 33:25
**created** 17:1
**credit** 30:9
**creditors** 5:2
**cross** 7:15 9:17
  12:22
**cumulative** 14:20
**customer** 11:6
  30:8
**customers** 9:1
  10:4,8 11:8,22
  12:13 29:21 30:12
  30:13 42:11,11

**d**

**d** 2:22 6:1
**data** 15:12 17:2,2
**database** 28:14
  29:3,5 36:16
  37:22,24
**date** 22:13 33:2
  46:25
**dates** 22:19
**day** 22:25 26:2,9
  27:12
**days** 26:4,21 33:1
**deal** 26:23 33:11
  34:6 41:9
**dealing** 23:19
**debtor** 1:10
**debtors** 6:4,20
**decided** 19:17
**decision** 21:23
  37:2,3 38:21
**decisions** 39:3
**defendant's** 7:20
  8:4,9,19 15:9
**defendants** 1:16
  6:5 7:15,18 8:2,10
  15:6 17:20 22:4
  23:18 25:10

**define** 31:3
**definition** 39:24
**delay** 23:12
**delays** 39:9
**depends** 22:4
**depo** 35:11,12
  43:12
**depose** 21:16
**deposition** 10:7
  20:3 21:18 22:1,6
  26:1,8 27:12,17
  27:19
**depositions** 25:20
**derived** 33:11
  37:17
**description** 33:7
**determine** 10:22
**determined** 38:17
**determining** 32:8
**didn't** 28:11,21
  34:19,20 39:18
  41:13
**difference** 20:24
**differences** 11:18
**different** 20:21
  27:24
**diligent** 19:19
**directed** 6:9
**direction** 10:15
  11:22 28:8
**directly** 16:18
**disagreement**
  21:17,19 44:25
**discount** 37:7,9
  42:8 43:2
**discounts** 35:24
  36:2 42:6,7,11,17
  42:20
**discovery** 6:8 7:4
  19:14,23 20:2,9
  20:13 24:18 30:11
  30:14 44:4

discuss 6:7 7:2
discussed 39:12
40:17 41:10
discussion 19:18
39:8
discussions 35:8
disputes 7:5
district 1:2 14:23
18:5
document 12:3
21:19 23:14 31:15
33:11 36:25 40:9
40:18 41:23 43:6
documents 17:11
22:5 24:6,21,22
24:24 25:9 27:25
28:23 30:6,20,20
30:24 31:2,3,5,7
33:19 38:21,25
39:14,20,22,25
40:6 41:11,14,17
41:22,25 43:6
doe 21:3
doesn't 34:24
35:7 39:18
doing 16:25 25:16
27:12 29:10 42:13
42:22 44:25
don't 25:13,23
26:10,12 28:7
30:14 33:15 34:4
34:5,9 35:22,22
36:11 37:8 40:25
41:11 43:4,5,6,13
43:18,23 44:4
double 17:23
doubt 13:21
drain 2:22 6:2
dropbox 13:22
duration 6:8

**e**

e 2:21,21 4:1,1 6:1
6:1 46:1
earlier 16:14 30:1
30:4
earth 22:23
easily 17:14
easy 26:14 28:7
ecro 2:25
effect 11:15
eight 7:9 26:8
either 11:25 35:3
35:9 39:16 44:24
electronically
16:23
eliminates 21:6
email 6:21 13:20
16:14 21:11 24:18
25:15 26:5 29:13
29:18,19 31:5
34:11 39:9
emails 6:13 7:8
21:8 24:19 27:10
33:6 38:25 39:19
40:2
employees 31:18
encompassed
36:24
ended 16:3
entered 10:15,16
28:23
entire 17:16
entitled 38:11
42:12
entries 17:17 37:6
entry 36:16
error 12:2
especially 12:4
essay 43:7
essence 9:18
essentially 42:13
estimate 30:5

et 1:12,15 3:2,3
39:1,1
everybody 39:5
evidence 6:24
8:23 9:1 12:20
exact 42:20
exactly 9:2 14:19
33:5 37:15
examination 7:15
examined 9:17
example 25:25
excel 15:18 18:25
20:19
excerpt 15:10
excess 24:6 40:16
exchanges 29:22
35:25 36:4 37:22
42:7,8,9,21
excluding 14:10
execution 36:13
exercise 16:25
exhibit 7:20 8:4
8:11,16,17,19 9:5
9:7 10:18 11:16
11:18 12:23 13:14
13:17 14:9 15:17
15:20,21,24 16:1
16:2,23 17:2
18:19 37:14
exhibits 6:12,24
7:1,8,16,19,25 8:3
8:8,9,13,15 14:10
14:18 15:4,9,19
15:20 19:10 30:25
expenses 32:8
expert 20:20
42:15
experts 42:18
explain 9:25 12:3
extent 15:5

**f**

f 2:21 46:1
face 10:5
fact 10:1 11:11
19:24 33:22 36:9
37:5
fair 6:14 31:23
fairly 38:23
fallback 22:20
false 36:15
fan 43:3
far 7:5 14:4 17:21
18:2 22:8 23:14
27:8 33:21 40:9
fat 31:21
fcc 18:17
february 42:16
federal 15:10 17:3
18:12 30:16
fees 31:16
felt 11:14
figure 19:20
figured 18:24
final 20:2
finance 39:16
find 13:13
fine 7:7 8:8 13:8
14:7 15:8 16:19
17:20 18:20 38:18
38:19 41:25 42:1
42:25 43:10 45:4
45:6
firm 32:25
first 6:8 7:5,14
8:15 11:3,4 14:20
16:11 21:25 22:6
24:15,16,22 31:15
35:10 36:16 41:11
five 7:21 23:19,22
24:1 28:6,7 33:21
38:3,9,16 40:15
41:6 42:2 43:22

**foerster** 5:1
**folks'** 27:10
**follow** 28:11
**following** 7:19 8:3
**footnotes** 20:4,5
**forecast** 20:16,18 20:21,25
**foregoing** 46:3
**forever** 25:18
**forgive** 16:11
**form** 15:3,12 20:1 35:21
**forma** 6:21
**formally** 6:25
**formula** 20:21
**formulas** 20:20
**forth** 38:25
**found** 11:18
**foundation** 9:11 9:16
**four** 7:20 28:3 41:21 43:22
**friday** 22:1,8,20 23:12,13
**friend** 10:21
**friends** 17:5
**front** 17:1
**full** 17:11,12
**function** 32:9
**further** 7:10 8:2 21:10

**g**

**g** 6:1
**gathered** 19:22
**generally** 6:9 43:11
**getting** 43:5
**giant** 18:24
**gist** 28:13
**give** 13:14 22:18 25:6 33:23
**given** 7:14 18:11 33:1,25 36:3 37:7

**go** 6:18 7:11 21:15 28:14 29:5 30:18 31:5 39:3,6,18 43:13
**goes** 14:5 33:21
**going** 24:11 40:15 40:21 41:11,13 43:16 44:23 45:3 45:5
**good** 6:2,19 25:25 29:9
**gotten** 22:13
**grab** 29:4,6,21
**granted** 11:12
**grounds** 9:10
**group** 30:24
**guess** 7:13 13:8 18:21 22:7,9 24:2 27:9,11 30:2 33:9 34:20
**guy** 39:16,16,17

**h**

**half** 30:5
**hand** 26:11
**handful** 25:11,18 39:14,20
**handle** 30:24 31:9
**happen** 36:15 39:10
**happened** 26:6
**happy** 6:17 15:2 17:4 18:15 24:3 32:4,5,13,16 39:23
**hard** 23:5
**hasn't** 33:16
**hear** 24:3
**hearing** 3:1 18:1
**hearings** 6:17
**hearsay** 9:16
**heaven** 22:23
**help** 26:2 43:2,5

**here's** 39:15
**hey** 39:1,15
**he's** 27:1,2 28:15 36:24
**highlight** 21:3
**highly** 25:17
**hire** 24:18
**hit** 37:10
**hoc** 13:15
**hockett** 5:10
**hogs** 31:21
**holdings** 1:8,12 3:2 6:3,4 15:12
**hon** 2:22
**honor** 6:19 7:13 7:24 8:6,11,15,24 9:2,9,20,22 10:12 10:14,23,24 11:24 12:9 13:13,22 14:3,7,15,20 15:7 15:14,17,22,25 16:4,8,11,17 17:6 17:25 19:8,15,20 20:10,14 21:21 22:16,21 23:6,23 24:5,13 26:20 27:13,20 28:24 30:5 32:4,19 34:9 34:18 36:14 37:5 38:19 39:5 41:8 43:25 44:7,16 45:4
**honor's** 17:19 18:10
**hope** 22:22 36:12 44:7
**hoped** 23:2
**hopefully** 13:16 45:1
**hour** 31:22
**hourly** 31:17 32:10

**hours** 25:24 26:4 26:8,9
**house** 26:1 32:8,8
**hyde** 3:25 46:3,8

**i**

**i.e.** 8:1
**identifiable** 30:7
**identified** 25:10
**identifies** 9:6
**identify** 12:13,17 18:17 26:15 41:4
**ignore** 20:8
**impact** 42:15
**impacted** 42:19
**impeach** 7:17
**impeachment** 7:18,20,21 8:1 15:15,20,22,23 16:1
**implied** 31:17,17
**imputed** 33:11
**inbound** 35:3
**inc.'s** 8:20 15:12
**included** 15:21 20:15 31:15
**includes** 8:15
**incorporated** 8:18
**independent** 12:18
**individual** 41:4
**individuals** 8:17
**inference** 19:22
**inflicts** 14:21,22
**information** 18:8 18:17 28:15,18 30:7,10 33:14 35:6 36:1
**initial** 19:14 20:1 40:3
**injunction** 10:15 10:16
**injunctive** 11:12

instance 27:21
instructed 10:20 34:17
instruction 33:19
instructions 6:6 28:18 29:1 33:25
insufficient 35:10
intend 8:11 25:6
internal 37:12
interrogatories 8:21 21:9,14 40:10,15,19 43:4 43:10
interrogatory 12:6,10,11,12,15 13:10 32:5 34:4,9 34:21,25 35:9,15 40:10,20 41:6,12
involve 18:24
involved 22:11
iowa 31:20
isn't 26:23 36:17 37:12 42:25
issue 6:11 7:10 18:3 19:10 20:9 21:1 27:9 31:11 31:13 32:1 35:24 41:10 42:12 43:23 44:24
issues 6:7,18 22:10 31:13 33:8 43:3
items 26:25
it's 29:6 30:2,13 32:9 34:3,7 35:12 36:23 37:3,4 38:12,25 39:16,16 39:17,17,25 40:6 42:9,10
i'll 29:18 34:10
i'm 26:3 27:9 28:24 31:20 35:23 39:23 42:2,12

43:2,10 44:11 45:5
i've 25:9 38:7

**j**

jane 37:9
january 42:17
jarosz 20:3
jarosz's 20:15
jason 5:9
joe 29:13
john 4:15
joint 13:16
judge 2:23 6:2 22:3 23:17 30:22 30:23 31:12 32:22 33:5,13,20 34:2 35:2,17,20 38:6 38:18 39:11 40:5 40:7,13 41:14,20 42:1,5 43:9,21 44:18,20 45:2
judicial 14:17 15:4 18:15
jumped 24:2,10
justification 39:22

**k**

kat 5:11
kattan 4:3
keep 25:13 27:14 35:22
keyboard 28:22
kingston 4:15 6:20,23,25 7:11 7:13 8:2,10,13,24 9:2,5 10:12,14 12:12 13:3,4,18 13:19,25 14:5,7,9 14:15 15:6,9,17 15:25 16:4,8,12 16:16,17,20 17:15 17:19,25 18:10,20 19:3,8 20:13,14

25:19
kingston's 21:11
know 9:11,25 12:2 18:21 21:10 22:7,11,19 23:11 23:11 26:10 29:13 30:24 31:18,19,21 32:25 34:5,6,14 35:7,22 37:6,10 37:18,20 38:8,9 38:10 40:25 41:12 41:13 42:10 43:13 43:23 44:4,22,23
knowing 10:6
knowledge 12:18
known 22:24
knows 43:16

**l**

laid 9:11
lawyers 26:1,1
learning 42:6
leave 17:12 26:17 43:19
leaving 18:13
ledanski 3:25 46:3 46:8
left 6:6 21:15
legal 32:8 33:7,10 46:20
let's 30:18 31:9 39:21
li 22:13,22 44:22
limited 31:8
line 11:17,17
link 18:8
list 7:20 8:4,16,25 8:25 9:6,10,13 10:17,18,21,22 11:1,6,7,9,13,16 11:22 12:1,7,8,16 12:21 13:2,5,9
listed 9:7 16:1

listening 44:5,8
lists 10:5
little 23:2,2 27:9
llp 4:3,10 5:1
local 32:10,11
locators 17:4
long 43:5,12
longer 8:10
look 14:1 20:23 29:3,5 38:19 39:3 39:24
looked 20:16 26:8
looking 15:16 36:8
lost 30:12
lot 20:16 26:23
louis 4:13,20

**m**

madison 4:5
mailed 11:2,8
mailer 10:19
mailing 8:16
making 26:3
manner 7:6
march 42:16
market 33:15 38:12,13
marketing 39:17
marketplace 32:10,11
markets 38:11
match 11:4,5 12:23
materials 43:1
matter 1:6
matters 37:8
mean 13:17 14:16 26:13,14 32:12 34:6 36:10 37:3 41:5,22 43:15
meaning 24:7
mechanism 32:7

**meet** 6:7 35:8 39:2
  39:12,13 40:14
**meeting** 39:1,4
**memory** 29:9
**mentioned** 20:4
**method** 13:23
**michael** 4:22
**middle** 31:16
**mike** 22:3 23:17
  30:22 31:14 32:22
  33:13 35:2 38:6
  39:11 40:13 42:5
  43:9
**million** 19:20 30:5
**millions** 39:18
**mind** 13:8,14
  16:17
**mine** 21:2
**mineola** 46:23
**minimum** 24:6
  30:5
**ministerial** 12:25
**minor** 7:3
**minute** 35:12
**minutes** 40:20
**misrepresented**
  17:14
**missouri** 31:20
**mo** 4:13,20
**modify** 40:3
**moment** 26:18
**monday** 22:15,16
**month** 37:15,16
**months** 33:2
  39:10 42:14
**morning** 22:1,15
  22:16
**morrison** 5:1
**move** 6:23 7:1,16
  7:18 8:3,11 14:12
  18:23 29:4
**moved** 22:23

**moves** 15:13
**muchin** 4:3
**multiple** 9:10
  14:25,25

### n

**n** 4:1 6:1 46:1
**name** 35:5
**names** 30:8
**narrow** 21:5,7,10
  32:17
**narrowed** 7:10
  44:3
**narrows** 43:3
**necessarily** 33:6
**need** 16:12 19:5
  21:6 22:10 34:9
  34:15,16 35:15
  39:18,20 41:12,12
  42:18
**needed** 6:9 23:7
  30:17
**nepple** 4:22 22:3
  22:3 23:10,17,17
  23:22,25 30:18,22
  30:22 31:12,14
  32:2,6,18,19,22
  32:22 33:5,13,13
  33:20 34:2 35:2,2
  35:17,20,21 36:6
  36:17,17 38:6,6
  38:10,15,18 39:11
  39:11 40:5,7,13
  40:13 41:7,13,16
  41:20,25 42:4,5
  42:24 43:9,9,17
  43:21 44:18,20
  45:2
**nepple's** 21:1
**never** 11:5 30:11
**new** 1:2 4:6 5:4
  13:14 30:12,14
  41:6

**nine** 7:9 23:19,23
  24:1 36:25 38:21
  41:22
**non** 42:7,21
**note** 7:14
**noted** 14:20
**notes** 34:20
**notice** 14:17 15:4
  18:15
**nowadays** 29:7
**number** 13:14
  24:4,9 26:3 27:7
  28:3,6,7 29:3,6
  30:19 38:1
**numbers** 20:2,19
  20:22,25 30:9,9
**ny** 2:3 4:6 5:4
  46:23

### o

**o** 2:21 6:1 46:1
**object** 6:24 7:1
  9:9
**objected** 40:12
**objection** 7:24 8:6
  14:18,19 16:9
  19:5 24:23 38:22
**objections** 7:2
  8:20 12:14 25:1
**obstreperous** 9:14
**obviously** 20:2
  22:4 35:5
**october** 20:1
  29:20
**offer** 37:23 38:22
  39:15 42:11,18
**offered** 36:9 39:2
  39:6 42:6,7,8
**offering** 42:17,20
**office** 44:5
**official** 5:2
**oh** 24:13
**okay** 7:25 8:8,12
  9:4,8,21 10:1,11

13:16 14:4,8,16
  15:8,15,23 16:3,6
  16:20 17:21 18:16
  19:3,9 21:3,7 22:7
  22:18 23:9 24:2
  24:11,13 25:1,7
  26:8 27:5,22
  29:23 30:18 31:25
  32:2,3,17,20
  33:21 34:18 35:18
  36:5 38:5,20 40:8
  40:21,24 41:9,15
  42:2 44:9,12,17
  45:5,5
**old** 46:21
**ones** 7:12 15:24
  18:16 23:15,21
  40:11
**online** 26:13
**open** 22:23 29:4
**operator's** 28:22
**opportunity**
  33:23 35:9 41:18
**opposed** 18:9 37:4
**oral** 34:3,7
**orally** 34:14
**order** 15:3 24:12
  40:16
**ordered** 31:4
**original** 30:11
**outbound** 35:4,13
**outside** 42:14,17
**overlooking** 28:22
**overnight** 21:25

### p

**p** 4:1,1 6:1
**page** 8:21 40:11
**pages** 16:16 17:17
  24:6 30:6
**paid** 31:18,22
**paper** 18:9
**paragraph** 21:13
  21:13

paralegal 26:6,7
27:10
part 14:23,24
23:1 33:18,19
38:2 41:5,5
particular 17:17
27:21
particularly
30:15
parties 6:7,13
18:4 22:10
people 9:1 18:18
21:24 31:15,22
36:4 38:25 42:20
43:14 44:10
perfectly 14:7
performed 27:15
period 20:13
person 28:17 29:3
29:8 34:16,19,22
34:23,23 35:4,5
35:10
personally 30:7
person's 35:11
persuasive 31:5
petitions 14:11
18:3
phone 28:13
photo 28:23
phrase 30:20
31:19
phrased 36:6
phraseology
24:21
picked 17:13
28:13
piece 38:7
pigs 31:20
pivot 17:1
place 6:9
plains 2:3
plaintiff 8:7 14:12

plaintiff's 8:19
plaintiffs 1:13 4:4
plaintiff's 38:21
plan 23:13
planning 45:3
plaza 4:12,19
please 29:21
plus 10:17 18:3
pm 2:6 45:9
point 7:9 17:16,19
18:10 23:15 28:2
30:2,10 35:19
pointed 19:24
22:24
points 6:16 18:14
portion 15:21
portions 16:24
possession 12:22
post 13:15
powerpoint 39:4
39:7,17
pre 20:9 37:22,23
prefaced 12:9
prefer 25:22
preliminary
10:15,16 24:5
preparation
27:19
prepare 23:3 26:2
prepared 19:21
27:2 28:9,12,15
43:12
preparing 26:9
present 25:21
presentation 39:4
39:7,17
pretty 6:16 44:10
44:11
previously 8:18
19:11
printed 26:13
privilege 27:9
31:11,13,25 33:8

privileged 25:13
25:17 26:16
pro 6:21
probably 18:12
21:4 26:20 34:25
36:8 41:21
problem 13:3,4
17:6,7 24:16,16
25:9
proceed 7:6
proceeding 3:1
6:5 36:14
proceedings 45:8
46:4
process 19:13
produce 25:23
29:18 34:11 39:2
39:7
produced 12:4
19:23,25 20:12,17
20:18 22:5 25:15
31:4 33:16
producing 21:25
25:12
product 12:1
16:21,25
production 20:9
21:9,13,19 23:20
24:20 43:6
program 43:2
programmed
28:17
progress 6:14
projected 33:23
projection 30:3
33:22
proper 21:16
proposed 11:16
21:22
proposing 22:15
proposition 26:22
prospective 42:11

provide 17:5
18:22 32:5,13,15
32:16 35:13 40:22
provided 10:17
11:13 13:5,12
16:23 19:20 29:1
33:22 37:15 38:7
providing 44:6
publication 15:10
18:11
pull 21:24 29:6,24
pulled 26:7,12
pulls 26:11
purpose 8:1
purposes 7:19,22
8:1,9
put 7:15 14:17
17:11,12 23:5
26:19 43:7
putting 13:9
30:19

### q

quarropas 2:2
question 16:12
41:18,23 42:10,25
43:13,16
questioning 21:24
quickly 6:16
quite 28:11 42:2

### r

r 2:21 4:1 6:1 46:1
raise 22:10 33:8
random 17:13
randomly 17:8
rappoport 5:6
rate 31:17,17,23
32:10 33:11,15
rates 32:8
rdd 1:3,4 3:1
read 6:13,16
readily 10:22
real 14:21,22 25:9

**really** 26:23,24
  33:24 35:19 36:16
  37:2,25 38:2 43:3
  43:4,5
**reason** 43:7
**reasonably** 30:16
  30:17
**reasons** 40:17
**recognize** 9:12
  17:10
**reconstruction**
  33:2
**record** 6:24,25
  13:9 17:4,14 18:6
  18:9,13 20:8
  23:18 25:15 28:21
  28:25 30:23 31:14
  32:23 33:14 35:3
  35:21 38:7 39:12
  40:13 42:5 43:10
  46:4
**recording** 28:22
**records** 25:11,19
  25:24 26:7 32:24
  35:22
**redact** 25:18
**redacted** 25:14
  30:7
**reference** 8:18
**referenced** 30:25
  31:1,1
**referred** 8:22
  12:12 13:10 31:2
**refers** 12:7
**reflect** 37:13
**regard** 18:7
**regarding** 21:12
**regular** 16:1
**related** 30:17
  38:21
**relevant** 20:20,22
  30:2 33:15,15

**relied** 20:3
**relief** 11:12
**relitigate** 19:16
**relitigating** 20:6
**relying** 13:12
**remaining** 8:13
  40:12
**repeatedly** 11:5
  30:12
**report** 20:15
  27:15,16 36:13
**reported** 27:11
**reporting** 26:5
  36:9
**reports** 25:16
**representation**
  41:1
**representative**
  17:8
**represented** 11:19
  34:3 35:23
**request** 12:10
  21:8 30:20 35:6
  36:25 39:24 40:18
  41:23 43:23
**requests** 21:12
  23:14,20 40:9
**required** 35:24
**requires** 24:17
**reserve** 7:15
**residential** 10:4,8
**resolves** 19:9
**respect** 6:10 31:13
  33:3 40:18
**respectfully** 8:2
**respond** 16:18
**response** 34:11
  38:2,8,16
**responses** 8:20
**resume** 6:10 14:6
**return** 13:25
**review** 18:9

**reviewed** 17:23
  31:7
**richardson** 5:11
**right** 7:6,16,23
  8:22 9:3 10:25
  16:6,9 19:1 20:11
  22:2,18 23:9 28:1
  32:17 34:13,22
  35:14,23 37:12
  38:14,20 39:5
  40:1,8,22 41:2,6
  42:9 44:1,1,14,14
  45:6
**road** 46:21
**robert** 2:22
**room** 2:2
**rosenman** 4:3
**ross** 4:8 6:19,20
  7:24 8:6 9:9,20,22
  10:4,24 11:1,17
  11:24 12:9,18,24
  13:13,20,21 14:3
  14:19 16:11,18
  17:6 19:6,12,15
  21:21 22:15,21
  23:5 24:3,4,9,13
  24:16 25:3,8,25
  26:12,16,19 27:1
  27:4,6,13,18,20
  27:23 28:3,5,7,13
  28:20 29:2,12,16
  29:24 30:4 31:6
  32:4,13,16 34:8
  34:14,18 35:8
  36:11,14,20,23
  37:5,14,19,21
  38:1,4,24 39:12
  39:23 40:2,14,23
  40:25 41:3 43:25
  44:2,5,7,10,13,16
  45:3
**round** 30:14

**rules** 30:16
**ruling** 33:3
**run** 29:7 31:5

**s**

**s** 4:1 6:1
**salaries** 31:14
  32:14 33:9
**salary** 31:24 32:9
  40:22
**sanjana** 5:9
**saw** 25:21
**saying** 9:18 11:25
  12:9 16:14 19:16
  28:24 29:11 34:25
  38:3 42:13,18
**says** 9:16 37:15
  38:12 42:15 43:13
  43:18,19
**scope** 6:8 40:16
  42:14
**screenshots** 15:19
  16:4,24 17:13
**scrolled** 17:9
**scrolling** 16:22
**se** 27:14
**search** 24:19
**searches** 31:5
**second** 11:5,8
  14:24 21:11
**secondly** 6:11
**see** 14:1 22:8
  23:10,12 35:15
  39:6
**selfish** 23:2
**send** 10:19 13:25
**sense** 17:10 22:9
  23:12 25:12 36:21
**sent** 8:17 10:8,20
  11:7,13,25 12:16
  12:19 13:17,25
  14:1 16:14
**separately** 15:5
  15:18 29:4 33:9

served 15:18
set 29:20
settlement 23:3
seventh 23:4
shared 24:17
shift 42:21
shortly 22:19 26:6
shoulders 28:22
should've 39:23
show 24:22,24
26:24 30:21 31:19
31:20 38:17
shown 9:10
shut 45:6
side 29:7
similar 18:3
simple 12:2 42:10
simply 9:13,24
10:10 14:25 20:8
25:3
site 18:8
six 23:19,19,22
24:1,3,4,9 30:3,4
35:18 36:17,19,24
42:14
sixth 22:16,17
23:4,6
size 13:21
slaughtered 31:21
small 38:23
smith 25:21,25
37:9
solutions 46:20
somebody 9:16,24
16:21,22 17:8,13
28:14 39:14
somewhat 18:3
sonya 3:25 46:3,8
soon 18:1 21:22
44:22
sorry 8:24 15:11
22:16 24:7,13
28:11

sort 6:21 30:13
southern 1:2
space 17:12
specifically 39:13
spend 31:22
spending 25:12
spent 26:8
spoke 6:20
spreadsheet 15:18
16:22,24 18:25
19:19 20:1,12,14
20:16,17 29:4,5,6
29:20 30:1
spreadsheets
20:23
spring 11:23
st 4:13,20
stamped 21:24
start 19:16 21:16
21:25 24:19 35:14
started 30:4
starts 39:25
state 28:9 31:19
31:20
states 1:1 2:1 9:6
10:5,5,9,20,23
steps 11:14
steven 5:6
stop 23:5
stored 17:2
straightforward
26:22
strategy 39:16
stray 34:10
street 2:2 5:3
stuff 25:17 44:6
subject 6:22 12:20
38:18
submit 13:15
32:25
submitted 33:14
subset 36:24

subsidiaries 15:13
substantively
9:15 27:15
suffice 41:18
sufficient 24:22
24:24 30:21
suggest 6:22
24:11
suggesting 11:25
suite 4:19 46:22
summary 9:5,19
9:23,25 10:2,3,10
14:4,5 36:9
supplemental
21:18 24:20
support 24:25
sure 11:4 13:19
17:22,24 29:10
34:19 42:3 44:11
surprise 25:10
suspicion 18:12

t
t 46:1,1
table 10:21 17:1,5
tailored 30:17
take 6:9 11:14
14:17 15:4 22:6
25:18 28:21 34:20
35:10 38:19 43:22
taken 8:14 17:19
18:10
takes 14:9
talked 20:24
talking 40:19
talks 39:5
tasked 35:6
tasks 27:15,18
telephone 29:17
telephonically 4:8
4:15,22 5:6,8
tell 11:9 28:9
38:12

terence 4:8
test 36:2 42:12
testify 11:2,10
27:1,2 28:15,20
testimony 6:11
7:17 10:6 24:25
thank 7:13 33:5
33:20 35:17 40:5
40:7 41:20 43:21
44:7,19,19,20
45:2,4,5
that's 25:17 31:25
32:5 33:18 35:10
36:7 37:2,3,3,8,25
38:1,2,9,18,19
41:5,5,25 42:1,19
42:23,25 43:15,25
44:1,2,16 45:6
theory 33:9
there's 25:10 28:8
28:20,23,25 29:18
31:13,19 34:5
37:5 39:4 43:7
44:23,24,25
they're 26:16
38:11 42:13,16,18
42:20,21 43:11
44:11
they've 31:16
42:8
thing 17:1 21:25
34:8 43:15
things 23:7 25:11
25:18
think 6:14 8:13,14
9:14,23 11:7,12
13:11 14:9 15:25
16:21 17:15 18:4
18:5,14 19:4,9
20:20,23,24 21:3
22:5 23:7,11,13
26:12 28:1 30:14
32:15,20,21 33:22

33:24 34:4,15
36:7,8,11,14,25
40:8,21 41:5,7,17
41:19 42:12 43:4
43:6,19 44:3
**thinking** 34:21
**third** 7:4 22:10
**thompson** 4:10,17
**thought** 8:25 21:5
21:7 24:14 36:6
44:1
**three** 7:5 8:4,14
23:19,22 24:1
27:5,23 32:20
39:9 41:10,19
**time** 21:16 22:23
23:3 25:12,21,23
26:6,19 27:14
31:15,23 32:24,25
**timesheets** 25:13
**timing** 21:9
**today** 6:17 21:23
**told** 29:10,17 30:1
34:7,20,23
**tomorrow** 21:25
**topics** 7:5
**total** 37:8
**touch** 42:4
**track** 27:14
**traffic** 35:13
**trained** 44:10
**transcribed** 3:25
**transcript** 45:7
46:4
**transmitted** 14:23
17:24 18:7,7
**travel** 25:11,19
**trial** 3:3 6:10
31:17 39:9
**true** 15:20 46:4
**trustworthy**
11:19

**try** 23:9
**trying** 9:14 36:21
42:21
**turn** 18:18
**two** 6:4,7,15,18
7:20 23:19,22
24:1 25:7 27:7,23
30:23,25 31:1,8
31:10,12,13 32:21
33:1 41:4
**type** 19:6
**typically** 24:20

## u

**u.s.** 2:23
**ultimately** 12:14
12:15
**undercut** 42:19
**understand** 10:19
16:15 20:17 23:11
33:2 35:7 36:7
**understanding**
18:21 20:19 25:3
27:23 29:16 32:23
**uniform** 17:4
**united** 1:1 2:1
**uniti** 22:25 23:3
**universally** 42:9
**universe** 17:16
31:4,8 38:23
**unknown** 2:25
**unnecessary** 15:1
30:15
**unsecured** 5:2
**use** 13:2

## v

**v** 1:14 3:2
**variant** 27:6
**various** 16:24
**vendor** 24:18,18
**verify** 13:17
**veritext** 46:20
**version** 20:12
30:1

**versus** 6:4
**volume** 22:4
**volumes** 14:25
**voluminous** 11:18
12:5 15:18,19
22:9 32:7

## w

**waiting** 21:24
**want** 13:6 14:5,17
15:3 17:16 18:9
20:7 25:4 29:14
31:21 33:24 37:10
42:10
**wanted** 19:13
29:10
**wasn't** 27:13
28:21 40:16
**waste** 17:11
**way** 11:25 12:17
13:24 18:24 25:13
29:2,7 31:9,10
32:21 36:1 39:3
41:9,21
**ways** 27:24
**we've** 18:23 21:23
**website** 15:11
17:3 18:12,18
19:6
**wednesday** 22:17
**week** 20:18
**weeks** 22:19
**went** 6:17 26:7,25
27:10 31:7 39:14
**weren't** 40:14
**west** 5:3
**we'd** 35:5,8
**we'll** 32:17 34:11
41:9
**we're** 25:21 32:4
32:5,13 42:14
44:22,25 45:3,4
**we've** 37:14 40:8
40:10,17,19 41:3

41:10 44:3
**what's** 37:10
**white** 2:3
**willing** 11:10
**windstream** 1:8
1:12 3:1 6:3,3
10:18,18 15:12
22:25 23:1,3
35:24 38:17 42:6
**withdraw** 8:10
**withdrawals**
23:18
**withdrawn** 21:13
21:15 28:5 43:25
**witness** 9:12
11:10 17:9 25:20
34:8,10,12,16
39:8
**witnesses** 12:3
**wonderful** 44:11
**won't** 45:1
**word** 24:17 38:12
**words** 38:24
**work** 22:20 23:7
23:10 25:16,17
32:11 33:7 40:16
44:6
**worked** 14:21
**works** 29:2
**worthless** 43:11
**would've** 29:9,9
**writing** 43:7
**written** 28:8
34:24 39:24 43:10
**wrong** 9:15,24
10:6 12:1 13:5
27:7 37:1
**wrote** 38:25

## x

**x** 1:5,11,17

| y |
|---|
| **yeah**　23:1 |
| **yep**　33:5 43:17 |
| **yesterday**　6:6,9 |
|   7:3 9:10 17:9,23 |
|   19:17,18 20:7,7 |
|   20:25 21:22 40:17 |
| **york**　1:2 4:6 5:4 |
| **you'd**　43:1 |
| **you're**　29:11 34:6 |
|   34:22 36:8,14 |
|   38:3 41:11 43:5 |
|   43:16 |

1   UNITED STATES BANKRUPTCY COURT

2   SOUTHERN DISTRICT OF NEW YORK

3   Case No. 19-22312-rdd

4   Adv. Case No. 19-08246-rdd

5   - - - - - - - - - - - - - - - - - - - - - - - - - - x

6   In the Matter of:

7

8   WINDSTREAM HOLDINGS, INC.,

9

10          Debtor.

11  - - - - - - - - - - - - - - - - - - - - - - - - - - x

12  WINDSTREAM HOLDINGS, INC., et al.,

13              Plaintiffs,

14          v.

15  CHARTER COMMUNICATIONS INC., et al.,

16              Defendants.

17  - - - - - - - - - - - - - - - - - - - - - - - - - - x

18

19

20

21

22

23

24

25

1              United States Bankruptcy Court

2              300 Quarropas Street, Room 248

3              White Plains, NY 10601

4

5              May 6, 2020

6              9:37 AM

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21   B E F O R E :

22   HON ROBERT D. DRAIN

23   U.S. BANKRUPTCY JUDGE

24

25   ECRO:   UNKNOWN

1    HEARING re Trial

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    Transcribed by:  Sonya Ledanski Hyde

```
1    A P P E A R A N C E S :

2

3    KATTAN MUCHIN ROSENMAN LLP

4         Attorneys for Plaintiffs

5         575 Madison Avenue

6         New York, NY, 10022

7

8    BY:  TERENCE ROSS (TELEPHONICALLY)

9

10   THOMPSON COBURN LLP

11        Attorneys for Charter Communications

12        One US Bank Plaza

13        St. Louis, MO 63101

14

15   BY:  JOHN KINGSTON (TELEPHONICALLY)

16

17   ALSO PRESENT TELEPHONICALLY:

18

19   NINO PRZULJ

20   STEVEN RAPPOPORT

21   JASON SANJANA

22   JAMES DREW

23   JOHN JAROSZ

24   MICHAEL JUSTUS

25   KRISTIN LOCHART
```

1    SHAYA ROCHESTER

2    MICHAEL ROSELLA

3    MARIE SIENA

4    GRACE THOMPSON

5    ERIC WERLINGER

6    JUSTIN MULLIGAN

7    STEVEN SHREDL

8    MATTHEW KARDOS

9    BRIAN HOCKETT

10   KAT RICHARDSON

11   MICHAEL NEPPLE

12   RICK ARCHER

13   MARIA CHUTCHIAN

14   CELINE BUEHL

15   XU PANG

16

17

18

19

20

21

22

23

24

25

1            P R O C E E D I N G S

2            THE COURT:  Okay, good morning.  This is Judge

3    Drain, and we are here in In re Windstream Holdings, Inc. et

4    al and Windstream Holdings, Inc., et al v. Charter

5    Communications, Inc. and Charter Communications Operating,

6    LLC.  This is the second adjourn date of the trial in this

7    matter, and I'm ready to proceed.

8            MR. ROSS:  Your Honor, this is Mr. Ross for the

9    Plaintiff.  And we've already tendered and the Court has

10   accepted the declaration of Mr. Auman in lieu of direct

11   testimony.  And I guess there are a couple of housekeeping

12   matters before that starts.

13           The first is that there was questions about

14   Defendant's Exhibit 110 when we broke off last.  We've been

15   challenged in trying to figure out what's right and what's

16   wrong, but we're going to just allow Defendant's Exhibit 110

17   come in for whatever it is.  The party's going to argue over

18   what it is, but we will withdraw our objection and that can

19   be part of the record.

20           The second issue --

21           THE COURT:  I'm sorry, Mr. Ross, would you just

22   remind me, rather than my digging around for it, what was

23   Exhibit 110 or what is it?

24           MR. ROSS:  It's a long list of -- I believe the

25   Defendants represent it was a list of people who received

1      their false advertisement.  It's a long --

2                THE COURT:  Okay.  Oh, right.  There was some

3      dispute as to whether those were the people or whether it

4      was an accurate list of the other -- of the real people -- I

5      recall that now.

6                MR. ROSS:  And it's just a nightmare to try to

7      figure out.  We're just not going to fight about it.  It is

8      whatever it is.

9                THE COURT:  Okay.

10                MR. ROSS:  And the people -- and lawyers can argue

11     over.

12                THE COURT:  Okay.

13                MR. ROSS:  The second issue that's been resolved

14     with deposition designations.  I believe counsel to Charter

15     had sent in some deposition designations on our behalf and

16     represented that would save time.  We've reviewed those, and

17     there's a number of missing designations.  There are a

18     number of incorrectly marked designations.  Not worth the

19     Court's time to discuss that.  We have simply sent in our

20     designations and would request that the Court rely upon

21     them, because they're properly marked.

22                And that's it, Your Honor.  So the witness is on

23     to Mr. Kingston.

24                THE COURT:  Okay.

25                Mr. Auman, it's been a couple of days now.  I

1   usually just remind people that they're under oath when we

2   take a lunch break, but let me put you under oath again if

3   you don't mind.

4           Could you raise your right hand, please?

5           MR. AUMAN:  Yes, sir.

6           THE COURT:  Do you swear or affirm to tell the

7   truth, the whole truth, and nothing but the truth, so help

8   you God?

9           MR. AUMAN:  I do.

10          THE COURT:  Okay.  Thank you.

11          All right, Mr. Kingston, you can go ahead.

12                      CROSS-EXAMINATION

13  BY MR. KINGSTON:

14  Q    Mr. Auman, do you have in front of you Defendant's

15  Exhibit 146?

16  A    One moment, please.  Okay, I'm open to Tab 146.

17  Q    All right.  And does Defendant's Exhibit 146 appear to

18  you to be a pleading in this lawsuit, sir?  Do you see your

19  name and your lawyer's in the upper-left-hand corner?

20  A    Yes, I do.

21  Q    Okay.

22          MR. KINGSTON:  Your Honor, Defendant's Exhibit 146

23  has been previously admitted.

24  BY MR. KINGSTON:

25  Q    Mr. Auman, I'd like you to turn to page 5.  Are you

Page 9

1    with me, sir?

2    A    Yes, I am.  I just want to make sure.  It's the second

3    -- it looks like the second page to a response to

4    interrogatory.  Is that correct?

5    Q    Yes, sir.

6    A    Okay.

7    Q    And I read the last line of that response to the

8    interrogatory as follows.  "Indeed, pursuant to a court

9    order, Windstream has received from Charter a list of

10    approximately 800,000 individuals to whom the advertisements

11    were sent.  Windstream reasonably believes that this is the

12    best evidence identifying those individuals that were sent

13    the Charter advertisement, and hereby incorporates that

14    document in response to this interrogatory pursuant to Rule

15    33(d) of the Federal Rules of Civil Procedure."  Have I read

16    that correctly, sir?

17    A    Yes, sir.

18    Q    Mr. Auman, do you have any reason to believe that

19    Defendant's Exhibit 110 is not the document that was

20    incorporated by reference as the best evidence identifying

21    those individuals that were sent the Charter advertisement

22    in Plaintiff's response to the interrogatory that I just

23    read to you in Defendant's Exhibit 146?

24    A    Let me look through 110, please.

25    Q    Sure.

1    A    Mr. Auman, if it helps you, Exhibit 110 was an Excel

2    spreadsheet.  It is voluminous.

3    A    Yes, it's -- I've got my magnifying glass.

4          MR. ROSS:  So, Your Honor, this is Mr. Ross.  I

5    don't know what we're doing.  We just discussed this, and we

6    explained that Windstream's position is we can't be certain

7    what this is or what it's not.  We've allowed it into

8    evidence for whatever it is.  Does Mr. Kingston really want

9    this witness to read 500, 600 pages here to check against

10   something else?

11         MR. KINGSTON:  Your Honor, Plaintiff identified

12   and incorporated Exhibit 110 by reference into their

13   interrogatory.  It's a sworn interrogatory response saying

14   that this is the best evidence of who was sent the Charter

15   advertisement.  They were given an opportunity to say a

16   document that has been identified as Exhibit 110 is or is

17   not what they have.  They have the Excel spreadsheet.

18         THE COURT:  The interrogatory answer doesn't

19   identify a particular Excel spreadsheet.  It just says a

20   list of approximately a thousand individuals.  So it just

21   depends on -- I mean, do you -- someone must have sent this

22   to Windstream from Charter.

23         MR. KINGSTON:  Yes, Your Honor, on May 13th.

24         THE COURT:  So is 110 printed out from that email?

25         MR. KINGSTON:  I think the Excel spreadsheet is

1  from an email, Your Honor.

2          THE COURT:  Did someone prepare the Excel

3  spreadsheet by inputting all of the names from the email?

4          MR. KINGSTON:  Yes, Your Honor.  I think I'm not

5  following what the Court is asking.

6          THE COURT:  Is the Excel spreadsheet a summary

7  typed by someone else of the email, or do we have the email

8  itself that has the attachment?

9          MR. KINGSTON:  The Excel spreadsheet that is 110

10  is the spreadsheet that we believe was provided on May 13th.

11  I want to clarify that I'm not positive if it was provided

12  as an attachment to an email or provided as, you know, a

13  link to a box account as is sometimes the practice with

14  voluminous documents.  My suspicion is that it was probably

15  a link to a box account.

16          THE COURT:  Well, do we have the email?

17          MR. KINGSTON:  My understanding is that when

18  Defendants -- or excuse me, the Plaintiffs challenged 110,

19  that they would go back and look at that email and compare

20  it to the Excel spreadsheet that we understand to be the one

21  that was provided.

22          THE COURT:  Why don't we just admit the email with

23  the attachment and 110?  And if it ever becomes important to

24  decide whether 110 is different than the email,  someone can

25  look at it.  But it seems to me that the email should be

1    enough.  No one is going to look at each of the individual

2    names.

3              MR. KINGSTON:  No, I don't think --

4              THE COURT:  And I don't think there's any

5    disagreement that there are a lot of names on the list.

6              MR. KINGSTON:  That is the case, Your Honor.  But

7    I do think there may be some disagreement as to where -- as

8    to the states and addresses on that list.  And maybe the

9    easiest way -- I think Your Honor's suggestion is well

10   taken.  We will submit the email as a supplemental exhibit.

11             THE COURT:  Okay.  That's fine.  Let's just make

12   that -- I think we're up to 369 at this point.

13   BY MR. KINGSTON:

14   Q    Mr. Auman, can you look at Defendant's Exhibit 87?

15   A    Yes.  I'm sorry, I didn't catch the exhibit number.

16   Q    87.

17   A    87.

18             MR. KINGSTON:  And, Your Honor, Exhibit 87 was

19   previously offered, the summary exhibit of the states

20   identified in Exhibit 110.

21   BY MR. KINGSTON:

22   A    I have it open.

23             MR. KINGSTON:  And I understood Counsel to be

24   withdrawing their objection to Exhibit 110.  Exhibit 87 is a

25   summary of Exhibit 110.  I don't know if Counsel has

1    similarly withdrawn their objection to Defendant's Exhibit

2    87.

3              MR. ROSS:  We have not.  The problem with 87 is

4    that nobody has come into court to authenticate this, lay

5    foundation for it, or explain why it's not in some way

6    hearsay.  So that's the simple problem.  They should have

7    put on a witness at what this was.

8              MR. KINGSTON:  Your Honor, Exhibit 87 is a summary

9    exhibit.  And what the rule requires is that the other side

10   have the voluminous material that provides the underpinning

11   for that summary exhibit, which was provided to Counsel on

12   May 13th, and which we understood Counsel to be confirming

13   while we were in recess.

14             THE COURT:  Well, what is -- is it a summary of

15   the states' addresses of 110?

16             MR. KINGSTON:  Yes, Your Honor.  Just the states.

17             THE COURT:  All right.  Well, I don't -- it's

18   admitted as a summary of what's in 110.

19             MR. KINGSTON:  Thank you, Your Honor.

20   BY MR. KINGSTON:

21   Q    Mr. Auman, you can put that aside.  Mr. Auman, do you

22   have in front of you Defendant's impeachment Exhibit 65?  It

23   should be in a sealed -- that should be in a sealed packet

24   that you haven't opened yet, sir.

25   A    Yes, sir.  I have it right behind me.

1          THE COURT:  Did you say 225, Mr. Kingston?

2          MR. KINGSTON:  Your Honor, I said Defendant's

3    impeachment Exhibit 65.

4          THE COURT:  65, okay.

5          MR. KINGSTON:  Yes, Your Honor.  It's the

6    transcript --

7          THE COURT:  No, I have it.

8    BY MR. KINGSTON:

9    A    65.  I have it open.

10   Q    It should have been in a sealed package, Mr. Auman?

11   A    The one I had yesterday was in a sealed package.  This

12   one in particular came in an unsealed package, but I had not

13   seen it yet.

14   Q    That's just fine, sir.  You recall you appeared for

15   your deposition on behalf of the Plaintiff in this lawsuit

16   on September 24th, 2019?

17   A    Yes, sir.

18   Q    Okay.  Exhibit 65, or Defendant's impeachment Exhibit

19   65 is a transcript of that deposition.  And I'd just like to

20   ask you to keep that close at hand throughout the course of

21   our discussion today.  Would you do that for me, sir?

22   A    Yes, sir.

23   Q    It's true isn't it, Mr. Auman, that you are not

24   involved in the preparation of any financial statements or

25   reports on behalf of Windstream?

1    A    Not outside my normal course of business.

2    Q    It's true that you're not involved in the preparation

3    of any financial statements or reports on behalf of

4    Windstream.  Isn't that right, sir?

5              MR. ROSS:  Objection, Your Honor.  Asked and

6    answered.  It's also vague and ambiguous.  Financial

7    statements could encompass five million things.

8    BY MR. KINGSTON:

9    Q    Mr. Auman, I would direct your attention to Page 17 of

10   your deposition.

11             MR. ROSS:  And I'm going to object, Your Honor,

12   because this is inappropriate impeachment.  He needs to ask

13   a question and have the witness answer it.  And then if he

14   thinks the answer is contradicted by his deposition

15   testimony, then bring it up.  He hasn't asked a question

16   that's in doubt.

17             THE COURT:  Well, unless it was the last answer

18   that Mr. Auman gave.

19   BY MR. KINGSTON:

20   Q    Page 17, line 23 through page 18, line one.  I read the

21   question and answer as follows.  Question, "Okay.  Are you

22   involved in the preparation of any financial statements or

23   reports on behalf of Windstream?"  Answer by Mr. Auman,

24   "No."  Have I read that correctly, sir?

25   A    Let me make sure I see where we are here.

1   Q   And it may be useful for you, Mr. Auman, the transcript

2   in front of you is what is called a condensed transcript or

3   a mini-script, and the pagination can be a little confusing.

4   When I refer to a page in Exhibit 65 or your deposition, I'm

5   going to be referring to the page numbers that are on the

6   reduced size pages, of which there are four on each page.

7   Take a look at Exhibit 5 and maybe we can sort this out and

8   save ourselves some time down the road.  So if you just look

9   at the page number that's labeled 65.005 in the bottom-left-

10   hand corner.  Are you with me, sir?

11   A   I am.  Yes, sir.

12   Q   And do you see that there are four pages actually from

13   your deposition transcript represented on Page 5?

14   A   I do.  Yes, sir.

15   Q   Pages 14 through 17.

16   A   Yes.

17   Q   And so when I refer to your deposition transcript, Mr.

18   Auman, the pages I'm going to be referring to  are the pages

19   of the actual transcript.  So there will be four to a page

20   in the exhibit, and they will be in the upper-right-hand

21   corner of the condensed view of each page.  Are you with me,

22   sir?

23   A   Yes, sir.

24   Q   And with that sort of extended lead-in, Mr. Auman, I'll

25   direct your attention to page 17, line 23 through page 18,

1    line 1 of your deposition transcript.  Do you see that, sir?

2    A    Yes, I do.  Yes.

3    Q    I read that as follows.  Question, "Are you involved in

4    the preparation of any financial statements or reports on

5    behalf of Windstream?"  Answer, "No."  Have I correctly read

6    the question that was posed to you and the answer that you

7    gave?

8    A    Yes, sir.

9    Q    And you understood my question because you answered it.

10   Isn't that right, sir?

11   A    Yes, sir.

12            MR. ROSS:  Your Honor, I'll object and move that

13   this be stricken since it's not inconsistent with the

14   testimony he just gave.

15            THE COURT:  Well, he qualified his testimony.

16   It's not worth striking.  His testimony today was somewhat

17   qualified from his answer.

18   BY MR. KINGSTON:

19   Q    Mr. Auman, it's a true statement that you don't have

20   any personal knowledge related to the interruption or

21   disconnection of services to Windstream customers since

22   January 1 of 2019.  Isn't that the case, sir?

23   A    Well, I have reviewed documents that give me personal

24   knowledge to that.

25   Q    You make a fair point.  Let me see if I can ask a

1    better question.  Mr. Auman, it's true that as of September

2    24th of 2019, you did not have any personal knowledge

3    related to the interruption or disconnection of services to

4    Windstream customers since January 1 of 2019.

5    A    I believe that was what I testified to in my

6    deposition.

7    Q    And you testified to that in your deposition because it

8    was true.  Isn't that right, sir?

9    A    Yes, sir.

10   Q    So it was true that as of September 24th, 2019, you

11   didn't have any personal knowledge related to the

12   interruptions or disconnection of services to Windstream

13   customers.

14   A    Yes, sir.

15   Q    And since that time you've gained some personal

16   knowledge by reading pieces of paper.  Is that right?

17   A    I've read -- I've spoken to colleagues, I've read

18   documents, I've validated what my colleagues have shared

19   with me.  So I've investigated the matters I testified to

20   robustly.

21   Q    You talked to people.  True?

22   A    Yes, sir.

23   Q    You read documents?

24   A    Yes, sir.

25   Q    And everything that you did to acquire that information

1  involved talking to a person, reading a document, or looking

2  at bits and bytes on a screen.  Isn't that right, sir?

3  A    Yes, I did that.  Yes, sir.  I also reviewed processes

4  and in some cases got a better understanding of the systems

5  involved.

6  Q    And the processes you reviewed, you reviewed those

7  processes by looking at pieces of paper, talking to people,

8  and looking at bits and bytes on a screen.  Isn't that

9  right, sir?

10  A    Yes, sir.  That's a fair assessment.

11  Q    And all of those pieces of paper and all of those bits

12  and bytes and all of those people that you're talking to,

13  they're not available for me to cross-examine today.  Isn't

14  that right, sir?

15          MR. ROSS:  Objection.  How do you cross-examine a

16  piece of paper or a bit and a byte?

17          MR. KINGSTON:  We will concede that you can't,

18  Your Honor.  And we'll concede that that's the basis for

19  Rule 802 of the Federal Rules of Evidence.  And we'll point

20  out that numerous cases point out that corporate

21  representatives can rely on exactly that information and

22  testifying in court as a corporate representative.

23          MR. ROSS:  Your Honor, I don't -- you addressed

24  this I thought definitively on the second day of trial.  I

25  won't get into an extended colloquy with Counsel.  I do

1    think there was a question posed.  I don't know if Mr. Auman

2    has answered it yet.

3              THE COURT:  Do you remember the question?  Do you

4    remember the question, Mr. Auman?

5    BY MR. KINGSTON:

6    A    Would you mind repeating the question, please?

7    Q    Goodness, Mr. Auman, I'm afraid I can't remember it,

8    either.  I'm happy to move on.  Mr. Auman, it's true that

9    you don't have any responsibility related to the Spectrum

10   Value Added Retail Agreement, isn't that right?

11   A    I have knowledge of the VAR, I've read the VAR.  I

12   didn't sign the VAR, but I'm very familiar with the VAR and

13   what it does to our business.

14   Q    Mr. Auman --

15   A    So I have knowledge with respect to that.

16   Q    I apologize, sir.  I did not mean to speak over you.

17   I'm struggling just a little bit with the (indiscernible).

18   A    Yes, sir.

19   Q    Mr. Auman, it's true that you don't have any

20   responsibility related to the Spectrum Business Value Added

21   Retail Agreement.  Isn't that so?

22   A    In my day-to-day job, I don't have responsibility for

23   it.  As a representative of the company, I'm absolutely

24   familiar with the VAR, how we use the VAR, how the VAR

25   impacts our business, how important it is to our business.

1    So I'm very familiar with the VAR and how we -- our

2    partners, and honestly, with Charter, in our regular course

3    of business.

4    Q    I would direct your attention, Mr. Auman, to Page 34 of

5    your deposition, lines 21 through Page 35, line 3.  I read

6    the first question and answer as follows.  "Mr. Auman, do

7    you have any responsibilities related to the Spectrum

8    Business Value Added Retail Agreement?"  Answer by Mr.

9    Auman, "No."  Mr. Auman, have I correctly read the question

10   that was posed to you and your answer under oath on

11   September 24th, 2019?

12   A    Yes, sir.

13   Q    And you understood the question that I asked you, Mr.

14   Auman, because you answered it.  Isn't that the case?

15   A    Yes.  And I answered it as whether or not I used the

16   VAR in my day-to-day operations in my role.  So, yes, I

17   understood the question and answered it.

18   Q    And the question was, "Do you have any responsibilities

19   related to the Spectrum Business Value Added Retail

20   Agreement?"  And what was your answer to that question that

21   you understood, Mr. Auman?

22   A    No.

23   Q    Mr. Auman, do you have any personal -- did you -- do

24   you mind if I start over, Mr. Auman?

25   A    Yes, please.

1   Q     As of September 24, 2019, Mr. Auman, did you have any

2   personal knowledge related to the Spectrum Business Value

3   Added Retail Agreement?

4   A     In September I didn't have personal knowledge related

5   to the VAR and to the Spectrum Value Added Retail Agreement.

6   Q     Since that time you've talked to some people --

7   A     Now, I have -- I'm sorry.  I do now.

8   Q     Mr. Auman, as of September 24th, 2019, you did not have

9   any personal knowledge related to the Spectrum Business

10  Value Added Retail Agreement.  True?

11  A     True.  That is correct.

12  Q     Since that time -- Mr. Auman, it's also true that you

13  don't have a time machine.  True?

14  A     That I don't.  Yes, sir.

15  Q     And so you didn't go back in time to March of 2019 to

16  gain any personal knowledge related to that Spectrum

17  Business Value Added Retail Agreement.  Isn't that right,

18  sir?

19  A     No, I didn't go back in time.

20  Q     What you did is you talked to people, right?  Among

21  other things.

22  A     Yes, sir.  I talked to people.  I reviewed the VAR.  I

23  read the documents and testimony surrounding the VAR, and I

24  very much understand the VAR.  It's a very common practice

25  in telecommunications.  And, frankly, it's something that's,

1    like I said, very common.

2    Q    You talked to people who aren't here, correct?

3    A    Some of the folks that I spoke with are not here.  Yes,

4    sir.

5    Q    Is there anybody that you spoke to to gain personal

6    knowledge related to the Spectrum Business Value Added

7    Retail Agreement that are here?

8    A    I spoke to our Counsel for sure in discussions

9    throughout the course of the year.

10   Q    Are you willing to talk about the facts that you

11   discussed with your counsel related to the Spectrum Business

12   Value Added Retail Agreement?

13             MR. ROSS:  Objection.  Attorney-client privilege.

14   Counsel knows that.

15   BY MR. KINGSTON:

16   Q    So I can't ask about that, can I, Mr. Auman?

17   A    Evidently not.

18   Q    Okay.  Other than your lawyers, is there anybody here

19   that you talked to to gain personal knowledge related to

20   that Spectrum Business Value Added Retail Agreement since

21   September 24 of 2019?

22   A    No, sir.

23   Q    So I can't ask whoever you talked to any questions

24   today.  Is that right?

25   A    Yes, sir.

1  Q    And you don't have any reason to quibble with your

2  lawyer's assertion that I can't ask any questions to a piece

3  of paper, do you, sir?

4  A    No, I do not.

5  Q    Okay.  It's true, isn't it, Mr. Auman, that the

6  competitive assessment that helps you understand the markets

7  where Spectrum competes with Windstream is not your area,

8  isn't that right, sir?

9  A    It is now.  Yes, sir.

10 Q    As of September -- I'm sorry.

11 A    Yes, I have responsibilities for that part of the

12 business within the consumer and small and medium business.

13 So the 18 states that we are the ILEC, I have responsibility

14 now within my organization.

15 Q    You said twice now it is your responsibility now.

16 Isn't that right, sir?

17 A    Yes, sir.

18 Q    And as of September 24 of 2019, it was not your

19 responsibility.  Isn't that right?

20 A    Yes, sir.  It was my colleague, Mr. Brad Brannon

21 responsibility at that time.

22 Q    It wasn't your area as of September 24 of 2019?

23 A    My team didn't do the competitive assessment of that

24 time.  We use the information all the time.  That's how we

25 go to market.  So it was my colleague at the time, Brad.

1    That responsibility has since shifted over to my team, my

2    organization.

3    Q    As of September 24 of 2019, you didn't have any

4    specialized knowledge related to the competitive assessment

5    that would help you understand the markets where Spectrum

6    competes with Windstream.  Isn't that right, sir?

7    A    Specialized knowledge?  We use the competitive

8    information on a daily basis.  I'm responsible for our

9    overall go-to-market efforts to acquire customers, and in

10   all of our 18 states for sales and marketing.  So the

11   competitive assessment is foundational.  It's table stakes

12   to what we do.

13   Q    You use a phone on a daily basis, don't you, Mr. Auman?

14   A    I'm sorry?

15   Q    You use a phone on a daily basis, don't you, Mr. Auman?

16   A    Typically I do.  Yes, sir.

17   Q    Do you use an iPhone?

18   A    Yes, sir.

19   Q    All right.  You can't build an iPhone, can you, sir?

20   A    No, sir, I cannot.

21   Q    You don't have any specialized knowledge that would

22   enable you to opine on how an iPhone would properly be

23   created and manufactured and assembled, do you, sir?

24   A    No, sir.

25   Q    And that's the case even though use an iPhone every

1    single day.

2    A    That is correct, sir.

3    Q    And as of September 24 of 2019, you used a competitive

4    assessment, but that wasn't your area, was it, sir?

5    A    No, I was not responsible for the -- the people that

6    pull that together to assimilate that data didn't report to

7    me at that time.  They sat across the table.

8    Q    You use the competitive assessment data, but as far as

9    opining as to where Spectrum competes with Windstream,

10   that's not an opinion that you formed.  Isn't that right,

11   sir?

12   A    Where Spectrum and Windstream compete is critically

13   important to me.  And so yeah, I have an opinion on that and

14   I have resources with -- my responsibility is sales and

15   marketing.  So we have thousands of people in all of these

16   markets.  And that is the basis of which we get the

17   competitive intelligence.  So it comes from my team.  The

18   repository of it though at the time was with Mr. Brad

19   Brannon's team.  Now it's with mine.  I hope that helps

20   explain.

21   Q    If you wanted to know whether Spectrum and a subsidiary

22   of Windstream Holdings compete in some town in Texas, you

23   would ask Mr. Brannon.  Isn't that right, sir?  In September

24   of 2019.

25   A    That is correct.  Yes, sir.  I could also -- that would

1    be one method.  I could also ask my sales organization, my

2    local marketing organization, which was in effect at that

3    time as well.  But the repository, if at the time I wanted a

4    quick report, I would have asked the individual at that time

5    on Mr. Brad Brannon's team to pull it.

6    Q    And the person you understand to be responsible for

7    that repository was Mr. Brannan as of September 24 of 2019,

8    correct?

9    A    That was within his job scope at the time.  Yes, sir.

10   We are a very small and nimble team.  We work

11   collaboratively every single hour of the business day.  And

12   so, you know, we depend on each other.  Not one individual

13   is self-sufficient.

14   Q    In fact, your understanding on September 24 of 2019 was

15   that competitive market areas were determined by reviewing

16   licensing records.  Isn't that the case, sir?

17   A    Licensing records are one input.  I would say a more

18   relevant input that I count on is people in our markets

19   sharing the information.  That's frankly how we see what's

20   going on in near real-time information.  It's how we saw

21   that folks from Spectrum were going door-to-door with the

22   false and misleading advertising.  If you rely just on

23   licensing, you're usually a little behind.  But we have

24   multiple inputs into that repository.  We rely on the 3,500

25   technicians we have in our markets, our sales organization,

1    our local marketing consultants, licensing, across the

2    board.

3    Q    In September of 2019, about a month before -- or excuse

4    me, about 15 days before Mr. Jarosz submitted his expert

5    report, your understanding was that it requires a license or

6    some type of license to compete in geographies, and that's

7    how a competitive assessment was performed.  Isn't that

8    right, sir?

9    A    My understanding is it requires a license to compete in

10   geographies.  For example, we are an ILEC, which stands for

11   incumbent local exchange carrier.  Our geographies are

12   regulated typically by the public service commissions or

13   public utility commissions of the state.  That requires

14   licensing.  Not anybody can just come into the market and

15   hang cables on telephone poles and bury service wires

16   through people's yards to provide competitive services.

17   Q    And of course you understand that Spectrum is not

18   comprised -- or Charter Communications, Inc. doesn't have a

19   bunch of subsidiaries that used to be incumbent local

20   exchange carriers.  You know that, right?

21   A    Yes, sir.  That's my understanding.  I've been

22   (indiscernible) --

23   Q    And you also understand that (indiscernible) doesn't

24   have a bunch of subsidiaries that are what's called

25   competitive local exchange carriers.  Isn't that right, sir?

1              MR. ROSS:  I'm sorry, Your Honor, but Mr. Auman

2    was cut off mid-answer by Mr. Kingston.  I would request

3    that the witness be allowed to complete his answer before a

4    new question is posed.

5              THE COURT:  The answer on the ILECs?

6              MR. ROSS:  Yes, Your Honor.

7              THE COURT:  Okay.

8    BY MR. KINGSTON:

9    Q    I apologize, Mr. Auman.  Please.

10   A    That's okay.  It's very difficult over Skype sometimes.

11   What I was just sharing is I'm familiar with your question

12   that Charter is not confined to ILECs.  And I've been in

13   this business for 25 years overall.

14   Q    And is Charter comprised of CLECs?

15   A    I don't believe so, but I'm not sure.

16   Q    So whatever specialized knowledge you bring, your

17   understanding of the competitive market assessment, that

18   specialized knowledge doesn't include knowing whether

19   Charter Communications, Inc. had subsidiaries that operate

20   as competitive local exchange carriers.  Is that right?

21   A    That is correct.  I don't know the specific -- whether

22   or not Charter needs to register as a CLEC or not.

23   Obviously I know that we compete head-to-head in 12 of our

24   18 states and that Charter has a broader national footprint.

25   Q    And you know now that --

1   A    But designated as a CLEC, I don't know.

2   Q    Do you have your sworn declaration in front of you, Mr.

3   Auman?

4   A    Yes, sir, I do.  Let me fish it out here.  I have it.

5   Q    And this is your trial testimony under penalty of

6   perjury.  Isn't that right, sir?

7   A    Yes, sir.

8   Q    And you executed your declaration on April 20th, 2020

9   under penalty of perjury as evidenced by your signature on

10  the last page of the declaration?

11  A    Yes, sir.

12  Q    I would direct your attention to paragraph 24.  Can you

13  see where you vouch for the authenticity of the document in

14  paragraph 24?

15  A    Paragraph 24 is Plaintiff's trial Exhibit 17.

16  Q    Can you take a look at Plaintiff's trial Exhibit 17 if

17  you would, sir?

18  A    Yes.  Is that in the joint exhibit book?

19  Q    I believe that it is in the Plaintiff's exhibit book,

20  sir.

21  A    I have it in front of me.

22  Q    And is that the record of customer contacts related to

23  the Charter advertising that you identified in Paragraph 24

24  of your sworn testimony?

25  A    Yes, sir.

1   Q   And Exhibit 17 has a number of columns where somebody

2   just sort of plugs in information as they go along?

3   A   It appears that there is some -- so I don't know if

4   somebody plugged it in or if there is an automatic

5   population, but it appears that there's some -- either a

6   menu of options or some manual input.  Yes, sir.

7   Q   You don't know how Plaintiff's Exhibit 17 was prepared?

8   A   I did not review with individuals who prepared this

9   document.

10   Q   So you don't know how Plaintiff's Exhibit 17 was

11   prepared?

12   A   Not the individuals, no, sir.

13   Q   Actually, take a look at Defendant's impeachment

14   Exhibit 113 if you would, sir.

15   A   Defendant's?

16   Q   Defendant's impeachment Exhibit 113.  I think that one

17   is going to be in the sealed envelope that you got just

18   recently.

19   A   Okay.  My office here is swimming in documents.

20   Q   I understand, sir.  And I appreciate both your patience

21   and everybody else's patience.  I miss the days when I could

22   just hand stuff to people.

23   A   I have it.

24   Q   And it looks like Defendant's Impeachment Exhibit 113

25   is just kind of a variant of that record of customer

1   contacts.

2   A    Yes, sir.

3   Q    Only this time has a -- Defendant's Impeachment Exhibit

4   113, it has a column with dollar amounts plugged in as well?

5   A    Yes, sir.

6   Q    And do you know how Defendant's Impeachment Exhibit 113

7   was prepared?

8   A    Yes, sir, I do.

9   Q    And with all those dollar amounts plugged in, it's a

10  simple exercise to just add those up and come up with that

11  total at the bottom.  Isn't that right, sir?

12  A    Yes, sir.

13  Q    It's not something that requires any specialized

14  knowledge or scientific or technical background such as

15  math.  Isn't that right?

16  A    Yes, sir.

17  Q    You don't have to hire an expert to add those numbers

18  up and come up with $5,278?

19  A    No, sir.  That's Excel spreadsheet summation.

20  Q    Directing your attention back to Plaintiff's Exhibit

21  17.  And just briefly, do you see a reference to a customer

22  care screenshot or customer care screenshot?

23  A    I do, yes, sir.

24  Q    And tell me what that is.

25  A    So typically a sales rep -- I'm sorry, an inside rep,

1  whether it's sales or customer care -- in this case it would

2  most likely be our customer care group.  Part of the system

3  allows he or she to take a screenshot of the visual that

4  they're looking at on their computer screen.  I've seen

5  that.  I believe that's what this is referencing.  I side

6  jack with sales reps and customer care reps occasionally.  I

7  witness them take screenshots.

8  Q    And of course just for the benefit of the Court and the

9  record, side jacking is when you plug in and listen in on a

10 call between a customer -- involving a customer care

11 associate and a customer that is calling in with kind of a

12 question or concern?

13 A    Yes, sir.  That's correct.  It's how we -- as

14 executives when we make a visit, we typically like to sit

15 down with our folks that are taking calls and get grassroots

16 information.

17 Q    And as those customer care associates are talking to

18 customers, they can make call notes into a system that can

19 be reproduced as screenshots.  Isn't that right?

20 A    Yes, sir.  It's a manual -- what I've seen, what I've

21 observed, it's manual.  Similar to what you would do on your

22 Apple computer.

23 Q    And the goal is to -- not to make the obvious point,

24 but when a customer calls in with a complaint and concern,

25 the goal of the customer care associate is to persuade that

1  customer to maintain their service with Windstream.  Isn't

2  that the case?

3  A    Absolutely.  We fight tooth and nail to acquire

4  customers.  And when a customer is with us, we do everything

5  in our power to keep them with us, and mostly by giving them

6  great service, answering their call when they come in.  You

7  know, literally, figuratively giving them a bear hug and

8  making sure that they're listening to their complaints and

9  anything that they might have.

10  Q    And the point of listening to their complaints and

11  being responsive and the figurative bear hug is to convince

12  those customers to maintain their service with Windstream.

13  Isn't that right?

14  A    Yes, sir, it is.  And -- yes, it is.  Absolutely.

15  Q    Take a look if you would at Defendant's Exhibit 19.

16  A    Okay.  It's a screenshot, it appears.  It says AT&T and

17  Spectrum false advertising.  That one?

18  Q    Yes, sir, that one.

19  A    Okay.

20  Q    And I guess before we talk about Defendant's Exhibit

21  19, I want to make sure I understand.  Kind of the

22  figurative existing customer bear hug to maintain their

23  service, that's a different thing than going out and trying

24  to get new customers.  Isn't that right, sir?

25  A    Yes, sir.  Of course how you treat your existing

1    customers has a lot to do with (indiscernible) acquiring new

2    customers.  If customers are unhappy or kind of -- the five-

3    to-one ratio that I've learned in marketing and also in my

4    home life is, you know, one negative is five positives.  So

5    -- or it takes five positives to offset one negative.  So if

6    a customer is in need of service, taking care of that

7    customer is a very important thing, because they will go out

8    and tell other people about their poor experience or their

9    concerns.

10   Q    One way that you build your business is to go out and

11   get new customers, yes?

12   A    Absolutely.  Yes, sir.

13   Q    And then once you have that new customer, once you have

14   that customer, then you want to convince that customer to

15   maintain their service with you.  And that's a different

16   thing, right?

17   A    Yes, sir.  The convincing isn't as much of a sales

18   pitch as it is delivering.  It's honoring our commitment to

19   that customer and making sure that they don't get

20   disconnected, making sure that what we advertise the price

21   to be is what they pay.  And when they call in, they get the

22   service.  Just like you would expect, as we all expect as

23   being consumers.

24   Q    And I lost the thread, and I appreciate your patience

25   with me, Mr. Auman.  But going back to Defendant's Exhibit

1   19, that's one of these customer care call notes that are

2   referenced in Plaintiff's Exhibit 17.  Is that right, sir?

3   A    I don't know if this particular screenshot is from

4   Plaintiff's Exhibit 17 or -- did you say 17?

5   Q    I said 17.  And --

6   A    (indiscernible).

7   Q    I'm sorry, Mr. Auman.  I'm trying not to speak over

8   you.  But just to clarify, I'm not asking if Defendant's

9   Exhibit 19 is actually reflect on Plaintiff's Exhibit 17.

10  I'm just asking this is what we're talking about when we're

11  talking about call notes.

12  A    There's call notes on here for sure.  I think this is

13  more representative of a screenshot.

14  Q    (indiscernible) for the record.  And you don't know --

15  is there a separate spreadsheet out there of folks calling

16  in to report the AT&T false advertising?

17  A    I'm not aware of one.

18  Q    This customer care screenshot indicates somebody called

19  in to report AT&T and Spectrum false advertising.  Isn't

20  that right?

21  A    I just can read off of what the screenshot says.  And I

22  see to report AT&T and Spectrum false advertising.

23  Q    That's what somebody -- an employee of some Windstream

24  entity plugged in while they were talking to some customer

25  on the phone trying to convince them to maintain their

1    service with Windstream.  Isn't that right, sir?

2    A    So I don't know the background and the specifics of the

3    call, whether there was discussion of, you know, threatening

4    to leave or not.  I heard calls of customers.  I listened to

5    recorded calls earlier, and I think I testified to this, of

6    customers calling in that were confused.  And they just

7    called in to report Spectrum's false and misleading

8    advertising at the time, and it was compelling.  So I don't

9    know if they were threatening to leave here or -- I didn't

10   listen to the specific one.  I didn't --

11   Q    What we know from this document produced by Plaintiffs

12   is that somebody called in to report AT&T and Spectrum false

13   advertising.  Isn't that right?

14   A    That's what's -- that -- (indiscernible) --

15   Q    This is one of those circumstances where there's a

16   difference between looking at a piece of paper that you

17   can't ask questions to and talking to a person to whom you

18   could pose questions.  Isn't that right, sir?

19   A    I would agree with that, or listening to the call

20   recording, which I prefer to do, yes.

21   Q    Yes.  And certainly the best evidence would be an audio

22   recording itself.  Isn't that right, Mr. Auman?

23   A    I think you can get a lot of information from it.  But

24   they're sometimes difficult to find.  I'll just read it for

25   what it is.  Yes, sir.

1   Q    Take a look at Defendant's Impeachment Exhibit 114, if

2   you would, Mr. Auman.

3   A    I have it, yes, sir.  It's a sent letter from Spectrum

4   bankruptcy.

5   Q    If it was Defendant's Exhibit 114, another one of those

6   customer care screenshots.

7   A    Yes, sir.  It appears to be.

8   Q    And so I read the call notes on that screenshot as

9   follows.  PI -- and I understand that to mean call in.  Is

10  that right?

11  A    That's -- I've seen that.  I've observed that as well

12  previously.

13  Q    "Called in with a sent letter from Spectrum about

14  bankruptcy.  Wanted us to beat offer from Spectrum, offered

15  modem credit, accepted."  Have I read that correctly, sir?

16  A    Yes, sir.

17  Q    And so this is a circumstance where Windstream's

18  customer care associates are offering upgrades or discounts

19  or pricing promotions in order to convince that customer to

20  maintain their service with Windstream.  Isn't that right,

21  sir?

22  A    That's certainly what it appears to me, that they

23  received a call mid-April, which would have been typical of

24  when we were receiving quite a few phone calls from the

25  advertising from Spectrum that was sent out about us, you

1    know, going out of business or risk losing the service.  And

2    this appears to be one of those situations where the

3    customer, you know, leveraged it and we were able to save

4    the customer by offering a modem credit.

5    Q    You were able to convince that customer to maintain

6    their service with Windstream by offering them a modem

7    credit.  Isn't that right?

8    A    That's certainly what it appears.  Yes, sir.

9    Q    And if we wanted to put a dollar value on that modem

10   credit, what's a Windstream modem run you?

11   A    It varies a little bit.  But I think on the 6.99, 5.99,

12   6.99 range per month.  So if you take that and you say the

13   average tenure of a customer is let's just say ballpark 50

14   months, it's pretty substantial.  You're taking a $300 hit

15   over the lifetime value of that customer.  So I would

16   consider this a material cost.

17   Q    And so the customer -- and that's because the customer

18   could pay up to -- over the lifetime pay $300 for that modem

19   through the rental fee?

20   A    If they stayed as a rental, yes, sir.

21   Q    Take a look if you would at Defendant's Impeachment

22   Exhibit 109.  I'm trying to get my arms around, Mr. Auman,

23   what it would cost a customer to just buy a modem as opposed

24   to spending $300 renting a modem from Windstream over the

25   course of their customer lifetime.

1          MR. ROSS:  Your Honor, I think we've given Mr.

2    Kingston ample room to run here.  I am mystified as to the

3    relevance of this line of questioning unless it's intended

4    to simply run out the clock today.

5          MR. KINGSTON:  Your Honor, I think I'll make the

6    relevance clear as we continue.

7    BY MR. KINGSTON:

8    Q    But, Mr. Auman, if I wanted to buy a modem on

9    Amazon.com, could I possibly pay more than $200 bucks?

10         MR. ROSS:  Excuse me, Mr. Kingston --

11         THE COURT:  I don't know where this is going, Mr.

12    Kingston.  I mean, they have an agreement, the customers

13    have an agreement with these folks.

14         MR. KINGSTON:  Very good.

15         THE COURT:  The world has many instances where

16    people could do other things more cheaply, but they don't

17    because they want to have one agreement.

18         MR. KINGSTON:  Your Honor's point is well-taken,

19    and we're looking to establish that we could put a dollar

20    amount on that modem credit.  And I think Mr. Auman has

21    confirmed that we can.  Haven't you, Mr. Auman?

22    BY MR. KINGSTON:

23    A    I'm sure there's definitely a cost of crediting back

24    that modem, that rental fee.  And I believe it's around

25    $5.99 per month.  Your financing options of the iPhone that

1   you spoke of earlier, right?  You pay a thousand dollars of

2   have another alternative.

3   Q    Sure.  It used to be back in the incumbent local

4   exchange carrier days that you were required to rent your --

5   was it your bakelite phone from Ma Bell?  Do you remember

6   those days, sir?

7   A    Unfortunately I think I do.  Yes, sir.  That was my

8   first job as well around 25 years ago and working with a

9   local exchange carrier.  Yes, sir.

10  Q    Of course Ma Bell got hit with a giant class action for

11  leasing those phones, didn't they, sir?

12           THE COURT:  We're wasting time, Mr. Kingston.

13           MR. KINGSTON:  Very good.  Thank you, Your Honor.

14  BY MR. KINGSTON:

15  Q    Exhibit 17, Plaintiff's Exhibit 17, Mr. Auman, couldn't

16  you have just added a column down the side of Plaintiff's

17  Exhibit 17 that would include that offered modem credit and

18  similar pricing promotions that were offered to maintain

19  customer service?

20  A    Let me get back to 17.  Hold on.  All right, 17.  It's

21  back on the list of customers that called in that we took

22  screenshots on.

23  Q    Yes, sir.  And you'll recall Defendant's Impeachment

24  Exhibit 13, it was possible to just plug in a list of dollar

25  amounts associated with the various successful efforts to

1   convince customers to maintain their service with Windstream

2   by offering upgrades, discounts, and pricing promotions.  Do

3   you recall that, sir?

4   A    Hold on.  I've got to go back to 13.

5            THE COURT:  I don't.  Thirteen was about repairs I

6   thought.

7   BY MR. KINGSTON:

8   A    This is Plaintiff's Exhibit 13?

9   Q    Yes, sir. Oh, no, Defendant's Impeachment Exhibit 13.

10  A    Oh, okay.

11  Q    Oh, I'm sorry, I said Defendant's Impeachment Exhibit

12  13 and what I should have said was Defendant's Impeachment

13  Exhibit 113.

14  A    One thirteen, okay, got it. So, Exhibit 113 is where we

15  had last mile customers of Spectrum that were disconnected

16  that called in, in some cases --yes. And these are the --

17  there's a longer list than this -- but these are the

18  customers that we gave credit to, monetary credit to, for

19  being out of service because they had called in reporting an

20  outage, circuit down, hard circuit down, no voice and data -

21  - business customers.  That's why it's a lot more money;

22  that we had 100 percent certainty that called in because of

23  Spectrum's disconnects. That's 113.

24  Q    Yes, sir. And you offered them a credit, you offered

25  those disgruntled customers credit, so that they would

1    maintain their service with Windstream?

2    A    Yes, sir.

3    Q    And then you wrote down, or somebody input it, in some

4    fashion, the dollar amount of those credits.

5    A    Yes, sir. Our normal course of business is we keep a

6    record of credits offered.

7    Q    And so, it would be feasible on Plaintiff's Exhibit 17

8    to include a similar column with a similar listing of the

9    dollar amounts of the upgrades or discounts or pricing

10   promotions that were offered to get those customers to

11   maintain their service with Windstream?

12   A    Honestly, I'm not aware. Like I said, I didn't sit down

13   with the folks that hold this one. This, to me, looks like a

14   report that was pulled -- so, I don't know, is the answer on

15   that one. And there's retail store reports in here, door-to-

16   door.

17   Q    Direct your attention to paragraph 15 of your

18   declaration, Mr. Auman.

19   A    Yes, sir, I have it.

20   Q    Read the last two sentences of your sworn testimony in

21   paragraph 15, as follows: "Windstream was forced to offer

22   customer upgrades, discounts and pricing promotions to

23   convince customers to maintain their service with

24   Windstream. The total approximate cost of this was

25   $4,033,425." Now, have I read your sworn testimony

1    correctly?

2    A    Yes, sir.

3    Q    I'm going to direct your attention, sir, to Defendant's

4    Impeachment Exhibit 110. Are you with me, Mr. Auman?

5    A    Yes, sir.

6    Q    I see at the top of Defendant's Impeachment Exhibit 110

7    a Bates range. Do you know what a Bates range is, sir?

8    A    I think so, but let me -- I'll just ask you to clarify

9    to make sure that --

10   Q    You recall that when we were looking at Defendant's

11   Exhibit 19, that there was a little number in the bottom

12   that was preceded by WIN, and then there was the number

13   1772.

14   A    Yes.

15   Q    And you're generally familiar with the concept, Mr.

16   Auman, that when lawyers exchange papers with each other

17   they put little numbers down at the bottom to kind of keep

18   track of what the papers are and how many papers were given

19   to each other.

20   A    Yes, I've leaned that. That I've become -- have

21   specialized knowledge in now. Yes, sir.

22   Q    You've heard those numbers referred to as Bates

23   numbers, from time to time?

24   A    I wasn't paying attention to that, but I hear you. And

25   I'm glad I asked you because I was thinking of something

1    completely different.

2    Q    And so, at the top of Defendant's Impeachment Exhibit

3    110, I see the Bates range WIN1 through WIN4712. Do you have

4    any reason to disbelieve that that's the number of pages of

5    pieces of paper that Plaintiffs have produced in this

6    lawsuit, sir?

7    MR. ROSS: Your Honor, I'm going to object. Do you have any

8    reason to believe that isn't? I mean that's an inappropriate

9    question.

10   MR. KINGSTON: I think it's perfectly appropriate, Your

11   Honor, to see what the witness is in a position to dispute

12   or not to dispute. If he's not in a position to dispute it,

13   that's the last question.

14   MR. ROSS: He's not here to dispute lawyer argument, Your

15   Honor. He's here to testify as to fact.

16   THE COURT: Are you asking him to identify this document? I'm

17   just --

18   MR. KINGSTON: No, sir. This is a summary exhibit and I'm

19   going to ask Mr. Auman to help me validate the various

20   component parts before our case in chief be offered into

21   evidence.

22   MR. ROSS: Your Honor, this document is not in evidence. I

23   think it is the most deceptive document I've ever seen

24   attempted to be offered into evidence. But I'm going to

25   insist that it not be reviewed by the factfinder until it is

1   accepted into evidence. It is not allowed to be published to

2   the factfinder unless in evidence. It clearly cannot come

3   into evidence.

4   MR. KINGSTON: Your Honor, I'll ask for it in a bench trial.

5   And the factfinder has -- it's the Court who determines

6   admissibility. And it's long been established that the

7   factfinding judge can determine that if a document is

8   irrelevant that he or she need not pay attention to it. It's

9   not the same thing as publishing it to a jury, Your Honor.

10  MR. ROSS: The starting point here should be to lay a

11  foundation for this document's admissibility. This witness

12  has never seen -- well, I won't say that --

13  THE COURT: I think you were trying to lay a foundation, but

14  I don't understand why you asked the question you did about

15  the Bates numbers because --

16  MR. KINGSTON: I'll move on.

17  Q   Mr. Auman, do you know whether Plaintiff has produced

18  more or less than 187 documents in this lawsuit?

19  A   I know we've produced a lot of documents. So …

20  speculation, but there's been a lot of documents that have

21  gone back and forth. I have a lot of documents here in my

22  office.

23  Q   Whatever the number of documents that have been

24  produced, Plaintiffs have them and Defendants have them, and

25  the entirety of them can be provided to the Court. Isn't

1    that right, sir?

2    A    That's my understanding.

3    Q    And if you take a look at the upper left hand corner of

4    the table, I see a quotation from your sworn trial

5    testimony. Do you see the same thing, Mr. Auman?

6    Q    Yes, sir.

7    MR. ROSS: Your Honor, I'm going to renew my objection. The

8    first question that needs to be put to this witness is, has

9    he ever seen this document before, such that he can

10   authenticate it.

11   MR. KINGSTON: That's not how it works, Your Honor.

12   THE COURT: I think it's fine to ask him if he can identify

13   paragraph 15, which we just went through. So, you can move

14   onto the next question.

15   Q    Thank you. And in paragraph 15, Mr. Auman, did you

16   identify an approximate cost related to those efforts to

17   convince customers to maintain their service with

18   Windstream?

19   A    I'm sorry, I want to go back to my testimony to make

20   sure that they matched up. Could you repeat the question?

21   I'm sorry.

22   Q    Have you confirmed. Mr. Auman, that your testimony

23   matches up with the quotation in the upper left hand corner

24   of the table depicted in Defendant's Impeachment Exhibit

25   110?

1    A    Yes, sir.

2    Q    What we see in that upper left hand corner is what you

3    testified to under oath.

4    A    Yes, sir.

5    Q    And when you testified under oath, you identified an

6    approximate cost related to convincing customers to maintain

7    their service with Windstream, did you not sir?

8    A    It wasn't just maintain. The majority of this has to do

9    with the promotional cost to attract customers to make up

10   for the loss of customers that we suffered in the March and

11   August timeframe, that were disconnects, as well as the

12   suppressed demand that we saw for new customers during that

13   time and beyond. This whole promotion and these costs are

14   for the promotional cost associated with bringing new

15   customers in. And it's just in the charter markets.

16   Q    Mr. Auman, the word that you signed under penalty of

17   perjury in paragraph 15 included the following: "Windstream

18   was forced to offer customer upgrade, discounts and pricing

19   promotions to convince customers to maintain their service

20   with Windstream. The total approximate cost of this was

21   $4,033,425." Have I read that correctly, sir?

22   A    Yes, sir.

23   Q    That was your sworn testimony? Yes, sir?

24   A    Yes, sir.

25   Q    And the total approximate cost in your sworn testimony,

1   to maintain their service, was $4,033,425 to the dollar.

2   Isn't that right, sir?

3   MR. ROSS: I'm going to object to that. He has to read the

4   entire sentence. He doesn't get to pick and choose. And

5   we've read it four times. If counsel is going to insist he

6   doesn't have enough time this morning, we're going to come

7   back and revisit. But the whole problem is he's asking the

8   same question four times. If he wants to make a lawyer

9   argument, let him do it at closing.

10  Q    Mr. Auman, your sworn testimony was that there was an

11  approximate cost of $4,033,425. Is that true?

12  THE COURT: You've asked him this about six times now, Mr.

13  Kingston.

14  Q    Okay. Mr. Auman, do you have any reason to believe that

15  Plaintiffs have produced more than 12 documents related to

16  customer upgrades to convince customers to maintain their

17  service with Windstream?

18  A    Say that again, sir. I'm sorry.

19  Q    Mr. Auman, do you have any reason to believe that

20  Plaintiffs have produced more than 12 pages of documents

21  related to customer upgrades to convince customers to

22  maintain their service with Windstream.

23  MR. ROSS: Again, we object. This use of the phrase, "Do you

24  have any reason to believe?" is inappropriate.

25  THE COURT: Were you involved in the production of the

1    documents, Mr. Auman? With the documents that Mr. Kingston

2    is referring to?

3    MR. AUMAN: Not to the ones that he's referring to with

4    specific customer upgrades.

5    THE COURT: Okay. So, you'd just be speculating at this

6    point?

7    MR. AUMAN: Yes, sir.

8    Q    You would have to speculate, Mr. Auman, as to any

9    documents related to convincing customers to maintain their

10   service with Windstream through customer upgrades. Is that

11   right?

12   MR. ROSS: I'm sorry, that's not what he testified to just

13   now.

14   THE COURT: That's not what I asked him. I said, is he

15   speculating as to the number of documents produced on this

16   topic?

17   MR. KINGSTON: It's my question posed to him, Your Honor.

18   THE COURT: But it's an unfair question. You need to be more

19   specific about what you're asking him about speculating

20   about.

21   Q    Mr. Auman, you swore under oath that Windstream spent

22   $4,033,425 in part related to customer upgrade to convince

23   customers to maintain their service with Windstream, did you

24   not?

25   A    So, that's not the full extent of the testimony. You're

1    truncating it.

2    Q    I'm trying to break out -- there's the piece parts, Mr.

3    Auman. You understand you identified three things: customer

4    upgrades, to convince customers to maintain their service;

5    discounts to convince customers to maintain their service,

6    and pricing promotions to convince customers to maintain

7    their service. All I'm trying to do, Mr. Auman, is add those

8    three things up and see how in the world we can get to

9    $4,033,425. Can you help me with that, sir?

10   A    Yes, of course.

11   Q    Okay. Customer upgrades.

12   A    The story here is, is that the false and misleading

13   advertising that was sent to our customers and to our

14   markets, and not just existing customers, but non-Windstream

15   customers, now have fear, uncertainty and doubt about the

16   viability of Windstream going forward. So, if they're in the

17   market to buy new internet service, they may not call. And I

18   can assure you that we believe that's the case. So, we lost

19   -- we've been in a growth streak since July of 2018 in

20   charter exchanges, and a growth streak overall since March

21   of 2018. After losing customers since 2014, lost customers

22   after year, we finally got the growth. And once the false

23   and misleading advertising hit in those charter markets, we

24   went negative; means we lost more customers than we

25   acquired. And so, we were on a growth trajectory, now we're

1    behind plan. And at one point, in April-June timeframe, we

2    were about 5,000 customers behind our business plan. And so,

3    we introduced an offer later in the year that involved three

4    months free, one month free, service credits, to recover

5    those losses. This $4 million is associated with those

6    promotional costs. If we went back and looked at our

7    customers that called in that were existing customers as

8    well, and wanted that promotion, I'm highly confident we'd

9    find a lot more money that we offered those customers. To be

10   definitive, however, we produced the $4,033,425 as the cost

11   of that promotion for just the charter exchanges. It

12   actually cost us over six million overall. So, that's where

13   the $4 million comes from.

14   Q    You spent, you're now telling the Court that Plaintiffs

15   spent $4,033,425 acquiring new internet customers, right?

16   A    Yes, sir. We did.

17   Q    And those are new internet customers. Those aren't the

18   ones that you're figuratively hugging to maintain their

19   service that we talked about before, right?

20   A    Those in particular would be new customers. They may

21   have been previously. The stipulation was they couldn't be

22   with us for the past 30 days. So, some of those customers

23   likely disconnected and came back with us and enjoyed a

24   promotional period, or a promotion that we offered that was,

25   frankly, by far the most aggressive promotion that we had

1    offered since my time here. And cost a substantial amount of

2    money. I mean, $4 million is a lot of money to us. It's, you

3    know, a significant chunk of my marketing budget. It's a big

4    deal.

5    Q    Four million dollars is, indeed, a lot money. Isn't it,

6    Mr. Auman?

7    A    Yes, sir. It is.

8    Q    And if you're going to tell the Court that Charter

9    ought to be made to write a check for $4 million, you ought

10   to tell the truth about the reason why. Shouldn't you, Mr.

11   Auman?

12   MR. ROSS: I'll object to that. That's absolutely scandalous

13   to suggest that the witness hasn't been telling the truth.

14   That should be stricken.

15   THE COURT: It's a question, it's not a statement. So, you

16   could answer it, Mr. Auman.

17   A    Yes, sir, I speak the truth.

18   Q    Show me, in paragraph 15, where I see a reference to a

19   new internet customer.

20   A    Say that again, sir?

21   Q    Can you direct my attention, Mr. Auman, in paragraph 15

22   of your sworn trial testimony, to the reference to a new

23   internet customer.

24   A    There's no words of their new internet customer in that

25   paragraph.

1  Q   There's a dollar amount, isn't there, sir?

2  A   Yes, sir, there is.

3  Q   And that dollar amount is connected to the approximate

4  cost of convincing customers to maintain their service with

5  Windstream, isn't it, sir?

6  A   It's more -- there's more to it than that. But the

7  dollar figure -- the word 'maintain' is in there and the $4

8  million is in there.

9  Q   And 'new internet customers' is not in there.

10  A   Not in that paragraph, no sir.

11  Q   And am I correct, Mr. Auman, that it would be false to

12  say that Windstream spent $4,033,425 on upgrades, discounts

13  and pricing promotions to convince customers to maintain

14  their service with Windstream?

15  MR. ROSS: I'm going to object to that. He's basically

16  asking, saying to the witness, "You lied in paragraph 15."

17  THE COURT: Well, yes. Can you state the question again?

18  Q   I'm not sure I can remember it, but I'll take a run at

19  it, Your Honor. Mr. Auman, would it be false to say that

20  Windstream spent $4,033,425 offering customer upgrades,

21  discounts and pricing promotions to convince customers to

22  maintain their service with Windstream?

23  MR. ROSS: I'll repeat my objection. He's essentially asking

24  this witness to say that paragraph 15 is a lie. And he's

25  repeatedly said it is the truth.

1  THE COURT: So, you basically -- it's asked and answered? Is

2  that the objection?

3  MR. ROSS: Yes, Your Honor.

4  THE COURT: All right, I do think we've covered this. We've

5  covered this already.

6  MR. KINGSTON: I do want to make sure, Your Honor, that I've

7  confirmed whether or not Mr. Auman disputes some of the

8  granular figures that go into the $4 million number that

9  he's articulated in paragraph 15. As far as --

10 Q    Can you help me do that, Mr. Auman?

11 A    I don't understand your question.

12 Q    I'm just asking, I took a long way of saying, are you

13 ready to move on just a little bit further?

14 A    I'm here for you, yes, sir.

15 Q    Very good. As far as customer upgrades, so upgrading

16 from 25 megabits to 50 megabits, Mr. Auman, did Windstream

17 spend more or less than $4,000 on customer upgrades to

18 convince customers to maintain their service with

19 Windstream?

20 A    So, where … is this -- where am I looking at this?

21 Q    I'm just asking you to help me break down the figures

22 in the $4,033,425 number in your sworn trial testimony at

23 paragraph 15.

24 THE COURT: So, are there components of that number that you

25 can identify?

1    MR. KINGSTON: Thank you, Judge. That's what I was -- I was

2    struggling with the word 'component.

3    A    The $4 million represents the promotional costs of new

4    customers that hadn't been with Windstream in the past 30

5    days, to join.

6    Q    So, the existing -- I'm sorry, Mr. Auman, I didn't mean

7    to speak over you.

8    A    Existing customers that we offered, that called in to

9    do this promotion, and it's very typical that your base, you

10   know, your base sees a better deal out there, they'll call

11   in and they'll say, "Hey, can I be offered a similar deal?"

12   And in that case, we'll offer credits, as you've seen

13   before. Those are not included in this $4 million. That's

14   harder to track. This was a definitive number around the

15   promotional costs associated with bringing new customers in,

16   from September to the end of December; so, convincing new

17   customers, convincing customers to join Windstream, some of

18   which were previously with us, to come back. And those were

19   in the Charter markets. So, when I say Charter markets only,

20   those are the exchanges that we compete with --- Spectrum,

21   the brand name -- direct, head to head. No other costs -- we

22   didn't include any other costs in that number. But there are

23   other costs.

24   Q    So, the existing -- I'm sorry, Mr. Auman, I'm honestly

25   trying not to speak over you. I'm struggling with the Skype

1    a little bit.

2    A     This is a conservative number.

3    Q     Are you finished, sir?

4    A     Yes.

5    Q     So, the existing customer upgrade component of that

6    $4,033,425 figure is zero, correct?

7    A     Yes, sir, it's not included in this. This is the

8    promotional cost only.

9    Q     And the existing customer discount component of that

10   $4,033,425 figure is zero, correct?

11   A     No, that's not correct.

12   Q     What is it?

13   A     Part of the promotion was to offer $100 discounts or

14   $150 discounts depending on what sales channel the acquired,

15   they came to us on. So there were -- I categorized those as

16   discounts. And those are in the spreadsheet that I know that

17   we provided because we worked on that last week.

18   Q     The spreadsheet that you worked on last week was all

19   new customer information, correct?

20   A     Yes, there's discounts involved in that, though.

21   Q     So, the existing customer discount component of that

22   $4,033,425 number would be zero, correct?

23   A     Yes, that's correct. This is all promotion cost

24   associated with bringing on new customers in our attempt to

25   recover the losses based on the suppressed demand, and the

1    false and misleading advertising, you know, earlier in the

2    year. We were way behind -- it had a material impact. I

3    think I spoke to that. We had a material spike in

4    disconnects. There was overall suppressed demand. It overall

5    took air off our wing. And so, once we launched this

6    promotion we got back to growth and we got back, close back

7    to our plan commitment for the year --

8    MR. KINGSTON:  Objection, Your Honor --

9    A    -- (indiscernible) cost associated with that.

10   MR. KINGSTON: Your Honor, I move to strike everything after

11   the word 'yes' as nonresponsive.

12   MR. ROSS: I think he answered the question appropriately.

13   The fact that counsel doesn't like the answer is irrelevant.

14   THE COURT: It's just a function of your asking the question

15   several times.

16   MR. KINGSTON: Thank you, Your Honor.

17   THE COURT: So, I won't strike it. He already gave the answer

18   that he just gave again, to the question as that was asked

19   again.

20   Q    I think we had moved onto the third component. The

21   existing customer pricing promotions component of that four

22   million --

23   THE COURT: Mr. Kingston, he said all of this is for new

24   customers. So, we don't need to ask about each element

25   because it's all subsumed by the testimony that all of this

1    figure, $4,033,425, is made up of promotional costs and

2    other costs, but it's all in respect of new customers, not

3    addressed to rectifying directly the complaints of existing

4    customers.

5    Q    And so, zero dollars out of that $4,033,425 figure was

6    to convince customers to maintain their service with

7    Windstream, isn't that so, Mr. Auman?

8    THE COURT: He's already said that like five times.

9    MR. KINGSTON: Thank you, Your Honor.

10   Q    I'll direct your attention, Mr. Auman, to Defendant's

11   Impeachment Exhibit 75.

12   A    Yes, sir.

13   THE COURT: While you're looking at that, Mr. Kingston, your

14   video has been off for a while. I don't know if you have

15   someone you can … tell you to turn it on. I'm assuming you

16   can see Mr. Auman and everyone else, but we can't see you.

17   MR. KINGSTON: Oh, goodness.

18   THE COURT: We've been able to hear you fine.

19   MR. KINGSTON: Thank you, Your Honor, for pointing that out.

20   Somebody's looking into that. I'm going to try and just turn

21   it off and then on.

22   THE COURT: Yeah, there you are.

23   MR. KINGSTON: Very good. Thank you, Your Honor.

24   Q    Defendant's Impeachment Exhibit -- I think we're ready

25   to go. Thank you. -- Defendant's Impeachment Exhibit 75, Mr.

```
1    Auman. It's heavily redacted electronic mail, in
2    correspondence. Do you see it, sir?
3    A    Yes, sir, I do.
4    Q    Is Cynthia Bennett a lawyer?
5    A    I'm sorry, say that again.
6    Q    Is Cynthia Bennett a lawyer?
7    A    You know, I don't know if she has a law background.
8    That's not the capacity that she works today.
9    Q    Her capacity -- she's not a legal counsel?
10   A    No, sir.
11   Q    What about Steve Brandon?
12   A    Again, I don't know if they're lawyers or not, but
13   that's not in his capacity here.
14   Q    So, it looks like on Defendant's Impeachment Exhibit
15   75, is that some internal Windstream correspondence?
16   A    Yes, I'm familiar with this document.
17   Q    Okay. And it looks like there was an email that was
18   sent, it looks like Daniel Martinez is replying to an email
19   and he is replying to a Mr. Brannon, Ms. Hu, Ms. Bennett and
20   Brandon. Do you read it the same way that I do?
21   A    With respect to the one on April 7, yes, sir.
22   Q    Mr. Martinez is responding to four non-lawyers.
23   A    Yes, sir.
24   Q    Strike that. Mr. Martinez is responding to four people
25   who don't act as legal counsel to Windstream?
```

1    A    Yes, that's -- yes, sir.

2    MR. KINGSTON: Your Honor, given the witness's testimony, it

3    appears that, at least the bottom portion of Defendant's

4    Impeachment Exhibit 75, which bears the Bates labels WIN3060

5    through WIN3063, has been improperly redacted. It doesn't

6    look like there's any attorney-client privilege that could

7    be claimed as to that document, and we would ask that it be

8    produced in an unredacted form.

9    THE COURT: Do you know, Mr. Ross, why it was -- is Martinez

10   a lawyer?

11   MR. ROSS: No, but I know why the party just referred to, the

12   bottom of -- sorry, Mr. Kingston, did you say 3062 or 3063?

13   MR. KINGSTON: The redacted portion that I'm talking about at

14   present is on pages 3026 and 3063. So, it's --

15   MR. ROSS: Yes, Your Honor. That email chain begins with --

16   well, so I sent an email to Mr. Auman, and you ask him this,

17   with some thoughts on trial strategy and some queries. He

18   cut and pasted part of that in an email which he sent to Mr.

19   Martinez, or eventually got to Mr. Martinez, which was

20   unfortunate. And this is the response back. So, the

21   privilege part is an email of mine, or a portion of an email

22   of mine, that is both privileged and attorney work product.

23   THE COURT: Okay.

24   MR. KINGSTON: It seems, Your Honor, that Mr. Martinez is

25   responding to an inquiry and you can't use the privilege as

1   both a sword and a shield. We're entitled to know what Mr.

2   Martinez is responding to.

3   THE COURT: How is it being used as a sword?

4   MR. KINSTON: That's fair enough, Your Honor. With that

5   explanation, is it -- I don't want to spend a huge amount on

6   time of this, but it is something that can just be provided

7   to the Court for in camera review.

8   MR. ROSS: This is just more delay and distraction.

9   THE COURT: I mean, is there any reason to doubt that this

10  contained, the redacted part, contains the work product or

11  communication from counsel?

12  MR. KINGSTON: The Court has all the information that I have.

13  All I have, are the redaction.

14  THE COURT: But it's not the -- it's not really being

15  MR. KINGSTON: The Court's point, I think, is well taken.

16  They're not offering it. And so, I can't fuss about it

17  unless they're offering it.

18  THE COURT: Right. I mean, they have said elsewhere that the

19  four million is just the charter markets, but I don't think

20  this is being offered for that. They have separate exhibits

21  that deal with that issue. I think.

22  MR. ROSS: We haven't offered anything. This is part of a

23  production --

24  THE COURT: I understand.

25  MR. ROSS: --that we made at Charter's request.

1    THE COURT: So, I don't think -- I just think it's a non-

2    issue.

3    MR. KINGSTON: Very good.

4    Q    I'll direct your attention, Mr. Auman, to Defendant's

5    Impeachment Exhibit 77.

6    A    Yes, sir.

7    Q    And is Defendant's Impeachment Exhibit 77 a PowerPoint

8    describing a three-month free promotion?

9    A    Yes, sir.

10   Q    And that's in tiers one and two, isn't that right, sir?

11   A    Yes, sir.

12   Q    The tiers are with a C, correct?

13   A    No, sir.

14   Q    Take a look, if you would, Mr. Auman, at page four of

15   Defendant's Impeachment Exhibit 77.

16   A    The tiers are -- the primary driver of the tiering is

17   who we compete against. Tier one, as we define it, is all

18   Charter exchanges, part of our 1,400 exchanges, where we go

19   head to head with Charter Spectrum; tier two would be

20   Comcast. So, tier one would be about 43 percent of our

21   market and tier two would be about, I think it's around nine

22   or ten percent. So, a big, big chunk of our business is

23   where we compete head to head with Spectrum. About 43

24   percent of our base customers and around the same percentage

25   of new acquisition customers as well. So, it's less about

1   speed. But it so happens that we have more speed in tier one

2   markets, typically.

3   Q    Take a look at page four of Defendant's Impeachment

4   Exhibit 77.

5   A    Yes, sir.

6   Q    What's the first reference to tier one you see on page

7   four?

8   A    The tier one version speeds up to 200 megabits

9   included.

10  Q    It says, "Tier one version, speeds up to 200 megabits

11  included," right?

12  A    Yes, sir.

13  Q    What's the first reference to Charter that you see on

14  page four?

15  A    Charter is not mentioned in page four. This is a

16  document that we create to launch campaigns to our frontline

17  sales folks, marketing folks, operational folks. Mostly

18  sales. It's called a marketing brief, very typical. And the

19  people that work here, what they care about is the

20  promotional offers. They know they compete against in the

21  markets. That would be -- so, Charter's not mentioned, but

22  this is a normal course of business about how we launch

23  campaigns.

24  Q    Normal course of business in how you launch campaigns

25  to conceal the names of the competitors that you're

1    competing against?

2    A    Conceal -- we know. We do this on a daily basis. So,

3    tier one is Charter, Charter market; tier two is Comcast

4    markets, and we have four tiers.

5    Q    What's the first reference to tier two that you see?

6    A    On page one, on the cover sheet where it says "Tiers

7    one and two."

8    Q    I'm sorry, Mr. Auman, on Defendant's Impeachment

9    Exhibit 77, page four, the description of the direct mail

10   product offered. Do you see a reference to tier two on that

11   page, sir?

12   A    Yes, sir.

13   Q    Do you see a reference to non-Charter in connection

14   with tier two? Or do you see a reference to a certain speed?

15   A    This is -- I see a reference to speed, but to put this

16   in context, our pricing strategy, which this is about, in

17   tier one markets, the entry level price is speeds up to 200

18   megabit per second. So, if you qualify for 50, it costs the

19   same as if you qualify for 200 megabits per second. So,

20   think of it as we offer, for the same price, up to a certain

21   speed in those markets; because the speed matters. And in

22   those markets, by and large, we have more speed

23   availability. But that's really changed. We now offer 100

24   meg greater across more than 40 percent of our markets. And

25   so, it's in reference to -- we want to give the customer,

1    basically, as much value as possible.

2    Q    Take a look at Defendant's Impeachment Exhibit 86, if

3    you would, Mr. Auman.

4    A    Eight six.

5    Q    Eight six.

6    A    I have that.

7    Q    Is Defendant's Impeachment Exhibit 86 an operational

8    bulletin related to one of your three-month-free promotions?

9    A    Yes, it is. This is, essentially, the test we ran in

10   advance of the ultimate three-month-free promotion that we

11   ran in the last quarter of the year. And this is the -- so,

12   we brought this to market in June at a much narrower scope,

13   to determine the results, the impact of what this would

14   have, since we didn't have any operational knowledge. It's

15   the most aggressive campaign that we have fun. And so, this

16   is what that one is. It's much narrower in scope, but if you

17   -- it's much earlier as well.

18   Q    Take a look at page two. You see assumptions associated

19   with that offer?

20   A    Yes, sir.

21   Q    What's the very first assumption?

22   A    Offers listed are available to new residential Kinetic

23   internet customers only.

24   Q    Going back to page one, do you see an overview?

25   A    Yes.

1    Q    And I read that last sentence in the overview, first

2    paragraph, to say, "This promotion will position Kinetic

3    internet more aggressively in market where we are competing

4    with Charter, Spectrum and Allo." Have I read that

5    correctly?

6    A    Yes, sir.

7    Q    And then you see a list of those markets?

8    A    Those are exchanges. Yes.

9    Q    And are those exchanges where you understand Windstream

10   to be competing with Charter?

11   A    Yes, I do. It might not be in -- offhand, I'm not

12   familiar with every single one of those exchanges, goes head

13   to head with Charter, but I believe it does.

14   Q    Take a look at Plaintiff's Exhibit 60, please.

15   A    Plaintiff's Exhibit 60?

16   Q    Yes, sir.

17   A    Yes, I have it open.

18   Q    You didn't have anything to do with putting Plaintiff's

19   Exhibit 60 together, did you, sir?

20   A    Did I … no, I did not. I didn't put this document

21   together. I'm familiar with the document. It's a summary of

22   something I see on a daily basis.

23   Q    What's the first exchange identified in that

24   operational bulletin, for this three-month-free promotion on

25   Defendant's Impeachment Exhibit 86?

1    A    Nebraska 150E delta, echo -- or alpha -- victory,

2    Yankee, Davey.

3    Q    Is there a town or a city associated with that

4    exchange?

5    A    I'm not familiar with this central office. Besides,

6    there are many -- there are small, little communities, rural

7    communities, in and around Lincoln, Nebraska. And so, I'm

8    not sure, typically, since we grew up as a rural provider.

9    The central office is in a town which is how the whole local

10   exchange designation came about. But I'm not familiar with

11   this particular -- where this Davey location is.

12   Q    If you take a look at page 38 of Exhibit 50, is Charter

13   a primary competitor of Windstream in Davey, Nebraska?

14   A    No, it's Affordable Internet Solutions, AIS Wireless.

15   Q    Is there even a cable competitor listed for Davey,

16   Nebraska?

17   A    No.

18   Q    Let's try the next one, on the operational bullet.

19   That's Defendant's Impeachment Exhibit 86. What's the next

20   town listed?

21   A    Denton.

22   Q    Can you look at Exhibit 50, is Charter either the

23   primary competitor or even a competitor at all, in Denton,

24   Nebraska?

25   A    Not according to our records, no competitor from

1    Spectrum.

2    Q    So, in putting this offer together, your records didn't

3    suggest that Charter was either a primary or even a

4    secondary competitor in Denton, Nebraska?

5    A    No. The main exchange here is Lincoln. That's --

6    Q    Let's look at Hickman.

7    A    Lincoln is -- and so, then there's surrounding

8    communities. And so, we would, you know, we'd try to offer -

9    - it's called, something called a DNA. And so, when it comes

10   to a marketing area, if you offer the service in the area

11   where you're marketing, people in these other cities are

12   going to get the message, so you want to be consistent in

13   the offer.

14   Q    Mr. Auman, do I correctly get the impression that you'd

15   rather talk about Lincoln, Nebraska than Hickman or Malcolm

16   or Martell or Pleasant Dale or Raymond?

17   A    No, sir. I'm just --

18   Q    Well, let's talk about Hickman then.

19   A    Okay.

20   Q    Is Charter a competitor of Windstream, according to

21   your records in Hickman, Nebraska?

22   A    No, sir.

23   Q    What about Malcolm, Malcolm, Nebraska? Is Charter a

24   competitor in Malcolm, Nebraska?

25   A    No, sir.

1   Q    What about Martell? Is Charter a primary or even a

2   secondary competitor in Martell, Nebraska?

3   A    No, no, sir. That's --

4   Q    What about Pleasant Dale or --

5   A    Go ahead.

6   Q    I was asking if Charter was a primary or even a

7   secondary competitor in Pleasant Dale or Raymond, Nebraska.

8   A    The answer is going to be no. No, it's Zito. Raymond,

9   no, that's Affordable.

10  Q    Of course, Allo, Allo is a competitor in Lincoln,

11  Nebraska, isn't it, sir?

12  A    Yes, sir.

13  Q    And Allo is fast, right?

14  A    What do you mean by fast?

15  Q    Way faster than Windstream.

16  A    You're referring to speeds?

17  Q    Yes.

18  A    Well, no. It depends where the service location is.

19  This business is all down to your home address and what --

20  Q    Very good --

21  A    -- speed your home address.  Lincoln, Nebraska happens

22  to be an area where we're deploying fiber, which -- you

23  know, and speed, it's not just about speed. It's about

24  stability, it's about bandwidth. I mean, just because cable,

25  for example is a shared bandwidth just because if you have

1   200 megs on cable, your whole community gets on, cable is a

2   shared bandwidth, your service will go down. So, there's a

3   lot of complexity to that. But we offer fiber service in

4   many parts of Lincoln, which our speeds are better than

5   others, and in some cases not as fast as others, talk about

6   (indiscernible) download --

7   Q    One of the things you do, Mr. Auman --

8   A    Go ahead, I'm sorry.

9   Q    No, no, finish your answer, sir. I apologize.

10  A    It's just there's more complexity around it. There's

11  upload and download speeds, there's through put, stability.

12  Q    Now that you've gotten into the competitive assessment

13  line, one of the things that you do to figure out where your

14  competitors are competing is to look at their advertising

15  and promotions, isn't that right, Mr. Auman?

16  A    That's certainly one way, absolutely. In fact that's,

17  yes, that's one input.

18  Q    One way we could see where Allo --

19  A    -- (indiscernible) leading indicator of where you're

20  going. Yes.

21  Q    One way in which we could see where Allo competes with

22  Windstream would be to look up where Allo offers services on

23  its website. Isn't that so?

24  A    That would be another input, yes, sir.

25  Q    Take a look at Defendant's Impeachment Exhibit 89.

1    A    I'm there.

2    Q    You see the Allo website and the list of apartment

3    buildings where, according to its website at least, Allo

4    supports the office services?

5    A    Yes, sir, I do.

6    Q    See that first one, 1020 H Street in Lincoln, Nebraska?

7    A    Hold on … 1020, yes, sir.

8    Q    And of course, you understand that you can just plug

9    that address into the FCC's broadband deployment map to see

10   who competes with who where and what speeds they offer,

11   right?

12   A    That could be one input, yes.

13   Q    Can you take a look at Defendant's Impeachment Exhibit

14   91?

15   A    Okay. I'm there.

16   Q    And is Defendant's Impeachment Exhibit 91 a screen shot

17   of the FCC's fixed broadband deployment map?

18   A    Yes, dated June of last year.

19   Q    And as of June of last year, were Allo and Windstream

20   and competing for customers in that apartment building at

21   1020 H Street in Lincoln, Nebraska?

22   A    We were … yes, we offer service there. Yes, sir.

23   Q    And what was the speed that Windstream Nebraska Inc.

24   was offering at that apartment building?

25   MR. ROSS: Your Honor, what is the relevance of an of this?

1    MR. KINGSTON: The relevance, Your Honor, is to show that

2    this new promotion was because Windstream was getting

3    thumped in the marketplace based on speed, not because of

4    some junk mail sent in March.

5    THE COURT: Right. You can ask the question.

6    A    In this case, it's 75 megabits per second.

7    Q    And is Allo faster or slower than that?

8    A    It appears they have a fiber deployment there which

9    would be significantly faster at this particular location.

10   Q    Allo isn't, as far as you know, comprised of local

11   exchange carriers or competitive local exchange carriers.

12   Isn't that right, sir?

13   A    No. My knowledge of Allo is they're a, what's called an

14   over-builder who comes in and cherry picks off kind of, you

15   know, the top of the business, the cream, so to speak.

16   They're not a carrier of last resort, which we are, which we

17   have a whole different requirements and regulations; which

18   mean we have to provide service to customers that others

19   will not or don't want to. But in this case, that's my

20   understanding of Allo. Yeah, they're a good competitor.

21   Q    And Windstream provides services to rural communities

22   to such an extent that it gets five percent of its revenue

23   from state and federal Universal Service Fund payments.

24   Isn't that right?

25   A    I'm not familiar with the amount that we get from USF.

1    But I know that we do get some USF as well as CAF funding.

2    We were, I believe, the only ILEC actually to meet our

3    eligibility requirements for that CAF funding. So, I think

4    we did a pretty good job.

5    Q    Allo doesn't get that revenue from state and federal

6    USF funding. But it does get to go after the most densely-

7    populated areas, isn't that right, sir?

8    A    I'm not completely familiar, internally, with their

9    business strategy. But I mean, they're an over-builder.

10   They're out of Lincoln, Nebraska, among other cities. My son

11   actually goes to the University of Nebraska, so real

12   familiar them. And they're, you know, they're a fierce

13   competitor, just like a lot of competitors in all of our

14   markets.

15   Q    Allo is very fast and goes for the cream of the crop.

16   Is that what you testified earlier?

17   A    What's that?

18   Q    Allo is very fast and goes for the cream of the crop as

19   far as competitive marketplaces, isn't that what you

20   testified earlier?

21   A    I don't know their business strategy. What I do know is

22   we call them an over-builder and what I've seen in my

23   experience is the over-builders, and even -- you know, yeah,

24   go where they can bring fiber and get the most return on

25   investment.

1   Q    And the places where you can get the most return on

2   your investment are the more densely-populated exchanges,

3   isn't that right?

4   A    Every business strategy is different. Some of the over-

5   builders target businesses only because --

6   Q    Mr. Auman, you don't disagree with --

7   A    I'm sorry?

8   Q    No, no, go ahead.

9   A    There are different strategies.

10  Q    You don't disagree with the proposition, Mr. Auman,

11  that it's a lot cheaper to run a one gig fiber to an

12  apartment building than it would be to run it to the same

13  number of people strewn throughout a rural township, do you?

14  A    It seems logical that if you got fiber to an apartment

15  complex you could get more customers than bringing it to a

16  rural area, so to speak. It's expensive to build out --

17  Q    And of course the --

18  A    -- (indiscernible) customers have more churn, they're

19  higher, their lower (indiscernible). There's, generally

20  speaking, we call those MDUs, there's marketing agreements

21  in place that they pay a lower rate. So, it's all -- there's

22  a lot of factors.

23  Q    Of course, the exchanges that Plaintiffs identify as

24  Charter exchanges are much more densely populated than the

25  exchanges that Plaintiffs identify as non-Charter exchanges.

1   Isn't that right?

2   A     So, our exchanges that we compete with Charter, it is

3   what it is. It's where Charter and Windstream go head to

4   head for the same customers. You know, it's where the

5   geographies overlap. And even within a local exchange, it's

6   not going to be everywhere, right? It happens to be where

7   the two service areas intersect and then that's how we

8   define it.

9   Q     Is a true statement, Mr. Auman, that even in a local

10  exchange, it's not going to be everywhere that Charter and

11  Windstream compete, right?

12  A     Yes, sir, that's correct.

13  Q     There's going to be census blocks in that exchange

14  where Charter and Windstream don't compete; isn't that true?

15  A     Absolutely.

16  Q     And so if you iden- -- and those census blocks would be

17  incorrectly identified as areas where Charter and Windstream

18  compete if you were just looking at the exchanges; isn't

19  that right, sir?

20  A     We don't use census blocks to measure our business.  We

21  use the exchanges, which go back to the bell operating days.

22  And because we're regulated, you know, by public service

23  commissions, public utility commissions.  And as an

24  incumbent local exchange area, we use and have used for a

25  number of years those exchanges as our footprint, and we

1    compete against in that footprint.

2    Q    I want to circle back to that, but first I want to -- I

3    think we need to close the loop on this concept of number of

4    customers per exchange amongst those identified as Charter

5    and non-Charter exchanges.  Can you help me through that,

6    Mr. Auman?

7    A    Yes, absolutely.

8    Q    It's a true statement, isn't it, Mr. Auman, that there

9    are many, many more customers per exchange than the

10   exchanges that you have identified as Charter exchanges on

11   Exhibit 60 than there customers per exchange in the

12   exchanges that you have identified as non-Charter exchanges;

13   isn't that so?

14   A    So I think earlier I gave you the percentage of overlap

15   of our base.  It's our roughly 42 percent of our base

16   customers, meaning of the million plus customers that we

17   have and across our geography, 42 percent of the areas will

18   in the exchanges we compete head to head with Charter.  So

19   in totality, there would be more, you know, 58 percent of

20   our base would be non-Charter exchanges.

21   Q    There's 1,400 -- I'm sorry, Mr. Auman.

22   A    Go ahead.

23   Q    There are 1,428 exchanges identified on Plaintiffs'

24   Exhibit 60, are there not?

25   A    I mean, look, that sounds familiar though.

1    Q    If you take a look at the top of Page 18.

2    A    Hold on one second.  It's Plaintiffs' Exhibit 60?

3    Q    Yes, sir.

4    A    Okay.  Yes, sir.

5    Q    And 134 of those exchanges are identified as Charter

6    exchanges; isn't that right?

7    A    So where would that be on here; what page?

8    Q    Well, if it was provided -- if the document was

9    provided in native when I read this (indiscernible), I won't

10   ask you to count it, but do you have any reason to think

11   that the number is greater or fewer than 134 Charter

12   exchanges on Plaintiffs' Exhibit 60?

13   A    I would not.  If you'd counted it, I'll take it.  Yeah,

14   it changes over time.  I'll accept it if you've counted it;

15   that helps.

16   Q    If you look at Page 5, do you see some customer numbers

17   for August of 2019?

18   A    Yes.  Yes, sir, I see that.

19   Q    And it looks like there are 360,198 out of the total

20   1,037,110 customers that Plaintiffs contend are in the 134

21   Charter exchanges.  Does it look right to you, right?

22   A    Let me make sure.  Yes, 360,198 at that time.

23   Q    So at that time, you have 360,000 people crammed into

24   134 exchanges, and that worked out to be roughly 2600 people

25   per exchange.  Does that make sense to you, sir?

1    A    There's on average, so you're -- I mean, you're taking

2    the number of exchanges divided by the base count and

3    averaging it over the number of exchanges.  And I think when

4    you say that number 134, that's exclusively Charter?  I get

5    the math.  It's just --

6    Q    Well, I mean, exclusively Charter.  Is it exclusively

7    Charter and Windstream Nebraska at 1020 H Street, or there

8    are some other folks there?

9    A    I'm sorry?

10   Q    Well, going back to Exhibit 91 -- I'm sorry,

11   Defendants' Impeachment Exhibit 91.  I mean, that's not

12   exclusively Charter the competition is reflected on

13   Defendants' Impeachment Exhibit 91, is it?

14   A    No, no, no.  There's, in that particular location,

15   according to the FCC, there is Allo as well.  And then you

16   have some satellite providers which, you know, we don't

17   really consider them direct competitors in this case, but

18   they offer a niche service, yeah.

19   Q    If Allo's going to spend the money bringing gig service

20   to somebody being an overbuilder, well, it's going to target

21   that densely populated apartment building; it's not going

22   for the rural community, right?

23   A    Oh, I guess it's -- they -- well, the address is part;

24   it's a couple hour drive from Lincoln, Nebraska and they've

25   gone there.  I believe they're going to York, which is a

1  couple thousand people, and that's an hour drive from

2  Lincoln.  Hastings, Nebraska, you know, it's an area that's,

3  I think, in the 10,000 range maybe, you know, shat I

4  consider, you know, small community kind of a Main-on-Main

5  Street type of thing.  And they either had permits to go

6  build there or backed away from it, so I would consider them

7  building in pretty rural areas.

8  Q    So when you were suggesting that Allo was --

9  A    Lincoln, Nebraska for us is pretty big.  But, you know,

10 for -- it just depends on your perspective.

11 Q    So when you were suggesting that Allo was targeting the

12 cream of the crop, you weren't trying to suggest they were

13 targeting the more densely populated areas where you could

14 get more customers for -- associated with fewer building

15 expenses.

16 A    I think I want to clarify.  I said based on my

17 experience, overbuilders may target the cream of the crop,

18 but they're not the carrier of last resort.  I don't have

19 intimate knowledge of Allo's internal strategy, as if that's

20 what they're doing.  The cream of the crop is kind of --

21 it's pretty broad, right?  I mean, you can go after business

22 customers only.  So -- I just want to clarify that.

23 Q    All right.

24 A    I don't have any knowledge of strategy.

25 Q    I think I forgot to close the circle on the non-Charter

1   exchanges, going back to Exhibit 60.  Do you have any reason

2   to dispute that of the 676,000 roughly remaining customers,

3   (indiscernible) 1,294 remaining exchanges; could that work

4   approximately about 500 customers per exchange?

5   A    I'll accept your math.

6   Q    Whatever personal knowledge --

7   A    I mean, that involves your local -- I mean, the markets

8   that we can be head to head was with Charter, I imagine are

9   larger markets.

10  Q    All right.  And if you're providing broadband, sir,

11  you've got to build stuff, right?  I mean, you got to run

12  fiber or cable or antenna along satellites, I guess, right?

13  A    Yes, sir.

14  Q    And building stuff costs money, right?

15  A    Yes, it does.

16  Q    And if you're going to spend money building stuff, why

17  you'd rather build stuff where there's a whole bunch of

18  people that could pay you money for subscriber fees than

19  very few people, right?

20  A    Yes, sir, that's a good business strategy.

21  Q    And so, those densely populated Charter exchanges, I

22  mean, those are going to be palatable to other competitors

23  like Allo, right?

24  A    There's overbuilders and in many places and there's, I

25  guess, there's lot of competition and smaller competitors

1   out there all over.  Yes, there's comp- -- it's a

2   competitive market; yes, sir.

3   Q    All right.  Take a look a Defendants' Impeachment

4   Exhibit 94.  I see Defendants' Impeachment Exhibit 94 to be

5   the FCC's fixed broadband map information for Lincoln,

6   Nebraska.  Do you see it the same way, sir?

7   A    Yes, sir.

8   Q    And in truth, it's not Lincoln, Nebraska.  It's the

9   census block right in the middle of Lincoln, Nebraska; isn't

10  that right, sir?

11  A    I don't know.  I can't see.  I'm familiar with Lincoln,

12  recognize some of those streets.  I don't know exactly where

13  this is taken.

14  Q    Well, what's the top --

15  A    Very small (crosstalk).

16  Q    What's the top download speed that Windstream Nebraska,

17  Inc. offers in that census block; it comes up if you put

18  Lincoln, Nebraska in the FCC's fixed broadband deployment

19  map as of June of 2019?

20  A    DSL service, 12 down and 1.5 up.

21  Q    Is that --

22  A    Not a key competitive area for us, that particular

23  location.

24  Q    I mean, that point of the area is where you were

25  offering this three-month free service though, right?  If

1    you go back to Defendants' Impeachment Exhibit 86.

2    A    Yes, sir.

3    Q    I mean, but Lincoln, Nebraska, that's one of the

4    exchanges that you're targeting for this three months of

5    free service for new customers, right?

6    A    Yes, sir, it is.

7    Q    I mean, but your problem in Lincoln, Nebraska is not

8    junk mail.  It's that Allo Communication and Charter are

9    way, way faster than you, right?

10            MR. ROSS:  Objection to the use of the term junk

11    mail as vague and ambiguous.  I think he's referring to what

12    this court has found to be the false and unlawful

13    advertisement, but he should say that then.

14            THE COURT:  Just substitute those words for junk

15    mail, but you can answer the question.

16    BY MR. KINGSTON:

17    A    So this is a narrow slice of the market, and we compete

18    very favorably in Lincoln, Nebraska and the surrounding

19    community, and we deploy fiber cable.  And I'm quite

20    confident that I could pull out and show a, you know, a

21    contrary example where our speeds are at the top, and so,

22    this is a narrow slice.  Lincoln is a big market for us.

23    It's a big deal relative to -- in our business.  We think

24    of, you know, kind of Lincoln, Lexington, Kentucky,

25    Sugarland, Texas, North Georgia; it's a very big market.

1    It's an important market for us.

2    Q    Just so the record is clear, and I don't know that I

3    went through this.  What is the -- what's the speed that

4    Allo Communications offers in the Lincoln, Nebraska

5    marketplace according to the FCC's broadband deployment map,

6    the download speed, sir?

7              MR. ROSS:  Your Honor, why are we asking the

8    witness to read documents when the Court has limited court

9    time?

10              THE COURT:  Yeah.  I think we can move on on this.

11              MR. KINGSTON:  Thank you, Your Honor.

12    BY MR. KINGSTON:

13    Q    Mr. Auman, you had talked earlier about the fashion in

14    which Plaintiffs track where their customers are located.

15    Do you recall that, sir?

16    A    No, not off hand, I don't.

17    Q    You were talking about where your customers are and you

18    said, well, their exchanges.  Do you remember that

19    conversation in sort of broad strokes, Mr. Auman?

20    A    Yes.  Our customers are in exchanges.  Yes, sir.

21    Q    But you know more about a customer than what exchange

22    it's in; don't you, sir?

23    A    We -- yes, certainly, we know where customer -- where

24    our customers live.  We know the service levels they're

25    experiencing.  We monitor the performance of our network.

1    We kind of proactively communicate with them if, you know,

2    just as I said earlier, working to keep them happy.  We know

3    their billing, you know, their payment history.  So all the

4    legal things that we can and or are shared with us with our

5    customers.  We definitely -- define that, sir.

6    Q    I mean, the service you provide is over a cable or a

7    fiber optic cord or a copper line or something, right?

8    A    We have some fixed wireless as well; yes, sir.

9    Q    And you send your customers bills, right?

10   A    They are billed; yes, sir.

11   Q    So you have an address.  You actually have an address

12   associated with that customer; don't you, sir?

13   A    Yes, we do.

14   Q    Take a look at Defendants' Impeachment Exhibit 105.

15   Defendants' Impeachment Exhibit 105 is a substantial

16   document bearing the Bates numbers WIN3100 through WIN3213.

17   Have I correctly described exhibit -- Defendants'

18   Impeachment Exhibit 105, Mr. Auman?

19   A    Could you repeat the description again?

20            THE COURT:  He just gave you the page numbers,

21   nothing else.

22   BY MR. KINGSTON:

23   A    Oh, yes, sir.  Yes, WIN3100, yes, sir.

24   Q    Mr. Auman, I'll represent to you that this was a

25   document provided by Plaintiffs.  Can you tell me what it

1    is, sir?

2    A    This is the source data from one of our customer lists.

3    I can't tell you definitely what it is with the redacted

4    information, other than I believe it is either a list of

5    customers where -- that took the three months promotion for

6    one form of the promotion or a list of customers that we

7    were going to -- been emailed information to and contact.

8    Q    So Plaintiff can push a button and then the bits and

9    bytes will spit out a list of customers, complete with

10   customer addresses; isn't that right?

11   A    For our -- yes, sir.  Typically, for our residents.

12   This is the -- I know that these are our ILEC customers, so

13   this is the ILEC part of our business, one that we've been

14   mostly talking about today.  And so, yes, sir.

15   Q    And so, I mean --

16   A    Have our customers --

17   Q    So you have granular details where your customers are

18   located because you have it down to the house, right?

19   A    Yes, sir.

20   Q    Wouldn't that be the more -- that be the more granular

21   level of detail then in a census block; isn't it, sir?

22   A    Yes, sir.

23   Q    And so, if you look at Page 51.

24   A    Yes, sir.

25   Q    You'll see that you have a customer identified there as

1    somebody residing in Faubush, Kentucky; second line from the

2    top.

3    A    Yes, sir.

4    Q    You can take that -- if you had that customer's street

5    address, just like that apartment building that we looked up

6    for Allo, you could plug that street address into the

7    broadband map and see what type of block it was in; couldn't

8    you, sir?

9    A    I'm not aware.  We don't use census blocks to manage

10   our business.

11   Q    Well, you report census blocks -- you report

12   information by provider at the census block level to the

13   FCC, just as every fixed broadband carrier is required to;

14   don't you sir?

15   A    Yes, sir, we do.  I believe that happens twice a year.

16   Q    Yeah.

17   A    But we manage our business with exchanges.

18   Q    Well, you've got the customers' address, don't you?

19   A    Yes, sir.

20   Q    Well, if you look up Faubush, Kentucky.  Can you turn

21   to Defendants' Impeachment Exhibit 32?

22   A    Yes, sir.  I see it.

23   Q    So you know the day a customer is served by the ILEC

24   called Windstream Kentucky, LLC, right?

25   A    Yes, part of Windstream Holdings.

1    Q    Yeah, but the (audio distortion) that is the provider

2    for that customer in Faubush, Kentucky is Windstream

3    Kentucky East, LLC, right?

4    A    Yes, sir.  And it does -- we do business as Kinetic by

5    Windstream.

6    Q    And you can see that there's Spectrum in the name in

7    Faubush, Kentucky, right?

8    A    I'm sorry.  I didn't hear what you said.

9    Q    And you can see looking at Defendants' Impeachment

10   Exhibit 32 that Spectrum does not compete with Windstream

11   Kentucky East, LLC in Faubush, Kentucky, right?

12   A    I don't know that's accurate, not in this -- not in

13   this census block.

14   Q    Right.  You would need to look at --

15   A    (crosstalk) small.

16   Q    Right, the census blocks are real small.  And so, to

17   get a really good idea of whether customers compete and

18   don't compete, you would want to look at the individual

19   census blocks, right?

20   A    You could.

21   Q    I mean, and you could put -- you have that customer's

22   address.  There's nothing preventing you from typing that in

23   and you could see exactly which census block that customer

24   is in; couldn't you, sir?

25   A    I have not done that, but I suppose you could; yes,

1   sir.  I would assume you can.

2   Q    Take a look at Page 87 if you would of Defendants'

3   Impeachment Exhibit 105.

4   A    I'm here.

5   Q    Do you see about nine lines from the bottom, Fabens,

6   Texas?

7   A    I'm sorry.  I turned to the wrong --

8   Q    87 of Defendants' Impeachment Exhibit 105.

9   A    105.  Yes, sir.

10  Q    And you could look up Fabens, Texas, right?  Can you

11  take a look at Defendants' Impeachment Exhibit 2?

12  A    I must be on the wrong page.

13            THE COURT:  Is this to make the same point, Mr.

14  Kingston?

15            MR. KINGSTON:  I think I was going to make the

16  same point, Your Honor.  But then I was going to go ahead

17  and track through the operating report and show how he could

18  identify the money flowing into the incumbent local exchange

19  carrier, Valor Telecommunications of Texas through both the

20  cash disbursement statements in the bank account.  But if

21  the Court's question is -- if the Court's telling me I'm

22  treading on ground and would like me to move on, then I'll

23  do so.

24            THE COURT:  I think this is just cumulative at

25  this point.

1          MR. KINGSTON:  Thank you, Your Honor.

2          MR. ROSS:  Your Honor, I'll also say for

3    Plaintiffs, so as not to be unfair to Mr. Kingston.  We'll

4    stipulate that there are addresses on Defendants'

5    Impeachment Exhibit 105 that aren't going to be in the

6    census block because that exhibit contains both Charter and

7    non-Charter exchanges.  I'm happy to stipulate to that.

8    BY MR. KINGSTON:

9    Q    Well, I mean there's -- Mr. Auman, on your Plaintiffs

10   Exhibit 60, is Faubush, Kentucky listed as a Charter

11   exchange?

12   A    I don't know offhand.  I'll have to look.  I don't know

13   if that city is an exchange, what we'll call a wire center.

14   Here it is.  Yes, it is.

15   Q    And you just looked on the broadband map that indicated

16   that Charter was not present there?

17          MR. ROSS:  Well, now, Your Honor, I'm going to

18   object.  This is the same problem that we had with Mr.

19   Jarosz.  He's trying to compare apples to oranges.  All our

20   exchanges do not track the census blocks.

21   BY MR. KINGSTON:

22   Q    Mr. Auman, are you the person to explain to me why

23   Charter doesn't appear on the census block associated with

24   Faubush, Kentucky, but does appear on your -- on Plaintiffs'

25   Exhibit 60?

1          MR. ROSS:  I have an objection pending.

2          THE COURT:  Well, I think he asked a different

3     question, which is, Mr. Auman, can you explain the

4     difference between the census block and the exchange and why

5     Charter would appear on one, i.e., the exchange, but not on

6     the census block.  It's a new question.

7     BY MR. KINGSTON:

8     A     I believe so, sir, yes.

9     Q     And tell me your opinion as to why Plaintiffs Exhibit

10    60 is accurate, notwithstanding the disconnect between

11    Plaintiffs Exhibit 60 and the data appearing on the FCC

12    broadband map?

13          MR. ROSS:  So now he's gone back to the same

14    question, Your Honor, which is asking him to compare apples

15    to oranges.  He's not asking the question the Court put the

16    witness, which probably is the one that should be answered.

17          THE COURT:  Well, what do you mean by accurate,

18    Mr. Kingston?

19          MR. KINGSTON:  I forgot my question, Your Honor.

20          THE COURT:  Okay.  So can you explain why Charter

21    would be listed on a competitor at the exchange level but

22    not at the census level for certain locations, Mr. Auman?

23          THE WITNESS:  Yes, sir.  So the local exchanges

24    that we use are, again, defined I believe by the PUC/PSC,

25    Public Service Commission, is our service footprint.  And

1    when you take a census block, a very small geographic

2    location, and it may or may not overlap with Spectrum's

3    service area.  That doesn't mean that in that geography that

4    we don't compete head to head and within our local exchange

5    area.

6              THE COURT:  And how do you --

7              THE WITNESS:  It's a (audio distortion) area.

8              THE COURT:  How do you determine that you compete

9    head to head in the exchange?  Where do you get the data on

10   Charter or Spectrum for that exchange?

11             THE WITNESS:  Yes, sir.  So in a given exchange,

12   if -- so we source data from our 3500 technicians.  Each

13   central office has leadership there; we have salespeople.  A

14   lot of our information sources from the people in the

15   market, who the competition is.  That's, frankly, like the

16   best place we get it because you pick up on new promotional

17   offers, you pick up on new entrants into the market.

18             We also source it from other competitors'

19   websites.  We'll look at whose license is served in that

20   area.  There's multiple inputs into it.  This is -- I mean,

21   it's -- Your Honor, it's pretty common that you know who

22   your competitors are in a geography.

23             THE COURT:  But do you know which household is a

24   Charter household and which household is some other

25   competitor; is it at that level?

1          THE WITNESS:  No, sir, it's not.  We don't have it

2     typically down to that granular level.  It would be four

3     million for us.  I mean, I think we serve over four million

4     households in that footprint.  And, you know, but we don't

5     necessarily just target one direct mail to, you know, an

6     individual like we have class buy ins of competition or not,

7     which it's a broader effort than that.  And so, we run our

8     business with -- based on how the EFCs and PUCs define our

9     service area.  And within that exchange, that's how we

10    define who our competition is.  Our competitors, they might

11    run their businesses differently.

12         MR. KINGSTON:  I'm happy to take a run at it, Your

13    Honor.  I didn't know if you were finished inquiring.

14         THE COURT:  No, go ahead.

15         MR. KINGSTON:  Thank you, Your Honor.

16    BY MR. KINGSTON:

17    Q    Mr. Auman, we talked about the fact that to provide

18    broadband service, you have to build some stuff, right;

19    generation cable, copper wire, whatever it is you use, you

20    have to build things, right?

21    A    Yes, sir.

22    Q    And you can't provide broadband service to somebody

23    unless you've built something, an antenna or a wire, that

24    lets you provide that service, can you?

25    A    No, sir.

1  Q    All right.  And you have to tell the FCC twice a year

2  where you've built your stuff and where it is that allows

3  you to compete for somebody, right?

4  A    We report our information to census block.  We also

5  report and are required to report our exchange information.

6  And as a matter of fact, local exchanges are used, typically

7  they're called the study areas as well, which is both the

8  FCC and state and local government, as best of my

9  understanding, uses exchanges to study areas as well.  So we

10 report information to a lot of sources.

11 Q    Well, Charter doesn't report anything in exchange

12 areas, does it, right?

13 A    I don't -- I don't believe that Charter does.  I don't

14 know, but Charter's not an ILEC; it's not an incumbent local

15 exchange carrier.

16 Q    Well, either Charter doesn't report its --

17 A    (crosstalk), like --

18          THE COURT:  Go ahead, Mr. Auman.

19          THE WITNESS:  I'm sorry?

20          THE COURT:  Go ahead.

21 BY MR. KINGSTON:

22 A    I'm just saying, Windstream is an incumbent local

23 exchange carrier, and so we do have to report information on

24 our exchanges to the FCC and state and local governments, as

25 well as we report as required to the FCC for census block.

1    We're good at it too.

2    Q    Either Charter doesn't report exchanges to the FCC or,

3    if it does, nobody on your end looks at those reports,

4    correct?

5    A    That's correct.  I'm not aware that Charter reports as

6    a local exchange carrier.

7    Q    Charter does report where it has built stuff that would

8    enable it to do -- to provide service and what speeds it

9    advertises at the census block level where it can provide

10   those services, right?

11   A    That's the documents you have shown me, yes, sir.  I

12   assume that they report accurately and twice a year, just

13   like -- just like others do.  We do.

14   Q    So when Windstream is deciding where it's going to try

15   and identify its competition, it doesn't care where its

16   competition is physically capable of providing service;

17   that's not something it looks at?

18   A    We absolutely care.  It's how we define who our

19   competition is (audio distortion).

20   Q    If all -- do you know of any place where people are

21   required to report certified as true where they are

22   physically capable of providing service, Mr. Auman?

23   A    Do I know where that they're -- I'm misunderstanding.

24   I'm sorry.

25   Q    Yeah.  Are you aware of any maybe federal agency that

1    maintains a database of where people state -- or where

2    broadband providers indicate that they are capable of

3    providing service?

4    A    I know we report to the census -- to the FCC both

5    exchange information, census block information.  We work

6    very closely with the state governments and local

7    governments, because state PSC, Public Service Commission,

8    Public Utility Commission on exchanges.  We have information

9    based on that as we collect.  You mentioned USF funds.  We

10   actually collect USF funds and others don't.  I think cable

11   necessarily does, so the exchanges are used for that

12   purposes.  So I'm aware we report to both the federal and

13   state and I believe local governments as well.

14   Q    As far as you know, whoever put Plaintiffs' Exhibit 60

15   together didn't refer to the reported data available from

16   the Federal Communications Commission as to where broadband

17   providers are physically capable of providing service?

18   A    This is our internal document of how we manage our

19   business with our exchanges.

20              THE COURT:  So you didn't use the -- you didn't

21   use the census information.

22              THE WITNESS:  Not to compile this -- compile this

23   report, no, sir.  I mean, we -- this is our internal reports

24   of how we manage our business, and we define our footprint

25   based on our local exchanges and this is a reflection of how

1    we manage the business.  I look at reports on a daily basis

2    that are, kind of daily cutouts of this for broader summary

3    level.  We have the same documents, the same source data

4    shows additions, customers that joined us, customers that

5    left us on a daily basis by exchange.

6    BY MR. KINGSTON:

7    Q    All right.  Mr. Auman, are you familiar with a company

8    called ShareTracker?

9    A    What's the name of the company, sir?

10   Q    ShareTracker.

11   A    What do they do?

12   Q    You don't know what ShareTracker does?

13   A    Name isn't -- doesn't sound familiar offhand.  But if

14   you tell me what they do, it might job my memory.

15   Q    Do you have any special expertise or knowledge, Mr.

16   Auman, that would allow you to list for us third-party

17   market share companies to help competitors such as

18   Windstream and Charter identify where and with whom they

19   compete?

20   A    So, like, from a share voice standpoint, like different

21   companies that look at advertising spend, marketing

22   materials or physical presence?  I'm not sure what you're

23   referring to.

24   Q    Does Windstream contract or otherwise engage any third-

25   party vendors to help it identify the competitive overlap

1    between any of its incumbent local exchange carriers and

2    other providers in the marketplace?

3    A    Our marketing or the agency which we have uses

4    marketing and competitive assessment data as a normal course

5    of business, and this is the normal course of business or as

6    to demographics of our markets.  And part of that I know is,

7    you know, competitive with which is law.  But our primary

8    source is the competitors' analysis that shows up in Exhibit

9    60.

10   Q    All right.  Take a look at Defendants' Impeachment --

11   or excuse me, Defendants' Exhibit 85, and then I'm going to

12   ask you to look at 86 shortly thereafter.

13   A    Okay.  This is the Defendant Exhibit?

14   Q    Yes, sir.

15   A    Okay, I'm here.

16   Q    Mr. Auman, I'm not asking you to authenticate

17   Defendants' Exhibit 85.  Defendants' Exhibit 85 appears to

18   be a screenshot from a website or an entity called

19   ShareTracker.  Do you have any familiarity at all with

20   ShareTracker, Mr. Auman?

21   A    No, sir, this is unfamiliar to me.

22   Q    You never --

23   A    (crosstalk).

24   Q    So whatever competitive analytic background or special

25   knowledge you have, it doesn't include knowing the name or

1    knowing the identity of the company called ShareTracker.

2    A    No.  I'm not familiar with ShareTracker.  My team might

3    be, but I'm not.

4    Q    Somebody who's not here today might be, but you're not.

5    A    I'm not.

6    Q    Do you know if Mr. Brannon is familiar with -- excuse

7    me -- Mr. Brad Bannon, is he familiar with ShareTracker, do

8    you know?

9          MR. ROSS:  He's now asking the witness to guess

10   what's in another person's mind; is that what we're doing

11   here?

12         THE COURT:  On something that the Debtors aren't

13   relying on or have used, so let's move on.

14         MR. KINGSTON:  Very good.

15   BY MR. KINGSTON:

16   Q    Because you're not familiar with ShareTracker, Mr.

17   Auman, do I correctly infer that you can't offer any

18   explanation as to why ShareTracker indicates that there are

19   203,225 internet subscribers for whom Windstream and Charter

20   compete, but Exhibit 60 says there are some 300,000?

21         MR. ROSS:  So we object to that as assuming a fact

22   that is not in evidence and is based on hearsay.

23         THE COURT:  He just said no from ShareTracker.

24         MR. KINGSTON:  That answers my question.  Because

25   he doesn't know, he couldn't begin to explain that

1    difference to us.  And if he can't, he can't; that's fine.

2            MR. ROSS:  No, Your Honor --

3            THE COURT:  He can't even explain whether there is

4    a difference because it's not established that there's a

5    difference that's warranted, so we should move on.

6            MR. ROSS:  Thank you, Your Honor.

7    BY MR. KINGSTON:

8    Q    Mr. Auman, do you have Plaintiffs' Exhibit 34?

9    A    Yeah, excuse me for one moment.  That's the book -- the

10   binder that hit the deck.  I got to fish it out real quick.

11   Yes, sir, I have that exhibit.

12   Q    And I think that you've identified that as a listing of

13   the trouble tickets associated with disconnects on March 15

14   of 2019?

15   A    Yes, sir.  Customers that -- I believe these are

16   customers that reported that they were disconnected.  And I

17   believe are our last known customers, so these are -- a few

18   of these are customers that were disconnected by Charter.

19   Q    And these were the disconnects on March 15th of 2019?

20   A    Yes, sir.  I know around that timeframe.

21   Q    Well, looking at that --

22   A    I think there are some that are 16th, and I think 1st

23   and 5th.

24   Q    Well, there were 289 customers disconnected on March

25   15th; isn't that right, Mr. Auman?

1    A    Yes, sir.

2    Q    And all of those customers were reconnected by Monday;

3    isn't that also right, Mr. Auman?

4    A    Yes, sir, that's my understanding.

5    Q    Okay.  So of those 289 customers that were

6    disconnected, March 15th -- I'm sorry, March 15 is a Friday,

7    right?

8    A    Yes, sir.

9    Q    And then they were all reconnected by March 19th,

10   correct; that's the Monday.

11   A    Yes, sir.  I believe that's accurate.

12   Q    And take a look, if you would, at Plaintiffs' Exhibit

13   67.

14   A    Plaintiffs' Exhibit 67?

15   Q    Yes, sir.

16   A    Yes, sir.

17   Q    Do you know what Plaintiffs' Exhibit 67 is, Mr. Auman?

18   A    I have it open in front of me.

19   Q    But what is it?

20   A    A month fee statement of Katten for compensation for

21   services rendered, reimbursement of --

22   Q    Can you look at Page -- can you look at Page 19 of that

23   monthly fee statement, Mr. Auman, can you tell me how many

24   fees were incurred and how many hours were worked on this

25   matter as of March 19th of 2019?

1   A    What dates do you want me to look at; is that 18?

2   Q    19, sir.

3   A    You want me to add up the hours on Page 19?

4   Q    No, sir, just the ones for March 19th.

5   A    Oh, okay.  On this document, it looks like just under

6   two hours, about one and a half hours.

7   Q    Take a look at Defendants' Impeachment Exhibit 111, if

8   you would, sir.

9   A    Sorry.  Yes, I have it.

10  Q    And Defendants' Impeachment Exhibit 111 is the

11  spreadsheet purported internal Windstream lawyer time that

12  was compiled last week; is that right, sir?

13           MR. ROSS:  I'm sorry.  I'm going to object to that

14  question.  It is inaccurate.  This was not compiled last

15  week as suggested.  Counsel knows that.

16  BY MR. KINGSTON:

17  Q    Were you present when Mr. Ross represented to the Court

18  that this document was compiled the week before last?  I

19  apologize.

20           MR. ROSS:  I'm sorry.  I never made that

21  representation.  There's an interrogatory that's been

22  answered and verified that testifies the fact that this was

23  compiled in part first week of August 2019 and in part the

24  first week of April of 2020.

25           MR. KINGSTON:  Thank you for the clarification,

1  counsel.  I'll withdraw the question.
2  BY MR. KINGSTON:
3  Q    Mr. Auman, do you see two time entries on March 18th
4  and March 25th?
5  A    I see one for March 18th and one for March 25th, and
6  then one for the week of March 25th; yes, sir.
7  Q    And the task says first C&D letter for March 18th, and
8  then a March 25 task second C&D letter?
9  A    Yes.
10  Q    Do you see that, sir?  And you don't see anything -- I
11  don't see the word disconnect in either of those task lists,
12  do you?
13  A    No, sir.  I'm assuming C&D is cease and desist.  I
14  don't see disconnect, no, sir.
15  Q    And as of March 18, the total time there is six hours.
16  Do you see that, sir?
17  A    Yes, for Carol Keith and Kent Smith, two attorneys at
18  Windstream.
19  Q    March is five months before August; is that right?
20  A    Yes, sir.
21  Q    It's not a good question.  March comes five months
22  before August, right?
23  A    Yes, sir.
24  Q    All right.  And this document was first -- started to
25  be compiled, as you understand it, in August of 2019; isn't

1    that right?

2    A    Yes, sir, that's correct.

3    Q    So that March 18th entry is five months after the event

4    it purports to describe?

5    A    My understanding, you know, Paula went back, I believe

6    it was after Mr. Langston's deposition where there was a

7    request to document the hours worked.  And so, in that

8    timeframe in August, she went back and using calendars and

9    travel records and I believe reviewing invoices, that she

10   created this spreadsheet on hours worked, internal hours

11   worked.

12   Q    You understand that if somebody went back and looked at

13   a bunch of old information in putting together the

14   information that is represented in Defendants' Impeachment

15   Exhibit 111; is that right?

16   A    Yes, sir.

17   Q    But they didn't plug it in at the time.  Nobody plugged

18   that information in in March; that's true?

19   A    That's true, that's my understanding.  She went back in

20   time and reviewed calendars, invoices, travel records,

21   receipts, other forms of documentation to create time spent.

22   Q    You can't say that that March 18th entry was made at or

23   near the time of March 18th?

24   A    No.  I don't -- I don't believe it was.  I believe it

25   was in August timeframe.

1    Q    Mr. Auman, what did you do -- how did you spend your

2    day on January 6th, 2020?

3    A    I would have to go back and look at my calendar.

4    Q    Do you know whether or not you spent exactly six hours

5    doing something on January 6th of 2020?

6    A    I'm pretty detailed on my calendar.  Other than the

7    past 10 years, it's gotten blown up, but I could -- I can

8    give you assessment of hours that I spent on January 6th,

9    unless it's a weekend.

10   Q    You know, when you're working, do you usually work in

11   one-hour increments?

12   A    Not typically.  Meetings often go for an hour.  When I

13   work, I multitask, like most other people.

14   Q    It would be unusual for you to work exactly six hours,

15   no more/no less, on January 6th; exactly six hours, no

16   more/no less on January 27th; exactly 40 hours, no more/no

17   less, the first week in February.  That would be

18   inconsistent with sort of your normal working pattern; is

19   that right?

20   A    Yes, that would be inconsistent with how --

21   Q    I mean, that would be hard to do, wouldn't it?

22   A    I would require probably some discipline, yeah, sure.

23   My understanding with respect to here, Miss Anderson rounded

24   down to the nearest hour.

25   Q    And that's based on something that somebody told you or

1    some piece of paper that you looked at?

2    A    We had discussions, I did.

3              MR. KINGSTON:  In which case, Your Honor, I would

4    move to strike the witness's statement as hearsay.

5              MR. ROSS:  The witness is bearing the corporate

6    representative; that's the way corporations talk.  It's the

7    knowledge of the corporation.

8              MR. KINGSTON:  Your Honor --

9              MR. ROSS:  Otherwise, we would be stuck bringing

10   in a hundred witnesses in every trial.

11             THE COURT:  But this is just -- this is based on

12   what?  Can you identify where you got this information from,

13   Mr. Auman?

14             THE WITNESS:  Yes, sir.  It was conversations I

15   had with counsel --

16             THE COURT:  Which counsel?

17             THE WITNESS:  -- to review a document.

18             THE COURT:  You asked counsel, outside counsel?

19             THE WITNESS:  Outside counsel was on the call, but

20   it was internal and outside -- outside counsel.

21             THE COURT:  So the internal counsel, did they --

22   did they say to you how they compiled -- I gather they did

23   because you've stated that the times is complied from

24   various records, calendars, travel records, receipts,

25   emails, things like that.

1          THE WITNESS:  Yes, sir.  There wasn't times that

2    they were tracking.  Miss Anderson was asked to do it --

3    sorry, Your Honor.

4          THE COURT:  Okay.  And this group decided that

5    time should be written down to the nearest hour?

6          THE WITNESS:  Yes, sir.

7          THE COURT:  All right.

8          THE WITNESS:  Rounded down.

9          THE COURT:  Okay.  And so, that was part of

10   compiling this exhibit?

11         THE WITNESS:  Yes, Your Honor.

12         THE COURT:  Okay.  I don't think that's hearsay.

13   That just explains how the exhibit was made.

14         MR. KINGSTON:  It's a statement by somebody out of

15   court for the truth of the matter asserted that there was --

16   that the time was rounded down, but I understand the Court.

17         THE COURT:  Mr. Auman was part of that exercise,

18   so I don't think that counts as hearsay.  You could have

19   said, no, rounded up, right, Mr. Auman?

20         THE WITNESS:  Yes, sir.

21         THE COURT:  Or you could have said make it exact

22   at six-minute increments because you were part of this

23   process.  But you didn't do that; you said have it be

24   rounded down.

25         MR. KINGSTON:  One of the pieces of papers this --

```
1              THE COURT:  I'm sorry.  I need an answer to that
2    question.  Is that what would happen?
3              THE WITNESS:  Yes, sir.
4              THE COURT:  All right.  I don't think that's even
5    hearsay.  That's just a description of how this document was
6    derived, so I overrule the objection.
7    BY MR. KINGSTON:
8    Q    What other pieces of paper that you looked at from
9    March 6th -- excuse me, from March 18th of 2019 that would
10   have enabled you to identify in six-minute increments what
11   those lawyers did?
12             MR. ROSS:  I'm sorry, I may have misheard.  Did
13   you say in six-minute increments?
14             MR. KINGSTON:  Yes.
15   BY MR. KINGSTON:
16   Q    That wasn't an option, right?
17             MR. ROSS:  I'll object because I don't understand
18   the question.
19             THE COURT:  I'm sorry.  What's the objection; that
20   the question doesn't make sense?
21             MR. ROSS:  Yes, Your Honor.
22             THE COURT:  Okay.  I mean, he's already testified
23   how this was done, so I think we should move on.
24             MR. KINGSTON:  Thank you, Your Honor.
25   BY MR. KINGSTON:
```

1    Q    Your understanding, Mr. Auman, is that the new internet

2    customer promotion was to make up for customers that had

3    been previously lost; is that right?

4    A    Yes, sir, absolutely.  And not just the customers that

5    were lost, but the demand that was suppressed.

6    Q    And the number of customers that Plaintiff contends

7    were lost -- pretty specific Plaintiff, but generally is

8    roughly 1,300 customers, right?

9    A    That's my understanding of the expert witnesses

10   estimate.  Is there a document to review?

11   Q    I think your answer is sufficient, sir, for my

12   purposes.  And it's true, isn't it, Mr. Auman, that these

13   promotions are very common, new customer promotions?

14   A    I'd say in the consumer business, you know, definitely

15   offers are common.  This promotion that we ran was

16   absolutely uncommon for Windstream.  It was very aggressive,

17   and it was, you know, was to recover from not just the

18   losses of customers; that was the air that was taken off the

19   growth wing.

20          So, probably even, frankly, more prominent impact

21   would be the customer demand that dried up during March to,

22   frankly, August timeframe.  And so we had lost customers to

23   make up for, we had the number of positive customers that

24   were in our growth plan to make up for, and we had to offset

25   or recover from the overall suppressed demand calling in to

1   Windstream for new service.

2          The false and misleading advertising had a big

3   impact on our business, and it was immediate, it was seen in

4   the net subscriber losses, it was seen by my sales

5   organization in customers not coming in, missed commissions,

6   missed sales plans.  It had a profound impact on our

7   business and we didn't see it in the non-Charter.  So, yes,

8   this promotion was designed to get back to our commitment.

9   Particularly being in Chapter 11, it was important as a

10  management team that we still delivered on our commitment

11  regardless of all the things that happened in the

12  marketplace.

13         So, as the management team, we took quick action,

14  we tested different offers in the marketplace -- three

15  months free, one month free, credits, and we introduced the

16  three-month promotion in September.  And it worked.  At one

17  point, our trajectory was to be well off -- more than 6-

18  7,000 customers off our growth plan, and (indiscernible) up

19  about 1,500 customers away from our growth plan within a

20  palatable amount.

21  Q    The promotion worked, yes?

22  A    It worked, yes, sir.

23  Q    You got even more customers --

24  A    October was the first month -- (Overlapping) we got

25  back, where we started meeting our plan again.  So, we

1   finally started to offset the losses in October and it

2   continued through the end of the year.  We still missed our

3   plan commitment for the entire year, and prior to this

4   commitment, you know -- so, yes.

5   Q    It's a true statement -- I think it's you -- I'm not

6   sure if you answered this at the beginning of your answer,

7   but it's a true statement that Plaintiffs regularly offer

8   steep discounts in the marketplace or cashback, credits,

9   that kind of thing?  Isn't it?

10  A    What's the question?  I'm sorry.

11  Q    That's okay, it got away from me.  It's true, isn't,

12  Mr. Auman, that Plaintiffs regularly offer substantial

13  credits in the marketplace?

14  A    So, I don't know if we'd say substantial credits, but

15  we definitely have different drive periods, different

16  promotional periods within the calendar year.  The one that

17  we did for this was extremely aggressive, costly, and

18  something that we hadn't done while I was here since

19  November of 2017, that we took a very calculated approach to

20  by testing first.  We only had one chance.  We only had one

21  chance to recover from the losses and we wanted to make sure

22  that we had the most data available to make the best

23  management decision as possible, and we executed in the

24  fourth quarter and it worked.

25  A    And the test runs --

1    Q    (indiscernible) got us close to where our growth

2    commitment was.

3    A    And the --

4    Q    But we saved money other places. You know, the

5    management team, regardless of the false misleading

6    advertising impacts, we still had to deliver our commitment.

7    A    And those test run, those were in those exchanges that

8    we talked about in Nebraska where Charter doesn't compete

9    with Windstream, and then in Lincoln where ALLO is pumping

10   Windstream as far as speed goes.  Those were the test runs

11   we were talking about, sir?

12            MR. ROSS:  So, I'll object.  That misstates his

13   prior testimony.

14            THE COURT:  Yeah.  Let's not -- we have the prior

15   testimony.  There's no reason to go over it again and

16   dispute whether the question was assuming facts not in

17   evidence or not.

18   BY MR. KINGSTON:

19   Q    Directing your attention, Mr. Auman, to Defendant's

20   Exhibit 129.

21   A    I have it, yes, sir.

22   Q    How many pages is your copy of Defendant's Exhibit 129?

23   A    It looks to be -- it goes through 129-18.

24   Q    Okay, very good.  Mr. Jarosz had an incomplete copy.

25   Are you familiar -- you're not involved in the preparation

1    of the financial statements for Windstream, isn't that so?

2         THE COURT:  Well, this is a monthly operating

3    report, so let's be specific.  Were you involved in

4    preparing the monthly operating report?

5         THE WITNESS:  No, sir.  No, Your Honor, I was not.

6         THE COURT:  Okay.

7    BY MR. KINGSTON:

8    Q    I think with that clarification it'll go pretty

9    quickly.  Turn to page 13 of the operating report, if you

10   would, Mr. Auman.

11   A    Yes, sir.

12   Q    Do you see a dollar figure associated with goodwill in

13   the assets listing on that balance sheet, sir?

14   A    Yes, sir, I do.

15   Q    And is that $434,683 -- excuse me -- Mr. Auman, do you

16   mind if I start that over?

17   A    Yes, sir.

18   Q    Is the reported goodwill on the operating report for

19   the period February 25, 2019 through March 31, 2019

20   $434,683,854?

21   A    Yes, sir.  That's how I read it.  March 31, 2019.

22   Q    Can you turn to Defendant's Exhibit 130, please?

23   A    I'm here.

24   Q    Do you see the reported goodwill on page 12 of

25   Defendant's Exhibit 130?

1    A    Yes, sir.

2    Q    And, Mr. Auman, is the goodwill reported for the period

3    ending April 30, 2019 identical to the goodwill reported for

4    the period ending March 31, 2019?

5    A    Yes, sir.

6    Q    I'll direct your attention to Defendant's Exhibit 132.

7    A    I'm here.

8    Q    I'm sorry.  Take a look, before that, if you would, at

9    Defendant's Exhibit 131.  Is that another one of those

10   operating reports?

11   A    Yes, sir.

12   Q    And what's the reported goodwill on page 12 of

13   Defendant's Exhibit 131?

14   A    $434,683,854.

15   Q    So, the reported goodwill on the operating report

16   submitted under penalty of perjury to the Court is identical

17   for the period ending May 31, 2019 as it was for the period

18   ending on April 30, 2019?

19   A    It appears to be, yes, sir.

20   Q    Now, if you would, turn to Defendant's Exhibit 132.

21   A    Yes, sir.

22   Q    Do you see a footnote at the bottom of page 11 that

23   discusses goodwill?

24   A    I'll read it.  Yes, sir.

25   Q    Do you see a reference to a pretax goodwill impairment

1    charge of some 373 million?

2    A    Yes, sir.

3    Q    Is that reference -- do you see any reference to

4    advertising or Charter in connection with that $373 million

5    impairment to goodwill?

6    A    No, sir, I do not.

7              MR. KINGSTON:  Your Honor, if I can confer with

8    Mr. Nepple, I might be pretty close to a stopping point.

9              THE COURT:  Okay.

10             MR. ROSS:  Your Honor, my colleague here has

11   handed me a note saying that we may lose Court Solutions

12   because of this four-hour cap it has, in eight minutes.

13             THE COURT:  Right.  Right, so why don't you do

14   your conferring, Mr. Kingston, and we'll hang up and call

15   back again while you're doing that?

16             MR. ROSS:  And if I can just advise folks, don't

17   turn off the Skype.  You don't need to do that.

18             THE COURT:  Right, it's just Court Solutions.

19   We'll hang up and then call back in again.  Leave Skype on.

20             MR. ROSS:  Thank you, Your Honor.

21             THE COURT:  And they should all -- they should all

22   hang up and redial in to Court Solutions.

23             THE WITNESS:  Your Honor, may I take a quick

24   restroom break?

25             THE COURT:  Yes.

1           THE WITNESS:  Thank you, sir.

2           THE COURT:  Okay.

3           (Recess)

4           AUTOMATED VOICE:  Welcome to Court Solutions, the

5     most innovative provider of communication solutions for

6     courts and attorneys.  For identification purposes, please

7     enter your verified 10-digit cell phone number.  Please

8     enter your 6-digit personal identification number.  Thank

9     you.  Your personal identification number has been accepted.

10          Welcome to your telephonic courtroom.  Your line

11    is live.  To access the Court Solutions advanced call

12    features go to Court-dash-Solutions.com and open the hearing

13    dashboard.  You are entering the courtroom.  Your line is

14    live.

15          MR. KINGSTON:  All right, I apologize to the

16    courtroom.  I accidentally disconnected Skype and there may

17    have been an expletive that got through on Court Solutions.

18    So, I apologize for that.

19          THE COURT:  Okay, well, I think everyone's back on

20    Skype at this point.  Oh, maybe not.  Are we all on, Arthur?

21          COURT REPORTER:  Yeah.  We have the dash board and

22    that's it.

23          THE COURT:  All right.  So you can go ahead, Mr.

24    Kingston.  And Mr. Auman, obviously you're still under oath.

25          THE WITNESS:  Yes, Your Honor.

 1                  MR. KINGSTON:  Your Honor, I pass the witness.

 2                  THE COURT:  Okay.  Is there any redirect?

 3                  MR. ROSS:  Yes, Your Honor.  This is Mr. Ross for

 4        the record.

 5                  THE COURT:  Okay, I just want to remind you all, I

 6        have a hearing at two and I would like to spend about five

 7        minutes eating lunch before that hearing, just so you could

 8        plan.

 9                  MR. ROSS:  Yes, Your Honor.

10                  REDIRECT EXAMINATION OF JEFFREY AUMAN

11        BY MR. ROSS:

12        Q    Mr. Auman, Charter's unlawful actions at issue here --

13        did they cause any harm to Windstream's brand?

14        A    Absolutely.

15        Q    Can you explain that?

16        A    Yes.  The false and misleading advertising breeds fear,

17        uncertainty and doubt.  Both existing customers and

18        potential prospects received information that we potentially

19        were going out of business, that they would be losing their

20        -- potentially losing their internet service, their

21        television service.  And it's a big deal with us.  That word

22        of mouth in these small communities means a lot.

23                  My father, for example, is in one of our markets

24        and it was a conversation at his own ham radio meeting.  In

25        these smaller markets and communities, people talk.  And

1    when they received this, it created quite a bunch of

2    concern.  We saw it in the calls in to our customer service

3    agents, we saw it in our retail stores.  I listened to calls

4    where existing customers were discussing in Walmarts at

5    kiosks where this information was shared, and so it appeared

6    incredibly credible.

7              And so that harm is done to the Kinetic by

8    Windstream brand in our ILEC footprint, but also to all

9    Windstream companies under the umbrella of Windstream

10   Holdings, which is across the entire country, particularly

11   on our Windstream enterprise side that is a CLEC that

12   competes with Charter nationally.

13             So, as I mentioned before, you know, in my

14   household and in my experience, one negative interaction --

15   it takes a lot to overcome that.  The ratio of five to one

16   positives to negatives I believe true, both in my business

17   experience and my relationships at home.  And so it's a big

18   deal.  It lingered on and we saw it in our numbers.

19   Q    So, Mr. Auman, you testified earlier and I apologize,

20   we aren't getting real time transcripts so I can use your

21   exact words, but it was along the lines of that you do

22   business in markets -- in the marketplace as Kinetic by

23   Windstream.  Can you explain what that means, doing business

24   in the marketplace as Kinetic by Windstream?

25   A    Yes.

1          MR. KINGSTON:  Objection, Your Honor.

2    (indiscernible) the scope of my cross.

3          MR. ROSS:  It's a question directly asked and

4    which he answered.  I just said I don't have the exact

5    testimony but I'm pretty sure that his testimony was he does

6    business in the marketplace as Kinetic by Windstream.

7    That's something I'm now allowed to redirect on.

8          MR. KINGSTON:  Your Honor, I don't think I asked a

9    question on that topic at all.

10          MR. ROSS:  Ah, gosh.  You know, I'm sorry I don't

11    --

12          THE COURT:  I don't recall it either, Mr. Ross.

13    I...

14          MR. ROSS:  It was at 12:01 p.m.  It was

15    immediately before he started asking him about Sharetracker,

16    and it was immediately after he asked him about Defendant's

17    Impeachment Exhibit 105 -- it was a partial list of the

18    promotional customers.  And during the course of his answer,

19    he said, we do business as Kinetic by Windstream.

20          MR. KINGSTON:  I don't think what the witness

21    volunteers is the questioned that I asked --

22          THE COURT:  It's not a -- it didn't -- the

23    question really didn't go to the brand at all.  The name.  I

24    mean, I think that's Mr. Kingston's point.  I tend to agree

25    with him.

1          MR. ROSS:  I can only -- I'm at a handicap without
2     having a transcript, Your Honor.  I can only tell you what I
3     wrote down word-for-word.  Gave you the time, I even gave
4     you the questions that I --
5          THE COURT:  No, he may well have mentioned
6     Kinetics in talking about, just like he did Spectrum instead
7     of Charter.  But the question didn't really go to anything
8     related to that Kinetics brand.  It was all about --
9          MR. KINGSTON:  Right, Your Honor.
10          THE COURT:  It was all about market, how to
11     measure the market in competitiveness with Charter, not the
12     brand information.  So, unless you're leading up to another
13     question that is relevant to -- or is responsive to the
14     cross, I think we should move on.
15          MR. ROSS:  All right, Your Honor.
16     BY MR. ROSS:
17     Q    Mr. Auman, do you recall being asked questions about
18     billing customers, and customers got billed in invoices,
19     correct?
20     A    Yes, sir.
21     Q    Who were the customers then instructed to write their
22     checks or make their payments to?
23     A    All of our Kinetic by Windstream customers and our
24     Windstream enterprise customers, they pay Windstream and --
25     Q    Mr. Auman --

1    A    They write their checks to Windstream.

2    Q    And, Mr. Auman, when you saw some census block data,

3    for lack of a better word -- I guess they're census block

4    maps -- earlier today, do you recall t hose?

5    A    Yes.

6    Q    Are you aware whether any of those FCC census blocks

7    reflect actual customer data such as new customers,

8    disconnected customers, churn rate?

9    A    I'm not aware of any data within the census blocks and

10   how that would impact -- no.  The answer is I don't know of

11   any customer data associated with the census blocks, which

12   would meet the --

13   Q    Mr. Auman, you were asked some questions about

14   deposition testimony today.  Do you recall that?

15   A    Yes, sir.

16   Q    Is it accurate to say that all the testimony you gave

17   in your deposition was your state of knowledge as of

18   September 24, 2019?

19   A    Yes, sir, it was.

20   Q    And in making your declaration in this lawsuit, you did

21   not limit your testimony to your knowledge as of that date,

22   correct?

23   A    That's absolutely correct, yes, sir.

24   Q    Now, Mr. Auman, you were asked a number of questions

25   about paragraph 15 of your declaration.  Could you get that

1    open in front of you, please?

2    A    Give me one moment.  I'm sorry.  It's disappeared here

3    among my mass of documents.  Okay.

4    Q    If I could get your focus on paragraph 15, which you

5    were examined on earlier.  Tell me when you're there.

6    A    I'm here.

7    Q    Now, by your testimony here, did you mean to imply that

8    the $4 million listed was in any way related exclusively to

9    existing customers?

10            MR. KINGSTON:  Objection.  Leading.

11            THE COURT:  You should rephrase it.

12   BY MR. ROSS:

13   Q    Did you -- did your testimony here in declaration 15

14   with respect to the $4 million -- what set of customers was

15   that directed to?

16   A    The $4 million was directed towards new customers that

17   we were attempting to acquire to offset the losses and

18   suppress demand from the false and misleading advertising

19   back in mid-March.  (indiscernible)

20   Q    And looking at the wording -- I'm sorry, Mr. Auman, I'm

21   having the same problem Mr. Kingston was, and I think it has

22   to do with the slight lag time in the video to the audio.

23   But go ahead and finish your question -- your answer.

24   A    That's okay, I'm done.

25   Q    So, in no way did you intend to...  I'll strike that

1    question.  Let me ask this question.  Both Mr. Kingston and

2    I have asked you a large number of questions today.  Have

3    you had any problem on the Skype feed understanding any

4    questions?  Has there been any doubt in your mind as to what

5    you've been asked or what the Court has asked, for that

6    matter?

7    A    No, sir.  I was able to hear pretty clearly and also

8    any time that it was muted, we asked for repeating the

9    question.

10   Q    Let me get you to look at what has been labeled as

11   Defendant's Impeachment Exhibit 111, which you were examined

12   on earlier.  And let us know when you're there.

13   A    Yes.

14   Q    Do you recognize this document, sir?

15   A    Yes.

16   Q    And just for the record, could you explain what it is?

17   A    Yes.  This is a spreadsheet that (indiscernible)

18   Anderson put together following the request from Mr.

19   Langston's deposition in order to document, validate that

20   the internal legal team at Windstream has spent on working

21   on the Charter case.  But that's where we were going --

22   based on inputs from calendars, looking at invoices from

23   Caton and others.  Invoices such as travel expenses, Uber

24   receipts to document time spent.

25              MR. ROSS:  Your Honor, the Plaintiffs would offer

1    into evidence Defendant's Impeachment Exhibit Number 111.

2         MR. KINGSTON:  We object, Your Honor, on the

3    grounds of hearsay and it because it is not -- the witness'

4    testimony is established that it's not a proper business

5    record in that it was not prepared contemporaneously as

6    required by Federal Rule 803.

7         So, the witness' testimony was that this was based

8    on contemporaneous records, therefore summarizes those

9    records, which were privileged and therefore, could not be

10   entered into evidence.

11        THE COURT:  I agree with that portion of it.  Let

12   me ask you, Mr. Auman, does Windstream generate this type of

13   record in other contexts where it breaks out time that is

14   accrued by its in-house legal counsel so that that time can

15   be either measured or allocated to a particular matter or

16   billed to someone else?

17        THE WITNESS:  Yes, Your Honor.  On other cases,

18   similar type of work has been done.  Daily timesheets are

19   not.

20        THE COURT:  And was the process for developing

21   this time summary substantially the same as those other

22   times you've referenced?

23        THE WITNESS:  That's my understanding, sir, Your

24   Honor.

25        THE COURT:  Okay.  Mr. Kingston, do you have any

1    questions on that point?

2            MR. KINGSTON:  Your Honor, if I haven't convinced

3    the Court that August is not at or near March, then I don't

4    know that I'm going to win on the other points.

5            THE COURT:  Okay.  I take it that you don't have

6    questions about whether this type of record is readily

7    produced in the ordinary course of the Debtor's business.

8            As far as the other point is concerned, the record

9    is produced as of August but the inputs were

10   contemporaneous, i.e., time records, receipt records,

11   calendar entries and the like, emails, etc.  So, I will

12   overrule the objection and admit this as whatever

13   Plaintiff's exhibit next in line is.  You can figure that

14   out later.

15           MR. ROSS:  Plaintiff's Exhibit 315, Your Honor.

16   I'm sorry to take a moment.

17           THE COURT:  315.

18        (Plaintiff's Exhibit 315 Entered into Evidence)

19   BY MR. ROSS:

20   Q    Mr. Auman, looking at what's now been entered into

21   evidence as Plaintiff's Exhibit 315, it's that same document

22   you've been looking at, so could you please explain who Kent

23   is in the listing?  And down at the bottom I believe it says

24   his full name, Kent Smith.  But could you explain who he is

25   and what he does?

1   A    Yes.  Kent Smith is a senior attorney here at

2   Windstream and he has been a point of contact throughout the

3   past year with respect to this case, up to and including

4   initially in March of last year when we learned of the

5   advertising.  So, he's an in-house attorney and he's a

6   senior attorney here.

7   Q    Do you know approximately how many years of experience

8   of practicing law that he has?

9            MR. KINGSTON:  Objection.  Beyond the scope of the

10  cross.

11           THE COURT:  I'm sorry?

12           MR. KINGSTON:  I object, Your Honor.  The question

13  is beyond the scope of my cross-examination.

14           MR. ROSS:  He asked -- extensively asked questions

15  about the lawyers and the times and what they billed for.

16           THE COURT:  Just the time records.  Not their

17  experience.  Or their imputed billing rates.  I think those

18  were just accepted.

19           MR. ROSS:  All right, Your Honor, thank you.  Your

20  Honor, I'm going to have to ask you to change books.  I

21  apologize.  But we should be now looking at a binder that

22  would say Debtor's Trial Exhibits 107, 301-317 that was

23  delivered yesterday.

24           THE COURT:  Okay, I have it.

25           MR. ROSS:  And, again, unfortunately, some of

1   these exhibits are separately numbered by Charter but we'll

2   go with this set.

3   BY MR. ROSS:

4   Q    Mr. Auman, can I get you to look at Exhibit --

5   Plaintiff's Exhibit 316, please?

6   A    You said 316?

7   Q    Three-one-six.  It's...help me out.  Look at

8   Defendant's Impeachment Exhibit 113 perhaps.

9   A    Okay.

10           MR. ROSS:  And, Your Honor, it'll be the same as

11   in your book, Plaintiff's Exhibit 316.

12   BY MR. ROSS:

13   Q    And let us know when you're there, Mr. Auman.

14   A    Is it Plaintiff 113?

15   Q    Defendant's Impeachment Exhibit 113.

16   A    Okay.  Okay, I'm here.

17   Q    You were shown this earlier today by Mr. Kingston,

18   correct?

19   A    Yes, sir.

20   Q    And could you just tell us what your understanding as

21   to what this is is?

22   A    Yes.  This was a conservative summary, meaning that --

23   a conservative summary of credit that we paid out to

24   customers that were discontinued by Charter -- that were

25   disconnected by Charter.  And these are 100 percent

1    confident that the credit were paid out and they were from

2    last mile customers -- Charter's last mile customers, the

3    ones that they supplied connectivity to, that were

4    disconnected, that called in to Windstream -- explanation

5    and ultimately complaining and (indiscernible)...

6            We believe that there's probably almost three

7    times as much as this, but this is -- we're 100 percent

8    confident.

9    Q    Is this data that's kept by the company in the regular

10   course of business?

11   A    The data is part of the regular course of business.

12   Our agents' long trouble tickets on a regular basis, and all

13   of this data was sourced in the regular course of business.

14           MR. ROSS:  Your Honor, we would move this document

15   into evidence as Plaintiff's Exhibit 316.

16           THE COURT:  It wasn't already admitted?

17           MR. ROSS:  They did not make any motion on this,

18   Your Honor.

19           THE COURT:  But you didn't either until now?

20           MR. ROSS:  That's correct, Your Honor.

21           THE COURT:  Okay.  All right.  All right, I'll

22   admit it.

23           MR. KINGSTON:  Your Honor, if I --

24           THE COURT:  I'm sorry, I thought you weren't

25   objecting.  If you have an objection, let me know.

1          MR. KINGSTON:  No, no.  I am objecting, Your

2    Honor.  And maybe before I object, I'd just to inquire

3    briefly of the witness, a voir dire of the exhibit.

4          THE COURT:  Okay.

5              VOIR DIRE OF JEFFREY AUMAN

6    BY MR. KINGSTON:

7    Q    Mr. Auman, what is the last transaction date that you

8    see on Plaintiff's Exhibit 316?

9    A    I was looking at the Impeachment Exhibit 113.

10   Q    I believe they're identical and I'm just asking you for

11   the date of the very last transaction.

12   A    The date is April 1, 2019.

13   Q    And do you know --

14   A    I'm sorry -- I'm sorry, do you mean the last

15   transaction at the bottom or the last transaction page?

16   Q    Temporally, sir.  In time, what is the latest

17   transaction?

18   A    That was almost a year ago today, May 7, 2019.

19   Q    Mr. Auman, do you know why the document that was the

20   last transaction that was almost a year ago today was not

21   produced to Plaintiff -- or, excuse me, to Defendant before

22   October 31st of 2019?

23   A    Sir, I don't know when this was produced to Defendants.

24   Q    You don't -- you don't have any idea why this wasn't

25   produced until last week, Mr. Auman?

1    A    No, sir, I don't know when it was produced.

2               MR. KINGSTON:  Your Honor, we would renew our

3    objection to the admission of Plaintiff's Exhibit 316 under

4    the -- under Rule 26 and Rule 37 of the Federal Rules of

5    Civil Procedure for the reasons that we have discussed in

6    Defendant's motion in limine.

7               MR. ROSS:  Your Honor, that motion was denied by

8    the Court, so I assume --

9               THE COURT:  I've already addressed this.  You've

10   had a chance to look at it.  You've asked questions about

11   it.  And I don't see the need to spend any more time on

12   them.  So, it's admitted.

13              MR. ROSS:  Thank you, Your Honor.

14         (Plaintiff's Exhibit 316 Entered into Evidence)

15   BY MR. ROSS:

16   Q    So, Mr. Auman, could I now get you to look at what has

17   been marked as Defendant's Exhibit 112 for Impeachment?  And

18   to save the Court time looking for another, it's also

19   Plaintiff's Exhibit 313.

20   A    Yes, I'm at 112.

21   Q    Now, do you recognize this document, sir?

22              MR. KINGSTON:  Objection.  Beyond the scope of my

23   cross.

24              MR. ROSS:  Well, actually, his cross was heavily

25   focused on the --

1                    THE COURT:  Well, let me just ask -- do you

2      recognize what this document is?  Let's start with that, so

3      I can decide whether it's been discussed or not.

4                    THE WITNESS:  Yes, Your Honor, I do.

5                    THE COURT:  Okay.  And what is it?

6                    THE WITNESS:  This is a summary of the costs

7      associated with the promotion that we ran September 1 to

8      December 31, 2019 to recover from the losses, customer

9      losses and suppressed demand that we experienced from the

10     false and misleading advertising.

11                   THE COURT:  So, this is the breakdown of the $4

12     million number?  I'm just trying to figure out...

13                   THE WITNESS:  Yes, Your Honor.

14                   THE COURT:  Okay.  Well, I mean, that was

15     extensively discussed.

16                   MR. KINGSTON:  Your Honor, I did not ask questions

17     about Plaintiff's Exhibit 313 or the pre-marked -- or

18     Defendant's impeachment exhibit that Mr. Ross referred to.

19     Neither one.  I just confirmed --

20                   THE COURT:  I understand you didn't ask about the

21     exhibit, but there was a lengthy discussion about what made

22     up the 4,033,000, etc., what it was about.  And I mean,

23     frankly, I'm not quite sure why we need this but I think it

24     was sufficiently the topic.  We'll see what Mr. Ross asks

25     about this but clearly the topic of the components of the

1    Charter 4,033,000 allocated cost was the subject of lengthy

2    cross.  So, let's see what questions Mr. Ross asks, if any,

3    but to me this just puts out by month the detail in the

4    exhibit that you did ask him about.

5            MR. ROSS:  And that's my sole purpose in doing

6    this, Your Honor, is the detail.  The suggestion's been left

7    by counsel that there was no backup for this $4 million

8    number.  And this puts a lie to that, this document, and we

9    don't need to take up a lot of the Court's time.  We can

10    simply -- it's been identified.  We will offer it into

11    evidence.

12            I should say that would be as exhibit --

13    Plaintiff's Exhibit 313.

14            THE COURT:  Okay.  Any objection to its admission?

15            MR. KINGSTON:  Yes, Your Honor, we would object

16    under Rule 26 and 37 for the reasons that have been

17    discussed before.  And we would also object on hearsay

18    grounds.  Mr. Auman testified at some length about what an

19    extraordinary promotion this was, which means it's not a

20    business record that was created in the ordinary course and

21    it's not subject to any hearsay exception.

22            MR. ROSS:  So, the promotion was extraordinary,

23    the data was kept in the same way that all data is kept as a

24    new customer comes --

25            THE COURT:  Well, let me ask, Mr. Auman, is that

1   the case?  How is this data derived per month, the reporting

2   data?

3            THE WITNESS:  The source data is the daily

4   transactional report, which we use on a daily basis.  I

5   review both customer additions and disconnects on a daily

6   basis to tally a report on a daily basis our results from

7   the previous day.

8            THE COURT:  So, let me make sure I understand --

9            THE WITNESS:  So, the source data --

10           THE COURT:  Is this -- is this -- I'm sorry to

11  talk over you -- is this chart here prepared before you ran

12  out the program to project how it was going to cost, or does

13  this reflect the actual cost?

14           THE WITNESS:  So, Your Honor, this one reflects

15  the actual costs.  We also prepared one previously that

16  forecasted the costs --

17           THE COURT:  But this is the actual cost and you're

18  saying that the inputs all came in in your regular way of

19  reporting costs for promotions?

20           THE WITNESS:  Yes, sir.  And we would have to

21  generate this report by typing commands into the database.

22           THE COURT:  All right.  I will admit it as a

23  business record based on that.  And, again, we put off the

24  trial so there could be a discussion about the components of

25  the -- in deposition and production of the $4,033,000

1  number, and that ruling's not going to be (indiscernible).

2       (Plaintiff's Exhibit 313 Entered into Evidence)

3       MR. ROSS:  Your Honor, at this point I need a

4  little bit of guidance.  Mr. Kingston offered -- did not

5  offer -- showed the witness a number of exhibits.  Is it his

6  intention to offer those into evidence or not?  Because that

7  will determine what I ask next.

8       THE COURT:  Were those just for impeachment

9  purposes, Mr. Kingston?

10      MR. KINGSTON:  I think if you'll -- if the exhibit

11  was labeled as impeachment exhibit, then yes, it would be

12  for impeachment purposes only.  I think that there were a

13  couple of Defendant's exhibits, like for example, the

14  operating reports that were not marked as impeachment

15  exhibits and which we intend to offer in our case in chief.

16  And I'm going to have to tell you exhibit by exhibit, Your

17  Honor.

18      But, generally, yes.  If it's an impeachment

19  exhibit, I would only be offering it for impeachment

20  purposes only.

21      THE COURT:  Okay.  I don't know if that helps, Mr.

22  Ross, for you to decide.

23      MR. ROSS:  I guess my question is -- during his

24  turn with the witness, he should've offered them.  Is he

25  offering them or not so that I have some understanding as to

1    whether or not I'm allowed to --

2            THE COURT:  Well, the operating reports -- I could

3    take judicial notice that they're the operating reports.  I

4    don't know if anything else counts as something...  I mean,

5    the impeachment exhibits have not been offered up into

6    evidence and are not going to be, as Mr. Kingston said.  So,

7    I don't know if there was any other exhibit he used that

8    wasn't already in evidence or that I can't take judicial

9    notice of.

10           MR. ROSS:  So, the one exhibit that I'm interested

11   in, Your Honor, is the exhibit he showed the witness that

12   was the answers to interrogatories that were recently

13   propounded.  That was not -- that's not in evidence yet and

14   has not been offered into evidence.  If he intends to offer

15   it into evidence, that's fine; if not, I'll offer it into

16   evidence now.

17           MR. KINGSTON:  I'm sorry, I think Mr. Ross is

18   asking -- I don't know that I asked Mr. Auman about

19   Plaintiff's responses to interrogatories.  And I understand

20   Mr. Ross to be wanting to offer interrogatory responses into

21   evidence on behalf of the party making those responses.  So,

22   I'm not -- I'm being waved at by my colleague and I'm not

23   sure if I have an objection or not, but I don't think -- I

24   actually don't think that I showed those to the witness or

25   talked about those to the witness.

1              THE COURT:  Well, you showed the -- you did ask

2    him about the list.  We actually began -- you began the

3    cross with the answer to that interrogatory.

4              MR. KINGSTON:  Oh, that's already been admitted,

5    Your Honor.  146?  I think that Mr. Ross is referring to

6    interrogatories prepared in response to discoveries

7    submitted last week.

8              THE COURT:  Okay.

9              MR. ROSS:  That's correct, Your Honor.  Thank you,

10   Mr. Kingston.  And I've now found it.  It's Defendant's

11   Impeachment Exhibit 74.

12             THE COURT:  All right, well, he's not offering

13   that, right?  Mr. Kingston?

14             MR. KINGSTON:  Correct.  I don't think I used it.

15             THE COURT:  Well, even if you used it, you're not

16   offering it as evidence.

17             MR. KINGSTON:  No, Your Honor's point is well

18   taken.

19             MR. ROSS:  So, we'd like to offer that, Your

20   Honor.

21             THE COURT:  Well...

22             MR. KINGSTON:  Your Honor, I'm pretty sure I

23   object unless I'm misinterpreting the signals from my

24   colleague over here.

25             THE COURT:  And the basis?

1          MR. KINGSTON:  I can't tell if he's just getting

2    hungry or not.  Okay, so the objection, Your Honor, is

3    obviously hearsay.  The two declarants are not here.  I

4    haven't had any chance to cross-examine them.  So, we would

5    object to the admission of out of court statements for the

6    truth of the matter asserted.

7          MR. ROSS:  So, they've both been verified, Your

8    Honor, under oath, so they're not hearsay.

9          MR. KINGSTON:  I'm not -- that's not how hearsay

10   works, Your Honor.

11         MR. ROSS:  That's absolutely how it is.

12         MR. KINGSTON:  It's an out of court statement for

13   the truth of the matter asserted.  And the whole point of

14   the hearsay rule is I can't speak to Mr. Martinez or Mr.

15   Smith, who are the declarants for that interrogatory.

16         MR. ROSS:  That's actually not the purpose of the

17   hearsay rule.  The hearsay rule is to ensure that whatever

18   is entered into evidence it's sufficiently reliable that it

19   can be taken account of.

20         THE COURT:  Well, what is it in those

21   interrogatories you wanted to have admitted?  Or do you want

22   to have the whole set admitted?

23         MR. ROSS:  Well, there's only two interrogatories,

24   Your Honor.  They were specially propounded last week.

25   There was a great deal of insistence upon Charter's part

1    that we have special people go find them, we went through

2    that trouble --

3              THE COURT:  Well, was it acknowledged that that

4    could serve and move their testimony?

5              MR. ROSS:  No.  I don't think there was any

6    acknowledgment about testimony.  But the only purpose of

7    propounding the interrogatories was to find out -- to get

8    information that Charter wanted --

9              THE COURT:  And Charter had the ability to, in

10   fact, examine them, right?  You didn't refuse to make them

11   available?  Either today or beforehand?

12             MR. KINGSTON:  Well, I'm not sure how to answer

13   that question.

14             THE COURT:  Did Charter ask --

15             MR. KINGSTON:  Charter did not ask and we did not

16   offer --

17             MR. ROSS:  Oh, I think that I did.

18             THE COURT:  So, you did not refuse?

19             MR. ROSS:  We did not refuse.  No, Your Honor.

20             THE COURT:  Okay.  I will admit them.

21             MR. ROSS:  So we'll enter those into evidence,

22   Your Honor, at Plaintiff's Exhibit 350, 3-5-0.

23        (Plaintiff's Exhibit 350 Admitted into Evidence)

24             THE COURT:  Okay.  I mean, Mr. Kingston, it's --

25   they are not reporting what other people told them, right?

1    It's their answer.

2              MR. KINGSTON:  As I understand the interrogatories

3    -- the declarants are a Mr. Daniel Martinez, and Mr. Kent

4    Smith.  And when I saw the interrogatory, I didn't realize

5    that Mr. Martinez had also been a declarant.  But I asked if

6    Mr. Smith would be available for a deposition, and I was

7    told that Mr. Auman would be the only person available for a

8    deposition.

9              So we have not had an opportunity to cross-examine

10   either Mr. Martinez or Mr. Smith, and neither of those

11   gentlemen were identified as a potential witness on any Rule

12   26(a) disclosure that I've seen, or on any witness list.  So

13   the suggestion that I've had a chance to, and declined a

14   chance to examine those witnesses is just untrue, Your

15   Honor.

16             THE COURT:  Okay.

17             MR. ROSS:  They've never been offered on a witness

18   list, because we never got asked until last week to produce

19   these documents, and we were not asked these interrogatories

20   until last week.  I mean, it's sort of, it's sort of unfair

21   to plaintiffs to say you got to go through all this work,

22   special work and disrupt your trial preparation, in order to

23   prepare these interrogatories, which have this critical

24   information that we have to put in front of the court, and

25   then to say oops, no, we're not going to actually allow it

1    to go in front of the court.

2              MR. KINGSTON:  The suggestion to the Court all of

3    last week was that Mr. Auman was a knowledgeable witness, he

4    apparently wasn't knowledgeable enough to sign the

5    interrogatories.  The person who was knowledgeable wasn't

6    made available to us, Your Honor.

7              MR. ROSS:  We wanted Mr. Auman to sign it.  We

8    were told we had to get Mr. Martinez and someone from the

9    legal department to sign it, by Charter.

10             MR. KINGSTON:  That's (indiscernible).

11             THE COURT:  I'm sorry, where do these

12   interrogatory answers appear?

13             MR. KINGSTON:  It's Defendant's Impeachment

14   Exhibit 74.  And to help the Court, it starts at Page 11 and

15   goes on to Page 12.

16             THE COURT:  Okay, so Charter did have the

17   opportunity to call these two people who -- well the

18   verification, I see, I see, they both signed it, to call.

19   Mr. Smith and Mr. Martinez for today, right?  They weren't

20   refused that?  Did Charter ask for today?

21             MR. ROSS:  No, Your Honor, they did not.

22             THE COURT:  And Charter did ask to depose Martinez

23   after you got the interrogatory?

24             MR. ROSS:  No, they did not ask for Mr. Martinez?

25             THE COURT:  Well, I thought I heard Mr. Kingston

1    say that they did.

2              MR. KINGSTON:  No, Your Honor, I asked for -- when

3    I got the interrogatory, I asked for Mr. Smith, because I

4    didn't realize that Mr. Martinez had also signed.  I just

5    skipped back to the declaration.

6              THE COURT:  Okay, so did you ask for Mr. Smith

7    after he signed the interrogatory?

8              MR. KINGSTON:  Yes, Your Honor.

9              MR. ROSS:  Well, that's not quite -- well, I was

10   about to say something that was impolite, I'll pause.  The

11   question posed by Mr., in an email from Mr. Kingston which I

12   can produce is, is the witness appearing on Monday for the

13   deposition going to Mr. Smith?  And I wrote back no, it's

14   Mr. Auman.  We discussed this in court.  There was no

15   request to produce Mr. Smith.  It was simply, who's showing

16   up on Monday to be the 30(b)(6) witness.

17             THE COURT:  Okay, look, the whole point of this

18   was to have this information produced, so that if Charter

19   wanted to cross-examine these people, it could.  And the

20   information itself is their information, so I will admit it.

21             MR. ROSS:  With that, Your Honor, we have no

22   further question for the witness.

23             THE COURT:  Okay, very well.  I would normally ask

24   for you step down, but you can stay on the screen.  But do

25   you have -- is there any re-cross on any of that, Mr.

1    Kingston?  I'm sorry, I spoke too soon, Mr. Auman.

2             RE-CROSS EXAMINATION OF JEFFREY AUMAN

3    BY MR. KINGSTON:

4    Q    No, I have a few questions.  Mr. Auman, do you have

5    exhibit, Defendant's Exhibit 127, which has been admitted?

6    A document caption understanding your Kinetic bill,

7    (indiscernible), sir?

8    A    The (indiscernible) 127, I have it in front of me.

9    Q    And I'll direct your attention to the exemplar of a

10   Kinetic bill, (indiscernible), sir?

11   A    Yes, I do.

12   Q    Can you see a payment slip at the bottom?

13   A    Yes, sir.  The Louisville, Kentucky --

14   Q    Yes, sir.  And then you see a perforated line where the

15   payment slip would be detached?

16   A    Yes, sir.

17   Q    And then the writing below that line, I read as

18   follows: detach and return the payment slip with your check

19   payable to Windstream, Georgia Communications, LLC.  Have I

20   read that correctly, sir?

21   A    Yes.

22            MR. KINGSTON:  I pass the witness, Your Honor.

23            THE COURT:  Okay.

24            MR. ROSS:  No questions, Your Honor.

25            THE COURT:  Okay, now you're done, Mr. Auman.

1           MR. AUMAN:  Thank you, Your Honor.

2           THE COURT:  All right.  Actually I -- this is like

3    Monty Python.  I actually did have one question for you.

4    There was quite a bit of questioning of you regarding where

5    within exchange areas you compete with Charter or Spectrum,

6    do you recall that?

7           MR. AUMAN:  Yes, Your Honor.

8           THE COURT:  And at least for certain of the census

9    areas, it looks like there are parts of exchange areas where

10   Charter isn't conducting business.  And then you are also

11   asked questions about the Allo Company, that had the

12   apartment buildings?  My question was, with regard to the

13   promotional program, the four million and change program, is

14   that -- was that done evenly by exchange, or would you pick

15   and choose within the exchange on how to run it out?

16          MR. AUMAN:  Your Honor, it was a mass market

17   promotion.  So it was everywhere.  All of our tier one and

18   tier two exchanges received the same offer.  We used every

19   bit of marketing apparatus that we had to get the message

20   out.  So it was a, it was a broad mass-market offer across

21   all of our tier one and tier two exchanges.

22          THE COURT:  Okay, any question on that?

23          MR. ROSS:  No, Your Honor.

24          MR. KINGSTON:  None from the defendant, Your

25   Honor.

1          THE COURT:  All right, so now you are truly done,

2     Mr. Auman.  All right, I had told you all that I would have

3     brief oral arguments.  Given the hour, and the fact that I

4     have a disclosure statement hearing in a mega-case at 2:00,

5     which is 15 minutes from now, I thought it would be more

6     productive to tell you things that I would want you to cover

7     in post-trial briefing.  You're free to cover whatever you

8     want to, and you should just cover what I'm asking you.

9     Cover whatever you want to.

10          But I did want you to address the following.  From

11     the record, at least, it appears that a substantial portion

12     of the damages being asserted, or the sanction being

13     asserted, for a breach of the automatic stay, is in respect

14     of the false advertising campaigns, as opposed to the

15     interruption, or discontinuance of service.

16          I would like you to brief, and I think this is

17     sort of inherent in Charter's attempt to introduce matters

18     for judicial notice, which has previously been dealt with,

19     the existing case law on the application of the automatic

20     stay to actions by parties that harm a Debtor's contractual

21     relationships, based on the parties' assertion of the

22     effect, or consequences of the bankruptcy on those

23     relationships.  This doesn't go to the breach finding, but

24     rather to the contempt issue.

25          Related to that, you should at least address the

```
1    issue of whether the standard in the Second Circuit,
2    perhaps, is affected by the Taggart case, which doesn't deal
3    with the stay, still deals with contempt, is an objective
4    one, i.e. a reasonable party, or a subjective one.  And if
5    it's the latter, whether a sophisticated party should be
6    subject to the subjective one.
7            The only other thing I would like is a timeline as
8    to when, if ever, the defendants identified any expert
9    witnesses and/or pulled them from being actual witnesses.
10   But again, those are things that I want you to address.  I
11   don't mean by that to say that you should also address
12   whatever you want to address, for example, on Charter side,
13   whether it believes, and why, the plaintiffs established
14   appropriate sanction, and flip side, as far as the
15   plaintiffs are concerned.
16           MR. ROSS:  Thank you, Your Honor.  Two
17   housekeeping issues on that.  Just so that everybody's
18   operating on the same field, I assume that the way one would
19   read the local bankruptcy rules, this would be a 45-page
20   brief.  I'm not telling you we're going to write a 45-page
21   brief, but I just want to make sure we're all on the same
22   playing field.
23           THE COURT:  Well, yeah.  Let me address the
24   process.  I kind of played these being simultaneous briefs
25   with citations to the record.  So it'll take a while,
```

1    because you'll want to get the record, and go through it.

2    I'm not asking for proposed findings of fact, and

3    conclusions of law.  Just memorandum of law, but I would

4    like you to cite the record the prop -- the factual

5    proposition that you're stating.

6              So I leave it up to you as to when those

7    simultaneous briefs should be provided.  I think the

8    earliest would be 30 days, but it could be longer than that.

9    And I want you email them to chambers as well as filing

10   them, because 30 days or 45 days from now I will have

11   forgotten about this, and would not be checking the docket,

12   which I don't do anyway.

13             I would expect any reply brief only if someone

14   says something that is contrary to the record, contrary to

15   the law, you know, basically makes your hair stand on end.

16   So you should put all your eggs in the initial pleading,

17   because I would think any reply pleading, if at all, would

18   be no more than a page or two.  And yes, 45 pages is fine.

19             MR. ROSS:  But Your Honor, I don't like to leave

20   things up in the air, I think my judge taught me not to do

21   that.  Could we set June 5th as the deadline, and could we

22   say also that no reply brief is allowed unless the Court is

23   -- the Court grants permission in advance first?

24             THE COURT:  Well, that's a little under 30 days,

25   is that all right with the folks in -- representing Charter?

1          MR. KINGSTON:  I was about to respond in the

2    affirmative, and my friends in the room started purpling, so

3    maybe if we could bump that out a week.

4          THE COURT:  All right, let's make it --

5          MR. ROSS:  You know, justice delayed is justice

6    denied, this is taking a long time.

7          THE COURT:  Well, let's just make it --

8          MR. ROSS:  We were going to suggest doing this in

9    14 days, because we already have the record.

10         THE COURT:  Let's make it June 5th.

11         MR. KINGSTON:  That's fine, Your Honor.  I did

12   have one housekeeping item.

13         THE COURT:  I'm sorry, I'm sorry, excuse me,

14   that's what you said before.  Let's make it June 9th.

15   That'll give you, or some poor associate the weekend to

16   finish it up.

17         MR. KINGSTON:  If they're here, I'm here, Your

18   Honor.  That's fine, Your Honor, thank you.

19         THE COURT:  Okay.  And replies, I really, I think

20   it's fine to ask permission.  You can do that in an email.

21   And again, it's, I really, this is only if someone says

22   something that you believe is a gross mis-citation to the

23   record, or to the law.  And you know, something that makes

24   your hair stand on end, that's the type of thing that I

25   would have in reply, nothing else.  So don't hold anything

1   back in the brief itself.

2         MR. ROSS:  Your Honor, there's one other thing I

3   always do at the end of trial, whether it's bench or jury, I

4   offer to put together for the court a list of the exhibits

5   actually entered into evidence in one handy sheet so that

6   the Court doesn't have to plough through a transcript.

7         THE COURT:  Yeah, that would be helpful.

8         MR. ROSS:  I can also show it to (indiscernible) -

9   -

10        THE COURT:  That would be helpful, particularly

11  since we're using two sets of -- actually, three sets of

12  exhibit books, joint, plaintiff's, and defendant's.  So that

13  would be helpful.

14        MR. ROSS:  I will do that, and I will show it to

15  MR. Kingston before submitting it, Your Honor.

16        THE COURT:  Okay.  Anything else from either side?

17        MR. ROSS:  NO, Your Honor.

18        MR. KINGSTON:  None from the defendant, Your

19  Honor.

20        THE COURT:  Okay, all right.  I appreciate the

21  work you all put into this, including the unusual work in

22  preparing to do this by video, and getting all the exhibits

23  out the way you did.  I would normally tell you that you

24  also should be using this period to see if you could settle

25  this matter, but I appreciate that the matters before me are

1    only a small piece of the overall litigation.

2            But on the other hand, you can certainly evaluate

3    the other claims.  I think both sides are primarily unfair

4    competition lawyers anyway.  So having seen how this factual

5    presentation went, I think you still should consider

6    settling the entire ball of wax.  But failing that, I'll

7    look for your briefs via email on the 9th, as well as the

8    exhibit list of actually admitting exhibits.  Thank you.

9            MR. ROSS:  Thank you, Your Honor.  Stay safe,

10   everybody.

11           THE COURT:  We'll log off.

12           (Whereupon these proceedings were concluded at

13   1:52 PM)

14

15

16

17

18

19

20

21

22

23

24

25

1        C E R T I F I C A T I O N

2

3        I, Sonya Ledanski Hyde, certified that the foregoing

4    transcript is a true and accurate record of the proceedings.

5

6

7

8    Sonya Ledanski Hyde

9

10

11

12

13

14

15

16

17

18

19

20    Veritext Legal Solutions

21    330 Old Country Road

22    Suite 300

23    Mineola, NY 11501

24

25    Date:

**1**

**1** 17:1,22 18:4
129:12 131:7
**1,037,110** 78:20
**1,294** 81:3
**1,300** 109:8
**1,400** 63:18 77:21
**1,428** 77:23
**1,500** 110:19
**1.5** 82:20
**10** 105:7 116:7
**10,000** 80:3
**100** 42:22 57:13
65:23 127:25
128:7
**10022** 4:6
**1020** 72:6,7,21
79:7
**105** 85:14,15,18
89:3,8,9 90:5
119:17
**10601** 2:3
**107** 126:22
**109** 39:22
**11** 110:9 114:22
140:14
**110** 6:14,16,23
9:19,24 10:1,12
10:16,24 11:9,18
11:23,24 12:20,24
12:25 13:15,18
44:4,6 45:3 47:25
**111** 102:7,10
104:15 123:11
124:1
**112** 130:17,20
**113** 31:14,16,24
32:4,6 42:13,14
42:23 127:8,14,15
129:9
**114** 38:1,5
**11501** 150:23

**12** 29:23 49:15,20
82:20 113:24
114:12 140:15
**127** 142:5,8
**129** 112:20,22
**129-18** 112:23
**12:01** 119:14
**13** 41:24 42:4,8,9
42:12 113:9
**130** 113:22,25
**131** 114:9,13
**132** 114:6,20
**134** 78:5,11,20,24
79:4
**13th** 10:23 11:10
13:12
**14** 16:15 147:9
**146** 8:15,16,17,22
9:23 136:5
**15** 28:4 43:17,21
47:13,15 48:17
53:18,21 54:16,24
55:9,23 100:13
101:6 121:25
122:4,13 144:5
**150** 57:14
**150e** 68:1
**15th** 100:19,25
101:6
**16th** 100:22
**17** 15:9,20 16:15
16:25 30:15,16
31:1,7,10 32:21
36:2,4,4,5,9 41:15
41:15,17,20,20
43:7
**1772** 44:13
**18** 15:20 16:25
24:13 25:10 29:24
78:1 102:1 103:15
**187** 46:18
**18th** 103:3,5,7
104:3,22,23 108:9

**19** 34:15,21 36:1,9
44:11 101:22
102:2,3
**19-08246** 1:4
**19-22312** 1:3
**19th** 101:9,25
102:4
**1:52** 149:13
**1st** 100:22

**2**

**2** 89:11
**200** 40:9 64:8,10
65:17,19 71:1
**2014** 51:21
**2017** 111:19
**2018** 51:19,21
**2019** 14:16 17:22
18:2,4,10 21:11
22:1,8,15 23:21
24:18,22 25:3
26:3,24 27:7,14
28:3 78:17 82:19
100:14,19 101:25
102:23 103:25
108:9 113:19,19
113:21 114:3,4,17
114:18 121:18
129:12,18,22
131:8
**2020** 2:5 30:8
102:24 105:2,5
**203,225** 99:19
**20th** 30:8
**21** 21:5
**225** 14:1
**23** 15:20 16:25
**24** 22:1 23:21
24:18,22 25:3
26:3 27:7,14
30:12,14,15,23
121:18
**248** 2:2

**24th** 14:16 18:2
18:10 21:11 22:8
**25** 29:13 41:8
55:16 103:8
113:19
**25th** 103:4,5,6
**26** 130:4 132:16
139:12
**2600** 78:24
**27th** 105:16
**289** 100:24 101:5
**2:00** 144:4

**3**

**3** 21:5
**3,500** 27:24
**3-5-0** 138:22
**30** 52:22 56:4
114:3,18 141:16
146:8,10,24
**300** 2:2 39:14,18
39:24 150:22
**300,000** 99:20
**301-317** 126:22
**3026** 61:14
**3062** 61:12
**3063** 61:12,14
**31** 113:19,21
114:4,17 131:8
**313** 130:19 131:17
132:13 134:2
**315** 125:15,17,18
125:21
**316** 127:5,6,11
128:15 129:8
130:3,14
**31st** 129:22
**32** 87:21 88:10
**33** 9:15
**330** 150:21
**34** 21:4 100:8
**35** 21:5
**350** 138:22,23

| | | | |
|---|---|---|---|
| **3500** 92:12 | **6** | **9:37** 2:6 | **actual** 16:19 |
| **360,000** 78:23 | | **9th** 147:14 149:7 | 121:7 133:13,15 |
| **360,198** 78:19,22 | **6** 2:5 110:17 116:8 | **a** | 133:17 145:9 |
| **369** 12:12 | 141:16 | | **add** 32:10,17 51:7 |
| **37** 130:4 132:16 | **6.99** 39:11,12 | **ability** 138:9 | 102:3 |
| **373** 115:1,4 | **60** 67:14,15,19 | **able** 39:3,5 59:18 | **added** 20:10,20 |
| **38** 68:12 | 77:11,24 78:2,12 | 123:7 | 21:8,19 22:3,5,10 |

**3500** 92:12
**360,000** 78:23
**360,198** 78:19,22
**369** 12:12
**37** 130:4 132:16
**373** 115:1,4
**38** 68:12

**4**

**4** 52:5,13 53:2,9
54:7 55:8 56:3,13
122:8,14,16
131:11 132:7
**4,000** 55:17
**4,033,000** 131:22
132:1 133:25
**4,033,425** 43:25
48:21 49:1,11
50:22 51:9 52:10
52:15 54:12,20
55:22 57:6,10,22
59:1,5
**40** 65:24 105:16
**42** 77:15,17
**43** 63:20,23
**434,683** 113:15
**434,683,854**
113:20 114:14
**45** 145:19,20
146:10,18

**5**

**5** 8:25 16:7,13
78:16
**5,000** 52:2
**5,278** 32:18
**5.99** 39:11 40:25
**50** 39:13 55:16
65:18 68:12,22
**500** 10:9 81:4
**51** 86:23
**575** 4:5
**58** 77:19
**5th** 100:23 146:21
147:10

**6**

**6** 2:5 110:17 116:8
141:16
**6.99** 39:11,12
**60** 67:14,15,19
77:11,24 78:2,12
81:1 90:10,25
91:10,11 96:14
98:9 99:20
**600** 10:9
**63101** 4:13
**65** 13:22 14:3,4,9
14:18,19 16:4
**65.005** 16:9
**67** 101:13,14,17
**676,000** 81:2
**6th** 105:2,5,8,15
108:9

**7**

**7** 60:21 129:18
**7,000** 110:18
**74** 136:11 140:14
**75** 59:11,25 60:15
61:4 73:6
**77** 63:5,7,15 64:4
65:9

**8**

**800,000** 9:10
**802** 19:19
**803** 124:6
**85** 98:11,17,17
**86** 66:2,7 67:25
68:19 83:1 98:12
**87** 12:14,16,17,18
12:24 13:2,3,8
89:2,8
**89** 71:25

**9**

**91** 72:14,16 79:10
79:11,13
**94** 82:4,4

**9:37** 2:6
**9th** 147:14 149:7

**a**

**ability** 138:9
**able** 39:3,5 59:18
123:7
**absolutely** 20:23
34:3,14 35:12
53:12 71:16 76:15
77:7 95:18 109:4
109:16 117:14
121:23 137:11
**accept** 78:14 81:5
**accepted** 6:10
38:15 46:1 116:9
126:18
**access** 116:11
**accidentally**
116:16
**account** 11:13,15
89:20 137:19
**accrued** 124:14
**accurate** 7:4
88:12 91:10,17
101:11 121:16
150:4
**accurately** 95:12
**acknowledged**
138:3
**acknowledgment**
138:6
**acquire** 18:25
25:9 34:3 122:17
**acquired** 51:25
57:14
**acquiring** 35:1
52:15
**acquisition** 63:25
**act** 60:25
**action** 41:10
110:13
**actions** 117:12
144:20

**actual** 16:19
121:7 133:13,15
133:17 145:9
**add** 32:10,17 51:7
102:3
**added** 20:10,20
21:8,19 22:3,5,10
22:17 23:6,12,20
41:16
**additions** 97:4
133:5
**address** 70:19,21
72:9 79:23 85:11
85:11 87:5,6,18
88:22 144:10,25
145:10,11,12,23
**addressed** 19:23
59:3 130:9
**addresses** 12:8
13:15 86:10 90:4
**adjourn** 6:6
**admissibility** 46:6
46:11
**admission** 130:3
132:14 137:5
**admit** 11:22
125:12 128:22
133:22 138:20
141:20
**admitted** 8:23
13:18 128:16
130:12 136:4
137:21,22 138:23
142:5
**admitting** 149:8
**adv** 1:4
**advance** 66:10
146:23
**advanced** 116:11
**advertise** 35:20
**advertisement** 7:1
9:13,21 10:15
83:13

**advertisements** 9:10
**advertises** 95:9
**advertising** 27:22 30:23 34:17 36:16 36:19,22 37:8,13 38:25 51:13,23 58:1 71:14 97:21 110:2 112:6 115:4 117:16 122:18 126:5 131:10 144:14
**advise** 115:16
**affirm** 8:6
**affirmative** 147:2
**affordable** 68:14 70:9
**afraid** 20:7
**agency** 95:25 98:3
**agents** 118:3
**agents'** 128:12
**aggressive** 52:25 66:15 109:16 111:17
**aggressively** 67:3
**ago** 41:8 129:18 129:20
**agree** 37:19 119:24 124:11
**agreement** 20:10 20:21 21:8,20 22:3,5,10,17 23:7 23:12,20 40:12,13 40:17
**agreements** 75:20
**ah** 119:10
**ahead** 8:11 70:5 71:8 75:8 77:22 89:16 93:14 94:18 94:20 116:23 122:23
**air** 58:5 109:18 146:20

**ais** 68:14
**al** 1:12,15 6:4,4
**allo** 67:4 70:10,10 70:13 71:18,21,22 72:2,3,19 73:7,10 73:13,20 74:5,15 74:18 79:15 80:8 80:11 81:23 83:8 84:4 87:6 112:9 143:11
**allo's** 79:19 80:19
**allocated** 124:15 132:1
**allow** 6:16 97:16 139:25
**allowed** 10:7 29:3 46:1 119:7 135:1 146:22
**allows** 33:3 94:2
**alpha** 68:1
**alternative** 41:2
**amazon.com** 40:9
**ambiguous** 15:6 83:11
**amount** 40:20 43:4 53:1 54:1,3 62:5 73:25 110:20
**amounts** 32:4,9 41:25 43:9
**ample** 40:2
**analysis** 98:8
**analytic** 98:24
**anderson** 105:23 107:2 123:18
**answer** 10:18 15:13,14,17,21,23 17:5,6,17 21:6,8 21:10,20 29:2,3,5 43:14 53:16 58:13 58:17 70:8 71:9 83:15 108:1 109:11 111:6 119:18 121:10

122:23 136:3 138:12 139:1
**answered** 15:6 17:9 20:2 21:14 21:15,17 55:1 58:12 91:16 102:22 111:6 119:4
**answering** 34:6
**answers** 99:24 135:12 140:12
**antenna** 81:12 93:23
**anybody** 23:5,18 28:14
**anyway** 146:12 149:4
**apartment** 72:2 72:20,24 75:12,14 79:21 87:5 143:12
**apologize** 20:16 29:9 71:9 102:19 116:15,18 118:19 126:21
**apparatus** 143:19
**apparently** 140:4
**appear** 8:17 90:23 90:24 91:5 140:12
**appeared** 14:14 118:5
**appearing** 91:11 141:12
**appears** 31:3,5 34:16 38:7,22 39:2,8 61:3 73:8 98:17 114:19 144:11
**apple** 33:22
**apples** 90:19 91:14
**application** 144:19

**appreciate** 31:20 35:24 148:20,25
**approach** 111:19
**appropriate** 45:10 145:14
**appropriately** 58:12
**approximate** 43:24 47:16 48:6 48:20,25 49:11 54:3
**approximately** 9:10 10:20 81:4 126:7
**april** 30:8 38:23 52:1 60:21 102:24 114:3,18 129:12
**archer** 5:12
**area** 24:7,22 26:4 69:10,10 70:22 75:16 76:24 80:2 82:22,24 92:3,5,7 92:20 93:9
**areas** 27:15 74:7 76:7,17 77:17 80:7,13 94:7,9,12 143:5,9,9
**aren't** 118:20
**argue** 6:17 7:10
**argument** 45:14 49:9
**arguments** 144:3
**arms** 39:22
**arthur** 116:20
**articulated** 55:9
**aside** 13:21
**asked** 15:5,15 21:13 27:4 44:25 46:14 49:12 50:14 55:1 58:18 91:2 106:18 107:2 119:3,8,16,21 120:17 121:13,24

123:2,5,5,8
126:14,14 130:10
135:18 139:5,18
139:19 141:2,3
143:11
**asking** 11:5 36:8
36:10 45:16 49:7
50:19 54:16,23
55:12,21 58:14
70:6 84:7 91:14
91:15 98:16 99:9
119:15 129:10
135:18 144:8
146:2
**asks** 131:24 132:2
**assembled** 25:23
**asserted** 107:15
137:6,13 144:12
144:13
**assertion** 24:2
144:21
**assessment** 19:10
24:6,23 25:4,11
26:4,8 28:7 29:17
71:12 98:4 105:8
**assets** 113:13
**assimilate** 26:6
**associate** 33:11,25
147:15
**associated** 41:25
48:14 52:5 56:15
57:24 58:9 66:18
68:3 80:14 85:12
90:23 100:13
113:12 121:11
131:7
**associates** 33:17
38:18
**assume** 89:1
95:12 130:8
145:18
**assuming** 59:15
99:21 103:13

112:16
**assumption** 66:21
**assumptions**
66:18
**assure** 51:18
**at&t** 34:16 36:16
36:19,22 37:12
**attachment** 11:8
11:12,23
**attempt** 57:24
144:17
**attempted** 45:24
**attempting**
122:17
**attention** 15:9
16:25 21:4 30:12
32:20 43:17 44:3
44:24 46:8 53:21
59:10 63:4 112:19
114:6 142:9
**attorney** 23:13
61:6,22 126:1,5,6
**attorneys** 4:4,11
103:17 116:6
**attract** 48:9
**audio** 37:21 88:1
92:7 95:19 122:22
**august** 48:11
78:17 102:23
103:19,22,25
104:8,25 109:22
125:3,9
**auman** 6:10 7:25
8:5,9,14,25 9:18
10:1 12:14 13:21
13:21 14:10,23
15:9,18,23 16:1
16:18,24 17:19
18:1 20:1,4,7,8,14
20:19 21:4,6,9,9
21:14,21,23,24
22:1,8,12 23:16
24:5 25:13,15

29:1,9 30:3 35:25
36:7 37:22 38:2
39:22 40:8,20,21
41:15 43:18 44:4
44:16 45:19 46:17
47:5,15,22 48:16
49:10,14,19 50:1
50:3,7,8,21 51:3,7
53:6,11,16,21
54:11,19 55:7,10
55:16 56:6,24
59:7,10,16 60:1
61:16 63:4,14
65:8 66:3 69:14
71:7,15 75:6,10
76:9 77:6,8,21
84:13,19 85:18,24
90:9,22 91:3,22
93:17 94:18 95:22
97:7,16 98:16,20
99:17 100:8,25
101:3,17,23 103:3
105:1 106:13
107:17,19 109:1
109:12 111:12
112:19 113:10,15
114:2 116:24
117:10,12 118:19
120:17,25 121:2
121:13,24 122:20
124:12 125:20
127:4,13 129:5,7
129:19,25 130:16
132:18,25 135:18
139:7 140:3,7
141:14 142:1,2,4
142:25 143:1,7,16
144:2
**authenticate** 13:4
47:10 98:16
**authenticity**
30:13

**automated** 116:4
**automatic** 31:4
144:13,19
**availability** 65:23
**available** 19:13
66:22 96:15
111:22 138:11
139:6,7 140:6
**avenue** 4:5
**average** 39:13
79:1
**averaging** 79:3
**aware** 36:17
43:12 87:9 95:5
95:25 96:12 121:6
121:9

**b**

**b** 2:21 141:16
**back** 11:19 22:15
22:19 32:20 35:25
40:23 41:3,20,21
42:4 46:21 47:19
49:7 52:6,23
56:18 58:6,6,6
61:20 66:24 76:21
77:2 79:10 81:1
83:1 91:13 104:5
104:8,12,19 105:3
110:8,25 115:15
115:19 116:19
122:19 141:5,13
148:1
**backed** 80:6
**background**
32:14 37:2 60:7
98:24
**backup** 132:7
**bakelite** 41:5
**balance** 113:13
**ball** 149:6
**ballpark** 39:13
**bandwidth** 70:24
70:25 71:2

**bank** 4:12 89:20
**bankruptcy** 1:1
  2:1,23 38:4,14
  144:22 145:19
**bannon** 99:7
**base** 56:9,10
  63:24 77:15,15,20
  79:2
**based** 57:25 73:3
  80:16 93:8 96:9
  96:25 99:22
  105:25 106:11
  123:22 124:7
  133:23 144:21
**basically** 54:15
  55:1 66:1 146:15
**basis** 19:18 25:8
  25:13,15 26:16
  65:2 67:22 97:1,5
  128:12 133:4,6,6
  136:25
**bates** 44:7,7,22
  45:3 46:15 61:4
  85:16
**bear** 34:7,11,22
**bearing** 85:16
  106:5
**bears** 61:4
**beat** 38:14
**began** 136:2,2
**beginning** 111:6
**begins** 61:15
**behalf** 7:15 14:15
  14:25 15:3,23
  17:5 135:21
**believe** 6:24 7:14
  9:18 11:10 18:5
  29:15 30:19 33:5
  40:24 45:8 49:14
  49:19,24 51:18
  67:13 74:2 79:25
  86:4 87:15 91:8
  91:24 94:13 96:13

100:15,17 101:11
  104:5,9,24,24
  118:16 125:23
  128:6 129:10
  147:22
**believes** 9:11
  145:13
**bell** 41:5,10 76:21
**bench** 46:4 148:3
**benefit** 33:8
**bennett** 60:4,6,19
**best** 9:12,20 10:14
  37:21 92:16 94:8
  111:22
**better** 18:1 19:4
  56:10 71:4 121:3
**beyond** 48:13
  126:9,13 130:22
**big** 53:3 63:22,22
  80:9 83:22,23,25
  110:2 117:21
  118:17
**bill** 142:6,10
**billed** 85:10
  120:18 124:16
  126:15
**billing** 85:3
  120:18 126:17
**bills** 85:9
**binder** 100:10
  126:21
**bit** 19:16 20:17
  39:11 55:13 57:1
  134:4 143:4,19
**bits** 19:2,8,11 86:8
**block** 82:9,17
  86:21 87:7,12
  88:13,23 90:6,23
  91:4,6 92:1 94:4
  94:25 95:9 96:5
  121:2,3
**blocks** 76:13,16
  76:20 87:9,11

88:16,19 90:20
  121:6,9,11
**blown** 105:7
**board** 28:2 116:21
**book** 30:18,19
  100:9 127:11
**books** 126:20
  148:12
**bottom** 16:9 32:11
  44:11,17 61:3,12
  89:5 114:22
  125:23 129:15
  142:12
**box** 11:13,15
**brad** 24:20,25
  26:18 27:5 99:7
**brand** 56:21
  117:13 118:8
  119:23 120:8,12
**brandon** 60:11,20
**brannan** 27:7
**brannon** 24:20
  26:23 60:19 99:6
**brannon's** 26:19
  27:5
**breach** 144:13,23
**break** 8:2 51:2
  55:21 115:24
**breakdown**
  131:11
**breaks** 124:13
**breeds** 117:16
**brian** 5:9
**brief** 64:18 144:3
  144:16 145:20,21
  146:13,22 148:1
**briefing** 144:7
**briefly** 32:21
  129:3
**briefs** 145:24
  146:7 149:7
**bring** 15:15 29:16
  74:24

**bringing** 48:14
  56:15 57:24 75:15
  79:19 106:9
**broad** 80:21 84:19
  143:20
**broadband** 72:9
  72:17 81:10 82:5
  82:18 84:5 87:7
  87:13 90:15 91:12
  93:18,22 96:2,16
**broader** 29:24
  93:7 97:2
**broke** 6:14
**brought** 66:12
**bucks** 40:9
**budget** 53:3
**buehl** 5:14
**build** 25:19 35:10
  75:16 80:6 81:11
  81:17 93:18,20
**builder** 73:14
  74:9,22
**builders** 74:23
  75:5
**building** 72:20,24
  75:12 79:21 80:7
  80:14 81:14,16
  87:5
**buildings** 72:3
  143:12
**built** 93:23 94:2
  95:7
**bullet** 68:18
**bulletin** 66:8
  67:24
**bump** 147:3
**bunch** 28:19,24
  81:17 104:13
  118:1
**bury** 28:15
**business** 15:1
  20:13,20,25,25
  21:3,8,19 22:2,9

22:17 23:6,11,20
24:12,12 27:11
29:13 35:10 39:1
42:21 43:5 52:2
63:22 64:22,24
70:19 73:15 74:9
74:21 75:4 76:20
80:21 81:20 83:23
86:13 87:10,17
88:4 93:8 96:19
96:24 97:1 98:5,5
109:14 110:3,7
117:19 118:16,22
118:23 119:6,19
124:4 125:7
128:10,11,13
132:20 133:23
143:10
**businesses** 75:5
93:11
**button** 86:8
**buy** 39:23 40:8
51:17 93:6
**byte** 19:16
**bytes** 19:2,8,12
86:9

**c**

**c** 4:1 6:1 63:12
150:1,1
**c&d** 103:7,8,13
**cable** 68:15 70:24
71:1,1 81:12
83:19 85:6 93:19
96:10
**cables** 28:15
**caf** 74:1,3
**calculated** 111:19
**calendar** 105:3,6
111:16 125:11
**calendars** 104:8
104:20 106:24
123:22

**call** 33:10,18 34:6
35:21 36:1,11,12
37:3,19 38:8,9,23
51:17 56:10 74:22
75:20 90:13
106:19 115:14,19
116:11 140:17,18
**called** 16:2 28:24
36:18 37:7,12
38:13 41:21 42:16
42:19,22 52:7
56:8 64:18 69:9,9
73:13 87:24 94:7
97:8 98:18 99:1
128:4
**calling** 33:11
36:15 37:6 109:25
**calls** 33:15,24
37:4,5 38:24
118:2,3
**camera** 62:7
**campaign** 66:15
**campaigns** 64:16
64:23,24 144:14
**can't** 135:8 137:1
137:14
**cap** 115:12
**capable** 95:16,22
96:2,17
**capacity** 60:8,9,13
**caption** 142:6
**care** 32:22,22
33:1,2,6,10,17,25
35:6 36:1,18 38:6
38:18 64:19 95:15
95:18
**carol** 103:17
**carrier** 28:11 41:4
41:9 73:16 80:18
87:13 89:19 94:15
94:23 95:6
**carriers** 28:20,25
29:20 73:11,11

98:1
**case** 1:3,4 12:6
17:22 21:14 25:25
27:16 33:1 34:2
45:20 51:18 56:12
73:6,19 79:17
106:3 123:21
126:3 133:1
134:15 144:4,19
145:2
**cases** 19:4,20
42:16 71:5 124:17
**cash** 89:20
**cashback** 111:8
**catch** 12:15
**categorized** 57:15
**caton** 123:23
**cause** 117:13
**cease** 103:13
**celine** 5:14
**cell** 116:7
**census** 76:13,16
76:20 82:9,17
86:21 87:9,11,12
88:13,16,19,23
90:6,20,23 91:4,6
91:22 92:1 94:4
94:25 95:9 96:4,5
96:21 121:2,3,6,9
121:11 143:8
**center** 90:13
**central** 68:5,9
92:13
**certain** 10:6 65:14
65:20 91:22 143:8
**certainly** 37:21
38:22 39:8 71:16
84:23 149:2
**certainty** 42:22
**certified** 95:21
150:3
**chain** 61:15

**challenged** 6:15
11:18
**chambers** 146:9
**chance** 111:20,21
130:10 137:4
139:13,14
**change** 126:20
143:13
**changed** 65:23
**changes** 78:14
**channel** 57:14
**chapter** 110:9
**charge** 115:1
**chart** 133:11
**charter** 1:15 4:11
6:4,5 7:14 9:9,13
9:21 10:14,22
21:2 28:18 29:12
29:14,19,22,24
30:23 48:15 51:20
51:23 52:11 53:8
56:19,19 62:19
63:18,19 64:13,15
65:3,3,13 67:4,10
67:13 68:12,22
69:3,20,23 70:1,6
75:24,25 76:2,3
76:10,14,17 77:4
77:5,10,12,18,20
78:5,11,21 79:4,6
79:7,12 80:25
81:8,21 83:8 90:6
90:7,10,16,23
91:5,20 92:10,24
94:11,13,16 95:2
95:5,7 97:18
99:19 100:18
110:7 112:8 115:4
118:12 120:7,11
123:21 127:1,24
127:25 132:1
138:8,9,14,15
140:9,16,20,22

141:18 143:5,10
145:12 146:25
**charter's** 62:25
64:21 94:14
144:17
**charter's** 117:12
128:2 137:25
**cheaper** 75:11
**cheaply** 40:16
**check** 10:9 53:9
142:18
**checking** 146:11
**checks** 120:22
121:1
**cherry** 73:14
**chief** 45:20 134:15
**choose** 49:4
143:15
**chunk** 53:3 63:22
**churn** 75:18 121:8
**chutchian** 5:13
**circle** 77:2 80:25
**circuit** 42:20,20
145:1
**circumstance**
38:17
**circumstances**
37:15
**citation** 147:22
**citations** 145:25
**cite** 146:4
**cities** 69:11 74:10
**city** 68:3 90:13
**civil** 9:15 130:5
**claimed** 61:7
**claims** 149:3
**clarification**
102:25 113:8
**clarify** 11:11 36:8
44:8 80:16,22
**class** 41:10 93:6
**clear** 40:6 84:2

**clearly** 46:2 123:7
131:25
**clec** 29:22 30:1
118:11
**clecs** 29:14
**client** 23:13 61:6
**clock** 40:4
**close** 14:20 58:6
77:3 80:25 112:1
115:8
**closely** 96:6
**closing** 49:9
**coburn** 4:10
**collaboratively**
27:11
**colleague** 24:20
24:25 115:10
135:22 136:24
**colleagues** 18:17
18:18
**collect** 96:9,10
**colloquy** 19:25
**column** 32:4
41:16 43:8
**columns** 31:1
**comcast** 63:20
65:3
**come** 6:17 13:4
28:14 32:10,18
34:6 46:2 49:6
56:18
**comes** 26:17
52:13 69:9 73:14
82:17 103:21
132:24
**coming** 110:5
**commands** 133:21
**commission** 91:25
96:7,8,16
**commissions**
28:12,13 76:23,23
110:5

**commitment**
35:18 58:7 110:8
110:10 111:3,4
112:2,6
**common** 22:24
23:1 92:21 109:13
109:15
**communicate**
85:1
**communication**
62:11 83:8 116:5
**communications**
1:15 4:11 6:5,5
28:18 29:19 84:4
96:16 142:19
**communities** 68:6
68:7 69:8 73:21
117:22,25
**community** 71:1
79:22 80:4 83:19
**comp** 82:1
**companies** 97:17
97:21 118:9
**company** 20:23
97:7,9 99:1 128:9
143:11
**compare** 11:19
90:19 91:14
**compelling** 37:8
**compensation**
101:20
**compete** 26:12,22
28:6,9 29:23
56:20 63:17,23
64:20 76:2,11,14
76:18 77:1,18
83:17 88:10,17,18
92:4,8 94:3 97:19
99:20 112:8 143:5
**competes** 24:7
25:6 26:9 71:21
72:10 118:12

**competing** 65:1
67:3,10 71:14
72:20
**competition** 79:12
81:25 92:15 93:6
93:10 95:15,16,19
149:4
**competitive** 24:6
24:23 25:4,7,11
26:3,8,17 27:15
28:7,16,25 29:17
29:20 71:12 73:11
74:19 82:2,22
97:25 98:4,7,24
**competitiveness**
120:11
**competitor** 68:13
68:15,23,23,25
69:4,20,24 70:2,7
70:10 73:20 74:13
91:21 92:25
**competitors** 64:25
71:14 74:13 79:17
81:22,25 92:18,22
93:10 97:17 98:8
**compile** 96:22,22
**compiled** 102:12
102:14,18,23
103:25 106:22
**compiling** 107:10
**complaining**
128:5
**complaint** 33:24
**complaints** 34:8
34:10 59:3
**complete** 29:3
86:9
**completely** 45:1
74:8
**complex** 75:15
**complexity** 71:3
71:10

**complied** 106:23
**component** 45:20
56:2 57:5,9,21
58:20,21
**components** 55:24
131:25 133:24
**comprised** 28:18
29:14 73:10
**computer** 33:4,22
**conceal** 64:25
65:2
**concede** 19:17,18
**concept** 44:15
77:3
**concern** 33:12,24
118:2
**concerned** 125:8
145:15
**concerns** 35:9
**concluded** 149:12
**conclusions** 146:3
**condensed** 16:2
16:21
**conducting**
143:10
**confer** 115:7
**conferring** 115:14
**confident** 52:8
83:20 128:1,8
**confined** 29:12
**confirmed** 40:21
47:22 55:7 131:19
**confirming** 13:12
**confused** 37:6
**confusing** 16:3
**connected** 54:3
**connection** 65:13
115:4
**connectivity**
128:3
**consequences**
144:22

**conservative** 57:2
127:22,23
**consider** 39:16
79:17 80:4,6
149:5
**consistent** 69:12
**consultants** 28:1
**consumer** 24:12
109:14
**consumers** 35:23
**contact** 86:7
126:2
**contacts** 30:22
32:1
**contained** 62:10
**contains** 62:10
90:6
**contemporaneous**
124:8 125:10
**contemporaneo...**
124:5
**contempt** 144:24
145:3
**contend** 78:20
**contends** 109:6
**context** 65:16
**contexts** 124:13
**continue** 40:6
**continued** 111:2
**contract** 97:24
**contractual**
144:20
**contradicted**
15:14
**contrary** 83:21
146:14,14
**conversation**
84:19 117:24
**conversations**
106:14
**convince** 34:11
35:14 36:25 38:19
39:5 42:1 43:23

47:17 48:19 49:16
49:21 50:22 51:4
51:5,6 54:13,21
55:18 59:6
**convinced** 125:2
**convincing** 35:17
48:6 50:9 54:4
56:16,17
**copper** 85:7 93:19
**copy** 112:22,24
**cord** 85:7
**corner** 8:19 16:10
16:21 47:3,23
48:2
**corporate** 19:20
19:22 106:5
**corporation** 106:7
**corporations**
106:6
**correct** 9:4 22:11
23:2 26:2,25 27:8
29:21 33:13 54:11
57:6,10,11,19,22
57:23 63:12 76:12
95:4,5 101:10
104:2 120:19
121:22,23 127:18
128:20 136:9,14
**correctly** 9:16
15:24 17:5 21:9
38:15 44:1 48:21
67:5 69:14 85:17
99:17 142:20
**correspondence**
60:2,15
**cost** 39:16,23
40:23 43:24 47:16
48:6,9,14,20,25
49:11 52:10,12
53:1 54:4 57:8,23
58:9 132:1 133:12
133:13,17

**costly** 111:17
**costs** 48:13 52:6
56:3,15,21,22,23
59:1,2 65:18
81:14 131:6
133:15,16,19
**counsel** 7:14
12:23,25 13:11,12
19:25 23:8,11,14
49:5 58:13 60:9
60:25 62:11
102:15 103:1
106:15,16,18,18
106:19,20,21
124:14 132:7
**count** 27:18 78:10
79:2
**counted** 78:13,14
**country** 118:10
150:21
**counts** 107:18
135:4
**couple** 6:11 7:25
79:24 80:1 134:13
**course** 14:20 15:1
21:2 23:9 28:17
33:8 34:25 39:25
41:10 43:5 51:10
64:22,24 70:10
72:8 75:17,23
98:4,5 119:18
125:7 128:10,11
128:13 132:20
**court** 1:1 2:1 6:2,9
6:21 7:2,9,12,20
7:24 8:6,10 9:8
10:18,24 11:2,5,6
11:16,22 12:4,11
13:4,14,17 14:1,4
14:7 15:17 17:15
19:22 20:3 29:5,7
33:8 40:11,15
41:12 42:5 45:16

46:5,13,25 47:12
49:12,25 50:5,14
50:18 52:14 53:8
53:15 54:17 55:1
55:4,24 58:14,17
58:23 59:8,13,18
59:22 61:9,23
62:3,7,9,12,14,18
62:24 63:1 73:5
83:12,14 84:8,8
84:10 85:20 89:13
89:24 91:2,15,17
91:20 92:6,8,23
93:14 94:18,20
96:20 99:12,23
100:3 102:17
106:11,16,18,21
107:4,7,9,12,15
107:16,17,21
108:1,4,19,22
112:14 113:2,6
114:16 115:9,11
115:13,18,18,21
115:22,25 116:2,4
116:11,12,17,19
116:21,23 117:2,5
119:12,22 120:5
120:10 122:11
123:5 124:11,20
124:25 125:3,5,17
126:11,16,24
128:16,19,21,24
129:4 130:8,9,18
131:1,5,11,14,20
132:14,25 133:8
133:10,17,22
134:8,21 135:2
136:1,8,12,15,21
136:25 137:5,12
137:20 138:3,9,14
138:18,20,24
139:16,24 140:1,2
140:11,14,16,22

140:25 141:6,14
141:17,23 142:23
142:25 143:2,8,22
144:1 145:23
146:22,23,24
147:4,7,10,13,19
148:4,6,7,10,16
148:20 149:11
court's 7:19 62:15
89:21,21
courtroom 116:10
116:13,16
courts 116:6
court's 132:9
cover 65:6 144:6
144:7,8,9
covered 55:4,5
crammed 78:23
cream 73:15
74:15,18 80:12,17
80:20
create 64:16
104:21
created 25:23
104:10 118:1
132:20
credible 118:6
credit 38:15 39:4
39:7,10 40:20
41:17 42:18,18,24
42:25 127:23
128:1
crediting 40:23
credits 43:4,6
52:4 56:12 110:15
111:8,13,14
critical 139:23
critically 26:12
crop 74:15,18
80:12,17,20
cross 8:12 19:13
19:15 119:2
120:14 126:10,13

130:23,24 132:2
136:3 137:4 139:9
141:19,25 142:2
crosstalk 82:15
88:15 94:17 98:23
cumulative 89:24
customer 30:22
31:25 32:21,22
33:1,2,6,10,10,11
33:17,24,25 34:1
34:4,22 35:6,7,13
35:14,14,19 36:1
36:18,24 38:6,18
38:19 39:3,4,5,13
39:15,17,17,23,25
41:19 43:22 48:18
49:16,21 50:4,10
50:22 51:3,11
53:19,23,24 54:20
55:15,17 57:5,9
57:19,21 58:21
65:25 78:16 84:21
84:23 85:12 86:2
86:10,25 87:23
88:2,23 109:2,13
109:21 118:2
121:7,11 131:8
132:24 133:5
customer's 87:4
88:21
customers 17:21
18:4,13 25:9
33:18 34:4,12,24
35:1,2,2,11 37:4,6
40:12 41:21 42:1
42:15,18,21,25
43:10,23 47:17
48:6,9,10,12,15
48:19 49:16,21
50:9,23 51:4,5,6
51:13,14,15,21,21
51:24 52:2,7,7,9
52:15,17,20,22

54:4,9,13,21
55:18 56:4,8,15
56:17,17 57:24
58:24 59:2,4,6
63:24,25 66:23
72:20 73:18 75:15
75:18 76:4 77:4,9
77:11,16,16 78:20
80:14,22 81:2,4
83:5 84:14,17,20
84:24 85:5,9 86:5
86:6,9,12,16,17
87:18 88:17 97:4
97:4 100:15,16,17
100:18,24 101:2,5
109:2,4,6,8,18,22
109:23 110:5,18
110:19,23 117:17
118:4 119:18
120:18,18,21,23
120:24 121:7,8
122:9,14,16
127:24 128:2,2
cut 29:2 61:18
cutouts 97:2
cynthia 60:4,6

d

d 2:22 6:1 9:15
daily 25:8,13,15
65:2 67:22 97:1,2
97:5 124:18 133:3
133:4,5,6
dale 69:16 70:4,7
damages 144:12
daniel 60:18
139:3
dash 116:12,21
dashboard 116:13
data 26:6,8 42:20
86:2 91:11 92:9
92:12 96:15 97:3
98:4 111:22 121:2
121:7,9,11 128:9

128:11,13 132:23
132:23 133:1,2,3
133:9
**database** 96:1
133:21
**date** 6:6 121:21
129:7,11,12
150:25
**dated** 72:18
**dates** 102:1
**davey** 68:2,11,13
68:15
**day** 19:24 20:22
20:22 21:16,16
26:1 27:11 87:23
105:2 133:7
**days** 7:25 28:4
31:21 41:4,6
52:22 56:5 76:21
146:8,10,10,24
147:9
**deadline** 146:21
**deal** 53:4 56:10,11
62:21 83:23
117:21 118:18
137:25 145:2
**deals** 145:3
**dealt** 144:18
**debtor** 1:10
**debtor's** 144:20
**debtors** 99:12
**debtor's** 125:7
126:22
**december** 56:16
131:8
**deceptive** 45:23
**decide** 11:24
131:3 134:22
**decided** 107:4
**deciding** 95:14
**decision** 111:23
**deck** 100:10

**declarant** 139:5
**declarants** 137:3
137:15 139:3
**declaration** 6:10
30:2,8,10 43:18
121:20,25 122:13
141:5
**declined** 139:13
**defendant** 98:13
129:21 143:24
148:18
**defendant's** 6:14
6:16 8:14,17,22
9:19,23 12:14
13:1,22 14:2,18
31:13,15,16,24
32:3,6 34:15,20
35:25 36:8 38:1,5
39:21 41:23 42:9
42:11,12 44:3,6
44:10 45:2 47:24
59:10,24,25 60:14
61:3 63:4,7,15
64:3 65:8 66:2,7
67:25 68:19 71:25
72:13,16 140:13
142:5 148:12
**defendants** 1:16
6:25 11:18 46:24
79:11,13 82:3,4
83:1 85:14,15,17
87:21 88:9 89:2,8
89:11 90:4 98:10
98:11,17,17 102:7
102:10 104:14
129:23 145:8
**defendant's**
112:19,22 113:22
113:25 114:6,9,13
114:20 119:16
123:11 124:1
127:8,15 130:6,17
131:18 134:13

136:10
**define** 63:17 76:8
85:5 93:8,10
95:18 96:24
**defined** 91:24
**definitely** 40:23
85:5 86:3 109:14
111:15
**definitive** 52:10
56:14
**definitively** 19:24
**delay** 62:8
**delayed** 147:5
**deliver** 112:6
**delivered** 110:10
126:23
**delivering** 35:18
**delta** 68:1
**demand** 48:12
57:25 58:4 109:5
109:21,25 122:18
131:9
**demographics**
98:6
**denied** 130:7
147:6
**densely** 74:6 75:2
75:24 79:21 80:13
81:21
**denton** 68:21,23
69:4
**department** 140:9
**depend** 27:12
**depending** 57:14
**depends** 10:21
70:18 80:10
**depicted** 47:24
**deploy** 83:19
**deploying** 70:22
**deployment** 72:9
72:17 73:8 82:18
84:5

**depose** 140:22
**deposition** 7:14
7:15 14:15,19
15:10,14 16:4,13
16:17 17:1 18:6,7
21:5 104:6 121:14
121:17 123:19
133:25 139:6,8
141:13
**derived** 108:6
133:1
**describe** 104:4
**described** 85:17
**describing** 63:8
**description** 65:9
85:19 108:5
**designated** 30:1
**designation** 68:10
**designations** 7:14
7:15,17,18,20
**designed** 110:8
**desist** 103:13
**detach** 142:18
**detached** 142:15
**detail** 86:21 132:3
132:6
**detailed** 105:6
**details** 86:17
**determine** 46:7
66:13 92:8 134:7
**determined** 27:15
**determines** 46:5
**developing**
124:20
**didn't** 110:7
119:22,23 120:7
128:19 131:20
138:10
**difference** 37:16
91:4 100:1,4,5
**different** 11:24
34:23 35:15 45:1
73:17 75:4,9 91:2

97:20 110:14
111:15,15
**differently** 93:11
**difficult** 29:10
37:24
**digging** 6:22
**digit** 116:7,8
**dire** 129:3,5
**direct** 6:10 15:9
16:25 21:4 30:12
43:17 44:3 53:21
56:21 59:10 63:4
65:9 79:17 93:5
114:6 142:9
**directed** 122:15
122:16
**directing** 32:20
112:19
**directly** 59:3
119:3
**disagree** 75:6,10
**disagreement**
12:5,7
**disappeared**
122:2
**disbelieve** 45:4
**disbursement**
89:20
**discipline** 105:22
**disclosure** 139:12
144:4
**disconnect** 91:10
103:11,14
**disconnected**
35:20 42:15 52:23
100:16,18,24
101:6 116:16
121:8 127:25
128:4
**disconnection**
17:21 18:3,12
**disconnects** 42:23
48:11 58:4 100:13

100:19 133:5
**discontinuance**
144:15
**discontinued**
127:24
**discount** 57:9,21
**discounts** 38:18
42:2 43:9,22
48:18 51:5 54:12
54:21 57:13,14,16
57:20 111:8
**discoveries** 136:6
**discuss** 7:19
**discussed** 10:5
23:11 130:5 131:3
131:15 132:17
141:14
**discusses** 114:23
**discussing** 118:4
**discussion** 14:21
37:3 131:21
133:24
**discussions** 23:8
106:2
**disgruntled** 42:25
**dispute** 7:3 45:11
45:12,12,14 81:2
112:16
**disputes** 55:7
**disrupt** 139:22
**distortion** 88:1
92:7 95:19
**distraction** 62:8
**district** 1:2
**divided** 79:2
**dna** 69:9
**docket** 146:11
**document** 9:14,19
10:16 19:1 30:13
31:9 37:11 45:16
45:22,23 46:7
47:9 60:16 61:7
64:16 67:20,21

78:8 85:16,25
96:18 102:5,18
103:24 104:7
106:17 108:5
109:10 123:14,19
123:24 125:21
128:14 129:19
130:21 131:2
132:8 142:6
**document's** 46:11
**documentation**
104:21
**documents** 11:14
17:23 18:18,23
22:23 31:19 46:18
46:19,20,21,23
49:15,20 50:1,1,9
50:15 84:8 95:11
97:3 122:3 139:19
**doesn't** 112:8
144:23 145:2
**doing** 10:5 80:20
99:10 105:5
115:15 118:23
132:5 147:8
**dollar** 32:4,9 39:9
40:19 41:24 43:4
43:9 49:1 54:1,3,7
113:12
**dollars** 41:1 53:5
59:5
**don't** 111:14
115:13,16,17
119:4,8,10,12,20
121:10 125:3,5
129:23,24,24
130:1,11 132:9
134:21 135:4,7,18
135:23,24 136:14
138:5 145:11
146:12,19 147:25
**door** 27:21,21
43:15,16

**doubt** 15:16 51:15
62:9 117:17 123:4
**download** 71:6,11
82:16 84:6
**drain** 2:22 6:3
**drew** 4:22
**dried** 109:21
**drive** 79:24 80:1
111:15
**driver** 63:16
**dsl** 82:20

---

**e**

**e** 2:21,21 4:1,1 6:1
6:1 150:1
**earlier** 37:5 41:1
58:1 66:17 74:16
74:20 77:14 84:13
85:2 118:19 121:4
122:5 123:12
127:17
**earliest** 146:8
**easiest** 12:9
**east** 88:3,11
**eating** 117:7
**echo** 68:1
**ecro** 2:25
**efcs** 93:8
**effect** 27:2 144:22
**effort** 93:7
**efforts** 25:9 41:25
47:16
**eggs** 146:16
**eight** 66:4,5
115:12
**either** 20:8 31:5
68:22 69:3 80:5
86:4 94:16 95:2
103:11 119:12
124:15 128:19
138:11 139:10
148:16
**electronic** 60:1

element 58:24
eligibility 74:3
else's 31:21
email 10:24 11:1,3
11:7,7,12,16,19
11:22,24,25 12:10
60:17,18 61:15,16
61:18,21,21
141:11 146:9
147:20 149:7
emailed 86:7
emails 106:25
125:11
employee 36:23
enable 25:22 95:8
enabled 108:10
encompass 15:7
engage 97:24
enjoyed 52:23
ensure 137:17
enter 116:7,8
138:21
entered 124:10
125:18,20 130:14
134:2 137:18
148:5
entering 116:13
enterprise 118:11
120:24
entire 49:4 111:3
118:10 149:6
entirety 46:25
entitled 62:1
entity 36:24 98:18
entrants 92:17
entries 103:3
125:11
entry 65:17 104:3
104:22
envelope 31:17
eric 5:5
essentially 54:23
66:9

establish 40:19
established 46:6
100:4 124:4
145:13
estimate 109:10
et 1:12,15 6:3,4
evaluate 149:2
evenly 143:14
event 104:3
eventually 61:19
everybody 31:21
149:10
everybody's
145:17
everyone's 116:19
evidence 9:12,20
10:8,14 19:19
37:21 45:21,22,24
46:1,2,3 99:22
112:17 124:1,10
125:18,21 128:15
130:14 132:11
134:2,6 135:6,8
135:13,14,15,16
135:21 136:16
137:18 138:21,23
148:5
evidenced 30:9
evidently 23:17
exact 107:21
118:21 119:4
exactly 19:21
82:12 88:23 105:4
105:14,15,16
examination 8:12
117:10 126:13
142:2
examine 19:13,15
137:4 138:10
139:9,14 141:19
examined 122:5
123:11

example 28:10
70:25 83:21
117:23 134:13
145:12
excel 10:1,17,19
10:25 11:2,6,9,20
32:19
exception 132:21
exchange 28:11
28:20,25 29:20
41:4,9 44:16
67:23 68:4,10
69:5 73:11,11
76:5,10,13,24
77:4,9,11 78:25
81:4 84:21 89:18
90:11,13 91:4,5
91:21 92:4,9,10
92:11 93:9 94:5
94:11,15,23 95:6
96:5 97:5 98:1
143:5,9,14,15
exchanges 51:20
52:11 56:20 63:18
63:18 67:8,9,12
75:2,23,24,25,25
76:2,18,21,25
77:5,10,10,12,12
77:18,20,23 78:5
78:6,12,21,24
79:2,3 81:1,3,21
83:4 84:18,20
87:17 90:7,20
91:23 94:6,9,24
95:2 96:8,11,19
96:25 112:7
143:18,21
exclusively 79:4,6
79:6,12 122:8
excuse 11:18 28:3
40:10 98:11 99:6
100:9 108:9
113:15 129:21

147:13
executed 30:8
111:23
executives 33:14
exemplar 142:9
exercise 32:10
107:17
exhibit 6:14,16,23
8:15,17,22 9:19
9:23 10:1,12,16
12:10,14,15,18,19
12:20,24,24,25
13:1,8,9,11,22
14:3,18,18 16:4,7
16:20 30:15,16,18
30:19 31:1,7,10
31:14,16,24 32:3
32:6,20 34:15,20
35:25 36:2,4,9,9
38:1,5 39:22
41:15,15,17,24
42:8,9,11,13,14
43:7 44:4,6,11
45:2,18 47:24
59:11,24,25 60:14
61:4 63:5,7,15
64:4 65:9 66:2,7
67:14,15,19,25
68:12,19,22 71:25
72:13,16 77:11,24
78:2,12 79:10,11
79:13 81:1 82:4,4
83:1 85:14,15,17
85:18 87:21 88:10
89:3,8,11 90:5,6
90:10,25 91:9,11
96:14 98:8,11,13
98:17,17 99:20
100:8,11 101:12
101:14,17 102:7
102:10 104:15
107:10,13 112:20
112:22 113:22,25

114:6,9,13,20
119:17 123:11
124:1 125:13,15
125:18,21 127:4,5
127:8,11,15
128:15 129:3,8,9
130:3,14,17,19
131:17,18,21
132:4,12,13 134:2
134:10,11,16,16
134:19 135:7,10
135:11 136:11
138:22,23 140:14
142:5,5 148:12
149:8
**exhibits** 62:20
126:22 127:1
134:5,13,15 135:5
148:4,22 149:8
**existing** 34:22,25
51:14 52:7 56:6,8
56:24 57:5,9,21
58:21 59:3 117:17
118:4 122:9
144:19
**expect** 35:22,22
146:13
**expenses** 80:15
123:23
**expensive** 75:16
**experience** 35:8
74:23 80:17
118:14,17 126:7
126:17
**experienced**
131:9
**experiencing**
84:25
**expert** 28:4 32:17
109:9 145:8
**expertise** 97:15
**explain** 13:5
26:20 90:22 91:3

91:20 99:25 100:3
117:15 118:23
123:16 125:22,24
**explained** 10:6
**explains** 107:13
**explanation** 62:5
99:18 128:4
**expletive** 116:17
**extended** 16:24
19:25
**extensively**
126:14 131:15
**extent** 50:25
73:22
**extraordinary**
132:19,22
**extremely** 111:17

**f**

**f** 2:21 150:1
**fabens** 89:5,10
**fact** 27:14 45:15
58:13 71:16 93:17
94:6 99:21 102:22
138:10 144:3
146:2
**factfinder** 45:25
46:2,5
**factfinding** 46:7
**factors** 75:22
**facts** 23:10 112:16
**factual** 146:4
149:4
**failing** 149:6
**fair** 17:25 19:10
62:4
**false** 7:1 27:22
34:17 36:16,19,22
37:7,12 51:12,22
54:11,19 58:1
83:12 110:2 112:5
117:16 122:18
131:10 144:14

**familiar** 20:12,24
21:1 29:11 44:15
60:16 67:12,21
68:5,10 73:25
74:8,12 77:25
82:11 97:7,13
99:2,6,7,16
112:25
**familiarity** 98:19
**far** 26:8 52:25
55:9,15 73:10
74:19 96:14
112:10 125:8
145:14
**fashion** 43:4
84:13
**fast** 70:13,14 71:5
74:15,18
**faster** 70:15 73:7
73:9 83:9
**father** 117:23
**faubush** 87:1,20
88:2,7,11 90:10
90:24
**favorably** 83:18
**fcc** 79:15 87:13
91:11 94:1,8,24
94:25 95:2 96:4
121:6
**fcc's** 72:9,17 82:5
82:18 84:5
**fear** 51:15 117:16
**feasible** 43:7
**features** 116:12
**february** 105:17
113:19
**federal** 9:15 19:19
73:23 74:5 95:25
96:12,16 124:6
130:4
**fee** 39:19 40:24
101:20,23

**feed** 123:3
**fees** 81:18 101:24
**fewer** 78:11 80:14
**fiber** 70:22 71:3
73:8 74:24 75:11
75:14 81:12 83:19
85:7
**field** 145:18,22
**fierce** 74:12
**fight** 7:7 34:3
**figurative** 34:11
34:22
**figuratively** 34:7
52:18
**figure** 6:15 7:6
54:7 57:6,10 59:1
59:5 71:13 113:12
125:13 131:12
**figures** 55:8,21
**filing** 146:9
**finally** 51:22
111:1
**financial** 14:24
15:3,6,22 17:4
113:1
**financing** 40:25
**find** 37:24 52:9
138:1,7
**finding** 144:23
**findings** 146:2
**fine** 12:11 14:14
47:12 59:18 100:1
135:15 146:18
147:11,18,20
**finish** 71:9 122:23
147:16
**finished** 57:3
93:13
**first** 6:13 21:6
41:8 47:8 64:6,13
65:5 66:21 67:1
67:23 72:6 77:2
102:23,24 103:7

103:24 105:17
110:24 111:20
146:23
**fish** 30:4 100:10
**five** 15:7 35:2,4,5
59:8 73:22 103:19
103:21 104:3
117:6 118:15
**fixed** 72:17 82:5
82:18 85:8 87:13
**flip** 145:14
**flowing** 89:18
**focus** 122:4
**focused** 130:25
**folks** 23:3 27:21
33:15 36:15 40:13
43:13 64:17,17,17
79:8 115:16
146:25
**following** 11:5
48:17 123:18
144:10
**follows** 9:8 15:21
17:3 21:6 38:9
43:21 142:18
**footnote** 114:22
**footprint** 29:24
76:25 77:1 91:25
93:4 96:24 118:8
**forced** 43:21
48:18
**forecasted** 133:16
**foregoing** 150:3
**forgot** 80:25
91:19
**forgotten** 146:11
**form** 61:8 86:6
**formed** 26:10
**forms** 104:21
**forth** 46:21
**forward** 51:16
**found** 83:12
136:10

**foundation** 13:5
46:11,13
**foundational**
25:11
**four** 16:6,12,19
49:5,8 53:5 58:21
60:22,24 62:19
63:14 64:3,7,14
64:15 65:4,9 93:2
93:3 115:12
143:13
**fourth** 111:24
**frankly** 22:25
27:19 52:25 92:15
109:20,22 131:23
**free** 52:4,4 63:8
66:8,10 67:24
82:25 83:5 110:15
110:15 144:7
**friday** 101:6
**friends** 147:2
**front** 8:14 13:22
16:2 30:2,21
101:18 122:1
139:24 140:1
142:8
**frontline** 64:16
**full** 50:25 125:24
**fun** 66:15
**function** 58:14
**fund** 73:23
**funding** 74:1,3,6
**funds** 96:9,10
**further** 55:13
141:22
**fuss** 62:16

**g**

**g** 6:1
**gain** 22:16 23:5
23:19
**gained** 18:15
**gather** 106:22

**generally** 44:15
75:19 109:7
134:18
**generate** 124:12
133:21
**generation** 93:19
**gentlemen** 139:11
**geographic** 92:1
**geographies** 28:6
28:10,11 76:5
**geography** 77:17
92:3,22
**georgia** 83:25
142:19
**getting** 73:2
118:20 137:1
148:22
**giant** 41:10
**gig** 75:11 79:19
**give** 17:23 65:25
105:8 122:2
147:15
**given** 10:15 40:1
44:18 61:2 92:11
144:3
**giving** 34:5,7
**glad** 44:25
**glass** 10:3
**go** 8:11 11:19
22:15,19 24:25
25:9 31:2 35:7,10
42:4 47:19 55:8
59:25 63:18 70:5
71:2,8 74:6,24
75:8 76:3,21
77:22 80:5,21
83:1 89:16 93:14
94:18,20 105:3,12
112:15 113:8
116:12,23 119:23
120:7 122:23
127:2 138:1
139:21 140:1

144:23 146:1
**goal** 33:23,25
**god** 8:8
**goes** 67:12 74:11
74:15,18 112:10
112:23 140:15
**going** 6:16,17 7:7
12:1 15:11 16:5
16:18 27:20,21
31:17 34:23 35:25
39:1 40:11 44:3
45:7,19,24 47:7
49:3,5,6 51:16
53:8 54:15 59:20
66:24 69:12 70:8
71:20 76:6,10,13
79:10,19,20,21,25
81:1,16,22 86:7
89:15,16 90:5,17
95:14 98:11
102:13 117:19
123:21 125:4
126:20 133:12
134:1,16 135:6
139:25 141:13
145:20 147:8
**good** 6:2 40:14
41:13 55:15 59:23
63:3 70:20 73:20
74:4 81:20 88:17
95:1 99:14 103:21
112:24
**goodness** 20:7
59:17
**goodwill** 113:12
113:18,24 114:2,3
114:12,15,23,25
115:5
**gosh** 119:10
**gotten** 71:12
105:7
**government** 94:8

**governments**
94:24 96:6,7,13
**grace** 5:4
**grants** 146:23
**granular** 55:8
86:17,20 93:2
**grassroots** 33:15
**great** 34:6 137:25
**greater** 65:24
78:11
**grew** 68:8
**gross** 147:22
**ground** 89:22
**grounds** 124:3
132:18
**group** 33:2 107:4
**growth** 51:19,20
51:22,25 58:6
109:19,24 110:18
110:19 112:1
**guess** 6:11 34:20
79:23 81:12,25
99:9 121:3 134:23
**guidance** 134:4

**h**

**h** 72:6,21 79:7
**hadn't** 111:18
**hair** 146:15
147:24
**half** 102:6
**ham** 117:24
**hand** 8:4,19 14:20
16:10,20 31:22
47:3,23 48:2
84:16 149:2
**handed** 115:11
**handicap** 120:1
**handy** 148:5
**hang** 28:15
115:14,19,22
**happen** 108:2
**happened** 110:11

**happens** 64:1
70:21 76:6 87:15
**happy** 20:8 85:2
90:7 93:12
**hard** 42:20 105:21
**harder** 56:14
**harm** 117:13
118:7 144:20
**hastings** 80:2
**haven't** 125:2
137:4
**head** 29:23,23
56:21,21 63:19,19
63:23,23 67:12,13
76:3,4 77:18,18
81:8,8 92:4,4,9,9
**hear** 44:24 59:18
88:8 123:7
**heard** 37:4 44:22
140:25
**hearing** 3:1
116:12 117:6,7
144:4
**hearsay** 13:6
99:22 106:4
107:12,18 108:5
124:3 132:17,21
137:3,8,9,14,17
137:17
**heavily** 60:1
130:24
**help** 8:7 25:5
45:19 51:9 55:10
55:21 77:5 97:17
97:25 127:7
140:14
**helpful** 148:7,10
148:13
**helps** 10:1 24:6
26:19 78:15
134:21
**hey** 56:11

**he's** 126:5,5
136:12 137:1
**hickman** 69:6,15
69:18,21
**higher** 75:19
**highly** 52:8
**hire** 32:17
**history** 85:3
**hit** 39:14 41:10
51:23 100:10
**hockett** 5:9
**hold** 41:20 42:4
43:13 72:7 78:2
147:25
**holdings** 1:8,12
6:3,4 26:22 87:25
118:10
**home** 35:4 70:19
70:21 118:17
**hon** 2:22
**honestly** 21:2
43:12 56:24
**honor** 6:8 7:22
8:22 10:4,11,23
11:1,4 12:6,18
13:8,16,19 14:2,5
15:5,11 17:12
19:18,23 29:1,6
40:1,5 41:13 45:7
45:11,15,22 46:4
46:9 47:7,11
50:17 54:19 55:3
55:6 58:8,10,16
59:9,19,23 61:2
61:15,24 62:4
72:25 73:1 84:7
84:11 89:16 90:1
90:2,17 91:14,19
92:21 93:13,15
100:2,6 106:3,8
107:3,11 108:21
108:24 113:5
115:7,10,20,23

116:25 117:1,3,9
119:1,8 120:2,9
120:15 123:25
124:2,17,24 125:2
125:15 126:12,19
126:20 127:10
128:14,18,20,23
129:2 130:2,7,13
131:4,13,16 132:6
132:15 133:14
134:3,17 135:11
136:5,9,20,22
137:2,8,10,24
138:19,22 139:15
140:6,21 141:2,8
141:21 142:22,24
143:1,7,16,23,25
145:16 146:19
147:11,18,18
148:2,15,17,19
149:9
**honor's** 12:9
40:18
**honoring** 35:18
**honor's** 136:17
**hope** 26:19
**hose** 121:4
**hour** 27:11 79:24
80:1 105:11,12,24
107:5 115:12
144:3
**hours** 101:24
102:3,6,6 103:15
104:7,10,10 105:4
105:8,14,15,16
**house** 86:18
124:14 126:5
**household** 92:23
92:24,24 118:14
**households** 93:4
**housekeeping**
6:11 145:17
147:12

hu 60:19
hug 34:7,11,22
huge 62:5
hugging 52:18
hundred 106:10
hungry 137:2
hyde 3:25 150:3,8

**i**

i.e. 91:5 125:10
  145:4
idea 88:17 129:24
iden 76:16
identical 114:3,16
  129:10
identification
  116:6,8,9
identified 10:11
  10:16 12:20 30:23
  48:5 51:3 67:23
  76:17 77:4,10,12
  77:23 78:5 86:25
  100:12 132:10
  139:11 145:8
identify 10:19
  45:16 47:12,16
  55:25 75:23,25
  89:18 95:15 97:18
  97:25 106:12
  108:10
identifying 9:12
  9:20
identity 99:1
ilec 24:13 28:10
  74:2 86:12,13
  87:23 94:14 118:8
ilecs 29:5,12
imagine 81:8
immediate 110:3
immediately
  119:15,16
impact 58:2 66:13
  109:20 110:3,6
  121:10

impacts 20:25
  112:6
impairment
  114:25 115:5
impeachment
  13:22 14:3,18
  15:12 31:13,16,24
  32:3,6 38:1 39:21
  41:23 42:9,11,12
  44:4,6 45:2 47:24
  59:11,24,25 60:14
  61:4 63:5,7,15
  64:3 65:8 66:2,7
  67:25 68:19 71:25
  72:13,16 79:11,13
  82:3,4 83:1 85:14
  85:15,18 87:21
  88:9 89:3,8,11
  90:5 98:10 102:7
  102:10 104:14
  119:17 123:11
  124:1 127:8,15
  129:9 130:17
  131:18 134:8,11
  134:12,14,18,19
  135:5 136:11
  140:13
imply 122:7
impolite 141:10
important 11:23
  20:25 26:13 35:7
  84:1 110:9
impression 69:14
improperly 61:5
imputed 126:17
inaccurate 102:14
inappropriate
  15:12 45:8 49:24
include 29:18
  41:17 43:8 56:22
  98:25
included 48:17
  56:13 57:7 64:9

64:11
including 126:3
  148:21
incomplete
  112:24
inconsistent 17:13
  105:18,20
incorporated 9:20
  10:12
incorporates 9:13
incorrectly 7:18
  76:17
incredibly 118:6
increments
  105:11 107:22
  108:10,13
incumbent 28:11
  28:19 41:3 76:24
  89:18 94:14,22
  98:1
incurred 101:24
indicate 96:2
indicated 90:15
indicates 36:18
  99:18
indicator 71:19
indiscernible
  20:17 28:22,23
  35:1 36:6,14
  37:14 58:9 71:6
  71:19 75:18,19
  78:9 81:3 110:18
  112:1 119:2
  122:19 123:17
  128:5 134:1
  140:10 142:7,8,10
  148:8
individual 12:1
  27:4,12 88:18
  93:6
individuals 9:10
  9:12,21 10:20
  31:8,12

infer 99:17
information 18:25
  19:21 24:24 25:8
  27:19,20 31:2
  33:16 37:23 57:19
  62:12 82:5 86:4,7
  87:12 92:14 94:4
  94:5,10,23 96:5,5
  96:8,21 104:13,14
  104:18 106:12
  117:18 118:5
  120:12 138:8
  139:24 141:18,20
  141:20
inherent 144:17
initial 146:16
initially 126:4
innovative 116:5
input 27:17,18
  31:6 43:3 71:17
  71:24 72:12
inputs 27:24
  92:20 123:22
  125:9 133:18
inputting 11:3
inquire 129:2
inquiring 93:13
inquiry 61:25
ins 93:6
inside 32:25
insist 45:25 49:5
insistence 137:25
instances 40:15
instructed 120:21
intelligence 26:17
intend 122:25
  134:15
intended 40:3
intends 135:14
intention 134:6
interaction
  118:14

**interested** 135:10
**internal** 60:15
80:19 96:18,23
102:11 104:10
106:20,21 123:20
**internally** 74:8
**internet** 51:17
52:15,17 53:19,23
53:24 54:9 66:23
67:3 68:14 99:19
109:1 117:20
**interrogatories**
135:12,19 136:6
137:21,23 138:7
139:2,19,23 140:5
**interrogatory** 9:4
9:8,14,22 10:13
10:13,18 102:21
135:20 136:3
137:15 139:4
140:12,23 141:3,7
**interruption**
17:20 18:3 144:15
**interruptions**
18:12
**intersect** 76:7
**intimate** 80:19
**introduce** 144:17
**introduced** 52:3
110:15
**investigated**
18:19
**investment** 74:25
75:2
**invoices** 104:9,20
120:18 123:22,23
**involved** 14:24
15:2,22 17:3 19:1
19:5 49:25 52:3
57:20 112:25
113:3
**involves** 81:7

**involving** 33:10
**iphone** 25:17,19
25:22,25 40:25
**irrelevant** 46:8
58:13
**isn't** 111:9,11
113:1
**issue** 6:20 7:13
62:21 63:2 117:12
144:24 145:1
**issues** 145:17
**it'll** 145:25
**item** 147:12
**it'll** 113:8 127:10
**it's** 111:5,5,7,11
115:18 117:21
118:17 119:3,22
122:2 124:4
125:21 127:7
130:12,18 131:3
132:10,19,21
134:18 136:10
137:12,18
**i'd** 129:2
**i'll** 112:12 114:6
114:24 122:25
128:21 135:15
**i'm** 111:5,10
113:23 114:7,8
119:5,7,10 120:1
121:9 122:2,6,20
122:20,24 125:4
125:16 126:11,20
127:16 128:24
129:10,14,14
130:20 131:12,23
133:10 134:16
135:1,10,17,22,22
135:22 136:22,23
137:9 138:12
**i've** 130:9 136:10

**j**

**jack** 33:6
**jacking** 33:9
**james** 4:22
**january** 17:22
18:4 105:2,5,8,15
105:16
**jarosz** 4:23 28:4
90:19 112:24
**jason** 4:21
**jeffrey** 117:10
129:5 142:2
**job** 20:22 27:9
41:8 74:4 97:14
**john** 4:15,23
**join** 56:5,17
**joined** 97:4
**joint** 30:18 148:12
**judge** 2:23 6:2
46:7 56:1 146:20
**judicial** 135:3,8
144:18
**july** 51:19
**june** 52:1 66:12
72:18,19 82:19
146:21 147:10,14
**junk** 73:4 83:8,10
83:14
**jury** 46:9 148:3
**justice** 147:5,5
**justin** 5:6
**justus** 4:24

**k**

**kardos** 5:8
**kat** 5:10
**kattan** 4:3
**katten** 101:20
**keep** 14:20 34:5
43:5 44:17 85:2
**keith** 103:17
**kent** 103:17
125:22,24 126:1
139:3

**kentucky** 83:24
87:1,20,24 88:2,3
88:7,11,11 90:10
90:24 142:13
**kept** 128:9 132:23
132:23
**key** 82:22
**kind** 31:25 33:11
34:21 35:2 44:17
73:14 80:4,20
83:24 85:1 97:2
111:9 145:24
**kinetic** 66:22 67:2
88:4 118:7,22,24
119:6,19 120:23
142:6,10
**kinetics** 120:6,8
**kingston** 4:15
7:23 8:11,13,22
8:24 10:8,11,23
10:25 11:4,9,17
12:3,6,13,18,21
12:23 13:8,16,19
13:20 14:1,2,5,8
15:8,19 17:18
19:17 20:5 23:14
29:2,8 40:2,5,7,10
40:12,14,18,22
41:12,13,14 42:7
45:10,18 46:4,16
47:11 49:13 50:1
50:17 55:6 56:1
58:8,10,16,23
59:9,13,17,19,23
61:2,12,13,24
62:12,15 63:3
73:1 83:16 84:11
84:12 85:22 89:14
89:15 90:1,3,8,21
91:7,18,19 93:12
93:15,16 94:21
97:6 99:14,15,24
100:7 102:16,25

103:2 106:3,8
107:14,25 108:7
108:14,15,24,25
112:18 113:7
115:7,14 116:15
116:24 117:1
119:1,8,20 120:9
122:10,21 123:1
124:2,25 125:2
126:9,12 127:17
128:23 129:1,6
130:2,22 131:16
132:15 134:4,9,10
135:6,17 136:4,10
136:13,14,17,22
137:1,9,12 138:12
138:15,24 139:2
140:2,10,13,25
141:2,8,11 142:1
142:3,22 143:24
147:1,11,17
148:15,18
**kingston's** 119:24
**kinston** 62:4
**kiosks** 118:5
**know** 10:5 11:12
12:25 20:1 26:21
27:12 28:20 29:21
29:23,25 30:1
31:3,7,10 32:6
34:7 35:4 36:3,14
37:2,3,9,11 39:1,3
40:11 43:14 44:7
46:17,19 53:3
56:10 57:16 58:1
59:14 60:7,7,12
61:9,11 62:1
64:20 65:2 69:8
70:23 73:10,15
74:1,12,21,21,23
76:4,22 77:19
79:16 80:2,3,4,9
82:11,12 83:20,24

84:2,21,23,24
85:1,2,3 86:12
87:23 88:12 90:12
90:12 92:21,23
93:4,5,13 94:14
95:20,23 96:4,14
97:12 98:6,7 99:6
99:8,25 100:20
101:17 104:5
105:4,10 109:14
109:17 111:4,14
112:4 118:13
119:10 121:10
123:12 125:4
126:7 127:13
128:25 129:13,19
129:23 130:1
134:21 135:4,7,18
146:15 147:5,23
**knowing** 29:18
98:25 99:1
**knowledge** 17:20
17:24 18:2,11,16
20:11,15 22:2,4,9
22:16 23:6,19
25:4,7,21 29:16
29:18 32:14 44:21
66:14 73:13 80:19
80:24 81:6 97:15
98:25 106:7
121:17,21
**knowledgeable**
140:3,4,5
**known** 100:17
**knows** 23:14
102:15
**kristin** 4:25

**l**

**labeled** 16:9
123:10 134:11
**labels** 61:4
**lack** 121:3

**lag** 122:22
**langston's** 104:6
**langston's** 123:19
**large** 65:22 123:2
**larger** 81:9
**latest** 129:16
**launch** 64:16,22
64:24
**launched** 58:5
**law** 60:7 98:7
126:8 144:19
146:3,3,15 147:23
**lawsuit** 8:18 14:15
45:6 46:18 121:20
**lawyer** 45:14 49:8
60:4,6 61:10
102:11
**lawyer's** 8:19
24:2
**lawyers** 7:10
23:18 44:16 60:12
60:22 108:11
126:15 149:4
**lay** 13:4 46:10,13
**lead** 16:24
**leadership** 92:13
**leading** 71:19
120:12 122:10
**leaned** 44:20
**learned** 35:3
126:4
**leasing** 41:11
**leave** 37:4,9
115:19 146:6,19
**ledanski** 3:25
150:3,8
**left** 8:19 16:9 47:3
47:23 48:2 97:5
132:6
**legal** 60:9,25 85:4
123:20 124:14
140:9 150:20

**length** 132:18
**lengthy** 131:21
132:1
**letter** 38:3,13
103:7,8
**let's** 112:14 113:3
131:2 132:2
**level** 65:17 86:21
87:12 91:21,22
92:25 93:2 95:9
97:3
**levels** 84:24
**leveraged** 39:3
**lexington** 83:24
**license** 28:5,6,9
92:19
**licensing** 27:16,17
27:23 28:1,14
**lie** 54:24 132:8
**lied** 54:16
**lieu** 6:10
**life** 35:4
**lifetime** 39:15,18
39:25
**limine** 130:6
**limit** 121:21
**limited** 84:8
**lincoln** 68:7 69:5
69:7,15 70:10,21
71:4 72:6,21
74:10 79:24 80:2
80:9 82:5,8,9,11
82:18 83:3,7,18
83:22,24 84:4
112:9
**line** 9:7 15:20,20
16:25 17:1 21:5
40:3 71:13 85:7
87:1 116:10,13
125:13 142:14,17
**lines** 21:5 89:5
118:21

lingered 118:18
link 11:13,15
list 6:24,25 7:4 9:9
  10:20 12:5,8
  41:21,24 42:17
  67:7 72:2 86:4,6,9
  97:16 119:17
  136:2 139:12,18
  148:4 149:8
listed 66:22 68:15
  68:20 90:10 91:21
  122:8
listen 33:9 37:10
listened 37:4
  118:3
listening 34:8,10
  37:19
listing 43:8
  100:12 113:13
  125:23
lists 86:2 103:11
literally 34:7
litigation 149:1
little 16:3 20:17
  27:23 39:11 44:11
  44:17 55:13 57:1
  68:6 134:4 146:24
live 84:24 116:11
  116:14
llc 6:6 87:24 88:3
  88:11 142:19
llp 4:3,10
local 27:2 28:1,11
  28:19,25 29:20
  41:3,9 68:9 73:10
  73:11 76:5,9,24
  81:7 89:18 91:23
  92:4 94:6,8,14,22
  94:24 95:6 96:6
  96:13,25 98:1
  145:19
located 84:14
  86:18

location 68:11
  70:18 73:9 79:14
  82:23 92:2
locations 91:22
lochart 4:25
log 149:11
logical 75:14
long 6:24 7:1 46:6
  55:12 128:12
  147:6
longer 42:17
  146:8
look 9:24 11:19
  11:25 12:1,14
  16:7,8 30:16
  31:13 34:15 38:1
  39:21 47:3 61:6
  63:14 64:3 66:2
  66:18 67:14 68:12
  68:22 69:6 71:14
  71:22,25 72:13
  77:25 78:1,16,21
  82:3 85:14 86:23
  87:20 88:14,18
  89:2,10,11 90:12
  92:19 97:1,21
  98:10,12 101:12
  101:22,22 102:1,7
  105:3 114:8
  123:10 127:4,7
  130:10,16 141:17
  149:7
looked 52:6 87:5
  90:15 104:12
  106:1 108:8
looking 19:1,7,8
  33:4 37:16 40:19
  44:10 55:20 59:13
  59:20 76:18 88:9
  100:21 122:20
  123:22 125:20,22
  126:21 129:9
  130:18

looks 9:3 31:24
  43:13 60:14,17,18
  78:19 95:3,17
  102:5 112:23
  143:9
loop 77:3
lose 115:11
losing 39:1 51:21
  117:19,20
loss 48:10
losses 52:5 57:25
  109:18 110:4
  111:1,21 122:17
  131:8,9
lost 35:24 51:18
  51:21,24 109:3,5
  109:7,22
lot 12:5 35:1
  37:23 42:21 46:19
  46:20,21 52:9
  53:2,5 71:3 74:13
  75:11,22 81:25
  92:14 94:10
  117:22 118:15
  132:9
louis 4:13
louisville 142:13
lower 75:19,21
lunch 8:2 117:7

## m

ma 41:5,10
machine 22:13
madison 4:5
magnifying 10:3
mail 60:1 65:9
  73:4 83:8,11,15
  93:5
main 69:5 80:4,4
maintain 34:1,12
  34:22 35:15 36:25
  38:20 39:5 41:18
  42:1 43:1,11,23
  47:17 48:6,8,19

49:1,16,22 50:9
  50:23 51:4,5,6
  52:18 54:4,7,13
  54:22 55:18 59:6
maintains 96:1
majority 48:8
making 34:8
  35:19,20 121:20
  135:21
malcolm 69:15,23
  69:23,24
manage 87:9,17
  96:18,24 97:1
management
  110:10,13 111:23
  112:5
manual 31:6
  33:20,21
manufactured
  25:23
map 72:9,17 82:5
  82:19 84:5 87:7
  90:15 91:12
maps 121:4
march 22:15
  48:10 51:20 73:4
  100:13,19,24
  101:6,6,9,25
  102:4 103:3,4,5,5
  103:6,7,8,15,19
  103:21 104:3,18
  104:22,23 108:9,9
  109:21 113:19,21
  114:4 122:19
  125:3 126:4
maria 5:13
marie 5:3
marked 7:18,21
  130:17 131:17
  134:14
market 24:25
  25:9 27:15 28:14
  29:17 51:17 63:21

65:3 66:12 67:3
82:2 83:17,22,25
84:1 92:15,17
97:17 120:10,11
143:16,20
**marketing** 25:10
26:15 27:2 28:1
35:3 53:3 64:17
64:18 69:10,11
75:20 97:21 98:3
98:4 143:19
**marketplace** 73:3
84:5 98:2 110:12
110:14 111:8,13
118:22,24 119:6
**marketplaces**
74:19
**markets** 24:6 25:5
26:16 27:18,25
48:15 51:14,23
56:19,19 62:19
64:2,21 65:4,17
65:21,22,24 67:7
74:14 81:7,9 98:6
117:23,25 118:22
**martell** 69:16
70:1,2
**martinez** 60:18,22
60:24 61:9,19,19
61:24 62:2 137:14
139:3,5,10 140:8
140:19,22,24
141:4
**mass** 122:3
143:16,20
**matched** 47:20
**matches** 47:23
**material** 13:10
39:16 58:2,3
**materials** 97:22
**math** 32:15 79:5
81:5

**matter** 1:6 6:7
94:6 101:25
107:15 123:6
124:15 137:6,13
148:25
**matters** 6:12
18:19 65:21
144:17 148:25
**matthew** 5:8
**mdus** 75:20
**mean** 10:21 20:16
38:9 40:12 45:8
53:2 56:6 62:9,18
70:14,24 73:18
74:9 77:25 79:1,6
79:11 80:21 81:7
81:7,11,22 82:24
83:3,7 85:6 86:15
88:21 90:9 91:17
92:3,20 93:3
96:23 105:21
108:22 119:24
122:7 129:14
131:14,22 135:4
138:24 139:20
145:11
**meaning** 77:16
127:22
**means** 51:24
117:22 118:23
132:19
**measure** 76:20
120:11
**measured** 124:15
**medium** 24:12
**meet** 74:2 121:12
**meeting** 110:25
117:24
**meetings** 105:12
**meg** 65:24
**mega** 144:4
**megabit** 65:18

**megabits** 55:16,16
64:8,10 65:19
73:6
**megs** 71:1
**memorandum**
146:3
**memory** 97:14
**mentioned** 64:15
64:21 96:9 118:13
120:5
**menu** 31:6
**message** 69:12
143:19
**method** 27:1
**michael** 4:24 5:2
5:11
**mid** 29:2 38:23
122:19
**middle** 82:9
**mile** 42:15 128:2,2
**million** 15:7 52:5
52:12,13 53:2,5,9
54:8 55:8 56:3,13
58:22 62:19 77:16
93:3,3 115:1,4
122:8,14,16
131:12 132:7
143:13
**mind** 8:3 20:6
21:24 99:10
113:16 123:4
**mine** 26:19 61:21
61:22
**mineola** 150:23
**mini** 16:3
**minute** 107:22
108:10,13
**minutes** 115:12
117:7 144:5
**mis** 147:22
**misheard** 108:12
**misinterpreting**
136:23

**misleading** 27:22
37:7 51:12,23
58:1 110:2 112:5
117:16 122:18
131:10
**missed** 110:5,6
111:2
**missing** 7:17
**misstates** 112:12
**misunderstanding**
95:23
**mo** 4:13
**modem** 38:15
39:4,6,9,10,18,23
39:24 40:8,20,24
41:17
**moment** 8:16
100:9 122:2
125:16
**monday** 101:2,10
141:12,16
**monetary** 42:18
**money** 42:21 52:9
53:2,2,5 79:19
81:14,16,18 89:18
112:4
**monitor** 84:25
**month** 28:3 39:12
40:25 52:4 63:8
66:8,10 67:24
82:25 101:20
110:15,16,24
132:3 133:1
**monthly** 101:23
113:2,4
**months** 39:14
52:4 83:4 86:5
103:19,21 104:3
110:15
**monty** 143:3
**morning** 6:2 49:6
**motion** 128:17
130:6,7

mouth 117:22
move 17:12 20:8
46:16 47:13 55:13
58:10 84:10 89:22
99:13 100:5 106:4
108:23 120:14
128:14 138:4
moved 58:20
muchin 4:3
mulligan 5:6
multiple 27:24
92:20
multitask 105:13
muted 123:8
mystified 40:2

**n**

n 4:1 6:1 150:1
nail 34:3
name 8:19 56:21
88:6 97:9,13
98:25 119:23
125:24
names 11:3 12:2,5
64:25
narrow 83:17,22
narrower 66:12
66:16
national 29:24
nationally 118:12
native 78:9
near 27:20 104:23
125:3
nearest 105:24
107:5
nebraska 68:1,7
68:13,16,24 69:4
69:15,21,23,24
70:2,7,11,21 72:6
72:21,23 74:10,11
79:7,24 80:2,9
82:6,8,9,16,18
83:3,7,18 84:4
112:8

necessarily 93:5
96:11
need 35:6 46:8
50:18 58:24 77:3
88:14 108:1
115:17 130:11
131:23 132:9
134:3
needs 15:12 29:22
47:8
negative 35:4,5
51:24 118:14
negatives 118:16
neither 131:19
139:10
nepple 5:11 115:8
net 110:4
network 84:25
never 46:12 98:22
102:20 139:17,18
new 1:2 4:6 29:4
34:24 35:1,11,13
48:12,14 51:17
52:15,17,20 53:19
53:22,24 54:9
56:3,15,16 57:19
57:24 58:23 59:2
63:25 66:22 73:2
83:5 91:6 92:16
92:17 109:1,13
110:1 121:7
122:16 132:24
niche 79:18
nightmare 7:6
nimble 27:10
nine 63:21 89:5
nino 4:19
non 51:14 60:22
63:1 65:13 75:25
77:5,12,20 80:25
90:7 110:7
nonresponsive
58:11

normal 15:1 43:5
64:22,24 98:4,5
105:18
normally 141:23
148:23
north 83:25
note 115:11
notes 33:18 36:1
36:11,12 38:8
notice 135:3,9
144:18
notwithstanding
91:10
november 111:19
number 7:17,18
12:15 16:9 31:1
44:11,12 45:4
46:23 50:15 55:8
55:22,24 56:14,22
57:2,22 75:13
76:25 77:3 78:11
79:2,3,4 109:6,23
116:7,8,9 121:24
123:2 124:1
131:12 132:8
134:1,5
numbered 127:1
numbers 16:5
32:17 44:17,22,23
46:15 78:16 85:16
85:20 118:18
numerous 19:20
ny 2:3 4:6 150:23

**o**

o 2:21 6:1 150:1
oath 8:1,2 21:10
48:3,5 50:21
116:24 137:8
object 15:11
17:12 45:7 49:3
49:23 53:12 54:15
90:18 99:21
102:13 108:17

112:12 124:2
126:12 129:2
132:15,17 136:23
137:5
objecting 128:25
129:1
objection 6:18
12:24 13:1 15:5
19:15 23:13 47:7
54:23 55:2 58:8
83:10 91:1 108:6
108:19 119:1
122:10 125:12
126:9 128:25
130:3,22 132:14
135:23 137:2
objective 145:3
observed 33:21
38:11
obvious 33:23
obviously 29:23
116:24 137:3
occasionally 33:6
october 110:24
111:1 129:22
offer 38:14 43:21
48:18 52:3 56:12
57:13 65:20,23
66:19 69:2,8,10
69:13 71:3 72:10
72:22 79:18 99:17
111:7,12 123:25
132:10 134:5,6,15
135:14,15,20
136:19 138:16
143:18,20 148:4
offered 12:19
38:14 41:17,18
42:24,24 43:6,10
45:20,24 52:9,24
53:1 56:8,11
62:20,22 65:10
134:4,24 135:5,14

139:17
**offering** 38:18
39:4,6 42:2 54:20
62:16,17 72:24
82:25 134:19,25
136:12,16
**offers** 64:20 66:22
71:22 82:17 84:4
92:17 109:15
110:14
**offhand** 67:11
90:12 97:13
**office** 31:19 46:22
68:5,9 72:4 92:13
**offset** 35:5 109:24
111:1 122:17
**oh** 7:2 42:9,10,11
59:17 79:23 85:23
102:5 116:20
136:4 138:17
**okay** 6:2 7:2,9,12
7:24 8:10,16,21
9:6 12:11 14:4,18
15:21 23:18 24:5
29:7,10 31:19
34:16,19 42:10,14
49:14 50:5 51:11
60:17 61:23 69:19
72:15 78:4 91:20
98:13,15 101:5
102:5 107:4,9,12
108:22 111:11
112:24 113:6
115:9 116:2,19
117:2,5 122:3,24
124:25 125:5
126:24 127:9,16
127:16 128:21
129:4 131:5,14
132:14 134:21
136:8 137:2
138:20,24 139:16
140:16 141:6,17

141:23 142:23,25
143:22 147:19
148:16,20
**old** 104:13 150:21
**once** 35:13,13
51:22 58:5
**ones** 50:3 52:18
102:4 128:3
**oops** 139:25
**open** 8:16 12:22
14:9 67:17 101:18
116:12 122:1
**opened** 13:24
**operate** 29:19
**operating** 6:5
76:21 89:17 113:2
113:4,9,18 114:10
114:15 134:14
135:2,3 145:18
**operational** 64:17
66:7,14 67:24
68:18
**operations** 21:16
**opine** 25:22
**opining** 26:9
**opinion** 26:10,13
91:9
**opportunity**
10:15 139:9
140:17
**opposed** 39:23
144:14
**optic** 85:7
**option** 108:16
**options** 31:6
40:25
**oral** 144:3
**oranges** 90:19
91:15
**order** 9:9 38:19
123:19 139:22
**ordinary** 125:7
132:20

**organization**
24:14 25:2 27:1,2
27:25 110:5
**ought** 53:9,9
**outage** 42:20
**outside** 15:1
106:18,19,20,20
**overall** 25:9 29:13
51:20 52:12 58:4
58:4 109:25 149:1
**overbuilder** 79:20
**overbuilders**
80:17 81:24
**overcome** 118:15
**overlap** 76:5
77:14 92:2 97:25
**overlapping**
110:24
**overrule** 108:6
125:12
**overview** 66:24
67:1

## p

**p** 4:1,1 6:1
**p.m.** 119:14
**package** 14:10,11
14:12
**packet** 13:23
**page** 8:25 9:3 15:9
15:20,20 16:4,5,6
16:9,13,19,21,25
16:25 21:4,5
30:10 63:14 64:3
64:6,14,15 65:6,9
65:11 66:18,24
68:12 78:1,7,16
85:20 86:23 89:2
89:12 101:22,22
102:3 113:9,24
114:12,22 129:15
140:14,15 145:19
145:20 146:18

**pages** 10:9 16:6
16:12,15,18,18
45:4 49:20 61:14
112:22 146:18
**pagination** 16:3
**paid** 127:23 128:1
**palatable** 81:22
110:20
**pang** 5:15
**paper** 18:16 19:7
19:11,16 24:3
37:16 45:5 106:1
108:8
**papers** 44:16,18
44:18 107:25
**paragraph** 30:12
30:14,15,23 43:17
43:21 47:13,15
48:17 53:18,21,25
54:10,16,24 55:9
55:23 67:2 121:25
122:4
**part** 6:19 24:11
33:2 50:22 57:13
61:18,21 62:10,22
63:18 79:23 86:13
87:25 98:6 102:23
102:23 107:9,17
107:22 128:11
137:25
**partial** 119:17
**particular** 10:19
14:12 36:3 52:20
68:11 73:9 79:14
82:22 124:15
**particularly**
110:9 118:10
148:10
**parties** 144:20,21
**partners** 21:2
**parts** 45:20 51:2
71:4 143:9

**party** 61:11 97:16
97:25 135:21
145:4,5
**party's** 6:17
**pass** 117:1 142:22
**pasted** 61:18
**patience** 31:20,21
35:24
**pattern** 105:18
**paula** 104:5
**pause** 141:10
**pay** 35:21 39:18
39:18 40:9 41:1
46:8 75:21 81:18
120:24
**payable** 142:19
**paying** 44:24
**payment** 85:3
142:12,15,18
**payments** 73:23
120:22
**penalty** 30:5,9
48:16 114:16
**pending** 91:1
**people** 6:25 7:3,4
7:10 8:1 18:21
19:7,12 22:6,20
22:22 23:2 26:5
26:15 27:18 31:22
35:8 40:16 60:24
64:19 69:11 75:13
78:23,24 80:1
81:18,19 92:14
95:20 96:1 105:13
117:25 138:1,25
140:17 141:19
**people's** 28:16
**percent** 42:22
63:20,22,24 65:24
73:22 77:15,17,19
127:25 128:7
**percentage** 63:24
77:14

**perfectly** 45:10
**perforated** 142:14
**performance**
84:25
**performed** 28:7
**period** 52:24
113:19 114:2,4,17
114:17 148:24
**periods** 111:15,16
**perjury** 30:6,9
48:17 114:16
**permission**
146:23 147:20
**permits** 80:5
**person** 19:1 27:6
37:17 90:22 139:7
140:5
**person's** 99:10
**personal** 17:20,23
18:2,11,15 21:23
22:2,4,9,16 23:5
23:19 81:6 116:8
116:9
**perspective** 80:10
**persuade** 33:25
**phone** 25:13,15
36:25 38:24 41:5
116:7
**phones** 41:11
**phrase** 49:23
**physical** 97:22
**physically** 95:16
95:22 96:17
**pi** 38:9
**pick** 49:4 92:16
92:17 143:14
**picks** 73:14
**piece** 19:16 24:2
37:16 51:2 106:1
149:1
**pieces** 18:16 19:7
19:11 45:5 107:25
108:8

**pitch** 35:18
**place** 75:21 92:16
95:20
**places** 75:1 81:24
112:4
**plains** 2:3
**plaintiff** 6:9 10:11
14:15 46:17 86:8
109:6,7 127:14
129:21
**plaintiff's** 9:22
30:15,16,19 31:7
31:10 32:20 36:2
36:4,9 41:15,16
42:8 43:7 67:14
67:15,18 138:22
138:23 148:12
**plaintiffs** 1:13 4:4
11:18 37:11 45:5
46:24 49:15,20
52:14 75:23,25
77:23 78:2,12,20
84:14 85:25 90:3
90:9,24 91:9,11
96:14 100:8
101:12,14,17
111:7,12 123:25
139:21 145:13,15
**plaintiff's** 125:13
125:15,18,21
127:5,11 128:15
129:8 130:3,14,19
131:17 132:13
134:2 135:19
**plan** 52:1,2 58:7
109:24 110:18,19
110:25 111:3
117:8
**plans** 110:6
**played** 145:24
**playing** 145:22
**plaza** 4:12

**pleading** 8:18
146:16,17
**pleasant** 69:16
70:4,7
**please** 8:4,16 9:24
20:6 21:25 29:9
67:14 113:22
116:6,7 122:1
125:22 127:5
**plough** 148:6
**plug** 33:9 41:24
72:8 87:6 104:17
**plugged** 31:4 32:4
32:9 36:24 104:17
**plugs** 31:2
**plus** 77:16
**pm** 149:13
**point** 12:12 17:25
19:19,20 33:23
34:10 40:18 46:10
50:6 52:1 62:15
82:24 89:13,16,25
110:17 115:8
116:20 119:24
125:1,8 126:2
134:3 136:17
137:13 141:17
**pointing** 59:19
**points** 125:4
**poles** 28:15
**poor** 35:8 147:15
**populated** 74:7
75:2,24 79:21
80:13 81:21
**population** 31:5
**portion** 61:3,13
61:21 124:11
144:11
**pose** 37:18
**posed** 17:6 20:1
21:10 29:4 50:17
141:11

position 10:6
45:11,12 67:2
positive 11:11
109:23
positives 35:4,5
118:16
possible 41:24
66:1 111:23
possibly 40:9
post 144:7
potential 117:18
139:11
potentially 117:18
117:20
power 34:5
powerpoint 63:7
practice 11:13
22:24
practicing 126:8
pre 131:17
preceded 44:12
prefer 37:20
preparation
14:24 15:2,22
17:4 112:25
139:22
prepare 11:2
139:23
prepared 31:7,8
31:11 32:7 124:5
133:11,15 136:6
preparing 113:4
148:22
presence 97:22
present 4:17
61:14 90:16
102:17
presentation
149:5
pretax 114:25
pretty 39:14 74:4
80:7,9,21 92:21
105:6 109:7 113:8

115:8 119:5 123:7
136:22
preventing 88:22
previous 133:7
previously 8:23
12:19 38:12 52:21
56:18 109:3
133:15 144:18
price 35:20 65:17
65:20
pricing 38:19
41:18 42:2 43:9
43:22 48:18 51:6
54:13,21 58:21
65:16
primarily 149:3
primary 63:16
68:13,23 69:3
70:1,6 98:7
printed 10:24
prior 111:3
112:13,14
privilege 23:13
61:6,21,25
privileged 61:22
124:9
proactively 85:1
probably 11:14
91:16 105:22
109:20 128:6
problem 13:3,6
49:7 83:7 90:18
122:21 123:3
procedure 9:15
130:5
proceed 6:7
proceedings
149:12 150:4
process 107:23
124:20 145:24
processes 19:3,6,7
produce 139:18
141:12,15

produced 37:11
45:5 46:17,19,24
49:15,20 50:15
52:10 61:8 125:7
125:9 129:21,23
129:25 130:1
141:18
product 61:22
62:10 65:10
production 49:25
62:23 133:25
productive 144:6
profound 110:6
program 133:12
143:13,13
project 133:12
prominent 109:20
promotion 48:13
52:8,11,24,25
56:9 57:13,23
58:6 63:8 66:10
67:2,24 73:2 86:5
86:6 109:2,15
110:8,16,21 131:7
132:19,22 143:17
promotional 48:9
48:14 52:6,24
56:3,15 57:8 59:1
64:20 92:16
111:16 119:18
143:13
promotions 38:19
41:18 42:2 43:10
43:22 48:19 51:6
54:13,21 58:21
66:8 71:15 109:13
109:13 133:19
prop 146:4
proper 124:4
properly 7:21
25:22
proposed 146:2

proposition 75:10
146:5
propounded
135:13 137:24
propounding
138:7
prospects 117:18
provide 28:16
73:18 85:6 93:17
93:22,24 95:8,9
provided 11:10,11
11:12,21 13:11
46:25 57:17 62:6
78:8,9 85:25
146:7
provider 68:8
87:12 88:1 116:5
providers 79:16
96:2,17 98:2
provides 13:10
73:21
providing 81:10
95:16,22 96:3,17
przulj 4:19
psc 91:24 96:7
public 28:12,13
76:22,23 91:25
96:7,8
published 46:1
publishing 46:9
puc 91:24
pucs 93:8
pull 26:6 27:5
83:20
pulled 43:14
145:9
pumping 112:9
purpling 147:2
purported 102:11
purports 104:4
purpose 132:5
137:16 138:6

**purposes** 96:12
109:12 116:6
134:9,12,20
**pursuant** 9:8,14
**push** 86:8
**put** 8:2 13:7,21
39:9 40:19 44:17
47:8 65:15 67:20
71:11 82:17 88:21
91:15 96:14
123:18 133:23
139:24 146:16
148:4,21
**puts** 132:3,8
**putting** 67:18
69:2 104:13
**python** 143:3

**q**

**qualified** 17:15,17
**qualify** 65:18,19
**quarropas** 2:2
**quarter** 66:11
111:24
**queries** 61:17
**question** 15:13,15
15:21,21 17:3,6,9
18:1 20:1,3,4,6
21:6,9,13,17,18
21:20 29:4,11
33:12 45:9,13
46:14 47:8,14,20
49:8 50:17,18
53:15 54:17 55:11
58:12,14,18 73:5
83:15 89:21 91:3
91:6,14,15,19
99:24 102:14
103:1,21 108:2,18
108:20 111:10
112:16 119:3,9,23
120:7,13 122:23
123:1,1,9 126:12
134:23 138:13

141:11,22 143:3
143:12,22
**questioned**
119:21
**questioning** 40:3
143:4
**questions** 6:13
23:23 24:2 37:17
37:18 120:4,17
121:13,24 123:2,4
125:1,6 126:14
130:10 131:16
132:2 142:4,24
143:11
**quibble** 24:1
**quick** 27:4 100:10
110:13 115:23
**quickly** 113:9
**quite** 38:24 83:19
118:1 131:23
141:9 143:4
**quotation** 47:4,23

**r**

**r** 2:21 4:1 6:1
150:1
**radio** 117:24
**raise** 8:4
**ran** 66:9,11
109:15 131:7
133:11
**range** 39:12 44:7
44:7 45:3 80:3
**rappoport** 4:20
**rate** 75:21 121:8
**rates** 126:17
**ratio** 35:3 118:15
**raymond** 69:16
70:7,8
**rdd** 1:3,4
**read** 9:7,15,23
10:9 15:20,24
17:3,5 18:17,17
18:23 20:11 21:5

21:9 22:23 36:21
37:24 38:8,15
43:20,25 48:21
49:3,5 60:20 67:1
67:4 78:9 84:8
113:21 114:24
142:17,20 145:19
**readily** 125:6
**reading** 18:16
19:1
**ready** 6:7 55:13
59:24
**real** 7:4 27:20
74:11 88:16
100:10 118:20
**realize** 139:4
141:4
**really** 10:8 62:14
65:23 79:17 88:17
119:23 120:7
147:19,21
**reason** 9:18 24:1
45:4,8 49:14,19
49:24 53:10 62:9
78:10 81:1 112:15
**reasonable** 145:4
**reasonably** 9:11
**reasons** 130:5
132:16
**recall** 7:5 14:14
41:23 42:3 44:10
84:15 119:12
120:17 121:4,14
143:6
**receipt** 125:10
**receipts** 104:21
106:24 123:24
**received** 6:25 9:9
38:23 117:18
118:1 143:18
**receiving** 38:24
**recess** 13:13 116:3

**recognize** 82:12
123:14 130:21
131:2
**reconnected**
101:2,9
**record** 6:19 30:22
31:25 33:9 36:14
43:6 84:2 117:4
123:16 124:5,13
125:6,8 132:20
133:23 144:11
145:25 146:1,4,14
147:9,23 150:4
**recorded** 37:5
**recording** 37:20
37:22
**records** 27:16,17
68:25 69:2,21
104:9,20 106:24
106:24 124:8,9
125:10,10 126:16
**recover** 52:4
57:25 109:17,25
111:21 131:8
**rectifying** 59:3
**redacted** 60:1
61:5,13 62:10
86:3
**redaction** 62:13
**redial** 115:22
**redirect** 117:2,10
119:7
**reduced** 16:6
**refer** 16:4,17
96:15
**reference** 9:20
10:12 32:21 53:18
53:22 64:6,13
65:5,10,13,14,15
65:25 114:25
115:3,3
**referenced** 36:2
124:22

**referencing** 33:5
**referred** 44:22
  61:11 131:18
**referring** 16:5,18
  50:2,3 70:16
  83:11 97:23 136:5
**reflect** 36:9 121:7
  133:13
**reflected** 79:12
**reflection** 96:25
**reflects** 133:14
**refuse** 138:10,18
  138:19
**refused** 140:20
**regard** 143:12
**regarding** 143:4
**regardless** 110:11
  112:5
**register** 29:22
**regular** 21:2
  128:9,11,12,13
  133:18
**regularly** 111:7
  111:12
**regulated** 28:12
  76:22
**regulations** 73:17
**reimbursement**
  101:21
**related** 17:20 18:3
  18:11 20:9,20
  21:7,19 22:2,4,9
  22:16 23:6,11,19
  25:4 30:22 47:16
  48:6 49:15,21
  50:9,22 66:8
  120:8 122:8
  144:25
**relationships**
  118:17 144:21,23
**relative** 83:23
**relevance** 40:3,6
  72:25 73:1

**relevant** 27:18
  120:13
**reliable** 137:18
**rely** 7:20 19:21
  27:22,24
**relying** 99:13
**remaining** 81:2,3
**remember** 20:3,4
  20:7 41:5 54:18
  84:18
**remind** 6:22 8:1
  117:5
**rendered** 101:21
**renew** 47:7 130:2
**rent** 41:4
**rental** 39:19,20
  40:24
**renting** 39:24
**rep** 32:25,25
**repairs** 42:5
**repeat** 47:20
  54:23 85:19
**repeatedly** 54:25
**repeating** 20:6
  123:8
**rephrase** 122:11
**replies** 147:19
**reply** 146:13,17
  146:22 147:25
**replying** 60:18,19
**report** 26:6 27:4
  28:5 36:16,19,22
  37:7,12 43:14
  87:11,11 89:17
  94:4,5,5,10,11,16
  94:23,25 95:2,7
  95:12,21 96:4,12
  96:23 113:3,4,9
  113:18 114:15
  133:4,6,21
**reported** 96:15
  100:16 113:18,24
  114:2,3,12,15

**reporter** 116:21
**reporting** 42:19
  133:1,19 138:25
**reports** 14:25
  15:3,23 17:4
  43:15 95:3,5
  96:23 97:1 114:10
  134:14 135:2,3
**repository** 26:18
  27:3,7,24
**represent** 6:25
  85:24
**representation**
  102:21
**representative**
  19:22 20:23 36:13
  106:6
**representatives**
  19:21
**represented** 7:16
  16:13 102:17
  104:14
**representing**
  146:25
**represents** 56:3
**reproduced** 33:19
**reps** 33:6,6
**request** 7:20 29:2
  62:25 104:7
  123:18 141:15
**require** 105:22
**required** 41:4
  87:13 94:5,25
  95:21 124:6
**requirements**
  73:17 74:3
**requires** 13:9 28:5
  28:9,13 32:13
**residential** 66:22
**residents** 86:11
**residing** 87:1
**resolved** 7:13

**resort** 73:16 80:18
**resources** 26:14
**respect** 20:15 59:2
  60:21 105:23
  122:14 126:3
  144:13
**respond** 147:1
**responding** 60:22
  60:24 61:25 62:2
**response** 9:3,7,14
  9:22 10:13 61:20
  136:6
**responses** 135:19
  135:20,21
**responsibilities**
  21:7,18 24:11
**responsibility**
  20:9,20,22 24:13
  24:15,19,21 25:1
  26:14
**responsible** 25:8
  26:5 27:6
**responsive** 34:11
  120:13
**restroom** 115:24
**results** 66:13
  133:6
**retail** 20:10,21
  21:8,19 22:3,5,10
  22:17 23:7,12,20
  43:15 118:3
**return** 74:24 75:1
  142:18
**revenue** 73:22
  74:5
**review** 31:8 62:7
  106:17 109:10
  133:5
**reviewed** 7:16
  17:23 19:3,6,6
  22:22 45:25
  104:20

**reviewing** 27:15
104:9
**revisit** 49:7
**richardson** 5:10
**rick** 5:12
**right** 6:15 7:2 8:4
8:11,17 13:17,25
15:4 16:20 17:10
18:8,16 19:2,9,14
20:10 22:17,20
23:24 24:8,16,19
25:6,19 26:10,23
28:8,20,25 29:20
30:6 32:11,15
33:19 34:13,24
35:16 36:2,20
37:1,13,18,22
38:10,20 39:7
41:1,20 47:1 49:2
50:11 52:15,19
55:4 62:18 63:10
64:11 70:13 71:15
72:11 73:5,12,24
74:7 75:3 76:1,6
76:11,19 78:6,21
78:21 79:22 80:21
80:23 81:10,11,12
81:14,19,23 82:3
82:9,10,25 83:5,9
85:7,9 86:10,18
87:24 88:3,7,11
88:14,16,19 89:10
93:18,20 94:1,3
94:12 95:10 97:7
98:10 100:25
101:3,7 102:12
103:19,22,24
104:1,15 105:19
107:7,19 108:4,16
109:3,8 115:13,13
115:18 116:15,23
120:9,15 126:19
128:21,21 133:22

136:12,13 138:10
138:25 140:19
143:2 144:1,2
146:25 147:4
148:20
**risk** 39:1
**road** 16:8 150:21
**robert** 2:22
**robustly** 18:20
**rochester** 5:1
**role** 21:16
**room** 2:2 40:2
147:2
**rosella** 5:2
**rosenman** 4:3
**ross** 4:8 6:8,8,21
6:24 7:6,10,13
10:4,4 13:3 15:5
15:11 17:12 19:15
19:23 23:13 29:1
29:6 40:1,10 45:7
45:14,22 46:10
47:7 49:3,23
50:12 53:12 54:15
54:23 55:3 58:12
61:9,11,15 62:8
62:22,25 72:25
83:10 84:7 90:2
90:17 91:1,13
99:9,21 100:2,6
102:13,17,20
106:5,9 108:12,17
108:21 112:12
115:10,16,20
117:3,3,9,11
119:3,10,12,14
120:1,15,16
122:12 123:25
125:15,19 126:14
126:19,25 127:3
127:10,12 128:14
128:17,20 130:7
130:13,15,24

131:18,24 132:2,5
132:22 134:3,22
134:23 135:10,17
135:20 136:5,9,19
137:7,11,16,23
138:5,17,19,21
139:17 140:7,21
140:24 141:9,21
142:24 143:23
145:16 146:19
147:5,8 148:2,8
148:14,17 149:9
**roughly** 77:15
78:24 81:2 109:8
**rounded** 105:23
107:8,16,19,24
**rule** 9:14 13:9
19:19 124:6 130:4
130:4 132:16
137:14,17,17
139:11
**rules** 9:15 19:19
130:4 145:19
**ruling's** 134:1
**run** 39:10 40:2,4
54:18 75:11,12
81:11 93:7,11,12
112:7 143:15
**runs** 111:25
112:10
**rural** 68:6,8 73:21
75:13,16 79:22
80:7

| s |
|---|

**s** 4:1 6:1
**safe** 149:9
**sales** 25:10 26:14
27:1,25 32:25
33:1,6 35:17
57:14 64:17,18
110:4,6
**salespeople** 92:13

**sanction** 144:12
145:14
**sanjana** 4:21
**sat** 26:7
**satellite** 79:16
**satellites** 81:12
**save** 7:16 16:8
39:3 130:18
**saved** 112:4
**saw** 27:20 48:12
118:2,3,18 121:2
139:4
**saying** 10:13
54:16 55:12 94:22
115:11 133:18
**says** 10:19 34:16
36:21 64:10 65:6
99:20 103:7
125:23 146:14
147:21
**scandalous** 53:12
**scientific** 32:14
**scope** 27:9 66:12
66:16 119:2 126:9
126:13 130:22
**screen** 19:2,8 33:4
72:16 141:24
**screenshot** 32:22
32:22 33:3 34:16
36:3,13,18,21
38:8 98:18
**screenshots** 33:7
33:19 38:6 41:22
**script** 16:3
**sealed** 13:23,23
14:10,11 31:17
**second** 6:6,20
7:13 9:2,3 19:24
65:18,19 73:6
78:2 87:1 103:8
145:1
**secondary** 69:4
70:2,7

see 8:18 15:25
16:12 17:1,25
27:19 30:13 32:21
36:22 44:6 45:3
45:11 47:4,5 48:2
51:8 53:18 59:16
59:16 60:2 64:6
64:13 65:5,10,13
65:14,15 66:18,24
67:7,22 71:18,21
72:2,6,9 78:16,18
82:4,6,11 86:25
87:7,22 88:6,9,23
89:5 103:3,5,10
103:10,11,14,16
110:7 113:12,24
114:22,25 115:3
129:8 130:11
131:24 132:2
140:18,18 142:12
142:14 148:24
seen 14:13 33:4
33:20 38:11 45:23
46:12 47:9 56:12
74:22 110:3,4
139:12 149:4
sees 56:10
self 27:13
send 85:9
senior 126:1,6
sense 78:25
108:20
sent 7:15,19 9:11
9:12,21 10:14,21
38:3,13,25 51:13
60:18 61:16,18
73:4
sentence 49:4
67:1
sentences 43:20
separate 36:15
62:20

separately 127:1
september 14:16
18:1,10 21:11
22:1,4,8 23:21
24:10,18,22 25:3
26:3,23 27:7,14
28:3 56:16 110:16
121:18 131:7
serve 93:3 138:4
served 87:23
92:19
service 28:12,15
34:1,6,12,23 35:6
35:15,22 37:1
38:20 39:1,6
41:19 42:1,19
43:1,11,23 47:17
48:7,19 49:1,17
49:22 50:10,23
51:4,5,7,17 52:4
52:19 54:4,14,22
55:18 59:6 69:10
70:18 71:2,3
72:22 73:18,23
76:7,22 79:18,19
82:20,25 83:5
84:24 85:6 91:25
91:25 92:3 93:9
93:18,22,24 95:8
95:16,22 96:3,7
96:17 110:1
117:20,21 118:2
144:15
services 17:21
18:3,12 28:16
71:22 72:4 73:21
95:10 101:21
set 122:14 127:2
137:22 146:21
sets 148:11,11
settle 148:24
settling 149:6

share 97:17,20
shared 18:18
70:25 71:2 85:4
118:5
sharetracker 97:8
97:10,12 98:19,20
99:1,2,7,16,18,23
119:15
sharing 27:19
29:11
shat 80:3
shaya 5:1
sheet 65:6 113:13
148:5
shield 62:1
shifted 25:1
shortly 98:12
shot 72:16
should've 134:24
show 53:18 73:1
83:20 89:17 148:8
148:14
showed 134:5
135:11,24 136:1
showing 141:15
shown 95:11
127:17
shows 97:4 98:8
shredl 5:7
side 13:9 33:5,9
41:16 118:11
145:12,14 148:16
sides 149:3
siena 5:3
sign 20:12 140:4,7
140:9
signals 136:23
signature 30:9
signed 48:16
140:18 141:4,7
significant 53:3
significantly 73:9

similar 33:21
41:18 43:8,8
56:11 124:18
similarly 13:1
simple 13:6 32:10
simply 7:19 40:4
132:10 141:15
simultaneous
145:24 146:7
single 26:1 27:11
67:12
sir 8:5,18 9:1,5,16
9:17 13:24,25
14:14,17,21,22
15:4,24 16:10,11
16:14,22,23 17:1
17:8,10,11,22
18:8,9,14,22,24
19:2,3,9,10,14
20:16,18 21:12
22:14,18,22 23:4
23:22,25 24:3,8,9
24:16,17,20 25:6
25:16,18,19,20,23
25:24 26:2,4,11
26:23,25 27:9,16
28:8,21,25 30:4,6
30:7,11,17,20,25
31:6,12,14,20
32:2,5,8,11,12,16
32:19,23 33:13,20
34:14,18,24,25
35:12,17 36:2
37:1,18,25 38:3,7
38:15,16,21 39:8
39:20 41:6,7,9,11
41:23 42:3,9,24
43:2,5,19 44:2,3,5
44:7,21 45:6,18
47:1,6 48:1,4,7,21
48:22,23,24 49:2
49:18 50:7 51:9
52:16 53:7,17,20

54:1,2,5,10 55:14
57:3,7 59:12 60:2
60:3,10,21,23
61:1 63:6,9,10,11
63:13 64:5,12
65:11,12 66:20
67:6,16,19 69:17
69:22,25 70:3,11
70:12 71:9,24
72:5,7,22 73:12
74:7 76:12,19
78:3,4,18,25
81:10,13,20 82:2
82:6,7,10 83:2,6
84:6,15,20,22
85:5,8,10,12,23
85:23 86:1,11,14
86:19,21,22,24
87:3,8,14,15,19
87:22 88:4,24
89:1,9 91:8,23
92:11 93:1,21,25
95:11 96:23 97:9
98:14,21 100:11
100:15,20 101:1,4
101:8,11,15,16
102:2,4,8,12
103:6,10,13,14,16
103:20,23 104:2
104:16 106:14
107:1,6,20 108:3
109:4,11 110:22
112:11,21 113:5
113:11,13,14,17
113:21 114:1,5,11
114:19,21,24
115:2,6 116:1
120:20 121:15,19
121:23 123:7,14
124:23 127:19
129:16,23 130:1
130:21 133:20
142:7,10,13,14,16

142:20
**sit** 33:14 43:12
**situations** 39:2
**six** 49:12 52:12
66:4,5 103:15
105:4,14,15
107:22 108:10,13
127:7
**size** 16:6
**skipped** 141:5
**skype** 29:10 56:25
115:17,19 116:16
116:20 123:3
**slice** 83:17,22
**slight** 122:22
**slip** 142:12,15,18
**slower** 73:7
**small** 24:12 27:10
68:6 80:4 82:15
88:15,16 92:1
117:22 149:1
**smaller** 81:25
117:25
**smith** 103:17
125:24 126:1
137:15 139:4,6,10
140:19 141:3,6,13
141:15
**sole** 132:5
**solutions** 68:14
115:11,18,22
116:4,5,11,17
150:20
**solutions.com**
116:12
**somebody** 31:1,4
36:18,23 37:12
43:3 79:20 87:1
93:22 94:3 99:4
104:12 105:25
107:14
**somebody's** 59:20

**somewhat** 17:16
**son** 74:10
**sonya** 3:25 150:3
150:8
**soon** 142:1
**sophisticated**
145:5
**sorry** 6:21 12:15
22:7 24:10 25:14
29:1 32:25 36:7
42:11 47:19,21
49:18 50:12 56:6
56:24 60:5 61:12
65:8 71:8 75:7
77:21 79:9,10
88:8 89:7 94:19
95:24 101:6 102:9
102:13,20 107:3
108:1,12,19
111:10 114:8
119:10 122:2,20
125:16 126:11
128:24 129:14,14
133:10 135:17
140:11 142:1
147:13,13
**sort** 16:7,24 31:2
84:19 105:18
139:20,20 144:17
**sound** 97:13
**sounds** 77:25
**source** 86:2 92:12
92:18 97:3 98:8
133:3,9
**sourced** 128:13
**sources** 92:14
94:10
**southern** 1:2
**speak** 20:16 36:7
53:17 56:7,25
73:15 75:16
137:14

**speaking** 75:20
**special** 97:15
98:24 138:1
139:22
**specialized** 25:4,7
25:21 29:16,18
32:13 44:21
**specially** 137:24
**specific** 29:21
37:10 50:4,19
109:7 113:3
**specifics** 37:2
**spectrum** 20:9,20
21:7,19 22:2,5,9
22:16 23:6,11,20
24:7 25:5 26:9,12
26:21 27:21 28:17
34:17 36:19,22
37:12 38:3,13,14
38:25 42:15 56:20
63:19,23 67:4
69:1 88:6,10
92:10 120:6 143:5
**spectrum's** 37:7
42:23 92:2
**speculate** 50:8
**speculating** 50:5
50:15,19
**speculation** 46:20
**speed** 64:1,1
65:14,15,21,21,22
70:21,23,23 72:23
73:3 82:16 84:3,6
112:10
**speeds** 64:8,10
65:17 70:16 71:4
71:11 72:10 83:21
95:8
**spend** 55:17 62:5
79:19 81:16 97:21
105:1 117:6
130:11

spending 39:24
spent 50:21 52:14
  52:15 54:12,20
  104:21 105:4,8
  123:20,24
spike 58:3
spit 86:9
spoke 23:3,5,8
  41:1 58:3 142:1
spoken 18:17
spreadsheet 10:2
  10:17,19,25 11:3
  11:6,9,10,20
  32:19 36:15 57:16
  57:18 102:11
  104:10 123:17
st 4:13
stability 70:24
  71:11
stakes 25:11
stand 146:15
  147:24
standard 145:1
standpoint 97:20
stands 28:10
start 21:24 113:16
  131:2
started 103:24
  110:25 111:1
  119:15 147:2
starting 46:10
starts 6:12 140:14
state 28:13 54:17
  73:23 74:5 94:8
  94:24 96:1,6,7,13
  121:17
stated 106:23
statement 17:19
  53:15 76:9 77:8
  101:20,23 106:4
  107:14 111:5,7
  137:12 144:4

statements 14:24
  15:3,7,22 17:4
  89:20 113:1 137:5
states 1:1 2:1 12:8
  12:19 13:15,16
  24:13 25:10 29:24
stating 146:5
stay 141:24
  144:13,20 145:3
  149:9
stayed 39:20
steep 111:8
step 141:24
steve 60:11
steven 4:20 5:7
stipulate 90:4,7
stipulation 52:21
stopping 115:8
store 43:15
stores 118:3
story 51:12
strategies 75:9
strategy 61:17
  65:16 74:9,21
  75:4 80:19,24
  81:20
streak 51:19,20
street 2:2 72:6,21
  79:7 80:5 87:4,6
streets 82:12
strewn 75:13
stricken 17:13
  53:14
strike 58:10,17
  60:24 106:4
  122:25
striking 17:16
strokes 84:19
struggling 20:17
  56:2,25
stuck 106:9
study 94:7,9

stuff 31:22 81:11
  81:14,16,17 93:18
  94:2 95:7
subject 132:1,21
  145:6
subjective 145:4,6
submit 12:10
submitted 28:4
  114:16 136:7
submitting 148:15
subscriber 81:18
  110:4
subscribers 99:19
subsidiaries 28:19
  28:24 29:19
subsidiary 26:21
substantial 39:14
  53:1 85:15 111:12
  111:14 144:11
substantially
  124:21
substitute 83:14
subsumed 58:25
successful 41:25
suffered 48:10
sufficient 27:13
  109:11
sufficiently
  131:24 137:18
sugarland 83:25
suggest 53:13
  69:3 80:12 147:8
suggested 102:15
suggesting 80:8
  80:11
suggestion 12:9
  139:13 140:2
suggestion's
  132:6
suite 150:22
summarizes 124:8
summary 11:6
  12:19,25 13:8,11

13:14,18 45:18
  67:21 97:2 124:21
  127:22,23 131:6
summation 32:19
supplemental
  12:10
supplied 128:3
supports 72:4
suppose 88:25
suppress 122:18
suppressed 48:12
  57:25 58:4 109:5
  109:25 131:9
sure 9:2,25 15:25
  23:8 29:15 34:8
  34:21 35:19,20
  36:12 40:23 41:3
  44:9 47:20 54:18
  55:6 68:8 78:22
  97:22 105:22
  111:6,21 119:5
  131:23 133:8
  135:23 136:22
  138:12 145:21
surrounding
  22:23 69:7 83:18
suspicion 11:14
swear 8:6
swimming 31:19
sword 62:1,3
swore 50:21
sworn 10:13 30:2
  30:24 43:20,25
  47:4 48:23,25
  49:10 53:22 55:22
system 33:2,18
systems 19:4

                t

t 121:4 150:1,1
tab 8:16
table 25:11 26:7
  47:4,24

taggart 145:2
take 8:2 16:7
  30:16 31:13 33:3
  33:7 34:15 38:1
  39:12,21 47:3
  54:18 63:14 64:3
  66:2,18 67:14
  68:12 71:25 72:13
  78:1,13 82:3
  85:14 87:4 89:2
  89:11 92:1 93:12
  98:10 101:12
  102:7 114:8
  115:23 125:5,16
  132:9 135:3,8
  145:25
taken 12:10 40:18
  62:15 82:13
  109:18 136:18
  137:19
takes 35:5 118:15
talk 23:10 34:20
  69:15,18 71:5
  106:6 117:25
  133:11
talked 18:21 22:6
  22:20,22 23:2,19
  23:23 52:19 84:13
  93:17 112:8
  135:25
talking 19:1,7,12
  33:17 36:10,11,24
  37:17 61:13 84:17
  86:14 112:11
  120:6
tally 133:6
target 75:5 79:20
  80:17 93:5
targeting 80:11
  80:13 83:4
task 103:7,8,11
taught 146:20

team 24:23 25:1
  26:17,19 27:5,10
  99:2 110:10,13
  112:5 123:20
technical 32:14
technicians 27:25
  92:12
telecommunicat...
  22:25 89:19
telephone 28:15
telephonic 116:10
telephonically 4:8
  4:15,17
television 117:21
tell 8:6 32:24 35:8
  53:8,10 59:15
  85:25 86:3 91:9
  94:1 97:14 101:23
  120:2 122:5
  127:20 134:16
  137:1 144:6
  148:23
telling 52:14
  53:13 89:21
  145:20
temporally
  129:16
ten 63:22
tend 119:24
tendered 6:9
tenure 39:13
terence 4:8
term 83:10
test 66:9 111:25
  112:7,10
tested 110:14
testified 18:5,7,19
  37:5 48:3,5 50:12
  74:16,20 108:22
  118:19 132:18
testifies 102:22
testify 45:15

testifying 19:22
testimony 6:11
  15:15 17:14,15,16
  22:23 30:5,24
  43:20,25 47:5,19
  47:22 48:23,25
  49:10 50:25 53:22
  55:22 58:25 61:2
  112:13,15 119:5,5
  121:14,16,21
  122:7,13 124:4,7
  138:4,6
testing 111:20
texas 26:22 83:25
  89:6,10,19
thank 8:10 13:19
  41:13 47:15 56:1
  58:16 59:9,19,23
  59:25 84:11 90:1
  93:15 100:6
  102:25 108:24
  115:20 116:1,8
  126:19 130:13
  136:9 143:1
  145:16 147:18
  149:8,9
that's 111:11
  113:21 116:22
  119:7,24 121:23
  122:24 123:21
  124:23 128:9,20
  132:5 135:13,15
  136:4,9 137:9,11
  137:16
there's 112:15
  128:6 137:23
they're 121:3
  129:10 135:3
  137:8
they've 137:7
  139:17
thing 34:23 35:7
  35:16 46:9 47:5

80:5 111:9 145:7
  147:24 148:2
things 15:7 22:21
  40:16 51:3,8 71:7
  71:13 85:4 93:20
  106:25 110:11
  144:6 145:10
  146:20
think 10:25 11:4
  12:3,4,7,9,12 20:1
  31:16 36:12 37:5
  37:23 39:11 40:1
  40:5,20 41:7 44:8
  45:10,23 46:13
  47:12 55:4 58:3
  58:12,20 59:24
  62:15,19,21 63:1
  63:1,21 65:20
  74:3 77:3,14
  78:10 79:3 80:3
  80:16,25 83:11,23
  84:10 89:15,24
  91:2 93:3 96:10
  100:12,22,22
  107:12,18 108:4
  108:23 109:11
  111:5 113:8
  116:19 119:8,20
  119:24 120:14
  122:21 126:17
  131:23 134:10,12
  135:17,23,24
  136:5,14 138:5,17
  144:16 146:7,17
  146:20 147:19
  149:3,5
thinking 44:25
thinks 15:14
third 58:20 97:16
  97:24
thirteen 42:5,14
thompson 4:10
  5:4

thought 19:24
42:6 128:24
140:25 144:5
thoughts 61:17
thousand 10:20
41:1 80:1
thousands 26:15
thread 35:24
threatening 37:3
37:9
three 51:3,8 52:3
63:8 66:8,10
67:24 82:25 83:4
86:5 110:14,16
127:7 128:6
148:11
thumped 73:3
tickets 100:13
128:12
tier 63:17,19,20
63:21 64:1,6,8,10
65:3,3,5,10,14,17
143:17,18,21,21
tiering 63:16
tiers 63:10,12,16
65:4,6
time 7:16,19 16:8
18:15 22:6,12,13
22:15,19 24:21,24
24:24,25 26:7,18
27:3,3,4,9,20 32:3
37:8 41:12 44:23
44:23 48:13 49:6
53:1 62:6 78:14
78:22,23 84:9
102:11 103:3,15
104:17,20,21,23
107:5,16 118:20
120:3 122:22
123:8,24 124:13
124:14,21 125:10
126:16 129:16
130:11,18 132:9

147:6
timeframe 48:11
52:1 100:20 104:8
104:25 109:22
timeline 145:7
times 49:5,8,12
58:15 59:8 106:23
107:1 124:22
126:15 128:7
timesheets 124:18
today 14:21 17:16
19:13 23:24 40:4
60:8 86:14 99:4
121:4,14 123:2
127:17 129:18,20
138:11 140:19,20
told 105:25
138:25 139:7
140:8 144:2
tooth 34:3
top 44:6 45:2
73:15 78:1 82:14
82:16 83:21 87:2
topic 50:16 119:9
131:24,25
total 32:11 43:24
48:20,25 78:19
103:15
totality 77:19
town 26:22 68:3,9
68:20
township 75:13
track 44:18 56:14
84:14 89:17 90:20
tracking 107:2
trajectory 51:25
110:17
transaction 129:7
129:11,15,15,17
129:20
transactional
133:4

transcribed 3:25
transcript 14:6,19
16:1,2,13,17,19
17:1 120:2 148:6
150:4
transcripts
118:20
travel 104:9,20
106:24 123:23
treading 89:22
treat 34:25
trial 3:1 6:6 19:24
30:5,15,16 46:4
47:4 53:22 55:22
61:17 106:10
126:22 133:24
139:22 144:7
148:3
trouble 100:13
128:12 138:2
true 14:23 15:2
17:19 18:1,8,10
18:21 20:8,19
22:10,11,12,13
24:5 49:11 76:9
76:14 77:8 95:21
104:18,19 109:12
111:5,7,11 118:16
150:4
truly 144:1
truncating 51:1
truth 8:7,7,7
53:10,13,17 54:25
82:8 107:15 137:6
137:13
try 7:6 59:20
68:18 69:8 95:14
trying 6:15 34:23
36:7,25 39:22
46:13 51:2,7
56:25 80:12 90:19
131:12

turn 8:25 59:15
59:20 87:20 113:9
113:22 114:20
115:17 134:24
turned 89:7
twice 24:15 87:15
94:1 95:12
two 43:20 63:10
63:19,21 65:3,5,7
65:10,14 66:18
76:7 102:6 103:3
103:17 117:6
137:3,23 140:17
143:18,21 145:16
146:18 148:11
type 28:6 80:5
87:7 124:12,18
125:6 147:24
typed 11:7
typical 38:23 56:9
64:18
typically 25:16
28:12 32:25 33:14
64:2 68:8 86:11
93:2 94:6 105:12
typing 88:22
133:21

**u**

u.s. 2:23
uber 123:23
ultimate 66:10
ultimately 128:5
umbrella 118:2
uncertainty 51:15
117:17
uncommon
109:16
underpinning
13:10
understand 11:20
22:24 24:6 25:5
27:6 28:17,23
31:20 34:21 38:9

46:14 51:3 55:11
62:24 67:9 72:8
103:25 104:12
107:16 108:17
131:20 133:8
135:19 139:2
**understanding**
11:17 19:4 27:14
28:5,9,21 29:17
47:2 73:20 94:9
101:4 104:5,19
105:23 109:1,9
123:3 124:23
127:20 134:25
142:6
**understood** 12:23
13:12 17:9 21:13
21:17,21
**unfair** 50:18 90:3
139:20 149:3
**unfamiliar** 98:21
**unfortunate**
61:20
**unfortunately**
41:7 126:25
**unhappy** 35:2
**united** 1:1 2:1
**universal** 73:23
**university** 74:11
**unknown** 2:25
**unlawful** 83:12
117:12
**unredacted** 61:8
**unsealed** 14:12
**untrue** 139:14
**unusual** 105:14
148:21
**upgrade** 48:18
50:22 57:5
**upgrades** 38:18
42:2 43:9,22
49:16,21 50:4,10
51:4,11 54:12,20

55:15,17
**upgrading** 55:15
**upload** 71:11
**upper** 8:19 16:20
47:3,23 48:2
**use** 20:24 24:24
25:7,13,15,17,25
26:8 49:23 61:25
76:20,21,24 83:10
87:9 91:24 93:19
96:20,21 118:20
133:4
**useful** 16:1
**uses** 94:9 98:3
**usf** 73:25 74:1,6
96:9,10
**usually** 8:1 27:23
105:10
**utility** 28:13 76:23
96:8

**v**

**v** 1:14 6:4
**vague** 15:6 83:11
**validate** 45:19
123:19
**validated** 18:18
**valor** 89:19
**value** 20:10,20
21:8,19 22:2,5,10
22:17 23:6,12,20
39:9,15 66:1
**var** 20:11,11,12
20:12,24,24,24
21:1,16 22:5,22
22:23,24
**variant** 31:25
**varies** 39:11
**various** 41:25
45:19 106:24
**vendors** 97:25
**verification**
140:18

**verified** 102:22
116:7 137:7
**veritext** 150:20
**version** 64:8,10
**viability** 51:16
**victory** 68:1
**video** 59:14
122:22 148:22
**view** 16:21
**visit** 33:14
**visual** 33:3
**voice** 42:20 97:20
116:4
**voir** 129:3,5
**voluminous** 10:2
11:14 13:10
**volunteers** 119:21
**vouch** 30:13

**w**

**walmarts** 118:4
**want** 9:2 10:8
11:11 34:21 35:14
40:17 47:19 55:6
62:5 65:25 69:12
73:19 77:2,2
80:16,22 88:18
102:1,3 117:5
137:21 144:6,8,9
144:10 145:10,12
145:21 146:1,9
**wanted** 26:21
27:3 38:14 39:9
40:8 52:8 111:21
137:21 138:8
140:7 141:19
**wanting** 135:20
**wants** 49:8
**warranted** 100:5
**wasn't** 128:16
129:24 135:8
140:5
**wasting** 41:12

**waved** 135:22
**wax** 149:6
**way** 12:9 13:5
35:10 55:12 58:2
60:20 70:15 71:16
71:18,21 82:6
83:9,9 106:6
122:8,25 132:23
133:18 145:18
148:23
**we've** 6:9,14 7:16
10:7 40:1 46:19
49:5 51:19 55:4,4
59:18 86:13
**website** 71:23
72:2,3 98:18
**websites** 92:19
**week** 57:17,18
102:12,15,18,23
102:24 103:6
105:17 129:25
136:7 137:24
139:18,20 140:3
147:3
**weekend** 105:9
147:15
**welcome** 116:4,10
**went** 47:13 51:24
52:6 84:3 104:5,8
104:12,19 138:1
149:5
**weren't** 128:24
**werlinger** 5:5
**we'd** 111:14
136:19
**we'll** 115:14,19
127:1 131:24
**we're** 128:7
**what's** 111:10
114:12 125:20
**white** 2:3
**willing** 23:10

**win** 44:12 125:4
**win1** 45:3
**win3060** 61:4
**win3063** 61:5
**win3100** 85:16,23
**win3213** 85:16
**win4712** 45:3
**windstream** 1:8
1:12 6:3,4 9:9,11
10:22 14:25 15:4
15:23 17:5,21
18:4,12 24:7 25:6
26:9,12,22 34:1
34:12 36:23 37:1
38:20 39:6,10,24
42:1 43:1,11,21
43:24 47:18 48:7
48:17,20 49:17,22
50:10,21,23 51:14
51:16 54:5,12,14
54:20,22 55:16,19
56:4,17 59:7
60:15,25 67:9
68:13 69:20 70:15
71:22 72:19,23
73:2,21 76:3,11
76:14,17 79:7
82:16 87:24,25
88:2,5,10 94:22
95:14 97:18,24
99:19 102:11
103:18 109:16
110:1 112:9,10
113:1 118:8,9,9
118:11,23,24
119:6,19 120:23
120:24,24 121:1
123:20 124:12
126:2 128:4
142:19
**windstream's**
10:6 38:17

**windstream's**
117:13
**wing** 58:5 109:19
**wire** 90:13 93:19
93:23
**wireless** 68:14
85:8
**wires** 28:15
**withdraw** 6:18
103:1
**withdrawing**
12:24
**withdrawn** 13:1
**witness** 7:22 10:9
13:7 15:13 29:3
33:7 45:11 46:11
47:8 53:13 54:16
54:24 84:8 91:16
91:23 92:7,11
93:1 94:19 96:22
99:9 106:5,14,17
106:19 107:1,6,8
107:11,20 108:3
113:5 115:23
116:1,25 117:1
119:20 124:17,23
129:3 131:4,6,13
133:3,9,14,20
134:5,24 135:11
135:24,25 139:11
139:12,17 140:3
141:12,16,22
142:22
**witness's** 61:2
106:4
**witnesses** 106:10
109:9 139:14
145:9,9
**witness'** 124:3,7
**word** 48:16 54:7
56:2 58:11 103:11
117:21 120:3,3
121:3

**wording** 122:20
**words** 53:24
83:14 118:21
**work** 27:10 61:22
62:10 64:19 81:3
96:5 105:10,13,14
124:18 139:21,22
148:21,21
**worked** 57:17,18
78:24 101:24
104:7,10,11
110:16,21,22
111:24
**working** 41:8 85:2
105:10,18 123:20
**works** 47:11 60:8
137:10
**world** 40:15 51:8
**worth** 7:18 17:16
**write** 53:9 120:21
121:1 145:20
**writing** 142:17
**written** 107:5
**wrong** 6:16 89:7
89:12
**wrote** 43:3 120:3
141:13

**x**

**x** 1:5,11,17
**xu** 5:15

**y**

**yankee** 68:2
**yards** 28:16
**yeah** 26:13 59:22
73:20 74:23 78:13
79:18 84:10 87:16
88:1 95:25 100:9
105:22 112:14
116:21 145:23
148:7
**year** 23:9 51:22
52:3 58:2,7 66:11
72:18,19 87:15

94:1 95:12 111:2
111:3,16 126:3,4
129:18,20
**years** 29:13 41:8
76:25 105:7 126:7
**yesterday** 14:11
126:23
**york** 1:2 4:6 79:25
**you'll** 134:10
**you're** 112:25
115:15 116:24
120:12 122:5
123:12 127:13
133:17 136:15
**you've** 123:5
124:22 125:22
130:9,10

**z**

**zero** 57:6,10,22
59:5
**zito** 70:8

1

2    UNITED STATES BANKRUPTCY COURT

3    SOUTHERN DISTRICT OF NEW YORK

4    Lead Case No. 19-22312-rdd; Adv. Proc. No. 19-08246-rdd

5    - - - - - - - - - - - - - - - - - - - -x

6    In the Matters of:

7    WINDSTREAM HOLDINGS, INC., et al.,

8                    Debtors.

9    - - - - - - - - - - - - - - - - - - - -x

10   WINDSTREAM HOLDINGS, INC. et al.,

11                   Plaintiffs,

12   vs.

13   CHARTER COMMUNICATIONS, INC. and

14   CHARTER COMMUNICATIONS OPERATING, LLC,

15                   Defendants.

16   - - - - - - - - - - - - - - - - - - - -x

17                   United States Bankruptcy Court

18                   300 Quarropas Street, Room 248

19                   White Plains, New York 10601

20

21                   December 18, 2019

22                   10:24 AM

23   B E F O R E:

24   HON. ROBERT D. DRAIN

25                       U.S. BANKRUPTCY JUDGE

1    HEARING Re 1) Motion for an Order Extending the Debtors

2    Exclusive Periods to File a Chapter 11 Plan and Solicit

3    Acceptances Thereof Pursuant to Section 1121 of the

4    Bankruptcy Code (related document(s) 1281)

5

6    HEARING Re 2) Debtors' First Omnibus Objection to (A)

7    Amended Claims, (B) Exact Duplicate Claims, and (C)

8    Substantively Duplicate Claims, and (D) Insufficient

9    Documentation Claims (ECF 1224)

10

11   HEARING Re 3) Adversary proceeding: 19-08246-rdd Windstream

12   Holdings, Inc. et al v. Charter Communications, Inc. et al

13   DECLARATION OF GRACE A. THOMPSON IN SUPPORT OF THE DEBTORS

14   MOTION FOR SUMMARY JUDGMENT OF LIABILITY ON ALL COUNTS

15   (related document(s) 122) filed by Shaya Rochester on behalf

16   of Windstream Holdings, Inc., et al (ECF 127)

17

18   HEARING Re 4) Adversary proceeding: 19-08246-rdd Windstream

19   Holdings, Inc. et al v. Charter Communications, Inc. et al

20   Motion to Dismiss adversary Proceeding (Motion for Judgment

21   on the Pleadings on Count VI and Motion to Dismiss Count VII

22   for Lack of Subject Matter Jurisdiction) (ECF 109)

23

24   HEARING Re 5) Adversary proceeding: 19-08246-rdd Windstream

25   Holdings, Inc. et al v. Charter Communications, Inc. et al

1    Notice of Hearing (related document(s) 109)

2

3    HEARING Re 6) Adversary proceeding: 19-08246-rdd Windstream

4    Holdings, Inc. et al v. Charter Communications, Inc. et al

5    Motion for Summary Judgment DEBTORS MOTION FOR SUMMARY

6    JUDGMENT OF LIABILITY ON ALL COUNTS (related document(s) 1)

7    filed by Shaya Rochester on behalf of Windstream Holdings,

8    Inc., et al. (ECF 122)

9

10   HEARING Re 7) Adversary proceeding: 19-08246-rdd Windstream

11   Holdings, Inc. et al v. Charter Communications, Inc. et al

12   DEBTORS MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR

13   SUMMARY JUDGMENT OF LIABILITY ON ALL COUNTS (related

14   document(s) 122) filed by Shaya Rochester on behalf of

15   Windstream Holdings, Inc., et al. (ECF 123)

16

17   HEARING Re 8) Adversary proceeding: 19-08246-rdd Windstream

18   Holdings, Inc. et al v. Charter Communications, Inc. et al

19   DEBTORS STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF

20   THEIR MOTION FOR SUMMARY JUDGMENT OF LIABILITY ON ALL COUNTS

21   Filed by Shaya Rochester on behalf of Windstream Holdings,

22   Inc., et al. (ECF 124)

23

24   HEARING Re 9) Adversary proceeding: 19-08246-rdd Windstream

25   Holdings, Inc. et al v. Charter Communications, Inc. et al

1   DECLARATION OF JEFFREY H. AUMAN IN SUPPORT OF THE DEBTORS

2   MOTION FOR SUMMARY JUDGMENT OF LIAIBILITY ON ALL COUNTS

3   (related document(s) 122) filed by Shaya Rochester on behalf

4   of Windstream Holdings, Inc., et al. (ECF 125)

5

6   HEARING Re 10) Adversary proceeding: 19-08246-rdd Windstream

7   Holdings, Inc. et al v. Charter Communications, Inc. et al

8   DECLARATION OF PAUL STRICKLAND, JR. IN SUPPORT OF THE

9   DEBTORS MOTION FOR SUMMARY JUDGMENT OF LIAIBILITY ON ALL

10  COUNTS (related document(s) 122) filed by Shaya Rochester on

11  behalf of Windstream Holdings, Inc., et al. (ECF 126)

12

13  HEARING Re 11) Adversary proceeding: 19-08246-rdd Windstream

14  Holdings, Inc. et al v. Charter Communications, Inc. et al

15  DEBTORS MOTION FOR LEAVE TO FILE UNDER SEAL CERTAIN PORTIONS

16  OF (A) DEBTORS MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION

17  FOR SUMMARY JUDGMENT OF LIAIBILITY ON ALL COUNTS; (B)

18  DEBTORS STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT

19  THEREOF; AND (C) CERTAIN EXHIBITS TO THE DECLARATIONS OF

20  JEFFREY H. AUMAN, PAUL STRICKLAND, JR., AND GRACE A.

21  THOMPSON (related document(s) 126, 125, 127, 124, 123) filed

22  by Shaya Rochester on behalf of Windstream Holdings, Inc.

23  (ECF 128)

24

25  HEARING Re 12) Adversary proceeding: 19-08246-rdd Windstream

1   Holdings, Inc. et al v. Charter Communications, Inc. et al
2   Motion for Summary Judgment Defendant Charter
3   Communications, Inc. and Charter Communications Operating,
4   LLC Motion for Summary Judgment (ECF 129)
5
6   HEARING Re 13) Adversary proceeding: 19-08246-rdd Windstream
7   Holdings, Inc. et al v. Charter Communications, Inc. et al
8   Memorandum of Law Defendants Charter Communications, Inc.
9   and Charter Communications Operating, LLC Memorandum in
10  Support of Summary Judgment (related document(s) 129) filed
11  by John Scott Kingston on behalf of Charter Communications
12  Operating, LLC, Charter Communications, Inc. (ECF 130)
13
14  HEARING Re 14) Adversary proceeding: 19-08246-rdd Windstream
15  Holdings, Inc. et al v. Charter Communications, Inc. et al
16  Statement of Undisputed Facts in Support of Defendants'
17  Motion for Summary Judgment Filed by John Scott Kingston on
18  behalf of Charter Communications Operating, LLC, Charter
19  Communications, Inc. (ECF 131)
20
21  HEARING Re 15) Adversary proceeding: 19-08246-rdd Windstream
22  Holdings, Inc. et al v. Charter Communications, Inc. et al
23  Declaration of Brian Hockett in Support of Defendants
24  Charter Communications, Inc. and Charter Communications
25  Operating, LLC's Motion for Summary Judgment (related

1   document(s) 129) filed by John Scott Kingston on behalf of

2   Charter Communications Operating, LLC, Charter

3   Communications, Inc. (ECF 132)

4

5   HEARING Re 16) Adversary proceeding: 19-08246-rdd Windstream

6   Holdings, Inc. et al v. Charter Communications, Inc. et al

7   Motion to Seal Defendants Charter Communications, Inc. and

8   Charter Communications Operating, LLC's Ex-Parte Motion to

9   Seal Documents Filed in connection with their Motion for

10  Summary Judgment (related document(s) 131, 129, 130, 132)

11  filed by John Scott Kingston on behalf of Charter

12  Communications Operating, LLC, Charter Communications, Inc.

13  (ECF 133)

14

15  HEARING Re 17) Adversary proceeding: 19-08246-rdd Windstream

16  Holdings, Inc. et al v. Charter Communications, Inc. et al

17  Response to Motion (Defendants' Response to Debtors'

18  statement of Facts) filed by John Scott Kingston on behalf

19  of Charter Communications Operating, LLC, Charter

20  Communications, Inc. (ECF 140)

21  HEARING Re 18) Adversary proceeding: 19-08246-rdd Windstream

22  Holdings, Inc. et al v. Charter Communications, Inc. et al

23  Declaration of Brian Hockett in Support of Defendants

24  Charter Communications, Inc. and Charter Communications

25  Operating, LLC's Response to Debtors' Statement of Facts

1   filed by John Scott Kingston on behalf of Charter

2   Communications Operating, LLC, Charter Communications, Inc.

3   (ECF 141)

4

5   HEARING Re 19) Adversary proceeding: 19-08246-rdd Windstream

6   Holdings, Inc. et al v. Charter Communications, Inc. et al

7   Motion to Seal (Defendants' Ex-Parte Motion to Seal

8   Documents Filed in Connection with their Memorandum in

9   Opposition to Debtors' Motion for Partial Summary Judgment)

10  filed by John Scott Kingston on behalf of Charter

11  Communications Operating, LLC, Charter Communications, Inc.

12  (ECF 142)

13

14  HEARING Re 20) Adversary proceeding: 19-08246-rdd Windstream

15  Holdings, Inc. et al v. Charter Communications, Inc. et al

16  DEBTORS MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS MOTION

17  FOR SUMMARY JUDGMENT (related document(s) 129) filed by

18  Shaya Rochester on behalf of Windstream Holdings, Inc., et

19  al. (ECF 144)

20

21  HEARING Re 21) Adversary proceeding: 19-08246-rdd Windstream

22  Holdings, Inc. et al v. Charter Communications, Inc. et al

23  DEBTORS RESPONSE TO DEFENDANTS STATEMENT OF UNCONTROVERTED

24  MATERIAL FACTS filed by Shaya Rochester on behalf of

25  Windstream Holdings, Inc., et al. (ECF 145)

1    HEARING Re 22) Adversary proceeding: 19-08246-rdd Windstream

2    Holdings, Inc. et al v. Charter Communications, Inc. et al

3    DECLARATION OF GRACE A. THOMPSON filed by Shaya Rochester on

4    behalf of Windstream Holdings, Inc., et al. (ECF 146)

5

6    HEARING Re 23) Adversary proceeding: 19-08246-rdd Windstream

7    Holdings, Inc. et al v. Charter Communications, Inc. et al

8    DECLARATION OF JEFFREY H. AUMAN IN SUPPORT OF THE DEBTORS

9    OPPOISTION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT filed

10   by Shaya Rochester on behalf of Windstream Holdings, Inc.,

11   et al. (ECF 147)

12

13   HEARING Re 24) Adversary proceeding: 19-08246-rdd Windstream

14   Holdings, Inc. et al v. Charter Communications, Inc. et al

15   Joinder of Official Committee of Unsecured Creditors to the

16   Debtors' Opposition to Charter's Motion for Summary Judgment

17   (related document(s) 130, 144) filed by Lorenzo Marinuzzi on

18   behalf of Official Committee of Unsecured Creditors (ECF

19   149)

20   HEARING Re 25) Adversary proceeding: 19-08246-rdd Windstream

21   Holdings, Inc. et al v. Charter Communications, Inc. et al

22   Motion to File Under Seal/The Committees Motion for Leave to

23   File Under Seal Certain Portions of the Committees Joinder

24   to the Debtors Opposition to Charters Motion for Summary

25   Judgment (ECF 151)

1

2    HEARING Re 26) Adversary proceeding: 19-08246-rdd Windstream

3    Holdings, Inc. et al v. Charter Communications, Inc. et al

4    Declaration of Brian Hockett in Support of Defendants

5    Charter Communications, Inc. and Charter Communications

6    Operating, LLC's Motion for Summary Judgment (ECF 153)

7

8    HEARING Re 27) Adversary proceeding: 19-08246-rdd Windstream

9    Holdings, Inc. et al v. Charter Communications, Inc. et al

10   Memorandum of Law in Opposition to Debtors' Motion for

11   Partial Summary Judgment (related document(s) 122) filed by

12   John Scott Kingston on behalf of Charter Communications

13   Operating, LLC, Charter Communications, Inc. (ECF 157)

14

15   HEARING Re 28) Adversary proceeding: 19-08246-rdd Windstream

16   Holdings, Inc. et al v. Charter Communications, Inc. et al

17   Statement of Undisputed Fact (Defendants' Statement of

18   Additional Facts) filed by John Scott Kingston on behalf of

19   Charter Communications Operating, LLC, Charter

20   Communications, Inc. (ECF 158)

21

22

23

24

25

1  HEARING Re 29) Adversary proceeding: 19-08246-rdd Windstream

2  Holdings, Inc. et al v. Charter Communications, Inc. et al

3  DEBTORS Motion FOR LEAVE TO FILE UNDER SEAL CERTAIN PORTIONS

4  OF (A) DEBTORS MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS

5  MOTION FOR SUMMARY JUDGMENT, (B) DEBTORS RESPONSE TO

6  DEFENDANTS STATEMENT OF UNCONTROVERTED MATERIAL FACTS (C)

7  CERTAIN EXHIBITS TO THE DECLARATION OF GRACE A. THOMPSON,

8  (D) DECLARATION OF JEFFREY H. AUMAN IN SUPPORT OF THE

9  DEBTORS OPPOSITION TO DEFENDANTS MOTION FOR SUMMARY

10  JUDGMENT, AND (E) EXPERT DECLARATION OF SARAH BUTLER filed

11  by Shaya Rochester on behalf of Windstream Holdings, Inc. et

12  al. (ECF 159)

13

14  HEARING Re 30) Adversary proceeding: 19-08246-rdd Windstream

15  Holdings, Inc. et al v. Charter Communications, Inc. et al

16  DEBTORS MOTION FOR LEAVE TO FILE UNDER SEAL DEBTORS

17  MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION TO EXCLUDE THE

18  REBUTTAL EXPERT REPORT OF HENRY D. OSTBERG filed by Shaya

19  Rochester (ECF 160)

20

21  HEARING Re 31) Adversary proceeding: 19-08246-rdd Windstream

22  Holdings, Inc. et al v. Charter Communications, Inc. et al

23  DEBTORS OPPOSITION TO DEFENDANTS MOTION FOR JUDGMENT ON THE

24  PLEADINGS ON COUNT VI AND MOTION TO DISMISS COUNT VII FOR

25  LACK OF SUBJECT MATTER JR (related document(s) 109) filed by

1   Shaya Rochester on behalf of Windstream Holdings, Inc., et

2   al. (ECF 161)

3

4   HEARING Re 32) Adversary proceeding: 19-08246-rdd Windstream

5   Holdings, Inc. et al v. Charter Communications, Inc. et al

6   DECLARATION OF GRACE A. THOMPSON IN SUPPORT OF DEBTORS

7   OPPOSITION TO DEFENDANTS MOTION FOR JUDGMENT ON THE

8   PLEADINGS ON COUNT VI AND MOTION TO DISMISS COUNT VII FOR

9   LACK OF SUBJECT MATTER JURISDICTION (related document(s)

10  161) filed by Shaya Rochester on behalf Windstream Holdings,

11  Inc., et al. (ECF 162)

12

13  HEARING Re 33) Adversary proceeding: 19-08246-rdd Windstream

14  Holdings, Inc. et al v. Charter Communications, Inc. et al

15  Joinder of the Official Committee of Unsecured Creditors to

16  the Debtors' Opposition to Defendants' Motion for Summary

17  Judgment on the Pleadings on Count VI and Motion to Dismiss

18  Count VII for Lack of Subject Matter Jurisdiction (related

19  document(s) 109, 161) filed by Lorenzo Marinuzzi on behalf

20  of Official Committee of Unsecured Creditors (ECF 163)

21

22  HEARING Re 34) Adversary proceeding: 19-08246-rdd Windstream

23  Holdings, Inc. et al v. Charter Communications, Inc. et al

24  DEBTORS MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS MOTION

25  TO EXCLUDE THE TESTIMONY OF JOHN C. JAROSZ (related

1   document(s) 115) filed by Shaya Rochester on behalf of

2   Windstream Holdings, Inc., et al. (ECF 164)

3

4   HEARING Re 35) Adversary proceeding: 19-08246-rdd Windstream

5   Holdings, Inc. et al v. Charter Communications, Inc. et al

6   DECLARATION OF JOHN C. JAROSZ IN SUPPORT OF DEBTORS'

7   OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE THE EXPERT

8   TESTIMONY OF JOHN C. JAROSZ (related document(s) 164) filed

9   by Shaya Rochester on behalf of Windstream Holdings, Inc.,

10  et al. (ECF 165)

11

12  HEARING Re 36) Adversary proceeding: 19-08246-rdd Windstream

13  Holdings, Inc. et al v. Charter Communications, Inc. et al

14  DECLARATION OF GRACE A. THOMPSON IN SUPPORT OF DEBTORS

15  MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS MOTION TO

16  EXCLUDE THE EXPERT TESTIMONY OF JOHN C. JAROSZ (related

17  document(s) 164) filed by Shaya Rochester on behalf of

18  Windstream Holdings, Inc., et al. (ECF 166)

19

20  HEARING Re 37) Adversary proceeding: 19-08246-rdd Windstream

21  Holdings, Inc. et al v. Charter Communications, Inc. et al

22  DEBTORS MOTION FOR LEAVE TO FILE UNDER SEAL CERTAIN PORTIONS

23  OF (A) DEBTORS MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS

24  MOTION TO EXCLUDE EXPERT TESTIMONY OF JOHN C. JAROSZ, AND

25  (B) DECLARATION OF JOHN C. JAROSZ IN SUPPORT OF DEBTORS

1    OPPOSITION TO DEFENDANTS MOTION TO EXCLUDE EXPERT TESTIMONY

2    OF JOHN C. JAROSZ (related document(s) 165, 164) filed by

3    Shaya Rochester on behalf of Windstream Holdings, Inc., et

4    al. (ECF 168)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    Transcribed by:  Tracey Williams, Lisa Beck and Nicole Yawn

```
 1                A P P E A R A N C E S :

 2              KATTEN MUCHIN ROSENMAN LLP

 3    Conflicts Counsel for Windstream Holdings, LLC and its

 4                   Affiliated Debtors

 5                   575 Madison Avenue

 6                   New York, NY 10022

 7

 8          BY:  SHAYA ROCHESTER, ESQ.

 9               TERRENCE P. ROSS, ESQ.

10

11                KIRKLAND & ELLIS LLP

12       Attorneys for Debtors and Debtors-in-Possession

13                  601 Lexington Avenue

14                   New York, NY 10022

15

16          BY:  TRUDY SMITH, ESQ.

17

18                KIRKLAND & ELLIS LLP

19       Attorneys for Debtors and Debtors-in-Possession

20                   300 North LaSalle

21                   Chicago, IL 60654

22

23          BY:  BRAD WEILAND, ESQ.

24               ROSS M. KWASTENIET, ESQ.

25
```

```
 1                  MORRISON & FOERSTER LLP
 2        Attorneys for the Official Committee of Unsecured
 3                          Creditors
 4                      250 West 55th Street
 5                      New York, NY 10019
 6
 7                 BY:  TODD M. GOREN, ESQ.
 8                      STEVE RAPPOPORT, ESQ.
 9            LORENZO MARINUZZI, ESQ. (TELEPHONICALLY)
10
11                  DAVIS POLK & WARDWELL LLP
12                  Attorneys for Citibank, N.A.
13                    450 Lexington Avenue
14                      New York, NY 10017
15
16        BY:  NATASHA TSIOURIS, ESQ. (TELEPHONICALLY)
17
18                        MILBANK LLP
19            Attorneys for Second Lien Noteholders
20                       55 Hudson Yards
21                      New York, NY 10001
22
23                 BY:  DENNIS F. DUNNE, ESQ.
24
25
```

1          PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

2                   Attorneys for Brian S. Hermann

3                      1285 Avenue of the Americas

4                         New York, NY 10019

5

6                   BY:  SAMUEL E. LOVETT, ESQ.

7

8                        THOMAS COBURN LLP

9               Attorneys for Charter Communications

10                      One US Bank Plaza

11                      St. Louis, MO 63101

12

13                  BY:  BRIAN HOCKETT, ESQ.

14                       JOHN KINGSTON, ESQ.

15                       MIKE NEPPLE, ESQ.

16

17

18

19

20

21

22

23

24

25

1                    WHITE & CASE LLP

2        Attorneys for UMB Bank, National Association, as

3          Successor Indenture Trustee, US Bank National

4                          Association

5               1221 Avenue of the Americas

6                      New York, NY 10220

7

8            BY:   J. CHRISTOPHER SHORE, ESQ.

9                    JULIA WINTERS, ESQ.

10                   CHARLES KOSTER, ESQ.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              P R O C E E D I N G S

2              THE COURT:  Please be seated.  Okay.  Good

3    morning.  In re Windstream Holdings, Inc., et al.

4              MR. WEILAND:  Good morning, Your Honor.

5              THE COURT:  Good morning.

6              MR. WEILAND:  Nice to see you.  For the record,

7    Brad Weiland of Kirkland & Ellis, LLP, here today for the

8    Windstream debtors.  With me are Ross Kwasteniet and Trudy

9    Smith from the Kirkland team as well.

10             THE COURT:  Okay.

11             MR. WEILAND:  Your Honor, we have just a couple

12   items on the omnibus hearing agenda before we get to the

13   matters in the Charter adversary proceeding being handled by

14   Mr. Rochester of Katten Muchin.

15             First, we have our second motion to extend

16   exclusivity.  That has received limited objections from

17   certain creditors.  If it's acceptable to Your Honor, I'll

18   be arguing that for the debtors and then turning it over to

19   Ms. Smith to address the debtors' claims objection which is

20   not contested today.

21             THE COURT:  Okay.

22             MR. WEILAND:  Your Honor, we filed our second

23   exclusivity motion on November 4th, at docket number 1281,

24   and a reply in support yesterday at docket 1335.

25             The motion initially requested extensions to our

1   plan filing and solicitation periods through the statutory

2   maximums, approximately eight months, to August 25th and

3   October 26th, respectively.  We believe that those

4   extensions were appropriate to maintain a centralized

5   process for these cases through the Uniti litigation without

6   the distraction and expense of competing plans or filing and

7   litigating an additional extension of the exclusive periods.

8               No extension here is intended to prejudice any

9   stakeholders.  To be frank, the debtors and the parties

10  objecting today have worked together constructively through

11  the case, including the Uniti litigation, in which every

12  objecting party has intervened.  We've coordinated closely

13  with the intervening parties and have managed to build what

14  I would say is near unanimous consensus on almost every

15  aspect of the litigation, and we've engaged in discussions

16  regarding exclusivity as well.

17              To be clear, no one here today argues that

18  exclusivity shouldn't be extended.  Factors under Adelphia

19  and the other case law are met.  The cases are large and

20  complex.  Debtors continue to litigate and negotiate toward

21  a potential resolution of issues with Uniti and the

22  litigation is midway toward a trial in March, as Your Honor

23  well knows from our motion to dismiss trial -- or hearing

24  last week.

25              THE COURT:  Do we -- I'm sorry, on that point, I

1   had directed -- or given leave to amend the complaint in

2   light of my rulings --

3           MR. WEILAND:  Yes, Your Honor.

4           THE COURT:  -- that hasn't changed the trial date,

5   though, right?

6           MR. WEILAND:  No, Your Honor.  And we don't think

7   it should.

8           THE COURT:  And that's still set to commence March

9   what?

10          MR. WEILAND:  March 2nd, Your Honor.

11          THE COURT:  March 2nd, early March, okay.

12          MR. WEILAND:  Your Honor, based on our

13  collaboration and cooperation to date, we did communicate a

14  compromise position to the objecting creditors last week.

15  We offered to reduce the extensions requested today through

16  the end of May for filing exclusivity and the end of July

17  for solicitation.  We filed a revised proposed form of order

18  yesterday reflecting that reduced relief.  We had hoped that

19  that would avoid objections, but, unfortunately -- and I do

20  mean unfortunately, because we'd prefer not to be fighting

21  with anyone here today -- objections were filed on Monday

22  arguing that exclusivity should be kept even shorter in our

23  proposed compromise, and shorter just doesn't work here.

24  Largely --

25          THE COURT:  I'm sorry to interrupt you again.

1    What is the omnibus date in April?

2              MR. WEILAND:  We -- I don't believe one has been

3    set --

4              THE COURT:  You don't have one yet?

5              MR. WEILAND:  -- for April.  In March, it's March

6    17th, Your Honor, and I think --

7              THE COURT:  Okay.

8              MR. WEILAND:  -- that's the last one on the

9    calendar.

10             THE COURT:  All right, so we don't have one yet

11   for April.

12             MR. WEILAND:  That's correct.

13             THE COURT:  Okay.

14             MR. WEILAND:  In any event, Your Honor, we think

15   shorter doesn't work here largely because of the litigation

16   schedule, which takes us into March.  Absent the settlement

17   with Uniti, even the new periods we've proposed likely will

18   require us to quickly evaluate your ruling in the litigation

19   and negotiate a plan on a short timeline.  Of course, we'll

20   move with all haste to do that, but presuming that the trial

21   concludes the week of March the 2nd and Your Honor issues a

22   decision later that month, we're really looking at

23   approximately 60 days to negotiate and file a plan.  We

24   certainly reserve the right to seek further extensions of

25   exclusivity, but we think we're -- we think and hope we'd be

1    up to that task.

2            Of course, there's inherent uncertainty today and

3    we'd respectively ask -- respectfully ask the Court to set

4    exclusivity to allow for sufficient time for, one, some of

5    that uncertainty to resolve itself through the litigation;

6    and, two, a reasonable time to negotiate and build what

7    consensus we can on a plan before we have to file it.

8            The objecting parties have proposed what we view

9    as sort of unrealistic and unreasonable dates.  The

10   indenture trustees requested a filing exclusivity that

11   expires in March of 2020, the creditors' committee proposed

12   some reasonable period of time following the March trial.

13   We think that's what our proposed relief grants, by the way.

14   The second liens ad hoc committee requested March 31st and

15   the first lien ad hoc group proposed April 15.

16           All of those, Your Honor, just means that we'd be

17   drafting a motion and seeking a further extension without

18   any reasonable time to assess the outcome of the litigation.

19   In some cases we'd need to file a motion before or during

20   the trial, given the March omnibus date and the notice

21   periods associated with it, even if we got the date later in

22   March.  We think that just puts undue pressure on -- first,

23   Your Honor, on the Court to issue a ruling, and then

24   potentially on the debtors to give creditors more input,

25   extra say in a bargain for support for another exclusivity

1    extension.  We just don't think it's appropriate for the

2    debtors to have to bargain for doled out support as they

3    proceed through these cases in a reasonable time.  We think

4    that reasonable time is really only possible with our

5    proposed dates.

6            So while everyone here agrees today that

7    exclusivity should be extended, the extension, we would

8    submit, really shouldn't be any shorter than May 31st for

9    filing exclusivity and July 31st for solicitation.  So we

10   would respectfully ask Your Honor to grant the motion

11   according to the revised order that we filed yesterday.

12           THE COURT:  Okay.

13           MR. DUNNE:  Good morning, Your Honor.  For the

14   record, Dennis Dunne from Milbank LLP on behalf of the ad

15   hoc committee of second lien noteholders.  I'll be brief,

16   Your Honor.  I'll dispense with a review of the case law and

17   the factors; I think we all know that, I just want to get to

18   the argument.

19           We're aligned with the debtors on most everything

20   that's occurring in the case and we agree that exclusivity

21   needs to be extended; we have a small debate on what the

22   appropriate date is.

23           The debtors say they want to provide ample time

24   for the Court to consider the evidence, fashion its ruling,

25   and for the debtors to craft a plan that comports with

1   however Your Honor comes out.  I'd say we all agree with

2   that.  We agree, A, that the Uniti litigation is the main

3   event right now and we need to see it to resolution, and

4   that Your Honor should have all the time the Court needs for

5   the ruling.

6           Where do we disagree?  We disagree on this point.

7   There are a number of future scenarios that could develop

8   between today and the end of March that could mean it's

9   quite possible and reasonable to draft a plan and file it

10  before the end of March.  Examples:  We could settle with

11  Uniti before then.  Your Honor could rule quickly.  I've

12  actually seen Your Honor rule quickly on many, many issues.

13  And in those cases the deadline of March 31 may actually be

14  a spur to action.

15          I know what the debtors are going to say, because

16  we've heard this, is that they'll say, look, in that happy

17  scenario where there's a settlement or something like that,

18  we're not going to linger in Chapter 11 and we'll move

19  quickly.  My retort to that is -- and it's just too many

20  years of doing this now -- is the reality, Your Honor, is

21  that too frequently, you know, files are filed at the

22  expiration of the exclusivity period, shortly before it.

23  Lawyers are by nature like inert gases, Your Honor, we kind

24  of expand to fill up the volume allotted.  So we'd like to

25  see a March 31 date, because, at best, it will kind of

1      galvanize action if things develop where it's possible to

2      file a plan by then and, at worst, it will serve as a useful

3      checkpoint to see how much more time do we need.

4            And so we think, for those reasons, March 31 is an

5      appropriate date, Your Honor.

6            THE COURT:  Okay.

7            MR. HERMANN:  Good morning, Your Honor, Brian

8      Hermann from Paul, Weiss, Rifkind, Wharton & Garrison on

9      behalf of the first lien lender group.  We agree with Mr.

10     Dunne.  We were a little bit more generous in the time

11     allotted, we had suggested April 15th, but fundamentally we

12     think a lot can happen between now and then.

13           And it's not a given that we're going to proceed

14     to a trial and then to the end of March to a ruling such

15     that they need all the time that they're asking for.  And we

16     think the better approach is to evaluate the facts on the

17     ground closer in time and, if they do need more time based

18     on what's transpired, then they can ask for it and my guess

19     is, if they've earned it, they'll get it.  But to sit here

20     today and say by default they need until June 1st seems like

21     too long a period of time and we think April 15th is far

22     more reasonable.

23           Thank you, Your Honor.

24           THE COURT:  Okay.

25           MR. SHORE:  Good morning, Your Honor, Chris Shore

1    from White & Case on behalf of the two indenture trustees.

2              Look, I think what Your Honor is hearing is some

3    creditor concern about the ability of the debtors and the

4    team to kind of push this case forward to closure.  From our

5    perspective, the debtor has been fairly passive in the case;

6    they did not want to litigate the lease issues.  It's taken

7    a drumbeat from the creditors that you have to litigate

8    these, you've got to litigate these quickly.  We can't

9    continue to pay rent to get this going forward.

10             The only distinction, I think, between what the

11   debtors are saying and what we're saying is, quite frankly,

12   the litigation isn't going to be completed in March.  After

13   Your Honor's ruling, the only way we're going to get to

14   closure is if the parties settle or the inevitable appellate

15   court rules.  What's going to have to happen here is the

16   debtors are going to have to get a plan on file that deals

17   with both contingencies, whichever way Your Honor rules on

18   that, we're going to have to have a plan that can get the

19   cases out.

20             So giving the debtors a wait-and-see approach is

21   going to, we fear, drive them into a position where they are

22   just going to sit back and not try to actively do it.  Just

23   have Your Honor rule and then react to that.  We think it's

24   probably better to get a plan out on file before Your Honor

25   rules, which means sometime in March the debtor should be

1    doing that.  We're going to be here a lot during the month

2    of March.  We can have a, you know, stop-look-and-listen at

3    that point as to where the debtors are going and, if they're

4    not willing to, you know, kind of actively move the case

5    forward rather than just sitting around and waiting for a

6    ruling, maybe it's time for the creditors to do that.

7                   THE COURT:  Okay.

8                   MR. GOREN:  Good morning, Your Honor, Todd Goren,

9    Morrison & Foerster, on behalf of the creditors' committee.

10                  THE COURT:  Good morning.

11                  MR. GOREN:  The good news is, everybody agrees an

12   extension of exclusivity is appropriate and the debtors have

13   taken off the table the eight months, which everybody

14   thought was inappropriate.  So, beyond that, it's sort of a

15   Goldilocks playing going on, you know, this one is too

16   short, that one is too long, you know, that -- but we're --

17   at the end of the day, we're arguing over about 60 days.  So

18   what's just right, I'm not sure, but it seems like something

19   kind of right in the middle, you know, maybe at the end of

20   April seems appropriate to us.  You know, that's about

21   halfway to the remaining exclusivity term, it's, you know,

22   45 to 60 days after the trial, so it gives people some time

23   to digest and react to what's happened there.

24                  So that would be our suggestion.  You know, at the

25   end of the day, it's likely that they're going to have to

1    come back and move for more, but hopefully a nearer term

2    date will spark some action and get the parties to get a

3    plan on file before the date happens.

4            So thank you, Your Honor.

5            THE COURT:  Thank you.

6            MR. WEILAND:  Your Honor, if I could briefly reply

7    to a few of those points?

8            THE COURT:  Okay.

9            MR. WEILAND:  Thank you.  Just quickly, Your

10   Honor.  Mr. Dunne's belief that we will lose all the extra

11   time, he called it the inert gas, in fact I've called it the

12   goldfish effect --

13           THE COURT:  Just don't let your children hear that

14   analogy to lawyers or --

15           MR. WEILAND:  I've called it the goldfish effect,

16   but no one in this case wants to move faster than the

17   debtors do and I don't think that that is a concern that

18   should results in a shorter extension that will only slow us

19   down by making us come back for more later.

20           Mr. Hermann mentioned that a lot can happen

21   between now and April, he's absolutely right.  A lot can and

22   is happening, and will continue through what we think is an

23   appropriate period for us to have as an exclusive right to

24   file a plan.

25           Mr. Shore called the debtors passive.  Nothing

1    could be further from the truth.  The debtors filed the

2    adversary proceeding to litigate the lease issues, that was

3    not prompted by creditors; that was prompted by a thorough

4    investigation that we conducted after the commencement of

5    these cases.  As Your Honor recalls, these cases were filed

6    very quickly after external factors led us to file them, we

7    didn't have time to run this investigation until we were in

8    Chapter 11.  We did that quickly and thoroughly and

9    prudently before filing a lawsuit to litigate the issues.

10   We've done that, we have driven these cases forward.  We're

11   not taking a wait-and-see approach, we are leading the

12   charge.

13             And Mr. Goren mentioned end of April as a

14   compromise.  I think that just results in a new motion being

15   filed to extend exclusivity and/or to Mr. Goren's point and

16   Mr. Shore's point about get a plan on file in March, that

17   would just lead us to file a plan that either doesn't work

18   based on an outcome in the litigation that's unknowable at

19   the time, or isn't something anybody likes and doesn't have

20   support of creditors, again, which may be hard to come by

21   when there's significant uncertainty in what they'd actually

22   be supporting given the facts on the ground won't have

23   developed.

24             So I think we stand by our proposal for May 31st

25   and July 31st, and would respectfully ask Your Honor to

1    grant those dates.

2              THE COURT:  Okay.  Thank you.

3              MR. WEILAND:  Thank you.

4              THE COURT:  All right.  I have a motion before me

5    by the debtors in these Chapter 11 cases seeking their

6    second extension of their exclusive period to file and seek

7    -- solicit -- or to solicit acceptances of a Chapter 11 plan

8    under Section 1121 of the Bankruptcy Code.  Section 1121(d)

9    simply says that the exclusive periods may be extended for

10   cause, without defining cause.

11             It's a fact-based inquiry, as the parties well

12   recognize and have cited in their briefs, and the parameters

13   of that inquiry are well established at this point. They

14   include the size and complexity of the case; the necessity

15   of sufficient time to permit the debtor to negotiate a plan

16   and prepare a disclosure statement; the existence of good-

17   faith progress toward a reorganization; the debtor is paying

18   its bills as they come due; whether the debtor has

19   demonstrated reasonable prospects for filing a viable plan;

20   whether the debtor has made progress in its negotiations

21   with its creditors; the sheer amount of time that's elapsed

22   in the case; whether the debtor is seeking an extension of

23   exclusivity in order to pressure creditors improperly; and

24   whether an unresolved contingency exists.  See, for example,

25   In re Borders Group, Inc., 460 B.R. 818 (Bankr. S.D.N.Y.

1    2011); and In re Adelphia Communications Corp., 336 B.R.

2    610, 674 (Bankr. S.D.N.Y. 2006), affirmed 342 B.R. 122

3    (S.D.N.Y. 2006).

4              Most of these factors clearly argue for an

5    extension, and in fact no one has objected to an extension.

6    These debtors are clearly viable entities that have a more

7    than reasonable prospect to eventually confirm a Chapter 11

8    plan, they're paying their bills as they become due, they

9    have relatively complex businesses and a fairly complex

10   capital structure, and no one has alleged that a debtor at

11   this time is acting improperly in seeking an extension or

12   pressuring creditors.

13             Generally, without getting into all of the facts

14   and circumstances of this case, it would appear to me that

15   the debtors would have filed a plan by now but for one

16   significant unresolved contingency, which is the issues

17   raised in their adversary proceeding against Uniti in

18   connection with what the adversary proceeding calls the

19   "Uniti arrangement."  It is clear to me and clear to

20   everyone that that is an important unresolved contingency

21   that is necessary to understand better, at least at the

22   trial court level or, ideally, through a settlement, in

23   order to confirm a plan.

24             The issues involved in the Uniti adversary

25   proceeding have been under or subject to mediation on a very

1    active basis for some time now.  I understand that that

2    mediation is continuing, and ideally, as I said -- and

3    perhaps it's not an ideal, it should be a reality, the

4    parties would be in a position to settle that litigation in

5    the coming weeks, but it currently is not settled and the

6    debtors are facing the need for an extension.  If it's not

7    settled, it is scheduled for trial at the beginning of

8    March.  It's clear to me that that trial will be

9    substantial, even with the procedures that I have required

10   and the excellent nature of the lawyers involved, and that

11   it is unlikely that there would be a ruling until, at the

12   earliest, shortly after the trial.

13        The debtors are proposing 60 to 75 days, depending

14   on when that ruling comes, after that ruling as an extension

15   of exclusivity.  Other parties in interest have proposed,

16   with one exception, an extension to a date that is roughly

17   two weeks to four weeks after a ruling could be given.

18        There's also a proposal that the extension be

19   potentially before a ruling would be given on the basis that

20   the debtors could conceivably propose a plan that

21   contemplates both an adverse result for the debtors in the

22   Uniti litigation and a positive result for them.  I'll

23   address that contention first.

24        It is certainly possible, and has been done, where

25   there is an unresolved contingency and a plan nevertheless

1  is legitimately proposed, i.e. it's not a waste of time and

2  in fact even confirmed where the plan contemplates, in the

3  current jargon, a toggle depending on the outcome of a

4  contingency.  I do not have the impression that as of today

5  such a plan here would be a useful exercise based on my

6  understanding of the Uniti litigation and potential

7  settlements of that litigation.  I don't think it is an easy

8  exercise to predict how that litigation will turn out; i.e.

9  it's not necessarily black or white.

10          And, further, I think it would unduly complicate

11  negotiations over a resolution of the Uniti issues to bake

12  in a proposal on allocation of value among creditors,

13  including potentially Uniti, without knowing either the

14  results at the trial level of the litigation, or a specific

15  settlement is negotiated.

16          That leaves the issue of whether a shorter

17  deadline on exclusivity would further negotiations and

18  further the resolution of the Uniti issues.  And I have

19  carefully considered that and I think that the important

20  deadline here is the scheduled commencement of the trial and

21  the Court's likely ruling thereafter.  I think it is

22  worthwhile at that point to have a relatively short period

23  for the parties to discuss the results of the trial,

24  assuming that there is a trial and not a prior settlement,

25  and those discussions can inform my decision on exclusivity.

1          So I believe that the debtor has clearly

2    demonstrated cause for an extension, but at this point in

3    managing the case the proper extension should be through a

4    day after the to-be-scheduled omnibus hearing date in April,

5    which I'm assuming will be roughly a month after the March

6    omnibus date.

7          I am now going to say for the third time that it

8    appears to me that the issues raised in the Uniti litigation

9    are the types of issues that warrant a settlement and that

10   the parties should continue to use the time between now and

11   the beginning of March, and, frankly, use the time between

12   now and New Year's, to try to conclude such a settlement.

13   If that happens, two things seem quite evident to me:

14   first, I would hope that that settlement itself will bake in

15   the basic terms of a plan, i.e. it won't just affect the

16   debtor/Uniti relationship, but will lead the parties to --

17   or most of the parties, at least -- to agree on a capital

18   structure for the reorganized debtors, in which case a plan

19   would be filed promptly, we wouldn't be waiting until

20   sometime in mid-April, or a substantial number of people or

21   constituents in the capital structure agree on a plan and a

22   settlement and the debtors don't, in which case Congress

23   clearly contemplated a motion to shorten an exclusive period

24   for cause.

25          So I think that the parties continue to have every

1     incentive to negotiate and resolve the underlying issue in

2     this case that's keeping a plan from being confirmed and

3     that they should do it over the next weeks, if not shorter.

4     So I'll ask the debtors to get future omnibus dates for

5     April and May -- and June, I guess -- and submit then an

6     order extending the exclusive periods, with the plan period

7     being the day after that omnibus hearing in April and then a

8     related 60-day extension for the solicitation period.

9                 MR. WEILAND:  We will coordinate that with your

10    chambers, Your Honor.  Thank you.

11                THE COURT:  Okay, very well.  But -- all right,

12    now I'll say it for the fifth time.  This case cries out to

13    settle the Uniti litigation and do a plan before then.  I

14    know that's not entirely in the debtors' control, because

15    you have active constituents here, but it is in large part

16    in the control of all or most of the parties who have

17    addressed this issue to reach agreement, so hopefully that

18    will happen well before March 2nd.

19                MR. WEILAND:  I think we are -- we continue with

20    other stakeholders to put a lot of effort toward that front,

21    Your Honor.

22                THE COURT:  Okay.

23                MR. WEILAND:  All right.  Thank you, Your Honor.

24                THE COURT:  Thank you.

25                MR. WEILAND:  I will cede the podium to my

1    colleague Ms. Smith.

2              THE COURT:  Okay.

3              MS. SMITH:  Good morning, Your Honor.

4              THE COURT:  Good morning.

5              MS. SMITH:  Jhanile Trudy Smith from Kirkland &

6    Ellis on behalf of the debtors.  Item No. 2 is next on the

7    agenda.  This is the debtors' first omnibus claims objection

8    at Docket No. 1224.

9              The debtors' claims and noticing agent, KCC,

10   served all affected parties with customized notice via first

11   class mail, which is consistent with the order that the

12   Court entered back in October.

13             THE COURT:  And when you say customized, you mean

14   individualized, so they each got the notice that said look

15   at the exhibit, you're on it --

16             MS. SMITH:  Exactly.

17             THE COURT:  -- if you don't object --

18             MS. SMITH:  Exactly.

19             THE COURT:  -- you may have your claim disallowed.

20             MS. SMITH:  That's exactly right, Your Honor.

21             THE COURT:  Okay.

22             MS. SMITH:  And so we filed a revised order and

23   schedule yesterday that shows changes based on comments and

24   responses that we received, both formally and informally.

25             One change that's worth noting for Your Honor is

1      that the order removes references to Schedule IV and then

2      Schedule IV is also no longer attached to the order.  What's

3      really going on there, Your Honor, is that we agreed with

4      those parties to kick out the response deadline to February

5      9th, 2020, and so those parties, along with the party that

6      filed the response at Docket No. 1300, have additional time

7      to file responses and all rights are reserved with respect

8      to that objection.

9               THE COURT:  Okay.  So, at this point, you're

10     seeking relief only in respect of objections to claims where

11     there was no response, whether formal or informal?

12              MS. SMITH:  Well, all the ones that are attached

13     to the order, which is just Schedules I, II, and III.  The

14     response that we did receive to Schedule I, we resolved that

15     by just revising the schedule to update the debtor name.

16              THE COURT:  Okay.

17              MS. SMITH:  And so, at this time, all the

18     responses are resolved except for the ones that we

19     continued.

20              THE COURT:  Right.  And as far as, again, the

21     other ones, you're adjourning as to anyone that objected or

22     contacted you?

23              THE COURT:  Exactly.

24              THE COURT:  Okay.  Does anyone have anything to

25     say on this first omnibus objection?

1             Okay.  I will grant the objection with one change,

2    which is on the amended claims and substantively duplicate

3    claims I want you to double check and make sure that, unless

4    you have an express agreement as to the one that gets

5    disallowed or the ones that get disallowed, it should be the

6    last filed claim that survives.  I think there are -- going

7    through this, I think there are instances where that wasn't

8    the case.

9             MS. SMITH:  Sure, we'll double check that, Your

10   Honor.

11            THE COURT:  Okay, because I'm assuming that,

12   unless they've contacted you or agreed that they're okay

13   with the first one surviving, it really should be the last

14   one, since that's what they filed last.

15            MS. SMITH:  Yeah.  With respect to the amended

16   claims schedule, that's certainly the case.  When it comes

17   to the substantive duplicate claims --

18            THE COURT:  Right.

19            MS. SMITH:  -- we determined which ones seemed to

20   comport with the liabilities and we chose that one, so that

21   one may not actually be --

22            THE COURT:  But that's --

23            MS. SMITH:  -- the later --

24            THE COURT:  -- but that's really on --

25            MS. SMITH:  -- in time.

1          THE COURT:  -- a different basis than duplication.
2     So I think it should be the last one.
3          MS. SMITH:  The last one even on the substantive
4     duplicate claims?
5          THE COURT:  Yes.
6          MS. SMITH:  Okay.
7          THE COURT:  I mean, if you want, you can reach out
8     to them and ask them.  This is the North Carolina one,
9     right?  You could ask them.
10          MS. SMITH:  Okay.
11          THE COURT:  If they want to have an earlier one,
12     that's fine, but I'm assuming that they wouldn't, because
13     they filed one after the one that the order says is
14     surviving.
15          MS. SMITH:  I guess one of the things here is that
16     the claimants are different for some of these, so I'm not
17     sure how your Court intends on resolving if there's a
18     discrepancy between the claimants.
19          THE COURT:  Well, I was doing this just on the
20     basis of "substantively duplicate" was another word for
21     "amended."
22          MS. SMITH:  Okay, so -- yeah.  So the amended
23     claims were actually self-identified as amended, so --
24          THE COURT:  I know, but I think, without saying
25     that, it looks as if the last one would be the one in the

1      latter category, substantively duplicate was another term

2      for amended.

3                    MS. SMITH:  Okay, yeah.  We'll double check and

4      just make sure.

5                    THE COURT:  You can check with them.

6                    MS. SMITH:  Yeah.

7                    THE COURT:  I mean, there's not a lot of them.

8      It's basically all by one set of --

9                    MS. SMITH:  Right.

10                   THE COURT:  -- claimants.  So you can either do

11     one of two things:  you can either confirm that they're

12     perfectly happy with the order that you proposed or,

13     alternatively, do the last one.

14                   MS. SMITH:  Okay, sounds good.  Thank you.

15                   THE COURT:  Okay, thanks.

16                   MR. WEILAND:  Thank you, Your Honor.  If I may, I

17     think that's the balance of the omnibus matters --

18                   THE COURT:  Right.

19                   MR. WEILAND:  -- and we'll be turning to the

20     Charter adversary proceeding.

21                   THE COURT:  Okay.

22                   MR. WEILAND:  I believe that there are a number of

23     parties here that are probably not essential to the Charter

24     hearing --

25                   THE COURT:  That's fine.

1          MR. WEILAND:  -- myself included, we're not

2    handling that.  And so if I could ask, Your Honor --

3          THE COURT:  You all can go off and try --

4          MR. WEILAND:  -- for people to be excused, that

5    would be good.

6          THE COURT:  -- to settle the Uniti matter.

7       (Laughter)

8          THE COURT:  Yeah, that includes people on the

9    phone too, if they want to --

10          MR. WEILAND:  Okay.

11          THE COURT:  -- ring off.

12          MR. WEILAND:  Thank you very much, Your Honor.

13    And happy holidays.

14          THE COURT:  Okay, same to you.

15       (Pause)

16          THE COURT:  Okay.  This is still in the Windstream

17    Holdings, Inc. Chapter 11 case, and this is Windstream

18    Holdings, Inc., et al. v. Charter Communications.

19          And if people want to state their names for the

20    record.

21          MR. ROSS:  Good morning, Your Honor.  Terry Ross

22    with the Katten firm representing the debtors and

23    debtors-in-possession and plaintiffs in this adversary

24    proceeding.

25          THE COURT:  Good morning.

1          MR. HOCKETT:  Good morning.  Brian Hockett of

2     Thompson Coburn on behalf of Charter Communications and

3     Charter Communications Operating.  Also with me today of

4     Thompson Coburn is Mike Nepple, who will also be presenting

5     certain items to the Court today; John Kingston, Nino

6     Przulj, and Steve Shredl, all of Thompson Coburn.  And I'll

7     leave it at that.  Thank you, Your Honor.

8          THE COURT:  Okay.  All right.  There are a number

9     of motions on the agenda for leave to seal certain

10    documents, all related to -- or to file under seal certain

11    documents related to the substantive matters on the agenda.

12    No one has opposed those motions and, unless there's any

13    developments on them -- are there any developments on them

14    that you want to let me know of -- no?  Okay, so I will

15    grant each of them.  They're listed on the agenda -- or the

16    amended agenda that was filed recently by the debtors'

17    counsel.

18          I would like you to use the form of order that I

19    generally use for sealing orders.  I just entered one either

20    the beginning of this week or the end of last week in the

21    Purdue case involving PJT's retention application.  There's

22    some fairly recent ones in the Sears case also.  I don't

23    want to have to substantially edit six or seven orders on

24    this type of motion, so I'll just ask you to do that when

25    you submit the orders to chambers.

1        So that covers the first seven -- I'm sorry, first

2    eight items in the adversary proceeding portion of the

3    agenda, Topic II, and it takes us to the defendants' motion

4    for judgment on the pleadings and motion to dismiss.

5            MR. HOCKETT:  Thank you, Your Honor.  Brian

6    Hockett again.

7            So the motion before the Court is a motion for

8    judgment on the pleadings with respect to Count VI, which

9    was relating to an alleged stay violation, as well as a

10   motion to dismiss on Count VII, which was for equitable

11   subordination.  I will address those in that order, first

12   with respect to the stay violation issue.

13           We filed this motion to dismiss because it

14   appeared that the debtors were pursuing Charter with respect

15   to a stay violation under 362(k), which I think all the

16   parties agree that the Court -- the Bankruptcy Code doesn't

17   authorize the Court to enter a judgment under 362(k)(1)

18   against a non-individual.  They are now saying that what

19   they were doing is seeking to pursue civil contempt, which

20   is the correct standard under which a debtor can seek to

21   rectify or have their rights addressed with respect to the

22   automatic stay when they are a non-individual; however, in

23   their pleading, they didn't plead civil contempt.  They

24   don't cite to 105, they don't mention contempt in their

25   motion -- or in their complaint at all.  And, finally, I'll

1   say that civil contempt is not actually a cause of action,

2   civil contempt is a motion that's brought under Rule 9020 or

3   9014 -- or 9014 by reference in Rule 9020.

4          Finally, they do cite to 28 U.S.C. 2201, which is

5   declaratory judgment, and they do reference that section.

6   However, in their requested relief they aren't asking for a

7   declaratory judgment relating to that.  And I will say that

8   the declaratory judgment action section is intended to

9   address issues in which parties are seeking to avoid

10   potential liability that they might have to another by

11   seeking a declaratory judgment ahead of time.  I will say

12   that it's not really intended to address a, hey, determine

13   the liability for these past acts.  That's not the purpose

14   of the declaratory judgment act, and none of the cases cited

15   by the debtors indicate that such a proceeding is the

16   appropriate mechanism to address an alleged stay violation.

17          So, I mean, in conclusion, on the Rule 12(c)

18   motion on Count VI, there's simply not a cause of action

19   here and it should be dismissed.

20          Turning to --

21          THE COURT:  Of course they never reference 362(k).

22          MR. HOCKETT:  No, Your Honor, they do not

23   reference 362(k), you are correct.  They reference 362 a few

24   times in the complaint and, you're right, they did not

25   reference 362(k).  You are correct.

1          THE COURT:  Okay.

2          MR. HOCKETT:  Nor did they reference 105 or civil

3    contempt.

4          The equitable subordination count, which is Count

5    VII.  So we filed a motion to dismiss this for lack of

6    subject matter jurisdiction.  To be clear, 1334(b) obviously

7    governs this Court's jurisdiction by reference from the

8    district court, the district court having the original

9    jurisdiction that gets referred to this Court.  I don't need

10   to teach Your Honor about bankruptcy jurisdiction, I'm sure

11   of that, but as with any court there has to be a case or

12   controversy and that issue is -- you know, certain aspects

13   of that are tested as of the filing of the complaint and

14   standing is one of those issues.  In order to have --

15          THE COURT:  But that's not a case or controversy,

16   that's a standing issue.

17          MR. HOCKETT:  I think case or controversy is a --

18   it is an element of case or controversy, Your Honor, you

19   can't have a case or controversy without standing.

20          THE COURT:  Right, but standing -- do you question

21   whether the debtor has -- a debtor has standing to bring an

22   equitable subordination claim?

23          MR. HOCKETT:  At the time that they brought it

24   against Charter Communications and Charter Communications

25   Operating?  Yes.

1          THE COURT:  But, again, that's not a standing

2  issue.  That's based on the timing of the claim, not whether

3  an entity has a right to relief, to bring a right to --

4  bring an action for a right to relief.

5          MR. HOCKETT:  Standing.  You have to look at what

6  the facts are at the time that the case was filed and, at

7  the time that this case was filed, there was no ability to

8  redress what their claimed injury was.

9          THE COURT:  Based on the theory that there hadn't

10  been a proof of claim filed.

11          MR. HOCKETT:  Well, that's right, there's no

12  allowed proof of claim.  I mean, Section 510 obviously

13  requires that there be an allowed claim in order to

14  subordinate it.

15          THE COURT:  But there is a filed -- there are

16  filed proofs of claim now.

17          MR. HOCKETT:  There are now some filed proofs of

18  claim -- I don't have the number right in front of me, I

19  think it's against 36 of the debtors, filed by Charter

20  Communications Operating.

21          THE COURT:  Right.  So -- all right, go ahead.

22          MR. HOCKETT:  I will say -- I'll continue --

23          THE COURT:  I don't want to prolong this.

24          MR. HOCKETT:  -- but I have a sense you -- do you

25  want me to wait for --

1              THE COURT:  No, no --

2              MR. HOCKETT:  Okay.

3              THE COURT:  -- go ahead, go ahead.

4              MR. HOCKETT:  Okay, I will continue.

5              THE COURT:  I'll give you my ruling at the end of

6        this.

7              MR. HOCKETT:  That's fine.  That's fine.  I just

8        wanted to make sure I caught what you wanted to have

9        addressed.

10             So, in order to have standing, they have to allege

11       an injury that is redressable by the relief requested, and

12       that's the point that we are making in our order.  This is a

13       standing issue, because at the time that the case was filed

14       they were requesting a subordination of a nonexistent claim.

15       The relief requested cannot redress any of the alleged

16       injury that they're claiming, that's part of standing and,

17       without standing, you can't have a case or controversy --

18             THE COURT:  Do you dispute that the debtors have

19       standing today?

20             MR. HOCKETT:  I would say in 36 instances they

21       would have standing today, yes, Your Honor.

22             THE COURT:  Okay, all right.

23             MR. HOCKETT:  Now, the debtors have tried to say,

24       well, this is an issue --

25             THE COURT:  Is Charter going to assert any right

1    to file any late claims against any of the other plaintiffs?

2              MR. HOCKETT:  I don't think that there are any.  I

3    think we've filed all the claims that we're going to file in

4    this case, Your Honor.  I filed --

5              THE COURT:  So was that a yes?

6              MR. HOCKETT:  -- them, I filed them, so I think

7    they're all the claims.

8              THE COURT:  Okay, all right.

9              MR. HOCKETT:  I mean, if something came up and

10   there was something missing that I needed to address the

11   Court and ask for that relief, I guess I would, but I think

12   we have captured the realm of all claims, Your Honor.

13             THE COURT:  Okay.

14             MR. HOCKETT:  So I can say that before the Court

15   today I think -- well, not before the Court today, but the

16   claims that are going to be filed by Charter have been

17   filed.

18             THE COURT:  Okay.

19             MR. HOCKETT:  The debtors want to make this an

20   issue of ripeness, because ripeness is tested throughout the

21   course of any litigation --

22             THE COURT:  Right.

23             MR. HOCKETT:  -- and which is kind of the flipside

24   of mootness, and that's different from standing --

25             THE COURT:  And they were in fact responding to

1  the cases that you cited, which were ripeness cases.  So I

2  can understand why they made that the issue.

3           MR. HOCKETT:  Well, the cases that we've cited to,

4  Your Honor, there was one case we cited to that said that

5  there has to be a case or controversy, and then the Supreme

6  Court case, I think in --

7           THE COURT:  I'm not talking about general cases

8  that deal with someone who didn't -- wasn't a citizen of a

9  proper -- in the proper standard country at the time the

10  action was brought, I'm talking about the cases that

11  specifically deal with equitable subordination that you

12  cited --

13           MR. HOCKETT:  Sure.

14           THE COURT:  -- each of which involved a case where

15  the bar date had passed and, therefore, at that time the

16  court knew that there was no reason to proceed with

17  equitable subordination since it deals with a claim.  Those

18  are ripeness cases, right?

19           MR. HOCKETT:  The case -- the case that we cited

20  to related to a case or controversy issue, Your Honor, and

21  it said that there has to be a case or controversy; ripeness

22  is part of case or controversy, Your Honor.  And so in those

23  cases, in the cases that the debtor cited certainly, those

24  were ripeness cases and ripeness is another issue here, and

25  because ripeness was addressed in those cases.  Those cases

1    did not address standing, Your Honor, which is a separate

2    issue.  And just because they're citing to cases that say,

3    hey, this is a ripeness issue doesn't mean that it's not

4    also a standing issue.

5            THE COURT:  This is just amazing, just amazing.  I

6    mean, I really will reiterate the inert gas point at this

7    point that we heard earlier.

8            MR. HOCKETT:  Your Honor, in the end here, they

9    didn't have standing when they filed the case and, even if

10   they are going to talk about the ripeness issue and that's

11   the way the Court goes, there are about 300 -- 360 claims

12   that the Court is going to need to dismiss because there's

13   no claim that's been filed.

14           THE COURT:  Okay.

15           MR. HOCKETT:  Thank you, Your Honor.

16           THE COURT:  Okay.

17           MR. ROSS:  Your Honor, again, Terry Ross for the

18   debtors, debtors in possession, and plaintiffs in this

19   adversary proceeding.

20           Let me start with Count VI.  The opening brief

21   that they filed said one thing and one thing only, they want

22   argument, they had -- we were trying to proceed under

23   362(k)(1), we weren't allowed to under Chateaugay and we

24   pointed out in our response, no, we've never mentioned

25   362(k)(1) and we weren't proceeding under it.  That should

1    be the end of this discussion.

2         In their reply brief, they introduced an entirely

3    new argument, which is, no -- oh, well, we were wrong, they

4    weren't proceeding under 362(k)(1), they were trying to pull

5    some sort of contempt motion, but we're not.  We have not

6    filed a motion, we don't use the word "contempt" anywhere,

7    and that's why we say this is absolutely frivolous because

8    it has no basis in law or fact.

9         None of the cases they cite to, none of them,

10   involve an adversary proceeding in which the court said

11   you've got the wrong procedural mechanism, because at the

12   end of the day that's what they're arguing, we've used the

13   wrong procedural mechanism.  And I have one answer to that,

14   Your Honor.  We cited this case, it's called Ace Elevator

15   Company; it's one of Your Honor's cases in which you

16   expressly allowed violation of the automatic stay to be

17   brought by way of an adversary proceeding.  There are other

18   cases in the Second Circuit involving -- that I can cite,

19   but it's simply a waste of this Court's time to go forward.

20        You are allowed to bring a violation of an

21   automatic stay that is not seeking damages through an

22   adversary -- through a cause of action in an adversary

23   proceeding.  Your Honor has already said that; I don't know

24   why we're spending any time on this.

25        Unless there's questions, I'd like to move on to

1    Count VII regarding subject matter jurisdiction.  And let me

2    start, the very first question you asked, Your Honor, aren't

3    these cases they cited, aren't they ripeness cases?  There's

4    a simple answer to that, yeah.  And do you know why?

5    Because I actually went and read the motions.  The motions

6    are all brought under 12(b)(6), which is how you bring a

7    ripeness motion.  If you want to bring a subject matter

8    motion, you bring it under 12(b)(1).  None of those cases

9    were brought under 12(b)(1).

10          We have subject matter jurisdiction, very simply,

11   Your Honor.  Justice Scalia says there should be a four-part

12   test.  Is there, first, a federal question?  Yes, 1334.

13   Second, is there an actual controversy?  Absolutely.  We say

14   they've engaged in inequitable conduct and that's happened.

15   Third, is there some sort of personal stake in the

16   litigation?  Of course, the inequitable conduct was against

17   us, we're motivated to bring it.  And, finally, would the

18   relief sought give you a remedy?  And, yes, subordination of

19   their claims would remedy the inequitable conduct.

20          So there's standing.  The question is not about

21   standing, it's about ripeness.  And, again, there's a simple

22   single case that answers this out of this Court, and that's

23   In re Manhattan Investment Fund, in which this Court said

24   that even if you have not filed your proof of claim and the

25   bar date has not passed, you are allowed to bring a cause of

1    action for equitable subordination.

2              I think these are both frivolous motions that were

3    inflicted upon us.  Personally, I think they should be

4    sanctioned for it.  That's all I have, Your Honor.

5              THE COURT:  Well, you didn't make a Rule 9011

6    demand, though, right?

7              MR. ROSS:  We have not, Your Honor.  We've simply

8    pointed that out and, depending on the ruling of the Court,

9    we may well --

10             THE COURT:  Well, no.  I mean, I think the way the

11   rule is set up you have to make the demand, with certain

12   exceptions, which I don't think apply here, in order for

13   there to be sanctions imposed under Rule 9011.  You have to

14   -- in other words --

15             MR. ROSS:  You have to give them an opportunity --

16             THE COURT:  -- you have to give the --

17             MR. ROSS:  -- to withdraw the -- you're absolutely

18   right, Your Honor.

19             THE COURT:  You have to give them the chance to

20   withdraw it.  Okay, all right.  I have a motion before me by

21   the defendants -- oh, I'm sorry, it does now appear,

22   however, before I give my ruling, it now appears that

23   Charter has filed proofs of claim against certain of the

24   plaintiffs, not all of them, and the bar date has passed,

25   and counsel for Charter has said that those are the claims

1    it's going to file.  So it would seem to me that, on the

2    ripeness grounds, there's no reason to equitably subordinate

3    as to the other plaintiffs where there haven't been proofs

4    of claim filed.

5           MR. ROSS:  I concur, Your Honor, that's correct,

6    now the bar -- now that they said they're not going to file

7    late.

8           THE COURT:  Okay, let me go back to where I was

9    starting.  I have a Motion for judgment on the pleadings

10   with respect to Count VI in the adversary complaint, which

11   asserts a violation of the automatic stay in place under

12   Section 362(a) of the Bankruptcy Code.

13          The motion also seeks to have the Court dismiss

14   Count VII of the complaint, which alleges a claim that all

15   claims of Charter Communications, Inc. and its subsidiaries

16   and affiliates against the debtors should be equitably

17   subordinated, under 11 U.S.C. Section 510(c), to the claims

18   of all other creditors of those debtor plaintiffs.

19          The first aspect of the motion asserted that the

20   debtor/plaintiffs, as corporate entities, could not assert a

21   claim under Section 362(k) of the Bankruptcy Code, which

22   recognizes a specific statutory cause of action for

23   violation of the automatic stay set forth in Section 362(a)

24   of the Bankruptcy Code for individuals.  The motion assumed

25   that Section 362(k) was the basis for the cause of action,

1    which it conceivably could have, although the complaint

2    itself did not rely on Section 362(k) or refer to it.  The

3    Second Circuit has long recognized, however, that Section

4    362(k) is not the only remedy for a violation of the

5    automatic stay, and indeed it would be odd for Congress to

6    have a statutory stay and limit the remedy solely to

7    individuals.

8          Contrary to that logic, the Second Circuit held in

9    In re Chateaugay Corp., 920 F.2d 182, 186 through 187 (2nd

10   Cir. 1990), that there is a separate remedy for a violation

11   of the automatic stay in the Chapter 11 case -- or a 7 case,

12   for that matter -- of a corporate entity, and that that

13   remedy is one for contempt.  The court recognized that the

14   automatic stay has been analogized to a court order and,

15   consequently, the contempt power can be invoked for a stay

16   violation.

17         In addition, Section 105(a) of the Bankruptcy Code

18   provides that the court may issue any order, process, or

19   judgment that is necessary or appropriate to carry out the

20   provisions of this title.  Obviously, Section 362(a) of the

21   Bankruptcy Code is a provision of the Bankruptcy Code.

22   Indeed, in addition to the discharge, it has been recognized

23   as the most important provision of the Bankruptcy Code; so

24   Congress recognized a remedy in Section 105(a) for its

25   breach.

1          The reply to the objection, which made the

2    foregoing points, then states that (a) the plaintiffs are

3    precluded from bringing the claim based on the contempt

4    power and Section 105(a) because they don't cite contempt or

5    105(a).  But of course it is well recognized that Rule 8

6    does not require a claimant to set forth any legal theory or

7    statute justifying the relief sought on the facts alleged,

8    requiring only sufficient factual reference to show that the

9    claimant may be entitled to relief.  Newman v. Silver, 713

10   F.2d 1415 (2d Cir. 1983); and Tolle v. Carroll Touch, Inc.,

11   977 F.2d 1129, 1134 (7th Cir. 1992).

12          Clearly, as alleged in paragraphs 6 and 32, among

13   others, of the complaint, the complaint sets forth

14   sufficient facts to allege a breach of the automatic stay

15   and a right on a motion to dismiss basis for a remedy for

16   such breach.

17          The reply also argues (b) that such a remedy must

18   be pursued pursuant to a motion and not in an adversary

19   proceeding, relying upon bankruptcy rules which state which

20   matters are appropriate for an adversary proceeding and, by

21   inference, then, which matters are appropriate for a motion.

22          It is certainly true that one may bring the claim

23   for damages for breach of the automatic stay, as well as for

24   an award prohibiting continued breach of the automatic stay,

25   as a motion, given that Congress clearly wanted such

1   breaches to be dealt with promptly.  However, the adversary

2   proceeding format actually provides additional protections

3   to a defendant by incorporating the Part VII rules --

4   providing for the Part VII rules to apply, some of which

5   don't apply with respect to motions.

6          Moreover, the Court can direct the application of

7   not only the specific rules incorporated in Bankruptcy Rule

8   9014 as applicable to motions, but all the other Part VII

9   rules, as well, at any stage in the case.  As was pointed

10  out at oral argument, this has been frequently done where a

11  defendant was sued in an adversary proceeding for either

12  breach of the automatic stay or breach of the discharge, and

13  contended that the adversary proceeding should be dismissed

14  because it was entitled to the lesser protections of a party

15  at the wrong end of a motion.  And that's what I will do

16  here, incorporating the adversary proceeding rules for both

17  parties' benefit, including the defendants.

18         Lastly, (c), the reply to the objection contends

19  that the complaint should be dismissed because the complaint

20  asserts a right to declaratory relief, as well as relief

21  under Bankruptcy Rule 7001, and for simple damages for

22  violating the automatic stay.

23         As a corollary to the Newman v. Silver principle,

24  the fact that the debtors have sought a specific declaratory

25  judgment that the stay was violated is really neither here

1    nor there.  They've alleged that the stay was violated,

2    there's clearly a cause of action based on such an

3    allegation under the general contempt power, as well as

4    105(a), and that's how I will treat this complaint with

5    respect to this cause of action.

6            As I noted, the motion also seeks dismissal of the

7    equitable subordination cause of action asserted in the

8    seventh and last cause of action in the complaint.  The

9    motion doesn't really state the theory for that contention

10   other than to say that the Court lacks subject matter

11   jurisdiction with respect to such claim, based on the fact

12   that the cause of action seeks to equitably subordinate the

13   defendants' claims in this case to -- in this bankruptcy

14   case, that is, to the claims of the debtors' other

15   creditors, where at the time that the motion was filed the

16   defendants had not filed any proofs of claim, the bar date

17   not yet having passed.

18           The motion cited two cases primarily for this

19   proposition, In re BHS&B Holdings, LLC, 420 B.R. 112, 154

20   (Bankr. S.D.N.Y. 2009); and O'Connell v. Arthur Andersen,

21   383 B.R. 231, 276 (Bankr. S.D.N.Y. 2008).  In both of those

22   cases there was an equitable subordination claim, and the

23   court dismissed it because the bar date had passed and no

24   proof of claim had been filed.

25           The motion then cites certain cases out of context

1   or not on point for the general proposition that the

2   jurisdiction of the Court depends upon the state of things

3   at the time of action brought, quoting Grupo Dataflux v.

4   Atlas Global Group, LLP, 541 U.S. 567, 570 (2004), where the

5   non-moving party changed its citizenship after the case was

6   filed and argued that that cured the lack of jurisdiction, a

7   far cry from the facts here.  As are Lujan v. Defenders of

8   Wildlife; Chevron Corp. v. Donziger; and Davis v. Federal

9   Election Commission, also cited in the next paragraph.

10          As they must, the defendants who have now filed

11  proofs of claim recognize that as far as ripeness is

12  concerned the proposition that the jurisdiction of the Court

13  depends upon the state of things at the time of action

14  brought is an inaccurate proposition of law.  Indeed,

15  ripeness is determined based on the time that the Court is

16  asked to act, as a matter of timing.  Hargrave v. Vermont,

17  340 F.3d 27, 34 (2d Cir. 2003); American Motorists Insurance

18  Company v. United Furnace Company, 876 F.2d 293 Note 4 (2d

19  Cir. 1989); and Guarneri v. West, 518 F. Supp. 2d 514, 520

20  (W.D.N.Y. 2007).  See also Buckley v. Valeo, 424 U.S. 114 --

21  I'm sorry U.S. 1 and 114 through 118 (1976).

22          Now, in reply, instead defendants argue that the

23  debtors lack standing to bring the claim.  Notwithstanding

24  their acknowledgment, as they must, that of course equitable

25  subordination is a remedy that not only can be brought by

1    creditors, but also by debtors.  And, indeed, as recognized

2    in the case law, courts are deferential to debtors'

3    decisions to bring equitable subordination claims in

4    managing their docket, or debtors' choice to bring such

5    claims.  Clearly, the debtor has standing to bring the

6    claim.

7            Moreover, the complaint itself asserts that

8    Charter defendants wrongfully breached the automatic stay

9    based on the alleged termination of service to Windstream

10   customers as an attempt to collect on "prepetition debt owed

11   to Charter."  See paragraph 6 of the complaint.  Prepetition

12   debt is another word for claim.

13           So, now that the claims have been -- so, in light

14   of that and the general standing that debtors have to bring

15   such a complaint, the Court is easily guided by Judge

16   Lifland's ruling in In re Manhattan Investment Fund Ltd.,

17   310 B.R. 500, 513 (Bankr. S.D.N.Y. 2002), where he declined

18   to dismiss an equitable subordination claim where the bar

19   date had not yet passed and it was argued that no proof of

20   claim had been filed yet.  Of course, now we know that

21   proofs of claim were in fact filed, as one could have

22   anticipated in reading the complaint.

23           And so the motion is denied as to every defendant

24   that has filed a proof of claim.

25           As far as the objection to the motion's request

1    for sanctions, I will not grant that request given the

2    procedure outlined in Bankruptcy Rule 9011 and the conceded

3    failure of the debtors to follow that procedure as it would

4    be applicable here, which would be to have made the movant

5    aware of the problems with its motion and given the movant

6    an opportunity to withdraw the motion before seeking

7    sanctions.  That's not to say that this motion was one of

8    the weakest motions I've ever read, which it is.

9              So you can submit the order denying the motion on

10   behalf of the debtors.

11             MR. ROSS:  We will do so, Your Honor.

12             THE COURT:  All right.  So that leaves the dueling

13   summary judgment motions.

14             MR. ROSS:  Your Honor is correct and I think

15   that's an accurate phraseology, and I will look to the Court

16   for some guidance on how it wants to proceed.  And in many

17   respects their affirmative motion is just a restatement of

18   the opposition --

19             THE COURT:  Right.

20             MR. ROSS:  -- to our brief.  We're happy to start

21   off with ours, but it's whatever the Court would prefer.

22             THE COURT:  It's two sides of the same coin.  So

23   do you have any thoughts on it?

24             MR. HOCKETT:  Your Honor, no.  I'm okay with going

25   -- presenting them in any order that the debtor (sic) wants.

1    I did want to raise the point, though, that with respect to

2    Counts I through V, Charter has not consented to this Court

3    entering final orders of judgments and we have asked the

4    district court to remove the reference.  I want to just make

5    that clear on the record today, so we are asking that the

6    Court make findings and conclusions.

7              With that, we'll take them in any order you want

8    to.

9              THE COURT:  What is the status of the motion to

10   withdraw the reference?

11             MR. HOCKETT:  Fully briefed, not yet decided.  And

12   I --

13             THE COURT:  Okay.

14             MR. HOCKETT:  -- obviously can't tell you what the

15   district court is going to do or when they're going to do

16   it.

17             THE COURT:  Right.  Was argument scheduled or was

18   argument waived or --

19             MR. ROSS:  Argument was not waived.  Argument has

20   not been scheduled.  I looked at a recent one of these that

21   Judge Karas had done and that it took six to seven months

22   given his docket to get to hear it and then some months

23   after that for a decision.  So I think you are going to be

24   way ahead of the curve.

25             THE COURT:  Okay.  Well, he doesn't always have

1    oral argument, so --

2                MR. ROSS:  That's correct.

3                THE COURT:  -- but you have not gotten an

4    indication from his chambers whether there's any decision to

5    have oral argument or not.

6                MR. HOCKETT:  No, Your Honor.

7                THE COURT:  Okay, all right.  Well, why don't we

8    then proceed with the debtors' motion.  And I guess what we

9    should do -- I mean, as far as both motions are concerned,

10   obviously -- well, I believe at least that they really are

11   two sides of the same coin.  I don't think there's anything

12   unique in either of them, but you can let me know if you

13   think otherwise.  I mean, I think in proceeding with the

14   debtors' motion, as a matter of efficiency, we're probably

15   also dealing with the flipside, unless there's something

16   unique that you want to tell me on the Charter motion.

17               MR. HOCKETT:  No.  That's fine, Your Honor.  We're

18   fine with that.

19               THE COURT:  Okay.

20               MR. ROSS:  So, Your Honor, I'm going to start off

21   with a brief recitation of what we believe are undisputed,

22   undisputable facts and I will make a couple comments along

23   the way as to the ones that the other side might want to

24   comment on.

25               But these Chapter 11 cases aren't the result --

1   are the result of an adverse court decision.  But for that

2   decision, we wouldn't be here, the Court knows that.  This

3   is -- the Chapter 11 filings seek a balance sheet

4   restructuring and are not precipitated by problems with the

5   operations of the company.  The Court earlier today made

6   that exact same comment in connection with an earlier

7   motion, that this is a viable company.

8                As one of our witnesses testified that's gone

9   unrebutted, Windstream was not in any material way at risk

10  of not delivering services to its customers or going out of

11  business.  Indeed, the Court said that exact same thing at

12  the TRO hearing.

13               So what happened?  Charter was aware that

14  Windstream would be operating, quote, "business as usual

15  notwithstanding Chapter 11 and would be BAU," meaning

16  business as usual, "for some time."  And that is reading

17  from an email internal to Charter.

18               Charter's Senior Director of Marketing told his

19  colleagues that the, quote, Chapter 11 filing doesn't mean

20  they won't "reorg and stay in business."  Again, reading

21  from an internal email, not disputable.

22               Charter's Director of National Carrier Sales told

23  its management that Windstream, quote, "does have funding to

24  continue normal operations while it restructures," close

25  quote.

1          All these are emails internal of Charter, can't be
2   disputed.
3          Charter's head of marketing ordered a marketing
4   campaign, quote, "to leverage this situation," referring to
5   the Windstream bankruptcy.
6          Charter developed a plan to mail out an
7   advertisement to consumers in states in which they competed
8   with Windstream.  They brought in an outside firm called
9   Rapp to develop the mailer.  Charter provided Rapp with a
10  template for a previous campaign against Google when Google
11  was in fact going out of business.
12         Charter told Rapp, according to Rapp, quote, "the
13  objective was to attract new customers to switch to Spectrum
14  and the key message was around a Chapter 11 and specifically
15  around creating some uncertainty around that," close quote.
16         Again, can't dispute this, these are from emails.
17         Charter then, as the Court knows, intentionally
18  designed the envelope to look like it was coming from
19  Windstream.  The envelope and the mailing inside the
20  envelope are in evidence and the Court knows them well.  I'm
21  not going to comment on all the elements of that that were
22  false.
23         In putting together that piece, however, Charter's
24  head of marketing recognized, quote, "While they" --
25  Windstream -- "are in bankruptcy, customers may be confused

1    about their services," close quote.

2            Charter's head of marketing then testified at

3    deposition, quote, "The goal of this advertisement was to

4    capitalize on that confusion" -- I'm sorry, the question she

5    asked was, "The goal of this advertisement was to capitalize

6    on that confusion?"  And she answered, "I would expect

7    that."

8            Rapp then testified at deposition -- this is the

9    outside marketing agency -- that having Internet service

10   available was, quote, "the lifeblood of small businesses,"

11   and the intention of the advertisement was "to create

12   uncertainty as to whether they would have that service."

13           Again, these are undisputable.

14           And the false advertisement worked.  We know that

15   209 Windstream customers called about the advertisement.

16   Now, the other side -- and we'll flag this fact for Your

17   Honor -- the other side objects to this fact as being not

18   compliant with the best evidence rule and there is an

19   argument over that, but I think it's a frivolous argument.

20           Those calls, the transcripts of those calls and

21   the audio tapes, which we would make available to the Court,

22   if the Court wants to review them in camera, all express the

23   view that Windstream must be going out of business.

24           Now, the false advertisement, which the Court has

25   seen, had at the bottom a unique and dedicated phone number,

1    one of these 1-800 numbers, except it was, Your Honor, 1-855

2    something, and only people -- and that was only used on that

3    flier, no place else, so that it could specifically track

4    the calls.

5              Charter got 3,721 calls to that number, that

6    unique number.  This is from their internal records, not

7    disputable.  Also from that same internal records, not

8    disputable, 663 of those calls purchased services from

9    Charter.

10             Now, that advertisement, Your Honor, also had a

11   provision offering to buy back Windstream customers, buy out

12   Windstream customers if they moved to Charter.  And, again,

13   internal tracking at Charter, which is indisputable, said

14   that at least 20 Windstream customers took advantage of that

15   offer.  So there we have actual evidence of a causal link

16   between the ad and lost customers.

17             Windstream did a damage calculation through an

18   expert, damages based on lost profits of between 3.2 and 5.1

19   million.  Windstream also has incurred correctional

20   promotional advertisement in the amount of approximately 8.8

21   million.  The Court has also -- that's in addition, Your

22   Honor, to the correctional advertising the Court ordered

23   back in May.

24             In addition, Windstream had to give up contract

25   concessions.  So when the customer calls up you said, oh,

1　well, okay, I'm sorry about that, we apologize, we want to

2　keep you serviced, we give you some sort of discount, and

3　it's done that with respect to the disconnects.

4　　　　　And, more importantly, the Windstream brand has

5　suffered serious damage to its -- and a loss of goodwill

6　here that applies across the entire group of debtors and the

7　entire corporate structure, because they all use, as the

8　testimony showed, in one way or another the Windstream

9　brand.

10　　　　　So that brings us to the actual argument, Your

11　Honor.  And I don't know any better way to do this than

12　cause of action by cause of action.  Unless the Court tells

13　me to do something else, I'll just start in.

14　　　　　False advertising requires us to prove five

15　elements for this summary judgment motion:  literal or

16　implied falseness, materiality, interstate commerce, and

17　causal injury, that the advertisement caused some sort of

18　likely injury, in other words.  That's laid out by the

19　Second Circuit.

20　　　　　The Court is familiar with the test from its TRO

21　and PI hearings.  The Court there found that this was a case

22　of literal falsity; nothing has changed in respect to that.

23　There's no new evidence other than the clear intent, that it

24　was intended to deceive and it had that effect.

25　　　　　Now, there are a number of defenses that are

1    raised by Charter to this finding of literal falsity.  And,

2    in no particular order, I'll start off with their defense

3    that you cannot find literal falsity if the statement, the

4    alleged false statement is ambiguous, and that's a correct

5    statement of the law from the Second Circuit.  Their basis

6    for saying that this was ambiguous was a consumer survey

7    done by Dr. Ostberg, which we've objected to and have filed

8    a motion, a Daubert motion on.  It is beyond just a Daubert

9    motion, there are a number of problems related to the case

10   management order as well.

11           But you don't have to resolve that to deal with

12   this defense of ambiguity.  The courts have uniformly said

13   you cannot use a consumer survey to introduce ambiguity into

14   a literally false statement or else you would read out of

15   the Lanham Act this notion of false advertising.

16           And the one case that they rely upon is a case

17   involving some yogurt companies, Dannon Yogurt, I'll just

18   refer to it as the Dannon Yogurt case, they claim that says

19   you can allow a survey, defendant can bring in a survey and

20   introduce it and say that creates an ambiguity.  That's not

21   what happened in that court case.  In that case, the

22   plaintiff introduced a survey, the court then said that's an

23   admission of ambiguity on your part.

24           So it's not what is going on here; we have no

25   survey, we don't think surveys are relevant.  The appellate

1    courts have uniformly held -- and we cite these cases to

2    Your Honor -- that you cannot use a survey for that purpose.

3    And so, therefore, the ambiguity defense is gone as a matter

4    of law.  There's no facts involved, just as a matter of law

5    it's gone.

6         The second defense they have is that this is a

7    "true fact".  That's from their brief, "true fact".  I don't

8    know if that's a coined term from somewhere or not but I

9    believe what it means based on the arguments that they make

10   is that what they were saying wasn't false.  It was true in

11   -- because there was risk and uncertainty surrounding a

12   bankruptcy, any bankruptcy.  And the problem with that

13   argument is it flies in the face of the way the Second

14   Circuit says you have to handle a false advertising case.

15   The Second Circuit in Time Warner and Dwight & Church --

16   Church & Dwight say you have to look at the advertisement in

17   context in its whole.  They have cherry-picked two words out

18   of the advertisement, "risk" and "uncertainty," and have

19   ignored all the others.  The Court addressed this issue at

20   the TRO hearing.  It correctly said I've got to look at it

21   in context.  I've got to look at all the words.  I've got to

22   look at the envelope.  That was one of the interesting

23   things about the survey, by the way.  The survey didn't

24   bother to show the respondents the envelope that the mailer

25   came in.

1          But the Court came to the conclusion then that

2    when you look at everything and understand the context, this

3    is literally false because you come away with the impression

4    that they're going to stop service and they're going out of

5    business.  And that's not true and it has never been true.

6          And therefore, this can't be a true fact.  That

7    defense simply falls by the wayside.

8          THE COURT:  But what about the debtors' disclosure

9    of the possible risk of going into Chapter 7 as one of the

10   risks --

11         MR. ROSS:  So -- yes, Your Honor.

12         THE COURT:  in the bankruptcy case?

13         MR. ROSS:  That these were -- that the public

14   statements somehow were allowed -- there's no dispute over

15   this fact.  They didn't see any of those.

16         THE COURT:  They who?

17         MR. ROSS:  The Charter people didn't read any of

18   those.  They say quite candidly, we got some sort of

19   intelligence report from a third party.  And, by the way, in

20   that intelligence report, it noted that Windstream had

21   obtained debtor-in-possession financing and was continuing

22   business.  But that was the basis for this advertisement

23   that -- not any of the public statements.  But the public

24   statements don't matter and for multiple reasons the Court's

25   already addressed this in the TRO.  So excuse me if I just

1    pare it back to Your Honor.

2              First, it's the wrong audience.  Those statements

3    are directed to sophisticated investors not -- or consumers

4    in the -- every day consumers of these types of services.

5    So that's the first issue.

6              The second issue is in none of those statements is

7    there anything that you could imply would indicate that

8    they're about to stop providing service.  To the contrary,

9    the notice -- one of the things they talk about is the

10   notice of commencement that's required to send out at the

11   beginning of a bankruptcy.  And, Your Honor, in the very top

12   of the notice of commencement in big bold writing, so that

13   nobody could ever possibly mistake it, it says -- and I'll

14   just quote it here:  "This does not affect your current

15   services with Windstream."

16             No possible way anyone notwithstanding the words

17   "risk" and "uncertainty" in the formality of the document

18   could somebody have thought that they were about to lose

19   their service based on that.

20             Now that is true with respect to all of these

21   public statements that they point to, that you simply do not

22   come away with the opinion that you're about to have your

23   service cut off.  And indeed, in all of them, there are

24   statements indicating why that is likely not to happen, such

25   as the granting of the first day motions on an interim

1    relief basis, the obtaining of DIP financing, the fact that

2    it's a company that they're going into bankruptcy only

3    because of this court case.  All those things are also

4    there, none of which are repeated in the advertisement.  The

5    advertisement purposefully takes out of context this risk

6    and uncertainty to create as the designer said "a mood of

7    uncertainty that service might get cut off" which was not

8    going to happen.  And it includes none of the countervailing

9    facts.

10        So the fourth defense they have with respect to it

11   not being a little falsity is that somehow it's an opinion

12   or a prediction.  The Courts say predictions are treated as

13   opinions so it's really the same thing but their wording

14   goes back and forth depending on who's writing their brief.

15        And this is an easy one because the Courts have

16   said a statement of fact is one that's capable of being

17   verified, of being tested in some empirical way, whereas an

18   opinion expresses a belief that is incapable of being

19   tested.

20        Now it can't be an opinion for the simple reason

21   that Charter itself never ever believed that Windstream was

22   going out of business.  Their e-mails after e-mails say,

23   hey, guys, they got their debtor-in-possession funding.

24   They're going to continue BAU, business as usual.  Another

25   one that says, hey, they're reorging -- they're reorg -- a

1    reorg.  That means they're going to stay in business.

2          They never ever believed themselves that this was

3    going to result in Windstream going out of business.

4    Therefore, it can't be an opinion.  An opinion requires a

5    belief being expressed by the proponent of the statement.

6    This is a fact that they're putting out into the public

7    domain, the fact that they're going to lose service.  And

8    that's something that's capable of being tested.  Are they

9    going to lose service?  Yes or no?  Well, the answer was --

10   and everybody knew it was, no.

11         So those are the four defenses they have to the

12   falsity element of the cause of action.  And those are also

13   the four arguments, I believe, they make with respect to why

14   they think they should get summary judgment on falsity.

15         THE COURT:  I don't -- I'm sorry.  I have three --

16         MR. ROSS:  So I made ambiguity --

17         THE COURT:  Ambiguity, not false and opinion.

18         MR. ROSS:  And public statements.

19         THE COURT:  Oh, okay.  But that's --

20         MR. ROSS:  Some of these are easily conflated into

21   the same thing.

22         THE COURT:  Okay.

23         MR. ROSS:  So that's element 1 of the cause of

24   action.  It is literally false.

25         The Second Circuit says if you make a finding of

1    literal falsity then injury and causation are presumed.

2    That presumption continues to be in effect post-eBay v.

3    MercExchange because the Second Circuit has said so.  They

4    recently in 2016, I believe it was, repeated this

5    presumption.  That's way past the eBay case.  So that

6    presumption exists with respect to a literal falsity here.

7    I can talk about those in a minute.  I will.  But

8    materiality is not presumed so let me focus on that.

9         What the Second Circuit says about materiality is

10   this.  And again, this is a legal test that cannot be

11   debated.  They put in the wrong test in multiple places.

12   They put in different tests.  But I'll just quote what the

13   test is.  That the false statement "misrepresented an

14   inherent quality or characteristic of the product" such that

15   it had the capacity to adversely affect the Plaintiffs'

16   business by influencing consumer purchasing decisions.

17   That's from Church & Dwight.  And in that same case, any

18   evidence that a plaintiff has been injured satisfies the

19   materiality element.

20        I would submit to the Court that as a matter of

21   simple logic, an allegation that a service provider is going

22   to stop providing service to its consumers is material to

23   the consumer's purchasing decision.

24        But we don't need to stop there.  Remember the

25   dedicated phone number they put into the ad.  We had 3700

1    people call that phone number and 663 ended up purchasing

2    from Charter.  They have at least 20 buyouts of Windstream

3    customers of their contracts with Windstream so that they

4    could start using Charter's services.

5            And they had over 4000 ports of telephone numbers

6    to Charter from Windstream.  So those were all actual losses

7    of business that are tied to that advertisement and

8    therefore that satisfies materiality even if the Court

9    thought that going out of business was not a material

10    allegation.

11           Now they make four defenses to this, Your Honor.

12    The first is simply frivolous.  And I'm sorry to have to

13    keep saying that but at one point when my colleagues, with

14    too much time on their hands, said you know, if you break

15    down their motion and their opposition and there's 43

16    arguments, sub-arguments and sub-subarguments.  And that's

17    true.  Anything they could have thought of, they put in

18    here.  And the first argument in defense here is that this

19    advertisement, the false advertisement they put out was the

20    worst marketing campaign of the year for them.  That it

21    didn't do well.  It didn't bring in enough customers.  It

22    didn't steal enough customers from Windstream compared to

23    other ads.  That is completely irrelevant to this case, let

24    alone materiality.

25           We do have no obligation to show that they did a

1    brilliant job with their false statement.  All we have to do

2    is show that the false allegation was material to consumer's

3    decisions.

4         The second argument they make is that they say one

5    of their many experts did something called a "time series

6    study."  Well, I went back and read that and there's no

7    mention at all of materiality in there.  There's no opinion

8    on materiality rendered by that expert.  What had happened

9    here is counsel has drawn a conclusion from a time series

10   study that goes to damages.  And that's not evidence of

11   anything.

12        The third defense they make -- and again, I don't

13   understand this defense.  So I can only say that -- I can

14   only repeat it.  They say that generalized sales evidence is

15   insufficient to show materiality.  And they cite a case for

16   that proposition, maybe several.  And fundamentally, what

17   happens in their cases that they cite to Your Honor is that

18   they show profits went up or down for the company.  And I

19   would agree with that.  That's evidence of nothing.

20        Our evidence here is that the ad had a 1-855

21   number that would dedicate it to this promotion and was

22   specifically tracked for this promotion.  And 663 bought on

23   that telephone line.  And this ad had a buyback feature and

24   at least 20 people bought back.  Our evidence is not

25   generalized sales evidence.  It's very specific evidence

1    tied to the very advertisement at issue.  That proves

2    injury; that proves materiality.

3          Now the fourth defense they have is that the call

4    transcripts are inadmissible evidence.  They are admissible.

5    I'm sorry.  Let me back up because I've got to be careful

6    how they phrase this here.  They say the call logs -- this

7    is where our people who receive telephone calls from

8    consumers wrote things down -- are inadmissible hearsay --

9    triple hearsay.  What they fail to point out is we did not

10   rely upon the logs for this motion.  So that's an

11   irrelevancy that they just threw in.

12         They then separately say that the call transcripts

13   which are certified transcripts are inadmissible under the

14   best evidence rule.  And they say we should use the audio

15   transcripts --the audio recordings instead.  The reason we

16   use transcripts is because the audio recordings have the

17   names of customers, their credit card information, their

18   addresses, their account numbers and other personal

19   information that's irrelevant in this case that cannot be

20   edited out of an audio recording.

21         This case comes up all the time, unfortunately, in

22   crash -- airplane crash cases, Your Honor.  There's a case

23   from the Western District of New York I might refer the

24   Court to.  And what happens is the FAA recovers the black

25   box and they do a certified transcript but they edit out of

1    the transcript all the stuff that nobody wants to hear,

2    people dying.  And the Courts face this problem on a regular

3    basis.  The Western District of New York, in a case cited by

4    Charter, called In re Air Crash Near Clarence Center, New

5    York, the Court said, look, there's an established procedure

6    here.  If you complain about the transcript, submit the

7    audio recording in camera to the Court and we'll decide

8    whether the transcripts are accurate.  And we offered that

9    at the TRO hearing.  We offer it again today.  If they're

10   contesting that the transcripts are inaccurate, that we've

11   dummied them up somehow, we'll give the Court in camera the

12   audio recordings and let the Court listen to them and

13   determine whether the transcripts are fair.  But we don't --

14   we think it's inappropriate to play in open court

15   information from an audio in which people, consumers, are

16   giving out credit card information, account numbers,

17   addresses, et cetera.  So we think that's a completely

18   inappropriate objection.  But the reality is, for this

19   summary judgment motion, you don't have to decide it because

20   it only goes to materiality and the proof of the 663

21   purchases and the 20 buyouts is sufficient to get you to

22   materiality.  And there's no dispute on that whatsoever.  No

23   objection.  No factual dispute because it's from their

24   internal records then produced to us.  So that's the second

25   element, materiality.

1          The third element, interstate commerce, has been
2    conceded of this motion so the Court doesn't have to reach
3    that.
4          The fourth -- some Courts say the fourth and fifth
5    are causation and injury.  Both of them are presumed.
6          But they make -- on a chance that you will not
7    accept the presumption, they make three defenses.  First,
8    they say that the Ostberg survey, which we've already talked
9    about -- that the Ostberg survey indicates that there could
10   not have been any causation here because we sent out a
11   letter at the exact same time announcing the commencement of
12   the proceeding and therefore people weren't sure what was
13   going on thanks to our notice of commencement.  The Ostberg
14   survey's very heavily flawed.  For example, it only has
15   three -- the respondents include three percent Windstream
16   customers.  So, on its face, it's worthless.
17         But the point is, they never asked whether or not
18   -- what is your view of this advertisement.  They asked a
19   bunch of complicated questions that really don't go to
20   anything.  And the bottom line was 61 percent were confused
21   by their advertisement.  61.4 percent confused by their
22   advertisement.  That's three times the number of people --
23   of consumers who saw the commencement in their consumer
24   survey group who thought there was something odd about that.
25         So that's the first defense they have.

1          The second defense they have goes to something

2     called call volume.  They say you only got 209 calls about

3     the advertisement, but the KKC, the -- KKC is

4          UNIDENTIFIED SPEAKER:  KCC.  Claims noticing

5     agent.

6          MR. ROSS:  -- claims noticing agent for this

7     bankruptcy got more calls than that based on the notice of

8     commencement.  Therefore, the notice of commencement must

9     have been more confusing.  That's illogical.  There's no

10    logic there to tell us.  People got it.  They were owed

11    money, a rebate.  They overpaid.  They had underpaid.  They

12    call up KCC to figure out how they solve that problem

13    because that's what the notice of commencement said to them.

14         It's irrelevant to whether or not the people who

15    received the advertisement were confused.

16         And then their third defense is, well, to the

17    extent that you're relying on the calls for proof of injury

18    or causation, they're inadmissible.  We already discussed

19    that.  The reality is that there's absolute -- one -- you

20    should give us the presumption.  The Second Circuit entitles

21    us to (indiscernible) causation and injury.  But even if you

22    don't, the proof that 663 people called that dedicated

23    number and bought services from Charter and that you had 20

24    buyouts under that offer of Windstream customers, that is

25    sufficient proof to show causation and injury.

1            THE COURT:  I am having a hard time finding

2    anything in the case law as to what is sufficient to rebut

3    the presumption of injury.

4            MR. ROSS:  That's because there are -- I do a lot

5    of work in this field, Your Honor.  There are virtually no

6    cases that are found that (indiscernible) consideration to

7    rebut that presumption.  It's not an irrebuttable

8    presumption.  But the reality is that there's very little

9    evidence they can come forward with.  How do you come

10   forward and say those 662 customers who bought --

11           THE COURT:  Oh, no.  I'm talking generally.  You

12   know, is it -- I have not found cases that say you need a

13   high quantum of evidence to rebut, it's an easily rebuttable

14   presumption.  You know, is there anything along those lines

15   that either side's aware of?

16           MR. ROSS:  So I haven't looked for that specific

17   issue but my recollection is that it simply --

18           UNIDENTIFIED SPEAKER:  Until an actual confusion

19   is shown, it's almost impossible to rebut.

20           MR. ROSS:  Oh, I'm sorry.  Okay.  So let's -- let

21   me back up, Your Honor.  It is my fault.

22           The case law says it is a rebuttable presumption

23   unless there's evidence of actual confusion and that it's

24   irrebuttable.  And here, we have the telephone calls which

25   show actual confusion.

1          But if you set aside -- for example, if Your Honor

2     said, well, those are inadmissible.  I'm not going to

3     consider them.  The standard would be more reasonable than

4     not.  The same standard -- the same presumption that you

5     would apply as a factfinder at a trial of a civil action.

6     And there's no way you can rebut this fact that 662

7     people -- 663 people called the unique telephone number and

8     bought their services.  That's tied exactly to the flyer

9     that went out.  That number wasn't used any place except on

10    the flyer.  People would not have gotten that phone number

11    except off of the flyer.  And I don't see how you rebut

12    that.  I think that's impossible to rebut.

13         So that's the four elements of the cause of action

14    for false advertising.  The parties agree that the state

15    causes of action all -- various states -- cases in each of

16    those states say that a violation of the Lanham Act would be

17    sufficient to constitute an unfair trade practice under

18    those statutes.  So that takes care of Counts I through IV.

19         THE COURT:  Before we move on, the briefing

20    alleges that the defendants waived their right with respect

21    to the tapes as opposed to the transcript.  So are you

22    waiving that argument or is that still --

23         MR. ROSS:  No.  I think they did exactly that.

24    They came into this court at the TRO hearing and insisted

25    that we produce certified transcripts.  And the reason they

1    did that is because they knew that we didn't have time to do

2    them all yet.  We had produced only a sampling of them.  And

3    so we went out and we paid people to transcribe them and to

4    certify them under oath.  And we produced those.  Those

5    redact out the personal identifiable information and

6    confidential information.  We can't do that with the

7    audiotapes.  We just don't -- the technology doesn't exist

8    for that.

9          THE COURT:  Right.  But I thought you were saying

10   that the defendants had the chance to get the audiotapes and

11   they waived it.  Am I missing that?

12         MR. ROSS:  So what happened is this, is we told

13   them we would -- they had a very broad request for all

14   audiotapes from January 1st on about everything in the

15   world, not limited to this.  We said what we're going to do

16   -- that's overbroad; we object.  We will produce you

17   certified transcripts of every single call that we rely upon

18   or intend to rely upon.  And we produced -- so we sent that

19   e-mail.  Counsel said back, are they certified transcripts.

20   We said, of course they're certified.  They said, okay,

21   that's all right then.  It is our position that that

22   indicates an acceptance of the certified transcripts in lieu

23   of the audiotapes.  But, as I said before, under the

24   procedures that courts commonly use, if they say we don't

25   believe your certified transcripts, we think that you're

1    lying to us, what Courts do there is they say give me the

2    audiotapes, I'll listen, I'll see if they're correct, the

3    certified transcripts.  And that way the information of

4    confidential information is protected.  I mean, they

5    candidly told us what they want to do is get the names of

6    the customers off the tapes and call them up.  We're not

7    going to allow that to happen.  That's inappropriate.

8              And so, this is a perfectly reasonable -- it can

9    be -- if the Court wants to listen to these in camera, we've

10   got them here.  We've got them on a drive, I think.  We'll

11   give them to the Court right now.  And the Court can say,

12   oh, yeah, they're accurately transcribed.  And oh, yeah, I

13   hear all this confidential information coming out.  There's

14   no way that should be allowed in court.

15             This is just a form over function objection.  If

16   the transcripts accurately say what was recorded --

17             THE COURT:  No.  I was just focusing on the waiver

18   point.  So the argument is that during the discovery phase,

19   the tapes themselves were sought in response, Plaintiff said

20   we'll provide you transcripts.  The answer was, well, are

21   they certified and you said yes.  And then there was no

22   further request other than to get the transcripts?  Is that

23   the --

24             MR. ROSS:  No -- and we did produce the

25   transcripts.

1          THE COURT:  And there was no further request for

2     tapes?

3          MR. ROSS:  No further request.  No motion filed

4     with the court, nothing.

5          THE COURT:  Okay.

6          MR. ROSS:  So unless there's other questions on

7     Counts I through IV, I'll move on to breach of contract,

8     Count V.

9          THE COURT:  Okay.

10         MR. ROSS:  There are four elements to the cause of

11    action here under New York law:  the existence of the

12    agreement.  The agreement is the VAR.  There's no dispute

13    that there is a contract.

14         The second element is adequate performance.  The

15    third element is breach of the contract.  And the fourth

16    element is injury.

17         There's no dispute that we have a contract.  They

18    do raise a defense saying that only Windstream Services is a

19    party to that contract.  And all you got to do is read the

20    first sentence of the contract to see that they're wrong,

21    like a lot of what they're saying in their briefs.  It's

22    Windstream Services and all of its affiliates.  All the

23    debtors here are parties.

24         We put in testimony from one of our senior people

25    saying that we've performed under the contract in all

1  respects.  They contest that in their brief but don't

2  explain how we didn't perform.

3          Finally, there's the question of breach.  And

4  their defense is, you know what, we -- well, it's a whole

5  bunch of things.  It was inadvertent.  It was the weather.

6  We didn't do it on purpose.  Nobody had instructions to make

7  that cutoff.  We didn't know who your people were, et

8  cetera, et cetera, et cetera.  None of those are defenses to

9  a breach of contract.  They were required to give us 30 days

10  notice before they cut anybody off so we have an opportunity

11  to cure any defect, and it's undisputed that they did not do

12  that.  So that's breach of contract.

13          And it feeds immediately into the violation of the

14  automatic stay.  So the automatic stay includes that they

15  shut down services to us, that they breached the VAR.

16  Again, they have defenses such as no intentionality; we

17  didn't help them identify who their customers are; took them

18  a long time to identify who the customers are.  And none of

19  those are defenses.  It's -- I mean, I don't know if the

20  bankruptcy cases say this but it's like a strict liability

21  defense.  It's like -- you run the stop sign and it doesn't

22  care that you didn't see the stop sign, doesn't care the sun

23  was in your eyes, doesn't care that it's a new stop sign.

24  Maybe those are arguments with respect to prosecutorial

25  discretion but it's a strict liability defense.

1          Now the violation of the automatic stay is beyond

2     the breach of the contract, Your Honor.  It also includes

3     the damage to the estate done by the false advertising.  And

4     if the Court should find liability, which is all we're

5     asking for here in our summary judgment motion on -- for

6     false advertising then, again, there are no defenses to that

7     and therefore, it should also constitute a violation of the

8     automatic stay.

9          THE COURT:  Well, as with all of these, then, with

10    the automatic stay cause of action, at this point you're

11    just looking for summary judgment as to whether the stay was

12    violated not as to whether there's a finding of contempt for

13    violation?

14          MR. ROSS:  Yes, Your Honor.

15          THE COURT:  Because certain of these defenses

16    would pertain to the contempt issue.

17          MR. ROSS:  Absolutely, Your Honor.

18          THE COURT:  So it's just breach.

19          MR. ROSS:  And let me just - if we weren't clear.

20    Our motion for summary judgment is on liability only, on all

21    --

22          THE COURT:  Right.

23          MR. ROSS:  -- seven counts.

24          THE COURT:  Right.

25          MR. ROSS:  We recognize that there's genuine

1    disputes of fact on the quantum of damages as opposed to the

2    fact of injury and we'll try that.

3            THE COURT:  Well, the thing is, it -- the claim

4    seeks damages for breach of the automatic stay.  We've made

5    it crystal clear that's for contempt.  The -- you can't have

6    a declaration if the stay hasn't been breached.  I've

7    already found that, I think, as part of the injunction.  But

8    as far as a contempt cause of action, I think that that

9    cause of action has an element which is breach.  But it has

10   more than that.

11           MR. ROSS:  Agreed -- you're absolutely right, Your

12   Honor, and that's why we haven't brought that contempt

13   motion yet.  And --

14           THE COURT:  Okay.  So this would just be for

15   partial summary judgment on this claim as to breach.  It's a

16   little different than saying as to liability because

17   liability, I understand, would apply under the Lanham Act

18   and state law equivalents, and then damages because -- the

19   quantum of damages.  But as to the stay and, frankly, as to

20   equitable subordination, too, if the cause of action is

21   really for contempt and the cause of action is equitable

22   subordination, there are elements to that cause of action

23   that go beyond breach or wrongful conduct.  To the cause of

24   action, i.e., you couldn't have a judgment as to liability

25   with damages to be decided because for equitable

1    subordination, damages is part of the liability finding.

2    It's one of the elements of the cause of action.  Similarly,

3    with contempt, there are -- it's not strict liability.  It's

4    strict liability as to breach of the automatic stay, but if

5    you're going to find someone liable for damages for contempt

6    then that's all one ball of wax, which includes, you know,

7    was there fair ground to think that you weren't violating

8    the stay.

9            MR. ROSS:  We agree with everything the Court just

10   said and I guess it's better to be said that we're looking

11   for a finding.

12           Now the Court said it had already found at the TRO

13   --

14           THE COURT:  Well, I don't remember.  I don't

15   remember --

16           MR. ROSS:  You did, but it was limited to the

17   breach and the VAR.  We're now --

18           THE COURT:  Yes.

19           MR. ROSS:  -- looking for a finding with

20   respect --

21           THE COURT:  As to other things.

22           MR. ROSS:  -- to false advertising.

23           THE COURT:  Right.

24           MR. ROSS:  -- and everything else.

25           THE COURT:  Okay.

1          MR. ROSS:  But I certainly accept that that's the

2     better phraseology that we're looking for a finding.

3          THE COURT:  Okay.  Very well.

4          MR. ROSS:  And that just leaves Count VII,

5     equitable subordination.  You know, the acts that we accuse

6     them of being inequitable on are false advertising,

7     violation of the automatic stay and intentionally setting

8     out to deceive our customers to the damage of our goodwill

9     and our brand.  I think all of those, if found to be by the

10    Court, would be inequitable conduct.

11         THE COURT:  So again, what you're looking for here

12    is partial summary judgment as to that element of the

13    equitable subordination --

14         MR. ROSS:  Yes, sir.

15         THE COURT:  -- cause of action.

16         MR. ROSS:  Yes, Your Honor.

17         THE COURT:  Okay.  Okay.

18         MR. ROSS:  So that takes us through our summary

19    judgment motion.  And I don't know whether you want them to

20    go through their summary judgment now but Your Honor can

21    tell us what to do next.

22         THE COURT:  No.  I think I should hear the

23    defendants' response.  I have to tell you, though.  I have

24    to take a call at 1 that will last about an hour.  So I'm

25    not going to cut you off at, you know, 3 of 1, but if you

1    want to take a lunch break and then come back at 2, so you

2    have your whole presentation in one fell swoop as opposed to

3    being interrupted -- I don't know how long your

4    presentation's going to be.

5              MR. NEPPLE:  Yeah, Judge.  It's going to be

6    shorter than his.

7              THE COURT:  All right.  Well, do you think you'll

8    be done by half an hour from now?

9              MR. NEPPLE:  No.  I don't -- it's going to be

10   longer than that.

11             THE COURT:  All right.  So why don't we take a

12   lunch break --

13             MR. NEPPLE:  Okay.

14             THE COURT:  -- and come back at 2.

15             MR. NEPPLE:  Thanks, Judge.

16             THE COURT:  I just have to take this call.  So --

17             MR. ROSS:  Judge, okay if we leave our materials

18   here?

19             THE COURT:  Yeah.  I wouldn't leave your computers

20   here because the courtroom is open for anyone in the

21   courthouse but certainly can leave your papers.

22        (Recess from 12:27 p.m. until 2:06 p.m.)

23             THE CLERK:  All rise.

24             THE COURT:  Please be seated.  Okay.  Good

25   afternoon.  We're back on the record in Windstream Holdings,

1    Inc., et al., v. Charter Communications, Inc. and Charter

2    Communications Operating LLC.  I think we were going to have

3    the argument by Charter.

4            MR. NEPPLE:  Thank you, Judge.  My name is Mike

5    Nepple.  I'm with Thompson Coburn in St. Louis and I

6    represent the two Charter entities or one of the attorneys

7    that does that.

8            To quote one of my dad's favorite entertainers,

9    Paul Harvey:  "And now for the rest of the story."

10           I'd like to go through a few e-mails first because

11   Mr. Ross' presentation made it sound like Charter

12   intentionally tried to confuse the customers.  I even wrote

13   that down a couple times.  Intentionally tried to confuse.

14   And he quoted parts of e-mails.  And he talked about RAPP

15   which is the entity that helped Charter create the envelope

16   and the advertisement.

17           I took the deposition of Mr. McGuire from RAPP and

18   he was asked the following questions:

19       "Q   And nobody at Charter ever told you that you, in

20   fact, could say things like 'going away'?

21       "A   That's correct.

22       "Q   Did anybody at Charter ever suggest to you that

23   you can suggest that Windstream was going away?

24       "A   No."

25           Exhibit 51, an e-mail that's in the record from

1    Jennifer Smith:

2              "Message about what the advertisement should look

3    like:  Tone to be consistent with Google but we cannot say

4    things like 'abandon' or 'going away'."

5              Also:

6              "Windstream has declared Chapter 11 but that

7    doesn't mean they won't reorg to stay in business."

8              So not only was Charter aware of what the rules

9    were, Charter took steps to follow those rules and Charter

10   told the entity that made the envelope and helped with the

11   advertisement of those rules.  So clear that one up right

12   now.

13             I think the Court was concerned about the

14   transcript issue.  And again, I took notes and if Mr. Ross

15   disagrees with what I wrote down, he can tell me.  But

16   here's what really happened with respect to the transcripts.

17             In April, we requested transcripts.  And Mr.

18   Kingston, who's sitting over there, my partner, said "Am I

19   getting certified transcripts?"  "Yes."  "Understood.  Thank

20   you."

21             What Mr. Ross told the Court this morning is

22   "Okay.  That's all right then."

23             That's not what happened.  In June, Charter, and

24   it's in the record, Exhibit 33, Request 43, specifically

25   asked for transcripts that contain two words, "Spectrum" and

1    "Charter". And we did not get those. We asked for them.

2    Mr. Ross said, oh, well, you know, that's got credit card

3    information and that's got names and they might want to talk

4    to them. Well, there's a protective order in this case like

5    there's a protective order in any case. Like, we're going

6    to go around and start sharing credit card numbers. Well,

7    that's just a specious argument.

8           As far as talking to them, no, we don't want to

9    talk to them. We want to see whose customers they are. We

10   want to see if they are our customer. That's the whole

11   purpose of getting the transcripts. So we objected to those

12   transcripts on the best evidence rule and that is a

13   perfectly appropriate objection.

14          THE COURT: I'm sorry. So let me make sure I

15   understand. The objection is not that the transcripts that

16   you have are insufficient and you want to get the tapes

17   themselves. It's rather that there are certain transcripts

18   that you don't have or certain transcripts that are

19   redacted?

20          MR. NEPPLE: There's --

21          THE COURT: I just want to make --

22          MR. NEPPLE: I'm sorry, Judge.

23          THE COURT: Go ahead.

24          MR. NEPPLE: There's a combination of things

25   there. Let me try to unpack that.

1          We wanted the transcripts at the time so we could

2     figure out if they were our customers.  That was a while

3     ago.  Our objection now, and it is the objection, is best

4     evidence because transcripts are not evidence.  They are not

5     the evidence.  The best evidence is the transcript

6     themselves.  Transcripts do not go back to the jury.

7               THE COURT:  I'm sorry.  You just said you had --

8     you mean the tapes --

9               MR. NEPPLE:  Correct.  I'm sorry.  The tapes.

10              THE COURT:  -- or the transcripts?

11              MR. NEPPLE:  Yes.  I'm sorry, Judge.  If I said

12    transcripts, I apologize.

13              THE COURT:  So in June, you asked for tapes

14    instead of transcripts?

15              MR. NEPPLE:  Correct.  We asked for recordings.

16    We asked for specifically Exhibit 33, Request 43, recordings

17    with the words "Spectrum" and "Charter".

18              THE COURT:  And then that's tapes not transcripts

19    that you wanted.

20              MR. NEPPLE:  Correct.

21              THE COURT:  Okay.

22              MR. NEPPLE:  Okay.

23              THE COURT:  And is that -- well, is that after or

24    before the deadline to ask for documents?

25              MR. NEPPLE:  Before.

1           THE COURT:  Okay.  And does the debtor agree with

2  that?

3           MR. ROSS:  Agree with what, Your Honor?

4           THE COURT:  That the request in June for tapes was

5  before the deadline to ask for --

6           MR. ROSS:  Yes.

7           THE COURT:  -- documents.

8           MR. ROSS:  But the request -- what he's failed to

9  tell you is the request was for tapes from August 1, 2018.

10  We objected as overbroad and containing privileged --

11  containing personally identifiable information.  And they

12  never filed a motion on the tapes or did anything further on

13  the tapes.  They did write a letter to the Court on the

14  transcripts in September but withdrew that letter in

15  November.  And they have used the transcripts as evidence in

16  their motions.

17           So it's sort of a sauce for the goose, sauce for

18  the gander.  We don't get to use transcripts but they do.

19           MR. NEPPLE:  Well --

20           MR. ROSS:  And I would submit all that is a

21  waiver.

22           THE COURT:  Okay.

23           MR. NEPPLE:  Okay.  All right.  Let me make sure

24  we're clear here.

25           When the transcripts were used, when the

1    transcripts were used, was early on in the process.  We --

2                    THE COURT:  I'm not focusing on the --

3                    MR. NEPPLE:  Okay.

4                    THE COURT:  -- transcripts so much as --

5                    MR. NEPPLE:  Thank you.

6                    THE COURT:  So the request was made for the tapes

7    in August of -- I'm sorry -- in June of '19 going back to

8    August of '18.  And there was an objection to that and then

9    nothing happened after that?

10                   MR. NEPPLE:  We'll confirm but I don't know that

11   fact because I did not follow up.  I was not in that loop.

12                   THE COURT:  Okay.  Well, that's important because

13   --

14                   MR. ROSS:  I have the facts here, Your Honor.

15                   THE COURT:  No one has hesitated to raise the --

16                   MR. ROSS:  I have it.

17                   THE COURT:  -- discovery issues before me.

18                   MR. ROSS:  The request was June 3rd.  The

19   objections were July 3rd.  There was no motion or letter

20   motion practice regarding tapes.

21                   THE COURT:  Okay.  Okay.

22                   MR. NEPPLE:  Okay.  So let's get back to a few

23   other clarifications.

24                   THE COURT:  So is there an issue with the

25   transcripts?  I don't think so, right?  It's just the tapes.

1    I think you may have misspoke.  You kept saying transcripts

2    and I think the issue is just with tapes, right?

3              MR. NEPPLE:  Transcripts are not --

4              THE COURT:  No.  I understand --

5              MR. NEPPLE:  Yes.  Okay.

6              THE COURT:  -- that but the transcripts you've

7    been provided, there's no issue that they're incomplete or

8    something like that.  It's just that you believe you're

9    entitled to the tapes.

10             MR. NEPPLE:  We believe we're entitled to the

11   tapes.

12             THE COURT:  Okay.  All right.

13             MR. NEPPLE:  Okay.  One other thing that seemed to

14   be drawing attention was this lineup of the ad and the

15   telephone number and the sales.  And the question went to

16   materiality.

17             I'm going to jump back into my outline later or

18   (indiscernible) this, but I wanted to address this because

19   it looked like it was of issue to the Court.

20             What Mr. Ross says -- and I do agree with him on

21   Lanham Act.  Lanham Act is not very clear on the issue of

22   materiality.  But a few things to take note of.  One, we

23   cited to the Court two cases that says just a general

24   increase of sales after an advertisement goes out does not

25   establish materiality.  Cite two cases to the Court.  And,

1      two, they've made no showing of what is actually driving

2      that.  All they say is you got the ad and you purchased it.

3      But they made no showing of what's in the ad.  Now the ad

4      has state --

5                 THE COURT:  I'm sorry.  When you say "ad", what

6      are you referring to "ad", add in customers or the

7      advertisement?

8                 MR. NEPPLE:  The Charter advertisement.  Okay?

9                 THE COURT:  Well, I've seen the ad.  That's in the

10     record.

11                MR. NEPPLE:  I understand.

12                THE COURT:  Well, you just said I don't have it.

13     I think that's what you said.

14                MR. NEPPLE:  No.  I believe I said they didn't --

15     what is in the advertisement, right, there is modems, there

16     is discounted prices, there's no contracts.  What he's

17     simply saying is if you got the ad and you bought from us,

18     we win.  That's not the law.  The law is the two cases that

19     I cited to the Court about the fact that general increase of

20     sales from the advertisement does not get you that with

21     materiality under the Lanham Act.

22                Now let's get back to where we started with the

23     fact of where we're at now.  We are in a summary judgment

24     proceeding.

25                THE COURT:  What are the two cases you're relying

1   on?  I just want to make sure I --

2           MR. NEPPLE:  Can you pull the two cites?

3           THE COURT:  They're in your --

4           MR. NEPPLE:  They're in my brief, yes.

5           THE COURT:  Okay.  Fine.

6           MR. NEPPLE:  Yeah.  And it's -- they try to

7   distinguish them.  And I believe it's in a footnote, Judge.

8           THE COURT:  Okay.

9           MR. NEPPLE:  But let's get to where we're at.

10  What has happened here is Mr. Ross had -- the preliminary

11  proceedings has relied upon a presumption, a presumption

12  when you sat as the finder of fact.  Now you are no longer

13  the finder of fact.  You are to determine simply whether

14  there is a factual dispute with respect to the truth of the

15  advertisement.

16          Now let's look at that.  What the Second Circuit

17  says is specifically that literally false advertisements,

18  whether it's literally false or literally false by necessary

19  implication, if the advertisement -- if the message is

20  ambiguous, it cannot fall in those two categories.

21          So let's look at all the evidence that we have of

22  that fact.  We have our survey evidence.  Dr. Ostberg, who

23  is one of the survey guys out there, has done hundreds of

24  these.  He has said there is multiple interpretations of the

25  message in the Charter ad.  So if there are multiple

1   interpretations in the Charter ad, that means it is

2   ambiguous, which means it cannot be literally false or

3   literally false by necessary implication.  And once that

4   presumption falls away then all the – it's Christmas is

5   over.  Mr. Ross and Windstream have to go through and prove

6   their case.  They lose all the presumptions on materiality,

7   of damages, of everything that they get from those

8   presumptions.

9          And that's not the only evidence of the fact of

10  the communication, the advertisement, is, in fact,

11  ambiguous.  We have internal e-mails from Charter on how the

12  e-mail -- or how the advertisement was to be created.  We've

13  got the RAPP e-mail testimony on how the advertisement was

14  to be created.  We've got the letter from Windstream's

15  inside general counsel or assistant general counsel who,

16  when they viewed the ad -- and they're up on advertising law

17  -- they never raised the fact that what they claim now that

18  the advertisement is literally false on its face or

19  literally false by necessary implication.

20         We've got other evidence is the reaction to the

21  ad.  Simply the numbers of calls.  If the advertisement was

22  literally false, okay, if it was literally false, the

23  reaction would have been crazy.  Every Windstream customer

24  would have been jumping up and down, I'm losing my service,

25  what's going on.  And there was only a limited number of

1    calls.

2            So there is a number of evidence -- pieces of

3    evidence in the evidentiary record that creates a disputed

4    issue of material fact on whether this advertisement was

5    literally false or literally false by necessary implication.

6            So that's the first step.  And as I said, that

7    strips off all the evidentiary bonuses that had been in the

8    case prior to this.

9            But going back to -- and I won't take much of the

10   Court's time because I think the Court understands -- the

11   messaging.  We've got to look at the advertisement and the

12   truth in reality.  And what the advertisement said was risks

13   and uncertainty of bankruptcy.  And is it disputed that

14   bankruptcy entails risks and uncertainty?  No.  It's not

15   disputed.  The evidence in the record is very clear.

16   There's public statements.  It's not just in 10Ks, in 10Qs.

17   They put out -- Windstream put out a link to their own

18   website which had issues about this advertisement.  They had

19   statements about this advertisement.

20           THE COURT:  I'm sorry.  Where are those in the

21   record?  What are you referring to --

22           MR. NEPPLE:  Can you give me the --

23           MR. KINGSTON:  We're talking about the press

24   release --

25           MR. NEPPLE:  Yes.

1              MR. KINGSTON:  -- that's available -- publicly

2       available on the website?

3              MR. NEPPLE:  Yes.

4              There's a public available press release, Judge.

5              THE COURT:  So you're referring to the press

6       release that was referred to and incorporated in the letter

7       to customers?

8              MR. NEPPLE:  Correct.

9              THE COURT:  So Exhibit 3.

10             MR. KINGSTON  That's correct.

11             MR. NEPPLE:  So there's an abundance of

12      evidence --

13             THE COURT:  Is there anything else that's --

14             MR. NEPPLE:  It's in our briefs.  But it's the

15      press release, it's the quarterly reports, the annual

16      reports and Windstream's own statement regarding bankruptcy.

17             THE COURT:  Namely the -- what was sent to the

18      customers --

19             MR. NEPPLE:  Correct.

20             THE COURT:  Okay.

21             MR. NEPPLE:  So all of those statements, wherever

22      they're sourced, that they say bankruptcy entails risks and

23      uncertainty and our advertisement says the same thing, risks

24      and uncertainty.  It tracks it.  That's all it says.  So

25      once they lose the presumption, they have to prove their

1    case.

2              THE COURT:  And let me unpack why you say it's

3    ambiguous.  The first is Ostberg's report.

4              MR. NEPPLE:  Correct.

5              THE COURT:  And that's based on his survey of --

6    right?

7              MR. NEPPLE:  Correct.

8              THE COURT:  Nothing else.  I mean, that's it,

9    right, as far as Ostberg is concerned.

10             MR. NEPPLE:  As far as Ostberg, correct.

11             THE COURT:  Ostberg.  And then you've addressed

12   the RAPP testimony and I have the e-mails.  And the general

13   counsel letter, you're saying it's because they didn't

14   discuss this issue and they raised other issues, that means

15   it's ambiguous?

16             MR. NEPPLE:  Yes, in part, Judge.  Here's the

17   argument.  If this thing is literally false or literally

18   false by necessary implication, the advertisements -- it

19   would have come to their attention.  They would have told

20   us, hey, this thing is literally false.  You're saying we're

21   going out of business.

22             THE COURT:  So if they don't use those specific

23   words, you're saying it makes it ambiguous?

24             MR. NEPPLE:  No.  I'm saying that's a piece of

25   evidence that the jury can consider on whether it's

```
 1   literally false.

 2              THE COURT:  But -- well, can we turn to the

 3   letter?

 4              MR. NEPPLE:  Sure.

 5              THE COURT:  I just want to make sure I

 6   (indiscernible) based on this.  What exhibit is it in the

 7   binder?

 8              MR. KINGSTON:  Are you referring to the letter

 9   from counsel or the letter to the --

10              THE COURT:  The counsel letter that's referred to.

11              MR. NEPPLE:  Counsel.

12              MR. KINGSTON:  It's 52 -- Exhibit -- excuse me --

13   53.  Charter --

14              THE COURT:  53.

15              MR. ROSS:  Your Honor, I'll make it easy for you.

16   It's Exhibit C to the complaint --

17              THE COURT:  Well --

18              MR. ROSS:  -- which is adversary docket number 1.

19              THE COURT:  Okay.  But it's the one dated March

20   21?

21              MR. NEPPLE:  I think it's March 21st and March

22   26th.

23              THE COURT:  Well, no -- okay.  They're both part

24   of the Exhibit 53.

25              So you think it's ambiguous because it just says
```

1    "false and misleading" and not "literally false and

2    misleading"?

3              MR. NEPPLE:  No.  What I think is ambiguous,

4    Judge, and I think it's a piece of evidence that the jury

5    can use because they don't say make -- what they're saying

6    now, what they're saying in court here is that the

7    advertisement, the Charter advertisement, says you're going

8    out of business and that's false.  That's not what's

9    identified in either the March 21st or the March 26th

10   letter.  They're concerned about terms like "risks" and

11   "uncertainty".  They never say, we read this -- hey, you're

12   telling people that we're going out of business.

13             THE COURT:  Well, what is the difference between

14   saying that you're at risk of losing your TV and internet

15   services and going out of business?  I mean --

16             MR. NEPPLE:  There's --

17             THE COURT:  Was there any other reason why they

18   would lose their services?

19             MR. NEPPLE:  Well, it's a whole panoply, Judge.

20   It's the reaction to the advertisement by people.  What

21   you're asking and what I'm saying is that this is one piece

22   of evidence in addition to Ostberg and all the other

23   evidence I just cited about five minutes ago.  Whether this

24   is literally true -- or literally false or literally false

25   by necessary implication doesn't rise and fall on Ostberg

1    alone.  There's seven or eight pieces of evidence in the

2    evidentiary record from which a reasonable jury can make

3    that determination.  They might --

4              THE COURT:  I still don't understand how this

5    letter indicates ambiguity, or the one from the 26th.

6              MR. NEPPLE:  It indicates ambiguity because they

7    would have said you're telling we're going out of business.

8    Clearly.  That's what they're saying.  Under the case law in

9    the Second Circuit, if you look at literally false law or

10   literally false by necessary implication, it says it has to

11   jump out at you.  It must be so clear that, essentially,

12   you're saying it with your words or you're saying that

13   there's no other interpretation.  And that's not consistent

14   with all the other evidence out there.

15             THE COURT:  Okay.  And your last piece beyond

16   Ostberg is people who didn't call?

17             MR. NEPPLE:  Well, I think you're looking at --

18   everything has to be taken into context.  You're looking at

19   the number of people that responded, right?  If this

20   advertisement actually said Windstream is going out of

21   business --

22             THE COURT:  Is there any case law that says one

23   can draw an inference on the literally false point from

24   people who don't call if there are plenty of people who do

25   call?  I'm not aware of such a law.

1              MR. NEPPLE:  Well --

2              THE COURT:  You're basically saying that it's

3    ambiguous and therefore literally false doesn't apply if

4    some customers don't react -

5              MR. NEPPLE:  Well --

6              THE COURT:  -- in a measurable way like through a

7    call.

8              MR. NEPPLE:  I am not aware of a case that's as

9    specific.  What I'm saying it's a piece of evidence in

10   context along with the other evidence.

11             THE COURT:  Well, wouldn't that mean that you

12   would never have summary judgment in these types of cases

13   because there's always someone who doesn't bother calling?

14             MR. NEPPLE:  Sure.  I'm not saying it rises and

15   falls on that piece of evidence.  I'm saying it's one of

16   additional --

17             THE COURT:  Well, but you're just saying there are

18   material facts in dispute.  It's either material or not

19   material.

20             MR. NEPPLE:  I believe it's material.

21             THE COURT:  So you're saying it's the dog that

22   didn't bark argument.  But that's where one dog didn't bark.

23   And there are plenty of dogs who bark here, right, including

24   under Ostberg?

25             MR. NEPPLE:  I don't think there's plenty of dogs

1    that bark.  But let's get -- I understand the Court's point

2    and I think we've --

3                THE COURT:  Okay.

4                MR. NEPPLE:  -- chewed that ground.

5                THE COURT:  All right.

6                MR. NEPPLE:  Okay.  But there is other evidence in

7    the record including Ostberg on that issue.

8                THE COURT:  Okay.

9                MR. NEPPLE:  So again, once we get past that, all

10   the presumptions go away and they have to prove every issue.

11   Not only do they have to prove it for one entity.  They have

12   205 entities.  Each of those entities have a separate case

13   with separate requirements.  And there's no showing in the

14   evidentiary record of any of that with respect to the 205.

15               THE COURT:  Well, on the literally false point, I

16   mean, does the advertisement and the campaign distinguish

17   between Windstream entities?  Didn't it go to all Windstream

18   customers?

19               MR. NEPPLE:  It went to the entire list.  There

20   are some that are named by Windstream, some that are not

21   named by Windstream, correct.

22               THE COURT:  Right.  So it went to all of them.

23               MR. NEPPLE:  Correct.

24               THE COURT:  So why would -- so if that's the case,

25   and I concluded -- and I know you're trying to persuade me

1     not to conclude -- but if I conclude that the advertisement

2     and the campaign are literally false and they went to all

3     the entities, why would they have to show more as to

4     specific entities on this point?

5             MR. NEPPLE:  If it went to all the entities.  But

6     what I'm saying is, that's not your decision right now.

7     Your decision is to determine --

8             THE COURT:  Well, what's the evidence that it

9     didn't go to all -- I thought we just confirmed it went to

10    all the customers.

11           MR. NEPPLE:  Yeah.  I --

12           THE COURT:  All right.

13           MR. NEPPLE:  If I said something wrong, I

14    misspoke.

15           THE COURT:  All right.  So it is my decision

16    because it went to all the customers.  Is there anything in

17    the record that says it didn't go to all the customers, that

18    it didn't go to the customer of entity 210 --

19           MR. NEPPLE:  No.

20           THE COURT:  -- I mean, 203 or 204 or 75?

21           MR. NEPPLE:  I think we're speaking past each

22    other, Judge.  I think the decision on whether it's

23    literally false is not your decision at this stage of the

24    case.  That's what I'm trying to --

25           THE COURT:  But I'm point -- I'm focusing on the

1   next point you made on that issue, which is even if it's

2   true as to some of the 205, they have to show it as to all

3   of the 205.  Are you backing off of that at this point?

4           MR. NEPPLE:  No.  I --

5           THE COURT:  Okay.  So I'm going to ask you one

6   more time.  Did it go to all 205 of the customers, all the

7   Windstream customers?

8           MR. NEPPLE:  I believe so, Judge.

9           THE COURT:  Well, then -- all right.  So you just

10  answered me on this issue.  I mean, the 205 is a red herring

11  then, right?  What's -- if I conclude it's literally false,

12  the 205 is a red herring 'cause it went to all the customers

13  of all the 205 entities.

14          MR. NEPPLE:  I understand what the Court is

15  saying.

16          THE COURT:  Okay.  All right.  So let's not ever

17  make that argument again.

18          You know, sometimes, it kind of makes sense to

19  stick with your best argument or even arguments that

20  don't -- can withstand two minutes of questioning.

21          Go ahead and see what you do on the next one.

22          Are you done with literally false?

23          MR. NEPPLE:  I believe so, Judge.

24          THE COURT:  All right.

25          MR. NEPPLE:  A couple other comments that I wanted

1    to make with respect to the envelope.  Mr. Ross stood up and

2    said the envelope is part of the intent and it's part of the

3    false advertising.  But the colors of a Windstream are not

4    protected.  They're not trademark protected.  They're not

5    trade-dress protected.  There's no reason why Charter can't

6    use those colors.

7            The case law that they cited to you talks about

8    trademark.  They splice cases talking about trademark

9    impingement.  There's nothing improper --

10            THE COURT:  No.  It's just about confusion, right?

11    It's not about trademark.  This case isn't a trademark case.

12            MR. NEPPLE:  Correct.

13            THE COURT:  So the fact that under trademark law

14    Charter can use those colors has nothing to do with the

15    Lanham Act issue, which is whether it's intended to mislead

16    Windstream's customers into opening the envelope as part of

17    the overall campaign.

18            MR. NEPPLE:  Correct.  And they have not cited any

19    cases saying that finding that is anything.  What they tried

20    to quote in their brief is a -- they said it was tricked.

21    And they used a trademark case -- I'm saying this is a

22    Lanham Act case.  They don't have a Lanham Act case saying

23    it's improper.  It's absolutely proper for Charter to use

24    those colors just as it's absolutely proper for Charter to

25    say "important information for Windstream customers".  We

1  have a nominative fair use rights that use the Windstream

2  name and a first permit right to do that.  So there's

3  nothing wrong with that envelope.

4          THE COURT:  Are you saying there's nothing solely

5  to use it or in the context of the overall message?

6          MR. NEPPLE:  In both, because the cases that they

7  cited, Judge --

8          THE COURT:  I'm not talking about their cases they

9  cited.  I'm talking about your argument that I should just

10  disregard that it came in this context.  Do you have cases

11  that say I should do that?

12          MR. NEPPLE:  Yes.  The case that we cited.

13  There's one case.

14          THE COURT:  Okay.

15          MR. NEPPLE:  And I don't recall it right now but

16  it says that if the false statement comes with the outer

17  envelope and it comes with the initial impact then it's

18  important.  Otherwise, it's not.  It goes right to what is

19  contained within --

20          THE COURT:  I'm sorry.  Say that again.  If it

21  what?  If it comes with what?

22          MR. NEPPLE:  The case that we cited to the Court

23  in the brief says, essentially, that what comes to the

24  recipient, all right, what they see first, if there's

25  nothing false on that, then it goes to what's inside the

1    envelope.

2              THE COURT:  Well, okay.  And so you're saying I --

3    the fact that the Windstream colors without a Charter

4    address on it or Charter indication that they sent it is not

5    false.  It's not trying to create a false impression?

6              MR. NEPPLE:  I'm saying is not false, correct.

7              THE COURT:  It's not trying to create a false

8    impression.

9              MR. NEPPLE:  That's correct.  There is nothing

10   wrong --

11             THE COURT:  And so why did they use that and why

12   did they design the campaign to do that other than to make

13   people think that it's coming from Windstream?

14             MR. NEPPLE:  For the same reason that people try

15   to make their products look like trademark products and get

16   as close as possible.  There's nothing with using the colors

17   and nothing wrong with using the (indiscernible).  And

18   there's no case that says that is a wrongful act under the

19   Lanham Act.

20             THE COURT:  Okay.  And this goes to which issue?

21             MR. NEPPLE:  False and misleading.

22             THE COURT:  Okay.  So let me make sure I

23   understand.  You're saying that even if the envelope is

24   intended to create a false impression that it's coming from

25   Windstream so that Windstream customers open it, as opposed

1    to a flyer that they could get from Charter or from, I don't

2    know, Verizon, whoever, that has a Verizon logo which they

3    could decide to open or, if they don't want to hear from

4    Verizon they throw it away, you're saying that -- that

5    falsity is unrelated to the message in the envelope and not

6    part of the overall plan and therefore I should disregard

7    it?

8            MR. NEPPLE:  I'm saying that is not false.

9    There's nothing wrong with trying to get close to other

10   people's trademarks/trade dress.  But they don't have one.

11   They have no -- they have no right to keep us from using

12   pink to purple or purple to pink.

13           THE COURT:  Well, but it's not a trademark issue.

14   It's just a -- it's just false, right?  Just a matter of

15   whether it's true or not.  It gives the impression that it's

16   from Windstream.

17           MR. NEPPLE:  I don't believe that's true, Judge.

18   It doesn't give the impression it's from Windstream.

19           THE COURT:  Well, that's a separate issue.

20           MR. NEPPLE:  Okay.

21           THE COURT:  You're saying even if it does, it

22   doesn't matter.

23           MR. NEPPLE:  That's exactly what I'm saying.

24           THE COURT:  But you're saying that's because the

25   only way it would matter is in a trademark suit.

1          MR. NEPPLE:  Correct.  And that's the case that's

2    in the briefing.

3          THE COURT:  Okay.

4          MR. NEPPLE:  And then the last point, going back

5    to Ostberg, Mr. Ross talked about cases that say that the

6    results of the survey do not trump the literally false or

7    necessarily false by implication cases.  And they cited four

8    cases.  And each one of those four cases, they are very

9    distinguishable.  One of them was a case about Havana Club.

10   And it said right on the bottle, it said Puerto Rican rum.

11   And that party tried to use a survey to say -- to try to

12   change is it Puerto Rican rum.  That doesn't work.

13          One of the other cases was a steam shot -- excuse

14   me -- the amount of steam per shot in a Rowenta iron.  And

15   in that case, the parties said the most powerful iron by the

16   grams of steam per shot.  When it turned out that it wasn't

17   true, what the other party -- what they did is they went out

18   and tried to get a survey to say "most powerful" means

19   something different.  They acted as their own lexicographer.

20   Right?  They turned out to be false and then they tried to

21   change the word.

22          That's not what Dr. Ostberg did here.  He sent out

23   the advertisement, put it to the panel and said what does

24   that mean to you.  So their case is saying you can't use a

25   survey to defeat literally false or allegations of literally

1    false are not applicable.

2              THE COURT:  And do you have cases where there was

3    that type of survey that does establish --

4              MR. NEPPLE:  Dannon.

5              THE COURT:  The Dannon case.

6              MR. NEPPLE:  Yes.

7              THE COURT:  Where it was the plaintiff's survey.

8              MR. NEPPLE:  Correct.  But what they said is, you

9    look at the survey.  You can overcome that issue because

10   that's all we're looking at here.  That's the most important

11   thing.  What do customers think when they receive the

12   advertisement?

13             THE COURT:  So you don't read Dannon as

14   aplaintiffs' --

15             MR. NEPPLE:  No.  I don't read --

16             THE COURT:  -- admission type of case.

17             MR. NEPPLE:  -- Dannon as an admission case,

18   correct.

19             THE COURT:  Not as an admission case.

20             MR. NEPPLE:  Correct.

21             THE COURT:  Okay.  Has it been cited by any case

22   for this proposition that you're --

23             MR. NEPPLE:  Not that I'm aware of, Judge.

24             THE COURT:  I guess not or you would have given it

25   to me.

1          MR. NEPPLE:  It just came out.  I'm not that aware

2     of --

3          THE COURT:  Okay.

4          MR. NEPPLE:  Okay.  That's all I have right now,

5     Judge.

6        (Pause)

7          THE COURT:  Do your colleagues have anything more

8     on whether there was any follow-up on the July objection on

9     the tape?

10          MR. KINGSTON:  Thank you, Your Honor.  This is

11     John Kingston.

12          There was a request for production in June.  It

13     was objected to.  It was for all recordings from August 1st,

14     2018 that referenced Spectrum or Charter.  And we did not

15     move to compel or seek a discovery dispute conference on

16     that issue.

17          And I do want to -- I think Mr. Nepple misspoke

18     because I do think that there was an April -- I think an

19     earlier request for production did actually ask for audio

20     recordings as well.

21          But in answer to the Court's inquiry, the June

22     request for production that asked for all recordings

23     referencing Charter or Spectrum that was objected to was not

24     the subject of a meet and confer letter.  I think our meet

25     and confer letter on the transcripts did include a reference

1    to -- in a footnote to debtors' promise to provide those

2    transcripts -- or, excuse me, those audio recordings at some

3    point.  And I don't think that we ever did move to compel.

4    I know that we did not move to compel on audio recordings.

5              THE COURT:  I'm sorry.  So the footnote was on the

6    transcripts and not --

7              MR. KINGSTON:  I misspoke, Judge.  I think there

8    was a -- as you recall, there was some meet and confer

9    correspondence.  And I don't think it was a call.  I think

10   you volunteered via e-mail to review redacted transcripts.

11   In the meet and confer correspondence on the transcripts,

12   Charter noted that we were still expecting the audio, all

13   recordings that had been promised in connection with the TRO

14   hearing and we haven't gotten them yet.

15             But as far as -- if the Court's question is did

16   anybody move to compel on audio recordings, the answer is

17   no.  We didn't move to compel on audio recordings.

18             THE COURT:  And after the objection by the

19   plaintiffs to the production of the audio recordings, did

20   the plaintiffs ever agree to provide audio recordings?

21             MR. KINGSTON:  No, sir.  They did not.

22             THE COURT:  Okay.  Fine.  Okay.  Thanks.

23             MR. KINGSTON:  And I guess the only thing I would

24   add to that is nor did they identify audio recordings as

25   evidence that they might use in support of a claim or

1    defense in -- as required by Rule 26(a).

2              THE COURT:  Okay.  Okay.

3         (Pause)

4              THE COURT:  On the contract breach claim, I

5    believe the debtors have now made it clear that that claim,

6    for purposes of this summary judgment motion, is for breach

7    of the section that requires 30 days notice for turning off

8    service?  Correct?

9              MR. ROSS:  Yes, Your Honor.  That's correct.

10             THE COURT:  Okay.  And I think it's acknowledged

11   that that notice wasn't given, right?

12             MR. KINGSTON:  Your Honor, I don't think there was

13   a 30-day notice for a discontinuation of service because it

14   wasn't Charter's intent to discontinue service.

15             THE COURT:  Well --

16             MR. KINGSTON:  So you're right.  As far as was

17   their notice before the (indiscernible) disconnects in

18   March, there was not.

19             THE COURT:  And breach of contract is not based on

20   intent.

21             MR. KINGSTON:  Well, the contract at issue, Your

22   Honor, has a reasonable best efforts clause.  It says we

23   will do our best to make sure that there aren't any

24   disconnects.  And Charter was in the process of doing its

25   best to make sure there weren't any disconnects when the

1    March 2015 disconnects occurred.

2      (Pause)

3         THE COURT:  Well, let's get out the contract.

4         MR. ROSS:  It's the very first exhibit to the

5    complaint which is adversary docket number 1, Your Honor.

6      (Pause)

7         THE COURT:  I'm sorry.

8         MR. ROSS:  Exhibit A to the complaint, Your Honor.

9         THE COURT:  Well, why don't we -- I'm using -- you

10   all were kind enough to put together these exhibit books.

11   So --

12         MR. ROSS:  Exhibit 4, Your Honor, to the entire

13   summary judgment (indiscernible) complaint so it will be

14   attached to that (indiscernible) --

15         THE COURT:  I'm sorry.  Exhibit 4, right?

16         MR. ROSS:  Yes, Your Honor.

17         THE COURT:  No.  Exhibit 4 is --

18         MR. ROSS:  It's the complaint on the back of it.

19   Attached as an exhibit is the copy.

20         THE COURT:  It's not Exhibit 4 in the binder.

21   Grab a copy of it.  Exhibit 4 in the binder is a deposition

22   excerpt.

23      (Pause)

24         MR. ROSS:  It's Exhibit 4 to adversary docket

25   number 153, Your Honor.

 1                 THE COURT:  Yeah.  I -- again, I'm using these

 2     binders which you have given me for this motion, not that --

 3     here.  Never mind.  Someone has given me a copy.

 4                 The value-added reseller agreement or VAR

 5     agreement.  Okay.  So let me make sure I understand the

 6     argument here.

 7          (Pause)

 8                 THE COURT:  Okay.  So, first of all, I just want

 9     to have this confirmed on the record.  Which paragraph are

10     you relying on on behalf of the plaintiffs?

11                 MR. ROSS:  2.3, Your Honor.

12                 THE COURT:  2.3.

13                 MR. ROSS:  It's on page 2 of the exhibit you have.

14                 THE COURT:  "Restrictions."

15                 MR. ROSS:  And it's the very last sentence, Your

16     Honor.

17                 THE COURT:  Okay.  And Windstream is relying on

18     Section 8.1?  Is that what you're relying on?

19                 MR. ROSS:  I believe so, Your Honor.  I want to

20     (indiscernible) myself.  Yes, Your Honor.

21                 MR. KINGSTON:  And just for the record, Your

22     Honor, we're referring to the last two sentences of Section

23     8.1 which read as follows:

24                 "Spectrum will use personally" --

25                 THE COURT:  Well, let's read the whole thing.

1    It's a limited warranty.

2            MR. KINGSTON:  Yes, Your Honor.

3            THE COURT:  "Spectrum warrants to Windstream that

4    Spectrum has the corporate power and authority to enter into

5    performance obligations under this Agreement.  Windstream

6    warrants to Spectrum that Windstream has the corporate power

7    and authority to enter into performance obligations under

8    this Agreement."  Repeats itself.  And then "Windstream will

9    use commercially reasonable efforts to provide the Spectrum

10   services to Company 24 hours per day, 7 days per week.  It

11   is possible, however, that there will be interruptions of

12   the Spectrum services."

13           MR. KINGSTON:  Yes, Your Honor.

14           THE COURT:  Okay.  And now service here was turned

15   off, right?

16           MR. KINGSTON:  It was inadvertently disconnected

17   pursuant to an automatic protocol.  Nobody made the decision

18   to turn the service off at the time it was turned off.

19       (Pause)

20           THE COURT:  Okay.  I read it.  Does someone need

21   this back?

22           MR. KINGSTON:  I'll get it.

23           THE COURT:  Okay.

24           MR. KINGSTON:  I think the point on that, Judge,

25   is just that discontinuing service is something that you

1    would do on purpose and it's nothing that Charter did on

2    purpose.

3              THE COURT:  Okay.

4              MR. ROSS:  I don't know how to respond to that.

5    An interruption is -- clearly contemplates the power lines

6    coming down because of a storm.  They made a purposeful

7    decision.  The fact that they entrusted that decision to an

8    audit artificial intelligence for failure to pay means that

9    it was discontinued.  And if it hadn't been for us spending

10   three days hassling them, it would not have been restored to

11   this day.  There is no such reservation of rights under 2.3.

12   It says you give us 30 days notice.  End of story.  They

13   broke the--they breached the contract.  They

14   (indiscernible).

15             THE COURT:  Okay.  All right.  Do you have any

16   rebuttal?

17             MR. ROSS:  Just a couple short things.  You know,

18   I want to make sure that this whole color thing doesn't get

19   -- become, you know, sort of forest for the trees.  But the

20   person who made that decision at Charter admitted she picked

21   that color because it resembled the kinetic color.  She

22   admitted she did it.  So -- to get people to open the

23   envelope.

24             THE COURT:  No.  I don't think that's disputed.

25   What is argued is if there's a legal proposition then it

1    doesn't matter because the issue of falsity is just as to

2    what happens when you open the envelope.

3           MR. ROSS:  Well, that's incorrect.  Under the

4    Second Circuit standard, you have to look at the context in

5    which the advertisement comes to the consumer.  And how does

6    it come to the consumer.  And this is flaw -- fundamental

7    flaw with the Ostberg survey.  He didn't show them the

8    envelope.  And what the consumer gets is a letter that looks

9    like it's from Windstream.  It says, "Windstream customers,

10   Important false information inside."  And then you opened it

11   up and you assume, as the confusion calls demonstrated, that

12   it came from Windstream and Windstream's announcing that

13   it's going out of business and you should switch to

14   Spectrum.  And so it's that totality that you have to look

15   at that assessing whether or not there was a little falsity.

16   And that's why it is relevant.

17          Secondly, if the Court decid --

18          THE COURT:  You're saying that if people believe

19   it's coming from Windstream it's more credible than if it's

20   coming from a competitor.

21          MR. ROSS:  Absolutely.  And that's why they did

22   it.  That's exactly why they did it.

23          Now the second part of this, Your Honor, is that

24   if you find literal falsity, you do not -- there's a

25   presumption of deceit.  You don't have to get into that.

1   However, if you decide it's not literally false, it's merely

2   misleading, then you do have to find deceit and that would

3   be evidence for a decision to use this color and the words

4   on the cover and the lack of return address would go to the

5   deceit point.  Our argument is you never have to get there

6   because you already filed a TRO and a PI that there's

7   literal falsity and nothing has changed as far as the

8   evidence goes.  So that's the argument there.

9            I'd like to talk for a minute about ambiguity if I

10  may.  The cases are unequivocal -- I have no idea what

11  they're talking about, much of what they argue, but the

12  cases are unequivocal on this ambiguity point.  And I'll

13  just read you a quote from the Seventh Circuit case that

14  we've cited in our brief.  And it says -- this is Mead

15  Johnson v. Abbott Laboratories:  "Never before has survey

16  research been used to determine the meaning of words or to

17  set the standard to which objectively verifiable claims must

18  be held."  Never before had survey research been allowed to

19  be used.  There's no such case law.  The Dannon Yogurt case

20  does not stand for that.

21           Now but to take it a step further, he said -- your

22  Court pointedly asked, is that your only evidence of

23  ambiguity.  And he said no, it's -- he saw the documents.

24  Why is all that legally irrelevant?  And the reason is the

25  same reason that surveys are irrelevant.  You look at the

1   face of the advertisement to determine if it is literally

2   false.  You don't look at other things.  You don't look at

3   survey evidence.  You don't look at 10Ks.  You don't look at

4   10Qs.  You don't look at notices of commencements.  Is it on

5   its face in the context of the entire advertisement and the

6   envelope literally false?  That's what the law says.  And

7   that's why everything he talked about as to ambiguity is

8   legally irrelevant.  You look at the advertisement and say

9   is this advertisement ambiguous.  And the answer is no.  It

10  leaves the unmistakable unambiguous message that they're

11  going to lose their service and they need to switch to

12  Spectrum.  So that's the ambiguity point, Your Honor.

13          The last thing I want to make absolutely clear is

14  with respect to the materiality point.  The key thing that

15  the Court has to find -- the question posed to the Court is

16  was the false statement of a nature that a consumer would

17  consider it material in purchasing decisions.  And if a

18  consumer is looking to buy internet, television, telephone

19  services, the fact that the provider is unable to provide

20  those services is highly material.  And you don't need

21  anything to tell you that except common sense.

22          But we can go one step beyond common sense.

23  Charter said the exact same thing in its lawsuit against

24  DirecTV in 2009.  It said to that Court the fact that

25  they're suggesting to consumers that we might go out of

1   business is material for purposes of the Lanham Act.  Now

2   they can't talk out of both sides of their mouths.  They

3   can't go into one federal court and say that's material and

4   then go into another federal court and say that's not

5   material.  And so I would say that that -- there simply is

6   no way that it is possible to say that this is not material

7   given the evidence that's of record and undisputed.

8            And that's the -- unless the Court has questions,

9   those are the only -- oh.  I will say one other thing.

10           We haven't talked about Count VI and VII.  They

11  did move for summary judgment on Count VI and VII but it was

12  for the same reasons in the motion for judgment on pleadings

13  that you've already decided.  And so those should fail for

14  the same reasons that the motion for judgment on the

15  pleadings was denied.  I just want to make sure that's on

16  the record.

17           And absent any questions, Your Honor, I'll sit

18  down.

19           THE COURT:  Okay.  Anything else?

20           MR. NEPPLE:  Just 30 seconds, Judge.

21           THE COURT:  Sure.

22           MR. NEPPLE:  The touchtone of what a Lanham Act

23  case -- of a false Lanham Act case is what does the consumer

24  think.  In the case you cited, the Mead case, they were

25  trying to use the survey to redefine language.  They were

```
 1    not trying to say what does this mean to you.  I believe
 2    even Mead was either -- or was not "America's Favorite
 3    Pasta" but the "1st Choice of Doctors".  And the dispute
 4    there in the "1st Choice of Doctors" case was some said that
 5    had to be a majority and some just had to say you have to be
 6    number one, ordinal number 1.  And the party that was using
 7    the survey was trying to recast what "first choice" meant to
 8    make it a majority.
 9             That's not what happened in here.  What Dr.
10    Ostberg did, who's done this thousands of times, is put the
11    advertisement in front of the consumer.
12             THE COURT:  All right.  I'm going to take a brief
13    break.
14             While I'm doing that, counsel for Charter, at the
15    start of this hearing, suggested that my ruling should be in
16    the form of proposed findings of fact and conclusions of
17    law.  Given that what I have before me, except in respect of
18    counts VI and VII which, as I said already, are really only
19    as to certain facts within those counts, is a motion for
20    summary judgment on liability but not damages, so it would
21    be partial summary judgment, my understanding of the Stern
22    v. Marshall issue with respect to partial summary judgment
23    rulings is that (a) Stern v. Marshall, with regard to non-
24    core matters or core but constitutionally non-core, is that
25    it limits the bankruptcy court's ability to issue final
```

1    orders in those matters.  My understanding is that any order

2    here, unless I were to grant the summary judgment motion on

3    Counts V and VI, which I've already denied as far as the

4    rationale on the motion to dismiss, would be only partial.

5    And so therefore this would just be a ruling, not a final

6    ruling, and therefore it wouldn't be in the form of proposed

7    findings of fact and conclusions of law.  See, for example,

8    In re Soundview Elite Ltd., 543 B.R. 78 at 88 through 89

9    (Bankr. S.D.N.Y. 2016), and the cases cited therein; and In

10   re Provident Royalties, LLC, 2017 Bankr. LEXIS 4567 at pages

11   14 through 15 (Bankr. N.D. Tex. June 3, 2017).

12            I'm going to take a few minutes to read a couple

13   of the cases that have been characterized to me during oral

14   argument and then I'll come back and give you my ruling.

15   But you can be thinking about what I just said in terms of

16   the procedural posture of the ruling in the meantime.

17            I'd also -- what is our current trial date under

18   the --

19            MR. ROSS:  Don't have a trial date, Your Honor.

20   The pretrial is now February 10.

21            THE COURT:  Okay.  So it'll probably be sometime

22   in March or April is my guess.

23            MR. ROSS:  Yes, Your Honor.

24            THE COURT:  Okay.

25            MR. ROSS:  It probably won't be that week that

1   you're doing the Uniti trial, I'll bet.

2           THE COURT:  Okay.  Thanks.

3       (Recess from 3:01 p.m. until 3:34 p.m.)

4           THE CLERK:  All rise.

5           THE COURT:  Please be seated.

6           Okay.  We're back on the record in Windstream

7   Holdings, Inc., et al. v. Charter Communications, Inc. and

8   Charter Communications Operating, LLC.

9           I have before me summary judgment motions by each

10  of the parties to this adversary proceeding.  With one

11  exception, they are reversed images of the same coin.  That

12  is, the same objections to a summary judgment motion also

13  support the objector's own summary judgment motion and vice

14  versa.  The one exception is that Charter has sought summary

15  judgment with respect to all of claims VI and VII in the

16  complaint, which allege, as far as claim VI is concerned,

17  breach of the automatic stay and a claim for damages for

18  such breach, and, as far as Count VII is concerned, a claim

19  for equitable subordination of Charter's claims in this

20  bankruptcy case.

21          The basis for Charter's summary judgment motion on

22  those two claims is the same as the bases for -- or are the

23  same as the bases for Charter's motion to dismiss which I

24  previously dealt with this morning.  For the same reasons

25  that I denied that motion to dismiss each of those claims, I

1    will deny Charter's summary judgment motion as it applies to

2    Counts VI and VII.

3              That leaves the summary judgment motions with

4    respect to the remaining counts in the complaint.

5              The first count is a violation of the Lanham Act,

6    15 U.S.C. Section 1125(a,) et seq.

7              Counts II through IV assert violations of

8    Georgia's, North Carolina's and Nebraska's, respectively,

9    Uniform and Deceptive Trade Practices Act, which the parties

10   acknowledge would be susceptible to summary judgment if

11   summary judgment was found in violation of the Lanham Act.

12             Count V asserts a breach of contract, the contract

13   being the so-called VAR agreement and, more specifically,

14   Section 2.3 of that agreement, which requires that Charter

15   provide 30 days advance notice before terminating a service

16   under that agreement.

17             The standard on summary judgment is well

18   established.  Under Federal Civil Procedure 56(a),

19   incorporated by Bankruptcy Rule 7056, summary judgment shall

20   be granted "if the movant shows that there is no genuine

21   dispute as to any material fact and it is entitled to

22   judgment as a matter of law".  Subject to subsections of

23   Rule 56 that are not at issue here:

24             "A party asserting that a fact cannot be or is

25   genuinely disputed must support the assertion by:

1          "(A) Citing to particular parts of material in the

2    record, including depositions, documents, electronically

3    stored information, affidavits or declarations, stipulations

4    (including those made for purposes of the motion only),

5    admissions, interrogatory answers, or other materials; or

6          "(B) Showing that the record does not establish

7    the absence or presence [as the case may be] of a genuine

8    dispute."

9          See Fed. R. Civ. P., 56(c)(1).

10         The movant bears the initial burden to satisfy

11   each material element of its claim or defense. Vermont Teddy

12   Bear Co. v. 1-800 Beargram Co., 373 F.3d 241, 244 (2d Cir.

13   2004); Isaac v. City of New York, 701 F.Supp. 2d 477, 485

14   (N.D.N.Y. 2010), affirmed 271 F. Appendix 60 (2d Cir. 2008).

15         Upon such a showing, the nonmoving party must

16   provide evidence of a genuine issue of material fact to

17   successfully oppose the motion.  Matsushita Electric Indus.

18   Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).

19         Facts are material if they "might affect the

20   outcome of the suit under the governing law".  Anderson v.

21   Liberty Lobby, Inc.,477 U.S. 242, 248 (1986).

22         The Court "is not to weigh the evidence but is

23   instead required to view the evidence in the light most

24   favorable to the party opposing summary judgment, to draw

25   all reasonable inferences in favor of that party and to

1    eschew credibility assessments".  Amnesty America v. Town of

2    West Hartford, 361 F.3d 113, 122 (2d Cir. 2004).

3            The summary judgment motion may not be defeated by

4    conclusory or self-serving statements, by simply raising

5    metaphysical doubts about a material fact, or by identifying

6    immaterial disputed facts.  Anderson v. Liberty Lobby, 477

7    U.S. at 247 through 48 (1986), and Matsushita Electric, 475

8    U.S. at 586.  Although, "if there is any evidence in the

9    record from any source from which a reasonable inference in

10   the nonmoving party's favor may be drawn, the moving party

11   simply cannot obtain a summary judgment".  Binder & Binder

12   PC v. Barnhart, 481 F.3d 141, 148 (2d Cir. 2007).

13           Of course, where the parties do not dispute the

14   material facts, disagreeing instead on the outcome based on

15   the applicable law, the matter is appropriate for summary

16   judgment.

17           Here, I will deal first with the plaintiffs'

18   motion for summary judgment, which is, in fact, a partial

19   motion for summary judgment with respect to all of the

20   claims, I believe, at least initially, that the plaintiffs

21   have sought summary judgment as to liability but not as to

22   the issue of damages resulting from that liability.

23           During oral argument, it appears that with regard

24   to Count VI, violation of the automatic stay, and Count VII,

25   equitable subordination, the plaintiffs have narrowed their

1    request, recognizing that ultimate liability for both of

2    those counts includes weighing issues where there are

3    disputed facts, namely, with regard to Count VI for

4    contempt, for violation of the automatic stay, whether the

5    actions taken as alleged in the motion and the complaint in

6    violation of the stay would satisfy the standard for civil

7    contempt as most recently articulated by the Supreme Court

8    in the Taggart case.  And with regard to equitable

9    subordination, the issue of damage, which is one of the

10   predicate elements, that is, damage to creditors is one of

11   the predicate elements of an equitable subordination claim.

12          So it appears to me from that colloquy on the

13   record, and even if that colloquy had not occurred, as a

14   matter of law, that all that the motion can seek with

15   respect to Count VI is partial summary judgment with respect

16   to whether the automatic stay in fact was violated by the

17   termination of the agreements -- I'm sorry -- of the

18   services under the VAR agreement.  And with regard to Count

19   VII, equitable subordination, whether the inequitable

20   conduct element of equitable subordination can be

21   established as a matter of summary judgment.  To the extent

22   that the motion seeks relief beyond that with regard to

23   Counts VI and VII, I will deny it.

24          As far as the violation of the Lanham Act and of

25   comparable state Uniform Deceptive Trade Practices Acts is

1    concerned, based on my review of the record before me,

2    including the parties' statements regarding undisputed

3    material facts and the responses to those statements, I

4    conclude that the motion should be granted as to liability.

5            The uncontroverted facts set forth in the debtors'

6    reply statement of facts in support of its motion for

7    summary judgment, which appears at the -- as an exhibit to

8    the debtors' reply, Exhibit 9 in volume 3 of 3 of the binder

9    for this motion, concluding in light of the defendants'

10   response, established for summary judgment purposes as a

11   violation of the Lanham Act and, accordingly, of the three

12   respective state Unfair and Deceptive Trade Practices Acts.

13           The general outlines of a Lanham Act claim under

14   Section 43(a) of that Act are generally well established.

15   The Second Circuit has gone through them relatively recently

16   and identified them clearly, as stated by Chief District

17   Judge McMahon in Danone US, LLC v. Chobani, LLC, 362 F.Supp.

18   3d 109, 118; "To establish a Lanham Act violation under

19   Section 43, Plaintiff must identify a statement in an

20   advertisement that (1) is false, (2) misrepresents an

21   inherent quality or characteristic of the product, (3) was

22   placed in interstate commerce, and (4) has or will likely

23   injure the plaintiff, citing Merck Eprova AG v. Gnosis

24   S.p.A., 760 F.3d 247, 255 (2d Cir. 2004).

25           In that case, the Second Circuit stated, "To

1    establish false advertising under Section 43(a) of the

2    Lanham Act, 15 U.S.C., Section 1125(a), the plaintiff must

3    first demonstrate that the statement in the challenged

4    advertisement is false.  A false advertising claim may be

5    based on one of two theories.  Falsity may be established by

6    proving that (1) the advertising is literally false as a

7    factual matter, or (2) although the advertisement is

8    literally true, it is likely to deceive or confuse

9    customers.

10          "In addition to proving falsity, the plaintiff

11   must also show that the defendants misrepresented an

12   inherent quality or characteristic of the product; that the

13   defendant placed the false or misleading statements in

14   interstate commerce; and that the plaintiff has been injured

15   as a result of the misrepresentation either by direct

16   diversion of sales or by a lessening of goodwill associated

17   with its products.

18          "Where an advertising claim is literally false,"

19   the court may grant relief based on an irrebuttable

20   presumption of injury.  "Even in cases of implied falsity

21   where a plaintiff adequately demonstrates that the defendant

22   has intentionally set out to deceive the public, the

23   defendant's deliberate conduct in this regard is of an

24   egregious nature, a presumption arises that consumers are,

25   in fact, being deceived.  In such a case, once a plaintiff

1    establishes a deceptive intent, the burden shifts to the

2    defendant to demonstrate the absence of consumer confusion."

3    See also Church & Dwight Co. v. SPD Swiss Precision

4    Diagnostics, GmbH, 843 F.3d 48, 65 (2d Cir. 2006), which

5    states that to establish its claim, a plaintiff such as

6    Windstream must prove "that the challenged message is either

7    literally or impliedly false, material, placed in interstate

8    commerce, and the cause of actual or likely injury to the

9    plaintiff."

10           Again, as I stated, when an advertisement is

11   proven to be literally false on its face, consumer deception

12   is presumed and the Court may grant relief without reference

13   to the advertisement's actual impact on the buying public.

14   Time Warner Cable, Inc. v. DIRECTV, Inc., 497 F.3d 144, 153

15   (2d Cir. 2007).

16           A Court may also determine an advertisement is

17   literally false by necessary implication.  In making such a

18   determination, it must analyze "the message conveyed in full

19   context and consider the advertisement in its entirety and

20   not engage in disputatious dissection. If the words or

21   images, considered in context, necessarily imply a false

22   message, the advertisement is literally false and no

23   extrinsic evidence of consumer confusion is required."

24   PamLab LLC v. Seton Pharmacy, LLC, 2010 U.S. District LEXIS

25   128819 at page 14 (S.D.N.Y. December 6, 2010).

1               However, if the language is susceptible to more

2     than one reasonable interpretation, the advertisement cannot

3     be literally false.  Then a plaintiff must show that the

4     advertisement, while not literally false, is nevertheless

5     likely to mislead or confuse customers.  In that case, the

6     plaintiff must set forth extrinsic evidence of consumer

7     deception.  See Merck Eprova AG v. Brookstone Pharm., LLC,

8     920 F.Supp.2d, 404, 407 (S.D.N.Y. 2013).  However, as I

9     noted above, there is an exception to this evidentiary

10    requirement when a plaintiff can show that the defendant

11    intentionally set out to deceive the public and the

12    defendant's deliberate conduct in this regard is of an

13    egregious nature.  There, a presumption arises shifting the

14    burden to the defendant to show that there was no such

15    confusion.  Id.  And see also Church & Dwight, 843 F.3d 48,

16    71 (2nd Cir. 2016).

17             As far as the first element of the cause of action

18    is concerned, the parties dispute whether there are material

19    factual issues as to whether the ad campaign described in

20    the undisputed material facts was literally false.  The

21    primary basis for that dispute as alleged by Charter is that

22    a survey conducted by one of its experts, Mr. Ostberg,

23    obtained when parties -- customers were shown the

24    correspondence of which Windstream complains, although not

25    the packaging for that correspondence, responded not

1   unanimously that the alleged false message, i.e., that there

2   was some substantial risk or likelihood that Windstream

3   would be either going out of business or terminating service

4   as a result of its bankruptcy, somewhat more than half of

5   those surveyed believed that was the -- or reported that was

6   their view or their interpretation, and a substantial

7   minority reported that that might be one interpretation but

8   not the only one, and a rather smaller minority did not read

9   the material that way.

10          The plaintiffs have challenged the bona fides or

11  accuracy of the survey on a number of grounds, including

12  that it did not include the envelope in which the

13  communication was sent, which clearly gave the impression,

14  as intended, that the envelope was coming from Windstream as

15  opposed to from one of Windstream's competitors.

16          More significantly, the plaintiffs, as a matter of

17  law, state that the use of such a survey, even if conducted

18  properly, can't be used to establish ambiguity for purposes

19  of whether something is literally false or not.  And that is

20  important because whether a message is literally false

21  depends in part on whether it is unambiguous, i.e.,

22  susceptible to more than one reasonable interpretation.

23  Time Warner, 497 F.3d at 158.

24          The plaintiffs contend that such survey

25  information is both not necessary to establish literal

1   falsity but, more importantly, not properly used to

2   establish literal falsity or to rebut it.  To the contrary,

3   citing the Dannon case that I previously cited, the Charter

4   defendants contend that such a survey can and should be used

5   to show ambiguity.

6           Having read the parties' authorities, and I will

7   note that only the Dannon case has been cited to me as

8   authority supporting Charter's proposition, I conclude that

9   neither party is exactly right.  It is clear to me, however,

10  that survey information is normally used in this context for

11  other elements of the cause of action and not for purposes

12  of establishing or rebutting literal falsity, but, rather,

13  to establish or rebut the fallback claim of consumer

14  confusion or other grounds -- or other elements of the

15  claim, including the quantum of damages.

16          It is also clear to me under the case law that if

17  the claim or the statement is clearly false on its face and

18  objectively so, survey research serves no purpose and should

19  be disregarded.  See, for example, Mead Johnson & Company v.

20  Abbott Labs, 201 F.3d 883, 885 through 86, and Groupe SEB

21  USA, Inc. v. Euro-Pro Operating LLC, 774 F.3d 192, 201 (3d

22  Cir. 2014).

23          On the other hand, the Dannon case stands for the

24  proposition, albeit in dicta since the Court granted the

25  underlying request for relief, albeit not on literal

1    falseness grounds but that the statement was impliedly false

2    and misleading, where the statement on its face was

3    ambiguous, i.e., it was literally true but one would only

4    get to that literal truth by considering a mathematical

5    analysis that could also lead to an untrue result depending

6    on a consumer's ability to get to that analysis.  There's no

7    similar facial ambiguity in the message in the mailer sent

8    to Windstream's customers and, therefore, I believe it would

9    be improper to look to a survey to reinterpret the words in

10   that mailer and its import.

11            Moreover, as did Judge McMahon in the Dannon case,

12   I conclude that, even if the -- oh, I'm sorry.  Before I get

13   to that, I should note, consistent with all of that, that a

14   Court may determine, based on its own common sense and logic

15   in interpreting the message, whether or not an advertisement

16   or representation made in a commercial context is literally

17   true or false.  General Cigar Company v. GDM, Inc., 988

18   F.Supp. 647 665 366 (S.D.N.Y. 1997), and that's consistent

19   with the case law that I've just cited.

20            And then, moreover, as I was saying, just as Judge

21   McMahon in the Dannon case concluded that the mailing was

22   likely to mislead or confuse customers, which requires

23   either extrinsic evidence of consumer deception or a showing

24   that the defendants intentionally set out to deceive the

25   public and that the defendant's deliberate conduct in this

1    regard is of an egregious nature, giving rise to a

2    presumption, which then needs to be rebutted.  On a summary

3    judgment basis, the undisputed facts establish a likelihood

4    to mislead or confuse customers, based on the mailing

5    campaign.

6              First, it does appear to me, including based on

7    the nature of the envelope itself and the admissions with

8    regard to the intentional campaign, as well as the

9    admissions with regard to Charter's knowledge that

10   Windstream was not in any imminent danger of terminating

11   service to its customers because of its financial condition,

12   Charter intentionally set out to deceive the public by

13   intentionally deceiving them to open a communication from

14   Windstream at a time when Windstream would be giving its

15   customers notice of its own bankruptcy, with the desire to

16   have them believe that the communication was coming from

17   Windstream, as opposed to one of Windstream's competitors,

18   and then alleging in the communication that Windstream's

19   service was at imminent risk of being terminated.

20             The evidence that Charter has pointed to as

21   establishing a rebuttal of that presumption, in fact,

22   establishes that, in fact, the mailing was misleading and

23   confusing -- or likely to mislead and confuse.

24   Mr. Ostberg's own survey found that more than half of the

25   surveyed customers were mislead or confused by the mailing.

1    In addition, it's uncontroverted that several hundred called

2    the 1-855 number that was uniquely contained in the mailing

3    to follow-up on the mailing with regard to imminent risk of

4    termination of service because of Windstream's bankruptcy.

5    The presumption, frankly, does not even need to be

6    established for Windstream to prevail on summary judgment on

7    this point, given the results of Mr. Ostberg's survey, and

8    the fact that it is undisputed with regard to the several

9    hundred calls and the over 20 customers who actually changed

10   service to a clearly established competitor in Charter.

11           Charter's other arguments as to why there is

12   additional evidence to show either lack of literal falsity

13   or lack of misleading or confusion simply doesn't pass the

14   Liberty Lobby/Matsushita test.  The internal e-mails from

15   Charter and with respect to its agent, RAPP, the advertising

16   company, that are undisputed clearly establish Charter's

17   intent to mislead.  Charter's argument that Windstream's

18   general counsel's letter warning Charter to cease its

19   communication effort, from March of 2019, that appear at

20   Exhibit 53, are being cited as an acknowledgement, at least

21   of some sort, of ambiguity or evidence of ambiguity, because

22   they don't use the words "literally false," although any

23   clear reading -- any clear-headed reading of those letters,

24   which use the words "false and misleading" repeatedly, are a

25   lot of difference between a letter from a general counsel

1  and pleading in a particular Lanham Act action.  They are

2  not evidence at all to the contrary of the plaintiffs'

3  evidence of literal falsity or false and misleading.

4        Finally, it's argued that the fact that some

5  customers did not respond and call the 1-855 number or

6  otherwise overtly react to the campaign is evidence of

7  ambiguity or lack of the information to be misleading.  If

8  that were the case, then a violation of the Lanham Act would

9  never occur.

10        Lastly, the defendants allege that its campaign

11  did nothing materially more than, as far as falsity and

12  misleading was concerned, than Windstream's own public

13  statements.  The two public statements that it relies on

14  primarily are Windstream's 10Ks and 10Qs pertaining to

15  disclosure of its bankruptcy filing, which clearly were not

16  for the benefit of its customers, but rather for investors.

17  As is the case with such forward-looking statements, they

18  contained typical boiler plate, laying out the risks of a

19  Chapter 11 case, which, among other things, would include

20  the possibility of the case not succeeding and eventually

21  converting to Chapter 7; but again, those communications

22  were not intended for or sent to Windstream's customers and,

23  in addition, did not indicate any risk of such a liquidation

24  of termination of service being imminent, which is the clear

25  message conveyed by the Charter mailings.

1          The Charter defendants also rely on the customer

2    communication sent out by Windstream with notice of its

3    bankruptcy filing and the press release that was referred to

4    in that customer communication, as well as being posted on

5    Windstream's website.  It's clear from a review of both of

6    those documents that they do not convey the message conveyed

7    by Charter's mailing campaign, but, indeed, reflect quite

8    clearly an intention to continue service and an ability to

9    do so.  The record is undisputed that, other than the fact

10   of Windstream being in a bankruptcy case, Charter had no

11   information to suggest that Windstream was in danger of

12   liquidating or having to terminate service because of its

13   bankruptcy or its financial condition, and, to the contrary,

14   the evidence reflected the opposite, which is that

15   Windstream was a viable company that was in bankruptcy to

16   restructure its debt and equity, but not to limit service

17   and that it had the financing to carry out that program.

18        (Pause)

19          THE COURT:  With regard to the materiality element

20   of the cause of action, although obviously there is some

21   overlap between it and the injury component, the Second

22   Circuit has stated, "Although the essential elements of the

23   materiality standard indeed appear to be somewhat unsettled

24   in our circuit, we need not resolve the issue now.  We

25   assume for purposes of this ruling, the defendant's false

1  advertising is not material to a plaintiff's Lanham Act

2  claim unless that falsity had the capacity to adversely

3  affect the plaintiff's business by influencing consumer

4  purchasing decisions. While the materiality of the falsity

5  and the likelihood of injury to the plaintiff resulting from

6  the defendant's falsity are separate essential elements, in

7  many cases, the evidence and the findings by the court that

8  a plaintiff has been injured or is likely to suffer injury

9  will satisfy the materiality standard, especially where the

10  defendant and plaintiff are competitors in the same market

11  and the falsity of the defendant's advertising is likely to

12  lead consumers to prefer the defendant's product over the

13  plaintiff's."  Church & Dwight Company, 483 F.3d at 71.

14          Here, in reading the source of the defendants'

15  objection to the plaintiffs' statement of undisputed fact as

16  to whether Windstream and Charter are competitors in the

17  same market covered by this complaint, I conclude that the

18  citations do not satisfy Rule 56 and that it's undisputed

19  that the two ARE competitors in the same market.

20          I also conclude, based on the evidence supporting

21  injury and consistent with Church & Dwight, that the

22  materiality component is satisfied here on a summary

23  judgment basis.  The injury here is not speculative, but

24  real, given the undisputed evidence of calls to the 1-855

25  line and the transfer of customers.  In addition, I believe

1   that, given the lack of any attempt to object to the

2   plaintiffs' objection to producing tapes of the calls to its

3   hotline regarding customer confusion and the context of the

4   lack of objection where the plaintiff, instead, provided

5   transcripts, certified transcripts, that those transcripts

6   can also be used as evidence to show the capacity to

7   adversely affect the plaintiffs' business, which, of course,

8   is, again, competitive with Charter's.

9           So, as I said at the start, I will grant the

10  motion for summary judgment as to liability on the Lanham

11  Act and Uniform Deceptive Trade Practices Act claims, the

12  last element of those claims, which I have not addressed,

13  being, as far as the Lanham Act is concerned and use in

14  interstate commerce, which is undisputed. That ruling also

15  explains why I am denying the Charter defendants' motion for

16  summary judgment.

17          As far as the contract cause of action is

18  concerned, it is undisputed that the Charter defendants

19  terminated service with respect to certain Windstream

20  customers under the VAR agreement without providing the 30

21  days notice required by Section 2.3 of the agreement.

22  Charter contends that such termination was not a breach of

23  that agreement for two reasons.  The first is that it

24  alleges that that agreement was only with one Windstream

25  entity, and, therefore, at best, only that entity could have

1   a cause of action, as opposed to all of the Windstream

2   plaintiffs.  To the contrary, the agreement is entered into

3   by Windstream and its affiliates and subsidiaries, or on

4   behalf of its affiliates and subsidiaries.  I'll note in

5   passing that Charter made a similar argument with respect to

6   the Lanham Act and state unfair practices claims, contending

7   that each plaintiff had to establish the elements of

8   liability under those statutes.  However, it is clear from

9   the record on oral argument that that objection is a red

10  herring, given that the mailer campaign went out to all of

11  the "Windstream," as generically defined, customers and did

12  not distinguish among Windstream entities.

13          It's also alleged that Section 8.1 of the VAR,

14  which has a reasonable efforts limitation on Charter's

15  providing service under the VAR, excuses Charter's breach of

16  the agreement under Section 2.3.  Based on the plain

17  language of those two provisions, it is clear and

18  unambiguous that the provision of service referred to in 8.1

19  does not address actions by Charter itself to terminate

20  service, including a decision by Charter to have termination

21  of service be robotically or automatically triggered.

22  Consequently, on a summary judgment basis, I conclude that

23  the plaintiffs have established a breach of contract claim

24  under New York law, which requires a showing of the

25  existence of an agreement, which I've already addressed,

1    adequate performance of the contract by the plaintiff,

2    breach of contract by the defendant, and damages.  Of

3    course, -- I'm sorry.  See Global Master Fund, Limited v.

4    Morgan Guarantee Trust Company of New York, 375 F.3d 168,

5    177 (2nd Cir. 2004).

6            Of course, as I noted at the beginning of this

7    ruling, summary judgment here is not sought on the issue of

8    damages, but only partially as to the issue of liability.  I

9    have not yet addressed the adequate performance of the

10   contract element of the cause of action, but in reviewing

11   the statements with regard to undisputed facts, the only

12   basis for challenging this element of the cause of action is

13   unsustainable.  It is the statement that because Charter's

14   -- I'm sorry -- because Windstream's 30(b)(6) witness does

15   not have personal knowledge of Windstream's adequate

16   performance of the contract his evidence is not admissible;

17   but, again, he's a 30(b)(6) witness, and there's no

18   challenge that he wasn't adequately  prepared to testify as

19   a 30(b)(6) witness on this issue.  So I'll grant the motion

20   as to liability for breach of contract of Section 2.3 or

21   specifically, Section 2.3 of the VAR.

22            As far as breach of the automatic stay is

23   concerned, there is no defense to the contention that

24   Charter breached the VAR agreement by direct nonperformance

25   under that agreement, based on Windstream's bankruptcy and

1    the prohibition of the automatic stay from paying

2    prepetition debt owed under that agreement.  Such an action

3    is clearly a violation of the automatic stay in that it is

4    an action to enforce a prepetition debt and/or to control

5    property of the estate, both of which are barred under

6    Section 362(a) of the Bankruptcy Code.

7            In addition, the violation of the Lanham Act and

8    its state law equivalents is an act to control property of

9    the estate, namely, the debtors' customers or contracts with

10   those customers, which would also constitute a violation of

11   the automatic stay, given that those rights are protected by

12   the automatic stay.  See In re Enron Corp., 300 B.R. 201 211

13   through 12 (Bankr. S.D.N.Y. 2003), as well as In re AMR

14   Corp., 45 B.R. 279 294 (Bankr. S.D.N.Y. 2013).

15           So I will partially grant the plaintiffs' motion

16   insofar as it seeks a determination that the automatic stay

17   was violated by the termination of service and by the

18   interference with the Windstream entities' contracts with

19   their customers by the mailing campaign.

20           Finally, as far as equitable subordination is

21   concerned, the cause of action requires a finding for

22   purposes of equitable subordination under Section 510(c) of

23   the Bankruptcy Code that the claimant -- and here, again,

24   the, as I ruled earlier this morning, this cause of action

25   only pertains to or can only be brought by, Windstream

1   plaintiffs who have had claims filed against them before the

2   bar date by the Charter defendants -- but the claimant must

3   have engaged in some type of inequitable conduct, the

4   misconduct resulted in injury to the creditors or the

5   bankrupt or conferred an unfair advantage on the claimant,

6   and equitable subordination would be consistent with the

7   provisions of the Bankruptcy Code.  Given that Charter is

8   not an insider, the conduct at issue also must be, quote,

9   "gross and egregious, tantamount to fraud,

10  misrepresentation, overreaching, or spoliation".  In re

11  Bernard L. Madoff Investor Securities, LLC, 583 B.R. 829 850

12  (Bankr. S.D.N.Y. 2011). Generally, where a non-insider is

13  involved, the claimant or creditor must be shown to have

14  acted improperly to gain an unfair advantage by breaching an

15  existing legally recognized duty under contract, tort or

16  other law.  Where the cause of action is based on solely a

17  breach of contract, the advantage taking must go beyond the

18  breach of the contract and show some improper additional

19  advantage taking caused by that breach.  One example, as

20  given by the Seventh Circuit, is where a movie star agrees

21  to act in a motion picture and then, after $20 million has

22  been spent, sulks in his dressing room until the contract

23  has been renegotiated.  Kham & Nate's Shoes No. 2, Inc. v.

24  First Bank of Whiting, 908 F.2d 1351 1356 through 57.  See

25  generally, In re 80 Nassau Associates, 169 B.R. 832 837

1    through 840 (Bankr. S.D.N.Y. 1994).

2           Here, I have already found a breach of a separate

3    and independent legal duty, namely, the breach in the Lanham

4    Act and its state law equivalents, which would give rise to,

5    or lead to the conclusion that the claimant has engaged in

6    some type of inequitable conduct and that conduct, given

7    that we're talking about a non-insider, was tantamount to

8    fraud, misrepresentation, or the like, given the requirement

9    to show falsity or misleading conduct and my conclusion that

10   the motion has established an intent to mislead.

11          The prior ruling on the Lanham Act and its state

12   law equivalents also inherently has required a finding for

13   summary judgment purposes that that misconduct resulted in

14   injury to the debtor.  It is not clear to me, however,

15   whether the creditors of the debtor will be injured, too,

16   and which creditors will be injured, and, given that

17   equitable subordination is an equitable remedy designed

18   solely to address the harm to creditors caused by the

19   improper conduct of a claimant, beyond finding that the

20   debtor was injured I cannot go further and grant any other

21   aspect, to the extent it's still being sought, of the

22   motion, with respect to the equitable subordination claim,

23   in that one does not know yet the nature or extent of the

24   injury to creditors.

25          This has been a long hearing with an extensive

1    record.  Given the rather short time frame that this matter

2    is on and the parties' efforts to conduct discovery promptly

3    to set up a trial, which probably will be in the spring,

4    I've given you all a lengthy bench ruling.  The underlying

5    results of that ruling won't change, but I might well write

6    an opinion on this issue as well.  That will depend on my

7    review of the transcript.  It's also possible and perhaps

8    likely that, after reviewing the transcript, I will want to

9    correct it, not only for typos or improper citation forms,

10   but for purposes of either correcting my grammar, organizing

11   the ruling more clearly, and sequentially, and/or

12   conceivably, adding additional case citations and reasoning.

13   If I do that, I will file the amended transcript, which will

14   at that time not be the transcript, but rather be treated as

15   an amended bench ruling.

16          So when the transcript comes out, I would ask the

17   debtors' counsel to send a copy to chambers, so that I could

18   go through that exercise, but that will not delay entry of a

19   partial summary judgment order.  Or, alternatively, which I

20   suggest, the parties can wait until there's a final ruling

21   in this case.  My ruling from the bench today will guide you

22   on as far as a trial goes, as to what issues are live for a

23   trial, and when there's a final result, you can submit an

24   order.  I leave that up to both sides.

25          As I said, I believe, given the nature of this

1    ruling, which is a partial summary judgment ruling, this is

2    not the type of context where a bankruptcy court should

3    issue proposed findings of fact and conclusions of law,

4    since it is not a final order, but only may result in a

5    final order.  Again, see In re Soundview Elite, Limited, 543

6    B.R. 78, 88 through 89 (Bankr. S.D.N.Y. 2016), and the cases

7    cited therein, and In re Provident Royalties, LLC, 2017

8    Bankr. LEXIS 4567 at pages 14 through 15 (Bankr. N.D.Tex.,

9    June 3, 2017).

10          Okay.  Any questions as to how the parties are to

11   proceed?

12          MR. ROSS:  No, Your Honor.

13          MR. KINGSTON:  None from the defendants, Your

14   Honor.

15          THE COURT:  Sorry?

16          MR. KINGSTON:  None from the defendants.

17          THE COURT:  Oh, okay, fine.  Thank you.

18      (Whereupon, these proceedings were concluded at 4:43

19   p.m.)

20

21

22

23

24

25

1                          I N D E X

2

3                       R U L I N G S

4

5    DESCRIPTION                                    PAGE

6    Debtors' motion seeking second extension of     35

7     exclusivity to solicit acceptances of

8     Chapter 11 plan granted

9    Debtors' first omnibus claims objection          39

10    sustained as amended on the record

11   Parties' motions for leave to file under seal  43

12    certain documents related to substantive

13    matters on the agenda granted

14   Defendants' motion for judgment on the          62

15    pleadings with respect to Count V in

16    the adversary complaint and motion to

17    dismiss Count VII for lack of subject

18    matter jurisdiction denied

19   Charter's summary judgment motion as it        134

20    applies to Counts VI and VII denied

21   Windstream's motion for summary judgment       138

22    as to liability granted

23   Plaintiffs' motion for summary judgment        150

24    as to liability granted

25

1                    I N D E X, cont'd

2

3                     R U L I N G S

4

5    DESCRIPTION                                PAGE

6    Defendants' motion for summary judgment        150

7     Denied

8    Plaintiffs' motion as to liability for breach 153

9     of contract Section 2.3 of the VAR agreement

10    granted

11    Plaintiffs' motion for summary judgment as to 153

12     breach of the automatic stay granted in part

13

14

15

16

17

18

19

20

21

22

23

24

25

C E R T I F I C A T I O N

We, Tracey Williams, Lisa Beck and Nicole Yawn certify that
the foregoing transcript is a true and accurate record of
the proceedings.

_____

Tracey Williams (CET**D-914)

AAERT Certified Electronic Transcriber

_____

Lisa Beck

_____

Nicole Yawn

Date:  December 23, 2019

Veritext Legal Solutions

330 Old Country Road

Suite 300

Mineola, NY 11501

| & |
|---|
| **&** 14:11,18 15:1 |
| 15:11 16:1 17:1 |
| 18:7 25:8 26:1 |
| 27:9 36:5 70:15 |
| 70:16 75:17 |
| 135:11 139:3 |
| 140:15 142:19 |
| 148:13,21 153:23 |

| 1 |
|---|
| **1** 2:1 3:6 43:17 |
| 50:23,25 51:4 |
| 52:8,9 59:21 |
| 74:23 91:24,25 |
| 97:9 106:18 122:5 |
| 130:6 134:9 |
| 137:20 138:6 |
| **1-800** 67:1 134:12 |
| **1-855** 67:1 77:20 |
| 145:2 146:5 |
| 148:24 |
| **10** 4:6 131:20 |
| **10001** 15:21 |
| **10017** 15:14 |
| **10019** 15:5 16:4 |
| **10022** 14:6,14 |
| **10220** 17:6 |
| **105** 43:24 45:2 |
| 55:17,24 56:4,5 |
| 58:4 |
| **10601** 1:19 |
| **109** 2:22 3:1 10:25 |
| 11:19 137:18 |
| **10:24** 1:22 |
| **10ks** 103:16 128:3 |
| 146:14 |
| **10qs** 103:16 128:4 |
| 146:14 |
| **11** 2:2 4:13 24:18 |
| 29:8 30:5,7 31:7 |
| 41:17 54:17 55:11 |
| 63:25 64:3,15,19 |
| 65:14 94:6 146:19 |
| 157:8 |
| **112** 58:19 |
| **1121** 2:3 30:8,8 |
| **1125** 133:6 138:2 |
| **1129** 56:11 |
| **113** 135:2 |
| **1134** 56:11 |
| **114** 59:20,21 |
| **115** 12:1 |
| **11501** 159:22 |
| **118** 59:21 137:18 |
| **12** 4:25 44:17 52:6 |
| 52:8,9 152:13 |
| **122** 2:15 3:8,14 |
| 4:3,10 9:11 31:2 |
| 135:2 |
| **1221** 17:5 |
| **1224** 2:9 36:8 |
| **123** 3:15 4:21 |
| **124** 3:22 4:21 |
| **125** 4:4,21 |
| **126** 4:11,21 |
| **127** 2:16 4:21 |
| **128** 4:23 |
| **1281** 2:4 18:23 |
| **1285** 16:3 |
| **128819** 139:25 |
| **129** 5:4,10 6:1,10 |
| 7:17 |
| **12:27** 92:22 |
| **13** 5:6 |
| **130** 5:12 6:10 8:17 |
| **1300** 37:6 |
| **131** 5:19 6:10 |
| **132** 6:3,10 |
| **133** 6:13 |
| **1334** 45:6 52:12 |
| **1335** 18:24 |
| **134** 157:19 |
| **1351** 153:24 |
| **1356** 153:24 |
| **138** 157:21 |
| **14** 5:14 131:11 |
| 139:25 156:8 |
| **140** 6:20 |
| **141** 7:3 135:12 |
| **1415** 56:10 |
| **142** 7:12 |
| **144** 7:19 8:17 |
| 139:14 |
| **145** 7:25 |
| **146** 8:4 |
| **147** 8:11 |
| **148** 135:12 |
| **149** 8:19 |
| **15** 5:21 22:15 |
| 131:11 133:6 |
| 138:2 156:8 |
| **150** 157:23 158:6 |
| **151** 8:25 |
| **153** 9:6 122:25 |
| 139:14 158:8,11 |
| **154** 58:19 |
| **157** 9:13 |
| **158** 9:20 141:23 |
| **159** 10:12 |
| **15th** 25:11,21 |
| **16** 6:5 |
| **160** 10:19 |
| **161** 11:2,10,19 |
| **162** 11:11 |
| **163** 11:20 |
| **164** 12:2,8,17 13:2 |
| **165** 12:10 13:2 |
| **166** 12:18 |
| **168** 13:4 151:4 |
| **169** 153:25 |
| **17** 6:15 |
| **177** 151:5 |
| **17th** 21:6 |
| **18** 1:21 6:21 98:8 |
| **182** 55:9 |
| **186** 55:9 |
| **187** 55:9 |
| **19** 7:5 98:7 |
| **19-08246** 1:4 2:11 |
| 2:18,24 3:3,10,17 |
| 3:24 4:6,13,25 5:6 |
| 5:14,21 6:5,15,21 |
| 7:5,14,21 8:1,6,13 |
| 8:20 9:2,8,15 10:1 |
| 10:14,21 11:4,13 |
| 11:22 12:4,12,20 |
| **19-22312** 1:4 |
| **192** 142:21 |
| **1976** 59:21 |
| **1983** 56:10 |
| **1986** 134:18,21 |
| 135:7 |
| **1989** 59:19 |
| **1990** 55:10 |
| **1992** 56:11 |
| **1994** 154:1 |
| **1997** 143:18 |
| **1st** 25:20 84:14 |
| 119:13 130:3,4 |

| 2 |
|---|
| **2** 2:6 36:6 92:1,14 |
| 123:13 137:20 |
| 138:7 153:23 |
| **2.3** 123:11 133:14 |
| 149:21 151:20,21 |
| 158:9 |
| **2.3.** 123:12 125:11 |
| 150:16 |
| **20** 7:14 67:14 76:2 |
| 77:24 79:21 81:23 |
| 145:9 153:21 |
| **2002** 60:17 |
| **2003** 59:17 152:13 |
| **2004** 59:4 134:13 |
| 135:2 137:24 |
| 151:5 |
| **2006** 31:2,3 139:4 |
| **2007** 59:20 135:12 |
| 139:15 |

**2008** 58:21 134:14
**2009** 58:20 128:24
**201** 142:20,21
  152:12
**2010** 134:14
  139:24,25
**2011** 31:1 153:12
**2013** 140:8 152:14
**2014** 142:22
**2015** 122:1
**2016** 75:4 131:9
  140:16 156:6
**2017** 131:10,11
  156:7,9
**2018** 97:9 119:14
**2019** 1:21 145:19
  159:17
**2020** 22:11 37:5
**203** 111:20
**204** 111:20
**205** 110:12,14
  112:2,3,6,10,12
  112:13
**209** 66:15 81:2
**21** 7:21 106:20
**210** 111:18
**211** 152:12
**21st** 106:21 107:9
**22** 8:1
**2201** 44:4
**23** 8:6 159:17
**231** 58:21
**24** 8:13 124:10
**241** 134:12
**242** 134:21
**244** 134:12
**247** 135:7 137:24
**248** 1:18 134:21
**25** 8:20
**250** 15:4
**255** 137:24
**25th** 19:2

**26** 9:2 121:1
**26th** 19:3 106:22
  107:9 108:5
**27** 9:8 59:17
**271** 134:14
**276** 58:21
**279** 152:14
**28** 9:15 44:4
**29** 10:1
**293** 59:18
**294** 152:14
**2:06** 92:22
**2d** 56:10 59:17,18
  59:19 134:12,13
  134:14 135:2,12
  137:24 139:4,15
**2nd** 20:10,11
  21:21 35:18 55:9
  140:16 151:5

**3**

**3** 2:11 91:25 104:9
  131:11 137:8,8,21
  156:9
**3,721** 67:5
**3.2** 67:18
**30** 10:14 87:9
  121:7,13 125:12
  129:20 133:15
  149:20 151:14,17
  151:19
**300** 1:18 14:20
  50:11 152:12
  159:21
**31** 10:21 24:13,25
  25:4
**310** 60:17
**31st** 22:14 23:8,9
  29:24,25
**32** 11:4 56:12
**33** 11:13 94:24
  96:16
**330** 159:20

**336** 31:1
**34** 11:22 59:17
**340** 59:17
**342** 31:2
**35** 12:4 157:6
**36** 12:12 46:19
  47:20
**360** 50:11
**361** 135:2
**362** 43:15,17
  44:21,23,23,25
  50:23,25 51:4
  54:12,21,23,25
  55:2,4,20 137:17
  152:6
**366** 143:18
**37** 12:20
**3700** 75:25
**373** 134:12
**375** 151:4
**383** 58:21
**39** 157:9
**3:01** 132:3
**3:34** 132:3
**3d** 137:18 142:21
**3rd** 98:18,19

**4**

**4** 2:18 59:18
  122:12,15,17,20
  122:21,24 137:22
**4000** 76:5
**404** 140:8
**407** 140:8
**420** 58:19
**424** 59:20
**43** 76:15 94:24
  96:16 137:14,19
  138:1 157:11
**45** 27:22 152:14
**450** 15:13
**4567** 131:10 156:8
**460** 30:25

**475** 134:18 135:7
**477** 134:13,21
  135:6
**48** 135:7 139:4
  140:15
**481** 135:12
**483** 148:13
**485** 134:13
**497** 139:14 141:23
**4th** 18:23

**5**

**5** 2:24
**5.1** 67:18
**500** 60:17
**51** 93:25
**510** 46:12 54:17
  152:22
**513** 60:17
**514** 59:19
**518** 59:19
**52** 106:12
**520** 59:19
**53** 106:13,14,24
  145:20
**541** 59:4
**543** 131:8 156:5
**55** 15:20
**55th** 15:4
**56** 133:18,23
  134:9 148:18
**567** 59:4
**57** 153:24
**570** 59:4
**574** 134:18
**575** 14:5
**583** 153:11
**586** 134:18 135:8

**6**

**6** 3:3 52:6 56:12
  60:11 139:25
  151:14,17,19
**60** 21:23 27:17,22
  32:13 35:8 134:14

**601** 14:13
**60654** 14:21
**61** 80:20
**61.4** 80:21
**610** 31:2
**62** 157:14
**63101** 16:11
**647** 143:18
**65** 139:4
**662** 82:10 83:6
**663** 67:8 76:1
77:22 79:20 81:22
83:7
**665** 143:18
**674** 31:2

**7**

**7** 3:10 55:11 71:9
124:10 146:21
**7001** 57:21
**701** 134:13
**7056** 133:19
**71** 140:16 148:13
**713** 56:9
**75** 32:13 111:20
**760** 137:24
**774** 142:21
**78** 131:8 156:6
**7th** 56:11

**8**

**8** 3:17 56:5
**8.1** 123:18,23
150:13,18
**8.8** 67:20
**80** 153:25
**818** 30:25
**829** 153:11
**832** 153:25
**837** 153:25
**840** 154:1
**843** 139:4 140:15
**850** 153:11
**86** 142:20

**876** 59:18
**88** 131:8 156:6
**883** 142:20
**885** 142:20
**89** 131:8 156:6

**9**

**9** 3:24 137:8
**9011** 53:5,13 61:2
**9014** 44:3,3 57:8
**9020** 44:2,3
**908** 153:24
**914** 159:8
**920** 55:9 140:8
**977** 56:11
**988** 143:17
**9th** 37:5

**a**

**aaert** 159:9
**abandon** 94:4
**abbott** 127:15
142:20
**ability** 26:3 46:7
130:25 143:6
147:8
**absence** 134:7
139:2
**absent** 21:16
129:17
**absolute** 81:19
**absolutely** 28:21
51:7 52:13 53:17
88:17 89:11
113:23,24 126:21
128:13
**abundance**
104:11
**accept** 80:7 91:1
**acceptable** 18:17
**acceptance** 84:22
**acceptances** 2:3
30:7 157:7
**account** 78:18
79:16

**accuracy** 141:11
**accurate** 61:15
79:8 159:4
**accurately** 85:12
85:16
**accuse** 91:5
**ace** 51:14
**acknowledge**
133:10
**acknowledged**
121:10
**acknowledgement**
145:20
**acknowledgment**
59:24
**act** 44:14 59:16
69:15 83:16 89:17
99:21,21 100:21
113:15,22,22
115:18,19 129:1
129:22,23 133:5,9
133:11 136:24
137:11,13,14,18
138:2 146:1,8
148:1 149:11,11
149:13 150:6
152:7,8 153:21
154:4,11
**acted** 117:19
153:14
**acting** 31:11
**action** 24:14 25:1
28:2 44:1,8,18
46:4 49:10 51:22
53:1 54:22,25
58:2,5,7,8,12 59:3
59:13 68:12,12
74:12,24 83:5,13
83:15 86:11 88:10
89:8,9,20,21,22
89:24 90:2 91:15
140:17 142:11
146:1 147:20

149:17 150:1
151:10,12 152:2,4
152:21,24 153:16
**actions** 136:5
150:19
**active** 32:1 35:15
**actively** 26:22
27:4
**acts** 44:13 91:5
136:25 137:12
**actual** 52:13
67:15 68:10 76:6
82:18,23,25 139:8
139:13
**ad** 22:14,15 23:14
67:16 75:25 77:20
77:23 99:14 100:2
100:3,3,5,6,9,17
101:25 102:1,16
102:21 140:19
**add** 100:6 120:24
**added** 123:4
**adding** 155:12
**addition** 55:17,22
67:21,24 107:22
138:10 145:1
146:23 148:25
152:7
**additional** 9:18
19:7 37:6 57:2
109:16 145:12
153:18 155:12
**address** 18:19
32:23 43:11 44:9
44:12,16 48:10
50:1 99:18 115:4
127:4 150:19
154:18
**addressed** 35:17
43:21 47:9 49:25
70:19 71:25
105:11 149:12
150:25 151:9

**addresses** 78:18
79:17
**adelphia** 19:18
31:1
**adequate** 86:14
151:1,9,15
**adequately**
138:21 151:18
**adjourning** 37:21
**admissible** 78:4
151:16
**admission** 69:23
118:16,17,19
**admissions** 134:5
144:7,9
**admitted** 125:20
125:22
**ads** 76:23
**adv** 1:4
**advance** 133:15
**advantage** 67:14
153:5,14,17,19
**adversary** 2:11,18
2:20,24 3:3,10,17
3:24 4:6,13,25 5:6
5:14,21 6:5,15,21
7:5,14,21 8:1,6,13
8:20 9:2,8,15 10:1
10:14,21 11:4,13
11:22 12:4,12,20
18:13 29:2 31:17
31:18,24 40:20
41:23 43:2 50:19
51:10,17,22,22
54:10 56:18,20
57:1,11,13,16
106:18 122:5,24
132:10 157:16
**adverse** 32:21
64:1
**adversely** 75:15
148:2 149:7

**advertisement**
65:7 66:3,5,11,14
66:15,24 67:10,20
68:17 70:16,18
71:22 73:4,5 76:7
76:19,19 78:1
80:18,21,22 81:3
81:15 93:16 94:2
94:11 99:24 100:7
100:8,15,20
101:15,19 102:10
102:12,13,18,21
103:4,11,12,18,19
104:23 107:7,7,20
108:20 110:16
111:1 117:23
118:12 126:5
128:1,5,8,9
130:11 137:20
138:4,7 139:10,16
139:19,22 140:2,4
143:15
**advertisement's**
139:13
**advertisements**
101:17 105:18
**advertising** 67:22
68:14 69:15 70:14
83:14 88:3,6
90:22 91:6 102:16
113:3 138:1,4,6
138:18 145:15
148:1,11
**affect** 34:15 72:14
75:15 134:19
148:3 149:7
**affidavits** 134:3
**affiliated** 14:4
**affiliates** 54:16
86:22 150:3,4
**affirmative** 61:17
**affirmed** 31:2
134:14

**afternoon** 92:25
**ag** 137:23 140:7
**agency** 66:9
**agenda** 18:12 36:7
42:9,11,15,16
43:3 157:13
**agent** 36:9 81:5,6
145:15
**ago** 96:3 107:23
**agree** 23:20 24:1
24:2 25:9 34:17
34:21 43:16 77:19
83:14 90:9 97:1,3
99:20 120:20
**agreed** 37:3 38:12
89:11
**agreement** 35:17
38:4 86:12,12
123:4,5 124:5,8
133:13,14,16
136:18 149:20,21
149:23,24 150:2
150:16,25 151:24
151:25 152:2
158:9
**agreements**
136:17
**agrees** 23:6 27:11
153:20
**ahead** 44:11 46:21
47:3,3 62:24
95:23 112:21
**air** 79:4
**airplane** 78:22
**al** 1:7,10 2:12,12
2:16,19,19,25,25
3:4,4,8,11,11,15
3:18,18,22,25,25
4:4,7,7,11,14,14
5:1,1,7,7,15,15,22
5:22 6:6,6,16,16
6:22,22 7:6,6,15
7:15,19,22,22,25

8:2,2,4,7,7,11,14
8:14,21,21 9:3,3,9
9:9,16,16 10:2,2
10:12,15,15,22,22
11:2,5,5,11,14,14
11:23,23 12:2,5,5
12:10,13,13,18,21
12:21 13:4 18:3
41:18 93:1 132:7
**albeit** 142:24,25
**aligned** 23:19
**allegation** 58:3
75:21 76:10 77:2
**allegations** 117:25
**allege** 47:10 56:14
132:16 146:10
**alleged** 31:10 43:9
44:16 47:15 56:7
56:12 58:1 60:9
69:4 136:5 140:21
141:1 150:13
**alleges** 54:14
83:20 149:24
**alleging** 144:18
**allocation** 33:12
**allotted** 24:24
25:11
**allow** 22:4 69:19
85:7
**allowed** 46:12,13
50:23 51:16,20
52:25 71:14 85:14
127:18
**alternatively**
40:13 155:19
**amazing** 50:5,5
**ambiguity** 69:12
69:13,20,23 70:3
74:16,17 108:5,6
127:9,12,23 128:7
128:12 141:18
142:5 143:7
145:21,21 146:7

**ambiguous** 69:4,6
  101:20 102:2,11
  105:3,15,23
  106:25 107:3
  109:3 128:9 143:3
**amend** 20:1
**amended** 2:7 38:2
  38:15 39:21,22,23
  40:2 42:16 155:13
  155:15 157:10
**america** 135:1
**america's** 130:2
**american** 59:17
**americas** 16:3
  17:5
**amnesty** 135:1
**amount** 30:21
  67:20 117:14
**ample** 23:23
**amr** 152:13
**analogized** 55:14
**analogy** 28:14
**analysis** 143:5,6
**analyze** 139:18
**andersen** 58:20
**anderson** 134:20
  135:6
**announcing** 80:11
  126:12
**annual** 104:15
**answer** 51:13 52:4
  74:9 85:20 119:21
  120:16 128:9
**answered** 66:6
  112:10
**answers** 52:22
  134:5
**anticipated** 60:22
**anybody** 29:19
  87:10 93:22
  120:16
**aplaintiffs'**
  118:14

**apologize** 68:1
  96:12
**appear** 31:14
  53:21 144:6
  145:19 147:23
**appeared** 43:14
**appears** 34:8
  53:22 135:23
  136:12 137:7
**appellate** 26:14
  69:25
**appendix** 134:14
**applicable** 57:8
  61:4 118:1 135:15
**application** 42:21
  57:6
**applies** 68:6 133:1
  157:20
**apply** 53:12 57:4
  57:5 83:5 89:17
  109:3
**approach** 25:16
  26:20 29:11
**appropriate** 19:4
  23:1,22 25:5
  27:12,20 28:23
  44:16 55:19 56:20
  56:21 95:13
  135:15
**approximately**
  19:2 21:23 67:20
**april** 21:1,5,11
  22:15 25:11,21
  27:20 28:21 29:13
  34:4,20 35:5,7
  94:17 119:18
  131:22
**argue** 31:4 59:22
  127:11
**argued** 59:6 60:19
  125:25 146:4
**argues** 19:17
  56:17

**arguing** 18:18
  20:22 27:17 51:12
**argument** 23:18
  50:22 51:3 57:10
  62:17,18,19,19
  63:1,5 66:19,19
  68:10 70:13 76:18
  77:4 83:22 85:18
  93:3 95:7 105:17
  109:22 112:17,19
  114:9 123:6 127:5
  127:8 131:14
  135:23 145:17
  150:5,9
**arguments** 70:9
  74:13 76:16,16
  87:24 112:19
  145:11
**arises** 138:24
  140:13
**arrangement**
  31:1
**arthur** 58:20
**articulated** 136:7
**artificial** 125:8
**aside** 83:1
**asked** 52:2 59:16
  62:3 66:5 80:17
  80:18 93:18 94:25
  95:1 96:13,15,16
  119:22 127:22
**asking** 25:15 44:6
  62:5 88:5 107:21
**aspect** 19:15
  54:19 154:21
**aspects** 45:12
**assert** 47:25 54:20
  133:7
**asserted** 54:19
  58:7
**asserting** 133:24
**assertion** 133:25

**asserts** 54:11
  57:20 60:7 133:12
**assess** 22:18
**assessing** 126:15
**assessments** 135:1
**assistant** 102:15
**associated** 22:21
  138:16
**associates** 153:25
**association** 17:2,4
**assume** 126:11
  147:25
**assumed** 54:24
**assuming** 33:24
  34:5 38:11 39:12
**atlas** 59:4
**attached** 37:2,12
  122:14,19
**attempt** 60:10
  149:1
**attention** 99:14
  105:19
**attorneys** 14:12
  14:19 15:2,12,19
  16:2,9 17:2 93:6
**attract** 65:13
**audience** 72:2
**audio** 66:21 78:14
  78:15,16,20 79:7
  79:12,15 119:19
  120:2,4,12,16,17
  120:19,20,24
**audiotapes** 84:7
  84:10,14,23 85:2
**audit** 125:8
**august** 19:2 97:9
  98:7,8 119:13
**auman** 4:1,20 8:8
  10:8
**authorities** 142:6
**authority** 124:4,7
  142:8

**authorize** 43:17
**automatic** 43:22
  51:16,21 54:11,23
  55:5,11,14 56:14
  56:23,24 57:12,22
  60:8 87:14,14
  88:1,8,10 89:4
  90:4 91:7 124:17
  132:17 135:24
  136:4,16 151:22
  152:1,3,11,12,16
  158:12
**automatically**
  150:21
**available** 66:10,21
  104:1,2,4
**avenue** 14:5,13
  15:13 16:3 17:5
**avoid** 20:19 44:9
**award** 56:24
**aware** 61:5 64:13
  82:15 94:8 108:25
  109:8 118:23
  119:1

**b**

**b** 1:23 2:7 4:17
  10:5 12:25 45:6
  52:6,8,9 56:17
  134:6 151:14,17
  151:19
**b.r.** 30:25 31:1,2
  58:19,21 60:17
  131:8 152:12,14
  153:11,25 156:6
**back** 26:22 28:1
  28:19 36:12 54:8
  67:11,23 72:1
  73:14 77:6,24
  78:5 82:21 84:19
  92:1,14,25 96:6
  98:7,22 99:17
  100:22 103:9
  117:4 122:18

  124:21 131:14
  132:6
**backing** 112:3
**bake** 33:11 34:14
**balance** 40:17
  64:3
**ball** 90:6
**bank** 16:10 17:2,3
  153:24
**bankr** 30:25 31:2
  58:20,21 60:17
  131:9,10,11
  152:13,14 153:12
  154:1 156:6,8,8
**bankrupt** 153:5
**bankruptcy** 1:2
  1:17,25 2:4 30:8
  43:16 45:10 54:12
  54:21,24 55:17,21
  55:21,23 56:19
  57:7,21 58:13
  61:2 65:5,25
  70:12,12 71:12
  72:11 73:2 81:7
  87:20 103:13,14
  104:16,22 130:25
  132:20 133:19
  141:4 144:15
  145:4 146:15
  147:3,10,13,15
  151:25 152:6,23
  153:7 156:2
**bar** 49:15 52:25
  53:24 54:6 58:16
  58:23 60:18 153:2
**bargain** 22:25
  23:2
**bark** 109:22,22,23
  110:1
**barnhart** 135:12
**barred** 152:5
**based** 20:12 25:17
  29:18 30:11 33:5

  36:23 46:2,9 56:3
  58:2,11 59:15
  60:9 67:18 70:9
  72:19 81:7 105:5
  106:6 121:19
  135:14 137:1
  138:5,19 143:14
  144:4,6 148:20
  150:16 151:25
  153:16
**bases** 132:22,23
**basic** 34:15
**basically** 40:8
  109:2
**basis** 32:1,19 39:1
  39:20 51:8 54:25
  56:15 69:5 71:22
  73:1 79:3 132:21
  140:21 144:3
  148:23 150:22
  151:12
**bau** 64:15 73:24
**bear** 134:12
**beargram** 134:12
**bears** 134:10
**beck** 13:25 159:3
  159:12
**beginning** 32:7
  34:11 42:20 72:11
  151:6
**behalf** 2:15 3:7,14
  3:21 4:3,11,22
  5:11,18 6:1,11,18
  7:1,10,18,24 8:4
  8:10,18 9:12,18
  10:11 11:1,10,19
  12:1,9,17 13:3
  23:14 25:9 26:1
  27:9 36:6 42:2
  61:10 123:10
  150:4
**belief** 28:10 73:18
  74:5

**believe** 19:3 21:2
  34:1 40:22 63:10
  63:21 70:9 74:13
  75:4 84:25 99:8
  99:10 100:14
  101:7 109:20
  112:8,23 116:17
  121:5 123:19
  126:18 130:1
  135:20 143:8
  144:16 148:25
  155:25
**believed** 73:21
  74:2 141:5
**bench** 155:4,15,21
**benefit** 57:17
  146:16
**bernard** 153:11
**best** 24:25 66:18
  78:14 95:12 96:3
  96:5 112:19
  121:22,23,25
  149:25
**bet** 132:1
**better** 25:16 26:24
  31:21 68:11 90:10
  91:2
**beyond** 27:14
  69:8 88:1 89:23
  108:15 128:22
  136:22 153:17
  154:19
**bhs&b** 58:19
**big** 72:12
**bills** 30:18 31:8
**binder** 106:7
  122:20,21 135:11
  135:11 137:8
**binders** 123:2
**bit** 25:10
**black** 33:9 78:24
**boiler** 146:18

**bold** 72:12
**bona** 141:10
**bonuses** 103:7
**books** 122:10
**borders** 30:25
**bother** 70:24
  109:13
**bottle** 117:10
**bottom** 66:25
  80:20
**bought** 77:22,24
  81:23 82:10 83:8
  100:17
**box** 78:25
**brad** 14:23 18:7
**brand** 68:4,9 91:9
**breach** 55:25
  56:14,16,23,24
  57:12,12 86:7,15
  87:3,9,12 88:2,18
  89:4,9,15,23 90:4
  90:17 121:4,6,19
  132:17,18 133:12
  149:22 150:15,23
  151:2,20,22
  153:17,18,19
  154:2,3 158:8,12
**breached** 60:8
  87:15 89:6 125:13
  151:24
**breaches** 57:1
**breaching** 153:14
**break** 76:14 92:1
  92:12 130:13
**brian** 5:23 6:23
  9:4 16:2,13 25:7
  42:1 43:5
**brief** 23:15 50:20
  51:2 61:20 63:21
  70:7 73:14 87:1
  101:4 113:20
  114:23 127:14
  130:12

**briefed** 62:11
**briefing** 83:19
  117:2
**briefly** 28:6
**briefs** 30:12 86:21
  104:14
**brilliant** 77:1
**bring** 45:21 46:3
  46:4 51:20 52:6,7
  52:8,17,25 56:22
  59:23 60:3,4,5,14
  69:19 76:21
**bringing** 56:3
**brings** 68:10
**broad** 84:13
**broke** 125:13
**brookstone** 140:7
**brought** 44:2
  45:23 49:10 51:17
  52:6,9 59:3,14,25
  65:8 89:12 152:25
**buckley** 59:20
**build** 19:13 22:6
**bunch** 80:19 87:5
**burden** 134:10
  139:1 140:14
**business** 64:11,14
  64:16,20 65:11
  66:23 71:5,22
  73:22,24 74:1,3
  75:16 76:7,9 94:7
  105:21 107:8,12
  107:15 108:7,21
  126:13 129:1
  141:3 148:3 149:7
**businesses** 31:9
  66:10
**butler** 10:10
**buy** 67:11,11
  128:18
**buyback** 77:23
**buying** 139:13

**buyouts** 76:2
  79:21 81:24

**c**

**c** 2:7 4:19 10:6
  11:25 12:6,8,16
  12:24,25 13:2
  14:1 18:1 44:17
  54:17 57:18
  106:16 134:9
  152:22 159:1,1
**cable** 139:14
**calculation** 67:17
**calendar** 21:9
**call** 76:1 78:3,6,12
  81:2,12 84:17
  85:6 91:24 92:16
  108:16,24,25
  109:7 120:9 146:5
**called** 28:11,11,15
  28:25 51:14 65:8
  66:15 77:5 79:4
  81:2,22 83:7
  133:13 145:1
**calling** 109:13
**calls** 31:18 66:20
  66:20 67:4,5,8,25
  78:7 81:2,7,17
  82:24 102:21
  103:1 126:11
  145:9 148:24
  149:2
**camera** 66:22
  79:7,11 85:9
**campaign** 65:4,10
  76:20 110:16
  111:2 113:17
  115:12 140:19
  144:5,8 146:6,10
  147:7 150:10
  152:19
**candidly** 71:18
  85:5

**can't** 141:18
**capable** 73:16
  74:8
**capacity** 75:15
  148:2 149:6
**capital** 31:10
  34:17,21
**capitalize** 66:4,5
**captured** 48:12
**card** 78:17 79:16
  95:2,6
**care** 83:18 87:22
  87:22,23
**careful** 78:5
**carefully** 33:19
**carolina** 39:8
**carolina's** 133:8
**carrier** 64:22
**carroll** 56:10
**carry** 55:19
  147:17
**case** 1:4 17:1
  19:11,19 23:16,20
  26:1,4,5 27:4
  28:16 30:14,22
  31:14 34:3,18,22
  35:2,12 38:8,16
  41:17 42:21,22
  45:11,15,17,18,19
  46:6,7 47:13,17
  48:4 49:4,5,6,14
  49:19,19,20,21,22
  50:9 51:14 52:22
  55:11,11 57:9
  58:13,14 59:5
  60:2 68:21 69:9
  69:16,16,18,21,21
  70:14 71:12 73:3
  75:5,17 76:23
  77:15 78:19,21,22
  79:3 82:2,22 95:4
  95:5 102:6 103:8
  105:1 108:8,22

109:8 110:12,24
111:24 113:7,11
113:11,21,22,22
114:12,13,22
115:18 117:1,9,15
117:24 118:5,16
118:17,19,21
127:13,19,19
129:23,23,24,24
130:4 132:20
134:7 136:8
137:25 138:25
140:5 142:3,7,16
142:23 143:11,19
143:21 146:8,17
146:19,20 147:10
155:12,21
**cases** 19:5,19
22:19 23:3 24:13
26:19 29:5,5,10
30:5 44:14 49:1,1
49:3,7,10,18,23
49:23,24,25,25
50:2 51:9,15,18
52:3,3,8 58:18,22
58:25 63:25 70:1
77:17 78:22 82:6
82:12 83:15 87:20
99:23,25 100:18
100:25 109:12
113:8,19 114:6,8
114:10 117:5,7,8
117:8,13 118:2
127:10,12 131:9
131:13 138:20
148:7 156:6
**categories** 101:20
**category** 40:1
**caught** 47:8
**causal** 67:15
68:17
**causation** 75:1
80:5,10 81:18,21

81:25
**cause** 30:10,10
34:2,24 44:1,18
51:22 52:25 54:22
54:25 58:2,5,7,8
58:12 68:12,12
74:12,23 83:13
86:10 88:10 89:8
89:9,20,21,22,23
90:2 91:15 112:12
139:8 140:17
142:11 147:20
149:17 150:1
151:10,12 152:21
152:24 153:16
**caused** 68:17
153:19 154:18
**causes** 83:15
**cease** 145:18
**cede** 35:25
**center** 79:4
**centralized** 19:4
**certain** 4:15,19
8:23 10:3,7 12:22
18:17 42:5,9,10
45:12 53:11,23
58:25 88:15 95:17
95:18 130:19
149:19 157:12
**certainly** 21:24
32:24 38:16 49:23
56:22 91:1 92:21
**certified** 78:13,25
83:25 84:17,19,20
84:22,25 85:3,21
94:19 149:5 159:9
**certify** 84:4 159:3
**cet** 159:8
**cetera** 79:17 87:8
87:8,8
**challenge** 151:18
**challenged** 138:3
139:6 141:10

**challenging**
151:12
**chambers** 35:10
42:25 63:4 155:17
**chance** 53:19 80:6
84:10
**change** 36:25 38:1
117:12,21 155:5
**changed** 20:4 59:5
68:22 127:7 145:9
**changes** 36:23
**chapter** 2:2 24:18
29:8 30:5,7 31:7
41:17 55:11 63:25
64:3,15,19 65:14
71:9 94:6 146:19
146:21 157:8
**characteristic**
75:14 137:21
138:12
**characterized**
131:13
**charge** 29:12
**charles** 17:10
**charter** 1:13,14
2:12,19,25 3:4,11
3:18,25 4:7,14 5:1
5:2,3,7,8,9,11,12
5:15,18,18,22,24
5:24 6:2,2,6,7,8
6:11,12,16,19,19
6:22,24,24 7:1,2,6
7:10,11,15,22 8:2
8:7,14,21 9:3,5,5
9:9,12,13,16,19
9:19 10:2,15,22
11:5,14,23 12:5
12:13,21 16:9
18:13 40:20,23
41:18 42:2,3
43:14 45:24,24
46:19 47:25 48:16
53:23,25 54:15

60:8,11 62:2
63:16 64:13,17
65:1,6,9,12,17
67:5,9,12,13 69:1
71:17 73:21 76:2
76:6 79:4 81:23
93:1,1,3,6,11,15
93:19,22 94:8,9,9
94:23 95:1 96:17
100:8 101:25
102:1,11 106:13
107:7 113:5,14,23
113:24 115:3,4
116:1 119:14,23
120:12 121:24
125:1,20 128:23
130:14 132:7,8,14
133:14 140:21
142:3 144:12,20
145:10,15,18
146:25 147:1,10
148:16 149:15,18
149:22 150:5,19
150:20 151:24
153:2,7
**charter's** 8:16
64:18,22 65:3,23
66:2 76:4 121:14
132:19,21,23
133:1 142:8 144:9
145:11,16,17
147:7 149:8
150:14,15 151:13
157:19
**charters** 8:24
**chateaugay** 50:23
55:9
**check** 38:3,9 40:3
40:5
**checkpoint** 25:3
**cherry** 70:17
**chevron** 59:8

chewed 110:4
chicago 14:21
chief 137:16
children 28:13
chobani 137:17
choice 60:4 130:3
130:4,7
chose 38:20
chris 25:25
christmas 102:4
christopher 17:8
church 70:15,16
75:17 139:3
140:15 148:13,21
cigar 143:17
cir 55:10 56:10,11
59:17,19 134:12
134:14 135:2,12
137:24 139:4,15
140:16 142:22
151:5
circuit 51:18 55:3
55:8 68:19 69:5
70:14,15 74:25
75:3,9 81:20
101:16 108:9
126:4 127:13
137:15,25 147:22
147:24 153:20
circumstances
31:14
citation 155:9
citations 148:18
155:12
cite 43:24 44:4
51:9,18 56:4 70:1
77:15,17 99:25
cited 30:12 44:14
49:1,3,4,12,19,23
51:14 52:3 58:18
59:9 79:3 99:23
100:19 107:23
113:7,18 114:7,9

114:12,22 117:7
118:21 127:14
129:24 131:9
142:3,7 143:19
145:20 156:7
cites 58:25 101:2
citibank 15:12
citing 50:2 134:1
137:23 142:3
citizen 49:8
citizenship 59:5
city 134:13
civ 134:9
civil 43:19,23 44:1
44:2 45:2 83:5
133:18 136:6
claim 36:19 38:6
45:22 46:2,10,12
46:13,16,18 47:14
49:17 50:13 52:24
53:23 54:4,14,21
56:3,22 58:11,16
58:22,24 59:11,23
60:6,12,18,20,21
60:24 69:18 89:3
89:15 102:17
120:25 121:4,5
132:16,17,18
134:11 136:11
137:13 138:4,18
139:5 142:13,15
142:17 148:2
150:23 154:22
claimant 56:6,9
152:23 153:2,5,13
154:5,19
claimants 39:16
39:18 40:10
claimed 46:8
claiming 47:16
claims 2:7,7,8,9
18:19 36:7,9
37:10 38:2,3,16

38:17 39:4,23
48:1,3,7,12,16
50:11 52:19 53:25
54:15,17 58:13,14
60:3,5,13 81:4,6
127:17 132:15,19
132:22,25 135:20
149:11,12 150:6
153:1 157:9
clarence 79:4
clarifications
98:23
class 36:11
clause 121:22
clear 19:17 31:19
31:19 32:8 45:6
62:5 68:23 88:19
89:5 94:11 97:24
99:21 103:15
108:11 121:5
128:13 142:9,16
145:23,23 146:24
147:5 150:8,17
154:14
clearly 31:4,6
34:1,23 56:12,25
58:2 60:5 108:8
125:5 137:16
141:13 142:17
145:10,16 146:15
147:8 152:3
155:11
clerk 92:23 132:4
close 64:24 65:15
66:1 115:16 116:9
closely 19:12
closer 25:17
closure 26:4,14
club 117:9
coburn 16:8 42:2
42:4,6 93:5
code 2:4 30:8
43:16 54:12,21,24

55:17,21,21,23
152:6,23 153:7
coin 61:22 63:11
132:11
coined 70:8
collaboration
20:13
colleague 36:1
colleagues 64:19
76:13 119:7
collect 60:10
colloquy 136:12
136:13
color 125:18,21
125:21 127:3
colors 113:3,6,14
113:24 115:3,16
combination
95:24
come 28:1,19
29:20 30:18 71:3
72:22 82:9,9 92:1
92:14 105:19
126:6 131:14
comes 24:1 32:14
38:16 78:21
114:16,17,21,23
126:5 155:16
coming 32:5
65:18 85:13
115:13,24 125:6
126:19,20 141:14
144:16
commence 20:8
commencement
29:4 33:20 72:10
72:12 80:11,13,23
81:8,8,13
commencements
128:4
comment 63:24
64:6 65:21

comments 36:23
63:22 112:25
commerce 68:16
80:1 137:22
138:14 139:8
149:14
commercial
143:16
commercially
124:9
commission 59:9
committee 8:15
8:18 11:15,20
15:2 22:11,14
23:15 27:9
committees 8:22
8:23
common 128:21
128:22 143:14
commonly 84:24
communicate
20:13
communication
102:10 141:13
144:13,16,18
145:19 147:2,4
communications
1:13,14 2:12,19
2:25 3:4,11,18,25
4:7,14 5:1,3,3,7,8
5:9,11,12,15,18
5:19,22,24,24 6:2
6:3,6,7,8,12,12,16
6:19,20,22,24,24
7:2,2,6,11,11,15
7:22 8:2,7,14,21
9:3,5,5,9,12,13,16
9:19,20 10:2,15
10:22 11:5,14,23
12:5,13,21 16:9
31:1 41:18 42:2,3
45:24,24 46:20
54:15 93:1,2

132:7,8 146:21
companies 69:17
company 51:15
59:18,18 64:5,7
73:2 77:18 124:10
142:19 143:17
145:16 147:15
148:13 151:4
comparable
136:25
compared 76:22
compel 119:15
120:3,4,16,17
competed 65:7
competing 19:6
competitive 149:8
competitor
126:20 145:10
competitors
141:15 144:17
148:10,16,19
complain 79:6
complains 140:24
complaint 20:1
43:25 44:24 45:13
54:10,14 55:1
56:13,13 57:19,19
58:4,8 60:7,11,15
60:22 106:16
122:5,8,13,18
132:16 133:4
136:5 148:17
157:16
completed 26:12
completely 76:23
79:17
complex 19:20
31:9,9
complexity 30:14
compliant 66:18
complicate 33:10
complicated
80:19

component
147:21 148:22
comport 38:20
comports 23:25
compromise
20:14,23 29:14
computers 92:19
conceded 61:2
80:2
conceivably 32:20
55:1 155:12
concern 26:3
28:17
concerned 59:12
63:9 94:13 105:9
107:10 132:16,18
137:1 140:18
146:12 149:13,18
151:23 152:21
concessions 67:25
conclude 34:12
111:1,1 112:11
137:4 142:8
143:12 148:17,20
150:22
concluded 110:25
143:21 156:18
concludes 21:21
concluding 137:9
conclusion 44:17
71:1 77:9 154:5,9
conclusions 62:6
130:16 131:7
156:3
conclusory 135:4
concur 54:5
condition 144:11
147:13
conduct 52:14,16
52:19 89:23 91:10
136:20 138:23
140:12 143:25
153:3,8 154:6,6,9

154:19 155:2
conducted 29:4
140:22 141:17
confer 119:24,25
120:8,11
conference
119:15
conferred 153:5
confidential 84:6
85:4,13
confirm 31:7,23
40:11 98:10
confirmed 33:2
35:2 111:9 123:9
conflated 74:20
conflicts 14:3
confuse 93:12,13
138:8 140:5
143:22 144:4,23
confused 65:25
80:20,21 81:15
144:25
confusing 81:9
144:23
confusion 66:4,6
82:18,23,25
113:10 126:11
139:2,23 140:15
142:14 145:13
149:3
congress 34:22
55:5,24 56:25
connection 6:9
7:8 31:18 64:6
120:13
consensus 19:14
22:7
consented 62:2
consequently
55:15 150:22
consider 23:24
83:3 105:25
128:17 139:19

**consideration**
82:6
**considered** 33:19
139:21
**considering** 143:4
**consistent** 36:11
94:3 108:13
143:13,18 148:21
153:6
**constituents**
34:21 35:15
**constitute** 83:17
88:7 152:10
**constitutionally**
130:24
**constructively**
19:10
**consumer** 69:6,13
75:16 80:23 126:5
126:6,8 128:16,18
129:23 130:11
139:2,11,23 140:6
142:13 143:23
148:3
**consumer's** 75:23
77:2 143:6
**consumers** 65:7
72:3,4 75:22 78:8
79:15 80:23
128:25 138:24
148:12
**cont'd** 158:1
**contacted** 37:22
38:12
**contain** 94:25
**contained** 114:19
145:2 146:18
**containing** 97:10
97:11
**contemplated**
34:23
**contemplates**
32:21 33:2 125:5

**contempt** 43:19
43:23,24 44:1,2
45:3 51:5,6 55:13
55:15 56:3,4 58:3
88:12,16 89:5,8
89:12,21 90:3,5
136:4,7
**contend** 141:24
142:4
**contended** 57:13
**contending** 150:6
**contends** 57:18
149:22
**contention** 32:23
58:9 151:23
**contest** 87:1
**contested** 18:20
**contesting** 79:10
**context** 58:25
70:17,21 71:2
73:5 108:18
109:10 114:5,10
126:4 128:5
139:19,21 142:10
143:16 149:3
156:2
**contingencies**
26:17
**contingency**
30:24 31:16,20
32:25 33:4
**continue** 19:20
26:9 28:22 34:10
34:25 35:19 46:22
47:4 64:24 73:24
147:8
**continued** 37:19
56:24
**continues** 75:2
**continuing** 32:2
71:21
**contract** 67:24
86:7,13,15,17,19

86:20,25 87:9,12
88:2 121:4,19,21
122:3 125:13
133:12,12 149:17
150:23 151:1,2,10
151:16,20 153:15
153:17,18,22
158:9
**contracts** 76:3
100:16 152:9,18
**contrary** 55:8
72:8 142:2 146:2
147:13 150:2
**control** 35:14,16
152:4,8
**controversy** 45:12
45:15,17,18,19
47:17 49:5,20,21
49:22 52:13
**converting** 146:21
**convey** 147:6
**conveyed** 139:18
146:25 147:6
**cooperation** 20:13
**coordinate** 35:9
**coordinated**
19:12
**copy** 122:19,21
123:3 155:17
**core** 130:24,24,24
**corollary** 57:23
**corp** 31:1 55:9
59:8 134:18
152:12,14
**corporate** 54:20
55:12 68:7 124:4
124:6
**correct** 21:12
43:20 44:23,25
54:5 61:14 63:2
69:4 85:2 93:21
96:9,15,20 104:8
104:10,19 105:4,7

105:10 110:21,23
113:12,18 115:6,9
117:1 118:8,18,20
121:8,9 155:9
**correcting** 155:10
**correctional**
67:19,22
**correctly** 70:20
**correspondence**
120:9,11 140:24
140:25
**counsel** 14:3
42:17 53:25 77:9
84:19 102:15,15
105:13 106:9,10
106:11 130:14
145:25 155:17
**counsel's** 145:18
**count** 2:21,21
10:24,24 11:8,8
11:17,18 43:8,10
44:18 45:4,4
50:20 52:1 54:10
54:14 86:8 91:4
129:10,11 132:18
133:5,12 135:24
135:24 136:3,15
136:18 157:15,17
**countervailing**
73:8
**country** 49:9
159:20
**counts** 2:14 3:6,13
3:20 4:2,10,17
62:2 83:18 86:7
88:23 130:18,19
131:3 133:2,4,7
136:2,23 157:20
**couple** 18:11
63:22 93:13
112:25 125:17
131:12

**course** 21:19 22:2
44:21 48:21 52:16
56:5 59:24 60:20
84:20 135:13
149:7 151:3,6
**court** 1:2,17 18:2
18:5,10,21 19:25
20:4,8,11,25 21:4
21:7,10,13 22:3
22:23 23:12,24
24:4 25:6,24
26:15 27:7,10
28:5,8,13 30:2,4
31:22 35:11,22,24
36:2,4,12,13,17
36:19,21 37:9,16
37:20,23,24 38:11
38:18,22,24 39:1
39:5,7,11,17,19
39:24 40:5,7,10
40:15,18,21,25
41:3,6,8,11,14,16
41:25 42:5,8 43:7
43:16,17 44:21
45:1,8,8,9,11,15
45:20 46:1,9,15
46:21,23 47:1,3,5
47:18,22,25 48:5
48:8,11,13,14,15
48:18,22,25 49:6
49:7,14,16 50:5
50:11,12,14,16
51:10 52:22,23
53:5,8,10,16,19
54:8,13 55:13,14
55:18 57:6 58:10
58:23 59:2,12,15
60:15 61:12,15,19
61:21,22 62:2,4,6
62:9,13,15,17,25
63:3,7,19 64:1,2,5
64:11 65:17,20
66:21,22,24 67:21

67:22 68:12,20,21
69:21,22 70:19
71:1,8,12,16 73:3
74:15,17,19,22
75:20 76:8 78:24
79:5,7,11,12,14
80:2 82:1,11
83:19,24 84:9
85:9,11,11,14,17
86:1,4,5,9 88:4,9
88:15,18,22,24
89:3,14 90:9,12
90:14,18,21,23,25
91:3,10,11,15,17
91:22 92:7,11,14
92:16,19,24 94:13
94:21 95:14,21,23
96:7,10,13,18,21
96:23 97:1,4,7,13
97:22 98:2,4,6,12
98:15,17,21,24
99:4,6,12,19,23
99:25 100:5,9,12
100:19,25 101:3,5
101:8 103:10,20
104:5,9,13,17,20
105:2,5,8,11,22
106:2,5,10,14,17
106:19,23 107:6
107:13,17 108:4
108:15,22 109:2,6
109:11,17,21
110:3,5,8,15,22
110:24 111:8,12
111:15,20,25
112:5,9,14,16,24
113:10,13 114:4,8
114:14,20,22
115:2,7,11,20,22
116:13,19,21,24
117:3 118:2,5,7
118:13,16,19,21
118:24 119:3,7

120:5,18,22 121:2
121:4,10,15,19
122:3,7,9,15,17
122:20 123:1,8,12
123:14,17,25
124:3,14,20,23
125:3,15,24
126:17,18 127:22
128:15,15,24
129:3,4,8,19,21
130:12 131:21,24
132:2,5 134:22
136:7 138:19
139:12,16 142:24
143:14 147:19
148:7 156:2,15,17
**court's** 33:21 45:7
51:19 71:24
103:10 110:1
119:21 120:15
130:25
**courthouse** 92:21
**courtroom** 92:20
**courts** 60:2 69:12
70:1 73:12,15
79:2 80:4 84:24
85:1
**cover** 127:4
**covered** 148:17
**covers** 43:1
**craft** 23:25
**crash** 78:22,22
79:4
**crazy** 102:23
**create** 66:11 73:6
93:15 115:5,7,24
**created** 102:12,14
**creates** 69:20
103:3
**creating** 65:15
**credibility** 135:1
**credible** 126:19

**credit** 78:17 79:16
95:2,6
**creditor** 26:3
153:13
**creditors** 8:15,18
11:15,20 15:3
18:17 20:14 22:11
22:24 26:7 27:6,9
29:3,20 30:21,23
31:12 33:12 54:18
58:15 60:1 136:10
153:4 154:15,16
154:18,24
**cries** 35:12
**cry** 59:7
**crystal** 89:5
**cure** 87:11
**cured** 59:6
**current** 33:3
72:14 131:17
**currently** 32:5
**curve** 62:24
**customer** 67:25
95:10 102:23
111:18 147:1,4
149:3
**customers** 60:10
64:10 65:13,25
66:15 67:11,12,14
67:16 76:3,21,22
78:17 80:16 81:24
82:10 85:6 87:17
87:18 91:8 93:12
95:9 96:2 100:6
104:7,18 109:4
110:18 111:10,16
111:17 112:6,7,12
113:16,25 115:25
118:11 126:9
138:9 140:5,23
143:8,22 144:4,11
144:15,25 145:9
146:5,16,22

148:25 149:20
150:11 152:9,10
152:19
**customized** 36:10
36:13
**cut** 72:23 73:7
87:10 91:25
**cutoff** 87:7

## d

**d** 1:24 2:8 10:8,18
18:1 30:8 157:1
158:1 159:8
**dad's** 93:8
**damage** 67:17
68:5 88:3 91:8
136:9,10
**damages** 51:21
56:23 57:21 67:18
77:10 89:1,4,18
89:19,25 90:1,5
102:7 130:20
132:17 135:22
142:15 151:2,8
**danger** 144:10
147:11
**dannon** 69:17,18
118:4,5,13,17
127:19 142:3,7,23
143:11,21
**danone** 137:17
**dataflux** 59:3
**date** 20:4,13 21:1
22:20,21 23:22
24:25 25:5 28:2,3
32:16 34:4,6
49:15 52:25 53:24
58:16,23 60:19
131:17,19 153:2
159:17
**dated** 106:19
**dates** 22:9 23:5
30:1 35:4

**daubert** 69:8,8
**davis** 15:11 59:8
**day** 27:17,25 34:4
35:7,8 51:12 72:4
72:25 121:13
124:10 125:11
**days** 21:23 27:17
27:22 32:13 87:9
121:7 124:10
125:10,12 133:15
149:21
**deadline** 24:13
33:17,20 37:4
96:24 97:5
**deal** 49:8,11 69:11
135:17
**dealing** 63:15
**deals** 26:16 49:17
**dealt** 57:1 132:24
**debate** 23:21
**debated** 75:11
**debt** 60:10,12
147:16 152:2,4
**debtor** 26:5,25
30:15,17,18,20,22
31:10 34:1,16
37:15 43:20 45:21
45:21 49:23 54:18
54:20 60:5 61:25
71:21 73:23 97:1
154:14,15,20
**debtors** 1:8 2:1,6
2:13 3:5,12,19 4:1
4:9,15,16,18 6:17
6:25 7:9,16,23 8:8
8:16,24 9:10 10:3
10:4,5,9,16,16,23
11:6,16,24 12:6
12:14,22,23,25
14:4,12,12,19,19
18:8,18,19 19:9
19:20 22:24 23:2
23:19,23,25 24:15

26:3,11,16,20
27:3,12 28:17,25
29:1 30:5 31:6,15
32:6,13,20,21
34:18,22 35:4,14
36:6,7,9 41:22,23
42:16 43:14 44:15
46:19 47:18,23
48:19 50:18,18
54:16 57:24 58:14
59:23 60:1,2,4,14
61:3,10 63:8,14
68:6 71:8 86:23
120:1 121:5 137:5
137:8 152:9
155:17 157:6,9
**deceit** 126:25
127:2,5
**deceive** 68:24
91:8 138:8,22
140:11 143:24
144:12
**deceived** 138:25
**deceiving** 144:13
**december** 1:21
139:25 159:17
**deception** 139:11
140:7 143:23
**deceptive** 133:9
136:25 137:12
139:1 149:11
**decid** 126:17
**decide** 79:7,19
116:3 127:1
**decided** 62:11
89:25 129:13
**decision** 21:22
33:25 62:23 63:4
64:1,2 75:23
111:6,7,15,22,23
124:17 125:7,7,20
127:3 150:20

**decisions** 60:3
75:16 77:3 128:17
148:4
**declaration** 2:13
4:1,8 5:23 6:23
8:3,8 9:4 10:7,8
10:10 11:6 12:6
12:14,25 89:6
**declarations** 4:19
134:3
**declaratory** 44:5
44:7,8,11,14
57:20,24
**declared** 94:6
**declined** 60:17
**dedicate** 77:21
**dedicated** 66:25
75:25 81:22
**default** 25:20
**defeat** 117:25
**defeated** 135:3
**defect** 87:11
**defendant** 5:2
57:3,11 60:23
69:19 138:13,21
139:2 140:10,14
148:10 151:2
**defendant's**
138:23 140:12
143:25 148:6,11
148:12
**defendants** 1:15
5:8,16,23 6:7,17
6:23 7:7,16,23 8:9
9:4,17 10:4,6,9,23
11:7,16,24 12:7
12:15,23 13:1
43:3 53:21 57:17
58:13,16 59:10,22
60:8 83:20 84:10
91:23 137:9
138:11 142:4
143:24 146:10

147:1 148:14
149:15,18 153:2
156:13,16 157:14
158:6
**defendant's**
147:25
**defenders** 59:7
**defense** 69:2,12
70:3,6 71:7 73:10
76:18 77:12,13
78:3 80:25 81:1
81:16 86:18 87:4
87:21,25 121:1
134:11 151:23
**defenses** 68:25
74:11 76:11 80:7
87:8,16,19 88:6
88:15
**deferential** 60:2
**defined** 150:11
**defining** 30:10
**delay** 155:18
**deliberate** 138:23
140:12 143:25
**delivering** 64:10
**demand** 53:6,11
**demonstrate**
138:3 139:2
**demonstrated**
30:19 34:2 126:11
**demonstrates**
138:21
**denied** 60:23
129:15 131:3
132:25 157:18,20
158:7
**dennis** 15:23
23:14
**deny** 133:1 136:23
**denying** 61:9
149:15
**depend** 155:6

**depending** 32:13
33:3 53:8 73:14
143:5
**depends** 59:2,13
141:21
**deposition** 66:3,8
93:17 122:21
**depositions** 134:2
**described** 140:19
**description** 157:5
158:5
**design** 115:12
**designed** 65:18
154:17
**designer** 73:6
**desire** 144:15
**determination**
108:3 139:18
152:16
**determine** 44:12
79:13 101:13
111:7 127:16
128:1 139:16
143:14
**determined** 38:19
59:15
**develop** 24:7 25:1
65:9
**developed** 29:23
65:6
**developments**
42:13,13
**diagnostics** 139:4
**dicta** 142:24
**difference** 107:13
145:25
**different** 39:1,16
48:24 75:12 89:16
117:19
**digest** 27:23
**dip** 73:1
**direct** 57:6 138:15
151:24

**directed** 20:1 72:3
**director** 64:18,22
**directv** 128:24
139:14
**disagree** 24:6,6
**disagreeing**
135:14
**disagrees** 94:15
**disallowed** 36:19
38:5,5
**discharge** 55:22
57:12
**disclosure** 30:16
71:8 146:15
**disconnected**
124:16
**disconnects** 68:3
121:17,24,25
122:1
**discontinuation**
121:13
**discontinue**
121:14
**discontinued**
125:9
**discontinuing**
124:25
**discount** 68:2
**discounted**
100:16
**discovery** 85:18
98:17 119:15
155:2
**discrepancy**
39:18
**discretion** 87:25
**discuss** 33:23
105:14
**discussed** 81:18
**discussion** 51:1
**discussions** 19:15
33:25

**dismiss** 2:20,21
10:24 11:8,17
19:23 43:4,10,13
45:5 50:12 54:13
56:15 60:18 131:4
132:23,25 157:17
**dismissal** 58:6
**dismissed** 44:19
57:13,19 58:23
**dispense** 23:16
**disputable** 64:21
67:7,8
**disputatious**
139:20
**dispute** 47:18
65:16 71:14 79:22
79:23 86:12,17
101:14 109:18
119:15 130:3
133:21 134:8
135:13 140:18,21
**disputed** 65:2
103:3,13,15
125:24 133:25
135:6 136:3
**disputes** 89:1
**disregard** 114:10
116:6
**disregarded**
142:19
**dissection** 139:20
**distinction** 26:10
**distinguish** 101:7
110:16 150:12
**distinguishable**
117:9
**distraction** 19:6
**district** 1:3 45:8,8
62:4,15 78:23
79:3 137:16
139:24
**diversion** 138:16

**docket** 18:23,24
36:8 37:6 60:4
62:22 106:18
122:5,24
**doctors** 130:3,4
**document** 2:4,15
3:1,6,14 4:3,10,21
5:10 6:1,10 7:17
8:17 9:11 10:25
11:9,19 12:1,8,17
13:2 72:17
**documentation**
2:9
**documents** 6:9
7:8 42:10,11
96:24 97:7 127:23
134:2 147:6
157:12
**dog** 109:21,22
**dogs** 109:23,25
**doing** 24:20 27:1
39:19 43:19
121:24 130:14
132:1
**doled** 23:2
**domain** 74:7
**donziger** 59:8
**double** 38:3,9
40:3
**doubts** 135:5
**dr** 69:7 101:22
117:22 130:9
**draft** 24:9
**drafting** 22:17
**drain** 1:24
**draw** 108:23
134:24
**drawing** 99:14
**drawn** 77:9
135:10
**dress** 113:5
116:10

**dressing** 153:22
**drive** 26:21 85:10
**driven** 29:10
**driving** 100:1
**drumbeat** 26:7
**due** 30:18 31:8
**dueling** 61:12
**dummied** 79:11
**dunne** 15:23
23:13,14 25:10
**dunne's** 28:10
**duplicate** 2:7,8
38:2,17 39:4,20
40:1
**duplication** 39:1
**duty** 153:15 154:3
**dwight** 70:15,16
75:17 139:3
140:15 148:13,21
**dying** 79:2

**e**
**e** 1:23,23 10:10
14:1,1 16:6 18:1,1
73:22,22 84:19
93:10,14,25
102:11,12,13
105:12 120:10
145:14 157:1
158:1 159:1
**earlier** 39:11 50:7
64:5,6 119:19
152:24
**earliest** 32:12
**early** 20:11 98:1
**earned** 25:19
**easily** 60:15 74:20
82:13
**easy** 33:7 73:15
106:15
**ebay** 75:2,5
**ecf** 2:9,16,22 3:8
3:15,22 4:4,11,23
5:4,12,19 6:3,13

6:20 7:3,12,19,25
8:4,11,18,25 9:6
9:13,20 10:12,19
11:2,11,20 12:2
12:10,18 13:4
**edit** 42:23 78:25
**edited** 78:20
**effect** 28:12,15
68:24 75:2
**efficiency** 63:14
**effort** 35:20
145:19
**efforts** 121:22
124:9 150:14
155:2
**egregious** 138:24
140:13 144:1
153:9
**eight** 19:2 27:13
43:2 108:1
**either** 29:17 33:13
40:10,11 42:19
57:11 63:12 82:15
107:9 109:18
130:2 138:15
139:6 141:3
143:23 145:12
155:10
**elapsed** 30:21
**election** 59:9
**electric** 134:17
135:7
**electronic** 159:9
**electronically**
134:2
**element** 45:18
74:12,23 75:19
79:25 80:1 86:14
86:15,16 89:9
91:12 134:11
136:20 140:17
147:19 149:12
151:10,12

**elements** 65:21
68:15 83:13 86:10
89:22 90:2 136:10
136:11 142:11,14
147:22 148:6
150:7
**elevator** 51:14
**elite** 131:8 156:5
**ellis** 14:11,18 18:7
36:6
**email** 64:17,21
**emails** 65:1,16
**empirical** 73:17
**ended** 76:1
**enforce** 152:4
**engage** 139:20
**engaged** 19:15
52:14 153:3 154:5
**enron** 152:12
**entails** 103:14
104:22
**enter** 43:17 124:4
124:7
**entered** 36:12
42:19 150:2
**entering** 62:3
**entertainers** 93:8
**entire** 68:6,7
110:19 122:12
128:5
**entirely** 35:14
51:2
**entirety** 139:19
**entities** 31:6 54:20
93:6 110:12,12,17
111:3,4,5 112:13
150:12 152:18
**entitled** 56:9
57:14 99:9,10
133:21
**entitles** 81:20
**entity** 46:3 55:12
93:15 94:10

110:11 111:18
149:25,25
**entrusted** 125:7
**entry** 155:18
**envelope** 65:18,19
65:20 70:22,24
93:15 94:10 113:1
113:2,16 114:3,17
115:1,23 116:5
125:23 126:2,8
128:6 141:12,14
144:7
**eprova** 137:23
140:7
**equitable** 43:10
45:4,22 49:11,17
53:1 58:7,22
59:24 60:3,18
89:20,21,25 91:5
91:13 132:19
135:25 136:8,11
136:19,20 152:20
152:22 153:6
154:17,17,22
**equitably** 54:2,16
58:12
**equity** 147:16
**equivalents** 89:18
152:8 154:4,12
**eschew** 135:1
**especially** 148:9
**esq** 14:8,9,16,23
14:24 15:7,8,9,16
15:23 16:6,13,14
16:15 17:8,9,10
**essential** 40:23
147:22 148:6
**essentially** 108:11
114:23
**establish** 99:25
118:3 134:6
137:18 138:1
139:5 141:18,25

142:2,13 144:3
145:16 150:7
**established** 30:13
79:5 133:18
136:21 137:10,14
138:5 145:6,10
150:23 154:10
**establishes** 139:1
144:22
**establishing**
142:12 144:21
**estate** 88:3 152:5
152:9
**et** 1:7,10 2:12,12
2:16,19,19,25,25
3:4,4,8,11,11,15
3:18,18,22,25,25
4:4,7,7,11,14,14
5:1,1,7,7,15,15,22
5:22 6:6,6,16,16
6:22,22 7:6,6,15
7:15,18,22,22,25
8:2,2,4,7,7,11,14
8:14,21,21 9:3,3,9
9:9,16,16 10:2,2
10:11,15,15,22,22
11:1,5,5,11,14,14
11:23,23 12:2,5,5
12:10,13,13,18,21
12:21 13:3 18:3
41:18 79:17 87:7
87:8,8 93:1 132:7
133:6
**euro** 142:21
**evaluate** 21:18
25:16
**event** 21:14 24:3
**eventually** 31:7
146:20
**everybody** 27:11
27:13 74:10
**evidence** 23:24
65:20 66:18 67:15

68:23 75:18 77:10
77:14,19,20,24,25
77:25 78:4,14
82:9,13,23 95:12
96:4,4,5,5 97:15
101:21,22 102:9
102:20 103:2,3,15
104:12 105:25
107:4,22,23 108:1
108:14 109:9,10
109:15 110:6
111:8 120:25
127:3,8,22 128:3
129:7 134:16,22
134:23 135:8
139:23 140:6
143:23 144:20
145:12,21 146:2,3
146:6 147:14
148:7,20,24 149:6
151:16
**evident** 34:13
**evidentiary** 103:3
103:7 108:2
110:14 140:9
**ex** 6:8 7:7
**exact** 2:7 64:6,11
80:11 128:23
**exactly** 36:16,18
36:20 37:23 83:8
83:23 116:23
126:22 142:9
**example** 30:24
80:14 83:1 131:7
142:19 153:19
**examples** 24:10
**excellent** 32:10
**exception** 32:16
132:11,14 140:9
**exceptions** 53:12
**excerpt** 122:22
**exclude** 10:17
11:25 12:7,16,24

13:1
**exclusive** 2:2 19:7
28:23 30:6,9
34:23 35:6
**exclusivity** 18:16
18:23 19:16,18
20:16,22 21:25
22:4,10,25 23:7,9
23:20 24:22 27:12
27:21 29:15 30:23
32:15 33:17,25
157:7
**excuse** 71:25
106:12 117:13
120:2
**excused** 41:4
**excuses** 150:15
**exercise** 33:5,8
155:18
**exhibit** 36:15
93:25 94:24 96:16
104:9 106:6,12,16
106:24 122:4,8,10
122:12,15,17,19
122:20,21,24
123:13 137:7,8
145:20
**exhibits** 4:19 10:7
**exist** 84:7
**existence** 30:16
86:11 150:25
**existing** 153:15
**exists** 30:24 75:6
**expand** 24:24
**expect** 66:6
**expecting** 120:12
**expense** 19:6
**expert** 10:10,18
12:7,16,24 13:1
67:18 77:8
**experts** 77:5
140:22

expiration 24:22
expires 22:11
explain 87:2
explains 149:15
express 38:4
66:22
expressed 74:5
expresses 73:18
expressly 51:16
extend 18:15
29:15
extended 19:18
23:7,21 30:9
extending 2:1
35:6
extension 19:7,8
22:17 23:1,7
27:12 28:18 30:6
30:22 31:5,5,11
32:6,14,16,18
34:2,3 35:8 157:6
extensions 18:25
19:4 20:15 21:24
extensive 154:25
extent 81:17
136:21 154:21,23
external 29:6
extra 22:25 28:10
extrinsic 139:23
140:6 143:23
eyes 87:23

**f**

f 1:23 15:23 59:19
134:14 159:1
f.2d 55:9 56:10,11
59:18 153:24
f.3d 59:17 134:12
135:2,12 137:24
139:4,14 140:15
141:23 142:20,21
148:13 151:4
f.supp. 134:13
137:17 143:18

f.supp.2d 140:8
faa 78:24
face 70:13 79:2
80:16 102:18
128:1,5 139:11
142:17 143:2
facial 143:7
facing 32:6
fact 9:17 28:11
30:11 31:5 33:2
48:25 51:8 57:24
58:11 60:21 65:11
66:16,17 70:7,7
71:6,15 73:1,16
74:6,7 83:6 89:1,2
93:20 98:11
100:19,23 101:12
101:13,22 102:9
102:10,17 103:4
113:13 115:3
125:7 128:19,24
130:16 131:7
133:21,24 134:16
135:5,18 136:16
138:25 144:21,22
145:8 146:4 147:9
148:15 156:3
factfinder 83:5
factors 19:18
23:17 29:6 31:4
facts 3:19 4:18
5:16 6:18,25 7:24
9:18 10:6 25:16
29:22 31:13 46:6
56:7,14 59:7
63:22 70:4 73:9
98:14 109:18
130:19 134:19
135:6,14 136:3
137:3,5,6 140:20
144:3 151:11
factual 56:8 79:23
101:14 138:7

140:19
fail 78:9 129:13
failed 97:8
failure 61:3 125:8
fair 79:13 90:7
114:1
fairly 26:5 31:9
42:22
faith 30:17
fall 101:20 107:25
fallback 142:13
falls 71:7 102:4
109:15
false 65:22 66:14
66:24 68:14 69:4
69:14,15 70:10,14
71:3 74:17,24
75:13 76:19 77:1
77:2 83:14 88:3,6
90:22 91:6 101:17
101:18,18 102:2,3
102:18,19,22,22
103:5,5 105:17,18
105:20 106:1
107:1,1,8,24,24
108:9,10,23 109:3
110:15 111:2,23
112:11,22 113:3
114:16,25 115:5,5
115:6,7,21,24
116:8,14 117:6,7
117:20,25 118:1
126:10 127:1
128:2,6,16 129:23
137:20 138:1,4,4
138:6,13,18 139:7
139:11,17,21,22
140:3,4,20 141:1
141:19,20 142:17
143:1,17 145:22
145:24 146:3
147:25

falseness 68:16
143:1
falsity 68:22 69:1
69:3 73:11 74:12
74:14 75:1,6
116:5 126:1,15,24
127:7 138:5,10,20
142:1,2,12 145:12
146:3,11 148:2,4
148:6,11 154:9
familiar 68:20
far 25:21 37:20
59:7,11 60:25
63:9 89:8 95:8
105:9,10 120:15
121:16 127:7
131:3 132:16,18
136:24 140:17
146:11 149:13,17
151:22 152:20
155:22
fashion 23:24
faster 28:16
fault 82:21
favor 134:25
135:10
favorable 134:24
favorite 93:8
130:2
fear 26:21
feature 77:23
february 37:4
131:20
fed 134:9
federal 52:12 59:8
129:3,4 133:18
feeds 87:13
fell 92:2
fides 141:10
field 82:5
fifth 35:12 80:4
fighting 20:20

figure 81:12 96:2
file 2:2 4:15 8:22
8:23 10:3,16
12:22 21:23 22:7
22:19 24:9 25:2
26:16,24 28:3,24
29:6,16,17 30:6
37:7 42:10 48:1,3
54:1,6 155:13
157:11
filed 2:15 3:7,14
3:21 4:3,10,21
5:10,17 6:1,9,11
6:18 7:1,8,10,17
7:24 8:3,9,17 9:11
9:18 10:10,18,25
11:10,19 12:1,8
12:17 13:2 18:22
20:17,21 23:11
24:21 29:1,5,15
31:15 34:19 36:22
37:6 38:6,14
39:13 42:16 43:13
45:5 46:6,7,10,15
46:16,17,19 47:13
48:3,4,6,16,17
50:9,13,21 51:6
52:24 53:23 54:4
58:15,16,24 59:6
59:10 60:20,21,24
69:7 86:3 97:12
127:6 153:1
files 24:21
filing 19:1,6 20:16
22:10 23:9 29:9
30:19 45:13 64:19
146:15 147:3
filings 64:3
fill 24:24
final 62:3 130:25
131:5 155:20,23
156:4,5

finally 43:25 44:4
52:17 87:3 146:4
152:20
financial 144:11
147:13
financing 71:21
73:1 147:17
find 69:3 88:4
90:5 126:24 127:2
128:15
finder 101:12,13
finding 69:1 74:25
82:1 88:12 90:1
90:11,19 91:2
113:19 152:21
154:12,19
findings 62:6
130:16 131:7
148:7 156:3
fine 39:12 40:25
47:7,7 63:17,18
101:5 120:22
156:17
firm 41:22 65:8
first 2:6 18:15
22:15,22 25:9
32:23 34:14 36:7
36:10 37:25 38:13
43:1,1,11 52:2,12
54:19 72:2,5,25
76:12,18 80:7,25
86:20 93:10 103:6
105:3 114:2,24
122:4 123:8 130:7
133:5 135:17
138:3 140:17
144:6 149:23
153:24 157:9
five 68:14 107:23
flag 66:16
flaw 126:6,7
flawed 80:14

flier 67:3
flies 70:13
flipside 48:23
63:15
flyer 83:8,10,11
116:1
focus 75:8
focusing 85:17
98:2 111:25
foerster 15:1 27:9
follow 61:3 94:9
98:11 119:8 145:3
following 22:12
93:18
follows 123:23
footnote 101:7
120:1,5
foregoing 56:2
159:4
forest 125:19
form 20:17 42:18
85:15 130:16
131:6
formal 37:11
formality 72:17
formally 36:24
format 57:2
forms 155:9
forth 54:23 56:6
56:13 73:14 137:5
140:6
forward 26:4,9
27:5 29:10 51:19
82:9,10 146:17
found 68:21 82:6
82:12 89:7 90:12
91:9 133:11
144:24 154:2
four 32:17 52:11
74:11,13 76:11
83:13 86:10 117:7
117:8

fourth 73:10 78:3
80:4,4 86:15
frame 155:1
frank 19:9
frankly 26:11
34:11 89:19 145:5
fraud 153:9 154:8
frequently 24:21
57:10
frivolous 51:7
53:2 66:19 76:12
front 35:20 46:18
130:11
full 139:18
fully 62:11
function 85:15
fund 52:23 60:16
151:3
fundamental
126:6
fundamentally
25:11 77:16
funding 64:23
73:23
furnace 59:18
further 21:24
22:17 29:1 33:10
33:17,18 85:22
86:1,3 97:12
127:21 154:20
future 24:7 35:4

g

g 18:1 157:3 158:3
gain 153:14
galvanize 25:1
gander 97:18
garrison 16:1
25:8
gas 28:11 50:6
gases 24:23
gdm 143:17
general 49:7 58:3
59:1 60:14 99:23

100:19 102:15,15
105:12 137:13
143:17 145:18,25
**generalized** 77:14
77:25
**generally** 31:13
42:19 82:11
137:14 153:12,25
**generically**
150:11
**generous** 25:10
**genuine** 88:25
133:20 134:7,16
**genuinely** 133:25
**georgia's** 133:8
**getting** 31:13
94:19 95:11
**give** 22:24 47:5
52:18 53:15,16,19
53:22 67:24 68:2
79:11 81:20 85:1
85:11 87:9 103:22
116:18 125:12
131:14 154:4
**given** 20:1 22:20
25:13 29:22 32:17
32:19 56:25 61:1
61:5 62:22 118:24
121:11 123:2,3
129:7 130:17
145:7 148:24
149:1 150:10
152:11 153:7,20
154:6,8,16 155:1
155:4,25
**gives** 27:22
116:15
**giving** 26:20
79:16 144:1,14
**global** 59:4 151:3
**gmbh** 139:4
**gnosis** 137:23

**go** 41:3 46:21 47:3
47:3 51:19 54:8
80:19 89:23 91:20
93:10 95:6,23
96:6 102:5 110:10
110:17 111:9,17
111:18 112:6,21
127:4 128:22,25
129:3,4 153:17
154:20 155:18
**goal** 66:3,5
**goes** 50:11 73:14
77:10 79:20 81:1
99:24 114:18,25
115:20 127:8
155:22
**going** 24:15,18
25:13 26:9,12,13
26:15,16,18,21,22
27:1,3,15,25 34:7
37:3 38:6 47:25
48:3,16 50:10,12
54:1,6 61:24
62:15,15,23 63:20
64:10 65:11,21
66:23 69:24 71:4
71:4,9 73:2,8,22
73:24 74:1,3,3,7,9
75:21 76:9 80:13
83:2 84:15 85:7
90:5 91:25 92:4,5
92:9 93:2,20,23
94:4 95:5 98:7
99:17 102:25
103:9 105:21
107:7,12,15 108:7
108:20 112:5
117:4 126:13
128:11 130:12
131:12 141:3
**goldfish** 28:12,15
**goldilocks** 27:15

**good** 18:2,4,5
23:13 25:7,25
27:8,10,11 30:16
36:3,4 40:14 41:5
41:21,25 42:1
92:24
**goodwill** 68:5
91:8 138:16
**google** 65:10,10
94:3
**goose** 97:17
**goren** 15:7 27:8,8
27:11 29:13
**goren's** 29:15
**gotten** 63:3 83:10
120:14
**governing** 134:20
**governs** 45:7
**grab** 122:21
**grace** 2:13 4:20
8:3 10:7 11:6
12:14
**grammar** 155:10
**grams** 117:16
**grant** 23:10 30:1
38:1 42:15 61:1
131:2 138:19
139:12 149:9
151:19 152:15
154:20
**granted** 133:20
137:4 142:24
157:8,13,22,24
158:10,12
**granting** 72:25
**grants** 22:13
**gross** 153:9
**ground** 25:17
29:22 90:7 110:4
**grounds** 54:2
141:11 142:14
143:1

**group** 22:15 25:9
30:25 59:4 68:6
80:24
**groupe** 142:20
**grupo** 59:3
**guarantee** 151:4
**guarneri** 59:19
**guess** 25:18 35:5
39:15 48:11 63:8
90:10 118:24
120:23 131:22
**guidance** 61:16
**guide** 155:21
**guided** 60:15
**guys** 73:23 101:23

**h**

**h** 4:1,20 8:8 10:8
**half** 92:8 141:4
144:24
**halfway** 27:21
**hand** 142:23
**handle** 70:14
**handled** 18:13
**handling** 41:2
**hands** 76:14
**happen** 25:12
26:15 28:20 35:18
72:24 73:8 85:7
**happened** 27:23
52:14 64:13 69:21
77:8 84:12 94:16
94:23 98:9 101:10
130:9
**happening** 28:22
**happens** 28:3
34:13 77:17 78:24
126:2
**happy** 24:16
40:12 41:13 61:20
**hard** 29:20 82:1
**hargrave** 59:16
**harm** 154:18

hartford 135:2
harvey 93:9
hasn't 89:6
hassling 125:10
haste 21:20
havana 117:9
head 65:3,24 66:2
headed 145:23
hear 28:13 62:22
  79:1 85:13 91:22
  116:3
heard 24:16 50:7
hearing 2:1,6,11
  2:18,24 3:1,3,10
  3:17,24 4:6,13,25
  5:6,14,21 6:5,15
  6:21 7:5,14,21 8:1
  8:6,13,20 9:2,8,15
  10:1,14,21 11:4
  11:13,22 12:4,12
  12:20 18:12 19:23
  26:2 34:4 35:7
  40:24 64:12 70:20
  79:9 83:24 120:14
  130:15 154:25
hearings 68:21
hearsay 78:8,9
heavily 80:14
held 55:8 70:1
  127:18
help 87:17
helped 93:15
  94:10
henry 10:18
hermann 16:2
  25:7,8 28:20
herring 112:10,12
  150:10
hesitated 98:15
hey 44:12 50:3
  73:23,25 105:20
  107:11

high 82:13
highly 128:20
hoc 22:14,15
  23:15
hockett 5:23 6:23
  9:4 16:13 42:1,1
  43:5,6 44:22 45:2
  45:17,23 46:5,11
  46:17,22,24 47:2
  47:4,7,20,23 48:2
  48:6,9,14,19,23
  49:3,13,19 50:8
  50:15 61:24 62:11
  62:14 63:6,17
holdings 1:7,10
  2:12,16,19,25 3:4
  3:7,11,15,18,21
  3:25 4:4,7,11,14
  4:22 5:1,7,15,22
  6:6,16,22 7:6,15
  7:18,22,25 8:2,4,7
  8:10,14,21 9:3,9
  9:16 10:2,11,15
  10:22 11:1,5,10
  11:14,23 12:2,5,9
  12:13,18,21 13:3
  14:3 18:3 41:17
  41:18 58:19 92:25
  132:7
holidays 41:13
hon 1:24
honor 18:4,11,17
  18:22 19:22 20:3
  20:6,10,12 21:6
  21:14,21 22:16,23
  23:10,13,16 24:1
  24:4,11,12,20,23
  25:5,7,23,25 26:2
  26:17,23,24 27:8
  28:4,6,10 29:5,25
  35:10,21,23 36:3
  36:20,25 37:3
  38:10 40:16 41:2

41:12,21 42:7
  43:5 44:22 45:10
  45:18 47:21 48:4
  48:12 49:4,20,22
  50:1,8,15,17
  51:14,23 52:2,11
  53:4,7,18 54:5
  61:11,14,24 63:6
  63:17,20 66:17
  67:1,10,22 68:11
  70:2 71:11 72:1
  72:11 76:11 77:17
  78:22 82:5,21
  83:1 88:2,14,17
  89:12 91:16,20
  97:3 98:14 106:15
  119:10 121:9,12
  121:22 122:5,8,12
  122:16,25 123:11
  123:16,19,20,22
  124:2,13 126:23
  128:12 129:17
  131:19,23 156:12
  156:14
honor's 26:13
  51:15
hope 21:25 34:14
hoped 20:18
hopefully 28:1
  35:17
hotline 149:3
hour 91:24 92:8
hours 124:10
hudson 15:20
hundred 145:1,9
hundreds 101:23

**i**

i.e. 33:1,8 34:15
  89:24 141:1,21
  143:3
idea 127:10
ideal 32:3

ideally 31:22 32:2
identifiable 84:5
  97:11
identified 39:23
  107:9 137:16
identify 87:17,18
  120:24 137:19
identifying 135:5
ignored 70:19
ii 37:13 43:3
  133:7
iii 37:13
il 14:21
illogical 81:9
images 132:11
  139:21
immaterial 135:6
immediately
  87:13
imminent 144:10
  144:19 145:3
  146:24
impact 114:17
  139:13
impingement
  113:9
implication
  101:19 102:3,19
  103:5 105:18
  107:25 108:10
  117:7 139:17
implied 68:16
  138:20
impliedly 139:7
  143:1
imply 72:7 139:21
import 143:10
important 31:20
  33:19 55:23 98:12
  113:25 114:18
  118:10 126:10
  141:20

**importantly** 68:4 142:1
**imposed** 53:13
**impossible** 82:19 83:12
**impression** 33:4 71:3 115:5,8,24 116:15,18 141:13
**improper** 113:9 113:23 143:9 153:18 154:19 155:9
**improperly** 30:23 31:11 153:14
**inaccurate** 59:14 79:10
**inadmissible** 78:4 78:8,13 81:18 83:2
**inadvertent** 87:5
**inadvertently** 124:16
**inappropriate** 27:14 79:14,18 85:7
**incapable** 73:18
**incentive** 35:1
**include** 30:14 80:15 119:25 141:12 146:19
**included** 41:1
**includes** 41:8 73:8 87:14 88:2 90:6 136:2
**including** 19:11 33:13 57:17 109:23 110:7 134:2,4 137:2 141:11 142:15 144:6 150:20
**incomplete** 99:7
**incorporated** 57:7 104:6 133:19

**incorporating** 57:3,16
**incorrect** 126:3
**increase** 99:24 100:19
**incurred** 67:19
**indenture** 17:3 22:10 26:1
**independent** 154:3
**indicate** 44:15 72:7 146:23
**indicates** 80:9 84:22 108:5,6
**indicating** 72:24
**indication** 63:4 115:4
**indiscernible** 81:21 82:6 99:18 106:6 115:17 121:17 122:13,14 123:20 125:14
**indisputable** 67:13
**individual** 43:18 43:22
**individualized** 36:14
**individuals** 54:24 55:7
**indus** 134:17
**inequitable** 52:14 52:16,19 91:6,10 136:19 153:3 154:6
**inert** 24:23 28:11 50:6
**inevitable** 26:14
**inference** 56:21 108:23 135:9
**inferences** 134:25
**inflicted** 53:3

**influencing** 75:16 148:3
**inform** 33:25
**informal** 37:11
**informally** 36:24
**information** 78:17 78:19 79:15,16 84:5,6 85:3,4,13 95:3 97:11 113:25 126:10 134:3 141:25 142:10 146:7 147:11
**inherent** 22:2 75:14 137:21 138:12
**inherently** 154:12
**initial** 114:17 134:10
**initially** 18:25 135:20
**injunction** 89:7
**injure** 137:23
**injured** 75:18 138:14 148:8 154:15,16,20
**injury** 46:8 47:11 47:16 68:17,18 75:1 78:2 80:5 81:17,21,25 82:3 86:16 89:2 138:20 139:8 147:21 148:5,8,21,23 153:4 154:14,24
**input** 22:24
**inquiry** 30:11,13 119:21
**inside** 65:19 102:15 114:25 126:10
**insider** 153:8,12 154:7
**insisted** 83:24

**insofar** 152:16
**instances** 38:7 47:20
**instructions** 87:6
**insufficient** 2:8 77:15 95:16
**insurance** 59:17
**intelligence** 71:19 71:20 125:8
**intend** 84:18
**intended** 19:8 44:8,12 68:24 113:15 115:24 141:14 146:22
**intends** 39:17
**intent** 68:23 113:2 121:14,20 139:1 145:17 154:10
**intention** 66:11 147:8
**intentional** 144:8
**intentionality** 87:16
**intentionally** 65:17 91:7 93:12 93:13 138:22 140:11 143:24 144:12,13
**interest** 32:15
**interesting** 70:22
**interference** 152:18
**interim** 72:25
**internal** 64:17,21 65:1 67:6,7,13 79:24 102:11 145:14
**internet** 66:9 107:14 128:18
**interpretation** 108:13 140:2 141:6,7,22

**interpretations** 101:24 102:1
**interpreting** 143:15
**interrogatory** 134:5
**interrupt** 20:25
**interrupted** 92:3
**interruption** 125:5
**interruptions** 124:11
**interstate** 68:16 80:1 137:22 138:14 139:7 149:14
**intervened** 19:12
**intervening** 19:13
**introduce** 69:13 69:20
**introduced** 51:2 69:22
**investigation** 29:4 29:7
**investment** 52:23 60:16
**investor** 153:11
**investors** 72:3 146:16
**invoked** 55:15
**involve** 51:10
**involved** 31:24 32:10 49:14 70:4 153:13
**involving** 42:21 51:18 69:17
**iron** 117:14,15
**irrebuttable** 82:7 82:24 138:19
**irrelevancy** 78:11
**irrelevant** 76:23 78:19 81:14 127:24,25 128:8

**isaac** 134:13
**issue** 22:23 33:16 35:1,17 43:12 45:12,16 46:2 47:13,24 48:20 49:2,20,24 50:2,3 50:4,10 55:18 70:19 72:5,6 78:1 82:17 88:16 94:14 98:24 99:2,7,19 99:21 103:4 105:14 110:7,10 112:1,10 113:15 115:20 116:13,19 118:9 119:16 121:21 126:1 130:22,25 133:23 134:16 135:22 136:9 147:24 151:7,8,19 153:8 155:6 156:3
**issues** 19:21 21:21 24:12 26:6 29:2,9 31:16,24 33:11,18 34:8,9 44:9 45:14 98:17 103:18 105:14 136:2 140:19 155:22
**it'll** 131:21
**item** 36:6
**items** 18:12 42:5 43:2
**it's** 102:4
**iv** 37:1,2 83:18 86:7 133:7

**j**

**j** 17:8
**january** 84:14
**jargon** 33:3
**jarosz** 11:25 12:6 12:8,16,24,25 13:2

**jeffrey** 4:1,20 8:8 10:8
**jennifer** 94:1
**jhanile** 36:5
**job** 77:1
**john** 5:11,17 6:1 6:11,18 7:1,10 9:12,18 11:25 12:6,8,16,24,25 13:2 16:14 42:5 119:11
**johnson** 127:15 142:19
**joinder** 8:15,23 11:15
**jr** 4:8,20 10:25
**judge** 1:25 60:15 62:21 92:5,15,17 93:4 95:22 96:11 101:7 104:4 105:16 107:4,19 111:22 112:8,23 114:7 116:17 118:23 119:5 120:7 124:24 129:20 137:17 143:11,20
**judgment** 2:14,20 3:5,6,13,20 4:2,9 4:17 5:2,4,10,17 5:25 6:10 7:9,17 8:9,16,25 9:6,11 10:5,10,23 11:7 11:17 43:4,8,17 44:5,7,8,11,14 54:9 55:19 57:25 61:13 68:15 74:14 79:19 88:5,11,20 89:15,24 91:12,19 91:20 100:23 109:12 121:6 122:13 129:11,12 129:14 130:20,21

130:22 131:2 132:9,12,13,15,21 133:1,3,10,11,17 133:19,22 134:24 135:3,11,16,18,19 135:21 136:15,21 137:7,10 144:3 145:6 148:23 149:10,16 150:22 151:7 154:13 155:19 156:1 157:14,19,21,23 158:6,11
**judgments** 62:3
**julia** 17:9
**july** 20:16 23:9 29:25 98:19 119:8
**jump** 99:17 108:11
**jumping** 102:24
**june** 25:20 35:5 94:23 96:13 97:4 98:7,18 119:12,21 131:11 156:9
**jurisdiction** 2:22 11:9,18 45:6,7,9 45:10 52:1,10 58:11 59:2,6,12 157:18
**jury** 96:6 105:25 107:4 108:2
**justice** 52:11
**justifying** 56:7

**k**

**k** 43:15,17 44:21 44:23,25 50:23,25 51:4 54:21,25 55:2,4
**karas** 62:21
**katten** 14:2 18:14 41:22
**kcc** 36:9 81:4,12

**keep** 68:2 76:13 116:11
**keeping** 35:2
**kept** 20:22 99:1
**key** 65:14 128:14
**kham** 153:23
**kick** 37:4
**kind** 24:23,25 26:4 27:4,19 48:23 112:18 122:10
**kinetic** 125:21
**kingston** 5:11,17 6:1,11,18 7:1,10 9:12,18 16:14 42:5 94:18 103:23 104:1,10 106:8,12 119:10,11 120:7 120:21,23 121:12 121:16,21 123:21 124:2,13,16,22,24 156:13,16
**kirkland** 14:11,18 18:7,9 36:5
**kkc** 81:3,3
**knew** 49:16 74:10 84:1
**know** 23:17 24:15 24:21 27:2,4,15 27:16,19,20,21,24 35:14 39:24 42:14 45:12 51:23 52:4 60:20 63:12 66:14 68:11 70:8 76:14 82:12,14 87:4,7 87:19 90:6 91:5 91:19,25 92:3 95:2 98:10 110:25 112:18 116:2 120:4 125:4,17,19 154:23
**knowing** 33:13

**knowledge** 144:9 151:15
**knows** 19:23 64:2 65:17,20
**koster** 17:10
**kwasteniet** 14:24 18:8

**l**

**l** 153:11 157:3 158:3
**laboratories** 127:15
**labs** 142:20
**lack** 2:22 10:25 11:9,18 45:5 59:6 59:23 127:4 145:12,13 146:7 149:1,4 157:17
**lacks** 58:10
**laid** 68:18
**language** 129:25 140:1 150:17
**lanham** 69:15 83:16 89:17 99:21 99:21 100:21 113:15,22,22 115:19 129:1,22 129:23 133:5,11 136:24 137:11,13 137:18 138:2 146:1,8 148:1 149:10,13 150:6 152:7 154:3,11
**large** 19:19 35:15
**largely** 20:24 21:15
**lasalle** 14:20
**lastly** 57:18 146:10
**late** 48:1 54:7
**laughter** 41:7
**law** 3:12 4:16 5:8 7:16 9:10 10:4,17

11:24 12:15,23 19:19 23:16 51:8 59:14 60:2 69:5 70:4,4 82:2,22 86:11 89:18 100:18,18 102:16 108:8,9,22,25 113:7,13 127:19 128:6 130:17 131:7 133:22 134:20 135:15 136:14 141:17 142:16 143:19 150:24 152:8 153:16 154:4,12 156:3
**lawsuit** 29:9 128:23
**lawyers** 24:23 28:14 32:10
**laying** 146:18
**lead** 1:4 29:17 34:16 143:5 148:12 154:5
**leading** 29:11
**lease** 26:6 29:2
**leave** 4:15 8:22 10:3,16 12:22 20:1 42:7,9 92:17 92:19,21 155:24 157:11
**leaves** 33:16 61:12 91:4 128:10 133:3
**led** 29:6
**legal** 56:6 75:10 125:25 154:3 159:19
**legally** 127:24 128:8 153:15
**legitimately** 33:1
**lender** 25:9
**lengthy** 155:4

**lessening** 138:16
**lesser** 57:14
**letter** 80:11 97:13 97:14 98:19 102:14 104:6 105:13 106:3,8,9 106:10 107:10 108:5 119:24,25 126:8 145:18,25
**letters** 145:23
**level** 31:22 33:14
**leverage** 65:4
**lexicographer** 117:19
**lexington** 14:13 15:13
**lexis** 131:10 139:24 156:8
**liabilities** 38:20
**liability** 2:14 3:6 3:13,20 44:10,13 87:20,25 88:4,20 89:16,17,24 90:1 90:3,4 130:20 135:21,22 136:1 137:4 149:10 150:8 151:8,20 157:22,24 158:8
**liable** 90:5
**liaibility** 4:2,9,17
**liberty** 134:21 135:6 145:14
**lien** 15:19 22:15 23:15 25:9
**liens** 22:14
**lieu** 84:22
**lifeblood** 66:10
**lifland's** 60:16
**light** 20:2 60:13 134:23 137:9
**likelihood** 141:2 144:3 148:5

likes 29:19
limit 55:6 147:16
limitation 150:14
limited 18:16
84:15 90:16
102:25 124:1
151:3 156:5
limits 130:25
line 77:23 80:20
148:25
lines 82:14 125:5
lineup 99:14
linger 24:18
link 67:15 103:17
liquidating
147:12
liquidation
146:23
lisa 13:25 159:3
159:12
list 110:19
listed 42:15
listen 27:2 79:12
85:2,9
literal 68:15,22
69:1,3 75:1,6
126:24 127:7
141:25 142:2,12
142:25 143:4
145:12 146:3
literally 69:14
71:3 74:24 101:17
101:18,18 102:2,3
102:18,19,22,22
103:5,5 105:17,17
105:20 106:1
107:1,24,24,24
108:9,10,23 109:3
110:15 111:2,23
112:11,22 117:6
117:25,25 127:1
128:1,6 138:6,8
138:18 139:7,11

139:17,22 140:3,4
140:20 141:19,20
143:3,16 145:22
litigate 19:20 26:6
26:7,8 29:2,9
litigating 19:7
litigation 19:5,11
19:15,22 21:15,18
22:5,18 24:2
26:12 29:18 32:4
32:22 33:6,7,8,14
34:8 35:13 48:21
52:16
little 25:10 73:11
82:8 89:16 126:15
live 155:22
llc 1:14 5:4,9,12
5:18 6:2,12,19 7:2
7:11 9:13,19 14:3
58:19 93:2 131:10
132:8 137:17,17
139:24,24 140:7
142:21 153:11
156:7
llc's 5:25 6:8,25
9:6
llp 14:2,11,18
15:1,11,18 16:1,8
17:1 18:7 23:14
59:4
lobby 134:21
135:6 145:14
logic 55:8 75:21
81:10 143:14
logo 116:2
logs 78:6,10
long 25:21 27:16
55:3 87:18 92:3
154:25
longer 37:2 92:10
101:12
look 24:16 26:2
27:2 36:14 46:5

61:15 65:18 70:16
70:20,21,22 71:2
79:5 94:2 101:16
101:21 103:11
108:9 115:15
118:9 126:4,14
127:25 128:2,2,3
128:3,4,8 143:9
looked 62:20
82:16 99:19
looking 21:22
88:11 90:10,19
91:2,11 108:17,18
118:10 128:18
146:17
looks 39:25 126:8
loop 98:11
lorenzo 8:17
11:19 15:9
lose 28:10 72:18
74:7,9 102:6
104:25 107:18
128:11
losing 102:24
107:14
loss 68:5
losses 76:6
lost 67:16,18
lot 25:12 27:1
28:20,21 35:20
40:7 82:4 86:21
145:25
louis 16:11 93:5
lovett 16:6
lujan 59:7
lunch 92:1,12
lying 85:1

**m**

m 14:24 15:7
madison 14:5
madoff 153:11
mail 36:11 65:6
84:19 93:25

102:12,13 120:10
mailer 65:9 70:24
143:7,10 150:10
mailing 65:19
143:21 144:4,22
144:25 145:2,3
147:7 152:19
mailings 146:25
mails 73:22,22
93:10,14 102:11
105:12 145:14
main 24:2
maintain 19:4
majority 130:5,8
making 28:19
47:12 139:17
managed 19:13
management
64:23 69:10
managing 34:3
60:4
manhattan 52:23
60:16
march 19:22 20:8
20:10,11,11 21:5
21:5,16,21 22:11
22:12,14,20,22
24:8,10,13,25
25:4,14 26:12,25
27:2 29:16 32:8
34:5,11 35:18
106:19,21,21
107:9,9 121:18
122:1 131:22
145:19
marinuzzi 8:17
11:19 15:9
market 148:10,17
148:19
marketing 64:18
65:3,3,24 66:2,9
76:20

marshall 130:22
130:23
master 151:3
material 3:19
4:18 7:24 10:6
64:9 75:22 76:9
77:2 103:4 109:18
109:18,19,20
128:17,20 129:1,3
129:5,6 133:21
134:1,11,16,19
135:5,14 137:3
139:7 140:18,20
141:9 148:1
materiality 68:16
75:8,9,19 76:8,24
77:7,8,15 78:2
79:20,22,25 99:16
99:22,25 100:21
102:6 128:14
147:19,23 148:4,9
148:22
materially 146:11
materials 92:17
134:5
mathematical
143:4
matsushita
134:17 135:7
145:14
matter 2:22 10:25
11:9,18 41:6 45:6
52:1,7,10 55:12
58:10 59:16 63:14
70:3,4 71:24
75:20 116:14,22
116:25 126:1
133:22 135:15
136:14,21 138:7
141:16 155:1
157:18
matters 1:6 18:13
40:17 42:11 56:20

56:21 130:24
131:1 157:13
maximums 19:2
mcguire 93:17
mcmahon 137:17
143:11,21
mead 127:14
129:24 130:2
142:19
mean 20:20 24:8
36:13 39:7 40:7
44:17 46:12 48:9
50:3,6 53:10 63:9
63:13 64:19 85:4
87:19 94:7 96:8
105:8 107:15
109:11 110:16
111:20 112:10
117:24 130:1
meaning 64:15
127:16
means 22:16
26:25 70:9 74:1
102:1,2 105:14
117:18 125:8
meant 130:7
measurable 109:6
mechanism 44:16
51:11,13
mediation 31:25
32:2
meet 119:24,24
120:8,11
memorandum
3:12 4:16 5:8,9
7:8,16 9:10 10:4
10:17 11:24 12:15
12:23
mention 43:24
77:7
mentioned 28:20
29:13 50:24

mercexchange
75:3
merck 137:23
140:7
merely 127:1
message 65:14
94:2 101:19,25
114:5 116:5
128:10 139:6,18
139:22 141:1,20
143:7,15 146:25
147:6
messaging 103:11
met 19:19
metaphysical
135:5
mid 34:20
middle 27:19
midway 19:22
mike 16:15 42:4
93:4
milbank 15:18
23:14
million 67:19,21
153:21
mind 123:3
mineola 159:22
minority 141:7,8
minute 75:7 127:9
minutes 107:23
112:20 131:12
misconduct 153:4
154:13
mislead 113:15
140:5 143:22
144:4,23,25
145:17 154:10
misleading 107:1
107:2 115:21
127:2 138:13
143:2 144:22
145:13,24 146:3,7
146:12 154:9

misrepresentation
138:15 153:10
154:8
misrepresented
75:13 138:11
misrepresents
137:20
missing 48:10
84:11
misspoke 99:1
111:14 119:17
120:7
mistake 72:13
mo 16:11
modems 100:15
monday 20:21
money 81:11
month 21:22 27:1
34:5
months 19:2
27:13 62:21,22
mood 73:6
mootness 48:24
morgan 151:4
morning 18:3,4,5
23:13 25:7,25
27:8,10 36:3,4
41:21,25 42:1
94:21 132:24
152:24
morrison 15:1
27:9
motion 2:1,14,20
2:20,21 3:5,5,12
3:20 4:2,9,15,16
5:2,4,17,25 6:7,8
6:9,17 7:7,7,9,16
8:9,16,22,22,24
9:6,10 10:3,5,9,16
10:17,23,24 11:7
11:8,16,17,24
12:7,15,22,24
13:1 18:15,23,25

19:23 22:17,19
23:10 29:14 30:4
34:23 42:24 43:3
43:4,7,7,10,13,25
44:2,18 45:5 51:5
51:6 52:7,8 53:20
54:9,13,19,24
56:15,18,21,25
57:15 58:6,9,15
58:18,25 60:23
61:5,6,7,9,17 62:9
63:8,14,16 64:7
68:15 69:8,8,9
76:15 78:10 79:19
80:2 86:3 88:5,20
89:13 91:19 97:12
98:19,20 121:6
123:2 129:12,14
130:19 131:2,4
132:12,13,21,23
132:25 133:1
134:4,17 135:3,18
135:19 136:5,14
136:22 137:4,6,9
149:10,15 151:19
152:15 153:21
154:10,22 157:6
157:14,16,19,21
157:23 158:6,8,11
**motion's** 60:25
**motions** 42:9,12
52:5,5 53:2 57:5,8
61:8,13 63:9
72:25 97:16 132:9
133:3 157:11
**motivated** 52:17
**motorists** 59:17
**mouths** 129:2
**movant** 61:4,5
133:20 134:10
**move** 21:20 24:18
27:4 28:1,16
51:25 83:19 86:7

119:15 120:3,4,16
120:17 129:11
**moved** 67:12
**movie** 153:20
**moving** 59:5
135:10
**muchin** 14:2
18:14
**multiple** 71:24
75:11 101:24,25

## n

**n** 14:1 18:1 157:1
157:3 158:1,3
159:1
**n.a.** 15:12
**n.d.** 131:11
**n.d.n.y.** 134:14
**n.d.tex.** 156:8
**name** 37:15 93:4
114:2
**named** 110:20,21
**names** 41:19
78:17 85:5 95:3
**narrowed** 135:25
**nassau** 153:25
**natasha** 15:16
**nate's** 153:23
**national** 17:2,3
64:22
**nature** 24:23
32:10 128:16
138:24 140:13
144:1,7 154:23
155:25
**near** 19:14 79:4
**nearer** 28:1
**nebraska's** 133:8
**necessarily** 33:9
117:7 139:21
**necessary** 31:21
55:19 101:18
102:3,19 103:5
105:18 107:25

108:10 139:17
141:25
**necessity** 30:14
**need** 22:19 24:3
25:3,15,17,20
32:6 45:9 50:12
75:24 82:12
124:20 128:11,20
145:5 147:24
**needed** 48:10
**needs** 23:21 24:4
144:2
**negotiate** 19:20
21:19,23 22:6
30:15 35:1
**negotiated** 33:15
**negotiations**
30:20 33:11,17
**neither** 57:25
142:9
**nepple** 16:15 42:4
92:5,9,13,15 93:4
93:5 95:20,22,24
96:9,11,15,20,22
96:25 97:19,23
98:3,5,10,22 99:3
99:5,10,13 100:8
100:11,14 101:2,4
101:6,9 103:22,25
104:3,8,11,14,19
104:21 105:4,7,10
105:16,24 106:4
106:11,21 107:3
107:16,19 108:6
108:17 109:1,5,8
109:14,20,25
110:4,6,9,19,23
111:5,11,13,19,21
112:4,8,14,23,25
113:12,18 114:6
114:12,15,22
115:6,9,14,21
116:8,17,20,23

117:1,4 118:4,6,8
118:15,17,20,23
119:1,4,17 129:20
129:22
**never** 44:21 50:24
71:5 73:21 74:2
80:17 97:12
102:17 107:11
109:12 123:3
127:5,15,18 146:9
**nevertheless**
32:25 140:4
**new** 1:3,19 14:6
14:14 15:5,14,21
16:4 17:6 21:17
29:14 34:12 51:3
65:13 68:23 78:23
79:3,4 86:11
87:23 134:13
150:24 151:4
**newman** 56:9
57:23
**news** 27:11
**nice** 18:6
**nicole** 13:25 159:3
159:15
**nino** 42:5
**nominative** 114:1
**non** 43:18,22 59:5
130:23,24 153:12
154:7
**nonexistent** 47:14
**nonmoving**
134:15 135:10
**nonperformance**
151:24
**normal** 64:24
**normally** 142:10
**north** 14:20 39:8
133:8
**note** 59:18 99:22
142:7 143:13
150:4

noted 58:6 71:20 120:12 140:9 151:6
noteholders 15:19 23:15
notes 94:14
notice 3:1 22:20 36:10,14 72:9,10 72:12 80:13 81:7 81:8,13 87:10 121:7,11,13,17 125:12 133:15 144:15 147:2 149:21
notices 128:4
noticing 36:9 81:4 81:6
noting 36:25
notion 69:15
notwithstanding 59:23 64:15 72:16
november 18:23 97:15
number 18:23 24:7 34:20 40:22 42:8 46:18 66:25 67:5,6 68:25 69:9 75:25 76:1 77:21 80:22 81:23 83:7 83:9,10 99:15 102:25 103:2 106:18 108:19 122:5,25 130:6,6 141:11 145:2 146:5
numbers 67:1 76:5 78:18 79:16 95:6 102:21
ny 14:6,14 15:5,14 15:21 16:4 17:6 159:22

**o**

o 1:23 18:1 159:1
o'connell 58:20
oath 84:4
object 36:17 84:16 149:1
objected 31:5 37:21 69:7 95:11 97:10 119:13,23
objecting 19:10 19:12 20:14 22:8
objection 2:6 18:19 36:7 37:8 37:25 38:1 56:1 57:18 60:25 79:18 79:23 85:15 95:13 95:15 96:3,3 98:8 119:8 120:18 148:15 149:2,4 150:9 157:9
objections 18:16 20:19,21 37:10 98:19 132:12
objective 65:13
objectively 127:17 142:18
objector's 132:13
objects 66:17
obligation 76:25
obligations 124:5 124:7
obtain 135:11
obtained 71:21 140:23
obtaining 73:1
obviously 45:6 46:12 55:20 62:14 63:10 147:20
occur 146:9
occurred 122:1 136:13
occurring 23:20

october 19:3 36:12
odd 55:5 80:24
offer 67:15 79:9 81:24
offered 20:15 79:8
offering 67:11
official 8:15,18 11:15,20 15:2
oh 51:3 53:21 67:25 74:19 82:11 82:20 85:12,12 95:2 129:9 143:12 156:17
okay 18:2,10,21 20:11 21:7,13 23:12 25:6,24 27:7 28:8 30:2 35:11,22 36:2,21 37:9,16,24 38:1 38:11,12 39:6,10 39:22 40:3,14,15 40:21 41:10,14,16 42:8,14 45:1 47:2 47:4,22 48:8,13 48:18 50:14,16 53:20 54:8 61:24 62:13,25 63:7,19 68:1 74:19,22 82:20 84:20 86:5 86:9 89:14 90:25 91:3,17,17 92:13 92:17,24 94:22 96:21,22 97:1,22 97:23 98:3,12,21 98:21,22 99:5,12 99:13 100:8 101:5 101:8 102:22 104:20 106:19,23 108:15 110:3,6,8 112:5,16 114:14 115:2,20,22 116:20 117:3

118:21 119:3,4 120:22,22 121:2,2 121:10 123:5,8,17 124:14,20,23 125:3,15 129:19 131:21,24 132:2,6 156:10,17
old 159:20
omnibus 2:6 18:12 21:1 22:20 34:4,6 35:4,7 36:7 37:25 40:17 157:9
once 102:3 104:25 110:9 138:25
ones 37:12,18,21 38:5,19 42:22 63:23
open 79:14 92:20 115:25 116:3 125:22 126:2 144:13
opened 126:10
opening 50:20 113:16
operating 1:14 5:3,9,12,18,25 6:2 6:8,12,19,25 7:2 7:11 9:6,13,19 42:3 45:25 46:20 64:14 93:2 132:8 142:21
operations 64:5 64:24
opinion 72:22 73:11,18,20 74:4 74:4,17 77:7 155:6
opinions 73:13
oppoistion 8:9
opportunity 53:15 61:6 87:10
oppose 134:17

**opposed** 42:12
83:21 89:1 92:2
115:25 141:15
144:17 150:1
**opposing** 134:24
**opposite** 147:14
**opposition** 7:9,16
8:16,24 9:10 10:4
10:9,23 11:7,16
11:24 12:7,15,23
13:1 61:18 76:15
**oral** 57:10 63:1,5
131:13 135:23
150:9
**order** 2:1 20:17
23:11 30:23 31:23
35:6 36:11,22
37:1,2,13 39:13
40:12 42:18 43:11
45:14 46:13 47:10
47:12 53:12 55:14
55:18 61:9,25
62:7 69:2,10 95:4
95:5 131:1 155:19
155:24 156:4,5
**ordered** 65:3
67:22
**orders** 42:19,23
42:25 62:3 131:1
**ordinal** 130:6
**organizing** 155:10
**original** 45:8
**ostberg** 10:18
69:7 80:8,9,13
101:22 105:9,10
105:11 107:22,25
108:16 109:24
110:7 117:5,22
126:7 130:10
140:22
**ostberg's** 105:3
144:24 145:7

**outcome** 22:18
29:18 33:3 134:20
135:14
**outer** 114:16
**outline** 99:17
**outlined** 61:2
**outlines** 137:13
**outside** 65:8 66:9
**overall** 113:17
114:5 116:6
**overbroad** 84:16
97:10
**overcome** 118:9
**overlap** 147:21
**overpaid** 81:11
**overreaching** 153:10
**overtly** 146:6
**owed** 60:10 81:10
152:2

**p**

**p** 14:1,1,9 18:1
134:9
**p.m.** 92:22,22
132:3,3 156:19
**packaging** 140:25
**page** 123:13
139:25 157:5
158:5
**pages** 131:10
156:8
**paid** 84:3
**pamlab** 139:24
**panel** 117:23
**panoply** 107:19
**papers** 92:21
**paragraph** 59:9
60:11 123:9
**paragraphs** 56:12
**parameters** 30:12
**pare** 72:1
**part** 35:15 47:16
49:22 52:11 57:3

57:4,8 69:23 89:7
90:1 105:16
106:23 113:2,2,16
116:6 126:23
141:21 158:12
**parte** 6:8 7:7
**partial** 7:9 9:11
89:15 91:12
130:21,22 131:4
135:18 136:15
155:19 156:1
**partially** 151:8
152:15
**particular** 69:2
134:1 146:1
**parties** 19:9,13
22:8 26:14 28:2
30:11 32:4,15
33:23 34:10,16,17
34:25 35:16 36:10
37:4,5 40:23
43:16 44:9 57:17
83:14 86:23
117:15 132:10
133:9 135:13
137:2 140:18,23
142:6 155:2,20
156:10 157:11
**partner** 94:18
**parts** 93:14 134:1
**party** 19:12 37:5
57:14 59:5 71:19
86:19 117:11,17
130:6 133:24
134:15,24,25
135:10 142:9
**party's** 135:10
**pass** 145:13
**passed** 49:15
52:25 53:24 58:17
58:23 60:19
**passing** 150:5

**passive** 26:5 28:25
**pasta** 130:3
**paul** 4:8,20 16:1
25:8 93:9
**pause** 41:15 119:6
121:3 122:2,6,23
123:7 124:19
147:18
**pay** 26:9 125:8
**paying** 30:17 31:8
152:1
**pc** 135:12
**people** 27:22
34:20 41:4,8,19
67:2 71:17 76:1
77:24 78:7 79:2
79:15 80:12,22
81:10,14,22 83:7
83:7,10 84:3
86:24 87:7 107:12
107:20 108:16,19
108:24,24 115:13
115:14 125:22
126:18
**people's** 116:10
**percent** 80:15,20
80:21
**perfectly** 40:12
85:8 95:13
**perform** 87:2
**performance**
86:14 124:5,7
151:1,9,16
**performed** 86:25
**period** 22:12
24:22 25:21 28:23
30:6 33:22 34:23
35:6,8
**periods** 2:2 19:1,7
21:17 22:21 30:9
35:6
**permit** 30:15
114:2

person 125:20
personal 52:15
  78:18 84:5 151:15
personally 53:3
  97:11 123:24
perspective 26:5
persuade 110:25
pertain 88:16
pertaining 146:14
pertains 152:25
pharm 140:7
pharmacy 139:24
phase 85:18
phone 41:9 66:25
  75:25 76:1 83:10
phrase 78:6
phraseology
  61:15 91:2
pi 68:21 127:6
picked 70:17
  125:20
picture 153:21
piece 65:23
  105:24 107:4,21
  108:15 109:9,15
pieces 103:2 108:1
pink 116:12,12
pjt's 42:21
place 54:11 67:3
  83:9
placed 137:22
  138:13 139:7
places 75:11
plain 150:16
plains 1:19
plaintiff 69:22
  75:18 85:19
  137:19,23 138:2
  138:10,14,21,25
  139:5,9 140:3,6
  140:10 148:5,8,10
  149:4 150:7 151:1

plaintiff's 148:1,3
  148:13
plaintiffs 1:11
  41:23 48:1 50:18
  53:24 54:3,18,20
  56:2 75:15 120:19
  120:20 123:10
  135:17,20,25
  141:10,16,24
  150:2,23 153:1
  157:23 158:8,11
plaintiffs' 146:2
  148:15 149:2,7
  152:15
plaintiff's 118:7
plan 2:2 19:1
  21:19,23 22:7
  23:25 24:9 25:2
  26:16,18,24 28:3
  28:24 29:16,17
  30:7,15,19 31:8
  31:15,23 32:20,25
  33:2,5 34:15,18
  34:21 35:2,6,13
  65:6 116:6 157:8
plans 19:6
plate 146:18
play 79:14
playing 27:15
plaza 16:10
plead 43:23
pleading 43:23
  146:1
pleadings 2:21
  10:24 11:8,17
  43:4,8 54:9
  129:12,15 157:15
please 18:2 92:24
  132:5
plenty 108:24
  109:23,25
podium 35:25

point 19:25 24:6
  27:3 29:15,16
  30:13 33:22 34:2
  37:9 47:12 50:6,7
  59:1 62:1 72:21
  76:13 78:9 80:17
  85:18 88:10
  108:23 110:1,15
  111:4,25 112:1,3
  117:4 120:3
  124:24 127:5,12
  128:12,14 145:7
pointed 50:24
  53:8 57:9 144:20
pointedly 127:22
points 28:7 56:2
polk 15:11
portion 43:2
portions 4:15 8:23
  10:3 12:22
ports 76:5
posed 128:15
position 20:14
  26:21 32:4 84:21
positive 32:22
possession 14:12
  14:19 41:23 50:18
  71:21 73:23
possibility 146:20
possible 23:4 24:9
  25:1 32:24 71:9
  72:16 115:16
  124:11 129:6
  155:7
possibly 72:13
post 75:2
posted 147:4
posture 131:16
potential 19:21
  33:6 44:10
potentially 22:24
  32:19 33:13

power 55:15 56:4
  58:3 124:4,6
  125:5
powerful 117:15
  117:18
practice 83:17
  98:20
practices 133:9
  136:25 137:12
  149:11 150:6
precipitated 64:4
precision 139:3
precluded 56:3
predicate 136:10
  136:11
predict 33:8
prediction 73:12
predictions 73:12
prefer 20:20
  61:21 148:12
prejudice 19:8
preliminary
  101:10
prepare 30:16
prepared 151:18
prepetition 60:10
  60:11 152:2,4
presence 134:7
presentation 92:2
  93:11
presentation's
  92:4
presenting 42:4
  61:25
press 103:23
  104:4,5,15 147:3
pressure 22:22
  30:23
pressuring 31:12
presumed 75:1,8
  80:5 139:12
presuming 21:20

presumption 75:2
75:5,6 80:7 81:20
82:3,7,8,14,22
83:4 101:11,11
102:4 104:25
126:25 138:20,24
140:13 144:2,21
145:5
presumptions
102:6,8 110:10
pretrial 131:20
prevail 145:6
previous 65:10
previously 132:24
142:3
prices 100:16
primarily 58:18
146:14
primary 140:21
principle 57:23
prior 33:24 103:8
154:11
privileged 97:10
pro 142:21
probably 26:24
40:23 63:14
131:21,25 155:3
problem 70:12
79:2 81:12
problems 61:5
64:4 69:9
proc 1:4
procedural 51:11
51:13 131:16
procedure 61:2,3
79:5 133:18
procedures 32:9
84:24
proceed 23:3
25:13 49:16 50:22
61:16 63:8 156:11
proceeding 2:11
2:18,20,24 3:3,10

3:17,24 4:6,13,25
5:6,14,21 6:5,15
6:21 7:5,14,21 8:1
8:6,13,20 9:2,8,15
10:1,14,21 11:4
11:13,22 12:4,12
12:20 18:13 29:2
31:17,18,25 40:20
41:24 43:2 44:15
50:19,25 51:4,10
51:17,23 56:19,20
57:2,11,13,16
63:13 80:12
100:24 132:10
proceedings
101:11 156:18
159:5
process 19:5
55:18 98:1 121:24
produce 83:25
84:16 85:24
produced 79:24
84:2,4,18
producing 149:2
product 75:14
137:21 138:12
148:12
production
119:12,19,22
120:19
products 115:15
115:15 138:17
profits 67:18
77:18
program 147:17
progress 30:17,20
prohibiting 56:24
prohibition 152:1
prolong 46:23
promise 120:1
promised 120:13
promotion 77:21
77:22

promotional
67:20
prompted 29:3,3
promptly 34:19
57:1 155:2
proof 46:10,12
52:24 58:24 60:19
60:24 79:20 81:17
81:22,25
proofs 46:16,17
53:23 54:3 58:16
59:11 60:21
proper 34:3 49:9
49:9 113:23,24
properly 141:18
142:1
property 152:5,8
proponent 74:5
proposal 29:24
32:18 33:12
propose 32:20
proposed 20:17
20:23 21:17 22:8
22:11,13,15 23:5
32:15 33:1 40:12
130:16 131:6
156:3
proposing 32:13
proposition 58:19
59:1,12,14 77:16
118:22 125:25
142:8,24
prosecutorial
87:24
prospect 31:7
prospects 30:19
protected 85:4
113:4,4,5 152:11
protections 57:2
57:14
protective 95:4,5
protocol 124:17

prove 68:14 102:5
104:25 110:10,11
139:6
proven 139:11
proves 78:1,2
provide 23:23
85:20 120:1,20
124:9 128:19
133:15 134:16
provided 65:9
99:7 149:4
provident 131:10
156:7
provider 75:21
128:19
provides 55:18
57:2
providing 57:4
72:8 75:22 149:20
150:15
proving 138:6,10
provision 55:21
55:23 67:11
150:18
provisions 55:20
150:17 153:7
prudently 29:9
przulj 42:6
public 71:13,23
71:23 72:21 74:6
74:18 103:16
104:4 138:22
139:13 140:11
143:25 144:12
146:12,13
publicly 104:1
puerto 117:10,12
pull 51:4 101:2
purchased 67:8
100:2
purchases 79:21
purchasing 75:16
75:23 76:1 128:17

148:4
**purdue** 42:21
**purple** 116:12,12
**purpose** 44:13
  70:2 87:6 95:11
  125:1,2 142:18
**purposeful** 125:6
**purposefully** 73:5
**purposes** 121:6
  129:1 134:4
  137:10 141:18
  142:11 147:25
  152:22 154:13
  155:10
**pursuant** 2:3
  56:18 124:17
**pursue** 43:19
**pursued** 56:18
**pursuing** 43:14
**push** 26:4
**put** 35:20 75:11
  75:12,25 76:17,19
  86:24 103:17,17
  117:23 122:10
  130:10
**puts** 22:22
**putting** 65:23
  74:6

**q**

**quality** 75:14
  137:21 138:12
**quantum** 82:13
  89:1,19 142:15
**quarropas** 1:18
**quarterly** 104:15
**question** 45:20
  52:2,12,20 66:4
  87:3 99:15 120:15
  128:15
**questioning**
  112:20
**questions** 51:25
  80:19 86:6 93:18

129:8,17 156:10
**quickly** 21:18
  24:11,12,19 26:8
  28:9 29:6,8
**quite** 24:9 26:11
  34:13 71:18 147:7
**quote** 64:14,19,23
  64:25 65:4,12,15
  65:24 66:1,3,10
  72:14 75:12 93:8
  113:20 127:13
  153:8
**quoted** 93:14
**quoting** 59:3

**r**

**r** 1:23 14:1 18:1
  134:9 157:3 158:3
  159:1
**radio** 134:18
**raise** 62:1 86:18
  98:15
**raised** 31:17 34:8
  69:1 102:17
  105:14
**raising** 135:4
**rapp** 65:9,9,12,12
  66:8 93:14,17
  102:13 105:12
  145:15
**rappoport** 15:8
**rationale** 131:4
**rdd** 1:4,4 2:11,18
  2:24 3:3,10,17,24
  4:6,13,25 5:6,14
  5:21 6:5,15,21 7:5
  7:14,21 8:1,6,13
  8:20 9:2,8,15 10:1
  10:14,21 11:4,13
  11:22 12:4,12,20
**reach** 35:17 39:7
  80:2
**react** 26:23 27:23
  109:4 146:6

**reaction** 102:20
  102:23 107:20
**read** 52:5 61:8
  69:14 71:17 77:6
  86:19 107:11
  118:13,15 123:23
  123:25 124:20
  127:13 131:12
  141:8 142:6
**reading** 60:22
  64:16,20 145:23
  145:23 148:14
**real** 148:24
**reality** 24:20 32:3
  79:18 81:19 82:8
  103:12
**really** 21:22 23:4
  23:8 37:3 38:13
  38:24 44:12 50:6
  57:25 58:9 63:10
  73:13 80:19 89:21
  94:16 130:18
**realm** 48:12
**reason** 49:16 54:2
  73:20 78:15 83:25
  107:17 113:5
  115:14 127:24,25
**reasonable** 22:6
  22:12,18 23:3,4
  24:9 25:22 30:19
  31:7 83:3 85:8
  108:2 121:22
  124:9 134:25
  135:9 140:2
  141:22 150:14
**reasoning** 155:12
**reasons** 25:4
  71:24 129:12,14
  132:24 149:23
**rebate** 81:11
**rebut** 82:2,7,13,19
  83:6,11,12 142:2
  142:13

**rebuttable** 82:13
  82:22
**rebuttal** 10:18
  125:16 144:21
**rebutted** 144:2
**rebutting** 142:12
**recall** 114:15
  120:8
**recalls** 29:5
**recast** 130:7
**receive** 37:14 78:7
  118:11
**received** 18:16
  36:24 81:15
**recess** 92:22 132:3
**recipient** 114:24
**recitation** 63:21
**recognize** 30:12
  59:11 88:25
**recognized** 55:3
  55:13,22,24 56:5
  60:1 65:24 153:15
**recognizes** 54:22
**recognizing** 136:1
**recollection** 82:17
**record** 18:6 23:14
  41:20 62:5 92:25
  93:25 94:24
  100:10 103:3,15
  103:21 108:2
  110:7,14 111:17
  123:9,21 129:7,16
  132:6 134:2,6
  135:9 136:13
  137:1 147:9 150:9
  155:1 157:10
  159:4
**recorded** 85:16
**recording** 78:20
  79:7
**recordings** 78:15
  78:16 79:12 96:15
  96:16 119:13,20

119:22 120:2,4,13
120:16,17,19,20
120:24
**records** 67:6,7
79:24
**recovers** 78:24
**rectify** 43:21
**red** 112:10,12
150:9
**redact** 84:5
**redacted** 95:19
120:10
**redefine** 129:25
**redress** 46:8
47:15
**redressable** 47:11
**reduce** 20:15
**reduced** 20:18
**refer** 55:2 69:18
78:23
**reference** 44:3,5
44:21,23,23,25
45:2,7 56:8 62:4
62:10 119:25
139:12
**referenced** 119:14
**references** 37:1
**referencing**
119:23
**referred** 45:9
104:6 106:10
147:3 150:18
**referring** 65:4
100:6 103:21
104:5 106:8
123:22
**reflect** 147:7
**reflected** 147:14
**reflecting** 20:18
**regard** 130:23
135:23 136:3,8,18
136:22 138:23
140:12 144:1,8,9

145:3,8 147:19
151:11
**regarding** 19:16
52:1 98:20 104:16
137:2 149:3
**regular** 79:2
**reinterpret** 143:9
**reiterate** 50:6
**related** 2:4,15 3:1
3:6,13 4:3,10,21
5:10,25 6:10 7:17
8:17 9:11 10:25
11:9,18,25 12:8
12:16 13:2 35:8
42:10,11 49:20
69:9 157:12
**relating** 43:9 44:7
**relationship**
34:16
**relatively** 31:9
33:22 137:15
**release** 103:24
104:4,6,15 147:3
**relevant** 69:25
126:16
**relied** 101:11
**relief** 20:18 22:13
37:10 44:6 46:3,4
47:11,15 48:11
52:18 56:7,9
57:20,20 73:1
136:22 138:19
139:12 142:25
**relies** 146:13
**rely** 55:2 69:16
78:10 84:17,18
147:1
**relying** 56:19
81:17 100:25
123:10,17,18
**remaining** 27:21
133:4

**remedy** 52:18,19
55:4,6,10,13,24
56:15,17 59:25
154:17
**remember** 75:24
90:14,15
**remove** 62:4
**removes** 37:1
**rendered** 77:8
**renegotiated**
153:23
**rent** 26:9
**reorg** 64:20 73:25
74:1 94:7
**reorganization**
30:17
**reorganized**
34:18
**reorging** 73:25
**repeat** 77:14
**repeated** 73:4
75:4
**repeatedly** 145:24
**repeats** 124:8
**reply** 18:24 28:6
51:2 56:1,17
57:18 59:22 137:6
137:8
**report** 10:18
71:19,20 105:3
**reported** 141:5,7
**reports** 104:15,16
**represent** 93:6
**representation**
143:16
**representing**
41:22
**request** 60:25
61:1 84:13 85:22
86:1,3 94:24
96:16 97:4,8,9
98:6,18 119:12,19
119:22 136:1

142:25
**requested** 18:25
20:15 22:10,14
44:6 47:11,15
94:17
**requesting** 47:14
**require** 21:18
56:6
**required** 32:9
72:10 87:9 121:1
134:23 139:23
149:21 154:12
**requirement**
140:10 154:8
**requirements**
110:13
**requires** 46:13
68:14 74:4 121:7
133:14 143:22
150:24 152:21
**requiring** 56:8
**research** 127:16
127:18 142:18
**reseller** 123:4
**resembled** 125:21
**reservation**
125:11
**reserve** 21:24
**reserved** 37:7
**resolution** 19:21
24:3 33:11,18
**resolve** 22:5 35:1
69:11 147:24
**resolved** 37:14,18
**resolving** 39:17
**respect** 37:7,10
38:15 43:8,12,14
43:21 54:10 57:5
58:5,11 62:1 68:3
68:22 72:20 73:10
74:13 75:6 83:20
87:24 90:20 94:16
101:14 110:14

113:1 128:14
130:17,22 132:15
133:4 135:19
136:15,15 145:15
149:19 150:5
154:22 157:15
**respectfully** 22:3
23:10 29:25
**respective** 137:12
**respectively** 19:3
22:3 133:8
**respects** 61:17
87:1
**respond** 125:4
146:5
**responded** 108:19
140:25
**respondents**
70:24 80:15
**responding** 48:25
**response** 6:17,17
6:25 7:23 10:5
37:4,6,11,14
50:24 85:19 91:23
137:10
**responses** 36:24
37:7,18 137:3
**rest** 93:9
**restatement** 61:17
**restored** 125:10
**restrictions**
123:14
**restructure**
147:16
**restructures**
64:24
**restructuring**
64:4
**result** 32:21,22
63:25 64:1 74:3
138:15 141:4
143:5 155:23
156:4

**resulted** 153:4
154:13
**resulting** 135:22
148:5
**results** 28:18
29:14 33:14,23
117:6 145:7 155:5
**retention** 42:21
**retort** 24:19
**return** 127:4
**reversed** 132:11
**review** 23:16
66:22 120:10
137:1 147:5 155:7
**reviewing** 151:10
155:8
**revised** 20:17
23:11 36:22
**revising** 37:15
**rican** 117:10,12
**rifkind** 16:1 25:8
**right** 20:5 21:10
21:24 24:3 27:18
27:19 28:21,23
30:4 35:11,23
36:20 37:20 38:18
39:9 40:9,18 42:8
44:24 45:20 46:3
46:3,4,11,18,21
46:21 47:22,25
48:8,22 49:18
53:6,18,20 56:15
57:20 61:12,19
62:17 63:7 83:20
84:9,21 85:11
88:22,24 89:11
90:23 92:7,11
94:11,22 97:23
98:25 99:2,12
100:15 105:6,9
108:19 109:23
110:5,22 111:6,12
111:15 112:9,11

112:16,24 113:10
114:2,15,18,24
116:11,14 117:10
117:20 119:4
121:11,16 122:15
124:15 125:15
130:12 142:9
**rights** 37:7 43:21
114:1 125:11
152:11
**ring** 41:11
**ripeness** 48:20,20
49:1,18,21,24,24
49:25 50:3,10
52:3,7,21 54:2
59:11,15
**rise** 92:23 107:25
132:4 144:1 154:4
**rises** 109:14
**risk** 64:9 70:11,18
71:9 72:17 73:5
107:14 141:2
144:19 145:3
146:23
**risks** 71:10 103:12
103:14 104:22,23
107:10 146:18
**road** 159:20
**robert** 1:24
**robotically**
150:21
**rochester** 2:15 3:7
3:14,21 4:3,10,22
7:18,24 8:3,10
10:11,19 11:1,10
12:1,9,17 13:3
14:8 18:14
**room** 1:18 153:22
**rosenman** 14:2
**ross** 14:9,24 18:8
41:21,21 50:17,17
53:7,15,17 54:5
61:11,14,20 62:19

63:2,20 71:11,13
71:17 74:16,18,20
74:23 81:6 82:4
82:16,20 83:23
84:12 85:24 86:3
86:6,10 88:14,17
88:19,23,25 89:11
90:9,16,19,22,24
91:1,4,14,16,18
92:17 93:11 94:14
94:21 95:2 97:3,6
97:8,20 98:14,16
98:18 99:20
101:10 102:5
106:15,18 113:1
117:5 121:9 122:4
122:8,12,16,18,24
123:11,13,15,19
125:4,17 126:3,21
131:19,23,25
156:12
**roughly** 32:16
34:5
**rowenta** 117:14
**royalties** 131:10
156:7
**rule** 24:11,12
26:23 44:2,3,17
53:5,11,13 56:5
57:7,21 61:2
66:18 78:14 95:12
121:1 133:19,23
148:18
**ruled** 152:24
**rules** 26:15,17,25
56:19 57:3,4,7,9
57:16 94:8,9,11
**ruling** 21:18
22:23 23:24 24:5
25:14 26:13 27:6
32:11,14,14,17,19
33:21 47:5 53:8
53:22 60:16

130:15 131:5,6,14
131:16 147:25
149:14 151:7
154:11 155:4,5,11
155:15,20,21
156:1,1
**rulings** 20:2
130:23
**rum** 117:10,12
**run** 29:7 87:21

**s**

**s** 2:4,15 3:1,6,14
4:3,10,21 5:10 6:1
6:10 7:17 8:17
9:11 10:25 11:9
11:19 12:1,8,17
13:2 14:1 16:2
18:1 157:3 158:3
**s.d.n.y.** 30:25 31:2
31:3 58:20,21
60:17 131:9
139:25 140:8
143:18 152:13,14
153:12 154:1
156:6
**s.p.a.** 137:24
**sales** 64:22 77:14
77:25 99:15,24
100:20 138:16
**sampling** 84:2
**samuel** 16:6
**sanctioned** 53:4
**sanctions** 53:13
61:1,7
**sarah** 10:10
**sat** 101:12
**satisfied** 148:22
**satisfies** 75:18
76:8
**satisfy** 134:10
136:6 148:9,18
**sauce** 97:17,17

**saw** 80:23 127:23
**saying** 26:11,11
39:24 43:18 69:6
70:10 76:13 84:9
86:18,21,25 89:16
99:1 100:17
105:13,20,23,24
107:5,6,14,21
108:8,12,12 109:2
109:9,14,15,17,21
111:6 112:15
113:19,21,22
114:4 115:2,6,23
116:4,8,21,23,24
117:24 126:18
143:20
**says** 30:9 39:13
52:11 69:18 70:14
72:13 73:25 74:25
75:9 82:22 99:20
99:23 101:17
104:23,24 106:25
107:7 108:10,22
111:17 114:16,23
115:18 121:22
125:12 126:9
127:14 128:6
**scalia** 52:11
**scenario** 24:17
**scenarios** 24:7
**schedule** 21:16
36:23 37:1,2,14
37:15 38:16
**scheduled** 32:7
33:20 34:4 62:17
62:20
**schedules** 37:13
**scott** 5:11,17 6:1
6:11,18 7:1,10
9:12,18
**seal** 4:15 6:7,9 7:7
7:7 8:22,23 10:3
10:16 12:22 42:9

42:10 157:11
**sealing** 42:19
**sears** 42:22
**seated** 18:2 92:24
132:5
**seb** 142:20
**second** 15:19
18:15,22 22:14
23:15 30:6 51:18
52:13 55:3,8
68:19 69:5 70:6
70:13,15 72:6
74:25 75:3,9 77:4
79:24 81:1,20
86:14 101:16
108:9 126:4,23
137:15,25 147:21
157:6
**secondly** 126:17
**seconds** 129:20
**section** 2:3 30:8,8
44:5,8 46:12
54:12,17,21,23,25
55:2,3,17,20,24
56:4 121:7 123:18
123:22 133:6,14
137:14,19 138:1,2
149:21 150:13,16
151:20,21 152:6
152:22 158:9
**securities** 153:11
**see** 18:6 24:3,25
25:3 26:20 29:11
30:24 59:20 60:11
71:15 83:11 85:2
86:20 87:22 95:9
95:10 112:21
114:24 131:7
134:9 139:3 140:7
140:15 142:19
151:3 152:12
153:24 156:5

**seek** 21:24 30:6
43:20 64:3 119:15
136:14
**seeking** 22:17
30:5,22 31:11
37:10 43:19 44:9
44:11 51:21 61:6
157:6
**seeks** 54:13 58:6
58:12 89:4 136:22
152:16
**seen** 24:12 66:25
100:9
**self** 39:23 135:4
**send** 72:10 155:17
**senior** 64:18
86:24
**sense** 46:24
112:18 128:21,22
143:14
**sent** 80:10 84:18
104:17 115:4
117:22 141:13
143:7 146:22
147:2
**sentence** 86:20
123:15
**sentences** 123:22
**separate** 50:1
55:10 110:12,13
116:19 148:6
154:2
**separately** 78:12
**september** 97:14
**seq** 133:6
**sequentially**
155:11
**series** 77:5,9
**serious** 68:5
**serve** 25:2
**served** 36:10
**serves** 142:18

service 60:9 66:9
66:12 71:4 72:8
72:19,23 73:7
74:7,9 75:21,22
102:24 121:8,13
121:14 124:14,18
124:25 128:11
133:15 141:3
144:11,19 145:4
145:10 146:24
147:8,12,16
149:19 150:15,18
150:20,21 152:17
serviced 68:2
services 64:10
66:1 67:8 72:4,15
76:4 81:23 83:8
86:18,22 87:15
107:15,18 124:10
124:12 128:19,20
136:18
serving 135:4
set 20:8 21:3 22:3
40:8 53:11 54:23
56:6 83:1 127:17
137:5 138:22
140:6,11 143:24
144:12 155:3
seton 139:24
sets 56:13
setting 91:7
settle 24:10 26:14
32:4 35:13 41:6
settled 32:5,7
settlement 21:16
24:17 31:22 33:15
33:24 34:9,12,14
34:22
settlements 33:7
seven 42:23 43:1
62:21 88:23 108:1
seventh 58:8
127:13 153:20

sharing 95:6
shaya 2:15 3:7,14
3:21 4:3,10,22
7:18,24 8:3,10
10:11,18 11:1,10
12:1,9,17 13:3
14:8
sheer 30:21
sheet 64:3
shifting 140:13
shifts 139:1
shoes 153:23
shore 17:8 25:25
25:25 28:25
shore's 29:16
short 21:19 27:16
33:22 125:17
155:1
shorten 34:23
shorter 20:22,23
21:15 23:8 28:18
33:16 35:3 92:6
shortly 24:22
32:12
shot 117:13,14,16
show 56:8 70:24
76:25 77:2,15,18
81:25 82:25 111:3
112:2 126:7
138:11 140:3,10
140:14 142:5
145:12 149:6
153:18 154:9
showed 68:8
showing 100:1,3
110:13 134:6,15
143:23 150:24
shown 82:19
140:23 153:13
shows 36:23
133:20
shredl 42:6

shut 87:15
sic 61:25
side 63:23 66:16
66:17
side's 82:15
sides 61:22 63:11
129:2 155:24
sign 87:21,22,23
significant 29:21
31:16
significantly
141:16
silver 56:9 57:23
similar 143:7
150:5
similarly 90:2
simple 52:4,21
57:21 73:20 75:21
simply 30:9 44:18
51:19 52:10 53:7
71:7 72:21 76:12
82:17 100:17
101:13 102:21
129:5 135:4,11
145:13
single 52:22 84:17
sir 91:14 120:21
sit 25:19 26:22
129:17
sitting 27:5 94:18
situation 65:4
six 42:23 62:21
size 30:14
slow 28:18
small 23:21 66:10
smaller 141:8
smith 14:16 18:9
18:19 36:1,3,5,5
36:16,18,20,22
37:12,17 38:9,15
38:19,23,25 39:3
39:6,10,15,22
40:3,6,9,14 94:1

solely 55:6 114:4
153:16 154:18
solicit 2:2 30:7,7
157:7
solicitation 19:1
20:17 23:9 35:8
solutions 159:19
solve 81:12
somebody 72:18
somewhat 141:4
147:23
sophisticated 72:3
sorry 19:25 20:25
43:1 53:21 59:21
66:4 68:1 74:15
76:12 78:5 82:20
95:14,22 96:7,9
96:11 98:7 100:5
103:20 114:20
120:5 122:7,15
136:17 143:12
151:3,14 156:15
sort 22:9 27:14
51:5 52:15 68:2
68:17 71:18 97:17
125:19 145:21
sought 52:18 56:7
57:24 85:19
132:14 135:21
151:7 154:21
sound 93:11
sounds 40:14
soundview 131:8
156:5
source 135:9
148:14
sourced 104:22
southern 1:3
spark 28:2
spd 139:3
speaker 81:4
82:18

speaking 111:21
specific 33:14
  54:22 57:7,24
  77:25 82:16
  105:22 109:9
  111:4
specifically 49:11
  65:14 67:3 77:22
  94:24 96:16
  101:17 133:13
  151:21
specious 95:7
spectrum 65:13
  94:25 96:17
  119:14,23 123:24
  124:3,4,6,9,12
  126:14 128:12
speculative
  148:23
spending 51:24
  125:9
spent 153:22
splice 113:8
spoliation 153:10
spring 155:3
spur 24:14
st 16:11 93:5
stage 57:9 111:23
stake 52:15
stakeholders 19:9
  35:20
stand 29:24
  127:20
standard 43:20
  49:9 83:3,4 126:4
  127:17 133:17
  136:6 147:23
  148:9
standing 45:14,16
  45:19,20,21 46:1
  46:5 47:10,13,16
  47:17,19,21 48:24
  50:1,4,9 52:20,21

59:23 60:5,14
stands 142:23
star 153:20
start 50:20 52:2
  61:20 63:20 68:13
  69:2 76:4 95:6
  130:15 149:9
started 100:22
starting 54:9
state 41:19 56:19
  58:9 59:2,13
  83:14 89:18 100:4
  136:25 137:12
  141:17 150:6
  152:8 154:4,11
stated 137:16,25
  139:10 147:22
statement 3:19
  4:18 5:16 6:18,25
  7:23 9:17,17 10:6
  30:16 69:3,4,5,14
  73:16 74:5 75:13
  77:1 104:16
  114:16 128:16
  137:6,19 138:3
  142:17 143:1,2
  148:15 151:13
statements 71:14
  71:23,24 72:2,6
  72:21,24 74:18
  103:16,19 104:21
  135:4 137:2,3
  138:13 146:13,13
  146:17 151:11
states 1:2,17 56:2
  65:7 83:15,16
  139:5
status 62:9
statute 56:7
statutes 83:18
  150:8
statutory 19:1
  54:22 55:6

stay 43:9,12,15,22
  44:16 51:16,21
  54:11,23 55:5,6
  55:11,14,15 56:14
  56:23,24 57:12,22
  57:25 58:1 60:8
  64:20 74:1 87:14
  87:14 88:1,8,10
  88:11 89:4,6,19
  90:4,8 91:7 94:7
  132:17 135:24
  136:4,6,16 151:22
  152:1,3,11,12,16
  158:12
steal 76:22
steam 117:13,14
  117:16
step 103:6 127:21
  128:22
steps 94:9
stern 130:21,23
steve 15:8 42:6
stick 112:19
stipulations 134:3
stood 113:1
stop 27:2 71:4
  72:8 75:22,24
  87:21,22,23
stored 134:3
storm 125:6
story 93:9 125:12
street 1:18 15:4
strickland 4:8,20
strict 87:20,25
  90:3,4
strips 103:7
structure 31:10
  34:18,21 68:7
study 77:6,10
stuff 79:1
sub 76:16,16
subarguments
  76:16

subject 2:22 10:25
  11:9,18 31:25
  45:6 52:1,7,10
  58:10 119:24
  133:22 157:17
submit 23:8 35:5
  42:25 61:9 75:20
  79:6 97:20 155:23
subordinate
  46:14 54:2 58:12
subordinated
  54:17
subordination
  43:11 45:4,22
  47:14 49:11,17
  52:18 53:1 58:7
  58:22 59:25 60:3
  60:18 89:20,22
  90:1 91:5,13
  132:19 135:25
  136:9,11,19,20
  152:20,22 153:6
  154:17,22
subsections
  133:22
subsidiaries 54:15
  150:3,4
substantial 32:9
  34:20 141:2,6
substantially
  42:23
substantive 38:17
  39:3 42:11 157:12
substantively 2:8
  38:2 39:20 40:1
succeeding
  146:20
successfully
  134:17
successor 17:3
sued 57:11
suffer 148:8

suffered 68:5
sufficient 22:4
  30:15 56:8,14
  79:21 81:25 82:2
  83:17
suggest 93:22,23
  147:11 155:20
suggested 25:11
  130:15
suggesting 128:25
suggestion 27:24
suit 116:25 134:20
suite 159:21
sulks 153:22
summary 2:14 3:5
  3:5,13,20 4:2,9,17
  5:2,4,10,17,25
  6:10 7:9,17 8:9,16
  8:24 9:6,11 10:5,9
  11:16 61:13 68:15
  74:14 79:19 88:5
  88:11,20 89:15
  91:12,18,20
  100:23 109:12
  121:6 122:13
  129:11 130:20,21
  130:22 131:2
  132:9,12,13,14,21
  133:1,3,10,11,17
  133:19 134:24
  135:3,11,15,18,19
  135:21 136:15,21
  137:7,10 144:2
  145:6 148:22
  149:10,16 150:22
  151:7 154:13
  155:19 156:1
  157:19,21,23
  158:6,11
sun 87:22
supp 59:19
support 2:13 3:12
  3:19 4:1,8,16,18

5:10,16,23 6:23
  8:8 9:4 10:8,17
  11:6 12:6,14,25
  18:24 22:25 23:2
  29:20 120:25
  132:13 133:25
  137:6
supporting 29:22
  142:8 148:20
supreme 49:5
  136:7
sure 27:18 38:3,9
  39:17 40:4 45:10
  47:8 49:13 80:12
  95:14 97:23 101:1
  106:4,5 109:14
  115:22 121:23,25
  123:5 125:18
  129:15,21
surrounding
  70:11
survey 69:6,13,19
  69:19,22,25 70:2
  70:23,23 80:8,9
  80:24 101:22,23
  105:5 117:6,11,18
  117:25 118:3,7,9
  126:7 127:15,18
  128:3 129:25
  130:7 140:22
  141:11,17,24
  142:4,10,18 143:9
  144:24 145:7
survey's 80:14
surveyed 141:5
  144:25
surveys 69:25
  127:25
survives 38:6
surviving 38:13
  39:14
susceptible
  133:10 140:1

141:22
sustained 157:10
swiss 139:3
switch 65:13
  126:13 128:11
swoop 92:2

**t**

t 159:1,1
table 27:13
taggart 136:8
take 62:7 91:24
  92:1,11,16 99:22
  103:9 127:21
  130:12 131:12
taken 26:6 27:13
  108:18 136:5
takes 21:16 43:3
  73:5 83:18 91:18
talk 50:10 72:9
  75:7 95:3,9 127:9
  129:2
talked 80:8 93:14
  117:5 128:7
  129:10
talking 49:7,10
  82:11 95:8 103:23
  113:8 114:8,9
  127:11 154:7
talks 113:7
tantamount 153:9
  154:7
tape 119:9
tapes 66:21 83:21
  85:6,19 86:2
  95:16 96:8,9,13
  96:18 97:4,9,12
  97:13 98:6,20,25
  99:2,9,11 149:2
task 22:1
teach 45:10
team 18:9 26:4
technology 84:7

teddy 134:11
telephone 76:5
  77:23 78:7 82:24
  83:7 99:15 128:18
telephonically
  15:9,16
television 128:18
tell 62:14 63:16
  81:10 91:21,23
  94:15 97:9 128:21
telling 107:12
  108:7
tells 68:12
template 65:10
term 27:21 28:1
  40:1 70:8
terminate 147:12
  150:19
terminated
  144:19 149:19
terminating
  133:15 141:3
  144:10
termination 60:9
  136:17 145:4
  146:24 149:22
  150:20 152:17
terms 34:15
  107:10 131:15
terrence 14:9
terry 41:21 50:17
test 52:12 68:20
  75:10,11,13
  145:14
tested 45:13 48:20
  73:17,19 74:8
testified 64:8 66:2
  66:8
testify 151:18
testimony 11:25
  12:8,16,24 13:1
  68:8 86:24 102:13
  105:12

tests 75:12
tex 131:11
thank 25:23 28:4
  28:5,9 30:2,3
  35:10,23,24 40:14
  40:16 41:12 42:7
  43:5 50:15 93:4
  94:19 98:5 119:10
  156:17
thanks 40:15
  80:13 92:15
  120:22 132:2
theories 138:5
theory 46:9 56:6
  58:9
thereof 2:3 4:19
thing 50:21,21
  64:11 73:13 74:21
  89:3 99:13 104:23
  105:17,20 118:11
  120:23 123:25
  125:18 128:13,14
  128:23 129:9
things 25:1 34:13
  39:15 40:11 59:2
  59:13 70:23 72:9
  73:3 78:8 87:5
  90:21 93:20 94:4
  95:24 99:22
  125:17 128:2
  146:19
think 20:6 21:6,14
  21:25,25 22:13,22
  23:1,3,17 25:4,12
  25:16,21 26:2,10
  26:23 28:17,22
  29:14,24 33:7,10
  33:19,21 34:25
  35:19 38:6,7 39:2
  39:24 40:17 43:15
  45:17 46:19 48:2
  48:3,6,11,15 49:6
  53:2,3,10,12

61:14 62:23 63:11
63:13,13 66:19
69:25 74:14 79:14
79:17 83:12,23
84:25 85:10 89:7
89:8 90:7 91:9,22
92:7 93:2 94:13
98:25 99:1,2
100:13 103:10
106:21,25 107:3,4
108:17 109:25
110:2 111:21,22
115:13 118:11
119:17,18,18,24
120:3,7,9,9
121:10,12 124:24
125:24 129:24
thinking 131:15
third 34:7 52:15
  71:19 77:12 80:1
  81:16 86:15
thomas 16:8
thompson 2:13
  4:21 8:3 10:7 11:6
  12:14 42:2,4,6
  93:5
thorough 29:3
thoroughly 29:8
thought 27:14
  72:18 76:9,17
  80:24 84:9 111:9
thoughts 61:23
thousands 130:10
three 74:15 80:7
  80:15,15,22
  125:10 137:11
threw 78:11
throw 116:4
tied 76:7 78:1
  83:8
time 22:4,6,12,18
  23:3,4,23 24:4
  25:3,10,15,17,17

25:21 27:6,22
28:11 29:7,19
30:15,21 31:11
32:1 33:1 34:7,10
34:11 35:12 37:6
37:17 38:25 44:11
45:23 46:6,7
47:13 49:9,15
51:19,24 58:15
59:3,13,15 64:16
70:15 76:14 77:5
77:9 78:21 80:11
82:1 84:1 87:18
96:1 103:10 112:6
124:18 139:14
141:23 144:14
155:1,14
timeline 21:19
times 44:24 80:22
  93:13 130:10
timing 46:2 59:16
title 55:20
today 18:7,20
  19:10,17 20:15,21
  22:2 23:6 24:8
  25:20 33:4 42:3,5
  47:19,21 48:15,15
  62:5 64:5 79:9
  155:21
todd 15:7 27:8
toggle 33:3
told 64:18,22
  65:12 84:12 85:5
  93:19 94:10,21
  105:19
tolle 56:10
tone 94:3
top 72:11
topic 43:3
tort 153:15
totality 126:14
touch 56:10

touchtone 129:22
town 135:1
tracey 13:25
  159:3,8
track 67:3
tracked 77:22
tracking 67:13
tracks 104:24
trade 83:17 113:5
  116:10 133:9
  136:25 137:12
  149:11
trademark 113:4
  113:8,8,11,11,13
  113:21 115:15
  116:13,25
trademarks
  116:10
transcribe 84:3
transcribed 13:25
  85:12
transcriber 159:9
transcript 78:25
  79:1,6 83:21
  94:14 96:5 155:7
  155:8,13,14,16
  159:4
transcripts 66:20
  78:4,12,13,15,16
  79:8,10,13 83:25
  84:17,19,22,25
  85:3,16,20,22,25
  94:16,17,19,25
  95:11,12,15,17,18
  96:1,4,6,10,12,14
  96:18 97:14,15,18
  97:25 98:1,4,25
  99:1,3,6 119:25
  120:2,6,10,11
  149:5,5,5
transfer 148:25
transpired 25:18

treat 58:4
treated 73:12
155:14
trees 125:19
trial 19:22,23
20:4 21:20 22:12
22:20 25:14 27:22
31:22 32:7,8,12
33:14,20,23,24
83:5 131:17,19
132:1 155:3,22,23
tricked 113:20
tried 47:23 93:12
93:13 113:19
117:11,18,20
triggered 150:21
triple 78:9
tro 64:12 68:20
70:20 71:25 79:9
83:24 90:12
120:13 127:6
trudy 14:16 18:8
36:5
true 56:22 70:7,7
70:10 71:5,5,6
72:20 76:17
107:24 112:2
116:15,17 117:17
138:8 143:3,17
159:4
trump 117:6
trust 151:4
trustee 17:3
trustees 22:10
26:1
truth 29:1 101:14
103:12 143:4
try 26:22 34:12
41:3 89:2 95:25
101:6 115:14
117:11
trying 50:22 51:4
110:25 111:24

115:5,7 116:9
129:25 130:1,7
tsiouris 15:16
turn 33:8 106:2
124:18
turned 117:16,20
124:14,18
turning 18:18
40:19 44:20 121:7
tv 107:14
two 22:6 26:1
32:17 34:13 40:11
58:18 61:22 63:11
70:17 93:6 94:25
99:23,25 100:1,18
100:25 101:2,20
112:20 123:22
132:22 138:5
146:13 148:19
149:23 150:17
type 42:24 118:3
118:16 153:3
154:6 156:2
types 34:9 72:4
109:12
typical 146:18
typos 155:9

**u**

u 157:3 158:3
u.s. 1:25 59:4,20
59:21 134:18,21
135:7,8 139:24
u.s.c. 44:4 54:17
133:6 138:2
ultimate 136:1
umb 17:2
unable 128:19
unambiguous
128:10 141:21
150:18
unanimous 19:14
unanimously
141:1

uncertainty 22:2
22:5 29:21 65:15
66:12 70:11,18
72:17 73:6,7
103:13,14 104:23
104:24 107:11
uncontroverted
7:23 10:6 137:5
145:1
underlying 35:1
142:25 155:4
underpaid 81:11
understand 31:21
32:1 49:2 71:2
77:13 89:17 95:15
99:4 100:11 108:4
110:1 112:14
115:23 123:5
understanding
33:6 130:21 131:1
understands
103:10
understood 94:19
undisputable
63:22 66:13
undisputed 3:19
4:18 5:16 9:17
63:21 87:11 129:7
137:2 140:20
144:3 145:8,16
147:9 148:15,18
148:24 149:14,18
151:11
undue 22:22
unduly 33:10
unequivocal
127:10,12
unfair 83:17
137:12 150:6
153:5,14
unfortunately
20:19,20 78:21

unidentified 81:4
82:18
uniform 133:9
136:25 149:11
uniformly 69:12
70:1
unique 63:12,16
66:25 67:6 83:7
uniquely 145:2
united 1:2,17
59:18
uniti 19:5,11,21
21:17 24:2,11
31:17,19,24 32:22
33:6,11,13,18
34:8,16 35:13
41:6 132:1
unknowable
29:18
unmistakable
128:10
unpack 95:25
105:2
unrealistic 22:9
unreasonable
22:9
unrebutted 64:9
unrelated 116:5
unresolved 30:24
31:16,20 32:25
unsecured 8:15
8:18 11:15,20
15:2
unsettled 147:23
unsustainable
151:13
untrue 143:5
update 37:15
usa 142:21
use 34:10,11
42:18,19 51:6
68:7 69:13 70:2
78:14,16 84:24

97:18 105:22
107:5 113:6,14,23
114:1,1,5 115:11
117:11,24 120:25
123:24 124:9
127:3 129:25
141:17 145:22,24
149:13
**useful** 25:2 33:5
**usual** 64:14,16
73:24

### v

**v** 2:12,19,25 3:4
3:11,18,25 4:7,14
5:1,7,15,22 6:6,16
6:22 7:6,15,22 8:2
8:7,14,21 9:3,9,16
10:2,15,22 11:5
11:14,23 12:5,13
12:21 41:18 56:9
56:10 57:23 58:20
59:3,7,8,8,16,18
59:19,20 62:2
75:2 86:8 93:1
127:15 130:22,23
131:3 132:7
133:12 134:12,13
134:18,20 135:1,6
135:12 137:17,23
139:3,14,24 140:7
142:19,21 143:17
151:3 153:23
157:15
**valeo** 59:20
**value** 33:12 123:4
**var** 86:12 87:15
90:17 123:4
133:13 136:18
149:20 150:13,15
151:21,24 158:9
**various** 83:15
**verifiable** 127:17

**verified** 73:17
**veritext** 159:19
**verizon** 116:2,2,4
**vermont** 59:16
134:11
**versa** 132:14
**vi** 2:21 10:24 11:8
11:17 43:8 44:18
50:20 54:10
129:10,11 130:18
131:3 132:15,16
133:2 135:24
136:3,15,23
157:20
**viable** 30:19 31:6
64:7 147:15
**vice** 132:13
**view** 22:8 66:23
80:18 134:23
141:6
**viewed** 102:16
**vii** 2:21 10:24
11:8,18 43:10
45:5 52:1 54:14
57:3,4,8 91:4
129:10,11 130:18
132:15,18 133:2
135:24 136:19,23
157:17,20
**violated** 57:25
58:1 88:12 136:16
152:17
**violating** 57:22
90:7
**violation** 43:9,12
43:15 44:16 51:16
51:20 54:11,23
55:4,10,16 83:16
87:13 88:1,7,13
91:7 133:5,11
135:24 136:4,6,24
137:11,18 146:8
152:3,7,10

**violations** 133:7
**virtually** 82:5
**volume** 24:24
81:2 137:8
**volunteered**
120:10
**vs** 1:12

### w

**w.d.n.y.** 59:20
**wait** 26:20 29:11
46:25 155:20
**waiting** 27:5
34:19
**waived** 62:18,19
83:20 84:11
**waiver** 85:17
97:21
**waiving** 83:22
**want** 23:17,23
26:6 38:3 39:7,11
41:9,19 42:14,23
46:23,25 48:19
50:21 52:7 62:1,4
62:7 63:16,23
68:1 85:5 91:19
92:1 95:3,8,9,10
95:16,21 101:1
106:5 116:3
119:17 123:8,19
125:18 128:13
129:15 155:8
**wanted** 47:8,8
56:25 96:1,19
99:18 112:25
**wants** 28:16 61:16
61:25 66:22 79:1
85:9
**wardwell** 15:11
**warner** 70:15
139:14 141:23
**warning** 145:18
**warrant** 34:9

**warrants** 124:3,6
**warranty** 124:1
**waste** 33:1 51:19
**wax** 90:6
**way** 22:13 26:13
26:17 50:11 51:17
53:10 62:24 63:23
64:9 68:8,11
70:13,23 71:19
72:16 73:17 75:5
83:6 85:3,14
109:6 116:25
129:6 141:9
**wayside** 71:7
**we've** 19:12,15
21:17 24:16 29:10
48:3 49:3 50:24
51:12 53:7 69:7
79:10 80:8 85:9
85:10 86:25 89:4
102:12,14,20
103:11 110:2
127:14
**weakest** 61:8
**weather** 87:5
**website** 103:18
104:2 147:5
**week** 19:24 20:14
21:21 42:20,20
124:10 131:25
**weeks** 32:5,17,17
35:3
**weigh** 134:22
**weighing** 136:2
**weiland** 14:23
18:4,6,7,11,22
20:3,6,10,12 21:2
21:5,8,12,14 28:6
28:9,15 30:3 35:9
35:19,23,25 40:16
40:19,22 41:1,4
41:10,12

weiss 16:1 25:8
went 52:5 77:6,18
  83:9 84:3 99:15
  110:19,22 111:2,5
  111:9,16 112:12
  117:17 150:10
west 15:4 59:19
  135:2
western 78:23
  79:3
wharton 16:1
  25:8
whatsoever 79:22
whichever 26:17
white 1:19 17:1
  26:1 33:9
whiting 153:24
wildlife 59:8
williams 13:25
  159:3,8
willing 27:4
win 100:18
windstream 1:7
  1:10 2:11,16,18
  2:24 3:3,7,10,15
  3:17,21,24 4:4,6
  4:11,13,22,25 5:6
  5:14,21 6:5,15,21
  7:5,14,18,21,25
  8:1,4,6,10,13,20
  9:2,8,15 10:1,11
  10:14,21 11:1,4
  11:10,13,22 12:2
  12:4,9,12,18,20
  13:3 14:3 18:3,8
  41:16,17 60:9
  64:9,14,23 65:5,8
  65:19,25 66:15,23
  67:11,12,14,17,19
  67:24 68:4,8
  71:20 72:15 73:21
  74:3 76:2,3,6,22
  80:15 81:24 86:18

86:22 92:25 93:23
  94:6 102:5,23
  103:17 108:20
  110:17,17,20,21
  112:7 113:3,25
  114:1 115:3,13,25
  115:25 116:16,18
  123:17 124:3,5,6
  124:8 126:9,9,12
  126:19 132:6
  139:6 140:24
  141:2,14 144:10
  144:14,14,17
  145:6 147:2,10,11
  147:15 148:16
  149:19,24 150:1,3
  150:11,12 152:18
  152:25
windstream's
  102:14 104:16
  113:16 126:12
  141:15 143:8
  144:17,18 145:4
  145:17 146:12,14
  146:22 147:5
  151:14,15,25
  157:21
winters 17:9
withdraw 53:17
  53:20 61:6 62:10
withdrew 97:14
withstand 112:20
witness 151:14,17
  151:19
witnesses 64:8
word 39:20 51:6
  60:12 117:21
wording 73:13
words 53:14
  68:18 70:17,21
  72:16 94:25 96:17
  105:23 108:12
  127:3,16 139:20

143:9 145:22,24
work 20:23 21:15
  29:17 82:5 117:12
worked 19:10
  66:14
world 84:15
worst 25:2 76:20
worth 36:25
worthless 80:16
worthwhile 33:22
write 97:13 155:5
writing 72:12
  73:14
wrong 51:3,11,13
  57:15 72:2 75:11
  86:20 111:13
  114:3 115:10,17
  116:9
wrongful 89:23
  115:18
wrongfully 60:8
wrote 78:8 93:12
  94:15

**x**

x 1:5,9,16 157:1
  158:1

**y**

yards 15:20
yawn 13:25 159:3
  159:15
yeah 38:15 39:22
  40:3,6 41:8 52:4
  85:12,12 92:5,19
  101:6 111:11
  123:1
year 76:20
year's 34:12
years 24:20
yesterday 18:24
  20:18 23:11 36:23
yogurt 69:17,17
  69:18 127:19

york 1:3,19 14:6
  14:14 15:5,14,21
  16:4 17:6 78:23
  79:3,5 86:11
  134:13 150:24
  151:4

**z**

zenith 134:18