# No. 22-2891

IN THE

## United States Court of Appeals
### for the Second Circuit

IN RE: WINDSTREAM HOLDINGS, INC., *Debtor*,

\* \* \* \* \*

WINDSTREAM HOLDINGS, INC.,

*Debtor-Plaintiff-Appellant*,

OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF WINDSTREAM HOLDINGS, INC.

*Plaintiff*,

v.

CHARTER COMMUNICATIONS OPERATING, LLC, CHARTER COMMUNICATIONS INC.,

*Defendants-Appellees.*

On Appeal From the United States District Court for the
Southern District of New York, Hon. Cathy Seibel, District Judge

## BRIEF FOR DEBTOR-PLAINTIFF-APPELLANT
## WINDSTREAM HOLDINGS, INC.

Shaya Rochester
KATTEN MUCHIN ROSENMAN LLP
50 Rockefeller Plaza
New York, NY 10020-1605
Tel.: 212-940-8529

Terence Patrick Ross
Robert T. Smith
KATTEN MUCHIN ROSENMAN LLP
2900 K Street, NW
Washington, DC 20007-5118
Tel: 202-625-3500

*Counsel for Debtor-Plaintiff-Appellant*

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, the Plaintiff-Appellant Windstream Holdings, Inc. states that it is a privately held company whose parent corporation, Windstream Holdings II, LLC, is also privately held. Over 10% of the stock of Windstream Holdings II, LLC is owned by Oaktree Capital Management, LP, whose parent corporation, Oaktree Capital Group, LLC, is publicly traded.

Attached to this brief as Exhibit A is a listing of the affiliated companies that are co-plaintiffs with Windstream Holdings, Inc. in the underlying adversary proceeding, but are not named in the caption. Pursuant to Rule 26.1(c) of the Federal Rules of Appellate Procedure, Windstream Holdings, Inc. states that each of the companies listed on Exhibit A is either a direct or indirect subsidiary of Windstream Holdings, Inc., and no publicly held corporation owns 10% or more of their stock.

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ...................................................... i

TABLE OF AUTHORITIES ................................................................... iv

INTRODUCTION ............................................................................. 1

STATEMENT OF JURISDICTION ........................................................ 5

STATEMENT OF THE ISSUES ............................................................ 6

STATEMENT OF THE CASE ............................................................... 7

    A.    Charter devised a scheme to exploit Windstream's bankruptcy by impersonating Windstream in a mailer that it sent to Windstream subscribers. ......................... 7

    B.    Charter's scheme had its intended effect and damaged Windstream's bankruptcy estate. ................................. 15

    C.    The Bankruptcy Court enjoined Charter's scheme and ultimately held Charter in contempt. ............................ 17

    D.    Ignoring key findings of fact, the District Court held that Charter's scheme did not violate the automatic stay and/or that a contempt sanction was not warranted. ............... 22

SUMMARY OF THE ARGUMENT .................................................... 27

STANDARD OF REVIEW ................................................................. 28

ARGUMENT ................................................................................. 30

I.    Charter violated the automatic stay. ........................................ 30

    A.    Overwhelming evidence supported the Bankruptcy Court's finding of fact that Charter impersonated Windstream to trick Windstream subscribers into switching their contracts to Charter. ........................... 30

B.   The automatic stay protects debtor estates against exactly the type of scheme perpetrated here by Charter. ........................34

    1.   Charter's impersonation of Windstream violated the automatic stay by exercising control over Windstream's goodwill. ........................................37

    2.   Charter also violated the automatic stay when it attempted to obtain Windstream subscriber contracts through the false and misleading mailer ..........39

    3.   Charter conceded that it violated the automatic stay by cutting off last-mile service to Windstream subscribers. ................................................................44

II.  Charter's violation of the automatic stay warranted a contempt sanction. ..............................................................................51

A.   *Taggart*'s objective "fair ground of doubt" standard applies in considering whether civil contempt is warranted for a violation of the automatic stay. ........................52

B.   The District Court misunderstood the standard applied by the Bankruptcy Court. ..................................................57

C.   The Bankruptcy Court properly applied *Taggart*'s objective standard. ...........................................................61

D.   Although proof of bad faith is not required, Charter knew that its conduct was unlawful, which further supports the Bankruptcy Court's contempt sanction. ......................64

CONCLUSION .............................................................................67

CERTIFICATE OF COMPLIANCE .................................................68

CERTIFICATE OF SERVICE ..........................................................69

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adams Apple Distrib. Co. v. Papeleras Reunidas, S.A.,*
  773 F.2d 925 (7th Cir. 1985) ..............................................................37

*Beckhart v. NewRez LLC,*
  31 F.4th 274 (4th Cir. 2022) .......................................................56, 64

*Chartschlaa v. Nationwide Mut. Ins. Co.,*
  538 F.3d 116 (2d Cir. 2008) ...............................................................40

*In re 48th Street Steakhouse,*
  835 F.2d 427 (2d Cir. 1987) ........................................................35, 36

*In re Advanced Modular Power Sys., Inc.,*
  413 B.R. 643 (Bankr. S.D. Tex. 2009), *aff'd sub nom. Hsu v. West*, 2009 WL 7760300 (S.D. Tex. Dec. 30, 2009) ......................................38

*In re Alert Holdings, Inc.,*
  148 B.R. 194 (Bankr. S.D.N.Y. 1992) .............................................42, 43, 49, 62

*In re All Trac Transportation, Inc.,*
  306 B.R. 859 (Bankr. N.D. Tex. 2004), *aff'd*, No. 04-cv-1759, 2005 WL 5012640 (N.D. Tex. July 28, 2005), *aff'd*, 223 F. App'x 299 (5th Cir. 2006) ........................................................................43, 62

*In re Allentown Ambassadors, Inc.,*
  361 B.R. 422 (Bankr. E.D. Pa. 2007) ...............................................59

*In re AMR Corp.,*
  730 F.3d 88 (2d Cir. 2013) ...............................................................40

*In re Bradley,*
  501 F.3d 421 (5th Cir. 2007) .............................................................23

*In re Chateaugay,*
  920 F.2d 183 (2d. Cir. 1990) .............................................................55

iv

*In re Cowen*,
849 F.3d 943 (10th Cir. 2017) ..........................................................36

*In re DeBatista*,
33 F.4th 698 (2d Cir. 2022) ......................................................*passim*

*In re Ellingsworth Residential Comm. Assoc., Inc.*,
No. 20-bk-01346, 2022 WL 2388636 (Bankr. M.D. Fla. Mar. 28,
2022) ...............................................................................................21, 54

*In re Golden Distributors, Ltd.*,
122 B.R 15 (Bankr. S.D.N.Y. 1990) ...........................39, 49, 50, 62

*In re Gucci*,
126 F.3d 380 (2d Cir. 1997) ..............................................................36

*In re GYPC, Inc.*,
834 B.R. 983 (Bankr. S.D. Ohio 2021) ....................................21, 54

*In re Jones*,
No. 18-cv-02837, 2019 WL 5061166 (Bankr. S.D. Miss. July 27,
2019) ...............................................................................................21, 55

*In re Prince*,
85 F.3d 314 (7th Cir. 1996) ..............................................................37

*In re Residential Cap., LLC*,
501 B.R. 549 (Bankr. S.D.N.Y. 2013) ............................................38

*In re Schultz*,
250 B.R. 22 (Bankr. E.D.N.Y. 2000) ..............................................38

*In re Sheehan*,
48 F.4th 513 (7th Cir. 2022) ..............................................................36

*In re Stone Res., Inc.*,
482 F. App'x 719 (3d Cir. 2012) ......................................................36

*In re Tate*,
   No. 19-adv-10009, 2020 WL 634293 (Bankr. D.D.C. Feb. 10,
   2020) .................................................................................................21, 54

*Jove Eng'g, Inc. v. IRS*,
   92 F.3d 1539 (11th Cir. 1996) ........................................................53

*Musso v. Ostashko*,
   468 F.3d 99 (2d Cir. 2006) .............................................................36

*Picard v. Fairfield Greenwich Ltd.*,
   762 F.3d 199 (2d Cir. 2014) ...........................................................35

*Robinson v. Watts Detective Agency, Inc.*,
   685 F.2d 729 (1st Cir. 1982) ..........................................................37

*Suh v. Anderson*,
   2020 WL 1277575 (BAP 9th Cir. Mar. 16, 2020)....................21, 54

*Taggart v. Lorenzen*,
   139 S. Ct. 1795 (2019)............................................................*passim*

*United States v. Olson*,
   4 F.3d 562 (8th Cir. 1993) ..............................................................23

*United States v. Ramirez*,
   297 F.3d 185 (2d Cir. 2002) ...........................................................29

*United States v. Whiting Pools, Inc.*,
   462 U.S. 198 (1983)........................................................................35

*Zervos v. Verizon N.Y., Inc.*,
   252 F.3d 163 (2d Cir. 2001) ...........................................................29

**Statutes**

11 U.S.C. § 105.....................................................................................5

11 U.S.C. § 362............................................................................*passim*

11 U.S.C. § 524...................................................................................21

28 U.S.C. § 157 ................................................................5

28 U.S.C. § 158 ...........................................................5, 22

28 U.S.C. § 1334 .............................................................5

**Rules**

F.R.A.P. 4(a)(1)(A) ..........................................................5

F.R.A.P. 32 ...................................................................68

F.R.B.P. 8002(a)(1).........................................................5

**INTRODUCTION**

Windstream Holdings, Inc. and its affiliates (collectively "Windstream") filed for Chapter 11 bankruptcy to restructure their balance sheets after an adverse court decision resulted in an immediate call on certain Windstream corporate bonds. Windstream did not file for bankruptcy because of any issue relating to its ability to provide service to its subscribers. Indeed, Windstream continued to operate in the ordinary course for the entirety of the Chapter 11 case. [1] Notwithstanding this, a competing telecommunications service provider, Charter Communications Operating LLC and Charter Communications Inc. (collectively, "Charter"), sought to capitalize on Windstream's bankruptcy by impersonating Windstream in communications with Windstream customers in order to trick them into thinking that Windstream was going out of business and that Windstream wanted them to transfer their contracts to Charter.

---

[1] On June 26, 2020, the Bankruptcy Court entered an order confirming Windstream's Chapter 11 Plan of Reorganization. On October 23, 2020, the Bankruptcy Court entered a Final Decree closing the Chapter 11 cases. On that date, Windstream and its affiliates emerged from Chapter 11.

The specifics of Charter's misconduct are not in dispute. Charter sent Windstream customers a mailer, designed to appear as though it was a notice from Windstream about its bankruptcy. JA1721-JA1722. The mailer informed Windstream subscribers that their services were at risk—a representation that Charter's executives admitted they knew at the time was false—and urged them to switch their contracts to Charter. Windstream subscribers believed that this false and misleading mailer was a genuine notice from Windstream informing them that they needed to find a new service provider, *i.e.*, Charter. Not surprisingly, thousands of Windstream subscribers switched their contracts to Charter.

When presented with this evidence, the Bankruptcy Court found that Charter had impersonated Windstream. Specifically, the Bankruptcy Court found that Charter sent its false and misleading mailer "with the desire to have [Windstream customers] believe that the communication was coming from Windstream, as opposed to one of Windstream's competitors." JA1191, lines 15-17. The Bankruptcy Court concluded that Charter's unlawful actions resulted in a misappropriation of Windstream's goodwill and interfered with Windstream subscriber contracts in violation of the automatic stay

imposed by the Bankruptcy Code immediately upon the filing of any bankruptcy.

Faced with this attack on the orderly administration of Windstream's bankruptcy, the Bankruptcy Court exercised its discretion to hold Charter in civil contempt and awarded compensatory damages to Windstream. In holding Charter in contempt, the Bankruptcy Court applied the standard for determining whether a contempt sanction is warranted set out by the Supreme Court in *Taggart v. Lorenzen*, 139 S. Ct. 1795 (2019).[2] The Bankruptcy Court found that Charter had no "fair ground of doubt" that its misconduct violated the automatic stay and warranted a sanction of civil contempt. SA30.

On appeal, the District Court ignored the Bankruptcy Court's specific findings of fact, concluding erroneously that "Charter did not misrepresent its identity."SA74. From this faulty premise, the District Court concluded that Charter's "advertisements" were nothing more than "mailings from a

---

[2] Both the Bankruptcy Court and the District Court assumed in their decisions below that the *Taggart* standard should apply to a violation of the automatic stay. SA16-SA18; SA76-SA79. The parties below also agreed that the *Taggart* standard applies. SA76. As discussed *infra*, however, this Court has never addressed the issue. Therefore, it is an issue of first impression in this Court.

competitor," which did not violate the automatic stay. SA73. The District Court further held that, even if Charter had violated the automatic stay, the Bankruptcy Court abused its discretion in holding Charter in contempt. SA74. The District Court mistakenly believed that the Bankruptcy Court had applied, in effect, a strict-liability standard in determining whether a contempt sanction was warranted. Accordingly, the District Court undertook its own analysis as to whether a contempt sanction was warranted and concluded that there was a "fair ground of doubt" as to the stay's applicability to what it viewed as mere "advertising." SA79-SA80.

As a result of these fundamental errors, the District Court incorrectly vacated in part the Bankruptcy Court's contempt order. This Court should reverse the order of the District Court, reinstate the judgment of the Bankruptcy Court, and remand to the Bankruptcy Court to assess whether to award Windstream appellate attorneys' fees. *See In re DeBatista*, 33 F.4th 698, 702-04 (2d Cir. 2022) (on remand, bankruptcy court may award appellate attorneys' fees to compensate fully a debtor for a creditor's violation of a bankruptcy court order).

## STATEMENT OF JURISDICTION

The Bankruptcy Court had jurisdiction over this adversarial proceeding pursuant to 28 U.S.C. §§ 157(a) and (b) and 1334(b). The Bankruptcy Court had authority to hold Charter in contempt for violating the automatic stay under 11 U.S.C. § 105 and its inherent authority.

The District Court had jurisdiction over Charter's appeal pursuant to 28 U.S.C. § 158(a)(1), and that appeal was timely under Rule 8002(a)(1) of the Federal Rules of Bankruptcy Procedure. The Bankruptcy Court entered a final judgment on April 15, 2021, and Charter filed its notice of appeal with the Bankruptcy Court within 14 days—specifically, on April 29, 2021. JA1691.

This Court has jurisdiction to review the District Court's order vacating in part the Bankruptcy Court's judgment pursuant to 28 U.S.C. §§ 158(d)(1) and 1291, and Windstream's appeal is timely under Rule 4(a)(1)(A) of the Federal Rules of Appellate Procedure. The District Court entered its order on October 6, 2022, and Windstream filed its notice of appeal with the District Court within 30 days—specifically, on November 3, 2022. JA3680.

## STATEMENT OF THE ISSUES

1. Whether the District Court erred in holding that Charter did not violate the automatic stay, when the Bankruptcy Court found that Charter misappropriated Windstream's goodwill by impersonating Windstream in order to convert Windstream subscriber contracts to Charter, and when the District Court ignored these findings of fact and held instead that Charter's misconduct amounted to nothing more than a "mailing[] from a competitor," SA73, thus, improperly substituting its own interpretation of the evidentiary record for the Bankruptcy Court's findings of fact.

2. Whether the Supreme Court's objective "fair ground of doubt" standard, set out in *Taggart v. Lorenzen*, 139 S. Ct. 1795 (2019), applies in the context of a violation of the Bankruptcy Code's automatic stay—an issue of first impression in this Court—and, if it does apply, whether the District Court erred in holding that the Bankruptcy Court abused its discretion by not properly applying that standard in finding Charter in contempt.

## STATEMENT OF THE CASE

**A.      Charter devised a scheme to exploit Windstream's bankruptcy by impersonating Windstream in a mailer that it sent to Windstream subscribers.**

On February 25, 2019, Windstream filed for Chapter 11 bankruptcy to restructure its balance sheet. Windstream, however, continued to operate in the ordinary course for the entirety of the Chapter 11 case. JA3574 at 60:17-61:6. Windstream's operations were on an upward trajectory prior to its Chapter 11 filing, JA3576 at 124:2-125:2; it obtained substantial relief from the Bankruptcy Court at the outset of Chapter 11 to continue operating in the ordinary course, JA3574 at 60:17-61:6; and it secured $1 billion in debtor-in-possession financing within days of the Chapter 11 filing. JA 588  at ¶ 5; JA 3577 at 126:19-127:20.  Thus, there was never any reasonable doubt that Windstream would emerge from bankruptcy as a going concern, and Charter knew as much.

Indeed, Charter knew exactly how Chapter 11 reorganization works. It, too, had reorganized under Chapter 11 just a few years earlier. *See* JA1745. Charter knew that, in a Chapter 11 bankruptcy, Windstream would not be going out of business. In fact, the Charter executives involved in the unlawful conduct at issue here expressly said so in internal Charter emails

in February and March 2019. JA1821-JA1823; JA3370-JA3376. Notwithstanding this, as Charter's Head of Marketing later confessed, Charter believed that Windstream's "customers may be confused about their services" when they learn about its Chapter 11 filing, so Charter decided to "capitalize on that confusion" by falsely suggesting to Windstream subscribers that they will lose their service as a result of the Chapter 11 filing. JA3605, lines 6-24. Therefore, Charter developed a multi-faceted scheme to trick Windstream subscribers into switching their Windstream contracts to Charter because of the Chapter 11 filing.

The cornerstone of Charter's scheme was a direct-mail campaign to Windstream subscribers in which it impersonated Windstream. Charter sent Windstream subscribers a false and misleading mailer—intentionally designed to appear as though it was a notice from Windstream. Charter's deception started with the envelope in which the mailer was sent. The return address intentionally omitted Charter's name. *See* JA1742-JA1743. The front of the envelope stated in bold: "**Important Information Enclosed for Windstream Customers**." *Id.* Moreover, Charter intentionally used Windstream's signature color pattern and Windstream's website font on the envelope. *Id.* Charter's advertising agency admitted that it "took inspiration

from the Windstream colors," JA3593 at 56:23-24, and "tried to align the fonts as close as possible to the font on [Windstream's] website," JA3594 at 57:15-18, to "grab attention from current Windstream customers." *Id.* at 58:3-4. A copy of the envelope is set out below.[3]



12405 Powerscourt Drive, St. Louis, Missouri 63131

Presorted STD
U.S. Postage
PAID
Permit #350
Chanhassen, MN

222222
90000219

Sample A. Sample
3/25/19 000020543
123 Main Street
Anytown, US 12345-6789

**Important Information Enclosed for Windstream Customers.**

---

[3] The envelope for Charter's mailer is JA1742-JA1743.

Charter admitted that it designed the envelope to "take on a look and feel that's similar" to Windstream's own mailers in order to get Windstream customers to "open it to see what's inside." JA3585 at 72:8-18. Based on the foregoing evidence of record, the Bankruptcy Court expressly found that Charter "intentionally design[ed] the false mailer to look like it was sent by [Windstream]." SA5 at ¶ 1.a.ii.

Inside the envelope was a double-sided page that informed Windstream customers: "Windstream has filed for Chapter 11 bankruptcy, which means uncertainty. Will they be able to provide the Internet and TV services you rely on in the future?" JA1721. This false and misleading mailer included the warning: "Windstream Customers, Don't Risk Losing Your Internet and TV Services," *id.*, and urged them to "switch to Spectrum"[4] in order to "ensure [they were] not left without vital Internet and TV services." *Id.* A copy of the mailer is set out below.[5]

---

[4] "Spectrum" is the brand name under which Charter provides telecommunication services.

[5] The insert for Charter's mailer is JA1721-JA1722.







Tuesdays @ 10pm on BET

Wednesdays @ 9pm on VH1

# Windstream Customers,
## Don't Risk Losing Your Internet and TV Services.

Windstream has filed for Chapter 11 bankruptcy, which means uncertainty. Will they be able to provide the Internet and TV services you rely on in the future? To ensure you are not left without vital Internet and TV services, switch to Spectrum. With a network built for the future, Spectrum is here for the long haul—with our best deal for Internet and TV services from **$59.98/month for 12 months**.*

- **Fast speeds** up to **200 Mbps.**™ Everyone at home can stream, game and download at the same time with no data caps.

- **Spectrum is the top performing Internet provider**, delivering more speed, more consistently.Ω

- **FREE** modem; Windstream charges $5.99/month for an Internet modem.¹

- **FREE** HD⁺ with instant access to a huge selection of On Demand titles.

- Download the **Spectrum TV⁺ App⁸** to stream up to 50+ LIVE channels⁺ including BET, OWN and VH1 on your devices, anywhere in your home and everywhere on-the-go.

Windstream has a 2-year contract. With Spectrum there are no contracts.
**Plus, we will buy you out of your current contract up to $500.**\*\*



BEST
DEAL
EVER!

Goodbye, Windstream.
**Hello, Spectrum.**

**Call 1-855-280-7152**
or visit Spectrum.com/lifestyle

**Limited-time offer! Expires 04/25/19**

SPECTRUM INTERNET 200 Mbps
+ SPECTRUM LIFESTYLE TV

$59⁹⁸
/mo. for
12 mos.*

**NO CONTRACT**

0325-ALD-59      33513001-A01-00595134-001552

11

# Spectrum▶

# Now is the time to switch
## to Spectrum.

Windstream's future is unknown, but Spectrum is here to stay—delivering Internet and TV services you can count on. Enjoy super-reliable **200 Mbps**\* Internet speeds, plus a **FREE** modem and **FREE** Security Suite.

With Spectrum Lifestyle TV, watch LIVE TV, your favorite shows, sporting events and more in superior digital picture and sound quality. Get instant access to thousands of **FREE** On Demand movies, shows and Primetime favorites. Download the Spectrum TV® App§ to stream LIVE TV and On Demand titles anywhere in your home and everywhere on-the-go.



Watch Do The Right Thing anytime
on STARZ ENCORE Black

Tuesdays @ 9pm on BET

Goodbye, Windstream.
**Hello, Spectrum.**

**Call 1-855-280-7152**
or visit Spectrum.com/lifestyle

**Limited-time offer! Expires 04/25/19**

**SPECTRUM INTERNET 200 Mbps
+ SPECTRUM LIFESTYLE TV**

## $59⁹⁸
/mo. for
12 mos.\*

**BEST DEAL EVER!**

**NO CONTRACT**

Offer expires 04/25/19; valid to qualified residential customers who have not subscribed to any services within the previous 30 days and have no outstanding obligations to Charter. *Bundle price for Spectrum Lifestyle TV and Internet is $59.98/mo., from yr 1; standard rates apply after promotional period ends, additional services are extra. **Restrictions apply. For contract buyout qualifications, go to spectrum.com/buyout. †Channel and HD programming availability based on level of service and may vary by area. It is possible that some channels are not available in certain areas. §TV App account log-in may be required to stream some TV content online. Apps are free with corresponding level of service. Apps and live streams available in the U.S. only and subject to additional restrictions. ‡Services compared to Kinetic Internet 200 and DirecTV packages per windstream.com; 03/07/19. General Terms: TV; Install, other equipment, taxes, fees and surcharges extra (bdcst. surcharge up to $11.99/mo.). INTERNET: ≠Available Internet speeds may vary by address. ⊘Based on the 2018 FCC Broadband Report. Services subject to all applicable service terms and conditions, subject to change. Services not available in all areas. Restrictions apply. To reduce Charter direct mail, visit spectrum.com/dmoptout. Viacom Media Networks, a division of Viacom International Inc. Starz® and Starz Encore℠ and related channels and service marks are the property of Starz Entertainment, LLC. Visit starz.com for airdates/times. Do The Right Thing ©1989 Universal City Studios, Inc. All trademarks are the property of their respective owners. ©2019 Charter Communications.

0325-ALD-59       33513001-A01-00595136-001552                     000020554

To compound the impact of this false and misleading mailer, Charter disseminated it at the same time Windstream communicated its bankruptcy to its customers, which added to the impression that the mailer came from Windstream. Indeed, many Windstream customers received Charter's false and misleading mailer—which repeatedly referenced Windstream's bankruptcy—within a few days of receiving truthful communications from Windstream explaining its bankruptcy filing. JA2534, lines 18-21; JA2571, lines 17-21; JA2772, lines 17-22; JA2982, line 22 - JA2983, line 6.

The timing and subject matter of Charter's mailer, combined with the deceptive envelope, caused many customers to believe Windstream sent the notice encouraging its subscribers to switch their contracts to Charter. JA2534, line 14 - JA2535, line 3; JA2571, lines 17-21. As a result, Windstream subscribers believed *Windstream* was telling them it would no longer be able to provide phone and internet services and was "recommending Spectrum" JA2299, lines 9-19, or "suggest[ing]" that "Spectrum might be a good place for [Windstream customers] to go to." JA2287, lines 3-8. *See also* JA2299, lines 7-14 (customer believed Windstream was "recommending Spectrum"); JA2494, lines 5-10 (customer believed Windstream sent the mailer recommending Charter).

Charter knew the assertions in the mailer were false. Despite the claims Charter made in the mailer, its executives knew that Windstream was not at risk of going out of business. Internal Charter emails reveal that its executives were aware that Windstream would operate "business as usual," JA1822, and that Windstream had "funding to continue its normal operations while it restructur[ed]." JA3370.

Indeed, Charter knew exactly how Chapter 11 reorganization works. It, too, had reorganized in Chapter 11. JA1744-JA1781. Notably, during its Chapter 11 case, Charter was on the receiving end of a nearly identical false notification that its competitor, DirecTV, sent to Charter's customers urging Charter customers to switch to DirecTV because Charter had filed for bankruptcy. *Id.* In response to DirecTV's mailer, Charter filed suit against DirecTV, rightly asserting that the notice was "false and misleading," and alleging that it was unlawful. JA1771. Thus, Charter was well aware that its own campaign against Windstream was unlawful.

To make the false "risk" of lost service appear to be real, at the same time Charter was disseminating its false and misleading mailer, it was simultaneously cutting off service to certain Windstream subscribers. Windstream and Charter have an agreement pursuant to which Charter

provides "last mile" connectivity service to Windstream. JA589 at ¶ 10.[6]

Under this agreement, Windstream has the right to use Charter's infrastructure to distribute Windstream services to subscribers in certain designated areas. JA589 at ¶ 11. Despite Charter's awareness of Windstream's bankruptcy and the automatic stay, Charter disconnected service to hundreds of Windstream subscribers between March and May 2019. JA589 at ¶¶ 13-14. Charter's disconnection of service resulted in complaints from Windstream subscribers, JA590 at ¶ 18, and fed Charter's false narrative that Windstream services were at risk.

**B. Charter's scheme had its intended effect and damaged Windstream's bankruptcy estate.**

As intended, Charter's scheme caused Windstream subscribers to experience "fear, uncertainty, and doubt" over Windstream's ability to continue in business. JA1623, lines 16-17. Hundreds of subscribers called

---

[6] Telecommunication providers arrange with other telecommunication providers to use their infrastructure to service their multi-state customers with locations in some states in which the provider does not operate. This is a common practice in the industry and is referred to as "last mile" connectivity service. Thus, Windstream has a contract with Charter pursuant to which Windstream has the right to use Charter's infrastructure in certain states to allow Windstream to service its multi-state customers. *See generally* JA589 at ¶¶ 10-11.

Windstream, concerned about their services. JA1824-JA3333; JA3402-JA3403. Windstream subscribers reported that the mailer "really concerned" them. JA1978, lines 17-18. As one subscriber explained, the notion that they would lose services was "very scary for elderly people who depend on the phone," JA1861, lines 17-18, and was "scaring the heck out of people." JA1994, lines 1-2. Other subscribers expressed concern that they "could just end up with no internet at some point," JA2931, lines 1-4, or that Windstream was "going to cut everybody off." JA2712, lines 23-24. In short, Windstream's brand and reputation was damaged by Charter's unlawful scheme.

Moreover, Windstream experienced a "significant spike in customers discontinuing service," JA3493 at ¶ 17, immediately after Charter started sending its false and misleading mailer. In the wake of Charter's unlawful scheme, more than 1,300 Windstream subscribers were fooled outright and switched their Internet service to Charter, JA3512 at ¶ 27, and more than 4,500 Windstream subscribers ported their phone service to Charter. JA3493 at ¶ 19. These lost subscribers represent between $3.2 million and $5.1 million in lost profits to Windstream. JA3512 at ¶ 27.

To mitigate the damage caused to its brand, reputation, and customer relationships, Windstream was forced to take drastic measures. Windstream

gave current subscribers contract credits and discounts to help repair customer relationships. JA3491-JA3492 at ¶¶ 12-14; JA3405; SA35. In addition, Windstream launched a corrective advertising campaign to combat Charter's falsehoods, JA3492-JA3493 at ¶ 16; JA3397-JA3401, which cost Windstream more than $800,000. JA590 at ¶ 22.

When these measures proved to be insufficient to remediate the damage caused by Charter's false and misleading mailer, Windstream had to undertake a unique promotional campaign—at a cost of over $4 million— to attract new subscribers to replace those who had left due to Charter's unlawful conduct. JA3493-JA3494 at ¶ 20; JA1554, lines 8-15; JA1562, lines 3-23; JA1615, line 15 - JA1616, line 12; JA3404. In addition, as explained below, Windstream was forced to take legal action to force Charter to stop its campaign, which cost Windstream millions of dollars more in fees and expenses.

### C. The Bankruptcy Court enjoined Charter's scheme and ultimately held Charter in contempt.

In April 2019, Windstream filed an adversary proceeding in the Bankruptcy Court asserting seven causes of action against Charter. As relevant to this appeal, Windstream asserted that Charter violated the

automatic stay through its false and misleading mailer and by cutting off last-mile services to Windstream subscribers to enforce claims of a pre-petition debt. JA218-JA248.

Almost immediately after filing suit, Windstream obtained a temporary restraining order requiring Charter to cease and desist from sending its false and misleading mailer and prohibiting Charter from "expressly or impliedly stating . . . that Windstream is going out of business, will go out of business or will terminate service to its subscribers." JA462. The temporary restraining order also prohibited Charter from further cutting off last-mile services to Windstream customers—a prohibition that Charter promptly violated. JA497.[7] In issuing the temporary restraining order, the Bankruptcy Court found that Charter intended "to get Windstream customers to open the [mailer] believing that it was a communication from [Windstream]." JA442, line 24 - JA443, line 2.

After expedited discovery, additional briefing, and a hearing, the Bankruptcy Court issued a preliminary injunction against Charter. JA495-

---

[7] Charter has conceded that it continued disconnecting Windstream customers after the Bankruptcy Court issued the temporary restraining order.

JA505. After additional discovery, the parties filed cross-motions for summary judgment. *See* JA18-JA19. As relevant to this appeal, Windstream moved for summary judgment as to liability on its claim that Charter violated the automatic stay by disseminating the false and misleading mailer and by cutting off last-mile services to Windstream customers to enforce an alleged pre-petition debt. *See* JA579-JA583.

The Bankruptcy Court granted Windstream's motion for summary judgment holding that there was no genuine dispute that Charter had violated the automatic stay. The Bankruptcy Court explained that Charter violated the automatic stay by terminating service to Windstream customers "in an effort to enforce a prepetition debt and/or to control property of the estate." SA7. In addition, the Bankruptcy Court held that Charter also violated the stay by disseminating the "literally false and intentionally misleading" mailer, which falsely informed Windstream customers that their services were at risk. *Id.*

Critically, the Bankruptcy Court found that Charter "intentionally design[ed] the false mailer to look like it was sent by the Debtors at a time when the Debtors would be notifying their customers of these Chapter 11 cases," SA5, and the "clear message conveyed" by Charter's notice was that

19

Windstream's "risk of . . . liquidation or termination of service [was] imminent." JA1193, lines 23-25. The Bankruptcy Court also found that "Charter had no information to suggest that Windstream was in danger of liquidating or having to terminate service because of its bankruptcy." JA1194, lines 10-13. Rather, the information Charter had "reflected the opposite, which is that Windstream was a viable company." *Id.* at lines 14-15.

Based on these findings of fact, the Bankruptcy Court held that Charter's misleading and false mailer constituted "an effort to control property of the Debtors' estate, namely, the Debtors' customers or contracts with those customers," SA7, and that Charter therefore violated the automatic stay. At the same time, the Bankruptcy Court determined that a trial was necessary to resolve whether Charter should be held in civil contempt for its violation of the automatic stay and, if so, the proper compensatory sanction.

After a four-day trial, the Bankruptcy Court issued a 45-page decision holding Charter in contempt for violating the automatic stay. SA11-SA55. The Bankruptcy Court held Charter in contempt for its "literally false and intentionally misleading advertising campaign that wrongfully interfered

with the Debtors' customer contracts and goodwill." SA13. The Bankruptcy Court expressly found that Charter "us[ed] mailings designed to seem as if they were coming from the Debtors." SA20.

Before imposing the sanction of contempt, however, the Bankruptcy Court carefully applied *Taggart v. Lorenzen*, 139 S. Ct. 1795 (2019), which it believed should govern its discretion to impose civil contempt for violation of a court order.[8] The Bankruptcy Court concluded that, under *Taggart*'s objective standard, there was "no fair ground of doubt" that Charter violated the automatic stay when it impersonated Windstream, misappropriated Windstream's goodwill, and attempted to convert Windstream subscriber contracts to Charter. SA30. Therefore, a contempt sanction was warranted. In addition, the Bankruptcy Court found that Charter's decision to suspend

---

[8] The Supreme Court's decision in *Taggart* involved a violation of a discharge order under 11 U.S.C. § 524(a)(2), not a violation of the automatic stay. Multiple courts, however, have held that the objective standard set out in *Taggart* for violations of a discharge order should also apply to violations of the automatic stay. *Suh v. Anderson*, 2020 WL 1277575, at *4 n.3 (BAP 9th Cir. Mar. 16, 2020) (applying *Taggart* standard to violation of the automatic stay); *In re Ellingsworth Residential Comm. Assoc., Inc.*, No. 20-bk-01346, 2022 WL 2388636, at *5 (Bankr. M.D. Fla. Mar. 28, 2022) (same); *In re GYPC, Inc.*, 834 B.R. 983, 991 (Bankr. S.D. Ohio 2021 (same); *In re Tate*, No. 19-adv-10009, 2020 WL 634293, at *3 n.2 (Bankr. D.D.C. Feb. 10, 2020) (same); *In re Jones*, No. 18-cv-02837, 2019 WL 5061166, at *4-5 (Bankr. S.D. Miss. July 27, 2019) (same). This is an issue of first impression in this Court.

last-mile services separately violated the automatic stay and also warranted a contempt sanction. SA13.

The Bankruptcy Court sanctioned Charter in the amount of $19,184,658.30 based on Windstream's lost profits and expenses incurred in responding to Charter's multiple violations of the automatic stay. SA55.

**D.**  **Ignoring key findings of fact, the District Court held that Charter's scheme did not violate the automatic stay and/or that a contempt sanction was not warranted.**

Charter appealed the Bankruptcy Court's judgment to the United States District Court for the Southern District of New York. *See* 28 U.S.C. § 158(a). In so doing, however, Charter did not contest the Bankruptcy Court's judgment that Charter's cut-off of last-mile services warranted a contempt sanction. Charter challenged only that portion of the Bankruptcy Court's order holding Charter in contempt based on the false and misleading mailer it sent to Windstream customers. SA59.

Charter's appeal to the District Court challenged only a single finding of fact by the Bankruptcy Court. Specifically, Charter asserted that it was a "fundamental error[]" for the Bankruptcy Court to find that Windstream had "customer contracts and goodwill" that could serve as a property right

protected by the automatic stay. Brief for Defendant-Appellant, at 25, *In re Windstream Holdings, Inc.* (No. 21-cv-4552, Dkt. No, 15), 2022 WL 5245633 (S.D.N.Y. Oct. 6, 2022). Charter, however, never challenged the Bankruptcy Court's finding of fact that Charter had impersonated Windstream in its false and misleading mailer, let alone explain why that finding of fact might be "clear error." *Id.* Charter's failure to raise this issue at that time constitutes a waiver of Charter's right to argue in this Court that the Bankruptcy Court's finding of fact was "clear error." *See In re Bradley*, 501 F.3d 421, 433 (5th Cir. 2007) ("Even if an issue is raised and considered in the bankruptcy court, this [court of appeals] will deem the issue waived if the party seeking review failed to raise it in the district court."); *United States v. Olson*, 4 F.3d 562, 567 (8th Cir. 1993) (same).

After briefing, but no hearing, the District Court vacated the Bankruptcy Court's judgment in part, holding that Charter's false and misleading mailer did not violate the stay. SA74. The District Court further held that, even if Charter's conduct did violate the stay, the Bankruptcy Court abused its discretion in holding Charter in contempt. *Id.*

The District Court's decision affirmed that there was sufficient evidence of record to establish that Windstream had a contractual

relationship with its customers that was protected by the automatic stay. SA68. The District Court also recognized that the automatic stay "protects a debtor's goodwill as property of the estate." SA69. Nevertheless, the District Court held that "Charter's [mailings] were not acts to 'obtain' or 'control' any such contracts," *id.*, and "Charter did not engage in any act that 'exercised control' over any goodwill that is cognizable as a property interest." SA70.

The District Court's conclusion in this regard was predicated solely on its own view of the evidence—specifically its own opinion that "Charter did not misrepresent its identity." SA74. The District Court did not take into account the Bankruptcy Court's finding of fact that Charter impersonated Windstream through the mailer, and the overwhelming evidence of record that supports that finding. To be clear, in substituting its view of the evidence for the Bankruptcy Court's finding of fact, the District Court did not hold that the finding of fact was "clear error," let alone explain why it was "clear error."[9]

---

[9] Indeed, Charter itself did not argue in the District Court that the Bankruptcy Court's finding that it impersonated Windstream was "clear error." *See* Brief for Defendant-Appellant, *In re Windstream Holdings, Inc.* (No. 21-cv-4552, Dkt. No, 15), 2022 WL 5245633 (S.D.N.Y. Oct. 6, 2022).

In reaching the conclusion that Charter "did not misrepresent its identity," SA74, the District Court failed to acknowledge, let alone consider, that the Bankruptcy Court had found Charter "intentionally design[ed] the false mailer to look like it was sent by [Windstream]." SA5. The District Court also failed to account for the undisputed evidence supporting that finding of fact. Indeed, the District Court did not address any of the evidence establishing that Charter impersonated Windstream, such as the envelope's use of Windstream's color scheme, Windstream's font, Windstream's name, and the intentional omission of Charter's name in the return address. In addition, the District Court failed to note, let alone discuss, the undisputed evidence that Windstream subscribers believed that Windstream had sent the notice, not Charter.

As a result, the District Court concluded that Charter's false and misleading mailer was an ordinary advertisement, that it was "clearly [a] mailing[] from a competitor," SA73, and that Charter's conduct therefore could not "reasonably be seen as an act to exercise control over property of Windstream's estate." SA74. Accordingly, based on the substitution of its own view of the mailer for the Bankruptcy Court's contrary finding of fact,

the District Court held that Charter's dissemination of the mailer to Windstream's subscribers did not violate the automatic stay.

The District Court further held that, even if Charter's conduct violated the automatic stay, the Bankruptcy Court abused its discretion in holding Charter in contempt. SA74. The District Court believed the Bankruptcy Court had required Charter to obtain advance approval for its direct-mail campaign and that its failure to do so, in and of itself, warranted a contempt sanction. The District Court believed that, in effect, the Bankruptcy Court had held Charter to the strict-liability standard rejected by the Supreme Court in *Taggart*. SA76-SA79. Furthermore, based on its belief that there was no evidence that Charter misrepresented its identity, the District Court held that, even if the mailer did violate the automatic stay, such a conclusion was not based on an "objectively obvious reading of the statute or the caselaw." SA80. Therefore, according to the District Court, the sanction of civil contempt was not warranted. *Id.*

As a result of its failure to accept the Bankruptcy Court's express findings of fact—which it was required to do absent finding them to be "clear error"—the District Court reversed that portion of the Bankruptcy Court's judgment holding Charter in contempt for sending the false and

misleading mailer. Because Charter did not challenge the portion of the Bankruptcy Court's judgment holding Charter in contempt for cutting off last-mile services, the District Court did not disturb that aspect of the judgment. SA59.

## SUMMARY OF THE ARGUMENT

The District Court's conclusion that Charter's scheme did not violate the automatic stay is based entirely on its view that "Charter did not misrepresent its identity." SA74. This conclusion ignores the Bankruptcy Court's findings of fact—based on overwhelming evidence of record—that Charter's mailings were "designed to seem as if they were coming from [Windstream]." SA20. The District Court may not substitute its opinion for the well-supported findings of fact of the Bankruptcy Court. Therefore, the Bankruptcy Court's decision that Charter's scheme violated the automatic stay was correct and should be reinstated.

Furthermore, the District Court's conclusion that the Bankruptcy Court abused its discretion in holding Charter in contempt should also be reversed. The District Court mistakenly believed that the Bankruptcy Court applied a strict-liability standard in holding Charter in contempt. SA76-SA79. In fact, the Bankruptcy Court correctly applied *Taggart*'s objective

"fair ground of doubt" standard. Moreover, the District Court's conclusion that, even under the *Taggart* standard, Charter could not be held in contempt was based upon its erroneous view that "Charter did not misrepresent its identity." SA74. Therefore, according to the District Court, it was "highly debatable" whether Charter's "advertising" violated the automatic stay. SA80. This conclusion is again predicated upon the District Court's substitution of its view of the evidence for the Bankruptcy Court's findings of fact. In addition, it ignores Charter's bad faith, particularly the fact that Charter had, during its own Chapter 11 case, sued a competitor for engaging in the exact same conduct. Accordingly, the Bankruptcy Court's decision to hold Charter in contempt should be reinstated.

## STANDARD OF REVIEW

"'An order of the district court functioning in its capacity as an appellate court in a bankruptcy case is subject to plenary review.'" *In re DiBattista*, 33 F.4th at 702 (quoting *Jackson v. Novak*, 593 F.3d 171, 176 (2d Cir. 2010)) (alteration omitted). "In other words," this Court "independently review[s] the bankruptcy court's decision, 'accepting the bankruptcy court's factual findings unless they are clearly erroneous and reviewing its

conclusions of law *de novo*." *Id.* (quoting *Jackson*, 593 F.3d at 176) (alteration omitted).

"A bankruptcy court's decision on sanctions is reviewed for abuse of discretion." *Id.* "The bankruptcy court 'necessarily abuses its discretion if it based its ruling on an erroneous view of the law or on a clearly erroneous assessment of the evidence.'" *Id.* (quoting *Solow v. Kalikow*, 602 F.3d 82, 91 (2d Cir. 2010)) (alteration omitted). Otherwise, the bankruptcy "court is empowered to make a decision—of *its* choosing"—and this Court will not disturb that conclusion unless it "cannot be located within the range of permissible decisions." *Zervos v. Verizon N.Y., Inc.*, 252 F.3d 163, 169 (2d Cir. 2001). "Accordingly, this Court will not upset [a court's exercise of discretion] simply because [this Court] would have reached a different conclusion had [it] considered the matter in the first instance." *United States v. Ramirez*, 297 F.3d 185, 193 (2d Cir. 2002) (alteration omitted).

**ARGUMENT**

## I. Charter violated the automatic stay.

The Bankruptcy Court correctly found that Charter impersonated Windstream by sending a false and misleading mailer in an envelope designed to appear to be a communication from Windstream in order to trick Windstream subscribers into believing that Windstream wanted them to switch their contracts to Charter because it was going out of business. The Bankruptcy Court held that this scheme violated the automatic stay. In reaching a contrary conclusion, the District Court overlooked the Bankruptcy Court's findings of fact, concluding instead that "Charter did not misrepresent its identity," SA74, and that the false and misleading mailer was nothing more than a "mailing[] from a competitor." SA73. In reaching this conclusion, the District Court improperly substituted its own view of the evidentiary record for the findings of fact of the Bankruptcy Court.

### A. Overwhelming evidence supported the Bankruptcy Court's finding of fact that Charter impersonated Windstream to trick Windstream subscribers into switching their contracts to Charter.

The Bankruptcy Court found that Charter "intentionally design[ed] the false mailer to look like it was sent by the Debtors at a time when

[Windstream] would be notifying [its] customers of these Chapter 11 cases." SA5. The Bankruptcy Court also found that, "based on the nature of the envelope itself and the admissions with regard to the intentional campaign, . . . Charter intentionally set out to deceive the public . . . with the desire to have them believe that the communication was coming from Windstream." JA1191, lines 6-17. In addition, the Bankruptcy Court found that the false and misleading mailer "was meant . . . to get the Windstream customers to open the envelope believing that it was a communication from their service provider." JA442, line 25 - JA443, line 2. As the Bankruptcy Court concluded, taken together, the evidence "clearly establish[ed] Charter's intent to mislead." JA1192, lines 14-17.

The evidence of record amply supports the Bankruptcy Court's foregoing findings of fact. The undisputed evidence of record is that Charter intentionally used Windstream's signature color pattern and font on the mailer envelope, omitted Charter's name in the return address and prominently placed in bold on the front of the envelope the words "**Important Information Enclosed for Windstream Customers**." JA1742-JA1743. Charter's advertising agency admitted that it "took inspiration from the Windstream colors," JA3593 at 56:17-18, and "tried to align the fonts as

close as possible to the font on [Windstream's] website," JA3594 at 57:15-16, to "grab attention from current Windstream customers." JA3594 at 58:3-4. In addition, Charter admitted that the envelope was designed to "take on a look and feel that's similar to" Windstream's mailings, and it intentionally omitted "putting [Charter's] brand on the outer envelope" to encourage Windstream's customers to "open it and see what's inside." JA3585 at 72:8-18. The record also established that Charter sent its false and misleading mailer at the same time Windstream was contacting its customers about its bankruptcy filing in order to further the impression that the mailer was a notice from Windstream regarding the bankruptcy. JA2534, lines 18-21; JA2571, lines 17-21; JA2762, lines 21-25; JA2772, lines 17-21; JA2982, line 22 - JA2983, line 6.

As a result of the foregoing, Windstream customers believed Charter's mailer was a genuine bankruptcy notice from Windstream. Windstream customers reported that they believed the mailing was a communication from Windstream. JA1840; JA2041; JA2123; JA2126-2127; JA2182; JA2186; JA2252; JA2287; JA2293; JA2299; JA2446; JA2535; JA3095; JA3189; JA3260. Thousands of subscribers switched their contracts to Charter as a result of Charter's false and misleading mailer. JA3493 at ¶ 19; JA3512 at ¶ 27.

Windstream's subscribers explained that the envelope:

- made them "th[ink] it was from [Windstream]," JA1840, lines 9-12;

- "appeared that it was from Windstream," JA2024, lines 23-24;

- "led [them] to believe that it was coming from [Windstream]," JA2535, lines 2-3; and

- "looked like it was from [Windstream]." JA3095, lines 15-17.

Charter's scheme to misappropriate Windstream's identity in order to steal its customer contracts was a success. As Charter intended, many Windstream subscribers believed that Charter's false and misleading mailer was a notice from Windstream informing them that its bankruptcy filing put their services at risk and advising them to switch their contracts to Charter. Windstream subscribers explained that they believed:

- "Spectrum [wa]s going to be taking over" Windstream, JA2756, lines 18-21;

- "Windstream customers need[ed] to go to Spectrum," JA2824, lines 5-8; and

- Windstream subscribers needed to "call Spectrum to keep [their] account open." JA2768, lines 5-7.

Other subscribers believed Windstream was "partnering" with Charter, JA3056, lines 22-23, or there was a "relationship" between the two companies, JA1984, lines 24-25, and, therefore, Windstream was "recommending Spectrum," JA2299, lines 9-19, or "suggest[ing]" that "Spectrum might be a good place for [Windstream's customers] to go." JA2287, lines 3-8. As a result, many Windstream subscribers believed they were simply following Windstream's advice by switching their contracts to Charter. JA1867, lines 12-14; JA2497, lines 12-13.

**B.      The automatic stay protects debtor estates against exactly the type of scheme perpetrated here by Charter.**

The evidence establishes that Charter viewed Windstream's bankruptcy filing as an opportunity to convert Windstream subscriber contracts to itself.[10] To exploit this opportunity, Charter devised a scheme to misappropriate Windstream's brand and customer loyalty in order to trick Windstream subscribers into thinking Windstream was going out of business and wanted them to switch their contracts to Charter. The

---

[10] It is important to understand that, in many markets in which Windstream operates, the only competing service is provided by Charter. JA589 at ¶ 8. Therefore, most Windstream customers discontinuing service with Windstream had nowhere to move their service except to Charter.

Bankruptcy Code, however, protects debtors from exactly this sort of interference with a debtor's estate.

Upon the filing of a bankruptcy petition, Section 362 of the Bankruptcy Code automatically stays "any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate." 11 U.S.C. 362(a)(3). The Bankruptcy Code defines property of the estate "broadly to include 'all legal or equitable interests of the debtor in property as of the commencement of the case.'" *In re 48th Street Steakhouse*, 835 F.2d 427, 430 (2d Cir. 1987) (quoting 11 U.S.C. § 541(a)(1)); *see also United States v. Whiting Pools, Inc.*, 462 U.S. 198, 205 (1983) (defining property of the estate to include "all kinds of property, including tangible or intangible property"). The automatic stay is broad in scope and prohibits "all actions that might be taken . . . to control or interfere with property of the estate." 7 Collier on Bankruptcy ¶ 1100.05[2] (2022).

This Court has held that the stay protects "bankruptcy estates by restraining any formal or informal action or legal proceeding that might dissipate estate assets or interfere with the trustee's orderly administration of the estate." *Picard v. Fairfield Greenwich Ltd.*, 762 F.3d 199, 207 (2d Cir. 2014). This Court has also has held that the automatic stay's broad scope

encompasses "all actions and proceedings that may affect the debtor's property," *Musso v. Ostashko*, 468 F.3d 99, 104 (2d Cir. 2006), as well as actions that would "inevitably have an adverse impact upon the property of the estate." *In re Gucci*, 126 F.3d 380, 392 (2d Cir. 1997). *See also In re Cowen*, 849 F.3d 943, 949 (10th Cir. 2017) (explaining that Congress intended for the automatic stay "to reach nonpossessory conduct that would nonetheless interfere with the estate's authority over a particular property interest").

The automatic stay's broad scope also encompasses "*attempts* to obtain or exercise control over both tangible and intangible property" of a bankruptcy estate. 3 Collier on Bankruptcy ¶ 362.03[5] (2022) (emphasis added). As such, this Court has held that a "Landlord's *attempt* to terminate [a] lease" violated the automatic stay. *In re 48th St. Steakhouse, Inc.*, 835 F.2d 427, 429 (2d Cir. 1987) (emphasis added). Other courts of appeals have explained that the automatic stay prohibits "any attempts to exercise control over any property of the estate," *In re Sheehan*, 48 F.4th 513, 521 (7th Cir. 2022), as well as "attempts to obtain possession of property" of the estate. *In re Stone Res., Inc.*, 482 F. App'x 719, 721 (3d Cir. 2012) (non-precedential).

### 1. Charter's impersonation of Windstream violated the automatic stay by exercising control over Windstream's goodwill.

Charter's impersonation of Windstream misappropriated Windstream's goodwill—its brand and customer loyalty. Such an exercise of control over a debtor's goodwill violates the automatic stay.

A debtor's goodwill is recognized as property of the estate, protected by the automatic stay. The leading treatise on bankruptcy law notes that it is "unquestioned that business goodwill, in connection with the business to which it relates, constitutes property in the hands of a debtor owner." 5 Collier on Bankruptcy ¶ 541.06[5] (2021). In addition, various courts of appeals have held that goodwill is considered property "in the bankruptcy setting." *Robinson v. Watts Detective Agency, Inc.*, 685 F.2d 729, 734 (1st Cir. 1982); *see also Adams Apple Distrib. Co. v. Papeleras Reunidas, S.A.*, 773 F.2d 925, 931 (7th Cir. 1985) (goodwill is an asset of a bankruptcy estate). As such, the Bankruptcy Court, as well as the District Court, correctly recognized that "acts that impair, interfere with or destroy the estate's interest in . . . goodwill" violate the automatic stay. SA71 (quoting SA22).

Windstream's brand and customer loyalty are core components of its goodwill and, as part of a debtor's estate, protected by the automatic stay.

*In re Prince*, 85 F.3d 314, 322 (7th Cir. 1996) (goodwill of debtor's estate includes "name recognition, consumer brand loyalty, or special relationships with suppliers or customers."); *In re Residential Cap., LLC*, 501 B.R. 549, 610 (Bankr. S.D.N.Y. 2013) (same); *In re Advanced Modular Power Sys., Inc.*, 413 B.R. 643, 667 (Bankr. S.D. Tex. 2009), *aff'd sub nom. Hsu v. West*, 2009 WL 7760300 (S.D. Tex. Dec. 30, 2009) (same); *In re Schultz*, 250 B.R. 22, 35 (Bankr. E.D.N.Y. 2000) (same). By intentionally designing its false and misleading mailer to appear as though it was a communication from Windstream, Charter misappropriated Windstream's goodwill—its brand and customer loyalty--which is clearly property of the estate. Indeed, Charter expressly admitted that it copied Windstream's color scheme and font in order to induce Windstream customers to open the envelope containing Charter's false and misleading mailer. Charter also used the "Windstream" name on the front cover of the envelope. By design, Charter's actions created the false impression that Windstream was associated with Charter or was recommending Charter's services to its customers. Windstream subscribers reported that is exactly what they thought—that Windstream was recommending they switch their contracts to Charter. In effect, Charter capitalized upon Windstream's brand recognition and loyalty

among its customers to induce them to switch their contracts to Charter because Windstream customers believed that is what Windstream wanted them to do because it was going out of business.

Accordingly, the Bankruptcy Court did not err in holding that this misappropriation of Windstream's goodwill was a violation of the automatic stay. SA20. Indeed, the assumption of a debtor's identity is the ultimate exercise of control over the property of a debtor's estate. *See In re Golden Distributors, Ltd.*, 122 B.R 15, 20 (Bankr. S.D.N.Y. 1990) (the automatic stay is violated when defendants "hold themselves out as related in any way to the defendant's business so as to acquire the goodwill that was associated with such business.").

> **2.    Charter also violated the automatic stay when it attempted to obtain Windstream subscriber contracts through the false and misleading mailer.**

Charter's misconduct—posing as Windstream to trick subscribers into believing that Windstream wanted them to switch their contracts to Charter to avoid losing their service—constitutes an attempt to obtain or interfere with estate property, in violation of the automatic stay. As property of the estate, Windstream subscriber contracts were "protected against termination

or other interference that would have the effect of removing or hindering [Windstream's] rights." 3 Collier ¶ 362.03[5][a].

The Bankruptcy Court correctly found that Windstream has a contractual relationship with its subscribers. SA7.  The District Court accepted this finding of fact. SA68. Indeed, there is overwhelming evidence that Windstream has a contractual relationship with its subscribers—they pay for services that Windstream provides pursuant to the terms of a subscription agreement. *See* JA1721; JA1025. In fact, Charter's false and misleading mailer expressly offered to buy out the "current contract" of Windstream customers. JA1721. Thus, Charter also viewed Windstream as having a contractual relationship with its subscribers.

This Court has held that "an effort to affect [the debtor's] contract rights" in derogation of the estate violates the automatic stay. *In re AMR Corp.*, 730 F.3d 88, 102 (2d Cir. 2013).  As this Court has recognized, contractual rights "clearly fall within the reach" of the definition of property of the estate.  *Chartschlaa v. Nationwide Mut. Ins. Co.*, 538 F.3d 116, 122 (2d Cir. 2008).  As such, the Bankruptcy Court, as well as the District Court, correctly noted that the automatic stay applies to "acts that impair, interfere with or destroy the estate's interest in contracts." SA71 (quoting SA22).

In this case, Charter impersonated Windstream to trick Windstream subscribers into believing that Windstream wanted them to switch their contracts from Windstream to Charter due to Windstream's bankruptcy. Indeed, the entire purpose of Charter's campaign was to leverage the confusion surrounding Windstream's bankruptcy to convince Windstream subscribers that their services would be at risk if they did not switch their contracts to Charter. JA3605 at 118:6-24.

Charter's plan was an undisputed success. Windstream subscribers believed that Charter's false and misleading mailer was a notice from Windstream advising subscribers that Windstream would no longer be able to provide telecommunications services and recommending that they switch their contracts to Charter. JA2287, lines 3-8; JA2299, lines 9-19; JA2494, lines 5-10. Windstream subscribers explained that they thought the notice meant they "had to go get a new provider right away," JA2301, lines 11-14, "need[ed] to go to Spectrum," JA2824, lines 5-8, or needed "to call Spectrum to keep [their] account open." JA2768, lines 5-7. Some Windstream subscribers who switched their contracts to Charter explained that they were "just d[oing] what the letter said," JA2497, lines 12-13, or were "follow[ing] through with the instructions" in Charter's false and misleading mailer.

JA1867, lines 12-14. Thus, Charter's misappropriation of Windstream's goodwill—its brand and customer loyalty—resulted in Charter actually obtaining control over Windstream subscriber contracts. Given this overwhelming evidence, the Bankruptcy Court did not err in finding that Charter's scheme to induce Windstream subscribers to switch their contracts to Charter violated the automatic stay. SA20-SA24.

This case is on all fours with *In re Alert Holdings, Inc.*, 148 B.R. 194 (Bankr. S.D.N.Y. 1992), which held that the same type of misconduct—passing oneself off as associated with a debtor and misrepresenting the effect of the debtor's bankruptcy to induce the debtor's customers to switch their services to a competitor—violates the automatic stay. In that case, shortly after the debtor filed for bankruptcy, one of its competitors began soliciting the debtor's customers through targeted false advertising, which "created the erroneous impression that [the debtor] may be going out of business" and misled the debtor's customers into believing the competitor was authorized to assume the debtor's customer accounts. *Id.* at 198. The competitor argued that this conduct did not violate the stay, but instead was merely a "marketing tool." *Id.* The court disagreed, holding that the competitor's action had been undertaken "with the aim of obtaining

possession and exercising control over . . . property of the estate," and, as such, it was "virtually inescapable" that the competitor violated the automatic stay. *Id*. at 203.

The same conclusion is compelled here. Charter posed as Windstream to trick Windstream customers into believing that they had to switch service to Charter because Windstream was going out of business. Thus, like the defendant in *In re Alert Holdings*, it is "virtually inescapable" that Charter violated the automatic stay. 148 B.R. at 203. In fact, it is hard to conceive of any more clear of an example of an exercise of control over property of a debtor's estate than using the debtor's identity to obtain control over the debtor's customer contracts.

The Bankruptcy Court's holding is also supported by *In re All Trac Transportation, Inc.*, 306 B.R. 859, 878-79 (Bankr. N.D. Tex. 2004), *aff'd*, No. 04-cv-1759, 2005 WL 5012640 (N.D. Tex. July 28, 2005), *aff'd*, 223 F. App'x 299 (5th Cir. 2006) (non-precedential). In that case, the defendant sent notices to the debtor's customers falsely informing them that the debtor had assigned its customer accounts to the defendant and they should redirect their payments to the defendant. *Id.* at 878-79. That conduct was likewise held to be a violation of the automatic stay.

Here, Charter's false and misleading mailer had the same effect. It tricked Windstream customers into switching their contracts to Charter. In the process, Charter redirected millions of dollars in revenue from Windstream to itself. The Bankruptcy Court did not err in finding that this was a violation of the automatic stay. SA20.

### 3. Charter conceded that it violated the automatic stay by cutting off last-mile service to Windstream subscribers.

The automatic stay also protects debtors against "any act to collect, assess, or recover a claim against the debtor that arose before the commencement of the case under this title." 11 U.S.C. § 362(a)(6). This provision prevents creditors from engaging in self-help, which would disrupt the fair and orderly distribution of assets to creditors. Charter has conceded that it repeatedly violated this provision of the Bankruptcy Code. *See* SA59.

Windstream and Charter are parties to a contract that provides Windstream with the right to use the so-called "last-mile" services of Charter. JA589 at ¶ 11. Under this agreement, Windstream may use Charter's Internet access to distribute Windstream's services to subscribers in certain designated areas. *Id*.

Shortly after Windstream filed for bankruptcy, Charter cut off last-mile services to hundreds of Windstream subscribers in a purported attempt to collect on pre-petition debt owed by Windstream to Charter. JA589-JA590 at ¶¶ 14-15. Even after the Bankruptcy Court specifically enjoined Charter from further disconnecting Windstream subscribers, Charter promptly violated that injunction by disconnecting additional Windstream subscribers.

Charter conceded that this misconduct violated the automatic stay. SA59. Indeed, Charter did not challenge the Bankruptcy Court's judgment in this regard, although it has steadfastly refused to acknowledge that its decision to cut off of last-mile services was related to its direct-mail campaign. By cutting off Windstream subscriber customer access, however, Charter fed the false narrative that Windstream was going out of business, and, therefore, Windstream subscribers were at imminent risk of losing their services. It also furthered Charter's goal of "creating an uncertainty," JA3590 at 42:14-15, in the minds of Windstream subscribers by suggesting that Windstream's bankruptcy put their services at risk. In fact, the only reason any Windstream customers were at risk of losing their services was because

Charter repeatedly violated the automatic stay by unlawfully cutting off last-mile services.

* * * * *

Charter's various acts of misconduct should not be viewed in isolation. They must be viewed as a multi-faceted and interrelated scheme with the ultimate aim of obtaining property of the estate, Windstream subscriber contracts. Charter's scheme harmed Windstream's bankruptcy estate, costing it millions of dollars to remedy—money that otherwise could have gone to creditors. Moreover, Charter's misconduct was a direct assault on the integrity of the bankruptcy proceedings. It co-opted the notification process that bankruptcy courts rely upon to keep creditors and customers apprised of the developments in a bankruptcy proceeding. The Bankruptcy Court was correct to hold Charter accountable for its unlawful scheme.

C. **The District Court overlooked the Bankruptcy Court's findings of fact that Charter impersonated Windstream to trick Windstream subscribers into switching their contracts to Charter.**

In vacating the Bankruptcy Court's judgment, the District Court relied upon its own view of the record that "Charter did not misrepresent its

identity." SA74. In reaching this conclusion, however, the District Court overlooked the Bankruptcy Court's findings of fact to the contrary.[11]

The District Court never considered, let alone accounted for, the Bankruptcy Court's finding that Charter "intentionally design[ed] the false mailer to look like it was sent by the Debtors at a time when the Debtors would be notifying their customers of these Chapter 11 cases." SA5. *See also* SA20 (Charter's mailer was "designed to seem as if they were coming from the debtors."). It never accounted for the Bankruptcy Court finding that the evidence "clearly establish[ed] Charter's intent to mislead" Windstream's customers. JA1192, lines 14-17. It also never accounted for the evidence from Windstream customers, who reported that they believed Charter's mailer came from Windstream. JA1840, lines 9-12; JA2024, lines 23-24; JA2535, lines 2-3; JA3095, lines 15-17. Finally, the District Court ignored the evidence relating to the design of the envelope, including Charter's own admission that it designed the envelope specifically to appear to come from Windstream. *See* JA3585 at 72:8-18.

---

[11] It is important to note that the District Court did not identify any finding of fact by the Bankruptcy Court as "clear error," and, therefore, was required to accept them.

This Court owes no deference to the District Court's unexplained failure to accept the Bankruptcy Court's findings of fact. *In re DiBattista*, 33 F.4th at 702. Rather, this Court "independently review[s] the bankruptcy court's decision," and "'accept[s] the bankruptcy court's factual findings unless they are clearly erroneous." *Id.* The Bankruptcy Court's findings of fact here derive ample support from the evidence of record and are not "clear error."

At the outset, it is important to note that Charter admitted it designed the envelope in which the mailer was sent to "take on a look and feel that's similar to" Windstream's own mailers, and avoided "putting [Charter's] brand on the outer envelope," to encourage Windstream's customers to "open it and see what's inside." JA3585 at 72:8-18. Charter's advertising agency also admitted that it used Windstream's signature color palette and font on the envelope. JA3594 at 58:3-4. And, it was no accident that the front cover of the envelope used to transmit Charter's mailer asserted that it provided "**Important Information**" for "**Windstream Customers**"—at the exact time Windstream was sending genuine mailings notifying its customers about its bankruptcy.

Because it overlooked all of this evidence of record, the District Court reached the wrong conclusion. This is made clear by the District Court's refusal to apply the holding in *In re Alert Holdings*. SA74. As discussed above, the court in that case found that a defendant violated the automatic stay by misappropriating the debtor's customer list and falsely "holding itself out as the proper and authorized servicer" of the debtor's accounts. *Alert Holdings*, 148 B.R. at 197-98. In purporting to distinguish *Alert Holdings*, the District Court emphasized that "Charter did not misrepresent its identity." SA74. This assertion, however, is belied by the evidence of record described above and the Bankruptcy Court's findings of fact derived from that evidence.[12]

The District Court's failure to recognize the findings of fact of the Bankruptcy Court caused it to analogize this case to *In re Golden Distributors, Ltd.*, 122 B.R. 15 (Bankr. S.D.N.Y. 1990). In that case, the court noted that the automatic stay is violated when companies "hold themselves out as related in any way to the debtor's business so as to acquire the good will that was associated with such business." *Id.* at 20. The court did not find a stay

---

[12] The District Court's conclusion in this regard is particularly odd given that Charter itself never argued that the Bankruptcy Court erred in finding it impersonated Windstream. *See supra* n.9.

violation there, however, because there was no evidence of impersonation. *Id.* In erroneously analogizing to the outcome in *Golden Distributors*, the District Court declared that "Charter's advertisements were clearly mailings from a competitor," SA73, and, as a result, Charter did not violate the automatic stay. The District Court, however, identified no evidence of record to support its conclusion. In fact, the record establishes that the exact opposite occurred here. Charter sent a false and misleading mailer in an envelope purposely designed to appear as though it was coming from Windstream. By posing as Windstream in an effort to acquire Windstream's contracts with subscribers, Charter violated the automatic stay.

The Bankruptcy Court's conclusion that Charter violated the automatic stay was based on findings of fact that were amply supported by the evidence of record. The District Court's decision to vacate the Bankruptcy Court's judgment was predicated on, at best, a failure by the District Court to review the evidence of record or, at worst, an improper substitution of its views for the Bankruptcy Court's findings of fact. Accordingly, the District Court decision should be reversed and the Bankruptcy Court's decision that Charter violated the automatic stay be reinstated.

**II.    Charter's violation of the automatic stay warranted a contempt sanction.**

The District Court also held that, even if Charter's conduct violated the automatic stay, the Bankruptcy Court abused its discretion in holding Charter in contempt. SA74. In reaching this conclusion, the District Court made two critical mistakes that dictate reversal.

First, the District Court erroneously believed that the Bankruptcy Court had, in effect, held Charter strictly liable for not obtaining advance approval from the Bankruptcy Court as to whether its direct-mail scheme would violate the automatic stay. *See* SA76-SA79. That, however, is not what the Bankruptcy Court did here. The Bankruptcy Court never applied such a strict-liability standard as a basis for determining whether Charter's conduct warranted a contempt sanction. Rather, the Bankruptcy Court applied *Taggart*'s objective "fair ground of doubt" standard. *E.g.*, SA24 (referring to *Taggart*'s "objective 'no reason to doubt' standard"); SA25 (referring to *Taggart*'s "fair ground of doubt" standard); SA27 (rejecting Charter's argument that it "would have a fair ground of doubt").

Second, in conducting its own *Taggart* analysis, the District Court erroneously concluded that there was "fair ground of doubt" that Charter's conduct violated the automatic stay based on its inaccurate belief that there was no evidence of impersonation by Charter. SA79-SA80. Indeed, that inaccurate premise was the only basis upon which the District Court distinguished *Alert Holdings* and similar cases. SA73-SA74. The District Court either overlooked or improperly refused to accept the findings of fact of the Bankruptcy Court that Charter intentionally impersonated Windstream. Moreover, the District Court failed to take into account that, during Charter's own bankruptcy, a competitor launched the exact same type of false advertising campaign and Charter sued that competitor alleging it was unlawful. Thus, Charter affirmatively knew its conduct was unlawful and could have no "fair ground of doubt" that its conduct violated the automatic stay.

> **A.** ***Taggart*'s objective "fair ground of doubt" standard applies in considering whether civil contempt is warranted for a violation of the automatic stay.**

The automatic stay is "essentially a court-ordered injunction, [and] any person or entity who violates the stay may be found in contempt of court."

*Jove Eng'g, Inc. v. IRS*, 92 F.3d 1539, 1546 (11th Cir. 1996) (citation omitted).

In *Taggart v. Lorenzen*, the Supreme Court affirmed that bankruptcy courts have the authority to hold parties in civil contempt for violating their orders. 139 S. Ct. at 1801. That authority is derived, in large part, from Section 105(a) of the Bankruptcy Code, *see id.*, which authorizes a court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title," 11 U.S.C. § 105(a). The Supreme Court ultimately held that a bankruptcy court may hold a party in "civil contempt for violating a [court] order if there is *no fair ground of doubt* as to whether the order barred the [party's] conduct." *Taggart*, 139 S. Ct. at 1799 (emphasis in original).

The order at issue in *Taggart* was a discharge order, which "bars creditors from attempting to collect any debt covered by the order." *Id.* (citing 11 U.S.C. § 524(a)(2)). The bankruptcy court had held a creditor in contempt under a standard "akin to 'strict liability.'" *Id.* (quoting *In re Taggart*, 522 B.R. 627, 632 (Bankr. D. Or. 2014)). In reversing the bankruptcy court, the Ninth Circuit adopted a "purely subjective standard," holding that a bankruptcy court "cannot hold a creditor in civil contempt if the creditor has a 'good faith belief' that the discharge order 'does not apply to the

creditor's claim." *Id.* (quoting *In re Taggart*, 888 F.3d 438, 444 (9th Cir. 2018)). In rejecting both approaches, the Supreme Court clarified that civil contempt "may be appropriate when a creditor violates a discharge order based on an objectively unreasonable understanding of the discharge order or the statute that governs its scope." *Id.* at 1802. Specifically, the Supreme Court held that civil contempt is inappropriate "where there is a fair ground of doubt as to the wrongfulness of the defendant's conduct." *Id.*

This case here presents an issue of first impression in this Court: whether *Taggart*'s objective "fair ground of doubt" standard applies in the context of a violation of the automatic stay. This Court should join the other courts that have held *Taggart* is not limited to violations of a discharge order, but also applies to violations of the automatic stay. *E.g.*, *Suh v. Anderson*, 2020 WL 1277575, at *4 n.3 (BAP 9th Cir. Mar. 16, 2020) (applying *Taggart* standard to violation of the automatic stay); *In re Ellingsworth Residential Comm. Assoc., Inc.*, No. 20-bk-01346, 2022 WL 2388636, at *5 (Bankr. M.D. Fla. Mar. 28, 2022) (same); *In re GYPC, Inc.*, 834 B.R. 983, 991 (Bankr. S.D. Ohio 2021) (same); *In re Tate*, No. 19-adv-10009, 2020 WL 634293, at *3 n.2 (Bankr. D.D.C. Feb. 10,

2020) (same); *In re Jones*, No. 18-cv-02837, 2019 WL 5061166, at *4-5 (Bankr. S.D. Miss. July 22, 2019) (same).[13]

First, although there are differences between Section 362(k)(1), the provision of the Bankruptcy Code that addresses remedies for violation of the automatic stay, and Section 105(a), which is used to address violations of a discharge order, that difference is irrelevant in a bankruptcy involving a corporate debtor, such as here. As this Court has held, in the case of a corporate debtor, the bankruptcy court's source of authority for sanctioning a violation of the automatic stay is Section 105(a), not Section 362(k)(1). *In re Chateaugay*, 920 F.2d 183, 186-87 (2d. Cir. 1990). Thus, at least with respect to corporate debtors, the source of authority for sanctioning violations of either a discharge order or the automatic stay is the same—Section 105(a). It would be anomalous to apply two different standards under that same provision.

Second, the Supreme Court's discussion in *Taggart* strongly supports its application to *any* civil contempt sanction under Section 105(a). The Supreme Court stated that Section 105(a) incorporates "traditional principles of equity practice" that "have long governed how courts enforce

---

[13] Appellants and Appellees agree that *Taggart* is the correct standard to apply here. SA76.

injunctions," including "the potent weapon of civil contempt." 139 S. Ct. at 1801. Drawing on cases outside the bankruptcy context, the Supreme Court explained that the standard for civil contempt "is generally an objective one" and that civil contempt is inappropriate "where there is a fair ground of doubt as to the wrongfulness of the defendant's conduct." *Id.* at 1801-02. Thus, the Supreme Court's standard was not based on circumstances unique to a violation of a discharge order, but more broadly to the violation of any court order. *See Beckhart v. NewRez LLC*, 31 F.4th 274, 277 (4th Cir. 2022) ("a bankruptcy court's authority to enforce its own orders—regardless of which chapter of the Bankruptcy Code those orders were issued under—derives from the same statutes and the same general principles the Supreme Court relied on in *Taggart*.").

Accordingly, this Court should hold that *Taggart*'s objective "fair ground of doubt" standard applies in determining whether the sanction of civil contempt is warranted for a violation of the automatic stay.[14]

_____

[14] Both the Bankruptcy Court and the District Court concluded that *Taggart*'s standard should be applied here, despite being in the context of a violation of the automatic stay. *See* SA16-SA18; SA76-SA79.

### B. The District Court misunderstood the standard applied by the Bankruptcy Court.

The District Court held that the civil contempt sanction issued against Charter was an abuse of discretion. The District Court reached this conclusion because it erroneously read the Bankruptcy Court's decision as requiring Charter to obtain advance approval for its direct-mail campaign and imposing a contempt sanction for Charter's failure to do so. SA76-SA79. In effect, the District Court believed that the Bankruptcy Court had held Charter to the strict-liability standard rejected by the Supreme Court in *Taggart*. *See* 139 S. Ct. at 1799. That, however, is not what the Bankruptcy Court did here.

Nowhere in the Bankruptcy Court's decision does it state that contempt is warranted because Charter failed to obtain advance approval for its actions. In fact, there are only two points in the Bankruptcy Court's decision in which it even discussed a would-be contemnor seeking clarification before engaging in conduct that might violate the automatic stay. Both, however, are merely passing observations and not part of the Bankruptcy Court's determination as to whether Charter's violation of the automatic stay warranted a contempt sanction.

The first reference to seeking advance approval occurs during a discussion by the Bankruptcy Court of *Taggart* and merely recounts the policy reasons set out in *Taggart* as to why courts might adopt varying standards for civil contempt, depending on whether the underlying violation was of a discharge order, as in *Taggart*, or of the automatic stay, as here. SA17-SA18. *See* 139 S. Ct. at 1804 (the automatic "stay aims to prevent damaging disruptions to the administration of a bankruptcy case in the short run, whereas a discharge is entered at the end of the case and seeks to bind creditors over a much longer period."). The Bankruptcy Court agreed with the Supreme Court that, because a bankruptcy court is "actively supervising" cases subject to the stay, and because the stay is of "fundamental importance" to the administration of the bankruptcy, there is some logic in requiring "those in doubt whether the stay applies to seek clarification from the court or be sanctioned for shooting first and aiming later." SA18. The Bankruptcy Court's observations in this regard, however, represent its analysis of *Taggart*, not the standard it actually applied to Charter's misconduct. As the Bankruptcy Court noted, in *Taggart*, the Supreme Court "specifically reserved" decision on the issue of requiring

advance clarification from a bankruptcy court. SA17 (citing *Taggart*, 139 S. Ct. at 1803-04).

Ultimately, however, the Bankruptcy Court did not need to settle this policy debate set out in *Taggart*, because it found that Charter violated *Taggart*'s objective "fair ground of doubt" standard. SA18-SA30. The most the Bankruptcy Court inferred from the Supreme Court's policy discussion was that it is "highly unlikely" that the Supreme Court would adopt "a standard that is more *lenient* to potential violators of the automatic stay than the objective 'fair ground of doubt' approach." SA18.

The second reference by the Bankruptcy Court to the ability of a would-be contemnor to seek advance clarification from a bankruptcy court came *in response to Charter's assertion* in its post-trial brief of *In re Allentown Ambassadors, Inc.*, 361 B.R. 422 (Bankr. E.D. Pa. 2007), "for the general proposition that 'control' as used in [Section 362(a)(3)] is ambiguous." SA27. In response, the Bankruptcy Court noted that *Allentown* did not stand for that general proposition, and Charter had otherwise "failed to address whether there was any ambiguity in how [Section 362(a)(3)] applied to [Charter's] own conduct." SA28. In passing, the Bankruptcy Court then noted that Charter had failed to address *Allentown*'s guidance that "if a party

doubts Section 362(a)'s applicability to their conduct," it can "seek relief from the automatic stay under 11 U.S.C. § 362(d)." *Id.* (citing *Allentown*, 361 B.R. at 331 n.40). The Bankruptcy Court decision, however, did not state that Charter was *required* to seek relief from the automatic stay in advance of taking any specific action relating to the debtor. And, it certainly never held Charter strictly liable for contempt for failing to seek such advance approval. The Bankruptcy Court simply observed that "a party [that] doubts Section 362(a)'s applicability" would be wise to seek clarification because a party's subjective, but mistaken, belief is not a defense under an objective standard. SA29. That observation is consistent with *Taggart*.

This Court, however, does not have to address whether, and to what extent, a party should seek advance clarification from a bankruptcy court because the Bankruptcy Court here never imposed such a requirement on Charter. The District Court erred in concluding otherwise. As discussed in detail below, the Bankruptcy Court properly applied *Taggart*'s objective "fair ground of doubt" standard to determining whether Charter's violation of the automatic stay warranted a contempt sanction.

### C. The Bankruptcy Court properly applied *Taggart*'s objective standard.

There can be no doubt that the Bankruptcy Court applied *Taggart*'s objective standard here. On December 18, 2019, at the hearing on the parties' cross-motions for summary judgment, the Bankruptcy Court announced its intent to apply *Taggart*'s objective standard to Charter's conduct. The Bankruptcy Court stated that "ultimate liability" depends on "whether the actions taken [by Charter] would satisfy the standard for civil contempt as most recently articulated by the Supreme Court in the *Taggart* case." JA1183.

Moreover, in holding Charter in contempt, the Bankruptcy Court properly applied *Taggart*'s objective standard. The Bankruptcy Court summarized its decision to hold Charter in contempt as follows.

> No reasonable person would believe that [Charter's] advertising campaign, designed to use false and knowingly misleading information to cause [Windstream's] customers to terminate their contracts and switch to Charter, protected a legitimate interest of Charter's and did not harm property interests of [Windstream]. Although every corporation expects legitimate advertising by competitors, and thus such advertising does not 'exercise control' over its property, improper advertising such as [Charter's] clearly and objectively interfered with [Windstream's] customer contracts and goodwill and thus clearly was precluded by section 362(a)(3)'s plain terms and the caselaw applying them.

SA29-SA30. This is clearly the application of an objective standard, not a strict-liability standard, and entirely consistent with *Taggart*.

This conclusion—that the Bankruptcy Court applied *Taggart*'s objective standard—is further supported by the Bankruptcy Court's response to Charter's argument that its executives "subjectively did not believe they were violating the stay." In rejecting that argument, the Bankruptcy Court emphasized that Charter's argument was "contrary to *Taggart's* objective 'no reason to doubt' standard." SA24.

Moreover, the Bankruptcy Court did not abuse its discretion in reaching the conclusion that *Taggart* allowed it to hold Charter in contempt. The Bankruptcy Court expressly found that Charter had impersonated Windstream in order "to induce [Windstream's] customers to terminate their contracts and switch to Charter by sending them literally false and intentionally misleading information about [Windstream's] bankruptcy cases and financial wherewithal." SA26. There is no objective doubt as to the law here. A party that falsely passes itself as the debtor or as somehow acting on behalf of the debtor to obtain the estate's contracts or goodwill violates the automatic stay. *See All Trac Transportation*, 306 B.R. at 878-79; *Alert Holdings*, 148 B.R. at 198-203; *Golden Distributors*, 122 B.R. at 20.

In attempting to argue otherwise, Charter did not even contest the fact that it had set out to impersonate Windstream. Rather, Charter focused on the breadth of the automatic stay, asserting that the statute is required to spell out, in exhaustive detail, every permutation of misconduct that violates its terms. No court, however, has ever accepted this argument. The automatic stay was intentionally written in broad terms. It applies to "all entities," not just creditors, as Charter had argued, and it "operates as a stay" of "*any* act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate." 11 U.S.C. § 362(a)(3). Moreover, Congress defined property of the estate broadly to cover not only Windstream customer contracts, but also intangible assets, like Windstream's goodwill. *Id.* at § 541(a).

In short, Charter's scheme used Windstream's goodwill—its identity—as part of an effort to obtain Windstream subscriber contracts. Such conduct falls within the literal proscription of the automatic stay and caselaw. There is no "fair ground of doubt" on that. The District Court erred in concluding otherwise.

**D.** **Although proof of bad faith is not required, Charter knew that its conduct was unlawful, which further supports the Bankruptcy Court's contempt sanction.**

*Taggart* held that subjective good faith is not a defense to a contempt finding. 139 S. Ct. at 1802. That, however, does not mean that subjective intent is always irrelevant. *Id.*

In *Taggart*, the Supreme Court clarified that, "civil contempt sanctions may be warranted when a party acts in bad faith." *Id.* "Thus, in *McComb*, we explained that a party's 'record of continuing and persistent violations' and 'persistent contumacy' justified placing 'the burden of any uncertainty in the [court's] decree on the shoulders' of the party who violated the court order." *Id.* (quoting *McComb v. Jacksonville Paper Co.*, 336 U.S. 187, 192-93 (1949)) (alterations omitted).

"On the flip side of the coin," the Court noted, "a party's good faith," even though "it does not bar civil contempt, may help to determine an appropriate sanction." *Id.* Thus, a court may decide to limit the sanctions that it imposes based on a finding that the party acted in subjective good faith. That does not mean, however, that a party who acts in good faith is shielded from a finding of contempt. *See, e.g., Beckhart*, 31 F.4th at 278 (advice of counsel is not a defense to a finding of contempt).

As discussed above, there was overwhelming evidence of Charter's bad faith. Despite its familiarity with the Chapter 11 process, resulting from its own Chapter 11 case, Charter purposely set out to exploit Windstream's bankruptcy by creating confusion among Windstream customers for the purpose of converting Windstream subscriber contracts to Charter. The record establishes that, in doing so, Charter:

- had actual notice of Windstream's bankruptcy and the application of the automatic stay;

- intentionally launched its scheme at the same time Windstream would be communicating with its customers about its bankruptcy and Windstream customers would be confused about their service;

- intentionally designed its mailer to trick Windstream customers into believing the communication had come from Windstream; and

- knew that Windstream was not going out of business, but lied about it anyway.

The Bankruptcy Court was entitled to take into account this evidence of Charter's bad faith. *Taggart*, 139 S. Ct. at 1802.

Moreover, what makes this case particularly unique is that Charter actually knew its conduct here was unlawful because Charter was previously a victim of the very same unlawful scheme. Charter had itself gone through a Chapter 11 bankruptcy several years earlier. Shortly after

entering bankruptcy, a competitor, DirecTV, launched the exact same campaign to convert Charter's customer contracts over to DirecTV. JA1744-JA1781. DirecTV sent a mailer to Charter's customers telling them that Charter was in bankruptcy and they needed to switch their service to DirecTV. Charter filed suit against DirecTV alleging that such conduct was unlawful. *Id*. Thus, when Charter launched its scheme against Windstream, it actually knew its actions were unlawful. This is quintessential bad faith and further supports a contempt sanction.

The District Court failed to take note of this evidence of Charter's bad faith, let alone consider it, in its decision to vacate the Bankruptcy Court's contempt sanction. The District Court's error in this regard requires reversal of its decision and the reinstatement of the Bankruptcy Court's judgment.

## CONCLUSION

For the foregoing, reasons, this Court should reverse the judgment of the District Court, reinstate the Bankruptcy Court's finding of contempt and its sanction of $19,184,658.30, and remand for an assessment of whether and to what extent Windstream is entitled to appellate attorneys' fees. *See In re Dibattista*, 33 F.4th at 702-04 (on remand, following a contempt finding, a bankruptcy court is justified in awarding appellate attorneys' fees to compensate fully a debtor for a creditor's violation of a bankruptcy court order).

Dated: February 16, 2023            Respectfully submitted,

/s/ Terence Patrick Ross

Shaya Rochester                     Terence Patrick Ross
KATTEN MUCHIN ROSENMAN LLP          Robert T. Smith
50 Rockefeller Plaza                KATTEN MUCHIN ROSENMAN LLP
New York, NY 10020-1605             2900 K Street, NW
Tel.: 212-940-8529                  Washington, DC  20007-5118
                                    Tel:  202-625-3500

*Counsel for Debtor-Plaintiff-Appellant*

## CERTIFICATE OF COMPLIANCE

Pursuant to Rule 32(g)(1) of the Federal Rules of Appellate Procedure, I hereby certify that this brief is in compliance with the type form and volume requirements. Specifically, this Brief is proportionately spaced; uses a Roman-style, serif typeface (Book Antiqua) of 14-point; and contains 12,421 words, exclusive of the material not counted under Rule 32(f) of the Federal Rule of Appellate Procedure.

/s/ Terence Patrick Ross
Terence Patrick Ross
*Counsel for Debtor-Plaintiff-Appellant*

**CERTIFICATE OF SERVICE**

I hereby certify that, on February 16, 2023, I caused the foregoing brief to be electronically filed via the CM/ECF system to the Office of the Clerk of the United States Court of Appeals for the Second Circuit. I certify that all counsel of record are registered ECF filers and that they will be served by electronic means via the CM/ECF system.

/s/ Terence Patrick Ross
Terence Patrick Ross
*Counsel for Debtor-Plaintiff-Appellant*

# EXHIBIT A

## CORPORATE DISCLOSURE STATEMENT ADDENDUM:
## Affiliated Companies Not Named in Caption

1. A.R.C. Networks, Inc.

2. Allworx Corp.

3. American Telephone Company LLC

4. ARC Networks, Inc.

5. ATX Communications, Inc.

6. ATX Licensing, Inc.

7. ATX Telecommunications Services of Virginia, LLC

8. Birmingham Data Link, LLC

9. BOB, LLC

10. Boston Retail Partners, LLC

11. BridgeCom Holdings, Inc.

12. BridgeCom International, Inc.

13. BridgeCom Solutions Group, Inc.

14. Broadview Networks of Massachusetts, Inc.

15. Broadview Networks of Virginia, Inc.

16. Broadview Networks, Inc.

17. Broadview NP Acquisition Corp.

18. Buffalo Valley Management Services, Inc.

19. Business Telecom of Virginia, Inc.

20. Business Telecom, LLC

21. BV-BC Acquisition Corporation

22. Cavalier IP TV, LLC

23. Cavalier Services, LLC

24. Cavalier Telephone Mid-Atlantic, L.L.C.

25. Cavalier Telephone, L.L.C.

26. CCL Historical, Inc.

27. Choice One Communications of Connecticut, Inc.

28. Choice One Communications of Maine, Inc.

29. Choice One Communications of Massachusetts, Inc.

30. Choice One Communications of New York, Inc.

31. Choice One Communications of Ohio, Inc.

32. Choice One Communications of Pennsylvania, Inc.

33. Choice One Communications of Rhode Island, Inc.

34. Choice One Communications of Vermont, Inc.

35. Choice One Communications Resale, L.L.C.

36. Choice One of New Hampshire, Inc.

37. Cinergy Communications Company of Virginia, LLC

38. Conestoga Enterprises, Inc.

39. Conestoga Management Services, Inc.

40. Conestoga Wireless Company

41. Connecticut Broadband, LLC

42. Connecticut Telephone & Communication Systems, Inc.

43. Conversent Communications Long Distance, LLC

44. Conversent Communications of Connecticut, LLC

45. Conversent Communications of Maine, LLC

46. Conversent Communications of Massachusetts, Inc.

47. Conversent Communications of New Hampshire, LLC

48. Conversent Communications of New Jersey, LLC

49. Conversent Communications of New York, LLC

50. Conversent Communications of Pennsylvania, LLC

51. Conversent Communications of Rhode Island, LLC

52. Conversent Communications of Vermont, LLC

53. Conversent Communications Resale, L.L.C.

54. CoreComm Communications, LLC

55. CoreComm-ATX, Inc.

56. CTC Communications Corporation

57. CTC Communications of Virginia, Inc.

58. D&E Communications, LLC

59. D&E Management Services, Inc.

60. D&E Networks, Inc.

61. D&E Wireless, Inc.

62. DeltaCom, LLC

63. EarthLink Business, LLC

64. EarthLink Carrier, LLC

65. Equity Leasing, Inc.

66. Eureka Broadband Corporation

67. Eureka Holdings, LLC

68. Eureka Networks, LLC

69. Eureka Telecom of VA, Inc.

70. Eureka Telecom, Inc.

71. Georgia Windstream, LLC

72. Heart of the Lakes Cable Systems, Inc.

73. Infocore, Inc.

74. InfoHighway Communications Corporation

75. Info-Highway International, Inc.

76. InfoHighway of Virginia, Inc.

77. Intellifiber Networks, LLC

78. Iowa Telecom Data Services, L.C.

79. Iowa Telecom Technologies, LLC

80. IWA Services, LLC

81. KDL Holdings, LLC

82. LDMI Telecommunications, LLC

83. Lightship Telecom, LLC

84. MASSCOMM, LLC

85. McLeodUSA Information Services LLC

86. McLeodUSA Purchasing, L.L.C.

87. McLeodUSA Telecommunications Services, L.L.C.

88. MPX, Inc.

89. Nashville Data Link, LLC

90. Network Telephone, LLC

91. Norlight Telecommunications of Virginia, LLC

92. Oklahoma Windstream, LLC

93. Open Support Systems, LLC

94. PaeTec Communications of Virginia, LLC

95. PaeTec Communications, LLC

96. PAETEC Holding, LLC

97. PAETEC iTel, L.L.C.

98. PAETEC Realty LLC

99. PAETEC, LLC

100. PCS Licenses, Inc.

101. Progress Place Realty Holding Company, LLC

102. RevChain Solutions, LLC

103. SM Holdings, LLC

104. Southwest Enhanced Network Services, LLC

105. Talk America of Virginia, LLC

106. Talk America, LLC

107. Teleview, LLC

108. Texas Windstream, LLC

109. The Other Phone Company, LLC

110. Trinet, LLC

111. TruCom Corporation

112. US LEC Communications LLC

113. US LEC of Alabama LLC

114. US LEC of Florida LLC

115. US LEC of Georgia LLC

116. US LEC of Maryland LLC

117. US LEC of North Carolina LLC

118. US LEC of Pennsylvania LLC

119. US LEC of South Carolina LLC

120. US LEC of Tennessee LLC

121. US LEC of Virginia LLC

122. US Xchange of Illinois, L.L.C.

123. US Xchange of Indiana, L.L.C.

124. US Xchange of Michigan, L.L.C.

125. US Xchange of Wisconsin, L.L.C.

126. US Xchange, Inc.

127. Valor Telecommunications of Texas, LLC

128. WaveTel NC License Corporation

129. WIN Sales & Leasing, Inc.

130. Windstream Accucomm Networks, LLC

131. Windstream Accucomm Telecommunications, LLC

132. Windstream Alabama, LLC

133. Windstream Arkansas, LLC

134. Windstream Buffalo Valley, Inc.

135. Windstream Business Holdings, LLC

136. Windstream BV Holdings, LLC

137. Windstream Cavalier, LLC

138. Windstream Communications Kerrville, LLC

139. Windstream Communications Telecom, LLC

140. Windstream Communications, LLC

141. Windstream Concord Telephone, LLC

142. Windstream Conestoga, Inc.

143. Windstream CTC Internet Services, Inc.

144. Windstream D&E Systems, LLC

145. Windstream D&E, Inc.

146. Windstream Direct, LLC

147. Windstream Eagle Holdings, LLC

148. Windstream Eagle Services, LLC

149. Windstream EN-TEL, LLC

150. Windstream Finance Corp.

151. Windstream Florida, LLC

152. Windstream Georgia Communications, LLC

153. Windstream Georgia Telephone, LLC

154. Windstream Georgia, LLC

155. Windstream Holding of the Midwest, Inc.

156. Windstream Iowa Communications, LLC

157. Windstream Iowa-Comm, LLC

158. Windstream IT-Comm, LLC

159. Windstream KDL, LLC

160. Windstream KDL-VA, LLC

161. Windstream Kentucky East, LLC

162. Windstream Kentucky West, LLC

163. Windstream Kerrville Long Distance, LLC

164. Windstream Lakedale Link, Inc.

165. Windstream Lakedale, Inc.

166. Windstream Leasing, LLC

167. Windstream Lexcom Communications, LLC

168. Windstream Lexcom Entertainment, LLC

169. Windstream Lexcom Long Distance, LLC

170. Windstream Lexcom Wireless, LLC

171. Windstream Mississippi, LLC

172. Windstream Missouri, LLC

173. Windstream Montezuma, LLC

174. Windstream Nebraska, Inc.

175. Windstream Network Services of the Midwest, Inc.

176. Windstream New York, Inc.

177. Windstream Norlight, LLC

178. Windstream North Carolina, LLC

179. Windstream NorthStar, LLC

180. Windstream NTI, LLC

181. Windstream NuVox Arkansas, LLC

182. Windstream NuVox Illinois, LLC

183. Windstream NuVox Indiana, LLC

184. Windstream NuVox Kansas, LLC

185. Windstream NuVox Missouri, LLC

186. Windstream NuVox Ohio, LLC

187. Windstream NuVox Oklahoma, LLC

188. Windstream NuVox, LLC

189. Windstream of the Midwest, Inc.

190. Windstream Ohio, LLC

191. Windstream Oklahoma, LLC

192. Windstream Pennsylvania, LLC

193. Windstream Services, LLC

194. Windstream SHAL Networks, Inc.

195. Windstream SHAL, LLC

196. Windstream Shared Services, LLC

197. Windstream South Carolina, LLC

198. Windstream Southwest Long Distance, LLC

199. Windstream Standard, LLC

200. Windstream Sugar Land, LLC

201. Windstream Supply, LLC

202. Windstream Systems of the Midwest, Inc.

203. Windstream Western Reserve, LLC

204. XETA Technologies, Inc.

## CERTIFICATE OF SERVICE

I hereby certify that, on March 8, 2023, I caused the foregoing Corrected Brief and Exhibit to be electronically filed via the CM/ECF system to the Office of the Clerk of the United States Court of Appeals for the Second Circuit. I certify that all counsel of record are registered ECF filers and that they will be served by electronic means via the CM/ECF system.

/s/ Terence Patrick Ross
Terence Patrick Ross
*Counsel for Debtor-Plaintiff-Appellant*